Douglas M. Foley (VSB No. 34364)
Patrick L. Hayden (VSB No. 30351)
McGUIREWOODS LLP
9000 World Trade Center
101 West Main Street
Norfolk, Virginia 23510
(757) 640-3700

Proposed Attorneys for the Debtors and
Debtors in Possession

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| WORKFLOW MANAGEMENT, INC., | ) | |
| et al., | ) | Case No. 10-_____(     ) |
| | ) | |
| Debtors. | ) | (Joint Administration Pending) |
| _____ | ) | |

**AFFIDAVIT OF PAUL H. BOGUTSKY, CHIEF FINANCIAL OFFICER,
EXECUTIVE VICE PRESIDENT AND TREASURER OF
WORKFLOW MANAGEMENT, INC. IN SUPPORT OF THE
<u>CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS</u>**

I, Paul H. Bogutsky, being duly sworn, depose and say:

1.      I am the Chief Financial Officer and Treasurer of WF Capital Holdings,

Inc., a corporation incorporated under the laws of State of Delaware with its principal place

of business in Norfolk, Virginia, which is the ultimate parent of each of the other entities

(the "Subsidiary Debtors," and together with WF Capital Holdings, Inc., the "Debtors" or

the "Company") that will commence proceedings under chapter 11 of title 11, United

States Code (the "Bankruptcy Code").[1]  I also am an Executive Vice President, Chief

---

[1] The Debtors and the last four digits of the Debtors' taxpayer identification numbers are as follows:
Workflow Management, Inc. (7104); Workflow Holdings Corporation (9217); WF Capital Holdings, Inc.
(5548); WF Holdings, Inc. (9106); Workflow Direct, Inc. (7497); Workflow Management Acquisition II

Financial Officer and Treasurer of Workflow Management, Inc. since 2004 and hold the

following positions in the other Subsidiary Debtors:

| | |
|---|---|
| WF Holdings, Inc. | Chief Financial Officer and Treasurer |
| Workflow Holdings Corporation | Chief Financial Officer and Treasurer |
| Old FGS, Inc. | Vice President and Treasurer |
| Workflow Solutions LLC | Chief Financial Officer, Executive Vice President and Treasurer |
| SFI of Puerto Rico, Inc. | Chief Financial Officer, Vice President and Treasurer |
| Old UE, LLC | Vice President, Chief Financial Officer, Treasurer and Assistant Secretary |
| WFIH, Inc. | Chief Financial Officer and Treasurer |
| WFMI, Inc. | Treasurer |
| Workflow Direct, Inc. | Treasurer |
| Workflow of Florida, Inc. | Treasurer |
| Workflow Management Acquisition II Corp. | Treasurer |
| The Relizon Company | Chief Financial Officer, Executive Vice President and Treasurer |
| Relizon KNE Inc. | Chief Financial Officer, Vice President and Treasurer |

---

Corp. (2039); WFIH, Inc. (0527); WFMI, Inc. (4282); Workflow of Florida, Inc. (4281); Workflow Solutions
LLC (3769); SFI of Puerto Rico, Inc. (3413); Old FGS, Inc. (1438); Old UE, LLC (4060); The Relizon
Company (4702); Relizon Wisconsin Inc. (8440); Relizon (Texas) Ltd., LLP (6437); Relizon SNE Inc.
(4537); Relizon KNE Inc. (3935); Relizon de Mexico Inc. (6996); Formcraft Holdings General Partner, Inc.
(5683); Formcraft Holdings Limited Partner, Inc. (5684).  The mailing address for WF Capital Holdings,
Inc., Old FGS, Inc., and Old UE, LLC is 150 West Main Street, Suite 2100, Norfolk, Virginia 23510.  For all
other Debtors, the mailing address is 220 E. Monument Avenue, Dayton, Ohio 45402.

| Relizon SNE Inc. | Chief Financial Officer, Vice President and Treasurer |
|---|---|
| Relizon Wisconsin Inc. | Chief Financial Officer, Vice President and Treasurer |
| Formcraft Holdings Limited Partner, Inc. | Chief Financial Officer, Vice President and Treasurer |
| Formcraft Holdings General Partner, Inc. | Chief Financial Officer, Vice President and Treasurer |
| Relizon (Texas) Ltd. LLP | Chief Financial Officer, Vice President and Treasurer |
| Relizon de Mexico Inc. | Chief Financial Officer, Vice President and Treasurer |

2.     The senior management team of WMI also includes Chairman and Chief Executive Officer Dave Davis, President and Chief Operating Officer Dean Truitt, Executive Vice President of Mergers, Acquisitions and Strategic Initiatives Brian Leitch, and General Counsel L. Scott Seymour.

3.     I am authorized to submit this Affidavit in support of the Debtors' chapter 11 petitions and the first day pleadings described herein.[2]

4.     I am familiar with the Debtors' day-to-day operations, business affairs, and books and records.  I also have reviewed the Debtors' "First Day Motions and Orders" and am familiar with the facts alleged therein and relief requested.  I have personal knowledge of the facts, circumstances and other matters set forth in the First Day Motions and Orders and in this Affidavit or have gained knowledge of such matters from the Company's

---

[2]  Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Motions (defined below).

officers, employees or retained advisers that report to me in the ordinary course of my

responsibilities as an Executive Vice President, Chief Financial Officer and Treasurer.  If

called as a witness, I would testify thereto and as follows:

## **INTRODUCTION**

5.      The Company regrets that it has become necessary to file these chapter 11

cases for the narrow purpose of addressing certain senior debt issues.  Simultaneously with

the filing of these chapter 11 cases, the Debtors filed a plan of reorganization that provides

for full payment of all creditors' undisputed claims and the full retention of equity by

existing shareholders.  As described more fully herein, the Debtors intend to use the

chapter 11 process solely to resolve certain balance sheet issues that they have not been

able to resolve consensually with certain of their lenders, and to complete the restructuring

of their balance sheet promptly.

6.      As more fully described below, the Company has been in the process of a

business turnaround since the fourth quarter of 2008.  Since that time, the Company has

dramatically reduced costs and dramatically improved both EBITDA margin and adjusted

EBITDA.[3]  As a result of the Transformation Plan, since the beginning of 2009, the

Company has delivered approximately $89.7 million in value to its First Lien Lenders, has

reduced the outstanding principal balance by approximately $62 million, and has

simultaneously increased the enterprise value for the benefit of all creditors and

stakeholders.  The turnaround is not complete, however.  Additional time and effort is

required to maximize the interests of all affected parties.

---

[3] As used herein, "adjusted EBITDA" has the meaning set forth in the First Lien Credit Agreement.

7.    The reason for the chapter 11 filing at this time is fairly simple.  While the Company is able to service the interest payments on its debt, has been making substantial amortization payments, and is becoming increasingly more profitable, the Company is unable to satisfy the recently increased amortization requirements on its First Lien Credit Facility.  The Company has a single Second Lien Lender who holds a controlling position in the Second Lien Credit Facility, and who recently acquired a new position in the First Lien Credit Facility (Revolver B) that further complicates the Company's refinancing efforts.  This Second Lien Lender has not consented to any refinancing proposals that the Company has made to date.  Without such consent, the Company has been prevented from refinancing its First Lien Credit Facility to obtain amortization relief.  Since February 2010, the Company has made a number of proposals to refinance the entire First Lien Credit Facility and pay down, prior to its stated maturity, a material portion of the Second Lien Credit Facility.  Under the Debtors' proposals, the Second Lien Lender would have retained its full senior second lien position for the balance of the outstanding amount owed to it, continuing to accrue interest at a very high rate.  All of the Company's refinancing suggestions, however, have been rebuffed by the controlling Second Lien Lender.

8.    Thus, in the absence of an agreement, the Company has sought bankruptcy protection to provide the Company with the additional time it needs to complete its turnaround by restructuring its senior debt obligations in order to provide maximum recoveries to all creditors.  The Company believes that such a course is vastly better for all interested parties – including the aforementioned Second Lien Lender – rather than resort to an immediate "363 sale approach."

## BACKGROUND

**A.     The Bankruptcy Cases**

9.      On September 29, 2010 (the "Petition Date"), the Debtors will each commence a bankruptcy case by filing a petition for relief in this Court under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code").

10.     One indirect subsidiary of WF Capital Holdings, Inc., CLNE Leasing Company, is an entity organized under the laws of Nova Scotia, Canada, and is not a debtor in these chapter 11 cases.

**B.     The Company's Corporate Structure**

11.     Newport News Printing, founded in Virginia in 1912, is one of the earliest predecessors of the Company.  Standard Forms, Inc. ("SFI"), another early predecessor of the Company, was founded in Virginia in 1927.  Another predecessor company, United Envelope LLC ("United") was founded in 1932 and later combined with SFI. Headquartered in Norfolk, Virginia, the Company continued to grow through acquisitions, and in early 1997, SFI and United were acquired by US Office Products ("USOP") to form its print management division.

12.     In June 1998, the print management division of USOP spun off as a public company called Workflow Management, Inc. ("WMI") and began trading under the ticker symbol "WORK."  Between 1998 and 2001, WMI completed approximately 28 acquisitions.

13.     In April 2004, WMI was taken private.  WF Holdings, Inc. ("WF

Holdings"), an entity formed and controlled by investment funds managed or controlled by Perseus, L.L.C. ("Perseus"), a private equity fund manager, and an individual investor, acquired substantially all of the outstanding common stock of WMI and its subsidiaries (the "Workflow Merger"). As a result of the Workflow Merger, WMI became a wholly owned subsidiary of WF Holdings.

14.     On November 30, 2005, The Relizon Company ("Relizon") was acquired. Relizon also had a long company history, starting as part of Reynolds and Reynolds in 1866.

15.     In connection with the acquisition of Relizon, WF Holdings' ownership was transferred to WF Capital Holdings, Inc. ("WF Capital"). WF Capital is owned by certain investment funds managed or controlled by Perseus and two financial institutions unrelated to Perseus. WF Capital is the ultimate parent of the Debtors and has its principal place of business in Norfolk, Virginia.

16.     WF Capital owns 96.9% of WF Holdings' common stock. The remaining 3.1% of WF Holdings' common stock is owned by employee or former employee restricted shareholders. WF Holdings owns 100% of Workflow Holdings Corporation, which was created in connection with the Relizon acquisition, who in turn owns 100% of WMI.

17.     WMI directly or indirectly owns all of the remaining Debtors, all as more fully set forth on Exhibit A, which is a chart reflecting the Debtors' corporate structure, and is fully incorporated herein by reference. As set forth on Exhibit A, each of the Debtors was incorporated in or formed under the laws of Delaware, New Jersey,

California, Wisconsin or Texas.  In addition to WF Capital, the principal place of business

of Old FGS, Inc. and Old UE, LLC is Norfolk, Virginia.  For all of the other Debtors, it is

Dayton, Ohio.

### C.    The Company's Business

18.    The Company is one of the leading providers of printed business

documents, print-related services and promotional marketing solutions in North America.

The Company offers clients a wide range of print-related products and services including

business documents, electronic print and mail solutions, promotional marketing products,

label solutions, sales and marketing materials and distribution services.

19.    The Company operates a nationwide network of approximately 49 offices,

17 distribution centers and 9 plants with over 3.2 million square feet of capacity and more

than 200 manufacturing assets including the latest in digital technology, offset and rotary

processes, complete bindery and finishing capabilities, as well as sophisticated systems for

distribution kitting and fulfillment.  With its national footprint, the Company generated

approximately $600 million of revenue and $60 million in adjusted EBITDA in the past

year.

20.    The Company has a diverse client base of approximately 10,000 active

clients in a variety of industries, including healthcare, financial services, manufacturing

and retail.  The Company has approximately 300 sales personnel and approximately 2,300

total employees nationwide.

21.    The Company sources its products through both in-house manufacturing

facilities and an extensive network of external trade partners.  The mix of internally versus

externally-sourced products is well balanced with approximately 50% of revenue being sourced externally and 50% manufactured in-house. The result is a relatively asset-light operating model with high operating leverage and low capital expenditure requirements.

22.     The Company is a recognized industry leader in print, print-related, and promotional marketing solutions. In August, it was ranked as the "Top Distributor of 2009" by Print Solutions magazine, the premier publication for the print distribution industry. Additionally, Print Professional magazine named the company "Top Distributor of 2009" for the fourth year in a row, while Printing Impressions magazine ranked the company 11th in their annual Printing Impressions 400. Further, the Company was recognized by Premier Healthcare Alliance and awarded with the Supplier Performance Award and prior, named Top 40 Distributor for 2009 in promotional products by Promo Marketing Magazine. Finally, it was ranked by the Advertising Specialty Institute and Counselor Magazine as the nation's 13th largest distributor of promotional products, rising above their prior position of 15th in 2008.

**D.     The Company's Capital Structure**

> **(1)     Debtors' Prepetition Secured Credit Facilities**

>> **(a)     First Lien Credit Facility**

23.     WMI, as borrower (the "Borrower"), entered into a First Lien Credit Agreement dated as of November 30, 2005 (as amended from time to time, the "First Lien Credit Agreement"), among the various financial institutions from time to time parties thereto (the "First Lien Lenders"), Credit Suisse, Cayman Islands Branch, as Administrative Agent for the First Lien Lenders (in such capacity, the "First Lien Agent"),

and the other agents referred to therein, providing for first lien credit facilities
(collectively, the "First Lien Credit Facility") consisting of (i) a term loan facility (the
"Term Loan Facility") in the initial principal amount of $275 million with a final maturity
on November 30, 2011, and (ii) a revolving credit facility (the "Revolving Credit Facility")
in the maximum principal amount of $35 million, a portion of which matures May 31,
2011 ("Revolver A") and the remainder of which matures November 30, 2010 ("Revolver
B").  The Revolving Credit Facility includes a subfacility comprised of $4,819,000 face
amount of outstanding letters of credit (collectively, the "Letters of Credit") issued by
Credit Suisse (the "Issuer").  Additionally, as part of the amendments of the First Lien
Credit Facility, one of the Debtors has purchased a participation in Revolver A in the
amount of $5 million.  That participation requires that that Debtor's interest in Revolver A
be repaid after all other amounts due under the First Lien Credit Facility have been paid.

24.     Originally, all of the Revolving Credit Facility matured on November 30,
2010.  However, the Debtors obtained an extension of the maturity date of Revolver A,
until May 31, 2011, from each of the First Lien Lenders participating in the Revolving
Credit Facility, other than the initial holder of Revolver B.  Revolver B is now held by
SPCP Group, LLC, an affiliate of Silver Point Finance LLC, the Second Lien Agent (as
hereafter defined).

25.     Pursuant to an amendment to the First Lien Credit Facility dated April 30,
2009, the Borrower was no longer permitted to borrow revolving loans or with certain
exceptions obtain new Letters of Credit under the Revolving Facility.  As such, since May
2009, the Debtors have been operating solely on cash flow without access to liquidity

under the Revolving Credit Facility.

26.    Outstanding loans under the First Lien Credit Facility are currently accruing interest, as follows: (a) the entire principal amount of such outstanding loans as of the Petition Date are being maintained as LIBO Rate Loans (as defined in the First Lien Credit Agreement) (currently in the approximate principal amount of $141.7 million, including capitalized interest and fees) and are currently accruing interest at a per annum rate equal to (i) the higher of (A) the LIBO Rate (as defined in the First Lien Credit Agreement) for a 3-month interest period expiring on September 30, 2010, or (B) 3%, plus (ii) a margin of 5%; and (b) the principal amount of any such outstanding loans as of the Petition Date that are or may become maintained as Base Rate Loans (as defined in the First Lien Credit Agreement) are accruing or will accrue interest at a per annum rate equal to (i) the Alternate Base Rate (as defined in the First Lien Credit Agreement) as in effect from time to time, now 6%, plus (ii) a margin of 4%.  Outstanding Letters of Credit accrue a fee of 5% per annum on the outstanding face amount thereof.  Accrued and unpaid interest on Base Rate Loans and accrued fees on Letters of Credit are payable on the last business day of each calendar quarter, and accrued and unpaid interest on LIBO Rate Loans is payable on the last day of the applicable interest period (and if such interest period is longer than three months, also at the end of each three-month period).  All such accrued and unpaid interest and fees are payable on the applicable payment dates in cash, except that the portion of the aggregate accrued interest on such loans equal to interest accruing at 0.50% per annum on the outstanding balance thereof is not paid in cash, and instead is paid on the applicable payment date by capitalizing and adding such portion to the principal balance of

the applicable loan, and thereafter the principal balance, as so increased, continues to accrue interest as provided above.

27.     The obligations of the Borrower under the First Lien Credit Facility are guaranteed by each of the other Debtors, except WF Capital (collectively the "Guarantors," and together with the Borrower, collectively, the "Loan Parties") pursuant to guaranties by each Guarantor in favor of the First Lien Agent (as amended from time to time, collectively, the "First Lien Guaranties").

28.     Pursuant to the First Lien Credit Agreement, the Loan Parties have entered into the following additional documents (together with the First Lien Credit Agreement, the notes thereunder, the Letters of Credit, the First Lien Guaranties, the fee letters thereunder and the Intercreditor Agreement referred to below, collectively, the "First Lien Loan Documents") to secure their respective obligations under the First Lien Credit Facility (collectively the "First Lien Loan Obligations"): (a) that certain Pledge and Security Agreement dated as of November 30, 2005, by each Loan Party in favor of the First Lien Agent (for the benefit of the First Lien Lenders, the Issuer and the First Lien Agent (collectively, the "First Lien Secured Parties")), granting a first priority security interest to the First Lien Agent (for the benefit of the First Lien Secured Parties) in substantially all of the personal property assets of such Loan Party, other than (i) 35% of the capital stock of a non-debtor foreign subsidiary and (ii) certain other excluded property including the Ohio Equipment (defined below) (collectively, the "Prepetition Personal Property Collateral"); and (b) three Mortgages (as defined in the First Lien Credit Agreement) each by Relizon, a Guarantor, in favor of the First Lien Agent (for the benefit

of the First Lien Secured Parties) encumbering certain real property (collectively, the "Prepetition Real Property Collateral" and together with the Prepetition Personal Property Collateral, collectively, the "Prepetition Collateral"). The Prepetition Collateral includes the cash and cash equivalents of the Loan Parties, as well as proceeds of the sales of Prepetition Collateral (such as inventory existing as of the Petition Date).

29.     As of the Petition Date, the aggregate outstanding First Lien Obligations (including undrawn Letters of Credit) totaled approximately $146.5 million (including interest accrued through September 30, 2010), consisting of: (a) approximately $111.5 million principal amount of loans outstanding under the Term Loan Facility; (b) approximately $30.2 million principal amount of loans outstanding under the Revolving Credit Facility; and (c) approximately $4.8 million undrawn face amount of Letters of Credit. The loans outstanding under the First Lien Credit Facility continue to accrue post petition interest. In addition, pursuant to the First Lien Credit Agreement, the Letters of Credit and the First Lien Agent are accruing certain postpetition fees and the First Lien Agent is incurring reimburseable expenses.

**(b)     Second Lien Credit Facility**

30.     The Borrower entered into an Amended and Restated Second Lien Credit Agreement dated as of December 19, 2005 (amending and restating the Second Lien Credit Agreement dated as of November 30, 2005, as such amended and restated agreement has been further amended from time to time, the "Second Lien Credit Agreement"), among the Borrower, the financial institutions from time to time parties thereto (collectively, the "Second Lien Lenders;" and together with the First Lien Lenders, collectively, the

"Prepetition Lenders"), Silver Point Finance LLC, as Administrative Agent for the Second

Lien Lenders (as the successor agent under the Second Lien Credit Agreement to Credit

Suisse, Cayman Islands Branch, in such capacity, the "Second Lien Agent;" and together

with the First Lien Agent, collectively, the "Prepetition Agents"), and the other agents

party thereto, providing a $140 million second lien term loan facility (the "Second Lien

Credit Facility" and together with the First Lien Credit Facility, collectively, the

"Prepetition Credit Facilities") due November 30, 2012.  Affiliates of the Second Lien

Agent hold approximately $110 million of the outstanding loans under the Second Lien

Credit Facility.  Other affiliates of the Second Lien Agent hold approximately $33 million

of the First Lien Credit Facility.  These holdings consist of (i) $22 million of the

obligations outstanding under the Term Loan Facility, (ii) $4.16 million of the obligations

outstanding under Revolver A, and (iii) all $6.8 million of the outstanding obligations

under Revolver B.

    31.    Loans outstanding under the Second Lien Credit Facility are currently

accruing interest at a per annum rate equal to (a) the higher of (i) the LIBO Rate (as

defined in the Second Lien Credit Agreement) for a 3-month interest period expiring on

November 4, 2010, or (ii) 3%, plus (b) a margin of 15%, which currently is approximately

18% interest.  Accrued and unpaid interest on such loans is payable on the last day of the

applicable interest period (and if such interest period is longer than three months, also at

the end of each three-month period).  The portion of such accrued and unpaid interest equal

to interest accruing at 14.75% per annum on such outstanding principal amount is payable

on the applicable payment dates in cash, and the remaining portion of the aggregate

accrued interest on such loans (3.25%) is not paid in cash, and instead is paid on the

applicable payment date by capitalizing and adding such remaining portion to the principal

balance of the applicable loan, and thereafter the principal balance, as so increased,

continues to accrue interest as provided above.

32.     The obligations of the Borrower under the Second Lien Credit Facility are

guaranteed pursuant to guaranties by each Guarantor in favor of the Second Lien Agent (as

amended from time to time, collectively, the "Second Lien Guaranties").

33.     Pursuant to the Second Lien Credit Agreement, the Loan Parties have

entered into the following additional documents (together with the Second Lien Credit

Agreement, the notes thereunder, the fee letter thereunder, the Second Lien Guaranties and

the Intercreditor Agreement, collectively, the "Second Lien Loan Documents") to secure

their respective obligations under the Second Lien Credit Facility (collectively, the

"Second Lien Loan Obligations"): (a) that certain Pledge and Security Agreement dated as

of November 30, 2005 (as amended from time to time), by each Loan Party in favor of the

Second Lien Agent (for the benefit of the Second Lien Lenders and the Second Lien Agent

(collectively, the "Second Lien Secured Parties;" and together with the First Lien Secured

Parties, collectively, the "Prepetition Secured Parties")) granting a second priority security

interest to the Second Lien Agent (for the benefit of the Second Lien Secured Parties) in

the Prepetition Personal Property Collateral; and (b) three separate Mortgages (as defined

in the Second Lien Credit Agreement) each by Relizon in favor of the Second Lien Agent

(for the benefit of the Second Lien Secured Parties), granting a second priority lien in the

Prepetition Real Property Collateral, in each case, including the Cash Collateral.

34.    As of the Petition Date, the aggregate outstanding Second Lien Loan

Obligations totaled approximately $196.5 million (including capitalized interest, accrued

but unpaid interest, and fees through September 30, 2010).  The amounts outstanding on

account of the Second Lien Credit Facility continue to accrue postpetition interest.  In

addition, pursuant to the Second Lien Credit Agreement, the Second Lien Agent is

accruing certain post-petition fees and is incurring reimburseable postpetition expenses.

### (c)    Prepetition Secured Parties Intercreditor Agreement

35.    The Prepetition Agents are party to that certain Intercreditor Agreement

dated as of November 30, 2005 (as amended from time to time, the "Intercreditor

Agreement").  Pursuant to that agreement, the Second Lien Agent has agreed, on behalf of

the Second Lien Secured Parties to, among other things, subordinate their liens on the

Prepetition Collateral to any liens on the Prepetition Collateral arising under the First Lien

Loan Documents.  The Second Lien Agent also has agreed to refrain from exercising

certain of the rights of the Second Lien Secured Parties with respect to the use of Cash

Collateral, provided that certain criteria have been met.  The Loan Parties have

acknowledged the Intercreditor Agreement.

### (2)    Other Debt for Borrowed Money

### (a)    The WF Capital Holdings, Inc. BB&T Loan

36.    Pursuant to a loan agreement dated as of December 31, 2008, among WF

Capital, as borrower, Perseus Market Opportunity Fund, L.P., as guarantor, and Branch

Banking and Trust Company ("BB&T"), WF Capital is indebted to BB&T in the principal

amount of $20 million (as amended to date, the "BB&T Loan").  The BB&T Loan is not

secured by any property of WF Capital or any other Debtor.  The BB&T Loan is fully

secured by certain assets of Perseus Market Opportunity Fund, L.P.  The interest rate on

the BB&T Loan is variable.  As of the Petition Date, the amount outstanding on account of

the BB&T Loan was approximately $20 million (not including accrued, but unpaid

interest).  No other Debtor is obligated on the BB&T Loan.

### (b)    The WF Capital Holdings, Inc. Perseus Convertible Note

37.    WF Capital is the maker of that certain Amended and Restated Convertible

Note payable to Perseus Partners VII, L.P., dated as of March 4, 2008 (the "Perseus

Note").  The Perseus Note is unsecured and is subordinated to the BB&T Loan.  The

Perseus Note was due September 4, 2009.  The Perseus Note was not paid on its stated

maturity date.  The Perseus Note accrues interest at 16% per annum.  As of the Petition

Date, approximately $58,500,000 (including accrued, but unpaid interest) was owed to

Perseus Partners VII, L.P. on account of the Perseus Note.  No other Debtor is obligated on

the Perseus Note.

### (c)    The WF Capital Holdings, Inc. Perseus Interest Note

38.    WF Capital is the maker of a certain demand note payable to Perseus

Market Opportunity Fund, L.P. (the "Perseus Interest Note"), dated as of October 29, 2009.

The Perseus Interest Note is unsecured, and subordinated to the BB&T Loan and the

Perseus Note.  The Perseus Interest Note is a demand note and accrues interest at 12% per

annum.  Prior to the Petition Date, Perseus Market Opportunity Fund, L.P. did not present

the Perseus Interest Note for payment.  As of the Petition Date, approximately $300,000

(including accrued, but unpaid interest) was owed to Perseus Market Opportunity Fund,

L.P. on account of the Perseus Interest Note.  No other Debtor is obligated on the Perseus

Interest Note.

### (d)       The WF Holdings, Inc. Carlyle Unsecured, Subordinated Note

39.       WF Holdings is the maker of that certain seller subordinated promissory

note payable to the Holder Representative defined therein for the benefit of the beneficial

holders indentified on Schedule I thereto dated December 21, 2006 (the "Carlyle Note").

The Carlyle Note matures on May 29, 2013.  The Carlyle Note is unsecured and

subordinated in right of payment to the First Lien Loan Obligations and the Second Lien

Loan Obligations.  The Carlyle Note accrues interest at 12% per annum.  As of the Petition

Date, approximately $12,500,000 (including accrued, but unpaid interest) was owed by

WF Holdings to the holder of the Carlyle Note.  No other Debtor is obligated on the

Carlyle Note.

### (e)       Workflow Management, Inc. Unsecured, Subordinated Note

40.       WMI is the maker of that certain promissory note payable to Perseus,

L.L.C. dated February 6, 2009.  That note was subsequently assigned from Perseus, L.L.C.

to Perseus Market Opportunity Fund, L.P. (the "PMOF Note").  The PMOF Note is due

February 6, 2011 (or any earlier date that the loans under the Second Lien Credit

Agreement become due and payable).  The PMOF Note is unsecured and subordinated in

right of payment to the First Lien Loan Obligations and the Second Lien Loan Obligations.

The PMOF Note accrues interest at 8% per annum.  As of the Petition Date, approximately

$1.1 million (including accrued, but unpaid interest) was owed by WMI to Perseus Market

Opportunity Fund, L.P. on account of the PMOF Note.  No other Debtor is obligated on

the PMOF Note.

### (f)   The Relizon Ohio Development Loan

41.     On January 31, 2003, Relizon entered into a loan agreement with the State of Ohio Director of Development (the "Ohio Director"), which provided for an $800,000 loan to Relizon (the "Ohio Development Loan") to finance a portion of the purchase price of certain equipment purchased by Relizon and located at a Relizon facility in Coldwater, Ohio (collectively, the "Ohio Equipment"). The Ohio Development Loan matures on January 31, 2013. Pursuant to a Security Agreement dated as of January 31, 2003, by Relizon in favor of the Ohio Director, Relizon granted a security interest in the Ohio Equipment to secure the Ohio Development Loan and agreed not to further encumber the Ohio Equipment. By reason of such negative pledge, the Ohio Equipment is excluded from the Prepetition Personal Property Collateral of the Prepetition Secured Parties. The interest rate applicable to the Ohio Development Loan is 3% per annum, plus a service fee of 0.25% per annum. The indebtedness outstanding on account of the Ohio Development Loan as of the Petition Date was approximately $233,000 (including accrued, but unpaid interest). No other Debtor is obligated on the Ohio Development Loan.

### (3)   Capital Leases

42.     Certain Debtors are also party to certain capital leases of personal property with various entities. There is approximately $325,000 in aggregate amounts remaining to be paid to the lessors of such leased property pursuant to these capital leases.

**(4)    Stockholders' Equity**

**(a)    Preferred and Common Stock**

43.     Effective upon the Workflow Merger in 2004, WF Holdings authorized the issuance of 150,000 shares of Common Stock, $.01 par value and 150,000 shares of Series A preferred stock, $.01 par value.  WF Holdings issued: (i) 85,000 shares of Series A Preferred, for a price of $990 per share and (ii) 90,730 share of Common Stock, for a price of $10 per share.

44.     In connection with the acquisition of Relizon in 2005, WF Holdings recapitalized its equity with the issuance of common and preferred shares for proceeds of $75.0 million.  On November 29, 2005, WF Holdings amended its certificate of incorporation authorizing the issuance of (i) 250,000 shares of Common Stock, $0.01 par value; (ii) 110,000 shares of Series A Preferred, $0.01 par value; (iii) 110,000 shares of preferred stock series B ("Series B Preferred"), $0.01 par value, and (iv) 30,000 shares of preferred stock series C ("Series C Preferred"), $0.01 par value.

45.     On November 30, 2005, WF Holdings issued (i) 45,996 shares of Series B Preferred, for a price of $990 per share, (ii) 11,128 shares of Series C Preferred, for a price of $1,348 per share, and (iii) 68,812 of common stock for a price of $243 per share.

46.     During 2007, WF Holdings issued (i) 301 shares of Series B Preferred, for a price of $990 per share, and (ii) 443 shares of common stock for a price of $243 per share to WF Capital.

47.     On March 4, 2008, WF Holding's Certificate of Incorporation was amended and authorized the issuance of (i) 350,000 shares of Common Stock, (ii) 110,000 shares of

Series A Preferred Stock, (iii) 150,000 shares of Series B Preferred Stock, (iv) 30,000

shares of Series C Preferred Stock, and (v) 100,000 shares of Series D Preferred Stock.

48.     On March 4, 2008, WF Holdings issued 39,000 shares of Series D Preferred

stock to WF Capital in exchange for $39 million.

49.     The Series A Preferred contains certain voting and repurchase rights and

carries a liquidating dividend, at a rate of 8% per annum compounded annually payable

under certain conditions.  As of December 31, 2009, the Series A Preferred had a

liquidating preference of approximately $53.9 million plus dividends in arrears of

approximately $29.6 million.

50.     The Series B Preferred contains certain voting and repurchase rights and

carries a liquidating dividend, at a rate of 8% per annum compounded annually of the sum

of the product of 1.34667 times the Series B Preferred as defined original issue price

payable under certain conditions.  As of December 31, 2009, the Series B Preferred had a

liquidating preference of approximately $45.8 million plus dividends in arrears of

approximately $23.7 million.

51.     The Series C Preferred contains certain voting and repurchase rights.  Under

certain conditions, the Series C Preferred automatically converts into Series B Preferred.

On March 4, 2008, the redemption price was increased to $1,797 per share and all

dividends accrued to date were canceled.  Dividends will accrue at a rate of 8% per annum

compounded annually from and after January 1, 2009 and are payable under certain

conditions.  As of December 31, 2009, the Series C Preferred had a liquidating preference

of approximately $20.0 million and dividends in arrears of approximately $1.6 million.

52.     The Series D Preferred stock carries a liquidating dividend at rates increasing from 12% to 16% on and after March 3, 2009.  The Series D Preferred stock is convertible into Series D units on or after September 4, 2009.  Each unit consists of one share of Series B Preferred and 1.4743 shares of Common Stock.  As of December 31, 2009, the Series D Preferred had a liquidating preference of approximately $39.0 million plus dividends in arrears of approximately $10.9 million.

53.     On March 4, 2008 and September 4, 2008, WF Holdings issued 2,679 and 2,542 warrants, respectively to WF Capital.  An additional 2,580 warrants were issued to WF Capital on March 4, 2009.  The warrants allow the holder to purchase Common Stock of WF Holdings at $1 per share.

54.     On March 4, 2008 and September 4, 2008, WF Capital issued 2,679 and 2,542 warrants, respectively to Perseus Partners VII, L.P.  An additional 2,580 warrants were issued to Perseus Partners VII, L.P. on March 4, 2009.  The warrants allow the holder to purchase Common Stock of WF Capital at $1 per share.

55.     On April 30, 2009, WF Capital restructured its capital structure (the "WF Capital Restructuring") and amended its certificate of incorporation authorizing the issuance of (i) 4,000,000 shares of common stock, $0.01 par value; and (ii) 250,000 shares of preferred stock, $0.01 par value.  As a result, WF Capital effectuated a reclassification and stock exchange such that previous owners of "WF Capital Series A Preferred Stock" were given 9.4 shares of "WF Capital Common Stock" in exchange for each share, and previous owners of "WF Capital Series B Preferred Stock" were given 12.66 shares of WF Capital Common Stock in exchange for each share

56.     In connection therewith, Perseus Market Opportunity Fund, L.P. contributed $4.25 million to WF Capital in exchange for 168,641.53 additional shares of WF Capital Common Stock.  WF Capital then contributed the $4.25 million to WF Holdings as a capital contribution, which was then contributed it downstream to WMI.

57.     Additionally, in connection with the WF Capital restructuring, WF Capital issued warrants to the Second Lien Lenders to purchase WF Capital Common Stock equal to 252,962.30 shares in the aggregate, or approximately 15% of the WF Capital Common Stock, subject to adjustment.

**(b)      Notes Receivable from Former Officer**

58.     Upon the Workflow Merger, WF Holdings loaned approximately $2.0 million to a now former officer ("officer") of the Company ("Officer Loan") for the officer's purchase of capital stock of WF Holdings.  The officer paid $647,000 toward the Officer Loan in January 2005.

59.     Upon the closing of the Relizon acquisition, an additional $1 million loan was extended from WF Capital to this officer to purchase capital stock in WF Capital.  The right of payment was later assigned by WF Capital to WF Holdings.

60.     The loans accrue interest at fixed rates ranging from 6% to 8.75%.  Interest income on these loans is approximately $81,000 for the years ended December 31, 2009 and 2008.

61.     In connection with the Company's redemption of the officer's equity investments in WF Holdings and WF Capital and the separation of the officer from the Company, the loans were assumed by three funds managed by an affiliate of Perseus in

May 2009.

### (c)    Share-Based Payments

62.    Effective with the Workflow Merger, WF Holdings adopted the 2004 Stock

Option Plan (the "Stock Option Plan") under which eligible employees received options to

purchase shares of its Common Stock at a price not less than fair value of the stock at the

date of grant.  On February 20, 2008, WF Holdings amended and restated the Stock Option

Plan.  The restated Stock Option Plan provides for awards of restricted Common Stock of

WF Holdings in addition to awards of qualified and non-qualified options.

63.    On February 29, 2008, stock options previously granted under the Stock

Option Plan were redeemed, surrendered and/or cancelled and none exist as of the Petition

Date.

64.    In exchange for the surrendered options, the eligible employees were issued

restricted Common Stock of WF Holdings.  During 2008, WF Holdings granted 13,701

restricted common shares to selected employees.  The shares have a vesting schedule

which varies by individual based on tenure with WF Holdings.  The grants are restricted

such that they are subject to substantial risk of forfeiture and to restrictions on their sale or

other transfer by the employee.  In 2009 and 2008, 5,503 and 816 shares of restricted

stock, respectively, were forfeited or redeemed in connection with employees ending their

employment with WF Holdings.

### E.    Recent Events and Pre-Filing Restructuring Efforts

65.    In 2006 and 2007, following the Relizon acquisition in late 2005, the

Company was focused on integrating the companies and rationalizing the business.  Then,

in 2008, the national credit crisis hit, which had a disproportionate impact on the Debtors because at that time, the Company had a high concentration of customers in the financial services industries who significantly reduced, if not cancelled, their orders (e.g., printing and direct mailing credit card offers).

66.    In late 2008 and early 2009, the Company was faced with severe liquidity challenges and had declining EBITDA from 2006 to 2008.  At that time, the Company implemented a transformation plan to reduce operating costs and realign its manufacturing and distribution locations to improve profitability (the "Transformation Plan").  The Company has continued to successfully execute the Transformation Plan through 2010.

67.    To assist with developing and implementing the Transformation Plan, the Company retained AlixPartners in the fourth quarter of 2008, but is no longer using their services as of the Petition Date.  I have been an officer of WMI since September 2004 and recently began working with a new management team with extensive operational and restructuring expertise.  Dean Truitt, formerly with AlixPartners, is the Company's Chief Operating Officer.  Dave Davis, formerly a Senior Managing Director of Perseus, is the Chairman and Chief Executive Officer.  Brian Leitch, also a former Senior Managing Director of Perseus, recently filled the position of Executive Vice President of Mergers, Acquisitions and Strategic Initiatives.

68.    As initially conceived, the Transformation Plan consisted of numerous operating initiatives, as well as asset sales, intended to reduce costs and improve operating performance.  These initiatives included reducing the workforce; reducing salaries and benefits for certain employees; the rationalization of the Company's plants and warehouse

facilities; reducing temporary labor and contractor costs; consolidating the corporate

headquarters; reducing working capital through reduction in inventories and improvement

in receivable collections; improving customer profitability; and renegotiating vendor

supply contracts.

69.    The goal of the Transformation Plan is to improve on profitability and

pursue disciplined growth.  The principal features include: (i) improving cost structure and

profitability through productivity improvements in the field client service organization,

additional manufacturing and distribution center consolidations, rationalization of excess

office space, improved manufacturing productivity through the implementation of lean

manufacturing practices, and improved procurement leverage; (ii) increasing sales force

effectiveness and productivity by increasing the Company's inside sales capacity and

reassigning small accounts, implementing improved sales and pipeline reporting tools and

processes, and implementing a more disciplined client service program to improve service

while increasing selling time in the field, and upgrading sales leadership talent and the

overall quality of performance of the Company's sales force; (iii) expanding revenue share

within the Company's existing client base by focusing on cross-selling various products

and solutions, targeting large clients, and focusing on expanding the Company's

relationships to other divisions, entities or hospitals within the group; and (iv)

strengthening the Company's key solution offerings to drive growth, including a focus on

include digital marketing, labels, promotional products, business process outsourcing, and

distribution and logistics services.

70.     Since implementing the Transformation Plan, the Company has significantly improved profitability by rationalizing and closing redundant plants, centralizing and leveraging purchasing expenditures and seeking operational efficiencies. While difficult, the Company also reduced headcount by approximately 16% and reduced salaries and benefits for certain employees, which saved approximately $24 million in total annual payroll costs. Additionally, certain non-core businesses were sold, including the assets and operations of United and Freedom Graphics Services, Inc., freeing up capital and improving operating flexibility.

71.     The Company also closed their headquarters in Stamford, Connecticut, and centralized corporate management for WMI and certain of the other Debtors in Dayton, Ohio, where the majority of the management staff from the Relizon acquisition was located. The principal place of business for WF Capital, the ultimate parent of the Debtors, and two other Debtors relocated back to Norfolk, Virginia. This restructuring effort led to significant improvement in financial results and a permanent reduction in operating cost structure. For the twelve months ended December 31, 2009, the Company generated net revenue of approximately $661.5 million and adjusted EBITDA of $61.5 million, or 9.3% adjusted EBITDA margin, as compared to 2008 adjusted EBITDA of $48.2 million, an adjusted EBITDA increase of 28% and 350bps on an adjusted EBITDA margin basis. In addition, expected savings from the Transformation Plan is expected to add an estimated $10 million of incremental EBITDA on an annual run-rate basis in subsequent years. In addition, for the twelve months ended December 31, 2009, compared to the twelve months ended December 31, 2008, there was a reduction of 61.9% in capital expenditures.

72.     The Transformation Plan called for $30 million in run rate savings in 2009. However, the results exceeded expectations and the initiatives delivered a $44 million run rate savings in 2009.

73.     The Company is continuing in its transformation efforts, and in 2010 it is forecasted to deliver approximately $19 million in annual run-rate cost savings by continuing to reduce headcount and drive productivity improvements; rationalizing plant and office footprint; updating distribution network; and growing revenue by transforming the sales organization.

74.     Further, since implementing the Transformation Plan, the Company has delivered approximately $89.7 million to First Lien Lenders, which is comprised of: $55 million amortization payment, $17.7 million interest, $10 million Revolver A pay down and commitment reduction, $2 million in proceeds from assets sales, and $5 million in fees paid or accrued.  The turnaround is not complete, however, and the Debtors need additional time and effort to maximize the interests of all affected parties.

**F.      Events Leading to the Filing of the Chapter 11 Cases**

75.     During the second quarter of 2009, the Debtors amended their First Lien and Second Lien Credit Agreements to seek covenant relief and certain other changes.  As set forth above, around this time, Perseus or an affiliate contributed approximately $4.25 million to the Company.

76.     Unfortunately, the credit markets have prevented the Debtors from refinancing their First Lien and Second Lien Credit Agreements in their entirety.  In an effort to address liquidity concerns raised by the softness of the economy and the Debtors'

recent performance, the Debtors negotiated with the First and Second Lien Lenders in an attempt to extend the maturity dates of the facilities.  As described above, the Debtors reached an agreement with certain of the First Lien Lenders with respect to extending the maturity date with respect to Revolver A, but were not able to reach an agreement with one First Lien Lender with respect to Revolver B and the Second Lien Credit Agreement.

77.     A single Second Lien Lender holds a controlling position in the Second Lien Credit Facility, and a position in the First Lien Credit Facility (Revolver B), and has frustrated the Company's refinancing efforts to date.  Negotiations were taking place in August 2010, with the goal being to reach agreement with the Second Lien Lenders to allow the Company to take out the first lien debt only through a refinance, however, no deal could be reached with this Second Lien Lender.

78.     As a result, the Debtors' payment obligations during the final quarter of 2010 will result in a severe lack of liquidity, which has necessitated the filing of these chapter 11 cases.  Specifically, on September 30, 2010, the Debtors are required to make an approximately $13 million payment of principal and interest on the First Lien Credit Facility, an approximately $7.1 million payment for interest on Second Lien Credit on November 4, 2010, an approximately $6.8 million principal payment on Revolver B on November 30, 2010, and another approximately $13 million payment of principal and interest on the First Lien Credit Facility on December 31, 2010.  Further, the stated maturity of the BB&T Loan is December 31, 2010.

**G.    Objectives of the Chapter 11 Cases**

79.    The Company commenced these chapter 11 cases to promptly and efficiently restructure its senior debt obligations.  The plan of reorganization filed concurrently herewith proposes to pay all creditors' undisputed claims in full and provides for the full retention of equity by existing shareholders.  The Company will commence these cases with the goal of emerging in January 2011.

## FIRST DAY MOTIONS AND ORDERS

80.    In furtherance of its restructuring objectives, the Company expects to file a number of first day motions (the "First Day Motions") and proposed orders (the "Proposed Orders"), and respectfully requests that the Court consider entering the Proposed Orders granting such First Day Motions.  I have reviewed each of the First Day Motions and Proposed Orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief, with appropriate reliance on corporate officers and advisors.  Moreover, I believe that the relief sought in each of the First Day Motions and Proposed Orders (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with a minimum interruption or disruption to their businesses or loss of productivity or value, (b) constitutes a critical element in achieving the Debtors' successful reorganization, and (c) ensures that the Company complies with applicable non-bankruptcy law, to the extent such law remains applicable in a chapter 11 bankruptcy proceeding.

**A.    Administrative Motions**

81.    The Company will file seven (7) "administrative" motions, which (i)

request an expedited "first day" hearing to consider the relief requested in each of the Motions, (ii) seek to have the Debtors' bankruptcy cases jointly administered, (iii) seek retention of Kurtzman Carson Consultants, LLC as claims, noticing and balloting agent, (iv) seek approval of case management procedures, (v) request authority to file a consolidated list of the thirty (30) largest unsecured creditors and an unformatted mailing matrix, (vi) request an extension of time within which the Debtors are required to file their schedules and statement of financial affairs, and (vii) establish a bar date for filing all claims arising prior to the Petition Date and approving certain notice procedures thereof.

82.     The administrative motions will assist the Debtors in a smooth and orderly transition into chapter 11.

**B.     Motion to Continue Use of Cash Management System, Bank Accounts and Business Forms**

83.     The Debtors will file a motion seeking authorization to continue the use of their existing bank accounts, cash management system and business forms, as well as seek a waiver of certain investment and deposit requirements.  Additionally, the Debtors are requesting that all intercompany claims arising from inter-Debtor transactions pertaining to the Cash Management System against a Debtor by another Debtor after the Petition Date be accorded administrative expense status.

84.     As set forth in detail in the motion, the Debtors operate a centralized Cash Management System in the ordinary course of their business.  The Cash Management System is designed to accurately and efficiently collect, transfer and disburse funds generated by the Debtors and to record each deposit, transfer, and disbursement made by the Debtors.  The centralized Cash Management System enables the Debtors' to (i) better

forecast and report its cash position, (ii) monitor collection and disbursement of funds and (iii) maintain control over the administration of the various bank accounts, all of which facilitates effective collection, disbursement and movement of cash.

85.     The continued use of the Bank Accounts is essential to a smooth and orderly transition into chapter 11.  All parties in interest will be best served by the Debtors' continued use of the Bank Accounts, as it will minimize the disruption of the Debtors' businesses.  To the extent that any account is construed to have a balance substantial enough to fall within the ambit of the Bankruptcy Code, the Debtors believe that the safety presented by the financially stable, and government insured, banking institutions with whom the Debtors bank constitutes sufficient cause to allow the Debtors to deviate from certain approved investment and deposit practices.  Accordingly, the Debtors are requesting authority to maintain their Bank Accounts in a safe and prudent manner in accordance with their existing banking practices.  The Debtors also are requesting that all financial institutions with which the Debtors maintain the Bank Accounts (as defined below) be authorized to continue to maintain, service and administer such accounts, except that such financial institutions shall not be authorized to honor any wire transfers, automated clearing house ("ACH") transfers, checks, other drafts or bank payments (collectively "Drafts") issued or dated prior to the Petition Date, unless the Debtors represent that the payment is authorized by an order of this Court.

86.     Additionally, in an effort to minimize administrative expense and delay, the Debtors request authority to continue to use their correspondence, business forms, including, but not limited to, letterhead, purchase orders, and invoices, and checks,

(collectively, the "Business Forms") in the forms existing immediately prior to the Petition

Date, without reference to their status as debtors in possession.  Changing the Business

Forms would be expensive and burdensome to the Debtors' business operations while

conferring no benefit to those dealing with the Debtors.

87.      The relief requested by the Debtors will help ensure the Debtors' orderly

entry into chapter 11 and will avoid many of the possible disruptions and distractions that

could divert the Debtors' attention from more pressing matters during the initial days of

these chapter 11 cases.

**C.      Payment of Employee Wages, Compensation and Benefits, Payroll
         Obligations, Certain Taxes and Workers Compensation Insurance**

88.      The Company will file a motion seeking authority to continue paying

various employee obligations, which are described in detail in the motion.

89.      To minimize the personal hardship that the Employees will suffer if

prepetition Employee-related obligations are not paid when due, and to maintain the

Employee's morale during this critical time, it is important to pay and/or perform, as

applicable, the employee-related obligations.

90.      Generally, the Debtors are seeking the following relief in connection with

their employee obligations: (a) authorizing, but not directing, the Debtors to continue to

pay and/or perform, as applicable, all obligations to employees of the Debtors, including

accrued prepetition wages, salaries, supporting salaries, commissions, vacation, personal,

holiday and sick time-off and other cash and non-cash compensation claims, except as

otherwise set forth herein, including any claims of human resource and payroll

administrators and benefits brokers and consultants; (b) authorizing, but not directing, the

Debtors to continue to reimburse Employees for expenses incurred on behalf of the

Debtors in the ordinary course of business or under the Debtors' relocation plan, including

expenses incurred prepetition and tuition reimbursement plan; (c) authorizing, but not

directing, the Debtors to continue to maintain or contribute to certain employee benefit

plans and programs, including medical, dental, vision, flexible spending accounts,

COBRA, life and disability insurance, Family Medical Leave, 401(k) plans, as well as

savings plans, and workers' compensation programs in which the Debtors or their

employees participate, the more significant of which are described below, and to pay all

fees, administrative and other costs in connection therewith, including such fees and costs

incurred prepetition, except as otherwise set forth herein; (d) authorizing, but not directing,

the Debtors to continue to maintain or contribute to the pension plan, including such fees

costs incurred prepetition; and (e) authorizing, but not directing, the Debtors to pay all

related prepetition employer withholdings and payroll-related taxes associated with the

Employee Claims and the Employee Benefit Obligations; (f) authorizing and directing the

Debtors' banks to receive, process, honor, and pay all of the Debtors' prepetition checks

and fund transfers on account of any of the Prepetition Employee Obligations; (g)

prohibiting the Debtors' banks from placing any holds on, or attempting to reverse, any

automatic transfers to any account of an Employee or other party for Prepetition Employee

Obligations and Commissions; and (h) authorizing the Debtors to issue new postpetition

checks or effect new postpetition fund transfers on account of the Prepetition Employee

Obligations and Commissions to replace any prepetition checks or fund transfer requests

that may be dishonored or rejected.

91.     Moreover, the Debtors are seeking authority, but not direction, to continue paying and/or contesting in good faith, as appropriate in the Debtors' business judgment, all amounts related to the Workers' Compensation Insurance in the ordinary course of business, including amounts that arose prior to the Petition Date.  In addition, the Debtors request authority, but not direction, to pay the Workers' Compensation Taxes and any other administrative fees and expenses relating to the Workers' Compensation Insurance in the ordinary course of business, including prepetition amounts.

92.     Currently, the Debtors estimate that fifty-six (56) Employees will be owed in excess of the priority wage cap of $11,725 for prepetition wages, salaries, and benefits – all of which are owed to rank and file Employees for commissions they earned during the month of September 2010.  Accordingly, the vast majority of the amounts sought to be paid to Debtors' approximately 2300 Employees would be entitled to priority and granting the relief requested would not adversely affect the Debtors' other unsecured creditors.

93.     The potential harm and economic disadvantage that would stem from the failure to pay the Prepetition Employee Obligations and Commissions is grossly disproportionate to the amount of any prepetition claim that may be paid.  Absent payment of the Prepetition Employee Obligations, Employee morale would decrease dramatically, likely leading to the loss of key Employees, lower service, and other severe business disruptions costing far in excess of the amount of the Prepetition Employee Obligations.  Likewise, absent payment of the Commissions, sales force Employees would be less likely to market the Debtors' business and solicit new business opportunities, leading to declines in business.

94.     The Debtors have examined other options short of payment of the Prepetition Employee Obligations and Commissions, and have determined that to avoid significant disruption of the Debtors' business operations, there exists no practical or legal alternative to payment of such obligations.

95.     The Prepetition Employee Obligations and Commissions ensure continued employee loyalty and satisfaction and the payments of which will help prevent the driving away of valuable employees that would result if the Debtors did not honor their obligations to their employees.  Therefore, the relief requested is necessary to avoid immediate and irreparable harm.

**E.      Motions for Payment of Other Critical Business Expenditures**

96.     The Company also will file a number of motions seeking authority to make critical business expenditures on account of: (i) sales, use, trust fund and other taxes; (ii) various customer programs and practices; (iii) purchases from and other transactions with certain essential trade vendors; and (iv) claims held by certain shippers and warehousemen. The Company has likewise filed a motion seeking to maintain existing insurance policies, including payment of premiums, brokers fees and other amounts due to third party service providers.  For each of these motions, the payment of these critical business expenditures is necessary to avoid immediate and irreparable harm.

97.     **Taxes.**  The Debtors collect from customers and others an assortment of state, commonwealth and local taxes, including, among others, sales and use taxes. Furthermore, the Debtors incur use taxes for purchases of materials and supplies in the ordinary course of business from out-of-jurisdiction vendors.  The Debtors remit actual

amounts due to approximately 200 Taxing Authorities monthly, generally in the month after collecting the applicable Tax.  Certain Taxing Authorities either have not been paid or have been sent checks and/or wires for Taxes that may or may not have been presented or cleared as of the Petition Date.  Payment of Taxes is necessary to the Debtors' ability to successfully conclude these bankruptcy cases and to preserve the value of the Debtors' estates.  Without the ability to pay the Taxes, the Debtors may bear the cost and expense of audits or litigation regarding the Taxes, as well as penalties and interest costs.

98.     **Customer Programs.**  All as more fully described in the motion, the Debtors are seeking authorization, but not direction, to honor all Customer Obligations, including, but not limited to: (a) Broker Services; (b) Prepaid Postage Obligations; (c) Warranties and Guarantees; (d) Warranties and Guarantees; (e) Refunds; (f) Rebates; (g) Buying Group Rebates; and all such other similar policies, programs and practices of the Debtors in the ordinary course of business.

99.     To effectuate a smooth transition into chapter 11, the Debtors must not only deliver their products, including corporate stationary, marketing materials and other paper products, but also maintain customer loyalty and goodwill through the Customer Programs. Indeed, the Debtors implemented the Customer Programs in the ordinary course of business as a means by which to maintain positive, productive, and profitable relationships with their customers, encourage new purchases, enhance customer satisfaction and ensure that the Debtors remain competitive in the their industry.  Although the terms of the Customer Programs may vary among the Debtors' customers, they are all designed and implemented to encourage the Debtors' customers to increase their purchasing frequency

and volume, which result in larger net revenues for the Debtors and, in return, provide customers with greater satisfaction.  Accordingly, the Debtors' ability to honor their Customer Programs in the ordinary course of business is necessary to retain their customer base and reputation within the industry.

100.    The success and viability of the Debtors' business, and ultimately the Debtors' ability to successfully reorganize, are dependent upon the patronage and loyalty of their customers.  In this regard, the Debtors' Customer Programs are critical, and any delay in honoring the Debtors' obligations thereunder will severely and irreparably impair customer relations.  Any failure to honor prepetition Customer Obligations or pay the prepetition Customer Claims, for even a brief time, may well drive away valuable customers, thereby harming the Debtors' efforts to reorganize.

101.    **__Essential Trade Vendors.__**  The Debtors will file a motion seeking authority, but not direction, to pay or honor, in the ordinary course of business, as and when due, certain prepetition claims or obligations owing to Essential Trade Vendors, subject to certain terms and conditions, and seeking authority and direction to the Debtors' banks to honor any prepetition checks drawn or fund transfer requests made for payment of claims owing to the Essential Trade Vendors.

102.    The Essential Trade Vendors and the prepetition Trade Claims are predominantly owed to vendors of various products, services and goods essential to the Debtors' businesses, including but not limited to: (i) paper; (ii) ink; (iii) labels; (iv) glue/cohesive; (v) mailing/sorting supplies and equipment; and (vi) foreign vendors.

103.    Some of the Essential Trade Vendors provide a certain style and/or quality of paper or ink to the Debtors that is essential and often times unique for use with different types of the Debtors' equipment.  For example, one vendor supplies a special non-toxic ink for use on goods specially manufactured for a pet store so as not to harm animals during transport.  Additionally, in other instances, the Debtors' customers have approved certain specifications for their orders and if the Debtors had to go out and find a new source to meet or exceed such specifications it would cause disruption to the Debtors' business and potentially delay production and/or delivery.  Further, for certain other of the Essential Trade Vendors, the Debtors negotiated a reduced cost for the goods and/or services.  If the Debtors can benefit from future low costs, it is prudent for the Debtors to pay such creditors' prepetition claims to the extent such vendors are willing sell their goods or services on favorable trade credit terms going forward.  Finally, with respect to the foreign vendors, the Debtors fear that if their claims are not paid, the foreign vendors may take precipitous action against the Debtors based upon the erroneous belief that they are not subject to the jurisdiction of this Court.

104.    Many of the Essential Trade Vendors may have delivered goods to the Debtors in the twenty (20) days prior to the Petition Date that may otherwise be entitled to payment in full on account of such claims.  Additionally, the Debtors will file a plan of reorganization that proposes to pay all undisputed trade claims in full.

105.    The Debtors are seeking authority to pay only those Trade Claims of the Essential Trade Vendors that agree to: (i) supply goods or services to the Debtors on the most favorable terms and practices (including any pricing related terms such as

allowances, rebates, or discounts) that existed in the one (1) year period prior to the

Petition Date between such Essential Trade Vendor and the relevant Debtor as determined

by the Debtors, and (ii) not cancel on less than ninety (90) days notice any contract or

agreement pursuant to which they provide goods and/or services to the Debtors.  The

continued availability of trade credit in amounts and on terms consistent with those that the

Debtors enjoyed prepetition is necessary for the Debtors to maintain liquidity for

operations and preserve the customer base and vender network that is essential for a

successful reorganization.  The Debtors believe that preserving working capital through the

retention or reinstatement of Customary Trade Terms will enable the Debtors to maintain

their competitiveness and to maximize the value of their businesses.  Conversely, a

deterioration of trade credit and disruption or cancellation of deliveries of goods would

hinder the Debtors' operations and undermine their ability to generate revenue and

ultimately to reorganize.

106.    If the Debtors pay a Trade Claim and an Essential Trade Creditor later

refuses to continue to supply goods or services to the Debtors on Customary Trade Terms

during the pendency of these chapter 11 cases, then on motion by any party in interest, and

with the Court's approval: (i) any payment of a prepetition Trade Claim made by the

Debtors shall be deemed to be an unauthorized postpetition advance that the Debtors may

recover from such Essential Trade Vendor in cash; and (ii) upon any such recovery by the

Debtors, the prepetition Trade Claim of such Essential Trade Vendor paid after the Petition

Date shall be reinstated in the amount so recovered.

107.    It is imperative that the Debtors' vendors, customers, and trade affiliates continue to do business with the Debtors in the ordinary course of business and pursuant to favorable and customary terms that existed in the normal course of dealing between the parties prior to the Petition Date.  The Debtors believe, in the exercise of their sound business judgment, that the ability to continue to purchase goods and services in the ordinary course of business from their trade vendors is vital to their ongoing operations and preservation of enterprise value.

108.    In the ordinary course of business, the Debtors make payments to the Essential Trade Vendors on a regular basis.  If the Essential Trade Vendors are not paid, they could cause an interruption of the Debtors' businesses.  Business interruption could have drastic consequences to the operations of the Debtors' businesses due to the lack of alternative suppliers or service providers in many situations, or the amount of time needed to locate and convert to alternative sources.  Such interruption also could negatively affect the Debtors' revenue and further strain the Debtors' liquidity.

109.    **Shippers and Warehousemen.**  The Debtors will file a motion seeking authority, but not direction to pay or honor, in the ordinary course of business, as and when due, any prepetition claims of certain common carriers, movers, shippers, freight forwarders/consolidators, delivery services, customs brokers, shipping auditing services, and certain other third-party service providers, including Cass Information Systems, Inc., a shipping procurement company engaged by the Debtors and warehousemen in satisfaction of perfected or potential mechanics', materialmen's or similar liens or claims. Additionally, the motion seeks authority for the Debtors' banks to receive, process, honor

and pay the prepetition checks and other transfers made to the Shippers and

Warehousemen to the extent the Debtors have sufficient funds standing to their credit with

such bank.

110.    The services provided by the Shippers and Warehousemen are essential to

the day-to-day operations of the Debtors.  At any given time, there are numerous

shipments en route to or from the Debtors.  Therefore, certain Shippers are currently in

possession of goods, inventory, materials, equipment or other items that are vital to the

Debtors' operations.  Likewise, the Debtors use Warehousemen to hold finished and

unfinished goods, inventory, and materials in warehouses and other storage space rented

by the Debtors.  If the Debtors do not pay the prepetition claims of the Shippers and

Warehousemen, the Shippers and Warehousemen might assert possessory liens against the

Debtors' property and refuse to deliver or release such property to the Debtors until they

are paid.  Such an outcome could cause significant disruptions to the operation of the

Debtors' businesses that would impede their ability to operate successfully in chapter 11.

The Debtors further estimate that the value of the supplies and materials in possession of

the Shippers substantially exceeds the amounts the Debtors owe to the Shippers.  The

inability to ship or receive essential materials for use in the ordinary course of the Debtors'

business would leave the Debtors' business moribund and likely unable to function.

111.    Further, the Debtors require the services of CASS to pay the Shippers and

Warehousemen for both prepetition and post-petition services.  Failure to pay the amounts

owed CASS, and thus the failure of CASS to pay the Shippers and Warehousemen, would

preclude the Debtors from obtaining the property currently in the possession of the

Shippers and Warehousemen and would make it difficult, if not impossible, for the Debtors

to obtain shipping and warehouse services post-petition.  The inability to ship or receive

essential materials for use in the ordinary course of the Debtors' business would leave the

Debtors' business moribund and unable to function.

112.    The ability to pay the Shippers and Warehousemen will enable the Debtors

to preserve and maximize the value of their businesses and assets for the benefit of the

Debtors' estates.  The Debtors have sufficient liquidity to pay these expenses.  The

Debtors' business is time sensitive and the ability to deliver timely to their customers is

essential to the Debtors' business operations.  Permitting the Debtors to make payment of

prepetition claims to the Shippers and the Warehousemen, including CASS, will enable the

Debtors to continue their operations without the serious disruptions that would result if the

Shippers or Warehousemen asserted their possessory liens on the property of Debtors'

estates in their possession or control, or failed to ship or store the property owned by the

Debtors after the Petition Date.

113.    **Insurance.**  The Debtors also are filing a motion seeking authorization, but

not direction to (i) maintain their existing insurance policies, (ii) pay all insurance

obligations arising thereunder or in connection therewith, and (iii) renew existing

insurance policies or enter into new insurance arrangements, as may be required as the

existing arrangements expire or terminate.  In addition, the Debtors are seeking authority

and direction to the Debtors' banks to receive, process, honor, and pay all of the Debtors'

prepetition checks and fund transfers on account of any prepetition Insurance Obligations.

114.    The Insurance Polices are provided to the Debtors by unaffiliated third party insurers.  The Insurance Policies include coverage for, among other things (i) general liability; (ii) damage to real and personal property; (iii) Directors' and Officers' liability; (iv) professional liability; (v) global travel; (vi) workers' compensation; (vii) damage to business automobiles and collision liability; (viii) damage due to natural disasters; and (ix) other special risks.

115.    Prior to the Petition Date, the Debtors paid Insurance Obligations according to payment schedules negotiated between the Debtor and each insurer, most of which required annual or quarterly premium payments.  As of the Petition Date, the Debtors do not believe that any Insurance Obligations remain outstanding with respect to coverage under the Insurance Policies for the period prior to the Petition Date.

116.    The Insurance Policies maintained by the Debtors will all eventually expire under their annual terms, beginning with certain policies due to expire in November 2010. The Debtors believe that renewal of these policies or entry into new insurance arrangements is necessary to comply with their duties as debtors in possession, as well as various state laws.

117.    If the Debtors fail to pay Insurance Obligations when due, the Debtors' may lose coverage under the Insurance Policies for nonpayment.  Because the Debtors are required to maintain insurance coverage during their chapter 11 cases, the cancellation of these policies would be particularly damaging.

**F.      Utilities.**

118.    In connection with the operation of their businesses and the management of

their property, the Debtors receive utility service from various Utility Companies,

including providers of water, gas, electricity, telephone, cable, ISDN, and sewer service

covering a number of utility accounts.  The services provided by the Utility Companies are

crucial to the continued operations of the Debtors.  It is my understanding that the Debtors

are generally current on utility payments as of the Petition Date.  I believe that the

procedures that the Company has proposed for the Utility Companies adequately protect

such Utility Companies' rights, while also protecting the Company's need for continuous

and uninterrupted Utility Services and will ensure that all parties act in good faith by

establishing a fair process.  This will protect the Debtors and their stakeholders from an

attempt by a Utility Company to delay a request until the last minute in an attempt to force

the Debtors to agree to its request or face cessation of essential services.  Additionally, the

Debtors intend to pay all postpetition obligations owed to the Utility Companies in a

timely manner.

**G.      Approval of Use of Cash Collateral**

119.    The Debtors have, with the assistance of their advisors, analyzed their cash

needs to enable the Debtors to maintain their operations in chapter 11 and to reorganize in

a short time frame.  In determining the amount of liquidity needed, the Debtors have

analyzed the impact of the global economic outlook on the Debtors' near-term projected

financial performance, including demand for the Debtors' products and services, and the

costs to operate their business.  The Debtors have also conferred with individuals with

responsibilities for the Debtors' operations and management with respect to key business

drivers in the near term and longer term to determine their liquidity needs.

120.    To assess their immediate funding needs, the Debtors developed a cash flow forecast taking into account anticipated cash receipts and disbursements.  The Debtors analyzed the impact of a bankruptcy filing on changes in working capital and other material cash disbursements.  The Debtors identified other potential cash outlays that would increase the amount of cash necessary to maintain operations through January 2011, including required vendor payments, among other material disbursements.

121.    The Debtors, in consultation with their advisors, have determined that the Debtors' immediate liquidity needs can be met by permitting the Debtors to use the Cash Collateral.  Therefore, the Debtors are filing a motion requesting use of Cash Collateral to preserve the value of the Debtors' estates for the benefit all of the Debtors' stakeholders and creditors, including the Prepetition Secured Parties.

122.    To avoid irreparable harm that would result from even a temporary loss of the use of Cash Collateral, the Debtors are seeking interim authorization to use Cash Collateral in accordance with the Debtors' cash management system and the budget set forth in the motion, and in accordance with orders of this Court, pending consideration at a final hearing.

123.    Without authorization from the Court to use Cash Collateral in accordance with the Budget, the Debtors will be left without a source of working capital and will be unable to operate their business.  Absent the ability to use Cash Collateral to fund daily operations on an interim basis, substantial value in the Debtors' estates will likely evaporate within days.  Thus, if the Debtors are to have any prospect of a maintaining their going concern value for the benefit of their creditors and other stakeholders, the Debtors

must be able to pay vendors, make payroll, continue the Debtors' restructuring efforts, and operate the Debtors' business post-petition in the ordinary course and without interruption.

124.    As indicated in the Budget, the Debtors propose to use Cash Collateral to fund the ongoing restructuring efforts, including, without limitation, paying payroll, paying post-petition vendors, paying post-petition rents and lease obligations, paying professionals, paying amounts approved by the Court, and otherwise operating their business in the ordinary course.  Use of Cash Collateral in this fashion will preserve value for all of the Debtors' stakeholders and creditors, including the Prepetition Secured Parties. Moreover, as indicated in the Budget, the use of Cash Collateral will produce additional cash and accounts receivable.

125.    The Adequate Protection described in the motion preserves the value of the applicable Prepetition Secured Parties' interest in the Prepetition Collateral, including the Cash Collateral, and thus adequately protects their interest therein.

126.    Given that the Debtors' use of Cash Collateral in accordance with the Budget will fund the Debtors' restructuring and ongoing operations, the Cash Collateral expended by the Debtors should yield additional revenues.  It is expected that the Debtors' cash, accounts receivable and inventory positions will increase over the period of the Budget.

127.    Under the Budget, the Debtors' operations are not only breaking even, they are generating positive cash flow.  This increased revenue more than adequately protects the value of the Prepetition Secured Parties' interest in the Cash Collateral.

128.    With access to this liquidity, the Debtors will have sufficient flexibility to adjust their capital structure and reorganize their operations, so that they may emerge from chapter 11 as viable entities.

I swear under penalty of perjury that the facts, circumstances and other matters set

forth in the First Day Motions, as well as the foregoing, is true and correct to the best of

my knowledge information and belief, with appropriate reliance on the Company's

officers, employees and advisors.

Dated: September 29, 2010

Paul H. Bogutsky

Chief Financial Officer,
Executive Vice President and Treasurer
Workflow Management, Inc.

Commonwealth of Virginia          )
                                  )ss.
City of Norfolk                   )

On this 29th day of September 2010, personally appeared before me Paul H. Bogutsky

who stated that (s)he is the Chief Financial Officer, Executive Vice President and

Treasurer of Workflow Management, Inc., a corporation, and that the instrument was

signed on behalf of the said corporation by authority of its board of directors and

acknowledged said instrument to be its voluntary act and deed.

Before me:

Notary Public for The Commonwealth of Virginia

My Commission Expires: December 31, 2013.
                        ID No. 306256

\17753031