# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **WORKFLOW MANAGEMENT INC.,** | ) | |
| et al., | ) | Case No. 10-74617 (SCS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

---

## DISCLOSURE STATEMENT RELATING TO
## THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
## FOR WORKFLOW MANAGEMENT, INC.
## AND ITS AFFILIATED DEBTORS

---

Dated: November 10, 2010

McGUIREWOODS LLP
Douglas M. Foley (VSB No. 34364)
Patrick L. Hayden (VSB No. 30351)
9000 World Trade Center
101 West Main Street
Norfolk, Virginia 23510
(757) 640-3700

Attorneys for the Debtors and
Debtors in Possession

TAVENNER & BERAN, PLC
Lynn L. Tavenner (VSB No. 30083)
Paula S. Beran (VSB No. 34679)
20 North Eighth Street
Second Floor
Richmond, Virginia 23219
(804) 783-8300

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE UNITED
STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF VIRGINIA,
NORFOLK DIVISION (THE "BANKRUPTCY COURT") UNDER SECTION 1125(b) OF
THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OF
THE PLAN DESCRIBED HEREIN. ACCORDINGLY, THE FILING AND DISTRIBUTION
OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE
CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN. THE
INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY
PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS
DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE
MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.[1]

---

[1] Legend to be removed upon entry by the Clerk of the Bankruptcy Court of Order of the Bankruptcy Court approving this Disclosure Statement.

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ................................................................................................ 1

II.    NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS ............................ 1

III.   EXPLANATION OF CHAPTER 11 ....................................................................... 3

IV.   OVERVIEW OF THE PLAN .............................................................................. 4

    A.    Summary of the Terms of the Plan ..................................................... 4

    B.    Summary of Distributions Under the Plan ............................................ 5

V.    GENERAL INFORMATION ............................................................................... 13

    A.    A History of the Debtors .................................................................. 14

    B.    The Businesses of the Debtors ......................................................... 14

    C.    Prepetition Capital Structure ........................................................... 15

        (i)    Debtors' Equity Structure ...................................................... 15

        (ii)   Debtors' Prepetition Secured Credit Facilities ........................... 15

            (1)   First Lien Credit Facility ............................................... 15

            (2)   Second Lien Facility .................................................... 17

            (3)   Credit Facilities' Secured Parties Intercreditor Agreement. ........ 17

        (iii)  Other Selected Obligations of the Debtors ............................. 18

            (1)   WF Capital/BB&T Note ................................................ 18

            (2)   WF Capital/Perseus Convertible Note ............................... 18

            (3)   WF Capital/Perseus Interest Note .................................... 18

            (4)   WF Holdings/Carlyle Note ............................................. 19

            (5)   Workflow Management/Perseus Note ............................... 19

            (6)   The Relizon Ohio Development Loan ................................ 19

            (7)   Capital Leases ........................................................... 19

            (8)   Pension Obligations ..................................................... 20

    D.    Pre-Filing Restructuring Efforts ....................................................... 20

    E.    Events Leading to the Filing of the Chapter 11 Cases ........................... 22

VI.   GOALS OF THE DEBTORS' PLAN ................................................................. 24

    A.    Preserving the Debtors' Operations ................................................. 24

    B.    Preservation of NOLs ..................................................................... 24

    C.    Providing Liquidity to the Debtors ................................................... 24

VII.    SELECTED FINANCIAL INFORMATION ................................................................. 25

    A.    Consolidated and Year-to-Date Annual Financial Information for the Debtors ................................................................................................................. 25

VIII.    FINANCIAL PROJECTIONS AND ASSUMPTIONS ......................................... 26

    A.    Purpose and Objectives .......................................................................... 26

    B.    Consolidated Pro Forma Balance Sheet ................................................. 26

    C.    Funds Necessary upon the Effectiveness of the Plan ............................. 26

IX.    THE CHAPTER 11 CASES ..................................................................................... 27

    A.    Commencement of the Chapter 11 Cases ............................................... 27

    B.    Continuation of Business after the Petition Date .................................... 27

        (i)    Cash Collateral ............................................................................ 27

        (ii)    Business Operations and Employee-Related Relief ................... 28

    C.    Representation of the Debtors ................................................................. 28

    D.    Formation and Representation of the Committee .................................... 28

    E.    Representation of the First Lien Agent ................................................... 29

    F.    Representation of the Second Lien Agent ............................................... 29

    G.    Matters Relating to Unexpired Leases and Executory Contracts ........... 29

    H.    Exclusivity .............................................................................................. 29

    I.    Claims Administration ............................................................................ 30

        (i)    Schedules and Bar Dates ............................................................ 30

        (ii)    Claim Objections ....................................................................... 30

X.    LITIGATION PENDING AGAINST THE DEBTORS ......................................... 31

    A.    Litigation ................................................................................................. 31

XI.    THE CHAPTER 11 PLAN ....................................................................................... 32

    A.    Introduction ............................................................................................. 32

    B.    General Description of the Treatment of Claims and Equity Interests .... 32

        (i)    Class 1 – Priority Non-Tax Claims ............................................ 32

        (ii)    Class 2 – First Lien Lender Claims ............................................ 32

        (iii)    Class 3 –First Lien Lender Claims of Cross Lien Holders ........ 32

        (iv)    Class 4 – Second Lien Lender Claims ........................................ 32

        (v)    Class 5 – Second Lien Lender Claims of Cross Lien Holders ... 33

        (vi)    Class 6 – Other Secured Claims ................................................. 33

        (vii)    Class 7 – General Unsecured Claims .......................................... 33

(viii) Class 8 – Lease Rejection Damage Claims.............................................. 34

(ix) Class 9 – Unsecured Note Claims......................................................... 34

(x) Class 10 – Unsecured Contingent Claims.............................................. 34

(xi) Class 11 – Intercompany Claims .......................................................... 34

(xii) Class 12 – WF Capital Equity Interests ................................................ 35

(xiii) Class 13 – Subsidiary Equity Interests.................................................. 35

(xiv) Class 14 – Convenience Claims ............................................................ 35

(xv) Deemed Satisfaction of Other Guaranty Claims.................................... 35

(xvi) Reinstatement of Pension Plan ............................................................. 35

(xvii) Reinstatement of Insurance Policies ..................................................... 35

C.      Provisions For Treatment Of Unclassified Claims Under The Plan................... 35

(i) Unclassified Claims ............................................................................. 35

(ii) Treatment of Administrative Expense Claims......................................... 36

(1) Time for Filing Administrative Expense Claims ........................ 36

(2) Time for Filing Fee Claims......................................................... 36

(3) Time for Filing Section 503(b)(9) Claims ................................. 36

(4) Allowance of Administrative Expense Claims, Fee Claims
and Section 503(b)(9) Claims ...................................................... 36

(5) Payment of Allowed Administrative Expense Claims................. 37

(iii) Treatment of Priority Tax Claims .......................................................... 37

D.      Acceptance or Rejection of the Plan; Effect of Rejection by One or More
Classes of Claims or Equity Interests .................................................................. 38

(i) Classes Entitled to Vote ....................................................................... 38

(ii) Class Acceptance Requirement.............................................................. 38

(iii) Tabulation of Votes on a Non-Consolidated Basis................................. 38

(iv) Separate Plan for Each Debtor .............................................................. 38

(v) Cramdown............................................................................................. 38

E.      Means for Implementation of the Plan................................................................. 39

(i) Certain Transactions On or Prior to the Effective Date.......................... 39

(ii) Corporate Action................................................................................... 39

(iii) Continued Corporate Existence of the Debtors ...................................... 40

(iv) Re-vesting of Assets .............................................................................. 40

(v) Initial Boards of Directors .................................................................... 40

| | (vi) | Officers | 41 |
| | (vii) | Retention of Causes of Action/Reservation of Rights | 41 |
| F. | | The Disbursing Agent | 41 |
| | (i) | Appointment of the Disbursing Agent | 41 |
| | (ii) | Powers and Duties | 41 |
| | (iii) | Disbursing Agent Post-Effective Date | 42 |
| G. | | Distribution Provisions | 42 |
| | (i) | Sources of Cash for Plan Distributions | 42 |
| | (ii) | Investment of Funds Held by the Disbursing Agent; Tax Reporting by the Disbursing Agent | 42 |
| | (iii) | Plan Distributions | 43 |
| | (iv) | Timing of Plan Distributions | 43 |
| | (v) | Address for Delivery of Plan Distributions/Unclaimed Distributions | 43 |
| | (vi) | Time Bar to Cash Payments | 43 |
| | (vii) | Manner of Payment under the Plan | 44 |
| | (viii) | Expenses Incurred on or after the Effective Date and Claims of the Disbursing Agent | 44 |
| | (ix) | Fractional Plan Distributions | 44 |
| | (x) | Surrender and Cancellation of Instruments | 44 |
| H. | | Procedures for Resolving and Treating Contested Claims | 45 |
| | (i) | Prosecution of Contested Claims | 45 |
| | (ii) | Objection Deadline | 45 |
| | (iii) | Claims Settlement | 45 |
| | (iv) | Entitlement to Plan Distributions upon Allowance | 45 |
| | (v) | Contested Claims Reserve | 45 |
| | (vi) | Estimation of Claims | 45 |
| | (vii) | No Recourse Against the Debtors or the Reorganized Debtors | 46 |
| I. | | Treatment Of Executory Contracts And Unexpired Leases | 46 |
| | (i) | Assumption and Rejection of Executory Contracts and Unexpired Leases | 46 |
| | (ii) | Cure Costs | 48 |
| | (iii) | Claims Arising from Rejected Contracts | 48 |

J.       Conditions Precedent to Confirmation of the Plan and the Occurrence of the Effective Date ............................................................................. 48

     (i)     Conditions Precedent to Confirmation ..................................... 48

     (ii)    Conditions Precedent to the Occurrence of the Effective Date .............. 49

     (iii)   Waiver of Conditions ............................................................ 50

     (iv)   Effect of Non-Occurrence of the Effective Date ...................... 50

K.      Retention of Jurisdiction .................................................................... 50

L.      MISCELLANEOUS PROVISIONS ................................................ 52

     (i)     Third Party Agreements; Subordination ................................ 52

     (ii)    Payment of Statutory Fees ..................................................... 52

     (iii)   Satisfaction of Claims ............................................................ 52

     (iv)   Exculpation .......................................................................... 53

     (v)     Discharge of Liabilities ......................................................... 53

     (vi)    Discharge of Debtors ............................................................ 53

     (vii)   Notices ................................................................................. 54

     (viii)  Headings .............................................................................. 54

     (ix)    Governing Law .................................................................... 54

     (x)     Expedited Determination ...................................................... 55

     (xi)    Exemption from Transfer Taxes ............................................ 55

     (xii)   Retiree Benefits .................................................................... 55

     (xiii)  Notice of Entry of Confirmation Order and Relevant Dates ............. 55

     (xiv)  Interest and Attorneys' Fees ................................................. 55

     (xv)   Modification of the Plan ........................................................ 55

     (xvi)  Revocation of Plan ............................................................... 56

     (xvii)  Setoff Rights ........................................................................ 56

     (xviii) Compliance with Tax Requirements ..................................... 56

     (xix)  Rates .................................................................................... 57

     (xx)   Injunctions ........................................................................... 57

     (xxi)  Binding Effect ...................................................................... 57

     (xxii)  Severability .......................................................................... 58

     (xxiii) No Admissions ..................................................................... 58

     (xxiv) Dissolution of the Committee ............................................... 58

XII.    RISK FACTORS ..................................................................................... 58

A.     The Risk of Non-confirmation of the Plan ............................................................ 59

B.     Risk of Non-Occurrence of Effective Date .......................................................... 59

C.     The Failure to Close the Exit Loan ...................................................................... 59

D.     Risk that Claims Will Be Higher than Estimated ................................................ 60

E.     Liquidity Risks Prior to Consummation of the Plan ............................................ 60

F.     Continuing Leverage and Ability to Service Debt ............................................... 60

G.     The Reorganized Debtors' Actual Financial Results May Vary
Significantly from the Projections Included in this Disclosure Statement .......... 60

H.     Inherent Uncertainty of Projections ..................................................................... 61

I.     General Economic Conditions .............................................................................. 61

J.     Increased Competition .......................................................................................... 62

K.     The Chapter 11 Cases May Affect the Reorganized Debtors' Relationship
with Key Employees, Suppliers and Customers .................................................. 62

L.     External Factors Beyond the Reorganized Debtors' Control May Cause
Fluctuations in Demand for their Products and in the Reorganized
Debtors' Prices and Margins ................................................................................ 63

XIII.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES .................................... 63

A.     U.S. Federal Income Tax Consequences to the Debtors ...................................... 65

    (i)     Cancellation of Debt Income ................................................................... 65

    (ii)    Accrued Interest ....................................................................................... 66

    (iii)   Utilization of Debtors' Net Operating Loss Carryforwards .................... 66

        (1)    Limitation on NOLs and Other Tax Attributes ........................... 66

        (2)    General Section 382 Annual Limitation ...................................... 67

B.     Certain U.S. Federal Income Tax Consequences to the Holders of Allowed
Claims that are Paid in Cash in Full .................................................................... 67

C.     U.S. Federal Income Tax Consequences to Holders of Allowed Claims
that are Paid in Full Using Consideration other than Solely Cash ...................... 68

    (i)     In General ................................................................................................. 68

    (ii)    Consequences of Modifying Existing Debt Instruments. ....................... 68

    (iii)   Reinstatement of Existing Debt Instruments .......................................... 69

    (iv)   Accrued but Unpaid Interest .................................................................... 69

    (v)    Market Discount ....................................................................................... 70

D.     Consequences to Pre-Bankruptcy Holders of Equity Interests ........................... 70

E.     Consequences of Ownership of Stock and Notes Reinstated Pursuant to
the Plan ................................................................................................................. 70

(i)     Consequences of Ownership of Stock Reinstated Pursuant to the Plan ................................................................................................ 70

       (1)    Distributions ................................................................. 70

       (2)    Sale or Exchange of Stock ........................................... 71

(ii)    Consequences of Ownership of Notes Retained Pursuant to the Plan ................................................................................................ 71

       (1)    Interest ......................................................................... 71

       (2)    Sale, Exchange or Retirement of Notes ...................... 71

F.    Backup Withholding Tax and Information Reporting Requirements ................. 71

XIV.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ................................................................................................... 72

A.    Liquidation Under Chapter 7 of the Bankruptcy Code ....................... 72

B.    Alternative Plans of Reorganization .................................................. 73

XV.    CONCLUSION .................................................................................... 73

<u>**SCHEDULES AND EXHIBITS**</u>

List of Defined Terms ......................................................................... Schedule 1

List of Debtors ..................................................................................... Schedule 2

List of Rejected Executory Contracts and Unexpired Leases .............. Schedule 3

Chapter 11 Plan of Reorganization ........................................................ Exhibit A

Disclosure Statement Order and Notice
of the Confirmation Hearing ................................................................... Exhibit B

Projections and Summary of Significant Assumptions Related Thereto ............ Exhibit C

Pro Forma Balance Sheet ........................................................................ Exhibit D

Liquidation Analysis .............................................................................. Exhibit E

# I.

## INTRODUCTION

All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings ascribed thereto in the Plan (see Article I of the Plan entitled "Definitions") or Schedule 1 of this Disclosure Statement.

THIS DISCLOSURE STATEMENT INCLUDES AND DESCRIBES THE FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION, DATED NOVEMBER 10, 2010 (THE "PLAN"), A COPY OF WHICH IS ATTACHED AS EXHIBIT "A," FILED BY THE CHAPTER 11 DEBTORS LISTED IN SCHEDULE 2 (THE "DEBTORS"). OTHER THAN CLASS 1 - PRIORITY NON-TAX CLAIMS, CLASS 11- INTERCOMPANY CLAIMS, CLASS 12 - WF CAPITAL EQUITY INTERESTS, AND CLASS 13 - SUBSIDIARY EQUITY INTERESTS, WHICH ARE UNIMPAIRED UNDER THE PLAN AND ARE THEREFORE DEEMED TO HAVE ACCEPTED THE PLAN, ALL CLASSES ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. ACCORDINGLY, THE DEBTORS ARE SOLICITING ACCEPTANCES OF THE PLAN FROM THE HOLDERS OF ALL CLAIMS AND INTERESTS, OTHER THAN THOSE HOLDING CLASS 1 - PRIORITY NON-TAX CLAIMS, CLASS 11- INTERCOMPANY CLAIMS, CLASS 12 - WF CAPITAL EQUITY INTERESTS, AND CLASS 13 - SUBSIDIARY EQUITY INTERESTS.

THE DEBTORS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALL CLASSES OF CLAIMS AND EQUITY INTERESTS. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN. TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND RECEIVED BY 4:00 p.m. PREVAILING PACIFIC TIME ON JANUARY [XX], 2011 (THE "VOTING DEADLINE").

FOR YOUR ESTIMATED PERCENTAGE RECOVERY UNDER THE PLAN, PLEASE SEE THE CHART SET OUT IN "OVERVIEW OF THE PLAN – SUMMARY OF DISTRIBUTIONS UNDER THE PLAN."

# II.

## NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.

PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND TO THIS DISCLOSURE STATEMENT.  THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.  IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE BANKRUPTCY RULES AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS AND DEBTORS IN POSSESSION IN THESE CASES.

On [December 15], 2010, after notice and a hearing, the Bankruptcy Court issued the Disclosure Statement Order approving the Disclosure Statement because it contains information of a kind, in sufficient detail, and adequate to enable a hypothetical, reasonable investor typical of the solicited classes of Claims of the Debtors to make an informed judgment with respect to the acceptance or rejection of the Plan (a true and correct copy of the Plan is annexed hereto as **Exhibit A**).  The Disclosure Statement Order is attached hereto as **Exhibit B** and should be referred to for details regarding the procedures for the solicitation of votes on the Plan.  **APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting.  No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code.  Except for the Debtors and certain of the professionals the Debtors have retained, no person has been authorized to use or promulgate any information concerning the Debtors, their businesses, or the Plan other than the information contained in this Disclosure Statement and if given or made, such information may not be relied upon as having been authorized by the Debtors.  You should not rely on any information relating to the Debtors, their businesses, or the Plan other than that contained in this Disclosure Statement and the exhibits hereto.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot and return the same to the address set forth on the Ballot, in the enclosed return envelope so that it will be received by the Balloting Agent, no later than the Voting Deadline.

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT**

You may be bound by the Plan if it is accepted by the requisite holders of Claims even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a Confirmation Hearing on **January [XX], 2011,** at **[XX:XX]** X.m., Prevailing Eastern Time, before the Honorable Stephen C.  St.  John, United States Bankruptcy Judge.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before **January [XX], 2011 at XX:XX X.m**, Prevailing Eastern Time in the manner described in the Disclosure Statement Order.

**THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN**

## III.

## EXPLANATION OF CHAPTER 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code, pursuant to which a debtor in possession may reorganize its business for the benefit of its creditors, equity holders, and other parties in interest.  The formulation of a plan of reorganization is the principal purpose of a Chapter 11 case.  The plan sets forth the means for satisfying the holders of claims against and interests in the debtor's estate.

Although referred to as a plan of reorganization, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets.  In either event, upon confirmation of the plan, it becomes binding on a debtor and all of its creditors and equity holders, and the obligations owed by a debtor to such parties are compromised and exchanged for the obligations specified in the plan.

After a plan of reorganization has been filed, the holders of impaired claims against and interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. **This Disclosure Statement is presented to holders of Claims against and Equity Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the solicitation of votes by the Debtors on the Plan.**

The bankruptcy court may confirm a plan of reorganization even though fewer than all the classes of impaired claims and equity interests accept such plan. For a plan of reorganization to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan. **The Plan has been structured so that it will satisfy the foregoing requirements as to any rejecting class of Claims and can therefore be confirmed, if necessary, over the objection of any (but not all) classes of Claims.**

## IV.

## OVERVIEW OF THE PLAN

The Plan provides for the treatment of Claims against and Equity Interests in all of the Debtors in <u>In re Workflow Management, Inc.</u>, <u>et al.</u>, Chapter 11 Case No. 10-74617(SCS), Jointly Administered. These cases have not been substantively consolidated, nor does the Plan seek to substantively consolidate the Debtors.

## A. Summary of the Terms of the Plan.

The Plan implements and is built around the following key elements:

- payment in full of all creditors through (i) payment in Cash of certain Claims in accordance with the terms of the Plan; (ii) reinstatement of all legal, equitable and contractual rights for certain Claims; (iii) reinstatement of terms of the Unsecured Notes, absent any rights provided due to defaults that occurred or were continuing on or prior to the Petition Date; and (iv) the modification of the terms of (a) the First Lien Credit Facility and (b) the Second Lien Credit Facility, on substantially the terms provided in schedule 1 to the Plan and schedule 2 to the Plan;

- the preservation of Intercompany Claims, the Workflow Equity Interests and the Subsidiary Equity Interests;

- the preservation of the substantial net operating loss carryforward of the Debtors; and

4

- obtaining the unsecured Exit Loan on substantially the terms provided in schedule 3 to the Plan.

The Plan reflects, in the view of the Debtors, a reasonable and appropriate compromise that permits the value of the Debtors' business to be maximized and allows for the payment in full of all creditors, other than those who may choose to negotiate differing treatment with the Debtors.

**B.      Summary of Distributions Under the Plan.**

The following is a summary of the distributions proposed under the Plan. It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as **Exhibit A.**

The claim amounts set forth below are based on information contained in the Debtors' Schedules and reflect what the Debtors believe to be reasonable estimates of the likely resolution of outstanding Claims. The amounts utilized may differ from the outstanding filed claims amounts.

The following chart summarizes the distribution to each class under the Plan:

**UNCLASSIFIED CLAIMS**

| **Classes of Claims** | **Treatment of Classes of Claims** |
| --- | --- |
| Administrative Expense Claims (includes costs of the chapter 11 proceedings for the Debtors and expenses of operation as specified in section 503(b) and 507(a)(2) of the Bankruptcy Code including Fee Claims, Claims arising after the Petition Date, obligations with respect to assumed executory contracts and leases, and any outstanding statutory fees). <br><br> Estimated Claims:  Undetermined | On the Distribution Date, each holder of an Allowed Administrative Expense Claim shall receive in full satisfaction of such Claims (i) the amount of such holder's Allowed Administrative Expense Claim in one Cash payment, or (ii) such other treatment as may be agreed upon in writing by the Debtors and such holder; provided, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim; provided, further, that an Administrative Expense Claim representing a liability incurred postpetition in the ordinary course of business of the Debtors may be paid at the Debtors' election in the ordinary course of business. <br><br> **Estimated Recovery:  100% of Allowed Claim.** |
| Priority Tax Claims (includes all Claims entitled to priority under section 507(a)(8) of the Bankruptcy Code). <br><br> Estimated Claims:  Approximately $[1.5] | Unless otherwise agreed with a holder of an Allowed Priority Tax Claim, the Debtors, in their sole discretion, may choose whether Allowed Priority Tax Claims will be paid either: (i) in Cash, in an aggregate amount equal to |

| million | such Allowed Priority Tax Claim, together with interest from the Effective Date at a fixed annual rate equal to five percent (5%) and paid in regular installments of equal amount over a period not exceeding five (5) years from the Petition Date; or (ii) in full in Cash on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim. The Debtors reserve the right to prepay, without penalty, at any time under option (i) above. Alternatively, a holder of an Allowed Priority Tax Claim may elect to receive the same treatment of its Claims as is offered to holders of Allowed General Unsecured Claims as provided in Article 5.5 of the Plan. |
| | **Estimated Recovery: 100% of Allowed Claim.** |

### CLASSIFIED CLAIMS AND INTERESTS

| **Classes of Claims and Interests** | **Treatment of Classes of Claims and Interests** |
|---|---|
| Class 1 – Priority Non-Tax Claims | Unimpaired. |
| Estimated Claims: Approximately $[300,000] | Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of each Allowed Priority Non-Tax Claim, each Allowed Priority Non-Tax Claim shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Claim entitles the holder in respect of such Claim shall be fully reinstated and retained, and such Allowed Priority Non-Tax Claim (including any amounts to which such holder is entitled pursuant to section 1124(2) of the Bankruptcy Code) shall be paid in full in accordance with such reinstated rights on the Effective Date. |
| | **Estimated Recovery: 100% of Allowed Claims.** |

| | |
|---|---|
| Class 2 – First Lien Debt Claims | Impaired. |
| Estimated Claims:  Approximately $[108.1] million | Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of each Allowed First Lien Lender Claim, each holder of an Allowed First Lien Lender Claim shall retain the liens securing its First Lien Lender Claim and receive deferred cash payments totaling at least the amount of such Allowed First Lien Lender Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in each Debtor's interest in such property, in the amounts and on the terms indicated on schedule 1 of the Plan. |
| | **Estimated Recovery:  100% of Allowed Claims.** |
| Class 3 – First Lien Debt Claims of Cross Lien Holders | Impaired. |
| Estimated Claims:  Approximately $[38.4] million | Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of such holder's Allowed First Lien Lender Claim, each holder of an Allowed First Lien Lender Claim that is a Cross Lien Holder shall retain the liens securing its First Lien Lender Claim and receive deferred cash payments totaling at least the amount of such Allowed First Lien Lender Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in each Debtor's interest in such property, in the amounts and on the terms indicated on schedule 1 of the Plan. |
| | **Estimated Recovery:  100% of Allowed Claims.** |
| Class 4  – Second Lien Debt Claims | Impaired. |
| Estimated Claims:  Approximately $[68.6] million | Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of such holder's Allowed Second Lien Lender Claim, each holder of an Allowed Second Lien Lender Claim shall retain the liens securing its Second Lien Lender Claim and receive deferred cash payments totaling at least the amount of such Allowed Second Lien Lender Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in each Debtor's |

interest in such property, in the amounts and on the terms indicated on schedule 2 of the Plan.

**Estimated Recovery:  100% of Allowed Claims.**

| | |
|---|---|
| Class 5  – Second Lien Debt Claims of Cross Lien Holders<br><br>Estimated Claims:  Approximately $[127.9] million | Impaired.<br><br>Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of such holder's Allowed Second Lien Lender Claim, each holder of an Allowed Second Lien Lender Claim that is a Cross Lien Holder shall retain the liens securing its Second Lien Lender Claim and receive deferred cash payments totaling at least the amount of such Allowed Second Lien Lender Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in each Debtor's interest in such property, in the amounts and on the terms indicated on schedule 2 of the Plan.<br><br>**Estimated Recovery:  100% of Allowed Claims.** |
| Class 6 – Other Secured Claims<br><br>Estimated Claims:  Undetermined | Impaired.<br><br>Except to the extent that the holder agrees to less favorable treatment, each holder of an Allowed Other Secured Claim against any Debtor shall, at the sole option of the Debtor obligated for the payment of such Allowed Other Secured Claim, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, (i) receive from such Debtor on the Distribution Date, Cash equal to the Allowed amount of such claim; (ii) retain its lien in such property, or the proceeds of such property, securing such Allowed Other Secured Claim and be paid in the ordinary course of business in accordance with the terms existing between the Debtors and such holder with respect to such Allowed Other Secured Claim prior to the Petition Date; (iii) retain its lien in such property, or the proceeds of such property, securing such Allowed Other Secured Claim and receive deferred cash payments totaling at least the amount of such Allowed Other Secured |

Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in each Debtor's interest in such property; or (iv) be transferred the collateral securing such Claim, each in full and complete satisfaction of such claim.

**Estimated Recovery: 100% of Allowed Claims.**

Class 7 – General Unsecured Claims

Impaired.

Estimated Claims: Approximately $[12.7] million (not including claims to be paid in the ordinary course of business)[2]

Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of each Allowed General Unsecured Claim (subject to section 12.3 of the Plan), each holder of an Allowed General Unsecured Claim shall receive, in the sole discretion of the Debtors, either (i)(a) on the Distribution Date, a Cash payment in an amount equal to fifty percent (50%) of the amount of such holder's Allowed General Unsecured Claim, without interest, and (b) sixty (60) days after the Distribution Date, an additional Cash payment in an amount equal to fifty percent (50%) of the amount of such holder's Allowed General Unsecured Claim, without interest; or (ii) payment in the ordinary course of business in accordance with the terms existing between the Debtor and such holder with respect to such Allowed General Unsecured Claim prior to the Petition Date.

**Estimated Recovery: 100% of Allowed Claims.**

Class 8 – Lease Rejection Damage Claims

Impaired.

Estimated Claims: Approximately $[2.1] million

Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of each Lease Rejection Damage Claim, each holder of an Allowed Lease Rejection Damage Claim will receive, in the sole discretion of the Debtors, either (i)(a) on the Distribution Date, a

---

[2] This estimate may include amounts that are due and owing on account of executory contracts that may be assumed. To the extent such contracts are assumed, such Cure Costs would reduce the estimated amount of General Unsecured Claims.

Cash payment in an amount equal to fifty percent (50%) of the amount of such holder's Allowed Lease Rejection Damage Claim, without interest, and (b) sixty (60) days after the Distribution Date, an additional Cash payment in an amount equal to fifty percent (50%) of the amount of such holder's Allowed Lease Rejection Damage Claim, without interest; or (ii) on the Distribution Date, a Cash payment in the amount of 1/12th of the amount of such holder's Allowed Lease Rejection Damage Claim, without interest, and additional Cash payments in the amount of 1/12th of such holder's Allowed Lease Rejection Damage Claim, without interest, on the last Business Day of each calendar month for the subsequent eleven calendar months beginning in the calendar month that is after the month in which the Distribution Date occurs.

**Estimated Recovery: 100% of Allowed Claims.**

| | |
|---|---|
| Class 9 – Unsecured Note Claims | Impaired. |
| Estimated Claims: Approximately $[91.1] million | Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of each Allowed Unsecured Note Claim, each Allowed Unsecured Note Claim shall be, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Unsecured Note Claim, reinstated, without interest during the pendency of the Chapter 11 Cases and notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Unsecured Note Claim to demand or receive payment of such Unsecured Note Claim prior to its stated maturity from and after the occurrence of a default, interest at an increased rate from and after the occurrence of a default, or any other right or benefit provided to such holder from and after the occurrence of a default. |

**Estimated Recovery: 100% of Allowed Claims.**

| | |
|---|---|
| Class 10 – Unsecured Contingent Claims | Impaired. |
| | Except to the extent that the holder agrees to less |

Estimated Claims: Undetermined

favorable treatment, each Allowed Unsecured Contingent Claim shall receive, upon the Allowed Unsecured Contingent Claim becoming a liquidated, fixed, and non-contingent claim, in the sole discretion of the Debtors, (i)(a) thirty (30) days after such date, a Cash payment in an amount equal to fifty percent (50%) of the amount of such holder's Allowed Unsecured Contingent Claim, without interest, and (b) sixty (60) days after such date, an additional Cash payment in an amount equal to fifty percent (50%) of the amount of such holder's Allowed Unsecured Contingent Claim, without interest; or (ii) all of the legal, equitable and contractual rights to which such Claim entitles the holder in respect of such Claim shall be fully reinstated and retained.

**Estimated Recovery: 100% of Allowed Claims.**

Class 11 – Intercompany Claims

Unimpaired.

Each Allowed Intercompany Claim shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Claim entitles a holder in respect of such Claim shall be fully reinstated and retained.

**Estimated Recovery: 100% of Allowed Claims.**

Class 12 – WF Capital Equity Interests

Unimpaired

Each Allowed WF Capital Equity Interest shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Equity Interest entitles the holder in respect of such Equity Interest shall be fully reinstated and retained.

| | |
|---|---|
| Class 13 – Subsidiary Equity Interests | Unimpaired |
| | Each Allowed Subsidiary Equity Interest shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Equity Interest entitles a holder in respect of such Equity Interest shall be fully reinstated and retained. |
| Class 14– Convenience Claims | Impaired |
| Estimated Claims: Approximately $[1.4] million | Each holder of an Allowed Convenience Claim shall receive on the Distribution Date a single Cash payment in an amount equal to one hundred percent (100%) of such holder's Allowed Convenience Claim, without interest. |
| | **Estimated Recovery: 100% of Allowed Claims.** |

Claims against any of the Debtors (excluding Claims for principal and interest based on a note issued under any indenture, loan agreement, or credit agreement) that otherwise would be General Unsecured Claims that are either (i) in an amount that is equal to or less than $2,000 or (ii) in an amount greater than $2,000, but whose holder has agreed on its Ballot to reduce its Claim to the amount of $2,000, will be treated as Convenience Class Claims. Each holder of an Allowed Convenience Class Claim will receive on the Distribution Date, in full and final satisfaction of such Allowed Claim, a single Cash payment in an amount of the lesser of (i) the actual amount of its Allowed Claim, or (ii) $2,000, regardless of the actual amount of its Allowed Claim.

# V.

## GENERAL INFORMATION

The Debtors consist of WF Capital, and 20 of its direct and indirect subsidiaries. The chart below depicts the corporate structure of Workflow and its subsidiaries as of the date of this Disclosure Statement.

Workflow Organizational Chart



## A. A History of the Debtors.

Newport News Printing, founded in Virginia in 1912, is one of the earliest predecessors of the Debtors (collectively, the "Company"). Standard Forms, Inc. ("SFI"), another early predecessor of the Company, was founded in Virginia in 1927. Another predecessor company, United Envelope LLC ("United") was founded in 1932 and later combined with SFI. Headquartered in Norfolk, Virginia, the Company continued to grow through acquisitions, and in early 1997, SFI and United were acquired by US Office Products ("USOP") to form its print management division.

In June 1998, the print management division of USOP spun off as a public company called Workflow Management, Inc. ("WMI") and began trading under the ticker symbol "WORK." Between 1998 and 2001, WMI completed approximately 28 acquisitions.

In April 2004, WMI was taken private. WF Holdings, Inc. ("WF Holdings"), an entity formed and controlled by investment funds managed or controlled by Perseus, L.L.C., a private equity fund manager, and an individual investor acquired substantially all of the outstanding common stock of WMI and its subsidiaries (the "Workflow Merger"). As a result of the Workflow Merger, WMI became a wholly owned subsidiary of WF Holdings.

On November 30, 2005, The Relizon Company ("Relizon") was acquired by the Company. Relizon also had a long company history, starting as part of Reynolds and Reynolds in 1866.

In connection with the acquisition of Relizon, WF Holdings' ownership was transferred to WF Capital. WF Capital is owned by certain investment funds managed or controlled by Perseus, L.L.C. and two financial institutions unrelated to Perseus, L.L.C. WF Capital is the ultimate parent of the Debtors and has its principal place of business in Norfolk, Virginia.

## B. The Businesses of the Debtors.

The Company is one of the leading providers of printed business documents, print-related services and promotional marketing solutions in North America. The Company offers clients a wide range of print-related products and services including business documents, electronic print and mail solutions, promotional marketing products, label solutions, sales and marketing materials and distribution services.

The Company operates a nationwide network of approximately 49 offices, 17 distribution centers and 9 plants with over 2.8 million square feet of capacity and more than 200 manufacturing assets including the latest in digital technology, offset and rotary processes, complete bindery and finishing capabilities, as well as sophisticated systems for distribution kitting and fulfillment. With its national footprint, the Company generated approximately $661 million of revenue and $61.5 million in adjusted EBITDA in 2009.

The Company has a diverse client base of approximately 10,000 active clients in a variety of industries, including healthcare, financial services, manufacturing and retail. The

Company has approximately 300 sales personnel and approximately 2,200 total employees nationwide.

The Company sources its products through both in-house manufacturing facilities and an extensive network of external trade partners. The mix of internally versus externally-sourced products is well balanced with approximately 50% of revenue being sourced externally and 50% manufactured in-house. The result is a relatively asset-light operating model with high operating leverage and low capital expenditure requirements.

The Company is a recognized industry leader in print, print-related, and promotional marketing solutions. In August 2010, it was ranked as the "Top Distributor of 2009" by Print Solutions magazine, the premier publication for the print distribution industry. Additionally, Print Professional magazine named the company "Top Distributor of 2009" for the fourth year in a row, while Printing Impressions magazine ranked the company 11th in their annual Printing Impressions 400. Further, the Company was recognized by Premier Healthcare Alliance and awarded with the Supplier Performance Award and prior, named Top 40 Distributor for 2009 in promotional products by Promo Marketing Magazine. It was also ranked by the Advertising Specialty Institute and Counselor Magazine as the nation's 13th largest distributor of promotional products, rising above their prior position of 15th in 2008.

## C.   Prepetition Capital Structure.

### (i)   Debtors' Equity Structure.

On the Petition Date, Perseus, L.L.C. and its affiliates owned approximately 98.8% of the outstanding stock of WF Capital. The remaining 1.2% of the outstanding stock of WF Capital was owned by certain investment funds unrelated to Perseus, L.L.C. The Second Lien Lenders hold warrants for approximately 15.5% of the common stock of WF Capital.

On the Petition Date, WF Capital held 96.9% of the stock of WF Holdings, Inc., with employees holding the remaining 3.1% of that stock as restricted shares which have limited transferability. All of the other Subsidiary Equity Interests are held by the direct parent(s) of each subsidiary.

### (ii)   Debtors' Prepetition Secured Credit Facilities.

#### (1)   First Lien Credit Facility.

On November 30, 2005, WMI, as borrower, and each of the other Debtors as guarantors, except WF Capital, entered into the First Lien Credit Agreement, which provided for the First Lien Credit Facility. The First Lien Credit Facility consisted of (i) a Term Loan Facility, in the initial principal amount of $275 million with a final maturity on November 30, 2011, and (ii) a Revolving Credit Facility, in the maximum committed amount, as amended, of approximately $35 million. The Revolving Credit Facility has two tranches, Revolver A in the amount of approximately $23.4 million, which matures on May 31, 2011, and Revolver B in the amount of approximately $6.8 million, which has a stated maturity date of November 30, 2010. Revolver B is held by SPCP Group, LLC, an affiliate of Silver Point Finance LLC. Other affiliates of Silver Point Finance LLC hold approximately $26 million of the First Lien Credit

Facility. The Revolving Credit Facility included a subfacility for Letters of Credit, pursuant to which $4.3 million[3] in face amount of Letters of Credit are currently outstanding. Prior to the Petition Date $4,819,000 was outstanding on account of Letters of Credit. Additionally, as part of the Fifth Amendment to the First Lien Credit Facility, Relizon purchased a participation in Revolver A in the amount of $5 million. That participation requires that that Debtor's interest in Revolver A be repaid after all other amounts due under the First Lien Credit Facility have been paid. Pursuant to an amendment to the First Lien Credit Facility dated April 30, 2009, the Borrower was no longer permitted to borrow revolving loans or, with certain exceptions, obtain new Letters of Credit under the Revolving Credit Facility. As such, since May 2009, the Debtors have been operating solely on cash flow without access to liquidity under the Revolving Credit Facility.

Prior to the Petition Date, outstanding loans under the First Lien Credit Facility accrued interest at a per annum rate of 8% (7.5% was paid in Cash, and 0.5% was capitalized). Outstanding Letters of Credit accrue a fee of 5% per annum on the outstanding face amount thereof.

Pursuant to the First Lien Credit Agreement, the Loan Parties granted a first priority security interest to the First Lien Agent (for the benefit of the First Lien Secured Parties) in substantially all of (a) the personal property assets of such Loan Party, other than (i) 35% of the capital stock of a non-debtor foreign subsidiary and (ii) certain other excluded property, including the Ohio Equipment (defined below); and (b) three Mortgages (as defined in the First Lien Credit Agreement) encumbering certain real property.

As of the Petition Date, the aggregate outstanding First Lien Loan Obligations (including undrawn Letters of Credit) totaled approximately $146.5 million, consisting of: (a) approximately $111.5 million principal amount of loans outstanding under the Term Loan Facility; (b) approximately $30.2 million principal amount of loans outstanding under the Revolving Credit Facility; and (c) approximately $4.8 million in undrawn face amount of Letters of Credit.

On the projected Effective Date, January 31, 2011, the Debtors believe that the aggregate outstanding First Lien Loan Obligations will total $141.5 million. As part of the Plan, the Debtors anticipate retiring the participation owned by The Relizon Company in Revolver A, which The Relizon Company purchased in connection with the Fifth Amendment to the First Lien Credit Facility.

As of the date hereof, under the provisions of the Cash Collateral Orders, interest and Letter of Credit fees on the First Lien Credit Facility are being paid current by the Debtors, at the default rate. In addition, under the Cash Collateral Orders, the legal and professional fees of the First Lien Agent are being paid current by the Debtors. Pursuant to the Cash Collateral

---

[3] This number reflects the amount of undrawn letters of credit as of November 10, 2010. It does not include the Letter of Credit issued to Keystone Urban Renewal ("Keystone") in the amount of $500,000. On October 19, 2010, Keystone drew in full on that Letter of Credit. Nothing in this Disclosure Statement shall be deemed an admission that Keystone's draw on the Letter of Credit was valid or permissible.

Orders, the First Lien Lenders have reserved their rights with respect to the applicable rate that the fees and interest should accrue after the Petition Date. The First Lien Lenders have asserted that interest and Letter of Credit fees should accrue at the default rates under the First Lien Credit Facility, which provides for a 2% increase of the applicable interest rate and fees on outstanding obligations arising under the First Lien Credit Facility.

### (2)    Second Lien Facility.

WMI, as borrower, and each of the other Debtors, except WF Capital, as guarantors, entered into an Amended and Restated Second Lien Credit Agreement dated as of December 19, 2005. Silver Point Finance LLC is the Second Lien Agent. The Second Lien Credit Facility provided for a $140 million second lien term loan facility due November 30, 2012, which is secured by a second priority security interest and lien in the same collateral as the First Lien Credit Facility. Affiliates of the Second Lien Agent hold, in the aggregate, approximately $111 million of the outstanding loans under the Second Lien Credit Facility.

From its inception, the Second Lien Credit Facility provided for interest to be paid largely in Cash, with a small portion to be capitalized, on a quarterly basis. However, due to constraints placed on the Company by the First Lien Lenders, the Company could no longer pay Cash interest on the Second Lien Loan Obligations after December 31, 2008. Instead, from January 1, 2009 to April 1, 2010, all of the interest that would have otherwise been paid in Cash on account of the Second Lien Loan Obligations was capitalized. After April 1, 2010, the Company was required to return to paying the majority of the interest on the Second Lien Loan Obligations in Cash.

As of the Petition Date, loans outstanding under the Second Lien Credit Facility accrued interest at a per annum rate equal to 18% interest (14.75% per annum in cash and 3.25% per annum was capitalized).

As of the Petition Date, the aggregate outstanding Second Lien Loan Obligations totaled approximately $196.5 million (including capitalized interest, accrued but unpaid interest, through September 30, 2010).

As of the projected Effective Date, the aggregate amount of the obligations arising under the Second Lien Credit Facility will be approximately $205 million (including capitalized interest, accrued but unpaid interest, and fees through the projected Effective Date, January 31, 2011).

As of the date hereof , under the Cash Collateral Orders, interest on the Second Lien Credit Facility is accruing, but is not being paid current by the Debtors, at the default rate, subject to section 506(b) of the Bankruptcy Code. In addition, under the Cash Collateral Orders, the legal and professional fees of the Second Lien Agent are being paid current by the Debtors.

### (3)    Credit Facilities' Secured Parties Intercreditor Agreement.

The First Lien Agent and the Second Lien Agent are party to that certain Intercreditor Agreement dated as of November 30, 2005. Pursuant to that agreement, the Second Lien Agent has agreed, on behalf of the Second Lien Secured Parties to, among other things,

subordinate their right to payment and their liens to any liens arising under the First Lien Loan Documents. The Loan Parties acknowledged the Intercreditor Agreement.

### (iii) Other Selected Obligations of the Debtors.

#### (1) WF Capital/BB&T Note.

Pursuant to a loan agreement and note dated as of December 31, 2008, among WF Capital, as borrower, Perseus Market Opportunity Fund, L.P., as guarantor, and Branch Banking and Trust Company ("BB&T"), WF Capital is indebted to BB&T in the principal amount of $20 million. The WF Capital/BB&T Note is not secured by any property of WF Capital or any other Debtor. The WF Capital/BB&T Note is fully secured by certain assets of Perseus Market Opportunity Fund, L.P. If BB&T forecloses on the assets pledged by Perseus Market Opportunity Fund, L.P. to secure the WF Capital/BB&T Note, Perseus Market Opportunity Fund, L.P. will likely be subrogated to the rights of BB&T under the WF Capital/BB&T Note. The interest rate on the WF Capital/BB&T Note is variable. As of the Petition Date, the amount outstanding on account of the WF Capital/BB&T Note was approximately $20 million (not including accrued, but unpaid interest). As of the projected Effective Date, the amount due on account of the WF Capital/BB&T Note will be approximately $20.2 million. No other Debtor is obligated on the WF Capital/BB&T Note.

#### (2) WF Capital/Perseus Convertible Note.

WF Capital is the maker of the WF Capital/Perseus Convertible Note payable to Perseus Partners VII, L.P., dated as of March 4, 2008. The WF Capital/Perseus Convertible Note is unsecured and is subordinated to the WF Capital/BB&T Note. The WF Capital/Perseus Convertible Note is convertible to WF Capital Equity Interests. The WF Capital/Perseus Convertible Note was due September 4, 2009. The WF Capital/Perseus Convertible Note was not paid on its stated maturity date. The WF Capital/Perseus Convertible Note accrues interest at 16% per annum. As of the Petition Date, approximately $58,500,000 (including accrued, but unpaid interest) was owed to Perseus Partners VII, L.P. on account of the WF Capital/Perseus Convertible Note. No other Debtor is obligated on the WF Capital/Perseus Convertible Note.

#### (3) WF Capital/Perseus Interest Note.

WF Capital is the maker of the WF Capital/Perseus Interest Note. The WF Capital/Perseus Interest Note is a demand note payable to Perseus Market Opportunity Fund, L.P., dated as of October 29, 2009. The WF Capital/Perseus Interest Note is unsecured, and subordinated to the WF Capital/BB&T Note. The WF Capital/Perseus Interest Note accrues interest at 12% per annum. Prior to the Petition Date, Perseus Market Opportunity Fund, L.P. did not present the WF Capital/Perseus Interest Note for payment. As of the Petition Date, approximately $300,000 (including accrued, but unpaid interest) was owed to Perseus Market Opportunity Fund, L.P. on account of the WF Capital/Perseus Interest Note. No other Debtor is obligated on the WF Capital/Perseus Interest Note.

### (4)    WF Holdings/Carlyle Note.

WF Holdings is the maker of the WF Holdings/Carlyle Note.  The WF Holdings/Carlyle Note is a seller subordinated promissory note payable to the Holder Representative defined therein for the benefit of the beneficial holders indentified on schedule I thereto dated December 21, 2006.  The WF Holdings/Carlyle Note matures on May 29, 2013.  The WF Holdings/Carlyle Note is unsecured and subordinated in right of payment to the First Lien Loan Obligations and the Second Lien Loan Obligations.  The WF Holdings/Carlyle Note accrues interest at 12% per annum.  As of the Petition Date, approximately $12,500,000 (including accrued, but unpaid interest) was owed by WF Holdings to the holder of the WF Holdings/Carlyle Note.  No other Debtor is obligated on the WF Holdings/Carlyle Note.

### (5)    Workflow Management/Perseus Note.

WMI is the maker of the Workflow Management/Perseus Note payable to Perseus Market Opportunity Fund, L.P.  The Workflow Management/Perseus Note is due February 6, 2011 (or any earlier date that the loans under the Second Lien Credit Agreement become due and payable).  The Workflow Management/Perseus Note is unsecured and subordinated in right of payment to the First Lien Loan Obligations and the Second Lien Loan Obligations.  The Workflow Management/Perseus Note accrues interest at 8% per annum.  As of the Petition Date, approximately $1.1 million (including accrued, but unpaid interest) was owed by WMI on account of the Workflow Management/Perseus Note.  No other Debtor is obligated on the Workflow Management/Perseus Note.

### (6)    The Relizon Ohio Development Loan.

On January 31, 2003, Relizon entered into a loan agreement with the State of Ohio Director of Development (the "Ohio Director"), which provided for the $800,000 Ohio Development Loan.  The Ohio Development Loan was used to finance a portion of the purchase price of certain equipment purchased by Relizon and located at a Relizon facility in Coldwater, Ohio.  The Ohio Development Loan matures on January 31, 2013.  Pursuant to a Security Agreement dated as of January 31, 2003, by Relizon in favor of the Ohio Director, Relizon granted a security interest in the Ohio Equipment to secure the Ohio Development Loan and agreed not to further encumber the Ohio Equipment.  The interest rate applicable to the Ohio Development Loan is 3% per annum, plus a service fee of 0.25% per annum.  The indebtedness outstanding on account of the Ohio Development Loan as of the Petition Date was approximately $233,000 (including accrued, but unpaid interest).  No other Debtor is obligated on the Ohio Development Loan.

### (7)    Capital Leases.

Certain Debtors also are party to certain capital leases of personal property with various entities.  There is approximately $325,000 in aggregate amounts remaining to be paid to the lessors of such leased property pursuant to these capital leases.

## (8) Pension Obligations.

One of the Debtors, Relizon, maintains The Relizon Company Retirement Plan, an ERISA-qualified defined benefit retirement plan (the "Pension Plan") for its employees, effective as of January 1, 2001. Effective July 1, 2001, all employees of The Relizon Company were eligible to participate in the Pension Plan on their date of hire, with different eligibility rules for those hired before such date. One-hundred percent vesting in the Pension Plan occurs after 5 years of service with The Relizon Company, or any predecessor company. The Relizon Company makes all of the contributions to the Pension Plan, with employees making no contributions to the Pension Plan. The Pension Plan is administered by The Workflow Management Benefit Plan Administrative Committee.

As of the date hereof, approximately 1,203 current employees participate in the Pension Plan, and a total of approximately 2,426 individuals participate in the Pension Plan. In July 2002, the Pension Plan was frozen as to new participants. In December 2006, the benefit levels of the Pension Plan were frozen.

The Pension Plan is currently underfunded in the approximate amount of $32 million based on actuarial calculations as of December 31, 2009. All contributions to the Pension Plan have been timely made by the Debtors, and under the Plan, the Pension Plan is unaffected.

## D. Pre-Filing Restructuring Efforts.

In 2006 and 2007, following the acquisition of The Relizon Company in late 2005, the Company was focused on integrating the companies and rationalizing their business operations. Then, in late 2008, the global economic credit crisis began to negatively impact the print industry resulting in an industry-wide decrease of 14.8% in print shipments in 2009. These factors also negatively impacted the Company's business operations.

In late 2008 and early 2009, the Company was faced with severe liquidity challenges and had declining EBITDA. At that time, the Company upgraded its management team and began implementing a transformation plan (the "Transformation Plan") to improve its profitability and liquidity going forward. The Company has continued to successfully execute the Transformation Plan through 2010.

The goals of the Transformation Plan are three-fold: (i) to improve the profitability of the Company, (ii) to improve liquidity, and (iii) to pursue disciplined and organic growth of the Company.

To improve profitability, the Transformation Plan has optimized the cost structure and reduced costs by: (i) rightsizing the organization through headcount reductions and aligning employee pay to market, (ii) centralizing the field client service organization and improving processes, (iii) consolidating the national manufacturing and distribution footprint, closing redundant locations and eliminating excess capacity, (iv) eliminating excess office space, (v) improving workforce productivity through the implementation of lean manufacturing practices

and process improvements, (vi) reducing sourcing costs by leveraging the Company's spend, and (vii) improving pricing practices and customer profitability.

The Transformation Plan has improved liquidity through reductions in working capital and inventories, improvement in past due receivables collections and days sales outstanding, and the sale of non-core assets.

The Transformation Plan is also focused on repositioning the Company for organic growth by: (i) increasing sales force effectiveness and productivity, (ii) realigning resources to focus on growing the number and size of strategic accounts, (iii) implementing improved sales and pipeline reporting tools and processes, (vi) implementing a more disciplined client service program to improve service while increasing selling time in the field, (v) upgrading sales leadership talent and the overall quality of the Company's sales force, (vi) expanding revenue share within the Company's existing client base by focusing on cross-selling various products and solutions, targeting large clients, and focusing on expanding the Company's relationships to other divisions, entities or hospitals within the group, and (vii) strengthening the Company's key solution offerings to drive growth of high potential solutions including digital marketing, labels, promotional products, business process outsourcing, and distribution and logistics services.

Since implementing the Transformation Plan, the Company has achieved $73 million in annual run rate savings by (i) rationalizing and closing 30 plants, distribution centers and offices, (ii) leveraging purchasing expenditures, (iii) reducing SG&A spending by 22%, and (iv) implementing operational efficiencies. Overall, the Company has reduced headcount by approximately 22.3% and reduced salaries and benefits for certain employees, saving the Company approximately $24 million in total annual payroll costs. The Company also closed its corporate headquarters in Stamford, Connecticut, and centralized its corporate management and certain of the other Debtors in Dayton, Ohio, where the majority of the management staff of The Relizon Company was located at the time it was acquired. The principal place of business of certain of the Debtors, however, remains Norfolk, Virginia. This restructuring effort undertaken pursuant to the Transformation Plan has led to significant improvement in financial results and a permanent reduction in operating costs.

Additionally, working capital has been reduced by approximately $30 million through inventory reductions, reduction in past due receivables and improved days sales outstanding. The sale of certain non-core businesses, including the assets and operations of United Envelope, LLC and Freedom Graphics Services, Inc., and the sale of a Florida plant provided approximately $11.7 million, net of expenses, in aggregate proceeds, freeing up capital and improving operating flexibility.

For the twelve months ended December 31, 2009, the Company generated net revenue of approximately $661.5 million and adjusted EBITDA of $61.5 million, or 9.3% adjusted EBITDA margin, as compared to 2008 adjusted EBITDA of $48.2 million, an adjusted EBITDA increase of 28% and 350bps on an adjusted EBITDA margin basis. In addition, projected savings from the Transformation Plan are expected to add an estimated $10 million of incremental EBITDA on an annual run-rate basis in subsequent years. For the twelve months

ended December 31, 2009, compared to the twelve months ended December 31, 2008, there was a reduction of 61.9% in capital expenditures. Unlevered cash flow in 2009 was $54.6 million, 48% better than 2008.

Since implementing the Transformation Plan, the Company has delivered approximately $89.7 million to First Lien Lenders, which is comprised of: $55 million in amortization payments, $17.7 million in interest payments, $10 million in a Revolver A pay down and commitment reduction, $2 million in proceeds from assets sales, and $5 million in fees paid or accrued.

The Transformation Plan has not been completed, however, and the Debtors need additional time and effort to maximize the benefits for all parties in interest in these cases. While the Company has demonstrated great success in cutting costs and improving efficiencies, the Company has faced recent challenges with respect to revenue generation. These challenges have resulted from the combination of a number of factors, including long term secular decline in industry demand, continued softness in the general economy, insufficient capital available to fund growth initiatives, and a vigorous competitive environment. The Company has responded to these challenges with an aggressive new revenue generation plan, involving changes in the structure, training and incentives of the sales force, creation of sales groups focusing on industry verticals, development and expansion of expertise in particular product and customer solution initiatives, and planning for capital expenditures to take advantage of the growing demand for digital printing capability. Upon restructuring the Company pursuant to the Plan, the Debtors will continue to implement the Transformation Plan.

## E.    Events Leading to the Filing of the Chapter 11 Cases.

The Company has an integrated network of suppliers, vendors and customers on which the Company relies in order to continue to operate as a going concern. It was apparent, prior to the Petition Date, that the Company's cash flow could support the Company's business operations, but for the amortization and interest payments required under the First Lien Credit Facility and the Second Lien Credit Facility. Key to the Company's success is retaining the business that the Company has developed with their suppliers, vendors and customers. As such, the Company sought to renegotiate the terms of the First Lien Credit Agreement and Second Lien Credit Agreement or refinance those agreements prior to the Petition Date.

In the fourth quarter of 2008, the Company's liquidity was greatly constrained due to the global credit crisis and its effect on the Company's businesses. Due to these liquidity constraints and the failure of a real property sale transaction to close, the Company did not make required interest payments under the First Lien Credit Facility on December 31, 2008.

In January 2009, the Company entered into forbearance agreements with the First Lien Secured Parties and the Second Lien Secured Parties. Pursuant to those forbearance agreements, interest on the Second Lien Credit Facility was capitalized in full and was not paid in Cash by the Company. The capitalization of all of the accrued interest on the Second Lien Credit Facility lasted for approximately16 months. In early 2009, SilverPoint replaced Credit Suisse, Cayman Island Branch, as the Second Lien Agent.

During the second quarter of 2009, the Company amended the First Lien Credit Agreement and the Second Lien Credit Agreement to obtain covenant relief and certain other changes to the First Lien Credit Agreement and the Second Lien Credit Agreement. While theses amendments provided immediate relief for the Company, the Company knew that this covenant relief would not provide a long-term solution. At the same time, Perseus contributed approximately $4.25 million to the Company to facilitate the amendments to the First Lien Credit Agreement and the Second Lien Credit Agreement.

Through the summer of 2009, the Company sought ways to rationalize the capital structure and operations of the Company. During the autumn of 2009, the Company believed that constrictions in the credit markets had begun to ease, which would permit them to restructure and/or refinance the obligations due under the First Lien Credit Facility and the Second Lien Credit Facility. The Company retained Morgan Stanley to facilitate such a transaction for the Company.

Morgan Stanley was prepared to organize a high-yield bond transaction that would provide for the payment of the First Lien Credit Facility in full, and a substantial pay-down of the Second Lien Credit Facility. This proposed high-yield transaction would have provided for a needed restructuring of the Company's balance sheets and operating liquidity sufficient to complete the operational transformation. Consent from the Second Lien Secured Parties was required to undertake the high-yield transaction. However, an agreement with the Second Lien Secured Parties that would have permitted the transaction could not be reached.

In the spring of 2010, the Company sought and reached an agreement with certain of the First Lien Lenders with respect to extending the maturity date of Revolver A principal, but was not able to reach an agreement with one First Lien Lender with respect to an extension of the maturity of the Revolver B principal.

After the Company was unable to organize a high-yield transaction, it explored a refinancing transaction which would have refinanced the First Lien Credit Facility. However, the Company was not able to obtain agreement with the Second Lien Secured Parties on a satisfactory refinancing transaction. Thus, the Company was unable to obtain the long-term relief it needed to rationalize its operations and its debt structure.

As a result of the inability to restructure the First Lien Credit Facility and the Second Lien Credit Facility, the Company's payment obligations during the final quarter of 2010, had they been made, would have resulted in a severe lack of liquidity, which necessitated the filing of these chapter 11 cases.[4] Specifically, on September 30, 2010, the Company would have been required to make: (i) an approximately $10.3 million payment of principal on the First Lien Credit Facility; (ii) an approximately $7.1 million payment for interest on the Second Lien Credit Facility on November 4, 2010; (iii) an approximately $6.9 million principal payment on Revolver B on November 30, 2010; and (iv) another approximately $13 million payment of

---

[4] The Debtors made an interest payment of $2.7 million to the First Lien Lenders immediately prior to the Petition Date.

principal and interest on the First Lien Credit Facility on December 31, 2010.  Further, the stated maturity of the WF Capital/BB&T Note is December 31, 2010.

Due to the inability of the Company to unilaterally alter the timing of the payment obligations under the First Lien Credit Facility and the Second Lien Credit Facility, the Company was forced to either default on these obligations and risk the First Lien Lenders and Second Lien Lenders seeking to foreclose on their collateral, or to seek bankruptcy protection. The Debtors sought bankruptcy protection on the Petition Date in order to avoid the consequences of default, operate in the ordinary course of business, and maintain their going concern value for the benefit of all of its parties in interest.

Since the Petition Date, the Debtors have continued to operate their business as debtors in possession.  Shortly after the commencement of the Chapter 11 Cases, the Debtors sought, and the Bankruptcy Court authorized the Debtors, to use Cash Collateral on an interim basis.  With the use of Cash Collateral on an interim basis, and the authority the Debtors received to pay certain essential vendors, shippers and warehousemen, and customer obligations, the Company has operated its businesses in the ordinary course.  This has permitted the Company to maintain its going concern value because it has preserved its relationships with its various customers, vendors and suppliers.

## VI.

## GOALS OF THE DEBTORS' PLAN

### A.     Preserving the Debtors' Operations.

The Plan has been drafted to preserve the Debtors' going concern value for all of their constituents and to pay creditors 100% of the allowed amount of their claims.  In doing so, the Debtors have sought to maintain the relationships they have with their customers, vendors, suppliers and lenders.  However, the Debtors are required to alter the payment terms of the First Lien Credit Facility and the Second Lien Credit Facility in order to continue to operate their businesses and ensure the repayment of such losses.

### B.     Preservation of NOLs.

The Plan has been structured with the intent of retaining the net operating loss ("NOL") carryforward of the Debtors which is in the approximate amount of $133 million as of the Petition Date.  The Plan contemplates the preservation of such NOL carryforwards for future utilization by the Reorganized Debtors, subject to the possible limitations and restrictions described under "CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES."

### C.     Providing Liquidity to the Debtors.

Through the Plan, the Debtors will also be able to enter into the Exit Loan, which will provide the Debtors with operating liquidity to aid in the continuation of their operations after the Effective Date.

# VII.

## SELECTED FINANCIAL INFORMATION

**A.** **Consolidated and Year-to-Date Annual Financial Information for the Debtors.**

| ASSETS (in thousands) | December 31, 2009 | September 30, 2010 |
|---|---|---|
| CURRENT ASSETS: | | |
| CASH | $29,249 | $18,655 |
| ACCOUNTS RECEIVABLE , NET | $78,693 | $72,928 |
| INVENTORIES | $30,332 | $27,208 |
| INCOME TAX RECEIVABLE | $3,131 | $673 |
| PREPAIDS AND OTHER CURRENT ASSETS | $11,335 | $10,537 |
| TOTAL CURRENT ASSETS | $152,740 | $130,001 |
| | | |
| PROPERTY, PLANT  & EQUIPMENT (NET) | $55,279 | $49,868 |
| GOODWILL | $133,989 | $133,295 |
| OTHER ASSETS | $17,942 | $13,990 |
| INTANGIBLE ASSETS (NET) | $52,074 | $39,391 |
| | | |
| TOTAL ASSETS | $412,026 | $366,545 |
| | | |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | |
| | | |
| CURRENT LIABILITIES: | | |
| CURRENT PORTION - LT DEBT | $49,429 | $74,190 |
| ACCOUNTS PAYABLE | $33,216 | $42,713 |
| ACCRUED LIABILITIES | $40,906 | $36,264 |
| TOTAL CURRENT LIABILITIES | $123,551 | $153,167 |
| | | |
| LONG-TERM DEBT, LESS CURRENT MATURITIES | $297,598 | $265,388 |
| DEFERRED INCOME TAXES | $5,213 | $3,052 |
| PENSION AND POSTRETIREMENT BENEFIT LIABILITIES | $34,413 | $34,099 |
| OTHER LONG-TERM LIABILITIES | $12,083 | $10,872 |
| | | |
| TOTAL LIABILITIES | $472,858 | $466,578 |
| | | |
| TOTAL STOCKHOLDERS' DEFECIT | ($60,832) | ($100,033) |
| | | |
| TOTAL LIABILITIES & STOCKHOLDERS' EQUITY | $412,026 | $366,545 |

| **Consolidated Statement of Income (in 000s)** | | |
|---|---|---|
| | Fiscal Year Ending  2009 | 9 months Ending September 30, 2010 |
| | | |
| NET REVENUES | $661,534 | $433,281 |
| COSTS OF GOODS AND SERVICES | $453,270 | $295,914 |
| GROSS PROFIT | **$208,264** | **$137,367** |
| | | |

| | | |
|---|---|---|
| SALES, GENERAL AND ADMINISTRATIVE EXPENSES | $165,366 | $109,300 |
| AMORTIZATION OF INTANGIBLES | $17,001 | $12,685 |
| RESTRUCTURING EXPENSES | $19,594 | $12,044 |
| OPERATING INCOME | $6,303 | $3,308 |
| | | |
| OTHER INCOME (EXPENSE): | | |
| INTEREST INCOME (EXPENSE); NET | ($52,588) | ($42,430) |
| INCOME (LOSS) FROM CONTINUING OPERATIONS, BEFORE BENEFIT FOR INCOME TAXES | ($46,285) | ($39,122) |
| INCOME TAX PROVISION | $ 1,331 | $178 |
| | | |
| NET (LOSS) | ($58,756) | (38,944) |

# VIII.

# FINANCIAL PROJECTIONS AND ASSUMPTIONS

## A.     Purpose and Objectives.

The Debtors' long term business plan (the "Business Plan") and the underlying projections and assumptions serve as the basis for the Plan.  The Debtors believe that the assumptions that underlie the projections are reasonable under the circumstances and that achieving the projections set forth herein will maximize the value of the Debtors' businesses.  The Debtors have prepared the projected operating and financial results (the "Projections") on a consolidated basis for the Reorganized Debtors for the period ending five years from the Effective Date.  The Projections, and a summary of significant assumptions related thereto, are attached to this Disclosure Statement as **Exhibit C.**

## B.     Consolidated Pro Forma Balance Sheet.

The Debtors have prepared a consolidated pro forma balance sheet of the Reorganized Debtors (the "Pro Forma Balance Sheet").  The Pro Forma Balance Sheet is attached hereto as **Exhibit D** and reflects the Projections with respect to the consolidated financial position of the Reorganized Debtors assuming the effects of certain transactions that will occur in connection with and upon consummation of the Plan.

## C.     Funds Necessary upon the Effectiveness of the Plan.

In the months following the Distribution Date, the Debtors will require an aggregate amount of $[___] in order to make the payments contemplated pursuant to the Plan, which amount does not include any payments on account of any of the First Lien Loan Obligations, the Second Lien Loan Obligations or the Unsecured Notes.  The Debtors anticipate making all the required distributions contemplated by the Plan from Cash on hand and from proceeds of the Exit Loan.

# IX.

## THE CHAPTER 11 CASES

**A.       Commencement of the Chapter 11 Cases.**

On September 29, 2010, Workflow and its affiliated Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, the Honorable Stephen C. St. John, presiding.

**B.       Continuation of Business after the Petition Date.**

Since the Petition Date, the Debtors have continued to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have sought Bankruptcy Court approval for all transactions that were outside the ordinary course of their businesses.  As discussed in this section, during the period immediately following the Petition Date, the Debtors sought and obtained authority from the Bankruptcy Court with respect to a number of matters deemed by the Debtors to be essential to their smooth and efficient transition into chapter 11 and the stabilization of their operations. The descriptions of such matters contained herein are summaries only, and are qualified in their entirety by the provisions of the relevant orders entered by the Bankruptcy Court.

**(i)       Cash Collateral.**

By order entered on October 1, 2010 (the "First Interim Cash Collateral Order"), the Bankruptcy Court authorized the immediate use of Cash Collateral, with the consent of the First Lien Lenders and the Second Lien Lenders, on an emergency and interim basis, through October 8, 2010, subject to certain limitations as to a Cash Collateral budget and regarding providing adequate protection to the First Lien Lenders and the Second Lien Lenders.  By order entered on October 8, 2010 (the "Second Interim Cash Collateral Order"), with the consent of the First Lien Lenders and the Second Lien Lenders, the Bankruptcy Court authorized the further use of Cash Collateral through October 28, 2010.  By order entered on October 29, 2010 (the "Third Interim Cash Collateral Order" and together with the First Interim Cash Collateral Order and the Second Interim Cash Collateral Order, the "Cash Collateral Orders"), with the consent of the First Lien Lenders and the Second Lien Lenders, the Bankruptcy Court authorized the further use of Cash Collateral through December 1, 2010.

Pursuant to the Cash Collateral Orders, the Bankruptcy Court granted the First Lien Lenders and the Second Lien Lenders, to the extent of any diminution in value of the Cash Collateral, replacement liens in essentially all property acquired by the Debtors after the Petition Date and superpriority administrative expense claims.  The Bankruptcy Court also authorized the Debtors to pay current interest to the First Lien Lenders on a monthly basis, and for interest to accrue in regard to the Second Lien Lenders both at the default rate.  The Debtors also agreed to pay the legal and professional fees of the First Lien Agent and the Second Lien Agent on a current basis.  In the Cash Collateral Orders, the Debtors also acknowledged the validity, priority, perfection, enforceability and principal amount of the liens and claims of the First Lien Lenders and the Second Lien Lenders, and waived the right to seek to avoid payments made

prior to the Petition Date, subject to the rights of the Committee to review and challenge such issues.

At a hearing on November 30, 2010 and at further hearings, the Debtors anticipate seeking further authority to use Cash Collateral, and will seek the continued consent of the First Lien Lenders and the Second Lien Lenders, throughout the course of the Chapter 11 Cases. As of the date hereof, the Debtors have not obtained consent to use Cash Collateral after November 30, 2010.

**(ii)      Business Operations and Employee-Related Relief.**

On October 1, 2010, the Bankruptcy Court entered orders granting the Debtors "first day" relief pertaining to the Debtors' ability to operate as smoothly as possible while in Chapter 11, including among other things: (i) authorizing the Debtors to continue to use their existing cash management system; (ii) authorizing the Debtors to pay certain prepetition obligations owing to the Debtors' employees; (iii) prohibiting the Debtors' utility companies from altering, refusing or discontinuing service as long as the Debtors complied with certain deposit guidelines; (iv) authorizing the Debtors to continue to maintain existing insurance arrangements; and (v) authorizing the Debtors to pay certain prepetition trust fund taxes owed to taxing authorities in the ordinary course of business.

Additionally, on October 1, 2010, the Bankruptcy Court also entered orders authorizing the Debtors to honor, in their discretion, their prepetition obligations to (i) customers under certain customer programs and to otherwise continue prepetition customer program practices in the ordinary course of business; (ii) shippers and warehousemen; and (iii) certain critical vendors.

The relief obtained in these first day orders has been instrumental in allowing the Debtors to maintain their customer and vendor relationships, which has allowed the Debtors to maintain the going concern value of their businesses for the benefit of all creditors. The First Lien Lenders, the Second Lien Lenders and the Committee have monitored the Debtors' payments made under these first day orders.

**C.      Representation of the Debtors**

In September 2010, the Debtors retained McGuireWoods LLP to provide legal advice with respect to various corporate, restructuring and bankruptcy matters. The Debtors retained Tavenner & Beran PLC to serve as bankruptcy co-counsel and conflicts counsel. The Debtors also employed Kaufman & Canoles, P.C. as special corporate counsel.

The Debtors also obtained approval from the Bankruptcy Court to retain FTI Consulting as the Debtors' restructuring and financial advisors.

**D.      Formation and Representation of the Committee**

On October 5, 2010, the U.S. Trustee appointed the Committee. The Committee retained as counsel the law firm of Venable LLP. The Committee retained Protiviti Inc. to serve as its financial advisory firm in the Debtors' chapter 11 cases.

The current members of the Committee include:

| | |
|---|---|
| Novation, LLC | The Carlyle Group |
| Business Card Service, Inc. (BCSI) | Baptist Memorial Health Care Corporation |
| Adecco Group NA | |

## E. Representation of the First Lien Agent

Credit Suisse, as administrative agent under the First Lien Credit Agreement, retained Wilmer Cutler Pickering Hale and Dorr LLP and Peter G. Zemanian as legal counsel. The First Lien Agent also retained Alvarez & Marsal Holdings, LLC as its financial advisor.

## F. Representation of the Second Lien Agent

Silver Point Finance, LLC, as administrative agent under the Second Lien Credit Agreement, retained Fried, Frank, Harris, Shriver & Jacobson LLP and Hunton & Williams LLP as legal counsel. The Second Lien Agent also retained Perella Weinberg Partners L.P. as its financial advisor.

## G. Matters Relating to Unexpired Leases and Executory Contracts

Section 365 of the Bankruptcy Code grants a debtor the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases.

On the Petition Date, the Debtors filed a motion seeking Bankruptcy Court approval to reject certain unexpired leases of nonresidential real property. That motion was heard on October 27, 2010, and the Bankruptcy Court granted the relief requested in this motion and these leases were rejected. The Plan contemplates that on the Effective Date, all unexpired contracts and nonresidential leases of real property not previously rejected by order of the Bankruptcy Court or included on Schedule 3 hereto (the Schedule of Rejected Contracts), as such schedule may be amended and/or supplemented pursuant to the Plan, shall be assumed by the Debtors.

## H. Exclusivity

Pursuant to sections 1121(b) and (c)(3) of the Bankruptcy Code, the Debtors have a certain amount of time within which (a) to file their Plan (the "Filing Period"); and (b) to solicit acceptances of their timely filed Plan (the "Solicitation Period") before other parties in interest are permitted to file plans. The Debtors filed a Plan on the Petition Date. Accordingly, the Debtors have, subject to a further extension, 180 days from the Petition Date to obtain acceptance of the Plan.

## I.    Claims Administration

### (i)    Schedules and Bar Dates.

On October 28, 2010, after having received an extension from the Bankruptcy Court, the Debtors filed their respective Schedules.  The aggregate scheduled liabilities for the Debtors were approximately $475 million.  Based upon a preliminary analysis conducted by the Debtors, a significant amount of the asserted claims represent duplicate or otherwise redundant claims and accordingly, a significant amount of claims that have been filed are subject to disallowance by the Bankruptcy Court.  While it is likely that only a small portion of the filed claims will be allowed, the claims resolution process is in its nascent stages and the resolution and allowance of such claims remain subject to determination of the Bankruptcy Court.

By order dated October 8, 2010 (the "Bar Date Order"), the Bankruptcy Court fixed December 8, 2010 at 5:00 p.m. Prevailing Pacific Time (the "Bar Date") as the deadline for all non-governmental unit holders of alleged Claims against the Debtors to file proofs of claim against the Debtors and March 28, 2011 at 5:00 p.m. Prevailing Pacific Time (the "Governmental Bar Date") as the deadline for all governmental units to file proofs of claim against the Debtors.  The Bar Date Order also approved the form of publication notice (the "Bar Date Notice") and the form of the proof of claim to be utilized by creditors.  The Bar Date Notice was published on October 13, 2010 in the Virginian-Pilot and the Dayton Daily News and on October 14, 2010 in USA Today (National Edition).

Pursuant to the Bar Date Order, claims associated with the rejection of an executory contract or unexpired lease must be filed by the later of the Bar Date or 30 days from the notice of the order rejecting the executory contract or unexpired lease.  With respect to claims affected by amended schedules, such claims must be filed by the later of the Bar Date or 30 days from the notice of the amended schedules, and only if such schedule amendment affects such claim as described in the Bar Date Order.

### (ii)    Claim Objections.

In the ordinary course of business, the Debtors maintain books and records (the "Books and Records") that reflect, among other things, the Debtors' liabilities and the amounts owed to their creditors in connection with such liabilities.  The Debtors and their professionals have preliminarily started the process of reviewing the proofs of claim submitted in the Chapter 11 Cases, including any supporting documentation, and comparing the Claims asserted in the proofs of claim with the Books and Records to determine the validity of such Claims.

The Debtors anticipate filing objections that will reduce the amount of Claims against the Debtors.  From and after the Effective Date, only the Reorganized Debtors shall have the right to assert Claims Objections.  The Debtors are continuing to examine all of the Claims and anticipate filing claims objections during the pendency of these Chapter 11 Cases.

# X.

## LITIGATION PENDING AGAINST THE DEBTORS

**A.     Litigation.**

The Company is involved in legal proceedings from time to time incidental to the ordinary conduct of its business.  Litigation is subject to many uncertainties, and the outcome of individual matters is not predictable with assurance.  It is reasonably possible that the final resolution of any litigation could require the Company to make additional expenditures in excess of reserves that may have been established on account of such litigation.  In the ordinary course of business, various claims, suits and complaints have been filed against the Company in addition to the one specifically referred to below.  There is no litigation currently pending that the Company believes is material.  Although the final resolution of any such litigation matters could have a material effect on the Company's operating results for a particular reporting period, the Company believes that the litigation should not materially affect its consolidated financial position.

Prior to the Petition Date, Workflow Solutions LLC, among others, was a defendant in a lawsuit captioned e-LYNXX Corporation v. Innerworkings, Inc., et al., Civ. Action No. 2:10-cv-299, pending in the United States District Court for the Eastern District of Texas.  The suit asserts that the Company infringed and continues to infringe on certain U.S. patents to which e-LYNXX Corporation holds the rights (the "Patent Claims").  Upon the Debtors seeking bankruptcy protection, the Patent Claims were stayed by section 362 of the Bankruptcy Code.  On or about October 5, 2010, the Debtors filed a Suggestion of Bankruptcy in that case.  In general, the patents at issue in that case concern the automated system by which a candidate is selected from a pool of potential vendors using specific job criteria.  The suit seeks a permanent injunction against the Company's alleged infringement, an unspecified amount of compensatory damages, treble damages pursuant to 35 U.S.C. § 284, attorney's fees pursuant to 35 U.S.C. § 285, costs, and pre- and post-judgment interest.  No trial date has been set.  The Company intends to vigorously defend against these Patent Claims and believes that it has a complete defense to the Patent Claims.

The Company believes that the estimated costs of the Patent Claims will not have a material adverse effect on the Company's consolidated financial condition or liquidity.  However, there is no assurance that the ultimate liability with respect to the Patent Claims, should the plaintiff prevail, will not present significantly greater and longer lasting financial exposure than currently anticipated by the Company.  The ultimate liability with respect to the Patent Claims is subject to various uncertainties, including, but not limited to, the costs of defending the claim and the risk of an adverse jury verdict.  Because of the uncertainties related to such Patent Claims, it is possible that the ultimate liability could have a material adverse effect on the Company's business, financial condition and results of operations.

**XI.**

**THE CHAPTER 11 PLAN**

**A.      Introduction.**

The following is a summary of certain terms and provisions of the Plan.  This summary of the Plan is qualified in its entirety by reference to the full text of the Plan, which is annexed to this Disclosure Statement as **Exhibit A**.

**B.      General Description of the Treatment of Claims and Equity Interests.**

**(i)      Class 1 – Priority Non-Tax Claims.**

Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of each Allowed Priority Non-Tax Claim, each Allowed Priority Non-Tax Claim will be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Claim entitles the holder in respect of such Claim will be fully reinstated and retained, and such Allowed Priority Non-Tax Claim (including any amounts to which such holder is entitled pursuant to section 1124(2) of the Bankruptcy Code) will be paid in full in accordance with such reinstated rights on the Effective Date.

**(ii)      Class 2 – First Lien Lender Claims.**

Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of each Allowed First Lien Lender Claim, each holder of an Allowed First Lien Lender Claim will, pursuant to the Plan, retain the liens securing its First Lien Lender Claim and receive deferred cash payments totaling at least the amount of such Allowed First Lien Lender Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in each Debtor's interest in such property, in the amounts and on the terms indicated on schedule 1 attached to the Plan.

**(iii)      Class 3 –First Lien Lender Claims of Cross Lien Holders.**

Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of such holder's Allowed First Lien Lender Claim, each holder of an Allowed First Lien Lender Claim that is a Cross Lien Holder will, pursuant to the Plan, retain the liens securing its First Lien Lender Claim and receive deferred cash payments totaling at least the amount of such Allowed First Lien Lender Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in each Debtor's interest in such property, in the amounts and on the terms indicated on schedule 1 attached to the Plan.

**(iv)      Class 4 – Second Lien Lender Claims.**

Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of such holder's Allowed Second Lien Lender Claim, each holder of an Allowed Second Lien Lender Claim will retain, pursuant to the Plan, the liens securing its

Second Lien Lender Claim and receive deferred cash payments totaling at least the amount of such Allowed Second Lien Lender Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in each Debtor's interest in such property, in the amounts and on the terms indicated on schedule 2 attached to the Plan.

**(v)  Class 5 – Second Lien Lender Claims of Cross Lien Holders.**

Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of such holder's Allowed Second Lien Lender Claim, each holder of an Allowed Second Lien Lender Claim that is a Cross Lien Holder will retain, pursuant to the Plan, the liens securing its Second Lien Lender Claim and receive deferred cash payments totaling at least the amount of such Allowed Second Lien Lender Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in each Debtor's interest in such property, in the amounts and on the terms indicated on schedule 2 attached to the Plan.

**(vi)  Class 6 – Other Secured Claims.**

Except to the extent that the holder agrees to less favorable treatment, each holder of an Allowed Other Secured Claim against any Debtor will, pursuant to the Plan, at the sole option of the Debtor obligated for the payment of such Allowed Other Secured Claim, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, (i) receive from such Debtor on the Distribution Date, Cash equal to the Allowed amount of such claim; (ii) retain its lien in such property or the proceeds of such property, securing such Allowed Other Secured Claim and be paid in the ordinary course of business in accordance with the terms existing between the Debtors and such holder with respect to such Allowed Other Secured Claim prior to the Petition Date; (iii) retain its lien in such property, or the proceeds of such property, securing such Allowed Other Secured Claim and receive deferred cash payments totaling at least the amount of such Allowed Other Secured Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in each Debtor's interest in such property, or (iv) be transferred the collateral securing such Claim, each in full and complete satisfaction of such claim.

**(vii)  Class 7 – General Unsecured Claims.**

Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of each Allowed General Unsecured Claim (subject to section 12.3 of the Plan), each holder of an Allowed General Unsecured Claim will receive, in the sole discretion of the Debtors, either (i)(a) on the Distribution Date, a Cash payment in an amount equal to fifty percent (50%) of the amount of such holder's Allowed General Unsecured Claim, without interest, and (b) sixty (60) days after the Distribution Date, an additional Cash payment in an amount equal to fifty percent (50%) of the amount of such holder's Allowed General Unsecured Claim, without interest; or (ii) payment in the ordinary course of business in accordance with the terms existing between the Debtor and such holder with respect to such Allowed General Unsecured Claim prior to the Petition Date.

**(viii)**     **Class 8 – Lease Rejection Damage Claims.**

Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of each Lease Rejection Damage Claim, each holder of an Allowed Lease Rejection Damage Claim will receive, in the sole discretion of the Debtors, either (i)(a) on the Distribution Date, a Cash payment in an amount equal to fifty percent (50%) of the amount of such holder's Allowed Lease Rejection Damage Claim, without interest, and (b) sixty (60) days after the Distribution Date, an additional Cash payment in an amount equal to fifty percent (50%) of the amount of such holder's Allowed Lease Rejection Damage Claim, without interest; or (ii) on the Distribution Date, a Cash payment in the amount of 1/12th of the amount of such holder's Allowed Lease Rejection Damage Claim, without interest, and additional Cash payments in the amount of 1/12th of such holder's Allowed Lease Rejection Damage Claim, without interest, on the last Business Day of each calendar month for the subsequent eleven calendar months beginning in the calendar month that is after the month in which the Distribution Date occurs.

**(ix)**     **Class 9 – Unsecured Note Claims.**

Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of each Allowed Unsecured Note Claim, each Allowed Unsecured Note Claim will be, pursuant to the Plan, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Unsecured Note Claim, reinstated, without interest  during the pendency of the Chapter 11 Cases and notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of an Allowed Unsecured Note Claim to demand or receive payment of such Unsecured Note Claim prior to its stated maturity from and after the occurrence of a default, interest at an increased rate from and after the occurrence of a default, or any other right or benefit provided to such holder from and after the occurrence of a default.

**(x)**     **Class 10 – Unsecured Contingent Claims.**

Except to the extent that the holder agrees to less favorable treatment, each Allowed Unsecured Contingent Claim will receive, pursuant to the Plan, upon the Allowed Unsecured Contingent Claim becoming a liquidated, fixed, and non-contingent claim, in the sole discretion of the Debtors, (i)(a) thirty (30) days after such date, a Cash payment in an amount equal to fifty percent (50%) of the amount of such holder's Allowed Unsecured Contingent Claim, without interest, and (b) sixty (60) days after such date, an additional Cash payment in an amount equal to fifty percent (50%) of the amount of such holder's Allowed Unsecured Contingent Claim, without interest; or (ii) all of the legal, equitable and contractual rights to which such Claim entitles the holder in respect of such Claim shall be fully reinstated and retained.

**(xi)**     **Class 11 – Intercompany Claims.**

Each Allowed Intercompany Claim will be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Claim entitles a holder in respect of such Claim shall be fully reinstated and retained.

**(xii)    Class 12 – WF Capital Equity Interests.**

Each Allowed WF Capital Equity Interest will be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Equity Interest entitles the holder in respect of such Equity Interest shall be fully reinstated and retained.

**(xiii)    Class 13 – Subsidiary Equity Interests.**

Each Allowed Subsidiary Equity Interest will be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Equity Interest entitles a holder in respect of such Equity Interest shall be fully reinstated and retained.

**(xiv)    Class 14 – Convenience Claims.**

Each holder of an Allowed Convenience Claim will receive pursuant to the Plan, on the Distribution Date, a single Cash payment in an amount equal to one hundred percent (100%) of such holder's Allowed Convenience Claim, without interest.

**(xv)    Deemed Satisfaction of Other Guaranty Claims.**

All Other Guaranty Claims shall be allowed in the amount of zero dollars ($0.00) and deemed satisfied in full as a result of distributions made on the underlying Allowed claim guaranteed in respect of such Guaranty Claim, pursuant to Article V of the Plan.  From and after the Effective Date of the Plan, no Other Guaranty Claim shall be of further force or effect.

**(xvi)    Reinstatement of Pension Plan.**

All obligations of the Debtors under or pertaining to the Pension Plan shall be reinstated in full on the Effective Date.

**(xvii)    Reinstatement of Insurance Policies.**

All insurance agreements and all obligations of the Debtors and the counterparties thereto shall be reinstated in full, and will be enforceable according to their terms and applicable law on the Effective Date.  The Debtors' coverage under its director and officer liability insurance agreements (including any tail coverage) shall remain in full force and effect after the Effective Date for the term provided under such policies.  To the extent executory, such insurance agreements shall be deemed assumed pursuant to Article XII of the Plan.

**C.    Provisions For Treatment Of Unclassified Claims Under The Plan.**

**(i)    Unclassified Claims.**

Under the Plan, Administrative Expense Claims and Priority Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively.  As such, Administrative Expense Claims and Priority Tax Claims are not

designated as classes of Claims for the purposes of the Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

    **(ii)**    **Treatment of Administrative Expense Claims.**

All Administrative Expense Claims will be treated as follows:

    **(1)**    **Time for Filing Administrative Expense Claims.**

The holder of an Administrative Expense Claim, other than (i) a Fee Claim; (ii) a liability incurred and payable after the Petition Date in the ordinary course of business by a Debtor (and not past due); (iii) a Section 503(b)(9) Claim; or (iv) an Administrative Expense Claim that has been Allowed on or before the Effective Date, will be required to file with the Bankruptcy Court and serve on the Debtors, the Committee, and the U.S. Trustee, notice of such Administrative Expense Claim within forty (40) days after service of Notice of Confirmation or such other specific date as may be established by the Bankruptcy Court. Such notice will be required to include at a minimum (A) the name of the Debtor(s) which are purported to be liable for the Claim, (B) the name of the holder of the Claim, (C) the amount of the Claim, and (D) the basis of the Claim (including any documentation evidencing or supporting such Claim). **THE FAILURE TO FILE A PROOF OF ADMINISTRATIVE CLAIM ON OR BEFORE THE ADMINISTRATIVE CLAIMS BAR DATE AND THE FAILURE TO SERVE SUCH NOTICE TIMELY AND PROPERLY WILL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED, DISALLOWED AND DISCHARGED WITHOUT FURTHER ORDER OF THE BANKRUPTCY COURT.**

    **(2)**    **Time for Filing Fee Claims.**

Each Professional who holds or asserts a Fee Claim will be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Fee Application within forty-five (45) days after the Effective Date or such other specific date as may be established by the Bankruptcy Court. **THE FAILURE TO FILE TIMELY AND SERVE SUCH FEE APPLICATION WILL RESULT IN THE FEE CLAIM BEING FOREVER BARRED AND DISCHARGED.**

    **(3)**    **Time for Filing Section 503(b)(9) Claims.**

In accordance with the Bar Date Order, the deadline for filing a Section 503(b)(9) Claim is December 8, 2010 at 5:00 p.m., Prevailing Pacific Time. **THE FAILURE TO SUBMIT SUCH REQUEST BY THE BAR DATE WILL RESULT IN THE SECTION 503(B)(9) CLAIM BEING DEEMED DISALLOWED AS AN ADMINISTRATIVE EXPENSE CLAIM.** Such disallowance does not prevent such Claim from being Allowed as a Claim other than as an Administrative Expense Claim to the extent otherwise allowable.

    **(4)**    **Allowance of Administrative Expense Claims, Fee Claims and Section 503(b)(9) Claims.**

An Administrative Expense Claim (other than a Fee Claim or Section 503(b)(9) Claim) with respect to which notice has been properly and timely filed and served pursuant to

Article 6.2(a) of the Plan, or a Section 503(b)(9) Claim with respect to which a request for allowance has been properly filed and served pursuant to Article 6.2(c) of the Plan, will become an Allowed Administrative Expense Claim if no objection is filed within thirty (30) days after the later of (i) the Effective Date, or (ii) the date of service of the applicable notice of Administrative Expense Claim or such later date as may be approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing. If an objection is filed within such 30-day period (or any extension thereof), the Administrative Expense Claim will become an Allowed Administrative Expense Claim only to the extent allowed by Final Order. A Fee Claim in respect of which a Fee Application has been properly filed and served pursuant to Article 6.2(b) of the Plan will become an Allowed Administrative Expense Claim only to the extent allowed by Final Order.

**(5)     Payment of Allowed Administrative Expense Claims.**

On the Distribution Date, each holder of an Allowed Administrative Expense Claim, will receive in full satisfaction of such Claims (i) the amount of such holder's Allowed Administrative Expense Claim in one Cash payment, or (ii) such other treatment as may be agreed upon in writing by the Debtors and such holder; provided, that such treatment will not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim; provided, further, that an Administrative Expense Claim representing a liability incurred in the ordinary course of business of the Debtors may be paid at the Debtors' election in the ordinary course of business.

**(iii)     Treatment of Priority Tax Claims.**

(1)     Unless otherwise agreed with a holder of an Allowed Priority Tax Claim, the Debtors, in their sole discretion, may choose whether Allowed Priority Tax Claims will be paid either: (1) in Cash, in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest from the Effective Date at a fixed annual rate equal to five percent (5%) and paid in regular installments of equal amount over a period not exceeding five (5) years from the Petition Date; or (2) in full in Cash on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim. The Debtors reserve the right to prepay, without penalty, at any time under option (1) above. Alternatively, a holder of an Allowed Priority Tax Claim may elect to receive the same treatment of its Claims as is offered to holders of Allowed General Unsecured Claims as provided in Article 5.5 of the Plan.

(2)     The Confirmation Order will enjoin any holder of an Allowed Tax Claim from commencing or continuing any action or proceeding against any responsible person, officer or director of the Debtors that otherwise would be liable to such holder for payment of a Tax Claim so long as the Debtors are in compliance with Article 6.3 of the Plan. So long as the holder of an Allowed Tax Claim is enjoined from commencing or continuing any

action or proceeding against any responsible person, officer or director under Article 6.3 of the Plan or pursuant to the Confirmation Order, the statute of limitations for commencing or continuing any such action or proceeding shall be tolled.

**D.  Acceptance or Rejection of the Plan; Effect of Rejection by One or More Classes of Claims or Equity Interests.**

**(i)  Classes Entitled to Vote.**

Only holders of Claims in the following classes will be permitted to vote on the Plan: First Lien Lender Claims; First Lien Lender Claims of Cross Lien Holders; Second Lien Lender Claims; Second Lien Lender Claims of Cross Lien Holders; Other Secured Claims; General Unsecured Claims; Lease Rejection Damage Claims; Unsecured Note Claims; Unsecured Contingent Claims; and Convenience Claims.

**(ii)  Class Acceptance Requirement.**

A class of Claims will have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such class that have voted on the Plan.  A class of Equity Interests will have accepted the Plan if it is accepted by holders of at least two-thirds (2/3) in amount of the Equity Interests in such class that actually vote on the Plan.

**(iii)  Tabulation of Votes on a Non-Consolidated Basis.**

The Balloting Agent will tabulate all votes on the Plan on a non-consolidated basis by class and by Debtor for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and/or (10) of the Bankruptcy Code with respect to each Debtor.

**(iv)  Separate Plan for Each Debtor.**

The Plan constitutes a separate chapter 11 plan of reorganization for each Debtor and, accordingly, the classifications set forth in Classes 1 through 14 will be deemed to apply to each of the Debtors separately, as applicable.  For example, without limitation and for illustration purposes only, WF Capital is not a borrower or a guarantor on the First Lien Loan Documents or the Second Lien Loan Documents; therefore the WF Capital Plan does not contain a Class 2 or Class 4 as WF Capital has no creditors that would be classified in Class 2 or Class 4.

**(v)  Cramdown.**

If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a) of the Bankruptcy Code, except subsection (8) thereof, the Plan will be treated as a request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the failure to satisfy the requirements of section 1129(a)(8), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each class of Claims that is impaired under, and has not accepted, the Plan.

**E.    Means for Implementation of the Plan.**

   **(i)    Certain Transactions On or Prior to the Effective Date.**

          Pursuant to section 1123(a)(5) of the Bankruptcy Code, the Reorganized Debtors will, on or prior to the Effective Date (i) execute and deliver all debt instruments and related documents, including collateral documents, contemplated under the Plan, including the Exit Loan; (ii) implement all settlements and compromises as set forth in or contemplated by the Plan; (iii) amend and restate its constituent documents in accordance with the terms of the Plan; and (iv) perform all obligations under the Plan Documents.

   **(ii)    Corporate Action.**

          (1)    The entry of the Confirmation Order shall constitute authorization for the Debtors and the Reorganized Debtors (as the case may be) to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including without limitation, any action required by the stockholders or directors of the Debtors and the Reorganized Debtors (as the case may be), including, among other things, (i) the adoption or amendment of any organizational documents; (ii) the modification, termination or cancellation of any outstanding instrument, document or agreement evidencing the First Lien Lender Claims or the Second Lien Lender Claims, as required by the Plan; (iii) all transfers of Assets that are to occur pursuant to the Plan; (iv) the incurrence of all obligations contemplated by the Plan, including the Exit Loan, and the making of all Plan Distributions; (v) the reinstatement and assumption of all indemnity obligations to the directors and officers of the Debtors; (vi) the implementation of all settlements and compromises as set forth in or contemplated by the Plan; and (vii) entering into the Exit Loan Agreement and any and all transactions, contracts, or arrangements permitted by applicable law, order, rule or regulation.

          (2)    The officers of the Debtors and the Reorganized Debtors, as the case may be, are authorized and directed to do all things and to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Plan and to take all necessary action required in connection therewith, in the name of and on behalf of the Debtors.  All obligations of the Debtors to indemnify and hold harmless their current and former directors, officers and employees, whether arising under the Debtors' constituent documents, contract, law or equity, shall be fully reinstated and assumed by the Debtors upon the occurrence of the Effective Date with the same effect as though such obligations constituted executory contracts that are assumed (or assumed and assigned, as

39

applicable) under section 365 of the Bankruptcy Code, and all such obligations shall be fully enforceable on their terms from and after the Effective Date. Nothing in the Plan will release any obligations of the Debtors to indemnify and hold harmless their current and former directors, officers and employees, which obligations are reinstated. Nothing in the Plan, including Article 16.20, will enjoin any of the Debtors' current and former directors, officers and employees from asserting any indemnity or hold harmless right against the Debtors.

(3)     The constituent documents of the Reorganized Debtors shall, as of the Effective Date, be amended to prohibit the issuance of non-voting equity securities by such Debtor as required by section 1123(a)(6) of the Bankruptcy Code, provided, however, that following the Effective Date, the Reorganized Debtors shall be entitled to issue non-voting securities, in their sole discretion.

**(iii)     Continued Corporate Existence of the Debtors.**

Each of the Debtors shall continue to exist, as a Reorganized Debtor, after the Effective Date as a separate entity, with all the powers available to such legal entity, in accordance with applicable law and pursuant to their constituent documents, as modified by the Plan. On or after the Effective Date, the Reorganized Debtors may, within their sole and exclusive discretion, take such action as permitted by applicable law, their constituent documents, and the Plan Documents, as they determine is reasonable and appropriate, <u>including</u> (a) causing any or all of the Reorganized Debtors to be merged into one or more of the other Reorganized Debtors or other legal entities; (b) liquidating any of the Reorganized Debtors; and (c) changing the legal name of any of the Reorganized Debtors.

**(iv)     Re-vesting of Assets.**

Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' Estates and any property acquired by a Debtor or Reorganized Debtor under the Plan shall vest in the Reorganized Debtors free and clear of all Claims, liens, encumbrances, charges and other interests, except as provided herein. On and after the Effective Date, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, each Reorganized Debtor may pay the charges that it incurs on or after the Effective Date for all fees, disbursements, expenses or related support services of Professionals (including fees relating to the preparation of professional fee applications) without application to, or approval of, the Bankruptcy Court.

**(v)     Initial Boards of Directors.**

From and after the Effective Date, the members of the board of directors (or managers, as applicable) of the Reorganized Debtors shall be as identified in the Plan

Supplement. Thereafter, the members of the board of directors (or managers, as applicable) of each of the Reorganized Debtors shall be selected and determined in accordance with the provisions of the organizational documents of such Reorganized Debtors and applicable law.

### (vi) Officers.

The current officers of each of the Debtors shall continue in such positions after the Effective Date in accordance with their respective employment agreements, if any, and applicable law. From and after the Effective Date, the officers of each of the Reorganized Debtors shall be selected and appointed by the respective boards of directors of such entities, in accordance with, and pursuant to, the provisions of applicable law and their respective organizational documents.

### (vii) Retention of Causes of Action/Reservation of Rights.

All Causes of Action, excluding Avoidance Actions, belonging to any of the Debtors shall, upon the occurrence of the Effective Date, be vested in the Reorganized Debtors for the benefit of the Debtors and their Estates. The rights of the Reorganized Debtors to commence, prosecute or settle such Causes of Action, respectively, shall be preserved notwithstanding the occurrence of the Effective Date.

No Person may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Estates expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise provided in the Plan. Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Final Order, the Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon or after the confirmation or consummation of the Plan.

## F. The Disbursing Agent.

### (i) Appointment of the Disbursing Agent.

Upon the occurrence of the Effective Date, the Reorganized Debtors will be appointed to serve as the Disbursing Agent, and shall have all powers, rights, duties and protections afforded the Disbursing Agent under the Plan.

### (ii) Powers and Duties.

Pursuant to the terms and provisions of the Plan, the Disbursing Agent will be empowered and directed to (a) take all steps and execute all instruments and documents necessary to make Plan Distributions to holders of Allowed Claims and Equity Interests; (b) comply with the Plan and the obligations thereunder; (c) employ, retain, or replace professionals to represent it with respect to its responsibilities; (d) object to Claims as specified in Article XI of the Plan, and prosecute such objections; (e) compromise and settle any issue or dispute

regarding the amount, validity, priority, treatment, or Allowance of any Claim as provided in Article XI of the Plan; (f) make annual and other periodic reports regarding the status of distributions under the Plan to the holders of Allowed Claims that are outstanding at such time; such reports to be made available upon request to the holder of any Contested Claim; and (g) exercise such other powers as may be vested in the Disbursing Agent pursuant to the Plan, the Plan Documents or order of the Bankruptcy Court.

   (iii)   **Disbursing Agent Post-Effective Date.**

   **<u>Except</u> as otherwise provided in Article 9.3 of the Plan, the Disbursing Agent, together with its officers, directors, employees, agents, and representatives, will be exculpated pursuant to the Plan by all Persons, Entities, holders of Claims and Equity Interests, and all other parties in interest, from any and all Causes of Action arising out of the discharge of the powers and duties conferred upon the Disbursing Agent by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in the furtherance of the Plan, or applicable law, <u>except</u> solely for actions or omissions arising out of the Disbursing Agent's willful misconduct or gross negligence. No holder of a Claim or an Equity Interest, or representative thereof, shall have or pursue any Cause of Action (a) against the Disbursing Agent or its officers, directors, employees, agents, and representatives for making Plan Distributions in accordance with the Plan, or (b) against any holder of a Claim for receiving or retaining Plan Distributions as provided for by the Plan. Nothing contained in Article 9.3 of the Plan shall preclude or impair any holder of an Allowed Claim or Allowed Equity Interest from bringing an action in the Bankruptcy Court against any Debtor to compel the making of Plan Distributions contemplated by the Plan on account of such Claim or Equity Interest.**

**G.   Distribution Provisions.**

   (i)   **Sources of Cash for Plan Distributions.**

   All Cash necessary for the Disbursing Agent to make payments and Plan Distributions will be obtained from the Cash of the Reorganized Debtors, proceeds of the Exit Loan and the Cash held in the Contested Claims Reserve, if any, as applicable.

   (ii)   **Investment of Funds Held by the Disbursing Agent; Tax Reporting by the Disbursing Agent.**

   The Disbursing Agent may, but will not be required to, invest any funds held by the Disbursing Agent pending the distribution of such funds pursuant to the Plan in investments that are exempt from federal, state, and local taxes. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (<u>including</u> the receipt by the Disbursing Agent of a private letter ruling if the Disbursing Agent so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Disbursing Agent), the Disbursing Agent may (a) treat the funds and other property held by it as held in a single trust for federal income tax purposes in accordance with the trust provisions of the Internal Revenue Code (sections 641 <u>et seq.</u>), and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

### (iii) Plan Distributions.

Pursuant to the terms and provisions of the Plan, the Disbursing Agent will make the required Plan Distributions specified under the Plan on the relevant Distribution Date therefor.

### (iv) Timing of Plan Distributions.

Each Plan Distribution shall be made on the relevant Distribution Date therefor. In the event a Plan Distribution shall be payable on a day other than a Business Day, such Plan Distribution shall instead be paid on the immediately succeeding Business Day, but shall be deemed to have been made on the date otherwise due. A Plan Distribution shall be deemed to have been timely made if made on such date or within ten (10) days thereafter.

For federal income tax purposes, except to the extent a Plan Distribution is made in connection with reinstatement of an obligation pursuant to section 1124 of the Bankruptcy Code, a Plan Distribution will be allocated first to the principal amount of a Claim and then, to the extent the Plan Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

### (v) Address for Delivery of Plan Distributions/Unclaimed Distributions.

Subject to Bankruptcy Rule 9010, any Plan Distribution or delivery to a holder of an Allowed Claim will be made at the address of such holder as set forth (a) in the Schedules, (b) on the proof of Claim filed by such holder, (c) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e) or (d) in any notice served by such holder giving details of a change of address. If any Plan Distribution is returned to the Disbursing Agent as undeliverable, no Plan Distributions shall be made to such holder unless the Disbursing Agent is notified of such holder's then current address within ninety (90) days after such Plan Distribution was returned. After such date, if such notice was not provided, a holder will have forfeited its right to such Plan Distribution, and the undeliverable Plan Distributions will be returned to the Reorganized Debtors. Supplemental Plan Distributions may be made from time to time at the discretion of the Disbursing Agent.

### (vi) Time Bar to Cash Payments.

Checks issued in respect of Allowed Claims will be null and void if not negotiated within one hundred and eighty (180) days after the date of issuance thereof. Requests for reissuance of any voided check will be made directly to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued. Any claim in respect of such a voided check will be made within one hundred and eighty (180) days after the date of issuance of such check. If no request is made as provided in the preceding sentence, any claims in respect of such void check will be discharged and forever barred and such unclaimed Plan Distribution shall revert to the Reorganized Debtors.

### (vii)    Manner of Payment under the Plan.

Unless the Person receiving a Plan Distribution agrees otherwise, any Plan Distribution to be made in Cash under the Plan will be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors may, in addition to the foregoing, be made, at the option of the Disbursing Agent, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

### (viii)   Expenses Incurred on or after the Effective Date and Claims of the Disbursing Agent.

Except as otherwise ordered by the Bankruptcy Court or as provided in the Plan, the amount of any reasonable fees and expenses incurred (or to be incurred) by the Disbursing Agent on or after the Effective Date (including, but not limited to, taxes) will be paid when due. Professional fees and expenses incurred by the Disbursing Agent from and after the Effective Date in connection with the effectuation of the Plan will be paid in the ordinary course of business. Any dispute regarding compensation will be resolved by agreement of the parties or if the parties are unable to agree, as determined by the Bankruptcy Court.

### (ix)    Fractional Plan Distributions.

Notwithstanding anything to the contrary contained herein, no Plan Distributions of fractional shares or fractions of dollars will be made. Fractional shares and fractions of dollars shall be rounded to the nearest whole unit (with any amount equal to or less than one-half share or one-half dollar, as applicable, to be rounded down).

### (x)    Surrender and Cancellation of Instruments.

Unless otherwise provided in the Plan, as a condition to receiving any Plan Distribution, on or before the Distribution Date, the holder of an Allowed Claim evidenced by a certificate, instrument or note, other than any such certificate, instrument or note that is being reinstated or being left unimpaired under the Plan, will be required to (i) surrender such certificate, instrument or note representing such Claim, and (ii) execute and deliver such other documents as may be necessary to effectuate the Plan in the sole determination of the Disbursing Agent. Such certificate, instrument or note, will thereafter be cancelled and extinguished. The Disbursing Agent will have the right to withhold any Plan Distribution to be made to or on behalf of any holder of such Claims unless and until (1) such certificates, instruments or notes are surrendered, or (2) any relevant holder provides to the Disbursing Agent an affidavit of loss or such other documents as may be required by the Disbursing Agent together with an appropriate indemnity in the customary form. Any such holder who fails to surrender such certificates, instruments or notes, or otherwise fails to deliver an affidavit of loss and indemnity prior to the second anniversary of the Effective Date, will be deemed to have forfeited its Claims and shall not participate in any Plan Distribution. All property in respect of such forfeited Claims will revert to the Reorganized Debtors.

**H.     Procedures for Resolving and Treating Contested Claims.**

**(i)     Prosecution of Contested Claims.**

After the Effective Date, only the Reorganized Debtors may object to the allowance of Contested Claims filed with the Bankruptcy Court.  All objections that are filed and prosecuted as provided herein shall be litigated to Final Order or compromised and settled in accordance with Article 11.3 of the Plan.

**(ii)    Objection Deadline.**

As soon as practicable, but in no event later than one hundred and eighty (180) days after the Effective Date (subject to being extended by the order of the Bankruptcy Court upon motion of the Disbursing Agent without notice or a hearing), objections to Claims will be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made.

**(iii)   Claims Settlement.**

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Disbursing Agent will have authority to settle or compromise all Claims and Causes of Action without further review or approval of the Bankruptcy Court.

**(iv)    Entitlement to Plan Distributions upon Allowance.**

Notwithstanding any other provision of the Plan, if any portion of a Claim is a Contested Claim, no payment or distribution provided hereunder will be made on account of such Claim unless and until such Claim becomes an Allowed Claim that is not a Contested Claim, subject to the setoff rights as provided in Article 16.17 of the Plan.  When a Claim that is not an Allowed Claim as of the Effective Date becomes an Allowed Claim the holder of such Allowed Claim will thereupon become entitled to receive the Plan Distributions in respect of such Claim the same as though such Claim had been an Allowed Claim on the Effective Date.

**(v)     Contested Claims Reserve.**

The Debtors may establish a Contested Claims Reserve in a segregated account for the purpose of effectuating distributions to the holders of Contested Claims pending the allowance or disallowance of such Claims in accordance with the Plan.

**(vi)    Estimation of Claims.**

The Debtors and the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Unsecured Contingent Claim, unliquidated or Contested Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim including, without limitation, during the pendency of any

appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Unsecured Contingent Claim, the amount so estimated will constitute (a) the Allowed amount of such Claim, which will be reclassified as a General Unsecured Claim; (b) a maximum limitation on such Unsecured Contingent Claim; or (c) in the event such Unsecured Contingent Claim is estimated in connection with the estimation of other Unsecured Contingent Claims, a maximum limitation on the aggregate amount of Allowed Claims on account of such Unsecured Contingent Claims so estimated. In the event that the Bankruptcy Court estimates any unliquidated or Contested Claim, the amount so estimated will constitute (a) the Allowed amount of such Contested Claim; (b) a maximum limitation on such Contested Claim; or (c) in the event such Contested Claim is estimated in connection with the estimation of other Contested Claims within the same Class, a maximum limitation on the aggregate amount of Allowed Claims on account of such Contested Claims so estimated. If the estimated amount constitutes a maximum limitation on the amount of such Claim, or on more than one such Claim within a Class of Claims, as applicable, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claims. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or otherwise resolved by any mechanism approved by the Bankruptcy Court.

**(vii)    No Recourse Against the Debtors or the Reorganized Debtors.**

If a Contested Claim Reserve is established pursuant to Article 11.5 of the Plan, any holder of a Contested Claim that ultimately becomes an Allowed Claim shall be entitled to receive its applicable distribution under the Plan solely from any Contested Claim Reserve established on account of such Contested Claims. In no event will any holder of a Contested Claim have any recourse with respect to distributions made, or to be made, under the Plan to holders of such Claims, to any Debtor or the Reorganized Debtors on account of such Contested Claim, regardless of whether such Contested Claim will ultimately become an Allowed Claim, and regardless of whether sufficient Cash or other property remains available for distribution in the Contested Claim Reserve established on account of such Contested Claims at the time such Claim becomes entitled to receive a distribution under the Plan.

**I.    Treatment Of Executory Contracts And Unexpired Leases.**

**(i)    Assumption and Rejection of Executory Contracts and Unexpired Leases.**

(1)    All executory contracts and unexpired leases of the Debtors will be assumed pursuant to the provisions of section 365 of the Bankruptcy Code effective as of and subject to the occurrence of the Effective Date, unless another date is specified in the Plan except: (i) any executory contracts and unexpired leases that are the subject of separate motions to assume or assume and assign filed pursuant to section 365 of the Bankruptcy Code by the Debtors before the Effective Date; (ii) contracts and leases listed in a schedule to the Disclosure Statement and any subsequently filed "Schedule of Rejected Executory Contracts and Unexpired Leases" to be filed by the Debtors with the Bankruptcy Court before the entry of, or as an exhibit to, the Confirmation Order; (iii) all executory contracts and

unexpired leases rejected by order of the Bankruptcy Court entered before the Effective Date; and (iv) any executory contract or unexpired lease that is the subject of a dispute over the amount or manner of cure pursuant to the Article 12 of the Plan and for which the Debtors make a motion to reject such contract or lease at any time based upon the existence of such dispute or the resolution of such dispute. The Debtors reserve the right to amend the schedule to the Disclosure Statement or any "Schedule of Rejected Executory Contracts and Unexpired Leases" prior to the entry of the Confirmation Order. Each executory contract and unexpired lease to be assumed by the Debtors will include modifications, amendments, supplements, restatements or other similar agreements made directly or indirectly by any agreement, instrument or other document that affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on the schedule to the Disclosure Statement or any "Schedule of Rejected Executory Contracts and Unexpired Leases."

(2)     The inclusion of a contract, lease or other agreement in Article 12.1 of the Plan or on any schedule to this Disclosure Statement or any "Schedule of Rejected Executory Contracts and Unexpired Leases" shall not constitute an admission by the Debtors as to the characterization of whether any such included contract, lease, or other agreement is, or is not, an executory contract or unexpired lease or whether any claimants under any such contract, lease or other agreement are time-barred from asserting Claims against the Debtors. The Debtors reserve all rights with respect to the characterization of any such agreements.

(3)     The Plan constitutes a motion to assume and assign to the Reorganized Debtors such executory contracts and unexpired leases assumed pursuant to Article 12.1 of the Plan, and the Debtors shall have no liability thereunder except as is specifically provided in the Plan. Entry of the Confirmation Order by the Clerk of the Bankruptcy Court will constitute approval of such assumption and assignment pursuant to sections 365(a), (b) and (f) of the Bankruptcy Code, and a finding by the Bankruptcy Court that the requirements of section 365(f) of the Bankruptcy Code have been satisfied.

(4)     The Plan shall constitute a motion to reject such executory contracts and unexpired leases as set forth in the schedule to the Disclosure Statement or any "Schedule of Rejected Executory Contracts and Unexpired Leases" as of the effective date denoted on the  Schedule of Rejected Executory Contracts and Unexpired Leases. Entry of the Confirmation Order by the Clerk of the Bankruptcy Court will constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code, subject to the occurrence of the Effective Date, and a finding by the Bankruptcy Court that each such rejected agreement, executory contract or unexpired lease is

burdensome and that the rejection thereof is in the best interests of the Debtors and their estates.

(5)     Any non-Debtor counterparty to an agreement, contract or unexpired lease to be assumed and assigned who disputes the assumption and assignment of an executory contract or unexpired lease must file with the Bankruptcy Court, and serve upon the Debtors, a written objection to the assumption and assignment, which objection will set forth the basis for the dispute by no later than ten (10) days prior to the Confirmation Hearing.  The failure to timely object will be deemed a waiver of any and all objections to the assumption and assignment of executory contracts and leases as set forth herein or as otherwise designated as being assumed or assumed and assigned in Article 12.1 of the Plan.

### (ii)     Cure Costs.

The provisions (if any) of each Executory Contract or Unexpired Lease to be assumed under the Plan which are or may be in default will be satisfied solely by Cure Costs.  In the event of a dispute regarding the assumption of an Executory Contract or Unexpired Lease, the provision of Cure Costs to the counterparty of the Executory Contract or Unexpired Lease will occur as soon as reasonably practicable following the entry of a Final Order resolving such dispute.

### (iii)     Claims Arising from Rejected Contracts.

Rejection Damage Claims must be submitted to the Claims Agent, with copies to counsel for the Debtors, on the later of December 8, 2010 and the first Business Day that is thirty (30) days following the effective date of the rejection of such Executory Contract or Unexpired Lease.  Properly submitted Rejection Damage Claims shall be treated as Class 7 General Unsecured Claims under the Plan, except to the extent that a Rejection Damage Claim is also a Lease Rejection Damage Claim, in which case, such claim shall be treated as a Class 8 Lease Rejection Damage Claim under the Plan.  All Lease Rejection Damage Claims shall be subject to objection by the Reorganized Debtors.  Any Rejection Damage Claims that are not properly submitted pursuant to Article 12.3 of the Plan will forever be barred from assertion and shall not be enforceable against the Reorganized Debtors, their respective Estates, Affiliates or Assets.

## J.     Conditions Precedent to Confirmation of the Plan and the Occurrence of the Effective Date.

### (i)     Conditions Precedent to Confirmation.

The following are conditions precedent to confirmation of the Plan:

(1)     The clerk of the Bankruptcy Court shall have entered an order or orders:

(a)     approving the Disclosure Statement as containing "adequate information"

pursuant to section 1125 of the Bankruptcy Code;

(b) authorizing the solicitation of votes with respect to the Plan;

(c) determining that all votes are binding and have been properly tabulated as acceptances or rejections of the Plan;

(d) confirming and giving effect to the terms and provisions of the Plan;

(e) determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Debtors and the Plan;

(f) approving the Plan Documents; and

(g) authorizing the Debtors to execute, enter into, and deliver the Plan Documents and to execute, implement, and to take all actions otherwise necessary or appropriate to give effect to, the transactions contemplated by the Plan and the Plan Documents.

(2) The Confirmation Order, the Plan Documents and the Plan are each in a form satisfactory to the Debtors.

**(ii) Conditions Precedent to the Occurrence of the Effective Date.**

The following are conditions precedent to the occurrence of the Effective Date:

(1) The Confirmation Order shall have been entered by the Clerk of the Bankruptcy Court, be in full force and effect and not be subject to any stay or injunction;

(2) There is sufficient available Cash to make all payments to be made on the Effective Date;

(3) The closing of the Exit Loan; and

(4) All necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments required

49

to be made on the Effective Date, including, without limitation, satisfaction or waiver of all conditions to the obligations of the Debtors under the Plan and the Plan Documents.

### (iii) Waiver of Conditions.

The Debtors may waive any one or more of the conditions set forth in Article 14.1 or Article 14.2(b) or (c) of the Plan in a writing executed by each of them without notice or order of the Bankruptcy Court and without notice to any parties in interest.

### (iv) Effect of Non-Occurrence of the Effective Date.

If the Effective Date shall not occur, the Plan shall be null and void and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Equity Interests in a Debtor; (b) prejudice in any manner the rights of any party-in-interest; or (c) constitute an admission, acknowledgement, offer or undertaking by the Debtors or any other party-in-interest.

### K. Retention of Jurisdiction.

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code the Bankruptcy Court will retain and will have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) that relates to the following:

(1) To hear and determine any and all motions or applications pending on the Confirmation Date or thereafter brought in accordance with Article XII of the Plan for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases to which any of the Debtors is a party or with respect to which any of the Debtors may be liable, and to hear and determine any and all Claims and any related disputes (including, without limitation, the exercise or enforcement of setoff or recoupment rights, or rights against any third party or the property of any third party resulting therefrom or from the expiration, termination or liquidation of any executory contract or unexpired lease);

(2) To determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Disbursing Agent or the Debtors, as applicable, after the Effective Date;

(3) To hear and determine any objections to the allowance of Claims, whether filed, asserted, or made before or after the Effective Date, including, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow, disallow or estimate any Contested Claim in whole or in part;

(4)  To issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

(5)  To consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(6)  To hear and determine all Fee Applications and applications for allowances of compensation and reimbursement of any other fees and expenses authorized to be paid or reimbursed under the Plan or the Bankruptcy Code;

(7)  To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Plan, the Plan Documents or their interpretation, implementation, enforcement, or consummation;

(8)  To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Confirmation Order (and all exhibits to the Plan) or its interpretation, implementation, enforcement, or consummation;

(9)  To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or Cause of Action by, on behalf of, or against the Estates;

(10)  To determine such other matters that may be set forth in the Plan, or the Confirmation Order, or that may arise in connection with the Plan, or the Confirmation Order;

(11)  To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which the Reorganized Debtors, the Debtors in Possession, or the Disbursing Agent may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(12)  To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with any setoff and/or recoupment rights of the Debtors or any Person under the Plan;

(13)  To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with Causes of Action of the Debtors commenced by the Disbursing Agent, the Debtors or any third parties, as applicable, before or after the Effective Date;

(14)  To enter an order or final decree closing the Chapter 11 Cases;

(15)  To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any

Person with consummation, implementation or enforcement of the Plan or the Confirmation Order; and

(16)     To hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code.

## L.     MISCELLANEOUS PROVISIONS.

### (i)     Third Party Agreements; Subordination.

The Plan Distributions to the various classes of Claims and Equity Interests thereunder shall not affect the right of any Person to levy, garnish, attach, or employ any other legal process with respect to such Plan Distributions by reason of any claimed subordination rights or otherwise. All of such rights and any agreements relating thereto will remain in full force and effect, <u>except</u> as compromised and settled pursuant to the Plan. Plan Distributions shall be subject to and modified by any Final Order directing distributions other than as provided in the Plan. The right of the Debtors to seek subordination of any Claim or Equity Interest pursuant to section 510 of the Bankruptcy Code is fully reserved; and the treatment afforded any Claim or Equity Interest that becomes a Subordinated Claim or subordinated Equity Interest at any time shall be modified to reflect such subordination. Unless the Confirmation Order provides otherwise, no Plan Distributions shall be made on account of a Subordinated Claim or subordinated Equity Interest. Notwithstanding the foregoing, the Intercreditor Agreement shall remain in full force and effect.

### (ii)     Payment of Statutory Fees.

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid by the Debtors on or before the Effective Date.

### (iii)     Satisfaction of Claims.

The rights afforded in the Plan and the treatment of all Claims and Equity Interests herein will be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, <u>including</u> any accrued postpetition interest, against the Debtors and the Debtors in Possession, or any of their Estates, Assets, properties, or interests in property. <u>Except</u> as otherwise provided herein, on the Effective Date, all Claims against and Equity Interests in the Debtors and the Debtors in Possession will be satisfied, discharged, and released in full. The Reorganized Debtors will not be responsible for any pre-Effective Date obligations of the Debtors or the Debtors in Possession, <u>except</u> those expressly assumed by any Reorganized Debtor(s), as applicable. <u>Except</u> as otherwise provided herein, all Persons and Entities will be precluded and forever barred from asserting against the Reorganized Debtors, their respective successors or assigns, or their Estates, Assets, properties, or interests in property any event, occurrence, condition, thing, or other or further Claims or Causes of Action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

(iv)    **Exculpation.**

**The Debtors and any Exculpated Persons will not be liable for any Cause of Action arising in connection with or out of the administration of the Chapter 11 Cases, pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, <u>except</u> for gross negligence or willful misconduct as determined by Final Order of the Bankruptcy Court. The Confirmation Order will enjoin all holders of Claims and Equity Interests from asserting or prosecuting any Claim or Cause of Action against any Exculpated Person as to which such Exculpated Person has been exculpated from liability pursuant to the preceding sentence.**

(v)    **Discharge of Liabilities.**

Except as otherwise provided in the Plan, upon the occurrence of the Effective Date, the Debtors will be discharged from all Claims and Causes of Action to the fullest extent permitted by section 1141 of the Bankruptcy Code, and all holders of Claims and Equity Interests will be precluded from asserting against the Reorganized Debtors, the Debtors, the Estates, the Assets, or any property dealt with under the Plan, any further or other Cause of Action based upon any act or omission, transaction, event, thing, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date.

**<u>EXCEPT</u> AS OTHERWISE PROVIDED IN THE PLAN, THE REORGANIZED DEBTORS WILL NOT HAVE, AND WILL NOT BE CONSTRUED TO HAVE OR MAINTAIN ANY LIABILITY, CLAIM, OR OBLIGATION, THAT IS BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION, EVENT, OTHER OCCURRENCE OR THING OCCURRING OR IN EXISTENCE ON OR PRIOR TO THE EFFECTIVE DATE OF THE PLAN (<u>INCLUDING</u>, WITHOUT LIMITATION, ANY LIABILITY OR CLAIMS ARISING UNDER APPLICABLE NON-BANKRUPTCY LAW AS A SUCCESSOR TO THE DEBTORS) AND NO SUCH LIABILITIES, CLAIMS, OR OBLIGATIONS FOR ANY ACTS SHALL ATTACH TO THE REORGANIZED DEBTORS.**

(vi)    **Discharge of Debtors.**

<u>Except</u> as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, without further notice or order, all Claims of any nature whatsoever will be automatically discharged forever. <u>Except</u> as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, the Debtors, their Estates, and all successors thereto will be deemed fully discharged and released from any and all Claims, <u>including</u>, but not limited to, demands and liabilities that arose before the Effective Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, whether or not (a) a proof of Claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code; (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code; or (c) the holder of a Claim based upon such debt has accepted the Plan. The Confirmation Order will be a judicial determination of discharge of all liabilities of the Debtors, their Estates, and all successors thereto. As provided in section 524 of the Bankruptcy Code, such discharge will void any

judgment against the Debtors, their Estates, or any successor thereto at any time obtained to the extent it relates to a Claim discharged, and operates as an injunction against the prosecution of any action against the Reorganized Debtors or property of the Debtors or their Estates to the extent it relates to a discharged Claim.

**(vii) Notices.**

Any notices, requests, and demands required or permitted to be provided under the Plan, in order to be effective, will be required to be in writing and, unless otherwise expressly provided herein, will be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> Workflow Management, Inc.
> Attention: L. Scott Seymour, General Counsel
> 150 West Main Street
> Post Office Box 3037
> Norfolk, Virginia 23514
> T (757) 624.3000
> F (757) 624.3169
>
> --and--
>
> McGuireWoods LLP
> Douglas M. Foley, Esq.
> Patrick L. Hayden, Esq.
> 9000 World Trade Center
> 101 West Main Street
> Norfolk, Virginia 23510
> Telephone: (757) 640-3700
> Facsimile: (757) 640-3701

**(viii) Headings.**

The headings used in the Plan are inserted for convenience only, and neither constitute a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

**(ix) Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of New York, without giving effect to the conflicts of laws principles thereof, will govern the construction of the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise expressly provided in such instruments, agreements or documents.

**(x)    Expedited Determination.**

The Disbursing Agent is hereby authorized to file a request for expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed with respect to the Debtors.

**(xi)    Exemption from Transfer Taxes.**

Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, lien, pledge or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under the Plan, will not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

**(xii)    Retiree Benefits.**

Pursuant to section 1129(a)(13), on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, will continue to be paid in accordance with applicable law.

**(xiii)    Notice of Entry of Confirmation Order and Relevant Dates.**

Promptly upon entry of the Confirmation Order, the Debtors will publish as directed by the Bankruptcy Court and serve on all known parties in interest and holders of Claims and Equity Interests, notice of the entry of the Confirmation Order and all relevant deadlines and dates under the Plan.

**(xiv)    Interest and Attorneys' Fees.**

(1)    Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in the Plan, the Confirmation Order or as otherwise required by the Bankruptcy Court or by applicable law.

(2)    Except as set forth in the Plan or as ordered by the Bankruptcy Court, no award or reimbursement of attorneys' fees or related expenses or disbursements will be allowed on, or in connection with, any Claim.

**(xv)    Modification of the Plan.**

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtors at any time before confirmation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors will have complied with section 1125 of the Bankruptcy Code. The Debtors may modify the Plan at any time after confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as

modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications.  A holder of a Claim that has accepted the Plan will be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such holder.

**(xvi)  Revocation of Plan.**

(1)  The Debtors reserve the right to revoke and withdraw the Plan or to adjourn the Confirmation Hearing with respect to any one or more of the Debtors prior to the occurrence of the Effective Date.  If the Debtors revoke or withdraw the Plan with respect to any one or more of the Debtors, or if the Effective Date does not occur as to any Debtor, then, as to such Debtor, the Plan and all settlements and compromises set forth in the Plan and not otherwise approved by a separate Final Order will be deemed null and void and nothing contained herein and no acts taken in preparation for consummation of the Plan will be deemed to constitute a waiver or release of any Claims against or Equity Interests in such Debtor or to prejudice in any manner the rights of any of the Debtors or any other Person in any other further proceedings involving such Debtor.

(2)  In the event that the Debtors choose to adjourn the Confirmation Hearing with respect to any one or more of the Debtors, the Debtors reserve the right to proceed with confirmation of the Plan with respect to those Debtors in relation to which the Confirmation Hearing has not been adjourned.  With respect to those Debtors with respect to which the Confirmation Hearing has been adjourned, the Debtors reserve the right to amend, modify, revoke or withdraw the Plan and/or submit any new plan of reorganization at such times and in such manner as they consider appropriate, subject to the provisions of the Bankruptcy Code.

**(xvii)  Setoff Rights.**

In the event that any Debtor has a Claim of any nature whatsoever against the holder of a Claim against such Debtor, then such Debtor may, but is not required to, set off against the Claim (and any payments or other Plan Distributions to be made in respect of such Claim hereunder) such Debtor's Claim against such holder.  Neither the failure to set off nor the allowance of any Claim under the Plan will constitute a waiver or release of any Claims that any Debtor may have against the holder of any Claim.

**(xviii)  Compliance with Tax Requirements.**

In connection with the Plan, the Debtors and the Disbursing Agent, as applicable, will comply with all withholding and reporting requirements imposed by federal, state, local, and foreign taxing authorities and all Plan Distributions hereunder will be subject to such withholding and reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim or Equity Interest that is to receive a Plan Distribution will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any

government unit, <u>including</u> income, withholding and other tax obligations, on account of such Plan Distribution.  The Disbursing Agent has the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to the Disbursing Agent for payment of any such tax obligations.

    **(xix)   Rates.**

        The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.

    **(xx)   Injunctions.**

        **On the Effective Date and <u>except</u> as otherwise provided herein, all Persons who have been, are, or may be holders of Claims against or Equity Interests in the Debtors shall be permanently enjoined from taking any of the following actions against or affecting the Debtors, the Reorganized Debtors, the Estates, the Assets, or the Disbursing Agent, or their respective assets and property, with respect to such Claims or Equity Interests (other than actions brought to enforce any rights or obligations under the Plan):**

        (1)   commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, all suits, actions, and proceedings that are pending as of the Effective Date, which must be withdrawn or dismissed with prejudice);

        (2)   enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order;

        (3)   creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance; and

        (4)   asserting any setoff, right of subrogation or recoupment of any kind; provided, that any defenses, offsets or counterclaims which the Debtors may have or assert in respect of the above referenced Claims are fully preserved in accordance with Article 16.17 of the Plan.

    **(xxi)   Binding Effect.**

        The Plan shall be binding upon the Reorganized Debtors, the holders of all Claims and Equity Interests, parties in interest, Persons and Entities and their respective successors and assigns.  To the extent any provision of the Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan will be binding and conclusive.

(xxii)  **Severability.**

IN THE EVENT THE BANKRUPTCY COURT DETERMINES THAT ANY PROVISION OF THE PLAN IS UNENFORCEABLE EITHER ON ITS FACE OR AS APPLIED TO ANY CLAIM OR EQUITY INTEREST OR TRANSACTION, THE DEBTORS MAY MODIFY THE PLAN IN ACCORDANCE WITH ARTICLE 16.15 OF THE PLAN SO THAT SUCH PROVISION WILL NOT BE APPLICABLE TO THE HOLDER OF ANY SUCH CLAIM OR EQUITY INTEREST OR TRANSACTION SUCH A DETERMINATION OF UNENFORCEABILITY WILL NOT (A) LIMIT OR AFFECT THE ENFORCEABILITY AND OPERATIVE EFFECT OF ANY OTHER PROVISION OF THE PLAN OR (B) REQUIRE THE RESOLICITATION OF ANY ACCEPTANCE OR REJECTION OF THE PLAN.

(xxiii)  **No Admissions.**

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER CAUSES OF ACTION OR THREATENED CAUSES OF ACTIONS, THE PLAN WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THE PLAN WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, AND OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS OR THEIR AFFILIATES, AS DEBTORS AND DEBTORS IN POSSESSION IN THESE CHAPTER 11 CASES.

(xxiv)  **Dissolution of the Committee.**

Effective on the Effective Date, the Committee will dissolve automatically, whereupon its members, professionals, and agents will be exculpated from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to (i) applications for Fee Claims or reimbursement of expenses incurred as a member of the Committee, and (ii) any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order or pending appeals of orders entered in the Chapter 11 Cases.

## XII.

## RISK FACTORS

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE DOCUMENTS DELIVERED TOGETHER WITH THIS DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT.  THE RISK FACTORS SET FORTH BELOW SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION

WITH THE PLAN AND ITS IMPLEMENTATION OR AN INVESTMENT IN THE SECURITIES OF THE REORGANIZED DEBTORS.

**A.     The Risk of Non-confirmation of the Plan.**

In order for the Reorganized Debtors to emerge successfully from the Chapter 11 Cases as viable entities, the Debtors, like any other chapter 11 debtors, must obtain approval of the Plan from their creditors and confirmation of the Plan through the Bankruptcy Court, and then successfully implement the Plan.  The foregoing process requires the Debtors to (a) meet certain statutory requirements with respect to the adequacy of this Disclosure Statement; (b) solicit and obtain creditor acceptances of the Plan; and (c) fulfill other statutory conditions with respect to the confirmation of the Plan.  The Debtors may or may not receive the requisite acceptances to confirm the Plan.  If the requisite acceptances of the Plan are received, the Debtors will seek confirmation of the Plan by the Bankruptcy Court.  If the requisite acceptances are not received, the Debtors will nevertheless seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code as long as at least one impaired Class has accepted the Plan (determined without including the acceptance of any "insider" in such impaired Class).  Even if the requisite acceptances of the Plan are received, or the Debtors are able to seek a "cramdown" confirmation, the Bankruptcy Court may not confirm the Plan as proposed.  A holder of a Claim in a non-accepting Class could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code.  Even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.  Specifically, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that: (a) confirmation of the Reorganized Debtor's Plan is not likely to be followed by a liquidation or a need for further financial reorganization of the Reorganized Debtors; (b) the value of distributions to holders of Claims within an impaired Class will not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code; and (c) in the event of a "cramdown" confirmation, the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to non-accepting Classes.  The Bankruptcy Court may determine that the Plan does not satisfy one or more of these applicable requirements, in which case the Plan could not be confirmed by the Bankruptcy Court.

**B.     Risk of Non-Occurrence of Effective Date.**

Although the Debtors anticipate that the Effective Date will occur soon after the Confirmation Date, if any, there can be no assurance as to such timing.  If each of the conditions precedent to the Plan becoming effective has not been satisfied or duly waived, the Confirmation Order may be vacated, in which event the Plan would be deemed null and void.

**C.     The Failure to Close the Exit Loan.**

The failure of the Debtors to close the Exit Loan could leave the Debtors with insufficient liquidity to operate its business and make the distributions proposed in the Plan.  If the Debtors are unable to close the Exit Loan, the Plan may not become effective.

**D.      Risk that Claims Will Be Higher than Estimated.**

The projected distributions and recoveries set forth in this Disclosure Statement and the Liquidation Analysis (defined below) are based on the Debtors' initial estimate of Allowed Claims, without yet having undertaken a substantive review of all filed Claims.  The actual amount at which such Claims are ultimately Allowed may differ from these estimates.  The Debtors project that the Claims and Equity Interests asserted against them will be resolved in and reduced to an amount that approximates their estimates.  There can be no assurance, however, that the Debtors' estimates will prove accurate.  Should these estimates prove wrong, the Debtors may not have sufficient funds to pay all Claims in Cash.

**E.      Liquidity Risks Prior to Consummation of the Plan.**

The public disclosure of the Debtors' Chapter 11 Cases has impaired the Debtors ability to maintain normal credit terms with a limited number of their suppliers.  As a result, the Debtors have been required to pay Cash on delivery or in advance to a limited number vendors and have experienced restrictions on the availability of trade credit, which has further reduced the Debtors' liquidity.  If liquidity further deteriorates, the Debtors' suppliers could refuse to provide key products and services to the Debtors.

**F.      Continuing Leverage and Ability to Service Debt.**

Although the consummation of the Plan will significantly restructure and reduce the Reorganized Debtors' debt service obligations, the Reorganized Debtors will remain leveraged.  The Debtors believe that, following consummation of the Plan, the Reorganized Debtors will be able to meet their anticipated future operating expenses, capital expenditures and debt service obligations.  However, the Reorganized Debtors' ability to meet the Reorganized Debtors' debt service obligations will depend on a number of factors, including future operating performance and ability to achieve the Business Plan (defined below).  These factors will be affected by general economic, financial, competitive, regulatory, business and other factors beyond the Reorganized Debtors' control.  The Projections (defined below) reflect the most recent data collected in connection with Reorganized Debtors' proposed Business Plan.  The Business Plan relies upon the success of the Debtors' business strategy and assumes increases in revenues over the course of the Business Plan.  However, there can be no assurance that such strategy will be successful or, even if successful, that it will have the effects upon sales and earnings that are reflected in and anticipated by the Projections.  Although the Debtors believe that their Projections are achievable if all assumptions are met, and that those assumptions are reasonable, there can be no assurance that the results set forth in such Projections will be obtained.

**G.      The Reorganized Debtors' Actual Financial Results May Vary Significantly from the Projections Included in this Disclosure Statement.**

The Projections included in this Disclosure Statement are dependent upon the successful implementation of the Reorganized Debtors' Transformation Plan and the validity of the numerous assumptions contained therein.  The significant assumptions underlying the

Projections are discussed in greater detail in the Disclosure Statement under "Financial Projections and Assumptions."

Many of these assumptions are beyond the control of the Debtors and may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the Projections may adversely affect the financial results of the Debtors. Although the Debtors believe that the Projections and assumptions are reasonable, variations between the actual financial results and those projected may be material.

**H.     Inherent Uncertainty of Projections.**

Although the Projections suggest that the Reorganized Debtors will be able to meet all of their financial obligations following consummation of the Plan, the Projections are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Because the actual results achieved throughout the periods covered by the Projections may vary from the projected results, the Projections should not be relied upon as a guaranty, representation, or other assurance of the actual results that will occur. Moreover, the Projections are dependent on certain assumptions that are an integral part of the Projections, regarding (among other things): (i) confirmation and consummation of the Plan in accordance with its terms; (ii) industry performance; (iii) general business and economic conditions; (iv) competition; (v) the availability of new financing; (vi) the ability of the Reorganized Debtors to obtain and maintain certain terms with vendors; (vii) service providers and customers; (viii) the continued supply and replenishment of inventory at assumed prices; (ix) the ability of the Reorganized Debtors to attract, motivate and retain key employees and; (x) other matters, many of which are beyond the control of the Reorganized Debtors, and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of Reorganized Debtors' operations.

If the actual financial results of the Reorganized Debtors' operations differ from the Projections, the Reorganized Debtors may lack sufficient liquidity to continue as going concerns as planned after the Effective Date. These factors may adversely affect the Reorganized Debtors' ability to pay the holders of certain Claims the amount that such holders are entitled to be paid under the Plan.

**I.     General Economic Conditions.**

The Debtors' business operations have historically been, and the Reorganized Debtors' business operations may in the future be, materially affected by adverse conditions in the financial markets and depressed economic conditions generally. The current economic downturn in the businesses in which the Debtors operate has substantially reduced demand for products and resulted in decreased sales volumes. Recently, concerns over inflation, energy costs, the availability and cost of credit and the instability of financial and credit markets in the United States and worldwide have contributed to increased volatility and diminished expectations for the global economy and markets. These factors, combined with volatile raw material prices, declining business and consumer confidence, increased unemployment and continuing financial market fluctuations, have precipitated the worldwide economic crisis that

could continue for an extended period of time.  The global crisis has adversely affected the Debtors' business operations because of a reduction in worldwide demand for their products. Moreover, many of the Reorganized Debtors' customers and suppliers rely on access to credit to adequately fund their own operations.  Disruptions in financial markets and economic slowdown may adversely impact the ability of the Reorganized Debtors' customers to finance the purchase of their products as well as the creditworthiness of those customers.  These same factors may also impact the ability and willingness of suppliers to provide the Reorganized Debtors' with materials for their business.

## J.      Increased Competition.

The Debtors sell their products in highly competitive markets.  Due to the nature of many of the Debtors' products, competition in these markets is based primarily on price, performance, product quality, product deliverability, reliability of supply and customer service. As a result, the Debtors, generally, are not able to protect their market position for these products solely by product differentiation and may not be able to pass on cost increases to its customers because of the competition found in the Debtors' business sector.  The Reorganized Debtors may face increased competition from companies that may have greater resources and different cost structures or strategic goals than the Reorganized Debtors.  Increased competition from these companies could limit their ability to increase product sales prices in response to raw material and other cost increases, or could cause the Reorganized Debtors to reduce product sales prices to compete effectively, which could reduce the Reorganized Debtors' margins.  Competitors that have greater financial resources than the Reorganized Debtors' may be able to invest significant capital into their businesses, including expenditures for product development.  In addition, specialty products that the Reorganized Debtors' produce may become common or may become easier to produce.  Accordingly, increases in raw material and other costs may not necessarily correlate with changes in prices for the Reorganized Debtor's products, either in the direction of the price change or in magnitude.  Timing differences in pricing between rising raw material costs, which may change daily, and contract product prices, which in many cases are negotiated well in advance of production, may further reduce margins of the Reorganized Debtors.

Even in periods during which raw material prices decline, the Reorganized Debtors may suffer decreasing margins if raw material price reductions occur at a slower rate than decreases in the selling prices of its products.  Further, volatility in costs and pricing can result in commercial disputes with customers and suppliers with respect to interpretations of complex contractual arrangements.  Significant adverse resolution of any such disputes also could reduce margins of the Reorganized Debtors.

## K.      The Chapter 11 Cases May Affect the Reorganized Debtors' Relationship with Key Employees, Suppliers and Customers.

The Chapter 11 Cases could significantly harm relationships the Debtors have with key customers, suppliers and employees, which in turn could materially and adversely affect their businesses and financial condition and make it less likely that the Reorganized Debtors will emerge from the Chapter 11 Cases with a sustainable and viable business.  The Reorganized Debtors' financial success will largely depend on the skills, experience and efforts of its key employees and management team together with the Debtors' advisors.  The Debtors'

ability to attract, motivate and retain key employees and managers is restricted by provisions in the Bankruptcy Code, which may limit the ability to implement a retention program or take other measures to motivate key employees and managers to remain with the Debtors until the Debtors' emergence from the Chapter 11 Cases.

**L.    External Factors Beyond the Reorganized Debtors' Control May Cause Fluctuations in Demand for their Products and in the Reorganized Debtors' Prices and Margins.**

External factors beyond the Reorganized Debtors' control may cause volatility in the price of raw materials and other operating costs, as well as significant fluctuations in demand for the Reorganized Debtors' products, and can magnify the impact of economic cycles on the Reorganized Debtors' businesses.  Examples of external factors include:

- supply of and demand for raw materials;
- increases in the cost of postage or other shipping costs;
- changes in customer buying patterns and demand for the Reorganized Debtors' products;
- general economic conditions;
- domestic and international events and circumstances;
- competitor actions;
- governmental regulation; and
- severe weather and natural disasters.

The volatility and relatively elevated level of prices for raw materials may impact the factors cited above and others may contribute to a slowdown in the business cycle or impact economic recovery, reducing demand and lowering operating rates and, ultimately, reducing the margins of the Reorganized Debtors.

# XIII.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain U.S. federal income tax consequences expected to result from the implementation of the Plan.  This discussion is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), as in effect on the date of this Disclosure Statement and on U.S.  Treasury Regulations in effect (or in certain cases, proposed) on the date of this Disclosure Statement, as well as judicial and administrative interpretations thereof available on or before such date.  All of the foregoing are subject to change, which change could apply retroactively and could affect the tax consequences described below.  There can be no assurance that the IRS will not take a contrary view with respect to one or more of the issues discussed below, and no ruling from the IRS has been or will be sought with respect to any issues which may arise under the Plan.

The following summary is for general information only and discusses certain U.S. federal income tax consequences of the Plan to the Debtors, the "U.S. Holders" of Allowed Claims or Equity Interests (sometimes referred to as "Stock") by virtue of their treatment under

the Plan. For purposes of this summary, a "U.S. Holder" is a beneficial owner of Stock or Notes that, for U.S. federal income tax purposes, is: (a) a citizen or resident of the United States; (b) a partnership or corporation created or organized in or under the laws of the United States or any state thereof (including the District of Columbia); (c) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (d) a trust if such trust validly elects to be treated as a United States person for U.S. federal income tax purposes, or if (I) a court within the United States is able to exercise primary supervision over its administration and (II) one or more United States persons have the authority to control all of the substantial decisions of such trust. This summary does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular holder. The tax treatment of a U.S. Holder of Allowed Claims or Equity Interests as the case may be, may vary depending upon such holder's particular situation. The following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtors and the U.S. Holders of Allowed Claims or Equity Interests. This summary does not address tax considerations applicable to holders that may be subject to special tax rules, such as financial institutions, insurance companies, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that hold an equity interest or a security in a Debtor as a position in a "straddle" or as part of a "hedging," "conversion" or "integrated" transaction for U.S. federal income tax purposes, persons that have a "functional currency" other than the U.S. dollar, persons who acquired an equity interest or a security in a Debtor in connection with the performance of services and persons who are not United States persons (as defined in the Tax Code).

If a partnership (or any other entity treated as a partnership for U.S. federal income tax purposes) holds Allowed Claims, Equity Interests, Stock or Notes, the tax treatment of a partner in such partnership generally will depend on the status of the partner and the activities of the partnership. Any such partner should consult its tax advisor as to its tax consequences.

EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

### INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE

PURSUANT TO INTERNAL REVENUE SERVICE CIRCULAR 230, WE HEREBY INFORM YOU THAT THE DESCRIPTION SET FORTH HEREIN WITH RESPECT TO U.S. FEDERAL TAX ISSUES WAS NOT INTENDED OR WRITTEN TO BE USED, AND SUCH DESCRIPTION CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER UNDER THE U.S. INTERNAL REVENUE CODE. THIS DESCRIPTION IS LIMITED TO THE U.S. FEDERAL TAX ISSUES DESCRIBED HEREIN. IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE U.S. FEDERAL TAX TREATMENT OF THE MATTER THAT IS THE SUBJECT OF THE DESCRIPTION NOTED HEREIN, AND THIS DESCRIPTION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES. TAXPAYERS

SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR
CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## A.      U.S. Federal Income Tax Consequences to the Debtors.

The Debtors file consolidated U.S. federal income tax returns which take into
account the income and losses of all of the Debtors (some of which are treated as partnerships or
disregarded entities for U.S. federal income tax purposes).  The Debtors' consolidated NOLs for
U.S. federal income tax purposes were approximately $96 million as of December 31, 2009 and
are projected to be in excess of $133 million as of the end of 2010.

As discussed below, in connection with the implementation of the Plan, the
amount of the Debtors' NOLs may be reduced, restricted or eliminated and therefore the
Debtors' utilization of any remaining NOLs and certain other tax attributes may be limited
following the Effective Date.

### (i)      Cancellation of Debt Income.

Pursuant to the terms of the Plan, no material cancellation of debt ("COD")
income is contemplated by the Debtors, except to the extent a holder opts to receive a Cash
payment in amount less than the payment equal to 100% of such holder's Allowed Claim.
Debtors generally realize "COD" income to the extent a creditor receives in discharge of its
claim, an amount of consideration in respect of such claim that is less than the amount of the
claim, subject to certain statutory or judicial exceptions that can apply to limit the amount of
COD income (as in the case where the payment of the cancelled debt would have given rise to a
tax deduction).  The amount of consideration paid to a creditor generally equals the amount of
Cash, the fair market value of property (including fair market value of any stock under Section
108(e)(8) of the Tax Code), and/or the issue price of any new debt instrument issued to such
creditor (under Section 108(e)(10) of the Tax Code).  The issue price of such new debt
instrument issued to the creditor is determined under either Section 1273 or 1274 of the Tax
Code.  Generally, these provisions treat the fair market value of a publicly-traded debt instrument
as its issue price and the stated principal amount of any other debt instrument as its issue price if
its terms provide for adequate stated interest.

When the discharge of indebtedness occurs in a proceeding under the Bankruptcy
Code, the reorganized debtors generally are able to exclude any COD income from gross income.
As a consequence of this exclusion (the "Bankruptcy Exclusion"), however, such reorganized
debtors must reduce tax attributes, such as NOLs, tax credits and tax basis in assets, to the
extent COD income is excluded under the Bankruptcy Exclusion.

The Plan provides for the payment of Allowed Claims through a combination of
reinstatement of claims, amendment of claims, payment in Cash or surrender of the collateral in
which a holder has an interest.  In particular, the Plan provides for the payment of the Allowed
Claims of (i) Class 2 –First Lien Lenders Claims with amendment and restatement of such
holders First Lien Lender Claim; (ii) Class 3 –First Lien Lenders Claims of Cross Lien Holders
with amendment and restatement of such holders First Lien Lender Claim; (iii) Class 4 –Second
Lien Lender Claims with amendment and restatement of such holders Second Lien Lender

Claim; (iv) Class 5 –Second Lien Lender Claims of Cross Lien Holders with amendment and restatement of such holders Second Lien Lender Claim; (v) Class 6 –Other Secured Claims in Cash, restatement of such holders Other Secured Claim, or surrender of the collateral in which the holder has an interest; (vi) Class 7 –General Unsecured Claims with reinstatement or Cash of such holders General Unsecured Claim; (vii) Class 8 –Lease Rejection Claims with Cash; (viii) Class 9 –Unsecured Note Claim with restatement of such holder's Unsecured Note Claim; (ix) Class 10 –Unsecured Contingent Claims with Cash or restatement of such holder's Unsecured Contingent Claim; (x) Class 11 –Intercompany Claims with reinstatement of such Intercompany Claims; (xi) Class 12 –WF Capital Equity Interests with reinstatement; (xii) Class 13 – Subsidiary Equity Interests with reinstatement of such holders Subsidiary Equity Interests; and (xiii) Class 14 –Convenience Class Claims with payment in Cash of such holder's Convenience Class Claim.

The Debtors expect, however, that holders of Claims entitled to distributions under the Plan generally will receive an amount of consideration that should equal the total amount of their Allowed Claims, except (i) to the extent a holder of a claim in excess of $2,000 opts to be treated as a member of Class 14 – Convenience Class Claims and opts to receive Cash in an amount of $2,000. Accordingly, it is expected that the Debtors should only recognize a limited amount of COD income, if any, as a result of the Plan.

**(ii)     Accrued Interest.**

To the extent that there exists accrued but unpaid interest on the indebtedness owing to holders of Allowed Claims and to the extent that such accrued but unpaid interest has not been deducted previously by a Debtor, portions of payments made in consideration for the indebtedness underlying such Allowed Claims that are allocable to such accrued but unpaid interest should be deductible by such Debtor. Any such interest that is not paid will not be deductible by such Debtor and will not give rise to COD income.

To the extent that a Debtor has previously taken a deduction for accrued but unpaid interest, any amounts so deducted that are paid will not give rise to any tax consequences to such Debtor. If such amounts are not paid, they will give rise to COD income that should be excluded from gross income pursuant to the Bankruptcy Exclusion. As a result, the Debtor would be required to reduce its tax attributes to the extent of such interest previously deducted and not paid.

**(iii)    Utilization of Debtors' Net Operating Loss Carryforwards.**

**(1)     Limitation on NOLs and Other Tax Attributes.**

Following the implementation of the Plan, any remaining NOLs, tax credit carryforwards, losses or deductions that are "built-in" (i.e., economically accrued but unrecognized) and possibly, certain other tax attributes of the Debtors allocable to periods prior to the Effective Date (collectively, "Pre-Change Losses") may be subject to an annual limitation under section 382 of the Tax Code if there is an "ownership change" of the Debtors (unless a special bankruptcy exception applies). In general, an ownership change occurs when the percentage of a corporation's stock owned by certain "5 percent shareholders" increases by more

than 50 percentage points in the aggregate over the lowest percentage owned by them at any time during the applicable "testing period" (generally, the shorter of (a) the 36-month period preceding the testing date or (b) the period of time since the most recent ownership change of the corporation).

Pursuant to the Plan, the Debtors will be reinstating the WF Capital Equity Interests. There should be no change in the percentage ownership of the Debtors. Therefore, the Debtors do not expect that the reinstatement of the WF Capital Equity Interest through the Plan will constitute an "ownership change" under section 382 of the Tax Code.

### (2) General Section 382 Annual Limitation.

In general, the amount of the annual limitation to which a loss corporation (or a loss consolidated group) that undergoes an ownership change would be subject is equal to the product of (i) the fair market value of the stock of the loss corporation immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (currently 3.32% in October 2010). Any unused limitation may be carried forward, thereby increasing the annual limitation in subsequent taxable years. However, the annual limitation may be further reduced if the loss corporation (or the loss consolidated group) (i) does not continue its historic business or uses a significant portion of its assets in a new business for two years after the ownership change or (ii) undergoes a second ownership change. In addition, if a loss corporation (or loss consolidated group or subgroup) has a "net unrealized built-in loss" beyond a certain minimum amount immediately before an ownership change, then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as a Pre-Change Loss and will be subject to the annual limitation. Conversely, if the loss corporation (or loss consolidated group) has a net unrealized built-in gain immediately before an ownership change, any built-in gains recognized during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized. Although the rules applicable to net unrealized built-in losses generally apply to consolidated groups on a consolidated basis, special rules apply to a corporation that joins the consolidated group within five years prior to the ownership change.

In general, a loss corporation's (or loss consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of: (i) $10,000,000, or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. It is anticipated that the Debtors' net unrealized loss will exceed this minimum threshold.

### B. Certain U.S. Federal Income Tax Consequences to the Holders of Allowed Claims that are Paid in Cash in Full.

A holder who receives Cash in exchange for its Allowed Claim pursuant to the Plan will generally recognize income, gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (i) the amount of Cash received in exchange for its Allowed Claim, and (ii) the holder's adjusted tax basis in its Allowed Claim. The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a

number of factors, including the tax status of the holder, the nature of the Allowed Claim in such holder's hands, whether the Allowed Claim constitutes a capital asset in the hands of the holder, whether the Allowed Claim was purchased at a discount, and whether and to what extent the holder has previously claimed a bad debt deduction with respect to its Allowed Claim. To the extent that any amount received by a holder of an Allowed Claim is attributable to accrued interest, such amount should be taxable to the holder as interest income. Conversely, a holder of an Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Allowed Claims was previously included in the holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear.

**C.**     **U.S. Federal Income Tax Consequences to Holders of Allowed Claims that are Paid in Full Using Consideration other than Solely Cash.**

   **(i)**     **In General.**

            The U.S. federal income tax consequences to holders of Allowed Claims that are not paid in full solely in Cash under the Plan may vary depending upon, among other things: (i) the type of consideration received by the holder in exchange for its Allowed Claim or Equity Interest; (ii) for Allowed Claims, the nature of the indebtedness owing to the holder; (iii) whether the holder has previously claimed a bad debt or worthless security deduction in respect of such holder's Allowed Claim or Equity Interest; and (iv) whether such Allowed Claim or Equity Interest constitutes a "security" for purposes of the reorganization provisions of the Tax Code (as described below). For tax purposes, the modification of a claim may represent an exchange of the claim for a new claim, even though no actual transfer takes place.

   **(ii)**     **Consequences of Modifying Existing Debt Instruments.**

            Where a creditor's Allowed Claim is a debt instrument that is restated, it may be a modification of a debt instrument that, if significant, will be treated as a "deemed exchange" of such Allowed Claims (an "old" debt instrument) for the treatment provided under the Plan (a "new" debt instrument) under the Treasury Regulations to section 1001 of the Tax Code. Such a "deemed exchange" would be a taxable event, unless a non-recognition provision of the Tax Code were to apply. If the debt modification does not constitute a significant modification of the old debt instrument, the modification would not result in a "deemed exchange" of a holder's old debt instrument for new debt instrument, and therefore a holder would not recognize gain or loss as a result of a deemed exchange.

            If the modification constitutes a significant modification, the resulting "deemed exchange" of a holder's old debt instrument for new debt instrument may constitute either (i) a tax-free recapitalization or (ii) a taxable exchange. The exchange is a tax-free recapitalization if both the old debt instrument and the new debt instruments are treated as "securities" for U.S. federal income tax purposes. If the deemed exchange is a tax-free recapitalization, a holder will not recognize a loss and a holder will only recognize a gain to the extent that the principal amount of the new debt instrument exceeds the principal amount of the old debt instrument. The holder will have initial tax basis in the new debt instruments received in the deemed exchange equal to the holder's tax basis in the old debt instrument deemed exchanged therefor immediately

prior to the deemed exchange, and the holder's holding period for the new debt instrument will include the period during which the holder held the old debt instrument deemed surrendered in the deemed exchange.

If the deemed exchange is not treated as a tax-free recapitalization, a holder generally will recognize gain or loss on such deemed exchange in an amount equal to the difference, if any, between (i) the issue price of the new debt instruments as determined under section 1273 or 1274 of the Tax Code and (ii) the holder's adjusted tax basis in the old debt instruments. Provided that the old instrument was held as a capital asset, such gain or loss should be capital in nature and should be long-term capital gain or loss if, at the time of the deemed exchange, the old debt instruments have been held for more than one year. However, holders may not be allowed to recognize currently any loss resulting from the deemed exchange if the deemed exchange is treated as involving "substantially identical" properties and thus as a "wash sale" within the meaning of section 1091 of the Tax Code.

The application of the Treasury Regulations to section 1001 of the Tax Code to the debt modification and the U.S. federal income tax consequences of the resulting deemed exchange is extremely complex. Creditors are therefore urged to consult their own tax advisors regarding the tax consequences of the exchange of their Allowed Claims for Notes.

**(iii)** **Reinstatement of Existing Debt Instruments.**

Holders generally should not recognize gain, loss or other taxable income upon the reinstatement of their Allowed Claims under the Plan, provided the reinstatement is not a substantial modification of the terms of the Allowed Claim. Taxable income, however, may be recognized by those holders if they are considered to receive interest, damages or other income in connection with the reinstatement, or if the reinstatement is considered for tax purposes to involve a significant modification of the Allowed Claim. A reinstatement generally will constitute a significant modification of the Allowed Claim if, based on all of the facts and circumstances, the legal rights and obligations under the reinstated obligation differ from those under the original obligation to a degree that is economically significant. If a reinstatement of the Allowed Claim constitutes a significant modification, such reinstatement will be treated as an exchange for U.S. federal income tax purposes (see discussion above). If such an exchange does not qualify as a tax-free reorganization, the holder of the Allowed Claim would have to recognize gain or loss in an amount equal to the difference between the amount realized on such exchange (the issue price of the new debt instrument) and such holder's adjusted tax basis in its Allowed Claim.

**(iv)** **Accrued but Unpaid Interest.**

In general, to the extent a holder of a debt instrument receives cash or property in satisfaction of interest accrued during the holding period of such instrument, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, such holder may recognize a deductible loss to the extent that any accrued interest claimed or amortized original issue discount was previously included in its gross income and is not paid in full. The extent to which cash or property received by a holder of a debt instrument will be attributable to accrued but unpaid interest is unclear. Pursuant to the Plan, all

distributions in respect of any Allowed Claim will be allocated first to the principal amount of such Allowed Claim, and thereafter to accrued but unpaid interest, if any. Certain legislative history indicates that an allocation of consideration between principal and interest provided in a bankruptcy plan of reorganization generally is binding for U.S. federal income tax purposes. However, there is no assurance that such allocation will be respected by the IRS for U.S. federal income tax purposes.

Each holder of an Allowed Claim is urged to consult its tax advisor regarding the inclusion in income of amounts received in satisfaction of accrued but unpaid interest, the allocation of consideration between principal and interest, and the deductibility of previously included unpaid interest and Original Issue Discount for tax purposes.

### (v) Market Discount.

If a holder of an Allowed Claim purchased the underlying security or debt obligation at a price less than its issue price, the difference would constitute "market discount" for U.S. federal income tax purposes. Any gain recognized by a holder on the exchange of its Allowed Claim on the Effective Date should be treated as ordinary income to the extent of any market discount accrued on the underlying securities or debt obligation by the holder on or prior to the date of the exchange. Any additional accrued but unrecognized market discount should carry over to any "securities" or debt obligation received in a tax-free exchange pursuant to the Plan, and should be allocated among such securities or debt obligation based upon their relative fair market values as of the Effective Date. Any gain recognized by such holder on a subsequent disposition of such securities or debt obligation received under the Plan may be treated as ordinary income to the extent of such accrued but unrecognized market discount.

### D. Consequences to Pre-Bankruptcy Holders of Equity Interests.

Pursuant to the Plan, each Allowed WF Capital Equity Interest shall be reinstated. A holder of WF Capital Equity Interest will not recognize gain or loss due to the Plan. Upon a subsequent sale or disposition of the WF Capital Equity Interests, a holder will recognize capital gain or loss equal to the difference between the amount realized and the holder's adjusted basis in the WF Capital Equity Interests.

### E. Consequences of Ownership of Stock and Notes Reinstated Pursuant to the Plan.

The following is a description of the principal U.S. federal income tax consequences that may be relevant with respect to the ownership and disposition of the Stock and the Notes. This discussion addresses only the U.S. federal income tax considerations of U.S. Holders that will retain Stock or Notes under the Plan and that will hold such Stock or Notes as capital assets.

### (i) Consequences of Ownership of Stock Reinstated Pursuant to the Plan.

### (1) Distributions.

The gross amount of any distribution of Cash or property made to a U.S. Holder with respect to the Stock generally will be includible in gross income by such holder as dividend

income to the extent such distributions are paid out of the current or accumulated earnings and profits of Debtors as determined under U.S. federal income tax principles. Dividends received by corporations may qualify for a dividends-received-deduction if certain holding period and taxable income requirements are satisfied, but such corporate holders may be subject to "extraordinary dividend" provisions of the Tax Code. Dividends received by non-corporate holders in taxable years beginning before January 1, 2011 may qualify for a reduced rate of taxation if certain holding period and other requirements are met.

A distribution in excess of Debtors' current and accumulated earnings and profits will first be treated as a return of capital to the extent of the holder's adjusted basis in the Stock and will be applied against and reduce such basis. To the extent that such distribution exceeds the holder's adjusted basis in its Stock, the distribution will be treated as capital gain, which will be treated as long-term capital gain if such holder's holding period in its Stock exceeds one year as of the date of the distribution. Long term capital gains may be eligible for reduced rates of taxation.

### (2) Sale or Exchange of Stock.

For U.S. federal income tax purposes, a holder generally will recognize capital gain or loss on the sale, exchange, or other taxable disposition of any of its Stock in an amount equal to the difference, if any, between the amount realized for the Stock and the holder's adjusted tax basis in the Stock. Capital gains of non-corporate holders derived with respect to a sale, exchange, or other disposition of Stock held for more than one year may be eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

### (ii) Consequences of Ownership of Notes Retained Pursuant to the Plan.

### (1) Interest.

It is expected that the Notes will not include an original issue discount. If you are a U.S. Holder of Notes, interest paid to you on a Note will be includible in your gross income as ordinary interest income in accordance with your usual method of tax accounting.

### (2) Sale, Exchange or Retirement of Notes.

If you are a U.S. Holder of Notes, upon the sale, exchange or retirement of a Note you will recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or retirement, other than accrued but unpaid interest which will be taxable as such, and your adjusted tax basis in the Note. Any such gain or loss will be capital gain or loss. Capital gains of non-corporate holders derived with respect to a sale, exchange, or other disposition of Notes held for more than one year may be eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

### F. Backup Withholding Tax and Information Reporting Requirements.

U.S. federal backup withholding tax and information reporting requirements generally apply to certain payments to certain non-corporate holders of the Debtors' stock or debt obligations. Information reporting generally will apply to payments under the Plan and to

payments of dividends on, interest on, and proceeds from the sale or redemption of such stock or debt obligations made within the United States to a holder of the Debtors' stock or debt obligations. A payor will be required to withhold backup withholding tax from any payments made under the Plan, and payments of dividends on, interest on or the proceeds from the sale or redemption of, the debtors' stock or debt obligations within the United States to a holder, other than an exempt recipient, if such holder fails to furnish its correct taxpayer identification number or otherwise fails to comply with, or establish an exemption from, such backup withholding tax requirements. The backup withholding tax rate is currently 28 percent.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder's United States federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

THE ABOVE SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL, PURPOSES ONLY. ALL HOLDERS OF ALLOWED CLAIMS, EQUITY INTERESTS, STOCK OR NOTES ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

## XIV.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have evaluated numerous alternatives to the Plan, including, without limitation, the sale of the Debtors as a going concern, either as an entirety or on limited bases, and the liquidation of the Debtors. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries of holders of all Claims and Equity Interests. The following discussion provides a summary of the analysis supporting the conclusion that a liquidation of the Debtors or an alternative plan of reorganization for the Debtors will not provide higher value to holders of Claims and Equity Interests.

**A.** **Liquidation Under Chapter 7 of the Bankruptcy Code.**

If no plan of reorganization can be confirmed, the Chapter 11 Cases of the Debtors may be converted to cases under chapter 7, in which event a trustee would be elected or appointed to liquidate the properties and interests in property of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because of (1) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee for bankruptcy and professional advisors to such trustee; (2) the erosion in value of the business as a going concern and the assets of the business in the context of the expeditious liquidation required under chapter 7 and the "forced sale" environment in which such a liquidation would likely occur; (3) the adverse effects on the salability of business segments as a result of the likely departure of key employees and the loss of customers; and (4) the substantial increases in claims which would

have to be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases. Attached hereto as **Exhibit E** is a liquidation analysis on which the Debtors base this belief. Accordingly, the Debtors have determined that confirmation of the Plan will provide each holder of a Claim or Equity Interest with a greater recovery than it would receive pursuant to liquidation of the Debtors under chapter 7.

Section 1129(a)(7) of the Bankruptcy Code provides that with respect to impaired classes, each holder of a claim or interest of such class must receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount such holder would so receive or retain if the debtor liquidated under chapter 7 of this title on such date. As the Plan provides for a full recovery to holders of Claims and unimpairs holders of Equity Interests, the Plan satisfies section 1129(a)(7).

## B.      Alternative Plans of Reorganization.

If the Plan is not confirmed, any other party in interest could undertake to formulate a different plan of reorganization. Such a plan of reorganization might involve either (x) a reorganization of the capital structure and continuation of the business of the Debtors, (y) the sale of the Debtors as a going concern or (z) an orderly liquidation of the properties and interests in property of the Debtors. With respect to an alternative plan of reorganization, the Debtors have examined various other alternatives in connection with the process involved in the formulation and development of the Plan. The Debtors believe that the Plan, as described herein, enables holders of Claims and Equity Interests to realize the best recoveries under the present circumstances. If the Debtors undertook a going concern sale, there is no assurance that unsecured creditors would receive a meaningful distribution on their claims. In a liquidation of the Debtors under chapter 11, the properties and interests in property would be sold in a more orderly fashion and over a more extended period of time than in a liquidation under chapter 7, probably resulting in marginally greater recoveries than in a chapter 7 case. Further, if a trustee were not appointed, since one is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than in a chapter 7 case. However, although preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 for the Debtors is a much less attractive alternative to holders of Claims and Equity Interests than the Plan because the recovery realized by holders of Claims and Equity Interests under the Plan is likely to be greater than the recovery under a chapter 11 liquidation.

## XV.

## CONCLUSION

The Debtors believe that the Plan is in the best interest of all holders of Claims and Equity Interests, and urge all holders of impaired Claims and Equity Interests in the Debtors to vote to accept the Plan and to evidence such acceptance by returning their Ballots in accordance with the instructions accompanying the Disclosure Statement.

Dated:  November 10, 2010                    Respectfully submitted,

**WORKFLOW MANAGEMENT, INC.**


By:_____
Name:
Title:


**WORKFLOW HOLDINGS CORPORATION**


 By:_____
Name:
Title:


**WORKFLOW SOLUTIONS LLC**


By:_____
Name:
Title:


**WORKFLOW DIRECT, INC.**


By:_____
Name:
Title:


**WF CAPITAL HOLDINGS, INC.**


By:_____
Name:
Title:


**WF HOLDINGS, INC.**


By:_____
Name:
Title:


**WORKFLOW OF FLORIDA, INC.**


By:_____
Name:
Title:

**WORKFLOW MANAGEMENT
ACQUISITION II CORP.**

By: _____
Name:
Title:


**WFIH, INC.**

By: _____
Name:
Title:


**WFMI, INC.**

By: _____
Name:
Title:


**THE RELIZON COMPANY**

By: _____
Name:
Title:


**RELIZON KNE INC.**

By: _____
Name:
Title:


**RELIZON SNE INC.**

By: _____
Name:
Title:


**OLD FGS, INC.**

By: _____
Name:
Title:

**OLD UE, LLC**

By:_____
Name:
Title:


**SFI OF PUERTO RICO, INC.**

By:_____
Name:
Title:


**RELIZON WISCONSIN INC.**

By:_____
Name:
Title:


**RELIZON (TEXAS) LTD.  LLP**

By:_____
Name:
Title:


**RELIZON DE MEXICO INC.**

By:_____
Name:
Title:


**FORMCRAFT HOLDINGS GENERAL PARTNER, INC.**

By:_____
Name:
Title:


**FORMCRAFT HOLDINGS LIMITED PARTNER, INC.**

By:_____
Name:
Title:

## GLOSSARY OF DEFINED TERMS

**1.1.** "**Administrative Expense Claim**" means any right to payment, whether secured or unsecured, constituting a cost or expense of administration of any of the Chapter 11 Cases under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Debtors' estates, any actual and necessary costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Chapter 11 Cases including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, and any allowances of compensation and reimbursement of expenses to the extent allowed by Final Order under section 330 or 503 of the Bankruptcy Code.

**1.2.** "**Affiliate**" means, with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

**1.3.** "**Allowed**" means, with respect to a Claim: (i) any Claim against any Debtor which has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed, (ii) any timely filed, liquidated, non-contingent Claim as to which the time for objection permitted by the Plan has expired and no objection has been interposed, or (iii) any Claim expressly allowed by a Final Order or by agreement in accordance with the provisions of the Plan.

**1.4.** "**Assets**" means, with respect to any Debtor, all of such Debtor's right, title and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

**1.5.** "**Avoidance Actions**" means all Causes of Action of the Estates that arise under section 544, 545, 547, 548, 549, 550, 551 and/or 553 of the Bankruptcy Code.

**1.6.** "**Ballot**" means those certain ballots sent to holders of Claims and Equity Interests for purposes of voting on the Plan.

**1.7.** "**Balloting Agent**" means Kurtzman Carson Consultants LLC.

**1.8.** "**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as codified at title 11 of the United States Code, as amended from time to time and applicable to the Chapter 11 Cases.

**1.9.** "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Virginia, Norfolk Division, or such other court having jurisdiction over the Chapter 11 Cases.

**1.10.** **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code and as applicable to the Chapter 11 Cases.

**1.11.** "**Borrower**" means Workflow Management, Inc.

**1.12.** "**Business Day**" means any day other than a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close for business in New York, New York.

**1.13.** **"Cash"** means legal tender of the United States of America or readily marketable direct obligations of, or obligations guaranteed by, the United States of America.

**1.14.** **"Cash Collateral Orders"** means the orders of the Bankruptcy Court, dated October 1, 2010, October 8, 2010, and October 29, 2010, granting the Debtors' authority to use cash collateral on an interim basis, and the order of the Bankruptcy Court dated XXXX, XX, granting the Debtors' authority to use cash collateral on a final basis.

**1.15.** **"Causes of Action"** means all claims, rights, actions, causes of action, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, asserted or unasserted, arising in law, equity or otherwise.

**1.16.** **"Chapter 11 Cases"** means the cases commenced under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court with respect to each of the Debtors styled as <u>In re Workflow Management, Inc., et al.</u>, Chapter 11 Case No. 10-74617 (SCS), Jointly Administered.

**1.17.** **"Claim"** means (a) any right to payment, whether or not such right is known or unknown, reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is known or unknown, reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

**1.18.** **"Claims Agent"** means Kurtzman Carson Consultants LLC.

**1.19.** **"Committee"** means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases, if any.

**1.20.** **"Confirmation Date"** means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

**1.21.** **"Confirmation Hearing"** means the hearing held by the Bankruptcy Court, as it may be continued from time to time, to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

**1.22.** **"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan.

**1.23.** **"Contested Claim"** means any Claim that is not an Allowed Claim or a Disallowed Claim.

**1.24.** **"Contested Claims Reserve"** means a reserve of Cash that may be established in accordance with Article 11.5 of the Plan.

**1.25.** **"Convenience Class Claim"** means a Claim, excluding a Claim for principal and interest based on a note issued under any indenture, loan agreement, or credit agreement, against any of the Debtors that otherwise would be a General Unsecured Claim that is either (i) in an amount that is equal to or less than $2,000 or (ii) a claim which is in an amount greater than $2,000 but whose holder has agreed on its Ballot to reduce its Claim to the amount of $2,000 in order to be treated as a Convenience Class Claim.

**1.26.** **"Cross Lien Holder"** means any Person that, together with its Affiliates (including the direct and indirect holders of its Equity Interests, other investors in such Person, and its and their other Affiliates), at the time of voting on the Plan or on the record date for voting on the Plan established by the Bankruptcy Court, as applicable, holds both a First Lien Lender Claim and a Second Lien Lender Claim.

**1.27.** **"CS"** means Credit Suisse, Cayman Islands Branch.

**1.28.** **"Cure Cost"** means the distribution within a reasonable period of time following the Effective Date of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption (or assumption and assignment) of an Executory Contract or Unexpired Lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties, under such Executory Contract or Unexpired Lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

**1.29.** **"Debtors"** means, collectively, WF Capital, and its direct and indirect subsidiaries, that are debtors in the Chapter 11 Cases as identified on Exhibit A annexed hereto.

**1.30.** **"Debtor-in-Possession"** means any Debtor, in its capacity as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**1.31.** **"Disallowed"** when used with respect to a Claim, means a Claim, or such portion of a Claim, (a) that has been disallowed by a Final Order, including any claims that are disallowed by failing to comply the Bankruptcy Court's order establishing the bar date for filing proofs of Claim, or (b) which were included on the Schedules as disputed or contingent and for which no contrary proof of Claim was timely filed.

**1.32.** **"Disbursing Agent"** means the Reorganized Debtors, in (a) making the Plan Distributions contemplated under the Plan, the Confirmation Order, or any other relevant Final Order, and (b) performing any other act or task that is or may be delegated to the Disbursing Agent under the Plan.

**1.33.** **"Disclosure Statement"** means the Disclosure Statement filed with respect to the Plan, as it may be amended or modified from time to time.

**1.34.** **"Disclosure Statement Order"** means the order entered by the Bankruptcy Court (a) approving the Disclosure Statement as containing adequate information required under section 1125 of the Bankruptcy Code, and (b) authorizing the use of the Disclosure Statement for soliciting votes on the Plan.

**1.35.** **"Distribution Date"** means, with respect to any Claim, (i) the Effective Date or a date that is as soon as reasonably practicable after the Effective Date, if such Claim is then an Allowed Claim, (ii) a date that is as soon as reasonably practicable after the date such Claim becomes Allowed, if not Allowed on the Effective Date; or (iii) the date of payment otherwise prescribed in this Plan.

**1.36.** **"Effective Date"** means a date selected by the Debtors which must be a Business Day that is no later than thirty (30) Business Days after all of the conditions specified in Article 14.2 have been satisfied or waived (to the extent subject to waiver).

**1.37.** **"Entity"** means any person or organization created by law, including, without limitation, any individual, company, corporation, limited liability company, partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, or government or any political subdivision thereof.

**1.38.** **"Equity Interest"** means any outstanding ownership interest in any of the Debtors, including without limitation, interests evidenced by common or preferred stock, partnership interests, membership interests, warrants and options or other rights to purchase or otherwise receive any ownership interest in any of the Debtors and any right to payment or compensation based upon any such interest, whether or not such interest is owned by the holder of such right to payment or compensation.

**1.39.** **"Estate"** means the estate of any Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

**1.40.** **"Exculpated Persons"** means each of (a) (i)the Debtors, (ii) the Reorganized Debtors, (iii) the Committee and the members thereof in their capacities as such, (iv) the Exit Lender; (b) (i) Perseus, (ii) the First Lien Secured Parties, and (iii) the Second Lien Secured Parties, to the extent such Person in this clause (b) votes in favor of the Plan (to the extent that such entity is eligible to vote on the Plan) and does not otherwise object to confirmation of the Plan; and (c) and all affiliates, officers, directors, principals, shareholders, parents, subsidiaries, members, auditors, accountants, financial advisors, predecessors, successors, servants, employees, agents, counsel, attorneys, partners, insurers, underwriters, administrators, executors, representatives or assigns of each of the foregoing Person listed in clause (a) or (b) to the extent such Person is an Exculpated Person.

**1.41.** **"Exit Lender"** means _____.

**1.42.** **"Exit Loan"** means that certain unsecured loan from the Exit Lender to the Debtors, in an original principal amount of $12.5 million ($12,500,000), to be used by the Debtors pursuant to the terms hereof and the Exit Loan Agreement.

**1.43.** **"Exit Loan Agreement"** means that certain loan agreement dated as of the Effective Date, between the Exit Lender and the Debtors, substantially on the terms provided in the term sheet attached hereto as Schedule 3 and in the form contained in the Plan Supplement, as amended, supplemented or modified from time to time.

**1.44.** **"Fee Application"** means an application for allowance and payment of a Fee Claim.

**1.45.** **"Fee Claim"** means a Claim of a Professional.

**1.46.** **"Final Order"** means (a) an order or judgment of the Bankruptcy Court or any other court or adjudicative body as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing is then pending, or (b) in the event that an appeal, writ of certiorari, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court or any other court or adjudicative body shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order.

**1.47.** **"First Lien Administrative Agent"** means CS, in its capacity as administrative agent for the First Lien Secured Parties pursuant to the First Lien Loan Documents.

**1.48.** **"First Lien Credit Agreement"** means that certain First Lien Credit Agreement, dated as of November 30, 2005, between Workflow Management, Inc., as borrower, the First Lien Lenders and the First Lien Administrative Agent, as amended from time to time.

**1.49.** "**First Lien Credit Facility**" means the Term Loan Facility and the Revolving Credit Facility made available pursuant to the First Lien Loan Documents.

**1.50.** "**First Lien Guaranties**" means the Guaranties entered into by the Guarantors in favor of the First Lien Administrative Agent for the benefit of the First Lien Secured Parties on account of the First Lien Lender Claims, as amended from time to time.

**1.51.** "**First Lien Guaranty Claims**" means any and all Claims against the Guarantors arising from or in connection with the First Lien Guaranties.

**1.52.** "**First Lien Lender Claims**" means any and all Claims, including the First Lien Guaranty Claims, against any of the Debtors arising from or in connection with the First Lien Loan Documents.

**1.53.** **"First Lien Lenders"** means the lenders who are party, from time to time, to the First Lien Credit Agreement.

**1.54.** "**First Lien Loan Documents**" means the First Lien Credit Agreement, the notes which evidence the loans under the First Lien Credit Facility, the fee letters referred to in the First Lien Credit Agreement, the First Lien Pledge Agreement, the First Lien Guaranties, the First Lien Mortgages, any outstanding Letters of Credit, and the Intercreditor Agreement, as any such documents are amended from time to time.

**1.55.** "**First Lien Mortgages**" means any mortgage recorded in favor of the First Lien Administrative Agent which secures the First Lien Lender Claims, as amended from time to time.

**1.56.** "**First Lien Pledge Agreement**" means that certain Pledge and Security Agreement dated as of November 30, 2005, granting a first priority security interest in substantially all of the personal property assets of the Loan Parties, by each Loan Party in favor of the First Lien Administrative Agent for the benefit of the First Lien Secured Parties, together with all documents, instruments and agreements executed or entered into in connection therewith, as amended from time to time.

**1.57.** "**First Lien Secured Parties**" means the First Lien Administrative Agent, the First Lien Lenders and the Issuer.

**1.58.** **"General Unsecured Claim"** means any unsecured Claim against a Debtor, other than an Administrative Expense Claim, a Convenience Class Claim, an Intercompany Claim, a Priority Tax Claim, a Priority Non-Tax Claim, an Unsecured Note Claim, a Lease Rejection Damage Claim, or an Unsecured Contingent Claim.

**1.59.** "**Guarantors**" means each of Workflow Holdings Corporation; WF Holdings, Inc.; Workflow Direct, Inc.; Workflow Management Acquisition II Corp.; WFIH, Inc.; WFMI, Inc.; Workflow of Florida, Inc.; Workflow Solutions LLC; SFI of Puerto Rico, Inc.; Old FGS, Inc.; Old UE, LLC; The Relizon Company; Relizon Wisconsin Inc.; Relizon (Texas) Ltd., LLP; Relizon SNE Inc.; Relizon KNE Inc.; Relizon de Mexico Inc.; Formcraft Holdings General Partner, Inc.; and Formcraft Holdings Limited Partner, Inc.

**1.60.** **"Guaranty"** means any guaranty by one or more Debtors of an obligation of any other Debtor.

**1.61.** **"Insider"** means with respect to any Person, all Persons that would fall within the definition assigned to such terms in section 101(31) of the Bankruptcy Code.

**1.62.** **"Intercompany Claim"** means any Claim held by any Debtor against any other Debtor that occurred or came into existence prior to the Petition Date.

**1.63.** **"Intercreditor Agreement"** means that certain Intercreditor Agreement, dated as of November 30, 2005, as amended April 30, 2009, by and between the First Lien Administrative Agent and the Second Lien Administrative Agent, and acknowledged by each Loan Party,

together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto.

**1.64.** **"Internal Revenue Code"** means the Internal Revenue Code of 1986, as amended, and any applicable rulings, regulations (including temporary and proposed regulations) promulgated thereunder, judicial decisions, and notices, announcements, and other releases of the United States Treasury Department or the IRS.

**1.65.** "**IRS**" means the United States Internal Revenue Service.

**1.66.** "**Issuer**" means Credit Suisse, as issuer of the outstanding Letters of Credit under the Letter of Credit Subfacility.

**1.67.** **"Lease Rejection Damage Claim"** means any Claim arising out of the rejection of an unexpired lease of non-residential real property pursuant to section 365 of the Bankruptcy Code.

**1.68.** "**Letter of Credit Subfacility**" means the Letter of Credit subfacility under, and that forms a part of, the Revolving Credit Facility under the First Lien Credit Agreement.

**1.69.** "**Letters of Credit**" means any letters of credit issued by the Issuer under the Letter of Credit Subfacility, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto.

**1.70.** "**Loan Parties**" means the Guarantors and the Borrower.

**1.71.** **"Notice of Confirmation"** means the notice of entry of the Confirmation Order to be filed with the Bankruptcy Court and mailed by the Claims Agent to holders of Claims and Equity Interests.

**1.72.** **"Objection Deadline"** means the deadline for filing objections to Claims as set forth in Article 11.2 of the Plan.

**1.73.** **"Ohio Development Loan"** means that certain loan made pursuant to a loan agreement between The Relizon Company and the State of Ohio Director of Development, dated as of January 31, 2003, in the original principal amount of $800,000, which matures on January 31, 2013 and is secured pursuant to the Ohio Security Agreement.

**1.74.** **"Ohio Equipment"** means that certain equipment securing the Ohio Development Loan pursuant to the Ohio Security Agreement.

**1.75.** **"Ohio Security Agreement"** means that certain Security Agreement between The Relizon Company and the State of Ohio Director of Development, dated as of January 31, 2003, which grants a first priority security interest and lien in the Ohio Equipment, and provides a negative covenant precluding the encumbrance of the Ohio Equipment by any other security interest or lien.

**1.76.** **"Other Guaranty Claims "** means any Claim arising out of a Guaranty, except the First Lien Guaranty Claims and the Second Lien Guaranty Claims.

**1.77.** **"Other Secured Claims"** means all Secured Claims other than the First Lien Lender Claims and the Second Lien Lender Claims, and including the Ohio Development Loan.

**1.78.** **"PBGC"** means the Pension Benefit Guaranty Corporation.

**1.79.** **"Pension Plan"** means the Relizon Company retirement plan.

**1.80.** **"Perseus"** means Perseus, L.L.C., Perseus Partners VII, L.P., Perseus Acquisition/Recapitalization Fund, L.L.C., Perseus 2000 Expansion, L.L.C., WF Holdings Co-Investment, L.P. and Perseus Market Opportunity Fund, L.P., and each of their respective present and former officers, directors and employees.

**1.81.** **"Person"** means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, unincorporated organization, governmental entity, or political subdivision thereof, or any other entity.

**1.82.** **"Petition Date"** means September 29, 2010.

**1.83.** **"Plan"** means this first amended joint chapter 11 plan of reorganization, either in its present form or as it may be amended, supplemented, or otherwise modified from time to time, and the exhibits and schedules hereto, as the same may be in effect at the time such reference becomes operative.

**1.84.** **"Plan Distribution"** means the payment or distribution under the Plan of Cash, Assets, or instruments evidencing an obligation under the Plan to the holder of an Allowed Claim or Allowed Equity Interest.

**1.85.** **"Plan Documents"** means the documents that aid in effectuating the Plan as specifically identified as such herein and filed with the Bankruptcy Court as specified in Article 2.4 of the Plan.

**1.86.** **"Plan Supplement"** means the compilation of Plan Documents or forms of documents specified in the Plan, including, but not limited to any exhibits or schedules to the Plan not included herewith, each in form and substance acceptable to the Debtors, which Debtors shall, as provided in Article 2.4, file with the Bankruptcy Court on or before the date that is ten (10) days prior to the Confirmation Hearing or at such other time as established by the Bankruptcy Court, all of which are incorporated herein by reference.

**1.87.** **"Prepetition Agents"** means the First Lien Administrative Agent and the Second Lien Administrative Agent.

**1.88.** **"Prepetition Collateral"** means the Prepetition Personal Property Collateral and the Prepetition Real Property Collateral.

**1.89.** **"Prepetition Personal Property Collateral"** means the personal property collateral pledged pursuant to the First Lien Pledge Agreement and the Second Lien Pledge Agreement.

**1.90.** "**Prepetition Real Property Collateral**" means the real property collateral pledged pursuant to the First Lien Mortgages and the Second Lien Mortgages.

**1.91.** "**Prepetition Secured Parties**" means the First Lien Secured Parties and the Second Lien Secured Parties.

**1.92.** "**Priority Non-Tax Claim**" means any Claim entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

**1.93.** "**Priority Tax Claim**" means any Claim, whether secured or unsecured, entitled to priority under section 507(a)(8) of the Bankruptcy Code.

**1.94.** "**Professional**" means a Person retained or to be compensated for services rendered or costs incurred on or after the Petition Date and on or prior to the Effective Date pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in these Chapter 11 Cases.

**1.95.** "**Rejection Damage Claim**" means any Claim arising out of the rejection of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

**1.96.** "**Reorganized Debtors**" means from and after the Effective Date, WF Capital and its affiliated Debtors and any successors thereto by merger, consolidation, or otherwise.

**1.97.** "**Revolver A**" means that portion of the Revolving Credit Facility which matures May 31, 2011.

**1.98.** "**Revolver B**" means that portion of the Revolving Credit Facility which matures November 30, 2010, and was owned by SPCP Group LLC on the Petition Date.

**1.99.** "**Revolving Credit Facility**" means the revolving loan facility established pursuant to the First Lien Credit Agreement.

**1.100.** "**Schedules**" means the schedules of assets and liabilities and list of Equity Interests and the statements of financial affairs filed by each of the Debtors with the Bankruptcy Court, as required by section 521 of the Bankruptcy Code and in conformity with the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be amended or supplemented by the Debtors from time to time in accordance with Bankruptcy Rule 1009.

**1.101.** "**Second Lien Administrative Agent**" means SilverPoint, in its capacity as successor administrative agent for the Second Lien Secured Parties pursuant to the Second Lien Loan Documents.

**1.102.** "**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of November 30, 2005, between Workflow Management, Inc., as borrower, the Second Lien Lenders and the Second Lien Administrative Agent, as amended from time to time.

**1.103.** "**Second Lien Credit Facility**" means the term loan facility established pursuant to the Second Lien Credit Agreement.

**1.104.** "**Second Lien Guaranties**" means the Guaranties entered into by the Guarantors in favor of the Second Lien Administrative Agent, for the benefit of the Second Lien Secured Parties on account of the Second Lien Lender Claims, as amended from time to time.

**1.105.** "**Second Lien Guaranty Claims**" means any and all Claims against the Guarantors arising from or in connection with the Second Lien Guaranties.

**1.106.** "**Second Lien Lender Claims**" means any and all Claims, including the Second Lien Guaranty Claims, against any of the Debtors arising from or in connection with the Second Lien Loan Documents.

**1.107.** "**Second Lien Lenders**" means the lenders that are party, from time to time, to the Second Lien Credit Agreement.

**1.108.** "**Second Lien Loan Documents**" means the Second Lien Credit Agreement, the notes which evidence the loans outstanding under the Second Lien Credit Facility, the fee letter referred to in the Second Lien Credit Agreement, the Second Lien Pledge Agreement, the Second Lien Guaranties, the Second Lien Mortgages, and the Intercreditor Agreement, as any such documents are amended from time to time.

**1.109.** "**Second Lien Mortgages**" means any mortgage recorded in favor of the Second Lien Administrative Agent which secures the Second Lien Lender Claims, as amended from time to time.

**1.110.** "**Second Lien Pledge Agreement**" means that certain Pledge and Security Agreement dated as of November 30, 2005, granting a second priority security interest in substantially all of the personal property assets of the Loan Parties, by each Loan Party in favor of the Second Lien Administrative Agent, for the benefit of the Second Lien Secured Parties, together with all documents, instruments and agreements executed or entered into in connection therewith, as amended from time to time.

**1.111.** "**Second Lien Secured Parties**" means the Second Lien Administrative Agent and the Second Lien Lenders.

**1.112.** "**Section 503(b)(9) Bar Date**" means the deadline for the filing of Section 503(b)(9) Claims established pursuant to an order of the Bankruptcy Court.

**1.113.** "**Section 503(b)(9) Claims**" means any Claims against any of the Debtors entitled to administrative expense status pursuant to section 503(b)(9) of the Bankruptcy Code.

**1.114.** "**Secured Claim**" means (a) a Claim secured by a lien on any Assets, which lien is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, and which is duly established in the Chapter 11 Cases, but only to the extent of the value of the holder's interest in the collateral that secures payment of the Claim; (b) a Claim against the Debtors that is subject to a valid right of setoff under section 553 of the Bankruptcy Code, but only to the extent of the Allowed amount subject to setoff as provided in section 506(a) of the Bankruptcy Code; and (c) a Claim deemed or treated under the Plan as a Secured Claim; provided, that, to the extent that the value of such

interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as a General Unsecured Claim unless, in any such case the class of which Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

**1.115. "SilverPoint"** means Silver Point Finance L.L.C.

**1.116. "Subordinated Claim"** means a Claim against any Debtor subordinated by a Final Order.

**1.117. "Subsidiary Debtor"** means any Debtor other than WF Capital.

**1.118. "Subsidiary Equity Interest"** means any Equity Interest in a Subsidiary Debtor.

**1.119.** "**Term Loan Facility**" means the term loan facility established pursuant to the First Lien Credit Agreement.

**1.120.** "**Unsecured Contingent Claim**" means any Claim for which a proof of Claim was filed and which Claim is contingent in nature, but excluding any Claim estimated pursuant to section 11.6 hereof.

**1.121. "Unsecured Note Claims"** means a Claim against any Debtor arising under any of the Unsecured Notes.

**1.122. "Unsecured Notes"** means the WF Capital/BB&T Note, the WF Holdings/Carlyle Note, WF Capital/Perseus Convertible Note, the WF Capital/Perseus Interest Note, and the Workflow Management/Perseus Note.

**1.123. "U.S. Trustee"** means the Office of the United States Trustee for Region 4.

**1.124. "WF Holdings/Carlyle Note"** means the subordinated promissory note made by WF Holdings, Inc. payable to Carlyle Partners III, L.P., as holder representative for the benefit of the beneficial holders identified on Schedule I thereto, dated December 21, 2006, in the amount of approximately $12,500,000 (including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

**1.125. "WF Capital"** means WF Capital Holdings, Inc., a Delaware corporation, one of the Debtors and Debtors-in-Possession in the Chapter 11 Cases.

**1.126. "WF Capital Equity Interests"** means all Equity Interests in WF Capital.

**1.127. "WF Capital/BB&T Note"** means the note made by WF Capital payable to Branch Banking & Trust Company, dated as of December 31, 2008, in the amount of approximately $20 million (not including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

**1.128.** **"WF Capital/Perseus Convertible Note"** means the amended and restated convertible note dated as of March 4, 2008, and made by WF Capital payable to Perseus Partners VII, L.P., in the amount of approximately $58.5 million (including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto, which note is convertible, at the note holder's option, to WF Capital Equity Interests.

**1.129.** **"WF Capital/Perseus Interest Note"** means the demand note made by WF Capital payable to Perseus Market Opportunity Fund, L.P., in the amount of approximately $302,000 (including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

**1.130.** **"Workflow Management/Perseus Note"** means the promissory note dated February 9, 2010, and made by Workflow Management, Inc. payable to Perseus, L.L.C., which was subsequently assigned by Perseus, L.L.C. to Perseus Market Opportunity Fund, L.P., in the amount of approximately $1.1 million (including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

# SCHEDULE 2

## LIST OF DEBTORS

| **ENTITY** | **CASE NO.** | **ID NUMBER** |
|---|---|---|
| FORMCRAFT HOLDINGS GENERAL PARTNER, INC. | 10-74631 | 52-2255683 |
| FORMCRAFT HOLDINGS LIMITED PARTNER, INC. | 10-74630 | 52-2255684 |
| OLD FGS, INC. | 10-74615 | 22-3171438 |
| RELIZON DE MEXICO INC. | 10-74628 | 20-3686996 |
| RELIZON KNE INC. | 10-74632 | 51-0413935 |
| RELIZON SNE INC. | 10-74629 | 51-0414537 |
| RELIZON (TEXAS) LTD., LLP | 10-74635 | 76-0566437 |
| RELIZON WISCONSIN INC. | 10-74633 | 39-1818440 |
| SFI OF PUERTO RICO, INC. | 10-74626 | 52-2103413 |
| THE RELIZON COMPANY | 10-74618 | 52-2254702 |
| OLD UE, LLC | 10-74616 | 54-1894060 |
| WF CAPITAL HOLDINGS, INC. | 10-74614 | 42-1685548 |
| WF HOLDINGS, INC. | 10-74620 | 20-0969106 |
| WFIH, INC. | 10-74623 | 20-2010527 |
| WFMI, INC. | 10-74622 | 52-2164282 |
| WORKFLOW DIRECT, INC. | 10-74627 | 95-3817497 |
| WORKFLOW HOLDINGS CORPORATION | 10-74621 | 20-3839217 |
| WORKFLOW MANAGEMENT ACQUISITION II CORP. | 10-74625 | 52-2242039 |
| WORKFLOW MANAGEMENT, INC. | 10-74617 | 06-1507104 |
| WORKFLOW OF FLORIDA, INC. | 10-74624 | 52-2164281 |
| WORKFLOW SOLUTIONS LLC | 10-74619 | 54-1893769 |

**SCHEDULE 3**

**<u>SCHEDULE OF REJECTED EXECUTORY</u>**

**<u>CONTRACTS AND UNEXPIRED LEASES</u>**

[To Be Provided]

**EXHIBIT A**

**FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION**

[Filed Concurrently Herewith]

**EXHIBIT B**

**DISCLOSURE STATEMENT ORDER**
**AND**
**NOTICE OF THE CONFIRMATION HEARING**


[To Be Provided]

**EXHIBIT C**

## PROJECTIONS AND SUMMARY OF SIGNIFICANT ASSUMPTIONS

[To Be Provided]

**EXHIBIT D**

**PRO FORMA BALANCE SHEETS**

[To Be Provided]

**EXHIBIT E**

<u>**LIQUIDATION ANALYSIS**</u>

# HYPOTHETICAL LIQUIDATION ANALYSIS

<u>Overview</u>

Section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired Allowed Claim or Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date of the Plan. The first step in meeting this test is to determine the dollar amount that would be generated from a hypothetical liquidation of the assets of the Debtors in the context of a chapter 7 liquidation in which a chapter 7 trustee is appointed and charged with reducing to Cash any and all assets of the Debtors.

THIS LIQUIDATION ANALYSIS ASSUMES THAT THE TRUSTEE WOULD BE UNABLE TO LIQUIDATE THE ASSETS AS GOING-CONCERNS AND WOULD INSTEAD SELL THE INDIVIDUAL ASSETS OF THE DEBTORS.

This Liquidation Analysis estimates the range of proceeds that would be generated from the liquidation of the Debtors' assets in the context of chapter 7 cases assuming that the Debtors would have no access to cash collateral. The gross amount of Cash available from a liquidation would be the sum of the proceeds from the disposition of the Debtors' assets, including Cash held by the Debtors (and its non- Debtor affiliates' assets and Cash if available to the trustee) at the time of the commencement of the hypothetical chapter 7 case. Such amount is reduced by the amount of any Claims secured by such assets, the costs and expenses of the liquidation, and such additional administrative expenses and priority Claims that may result from the termination of the Debtors' business and the use of chapter 7 for purposes of the hypothetical liquidation. Any remaining net Cash would be allocated to creditors and stockholders in strict priority in accordance with section 726 of the Bankruptcy Code. A general summary of the assumptions used by the Debtors in preparing this Liquidation Analysis follows in the Global Notes section. More specific assumptions are discussed in the Notes to Liquidation Analysis section.

THE DEBTORS' LIQUIDATION ANALYSIS IS AN ESTIMATE OF THE PROCEEDS THAT MAY BE GENERATED AS A RESULT OF A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF THE ASSETS OF THE DEBTORS. Underlying the Liquidation Analysis are a number of estimates and assumptions that are inherently subject to significant economic, competitive and operational uncertainties and contingencies beyond the control of the Debtors or a chapter 7 trustee. In addition, various liquidation decisions upon which certain assumptions are based are subject to change. Therefore, there can be no assurance that the assumptions and estimates employed in determining the liquidation values of the Debtors' assets will result in an accurate estimate of the proceeds that would be realized were the Debtors to undergo an actual liquidation in chapter 7. Additionally, the actual amounts of Claims against the estates could vary significantly from the estimate set forth herein, depending on the Claims asserted during the pendency of the chapter 7 cases. For example, the Debtors have assumed that wind-down costs and related professional fees will be paid before secured Claims. The Liquidation Analysis does not include potential recoveries from avoidance actions. Accordingly, the actual liquidation value of the Debtors is speculative in nature and could vary materially from the estimates provided herein. Further, while the analyses contained in the Liquidation Analysis are necessarily presented with numerical specificity, the Debtors can provide no assurances that the values assumed would be realized if the Debtors were in fact liquidated, nor can the Debtors provide assurances that the Bankruptcy Court would accept this analysis or concur with these assumptions in making its determination under section 1129(a) of the Bankruptcy Code.

ACTUAL LIQUIDATION PROCEEDS COULD BE MATERIALLY LOWER OR HIGHER THAN THE AMOUNTS SET FORTH IN THIS EXHIBIT. NO REPRESENTATION OR WARRANTY CAN OR IS BEING MADE WITH RESPECT TO THE ACTUAL PROCEEDS THAT COULD BE RECEIVED IN A CHAPTER 7 LIQUIDATION OF THE DEBTORS.

THIS LIQUIDATION ANALYSIS HAS BEEN PREPARED SOLELY FOR PURPOSES OF ESTIMATING PROCEEDS AVAILABLE IN A HYPOTHETICAL CHAPTER 7 LIQUIDATION OF EACH ESTATE AND DOES NOT REPRESENT VALUES THAT MAY BE APPROPRIATE FOR ANY OTHER PURPOSE. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO OR MAY BE ASSERTED TO CONSTITUTE A CONCESSION OR ADMISSION OF THE DEBTORS FOR ANY OTHER PURPOSE.

**Global Notes**

**Liquidation Date and Appointment of Chapter 7 Trustee**

The Liquidation Analysis assumes that the Debtors enter chapter 7 liquidation on September 30, 2010 (the "Liquidation Date"). On the Liquidation Date, it is assumed that the Bankruptcy Court would appoint one chapter 7 trustee (the "Chapter 7 Trustee") to oversee the liquidation of each Debtor entity ("Debtor Entity"). Should multiple Chapter 7 Trustees be appointed to administer each Debtor Entity, lower recoveries and higher administrative costs could result.

**Liquidation of the Debtors**

The Liquidation Analysis assumes the Debtors' liquidation begins on the Liquidation Date and continues for a period of approximately six (6) months. During such liquidation period, the assets of each Debtor Entity would be sold and the Cash proceeds, net of liquidation related costs, would then be distributed to holders of Allowed Claims against each Debtor Entity. The Liquidation Analysis assumes that the Chapter 7 Trustee liquidates each Debtor Entity separately and does not substantively consolidate the assets and Allowed Claims of the Debtors.

**Value of the Debtors' Assets**

Unless otherwise stated herein, the book values of the Debtors' assets used in the Liquidation Analysis are the estimated un-audited net book values for each of the Debtors as of September 30, 2010. The Liquidation Analysis presents Cash proceeds, expenses, Claims and recovery values on an undiscounted basis.

**Other Liabilities and Avoidance Actions**

The Liquidation Analysis includes other current and long-term liabilities as of September 30, 2010, but does not include estimates for the following additional Claims that may arise as part of any conversion to a chapter 7 liquidation:

- Potential lease or contract rejection Claims associated with section 365 of the Bankruptcy Code, except for three (3) real property leases rejected on the Petition Date;
- Potential Claims associated with the rejection of various management employment contracts;
- Potential obligations that could arise in connection with the Worker Adjustment and Retraining Notification Act (the "WARN Act"), relating to plant closures and termination of employees.

Additionally, a comprehensive analysis of potential avoidance actions was not performed by the Debtors or their advisors in connection with this Liquidation Analysis.

**Postpetition Claims**

As noted above, the basis of the Liquidation Analysis is as of September 30, 2010, immediately following the Petition Date. As such, the Liquidation Analysis does not reflect additional administrative Claims incurred in the chapter 11 bankruptcy proceeding that would inherently result from converting this Liquidation Analysis to a true "effective date" approach. However, in the view of the Debtors and their advisors, such inclusion would not materially impact the results reflected in the attached Liquidation Analysis and, as such, have been excluded.

**Liquidation Analysis Waterfall and Recovery Ranges**

The Liquidation Analysis assumes that the proceeds generated from the sale of each of the Debtors' assets will be available to the Chapter 7 Trustee (the "Liquidation Proceeds"). The Chapter 7 Trustee then would use the Liquidation Proceeds to satisfy the costs and expenses of the liquidation, including wind-down costs and the Chapter 7 Trustee fees and such additional Administrative Expense Claims that are estimated to be incurred in a chapter 7 liquidation.

Any remaining net Liquidation Proceeds at each Debtor Entity would then be allocated to holders of Claims against the respective Debtor Entity in accordance with the priorities set forth in section 726 of the Bankruptcy Code. The Liquidation Analysis provides for high and low recovery percentages for Claims against and the Debtors upon the Chapter 7 Trustee's application of the Liquidation Proceeds. The high and low recovery ranges reflect a high and low range of estimated Liquidation Proceeds from the Chapter 7 Trustee's sale of the Debtors' assets.

**Treatment of Debtors' Investment in Subsidiaries and Intercompany Receivables and Payables**

Certain Debtor Entities hold investments in subsidiary Debtor Entities as outlined in the Debtors' organizational structure. In accordance with the priorities set forth in section 726 of the Bankruptcy Code, investments in subsidiaries are assumed to be subordinated to general unsecured Claims of the subsidiary Debtor Entity to which an investment exists. The Liquidation Analysis assumes that investments in subsidiaries are not recoverable assets of the Debtor Entities given that no distributions are made to general unsecured creditors at the subsidiary Debtor Entities.

In the ordinary course of the Debtors business, intercompany receivables and intercompany payables arose between various Debtor Entities. The Liquidation Analysis assumes that all intercompany payables are classified as general unsecured Claims and that intercompany receivables are not recoverable assets of the Debtor Entities given that no distributions are made to general unsecured creditors at the Debtor Entities with the corresponding intercompany payable.

**Treatment of First Lien Secured Debt and Second Lien Secured Debt**

The Liquidation Analysis assumes that First Lien Secured Debt and Second Lien Secured Debt holders seek collection of the total amounts owed against each Debtor Entities from which they hold a guarantee. As such, the Liquidation Analysis shows the full estimated Claim amount for the First Lien Secured Debt and Second Lien Secured Debt on the analysis of each Debtor Entity. As noted in the summary pages below, this presentation will not overstate recoveries to the First Lien Secured Debt holders or Second Lien Secured Debt holders due to the deficiency of net liquidation proceeds at the Debtor Entities. The Liquidation Analysis assumes that the First Lien Secured Debt and the Second Lien Secured Debt are properly perfected by security interests and liens on all of the assets of the Debtors, except the assets of WF Capital Holdings, Inc. and certain other de minimis assets. Likewise, the Liquidation Analysis assumes the relative priorities between the First Lien Secured Debt and Second Lien Secured Debt.

**Liquidation Analysis Form and Summary of Debtor Entities**

The Liquidation Analysis assumes that each Debtor Entity is liquidated separate and apart from each other Debtor Entity. As such, a separate and distinct analysis of each Debtor Entity's assets and Claims was performed to determine recovery values for all creditors of the respective Debtor Entity. In the case of several Debtor Entities, investments in subsidiaries and intercompany receivables and Claims represent the only assets and Claims against a Debtor Entity. In such cases, no analysis of the Debtor Entities assets and Claims is presented.

The Liquidation Analysis provides for a summary below of the separate and distinct analyses of each Debtor Entity to determine the overall recoveries for each class of the Debtors' under the Plan.

**Workflow Management, Inc., et al.**
**Hypothetical Liquidation Analysis Summary**
(Unaudited)
*($ in millions)*

| | Net Liquidation Proceeds | | First Lien Secured Claims | | Second Lien Secured Claims | | Admin/Priority Claims | | | General Unsecured Claims | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Estimated Allowed Claim** | | | $ 141.6 | | $ 196.5 | | | | | | | |
| **Liquidation Recovery** | | | Recovery | | Recovery | | Estimated | Recovery | | Estimated | Recovery | |
| **Debtor Entity** | Low | High | Low | High | Low | High | Claim | Low | High | Claim | Low | High |
| WF Capital Holdings, Inc. | $ - | $ - | $ - | $ - | $ - | $ - | - | $ - | $ - | 78.8 | $ - | $ - |
| WF Holdings, Inc. | 2.5 | 2.6 | 2.5 | 2.6 | - | - | - | - | - | 11.3 | - | - |
| Workflow Holdings Corporation | - | - | - | - | - | - | - | - | - | - | - | - |
| Workflow Management, Inc. | 3.6 | 4.1 | 3.6 | 4.1 | - | - | 0.3 | - | - | 8.5 | - | - |
| Workflow Solutions LLC | 8.5 | 11.5 | 8.5 | 11.5 | - | - | 8.0 | - | - | 2.8 | - | - |
| The Relizon Company | 54.3 | 70.3 | 54.3 | 70.3 | - | - | 16.4 | - | - | 55.6 | - | - |
| SFI of Puerto Rico, Inc. | 0.4 | 0.5 | 0.4 | 0.5 | - | - | 0.1 | - | - | 0.1 | - | - |
| Relizon Texas Ltd, LLP | 0.1 | 0.2 | 0.1 | 0.2 | - | - | 0.1 | - | - | 0.2 | - | - |
| Relizon Wisconsin Inc. | 0.4 | 0.5 | 0.4 | 0.5 | - | - | 0.0 | - | - | 0.2 | - | - |
| Old UE, LLC "United Envelope" | 0.0 | 0.0 | 0.0 | 0.0 | - | - | - | - | - | 1.3 | - | - |
| Old FGS, Inc. "Freedom Graphics" | 0.0 | 0.0 | 0.0 | 0.0 | - | - | - | - | - | - | - | - |
| Relizon SNE, Inc. | - | - | - | - | - | - | - | - | - | - | - | - |
| WFMI, Inc. | - | - | - | - | - | - | - | - | - | - | - | - |
| Workflow of Florida, Inc. | - | - | - | - | - | - | - | - | - | - | - | - |
| Workflow Management Acq. II Corp. | - | - | - | - | - | - | - | - | - | - | - | - |
| WFIH, Inc. | - | - | - | - | - | - | - | - | - | - | - | - |
| Workflow Direct, Inc. | - | - | - | - | - | - | - | - | - | - | - | - |
| Relizon de Mexico Inc. | - | - | - | - | - | - | - | - | - | - | - | - |
| Formcraft Hold. Limited Partner, Inc. | - | - | - | - | - | - | - | - | - | - | - | - |
| Formcraft Hold. General Partner, Inc. | - | - | - | - | - | - | - | - | - | - | - | - |
| Relizon KNE Inc. | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Debtor Entities | $ 69.7 | $ 89.8 | $ 69.7 | $ 89.8 | $ - | $ - | $ 24.9 | $ - | $ - | $ 158.8 | $ - | $ - |
| **% Recovery of Claim** | | | **49.2%** | **63.4%** | **0.0%** | **0.0%** | | **0.0%** | **0.0%** | | **0.0%** | **0.0%** |

**Aggregation of all Debtor Entities**
(Unaudited)
*($ in thousands)*

| | Notes | Estimated Book Value 9/30/2010 | Estimated Recovery Value Low | Estimated Recovery Value High | Estimated Percent Recovery Low | Estimated Percent Recovery High |
|---|---|---|---|---|---|---|
| **I. Proceeds** | | | | | | |
| Cash | [A] | $ 18,708 | $ 18,708 | $ 18,708 | 100.0% | 100.0% |
| Accounts/Notes Receivable | [B] | 74,148 | 47,448 | 58,840 | 64.0% | 79.4% |
| Inventory | [C] | 27,208 | 13,240 | 16,822 | 48.7% | 61.8% |
| Prepaid & Other Current Assets | [D] | 7,186 | 2,262 | 2,595 | 31.5% | 36.1% |
| Property Plant & Equipment | [E] | 46,135 | 9,277 | 12,730 | 20.1% | 27.6% |
| Other Long Term Assets | [F] | 13,020 | 327 | 368 | 2.5% | 2.8% |
| Goodwill & Intangibles | [G] | 169,897 | - | - | 0.0% | 0.0% |
| Investment in Subsidiaries | [H] | - | - | - | n/a | n/a |
| Intercompany Receivables | [H] | - | - | - | n/a | n/a |
| Ohio Loan Project Facilities | [I] | 671 | 101 | 168 | 15.0% | 25.0% |
| Equity in Non-Debtor Subsidiaries | [J] | - | - | - | n/a | n/a |
| **Gross Liquidation Proceeds** | | **$ 356,973** | **$ 91,363** | **$ 110,231** | **25.6%** | **30.9%** |
| *Less: Liquidation Expenses* | | | | | | |
| Trustee Fees | [K] | | (2,180) | (2,746) | | |
| Professional Fees | [L] | | (6,000) | (5,500) | | |
| Shut-Down Costs | [M] | | (13,500) | (12,200) | | |
| **Total Liquidation Costs** | | | **$ (21,680)** | **$ (20,446)** | | |
| **Net Liquidation Proceeds** | | | **$ 69,683** | **$ 89,786** | | |

| | Notes | Estimated Allowed Claims | Estimated Recovery Value Low | Estimated Recovery Value High | Estimated Percent Recovery Low | Estimated Percent Recovery High |
|---|---|---|---|---|---|---|
| **II. First Lien Secured Claims** | | | | | | |
| First Lien Secured Claims | [N] | $ 141,348 | $ 69,607 | $ 89,650 | 49.2% | 63.4% |
| Ohio Loan | | 230 | 76 | 136 | 33.1% | 59.0% |
| Total First Lien Secured Claims | | $ 141,578 | $ 69,683 | $ 89,786 | 49.2% | 63.4% |
| Proceeds Available for Distributions to Second Lien Secured Claims | | | $ - | $ - | | |
| **III. Second Lien Secured Claims** | | | | | | |
| Second Lien Secured Claims | | $ 196,474 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Distributions to Admin / Priority Claims | | | $ - | $ - | | |
| **IV. Admin / Priority** | | | | | | |
| Priority Taxes | | $ 3,053 | $ - | $ - | 0.0% | 0.0% |
| Priority Employee Claims | [O] | 6,004 | - | - | 0.0% | 0.0% |
| 503(b)(9) Claims | [P] | 15,871 | - | - | 0.0% | 0.0% |
| Total Admin / Priority | | $ 24,928 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Distributions to General Unsecured Claims | | | $ - | $ - | | |
| **V. General Unsecured Claims** | | | | | | |
| Accounts Payable | [P] | $ 15,324 | $ - | $ - | 0.0% | 0.0% |
| Other Employee Related Claims | [O] | 5,242 | - | - | 0.0% | 0.0% |
| PBGC | | 32,451 | - | - | 0.0% | 0.0% |
| Other General Unsecured Claims | | 11,913 | - | - | 0.0% | 0.0% |
| BB&T Loan | [Q] | 20,000 | - | - | 0.0% | 0.0% |
| Perseus Claims | | 62,478 | - | - | 0.0% | 0.0% |
| Carlyle Note | | 11,346 | - | - | 0.0% | 0.0% |
| Total General Unsecured Claims | | $ 158,753 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Intercompany and Equity Stakeholders | | | $ - | $ - | | |

**WF Capital Holdings, Inc.**
(Unaudited)
*($ in thousands)*

| | Notes | Estimated Book Value 9/30/2010 | Estimated Recovery Value Low | Estimated Recovery Value High | Estimated Percent Recovery Low | Estimated Percent Recovery High |
|---|---|---|---|---|---|---|
| **I.  Proceeds** | | | | | | |
| Cash | [A] | $ 1 | $ 1 | $ 1 | 100.0% | 100.0% |
| Accounts/Notes Receivable | [B] | - | - | - | n/a | n/a |
| Inventory | [C] | - | - | - | n/a | n/a |
| Prepaid & Other Current Assets | [D] | - | - | - | n/a | n/a |
| Property Plant & Equipment | [E] | - | - | - | n/a | n/a |
| Other Long Term Assets | [F] | 14 | - | - | 0.0% | 0.0% |
| Goodwill & Intangibles | [G] | - | - | - | n/a | n/a |
| Investment in Subsidiaries | [H] | n/a | - | - | n/a | n/a |
| Intercompany Receivables | [H] | n/a | - | - | n/a | n/a |
| Ohio Loan Project Facilities | [I] | - | - | - | n/a | n/a |
| Equity in Non-Debtor Subsidiaries | [J] | - | - | - | n/a | n/a |
| **Gross Liquidation Proceeds** | | **$ 15** | **$ 1** | **$ 1** | **7.7%** | **7.7%** |
| | | | | | | |
| *Less: Liquidation Expenses* | | | | | | |
| Trustee Fees | [K] | | - | - | | |
| Professional Fees | [L] | | (1) | (1) | | |
| Shut-Down Costs | [M] | | (1) | (1) | | |
| **Total Liquidation Costs** | | | **$ (1)** | **$ (1)** | | |
| | | | | | | |
| **Net Liquidation Proceeds** | | | **$ -** | **$ -** | | |

| | Notes | Estimated Allowed Claims | Estimated Recovery Value Low | Estimated Recovery Value High | Estimated Percent Recovery Low | Estimated Percent Recovery High |
|---|---|---|---|---|---|---|
| **II.  First Lien Secured Claims** | | | | | | |
| First Lien Secured Claims | [N] | $ - | $ - | $ - | n/a | n/a |
| Ohio Loan | | - | | - | n/a | n/a |
| Total First Lien Secured Claims | | $ - | $ - | $ - | n/a | n/a |
| Proceeds Available for Distributions to Second Lien Secured Claims | | | $ - | $ - | | |
| | | | | | | |
| **III.  Second Lien Secured Claims** | | | | | | |
| Second Lien Secured Claims | | $ - | $ - | $ - | n/a | n/a |
| Proceeds Available for Distributions to Admin / Priority Claims | | | $ - | $ - | | |
| | | | | | | |
| **IV.  Admin / Priority** | | | | | | |
| Priority Taxes | | $ - | $ - | $ - | n/a | n/a |
| Priority Employee Claims | [O] | - | - | - | n/a | n/a |
| 503(b)(9) Claims | [P] | - | - | - | n/a | n/a |
| Total Admin / Priority | | $ - | $ - | $ - | n/a | n/a |
| Proceeds Available for Distributions to General Unsecured Claims | | | $ - | $ - | | |
| | | | | | | |
| **V.  General Unsecured Claims** | | | | | | |
| Accounts Payable | [P] | $ - | $ - | $ - | n/a | n/a |
| Other Employee Related Claims | [O] | - | - | - | n/a | n/a |
| PBGC | | - | - | - | n/a | n/a |
| Other General Unsecured Claims | | - | - | - | n/a | n/a |
| BB&T Loan | [Q] | 20,000 | - | - | 0.0% | 0.0% |
| Perseus Notes | | 58,788 | - | - | 0.0% | 0.0% |
| Total General Unsecured Claims | | $ 78,788 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Intercompany and Equity Stakeholders | | | $ - | $ - | | |

**WF Holdings, Inc.**
(Unaudited)
($ in thousands)

| | Notes | Estimated Book Value 9/30/2010 | Estimated Recovery Value Low | Estimated Recovery Value High | Estimated Percent Recovery Low | Estimated Percent Recovery High |
|---|---|---|---|---|---|---|
| **I. Proceeds** | | | | | | |
| Cash | [A] | $ - | $ - | $ - | n/a | n/a |
| Accounts/Notes Receivable | [B] | 3,251 | 3,251 | 3,251 | 100.0% | 100.0% |
| Inventory | [C] | - | - | - | n/a | n/a |
| Prepaid & Other Current Assets | [D] | - | - | - | n/a | n/a |
| Property Plant & Equipment | [E] | - | - | - | n/a | n/a |
| Other Long Term Assets | [F] | - | - | - | n/a | n/a |
| Goodwill & Intangibles | [G] | - | - | - | n/a | n/a |
| Investment in Subsidiaries | [H] | n/a | - | - | n/a | n/a |
| Intercompany Receivables | [H] | n/a | - | - | n/a | n/a |
| Ohio Loan Project Facilities | [I] | - | - | - | n/a | n/a |
| Equity in Non-Debtor Subsidiaries | [J] | - | - | - | n/a | n/a |
| **Gross Liquidation Proceeds** | | **$ 3,251** | **$ 3,251** | **$ 3,251** | **100.0%** | **100.0%** |
| *Less: Liquidation Expenses* | | | | | | |
| Trustee Fees | [K] | | (98) | (98) | | |
| Professional Fees | [L] | | (214) | (162) | | |
| Shut-Down Costs | [M] | | (480) | (360) | | |
| **Total Liquidation Costs** | | | **$ (791)** | **$ (620)** | | |
| **Net Liquidation Proceeds** | | | **$ 2,460** | **$ 2,632** | | |

| | Notes | Estimated Allowed Claims | Estimated Recovery Value Low | Estimated Recovery Value High | Estimated Percent Recovery Low | Estimated Percent Recovery High |
|---|---|---|---|---|---|---|
| **II. First Lien Secured Claims** | | | | | | |
| First Lien Secured Claims | [N] | $ 141,348 | $ 2,460 | $ 2,632 | 1.7% | 1.9% |
| Ohio Loan | | - | - | - | n/a | n/a |
| Total First Lien Secured Claims | | $ 141,348 | $ 2,460 | $ 2,632 | 1.7% | 1.9% |
| Proceeds Available for Distributions to Second Lien Secured Claims | | | $ - | $ - | | |
| **III. Second Lien Secured Claims** | | | | | | |
| Second Lien Secured Claims | | $ 196,474 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Distributions to Admin / Priority Claims | | | $ - | $ - | | |
| **IV. Admin / Priority** | | | | | | |
| Priority Taxes | | $ - | $ - | $ - | n/a | n/a |
| Priority Employee Claims | [O] | - | - | - | n/a | n/a |
| 503(b)(9) Claims | [P] | - | - | - | n/a | n/a |
| Total Admin / Priority | | $ - | $ - | $ - | n/a | n/a |
| Proceeds Available for Distributions to General Unsecured Claims | | | $ - | $ - | | |
| **V. General Unsecured Claims** | | | | | | |
| Accounts Payable | [P] | $ - | $ - | $ - | n/a | n/a |
| Other Employee Related Claims | [O] | - | - | - | n/a | n/a |
| PBGC | | - | - | - | n/a | n/a |
| Other General Unsecured Claims | | - | - | - | n/a | n/a |
| Carlyle Note | | 11,346 | - | - | 0.0% | 0.0% |
| Total General Unsecured Claims | | $ 11,346 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Intercompany and Equity Stakeholders | | | $ - | $ - | | |

**WF Holdings Corporation**
(Unaudited)
(\$ in thousands)

| | Notes | Estimated Book Value 9/30/2010 | Estimated Recovery Value | | Estimated Percent Recovery | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| **I. Proceeds** | | | | | | |
| Cash | [A] | $ - | $ - | $ - | n/a | n/a |
| Accounts/Notes Receivable | [B] | - | - | - | n/a | n/a |
| Inventory | [C] | - | - | - | n/a | n/a |
| Prepaid & Other Current Assets | [D] | - | - | - | n/a | n/a |
| Property Plant & Equipment | [E] | - | - | - | n/a | n/a |
| Other Long Term Assets | [F] | - | - | - | n/a | n/a |
| Goodwill & Intangibles | [G] | - | - | - | n/a | n/a |
| Investment in Subsidiaries | [H] | n/a | - | - | n/a | n/a |
| Intercompany Receivables | [H] | n/a | - | - | n/a | n/a |
| Ohio Loan Project Facilities | [I] | - | - | - | n/a | n/a |
| Equity in Non-Debtor Subsidiaries | [J] | - | - | - | n/a | n/a |
| **Gross Liquidation Proceeds** | | **$ -** | **$ -** | **$ -** | **n/a** | **n/a** |
| *Less: Liquidation Expenses* | | | | | | |
| Trustee Fees | [K] | | - | - | | |
| Professional Fees | [L] | | - | - | | |
| Shut-Down Costs | [M] | | - | - | | |
| **Total Liquidation Costs** | | | **$ -** | **$ -** | | |
| **Net Liquidation Proceeds** | | | **$ -** | **$ -** | | |

| | Notes | Estimated Allowed Claims | Estimated Recovery Value | | Estimated Percent Recovery | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| **II. First Lien Secured Claims** | | | | | | |
| First Lien Secured Claims | [N] | $ 141,348 | $ - | $ - | 0.0% | 0.0% |
| Ohio Loan | | - | - | - | n/a | n/a |
| Total First Lien Secured Claims | | $ 141,348 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Distributions to Second Lien Secured Claims | | | $ - | $ - | | |
| **III. Second Lien Secured Claims** | | | | | | |
| Second Lien Secured Claims | | $ 196,474 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Distributions to Admin / Priority Claims | | | $ - | $ - | | |
| **IV. Admin / Priority** | | | | | | |
| Priority Taxes | | $ - | $ - | $ - | n/a | n/a |
| Priority Employee Claims | [O] | - | - | - | n/a | n/a |
| 503(b)(9) Claims | [P] | - | - | - | n/a | n/a |
| Total Admin / Priority | | $ - | $ - | $ - | n/a | n/a |
| Proceeds Available for Distributions to General Unsecured Claims | | | $ - | $ - | | |
| **V. General Unsecured Claims** | | | | | | |
| Accounts Payable | [P] | $ - | $ - | $ - | n/a | n/a |
| Other Employee Related Claims | [O] | - | - | - | n/a | n/a |
| PBGC | | - | - | - | n/a | n/a |
| Other General Unsecured Claims | | - | - | - | n/a | n/a |
| Total General Unsecured Claims | | $ - | $ - | $ - | n/a | n/a |
| Proceeds Available for Intercompany and Equity Stakeholders | | | $ - | $ - | | |

**Workflow Management, Inc.**
(Unaudited)
($ in thousands)

| | Notes | Estimated Book Value 9/30/2010 | Estimated Recovery Value Low | Estimated Recovery Value High | Estimated Percent Recovery Low | Estimated Percent Recovery High |
|---|---|---|---|---|---|---|
| **I. Proceeds** | | | | | | |
| Cash | [A] | $ 2,282 | $ 2,282 | $ 2,282 | 100.0% | 100.0% |
| Accounts/Notes Receivable | [B] | 39 | 39 | 39 | 100.0% | 100.0% |
| Inventory | [C] | - | - | - | n/a | n/a |
| Prepaid & Other Current Assets | [D] | 4,379 | 2,192 | 2,517 | 50.1% | 57.5% |
| Property Plant & Equipment | [E] | 276 | 1 | 4 | 0.4% | 1.3% |
| Other Long Term Assets | [F] | 12,553 | 109 | 122 | 0.9% | 1.0% |
| Goodwill & Intangibles | [G] | - | - | - | n/a | n/a |
| Investment in Subsidiaries | [H] | n/a | - | - | n/a | n/a |
| Intercompany Receivables | [H] | n/a | - | - | n/a | n/a |
| Ohio Loan Project Facilities | [I] | - | - | - | n/a | n/a |
| Equity in Non-Debtor Subsidiaries | [J] | - | - | - | n/a | n/a |
| **Gross Liquidation Proceeds** | | **$ 19,529** | **$ 4,624** | **$ 4,965** | **23.7%** | **25.4%** |
| *Less: Liquidation Expenses* | | | | | | |
| Trustee Fees | [K] | | (70) | (80) | | |
| Professional Fees | [L] | | (304) | (248) | | |
| Shut-Down Costs | [M] | | (683) | (550) | | |
| **Total Liquidation Costs** | | | **$ (1,057)** | **$ (878)** | | |
| **Net Liquidation Proceeds** | | | **$ 3,567** | **$ 4,087** | | |

| | Notes | Estimated Allowed Claims | Estimated Recovery Value Low | Estimated Recovery Value High | Estimated Percent Recovery Low | Estimated Percent Recovery High |
|---|---|---|---|---|---|---|
| **II. First Lien Secured Claims** | | | | | | |
| First Lien Secured Claims | [N] | $ 141,348 | $ 3,567 | $ 4,087 | 2.5% | 2.9% |
| Ohio Loan | | - | - | - | n/a | n/a |
| Total First Lien Secured Claims | | $ 141,348 | $ 3,567 | $ 4,087 | 2.5% | 2.9% |
| Proceeds Available for Distributions to Second Lien Secured Claims | | | $ - | $ - | | |
| **III. Second Lien Secured Claims** | | | | | | |
| Second Lien Secured Claims | | $ 196,474 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Distributions to Admin / Priority Claims | | | $ - | $ - | | |
| **IV. Admin / Priority** | | | | | | |
| Priority Taxes | | 300 | $ - | $ - | 0.0% | 0.0% |
| Priority Employee Claims | [O] | 23 | - | - | 0.0% | 0.0% |
| 503(b)(9) Claims | [P] | - | - | - | n/a | n/a |
| Total Admin / Priority | | $ 323 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Distributions to General Unsecured Claims | | | $ - | $ - | | |
| **V. General Unsecured Claims** | | | | | | |
| Accounts Payable | [P] | $ 665 | $ - | $ - | 0.0% | 0.0% |
| Other Employee Related Claims | [O] | 1,546 | - | - | 0.0% | 0.0% |
| PBGC | | - | - | - | n/a | n/a |
| Other General Unsecured Claims | | 2,568 | - | - | 0.0% | 0.0% |
| Perseus Claims | | 3,690 | - | - | 0.0% | 0.0% |
| Total General Unsecured Claims | | $ 8,469 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Intercompany and Equity Stakeholders | | | $ - | $ - | | |

**Workflow Solutions LLC**
(Unaudited)
($ in thousands)

| | Notes | Estimated Book Value 9/30/2010 | Estimated Recovery Value Low | Estimated Recovery Value High | Estimated Percent Recovery Low | Estimated Percent Recovery High |
|---|---|---|---|---|---|---|
| **I. Proceeds** | | | | | | |
| Cash | [A] | $ - | $ - | $ - | n/a | n/a |
| Accounts/Notes Receivable | [B] | 11,092 | 7,210 | 8,988 | 65.0% | 81.0% |
| Inventory | [C] | 7,786 | 3,903 | 5,068 | 50.1% | 65.1% |
| Prepaid & Other Current Assets | [D] | - | - | - | n/a | n/a |
| Property Plant & Equipment | [E] | 1,127 | 63 | 143 | 5.6% | 12.7% |
| Other Long Term Assets | [F] | - | - | - | n/a | n/a |
| Goodwill & Intangibles | [G] | 15,888 | - | - | 0.0% | 0.0% |
| Investment in Subsidiaries | [H] | n/a | - | - | n/a | n/a |
| Intercompany Receivables | [H] | n/a | - | - | n/a | n/a |
| Ohio Loan Project Facilities | [I] | - | - | - | n/a | n/a |
| Equity in Non-Debtor Subsidiaries | [J] | - | - | - | n/a | n/a |
| **Gross Liquidation Proceeds** | | **$ 35,893** | **$ 11,176** | **$ 14,200** | **31.1%** | **39.6%** |
| *Less: Liquidation Expenses* | | | | | | |
| Trustee Fees | [K] | | (335) | (426) | | |
| Professional Fees | [L] | | (734) | (708) | | |
| Shut-Down Costs | [M] | | (1,651) | (1,571) | | |
| **Total Liquidation Costs** | | | **$ (2,721)** | **$ (2,706)** | | |
| **Net Liquidation Proceeds** | | | **$ 8,455** | **$ 11,494** | | |

| | Notes | Estimated Allowed Claims | Estimated Recovery Value Low | Estimated Recovery Value High | Estimated Percent Recovery Low | Estimated Percent Recovery High |
|---|---|---|---|---|---|---|
| **II. First Lien Secured Claims** | | | | | | |
| First Lien Secured Claims | [N] | $ 141,348 | $ 8,455 | $ 11,494 | 6.0% | 8.1% |
| Ohio Loan | | - | - | - | n/a | n/a |
| Total First Lien Secured Claims | | $ 141,348 | $ 8,455 | $ 11,494 | 6.0% | 8.1% |
| Proceeds Available for Distributions to Second Lien Secured Claims | | | $ - | $ - | | |
| **III. Second Lien Secured Claims** | | | | | | |
| Second Lien Secured Claims | | $ 196,474 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Distributions to Admin / Priority Claims | | | $ - | $ - | | |
| **IV. Admin / Priority** | | | | | | |
| Priority Taxes | | $ 1,242 | $ - | $ - | 0.0% | 0.0% |
| Priority Employee Claims | [O] | 320 | - | - | 0.0% | 0.0% |
| 503(b)(9) Claims | [P] | 6,451 | - | - | 0.0% | 0.0% |
| Total Admin / Priority | | $ 8,014 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Distributions to General Unsecured Claims | | | $ - | $ - | | |
| **V. General Unsecured Claims** | | | | | | |
| Accounts Payable | [P] | $ 2,843 | $ - | $ - | 0.0% | 0.0% |
| Other Employee Related Claims | [O] | - | - | - | n/a | n/a |
| PBGC | | - | - | - | n/a | n/a |
| Other General Unsecured Claims | | - | - | - | n/a | n/a |
| Total General Unsecured Claims | | $ 2,843 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Intercompany and Equity Stakeholders | | | $ - | $ - | | |

**The Relizon Company**
(Unaudited)
(*$ in thousands*)

| | Notes | Estimated Book Value 9/30/2010 | Estimated Recovery Value Low | | Estimated Recovery Value High | | Estimated Percent Recovery Low | Estimated Percent Recovery High |
|---|---|---|---|---|---|---|---|---|
| **I.  Proceeds** | | | | | | | | |
| Cash | [A] | $ 16,424 | $ 16,424 | $ | 16,424 | | 100.0% | 100.0% |
| Accounts/Notes Receivable | [B] | 58,723 | 36,284 | | 45,726 | | 61.8% | 77.9% |
| Inventory | [C] | 18,588 | 8,963 | | 11,267 | | 48.2% | 60.6% |
| Prepaid & Other Current Assets | [D] | 2,730 | 0 | | 0 | | 0.0% | 0.0% |
| Property Plant & Equipment | [E] | 43,995 | 9,111 | | 12,414 | | 20.7% | 28.2% |
| Other Long Term Assets | [F] | 453 | 219 | | 246 | | 48.3% | 54.3% |
| Goodwill & Intangibles | [G] | 145,050 | - | | - | | 0.0% | 0.0% |
| Investment in Subsidiaries | [H] | n/a | - | | - | | n/a | n/a |
| Intercompany Receivables | [H] | n/a | - | | - | | n/a | n/a |
| Ohio Loan Project Facilities | [I] | 671 | 101 | | 168 | | 15.0% | 25.0% |
| Equity in Non-Debtor Subsidiaries | [J] | - | - | | - | | n/a | n/a |
| **Gross Liquidation Proceeds** | | **$ 286,635** | **$ 71,102** | **$** | **86,246** | | **24.8%** | **30.1%** |
| *Less: Liquidation Expenses* | | | | | | | | |
| Trustee Fees | [K] | | (1,640) | | (2,095) | | | |
| Professional Fees | [L] | | (4,669) | | (4,303) | | | |
| Shut-Down Costs | [M] | | (10,506) | | (9,545) | | | |
| **Total Liquidation Costs** | | | **$ (16,815)** | **$** | **(15,943)** | | | |
| **Net Liquidation Proceeds** | | | **$ 54,287** | **$** | **70,304** | | | |

| | Notes | Estimated Allowed Claims | Estimated Recovery Value Low | | Estimated Recovery Value High | | Estimated Percent Recovery Low | Estimated Percent Recovery High |
|---|---|---|---|---|---|---|---|---|
| **II.  First Lien Secured Claims** | | | | | | | | |
| First Lien Secured Claims | [N] | $ 141,348 | $ 54,211 | $ | 70,168 | | 38.4% | 49.6% |
| Ohio Loan | | 230 | 76 | | 136 | | 33.1% | 59.0% |
| Total First Lien Secured Claims | | $ 141,578 | $ 54,287 | $ | 70,304 | | 38.3% | 49.7% |
| Proceeds Available for Distributions to Second Lien Secured Claims | | | $ - | $ | - | | | |
| **III.  Second Lien Secured Claims** | | | | | | | | |
| Second Lien Secured Claims | | $ 196,474 | $ - | $ | - | | 0.0% | 0.0% |
| Proceeds Available for Distributions to Admin / Priority Claims | | | $ - | $ | - | | | |
| **IV.  Admin / Priority** | | | | | | | | |
| Priority Taxes | | $ 1,370 | $ - | $ | - | | 0.0% | 0.0% |
| Priority Employee Claims | [O] | 5,596 | - | | - | | 0.0% | 0.0% |
| 503(b)(9) Claims | [P] | 9,420 | - | | - | | 0.0% | 0.0% |
| Total Admin / Priority | | $ 16,386 | $ - | $ | - | | 0.0% | 0.0% |
| Proceeds Available for Distributions to General Unsecured Claims | | | $ - | $ | - | | | |
| **V.  General Unsecured Claims** | | | | | | | | |
| Accounts Payable | [P] | $ 11,403 | $ - | $ | - | | 0.0% | 0.0% |
| Other Employee Related Claims | [O] | 3,695 | - | | - | | 0.0% | 0.0% |
| PBGC | | 31,377 | - | | - | | 0.0% | 0.0% |
| Other General Unsecured Claims | | 9,103 | - | | - | | 0.0% | 0.0% |
| Total General Unsecured Claims | | $ 55,577 | $ - | $ | - | | 0.0% | 0.0% |
| Proceeds Available for Intercompany and Equity Stakeholders | | | $ - | $ | - | | | |

**SFI of Puerto Rico, Inc.**
(Unaudited)
($ in thousands)

| | Notes | Estimated Book Value 9/30/2010 | Estimated Recovery Value Low | Estimated Recovery Value High | Estimated Percent Recovery Low | Estimated Percent Recovery High |
|---|---|---|---|---|---|---|
| **I. Proceeds** | | | | | | |
| Cash | [A] | $ - | $ - | $ - | n/a | n/a |
| Accounts/Notes Receivable | [B] | 244 | 156 | 195 | 64.1% | 80.1% |
| Inventory | [C] | 686 | 343 | 446 | 50.0% | 65.0% |
| Prepaid & Other Current Assets | [D] | - | - | - | n/a | n/a |
| Property Plant & Equipment | [E] | 29 | 2 | 4 | 6.4% | 12.7% |
| Other Long Term Assets | [F] | - | - | - | n/a | n/a |
| Goodwill & Intangibles | [G] | - | - | - | n/a | n/a |
| Investment in Subsidiaries | [H] | n/a | - | - | n/a | n/a |
| Intercompany Receivables | [H] | n/a | - | - | n/a | n/a |
| Ohio Loan Project Facilities | [I] | - | - | - | n/a | n/a |
| Equity in Non-Debtor Subsidiaries | [J] | - | - | - | n/a | n/a |
| **Gross Liquidation Proceeds** | | $ 959 | $ 501 | $ 645 | 52.3% | 67.3% |
| *Less: Liquidation Expenses* | | | | | | |
| Trustee Fees | [K] | | (15) | (19) | | |
| Professional Fees | [L] | | (33) | (32) | | |
| Shut-Down Costs | [M] | | (74) | (71) | | |
| **Total Liquidation Costs** | | | $ (122) | $ (123) | | |
| **Net Liquidation Proceeds** | | | $ 379 | $ 522 | | |

| | Notes | Estimated Allowed Claims | Estimated Recovery Value Low | Estimated Recovery Value High | Estimated Percent Recovery Low | Estimated Percent Recovery High |
|---|---|---|---|---|---|---|
| **II. First Lien Secured Claims** | | | | | | |
| First Lien Secured Claims | [N] | $ 141,348 | $ 379 | $ 522 | 0.3% | 0.4% |
| Ohio Loan | | - | - | - | n/a | n/a |
| Total First Lien Secured Claims | | $ 141,348 | $ 379 | $ 522 | 0.3% | 0.4% |
| Proceeds Available for Distributions to Second Lien Secured Claims | | | $ - | $ - | | |
| **III. Second Lien Secured Claims** | | | | | | |
| Second Lien Secured Claims | | $ 196,474 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Distributions to Admin / Priority Claims | | | $ - | $ - | | |
| **IV. Admin / Priority** | | | | | | |
| Priority Taxes | | $ 26 | $ - | $ - | 0.0% | 0.0% |
| Priority Employee Claims | [O] | 42 | - | - | 0.0% | 0.0% |
| 503(b)(9) Claims | [P] | - | - | - | n/a | n/a |
| Total Admin / Priority | | $ 67 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Distributions to General Unsecured Claims | | | $ - | $ - | | |
| **V. General Unsecured Claims** | | | | | | |
| Accounts Payable | | $ 67 | $ - | $ - | 0.0% | 0.0% |
| Other Employee Related Claims | [O] | - | - | - | n/a | n/a |
| PBGC | | - | - | - | n/a | n/a |
| Other General Unsecured Claims | | - | - | - | n/a | n/a |
| Total General Unsecured Claims | | $ 67 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Intercompany and Equity Stakeholders | | | $ - | $ - | | |

**Relizon Texas Ltd, LLP**
(Unaudited)
($ in thousands)

| | Notes | Estimated Book Value 9/30/2010 | Estimated Recovery Value Low | Estimated Recovery Value High | Estimated Percent Recovery Low | Estimated Percent Recovery High |
|---|---|---|---|---|---|---|
| **I.  Proceeds** | | | | | | |
| Cash | [A] | $          - | $          - | $          - | n/a | n/a |
| Accounts/Notes Receivable | [B] | 3 | 2 | 2 | 80.0% | 95.0% |
| Inventory | [C] | 128 | 24 | 31 | 18.8% | 24.0% |
| Prepaid & Other Current Assets | [D] | - | - | - | n/a | n/a |
| Property Plant & Equipment | [E] | 708 | 99 | 166 | 14.0% | 23.4% |
| Other Long Term Assets | [F] | - | - | - | n/a | n/a |
| Goodwill & Intangibles | [G] | 2,878 | - | - | 0.0% | 0.0% |
| Investment in Subsidiaries | [H] | n/a | - | - | n/a | n/a |
| Intercompany Receivables | [H] | n/a | - | - | n/a | n/a |
| Ohio Loan Project Facilities | [I] | - | - | - | n/a | n/a |
| Equity in Non-Debtor Subsidiaries | [J] | - | - | - | n/a | n/a |
| **Gross Liquidation Proceeds** | | **$     3,717** | **$      125** | **$      199** | **3.4%** | **5.4%** |
| *Less: Liquidation Expenses* | | | | | | |
| Trustee Fees | [K] | | (4) | (6) | | |
| Professional Fees | [L] | | (8) | (10) | | |
| Shut-Down Costs | [M] | | (18) | (22) | | |
| **Total Liquidation Costs** | | | **$      (30)** | **$      (38)** | | |
| **Net Liquidation Proceeds** | | | **$       95** | **$      161** | | |

| | Notes | Estimated Allowed Claims | Estimated Recovery Value Low | Estimated Recovery Value High | Estimated Percent Recovery Low | Estimated Percent Recovery High |
|---|---|---|---|---|---|---|
| **II.  First Lien Secured Claims** | | | | | | |
| First Lien Secured Claims | [N] | $   141,348 | $       95 | $      161 | 0.1% | 0.1% |
| Ohio Loan | | - | - | - | n/a | n/a |
| Total First Lien Secured Claims | | $   141,348 | $       95 | $      161 | 0.1% | 0.1% |
| Proceeds Available for Distributions to Second Lien Secured Claims | | | $          - | $          - | | |
| **III.  Second Lien Secured Claims** | | | | | | |
| Second Lien Secured Claims | | $   196,474 | $          - | $          - | 0.0% | 0.0% |
| Proceeds Available for Distributions to Admin / Priority Claims | | | $          - | $          - | | |
| **IV.  Admin / Priority** | | | | | | |
| Priority Taxes | | $      101 | $          - | $          - | 0.0% | 0.0% |
| Priority Employee Claims | [O] | 23 | - | - | 0.0% | 0.0% |
| 503(b)(9) Claims | [P] | - | - | - | n/a | n/a |
| Total Admin / Priority | | $      124 | $          - | $          - | 0.0% | 0.0% |
| Proceeds Available for Distributions to General Unsecured Claims | | | $          - | $          - | | |
| **V.  General Unsecured Claims** | | | | | | |
| Accounts Payable | [P] | $      156 | $          - | $          - | 0.0% | 0.0% |
| Other Employee Related Claims | [O] | - | - | - | n/a | n/a |
| PBGC | | - | - | - | n/a | n/a |
| Other General Unsecured Claims | | - | - | - | n/a | n/a |
| Total General Unsecured Claims | | $      156 | $          - | $          - | 0.0% | 0.0% |
| Proceeds Available for Intercompany and Equity Stakeholders | | | $          - | $          - | | |

**Relizon Wisconsin Inc.**
(Unaudited)
($ in thousands)

| | Notes | Estimated Book Value 9/30/2010 | Estimated Recovery Value Low | Estimated Recovery Value High | Estimated Percent Recovery Low | Estimated Percent Recovery High |
|---|---|---|---|---|---|---|
| **I. Proceeds** | | | | | | |
| Cash | [A] | $ - | $ - | $ - | n/a | n/a |
| Accounts/Notes Receivable | [B] | 795 | 505 | 637 | 63.5% | 80.1% |
| Inventory | [C] | 20 | 7 | 10 | 35.1% | 48.3% |
| Prepaid & Other Current Assets | [D] | - | - | - | n/a | n/a |
| Property Plant & Equipment | [E] | - | - | - | n/a | n/a |
| Other Long Term Assets | [F] | - | - | - | n/a | n/a |
| Goodwill & Intangibles | [G] | 6,080 | - | - | 0.0% | 0.0% |
| Investment in Subsidiaries | [H] | n/a | - | - | n/a | n/a |
| Intercompany Receivables | [H] | n/a | - | - | n/a | n/a |
| Ohio Loan Project Facilities | [I] | - | - | - | n/a | n/a |
| Equity in Non-Debtor Subsidiaries | [J] | - | - | - | n/a | n/a |
| **Gross Liquidation Proceeds** | | $ 6,895 | $ 512 | $ 646 | 7.4% | 9.4% |
| *Less: Liquidation Expenses* | | | | | | |
| Trustee Fees | [K] | | (15) | (19) | | |
| Professional Fees | [L] | | (34) | (32) | | |
| Shut-Down Costs | [M] | | (76) | (72) | | |
| **Total Liquidation Costs** | | | $ (125) | $ (123) | | |
| **Net Liquidation Proceeds** | | | $ 387 | $ 523 | | |

| | Notes | Estimated Allowed Claims | Estimated Recovery Value Low | Estimated Recovery Value High | Estimated Percent Recovery Low | Estimated Percent Recovery High |
|---|---|---|---|---|---|---|
| **II. First Lien Secured Claims** | | | | | | |
| First Lien Secured Claims | [N] | $ 141,348 | $ 387 | $ 523 | 0.3% | 0.4% |
| Ohio Loan | | - | - | - | n/a | n/a |
| Total First Lien Secured Claims | | $ 141,348 | $ 387 | $ 523 | 0.3% | 0.4% |
| Proceeds Available for Distributions to Second Lien Secured Claims | | | $ - | $ - | | |
| **III. Second Lien Secured Claims** | | | | | | |
| Second Lien Secured Claims | | $ 196,474 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Distributions to Admin / Priority Claims | | | $ - | $ - | | |
| **IV. Admin / Priority** | | | | | | |
| Priority Taxes | | $ 12 | $ - | $ - | 0.0% | 0.0% |
| Priority Employee Claims | [O] | - | - | - | n/a | n/a |
| 503(b)(9) Claims | [P] | - | - | - | n/a | n/a |
| Total Admin / Priority | | $ 12 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Distributions to General Unsecured Claims | | | $ - | $ - | | |
| **V. General Unsecured Claims** | | | | | | |
| Accounts Payable | [P] | $ 191 | $ - | $ - | 0.0% | 0.0% |
| Other Employee Related Claims | [O] | - | - | - | n/a | n/a |
| PBGC | | - | - | - | n/a | n/a |
| Other General Unsecured Claims | | - | - | - | n/a | n/a |
| Total General Unsecured Claims | | $ 191 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Intercompany and Equity Stakeholders | | | $ - | $ - | | |

**Old UE, LLC "United Envelope"**
(Unaudited)
*($ in thousands)*

| | Notes | Estimated Book Value 9/30/2010 | Estimated Recovery Value | | Estimated Percent Recovery | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| **I.** **Proceeds** | | | | | | |
| Cash | [A] | $ - | $ - | $ - | n/a | n/a |
| Accounts/Notes Receivable | [B] | - | - | - | n/a | n/a |
| Inventory | [C] | - | - | - | n/a | n/a |
| Prepaid & Other Current Assets | [D] | 56 | 50 | 56 | 90.0% | 100.0% |
| Property Plant & Equipment | [E] | - | - | - | n/a | n/a |
| Other Long Term Assets | [F] | - | - | - | n/a | n/a |
| Goodwill & Intangibles | [G] | - | - | - | n/a | n/a |
| Investment in Subsidiaries | [H] | n/a | - | - | n/a | n/a |
| Intercompany Receivables | [H] | n/a | - | - | n/a | n/a |
| Ohio Loan Project Facilities | [I] | - | - | - | n/a | n/a |
| Equity in Non-Debtor Subsidiaries | [J] | - | - | - | n/a | n/a |
| **Gross Liquidation Proceeds** | | **$ 56** | **$ 50** | **$ 56** | **90.0%** | **100.0%** |
| *Less: Liquidation Expenses* | | | | | | |
| Trustee Fees | [K] | | (2) | (2) | | |
| Professional Fees | [L] | | (3) | (3) | | |
| Shut-Down Costs | [M] | | (7) | (6) | | |
| **Total Liquidation Costs** | | | **$ (12)** | **$ (11)** | | |
| **Net Liquidation Proceeds** | | | **$ 38** | **$ 45** | | |

| | Notes | Estimated Allowed Claims | Estimated Recovery Value | | Estimated Percent Recovery | |
|---|---|---|---|---|---|---|
| | | | Low | High | Low | High |
| **II. First Lien Secured Claims** | | | | | | |
| First Lien Secured Claims | [N] | $ 141,348 | $ 38 | $ 45 | 0.0% | 0.0% |
| Ohio Loan | | - | - | - | n/a | n/a |
| Total First Lien Secured Claims | | $ 141,348 | $ 38 | $ 45 | 0.0% | 0.0% |
| Proceeds Available for Distributions to Second Lien Secured Claims | | | $ - | $ - | | |
| **III. Second Lien Secured Claims** | | | | | | |
| Second Lien Secured Claims | | $ 196,474 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Distributions to Admin / Priority Claims | | | $ - | $ - | | |
| **IV. Admin / Priority** | | | | | | |
| Priority Taxes | | $ - | $ - | $ - | n/a | n/a |
| Priority Employee Claims | [O] | - | - | - | n/a | n/a |
| 503(b)(9) Claims | [P] | - | - | - | n/a | n/a |
| Total Admin / Priority | | $ - | $ - | $ - | n/a | n/a |
| Proceeds Available for Distributions to General Unsecured Claims | | | $ - | $ - | | |
| **V. General Unsecured Claims** | | | | | | |
| Accounts Payable | [P] | $ - | $ - | $ - | n/a | n/a |
| Other Employee Related Claims | [O] | - | - | - | n/a | n/a |
| PBGC | | 1,075 | - | - | 0.0% | 0.0% |
| Other General Unsecured Claims | | 242 | - | - | 0.0% | 0.0% |
| Total General Unsecured Claims | | $ 1,317 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Intercompany and Equity Stakeholders | | | $ - | $ - | | |

**Old FGS, Inc. "Freedom Graphics"**
(Unaudited)
*($ in thousands)*

| | Notes | Estimated Book Value 9/30/2010 | Estimated Recovery Value Low | Estimated Recovery Value High | Estimated Percent Recovery Low | Estimated Percent Recovery High |
|---|---|---|---|---|---|---|
| **I. Proceeds** | | | | | | |
| Cash | [A] | $ - | $ - | $ - | n/a | n/a |
| Accounts/Notes Receivable | [B] | - | - | - | n/a | n/a |
| Inventory | [C] | - | - | - | n/a | n/a |
| Prepaid & Other Current Assets | [D] | 22 | 20 | 22 | 90.0% | 100.0% |
| Property Plant & Equipment | [E] | - | - | - | n/a | n/a |
| Other Long Term Assets | [F] | - | - | - | n/a | n/a |
| Goodwill & Intangibles | [G] | - | - | - | n/a | n/a |
| Investment in Subsidiaries | [H] | n/a | - | - | n/a | n/a |
| Intercompany Receivables | [H] | n/a | - | - | n/a | n/a |
| Ohio Loan Project Facilities | [I] | - | - | - | n/a | n/a |
| Equity in Non-Debtor Subsidiaries | [J] | - | - | - | n/a | n/a |
| **Gross Liquidation Proceeds** | | **$ 22** | **$ 20** | **$ 22** | **90.0%** | **100.0%** |
| *Less: Liquidation Expenses* | | | | | | |
| Trustee Fees | [K] | | (1) | (1) | | |
| Professional Fees | [L] | | (1) | (1) | | |
| Shut-Down Costs | [M] | | (3) | (2) | | |
| **Total Liquidation Costs** | | | **$ (5)** | **$ (4)** | | |
| **Net Liquidation Proceeds** | | | **$ 15** | **$ 18** | | |

| | Notes | Estimated Allowed Claims | Estimated Recovery Value Low | Estimated Recovery Value High | Estimated Percent Recovery Low | Estimated Percent Recovery High |
|---|---|---|---|---|---|---|
| **II. First Lien Secured Claims** | | | | | | |
| First Lien Secured Claims | [N] | $ 141,348 | $ 15 | $ 18 | 0.0% | 0.0% |
| Ohio Loan | | - | - | - | n/a | n/a |
| Total First Lien Secured Claims | | $ 141,348 | $ 15 | $ 18 | 0.0% | 0.0% |
| Proceeds Available for Distributions to Second Lien Secured Claims | | | $ - | $ - | | |
| **III. Second Lien Secured Claims** | | | | | | |
| Second Lien Secured Claims | | $ 196,474 | $ - | $ - | 0.0% | 0.0% |
| Proceeds Available for Distributions to Admin / Priority Claims | | | $ - | $ - | | |
| **IV. Admin / Priority** | | | | | | |
| Priority Taxes | | $ - | $ - | $ - | n/a | n/a |
| Priority Employee Claims | [O] | - | - | - | n/a | n/a |
| 503(b)(9) Claims | [P] | - | - | - | n/a | n/a |
| Total Admin / Priority | | $ - | $ - | $ - | n/a | n/a |
| Proceeds Available for Distributions to General Unsecured Claims | | | $ - | $ - | | |
| **V. General Unsecured Claims** | | | | | | |
| Accounts Payable | [P] | $ - | $ - | $ - | n/a | n/a |
| Other Employee Related Claims | [O] | - | - | - | n/a | n/a |
| PBGC | | - | - | - | n/a | n/a |
| Other General Unsecured Claims | | - | - | - | n/a | n/a |
| Total General Unsecured Claims | | $ - | $ - | $ - | n/a | n/a |
| Proceeds Available for Intercompany and Equity Stakeholders | | | $ - | $ - | | |

**Notes to Liquidation Analysis**


The letter designation for a particular line item in the "Notes" column of each separate and distinct analysis of a Debtor Entity corresponds to a specific note below. Although the aggregate recovery rate range for each asset group may vary by Debtor Entity, the specific notes below describing approximate recovery ranges are for each Debtor Entity analysis unless explicitly described differently herein.

A. Cash

The book Cash balance as of September 30, 2010 for each Debtor Entity is assumed to be fully recoverable at the Liquidation Date.

B. Accounts/Notes Receivable

Accounts/Notes Receivable represents primarily amounts owed to the Debtor Entities by the Debtors' customers, including amounts that have not been billed to the Debtors' customers and accrue on a monthly basis in the normal course of business, net of doubtful account reserves. Accounts receivable also includes amounts from scrap sales and the expected return of an overpayment to service providers. Accounts receivable is adjusted for rebates due to customers, due to expectation of set-off rights, but is not adjusted for unearned revenue Claims. The Debtors determined recovery ranges for accounts receivable by assessing the potential counter-Claims from customers for breach of contract, the aging of customer accounts (75% are current), and likelihood of collection for unbilled and accrued amounts.

Accounts/Notes Receivable also includes two note receivables due from Perseus, LLC for the benefit of WF Holdings, Inc. This Liquidation Analysis assumes a recovery of 100% of the principal balance and accrued interest of the notes. However, Perseus may assert setoff rights or other defenses.

C. Inventory

Inventory at the Debtor Entities represents raw materials, work in process, and finished goods, including paper, ink, film, supplies, package goods and distribution center goods ready for shipment. The net book value of inventory reflects adjustments for obsolescence and valuation reductions. Recovery values reflect the Debtors' assessment of potential buyers for inventory, suppliers likely refusing to purchase back raw materials, a limited marketplace for customer specific products, and the amount of inventory currently held relative to customer needs.

D. Prepaid Expenses and Other Current Assets

Prepaid expenses and other current assets include items such as prepaid expenses, prepaid postage, prepaid insurance, federal and state income tax refunds, COBRA receivables and professional firm retainers. Recovery estimates for these assets are based upon factors such as the nature of the assets as capitalized costs and potential use of the assets during the liquidation period. For purposes of the Liquidation Analysis, the Debtors have assumed no recovery for prepaid postage and prepaid expenses. The Liquidation Analysis assumes that professional fee retainers are recovered in full and are not netted against professional fee costs incurred during the chapter 7 liquidation. The Debtors also assume a significant recovery for income tax refunds based on their estimates from filed returns.

E. Property, Plant and Equipment

Property, plant and equipment primarily consists of land, land improvements, buildings, building improvements, machinery and equipment, furniture and fixtures, office equipment, computer hardware, computer software, leased assets under capital leases, and construction in process.

The range of recovery values for land and buildings (including improvements) was determined based on a liquidation discount of 50% to the estimated orderly liquidation values provided in a real property valuation sponsored by the Debtors in September 2008 that assumed a twelve (12) to eighteen (18) month sale process.

The Debtors determined recovery values for machinery and equipment, furniture, fixtures, office equipment and computer hardware based on recent appraisals performed by Great American Group dated September 9, 2010 and expected value diminution from a fire-sale liquidation rather than an orderly liquidation process. Leaseholds improvements, computer software, and construction in process are assumed to have no recovery.

F.  Other Long Term Assets

Other Long Term Assets consists of deposits, deferred tax assets, deferred financing fees, and other miscellaneous assets.  The Liquidation Analysis anticipates that no recoveries will be made from deferred tax assets, deferred financing fees, which represent amortization of debt financing costs over the term of loans, and other miscellaneous assets.  The Debtors expect to achieve a partial recovery on a portion of deposits for bid bonds and a corporate credit card program and a long-term note receivable from asset sales.

G.  Goodwill and Intangibles

Goodwill is the consideration paid in excess of the fair value of tangible and identified intangible assets acquired and liabilities assumed in business acquisitions.  The Liquidation Analysis assumes goodwill has no recovery value.

Intangibles primarily consist of customer relationships and trade names.  The Liquidation Analysis assumes these assets are not saleable and have no recovery value.

H.  Investment in Subsidiaries and Intercompany Receivables

Investment in Subsidiaries represents each Debtor Entities' net equity interest in their respective direct subsidiaries based on the orderly liquidation of such subsidiaries' assets.  As described in the Global Notes, the Liquidation Analysis assumes no proceeds are available for distribution to equity Interests of any subsidiary Debtor Entity.

Intercompany Receivables represent general unsecured obligations of the Debtor Entities between one another.  Recoveries of amounts due to a Debtor Entity are based on distributions available to general unsecured Claims at liable Debtor Entity.  In general, the assets available at each Debtor Entity were not sufficient to provide any recovery to intercompany creditors and Intercompany Receivables have zero recovery value.

I.  Ohio Loan Project Facilities

The Relizon Company entered into a loan agreement with the State of Ohio Department of Development in February 2003 to finance certain of The Relizon Company's machinery and equipment purchases.  Pursuant to a security agreement and in accordance with the loan agreement with the State of Ohio Department of Development ("Ohio Loan"), certain machinery and equipment ("Ohio Collateral") was pledged as collateral to secure the Ohio Loan.  The Ohio Collateral is specifically excluded from the first lien and second lien security liens that are assumed to encumber all of the Debtors' assets, other than certain de minimis assets.

The Ohio Collateral is estimated to have a net book value of $671,000 as of September 30, 2010 and consistent with the estimates of machinery and equipment, the Liquidation Analysis assumes a recovery range between 15% and 25%.  Recovery proceeds from the Ohio Collateral will first be used to satisfy administrative expenses incurred by the Chapter 7 Trustee and then to satisfy the Ohio Loan.  The net book value of Ohio Collateral has been excluded from Property, Plant and Equipment.

J.  Equity in Non-Debtor Subsidiaries

The Liquidation Analysis assumes that the equity investments of certain Debtor Entities in non-Debtor subsidiaries are not saleable and have zero recovery value.

K.  Chapter 7 Trustee Fees

It is assumed that the Chapter 7 Trustee fees would be paid by the Debtor Entities in accordance with section 326 of the Bankruptcy Code.  Chapter 7 Trustee fees are estimated based upon historical experience in other similar cases and are calculated to be 3% of the asset recovery value, excluding Cash and Cash equivalents on hand at the time of the chapter 7 filing.

L.  Professional Fees

Professional fees include the fees and expenses incurred by any attorneys, financial advisors, Claims agent, accountants, investment bankers and other professionals retained by the Chapter 7 Trustee and any official committee of unsecured creditors during the liquidation period.  Professional fees are assumed to be incurred by the Chapter 7 Trustee for the liquidation of all Debtor Entities' assets and distribution to creditors.  The Liquidation Analysis allocates the total professional fees to each Debtor Entity on a pro-rata basis of gross liquidation proceeds.

M.  Shut-down Costs

The Debtors estimate that to liquidate and completely shut-down each Debtor Entity will take six (6) months. The Debtors anticipate that they would incur certain costs in connection with the shut-down of their operations, the collection of receivables, and sale of assets.  Such costs include wages and benefits for necessary employed personnel and general corporate office overhead costs.  The Debtors assume that they will continue to utilize their distribution center facilities for at least ninety (90) days after the Liquidation Date to effectively move inventory to sale locations and facilitate an orderly shut-down of their business. As such, the shut-down costs for each Debtor Entity also include the costs associated with maintaining the distribution centers during this period, including rent and utilities.  Additionally, the Debtors expect to incur costs to secure and close facilities in preparation for sale.  Administrative costs would also be incurred to liquidate the non-manufacturing assets, collect outstanding accounts receivable, prepare final securities filings and tax returns and reconcile Claims.  Shut-down costs are assumed to be incurred by the Chapter 7 Trustee for the liquidation of all Debtor Entities' assets.  The Liquidation Analysis allocates all shut-down costs to each Debtor Entity on a pro-rata basis of gross liquidation proceeds.

N.  First Lien Secured Claims

With respect to each Debtor Entity, except for WF Capital Holdings, Inc., First Lien Secured Claims consists of the Revolver A, Revolver B, and Term Loan Claims ("First Lien Secured Claims").  The Debtor Entities' obligations under the First Lien Credit Agreement are assumed to be secured by a first priority lien on substantially all of the Debtor Entities' assets, subject to certain de minimis exceptions.  First Lien Secured Claims includes contingent Claims arising from letter of credit obligations of the Debtors.  First Lien Secured Claims does not include the Debtors' participation in the Revolver A.  First Lien Secured Claims are assumed to be paid on a pro rata basis from net proceeds of the liquidation of each Debtor Entities' assets due to guarantees of the First Lien Secured Claims at each Debtor Entity, where applicable.

O.  Priority Employee Claims

The Bankruptcy Code provides employees with an administrative priority Claim for compensation and benefits up to $11,725 per employee.  The estimated amount of these Claims vary by Debtor Entity but the majority of employee liabilities are assumed to be afforded administrative priority, with the exception of incentive pay, severance, and approximately $520,000 of commission liabilities for which payment would exceed the priority cap per employee.  Commission liabilities in excess of the priority cap per employee are treated as general unsecured Claims.

P.  503(b)(9) Administrative Claims

The Bankruptcy Code provides vendors with an administrative priority Claim for the value of goods received by the Debtor Entities within twenty (20) days before the Petition Date, as long as the goods have been sold to the Debtor Entities in the ordinary course of business.  The Debtors reviewed goods received in the periods prior to the Liquidation Date and estimated amount of these Claims by each Debtor Entity.  Accounts payable general unsecured Claims are reduced by the estimated amount of 503(b)(9) administrative priority Claims.

Q.  BB&T Loan

The Liquidation Analysis assumes that Branch Banking and Trust Company (BB&T) seeks collections of amounts owed to it under its unsecured note of WF Capital Holdings, Inc. prior to seeking payment from guarantor, Perseus Market Opportunity Fund, L.P.