Benjamin C. Ackerly, Esq. (VSB No. 09120)
Tara L. Elgie, Esq. (VSB No. 48259)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Telephone: (804) 788-8479
Facsimile: (804) 788-8218

*Attorneys for Silver Point Finance, LLC in its capacity as
Administrative Agent under the Second Lien Credit Agreement*

Gary L. Kaplan
Michael B. de Leeuw
Richard J. Slivinski
FRIED, FRANK, HARRIS, SHRIVER
    & JACOBSON LLP
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
## NORFOLK DIVISION

| | |
|---|---|
| In re | ) Chapter 11 |
| WORKFLOW MANAGEMENT, INC., <u>et al.</u>, | ) Case No. 10-74617 (SCS) |
| Debtors.[1] | ) Jointly Administered |

## MOTION OF SILVER POINT FINANCE, LLC, AS ADMINISTRATIVE AGENT UNDER THE SECOND LIEN CREDIT AGREEMENT, PURSUANT TO SECTION 1121(d) OF THE BANKRUPTCY CODE TO (I) TERMINATE THE DEBTORS' EXCLUSIVE PERIODS TO FILE A PLAN OF REORGANIZATION AND SOLICIT ACCEPTANCES THERETO OR, IN THE ALTERNATIVE, (II) AUTHORIZE AND DIRECT A SALE OF THE DEBTORS' ASSETS PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND MEMORANDUM IN SUPPORT THEREOF

---

[1]  The Debtors in these proceedings and the last four digits of each Debtor's taxpayer identification numbers are as follows: Workflow Management, Inc. (7104); Workflow Holdings Corporation (9217); WF Capital Holdings, Inc. (5548); WF Holdings, Inc. (9106); Workflow Direct, Inc. (7497); Workflow Management Acquisition II Corp. (2039); WFIH, Inc. (0527); WFMI, Inc. (4282); Workflow of Florida, Inc. (4281); Workflow Solutions LLC (3769); SFI of Puerto Rico, Inc. (3413); Old FGS, Inc. (1438); Old UE, LLC (4060); The Relizon Company (4702); Relizon Wisconsin Inc. (8440); Relizon (Texas) Ltd., LLP (6437); Relizon SNE Inc. (4537); Relizon KNE Inc. (3935); Relizon de Mexico Inc. (6996); Formcraft Holdings General Partner, Inc. (5683); Formcraft Holdings Limited Partner, Inc. (5684).  The mailing address for WF Capital Holdings, Inc., Old FGS, Inc., and Old UE, LLC is 150 West Main Street, Suite 2100, Norfolk, Virginia 23510. For all other Debtors, the mailing address is 220 E. Monument Avenue, Dayton, Ohio 45402.

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND..............................................................................................5

  The Secured Debt......................................................................................................5

  The Debtors' Bankruptcy Filing ................................................................................6

JURISDICTION ...............................................................................................................7

RELIEF REQUESTED......................................................................................................7

ARGUMENT ....................................................................................................................7

  I.     Cause Exists to Terminate the Exclusivity Periods ...........................................7

          A.    There are No Reasonable Prospects that the Debtors Will File A Viable Plan ................................................................................................................13

               (i)    The Debtors' Proposed Plan is Not Feasible..................................14

               (ii)   The Debtors' Proposed Plan Improperly Gerrymanders Claims....................17

               (iii)  The Debtors' Proposed Plan Violates the Absolute Priority Rule..............................................................................................................19

          B.    These Cases are Not Complex ................................................................21

          C.    The Debtors Have Not Made Good Faith Progress in Resolving Issues Facing the Estates or in Negotiating with Creditors...............................................23

          D.    The Debtors are Abusing Exclusivity to Pressure the Lenders.............................25

          E.    The Debtors Will Not Be Able to Continue to Pay their Bills Without Access to the Lenders' Cash Collateral..................................................................25

          F.    There are No Unresolved Contingencies ................................................25

          G.    The Lenders Lack Confidence in the Debtors' Management ................................26

  II.    If the Exclusivity Periods Are Not Terminated to Permit the Filing of Competing Plans, the Court Should Authorize and Direct a Sale of the Debtors' Assets Through a Section 363 Sale..................................................................27

CONCLUSION.................................................................................................30

# TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

<small>CASES</small>                                                                                      <small>PAGE(S)</small>

In re Adelphia Commc'ns Corp,
    Case No. 02-41729, Dkt. No. 11681 (Bankr. S.D.N.Y. June 25, 2002)
    (attached hereto as Exhibit 17) ...............................................................................29

In re All Seasons Indus., Inc.,
    121 B.R. 1002 (Bankr. N.D. Ind. 1990).........................................................8, 9, 26

In re Am. Health & Human Servs., Inc.,
    2009 WL 35177 (Bankr. E.D.N.C. Jan. 5, 2009)....................................................14

Bank of Am. Nat'l Trust & Sav. Assoc. v. 203 N. LaSalle St. P'ship,
    526 U.S. 434 (1999)...............................................................................................20

In re Bloomingdale Partners,
    155 B.R. 961 (Bankr. N.D. Ill. 1993) .....................................................................27

In re Bosque Power Co., LLC,
    Case No. 10-60348, Dkt. Nos. 351, 352, 514 & 521 (Bankr. W.D. Tex. July
    22, 2010) (attached hereto as Exhibits 1-4) ....................................................11, 12

In re Bryson Props., XVIII,
    961 F.2d 496 (4th Cir. 1992) .................................................................................17

Century Glove, Inc. v. First Am. Bank,
    860 F.2d 94 (3d Cir. 1988).....................................................................................11

In re Champion Enters. Inc.,
    Case No. 09-14019, Dkt. Nos. 517 & 523 (Bankr. D. Del. Nov. 15, 2009)
    (attached hereto as Exhibits 15 & 16).....................................................................28

In re Chrysler LLC,
    Case No. 09-50002, Dkt. No. 3073 (Bankr. S.D.N.Y. Apr. 30, 2009) (attached
    hereto as Exhibit 14) .............................................................................................28

In re D&W Realty Corp.,
    165 B.R. 127 (Bankr. S.D.N.Y. 1994) ...................................................................18

In re Davis,
    262 B.R. 791 (Bankr. D. Ariz. 2001)......................................................................20

In re Deluca,
    1996 WL 910908 (Bankr. E.D. Va. Apr. 12, 1996)................................................14

# TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

In re Dow Corning Corp.,
    208 B.R. 661 (Bankr. E.D. Mich. 1997) ......................................................8, 9, 25

In re Eagle-Picher Indus., Inc.,
    176 B.R. 143 (Bankr. S.D. Ohio 1994) ...............................................................9

In re EUA Power Corp.,
    130 B.R. 118 (Bankr. D.N.H. 1991) ..................................................................11

In re Exide Techs.,
    303 B.R. 48 (Bankr. D. Del. 2003) ....................................................................27

Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.,
    554 U.S. 33 (2008) ...........................................................................................28

In re Fountain Powerboat Indus., Inc.,
    2009 WL 4738202 (Bankr. E.D.N.C. Dec. 4, 2009) ....................................7, 8, 9

In re FX Luxury Las Vegas I, LLC,
    Case No. 10-17015, Dkt. Nos. 322 & 661 (Bankr. D. Nev. June 22, 2010)
    (attached hereto as Exhibits 5 & 6) .........................................11, 12, 23, 24

In re Global Ocean Carriers, Ltd.,
    251 B.R. 31 (Bankr. D. Del. 2000) ...............................................................20, 21

In re Grand Traverse Devel. Co.,
    147 B.R. 418 (Bankr. W.D. Mich. 1992) .............................................................9

In re Greystone III Joint Venture,
    995 F.2d 1274 (5th Cir. 1992) ..........................................................................18

In re Grossinger's Assocs.,
    116 B.R. 34 (Bankr. S.D.N.Y. 1990) ...........................................................11, 24

In re Haw. Telecom Commc'ns, Inc.,
    Case No. 08-02005, Dkt. Nos. 963 & 979 (Bankr. D. Haw. July 1, 2009)
    (attached hereto as Exhibits 8 & 9) .................................................................12

In re Hoffinger,
    292 B.R. 639 (B.A.P. 8th Cir. 2003) ...................................................................9

In re Metaldyne Corp.,
    409 B.R. 671 (Bankr. S.D.N.Y. 2009) ...............................................................28

In re Miami Ctr. Assocs., Ltd.,
    144 B.R. 937 (Bankr. S.D. Fla. 1992) ...............................................................19

# TABLE OF AUTHORITIES

CASES                                                                                                    PAGE(S)

In re Mother Hubbard, Inc.,
    152 B.R. 189 (Bankr. W.D. Mich. 1993)............................................................11

In re Pan Am. Hosp. Corp.,
    364 B.R. 832 (Bankr. S.D. Fla. 2007) ............................................................28

In re Paolini,
    312 B.R. 295 (Bankr. E.D. Va. 2004)............................................................17

In re Pine Run Trust, Inc.,
    67 B.R. 432 (Bankr. E.D. Pa. 1986) ............................................................10

In re Pliant Corp.,
    Case No. 09-10443, Dkt. No. 765 (Bankr. D. Del. July 2, 2009) (attached
    hereto as Exhibit 7) ............................................................11

In re Pub. Serv. Co. of N.H.,
    88 B.R. 521 (Bankr. D.N.H. 1988) ............................................................9

In re R.G. Pharmacy, Inc.,
    374 B.R. 484 (Bankr. D. Conn. 2007) ............................................................9, 22

In re Seitel, Inc.,
    Case No. 03-12227, Dkt. Nos. 391 & 449 (Bankr. D. Del. 2003) (attached
    hereto as Exhibits 10 & 11) ............................................................12

In re Sharon Steel,
    78 B.R. 762 (Bankr. W.D. Pa. 1987) ............................................................8

In re Situation Mgmt. Sys., Inc.,
    252 B.R. 859 (Bankr. D. Mass. 2000) ............................................................10, 25

In re Spansion, Inc.,
    Case No. 09-10690, Adv. Pro. No. 09-52274, Dkt. No. 3224 (Bankr. D. Del.
    Apr. 1, 2010) (attached hereto as Exhibit 13) ............................................................27

In re Sw. Oil Co.,
    84 B.R. 448 (Bankr. W.D. Tex. 1987) ............................................................11

In re Tex. Extrusion Corp.,
    68 B.R. 712 (N.D. Tex. 1986), aff'd, 844 F.2d 1142 (5th Cir. 1988)............................................................9

In re Texaco Inc.,
    81 B.R. 806 (Bankr. S.D.N.Y. 1988)............................................................7, 9, 10

# TABLE OF AUTHORITIES

**CASES**                                                                                                          **PAGE(S)**

In re Texaco Inc.,
    76 B.R. 322 (Bankr. S.D.N.Y. 1987) .................................................................................8

In re Union Fin. Servs. Grp., Inc.,
    303 B.R. 390 (Bankr. E.D. Mo. 2003) ..........................................................................13, 21

In re Walker,
    165 B.R. 994 (E.D. Va. 1994) (REP) ...............................................................................14

In re White Energy, Inc.,
    Case No. 09-11601, Dkt. No. 419 (Bankr. D. Del. Dec. 1, 2009) (attached
    hereto as Exhibit 12) .........................................................................................................22


**STATUTES**

11 U.S.C. § 105(a) ......................................................................................................................6

11 U.S.C. § 361 ...........................................................................................................................6

11 U.S.C. §§ 363(b), (f), (k) .............................................................................................. passim

11 U.S.C. § 1107 .........................................................................................................................6

11 U.S.C. § 1108 .........................................................................................................................6

11 U.S.C. § 1113 .......................................................................................................................21

11 U.S.C. § 1114 .......................................................................................................................21

11 U. S. C. § 1121(d)(1) ................................................................................................... passim

11 U.S.C. § 1129 ............................................................................................................... passim

28 U.S.C. § 157 ...........................................................................................................................7

28 U.S.C. § 1334 .........................................................................................................................7

28 U.S.C. § 1408 .........................................................................................................................7

28 U.S.C. § 1409 .........................................................................................................................7

# <u>TABLE OF AUTHORITIES</u>

**C**ASES                                                                                           **P**AGE(S)

**O**THER **A**UTHORITIES

H.R. 32, 94th Cong. 2d Sess. (1976) ................................................................9, 10, 25

H.R. Rep. No. 109-31, pt. 1 (2005)..................................................................9, 10, 25

H H.R. Rep. No. 95-595, at 231-32 (1977), <u>reprinted in</u> 1978 U.S.C.C.A.N. 5963.................8, 10

Silver Point Finance, LLC, in its capacity as administrative agent (the "<u>Second Lien Agent</u>") under that certain Amended and Restated Second Lien Credit Agreement dated as of December 19, 2005, as amended (the "<u>Second Lien Credit Agreement</u>"), among Workflow Management, Inc. ("<u>WMI</u>"), the financial institutions from time to time parties thereto (collectively, the "<u>Second Lien Lenders</u>"), the Second Lien Agent, as Administrative Agent for the Second Lien Lenders (as successor agent under the Second Lien Credit Agreement to Credit Suisse, Cayman Islands Branch), and the other agents party thereto, by its undersigned counsel, hereby submits this Motion (the "<u>Motion</u>") pursuant to section 1121(d) of chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") to (i) terminate the Debtors' exclusive periods to file a plan of reorganization and solicit acceptances thereto or, in the alternative, (ii) authorize and direct a sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code. In support of its Motion, the Second Lien Agent respectfully states as follows:

<u>**PRELIMINARY STATEMENT**</u>

While these cases were only commenced 48 days ago, it has become apparent that to preserve the value of the Debtors' estates and ensure a successful reorganization, the Debtors' exclusive periods to file and solicit acceptances of a chapter 11 plan should be terminated. Otherwise, these cases will drag on for many months as the Debtors pursue a patently unconfirmable plan that is opposed by the majority of its First Lien Lenders (as defined below) and its Second Lien Lenders (collectively, the "<u>Lenders</u>").

To date, negotiations between the Debtors and the Lenders have not resulted in any meaningful progress toward a consensual chapter 11 plan. Instead, the Debtors are pursuing a hopeless plan that, for all the reasons discussed below, is likely to result in a failed confirmation hearing and will waste many months and millions of dollars of cash and value. At the conclusion of the confirmation hearing on this plan, the Debtors will be no closer to emerging from chapter 11, which will significantly and negatively affect the value of the Debtors' business. Terminating exclusivity now would allow for the simultaneous solicitation of competing plans and would permit the Court to consider the competing plans together at the same hearing. Opening up the plan process would have the effect of not only shortening the process by many months but providing an alternative plan that would allow the

1

company to emerge from chapter 11 with a significantly de-levered capital structure, thus increasing its likelihood for future success. Alternatively, a sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code would accomplish similar results. Granting either form of relief will facilitate the Debtors' near-term emergence from chapter 11, avoid multiple hotly contested confirmation litigations and, most important, ensure that the value of the Debtors' business is maximized and any value deterioration from the bankruptcy is minimized.

The Debtors' chapter 11 plan is truly remarkable. Instead of deleveraging the Debtors' balance sheet, the Debtors' plan would actually increase their outstanding indebtedness, resulting in insolvent companies emerging from chapter 11 with even more debt than when they filed for bankruptcy. Indeed, the Debtors' own pro forma balance sheets filed as exhibits to their disclosure statement project that the reorganized debtors will have a shareholders deficit (i.e., the amount that liabilities exceed assets) of over $240 million at year end 2011, growing to over $350 million over a five year period. The Debtors' plan is nothing more than a "Hail Mary" that attempts to preserve for the Debtors' out-of-the-money sponsor, Perseus,[2] its junior investments on the backs of the Lenders. Rather than first developing a business plan (and accompanying financial projections) and then constructing an appropriate capital structure, Perseus and the Debtors approached the chapter 11 plan process backwards: they first determined the capital structure – one in which Perseus would remain in control and all claims and interests are retained – and are determined to do anything to make that structure work. This capital structure did not work before bankruptcy and it will not work after bankruptcy. In fact, the Debtors recognize that they cannot afford to pay the current interest rate under the Second Lien Credit Agreement during these cases or following emergence and thus filed a plan that significantly reduces the proposed interest rate on the new debt being issued to the First Lien Lenders and the Second Lien Lenders. Of course, given that the value of the Debtors is lower than the debt under the First Lien Credit Agreement (as defined below) and the Second Lien Credit Agreement, there is no way the Second Lien Lenders could receive debt instruments worth par regardless of the interest rate on the debt.

---

[2] Perseus, L.L.C., and its affiliates and managed funds are referred to collectively herein as "Perseus."

To further their goal of having Perseus retain control at all costs, the Debtors are artificially impairing unsecured creditors by paying them in full, in cash over 60 days after exit in order to cram down the plan on the Lenders.  Meanwhile, their plan would provide the Second Lien Lenders with new debt at a significantly lower interest rate than they currently have and no amortization, yet reinstate subordinate and unsecured debt and leave equity interests unimpaired.  Absent reaching consensus with the Lenders, the Debtors have no choice but to try to cram down the First Lien Lenders and the Second Lien Lenders because it is impossible for the Debtors to refinance that quantity of indebtedness in the capital markets given that the claims of the First Lien Lenders and the Second Lien Lenders exceed the value of the Debtors' assets.

The plan is simply not feasible, as it requires the Debtors to continue to make significant cash payments in the year following emergence (and then continue to make significant cash interest payments) which they are unlikely to be able to make.  A substantial portion of these payments would be made to junior creditors – including to Perseus on account of its claims – using the Lenders' cash collateral and without paying down the principal on the Second Lien debt.  Although the Debtors entered bankruptcy because they were over-leveraged and operating an insolvent business, their proposed chapter 11 plan would increase the Debtors' debt burden (which as of the petition date already stood at more than $460 million) and leave an insolvent company emerging from bankruptcy, all while Perseus retains control over the Debtors.  This conduct and approach to these cases raise serious questions as to whether the Debtors are acting as fiduciaries of the estates, rather than simply as agents of Perseus.

The Debtors' conduct in these cases is precisely the type of behavior that resulted in Congress limiting exclusivity for debtors and providing courts with the ability to terminate exclusivity.  The Debtors – at the behest of Perseus – have used exclusivity as a club against the Lenders, filing a take-it-or-leave-it plan, initially on their first day in bankruptcy and then an amended plan that is even more offensive to the Lenders, in the vain hope that Perseus retains control of the Debtors after emergence from chapter 11 – at the ultimate expense of the Lenders.  Terminating exclusivity is the most effective way to level the playing field and to maximize the value of the Debtors' estates.

Moreover, the filing of a competing plan will not prejudice the Debtors, as their plan will remain on the table for consideration; terminating exclusivity would simply afford creditors the right to consider alternative plans. Additionally, it would save substantial judicial resources by allowing the Court to consider confirmation of multiple plans at once, as opposed to serial, drawn out confirmation processes.

The Second Lien Agent agrees with the Debtors that it is critical that the Debtors emerge from chapter 11 as expeditiously as possible. Given the Debtors' declining revenues and profits (both pre-bankruptcy and post-bankruptcy as projected by the Debtors) and the nature of their business, the Debtors simply cannot sustain the costs and expense of chapter 11, and the negative impact on the Debtors' business, over an extended period of time. The best way to accomplish an expedited emergence from chapter 11 that would preserve the value of the Debtors' estates is to terminate exclusivity now.

Alternatively, to avoid a contested confirmation hearing, the Court could authorize and direct that the Debtors commence a process in which the Debtors sell their assets pursuant to section 363 of the Bankruptcy Code. A 363 sale process would provide a speedy and cost-effective method for the Debtors to resolve these cases. A 363 sale process would also resolve the question of valuation, as the market would determine the value. Under a 363 sale process, the Lenders would serve as the stalking horse bidders and any party-in-interest, including Perseus, could bid for the Debtors' assets. To the extent that Perseus (or any junior creditors including the multi-billion dollar financial institutions that hold junior unsecured notes) believes the Debtors are worth more than the Lenders' claims, such party would be free to place a higher and better bid. This would also avoid the otherwise-inevitable costs and expenses of at least the one, and potentially multiple, confirmation battles.

Terminating exclusivity or beginning a 363 sale process will have an additional benefit of increasing the likelihood of a consensual resolution of these cases. While the Debtors have had exclusivity, they have not made real progress towards a consensual plan with their creditors, and opening up the plan process may result in the Debtors coming to the negotiating table. Absent the relief requested herein, all stakeholders – the Debtors, their secured and unsecured creditors, their

approximately 2,300 employees, their customers, their trade vendors and all other parties-in-interest – will be on the short end of a losing bet taken by Perseus, with the Lenders picking up the tab.

## **FACTUAL BACKGROUND**[3]

*The Secured Debt*

1.       WMI is the borrower under the Second Lien Credit Agreement (the "Second Lien Credit Facility") due November 30, 2012.  The obligations of WMI under the Second Lien Credit Facility are guaranteed by each of the Debtors, except WF Capital Holdings, Inc. (the ultimate parent of each of the other Debtors, and which is majority owned by Perseus), in favor of the Second Lien Agent.

2.       Pursuant to the Second Lien Credit Agreement, the Second Lien Lenders have valid perfected second priority security interests in substantially all of the personal and real property assets of the Debtors, including cash and cash equivalents, as well as all proceeds thereof, in each case, including cash collateral.

3.       In addition to the Second Lien Credit Facility, the Debtors are party to that certain First Lien Credit Agreement dated as of November 30, 2005, as amended (the "First Lien Credit Agreement"), among WMI, the financial institutions from time to time parties thereto (collectively, the "First Lien Lenders"), Credit Suisse, Cayman Islands Branch, as Administrative Agent for the First Lien Lenders (the "First Lien Agent"), and the other agents party thereto, providing for first lien credit facilities (collectively, the "First Lien Credit Facility") consisting of (i) a term loan facility (the "Term Loan Facility") with a final maturity on November 30, 2011, and (ii) a revolving credit facility (the "Revolving Credit Facility"), a portion of which matures May 31, 2011 ("Revolver A") and the remainder of which matures November 30, 2010.  As part of the amendments of the First Lien Credit Facility, one of the Debtors purchased a participation in Revolver A in the amount of $5 million.  That participation requires that that Debtors' interest in Revolver A be repaid after all other

---

[3] In connection with the Second Lien Agent's impending objection to the Debtors' Cash Collateral Motion (as defined below), the Second Lien Agent will be submitting evidence, including expert testimony, on a number of issues including with respect to many of the infirmities in the Debtors' Amended Plan (as defined below).  Given that this Motion is returnable on the same date as the Cash Collateral Motion, and given the fact that a number of the issues relevant to both motions are intertwined, the Second Lien Lenders intend to offer the evidence developed in connection with the Cash Collateral Motion as part of the record on this Motion.

amounts due under the First Lien Credit Facility have been paid.

4.      The obligations of WMI under the First Lien Credit Facility are guaranteed by each of the Debtors, except WF Capital Holdings, Inc., in favor of the First Lien Agent.

5.      Pursuant to the First Lien Credit Agreement, the First Lien Lenders have perfected first priority security interests in substantially all of the personal and real property assets of the Debtors, including cash and cash equivalents, as well as all proceeds thereof, in each case, including cash collateral.

### *The Debtors' Bankruptcy Filing*

6.      On September 29, 2010 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under the Bankruptcy Code. The Debtors continue to operate their business as debtors and debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

7.      As of the return date on this Motion, the total amount outstanding under the Second Lien Credit Agreement will exceed $202 million, including principal and accrued interest, with post-petition interest continuing to accrue at a contractually negotiated rate of 20%.

8.      As of the Petition Date, the total amount outstanding under the First Lien Credit Agreement was approximately $146.5 million (including interest accrued through September 30, 2010), consisting of (a) approximately $111.5 million principal amount of loans outstanding under the Term Loan Facility; (b) approximately $30.2 million principal amount of loans outstanding under the Revolving Credit Facility; and (c) approximately $4.8 million undrawn face amount of letters of credit.

9.      On the Petition Date, the Debtors filed a proposed chapter 11 plan of reorganization (the "<u>Original Plan</u>") for these cases (Dkt. No. 27).

10.      The Court has entered three interim orders with respect to the Debtors' Motion for Entry of Interim and Final Orders Pursuant to Bankruptcy Code Sections 105(a), 361 and 363 and Bankruptcy Rules 2002 and 4001 (I) Authorizing Debtors to Use Cash Collateral, (II) Authorizing Debtors to Provide Adequate Protection in the Form of Replacement Liens, Administrative Expense Claims, and Accrual and/or Payment of Interest, (II) Scheduling Final Cash Collateral Hearing, and (IV) Granting Related Relief (Dkt. No. 26) (the "<u>Cash Collateral Motion</u>"), covering periods through and including December 1, 2010 (<u>see</u> Dkt. Nos. 39, 107 & 199). The First Lien Lenders and the

Second Lien Lenders have not consented to the use of their cash collateral beyond December 1, 2010 and will not consent to the continued use of cash collateral absent the termination of exclusivity.

11.     On November 10, 2010 the Debtors filed their First Amended Joint Chapter 11 Plan of Reorganization (the "Amended Plan") (Dkt. No. 244) and the Disclosure Statement Relating to the Amended Plan (the "Disclosure Statement") (Dkt. No. 245), and on November 12, 2010, the Debtors filed Exhibits C and D to the Disclosure Statement (Dkt. No. 256). Lenders holding a majority of the debt under each of the First Lien Credit Agreement and the Second Lien Credit Agreement oppose the Amended Plan and are expected to vote to reject the Amended Plan.

## JURISDICTION

12.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for the relief requested herein are sections 1121(d) and 363 of the Bankruptcy Code.

## RELIEF REQUESTED

13.     By this Motion, the Second Lien Agent seeks entry of an order (i) terminating the Debtors' Exclusivity Periods (as defined below) or, in the alternative, (ii) authorizing and directing a sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.

## ARGUMENT

**I.      Cause Exists to Terminate the Exclusivity Periods**

14.     Pursuant to section 1121(b) of the Bankruptcy Code, the Debtors have an initial period of 120 days from the Petition Date during which they have the exclusive right to propose and file a chapter 11 plan and, pursuant to section 1121(c)(3) of the Bankruptcy Code, the exclusive right for 180 days from the Petition Date to solicit and obtain acceptance of such plan (the "Exclusivity Periods").

15.     Section 1121(d) allows the Bankruptcy Court to reduce or enlarge the Exclusivity Periods when "cause" is shown:

> on request of a party in interest . . . and after notice and a hearing, the court may for cause reduce or increase the 120-day period or the 180-day period referred to in this section.

11 U. S. C. § 1121(d)(1) (emphasis added). The Bankruptcy Code does not define "cause," and it "does not define precisely what factors should be established to constitute 'cause[.]'" In re Fountain Powerboat Indus., Inc., 2009 WL 4738202, *3 (Bankr. E.D.N.C. Dec. 4, 2009) (citing In re Texaco Inc., 81 B.R. 806, 812 (Bankr. S.D.N.Y. 1988)). Rather, "Congress has left the meaning of the phrase 'for cause' to be determined by the facts and circumstances in each individual case." In re Sharon Steel, 78 B.R. 762, 763-64 (Bankr. W.D. Pa. 1987).

16.     The legislative history and case law make plain that this Court has wide latitude and discretion to determine whether sufficient "cause" exists to alter the Exclusivity Periods based on the totality of circumstances of these cases. See H.R. Rep. No. 95-595, at 231-32 (1977), reprinted in 1978 U.S.C.C.A.N. 5963 (stating same). The party seeking to reduce or extend the exclusivity period has the burden of establishing "cause." See, e.g., In re Texaco Inc., 76 B.R. 322, 326 (Bankr. S.D.N.Y. 1987).

17.     In assessing whether "cause" exists to reduce or expand the exclusivity periods, courts generally consider at least nine individually enumerated, though some overlapping, factors, while balancing all to determine if the Court's action would in fact "facilitate moving the case forward." See, e.g., In re Fountain Powerboat, 2009 WL 4738202, at *3-5 ("The Court has found no Fourth Circuit cases that have considered this issue. However, there are cases outside of this jurisdiction that have considered the issue of cause . . ."). These factors include:

1.     whether there are reasonable prospects for the debtor filing a viable plan;

2.     the size and complexity of the case;

3.     the debtor's good faith progress in resolving issues facing the estate;

4.     whether the debtor has made progress in negotiations with its creditors;

5.     the necessity of sufficient time to permit the debtor to negotiate a plan;

6.     the amount of time that has elapsed in the case;

7.     whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtor's reorganization demands;

8.     the fact that the debtor is paying its bills as they become due; and

9.     whether an unresolved contingency exists.

See, e.g., id. at *3-5 (applying multi-factor test adopted from various jurisdictions); In re Dow Corning Corp., 208 B.R. 661, 664-65 (Bankr. E.D. Mich. 1997) (same).

18.     Some courts look to the degree to which creditors distrust a debtor's management as another factor to consider.  See, e.g., In re All Seasons Indus., Inc., 121 B.R. 1002, 1006 (Bankr. N.D. Ind. 1990) ("[o]ne of the reasons that the debtor and its major secured creditors have not been able to find common ground upon which to build a plan of reorganization is that these creditors have lost faith in the capability and perhaps the integrity of debtor's management"); see also In re Fountain Powerboat, 2009 WL 4738202, at *6 (including "a creditor's loss of confidence" as an additional factor to weigh) (citing In re All Seasons, 121 B.R. at 1006; In re Grand Traverse Dev. Co., 147 B.R. 418, 420 (Bankr. W.D. Mich. 1992) (considering a debtor's "gross mismanagement" as an example of a "major obstacle[] of successful reorganization") (citing In re Texaco Inc., 81 B.R. at 812); In re Tex. Extrusion Corp., 68 B.R. 712, 725 (N.D. Tex. 1986), aff'd, 844 F.2d 1142 (5th Cir. 1988) (holding that reduction of time for debtor to file plan appropriate where there were "acrimonious relations" between the parties).

19.     Not all of these factors "are relevant in every case . . . .  It is within the discretion of the bankruptcy court to decide which factors are relevant and give appropriate weight to each."  In re Hoffinger, 292 B.R. 639, 643 (B.A.P. 8th Cir. 2003).  However, as courts have noted, "the primary consideration should be whether or not [terminating exclusivity] would facilitate moving the case forward."  In re Dow Corning, 208 B.R. at 670; see also In re All Seasons, 121 B.R. at 1004 (Bankr. N.D. Ind. 1990) ("Section 1121 was designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors") (citations omitted).

20.     Finally, in addition to this weighing of factors, courts keep a mindful eye on the relevant legislative history of section 1121(d).  See, e.g., In re R.G. Pharmacy, Inc., 374 B.R. 484 (Bankr. D. Conn. 2007).  The legislative history reveals that section 1121(d) is designed, above all else, to level the playing field for negotiations between a debtor and creditors during the reorganization process – particularly where a debtor abuses the exclusivity periods to hold creditors hostage until they accede to the debtor's demands.  See Bankruptcy Act Revision, Serial No. 27, Part 3, H'rgs on H.R. 31 & H.R. 32, 94th Cong. 2d Sess. (1976); see also In re Pub. Serv. Co. of N.H., 88 B.R. 521, 540 (Bankr. D.N.H. 1988) ("ending plan exclusivity does not by itself mean that multiple plans will be filed, or that the parties may not still agree to a consensual debtor plan. It simply returns the parties to a level

playing field.") (emphasis in original). As the R.G. Pharmacy court noted, "the legislative history of § 1121. . .indicates that the Bankruptcy Code imposed limitations on the debtor's exclusive right to file a plan in order to balance the bargaining positions of debtors and creditors in negotiating the terms of a reorganization." 374 B.R. at 484; see also In re Eagle-Picher Indus., Inc., 176 B.R. 143, 147 (Bankr. S.D. Ohio 1994) ("the legislative history accompanying [section 1121] indicates that the plan exclusivity provisions should not be employed as a tactical device to put pressure on parties to yield to a plan they consider unsatisfactory") (citing In re Texaco Inc., 81 B.R. at 812).

21.     Prior to the enactment of section 1121(d), only debtors could propose plans of reorganization; as such, creditors had very little bargaining power:

> [Under chapter XI], if the debtor and its creditors could not agree upon plan terms, the creditors were often limited to seeking either liquidation of the debtor or conversion to chapter X. These limited alternatives were usually not in the creditors' interest thereby weakening the creditors' bargaining position during negotiations over the chapter XI plan terms.

In re Pine Run Trust, Inc., 67 B.R. 432, 434 (Bankr. E.D. Pa. 1986).

22.     Congress sought to rectify this imbalance by enacting section 1121(d) to strengthen creditors' bargaining position by giving them the right, after a period of time or upon a showing of cause to propose their own plan of reorganization: "The take-it-or-leave-it attitude on the part of debtors as permitted by Chapter XI is fraught with potential abuse. The granting of authority to creditors to propose plans of reorganization and rehabilitation serves to eliminate the potential harm and disadvantage to creditors and democratizes the reorganization process." Bankruptcy Act Revision, Serial No. 27, Part 3, Hr'gs on H.R. 31 & H.R. 32, 94th Cong. 2d Sess. (1976) (footnotes omitted). Further, the House report accompanying section 1121(d) explained that "the bill allows the flexibility for individual cases that is unavailable today." H.R. Rep. No. 95-595, at 231-32 (1977), reprinted in 1978 U.S.C.C.A.N. 5963. Congress expressed the same displeasure with a debtor's exclusivity in the 2004 amendments to the Bankruptcy Code, and for that reason created a cap on the time that a debtor may extend exclusivity; now, in no event may a debtor maintain exclusivity beyond 18 months after the order for relief, whereas before, a judge could have extended a debtor's exclusivity rights indefinitely. See H.R. Rep. No. 109-31, pt. 1, at 88 (2005).

23.     Additionally, allowing competing plans to be filed permits a court to evaluate

competing bids for purposes of determining the preference of creditors.  See In re Situation Mgmt. Sys., Inc., 252 B.R. 859, 865-66 (Bankr. D. Mass. 2000).  The Third Circuit Court of Appeals has similarly observed that "[t]he ability of a creditor to compare the debtor's proposals against other possibilities is a powerful tool by which to judge the reasonableness of the proposals.  A broad exclusivity provision, holding that only the debtor's plan may be 'on the table,' takes this tool from creditors."  Century Glove, Inc. v. First Am. Bank, 860 F.2d 94, 102 (3d Cir. 1988).

24.     When all is said and done, opening the process simply returns parties to the balance Congress intended in these circumstances, and ideally leads to a consensual outcome.  See In re Mother Hubbard, Inc., 152 B.R. 189, 195-96 (Bankr. W.D. Mich. 1993) (observing that competing plans "may additionally motivate the debtor to more earnestly negotiate an acceptable consensual plan"); In re EUA Power Corp., 130 B.R. 118, 119 (Bankr. D.N.H. 1991) ( "It may well be . . . that while the process starts out after termination of exclusivity with competing plans, the ongoing process of the case results in compromises and negotiations whereby one joint plan goes forward").  The termination of a debtor's exclusivity does not prejudice the debtor, as it in no way "foreclose[s] [the debtor] from promulgating a meaningful plan of reorganization[,]" but merely grants other parties-in-interest the right to file a chapter 11 plan alongside the debtor's.  In re Grossinger's Assocs., 116 B.R. 34, 36 (Bankr. S.D.N.Y. 1990); see also In re Sw. Oil Co., 84 B.R. 448, 454 (Bankr. W.D. Tex. 1987) ("by denying the extension, the Court does not prejudice the debtors' co-existent right, nor dilute the debtor's duty to file a plan").

25.     Based on the totality of these factors, courts have frequently found "cause" to terminate a debtor's exclusive periods to file a plan where exclusivity was being utilized to hold creditors hostage to the debtor's demands in order to promote progress toward confirmation of a chapter 11 plan.  See, e.g., Findings of Fact and Conclusions of Law at 2, In re Bosque Power Co., LLC, Case No. 10-60348, Dkt. No. 352 (Bankr. W.D. Tex. July 22, 2010) (stating that terminating exclusivity would "promote an environment in which a consensual plan may be negotiated"); Transcript of Proceedings at 149:22-25,[4] In re FX Luxury Las Vegas I, LLC, Case No. 10-17015, Dkt.

---

[4] The transcripts cited herein are voluminous, and therefore only the portions relevant to this Motion have been attached as exhibits.  To the extent that the Court or any party-in-interest requests copies of a full transcript, the Second Lien Agent will make such copies available.

No. 322 (Bankr. D. Nev. June 22, 2010) ("if the best the [debtors] can come up with is what they have put forward thus far, I have some doubts as to whether keeping exclusivity in place is in the best interest of the estate"); Transcript of Hearing at 228:13-231:4, In re Pliant Corp., Case No. 09-10443, Dkt. No. 765 (Bankr. D. Del. July 2, 2009) (granting second lien holders right to file a competing plan while noting, "if there is an upside [to the value of the company] then I think the other Creditor constituents have a right to test that"); Order Denying Debtors' Motion & Transcript of Motion to Extend Exclusivity Period to File Plan at 62:11-12, In re Haw. Telecom Commc'ns, Inc., Case No. 08-02005, Dkt. Nos. 963 & 979 (Bankr. D. Haw. July 1, 2009) (terminating exclusivity and stating, "[t]here's always the possibility that the termination of exclusivity may speed things along towards a consensual plan"); Order Terminating the Debtors' Exclusivity Period & Transcript of Omnibus Hearing at 35:17-19 & 36:2-10, In re Seitel, Inc., Case No. 03-12227, Dkt. Nos. 391 & 449 (Bankr. D. Del. 2003) (approving motion to terminate exclusivity "in the interest of giving to [movant] a full picture of all that is in the cards here," and considering "it's pretty obvious that the parties are polls apart in terms of the enterprise value here").

      26.    As a very recent example, the Bankruptcy Court for the District of Nevada recently terminated a debtor's exclusivity at the behest of the debtors' second lien agent where the debtors had filed a plan that provided for a sale to insiders that was opposed by the second lien lenders. Transcript of Proceedings, In re FX Luxury Las Vegas I, LLC, Case No. 10-17015, Dkt. No. 322 (Bankr. D. Nev. June 22, 2010). With the ultimate goal of moving the cases toward a consensual result where discord had quickly become the norm, the court reviewed the totality of these factors, and held that, even though just 51 days had elapsed since the filings, terminating exclusivity would indeed nudge the parties back to the bargaining table in short order. See generally id., Dkt. No. 322 (141:2-151:6). Sure enough, consistent with the purpose and legislative intent of section 1121(d), termination of exclusivity spurred negotiations between the lenders and the debtors, and led to a settlement among all parties consummated in a consensual plan which was confirmed by the court on November 8, 2010. See id., Dkt. No. 661.

      27.    In another recent case, In re Bosque Power Company, LLC, the Bankruptcy Court for the Western District of Texas terminated exclusivity at the behest of the secured lenders'

agent, as exclusivity in that case yielded a deadlock between the debtor and its secured lenders over terms for a plan. Findings of Fact and Conclusions of Law & Order Reducing Debtors' Exclusive Period, In re Bosque Power Co., LLC, Case No. 10-60348, Dkt. Nos. 351 & 352 (Bankr. W.D. Tex. July 22, 2010). The court explained that terminating exclusivity "could allow creditors a choice between competing plans and would promote the maximum recovery to creditors . . . [and additionally would] promote an environment in which a consensual plan may be negotiated." Id., Dkt. No. 352 at 2. Subsequent to the court's order, the parties ultimately "reached an agreement to resolve their outstanding issues and disputes," id., Dkt. No. 514 at 4, and on October 7, 2010 the court confirmed a consensual plan propounded by the lenders, see id., Dkt. No. 521.

28.     As in the FX Luxury and Bosque Power cases, application of the factors here, as well as the totality of the circumstances of these cases, demonstrates that "cause" exists to terminate the Exclusivity Periods.

A.     There are No Reasonable Prospects that the Debtors Will File A Viable Plan

29.     This first factor inquires as to whether a debtor can put forward a plan that can reasonably expect to be confirmed, an inquiry that includes determining whether the plan satisfies the feasibility requirement in section 1129(a)(11). See, e.g., In re Union Fin. Servs. Grp., Inc., 303 B.R. 390, 420 (Bankr. E.D. Mo. 2003) ("the Plan accomplishes the rehabilitative goals of Chapter 11 by restructuring the debt obligations of the Debtors and providing the means through which the Debtors will operate a viable business going forward. The Plan allows creditors to realize fair and reasonable recoveries under the circumstances."). Although this Motion does not enumerate every failing, the Debtors' Amended Plan has numerous defects rendering it unconfirmable, including that it is not feasible; would result in the Debtors emerging from chapter 11 insolvent; proposes cramming down both the First Lien Lenders and the Second Lien Lenders; gerrymanders and artificially impairs creditors; and violates the absolute priority rule by entitling the Debtors' out-of-the-money equity sponsor to retain its holding company debt and equity interests, all while using the Lenders' collateral to pay unsecured and junior creditors in full prior to the Second Lien Lenders receiving a single payment of principal on their debt. Each of these considerations alone establishes sufficient "cause" to justify terminating the Exclusivity Periods.

(i) The Debtors' Proposed Plan is Not Feasible

30.     Pursuant to section 1129(a)(11) of the Bankruptcy Code, a bankruptcy court may not confirm a plan if it is "likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).  Courts in the Eastern District of Virginia scrutinize a chapter 11 plan carefully to determine if it is workable and has a reasonable prospect of succeeding.  See, e.g., In re Walker, 165 B.R. 994, 1004-05 (E.D. Va. 1994) (REP) (stating that plan "must provide a realistic and workable framework for reorganization" and holding that "it is impossible for a court to find that there will be no need for further financial reorganization or indeed liquidation[,]" because plan failed to articulate how it would yield sufficient funding); In re Am. Health & Human Servs., Inc., 2009 WL 35177, *2 (Bankr. E.D.N.C. Jan. 5, 2009) ("the income currently received does not support the future projections.  Accordingly, the plan does not comply with section 1129(a)(11).").

31.     The "success" sufficient for feasibility need not be guaranteed, but the plan cannot make promises a debtor will not be able to keep.  In re Walker, 165 B.R. at 1004 (stating that a plan needs only "present a workable scheme of organization and operation from which there may be a reasonable expectation of success.") (citation omitted).  In this regard, a company's past performance is powerful and objective evidence of future performance and of whether a debtor would be forced to liquidate or re-enter chapter 11 after confirmation.  See In re Deluca, 1996 WL 910908, *19-21 (Bankr. E.D. Va. Apr. 12, 1996) (SSM) (denying confirmation because projections provided by debtor to show plan feasibility revealed "little chance of success").

32.     The burden is on the debtor to show not only the possibility of success, but also the reasonable likelihood of success, see id. at *22, which can be demonstrated by looking at such things as: the adequacy of the debtor's capital structure; the earning power of the debtor's business; economic conditions; the ability of the debtor's management; the probability of the continuation of the same management; and any other facts indicating whether the debtor's operation will enable a successful performance of the plan, see, e.g., In re Am. Health & Human Servs., Inc., 2009 WL 35177 at *2; In re Deluca, 1996 WL 910908 at *19.

33. Here, the Amended Plan has no hope of success. It proposes, among other egregious provisions, adding more than $20.5 million of additional debt on the effective date (and the debt will continue to grow because of significant future payable-in-kind interest), onto the Debtors' capital structure and reinstating large sums of unsecured notes on substantially similar terms before any paydown of the Debtors' secured debt, thereby leaving the company hobbled by a debt load even more burdensome than the crippling debt that necessitated the filing of these cases in the first place. The Debtors' own projections recognize (without even adjusting the interest rates being paid to the Lenders to market rates or to their contractually negotiated preexisting rates) diminishing cash balances such that they will emerge from chapter 11 insolvent on a balance sheet basis, and they will remain insolvent through the entire five year projection period. See Dkt. No. 256. Taken as a whole, the Debtors' projected level of indebtedness will result in a company so over-leveraged on its own and in comparison to its peers that it simply cannot survive in the mid- to long-term and it is likely to make a return trip to chapter 11. Indeed, the Debtors are not even making interest payments to the Second Lien Lenders during these chapter 11 cases because they cannot generate adequate cash flow to fund operations and ongoing interest payments on their secured debt and/or the Debtors agree that the debt under the Second Lien Credit Agreement is not fully covered. If the Debtors cannot make these payments now, how will they have the liquidity to pay all unsecured creditors on the effective date of the Amended Plan and make interest payments to the Second Lien Lenders following emergence from chapter 11? For that matter, how will they be able to repay the secured and unsecured debt reinstated under the Amended Plan? While the interest rate provided to the Second Lien Lenders in the Original Plan was far below market rates or their contractually negotiated preexisting rates, the Debtors recognized they would not be able to satisfy that interest burden and, as a result, in their Amended Plan lowered the interest rate they would pay Second Lien Lenders even further. Of course, there is no way for the Debtors to issue the Second Lien Lenders debt that is worth par, given that the new debt issued to the Second Lien Lenders exceeds the value of the Debtors.

34. A portion of the additional debt being incurred by the Debtors is $12.5 million of unsecured subordinated "exit financing." See Amended Plan §§ 1.42, 1.43, Schedule 3. The Amended Plan fails to identify a lender or commitment letter for this funding because no arms' length

third party lender would provide financing to the Debtors on the terms proposed and given the Debtors' overleveraged and insolvent balance sheet. If the Debtors could obtain third party financing junior to their secured debt, the Debtors would have been able to refinance the First Lien Credit Agreement and the Second Lien Credit Agreement prior to the bankruptcy as they attempted (but failed) to do for nearly a year. In the end, it would not be surprising if the Debtors state that Perseus will be providing this "financing," as it is a small price to pay to protect its existing investment and at least $2.75 million of the financing would flow directly back to Perseus on account of claims it asserted for "management fees" (which the Amended Plan includes as General Unsecured Claims) and, since Perseus would retain control, it would likely avoid repaying to the Debtors the approximately $3.2 million that Perseus is indebted to WF Holdings, Inc.[5]

35.    Additionally, the Debtors have a long history of consistently underperforming and missing their projections. Since the beginning of 2007, the Debtors have provided the Lenders with at least 7 different sets of projections and the Debtors have failed to meet every single one. Dating back to 2006, the Debtors have missed their quarterly revenue projections in eighteen out of the last nineteen quarters. All the while, revenues have fallen from more than $854 million in 2006 to a projected $491 million in the eleven months ending December of 2011.

36.    In addition to the Debtors' historical inability to project future revenues and profits, the projections filed with the Disclosure Statement are premised on numerous unrealistic assumptions. For example, the projections assume all debt is refinanced at maturity at the same terms as maturing debt. See Dkt. No. 256 at 9. Given that the Debtors' pro forma balance sheet shows the Debtors emerging from chapter 11 insolvent and their inability to refinance the First Lien Credit Agreement and the Second Lien Credit Agreement, it is absurd to assume that the Debtors will be able to refinance this junior debt on the same terms as issued (unless the current lenders simply extend their maturities as they have no choice and no hope to be repaid). Moreover, after assuming this debt, the Debtors will face nearly $100 million of debt maturing between now and 2013 which could necessitate further financial restructuring to address such debt. In light of these circumstances, and because the Amended Plan provides for woefully inadequate capital, the Debtors will simply not be able to meet

---

[5] See Debtor WF Holdings, Inc.'s Schedule of Financial Affairs. Case No. 10-74620, Dkt. No. 9.

their obligations under the Amended Plan post-emergence.

(ii) The Debtors' Proposed Plan Improperly Gerrymanders Claims

37.     As noted at the outset, a majority of the First Lien Lenders and the Second Lien Lenders do not support the Amended Plan and will oppose its confirmation.  For all of the reasons discussed herein, the Lenders find the Amended Plan wholly unacceptable and fundamentally unfair, not to mention inconsistent with basic tenets of the Bankruptcy Code.  Because the Amended Plan is opposed by the Lenders, the Debtors have attempted to impair the unsecured creditors to try to cram the Amended Plan down on the Lenders.  Pursuant to section 1129(b)(1) of the Bankruptcy Code, a Court may only confirm a chapter 11 plan over the dissent of a class of creditors provided that all parts of section 1129(a) of the Bankruptcy Code, other than section 1129(a)(8), are met and at least one class of creditors entitled to vote has voted to accept the plan (excluding insiders).  See In re Bryson Props., XVIII, 961 F.2d 496, 501 (4th Cir. 1992).  However, in order to confirm a chapter 11 plan over a dissenting creditor's vote, a debtor may not create a class of consenting, impaired creditors purely to gerrymander classes.  See In re Paolini, 312 B.R. 295, 311-15 (Bankr. E.D. Va. 2004) (SCS) (holding that debtor's plan was "objectively futile" and was "without hope of confirmation" because of debtor's attempt to "gerrymander the voting process to obtain a consenting class" by separately classifying disputed and undisputed unsecured claims).

38.     Here, the Debtors' Amended Plan creates a classic example of class gerrymandering in a power grab by Perseus to retain its control over the Debtors after bankruptcy. Pursuant to the Amended Plan, holders of General Unsecured Claims (as defined in the Amended Plan) will receive 50% of their allowed claim on the effective date of the Amended Plan and the remaining 50% of their allowed claim in cash only sixty days after the effective date of the Amended Plan.  See Amended Plan § 5.7.  As a result of the Debtors' bifurcation of the payment of General Unsecured Claims, holders of such claims are ostensibly impaired under the Amended Plan and entitled to vote on the Amended Plan, even though holders of General Unsecured Claims will receive cash payments equaling 100% of their allowed claims within 60 days.  See id.  To the extent the Debtors can pay the unsecured creditors in full 60 days after the effective date, the Debtors can pay them on the effective date.  The only reason they are not doing so is to create an impaired class of creditors who will vote to

accept the Amended Plan and potentially enable the Debtors to cram the Amended Plan down on the First Lien Lenders and the Second Lien Lenders. Given that the Debtors have no reasonable justification for bifurcating the payment of General Unsecured Claims in the manner proposed under the Amended Plan, the classification of General Unsecured Claims is a classic case of artificial impairment rendering the Amended Plan unconfirmable.

39.     Additionally, the Amended Plan takes the unprecedented approach of classifying its secured lenders such that holders of claims on account of <u>both</u> the First Lien Credit Agreement and the Second Lien Credit Agreement are classified separately from those solely holding claims on account of <u>either</u> the First Lien Credit Agreement <u>or</u> the Second Lien Credit Agreement. <u>See</u> Amended Plan §§ 1.26, 5.3 & 5.5. The Bankruptcy Code prohibits the separate classification of (and unfair discrimination against) holders of similar claims. <u>See</u> 11 U.S.C. § 1129(b)(1) (stating that court may only confirm cramdown plan so long as it "does not discriminate unfairly, . . . is fair and equitable" with respect to each impaired class of claims, and the other requirements of confirmation are met); <u>In re Greystone III Joint Venture</u>, 995 F.2d 1274, 1279 (5th Cir. 1992) ("thou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan"). Creating separate classes of creditors holding multiple claims is both inappropriate gerrymandering and unfair discrimination. Although separate classification of similar claims may not be prohibited, it "may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an impaired, assenting class of claims." <u>Id.</u>; <u>see also</u> <u>In re D&W Realty Corp.</u>, 165 B.R. 127, 128 (Bankr. S.D.N.Y. 1994) ("separate classification must not offend due process and fair play. . . [t]hus, separate classification must be justified by a legitimate business reason or some legitimate difference in the treatment of creditors that are classified separately") (citations omitted). The Debtors' approach to classification flies in the face of the most basic tenets of bankruptcy law.

40.     Even beyond the legal reasons, pursuant to each of the First Lien Credit Agreement and the Second Lien Credit Agreement, the liens on the Debtors' assets were granted to the administrative agents for the benefit of the respective Lenders. Thus, the Debtors cannot conceivably separate certain Lenders' claims on this basis, even if they wanted to do so. This extraordinary classification scheme is yet another example of the inappropriate approach the Debtors have taken to

exploit the bankruptcy process at the expense of the Lenders so that Perseus may try to retain control over the Debtors after emergence from bankruptcy.

(iii)   The Debtors' Proposed Plan Violates the Absolute Priority Rule

41.    The Amended Plan violates basic principles of bankruptcy law in at least two respects.  First, it provides for no paydown of the Second Lien Lenders' secured debt for more than five years and yet uses the Lenders' collateral to pay junior creditors to implement the Amended Plan.  To the extent the Debtors have available cash, given the fundamental bankruptcy concept that more-senior creditors must be paid before junior creditors, this cash should first go to pay down the Lenders' claims.  See, e.g., In re Miami Ctr. Assocs., Ltd., 144 B.R. 937, 940 (Bankr. S.D. Fla. 1992) ("the plan violates the absolute priority rule because it does not pay [secured claimholder] its entire debt in present value terms while it does propose leaving value with equity interest holders").  The Debtors have turned this concept on its head by using the senior secured Lenders' collateral to pay the unsecured creditors while no principal payments are made to the senior secured creditors.

42.    Specifically, as the chart below indicates, during the pendency of these cases the Debtors will pay out in excess of $32.3 million on account of pre-petition unsecured claims, on or within 60 days of the effective date of the Amended Plan, $16.2 million to prepetition general unsecured creditors, and between the effective date and the maturity date of the new Second Lien debt, another $28.8 million on account of other unsecured liabilities.  This is in addition to the approximately $99.5 million of unsecured notes that will be assumed by the Debtors under the Amended Plan.

| Payments on Prepetition Unsecured Claims During the Chapter 11 | Estimated Prepetition General Unsecured Claims to be Paid within 60 Days of Effective Date | Other Unsecured Liabilities to be Paid Prior to Maturity of New Second Lien Debt | Unsecured Notes to be Assumed under the Plan |
| --- | --- | --- | --- |
| $32.3 million | $16.2 million | $28.8 million | $99.5 million |

Critically, and in direct contravention of fundamental principles of bankruptcy law, all of these payments will be made to these junior creditors from the Second Lien Lenders' collateral before the Second Lien Lenders receive one cent on account of the principal amount of their debt and even before they are paid the full amount of their interest, as a portion of the interest is payable in kind.

43.    Second, the Amended Plan is an insider plan that inures to the benefit of the

Debtors' out-of-the-money equity sponsor, Perseus. Under the Amended Plan, Perseus' holding company debt and equity interests will be left unimpaired and will be reinstated in full upon the effective date of the Amended Plan. Perseus will retain these claims and interests, even though the Amended Plan fails to provide for the payment in full of Second Lien Lenders' claims. In addition, the Amended Plan contemplates that Perseus will receive these claims and equity interests without contributing any real new value to the Debtors' estates to satisfy the Debtors' significant indebtedness, and if anything, Perseus would be simply adding more debt to an already insolvent and unsustainable capital structure.

44. Under a well-settled body of case-law, courts hold that in circumstances when a plan of reorganization favors an existing equity holder, "cause" exists to justify terminating a debtor's exclusivity periods under section 1121(d) of the Bankruptcy Code. In <u>Bank of America National Trust and Saving Assoc. v. 203 North LaSalle Street Partnership</u>, the Supreme Court held that an existing equity holder's exclusive right to obtain the new equity in a reorganized debtor was a property right subject to the absolute priority rule. 526 U.S. 434, 456-58 (1999). The Supreme Court stated:

> [I]t is that the exclusiveness of the opportunity, with its protection against the market's scrutiny of the purchase price by means of competing bids or even competing plan proposals, renders the [equity holder's] right a property interest extended "on account of" the old equity position and therefore subject to an unpaid senior creditor class's objection.

<u>Id.</u> at 457-58. The Supreme Court held that a "new value" plan would be unconfirmable in the absence of competitive bidding for the equity interests to determine the adequacy of the equity holder's contribution. <u>Id.</u> at 455.

45. Since the <u>LaSalle</u> decision, courts have held that the termination of exclusivity is justified when persons controlling the debtor "determine, without the benefit of a public auction or competing plans, who will own the equity of [the reorganized debtor] and how much they will pay for that privilege." <u>In re Global Ocean Carriers, Ltd.</u>, 251 B.R. 31, 48 (Bankr. D. Del. 2000) (holding that plan providing for noteholders to receive payment in cash of 50% of their claims and for the daughter of the debtor's existing controlling shareholder to purchase the new equity of the reorganized debtor violated the absolute priority rule); <u>see also</u> <u>In re Davis</u>, 262 B.R. 791, 797-99 (Bankr. D. Ariz. 2001)

(refusing to extend exclusivity where proposed plan would violate the absolute priority rule by permitting individual debtors to retain equity interests in certain properties). In <u>Global Ocean Carriers</u>, the bankruptcy court held that the debtors' plan must be subject to the "market place test" by "terminating exclusivity and allowing others to file a competing plan or allowing others to bid for the equity. . . ." 251 B.R. at 49; <u>see also</u> <u>In re Union Fin. Servs. Grp., Inc.</u>, 303 B.R. 390, 423-24 (Bankr. E.D. Mo. 2003) (finding "cause" to terminate exclusivity to permit competitive bidding).

   46. While these cases generally involve a sale process, they stand for the proposition that an insider cannot retain its ownership of an insolvent debtor – such as these Debtors – without the ability to consider a competing plan or market test. Like in the above cases, the Amended Plan violates the Bankruptcy Code by ensuring that Perseus' equity interests remain in the control of Perseus without subjecting such a proposal to the marketplace by either permitting parties-in-interest to file a competing plan or allowing them to bid in a competitive manner for the equity interests. Here, Perseus is not contributing any "new value" for the right to retain its old debt claims and equity interests in the Debtors; rather, the Amended Plan contemplates paying unsecured and junior creditors (including Perseus) prior to senior secured creditors, with Perseus retaining its debt claims and equity interests under the Amended Plan.[6] The Debtors' insider chapter 11 plan therefore constitutes grounds for "cause" under this first factor (prospects for a viable plan) to justify terminating the Exclusivity Periods.

  B. <u>These Cases are Not Complex</u>

   47. Among corporate chapter 11 cases, these cases are not particularly large or complex. Nor is the Debtors' capital structure complex. It consists of first lien debt, second lien debt and other miscellaneous creditors. There are no complex issues relating to sections 1113 or 1114 of the Bankruptcy Code (regarding rejection of collective bargaining agreements and payment of insurance benefits to retired employees, respectively), no regulatory or environmental issues, and no large litigation claims or other complicated issues that exist in other large chapter 11 cases. Reduced

---

[6] As noted above, the Debtors cannot argue that if Perseus provides the "exit loan," it is providing new value. At least $2.75 million of the proceeds would immediately flow back to Perseus on account of its asserted claims, and by allowing Perseus to retain control, it would likely obviate the need for Perseus to repay the $3.2 million in loans it owes the Debtors, all while further over-leveraging the company. This is not new value.

to their essential nature, these cases amount to a straight-forward dispute between an out-of-the-money equity sponsor and a lending group regarding the valuation of the Debtors, and thus this factor weighs in favor of terminating exclusivity.

48. Under similar circumstances, the Bankruptcy Court for the District of Delaware found "cause" to deny a debtor's request for an extension of exclusivity where the case was largely a negotiation between an out-of-the-money equity holder who controlled the debtors' board of directors and undersecured lenders holding liens on all or substantially all of the debtors' assets. Transcript of Proceedings, In re White Energy, Inc., Case No. 09-11601, Dkt. No. 419 (Bankr. D. Del. Dec. 1, 2009). The court explained:

> [G]iven that, in effect, what we have here is a two-party dispute and negotiation between the equity and secured creditors – with the unsecured creditors, of course, and the money are in the mix to try to maximize whatever they can get, it's their job – that I really don't see exclusivity affecting it one way or the other. Let's move the process along. Let's put the equity's feet to the fire. That's how you get the case taken care of.

Id. at 58:8-15; see also In re R.G. Pharmacy, Inc., 374 B.R. 484 (Bankr. D. Conn. 2007) (finding "cause" where debtor had "few major creditors" and pointing to a "breakdown of negotiations between the debtor and the objecting creditors"); In re Grossinger's Assocs., 116 B.R. 34, 36 (Bankr. S.D.N.Y. 1990) (finding cause where debtor had "uncomplicated financial structures and relatively few or no public shareholders").

49. In the FX Luxury case discussed above, the court recognized that the dollar amounts were large but the case was not complex (the proposed plan contemplated a $260 million transaction). See Transcript of Proceedings at 146:8-147:12, Case No. 10-17015, Dkt. No. 322 (Bankr. D. Nev. June 22, 2010). The court observed that "although this case is large in terms of dollars, I think it's relatively simple in terms of players," as the major stakeholders were first lienholders, second lienholders and the debtors, and "[p]art of the reasons I think that the fighting has been so intense is that the issues are relatively small." Id. (146:8-12 & 147:10-12).

50. As in the FX Luxury and White Energy cases, permitting the Debtors to retain exclusivity would not serve any purpose other than to enable Perseus to use the chapter 11 plan process

for its own benefit, at the risk of sacrificing the fortunes of the Debtors and recoveries of all other stakeholders. Each day the Debtors retain exclusivity and fail to make materially meaningful progress in these cases is simply another day that the Lenders' collateral erodes and the value and resources of the Debtors' estates are diminished for the sake of a hopelessly out-of-the-money equity sponsor. Although these cases revolve around large sums of money, they are not complex in comparison to other chapter 11 cases, and therefore further "cause" exists to terminate exclusivity.

        C.    <u>The Debtors Have Not Made Good Faith Progress in Resolving Issues Facing the Estates or in Negotiating with Creditors</u>

      51.    The third through sixth factors – existence of good faith progress toward reorganization; progress in negotiations with creditors; the necessity of sufficient time to permit the debtor to negotiate a plan; and the amount of time that has elapsed – overlap and strongly favor terminating exclusivity and moving forward with filing and soliciting acceptances of an alternative plan.

      52.    First, to date, negotiations between the Debtors and the Second Lien Lenders have not resulted in any meaningful progress toward a consensual chapter 11 plan. Instead the Debtors have only offered their unrealistic Original Plan, and then an even more offensive Amended Plan, without making any significant concessions or modifications. In fact, the worse treatment provided to the Second Lien Lenders under the Amended Plan, as well as the supposed "exit financing," evidences the Debtors' lack of good faith. Moreover, that the parties have only agreed on three interim orders authorizing temporary use of cash collateral and are at loggerheads on a final cash collateral order highlights the magnitude of the disputes between the Debtors and the Lenders. The Debtors have not, and will not, achieve <u>any</u> progress in <u>any</u> negotiations with the Second Lien Agent when the Debtors' proposed end-game for these cases – implementation of the Amended Plan – is premised on favoring insider equity holders and unsecured creditors at the expense of the Lenders.

      53.    Second, the Debtors had many months prior to the commencement of these cases to negotiate in a realistic manner with the Lenders and failed to do so. Instead, the Debtors simply did Perseus' bidding by single-mindedly pursuing alternatives that would not deleverage the Debtors, but would ensure Perseus' continued equity ownership. <u>See</u> Transcript of Proceedings at

147:19-25 , <u>In re FX Luxury</u>, Case No. 10-17015, Dkt. No. 322 ("The necessity of sufficient time to prevent the debtor to negotiate a plan, well, debtor had time. Debtor had the nine months prior to filing the case and file [its proposed plan]"). For months prior to the Petition Date, the Second Lien Agent repeatedly sought to discuss with the Debtors' management (which included individuals now previously employed by Perseus) reasonable alternatives to a bankruptcy filing, but was repeatedly and summarily rebuffed.

54.     While only 62 days will have elapsed since the Debtors filed their petitions until the hearing on this Motion, these cases have not progressed in any material manner – the Debtors and Lenders are still oceans apart on the terms of a chapter 11 plan. This is similar to the situation in <u>FX Luxury</u>, where the court stated that, at that point,

> it [had] been only 45 days, but that's somewhat misleading as well. It's not as though the bankruptcy was just filed 45 days ago. It's been in contemplation since at least last fall. . . . The process and procedures that lead up to the economic results contemplated by the plan have been in place longer, and to put it bluntly, if the best they can come up with is what they have put forward thus far, I have some doubts as to whether keeping exclusivity in place is in the best interest of the estate.

<u>Id.</u> (149:16-25 & 150:22-25) ("I'm mindful that they have been in negotiation since last year, and they have yet to find a common ground for which they can go forward.").

55.     The Debtors have had ample opportunity to discuss and negotiate a chapter 11 plan with creditors and other parties-in-interest, but they have made no progress in moving the cases forward. By filing their Amended Plan, the Debtors further illustrated that they have no interest in reaching a consensual result in these cases. The Amended Plan is predicated upon short-changing the Lenders so that the insolvent Debtors are saddled with additional debt and Perseus walks away with the company after emergence. The Debtors' chosen path demonstrates a lack of good faith in their negotiations, questions with respect to the Debtors' exercise of their fiduciary duties, lack of independence from Perseus, and no progress toward a confirmable plan, as the Debtors have shown minimal commitment to meaningful and productive negotiations. This is "cause" sufficient to terminate exclusivity. <u>See, e.g.</u>, <u>In re Grossinger's Assocs.</u>, 116 B.R. 34, 36 (Bankr. S.D.N.Y. 1990) (terminating exclusivity because "the debtor is simply bidding for more time because it does not have

any funding in place to support a plan at this point" and debtor's plan "does not offer any serious reorganizational possibilities").

D. The Debtors are Abusing Exclusivity to Pressure the Lenders

56.     A debtor may not seek to utilize the exclusivity periods in order to strong-arm creditors into submitting to its demands.  See Bankruptcy Act Revision Serial No. 27, Part 3, H'rgs on H.R. 31 & H.R. 32, 94th Congr. 2d Sess. (1976); see also In re Dow Corning Corp., 208 B.R. 661, 666 (Bankr. E.D. Mich. 1997).  Here, as noted above, the Debtors, at the behest of Perseus, are utilizing the bankruptcy and chapter 11 plan process in an attempt to coerce the Lenders into accepting a restructuring proposal to benefit Perseus.  In the meantime, the longer the Debtors remain in bankruptcy, the less value the Lenders will recover on their claims as a result of the diminishing value of the estates, increasing bankruptcy costs and increasing Lender claims.  No matter how one looks at the issue, the Debtors (i.e., Perseus) have not relented, and show no signs of doing so any time soon, in their exertion of pressure on the Lenders to assent to their terms.  The Debtors have simply sat back, relying on their exclusivity as the trump card to deter alternative proposals.  This behavior is exactly what Congress targeted with the amendments to section 1121(d) and undoubtedly suffices for "cause" to terminate exclusivity.

E. The Debtors Will Not Be Able to Continue to Pay their Bills Without Access to the Lenders' Cash Collateral

57.     The Debtors here are not substantially able to pay their bills as they become due, as they cannot pay interest on account of the Second Lien Credit Agreement during the pendency of these cases.  While the Debtors have otherwise been able to generally pay their bills, this is a result of the Lenders' assent to the use of their cash collateral under the three interim orders this Court has entered.  See Dkt. Nos. 39, 107 & 199.  Without agreement on cash collateral – and the Lenders have not consented to further use of cash collateral beyond the expiration of the third interim order – the Debtors will not be able to pay their bills, which further provides cause for terminating exclusivity.

F. There are No Unresolved Contingencies

58.     This final factor in the nine-part balancing test is simply not present here, as there are no pending appeals and no pending litigations.  See In re Situation Mgmt. Sys., Inc., 252 B.R. 859, 863 (Bankr. D. Mass. 2000) (finding that exclusivity could be terminated based on other factors

even where debtor's plan relied on outcome of an appeal).  This factor links with the second (complexity of the cases), as the lack of an unresolved contingency further demonstrates the relative simplicity of the dispute.

G.  The Lenders Lack Confidence in the Debtors' Management

59.     As an additional factor, courts consider a creditor's lack of confidence in the Debtors' management in assessing a motion to terminate exclusivity.  See, e.g., In re All Seasons Indus., Inc., 121 B.R. 1002, 1006 (Bankr. N.D. Ind. 1990).  Here, further grounds exist to terminate the Exclusivity Periods because of the understandable lack of trust that parties-in-interest have for the Debtors' management and their intentions in these cases.

60.     The Debtors' two senior managers – who for the most part were employed by Perseus prior to the bankruptcy filings and who are willing to do Perseus' bidding even though it puts the entire enterprise at risk – do not have the trust of the Lenders.  If the Debtors' management had the interest of the Debtors at heart, it would be seeking to file a plan that reduces the Debtors' leverage so that the Debtors have a solvent capital structure, are competitive with their peers and can better attract higher revenues and customers.  Instead, management is pursuing Perseus' Hail Mary plan and seeking to confirm a plan that leaves the Debtors substantially overleveraged – indeed, weighed down by even more debt than on the Petition Date – and at significant risk that they will return to chapter 11.  That is not the conduct of independent or credible management.

61.     Based on the totality of these factors, and consistent with case law, the creditors here must be given a chance to evaluate competing plans.  Terminating exclusivity is an optimal way to level the playing field between the Debtors (or, more precisely, Perseus' influence over the Debtors and these bankruptcy cases) and their creditors as Congress desired.  Grounds exist to terminate the Exclusivity Periods, as in situations such as these, Congress intended that a debtor's reorganization proposal be subject to competition in order to avoid unnecessary delay and ultimately ensure maximum recoveries for creditors.

62.     The Debtors will not be prejudiced by the termination of the Exclusivity Periods, as their Amended Plan can compete with alternatives on the same terms – and the competition may even spur the Debtors to make progress in negotiations.  Nor would the submission of alternate

plans result in additional expense to the Debtors' estates. In fact, terminating the Exclusivity Periods in these chapter 11 cases would actually save valuable time and eliminate significant costs – time and costs that the Debtors and their creditors cannot afford. Conversely, should the Court deny this Motion and preserve the Exclusivity Periods, these cases will likely involve not just one contested confirmation hearing, with the attendant discovery, expert witnesses and multiple days, if not weeks, of hearings before the Court, but likely a second one. See, e.g., Opinion on Confirmation, In re Spansion, Inc., Case No. 09-10690, Adv. Pro. No. 09-52274, Dkt. No. 3224 (Bankr. D. Del. Apr. 1, 2010) (stating that confirmation hearing took place over five days in February and March 2010 and involved a contested valuation of the debtors with various expert witnesses); In re Exide Techs., 303 B.R. 48, 52-53 & 58-59 (Bankr. D. Del. 2003) (confirmation hearing occurring over seven days between October and November 2003 and involving a contested valuation of the debtors with expert witnesses for the debtor and creditors' committee); In re Bloomingdale Partners, 155 B.R. 961, (Bankr. N.D. Ill. 1993) (stating that court held four days of valuation hearings to value certain collateral of the debtor, and additionally stating that six expert witnesses testified with respect to the appropriate interest rate to apply to creditor's secured claim under the debtor's plan).

63.     For all of these reasons, looking at all factors together and consistent with Congress' skepticism of exclusivity, abundant "cause" exists to terminate the Debtors' exclusivity. Doing so is a prudent way to move these cases forward, minimize prolonged and costly delay and maximize stakeholders' recoveries.

## II. If the Exclusivity Periods Are Not Terminated to Permit the Filing of Competing Plans, the Court Should Authorize and Direct a Sale of the Debtors' Assets Through a Section 363 Sale

64.     In the event that the Court wants to avoid having multiple competing chapter 11 plans and a hotly contested, extremely expensive confirmation battle, the Court could instead authorize and direct the Debtors to immediately commence a process for the sale of all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code. A 363 sale process would be a fair, open and value-maximizing mechanism to preserve the Debtors' business for the long-term and provide an expeditious and cost-effective resolution to these cases. Moreover, the Lenders would serve as a stalking horse bidder, thus establishing a floor for value.

65. Section 363(b) of the Bankruptcy Code permits a debtor, after notice and a hearing, to sell property of the estate other than in the ordinary course of business, and section 363(f) of the Bankruptcy Code permits such a sale to be "free and clear of any interest in such property" if certain conditions are met. 11 U.S.C. §§ 363(b), (f); see also Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc., 554 U.S. 33, 37 n.2 (2008) (stating that debtor may sell substantially all of its assets as a going concern and later submit a plan of liquidation providing for distribution of proceeds of sale). Pursuant to section 363(k) of the Bankruptcy Code, a secured creditor may credit bid its debt up to the full amount of its claim at a 363 sale, even if the claim amount exceeds the value of the collateral. See 11 U.S.C. § 363(k).

66. A major advantage of a 363 sale of all or substantially all of a debtor's assets is that it preserves the debtor's business as a going concern, with its customer relationships, employees and infrastructure intact, and avoids the destructive nature of a prolonged plan confirmation battle. A 363 sale process has been used frequently when the debtor and its lenders cannot agree on a chapter 11 plan and expediency is required to preserve value. See, e.g., Opinion Granting Debtors' Motion Seeking Authority to Sell at 17, In re Chrysler LLC, Case No. 09-50002, Dkt. No. 3073 (Bankr. S.D.N.Y. Apr. 30, 2009) ("approval of the Debtors' proposed sale of assets is necessary to preserve some portion of the going concern value of the Chrysler business and to maximize the value of the Debtors' estates"); In re Metaldyne Corp., 409 B.R. 671, 680 (Bankr. S.D.N.Y. 2009) ("if a sale is not consummated at this time, there may be even less available for creditors"); In re Pan Am. Hosp. Corp., 364 B.R. 832, 838 (Bankr. S.D. Fla. 2007) ("Section 363 assists bankruptcy courts in maximizing recovery to creditors . . . and enhance[s] pro rata return to all pre-sale creditors"). Courts authorize a 363 sale in cases where the debtors and creditors are intractably stalemated or when a plan faces repeated, but unsuccessful, attempts at confirmation. See, e.g., Order Authorizing and Approving (A) The Sale of Substantially All Assets of the Debtors and (B) The Assumption and Assignment of Certain Contracts and Leases & Transcript of Proceedings at 23:20-25, In re Champion Enters. Inc., Case No. 09-14019, Dkt. Nos. 517 & 523 (Bankr. D. Del. Nov. 15, 2009) ("I also take great comfort in the fact that it is a consensual proposal, and I think that a Court, absent very strong reasons, should at least listen to, if not more, [sic] to parties who have a financial stake in the proposed motion, and

accordingly, I will approve [the sale]"); Transcript of Debtors' Motion to Approve 363 Sale at 81:1-5, 10-13, In re Adelphia Commc'ns Corp, Case No. 02-41729, Dkt. No. 11681 (Bankr. S.D.N.Y. June 25, 2002) ("creditor strife made the plan process impracticable").

67.     Here, the Debtors and the Lenders are at an impasse and the Debtors must emerge from chapter 11 in the near term or the Debtors' value will be further harmed. Commencing a 363 sale process would put the Debtors on a quick path to a conclusion of these cases, thus maximizing value. A 363 sale also would avoid the prohibitive costs of having a fiercely contested confirmation litigation, which would have significant cost in terms of immediate dollars – just one confirmation fight will necessitate, at a minimum, extensive discovery, direct and cross-examination of fact witnesses and expert witnesses along with preparation of accompanying written reports, presentations by each parties' advisers, expensive analyses assessing valuation, in addition to significant investments of time, energy and attention from all stakeholders – and in terms of damage to employee morale and customer and supplier business, relationships and goodwill. Avoiding these costs would also facilitate a speedy resolution to the main disputes in these cases.

68.     Another significant advantage of the 363 sale process is that it would resolve one of the major issues the Court now faces by allowing the market to determine the value of the Debtors' estates. Opening the process to an auction format will allow any party-in-interest to bid on the Debtors' assets. In such a process, the secured creditors would credit bid their debt as a stalking horse bidder, providing a baseline bid for the Debtors' assets.

69.     The Debtors' capital structure is currently comprised of, among other things, equity held by Perseus and unsecured notes held by Perseus, The Carlyle Group and Branch Banking and Trust Company ("BB&T"). Collectively, these three financial institutions have hundreds of billions of dollars of assets. To the extent any or all of these parties believe that the Debtors' value exceeds the claims of the First Lien Lenders and the Second Lien Lenders, they have the resources and wherewithal to outbid the Lenders.

70.     A 363 sale therefore would therefore provide the Court with a cost effective and value-maximizing alternative to protracted litigation in connection with confirmation of the Debtors' Amended Plan, while maintaining the Debtors' business as a going concern.

## **CONCLUSION**

71.     These cases present a classic example of why Congress provided for termination of exclusivity.  The Debtors' out-of-the-money equity sponsor is currently using exclusivity to try to force an unpalatable chapter 11 plan on the Lenders and as a shield to avoid meaningful progress toward a consensual plan.  The only way for these cases to move rapidly towards a successful conclusion is for the Court to either permit other chapter 11 plans to proceed on a dual track with the Debtors' Amended Plan or by authorizing and directing a 363 sale process.

WHEREFORE, for all of the above-stated reasons, the Second Lien Agent respectfully requests that the Court (i) terminate the Debtors' exclusive periods to file a plan of reorganization and solicit acceptances thereto or, in the alternative, (ii) authorize and direct a sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code.

Dated: Richmond, Virginia
      November 16, 2010

Respectfully submitted,

*/s/ Tara L. Elgie*
Benjamin C. Ackerly, Esq. (VSB No. 09120)
Tara L. Elgie, Esq. (VSB No. 48259)
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Telephone: (804) 788-8479
Facsimile: (804) 788-8218

-and-

FRIED, FRANK, HARRIS, SHRIVER
     & JACOBSON LLP
Gary L. Kaplan
Michael B. De Leeuw
Richard J. Slivinski
One New York Plaza
New York, NY 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000

*Attorneys for Silver Point Finance, LLC in its capacity as Administrative Agent under the Second Lien Credit Agreement*

7890238