Douglas M. Foley (VSB No. 34364)
Patrick L. Hayden (VSB No. 30351)
McGUIREWOODS LLP
9000 World Trade Center
101 West Main Street
Norfolk, Virginia 23510
(757) 640-3700

Attorneys for the Debtors and
Debtors in Possession

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| WORKFLOW MANAGEMENT, INC., | ) | |
| <u>et al</u>., | ) | Case No. 10-74617 (SCS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| _____ | ) | |

**NOTICE OF FILING OF BLACKLINE REVISIONS TO JOINT CHAPTER 11
PLAN, DISCLOSURE STATEMENT AND ASSET PURCHASE AGREEMENT**

**PLEASE TAKE NOTICE** that on January 19, 2011, the above-captioned Debtors
filed the attached blacklined versions of the following documents:

> Third Amended Joint Chapter 11 Plan of Workflow Management, Inc. and Its
> Affiliated Debtors, attached hereto as <u>Exhibit A</u> (the "Plan");

> Disclosure Statement Relating to Third Amended Joint Chapter 11 Plan of
> Workflow Management, Inc. and Its Affiliated Debtors (the "Disclosure
> Statement"), attached hereto as <u>Exhibit B</u>; and

> Asset Purchase Agreement (as defined in the Plan), attached hereto as <u>Exhibit C</u>.

**PLEASE TAKE FURTHER NOTICE** that the attached blacklined Plan and
related Disclosure Statement reflect revisions to the draft Third Amended Joint Chapter 11
Plan and related draft Disclosure Statement filed with this Court on January 12, 2011
(Docket No. 686). The attached blacklined Asset Purchase Agreement reflects revisions to
the Asset Purchase Agreement filed as Exhibit B to the Second Amended Joint Chapter 11
Plan filed with this Court on December 29, 2010 (Docket No. 630).

**PLEASE TAKE FURTHER NOTICE** that the dates pertaining to solicitation and plan confirmation procedures and hearings set forth in the attached blacklines remain subject to revision and approval by the Court.

Dated: Norfolk, Virginia
January 19, 2011

WORKFLOW MANAGEMENT, INC., <u>et al</u>.


/s/*Douglas M. Foley*
Douglas M. Foley (VSB No. 34364)
Patrick L. Hayden (VSB No. 30351)
McGUIREWOODS LLP
9000 World Trade Center
101 West Main Street
Norfolk, Virginia, 23510
(757) 640-3700

Attorneys for the Debtors and
Debtors in Possession

**Exhibit A**

(Blacklined Third Amended Plan)

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **WORKFLOW MANAGEMENT INC.,** | ) | |
| <u>et al.</u>, | ) | **Case No. 10-74617 (SCS)** |
| | ) | |
| **Debtors**. | ) | **(Jointly Administered)** |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | ) | |

---

**THIRD AMENDED JOINT CHAPTER 11 PLAN**
**OF WORKFLOW MANAGEMENT, INC.**
**AND ITS AFFILIATED DEBTORS**

---

Dated:  January —,**14,** 2011

McGUIREWOODS LLP
Douglas M. Foley (VSB No. 34364)
Patrick L. Hayden (VSB No. 30351)
9000 World Trade Center
101 West Main Street
Norfolk, Virginia 23510
(757) 640-3700

TAVENNER & BERAN, PLC
Lynn L. Tavenner (VSB No. 30083)
Paula S. Beran (VSB No. 34679)
20 North Eighth Street
Second Floor
Richmond, Virginia 23219
(804) 783-8300

Attorneys for the Debtors and
Debtors in Possession

# TABLE OF CONTENTS

**Page**

ARTICLE I.        DEFINITIONS ................................................................................. 1

ARTICLE II.       INTERPRETATION AND APPLICATION .................................... 18

2.1       Interpretation ................................................................................. 18

2.2       Application of Definitions and Rules of Construction Contained in the
          Bankruptcy Code ........................................................................... 18

2.3       Other Terms ................................................................................... 18

2.4       Incorporation of Plan Documents .................................................. 18

ARTICLE III.      CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ................ 19

3.1       Administrative Expense Claims and Tax Claims ............................... 19

3.2       Claims and Equity Interests ............................................................ 19

3.3       Separate Classification of Other Secured Claims .............................. 20

ARTICLE IV.       IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND
                  EQUITY INTERESTS ..................................................................... 20

4.1       Impaired and Unimpaired Classes of Claims .................................... 20

4.2       Impairment Controversies .............................................................. 20

4.3       Classification Controversies ........................................................... 20

ARTICLE V.        PROVISIONS FOR TREATMENT OF CLAIMS AND EQUITY
                  INTERESTS UNDER THE PLAN ..................................... ~~20~~**21**

5.1       Class 1 – Priority Non-Tax Claims .................................................. 21

5.2       Class 2 – First Lien Lender Claims .................................................. 21

5.3       Class 3 – Second Lien Lender Secured Claims ................................. 22

5.4       Class 4 – Other Secured Claims ..................................................... 23

5.5       Class 5A – General Unsecured Claims against Non-Holdco Debtors ........ 23

5.6       Class 5B– General Unsecured Claims against Holdco Debtors ............. 24

5.7       Class 5C– Multi-Debtor General Unsecured Claims .......................... 24

5.8       Class 6 – Intercompany Claims ...................................................... 24

5.9       Class 7 – WF Equity Interests ........................................................ 24

5.10      Deemed Satisfaction of Secondary Liability Claims .......................... 24

5.11      Insurance Policies ......................................................................... 25

ARTICLE VI.       PROVISIONS FOR TREATMENT OF UNCLASSIFIED CLAIMS
                  UNDER THE PLAN ........................................................................ 25

| | | |
|---|---|---|
| 6.1 | Unclassified Claims | 25 |
| 6.2 | Treatment of Administrative Expense Claims | 25 |
| 6.3 | Treatment of Priority Tax Claims | 27 |
| ARTICLE VII. | ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY INTERESTS | 28 |
| 7.1 | Classes Entitled to Vote | 28 |
| 7.2 | Class Acceptance Requirement | 28 |
| 7.3 | Tabulation of Votes on a Non-Consolidated Basis | 28 |
| 7.4 | Separate Plan for Each Debtor | 28 |
| 7.5 | Cramdown | 28 |
| ARTICLE VIII. | MEANS FOR IMPLEMENTATION OF THE PLAN | 29 |
| 8.1 | Sale of Assets, Consummation of Sale Transaction and Distribution of New Notes and Newco Preferred Equity Interests | 29 |
| 8.2 | Certain Transactions On the Effective Date | 29 |
| 8.3 | Appointment of Plan Administrator | 30 |
| 8.4 | Unsecured Claims Fund | 30 |
| 8.5 | Cancellation of Notes and Equity Interests | 30 |
| 8.6 | Corporate Action | 30 |
| 8.7 | Continued Corporate Existence of the Debtors | 31 |
| 8.8 | Reserved | 31 |
| 8.9 | Revesting of Assets | 31 |
| 8.10 | Assumption of Priority Claims by Purchaser | 32 |
| 8.11 | Release of Liens | 32 |
| 8.12 | Substantive Consolidation | 32 |
| 8.13 | Initial Boards of Directors and Officers | ~~32~~**33** |
| 8.14 | Remittance of Excess Plan Funds to the Purchaser | 33 |
| 8.15 | Exemption from Securities Laws | 33 |
| ARTICLE IX. | THE PLAN ADMINISTRATOR | 33 |
| 9.1 | Generally | 33 |
| 9.2 | Appointment of the Plan Administrator | 33 |

9.3     Funding Expenses of the Plan Administrator ........................................ 34

9.4     Service and Removal. ........................................................................... 34

9.5     Authority. ............................................................................................. 34

9.6     Plan Distribution Withholding. ............................................................ 35

9.7     Termination of the Plan Administrator ................................................ 35

9.8     Plan Administrator Post-Effective Date .............................................. 35

ARTICLE X.       PLAN DISTRIBUTION PROVISIONS ...................................... 36

10.1     Sources of Cash for Plan Distributions ............................................... 36

10.2     Investment of Funds Held by the Plan Administrator; Tax Reporting by the Plan Administrator ........................................................................... 36

10.3     Timing of Plan Distributions ............................................................... 36

10.4     Unsecured Claims Fund ....................................................................... 37

10.5     Distributions After Allowance of Contested Class 5A and Class 5C Claims ...... 37

10.6     Distributions After Disallowance of Contested Class 5A or Class 5C Claims. ...................................................................................... 37~~37~~**38**

10.7     Address for Delivery of Plan Distributions/Unclaimed Distributions ................ 38

10.8     Time Bar to Cash Payments ................................................................. 38

10.9     Manner of Payment under the Plan ...................................................... 39

10.10    Minimum and Fractional Distributions ................................................ 39

10.11    Surrender and Cancellation of Instruments ......................................... 39

ARTICLE XI.      PROCEDURES FOR RESOLVING AND TREATING CONTESTED CLAIMS ...................................................................... ~~39~~**40**

11.1     Prosecution of Contested Claims ........................................................ 40

11.2     Objection Deadline .............................................................................. 40

11.3     Claims Settlement ................................................................................ 40

11.4     Entitlement to Plan Distributions Upon Allowance ............................ 40

11.5     Contested Claims Reserve ................................................................... 41

11.6     Estimation of Claims ........................................................................... 41

11.7     No Recourse Against the Debtors, the Purchaser or the Post-Effective Date Debtors ........................................................................................ 41

ARTICLE XII.     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .................................................................... 42

| | | |
|---|---|---|
| 12.1 | Assumption and Rejection of Executory Contracts and Unexpired Leases | 42 |
| 12.2 | Cure Costs | 43 |
| 12.3 | Claims Arising from Rejected Contracts | ~~43~~**44** |
| ARTICLE XIII. | SETTLEMENTS AND COMPROMISES | 44 |
| 13.1 | Compromise and Settlement | 44 |
| 13.2 | Releases by the Debtors. | 45 |
| 13.3 | Third Party Release | 46 |
| 13.4 | Exculpation | 47 |
| 13.5 | Reserved | 47 |
| 13.6 | Maintenance of Set-off Rights. | 47 |
| 13.7 | INJUNCTION | 48 |
| ARTICLE XIV. | CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE OCCURRENCE OF THE EFFECTIVE DATE | 48 |
| 14.1 | Conditions Precedent to Confirmation | 49 |
| 14.2 | Conditions Precedent to the Occurrence of the Effective Date | 49 |
| 14.3 | Waiver of Conditions | 50 |
| 14.4 | Effect of Non-Occurrence of the Effective Date | 50 |
| ARTICLE XV. | RETENTION OF JURISDICTION | 50 |
| ARTICLE XVI. | MISCELLANEOUS PROVISIONS | 52 |
| 16.1 | Payment of Statutory Fees | 52 |
| 16.2 | Satisfaction of Claims | 52 |
| 16.3 | Notices | ~~52~~**53** |
| 16.4 | Headings | ~~54~~**55** |
| 16.5 | Governing Law | 55 |
| 16.6 | Expedited Determination | 55 |
| 16.7 | Exemption from Transfer Taxes | 55 |
| 16.8 | Retiree Benefits | 55 |
| 16.9 | Notice of Entry of Confirmation Order and Relevant Dates | ~~55~~**56** |
| 16.10 | Interest and Attorneys' Fees | 56 |
| 16.11 | Modification of the Plan | 56 |

# TABLE OF CONTENTS
(continued)

**Page**

16.12    Revocation of Plan ............................................................................... 56

16.13    Setoff Rights ....................................................................................... 57

16.14    Compliance with Tax Requirements .................................................... 57

16.15    Rates ................................................................................................... 57

16.16    Binding Effect ..................................................................................... 57

16.17    Severability ..................................................................................... ~~57~~**58**

16.18    No Admissions .................................................................................... 58

16.19    Dissolution of the Committee .............................................................. 58

Workflow Management, Inc., and its affiliated debtors in the above-captioned jointly administered chapter 11 cases (the "Debtors"), hereby propose the following third amended joint chapter 11 plan of reorganization:

# ARTICLE I.

## DEFINITIONS

In this Plan, the following definitions apply:

**1.1.** "**Administrative Expense Claim**" means any right to payment constituting a cost or expense of administration of any of the Chapter 11 Cases under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary post-petition costs and expenses of preserving the Debtors' estates, any actual and necessary post-petition costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Chapter 11 Cases including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, and any allowances of compensation and reimbursement of expenses to the extent allowed by Final Order under section 330 or 503 of the Bankruptcy Code.

**1.2.** "**Administrative Expense Claim Bar Date**" means February 11, 2011, or such other specific date as may be established by the Bankruptcy Court.

**1.3.** "**Administrative Expense Claim Reserve**" means the portion of the Plan Funds to be used for distribution to holders of (i) Priority Tax Claims that are not assumed by the Purchaser as provided in Section 8.10, (ii) Priority Non-Tax Claims that are not assumed by the Purchaser as provided in Section 8.10, and (iii) Administrative Expense Claims that are not assumed by the Purchaser as provided in Section 6.2(e).

**1.4.** "**Affiliate**" means, with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

**1.5.** "**Allowed**" means, with respect to a Claim: (i) any Claim against any Debtor which has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed, (ii) any timely filed, liquidated, non-contingent Claim as to which the time for objection permitted by the Plan has expired and no objection has been interposed, or (iii) any Claim expressly allowed by a Final Order or by agreement in accordance with the provisions of the Plan, including, without limitation, Section 11.3 of the Plan.

**1.6.** "**Asset Purchase Agreement**" means that certain Asset Purchase Agreement by and among WFMI and its Debtor affiliates signatories thereto, and the Purchaser, dated ⸺, 201 , **January 14, 2011,** in the form attached hereto as Exhibit B, as further amended, supplemented or modified from time to time.

**1.7.** "**Assets**" means, with respect to any Debtor, all of such Debtor's right, title and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

**1.8.** "**Assigned Contracts**" shall have the meaning given in Section 12.1 of the Plan.

**1.9.** "**Assumed Liabilities**" has the meaning set forth in the Asset Purchase Agreement.

**1.10.** "**Assumed Priority Claim Schedule**" means the schedule delivered by the Purchaser to the Debtors on the Effective Date that denotes the Priority Tax Claims and Priority Non-Tax Claims that are being assumed by the Purchaser upon the closing of the Sale Transaction.

**1.11.** "**Avoidance Actions**" means all Causes of Action of the Estates that arise under section 544, 545, 547, 548, 549, 550, 551 and/or 553 of the Bankruptcy Code.

**1.12.** "**Ballot**" means those certain ballots that are sent to holders of Claims and Equity Interests for purposes of voting on the Plan.

**1.13.** "**Balloting Agent**" means Kurtzman Carson Consultants LLC.

**1.14.** "**Bankruptcy Code**" means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

**1.15.** "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Virginia, Norfolk Division, or such other court having jurisdiction over the Chapter 11 Cases.

**1.16.** "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code and as applicable to the Chapter 11 Cases.

**1.17.** "**Borrower**" means Workflow Management, Inc.

**1.18.** "**Business Day**" means any day other than a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close for business in New York, New York.

**1.19.** "**Cash**" means legal tender of the United States of America.

**1.20.** "**Cash Collateral Orders**" means the orders of the Bankruptcy Court, dated October 1, 2010, October 8, 2010, October 29, 2010, and December 2, 2010 granting the Debtors authority to use cash collateral on an interim basis, the order of the Bankruptcy Court dated December 16, 2010, granting the Debtors authority to use cash collateral on a final basis, as such order may be amended or extended in accordance with the terms thereof, and any further orders that may be entered regarding the use of cash collateral.

**1.21.** "**Causes of Action**" means all claims, rights, actions, causes of action, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, asserted or unasserted, arising in law, equity or otherwise.

**1.22.** "**Chapter 11 Cases**" means the cases commenced under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court with respect to each of the Debtors styled as In re Workflow Management, Inc., et al., Chapter 11 Case No. 10-74617 (SCS), Jointly Administered.

**1.23.** "**Claim**" means (a) any right to payment, whether or not such right is known or unknown, reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is known or unknown, reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

**1.24.** "**Claims Agent**" means Kurtzman Carson Consultants LLC.

**1.25.** "**Closing Consideration Amount**" has the meaning set forth in the Asset Purchase Agreement, which shall include the Plan Funds.

**1.26.** "**Committee**" means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases.

**1.27.** "**Confirmation Date**" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

**1.28.** "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court, as it may be continued from time to time, to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

**1.29.** "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan, which shall be in form and substance acceptable to the Debtors, the Purchaser, Perseus, and the Second Lien Administrative Agent.

**1.30.** "**Contested Claim**" means any Claim that is not an Allowed Claim or a Disallowed Claim, provided that, for the avoidance of doubt, the First Lien Lender Claims and the Second Lien Lender Claims shall not be Contested Claims.

**1.31.** "**Contested Claims Reserve**" means a reserve of Cash that may be established in accordance with Section 11.5 of the Plan.

**1.32.** "**CS**" means Credit Suisse AG, Cayman Islands Branch.

**1.33.** "**Cure Cost**" means the distribution within a reasonable period of time following the Effective Date of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption (or assumption and assignment) of an executory contract or unexpired lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties, under such executory contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

**1.34.** "**Debtors**" means, collectively, WF Capital, and its direct and indirect subsidiaries, that are debtors in the Chapter 11 Cases as identified on Exhibit A annexed hereto.

**1.35.** "**Debtor Release**" means the release given by the Debtors to the Debtor Releasees set forth in Section 13.2 of the Plan.

**1.36.** "**Debtor Releasees**" means, collectively, (a) all current and former officers and directors of the Debtors, (b) all Related Parties of the Debtors, and (c) and the Third Party Releasees.

**1.37.** "**Debtor-in-Possession**" means any Debtor, in its capacity as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**1.38.** "**Disallowed**" when used with respect to a Claim, means a Claim, or such portion of a Claim, (a) that has been disallowed by a Final Order, including, without limitation, any Claims that are disallowed by failing to comply with the Bankruptcy Court's order establishing the bar date for filing proofs of Claim, or (b) which were included on the Schedules as disputed or contingent and for which no contrary proof of Claim was timely filed.

**1.39.** "**Disclosure Statement**" means the Disclosure Statement filed with respect to the Plan, as it may be amended or modified from time to time.

**1.40.** "**Disclosure Statement Order**" means the order entered by the Bankruptcy Court, in form and substance reasonably acceptable to the Debtors, Perseus, the Purchaser and the Second Lien Administrative Agent, (a) approving the Disclosure Statement as containing adequate information required under section 1125 of the Bankruptcy Code, (b) authorizing the use of the Disclosure Statement for soliciting votes on the Plan, and (c) authorizing the Debtors to execute the Asset Purchase Agreement and incur the fee reimbursement obligations contemplated thereunder.

**1.41.** "**Distribution Date**" means, with respect to any Claim, (i) the Effective Date or a date that is as soon as reasonably practicable after the Effective Date, if such Claim is then an Allowed Claim, (ii) a date that is as soon as reasonably practicable after the date such Claim becomes Allowed, if not Allowed on the Effective Date; or (iii) the date of payment otherwise prescribed in the Plan.

**1.42.** "**Effective Date**" means a date selected by the Debtors which must be a Business Day that is no later than thirty (30) Business Days after all of the conditions specified in Section 14.2 of the Plan have been satisfied or waived (to the extent subject to waiver).

**1.43.** "**Entity**" means any person or organization created by law, including, without limitation, any individual, company, corporation, limited liability company, partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, or government or any political subdivision thereof.

**1.44.** "**Equity Interest**" means any outstanding ownership interest in any of the Debtors, including without limitation, interests evidenced by common or preferred stock, partnership interests, membership interests, warrants and options or other rights to purchase or otherwise receive any ownership interest in any of the Debtors and any right to payment or compensation based upon any such interest, whether or not such interest is owned by the holder of such right to payment or compensation.

**1.45.** "**Estate**" means the estate of any Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

**1.46.** "**Excluded Assets**" has the meaning set forth in the Asset Purchase Agreement.

**1.47.** "**Excluded Contracts**" means (i) contracts and leases listed in a schedule to the Disclosure Statement and any subsequently filed "Schedule of Rejected Executory Contracts and Unexpired Leases" to be filed by the Debtors as part of the Plan Supplement with the Bankruptcy Court at least ~~seven~~**ten** (~~7~~**10**) days before the date of the Confirmation Hearing; (ii) all executory contracts and unexpired leases that are the subject of a pending motion before the Bankruptcy Court or which have been rejected by order of the Bankruptcy Court entered before the Effective Date; and (iii) any executory contract or unexpired lease that is the subject of a dispute over the amount or manner of cure pursuant to Article 12 of the Plan and for which the Debtors make a motion to reject such contract or lease at any time based upon the existence of such dispute or the resolution of such dispute. The Debtors reserve the right to amend the schedule to the Disclosure Statement or any "Schedule of Rejected Executory Contracts and Unexpired Leases" at least two (2) days before the date of the Confirmation Hearing.

**1.48.** "**Exculpated Parties**" means each of (a) the Debtors, (b) the Post-Effective Date Debtors, (c) the Debtor Releasees, and (d) the Committee and its members (solely in their capacities as members of the Committee).

**1.49.** "**Fee Application**" means an application for allowance and payment of a Fee Claim.

**1.50.** "**Fee Claim**" means a Claim of a Professional.

**1.51.** "**Final Order**" means (a) an order or judgment of the Bankruptcy Court or any other court or adjudicative body as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing is then pending, or (b) in the event that an appeal, writ of certiorari, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court or any other court or adjudicative body shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, that no order shall fail to be a Final Order

solely because of the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order.

**1.52.** "**First Lien Administrative Agent**" means CS, in its capacity as administrative agent for the First Lien Secured Parties pursuant to the First Lien Loan Documents.

**1.53.** "**First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as of November 30, 2005, between Workflow Management, Inc., as borrower, the First Lien Lenders and the First Lien Administrative Agent, as amended from time to time.

**1.54.** "**First Lien Credit Facility**" means the Term Loan Facility and the Revolving Credit Facility made available pursuant to the First Lien Loan Documents.

**1.55.** "**First Lien Guaranties**" means the Guaranties entered into by the Guarantors in favor of the First Lien Administrative Agent for the benefit of the First Lien Secured Parties on account of the First Lien Lender Claims, as amended from time to time.

**1.56.** "**First Lien Guaranty Claims**" means any and all Claims against the Guarantors arising from or in connection with the First Lien Guaranties.

**1.57.** "**First Lien Lender Claims**" means any and all Claims, including, without limitation, the First Lien Guaranty Claims, against any of the Debtors arising from or in connection with the First Lien Loan Documents, which shall be Allowed as set forth in Section 5.2(a) of the Plan.

**1.58.** "**First Lien Lender Interest Claim**" has the meaning set forth in section 5.2(a) of the Plan.

**1.59.** "**First Lien Lender Principal Claim**" has the meaning set forth in section 5.2(a) of the Plan.

**1.60.** "**First Lien Lenders**" means the lenders who are party, from time to time, to the First Lien Credit Agreement.

**1.61.** "**First Lien Loan Documents**" means the First Lien Credit Agreement, the notes which evidence the loans under the First Lien Credit Facility, the fee letters referred to in the First Lien Credit Agreement, the First Lien Pledge Agreement, the First Lien Guaranties, the First Lien Mortgages, any outstanding Letters of Credit, and the Intercreditor Agreement, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto, as any such documents are amended from time to time.

**1.62.** "**First Lien Mortgages**" means any mortgage recorded in favor of the First Lien Administrative Agent which secures the First Lien Lender Claims, as amended from time to time.

**1.63.** "**First Lien Pledge Agreement**" means that certain Pledge and Security Agreement dated as of November 30, 2005, granting a first priority security interest in

substantially all of the personal property assets of the Loan Parties, by each Loan Party in favor of the First Lien Administrative Agent for the benefit of the First Secured Parties, together with all documents, instruments and agreements executed or entered into in connection therewith, as amended from time to time.

**1.64.** "**First Lien Secured Parties**" means the First Lien Administrative Agent, the First Lien Lenders and the Issuer.

**1.65.** "**Former Shareholder Notes**" means those certain promissory notes made by certain former shareholders of the Debtors payable to certain of the Debtors in the original aggregate principal amount of approximately $2,352,872.

**1.66.** "**General Unsecured Claim**" means any unsecured Claim against a Debtor, other than an Administrative Expense Claim, an Intercompany Claim, a Priority Tax Claim, or a Priority Non-Tax Claim.

**1.67.** "**Governmental Unit**" shall have the meaning assigned to such term in section 101(27) of the Bankruptcy Code.

**1.68.** "**Guarantors**" means each of Workflow Holdings Corporation; WF Holdings, Inc.; Workflow Direct, Inc.; Workflow Management Acquisition II Corp.; WFIH, Inc.; WFMI, Inc.; Workflow of Florida, Inc.; Workflow Solutions LLC; SFI of Puerto Rico, Inc.; Old FGS, Inc.; Old UE, LLC; The Relizon Company; Relizon Wisconsin Inc.; Relizon (Texas) Ltd., LLP; Relizon SNE Inc.; Relizon KNE Inc.; Relizon de Mexico Inc.; Formcraft Holdings General Partner, Inc.; and Formcraft Holdings Limited Partner, Inc.

**1.69.** "**Guaranty**" means any guaranty by one or more Debtors of an obligation of any other Debtor.

**1.70.** "**Holdco Debtors**" means WF Capital Holdings, Inc., WF Holdings, Inc., and Workflow Holdings Corporation.

**1.71.** "**Insider**" means with respect to any Person, all Persons that would fall within the definition assigned to such terms in section 101(31) of the Bankruptcy Code.

**1.72.** "**Intercompany Claim**" means any Claim held by any Debtor against any other Debtor that occurred or came into existence prior to the Petition Date.

**1.73.** "**Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of November 30, 2005, as amended April 30, 2009, by and between the First Lien Administrative Agent and the Second Lien Administrative Agent, and acknowledged by each Loan Party, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto.

**1.74.** "**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended, and any applicable rulings, regulations (including temporary and proposed regulations) promulgated thereunder, judicial decisions, and notices, announcements, and other releases of the United States Treasury Department or the IRS.

**1.75.** "**IRS**" means the United States Internal Revenue Service.

**1.76.** "**Issuer**" means CS, as issuer of the outstanding Letters of Credit under the Letter of Credit Subfacility.

**1.77.** "**Letter of Credit Subfacility**" means the Letter of Credit subfacility under, and that forms a part of, the Revolving Credit Facility under the First Lien Credit Agreement.

**1.78.** "**Letters of Credit**" means any letters of credit issued by the Issuer under the Letter of Credit Subfacility, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto.

**1.79.** "**Loan Parties**" means the Guarantors and the Borrower.

**1.80.** "**Maximum Allowable Amount**" means, with respect to any Contested Claim in Class 5A or Class 5C, the least of the amounts (a) set forth in the proof(s) of Claim filed by the holder thereof, (b) determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction as the maximum fixed amount of such Class 5A or Class 5C Claim or as the estimated amount of such Class 5A or Class 5C Claim for allowance, distribution, and reserve purposes, (c) in the case of a proof of Claim filed in an unliquidated, undetermined, or contingent amount, as determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction, or (d) as agreed upon, in writing, by the holder of such Contested Claim and the Debtors or Plan Administrator, as the case may be.

**1.81.** "**Multi-Debtor General Unsecured Claims**" means any General Unsecured Claim which is asserted by the holder of such Claim against WF Holdings, Inc. and all of its direct and indirect subsidiary Debtors, including, without limitation, the Second Lien Lender Deficiency Claims and the PBGC Claims.

**1.82.** "**Newco**" means Workflow Holdings LLC.

**1.83.** "**Newco First Lien Administrative Agent**" means an entity to be identified in the Plan Supplement.

**1.84.** "**Newco First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as of the Effective Date, between Purchaser, as borrower, the Newco First Lien Lenders and the Newco First Lien Administrative Agent, in the form contained in the Plan Supplement as a Plan Document, as amended from time to time, which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, Newco First Lien Administrative Agent and the Second Lien Administrative Agent.

**1.85.** "**Newco First Lien Lenders**" means the lenders that are party to the Newco First Lien Credit Agreement from time to time.

**1.86.** "**Newco First Lien Loan Documents**" means the Newco First Lien Credit Agreement, the Newco First Lien Loan Notes which evidence the loans made under the Newco First Lien Credit Agreement, the Newco First Lien Pledge Agreement, the Newco First Lien Mortgages, and the Newco Intercreditor Agreement, as any such documents are amended from

time to time, each of which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, the Newco First Lien Administrative Agent and the Second Lien Administrative Agent.

**1.87.** "**Newco First Lien Mortgages**" means any mortgage recorded in favor of the Newco First Lien Administrative Agent, which secures the obligations under the Newco First Lien Credit Agreement, which shall grant a first priority lien on the property that is the subject of the mortgage in favor of the Newco First Lien Administrative Agent on behalf of the Newco First Lien Lenders, and which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, the Newco First Lien Administrative Agent, and the Second Lien Administrative Agent.

**1.88.** "**Newco First Lien Loan Notes**" means the notes made by Purchaser, in the form contained in the Plan Supplement as a Plan Document, that evidence the payment obligations of Purchaser under the Newco First Lien Credit Agreement, which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, the Newco First Lien Administrative Agent and the Second Lien Administrative Agent.

**1.89.** "**Newco First Lien Pledge Agreement**" means that certain Pledge and Security Agreement dated as of the Effective Date, granting a first priority security interest in substantially all of the personal property assets of Purchaser, by Purchaser in favor of the Newco First Lien Administrative Agent for the benefit of the Newco First Lien Secured Parties, together with all documents, instruments and agreements executed or entered into in connection therewith, as amended from time to time, which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, the Newco First Lien Administrative Agent and the Second Lien Administrative Agent.

**1.90.** "**Newco First Lien Secured Parties**" means the Newco First Lien Administrative Agent, and the Newco First Lien Lenders.

**1.91.** "**Newco Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of the Effective Date, by and between the Newco First Lien Administrative Agent and the Newco Second Lien Administrative Agent, and acknowledged by Purchaser, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto, which shall be in form and substance reasonably acceptable to the Purchaser, the Newco First Lien Administrative Agent and the Newco Second Lien Administrative Agent.

**1.92.** "**Newco Preferred Equity Interests**" means the preferred Equity Interests issued by Newco, which shall (i) have an initial stated liquidation value of $30 million, (ii) have no stated maturity, and (iii) be entitled to receive a 15% preferred distribution which shall compound and accrue quarterly.

**1.93.** "**Newco Second Lien Administrative Agent**" means Silver Point.

**1.94.** "**Newco Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of the Effective Date, between Purchaser, as borrower, the Newco Second Lien Lenders and the Newco Second Lien Administrative Agent, in the form contained in the

Plan Supplement as a Plan Document, as amended from time to time, which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, and the Second Lien Administrative Agent.

**1.95.** "**Newco Second Lien Lenders**" means the lenders that are party to the Newco Second Lien Credit Agreement from time to time.

**1.96.** "**Newco Second Lien Loan Documents**" means the Newco Second Lien Credit Agreement, the Newco Second Lien Loan Notes which evidence the loans made under the Newco Second Lien Credit Agreement, the Newco Second Lien Pledge Agreement, the Newco Second Lien Mortgages, and the Newco Intercreditor Agreement, as any such documents are amended from time to time, each of which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, and the Second Lien Administrative Agent.

**1.97.** "**Newco Second Lien Mortgages**" means any mortgage recorded in favor of the Newco Second Lien Administrative Agent, which secures the obligations under the Newco Second Lien Credit Agreement, which shall grant a second priority lien on the property that is the subject of the mortgage in favor of the Newco Second Lien Administrative Agent on behalf of the Newco Second Lien Lenders, and which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, and the Second Lien Administrative Agent.

**1.98.** "**Newco Second Lien Loan Notes**" means the notes made by Purchaser, in the form contained in the Plan Supplement as a Plan Document, that evidence the payment obligations of Purchaser under the Newco Second Lien Credit Agreement, which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, and the Second Lien Administrative Agent.

**1.99.** "**Newco Second Lien Pledge Agreement**" means that certain Pledge and Security Agreement dated as of the Effective Date, granting a second priority security interest in substantially all of the personal property assets of Purchaser, by Purchaser in favor of the Newco Second Lien Administrative Agent for the benefit of the Newco Second Lien Secured Parties, together with all documents, instruments and agreements executed or entered into in connection therewith, as amended from time to time, which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, and the Second Lien Administrative Agent.

**1.100.** "**Newco Second Lien Secured Parties**" means the Newco Second Lien Administrative Agent, and the Newco Second Lien Lenders.

**1.101.** "**New Notes**" means the Newco First Lien Loan Notes and the Newco Second Lien Loan Notes.

**1.102.** "**Non-Holdco Debtors**" means each of the Debtors, except WF Capital Holdings, Inc., WF Holdings, Inc., and Workflow Holdings Corporation.

**1.103.** "**Notice of Confirmation**" means the notice of entry of the Confirmation Order to be filed with the Bankruptcy Court and mailed by the Claims Agent to holders of Claims and Equity Interests.

**1.104.** "**Objection Deadline**" means the deadline for filing objections to Claims as set forth in Section 11.2 of the Plan.

**1.105.** "**Ohio Development Loan**" means that certain loan made pursuant to a loan agreement between The Relizon Company and the State of Ohio Director of Development, dated as of January 31, 2003, in the original principal amount of $800,000, which matures on January 31, 2013 and is secured pursuant to the Ohio Security Agreement.

**1.106.** "**Ohio Equipment**" means that certain equipment securing the Ohio Development Loan pursuant to the Ohio Security Agreement.

**1.107.** "**Ohio Security Agreement**" means that certain Security Agreement between The Relizon Company and the State of Ohio Director of Development, dated as of January 31, 2003, which grants a first priority security interest and lien in the Ohio Equipment, and provides a negative covenant precluding the encumbrance of the Ohio Equipment by any other security interest or lien.

**1.108.** "**Other Secured Claims**" means all Secured Claims other than the First Lien Lender Claims and the Second Lien Lender Claims, and including, without limitation, the Ohio Development Loan.

**1.109.** "**PBGC**" means the Pension Benefit Guaranty Corporation.

**1.110.** "**PBGC Claims**" means any and all Claims against any of the Debtors which are or were held by the PBGC pertaining to, arising from, or in connection with the Pension Plan or otherwise.

**1.111.** "**Pension Plan**" means The Relizon Company Retirement Plan, an ERISA-qualified defined benefit retirement plan effective as of January 1, 2001.

**1.112.** "**Periodic Distribution Date**" means (a) initially, the first Business Day that is one full month after the Unsecured Claims Initial Distribution Date and (b) subsequently, a Business Day designated by the Plan Administrator that occurs in the month that is one full month after the immediately preceding Periodic Distribution Date, or in the case of either (a) or (b), such earlier or later date established by the Bankruptcy Court or designated as such by the Plan Administrator in its reasonable discretion in a filing with the Bankruptcy Court.

**1.113.** "**Perseus**" means Perseus, L.L.C., Perseus Partners VII, L.P., Perseus Acquisition/Recapitalization Fund, L.L.C., Perseus 2000 Expansion, L.L.C., WF Holdings Co-Investment, L.P. and Perseus Market Opportunity Fund, L.P., and each of their respective present and former officers, directors, managers and employees.

**1.114.** "**Person**" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, unincorporated organization, governmental entity, or political subdivision thereof, or any other entity.

**1.115.** "**Petition Date**" means September 29, 2010.

**1.116.** "**Plan**" means this third amended joint chapter 11 plan of reorganization, either in its present form or as it may be amended, supplemented, or otherwise modified from time to time, and the exhibits and schedules hereto, as the same may be in effect at the time such reference becomes operative.

**1.117.** "**Plan Administrator**" means the Entity to be granted the authority and charged with the responsibilities of the "Plan Administrator" under the Plan.

**1.118.** "**Plan Administrator Reserve**" means the reserve created to fund the costs and expenses necessary to administer and perform the contemplated functions of the Plan Administrator under the Plan including, without limitation, the reasonable fees and expenses of professionals retained by the Plan Administrator and the payment of post-Effective Date costs and wind-down expenses.

**1.119.** "**Plan Distribution**" means the payment or distribution under the Plan of Cash, Assets, or instruments evidencing an obligation under the Plan to the holder of an Allowed Claim.

**1.120.** "**Plan Documents**" means the Newco First Lien Credit Agreement, the Newco First Lien Loan Notes, the Newco Second Lien Credit Agreement, the Newco Second Lien Loan Notes and any other documents designated as Plan Documents by the Debtors, with the consent of Perseus, the Purchaser and the Second Lien Administrative Agent; provided, however, that the Plan Documents may not be amended **on or** after **one (1) Business Day before** the Voting Deadline in a manner that is material and adverse to the First Lien Lenders without the consent of the First Lien Administrative Agent, which consent shall not be unreasonably withheld, or if the First Lien Administrative Agent withholds its consent, then the Plan Documents may not be amended **in a manner that is material and adverse to the First Lien Lenders** without the consent of the holders of two-thirds **in dollar amount** of the First Lien Lender Principal Claim**; provided further that any such amended Plan Documents shall be promptly served upon the First Lien Administrative Agent**.

**1.121.** "**Plan Funds**" means the aggregate amount of (a) the Administrative Expense Claims Reserve in an amount to be agreed upon on or before the Effective Date by the Debtors and Purchaser which is sufficient to pay in full all Priority Tax Claims, Priority Non-Tax Claims, and Allowed Administrative Expense Claims, not assumed by Purchaser and which will be calculated based upon the aggregate of (i) the total amount of Allowed Priority Tax Claims not assumed by the Purchaser, (ii) the total amount of Allowed Priority Non-Tax Claims not assumed by the Purchaser, (iii) estimates for all Fee Claims as provided for in the Plan, (iv) the requests for payment of Administrative Expense Claims, not assumed by the Purchaser, filed prior to the Administrative Expense Claim Bar Date, and (v) the amounts payable to the First Lien Administrative Agent and the Second Lien Administrative Agent pursuant to Section 6.2(f) of the Plan; (b) the Unsecured Claims Fund in the amount of $1 million ($1,000,000) for distribution to holders of Allowed Claims in Class 5A and 5C; and (c) the Plan Administrator Reserve in the amount of $125,000.

**1.122.** "**Plan Supplement**" means the Plan Documents, the Schedule of Cure Costs, the Schedule of Rejected Executory Contracts and Unexpired Leases, the list of Retained Contracts,

the list of Assigned Contracts, the designation of the Newco First Lien Administrative Agent and any other item designated as part of the Plan Supplement by the Debtors, with the consent of Perseus, the Purchaser and the Second Lien Administrative Agent.

1.123. "**Post-Effective Date Debtors**" means the Debtors subsequent to the Effective Date of the Plan.

1.124. "**Prepetition Agents**" means the First Lien Administrative Agent and the Second Lien Administrative Agent.

1.125. "**Prepetition Collateral**" means the Prepetition Personal Property Collateral and the Prepetition Real Property Collateral.

1.126. "**Prepetition Personal Property Collateral**" means the personal property collateral pledged pursuant to the First Lien Pledge Agreement and the Second Lien Pledge Agreement.

1.127. "**Prepetition Real Property Collateral**" means the real property collateral pledged pursuant to the First Lien Mortgages and the Second Lien Mortgages.

1.128. "**Prepetition Secured Parties**" means the First Lien Secured Parties and the Second Lien Secured Parties.

1.129. "**Priority Non-Tax Claim**" means any Claim entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

1.130. "**Priority Tax Claim**" means any Claim, whether secured or unsecured, entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.131. "**Professional**" means a Person retained or to be compensated for services rendered or costs incurred on or after the Petition Date and on or prior to the Effective Date pursuant to sections 327, 328, 329, 330, 331, or 1103 of the Bankruptcy Code or otherwise entitled to compensation as estate professionals in these Chapter 11 Cases.

1.132. "**Pro Rata Share**" means, for any Allowed Claim or Allowed Equity Interest of any class, the proportion that such Allowed Claim or Allowed Equity Interest bears to the aggregate amount of all Claims or Equity Interests of such class or classes, as applicable, including Contested Claims or Equity Interests, but excluding Disallowed Claims, as calculated by the Plan Administrator; or as determined or estimated by the Bankruptcy Court, as the case may be.

1.133. "**Purchased Assets**" shall have the meaning set forth in the Asset Purchase Agreement and shall include Avoidance Actions.

1.134. "**Purchaser**" means Newco or its assignee as permitted under the Asset Purchase Agreement.

**1.135.** "**Rejection Damage Claim**" means any Claim arising out of the rejection of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

**1.136.** "**Related Parties**" means, with respect to a Person, all of such Person's affiliates, and all of such Person's and such Person's affiliates' officers, directors, principals, shareholders, parents, subsidiaries, members, managers, auditors, accountants, financial advisors, predecessors, successors, servants, agents, counsel, attorneys, partners, insurers, underwriters, administrators, executors, representatives or assigns, whether past or present.

**1.137.** "**Releasing Parties**" means the Second Lien Administrative Agent, Perseus, holders of Claims who vote to accept the Plan and, to the extent the First Lien Administrative Agent does not file an objection or otherwise oppose the Plan, the First Lien Administrative Agent.

**1.138.** "**Retained Contracts**" shall have the meaning given in Section 12.1 of the Plan.

**1.139.** "**Revolver A**" means that portion of the Revolving Credit Facility which matures May 31, 2011.

**1.140.** "**Revolver B**" means that portion of the Revolving Credit Facility which matured November 30, 2010.

**1.141.** "**Revolving Credit Facility**" means the revolving loan facility established pursuant to the First Lien Credit Agreement.

**1.142.** "**Sale Transaction**" means that certain transaction between the Debtors and the Purchaser as set forth in the Asset Purchase Agreement.

**1.143.** "**Schedules**" means the schedules of assets and liabilities and list of Equity Interests and the statements of financial affairs filed by each of the Debtors with the Bankruptcy Court, as required by section 521 of the Bankruptcy Code and in conformity with the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be amended or supplemented by the Debtors from time to time in accordance with Bankruptcy Rule 1009.

**1.144.** "**Second Lien Administrative Agent**" means Silver Point, in its capacity as successor administrative agent for the Second Lien Secured Parties pursuant to the Second Lien Loan Documents.

**1.145.** "**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of November 30, 2005, between Workflow Management, Inc., as borrower, the Second Lien Lenders and the Second Lien Administrative Agent, as amended from time to time.

**1.146.** "**Second Lien Credit Facility**" means the term loan facility established pursuant to the Second Lien Credit Agreement.

**1.147.** "**Second Lien Guaranties**" means the Guaranties entered into by the Guarantors in favor of the Second Lien Administrative Agent, for the benefit of the Second Lien Secured Parties on account of the Second Lien Lender Claims, as amended from time to time.

**1.148.** "**Second Lien Guaranty Claims**" means any and all Claims against the Guarantors arising from or in connection with the Second Lien Guaranties.

**1.149.** "**Second Lien Lender Claims**" means the Claims, including the Second Lien Guaranty Claims, against any of the Debtors arising from or in connection with the Second Lien Loan Documents, which shall be Allowed in the aggregate amount of $196,396,149.34.

**1.150.** "**Second Lien Lender Deficiency Claims**" means the portion of the Second Lien Lender Claims that do not constitute Secured Claims, as provided for in, and determined in accordance with, section 506(a) of the Bankruptcy Code, which shall be treated in Class 5C hereof. The Allowed Second Lien Lender Deficiency Claim is the amount which is the aggregate amount of the Allowed Second Lien Lender Claims less the aggregate amount of the Allowed Second Lien Lender Secured Claims.

**1.151.** "**Second Lien Lender Secured Claims**" means the $170,000,000.00 portion of the Second Lien Lender Claims that are Secured Claims, as provided for in, and determined in accordance with, section 506(a) of the Bankruptcy Code pursuant to the Plan.

**1.152.** "**Second Lien Lenders**" means the lenders that are party, from time to time, to the Second Lien Credit Agreement.

**1.153.** "**Second Lien Loan Documents**" means the Second Lien Credit Agreement, the notes which evidence the loans outstanding under the Second Lien Credit Facility, the fee letter referred to in the Second Lien Credit Agreement, the Second Lien Pledge Agreement, the Second Lien Guaranties, the Second Lien Mortgages, and the Intercreditor Agreement, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto, as any such documents are amended from time to time.

**1.154.** "**Second Lien Mortgages**" means any mortgage recorded in favor of the Second Lien Administrative Agent which secures the Second Lien Lender Claims, as amended from time to time.

**1.155.** "**Second Lien Pledge Agreement**" means that certain Pledge and Security Agreement dated as of November 30, 2005, granting a second priority security interest in substantially all of the personal property assets of the Loan Parties, by each Loan Party in favor of the Second Lien Administrative Agent, for the benefit of the Second Lien Secured Parties, together with all documents, instruments and agreements executed or entered into in connection therewith, as amended from time to time.

**1.156.** "**Second Lien Secured Parties**" means the Second Lien Administrative Agent and the Second Lien Lenders.

**1.157.** "**Secondary Liability Claim**" means a Claim that arises from a Guaranty or a Debtor otherwise being jointly, severally or secondarily liable for, any contractual, tort or other

obligation of another Debtor, including any Claim based on: (a) guaranties of collection, payment or performance; (b) indemnity bonds, obligations to indemnify or obligations to hold harmless; (c) performance bonds; (d) contingent liabilities arising out of contractual obligations or out of undertakings (including any assignment or other transfer) with respect to leases, operating agreements or other similar obligations made or given by a Debtor relating to the obligations or performance of another Debtor; (e) vicarious liability; (f) liabilities arising out of piercing the corporate veil, alter ego liability or similar legal theories; or (g) any other joint or several liability that any Debtor may have in respect of any obligation that is the basis of a Claim.

**1.158.** "**Section 503(b)(9) Bar Date**" means the deadline for the filing of Section 503(b)(9) Claims established pursuant to an order of the Bankruptcy Court.

**1.159.** "**Section 503(b)(9) Claims**" means any Claims against any of the Debtors entitled to administrative expense status pursuant to section 503(b)(9) of the Bankruptcy Code.

**1.160.** "**Secured Claim**" means (a) a Claim secured by a lien on any Assets, which lien is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, and which is duly established in the Chapter 11 Cases, but only to the extent of the value of the holder's interest in the collateral that secures payment of the Claim; (b) a Claim against any Debtor that is subject to a valid right of setoff under section 553 of the Bankruptcy Code, but only to the extent of the Allowed amount subject to setoff as provided in section 506(a) of the Bankruptcy Code; and (c) a Claim deemed or treated under the Plan as a Secured Claim; provided, that, to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as a General Unsecured Claim unless, in any such case the class of which Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

**1.161.** "**Silver Point**" means Silver Point Finance LLC.

**1.162.** "**Subordinated Claim**" means a Claim against any Debtor subordinated by a Final Order.

**1.163.** "**Term Loan Facility**" means the term loan facility established pursuant to the First Lien Credit Agreement.

**1.164.** "**Third Party Release**" means the release set forth in Section 13.3 of the Plan.

**1.165.** "**Third Party Releasees**" means, collectively, the Second Lien Administrative Agent, each of the Second Lien Lenders that vote in favor of the Plan, the Purchaser, Perseus, each of the First Lien Lenders that vote in favor of the Plan, ~~the Related Parties of each of the foregoing~~ and, to the extent the First Lien Administrative Agent does not file an objection or otherwise oppose the Plan, the First Lien Administrative Agent**, and** the Related Parties of each of the foregoing.

**1.166.** "**Unsecured Claims Cash Amount**" means $1 million ($1,000,000) in Cash of the Plan Funds, which shall make up the Unsecured Claims Fund.

**1.167.** "**Unsecured Claims Fund**" means the Unsecured Claims Cash Amount that shall be held in a segregated interest bearing account to be established by the Plan Administrator on the Effective Date for the purpose of making distributions to holders of Class 5A and Class 5C Allowed Claims pursuant to Sections 10.5 and 10.6 of the Plan.

**1.168.** "**Unsecured Claims Initial Distribution Date**" means the date that is the two month anniversary of the Effective Date.

**1.169.** "**U.S. Trustee**" means the Office of the United States Trustee for Region 4.

**1.170.** "**Voting Deadline**" means the deadline for voting on the Plan, as defined in the Disclosure Statement.

**1.171.** "**Voting Record Date**" means the date established by the Bankruptcy Court as the record date for voting on the Plan.

**1.172.** "**WF Capital**" means WF Capital Holdings, Inc., a Delaware corporation, one of the Debtors and Debtors in Possession in the Chapter 11 Cases.

**1.173.** "**WF Capital/BB&T Note**" means the note made by WF Capital payable to Branch Banking & Trust Company, dated as of December 31, 2008, in the amount of approximately $20 million (not including accrued, and unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

**1.174.** "**WF Capital/Perseus Convertible Note**" means the amended and restated convertible note dated as of March 4, 2008, and made by WF Capital payable to Perseus Partners VII, L.P., in the amount of approximately $58.4 million (including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto, which note is convertible, at the note holder's option, to WF Equity Interests.

**1.175.** "**WF Capital/Perseus Interest Note**" means the demand note made by WF Capital payable to Perseus Market Opportunity Fund, L.P., in the amount of approximately $302,000 (including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

**1.176.** "**WF Equity Interests**" means all Equity Interests in any of the Debtors.

**1.177.** "**WF Holdings/Carlyle Note**" means the subordinated promissory note made by WF Holdings, Inc. payable to Carlyle Partners III, L.P., as holder representative for the benefit of the beneficial holders identified on Schedule I thereto, dated December 21, 2006, in the amount of approximately $12,500,000 (including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

**1.178.** "**WFMI**" means Workflow Management Inc.

**1.179.** "**Workflow Management/Perseus Note**" means the promissory note dated February 9, 2010, and made by Workflow Management, Inc. payable to Perseus, L.L.C., which was subsequently assigned by Perseus, L.L.C. to Perseus Market Opportunity Fund, L.P., in the amount of approximately $1.1 million (including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

## ARTICLE II.

## INTERPRETATION AND APPLICATION

2.1     **Interpretation**.

Unless otherwise specified, all section, article, exhibit and schedule references in the Plan are to the respective section in, article of, or exhibit or schedule to, the Plan, as the same may be amended, waived, or modified from time to time.  Words denoting the singular number shall include the plural number and vice versa, as appropriate, and words denoting one gender shall include the other gender.  The Disclosure Statement may be referred to for purposes of interpretation to the extent any term or provision of the Plan is determined by the Bankruptcy Court to be ambiguous.

2.2     **Application of Definitions and Rules of Construction Contained in the Bankruptcy Code**.

Words and terms defined in section 101 of the Bankruptcy Code have the same meanings when used in the Plan, unless a different definition is set forth in Article I hereof.  The rules of construction contained in section 102 of the Bankruptcy Code, other than section 102(5) of the Bankruptcy Code, apply to the construction of the Plan.  For the purposes of construction of the Plan, "or" is disjunctive.

2.3     **Other Terms**.

The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.  The word "including" when used herein shall mean "including without limitation" in each instance.

2.4     **Incorporation of Plan Documents**.

All appendices, exhibits and schedules to the Plan and all Plan Documents are incorporated into the Plan by this reference and are a part of the Plan as if set forth in full herein.  All Plan Documents shall be filed with the Bankruptcy Court as part of the Plan Supplement not less than ~~seven~~**ten** (~~7~~**10**) days prior to the commencement of the Confirmation Hearing or at such other time as established by the Bankruptcy Court, _provided_, _however_, that any Plan Documents that are or may be subject to confidentiality provisions or otherwise contain confidential or propriety information may be filed in redacted form or under seal.

Holders of Claims and Equity Interests may obtain a copy of the Plan Documents (in redacted form, as applicable, and excluding any Plan Documents that are filed under seal), once filed, by a written request sent to the following address:

> Workflow Ballot Processing Center
> c/o Kurtzman Carson Consultants LLC
> 2335 Alaska Ave
> El Segundo, CA 90245-4808
> T: (866) 967-1786
> www.kccllc.net/workflow

## ARTICLE III.

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

Except as otherwise provided herein, for the purposes of organization, voting and all confirmation matters, all Claims and all Equity Interests in the Debtors will be classified as set forth in this Article III.

3.1     **Administrative Expense Claims and Tax Claims**.

As provided by section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims will not be classified under the Plan, and will instead be treated separately as unclassified Claims on the terms set forth in Article VI.

3.2     **Claims and Equity Interests**.

The Claims against and the Equity Interests in, with respect to and to the extent applicable for, each Debtor are classified under the Plan as follows:

(a)     Class 1 – Priority Non-Tax Claims

Class 1 shall consist of all Priority Non-Tax Claims.

(b)     Class 2 – First Lien Lender Claims

Class 2 shall consist of all First Lien Lender Claims.

(c)     Class 3 – Second Lien Lender Secured Claims

Class 3 shall consist of the Second Lien Lender Secured Claims.

(d)     Class 4 – Other Secured Claims

Class 4 shall consist of all Other Secured Claims.

(e)     Class 5A – General Unsecured Claims against the Non-Holdco Debtors

Class 5A shall consist of all General Unsecured Claims against the Non-Holdco Debtors, other than the PBGC Claims and the Second Lien Lender Deficiency Claims.

(f)     Class 5B – General Unsecured Claims against the Holdco Debtors

Class 5B shall consist of all General Unsecured Claims against the Holdco Debtors, other than the PBGC Claims and the Second Lien Lender Deficiency Claims.

(g)     Class 5C – Multi-Debtor General Unsecured Claims

Class 5C shall consist of all Multi-Debtor General Unsecured Claims against the Debtors.

(h)     Class 6 – Intercompany Claims

Class 6 shall consist of all Intercompany Claims.

(i)     Class 7 –WF Equity Interests

Class 7 shall consist of all WF Equity Interests.

3.3     **Separate Classification of Other Secured Claims**.

Although all Other Secured Claims against the Debtors have been placed in a single class for purposes of nomenclature, each such Other Secured Claim shall be treated as a separate class for purposes of voting on the Plan and receiving Plan Distributions.

## ARTICLE IV.

## IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND EQUITY INTERESTS

4.1     **Impaired and Unimpaired Classes of Claims**.

Priority Non-Tax Claims are not impaired under the Plan.  All other classes of Claims and Equity Interests are impaired under the Plan.

4.2     **Impairment Controversies**.

If a controversy arises as to whether any Claim or Equity Interest, or any class of Claims or Equity Interests, is impaired under the Plan, the Bankruptcy Court shall, after upon notice and motion, determine such controversy at the Confirmation Hearing.

4.3     **Classification Controversies**.

If a controversy arises as to whether any Claim or Equity Interest, or any class of Claims or Equity Interests, is properly classified under the Plan, the Bankruptcy Court shall, upon motion and notice, determine such controversy at the Confirmation Hearing.  If the Bankruptcy Court finds the classification of such Claim or Equity Interest, or any class of Claims or Equity Interests, is improper, such Claims or Equity Interests shall be reclassified and the

ballots previously cast by the holders of such Claims or Equity Interests shall be counted in, and the Claim or Equity Interest shall receive the treatment prescribed in, the class in which the Bankruptcy Court determines such Claims or Equity Interests should have been classified, without the necessity of resoliciting votes on the Plan.

## ARTICLE V.

## PROVISIONS FOR TREATMENT OF CLAIMS
## AND EQUITY INTERESTS UNDER THE PLAN

The classes of Claims against and Equity Interests in, with respect to and to the extent applicable for, each Debtor shall be treated under the Plan as follows:

5.1     **Class 1 – Priority Non-Tax Claims**.

(a)     Treatment.  Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of each Allowed Priority Non-Tax Claim, each Allowed Priority Non-Tax Claim shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Claim entitles the holder in respect of such Claim shall be fully reinstated and retained, and such Allowed Priority Non-Tax Claim (including any amounts to which such holder is entitled pursuant to section 1124(2) of the Bankruptcy Code) shall be paid in full in accordance with such reinstated rights on the Effective Date or may be assumed and paid by the Purchaser and may be paid at the Purchaser's election in the ordinary course of business.

(b)     Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 16.2 of the Plan, the distributions provided in this Section 5.1 to holders of Allowed Priority Non-Tax Claims (when distributed to holders of Allowed Priority Non-Tax Claims in accordance with the Plan) are in full settlement and release of each holder's Priority Non-Tax Claim and all other Claims of such holder against any and all of the Debtors, if any, of such holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such Priority Non-Tax Claim was based.  Class 1 is unimpaired.

5.2     **Class 2 – First Lien Lender Claims**.

(i)     (a)     Treatment.  The First Lien Lender Claims shall be deemed Allowed in full in the aggregate amount of $141,528,677 (the "First Lien Lender Principal Claim") plus any accrued but unpaid post-petition interest through the Effective Date at the rate payable as provided in the Cash Collateral Orders (the "First Lien Lender Interest Claim"), and will not be subject to avoidance, setoff, off-set, recoupment, subordination (whether contractual, equitable or otherwise), recharacterization, disallowance, disgorgement, impairment, defenses, Claims, Causes of Action, suits, counterclaims, cross-claims, reduction or any other challenges under any applicable law or regulation by any person or entity.  All payments received by the First Lien Secured Parties from the Debtors during the Chapter 11 Cases shall be retained by the First Lien Secured Parties and deemed interest payments or payments of reasonable professional fees, as applicable, and not reduction in principal.  In full and final satisfaction of each Allowed First Lien Lender Claim, each holder of an Allowed First Lien Lender Claim shall receive, on the

Effective Date (i) in respect of the First Lien Lender Principal Claim, (via an exchange) its Pro Rata Share of the Newco First Lien Loan Notes and the Newco First Lien Administrative Agent, on behalf of each holder of an Allowed First Lien Lender Claim, shall retain the liens which secured the First Lien Lender Claims as of the Petition Date by means of the Newco First Lien Loan Notes being secured by first priority liens on the assets of the Purchaser in accordance with the provisions of the Newco First Lien Loan Documents; under the Newco First Lien Loan Notes, each holder of an Allowed First Lien Lender Claim shall receive deferred cash payments in the amounts and on the terms indicated on Schedule 1 attached to the Plan, and (ii) in respect of the First Lien Lender Interest Claim, cash in the amount of such interest, as provided in Section 6.2(f) of the Plan.

(b)     Distribution.  All distributions on account of the First Lien Lender Interest Claim shall be made on the Effective Date to the First Lien Administrative Agent, and all other distributions on account of the First Lien Lender Claims shall be made on the Effective Date to the Newco First Lien Administrative Agent, or its designee, which shall serve as the designee for purposes of making distributions under the Plan to holders of First Lien Lender Claims.  The Debtors shall pay the Newco First Lien Administrative Agent and the Newco First Lien Administrative Agent its fees and expenses for making distributions under the Plan incurred through the Effective Date to holders of the First Lien Lender Claims.

(c)     Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 16.2 of the Plan, the consideration provided in this Section 5.2 to the holders of First Lien Lender Claims are in full settlement and release of each holder's First Lien Lender Claim and all other Claims against any and all of the Debtors, if any, of such holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such First Lien Lender Claim was based.  Class 2 is impaired.

5.3     **Class 3 – Second Lien Lender Secured Claims**.

(a)     Treatment.  The Second Lien Lender Secured Claims shall be deemed Allowed in the aggregate amount of $170,000,000 and shall not be subject to avoidance, setoff, off-set, recoupment, subordination (whether contractual, equitable or otherwise), recharacterization, disallowance, disgorgement, impairment, defenses, Claims, Causes of Action, suits, counterclaims, cross-claims, reduction or any other challenges under any applicable law or regulation by any person or entity.  All payments received by the Second Lien Secured Parties as adequate protection from the Debtors during the Chapter 11 Cases shall be retained by the Second Lien Secured Parties and shall not be deemed a reduction in principal.  In full and final satisfaction of each Allowed Second Lien Secured Lender Claim, each holder of an Allowed Second Lien Lender Secured Claim shall receive (via an exchange) its Pro Rata Share of (i) the Newco Preferred Equity Interests, and (ii) the Newco Second Lien Loan Notes and the Second Lien Administrative Agent, on behalf of each holder of an Allowed Second Lien Secured Lender Claim, shall retain the liens which secured the Second Lien Lender Secured Claims as of the Petition Date by means of the Newco Second Lien Loan Notes being secured by second priority liens on the assets of the Purchaser in accordance with the provisions of the Newco Second Lien Loan Documents; under the Newco Second Lien Loan Notes, each holder of an Allowed Second Lien Lender Secured Claim shall receive deferred cash payments in the amounts and on the terms indicated on Schedule 2 attached to the Plan.

(b)     Distribution.  All distributions on account of the Second Lien Lender Secured Claims shall be made on the Effective Date to the Newco Second Lien Administrative Agent or its designee, which shall serve as the designee for purposes of making distributions under the Plan to holders of Second Lien Lender Secured Claims.  The Debtors shall pay the Newco Second Lien Administrative Agent its fees and expenses for making distributions under the Plan incurred through the Effective Date to holders of the Second Lien Lender Secured Claims.

(c)     Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 16.2 of the Plan, the consideration provided in this Section 5.3 to the holders of Second Lien Lender Secured Claims are in full settlement and release of each holder's Second Lien Lender Secured Claim against any and all of the Debtors, if any.  Class 3 is impaired.

5.4     **Class 4 – Other Secured Claims**.

(a)     Treatment.  Except to the extent that the holder agrees to less favorable treatment, each holder of an Allowed Other Secured Claim against any Debtor shall, at the sole option of the Purchaser and subject to such holder's realization of any rights of setoff, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, (i) retain its lien in such property, or the proceeds of such property, securing such Allowed Other Secured Claim and be paid by the Purchaser in the ordinary course of business in accordance with the terms existing between the Debtors and such holder with respect to such Allowed Other Secured Claim prior to the Petition Date; (ii) retain its lien in such property, or the proceeds of such property, securing such Allowed Other Secured Claim and receive deferred cash payments from the Purchaser totaling at least the amount of such Allowed Other Secured Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in each Debtor's interest in such property, or (iii) be transferred the collateral securing such Claim, each in full and complete satisfaction of such Claim.

(b)     Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 16.2 of the Plan, the consideration provided in this Section 5.4 to the holders of Other Secured Claims are in full settlement and release of each holder's Other Secured Claim and all other Claims against any and all of the Debtors, if any, of such holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such Other Secured Claim was based.  Class 4 is impaired.

5.5     **Class 5A – General Unsecured Claims against Non-Holdco Debtors**.

(a)     Treatment.  Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of each such Allowed General Unsecured Claim against a Non-Holdco Debtor, each holder of an Allowed General Unsecured Claim against a Non-Holdco Debtor (other than those Claims classified in Class 5C) shall receive its Pro Rata Share of the Unsecured Claims Fund.

(b)     Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 16.2 of the Plan, the consideration provided in this Section 5.5 (and the

payment or transfer of such consideration to the Unsecured Claim Fund) to the holders of General Unsecured Claims are in full settlement and release of each holder's General Unsecured Claim and all other Claims against any and all of the Debtors, if any, of such holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such General Unsecured Claim was based.  Class 5A is impaired.

5.6      **Class 5B– General Unsecured Claims against Holdco Debtors**.

Holders of Claims in Class 5B shall not receive or retain any property under the Plan on account of the General Unsecured Claims against Holdco Debtors.

5.7      **Class 5C– Multi-Debtor General Unsecured Claims**

(a)      Treatment.  Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of each such Multi-Debtor General Unsecured Claim, each holder of an Allowed Multi-Debtor General Unsecured Claim shall receive its Pro Rata Share of the Unsecured Claims Fund; provided, however, that if at least two-thirds in aggregate dollar amount and more than one-half in the aggregate number of the Allowed Claims in Class 5A that vote, vote to accept the Plan, each of the holders of the Second Lien Lender Deficiency Claim shall be deemed to agree to accept the aggregate amount of $10 on account of all of their Class 5C Claims to be paid to the Second Lien Administrative Agent; provided further, however, that, with the consent of the Debtors, the Purchaser, Perseus, and the Second Lien Administrative Agent, the PBGC may agree to receive a different treatment on account of the PBGC Claims, which shall be in full and final satisfaction and settlement of such PBGC Claims.  By way of clarification, any such satisfaction and settlement shall provide for the release of all Claims and potential claims against any of the Debtors, the Purchaser, and their respective Related Parties (including, without limitation, any claims or potential claims relating to alleged control group or alter ego status) which are or were held by the PBGC pertaining to, arising from, or in connection with the Pension Plan or otherwise.

(b)      Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 16.2 of the Plan, the consideration provided in this Section 5.6**5.7** (and the payment or transfer of such consideration to the Unsecured Claim Fund) to the holders of Multi-Debtor General Unsecured Claims are in full settlement and release of each holder's Multi-Debtor General Unsecured Claim and all other Claims against any and all of the Debtors, if any, of such holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such Multi-Debtor General Unsecured Claim was based.  Class 5C is impaired.

5.8      **Class 6 – Intercompany Claims**.

All Intercompany Claims shall be cancelled as of the Effective Date, and holders thereof shall not receive a distribution under the Plan in respect of such Claims.

5.9      **Class 7 – WF Equity Interests**.

Each holder of a WF Equity Interest shall not receive or retain any Property under the Plan on account of such WF Equity Interest. Upon the termination of the Plan Administrator in accordance with Section 9.7 of the Plan, all WF Equity Interests shall be deemed cancelled.

5.10 **Deemed Satisfaction of Secondary Liability Claims**.

All Secondary Liability Claims shall be allowed in the amount of zero dollars ($0.00) and deemed satisfied in full as a result of Plan Distributions made on the underlying Allowed Claim pursuant to Article V. From and after the Effective Date, no Secondary Liability Claims shall be of further force or effect.

5.11 **Insurance Policies**.

Notwithstanding anything to the contrary in the Plan, all insurance agreements that are not assigned to and assumed by the Purchaser, and all obligations of the Debtors and the counterparties thereto shall be unaffected by the Plan and shall remain enforceable according to their terms and applicable law; provided, however, such agreements may be terminated at the discretion of the Debtors, Post-Effective Date Debtors, or the Plan Administrator.

# ARTICLE VI.

# PROVISIONS FOR TREATMENT
# OF UNCLASSIFIED CLAIMS UNDER THE PLAN

6.1 **Unclassified Claims**.

Administrative Expense Claims and Priority Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively. Administrative Expense Claims and Priority Tax Claims are not designated as classes of Claims for the purposes of the Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

6.2 **Treatment of Administrative Expense Claims**.

All Administrative Expense Claims shall be treated as follows:

(a) <u>Time for Filing Administrative Expense Claims</u>.

The holder of an Administrative Expense Claim, other than (i) a Fee Claim; (ii) a liability incurred and payable after the Petition Date in the ordinary course of business to customers, suppliers, vendors, contractors or employees by a Debtor (which is assumed by the Purchaser pursuant to section 6.2(e) of the Plan); (iii) a Section 503(b)(9) Claim; or (iv) an Administrative Expense Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve on the Debtors, the Committee, and the U.S. Trustee, notice of such Administrative Expense Claim by the Administrative Expense Claim Bar Date for such Administrative Expense Claims that have accrued or are anticipated to accrue on or before February 28, 2011. Any estimated Administrative Expense Claim that is filed on account of an anticipated Administrative Expense Claim will establish the maximum allowable amount of such

Administrative Expense Claim. Such notice must include at a minimum (A) the name of the Debtor(s) which are purported to be liable for the Claim, (B) the name of the holder of the Claim, (C) the amount of the Claim, and (D) the basis of the Claim (including any documentation evidencing or supporting such Claim). **THE FAILURE TO FILE A NOTICE OF ADMINISTRATIVE EXPENSE CLAIM ON OR BEFORE THE ADMINISTRATIVE EXPENSE CLAIM BAR DATE AND THE FAILURE TO SERVE SUCH NOTICE TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED AND DISALLOWED WITHOUT FURTHER ORDER OF THE BANKRUPTCY COURT**. **IF FOR ANY REASON ANY SUCH ADMINISTRATIVE EXPENSE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE OF ANY KIND TO ANY PROPERTY DISTRIBUTED PURSUANT TO THE PLAN.**

   (b) <u>Time for Filing Fee Claims</u>.

   Each Professional who holds or asserts a Fee Claim shall be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Fee Application within twenty (20) days after the Effective Date or such other specific date as may be established by the Bankruptcy Court. **THE FAILURE TO FILE TIMELY AND SERVE SUCH FEE APPLICATION SHALL RESULT IN THE FEE CLAIM BEING FOREVER BARRED**.

   (c) <u>Time for Filing Section 503(b)(9) Claims</u>.

   In accordance with the Bar Date Order, the deadline for filing a Section 503(b)(9) Claim was December 8, 2010 at 5:00 p.m., Prevailing Pacific Time. **THE FAILURE TO SUBMIT SUCH REQUEST BY THE BAR DATE SHALL RESULT IN THE SECTION 503(b)(9) CLAIM BEING DEEMED DISALLOWED AS AN ADMINISTRATIVE EXPENSE CLAIM**. Such disallowance does not prevent such Claim from being Allowed as a Claim other than as an Administrative Expense Claim to the extent otherwise allowable.

   (d) <u>Allowance of Administrative Expense Claims, Fee Claims and Section 503(b)(9) Claims</u>.

   An Administrative Expense Claim (other than a Fee Claim or Section 503(b)(9) Claim) with respect to which notice has been properly and timely filed and served pursuant to Section 6.2(a) of the Plan, or a Section 503(b)(9) Claim with respect to which a request for allowance has been properly filed and served pursuant to Section 6.2(c) of the Plan, shall become an Allowed Administrative Expense Claim if no objection is filed within thirty (30) days after the later of (i) the Effective Date, or (ii) the date of service of the applicable notice of Administrative Expense Claim or such later date as may be approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing. If an objection is filed within such 30-day period (or any extension thereof), the Administrative Expense Claim shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order or by mutual agreement among the parties. A Fee Claim in respect of which a Fee Application has been properly filed and served pursuant to Section 6.2(b) of the Plan shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order.

(e)     Payment of Allowed Administrative Expense Claims.

On the Distribution Date, all unpaid Administrative Expense Claims of the Debtors arising in the ordinary course of the Debtors' business to customers, suppliers, vendors, contractors or employees during the pendency of the Chapter 11 Cases and all Section 503(b)(9) Claims shall be assumed pursuant to the terms of the Asset Purchase Agreement and paid by the Purchaser and may be paid at the Purchaser's election in the ordinary course of business; provided that all other Administrative Expense Claims, including the Fee Claims, shall not be assumed by the Purchaser and will be paid by the Plan Administrator from the Administrative Expense Claim Reserve on the applicable Distribution Date; provided, further, however, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim; provided, further, however, that all fees and expenses of counsel and other advisors to the First Lien Administrative Agent and the Second Lien Administrative Agent shall constitute Allowed Administrative Expense Claims and shall be paid by the Debtors without the necessity to file a proof of claim or file any application to receive any approval from the Bankruptcy Court. For purposes of determining the amount of the Administrative Expense Claim Reserve, at least five (5) days prior to the Effective Date, each Professional who holds or asserts a Fee Claim shall be required to provide the Debtors and Purchaser with an estimate of the total amount of its Fee Claim. Upon the Effective Date, none of the Debtors, the Post-Effective Date Debtors, or the Plan Administrator shall have any obligation or liability on account of any Administrative Expense Claims assumed by the Purchaser. Upon the Effective Date, the Purchaser shall not have any obligation or liability on account of any Administrative Expense Claims other than the funding of the Administrative Expense Claims Reserve and the Administrative Expense Claims that are assumed by the Purchaser in accordance with the terms hereof and the Asset Purchase Agreement.

(f)     Payment of Amounts Accrued But Unpaid.

Notwithstanding anything else contained in the Plan, on the Effective Date, or as soon as practicable thereafter, any accrued but unpaid interest at the rate provided in the Cash Collateral Orders and reasonable professional fees to be paid to the First Lien Administrative Agent, and unpaid reasonable professional fees to be paid to the Second Lien Administrative Agent during the pendency of the Debtors' Chapter 11 Cases pursuant to the Cash Collateral Orders shall be paid in Cash by the Plan Administrator from the Administrative Expense Claims Reserve in accordance with the terms of the Cash Collateral Orders and without the necessity of First Lien Administrative Agent or Second Lien Administrative Agent being required to seek approval of such payment from the Bankruptcy Court.

6.3     **Treatment of Priority Tax Claims**.

(a)     Unless otherwise agreed with a holder of an Allowed Priority Tax Claim, the Debtors, in their sole discretion, may choose whether Allowed Priority Tax Claims will be paid either: (1) in Cash, in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest from the Effective Date at a fixed annual rate equal to five percent (5%) and paid in regular installments of equal amount over a period not exceeding five (5) years from the Petition Date; or (2) in full in Cash on, or as soon thereafter as is reasonably practicable, the

later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim. The Debtors reserve the right to prepay, without penalty, at any time under option (1) above. Priority Tax Claims may also be assumed and paid by Purchaser at Purchaser's election.

(b)     The Confirmation Order shall, among other things, enjoin any holder of an Allowed Tax Claim from commencing or continuing any action or proceeding against any responsible person, officer or director of the Debtors that otherwise would be liable to such holder for payment of a Tax Claim so long as the Debtors are in compliance with Section 6.3 of the Plan. So long as the holder of an Allowed Tax Claim is enjoined from commencing or continuing any action or proceeding against any responsible person, officer or director under the Plan or pursuant to the Confirmation Order, the statute of limitations for commencing or continuing any such action or proceeding shall be tolled.

## ARTICLE VII.

## ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY INTERESTS

7.1     **Classes Entitled to Vote**.

Only holders of Claims in the following classes are permitted to vote on the Plan: Class 2 (First Lien Lender Claims); Class 3 (Second Lien Lender Secured Claims); Class 4 (Other Secured Claims); Class 5A (General Unsecured Claims of Non-Holdco Debtors); and Class 5C (Multi-Debtor General Unsecured Claims).

7.2     **Class Acceptance Requirement**.

A class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such class that have voted on the Plan.

7.3     **Tabulation of Votes on a Non-Consolidated Basis**.

The Balloting Agent will tabulate all votes on the Plan on a non-consolidated basis by class and by Debtor.

7.4     **Separate Plan for Each Debtor**.

The Plan constitutes a joint chapter 11 plan of reorganization proposed with respect to each Debtor and, accordingly, the classifications set forth in Classes 1 through 7 shall be deemed to apply to each of the Debtors separately, as applicable. For example, without limitation and for illustration purposes only, WF Capital is not a borrower or a guarantor on the First Lien Loan Documents or the Second Lien Loan Documents; therefore the WF Capital Plan does not contain a Class 2 or Class 3 as WF Capital has no creditors that would be classified in Class 2 or Class 3. In the event that the Bankruptcy Court determines that the Plan is not confirmable with respect to any particular Debtor, the Debtors, with the consent of the Purchaser,

Perseus and the Second Lien Administrative Agent, which consent will not be unreasonably withheld, reserve the right to sever such Debtor from the Plan and proceed to confirm and consummate the Plan with respect to all other Debtors.

7.5     **Cramdown**.

        If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a) of the Bankruptcy Code, except subsection (8) thereof, the Plan shall be treated as a request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the failure to satisfy the requirements of section 1129(a)(8), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each class of Claims that is impaired under, and has not accepted, the Plan.

## ARTICLE VIII.

## MEANS FOR IMPLEMENTATION OF THE PLAN

8.1     **Sale of Assets, Consummation of Sale Transaction and Distribution of New Notes and Newco Preferred Equity Interests**

        On the Effective Date, the Debtors shall consummate the Sale Transaction and, among other things, the Purchased Assets including the Assigned Contracts, shall be transferred to the Purchaser free and clear of all liens, Claims, interests and encumbrances, other than Permitted Liens (as defined and provided in the Asset Purchase Agreement), pursuant to the terms of the Asset Purchase Agreement and the Confirmation Order.  In consideration of the Purchased Assets, the Purchaser shall execute and deliver the New Notes and the Newco Preferred Equity Interests to the Debtors, and the Debtors shall distribute the Newco First Lien Loan Notes to the Newco First Lien Administrative Agent in satisfaction of the First Lien Lender Claims, and the Debtors shall distribute the Newco Second Lien Loan Notes and the Newco Preferred Equity Interests to the Newco Second Lien Administrative Agent in satisfaction of the Second Lien Lender Secured Claims.  The New Notes shall be secured by the assets of the Purchaser, in accordance with the provisions of the Newco First Lien Loan Documents and the Newco Second Lien Loan Documents.  The Newco Intercreditor Agreement shall govern the relative priorities and rights between the holders of the Newco First Lien Loan Notes and the Newco Second Lien Loan Notes.  On the Effective Date, upon the consummation of the Sale Transaction, the Newco First Lien Loan Notes, the Newco Second Lien Loan Notes, the Newco Preferred Equity Interests, the Newco First Lien Loan Documents, the Newco Second Lien Loan Documents and the Newco Intercreditor Agreement shall each be executed and delivered by the Purchaser and shall be in full force and effect according to its terms.

8.2     **Certain Transactions On the Effective Date**.

        The Debtors shall, on the Effective Date (i) consummate the Sale Transaction; (ii) distribute the New Notes and the Newco Preferred Equity Interests; (iii) implement all settlements and compromises as set forth in or contemplated by the Plan; (iv) amend and restate their constituent documents in accordance with the terms of the Plan; and (v) execute, deliver, and perform all obligations under the Plan Documents.

8.3 **Appointment of Plan Administrator.**

On the Effective Date, the Plan Administrator shall be appointed and shall act in accordance with the provisions of the Plan, including, without limitation, the provisions of Article IX of the Plan. On the Effective Date, the Plan Funds shall be established from the Closing Consideration Amount and shall be under the control of the Plan Administrator in accordance with the terms of the Plan.

8.4 **Unsecured Claims Fund.**

On the Effective Date, the Unsecured Claims Fund will be established in the amount of $1 million ($1,000,000) from the Plan Funds. The Plan Administrator will administer the Unsecured Claims Fund in accordance with the provisions of the Plan and the Confirmation Order. The Unsecured Claims Fund will be the sole source of funding of distributions to be made to the holders of Allowed Claims in Class 5A and 5C.

8.5 **Cancellation of Notes and Equity Interests**

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing indebtedness of the Debtors and Equity Interests shall be cancelled, and the obligations of the Debtors thereunder or in any way related thereto shall be discharged. On the Effective Date, The Relizon Company's participation in the First Lien Credit Facility shall be deemed to be retired and satisfied in full.

8.6 **Corporate Action**.

(a) The entry of the Confirmation Order shall constitute authorization for the Debtors or the Plan Administrator (as the case may be) to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including without limitation, any action required by the stockholders or directors of the Debtors, including, among other things, (i) the adoption or amendment of any organizational documents; (ii) the modification, termination or cancellation of any outstanding instrument, document or agreement as required by the Plan; (iii) the modification, termination or cancellation of any Equity Interest of the Debtors, as required by the Plan; (iv) the appointment of the Plan Administrator; (v) the distribution of the New Notes and the Newco Preferred Equity Interests; (vi) all transfers of Assets that are to occur pursuant to the Plan; (vii) the making of all Plan Distributions; (viii) the implementation of all settlements and compromises as set forth in or contemplated by the Plan; (ix) performance and consummation of the Asset Purchase Agreement and consummation of the Sale Transaction; and (x) executing and/or entering into any and all transactions, contracts, or arrangements permitted by applicable law, order, rule or regulation.

(b) The officers of the Debtors or the Post-Effective Date Debtors (as the case may be) are authorized and directed to do all things and to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Plan and to take all necessary action required in connection therewith, in the name of and on behalf of the Debtors.

(c)     The constituent documents of all of the Post-Effective Date Debtors shall, as of the Effective Date, be amended to prohibit the issuance of non-voting equity securities by such Debtor as required by section 1123(a)(6) of the Bankruptcy Code.  Following the Effective Date, the Post-Effective Date Debtors shall be entitled to issue non-voting securities that are not equity securities, in their sole discretion, and shall be entitled to issue non-voting equity securities if the constituent documents are properly amended in the ordinary course after the Effective Date.

8.7     **Continued Corporate Existence of the Debtors**.

Each of the Debtors shall continue to exist after the Effective Date as a separate entity, with all the powers available to such legal entity, in accordance with applicable law and pursuant to their constituent documents, as modified by the Plan.  On or after the Effective Date, the Post-Effective Date Debtors may, within the Plan Administrator's sole and exclusive discretion, take such action as permitted by applicable law, their constituent documents, and the Plan Documents, as they determine is reasonable and appropriate, underline including (a) causing any or all of the Post-Effective Date Debtors to be dissolved or merged, combined, consolidated or converted into one or more of the other Post-Effective Date Debtors or other legal entities; (b) liquidating and dissolving any of the Post-Effective Date Debtors; and (c) changing the legal name of any of the Post-Effective Date Debtors.  New Equity Interests in any such Post-Effective Date Debtors, on terms determined by the Plan Administrator, shall be deemed to have been issued, as of the Effective Date, by such Post-Effective Date Debtors to its immediate parent as of the Petition Date or the Plan Administrator, as necessary and as applicable.

Upon the filing with the Bankruptcy Court, by the Plan Administrator, of a request to close the Bankruptcy Cases and upon the entry of a final decree, each of the Debtors will be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; provided, however, that the Plan Administrator may file on behalf of each Debtor, with the office of the applicable secretary of state, a certificate of dissolution.  From and after the Effective Date, each of the Debtors shall not be required to file any document, or take any other action, to withdraw its business operation from any state in which it was previously conducting its business operations.  On the date the Debtors are dissolved in accordance with the Plan, the common stock certificates and other instruments evidencing WF Equity Interests will be deemed cancelled without further act or action under any applicable agreement, law, regulation, order or rule, and the Equity Interests in the Debtors evidenced thereby will be extinguished.

8.8     **Reserved.**

8.9     **Revesting of Assets**.

Except as otherwise provided in the Plan, the Plan Documents, or in any agreements contemplated under the Plan, on the Effective Date all Excluded Assets (but no other assets) will vest in the Post-Effective Date Debtors free and clear of all Claims, liens, charges, encumbrances, or other interests.  However, property that the Post-Effective Date Debtors hold will be held in trust solely for the benefit of entities that are entitled under the Plan to receive that property or the net proceeds from the liquidation of that property.

8.10    **Assumption of Priority Claims by Purchaser**.

On the Effective Date, the Purchaser shall assume the obligations to pay Priority Tax Claims and Priority Non-Tax Claims listed on the Assumed Priority Claim Schedule. Upon the Effective Date, the Purchaser shall be solely liable for the payment of all such Priority Tax Claims and Priority Non-Tax Claims listed on the Assumed Priority Claim Schedule in accordance with the terms of the Plan. Upon the Effective Date, none of the Debtors, the Post-Effective Date Debtors, or the Plan Administrator shall have any obligation or liability on account of any such assumed Priority Tax Claims and Priority Non-Tax Claims.

8.11    **Release of Liens**.

Except as otherwise provided in the Plan (including, without limitation, the retention of liens described in Sections 5.2(a) and 5.3(a) of the Plan) or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Plan Distributions made pursuant to the Plan, all interests, mortgages, deeds of trust, liens or other security interests against the property of any Estate will be fully released.

Except as otherwise provided in the Asset Purchase Agreement, on the Effective Date all Purchased Assets shall be transferred to the Purchaser free and clear of all Claims or encumbrances pursuant to sections 105, 363, 365, 1123 and 1141(c) of the Bankruptcy Code.

8.12    **Substantive Consolidation**.

In the event that at or before the Confirmation Hearing, the Bankruptcy Court concludes, pursuant to Bankruptcy Code sections 105(a) and 1123(a)(5)(C), that substantive consolidation of one or more of the Debtors with one or more of the other Debtors is appropriate, and the Debtors, with the consent of Purchaser and the Second Lien Administrative Agent, which consent shall not unreasonably be withheld, reserve the right to request such consolidation, then, unless otherwise ordered by the Bankruptcy Court, all property, rights, and Claims of the substantively consolidated Debtors and their respective Estates, and all Claims against the substantively consolidated Debtors and their respective Estates shall be deemed pooled on the Effective Date for purposes of allowance, treatment, and Plan Distributions under the Plan and multiple proofs of Claim on account of any Claim upon which any of the substantively consolidated Debtors are co-obligors or guarantors or otherwise may be contingently liable shall, without necessity of objection by any party, be deemed to constitute a single proof of Claim entitled to a single satisfaction from the substantively consolidated Estates in accordance with the terms of the Plan; the duplicative Claims being otherwise deemed disallowed; provided, however, that the Purchaser or Second Lien Administrative Agent may withhold their consent in their sole discretion if any such substantive consolidation negatively affects the treatment provided to the First Lien Secured Parties, the Second Lien Secured Parties or Purchaser**. No request for substantive consolidation has been made as of the date hereof, and no request for substantive consolidation that is made shall be of any effect unless and until it is ordered by the Bankruptcy Court**.

8.13    **Initial Boards of Directors and Officers**.

On the Effective Date, the charters and by-laws of each Debtor shall be deemed amended, to the extent necessary, to require only one director and only one officer, who shall be the same person.  Such person shall be the Plan Administrator, or its designee.

8.14    **Remittance of Excess Plan Funds to the Purchaser.**

After the discharge by the Plan Administrator of all of its duties under the Plan, all Plan Funds, if any, remaining after the payment of all parties by the Plan Administrator in accordance with terms of the Plan, and after payment by the Plan Administrator of all of its expenses as provided in the Plan, will be remitted and absolutely assigned by the Plan Administrator to the Purchaser.

8.15    **Exemption from Securities Laws**.

The issuance of the New Notes and the Newco Preferred Equity Interests in exchange for claims or interests will be, to the maximum extent provided in section 1145 of the Bankruptcy Code and under other applicable nonbankruptcy law, exempt from registration under any applicable federal or state securities laws, including under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder, and the Debtors believe the Purchaser will not be subject to the reporting requirements of the Securities Exchange Act of 1934.  The New Notes and the Newco Preferred Equity Interests issued in connection with the Plan in reliance on section 1145 of the Bankruptcy Code may be freely transferred, subject to any restrictions contained in the governing documents for each instrument, unless the recipients are underwriters as provided in section 1145 of the Bankruptcy Code.  Nothing in the Plan is intended to preclude the Securities and Exchange Commission from performing its statutory duties regarding any person or entity in any forum with proper jurisdiction.

## ARTICLE IX.

## THE PLAN ADMINISTRATOR

9.1    **Generally**.

The powers, authority, responsibilities and duties of the Plan Administrator are set forth herein.

9.2    **Appointment of the Plan Administrator**.

On the Effective Date the Plan Administrator will be appointed.  The Plan Administrator shall be selected by the Committee so long as the Committee does not file an objection or otherwise oppose the Plan.  Should the Committee file an objection or otherwise oppose the Plan, the Debtors shall select the Plan Administrator.  The Plan Administrator shall have all powers, rights, duties and protections afforded the Plan Administrator under the Plan. All payments required or permitted to be made by the Plan Administrator or the Post-Effective Date Debtors under the Plan, including, without limitation, post-Effective Date operating expenses and the Plan Administrator Reserve, shall be made from the Plan Funds.  The Plan

Administrator shall use the Plan Administrator Reserve to fund the post-Effective Date operating and wind-down expenses of the Debtors, including to pay its professional fees.

9.3 **Funding Expenses of the Plan Administrator**.

On and after the Effective Date, the Plan Funds shall be under the direction and control of the Plan Administrator. The Plan Administrator shall disburse the Plan Funds, without further application to or order of the Bankruptcy Court, to (i) satisfy the obligations of the Plan Administrator and the Post-Effective Date Debtors after the Effective Date incurred in accordance with the provisions of the Plan and the Confirmation Order, (ii) pay the expenses from the Plan Administrator Reserve, and (iii) make the Plan Distributions. Professional fees and other wind-down expenses incurred by the Plan Administrator from and after the Effective Date in connection with the consummation and implementation of the Plan shall be paid in the ordinary course of business by the Plan Administrator from the Plan Administrator Reserve, without further application to or order of the Bankruptcy Court. Any dispute regarding compensation shall be resolved by agreement of the parties or if the parties are unable to agree, as determined by the Bankruptcy Court. The Plan Administrator Reserve will be the sole source of funding of distributions to pay the expenses of the Plan Administrator and any professionals retained by the Plan Administrator.

9.4 **Service and Removal**.

If the Plan Administrator resigns or is terminated, the U.S. Trustee shall select a new Plan Administrator, subject to Bankruptcy Court approval.

9.5 **Authority**.

The Plan Administrator shall have the authority and right on behalf of the Post-Effective Date Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

(a) control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors;

(b) receive, hold and disburse the Plan Funds in accordance with the provisions of the Plan;

(c) make Plan Distributions to holders of Allowed Claims in accordance with the Plan;

(d) administer the Excluded Assets;

(e) exercise its reasonable business judgment to direct and control the wind down, liquidation and/or abandoning of the assets of the Post-Effective Date Debtors;

(f) retain and pay professionals to assist in performing its duties under the Plan;

(g) maintain the books and records and accounts of the Post-Effective Date Debtors;

(h) invest Cash constituting the Plan Funds;

(i) incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator;

(j) administer each Post-Effective Date Debtor's tax obligations, including (a) filing and paying tax returns, (b) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of such Debtor ending after the Petition Date through the liquidation of such Debtor as determined under applicable tax laws and (c) representing the interest and account of each Debtor or its estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(k) take all action necessary to liquidate and dissolve each of the Post-Effective Date Debtors;

(l) prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Post-Effective Date Debtors that are required by any Governmental Unit or applicable law;

(m) cooperate with The Workflow Management Benefit Plan Administrative Committee, or any successor thereto, pertaining to the Pension Plan, provided that neither the **Purchaser, the** Plan Administrator nor the Post-Effective Date Debtors will have any liability or responsibility to make payments or contributions to the Pension Plan or on account of the PBGC Claims, other than as provided in Class 5C of the Plan; and

(n) remit any remaining Plan Funds to the Purchaser, in accordance with the provisions of Section 8.14 of the Plan.

9.6 **Plan Distribution Withholding**.

The Plan Administrator may withhold from amounts distributable to any Person any and all amounts, determined in the Plan Administrator's sole discretion, to be required by the Plan, any law, regulation, rule, ruling, directive or other governmental requirement.

9.7 **Termination of the Plan Administrator.**

The duties, responsibilities and powers of the Plan Administrator will terminate upon (i) the completion of its duties under the Plan, (ii) the completion of the administration of, and distributions on account of, all Claims under the Plan, and (iii) the closing of the Chapter 11 Cases.

9.8 **Plan Administrator Post-Effective Date**.

**Except** as otherwise provided in this Section 9.8, the Plan Administrator, together with its officers, directors, employees, agents, and representatives, are exculpated pursuant to the Plan by all Persons, Entities, holders of Claims and Equity Interests, and all other parties in interest, from any and all Causes of Action arising out of the discharge by the Plan Administrator of the powers and duties conferred upon the Plan Administrator by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in the furtherance of the Plan, or applicable law, **except** solely for actions or omissions arising out of the Plan Administrator's willful misconduct or gross negligence. No holder of a Claim or an Equity Interest, or representative thereof, shall have or pursue any Cause of Action (a) against the Plan Administrator or its officers, directors, employees, agents, and representatives for making Plan Distributions in accordance with the Plan, or (b) against any holder of a Claim for receiving or retaining Plan Distributions as provided for by the Plan. Nothing contained in this Section 9.8 shall preclude or impair any holder of an Allowed Claim or Allowed Equity Interest from bringing an action in the Bankruptcy Court against any Debtor or Post-Effective Date Debtor to compel the making of Plan Distributions contemplated by the Plan on account of such Claim or Equity Interest.

## ARTICLE X.

## PLAN DISTRIBUTION PROVISIONS

10.1    **Sources of Cash for Plan Distributions**.

All Cash necessary for the Plan Administrator to make payments and Plan Distributions shall be obtained from the Plan Funds.

10.2    **Investment of Funds Held by the Plan Administrator; Tax Reporting by the Plan Administrator**.

The Plan Administrator may, but shall not be required to, invest any funds held by the Plan Administrator pending the distribution of such funds pursuant to the Plan in investments that are exempt from federal, state, and local taxes. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Plan Administrator of a private letter ruling if the Plan Administrator so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Administrator), the Plan Administrator may (a) treat the funds and other property held by it as held in a single trust for federal income tax purposes in accordance with the trust provisions of the Internal Revenue Code (sections 641 et seq.), and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

10.3    **Timing of Plan Distributions**.

Except as otherwise provided in the Plan, without in any way limiting Article XI of the Plan, payments and distributions in respect of Allowed Claims will be made by the Plan Administrator on the relevant Distribution Date, provided, however, that (i) payments and distributions in respect of the Allowed First Lien Lender Claims will be made on the Effective Date in accordance with Section 5.2 of the Plan, (ii) payments and distributions in respect of the

Allowed Second Lien Lender Secured Claims will be made on the Effective Date in accordance with Section 5.3 of the Plan, and (iii) payments and distributions in respect of the Allowed Class 5A and 5C Claims will be made on the Unsecured Claims Initial Distribution Date or a Periodic Distribution Date in accordance with Section 10.5 of the Plan.

For federal income tax purposes, except to the extent a Plan Distribution is made in connection with reinstatement of an obligation pursuant to section 1124 of the Bankruptcy Code, a Plan Distribution will be allocated first to the principal amount of a Claim and then, to the extent the Plan Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

10.4 **Unsecured Claims Fund**.

(a) <u>Estimation</u>.

For purposes of effectuating the reserve provisions of the Plan and the allocations and distributions to holders of Allowed Class 5A and 5C Claims, the Bankruptcy Court will, on or prior to the Unsecured Claims Initial Distribution Date, pursuant to Section 11.6 of the Plan, fix or liquidate the amount of any Contested Class 5A or Class 5C Claim, in which event the amount so fixed will be deemed the Allowed amount of such Claim for purposes of the Plan or, in lieu thereof, the Court will determine the Maximum Allowable Amount. The Bankruptcy Court's entry of an estimation order may limit the distribution to be made on individual Contested Claims, regardless of the amount finally Allowed on account of such Contested Claims, and no holder shall have recourse against the Debtors or the Plan Administrator as such holder's sole recovery shall be from the Unsecured Claims Cash Amount.

(b) <u>Creation of Unsecured Claims Fund</u>.

Upon the occurrence of the Effective Date, the Plan Administrator shall deposit the Unsecured Claims Cash Amount in the Unsecured Claims Fund. The Unsecured Claims Fund and all amounts therein (including any interest actually earned thereon) shall be maintained by the Plan Administrator for distribution in accordance with Section 10.5 of the Plan to holders of Allowed Class 5A and Class 5C Claims.

10.5 **Distributions After Allowance of Contested Class 5A and Class 5C Claims**.

Distributions to each holder of a Contested Class 5A and Class 5C Claim, to the extent that such General Unsecured Claim ultimately becomes an Allowed General Unsecured Claim, will be made in accordance with the provisions of the Plan. From and after the Unsecured Claims Initial Distribution Date, as soon as practicable after the date that the order or judgment of the Court allowing any Contested General Unsecured Claim becomes a Final Order, the Plan Administrator will distribute to the holder of such Allowed General Unsecured Claim its Pro Rata Share of the Unsecured Claims Fund, based on the Maximum Allowable Amount of all the then Contested Class 5A or Class 5C Claims, on the next Periodic Distribution Date that is at least fifteen (15) days after the date of such Final Order. All amounts actually earned in respect of the Unsecured Claims Cash Amount (including all interest) shall be for the benefit of holders of Allowed General Unsecured Claims.

10.6    **Distributions After Disallowance of Contested Class 5A or Class 5C Claims.**

Holders of Allowed General Unsecured Claims that receive an initial distribution after allowance of such holder's General Unsecured Claim as set forth in Section 10.5 of the Plan, may receive subsequent distributions if and to the extent that other Class 5A or Class 5C Claims are disallowed or expunged, as follows: on a Periodic Distribution Date, each holder of an Allowed Class 5A or Class 5C Claim that has previously received any distributions pursuant to Section 10.5 of the Plan, shall receive a distribution in an amount equal to the difference, if any, between such holder's Pro Rata Share of the Unsecured Claims Fund and the aggregate payments previously paid to such holder under Section 10.5 of the Plan (excluding interest) and any interest actually earned thereon, (except for a final distribution after all Contested Class 5A or Class 5C Claims are either Allowed or expunged) until all Contested Class 5A or Class 5C Claims have been Allowed or expunged, in whole or part, and no additional distribution will be made prior thereto. The Plan Administrator may, in their discretion, make each Periodic Distribution Date more frequent than every month. If after all Contested Claims are resolved and all distributions are made in accordance with Section 10.5 of the Plan, at least $5,000 remains in the Unsecured Claims Fund, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of the remaining Cash. If less than $5,000 remains, such amount shall be returned to the Purchaser.

10.7    **Address for Delivery of Plan Distributions/Unclaimed Distributions**.

Subject to Bankruptcy Rule 9010, any Plan Distribution or delivery to a holder of an Allowed Claim shall be made at the address of such holder as set forth (a) in the Schedules, (b) on the proof of Claim filed by such holder, (c) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e) or (d) in any notice served by such holder giving details of a change of address. If any Plan Distribution is returned to the Plan Administrator as undeliverable, no Plan Distributions shall be made to such holder unless the Plan Administrator is notified of such holder's then current address within ninety (90) days after such Plan Distribution was returned. After such date, if such notice was not provided, a holder shall have forfeited its right to such Plan Distribution, and the undeliverable Plan Distributions shall be returned to the Plan Administrator. Supplemental Plan Distributions may be made from time to time at the discretion of the Plan Administrator.

Notwithstanding any provisions in the Plan to the contrary, the First Lien Loan Documents and the Second Lien Loan Documents will continue in effect only to the extent necessary to allow Plan Distributions on account of the Allowed First Lien Lender Claims and the Allowed Second Lien Lender Claims.

10.8    **Time Bar to Cash Payments**.

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Plan Administrator by the holder of the Allowed Claim to whom such check was originally issued. Any Claim in respect of such a voided check shall be made within one hundred and eighty (180) days after the date of issuance of such check. If no request is made as provided in the preceding sentence, any Claims in respect

of such void check shall be discharged and forever barred and such unclaimed Plan Distribution shall revert to the Post-Effective Date Debtors, provided that an unclaimed Plan Distribution of a holder of a Class 5A claim shall remain part of the Unsecured Claims Fund to be treated in accordance with the provisions of the Plan.

10.9 **Manner of Payment under the Plan**.

Unless the Person receiving a Plan Distribution agrees otherwise, any Plan Distribution to be made in Cash under the Plan shall be made, at the election of the Plan Administrator, by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors may, in addition to the foregoing, be made, at the option of the Plan Administrator, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. Notwithstanding the foregoing sentence or any other provision of the Plan to the contrary, Cash paid on account of First Lien Lender Claims or otherwise available to the First Lien Administrative Agent or the Second Lien Administrative Agent will be made on the Effective Date by wire transfer to the First Lien Administrative Agent or the Second Lien Administrative Agent, as applicable.

10.10 **Minimum and Fractional Distributions**.

Any other provision of the Plan notwithstanding, the Plan Administrator will not be required to make distributions or payments on account of any Allowed Claim of less than $50 (whether Cash or otherwise), and will likewise not be required to make distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment will be rounded to the nearest whole dollar (with any amount equal to or less than one-half dollar to be rounded down).

10.11 **Surrender and Cancellation of Instruments**.

Unless otherwise provided in the Plan, as a condition to receiving any Plan Distribution, on or before the Distribution Date, the holder of an Allowed Claim evidenced by a certificate, instrument or note, other than any such certificate, instrument or note that is being reinstated or being left unimpaired under the Plan, shall (i) surrender such certificate, instrument or note representing such Claim, and (ii) execute and deliver such other documents as may be necessary to effectuate the Plan in the sole determination of the Plan Administrator. Such certificate, instrument or note, shall thereafter be cancelled and extinguished. The Plan Administrator shall have the right to withhold any Plan Distribution to be made to or on behalf of any holder of such Claims unless and until (a) such certificates, instruments or notes are surrendered, or (b) any relevant holder provides to the Plan Administrator an affidavit of loss or such other documents as may be required by the Plan Administrator together with an appropriate indemnity in the customary form. Any such holder who fails to surrender such certificates, instruments or notes, or otherwise fails to deliver an affidavit of loss and indemnity prior to the second anniversary of the Effective Date, shall be deemed to have forfeited its Claims and shall not participate in any Plan Distribution. All property in respect of such forfeited Claims shall revert to the Post-Effective Date Debtors.

# ARTICLE XI.

## PROCEDURES FOR RESOLVING
## AND TREATING CONTESTED CLAIMS

11.1    **Prosecution of Contested Claims**.

After the Effective Date, only the Plan Administrator may object to the allowance of Contested Claims, and Purchaser shall reasonably cooperate with the Plan Administrator with respect to any such objections to the allowance of Contested Claims; provided, however, that Purchaser may elect to assume responsibility to object to and settle (in consultation with the Plan Administrator and on notice and a hearing) any Contested Claim if Purchaser believes in good faith that the prosecution and/or resolution of any Contested Claim may have a material impact on Purchaser's business. All objections that are filed and prosecuted as provided herein shall be litigated to Final Order or compromised and settled in accordance with Section 11.3 of the Plan. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the holder of a Claim if the Plan Administrator effects service in any of the following manners: (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (b) to the extent counsel for a holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto; or (c) by first class mail, postage prepaid, on any counsel that has appeared on behalf of any holder of a Claim in the Chapter 11 Cases.

11.2    **Objection Deadline**.

As soon as practicable, but in no event later than one hundred and eighty (180) days after the Effective Date (subject to being extended by the order of the Bankruptcy Court upon motion of the Plan Administrator without notice or a hearing), objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made.

11.3    **Claims Settlement**.

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Plan Administrator shall have authority to settle, compromise and pay in accordance with the Plan all Claims and Causes of Action without further review or approval of the Bankruptcy Court.

11.4    **Entitlement to Plan Distributions Upon Allowance**.

Notwithstanding any other provision hereof, and subject to Section 11.3 of the Plan, if any portion of a Claim is a Contested Claim, no Plan Distribution provided hereunder shall be made on account of such Claim unless and until such Claim becomes an Allowed Claim that is not a Contested Claim, subject to the setoff rights as provided in Section 16.13 of the Plan. When a Claim that is not an Allowed Claim as of the Effective Date becomes an Allowed Claim the holder of such Allowed Claim shall thereupon become entitled to receive the Plan

Distributions in respect of such Claim the same as though such Claim had been an Allowed Claim on the Effective Date.

11.5    **Contested Claims Reserve**.

The Plan Administrator may establish a Contested Claims Reserve in a segregated account for the purpose of effectuating Plan Distributions to the holders of Contested Claims pending the allowance or disallowance of such Claims in accordance with the Plan.

11.6    **Estimation of Claims**.

The Debtors (prior to the Effective Date) or the Plan Administrator (subsequent to the Effective Date) may at any time request that the Bankruptcy Court estimate any contingent, unliquidated or Contested Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Plan Administrator previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Claim, the amount so estimated shall constitute (a) the Allowed amount of such Claim, which shall be classified as a General Unsecured Claim; (b) a maximum limitation on such Claim; or (c) in the event such Claim is estimated in connection with the estimation of other Claims, a maximum limitation on the aggregate amount of Allowed Claims on account of Claims so estimated. In the event that the Bankruptcy Court estimates any unliquidated or Contested Claim, the amount so estimated shall constitute (a) the Allowed amount of such Contested Claim; (b) a maximum limitation on such Contested Claim; or (c) in the event such Contested Claim is estimated in connection with the estimation of other Contested Claims within the same Class, a maximum limitation on the aggregate amount of Allowed Claims on account of such Contested Claims so estimated. If the estimated amount constitutes a maximum limitation on the amount of such Claim, or on more than one such Claim within a Class of Claims, as applicable, the Debtors or the Plan Administrator may pursue supplementary proceedings to object to the allowance of such Claims. All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn or otherwise resolved by any mechanism approved by the Bankruptcy Court including the provisions in the Plan, including section 11.3 of the Plan. For the avoidance of doubt, Section 11.6 of the Plan shall not apply to the First Lien Lender Claims, the Second Lien Lender Claims, or to any amounts payable under the Plan to the First Lien Lenders, the First Lien Administrative Agent, the Second Lien Lenders, or the Second Lien Administrative Agent.

11.7    **No Recourse Against the Debtors, the Purchaser or the Post-Effective Date Debtors**.

Any holder of a Contested Claim that ultimately becomes an Allowed Claim shall be entitled to receive its applicable Plan Distribution under the Plan solely from any Contested Claim Reserve established on account of such Contested Claims. In no event shall any holder of a Contested Claim have any recourse with respect to Plan Distributions made, or to be made,

under the Plan to holders of such Claims, to any Debtor, the Purchaser or the Post-Effective Date Debtors on account of such Contested Claim, regardless of whether such Contested Claim shall ultimately become an Allowed Claim, and regardless of whether sufficient Cash or other property remains available for distribution in the Contested Claim Reserve established on account of such Contested Claims at the time such Claim becomes entitled to receive a Plan Distribution under the Plan.

# ARTICLE XII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 12.1 **Assumption and Rejection of Executory Contracts and Unexpired Leases**.

(a)     The Assigned Contracts shall be assumed and assigned to the Purchaser pursuant to the provisions of section 365 of the Bankruptcy Code effective as of and subject to the occurrence of the Effective Date, unless another date is specified in the Plan.  "Assigned Contracts" means all executory contracts and unexpired leases of the Debtors listed on schedule 2.2(f) of the Seller's disclosure schedules to the Asset Purchase Agreement, ~~which schedule~~**and a list of such contracts and leases** will be contained in the Plan Supplement, except for the Excluded Contracts and Retained Contracts.  "Retained Contracts" means all contracts listed on schedule 2.3(b)(ii) of the Seller's disclosure schedules to the Asset Purchase Agreement, which **list** will be contained in the Plan Supplement.  The Debtors will assume any Retained Contracts that are executory.  Each executory contract and unexpired lease to be assumed, or assumed and assigned, shall include modifications, amendments, supplements, restatements or other similar agreements made directly or indirectly by any agreement, instrument or other document that affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on the schedule to the Disclosure Statement or any "Schedule of Rejected Executory Contracts and Unexpired Leases."

(b)     The Plan shall constitute a motion to reject such executory contracts and unexpired leases as set forth in the schedule to the Disclosure Statement or any subsequently filed Schedule of Rejected Executory Contracts and Unexpired Leases as of the effective date denoted on the Schedule of Rejected Executory Contracts and Unexpired Leases.  Entry of the Confirmation Order by the clerk of the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code, subject to the occurrence of the Effective Date, and a finding by the Bankruptcy Court that each such rejected agreement, executory contract or unexpired lease is burdensome and that the rejection thereof is in the best interests of the Debtors and their estates.  Each executory contract and unexpired lease to be rejected shall include all modifications, amendments, supplements, restatements or other similar agreements made directly or indirectly by any agreement, instrument or other document that affects such rejected executory contract or unexpired lease.

(c)     The Plan shall constitute a motion to assume and assign the Assigned Contracts to the Purchaser pursuant to this Section 12.1, and the Debtors and Post-Effective Date Debtors shall have no liability thereunder, except as is specifically provided in the Plan.  The Plan will constitute a motion to assume any Retained Contracts to the extent executory.  Entry of the Confirmation Order by the clerk of the Bankruptcy Court shall constitute approval of the

assumption and assignment of the Assigned Contracts, and the assumption of any Retained Contracts that are executory, pursuant to sections 365(a), (b) and (f) of the Bankruptcy Code, and a finding by the Bankruptcy Court that the requirements of section 365(f) of the Bankruptcy Code have been satisfied. Other than the Assumed Liabilities, Permitted Liens (as defined in the Asset Purchase Agreement) and the funding of the Plan Funds, the Purchaser shall have no liability on account of any Claims or otherwise pursuant to the Plan under applicable federal or state law, including, but not limited to, successor or transferee liability.

(d)     Any non-Debtor counterparty to an agreement, contract or unexpired lease to be assumed, or assumed and assigned, who disputes the assumption, or assumption and assignment, of such executory contract or unexpired lease must file with the Bankruptcy Court, and serve upon the Debtors, a written objection to the assumption, or assumption and assignment, of an executory contract or unexpired lease, which objection shall set forth the basis for the dispute by no later than two (2) days prior to the Confirmation Hearing. The failure to timely object shall be deemed a waiver of any and all objections to the assumption, or assumption and assignment, of executory contracts and leases as set forth herein or as otherwise designated as being assumed or assumed and assigned in this Section 12.1. The inclusion of a contract or lease on any list or schedule of rejected contracts, Assigned Contracts or Retained Contracts is not an admission by the Debtors that such contract is executory, and the Debtors reserve all rights in regard thereto.

12.2    **Cure Costs**.

The provisions (if any) of each executory contract or unexpired lease to be assumed, or assumed and assigned, under the Plan which are or may be in default shall be satisfied solely by Cure Costs. A "Schedule of Cure Costs" shall be contained in the Plan Supplement (and may be amended from time to time thereafter) and shall set forth the Cure Costs for each agreement which the Debtors believe a Cure Cost must be satisfied as a condition to the assumption, or assumption and assignment, of such agreement. If an executory contract or unexpired lease to be assumed, or assumed and assigned, under the Plan does not have a Cure Cost, it will not be identified on the Schedule of Cure Costs. Any non-Debtor counterparty to an agreement being assumed, or assumed and assigned, under the Plan who disputes the scheduled Cure Costs (or objects to the omission of a scheduled Cure Costs) must file with the Bankruptcy Court, and serve upon the Debtors and the Committee, by no later than two (2) days prior to the Confirmation Hearing, a written objection to the proposed Cure Costs, which objection shall set forth the basis for the dispute, **and** the alleged correct Cure Cost. If a non-Debtor counterparty fails to file and serve an objection which complies with the foregoing, the Cure Costs set forth on the "Schedule of Cure Costs" shall be binding on the non-Debtor counterparty, and the non-Debtor counterparty shall be deemed to have waived any and all objections to the assumption, or assumption and assignment, of the relevant agreement as proposed by the Debtors. In the event of a dispute regarding the assumption, or assumption and assignment, of an executory contract or unexpired lease, the provision of Cure Costs to the counterparty of the executory contract or unexpired lease shall occur as soon as reasonably practicable following the entry of a Final Order or mutual agreement resolving such dispute. Under the provisions of the Asset Purchase Agreement, the Cure Costs for Assigned Contracts listed on the Schedule of Cure Costs (and no other Cure Costs) are assumed by, and shall be the sole liability of, the Purchaser, and none of

the Debtors, the Post-Effective Date Debtors or the Plan Administrator shall have any liability for the payment of such Cure Costs to any party.

12.3    **Claims Arising from Rejected Contracts**.

Rejection Damage Claims must be submitted to the Claims Agent, with copies to counsel for the Debtors, on the later of December 8, 2010 and the first Business Day that is thirty (30) days following the effective date of the rejection of such executory contract or unexpired lease.  Properly submitted Rejection Damage Claims shall be treated in accordance with Class 5A or Class 5B, as applicable, under the Plan.  All Rejection Damage Claims shall be subject to objection by the Post-Effective Date Debtors.  Any Rejection Damage Claims that are not properly submitted pursuant to this Section 12.3 will forever be barred from assertion and shall not be enforceable against the Post-Effective Date Debtors, their respective Estates, Affiliates or Assets.

# ARTICLE XIII.

# SETTLEMENTS AND COMPROMISES

13.1    **Compromise and Settlement**.

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Allowed Equity Interests and their respective Plan Distributions and treatments hereunder take into account for and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code, substantive consolidation or otherwise.  As of the Effective Date, any and all such rights described in the preceding sentence are settled, compromised and released pursuant hereto.  The Confirmation Order shall constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (a) in the best interests of the Debtors and their Estates, (b) fair, equitable and reasonable, (c) made in good faith and (d) approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019.  In addition, the allowance, classification and treatment of Allowed Claims take into account any Causes of Action, Claims or counterclaims, whether under the Bankruptcy Code or otherwise under applicable law, that may exist: (a) between the Debtors and the Releasing Parties; and (b) as between the Releasing Parties (to the extent set forth in the Third Party Release).  As of the Effective Date, any and all such Causes of Action, Claims and counterclaims are settled, compromised and released pursuant hereto.  The Confirmation Order will approve all such releases of contractual, legal and equitable subordination rights, Causes of Action, Claims and counterclaims against each such Releasing Party that are satisfied, compromised and settled pursuant hereto.

Notwithstanding anything to the contrary in this Plan, if the equity commitment agreement between Perseus, the Purchaser and the Second Lien Administrative Agent is terminated as a result of Perseus' breach of that agreement (subject to any applicable rights of cure) or if Perseus does not fund the Perseus Contribution (as such term is defined in the Asset

Purchase Agreement) in a circumstance other than one in which Perseus is excused from funding under the terms of the documents providing for such equity commitment, then all of the benefits, releases, consent rights and any other benefits provided to Perseus under the terms of the Plan shall be eliminated.

13.2 **Releases by the Debtors**.

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE AND IMMEDIATELY PRIOR TO THE CLOSING OF THE SALE TRANSACTION AND THE REVESTING OF THE EXCLUDED ASSETS WITH THE POST-EFFECTIVE DATE DEBTORS (SUCH THAT NEITHER PURCHASER NOR THE POST-EFFECTIVE DATE DEBTORS WILL RECEIVE ANY CAUSE OF ACTION RELEASED HEREUNDER), FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE DEBTOR RELEASEES, INCLUDING, WITHOUT LIMITATION: (A) THE DISCHARGE OF DEBT AND ALL OTHER GOOD AND VALUABLE CONSIDERATION PAID PURSUANT TO THE PLAN OR OTHERWISE; AND (B) THE SERVICES OF THE DEBTORS' PRESENT AND FORMER OFFICERS AND DIRECTORS IN FACILITATING THE IMPLEMENTATION OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, EACH OF THE DEBTORS SHALL PROVIDE A FULL DISCHARGE AND RELEASE TO THE DEBTOR RELEASEES (AND EACH SUCH DEBTOR RELEASEE SO RELEASED SHALL BE DEEMED RELEASED AND DISCHARGED BY THE DEBTORS) AND EACH SUCH DEBTOR RELEASEE'S RESPECTIVE ASSETS FROM ANY AND ALL CLAIMS, CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, INCLUDING, WITHOUT LIMITATION, THOSE THAT ANY OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR EQUITY INTEREST OR OTHER PERSON OR ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT FOR OR ON BEHALF OF ANY OF THE DEBTORS OR ANY OF THEIR ESTATES AND FURTHER INCLUDING THOSE IN ANY WAY RELATED TO OR ARISING OUT OF THE CHAPTER 11 CASES, THE PLAN, THE DISCLOSURE STATEMENT, OR THE PRE-PETITION OR POST-PETITION OPERATION OR ACTIVITIES OF THE DEBTORS; PROVIDED, HOWEVER, THAT THE FOREGOING RELEASES SHALL NOT APPLY TO ANY PERSON OR ENTITY WHO, IN CONNECTION WITH ANY ACT OR OMISSION BY THE DEBTORS OR THEIR BUSINESSES, HAS BEEN OR IS HEREAFTER FOUND BY ANY FINAL ORDER OR ANY COURT TRUBUNAL TO HAVE COMMITTED ACTUAL FRAUD; PROVIDED**

**FURTHER, HOWEVER, THAT THE FOREGOING RELEASES SHALL NOT APPLY TO THE FORMER SHAREHOLDER NOTES.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (A) IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES, REPRESENTING GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (B) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS; (C) FAIR, EQUITABLE, AND REASONABLE; (D) APPROVED AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (E) A BAR TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS ASSERTING ANY CLAIM RELEASED BY THE DEBTOR RELEASE AGAINST ANY OF THE DEBTOR RELEASEES OR THEIR RESPECTIVE PROPERTY.**

**THE POST-EFFECTIVE DATE DEBTORS AND THE PURCHASER SHALL BE BOUND, TO THE SAME EXTENT THE DEBTORS ARE BOUND, BY THE RELEASES SET FORTH ABOVE.**

13.3    **Third Party Release**.

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, ON THE EFFECTIVE DATE, EFFECTIVE AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES SHALL PROVIDE A FULL DISCHARGE AND RELEASE (AND EACH PERSON OR ENTITY SO RELEASED SHALL BE DEEMED RELEASED BY THE RELEASING PARTIES) TO THE DEBTORS, POST-EFFECTIVE DATE DEBTORS, THE DEBTOR RELEASEES, AND THEIR RESPECTIVE ASSETS FROM ANY AND ALL CLAIMS, CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, INCLUDING THOSE IN ANY WAY RELATED TO OR ARISING OUT OF THE CHAPTER 11 CASES, THE PLAN, THE DISCLOSURE STATEMENT, OR THE PRE-PETITION OR POST-PETITION OPERATION OR ACTIVITIES OF THE DEBTORS; PROVIDED, HOWEVER, THAT THE FOREGOING THIRD PARTY RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE THE PURCHASER FROM ITS OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT OR THE PLAN; PROVIDED, FURTHER HOWEVER,**

**THAT THE FOREGOING RELEASES WILL NOT APPLY TO ANY ACT OR OMISSION THAT HAS BEEN OR IS HEREAFTER FOUND BY ANY FINAL ORDER OR ANY COURT TRUBUNAL TO CONSTITUTE ACTUAL FRAUD.**

**THE THIRD PARTY RELEASE SHALL HAVE NO EFFECT ON THE CLAIMS OF THE RELEASEES TREATED UNDER THE PLAN, TO THE EXTENT OF ALLOWANCE OF CLAIMS AND SATISFACTION OF CLAIMS PURSUANT TO THE PLAN.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, _AND FURTHER_, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (A) IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE THIRD PARTY RELEASEES, REPRESENTING GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (B) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS; (C) FAIR, EQUITABLE, AND REASONABLE; (D) APPROVED AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (E) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED BY THE THIRD PARTY RELEASE AGAINST ANY OF THE THIRD PARTY RELEASEES OR THEIR PROPERTY**.

      13.4   **Exculpation**.

      Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any prepetition or postpetition act taken or omitted to be taken in connection with or related to formulating, negotiating, preparing, disseminating, implementing, administering the Plan, the Plan Supplement, the Disclosure Statement, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any other prepetition or post-petition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the Chapter 11 Cases, or confirming or consummating the Plan; provided, however, that the foregoing provisions of this Section 13.4 shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents; provided still further, that the foregoing Exculpation shall not apply to any acts or omissions expressly set forth in and preserved by the Plan or Plan Supplement.

      13.5   **Reserved.**

      13.6   **Maintenance of Set-off Rights.**

After the Effective Date the Plan Administrator, subject to Sections 13.2, 13.3, 13.4 and 13.7 of the Plan, shall retain all rights to assert any set-off rights which are Excluded Assets solely in response to any General Unsecured Claims asserted by Holders of Claims in Class 5A.

13.7 **INJUNCTION**.

Upon the Confirmation Date, Bankruptcy Code section 1141 shall become applicable with respect to the Plan. In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors. Bankruptcy Code section 1141 nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Equity Interests of creditors, equity security holders, and of general partners of the Debtors. Accordingly, no entity holding a Claim, lien, charge, encumbrance, or other interest may receive any payment from, or seek recourse against, any property other than property of the Post-Effective Date Debtors as provided in the Plan, and all persons and entities are permanently enjoined and prohibited from taking any actions to the contrary. As of the Confirmation Date, all parties are precluded from asserting against any property that is to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, or Equity Interests based upon any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in the Plan or the Confirmation Order.

**FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER. FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE DEBTORS, THE PURCHASER, PERSEUS, THE COMMITTEE, THE SECOND LIEN ADMINISTRATIVE AGENT, THE FIRST LIEN LENDERS THAT VOTE IN FAVOR OF THE PLAN, THE SECOND LIEN LENDERS THAT VOTE IN FAVOR OF THE PLAN, AND TO THE EXTENT THE FIRST LIEN ADMINISTRATIVE AGENT DOES NOT FILE AN OBJECTION OR OTHERWISE OPPOSE THE PLAN, THE FIRST LIEN AGENT, AND THEIR SUCCESSORS AND ASSIGNS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, OFFICERS, DIRECTORS, MANAGED FUNDS, INVESTMENT ADVISORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, PARTNERS, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING IN ITS INDIVIDUAL CAPACITY AS SUCH), AND THEIR ASSETS, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.** ~~BY ACCEPTING PLAN DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM RECEIVING PLAN DISTRIBUTIONS PURSUANT TO THE PLAN WILL BE DEEMED TO HAVE SPECIFICALLY CONSENTED TO THE INJUNCTIONS SET FORTH IN THIS SECTION 13.7.~~

# ARTICLE XIV.

## CONDITIONS PRECEDENT TO
## CONFIRMATION OF THE PLAN AND
## THE OCCURRENCE OF THE EFFECTIVE DATE

14.1 **Conditions Precedent to Confirmation**.

The following are conditions precedent to confirmation of the Plan:

(a) <u>Disclosure Statement</u>. The Disclosure Statement Order shall have been entered by the Bankruptcy Court in form and substance reasonably acceptable to the Debtors, Perseus, the Second Lien Administrative Agent and Purchaser;

(b) <u>Plan Documents</u>. All documents and agreements contemplated by, related to or necessary to the Plan, including the Plan, the Confirmation Order, and the Plan Documents, shall be in a form and substance satisfactory or reasonably satisfactory, as the case may be and as specified in the definitions of such terms, to each of the Entities identified as necessary to approve the form and substance of such document as reasonably satisfactory to such Entity pursuant to the Plan;

(c) <u>Newco First Lien Loan Documents</u>. The Newco First Lien Loan Documents shall be in form and substance reasonably satisfactory to Perseus, Purchaser, the Newco First Lien Administrative Agent, the Second Lien Administrative Agent and the Newco Second Lien Administrative Agent, as the case may be and as specified in the definitions of such terms; and

(d) <u>Newco Second Lien Loan Documents</u>. The Newco Second Lien Loan Documents shall be in form and substance reasonably satisfactory to Perseus, Purchaser, the Second Lien Administrative Agent and the Newco Second Lien Administrative Agent, as the case may be and as specified in the definitions of such terms.

14.2 **Conditions Precedent to the Occurrence of the Effective Date**.

The following are conditions precedent to the occurrence of the Effective Date:

(a) The Confirmation Order shall have been entered by the clerk of the Bankruptcy Court, shall be acceptable to the Debtors, Perseus, the Second Lien Administrative Agent and Purchaser, and shall be in full force and effect and shall be a Final Order;

(b) Payment on account of any Administrative Expense Claims that are assumed by the Purchaser shall not exceed an aggregate amount**amounts** indicated by the Debtors in the Plan Supplement, and the Administrative Expense Claim Reserve shall not exceed an amount indicated by the Debtors in the Plan Supplement; provided, however, in each case such amounts indicated in the Plan Supplement shall be acceptable to Purchaser in its sole discretion;

(c) There is sufficient available Cash to make all payments to be made on the Effective Date;

(d)     Closing of the Sale Transaction (including, without limitation, the satisfaction or waiver of all of the conditions to closing provided for in the Asset Purchase Agreement);

(e)     All necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments required to be made on the Effective Date, including, without limitation, satisfaction or waiver of all conditions to the obligations of the Debtors under the Plan and the Plan Documents; and

(f)     The Effective Date shall have occurred on or prior to May 16, 2011 (such date may be extended with the written consent of Perseus, the Purchaser and the Second Lien Administrative Agent).

14.3     **Waiver of Conditions**.

The Debtors, with the written consent of Perseus, the Purchaser and the Second Lien Administrative Agent may waive any one or more of the conditions set forth in Section 14.1 or Section 14.2(a), (b), (c) or (e) in a writing executed by each of them without notice or order of the Bankruptcy Court and without notice to any parties in interest.  Perseus, the Purchaser and the Second Lien Administrative Agent may waive the condition set forth in Section 14.2(f) in a writing executed by each of them without notice or order of the Bankruptcy Court and without notice to any parties in interest.

14.4     **Effect of Non-Occurrence of the Effective Date**.

If the Effective Date shall not occur, the Plan shall be null and void and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Equity Interests in a Debtor; (b) prejudice in any manner the rights of any party-in-interest; or (c) constitute an admission, acknowledgement, offer or undertaking by the Debtors or any other party-in-interest.

# ARTICLE XV.

# RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) that relates to the following:

(i)     To hear and determine any and all motions or applications pending on the Confirmation Date or thereafter brought in accordance with Article XII hereof for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases to which any of the Debtors is a party or with respect to which any of the Debtors may be liable, and to hear and determine any and all Claims and any related disputes (including, without limitation, the exercise or enforcement of setoff or recoupment rights, or rights against any third party or

the property of any third party resulting therefrom or from the expiration, termination or liquidation of any executory contract or unexpired lease);

(ii)     To determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Plan Administrator or the Debtors, as applicable, after the Effective Date;

(iii)     To hear and determine any objections to the allowance of Claims, whether filed, asserted, or made before or after the Effective Date, including, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow, disallow or estimate any Contested Claim in whole or in part;

(iv)     To issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

(v)     To consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(vi)     To hear and determine all Fee Applications and applications for allowances of compensation and reimbursement of any other fees and expenses authorized to be paid or reimbursed under the Plan or the Bankruptcy Code;

(vii)     To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Plan, the Sale Transaction, the Plan Documents or their interpretation, implementation, enforcement, or consummation;

(viii)     To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Confirmation Order (and all exhibits to the Plan) or its interpretation, implementation, enforcement, or consummation;

(ix)     To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or Cause of Action by, on behalf of, or against the Estates;

(x)     To determine such other matters that may be set forth in the Plan, or the Confirmation Order, or that may arise in connection with the Plan, or the Confirmation Order;

(xi)     To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which the Post-Effective Date Debtors, the Debtors in Possession, or the Plan Administrator may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xii)     To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with any setoff and/or recoupment rights of the Debtors or any Person under the Plan;

(xiii)     To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with Causes of Action of or against the Debtors commenced by the Plan Administrator, the Debtors or any third parties, as applicable, before or after the Effective Date;

(xiv)     To enter an order or final decree closing the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(xv)     To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of the Plan or the Confirmation Order; and

(xvi)     To hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code.

## ARTICLE XVI.

## MISCELLANEOUS PROVISIONS

16.1     **Payment of Statutory Fees**.

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date.

16.2     **Satisfaction of Claims**.

The rights afforded in the Plan and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any accrued postpetition interest, against the Debtors and the Debtors in Possession, or any of their Estates, Assets, properties, or interests in property.  Except as otherwise provided herein, on the Effective Date, all Claims against and Equity Interests in the Debtors and the Debtors in Possession shall be satisfied, discharged, and released in full.  The Post-Effective Date Debtors shall not be responsible for any pre-Effective Date obligations of the Debtors or the Debtors in Possession, except those expressly assumed by any Post-Effective Date Debtor(s), as applicable.  Except as otherwise provided herein, all Persons and Entities shall be precluded and forever barred from asserting against the Post-Effective Date Debtors, their respective successors or assigns, or their Estates, Assets, properties, or interests in property any event, occurrence, condition, thing, or other or further Claims or Causes of Action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date,

whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

16.3    **Notices**.

Any notices, requests, and demands required or permitted to be provided under the Plan, in order to be effective, shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**If to the Debtors:**

Workflow Management, Inc.
Attention: L. Scott Seymour, General Counsel
150 West Main Street
Post Office Box 3037
Norfolk, Virginia 23514
T (757) 624.3000
F (757) 624.3169

– and –

McGuireWoods LLP
Douglas M. Foley, Esq.
Patrick L. Hayden, Esq.
9000 World Trade Center
101 West Main Street
Norfolk, Virginia 23510
Telephone: (757) 640-3700
Facsimile: (757) 640-3701

**If to First Lien Administrative Agent:**

Credit Suisse AG, Cayman Islands Branch,
as First Lien Administrative Agent (Workflow)
Attn: Megan Kane
11 Madison Avenue
New York, New York  10010
Telephone: (212) 325-1690
Facsimile: (917) 326-8227

– and –

Wilmer Cutler Pickering Hale and Dorr LLP
Philip D. Anker, Esq.
George W. Shuster, Jr., Esq.

399 Park Avenue
New York, New York  10022
Telephone: (212) 880-8890
Facsimile: (212) 230-8888

**If to Second Lien Administrative Agent:**

Silver Point Finance, LLC
Attn: John Kneisley
Two Greenwich Plaza, 1st Floor
Greenwich, CT 06830
Telephone: (203) 542-4267
Facsimile: (203) 542-4367

– and –

Fried, Frank, Harris, Shriver & Jacobson LLP
Gary L. Kaplan, Esq.
Peter Siroka, Esq.
One New York Plaza
New York, New York 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000

– and –

Hunton & Williams LLP
Benjamin C. Ackerly, Esq.
Tara L. Elgie, Esq.
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA  23219-4074

**If to the Plan Administrator:**

_____
_____

**If to the Purchaser:**

Workflow Holdings, LLC
Attn: John Kneisley
Two Greenwich Plaza, 1st Floor
Greenwich, CT 06830
Attention: John Kneisley
Telephone: (203) 542-4267

Fax: (203)-542-4367

16.4    **Headings**.

The headings used in the Plan are inserted for convenience only, and neither constitutes a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

16.5    **Governing Law**.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of New York, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise expressly provided in such instruments, agreements or documents.

16.6    **Expedited Determination**.

The Plan Administrator is hereby authorized to file a request for expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed with respect to the Debtors.

16.7    **Exemption from Transfer Taxes**.

Each director or officer of each Debtor will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan and the Asset Purchase Agreement.  The secretary and any assistant secretary of each Debtor will be authorized to certify or attest to any of the foregoing actions.  Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer from a Debtor to the Post-Effective Date Debtors, the Purchaser or any other person or Entity pursuant to the Plan, including the following will not be subject to any stamp tax, real estate transfer tax or similar tax, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment: (a) the Sale Transaction; (b) the creation of any mortgage, deed of trust, lien or other security interest; (c) the making or assignment of any lease or sublease; (d) the granting or recording of any lien or mortgage on any property under the Newco First Lien Credit Agreement or the Newco Second Lien Credit Agreement or (e) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including (1) any merger agreements; (2) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (3) deeds; (4) bills of sale or (5) assignments executed in connection with the Plan.

16.8    **Retiree Benefits**.

The Debtors provide no retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code); accordingly, the Plan complies with section 1129(a)(13) of the Bankruptcy Code.

### 16.9 **Notice of Entry of Confirmation Order and Relevant Dates**.

Promptly upon entry of the Confirmation Order, the Debtors shall publish as directed by the Bankruptcy Court and serve on all known parties in interest and holders of Claims and Equity Interests, notice of the entry of the Confirmation Order and all relevant deadlines and dates under the Plan.

### 16.10 **Interest and Attorneys' Fees**.

(a)     Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in the Plan, the Confirmation Order or as otherwise required by the Bankruptcy Court or by applicable law.

(b)     Except as set forth in the Plan or as ordered by the Bankruptcy Court, no award or reimbursement of attorneys' fees or related expenses or disbursements shall be allowed on, or in connection with, any Claim.

### 16.11 **Modification of the Plan**.

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtors at any time before confirmation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code. The Debtors, with the written consent of the Purchaser, Perseus, and the Second Lien Administrative Agent, may modify the Plan at any time after confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications. A holder of a Claim that has accepted the Plan shall be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such holder.

### 16.12 **Revocation of Plan**.

(a)     The Debtors, with the written consent of the Purchaser, Perseus, and the Second Lien Administrative Agent, reserve the right to revoke and withdraw the Plan or to adjourn the Confirmation Hearing with respect to any one or more of the Debtors prior to the occurrence of the Effective Date. If the Debtors, with the written consent of Purchaser and the Second Lien Administrative Agent, revoke or withdraw the Plan with respect to any one or more of the Debtors, or if the Effective Date does not occur as to any Debtor, then, as to such Debtor, the Plan and all settlements and compromises set forth in the Plan and not otherwise approved by a separate Final Order shall be deemed null and void and nothing contained herein and no acts taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims against or Equity Interests in such Debtor or to prejudice in any manner

the rights of any of the Debtors or any other Person in any other further proceedings involving such Debtor.

(b)     In the event that the Debtors, with the written consent of Purchaser and the Second Lien Administrative Agent, choose to adjourn the Confirmation Hearing with respect to any one or more of the Debtors, the Debtors reserve the right to proceed with confirmation of the Plan with respect to those Debtors in relation to which the Confirmation Hearing has not been adjourned.  With respect to those Debtors with respect to which the Confirmation Hearing has been adjourned, the Debtors reserve the right, with the written consent of Purchaser and the Second Lien Administrative Agent to amend, modify, revoke or withdraw the Plan and/or submit any new plan of reorganization at such times and in such manner as they consider appropriate, subject to the provisions of the Bankruptcy Code.

16.13   **Setoff Rights**.

Except as otherwise provided in the Plan, in the event that any Debtor has a Claim of any nature whatsoever against the holder of a Claim against such Debtor, then such Debtor or the Plan Administrator, may, but is not required to, set off against the Claim (and any payments or other Plan Distributions to be made in respect of such Claim hereunder) such Debtor's Claim against such holder. Neither the failure to set off nor the allowance of any Claim under the Plan shall constitute a waiver or release of any Claims that any Debtor may have against the holder of any Claim.

16.14   **Compliance with Tax Requirements**.

In connection with the Plan, the Debtors and the Plan Administrator, as applicable, shall comply with all withholding and reporting requirements imposed by federal, state, local, and foreign taxing authorities and all Plan Distributions hereunder shall be subject to such withholding and reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim or Equity Interest that is to receive a Plan Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, including income, withholding and other tax obligations, on account of such Plan Distribution.  The Plan Administrator has the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to the Plan Administrator for payment of any such tax obligations.

16.15   **Rates**.

The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.

16.16   **Binding Effect**.

The Plan shall be binding upon the Post-Effective Date Debtors, the holders of all Claims and Equity Interests, parties in interest, Persons and Entities and their respective successors and assigns.  To the extent any provision of the Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

16.17    **Severability**.

IN THE EVENT THE BANKRUPTCY COURT DETERMINES THAT ANY PROVISION OF THE PLAN IS UNENFORCEABLE EITHER ON ITS FACE OR AS APPLIED TO ANY CLAIM OR EQUITY INTEREST OR TRANSACTION, THE DEBTORS MAY MODIFY THE PLAN IN ACCORDANCE WITH SECTION 16.11 OF THE PLAN SO THAT SUCH PROVISION SHALL NOT BE APPLICABLE TO THE HOLDER OF ANY SUCH CLAIM OR EQUITY INTEREST OR TRANSACTION. SUCH A DETERMINATION OF UNENFORCEABILITY SHALL NOT (A) LIMIT OR AFFECT THE ENFORCEABILITY AND OPERATIVE EFFECT OF ANY OTHER PROVISION OF THE PLAN OR (B) REQUIRE THE RESOLICITATION OF ANY ACCEPTANCE OR REJECTION OF THE PLAN.

16.18    **No Admissions**.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER CAUSES OF ACTION OR THREATENED CAUSES OF ACTIONS, THE PLAN SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THE PLAN SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, AND OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS OR THEIR AFFILIATES, AS DEBTORS AND DEBTORS IN POSSESSION IN THESE CHAPTER 11 CASES.

16.19    **Dissolution of the Committee**.

Effective on the Effective Date, the Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be exculpated from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to applications for Fee Claims or reimbursement of expenses incurred as a member of the Committee.

Dated:  January —,**14,** 2011                    Respectfully submitted,

**WORKFLOW MANAGEMENT, INC**.


By: _____
Name:
Title:


**WORKFLOW HOLDINGS CORPORATION**


By:
Name:
Title:


**WORKFLOW SOLUTIONS LLC**


By: _____
Name:
Title:


**WORKFLOW DIRECT, INC**.


By: _____
Name:
Title:


**WF CAPITAL HOLDINGS, INC**.


By: _____
Name:
Title:


**WF HOLDINGS, INC**.


By: _____
Name:
Title:


**WORKFLOW OF FLORIDA, INC**.


By: _____
Name:
Title:

**WORKFLOW MANAGEMENT ACQUISITION II CORP**.

By: _____
Name:
Title:

**WFIH, INC**.

By: _____
Name:
Title:

**WFMI, INC**.

By: _____
Name:
Title:

**THE RELIZON COMPANY**

By: _____
Name:
Title:

**RELIZON KNE INC**.

By: _____
Name:
Title:

**RELIZON SNE INC**.

By: _____
Name:
Title:

**OLD FGS, INC**.

By: _____
Name:
Title:

**OLD UE, LLC**

By: _____
Name:
Title:


**SFI OF PUERTO RICO, INC**.

By: _____
Name:
Title:


**RELIZON WISCONSIN INC**.

By: _____
Name:
Title:


**RELIZON (TEXAS) LTD**. **LLP**

By: _____
Name:
Title:


**RELIZON DE MEXICO INC**.

By: _____
Name:
Title:


**FORMCRAFT HOLDINGS GENERAL
PARTNER, INC**.

By: _____
Name:
Title:


**FORMCRAFT HOLDINGS LIMITED
PARTNER, INC**.

By: _____
Name:
Title:

# EXHIBIT A

## DEBTORS

| ENTITY | CASE NO. | ID NUMBER |
|--------|----------|-----------|
| FORMCRAFT HOLDINGS GENERAL PARTNER, INC. | 10-74631 | 52-2255683 |
| FORMCRAFT HOLDINGS LIMITED PARTNER, INC. | 10-74630 | 52-2255684 |
| OLD FGS, INC. | 10-74615 | 22-3171438 |
| RELIZON DE MEXICO INC. | 10-74628 | 20-3686996 |
| RELIZON KNE INC. | 10-74632 | 51-0413935 |
| RELIZON SNE INC. | 10-74629 | 51-0414537 |
| RELIZON (TEXAS) LTD., LLP | 10-74635 | 76-0566437 |
| RELIZON WISCONSIN INC. | 10-74633 | 39-1818440 |
| SFI OF PUERTO RICO, INC. | 10-74626 | 52-2103413 |
| THE RELIZON COMPANY | 10-74618 | 52-2254702 |
| OLD UE, LLC | 10-74616 | 54-1894060 |
| WF CAPITAL HOLDINGS, INC. | 10-74614 | 42-1685548 |
| WF HOLDINGS, INC. | 10-74620 | 20-0969106 |
| WFIH, INC. | 10-74623 | 20-2010527 |
| WFMI, INC. | 10-74622 | 52-2164282 |
| WORKFLOW DIRECT, INC. | 10-74627 | 95-3817497 |
| WORKFLOW HOLDINGS CORPORATION | 10-74621 | 20-3839217 |
| WORKFLOW MANAGEMENT ACQUISITION II CORP. | 10-74625 | 52-2242039 |
| WORKFLOW MANAGEMENT, INC. | 10-74617 | 06-1507104 |
| WORKFLOW OF FLORIDA, INC. | 10-74624 | 52-2164281 |
| WORKFLOW SOLUTIONS LLC | 10-74619 | 54-1893769 |

# EXHIBIT B

# ASSET PURCHASE AGREEMENT

SCHEDULE 1

**<u>Workflow Management, Inc</u>**.

**<u>First Lien Term Loan Plan Treatment Term Sheet</u>**

## New First Lien Term Loan Term Sheet

| | |
|---|---|
| Borrower: | Purchaser |
| Guarantors: | Any future domestic subsidiaries of Purchaser |
| Ranking: | First lien senior secured obligation |
| Term Loan Amount: | $141,528,677 first lien term loan |
| Interest: | LIBOR plus 7.00%, which shall be paid in Cash at least quarterly in arrears |
| LIBOR Floor: | 3.00% |
| Maturity: | Four (4) years from the Effective Date |
| Amortization: | Principal payments will be made quarterly in the amount of: (i) $1,000,000 per fiscal quarter on the last business day of each fiscal quarter of 2011, commencing with the quarter ended June 30, 2011; and (ii) $2,000,000 per fiscal quarter on the last business day of each fiscal quarter thereafter until maturity. |
| Mandatory Prepayments: | Mandatory prepayments will be the following:<br><br>(i) 50% annual excess free cash flow sweep;<br><br>(ii) 100% from non-permitted debt;<br><br>(iii) 100% from asset sales and insurance proceeds, subject to a 365-day reinvestment period and other terms and conditions. |
| Financial Ratio Covenants: | Financial ratio covenants will be:<br><br>(i) maximum ratio of total debt to adjusted EBITDA<br><br>(ii) minimum ratio of EBITDA to cash interest |

# SCHEDULE 2

## Workflow Management, Inc.

## Second Lien Lender Secured Claims Plan Treatment Term Sheet

**<u>New Second Lien Credit Facility Term Sheet</u>**

| | |
|---|---|
| Borrower: | Purchaser |
| Guarantors: | Any future domestic subsidiaries of Purchaser |
| Ranking: | Second lien senior secured obligation |
| Multi-Tranche Term Loan: | Second lien term loan in the aggregate amount of $140 million (the "<u>New Second Lien Term Loan</u>").  The New Second Lien Term Loan may be comprised of a to-be-determined dollar amount of tranche A term loan (the "<u>Tranche A Second Lien Term Loan</u>") and a to-be-determined dollar amount of tranche B term loan (the "<u>Tranche B Second Lien Term Loan</u>") each of which shall be treated pari passu, except that, upon the occurrence of an event of a default, all payments shall be applied first to pay in full all principal, accrued interest and call protection under the Tranche A Second Lien Term Loan before any payments are applied to the Tranche B Second Lien Term Loan. |
| Interest: | LIBOR plus 14.00% payable at least quarterly in arrears, subject to the following:<br><br>(i) Interest shall be payable in kind unless (x) the cash balance is greater than or equal to $12.5 million (after giving pro forma effect to the prospective interest payment) and (y) LTM Adjusted EBITDA (to be defined)  is greater than or equal to $37.5 million (collectively, the "<u>Cash Interest Conditions</u>").<br><br>(ii) If the Cash Interest Conditions are satisfied as of the most recent month end for which financial statements are available, interest shall be payable (x) 5.00% in cash and (y) LIBOR plus 9.00% in kind.<br><br>(iii) After the first anniversary of the Effective Date, if (A) the Cash Interest Conditions are satisfied, (B) the Adjusted Cash Balance (as defined below) is greater than or equal to $25 million and (C) the ratio of LTM Adjusted EBITDA to cash debt service payments (First and Second Lien cash interest payments and First Lien quarterly scheduled amortization payments) exceeds 2.0:1.0 (after giving effect to the prospective interest payment) (the "2x Test"), then interest shall be payable (x) 11.00% in cash and (y) the remainder in kind (calculated as described in (iv) below); <u>provided</u>, that if the 2x Test is not satisfied, the portion of interest payable in cash shall be decreased to the amount at which the 2x Test is satisfied (subject to a minimum of 5.00% if the Cash Interest Conditions are satisfied).<br><br>(iv) If cash interest is being paid at 5.00%, interest payable in kind shall be LIBOR plus 9.00%; if cash interest is being paid at 11.00%, interest payable in kind shall be LIBOR plus 1.00%; if cash interest is being paid at an amount greater than 5.00% but less than 11.00%, the all-in yield shall be adjusted by adjusting the spread over LIBOR of |

| | |
|---|---|
| | the portion of interest paid in kind in inverse proportion to the amount by which such cash interest payments exceed 5.00%. For example, if cash interest is being paid at 8.00% (midway between 5.00% and 11.00%), interest payable in kind shall be LIBOR plus 5.00% (midway between 1.00% and 9.00%) for an all-in minimum yield of 16.00%. |
| | (v) Adjusted Cash Balance means cash on hand plus the cumulative amount of excess cash flow payments applied to the first lien term loan since the Effective Date. |
| | (vi) Cash and payable-in-kind interest payments may be allocated differently between the Tranche A and Tranche B Second Lien Term Loans and in the aggregate will not exceed the total amount of cash and payable-in-kind interest paid pursuant to the foregoing provisions. |
| LIBOR Floor: | 3.00% |
| Call Protection: | Prepayment of the New Second Lien Term Loan will be permitted at any time after the second anniversary of the Effective Date, in whole or in part, at a redemption price (calculated on the basis of the then outstanding principal amount, including any paid-in-kind interest) equal to the amounts listed below: |
| | On or after the second and prior to the third anniversary of the Effective Date: 107.5% |
| | On or after the third and prior to the fourth anniversary of the Effective Date: 103.75% |
| | On or after the fourth anniversary of the Effective Date: 100% |
| | If prepayment of the New Second Lien Term Loan is made, in whole or in part, on or before the second anniversary of the Effective Date, the borrower shall pay a redemption price equal to (i) 100% of the then outstanding principal of the amount prepaid (including any paid-in-kind interest), plus (ii) all accrued and unpaid interest on the amount prepaid to such redemption date, plus (iii) a make-whole premium defined as an amount equal to the present value of (A) the remaining payments of interest on the amount prepaid (other than accrued and unpaid interest on the amount prepaid to the date of redemption) from the redemption date through and including the second anniversary of the Effective Date and (B) 7.5% of the amount that would be prepaid (including any paid-in-kind interest) as of the second anniversary of the Effective Date, using an annual discount factor (applied quarterly) equal to the applicable treasury rate plus 50 basis points; provided, however, that if there is a sale of Purchaser that is undertaken without the consent of Perseus, on or before the second anniversary of the Effective Date, then, notwithstanding anything herein, prepayment of the New Second Lien Term Loan on |

| | |
|---|---|
| | or before the second anniversary will be permitted at a redemption price (calculated on the basis of the then outstanding principal amount including any paid-in-kind interest) equal to 110%; <u>provided</u>, <u>further</u>, that in no case shall the make-whole premium be less than zero. |
| Maturity: | Four and a half (4.5) years from the Effective Date. |
| Amortization: | None |
| Mandatory Prepayments: | No mandatory prepayments until the First Lien Credit Facility is repaid in full.  After such repayment, mandatory prepayments shall be:<br><br>(i) 50% annual free excess cash flow sweep;<br><br>(ii) 100% from non-permitted debt;<br><br>(iii) 100% from asset sales and insurance proceeds, subject to a 365-day reinvestment period and other conditions. |
| Financial Ratio Covenants: | Same as First Lien Credit Facility |

//28504285.7
//28504285.9

Document comparison by Workshare Professional on Tuesday, January 18, 2011
3:20:39 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://DMSPROXY/Active/28504285/7 |
| Description | #28504285v7<Active> - WF Third Amended Plan |
| Document 2 ID | interwovenSite://DMSPROXY/Active/28504285/9 |
| Description | #28504285v9<Active> - WF Third Amended Plan |
| Rendering set | MW Standard |

| Legend: | |
|---|---|
| **<u>Insertion</u>** | |
| ~~Deletion~~ | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 32 |
| Deletions | 22 |
| Moved from | 1 |
| Moved to | 1 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 56 |

**Exhibit B**

(Blacklined Disclosure Statement)

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
## NORFOLK DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | **Chapter 11** |
|  | ) |  |
| **WORKFLOW MANAGEMENT INC.,** | ) |  |
| <u>et al</u>., | ) | **Case No.  10-74617 (SCS)** |
|  | ) |  |
| Debtors. | ) | **(Jointly Administered)** |
|  | ) |  |

---

### DISCLOSURE STATEMENT RELATING TO
### THIRD AMENDED JOINT CHAPTER 11 PLAN
### OF WORKFLOW MANAGEMENT, INC.
### AND ITS AFFILIATED DEBTORS

---

Dated:  January ——,**14,** 2011

| | |
|---|---|
| McGUIREWOODS LLP | TAVENNER & BERAN, PLC |
| Douglas M.  Foley (VSB No. 34364) | Lynn L. Tavenner (VSB No. 30083) |
| Patrick L.  Hayden (VSB No. 30351) | Paula S. Beran (VSB No. 34679) |
| 9000 World Trade Center | 20 North Eighth Street |
| 101 West Main Street | Second Floor |
| Norfolk, Virginia 23510 | Richmond, Virginia 23219 |
| (757) 640-3700 | (804) 783-8300 |

Attorneys for the Debtors and
Debtors in Possession

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF VIRGINIA, NORFOLK DIVISION (THE "BANKRUPTCY COURT") UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE FOR USE IN THE SOLICITATION OF ACCEPTANCES OF THE PLAN DESCRIBED HEREIN.  ACCORDINGLY, THE FILING AND DISTRIBUTION OF THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS A SOLICITATION OF ACCEPTANCES OF SUCH PLAN.  THE INFORMATION CONTAINED HEREIN SHOULD NOT BE RELIED UPON FOR ANY PURPOSE BEFORE A DETERMINATION BY THE BANKRUPTCY COURT THAT THIS DISCLOSURE STATEMENT CONTAINS "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE.[1]

---

[1]     Legend to be removed upon entry by the Clerk of the Bankruptcy Court of Order of the Bankruptcy Court approving this Disclosure Statement.

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ................................................................................................ 1

II.    NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS ............................ 1

III.   EXPLANATION OF CHAPTER 11 ...................................................................... 3

IV.    OVERVIEW OF THE PLAN ............................................................................... 4

       A.     Summary of the Terms of the Plan ....................................................... 4

       B.     Summary of Distributions under the Plan............................................. 5

       C.     Parties Entitled to Vote on The Plan................................................... 13

       D.     Solicitation Package........................................................................... 14

       E.     Voting Instructions............................................................................. 15

       F.     The Confirmation Hearing .................................................................. 16

       G.     Confirming and Consummating the Plan............................................. 16

V.     GENERAL INFORMATION REGARDING THE DEBTORS ..................................... 17

       A.     A History of the Debtors..................................................................... 18

       B.     The Businesses of the Debtors............................................................. 19

       C.     Prepetition Capital Structure.............................................................. 20

              (i)     Debtors' Equity Structure ....................................................... 20

              (ii)    Debtors' Board of Directors..................................................... 20

              (iii)   Debtors' Prepetition Secured Credit Facilities ........................ 20

              (iv)    Other Selected Obligations of the Debtors ............................. 23

       D.     Pre-Filing Restructuring Efforts ......................................................... 26

       E.     Events Leading to the Filing of the Chapter 11 Cases......................... 28

VI.    RESTRUCTURING OF THE DEBTORS THROUGH THE PLAN............................. 30

       A.     Goals of the Debtors Plan .................................................................. 30

              (i)     Preserving the Debtors' Operations......................................... 30

              (ii)    Deleveraging the Balance Sheets............................................. 30

              (iii)   Providing Liquidity................................................................. 30

              (iv)    Simplifying the Corporate Structure of the Business .............. 31

              (v)     Satisfaction of Administrative Liabilities ............................... 31

              (vi)    Distribution to Unsecured Creditors ....................................... 31

       B.     Implementation of Plan Goals ............................................................ 31

|  | (i) | Sale of Assets to Purchaser | 31 |
|  | (ii) | Determination of Amount of New Notes and the Newco Preferred Equity Interests | 32 |
|  | (iii) | Capital Structure of Newco | 33 |
|  | (iv) | Plan Administrator and Payment of Claims under the Plan | 33 |
| C. | | Material Terms of the Asset Purchase Agreement | ~~33~~**34** |
| D. | | Material Terms of the New Notes Issued by the Purchaser | 35 |
| E. | | Material Terms of the Newco Preferred Equity Interests | 36 |
| F. | | Resolution of PBGC Claims | ~~36~~**37** |
| G. | | Plan Releases and Third Party Releases | 37 |
| VII. | SELECTED FINANCIAL INFORMATION | | 39 |
| A. | | Consolidated and Year-to-Date Annual Financial Information for the Debtors | 39 |
| VIII. | FINANCIAL PROJECTIONS AND ASSUMPTIONS | | 40 |
| A. | | Purpose and Objectives | 40 |
| B. | | Consolidated Pro Forma Balance Sheet | 40 |
| C. | | Funds Necessary upon the Effectiveness of the Plan | 40 |
| IX. | THE CHAPTER 11 CASES | | 41 |
| A. | | Commencement of the Chapter 11 Cases | 41 |
| B. | | Continuation of Business after the Petition Date | 41 |
|  | (i) | Cash Collateral | 41 |
|  | (ii) | Business Operations and Employee-Related Relief | 42 |
|  | (iii) | Resolution of Issues Among Debtors, Second Lien Lenders and Perseus | 42 |
| C. | | Representation of the Debtors | 43 |
| D. | | Formation and Representation of the Committee | 43 |
| E. | | Representation of the First Lien Administrative Agent | 44 |
| F. | | Representation of the Second Lien Administrative Agent | 44 |
| G. | | Matters Relating to Unexpired Leases and Executory Contracts | 44 |
| H. | | Exclusivity | 44 |
| I. | | Claims Administration | 45 |
|  | (i) | Schedules and Bar Dates | 45 |
|  | (ii) | Claim Objections | 45 |

X.       LITIGATION PENDING AGAINST THE DEBTORS.................................................. 46

   A.       Litigation............................................................................................................. 46

XI.      SUMMARY OF THE CHAPTER 11 PLAN ........................................................... 46**47**

   A.       Introduction..................................................................................................... 46**47**

   B.       General Description of the Treatment of Claims and Equity Interests............... 47

   C.       Provisions for Treatment of Unclassified Claims under the Plan....................... 51

   D.        Acceptance or Rejection of the Plan; Effect of Rejection by One or More
            Classes of Claims or Equity Interests ................................................................ 54

   E.       Means for Implementation of the Plan.......................................................... 54**55**

   F.       The Plan Administrator..................................................................................... 59

   G.       Plan Distribution Provisions ............................................................................ 62

   H.       Procedures for Resolving and Treating Contested Claims ................................ 65

   I.        Treatment of Executory Contracts and Unexpired Leases ................................ 67

   J.        Settlements And Compromises...................................................................... 69**70**

   K.       Conditions Precedent To Confirmation Of The Plan And The Occurrence
            Of The Effective Date ....................................................................................... 74

   L.       Retention of Jurisdiction .................................................................................. 76

   M.       Miscellaneous Provisions.............................................................................. 77**78**

XII.     RISK FACTORS .......................................................................................... 84

   A.       Parties-in-Interest may Object To Debtors' Classification of Claims and
            Equity Interests ................................................................................................ 84

   B.       The Risk of Non-confirmation of the Plan ....................................................... 84

   C.       Risk of Non-Occurrence of Effective Date........................................................ 85

   D.       The Failure to Close the Sale Transaction ........................................................ 85

   E.       Risk that Claims Will Be Higher than Estimated .............................................. 85

   F.       Liquidity Risks Prior to Consummation of the Plan...................................... 85**86**

   G.       Continuing Leverage and Ability to Service Debt............................................. 86

   H.       **Risk of Loss of Senior Executives............................................................ 86**

   **I.**      The Purchaser's Actual Financial Results May Vary Significantly from the
            Projections Included in this Disclosure Statement.............................................. 86

   I. **J.** Inherent Uncertainty of Projections................................................................. 86**87**

   J. **K.** General Economic Conditions ......................................................................... 87

   K**L.**      External Factors Beyond the Purchaser's Control May Cause Fluctuations
            in Demand for their Products and in the Purchaser's Prices and Margins....... 87**88**

XIII.   SECURITIES LAW MATTERS ...................................................................... 88

    A.     Issuance of New Notes and Newco Preferred Equity Interests ........................... 88

    B.     Subsequent Transfers of New Notes and Newco Preferred Equity Interests... 88**89**

XIV.   CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES ................................... 90

         (i)     Consequences to Holders of General Unsecured Claims against the Holdco Debtors and Intercompany Claims ......................................... 91**92**

         (ii)    Consequences to Holders of General Unsecured Claims of the Non-Holdco Debtors and Multi-Debtor General Unsecured Claims ....... 92

         (iii)   Consequences to the First Lien Lender Claims and the Second Lien Lender Secured Claims ............................................................................ 92

         (iv)   Treatment of Accrued Interest ................................................................ 93

         (v)    Market Discount ...................................................................................... 93

         (vi)   Consequences to Holders of Equity Interests ......................................... 94

         (vii)   Information Reporting and Backup Withholding ................................... 94

         (viii)  Certain U.S. Federal Income Tax Consequences To Debtors ............. 94**95**

XV.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............................................................................................................... 95

    A.     Liquidation Under Chapter 7 of the Bankruptcy Code ...................................... 95

    B.     Alternative Plans of Reorganization ................................................................. 96

XVI.  CONCLUSION .......................................................................................... 96**97**

<u>**SCHEDULES AND EXHIBITS**</u>

List of Defined Terms ....................................................................... Schedule 1

List of Debtors ................................................................................. Schedule 2

List of Rejected Executory Contracts and Unexpired Leases ........................... Schedule 3

Chapter 11 Plan ................................................................................. Exhibit A

Disclosure Statement Order and Notice
of the Confirmation Hearing ................................................................ Exhibit B

Projections and Summary of Significant Assumptions Related Thereto ............ Exhibit C

Pro Forma Balance Sheet ..................................................................... Exhibit D

Liquidation Analysis .......................................................................... Exhibit E

# I.

## INTRODUCTION

All capitalized terms used in this Disclosure Statement and not otherwise defined herein shall have the meanings ascribed thereto in the Plan (see Article I of the Plan entitled "Definitions") or Schedule 1 of this Disclosure Statement.

THIS DISCLOSURE STATEMENT INCLUDES AND DESCRIBES THE THIRD AMENDED JOINT CHAPTER 11 PLAN, DATED JANUARY —,14, 2011 (THE "PLAN"), A COPY OF WHICH IS ATTACHED AS EXHIBIT A, FILED BY THE CHAPTER 11 DEBTORS LISTED IN SCHEDULE 2 (THE "DEBTORS"). OTHER THAN CLASS 1 - PRIORITY NON-TAX CLAIMS, WHICH IS UNIMPAIRED AND IS THEREFORE DEEMED TO HAVE ACCEPTED THE PLAN, AND CLASS 5B - GENERAL UNSECURED CLAIMS OF HOLDCO DEBTORS, CLASS 6 - INTERCOMPANY CLAIMS, AND CLASS 7 - WF EQUITY INTERESTS, WHICH RECEIVE NO PROPERTY UNDER THE PLAN AND ARE THEREFORE DEEMED TO HAVE REJECTED THE PLAN, ALL CLASSES ARE ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. ACCORDINGLY, THE DEBTORS ARE SOLICITING ACCEPTANCES OF THE PLAN FROM THE HOLDERS OF ALL CLAIMS AND INTERESTS, OTHER THAN THOSE HOLDING CLASS 1 - PRIORITY NON-TAX CLAIMS, CLASS 5B - GENERAL UNSECURED CLAIMS OF HOLDCO DEBTORS, CLASS 6 - INTERCOMPANY CLAIMS, AND CLASS 7 - WF EQUITY INTERESTS.

THE DEBTORS, THE SECOND LIEN ADMINISTRATIVE AGENT, AND PERSEUS BELIEVE THAT THE PLAN IS IN THE BEST INTEREST OF AND PROVIDES THE HIGHEST AND MOST EXPEDITIOUS RECOVERIES TO HOLDERS OF ALL CLASSES OF CLAIMS AND EQUITY INTERESTS. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN ARE URGED TO VOTE IN FAVOR OF THE PLAN. TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND RECEIVED BY 4:00 p.m. PREVAILING PACIFIC TIME ON FEBRUARY [14],14, 2011 (THE "VOTING DEADLINE").

FOR YOUR ESTIMATED PERCENTAGE RECOVERY UNDER THE PLAN, PLEASE SEE THE CHART SET OUT IN "OVERVIEW OF THE PLAN – SUMMARY OF DISTRIBUTIONS UNDER THE PLAN."

# II.

## NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS

The purpose of this Disclosure Statement is to enable you, as a creditor whose Claim is impaired under the Plan, to make an informed decision in exercising your right to accept or reject the Plan.

**THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.**

**PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN AND THE EXHIBITS ANNEXED TO THE PLAN AND TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. IN THE EVENT OF ANY CONFLICT BETWEEN THE DESCRIPTION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE BANKRUPTCY RULES AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS BEEN NEITHER APPROVED NOR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION ("SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS OF THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS AND DEBTORS IN POSSESSION IN THESE CASES.**

On ~~[January~~ ~~13],~~**14,** 2011, after notice and a hearing, the Bankruptcy Court issued the Disclosure Statement Order approving the Disclosure Statement because it contains information of a kind, in sufficient detail, and adequate to enable a hypothetical, reasonable investor typical of the solicited classes of Claims of the Debtors to make an informed judgment with respect to the acceptance or rejection of the Plan (a true and correct copy of the Plan is annexed hereto as **Exhibit A**). The Disclosure Statement Order is attached hereto as **Exhibit B** and should be referred to for details regarding the procedures for the solicitation of votes on the Plan. **APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY**

**COURT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT OF THE FAIRNESS OR MERITS OF THE PLAN OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.**

Each holder of a Claim entitled to vote to accept or reject the Plan should read this Disclosure Statement and the Plan in their entirety before voting. No solicitation of votes to accept or reject the Plan may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. Except for the Debtors and certain of the professionals the Debtors have retained, no person has been authorized to use or promulgate any information concerning the Debtors, their businesses, or the Plan other than the information contained in this Disclosure Statement and if given or made, such information may not be relied upon as having been authorized by the Debtors. You should not rely on any information relating to the Debtors, their businesses, or the Plan other than that contained in this Disclosure Statement and the exhibits hereto.

After carefully reviewing this Disclosure Statement, including the attached exhibits, please indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the enclosed Ballot and return the same to the address set forth on the Ballot, in the enclosed return envelope so that it will be received by the Balloting Agent, no later than the Voting Deadline.

**DO NOT RETURN ANY OTHER DOCUMENTS WITH YOUR BALLOT**

You may be bound by the Plan if it is accepted by the requisite holders of Claims even if you do not vote to accept the Plan, or if you are the holder of an unimpaired Claim.

Pursuant to section 1128 of the Bankruptcy Code, the Bankruptcy Court has scheduled a Confirmation Hearing on **February [17],17, 2011,** at ⸺:⸺ **1:00 p**.m., Prevailing Eastern Time, before the Honorable Stephen C. St. John, United States Bankruptcy Judge. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before **February [10],10, 2011 at** ⸺:⸺ **4:00 p**.m., Prevailing Eastern Time in the manner described in the Disclosure Statement Order.

**THE DEBTORS, THE SECOND LIEN ADMINISTRATIVE AGENT AND PERSEUS SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF IMPAIRED CLAIMS TO ACCEPT THE PLAN.**

**III.**

**EXPLANATION OF CHAPTER 11**

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code, pursuant to which a debtor in possession may reorganize its business for the benefit of its creditors, equity holders, and other parties in interest. The formulation of a plan is the principal purpose of a Chapter 11 case. The plan sets forth the means for satisfying the holders of claims against and interests in the debtor's estate.

Although referred to as a plan of reorganization, a plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of a debtor's assets. In either event, upon confirmation of the plan, it becomes binding on a debtor and all of its creditors and equity holders, and the obligations owed by a debtor to such parties are compromised and exchanged for the obligations specified in the plan.

After a plan has been filed, the holders of impaired claims against and interests in a debtor are permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires the debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. **This Disclosure Statement is presented to holders of Claims against and Equity Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code in connection with the solicitation of votes by the Debtors on the Plan.**

The bankruptcy court may confirm a plan even though fewer than all the classes of impaired claims and equity interests accept such plan. For a plan to be confirmed, despite its rejection by a class of impaired claims or equity interests, the plan must be accepted by at least one class of impaired claims (determined without counting the vote of insiders) and the proponent of the plan must show, among other things, that the plan does not "discriminate unfairly" and that the plan is "fair and equitable" with respect to each impaired class of claims or equity interests that has not accepted the plan. **The Plan has been structured so that it will satisfy the foregoing requirements as to any rejecting class of Claims and can therefore be confirmed, if necessary, over the objection of one or more (but not all) classes of Claims.**

## IV.

## OVERVIEW OF THE PLAN

The Plan provides for the treatment of Claims against and Equity Interests in all of the Debtors in In re Workflow Management, Inc., et al., Chapter 11 Case No. 10-74617(SCS), Jointly Administered. These cases have not been substantively consolidated.

## A.     Summary of the Terms of the Plan.

The Plan implements and is built around the following key elements:

- The sale of essentially all of the Debtors' assets to the Purchaser under the Asset Purchase Agreement;

- The distribution of debt instruments issued by the Purchaser to the First Lien Lenders and the Second Lien Lenders, secured by the assets of the Purchaser, on the terms provided in schedules 1 and 2 of the Plan and the Plan Documents. The secured claims of the First Lien Lenders will be paid through the issuance by Purchaser of the Newco First Lien Loan Notes in the full amount of the First Lien Lender Secured Claim. The total amount of the claims of the Second Lien Lenders is approximately

$196.5 million, and is bifurcated into a secured claim and an unsecured deficiency claim. The Second Lien Lender Secured Claim is allowed under the Plan in the amount of $170 million, and will be paid through the issuance by Purchaser of the Newco Second Lien Loan Notes and the Newco Preferred Equity Interests in the full amount of the Second Lien Lender Secured Claim. The amount of the Second Lien Lenders Deficiency Claim is approximately $26.5 million, and the Second Lien Lenders Deficiency Claim will receive the treatment specified in Class 5C – Multi-Debtor General Unsecured Claims;

- Deleveraging the balance sheets pertaining to the Debtors' business by more than $170 million;

- The payment in full from the Plan Funds of Administrative Expense Claims, Priority Non-Tax Claims and Priority Tax Claims, or the assumption and payment in full thereof in each case by the Purchaser;

- The assumption and assignment of certain executory contracts and unexpired leases to the Purchaser, and the assumption of the Cure Costs by the Purchaser;

- Partial payment in Cash of certain General Unsecured Claims will be provided by the Purchaser (from consideration that would otherwise be owing to the Second Lien Lenders); and

- The cancellation of all existing Equity Interests.

The Plan reflects, in the view of the Debtors, a reasonable and appropriate compromise that permits the value of the Debtors' business to be maximized for the benefit of all parties in interest in these cases.

**B.    Summary of Distributions under the Plan.**

The following is a summary of the distributions proposed under the Plan. It is qualified in its entirety by reference to the full text of the Plan, which is attached to this Disclosure Statement as **Exhibit A.**

The claim amounts set forth below are based on information contained in the Debtors' Schedules and reflect what the Debtors believe to be reasonable estimates of the likely resolution of outstanding Claims. The amounts utilized may differ from the outstanding filed claims amounts.

The following chart summarizes the distribution to each class under the Plan:

| **UNCLASSIFIED CLAIMS** | |
|---|---|
| **Classes of Claims** | **Treatment of Classes of Claims** |

| | |
|---|---|
| Administrative Expense Claims (includes costs of the chapter 11 proceedings for the Debtors and expenses of operation as specified in section 503(b) and 507(a)(2) of the Bankruptcy Code including Fee Claims, Claims arising after the Petition Date, obligations with respect to assumed executory contracts and leases, and any outstanding statutory fees).<br><br>Estimated Claims:  Undetermined | On the Distribution Date, all unpaid Administrative Expense Claims of the Debtors arising in the ordinary course of the Debtors' business to customers, suppliers, vendors, contractors or employees during the pendency of the Chapter 11 Cases and all Section 503(b)(9) Claims will be assumed and paid by the Purchaser and may be paid at the Purchaser's election in the ordinary course of business; <u>provided that</u> all other Administrative Expense Claims, including the Fee Claims, will not be assumed by the Purchaser and will be paid by the Plan Administrator from the Administrative Expense Claim Reserve on the applicable Distribution Date; <u>provided</u>, <u>further</u>, <u>however</u>, that such treatment will not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim; <u>provided</u>, <u>further</u>, <u>however</u>, that all fees and expenses of counsel and other advisors to the First Lien Administrative Agent and the Second Lien Administrative Agent will constitute Allowed Administrative Expense Claims and will be paid by the Debtors in the ordinary course of business during the Chapter 11 Cases without the necessity to file a proof of claim or file any application to receive any approval from the Bankruptcy Court.  For purposes of determining the amount of the Administrative Expense Claim Reserve, at least five (5) days prior to the Effective Date, each Professional who holds or asserts a Fee Claim will be required to provide the Debtors and Purchaser with an estimate of the total amount of its Fee Claim.  Upon the Effective Date, none of the Debtors, the Post-Effective Date Debtors, or the Plan Administrator will have any obligation or liability on account of any Administrative Expense Claims assumed by the Purchaser.  Upon the Effective Date, the Purchaser will not have any obligation or liability on account of any Administrative Expense Claims other than the funding of the Administrative Expense Claims Reserve and the Administrative Expense Claims that are assumed by the Purchaser in accordance with the terms hereof and **of** the Asset Purchase Agreement.<br><br>**Estimated Recovery:  100% of Allowed Claim.** |

| Priority Tax Claims (includes all Claims entitled to priority under section 507(a)(8) of the Bankruptcy Code).<br><br>Estimated Claims: Approximately $1.5 million | Unless otherwise agreed with a holder of an Allowed Priority Tax Claim, the Debtors, in their sole discretion, may choose whether Allowed Priority Tax Claims will be paid either: (1) in Cash, in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest from the Effective Date at a fixed annual rate equal to five percent (5%) and paid in regular installments of equal amount over a period not exceeding five (5) years from the Petition Date; or (2) in full in Cash on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim. The Debtors reserve the right to prepay, without penalty, at any time under option (1) above. Priority Tax Claims may also be assumed and paid by Purchaser at Purchaser's election.<br><br>**Estimated Recovery: 100% of Allowed Claim.** |

| CLASSIFIED CLAIMS AND INTERESTS | |
|---|---|
| **Classes of Claims and Interests** | **Treatment of Classes of Claims and Interests** |
| Class 1 – Priority Non-Tax Claims<br><br>Estimated Claims: Approximately $300,000 | Unimpaired.<br><br>Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of each Allowed Priority Non-Tax Claim, each Allowed Priority Non-Tax Claim will be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Claim entitles the holder in respect of such Claim will be fully reinstated and retained, and such Allowed Priority Non-Tax Claim (including any amounts to which such holder is entitled pursuant to section 1124(2) of the Bankruptcy Code) will be paid in full in accordance with such reinstated rights on the Effective Date or which may be assumed and paid by the Purchaser and may be paid at the Purchaser's election in the ordinary course of business.<br><br>**Estimated Recovery: 100% of Allowed Claims.** |
| Class 2 – First Lien Debt Claims<br><br>Estimated Claims: $141,528,677 | Impaired.<br><br>The First Lien Lender Claims will be deemed Allowed in full in the aggregate amount of $141,528,677 plus any accrued but unpaid post-petition interest through the Effective Date at the rate payable as provided in the Cash Collateral Orders, and will not be subject to avoidance, setoff, off-set, recoupment, subordination (whether contractual, equitable or otherwise), recharacterization, disallowance, disgorgement, impairment, defenses, Claims, Causes of Action, suits, counterclaims, cross-claims, reduction or any other challenges under any applicable law or regulation by any person or entity. All payments received by the First Lien Secured Parties from the Debtors during the Chapter 11 Cases will be retained by the First Lien Secured Parties and deemed interest payments or payments of reasonable professional fees, as applicable, and |

| | not reduction in principal. In full and final satisfaction of each Allowed First Lien Lender Claim, each holder of an Allowed First Lien Lender Claim will receive (via an exchange) its Pro Rata Share of the Newco First Lien Loan Notes and the Newco First Lien Administrative Agent, on behalf of each holder of an Allowed First Lien Lender Claim, will retain the liens which secured the First Lien Lender Claims as of the Petition Date by means of the Newco First Lien Loan Notes being secured by first priority liens on the assets of the Purchaser in accordance with the provisions of the Newco First Lien Loan Documents; under the Newco First Lien Loan Notes, each holder of an Allowed First Lien Lender Claim will receive deferred cash payments in the amounts and on the terms indicated on Schedule 1 attached to the Plan. **Estimated Recovery: 100% of Allowed Claims.** |
|---|---|
| Class 3 – Second Lien Lender Secured Claim  Estimated Claims: $170,000,000 | Impaired.  The Second Lien Lender Secured Claims will be deemed Allowed in the aggregate amount of $170,000,000 and will not be subject to avoidance, setoff, off-set, recoupment, subordination (whether contractual, equitable or otherwise), recharacterization, disallowance, disgorgement, impairment, defenses, Claims, Causes of Action, suits, counterclaims, cross-claims, reduction or any other challenges under any applicable law or regulation by any person or entity. All payments received by the Second Lien Secured Parties as adequate protection from the Debtors during the Chapter 11 Cases will be retained by the Second Lien Secured Parties and will not be deemed a reduction in principal. In full and final satisfaction of each Allowed Second Lien Secured Lender Claim, each holder of an Allowed Second Lien Lender Secured Claim will receive (via an exchange) its Pro Rata Share of (i) the Newco Preferred Equity Interests and (ii) the Newco Second Lien Loan Notes and the Newco Second Lien Administrative Agent, on behalf of each holder of an Allowed Second Lien Secured Lender Claim, will retain the liens which secured the |

| | Second Lien Lender Secured Claims as of the Petition Date by means of the Newco Second Lien Loan Notes being secured by second priority liens on the assets of the Purchaser in accordance with the provisions of the Newco Second Lien Loan Documents; under the Newco Second Lien Loan Notes, each holder of an Allowed Second Lien Lender Secured Claim will receive deferred cash payments in the amounts and on the terms indicated on Schedule 2 attached to the Plan.<br><br>**Estimated Recovery: 100% of Allowed Claims.** |
|---|---|
| Class 4 – Other Secured Claims<br><br>Estimated Claims: No more than $1,000,000 | Impaired.<br><br>Except to the extent that the holder agrees to less favorable treatment, each holder of an Allowed Other Secured Claim against any Debtor will, at the sole option of the Purchaser and subject to such holder's realization of any rights of setoff, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, (i) retain its lien in such property, or the proceeds of such property, securing such Allowed Other Secured Claim and be paid by the Purchaser in the ordinary course of business in accordance with the terms existing between the Debtors and such holder with respect to such Allowed Other Secured Claim prior to the Petition Date and absent any default rights; (ii) retain its lien in such property, or the proceeds of such property, securing such Allowed Other Secured Claim and receive deferred cash payments from the Purchaser totaling at least the amount of such Allowed Other Secured Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in each Debtor's interest in such property, or (iii) be transferred the collateral securing such Claim, each in full and complete satisfaction of such Claim.<br><br>**Estimated Recovery: 100% of Allowed Claims.** |

| Class 5A – General Unsecured Claims against the Non-Holdco Debtors<br><br>Estimated Claims:  $25 million **to $50 million**[2] | Impaired.<br><br>Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of each such Allowed General Unsecured Claim against a Non-Holdco Debtor, each holder of an Allowed General Unsecured Claim against a Non-Holdco Debtor (other than those Claims classified in Class 5C) will receive its Pro Rata Share of the Unsecured Claims Fund.<br><br>**Estimated Recovery:  ~~1.0~~0.8% - 4.0%**<br><br>**The low estimate for recoveries to holders of Class 5A Claims is a ~~1.0~~0.8% recovery on such Class 5A Claims.  This estimate is based on Class 5A rejecting the Plan, estimated Class 5A Claims of $50 million, and the PBGC Claims not being settled.**<br><br>**The high estimate for recoveries to holders of Class 5A Claims is a 4.0% recovery on such Class 5A Claims.  This estimate is based on Class 5A accepting the Plan, estimated Class 5A Claims of $25 million, and the PBGC Claims being settled or reduced to $0.** |
| Class 5B – General Unsecured Claims against the Holdco Debtors<br><br>Estimated Claims:  Approximately $95 million | Impaired.<br><br>Holders of Claims in Class 5B will not receive or retain any property under the Plan on account of the General Unsecured Claims against Holdco Debtors.<br><br>**Estimated Recovery:  0% of Allowed Claims.** |

---

[2] **This estimate range is based on the Debtors' analysis of claims as of the date hereof.**  This estimate may include amounts that are due and owing on account of executory contracts that may be assumed.  To the extent such contracts are assumed, such Cure Costs would reduce the estimated amount of General Unsecured Claims.

| Class 5C – Multi-Debtor General Unsecured Claims<br><br>Estimated Claims: $75 million. | Impaired<br><br>Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of each such Multi-Debtor General Unsecured Claim, each holder of an Allowed Multi-Debtor General Unsecured Claim will receive its Pro Rata Share of the Unsecured Claims Fund; <u>provided, however,</u> that if at least two-thirds in aggregate dollar amount and more than one-half in the aggregate number of the Allowed Claims in Class 5A that vote, vote to accept the Plan, each of the holders of the Second Lien Lender Deficiency Claim will be deemed to agree to accept the aggregate amount of $10 on account of all of their Class 5C Claims to be paid to the Second Lien Administrative Agent; <u>provided further, however,</u> that, with the consent of the Debtors, the Purchaser, Perseus, and the Second Lien Administrative Agent, the PBGC may agree to receive a different treatment on account of the PBGC Claims, which will be in full and final satisfaction and settlement of such PBGC Claims.  By way of clarification, any such satisfaction and settlement shall provide for the release of all Claims and potential claims against any of the Debtors, the Purchaser and their respective Related Parties (including, without limitation, any claims or potential claims relating to alleged control group or alter ego status) which are or were held by the PBGC pertaining to, arising from, or in connection with the Pension Plan or otherwise.<br><br>**Estimated Recovery:  0.0% - 1.0%**<br><br>**The low estimate for recoveries to holders of Class 5C Claims is a 0.0% recovery to holders of Class 5C Claims.  This estimate is based on Class 5A voting to accept the Plan and the PBGC Claims being settled at $0.00.**<br><br>**The high estimate for recoveries to holders of Class 5C Claims is a 1.0% recovery to holders of Class 5C Claims.  This estimate is based on Class 5A voting to reject the Plan and the PBGC Claims being Allowed in an amount of at least $50 million.** |

| Class 6 – Intercompany Claims | Impaired. |
| | |
| | All Intercompany Claims will be cancelled as of the Effective Date, and holders thereof will not receive a distribution under the Plan in respect of such Claims. |
| | |
| | **Estimated Recovery: 0% of Allowed Claims.** |
| Class 7 – WF Equity Interests | Impaired |
| | |
| | Each holder of a WF Equity Interest will not receive or retain any Property under the Plan on account of such WF Equity Interest. Upon the termination of the Plan Administrator in accordance with Section 9.7 of the Plan, all WF Equity Interests will be deemed cancelled. |

**C.      Parties Entitled to Vote on The Plan**

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan. Holders of Claims not impaired by the Plan are deemed to accept the Plan under section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote on the Plan. Holders of Impaired Claims or Equity Interests receiving no distribution under the Plan are not entitled to vote because they are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.

The following sets forth the Classes that are entitled to vote on the Plan and the Classes that are not entitled to vote on the Plan:

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| **1** | **Priority Non-Tax Claims** | **Unimpaired** | **Deemed to Accept** |
| **2** | **First Lien Lender Claims** | **Impaired** | **Entitled to Vote** |
| **3** | **Second Lien Lender Claims** | **Impaired** | **Entitled to Vote** |
| **4** | **Other Secured Claims** | **Impaired** | **Entitled to Vote** |
| **5A** | **General Unsecured Claims of the Non-Holdco Debtors** | **Impaired** | **Entitled to Vote** |
| **5B** | **General Unsecured Claims of the Holdco Debtors** | **Impaired** | **Deemed to Reject** |
| **5C** | **Multi-Debtor General Unsecured Claims** | **Impaired** | **Entitled to Vote** |
| **6** | **Intercompany Claims** | **Impaired** | **Deemed to Reject** |
| **7** | **WF Equity Interests** | **Impaired** | **Deemed to Reject** |

### D. Solicitation Package

The following materials constitute the Solicitation Package:

- the notice of the Confirmation Hearing;

- the appropriate Ballot(s) and applicable voting instructions if the recipient is entitled to vote;

- a pre-addressed, postage pre-paid return envelope if the recipient is entitled to vote;

- the Disclosure Statement with all exhibits and schedules which may be filed with the Bankruptcy Court;

- a letter to the Holders in each of the voting classes urging them to vote to accept the Plan;

- the Disclosure Statement Order, which, among other things, (a) approves this Disclosure Statement as containing "adequate information" in accordance with section 1125 of the Bankruptcy Code, (b) fixes a voting record date, (c) approves solicitation and voting procedures with respect to the Plan, (d) approves the form of the Solicitation Package and the notices to be distributed with respect thereto, and (e) schedules certain dates in connection therewith; and

- the Solicitation Procedures.

The above are collectively referred to as the "Solicitation Package".

The 2002 Service List[3] as of the Voting Record Date (as hereinafter defined) and all parties entitled to vote to accept or reject the Plan will be served either paper copies or a CD-ROM containing the Disclosure Statement Order, the Disclosure Statement and all exhibits to the Disclosure Statement, including the Plan. Any party who is served a CD-ROM but desires a paper copy of these documents may request a copy from the Debtors' Balloting Agent by writing to Workflow Claims Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, CA 90245 or by calling (877) 565-8217. The Solicitation Package (except the Ballots and/or Master Ballots) also can be obtained by any party by accessing the Balloting Agent's website at http://www.kccllc.net/workflow. Moreover, all parties entitled to vote to accept or reject the Plan will receive a Solicitation Package containing paper copies of the notice of the Confirmation Hearing, an appropriate Ballot, and the Solicitation Procedures (which will be an exhibit to the order approving this Disclosure Statement).

---

[3] "2002 Service List" has the meaning set forth in the Order Pursuant to Bankruptcy Code Sections 102 and 105(a) of the Bankruptcy Code and Bankruptcy Rules 2002(m) and 9007 and Local Rules 2002-1 and 9013-1, (A) Establishing Omnibus Hearing Dates and (B) Authorizing Certain Electronic Notice, Case Management and Administrative Procedure entered by this Court on October 8, 2010 [Docket No. 95].

The Plan Supplement will be filed by the Debtors on or before ~~seven~~**ten** (~~7~~**10**) days before the Confirmation Hearing. When filed, the Plan Supplement will be made available on the Balloting Agent's website at http://www.kccllc.net/workflow. The Debtors will not serve paper or CD-ROM copies of the Plan Supplement. However, parties may request a copy of the Plan Supplement from the Debtors' Balloting Agent by writing to Workflow Claims Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, CA 90245 or calling (877) 565-8217.

**E.      Voting Instructions**

Only the holders of Allowed Claims in Classes 2, 3, 4, 5A, and 5C as of January [13], 2011 (the "Voting Record Date") are entitled to vote to accept or reject the Plan, and they may do so by completing the Ballot and returning it in the envelope provided to the Balloting Agent by the Voting Deadline. Voting Instructions are attached to each Ballot.

The Debtors, with the approval of the Bankruptcy Court, have engaged Kurtzman Carson Consultants LLC ("KCC") 2335 Alaska Avenue, El Segundo, CA 90245, as the Claims and noticing agent and as the Balloting Agent (the "Balloting Agent") to assist in the solicitation process. The Balloting Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process. The Balloting Agent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will file a voting report (the "Voting Report") as soon as practicable before the Confirmation Hearing.

The deadline to vote on the Plan is 4:00 p.m., Prevailing Pacific Time, **February [~~14~~]**,**14**, **2011.**

| **BALLOTS** |
| --- |
| Ballots must be actually received by the Balloting Agent by the Voting Deadline by using the envelope provided, or by First Class Mail, Overnight Courier or Personal Delivery to:<br><br>Workflow Claims Processing<br>c/o Kurtzman Carson Consultants LLC<br>2335 Alaska Avenue<br>El Segundo, CA 90245<br><br>If you have any questions on the procedures for voting on the Plan, please call the Balloting Agent at the following telephone number: (877) 565-8217. |

**ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM, BUT WHICH DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR**

REJECTION OF THE PLAN OR WHICH INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN SHALL NOT BE COUNTED.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS OR EQUITY INTERESTS WITHIN A PARTICULAR PLAN CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT ITS VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM IN CLASSES 2, 3, 4, 5A AND 5C WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN.

ALL BALLOTS ARE ACCOMPANIED BY RETURN ENVELOPES.  IT IS IMPORTANT TO FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON EACH BALLOT.

## F.      The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for February [17],**17**, 2011, at —:——**1:00 p**.m., Eastern Time, (the "Confirmation Hearing Date") before the Honorable Stephen C. St. John, United States Bankruptcy Judge.  The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtors, and certain other parties, on or before 4:00 p.m., Eastern Time, February [10],**10**, 2011 in accordance with the Disclosure Statement Order that accompanies this Disclosure Statement.  THE BANKRUPTCY COURT WILL NOT CONSIDER OBJECTIONS TO CONFIRMATION UNLESS THEY ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE DISCLOSURE STATEMENT ORDER.

The Debtors will publish the notice of the Confirmation Hearing, which will contain, among other things, the Confirmation Hearing Date and time, the Voting Record Date, the Voting Deadline, and the Plan Objection Deadline, in The Dayton Daily News, Virginian-Pilot and USA Today in order to provide notification to those persons who may not receive notice by mail.

## G.      Confirming and Consummating the Plan

It will be a condition to Confirmation of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order.  In addition, certain other conditions contained in the Plan will have been satisfied or waived pursuant to the provisions of Article XIV of the Plan.

Following Confirmation, the Plan will be consummated on the Effective Date.

For further information, see Section XI hereof—"SUMMARY OF THE CHAPTER 11 PLAN— Conditions Precedent to Confirmation of the Plan and the Occurrence of the Effective Date."

## V.

## GENERAL INFORMATION REGARDING THE DEBTORS

The Debtors consist of WF Capital, and 20 of its direct and indirect subsidiaries. The chart below depicts the corporate structure of Workflow and its subsidiaries as of the date of this Disclosure Statement.

Workflow Organizational Chart



## A. A History of the Debtors.

Newport News Printing, founded in Virginia in 1912, is one of the earliest predecessors of the Debtors (collectively, the "Company"). Standard Forms, Inc. ("SFI"), another early predecessor of the Company, was founded in Virginia in 1927. Another predecessor company, United Envelope LLC ("United") was founded in 1932 and later combined with SFI. Headquartered in Norfolk, Virginia, the Company continued to grow through acquisitions, and in early 1997, SFI and United were acquired by US Office Products ("USOP") to form its print management division.

In June 1998, the print management division of USOP spun off as a public company called Workflow Management, Inc. ("WFMI") and began trading under the ticker symbol "WORK." Between 1998 and 2001, WFMI completed approximately 28 acquisitions.

In April 2004, WFMI was taken private. WF Holdings, Inc. ("WF Holdings"), an entity formed and controlled by investment funds managed or controlled by Perseus, L.L.C., a private equity fund manager, and an individual investor acquired substantially all of the outstanding common stock of WFMI and its subsidiaries (the "Workflow Merger"). As a result of the Workflow Merger, WFMI became a wholly owned subsidiary of WF Holdings.

On November 30, 2005, The Relizon Company ("Relizon") was acquired by the Company. Relizon also had a long company history, starting as part of Reynolds and Reynolds in 1866.

In connection with the acquisition of Relizon, WF Holdings' ownership was transferred to WF Capital. WF Capital is owned by certain investment funds managed or controlled by Perseus, L.L.C. and two financial institutions unrelated to Perseus, L.L.C. WF Capital is the ultimate parent of the Debtors and has its principal place of business in Norfolk, Virginia.

## B.     The Businesses of the Debtors.

The Company is one of the leading providers of printed business documents, print-related services and promotional marketing solutions in North America. The Company offers clients a wide range of print-related products and services including business documents, electronic print and mail solutions, promotional marketing products, label solutions, sales and marketing materials and distribution services.

The Company operates a nationwide network of approximately 49 offices, 17 distribution centers and 9 plants with over 2.8 million square feet of capacity and more than 200 manufacturing assets including the latest in digital technology, offset and rotary processes, complete bindery and finishing capabilities, as well as sophisticated systems for distribution kitting and fulfillment. With its national footprint, the Company generated approximately $661 million of revenue and $61.5 million in adjusted EBITDA in 2009.

The Company has a diverse client base of approximately 10,000 active clients in a variety of industries, including healthcare, financial services, manufacturing and retail. The Company has approximately 300 sales personnel and approximately 2,200 total employees nationwide.

The Company sources its products through both in-house manufacturing facilities and an extensive network of external trade partners. The mix of internally versus externally-sourced products is well balanced with approximately 50% of revenue being sourced externally and 50% manufactured in-house. The result is a relatively asset-light operating model with high operating leverage and low capital expenditure requirements.

The Company is a recognized industry leader in print, print-related, and promotional marketing solutions. In August 2010, it was ranked as the "Top Distributor of

2009" by Print Solutions magazine, the premier publication for the print distribution industry. Additionally, Print Professional magazine named the company "Top Distributor of 2009" for the fourth year in a row, while Printing Impressions magazine ranked the company 11th in their annual Printing Impressions 400. Further, the Company was recognized by Premier Healthcare Alliance and awarded with the Supplier Performance Award and prior, named Top 40 Distributor for 2009 in promotional products by Promo Marketing Magazine. It was also ranked by the Advertising Specialty Institute and Counselor Magazine as the nation's 13th largest distributor of promotional products, rising above their prior position of 15th in 2008.

## C.    Prepetition Capital Structure.

### (i)    Debtors' Equity Structure.

On the Petition Date, Perseus, L.L.C. and its affiliates owned approximately 98.8% of the outstanding stock of WF Capital. The remaining 1.2% of the outstanding stock of WF Capital was owned by certain investment funds unrelated to Perseus, L.L.C. The Second Lien Lenders hold warrants for approximately 15.5% of the common stock of WF Capital.

On the Petition Date, WF Capital held 96.9% of the stock of WF Holdings, Inc., with employees holding the remaining 3.1% of that stock as restricted shares which have limited transferability. All of the other Subsidiary Equity Interests are held by the direct parent(s) of each subsidiary.

### (ii)    Debtors' Board of Directors.

Prior to the Petition Date and during the pendency of the Chapter 11 Cases, the board of directors of WF Capital included Brian Leitch, David Davis and Frank Pearl. Frank Pearl is the Chairman and Chief Executive Officer of Perseus. Messrs. Leitch and Davis were employed by Perseus prior to the Petition Date. Although their employment relationship with Perseus terminated prior to the Petition Date, Messrs. Leitch and Davis retained certain investments in a fund managed by Perseus that will be an investor in the Purchaser and Mr. Davis and Mr. Leitch have certain financial interests and management roles in other entities in which Perseus has an ownership interest. These include a Perseus portfolio company in which Mr. Davis serves as CEO and Mr. Leitch is chairman of the board of directors, and an additional Perseus portfolio company in which Mr. Leitch serves as chairman of the board of directors of such company and may be indirectly compensated by Perseus for his service on such board. Messrs. Leitch and Davis will not participate, either directly or indirectly, through their investment in the fund managed by Perseus, in Perseus' investment in the Purchaser.

### (iii)    Debtors' Prepetition Secured Credit Facilities.

### (1)    First Lien Credit Facility.

On November 30, 2005, WFMI, as borrower, and each of the other Debtors as guarantors, except WF Capital, entered into the First Lien Credit Agreement, which provided for the First Lien Credit Facility. The First Lien Credit Facility consisted of (i) a Term Loan Facility, in the initial principal amount of $275 million with a final maturity on November 30,

2011, and (ii) a Revolving Credit Facility, in the maximum committed amount, as amended, of approximately $35 million. The Revolving Credit Facility has two tranches, Revolver A in the amount of approximately $23.4 million, which matures on May 31, 2011, and Revolver B in the amount of approximately $6.8 million, which has a stated maturity date of November 30, 2010. The Revolving Credit Facility included a subfacility for Letters of Credit, pursuant to which $4,819,000 in Letters of Credit were issued and outstanding on the Petition Date. As of the date of this Disclosure Statement, each of the Letters of Credit had been drawn. Nothing in this Disclosure Statement should be deemed an admission that any draw on a Letter of Credit was valid. Additionally, as part of the Fifth Amendment to the First Lien Credit Facility, Relizon purchased a participation in Revolver A in the amount of $5 million. That participation requires that that Debtor's interest in Revolver A be repaid after all other amounts due under the First Lien Credit Facility have been paid. Pursuant to an amendment to the First Lien Credit Facility dated April 30, 2009, the Borrower was no longer permitted to borrow revolving loans or, with certain exceptions, obtain new Letters of Credit under the Revolving Credit Facility. As such, since May 2009, the Debtors have been operating solely on cash flow without access to liquidity under the Revolving Credit Facility.

Prior to the Petition Date, outstanding loans under the First Lien Credit Facility accrued interest at a per annum rate of 8% (7.5% was paid in Cash, and 0.5% was capitalized). Outstanding Letters of Credit accrue a fee of 5% per annum on the outstanding face amount thereof.

Pursuant to the First Lien Credit Agreement, the Loan Parties granted a first priority security interest to the First Lien Administrative Agent (for the benefit of the First Lien Secured Parties) in substantially all of (a) the personal property assets of such Loan Party, other than (i) 35% of the capital stock of a non-debtor foreign subsidiary and (ii) certain other excluded property, including the Ohio Equipment (defined below); and (b) three Mortgages (as defined in the First Lien Credit Agreement) encumbering certain real property.

As of the Petition Date, the aggregate outstanding First Lien Lender Claims (including undrawn Letters of Credit) totaled approximately $146.5 million, consisting of: (a) approximately $111.5 million principal amount of loans outstanding under the Term Loan Facility; (b) approximately $30.2 million principal amount of loans outstanding under the Revolving Credit Facility; and (c) approximately $4.8 million in undrawn face amount of Letters of Credit.

On the projected Effective Date, about February 28, 2011, the Debtors believe that the aggregate outstanding First Lien Lender Claims will total approximately $141.5 million. As part of the Plan, the Debtors will retire the participation owned by The Relizon Company in Revolver A, which The Relizon Company purchased in connection with the Fifth Amendment to the First Lien Credit Facility.

As of the date hereof, under the provisions of the Cash Collateral Orders, interest and Letter of Credit fees on the First Lien Credit Facility are being paid current by the Debtors, at the default rate. In addition, under the Cash Collateral Orders, the professional fees of the First Lien Administrative Agent are being paid current by the Debtors. Pursuant to the Cash Collateral Orders, the First Lien Lenders have reserved their rights with respect to the applicable

rate that the fees and interest should accrue after the Petition Date. The First Lien Lenders have asserted that interest and Letter of Credit fees should accrue at the default rates under the First Lien Credit Facility, which provides for a 2% increase of the applicable interest rate and fees on outstanding obligations arising under the First Lien Credit Facility. The First Lien Administrative Agent has likewise reserved its rights in regard to seeking legal fees which have accrued, but have not been paid, during the course of these Chapter 11 Cases. The Plan provides that the First Lien Lender Claims will accrue interest and be paid at the interest rate payable as provided in the Cash Collateral Orders.

(2)     **Second Lien Facility.**

WFMI, as borrower, and each of the other Debtors, except WF Capital, as guarantors, entered into an Amended and Restated Second Lien Credit Agreement dated as of December 19, 2005. The Second Lien Credit Facility provided for a $140 million second lien term loan facility due November 30, 2012, which is secured by a second priority security interest and lien in the same collateral as the First Lien Credit Facility.

From its inception, the Second Lien Credit Facility provided for interest to be paid largely in Cash, with a small portion to be capitalized, on a quarterly basis. However, due to constraints placed on the Company by the First Lien Lenders, the Company could no longer pay Cash interest on the Second Lien Lender Claims after December 31, 2008. Instead, from January 1, 2009 to April 1, 2010, all of the interest that would have otherwise been paid in Cash on account of the Second Lien Lender Claims was capitalized. After April 1, 2010, the Company was required to return to paying the majority of the interest on the Second Lien Lender Claims in Cash.

As of the Petition Date, loans outstanding under the Second Lien Credit Facility accrued interest at a per annum rate equal to 18% interest (14.75% per annum in cash and 3.25% per annum was capitalized).

As of the Petition Date, the aggregate outstanding Second Lien Lender Claims totaled approximately $196.5 million (including capitalized interest, accrued but unpaid interest, through September 30, 2010).

On the projected Effective Date, about February 28, 2011, the Debtors believe that the aggregate outstanding Second Lien Lender Claims will total approximately $196.5 million. As further described below, the Debtors anticipate that on the Effective Date, the amount of the Second Lien Lenders Secured Claim will be $170 million, and the amount of the Second Lien Lenders Deficiency Claim will be approximately $26.5 million. If the Bankruptcy Court reaches a different conclusion and determines that there is no Second Lien Lenders Deficiency Claim (because the Second Lien Lenders are fully or over secured), then, pursuant to Bankruptcy Code section 506(b), the Second Lien Lenders would be entitled to add additional amounts to their allowable claims. These additional amounts could include postpetition interest (perhaps at a rate as high as 20% per annum) and other costs or charges. As such, in such a scenario, the aggregate outstanding Second Lien Lender Claims would total substantially more than $196.5 million.

Under the Cash Collateral Orders, interest on the Second Lien Credit Facility was accruing, but not being paid by the Debtors. Because the value of the collateral on which the Second Lien Lender Claims had a lien on the Petition Date was less than the amount of the Second Lien Lender Claims on the Petition Date, the accrual of this interest is not allowable as a portion of the Second Lien Lender Claim pursuant to sections 502(b)(2) or 506(b) of the Bankruptcy Code. Under the Cash Collateral Orders, certain of the professional fees of the Second Lien Administrative Agent were paid current, subject to a cap provided in the Cash Collateral Orders, by the Debtors. Any ability to recharacterize payments previously made as principal payments under the Cash Collateral Orders was waived in certain circumstances.

### (3) Credit Facilities' Secured Parties Intercreditor Agreement.

The First Lien Administrative Agent and the Second Lien Administrative Agent are party to that certain Intercreditor Agreement dated as of November 30, 2005. Pursuant to that agreement, the Second Lien Administrative Agent has agreed, on behalf of the Second Lien Secured Parties to, among other things, subordinate their right to payment and their liens to any liens arising under the First Lien Loan Documents.

### (iv) Other Selected Obligations of the Debtors.

### (1) WF Capital/BB&T Note.

Pursuant to a loan agreement and note dated as of December 31, 2008, among WF Capital, as borrower, Perseus Market Opportunity Fund, L.P. ("PMOF"), as guarantor, and Branch Banking and Trust Company ("BB&T"), WF Capital is indebted to BB&T in the principal amount of $20 million. The WF Capital/BB&T Note is not secured by any property of WF Capital or any other Debtor. The interest rate on the WF Capital/BB&T Note is variable. As of the Petition Date, the amount outstanding on account of the WF Capital/BB&T Note was approximately $20 million (not including accrued, but unpaid interest). No other Debtor is obligated on the WF Capital/BB&T Note.

The Debtors are aware that PMOF has filed a proof of claim against WF Capital based upon, *inter alia*, $20,202,388.89 that PMOF paid to BB&T on December 3, 2010. In that proof of claim, PMOF states that "[s]uch payment constituted full satisfaction of all of BB&T's claims relating to the BB&T Note, including, without limitation, pursuant to section 509(c) of the Bankruptcy Code" and "asserts a claim against WF Capital in respect of the payment of the BB&T Note in the amount of $20,202,388.89" based upon PMOF's "rights to subrogation, reimbursement, contribution, or indemnity, whether arising under Bankruptcy Code section 509(a), applicable non-bankruptcy law or otherwise." In that same proof of claim, PMOF further reserves, *inter alia*, "any other rights or claims arising out of or relating to the Loan Agreement, BB&T Note, the Guaranty Agreement or otherwise."

### (2) WF Capital/Perseus Convertible Note.

WF Capital is the maker of the WF Capital/Perseus Convertible Note payable to Perseus Partners VII, L.P., dated as of March 4, 2008. The WF Capital/Perseus Convertible Note is unsecured and is subordinated to the WF Capital/BB&T Note. The WF Capital/Perseus Convertible Note is convertible to Equity Interests in WF Capital. The WF Capital/Perseus

Convertible Note was due September 4, 2009. The WF Capital/Perseus Convertible Note was not paid on its stated maturity date. The WF Capital/Perseus Convertible Note accrues interest at 16% per annum. As of the Petition Date, approximately $58,400,000 (including accrued, but unpaid interest) was owed to Perseus Partners VII, L.P. on account of the WF Capital/Perseus Convertible Note. No other Debtor is obligated on the WF Capital/Perseus Convertible Note.

(3)    **WF Capital/Perseus Interest Note.**

WF Capital is the maker of the WF Capital/Perseus Interest Note. The WF Capital/Perseus Interest Note is a demand note payable to Perseus Market Opportunity Fund, L.P., dated as of October 29, 2009. The WF Capital/Perseus Interest Note is unsecured, and subordinated to the WF Capital/BB&T Note. The WF Capital/Perseus Interest Note accrues interest at 12% per annum. Prior to the Petition Date, Perseus Market Opportunity Fund, L.P. did not present the WF Capital/Perseus Interest Note for payment. As of the Petition Date, approximately $302,000 (including accrued, but unpaid interest) was owed to Perseus Market Opportunity Fund, L.P. on account of the WF Capital/Perseus Interest Note. No other Debtor is obligated on the WF Capital/Perseus Interest Note.

(4)    **WF Holdings/Carlyle Note.**

WF Holdings is the maker of the WF Holdings/Carlyle Note. The WF Holdings/Carlyle Note is a seller subordinated promissory note payable to the Holder Representative defined therein for the benefit of the beneficial holders indentified on schedule I thereto dated December 21, 2006. The WF Holdings/Carlyle Note matures on May 29, 2013. The WF Holdings/Carlyle Note is unsecured and subordinated in right of payment to the First Lien Lender Claims and the Second Lien Lender Claims. The WF Holdings/Carlyle Note accrues interest at 12% per annum. As of the Petition Date, approximately $12,500,000 (including accrued, but unpaid interest) was owed by WF Holdings to the holder of the WF Holdings/Carlyle Note. No other Debtor is obligated on the WF Holdings/Carlyle Note.

(5)    **Workflow Management/Perseus Note.**

WFMI is the maker of the Workflow Management/Perseus Note payable to Perseus Market Opportunity Fund, L.P. The Workflow Management/Perseus Note is due February 6, 2011 (or any earlier date that the loans under the Second Lien Credit Agreement become due and payable). The Workflow Management/Perseus Note is unsecured and subordinated in right of payment to the First Lien Lender Claims and the Second Lien Lender Claims. The Workflow Management/Perseus Note accrues interest at 8% per annum. As of the Petition Date, approximately $1.1 million (including accrued, but unpaid interest) was owed by WFMI on account of the Workflow Management/Perseus Note. No other Debtor is obligated on the Workflow Management/Perseus Note.

(6)    **The Relizon Ohio Development Loan.**

On January 31, 2003, Relizon entered into a loan agreement with the State of Ohio Director of Development (the "Ohio Director"), which provided for the $800,000 Ohio Development Loan. The Ohio Development Loan was used to finance a portion of the closing consideration amount of certain equipment purchased by Relizon and located at a Relizon

facility in Coldwater, Ohio.  The Ohio Development Loan matures on January 31, 2013.  Pursuant to a Security Agreement dated as of January 31, 2003, by Relizon in favor of the Ohio Director, Relizon granted a security interest in the Ohio Equipment to secure the Ohio Development Loan and agreed not to further encumber the Ohio Equipment.  The interest rate applicable to the Ohio Development Loan is 3% per annum, plus a service fee of 0.25% per annum.  The indebtedness outstanding on account of the Ohio Development Loan as of the Petition Date was approximately $233,000 (including accrued, but unpaid interest).  No other Debtor is obligated on the Ohio Development Loan.

(7)     **Capital Leases.**

Certain Debtors also are party to certain capital leases of personal property with various entities.  There is approximately $325,000 in aggregate amounts remaining to be paid to the lessors of such leased property pursuant to these capital leases.

(8)     **Pension Obligations.**

One of the Debtors, The Relizon Company, maintains The Relizon Company Retirement Plan, an ERISA-qualified defined benefit retirement plan (the "Pension Plan") for its employees, effective as of January 1, 2001.  Effective July 1, 2001, all employees of The Relizon Company were eligible to participate in the Pension Plan on their date of hire, with different eligibility rules for those hired before such date.  One-hundred percent vesting in the Pension Plan occurs after 5 years of service with The Relizon Company, or any predecessor company.  The Relizon Company is the sponsor of the Pension Plan and makes all of the contributions to the Pension Plan, with employees making no contributions to the Pension Plan.  The Pension Plan is administered by The Workflow Management Benefit Plan Administrative Committee (the "Pension Plan Administrative Committee").  Additionally, Aon is the actuary and the record keeper for the Pension Plan.

As of the date hereof, approximately 1,203 current employees participate in the Pension Plan, and a total of approximately 2,426 individuals participate in the Pension Plan.  In July 2002, the Pension Plan was frozen as to new participants.  In December 2006, the benefit levels of the Pension Plan were frozen.  The Pension Plan is currently underfunded in the approximate amount of $32 million based on actuarial calculations as of December 31, 2009.  All contributions to the Pension Plan have been timely made by the Debtors for calendar year 2010.

The PBGC filed certain proofs of claim against the Debtors' bankruptcy estates, as follows (the following summary is provided for informational purposes; the Debtors do not admit the validity or accuracy of these claims and dispute the amounts and priority asserted by the PBGC, and the Debtors reserve all rights in regard to the validity and accuracy of the proofs of claim).  Unless a settlement is reached with the PBGC, it is anticipated that either the Debtors or the Plan Administrator will object to the PBGC's claims.

(1)     PBGC filed Claim No. 1171 on December 7, 2010 asserting a general unsecured claim for shortfall and waiver amortization charges for the year in which the Pension Plan termination date occurs plus the aggregate total of shortfall amortization installments for

succeeding plan years, in an estimated amount of $17,990,231. If the Pension Plan terminates, PBGC asserts that the Debtors and each member of their controlled group will be jointly and severally liable to PBGC for these amounts pursuant to 29 U.S.C. §1342(b) or (c).

(2)     PBGC filed Claim No. 1173 on December 7, 2010 asserting a claim in the amount of $55,490,446 for underfunded benefit liabilities regarding the Pension Plan. PBGC asserts that this claim is entitled to administrative expense priority as a tax incurred by the estate in an amount up to 30% of the controlled group's collective net worth. Alternatively, PBGC asserts that this claim is entitled to priority as a tax under section 507(a)(8) of the Bankruptcy Code in an amount up to 30% of the controlled group's collective net worth. This claim is contingent on termination of the Pension Plan.

(3)     PBGC filed Claim No. 1172 on December 7, 2010 asserting a claim in the amount of $535,270 for unpaid minimum funding contributions under 26 U.S.C. §§41 and 430, and 29 U.S.C. §1082.  PBGC asserts that the claim is entitled to priority as follows: $1,208 is entitled to priority under sections 503(b) and 507(a)(2) of the Bankruptcy Code as an ordinary course expense, and the amount of $~~101,29~~**101,129** is entitled to priority under section 507(a)(5) of the Bankruptcy Code.  The PBGC asserts any contributions not entitled to priority as general unsecured claims.

(4)     PBGC filed Claim No. 1177 on December 7, 2010 asserting an unliquidated claim for statutory liability under 29 U.S.C. §1307 (termination premiums resulting from distress termination).  PBGC asserts that this claim is entitled to administrative expense priority status under sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code.  Alternatively, PBGC asserts that this claim is entitled to priority as a tax under section 507(8) of the Bankruptcy Code.

**D.     Pre-Filing Restructuring Efforts.**

In 2006 and 2007, following the acquisition of The Relizon Company in late 2005, the Company was focused on integrating the companies and rationalizing their business operations.  Then, in late 2008, the global economic credit crisis began to negatively impact the print industry resulting in an industry-wide decrease of 19.3% in print shipments in 2009.  These factors also negatively impacted the Company's business operations.

In late 2008 and early 2009, the Company was faced with severe liquidity challenges and had declining EBITDA.  At that time, the Company upgraded its management team and began implementing a transformation plan (the "Transformation Plan") to improve its profitability and liquidity going forward.  The Company has continued to successfully execute the Transformation Plan through 2010.

The goals of the Transformation Plan are three-fold: (i) to improve the profitability of the Company, (ii) to improve liquidity, and (iii) to pursue disciplined growth of the Company.

To improve profitability, the Transformation Plan has optimized the cost structure by: (i) rightsizing the organization through headcount reductions and aligning employee pay to market, (ii) centralizing the field client service organization and improving processes, (iii)

consolidating the national manufacturing and distribution footprint, closing redundant locations and eliminating excess capacity, (iv) eliminating excess office space, (v) improving workforce productivity through the implementation of lean manufacturing practices and process improvements, (vi) reducing sourcing costs by leveraging the Company's spend, and (vii) improving pricing practices and customer profitability.

The Transformation Plan has improved liquidity through reductions in working capital and inventories, improvement in past due receivables collections and days sales outstanding, and the sale of non-core assets.

The Transformation Plan is also focused on repositioning the Company for growth by: (i) increasing sales force effectiveness and productivity, (ii) realigning resources to focus on growing the number and size of strategic accounts, (iii) implementing improved sales and pipeline reporting tools and processes, (vi) implementing a more disciplined client service program to improve service while increasing selling time in the field, (v) upgrading sales leadership talent and the overall quality of the Company's sales force, (vi) expanding revenue share within the Company's existing client base by focusing on cross-selling various products and solutions, targeting large clients, and focusing on expanding the Company's relationships to other divisions, entities or hospitals within the group, and (vii) strengthening the Company's key solution offerings to drive growth of high potential solutions including digital marketing, labels, promotional products, business process outsourcing, and distribution and logistics services.

Since implementing the Transformation Plan, by the end of 2010, the Company will have achieved $73 million in annual run rate savings by (i) rationalizing and closing 30 plants, distribution centers and offices, (ii) leveraging purchasing expenditures, (iii) reducing SG&A spending by 22%, and (iv) implementing operational efficiencies. Overall, the Company has reduced headcount by approximately 22.3% and reduced salaries and benefits for certain employees, saving the Company approximately $24 million in total annual payroll costs. The Company also closed its corporate headquarters in Stamford, Connecticut, and centralized its corporate management and certain of the other Debtors in Dayton, Ohio, where the majority of the management staff of The Relizon Company was located at the time it was acquired. The principal place of business of certain of the Debtors, however, remains Norfolk, Virginia. This restructuring effort undertaken pursuant to the Transformation Plan has led to significant improvement in financial results and a permanent reduction in operating costs.

Additionally, working capital has been reduced by approximately $30 million through inventory reductions, reduction in past due receivables and improved days sales outstanding. The sale of certain non-core businesses, including the assets and operations of United Envelope, LLC and Freedom Graphics Services, Inc., and the sale of a Florida plant provided approximately $11.7 million, net of expenses, in aggregate proceeds, freeing up capital and improving operating flexibility.

For the twelve months ended December 31, 2009, the Company generated net revenue of approximately $661.5 million and adjusted EBITDA of $61.5 million, or 9.3% adjusted EBITDA margin, as compared to 2008 adjusted EBITDA of $48.2 million, an adjusted EBITDA increase of 28% and 350bps on an adjusted EBITDA margin basis. In addition,

projected savings from the Transformation Plan are expected to add an estimated $10 million of incremental EBITDA on an annual run-rate basis in subsequent years. For the twelve months ended December 31, 2009, compared to the twelve months ended December 31, 2008, there was a reduction of 61.9% in capital expenditures. Unlevered cash flow in 2009 was $54.6 million, 48% better than 2008.

Since implementing the Transformation Plan, the Company has delivered approximately $87 million to First Lien Lenders, which is comprised of: $55 million in amortization payments, $15 million in interest payments, $10 million in a Revolver A pay down and commitment reduction, $2 million in excess proceeds from assets sales, and $5 million in fees paid or accrued.

The Transformation Plan has not been completed, however, and the business needs additional time and effort to maximize the benefits for all parties in interest in these cases. While the Company has demonstrated great success in cutting costs and improving efficiencies, the Company has faced recent challenges with respect to revenue generation. These challenges have resulted from the combination of a number of factors, including long term secular decline in industry demand, continued softness in the general economy, insufficient capital available to fund growth initiatives, and a vigorous competitive environment. The Company has responded to these challenges with an aggressive new revenue generation plan, involving changes in the structure, training and incentives of the sales force, creation of sales groups focusing on industry verticals, development and expansion of expertise in particular product and customer solution initiatives, and planning for capital expenditures to take advantage of the growing demand for digital printing capability. Upon restructuring the business pursuant to the Plan, the Transformation Plan will continue to be implemented.

## E. Events Leading to the Filing of the Chapter 11 Cases.

The Company has an integrated network of suppliers, vendors and customers on which the Company relies in order to continue to operate as a going concern. It was apparent, prior to the Petition Date, that the Company's cash flow could support the Company's business operations, but for the amortization and interest payments required under the First Lien Credit Facility and the Second Lien Credit Facility. Key to the Company's success is retaining the business that the Company has developed with their suppliers, vendors and customers. As such, the Company sought to renegotiate the terms of the First Lien Credit Agreement and Second Lien Credit Agreement or refinance those agreements prior to the Petition Date.

In the fourth quarter of 2008, the Company's liquidity was greatly constrained due to the global credit crisis and its effect on the Company's businesses. Due to these liquidity constraints and the failure of a real property sale transaction to close, the Company did not make required interest payments under the First Lien Credit Facility on December 31, 2008.

In January 2009, the Company entered into forbearance agreements with the First Lien Secured Parties and the Second Lien Secured Parties. Pursuant to those forbearance agreements, interest on the Second Lien Credit Facility was capitalized in full and was not paid in Cash by the Company. The capitalization of all of the accrued interest on the Second Lien

Credit Facility lasted for approximately 16 months. In early 2009, Silver Point replaced Credit Suisse, Cayman Island Branch, as the Second Lien Administrative Agent.

During the second quarter of 2009, the Company amended the First Lien Credit Agreement and the Second Lien Credit Agreement to obtain covenant relief and certain other changes to the First Lien Credit Agreement and the Second Lien Credit Agreement. While theses amendments provided immediate relief for the Company, the Company knew that this covenant relief would not provide a long-term solution. At the same time, Perseus contributed approximately $4.25 million to the Company to facilitate the amendments to the First Lien Credit Agreement and the Second Lien Credit Agreement.

Through the summer of 2009, the Company sought ways to rationalize the capital structure and operations of the Company. During the autumn of 2009, the Company believed that constrictions in the credit markets had begun to ease, which would permit them to restructure and/or refinance the obligations due under the First Lien Credit Facility and the Second Lien Credit Facility. The Company retained Morgan Stanley to facilitate such a transaction for the Company.

Morgan Stanley was prepared to organize a high-yield bond transaction that would provide for the payment of the First Lien Credit Facility in full, and a substantial pay-down of the Second Lien Credit Facility. This proposed high-yield transaction would have provided for a needed restructuring of the Company's balance sheets and operating liquidity sufficient to complete the operational transformation. However, an agreement that would have permitted the transaction could not be reached.

In the spring of 2010, the Company sought and reached an agreement with certain of the First Lien Lenders with respect to extending the maturity date of Revolver A principal, but was not able to reach an agreement with one First Lien Lender with respect to an extension of the maturity of the Revolver B principal.

After the Company was unable to organize a high-yield transaction, it explored a refinancing transaction which would have refinanced the First Lien Credit Facility. However, the Company was not able to obtain agreement on a satisfactory refinancing transaction. Thus, the Company was unable to obtain the long-term relief it needed to rationalize its operations and its debt structure.

As a result of the inability to restructure the First Lien Credit Facility and the Second Lien Credit Facility, the Company's payment obligations during the final quarter of 2010, had they been made, would have resulted in a severe lack of liquidity, which necessitated the filing of these Chapter 11 Cases.[4] Specifically, on September 30, 2010, the Company would have been required to make: (i) an approximately $10.3 million payment of principal on the First Lien Credit Facility; (ii) an approximately $7.1 million payment for interest on the Second Lien Credit Facility on November 4, 2010; (iii) an approximately $6.9 million principal payment on

---

[4] The Debtors made an interest payment of $2.7 million to the First Lien Lenders immediately prior to the Petition Date.

Revolver B on November 30, 2010; and (iv) another approximately $13 million payment of principal and interest on the First Lien Credit Facility on December 31, 2010. Further, the stated maturity of the WF Capital/BB&T Note is December 31, 2010.

Due to the inability of the Company to alter unilaterally the timing of the payment obligations under the First Lien Credit Facility and the Second Lien Credit Facility, the Company was forced either to default on these obligations and risk the First Lien Lenders and Second Lien Lenders seeking to foreclose on their collateral, or to seek bankruptcy protection. The Debtors sought bankruptcy protection on the Petition Date in order to avoid the consequences of default, operate in the ordinary course of business, and maintain their going concern value for the benefit of all of its parties in interest.

Since the Petition Date, the Debtors have continued to operate their business as debtors in possession. Shortly after the commencement of the Chapter 11 Cases, the Debtors sought, and the Bankruptcy Court authorized the Debtors, to use Cash Collateral on an interim basis. With the use of Cash Collateral on an interim basis, and the authority the Debtors received to pay certain essential vendors, shippers and warehousemen, and customer obligations, the Company has operated its businesses in the ordinary course. This has permitted the Company to maintain its going concern value because it has preserved its relationships with its various customers, vendors and suppliers.

## VI.

## RESTRUCTURING OF THE DEBTORS THROUGH THE PLAN

### A.    Goals of the Debtors Plan

#### (i)    Preserving the Debtors' Operations.

The Plan has been drafted to preserve the going concern value of the Debtors' business. The Debtors believe that implementation of the Plan described in this Disclosure Statement will provide holders of Allowed Claims the greatest recovery possible on account of such Claims. Although the Debtors are not able to provide all creditors a 100% recovery on account of their Allowed Claims, the Debtors have sought to maintain the relationships they have with their customers, vendors, suppliers and lenders.

#### (ii)    Deleveraging the Balance Sheets.

Under the Plan, the Debtors eliminate more than $50 million of secured debt held by the Second Lien Secured Parties. Under the Plan, the Debtors also eliminate more than $95 million of unsecured debt from the balance sheets at the Holdco Debtors level, and more than $76 million of debt and claims at the Non-Holdco Debtors level. The result of this deleveraging is reflected in the projections and balance sheets attached to this Disclosure Statement.

#### (iii)    Providing Liquidity.

Under the Plan, the Purchaser will have sufficient operating liquidity to operate the Debtors' business after the Effective Date. Perseus is providing $12.5 million in capital to the

Purchaser. This capital contribution by Perseus will be among the funds used by the Purchaser to make payments to the Post-Effective Date Debtors to fund the Administrative Expense Claim Reserve and the Unsecured Claim Fund. The Closing Consideration Amount provided to the Debtors in the Asset Purchase Agreement will allow the Debtors to make the payments and other distributions required of the Debtors under the Plan. Remaining funds will permit the Purchaser to operate effectively and further achieve the Company's goals under the Transformation Plan.

(iv)     **Simplifying the Corporate Structure of the Business.**

Pursuant to the Plan and the Asset Purchase Agreement, the Debtors will sell essentially all of their assets to the Purchaser. This will significantly streamline the corporate structure of the business and eliminate numerous levels of subsidiaries, which the Debtors currently use to operate the business, allowing operational savings to the Purchaser.

(v)     **Satisfaction of Administrative Liabilities.**

Under the Plan, the Purchaser will provide funds to enable the Debtors and the Plan Administrator, as the case may be, to satisfy all administrative and priority claims, either through payment in Cash by the Plan Administrator or by assumption by the Purchaser. All Administrative Expense Claims that are not assumed by the Purchaser will be paid in full from the Plan Funds by the Plan Administrator. The amount of the Plan Funds is to be determined through an estimate of Administrative Expense Claims provided by the Debtors, as well as through an estimate of all Fee Claims that will be provided in accordance with the Plan five (5) days prior to the Effective Date. Based on these estimates, Purchaser and the Debtors will agree on the amount of the Administrative Expense Claim Reserve, which will be funded by Purchaser as part of the Plan Funds. All Priority Tax Claims and Priority Non-Tax Claims not assumed by the Purchaser will be paid in full from the Plan Funds by the Plan Administrator. Notwithstanding the foregoing, other than the funding of the Administrative Expense Claim Reserve and the assumption of certain Priority Tax Claims and Priority Non-Tax Claims, there will be no other recourse to Purchaser on account of any Administrative Expense Claims.

(vi)     **Distribution to Unsecured Creditors.**

The Debtors believe that, currently, all or substantially all of the cash in the estate is encumbered and would not otherwise be available generally for the payment of such claims. As a result of the funding provided by the Purchaser, the Plan also provides holders of General Unsecured Claims a Pro Rata Share of the Unsecured Claim Fund. Accordingly, the holders of General Unsecured Claims against the Non-Holdco Debtors (Class 5A) and the Multi-Debtor General Unsecured Claims (Class 5C), will receive, from the Plan Funds, their Pro Rata Share of the Unsecured Claims Fund**. See also Section VI.C below**.

**B.     Implementation of Plan Goals**

(i)     **Sale of Assets to Purchaser**

Under the Asset Purchase Agreement, the Purchaser will purchase essentially all of the assets of the Debtors, free and clear of all liens, claims, encumbrances and interests, and the Purchaser will thereafter operate the Debtors' business. In consideration of the purchase of

the assets, the Purchaser will issue the Newco First Lien Loan Notes in the aggregate principal amount of approximately $141.5 million on the terms described in the Newco First Lien Loan Documents, and secured by a lien of the same priority and on the same property as the First Lien Loan Notes. Additionally, the Purchaser will issue the Newco Second Lien Loan Notes in the aggregate principal amount of $140 million, secured by a second lien on the assets of the Purchaser on the terms described in the Newco Second Lien Loan Documents and the Newco Preferred Equity Interests. The Debtors will distribute the Newco First Lien Loan Notes to the First Lien Lenders in satisfaction of the First Lien Lenders' claims against the Debtors. The Debtors will distribute the Newco Second Lien Loan Notes and the Newco Preferred Equity Interests to the Second Lien Lenders in satisfaction of the Second Lien Lender Secured Claims against the Debtors.

(ii)     **Determination of Amount of New Notes and the Newco Preferred Equity Interests**

Under Bankruptcy Code section 506, a claim may be bifurcated into a "secured" claim and an "unsecured" claim. A claim is secured only to the extent that the lien securing such claim is valid and enforceable and the value of the collateral securing such claim exceeds the allowed portion of the claim. The rest of the claim, if any, is unsecured. The Plan treats the First Lien Lender Claims as oversecured, and thereby entitled, among other things, to interest on such indebtedness during the Chapter 11 Cases, whereas the Plan treats the Second Lien Lender Claims as undersecured, and thereby entitled to both a secured (the "Second Lien Lender Secured Claims") and unsecured component (the "Second Lien Lender Deficiency Claim") but no post-petition interest.

Specifically, the First Lien Lender Claims are allowed under the Plan in their full amount of $141.5 million (which amount includes the retirement pursuant to the Plan of the $5 million participation in Revolver A owned by The Relizon Company), and the Newco First Lien Loan Notes will be issued by the Purchaser, and distributed by the Debtors to the First Lien Lenders, in the aggregate, in that amount. The Second Lien Lender Secured Claim is allowed under the Plan in the amount of $170 million, and the Newco Second Lien Loan Notes and the Newco Preferred Equity Interests will be issued by the Purchaser, and distributed by the Debtors, to the Second Lien Lenders on account of the Second Lien Lender Secured Claim. Accordingly, under the Plan, the amount of the Second Lien Lenders Deficiency Claim is approximately $26.5 million.

The Debtors believe that the allocation between the secured and unsecured portion of the Second Lien Lender Claims is appropriate. Indeed, the sole effect of a determination that the value of the collateral securing the Second Lien Lender Claims is greater than $170 million embodied in the Plan would be to increase the Second Lien Lender Secured Claims and correspondingly decrease the Second Lien Lender Deficiency Claims (the latter of which is receiving substantially less than payment in full under the Plan, and possibly as little as $10.00). The only party that would be affected by such a higher value would be the Second Lien Lenders, whom the Debtors believe will consent to the allocation proposed under the Plan. The Plan reflects a compromise on the question of valuation and the prospect that, in the context of a contested (and quite likely protracted) confirmation dispute on the question of valuation, the Bankruptcy Court would be unlikely to find that the value of the collateral securing the Second

Lien Lender Claims exceeds not only the amount owing to those holders on the Petition Date, but also the substantial post-petition interest to which such holders would be entitled if they were oversecured. Likewise, if the Bankruptcy Court were to determine that the value of the collateral securing the Second Lien Lender Claims is less than $170 million, this would serve only to increase the Second Lien Lender Deficiency Claims and possibly thereby further dilute the recovery available to unsecured creditors under the Plan. In sum, under any realistic scenario, a higher or lower valuation would not increase the overall consideration available to any creditors other than possibly the Second Lien Lenders.

At the Confirmation Hearing, the Bankruptcy Court may be requested to determine that the proposed allocation of the Second Lien Lender Claims between secured and unsecured is appropriate under the circumstances, in light of the record of the Chapter 11 Cases, the value available for satisfaction of the Debtors' liabilities, and the provisions of the Plan.

(iii)    **Capital Structure of Newco**

Purchaser is an entity that was formed for the purpose acquiring the assets of the Debtors. Purchaser was initially formed by affiliates of the Second Lien Administrative Agent on behalf of the Second Lien Lenders. Prior to the closing of the Sale Transaction and the occurrence of the Effective Date, certain funds managed by Perseus will hold, in the aggregate, 41.5% of Purchaser's common equity as a result of their contribution of the sum of $12.5 million to Purchaser. At closing, the Second Lien Lenders will hold, in the aggregate, preferred equity in the aggregate amount of $30 million. In addition, the Second Lien Lenders who execute the Purchaser's LLC agreement will receive 58.5% of Purchaser's common equity, in the aggregate and subject to the terms of such LLC agreement. **The term sheet between Silver Point and Perseus provides, _inter alia_, that Mr. Davis will serve as Chief Executive Officer of the Purchaser, subject to an agreement between Mr. Davis and the Purchaser on the terms of his employment. Negotiations regarding the terms of an employment agreement for Mr. Davis are ongoing and are expected to continue. As of the date hereof, however, the terms of such an employment agreement have not been agreed upon. If such terms are not agreed upon, then Perseus has advised the Debtors that it may elect not to contribute the $12.5 million to the Purchaser. Silver Point has advised the Debtors and Perseus that it believes that failure to reach agreement with Mr. Davis on the terms of an employment agreement does not provide Perseus with a right not to fund the $12.5 million. All parties have reserved their respective rights regarding this issue.**

(iv)    **Plan Administrator and Payment of Claims under the Plan**

Under the Plan and the Asset Purchase Agreement, the Purchaser will fund the Plan Funds, which will be administered by the Plan Administrator. The Plan Administrator will use the Plan Funds to make the required payments to creditors under the Plan. The Plan Administrator will also use the Plan Funds for post-Effective Date operating and wind down expenses of the Post-Effective Date Debtors. After the Plan Administrator has discharged all of its duties under the Plan, if there are any Plan Funds then remaining, they will be remitted to the Purchaser. The Plan Administrator can use the Plan Administrator Reserve to fund only the costs and expenses necessary to administer and perform the contemplated functions of the Plan Administrator under the Plan including, without limitation, to pay the reasonable fees and

expenses of professionals retained by the Plan Administrator and the payment of post-Effective Date costs and wind-down expenses for the Post-Effective Date Debtors. Under the Plan, the amount of the Plan Administrator Reserve is $125,000.

## C.      Material Terms of the Asset Purchase Agreement

Under the provisions of the Asset Purchase Agreement, the Purchaser will purchase essentially all of the assets of the Debtors, and the Purchaser will thereafter operate the Debtors' business.  In consideration of the sale of their assets, the Debtors will receive from the Purchaser Newco First Lien Notes to distribute to the First Lien Lenders in full satisfaction of their claims against the Debtors, and the Debtors will receive from the Purchaser Newco Second Lien Notes and Newco Preferred Equity Interests to distribute to the Second Lien Lenders in full satisfaction of their secured claims against the Debtors.  The Purchaser will grant liens on substantially all of its assets to secure the Newco First Lien Notes and the Newco Second Lien Notes.

The Debtors will also receive from the Purchaser the amount of the Plan Funds which the Debtors believe will be sufficient to pay in full the Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims which are not assumed by the Purchaser.  The Plan Funds will also allow the Debtors to make a distribution to the holders of General Unsecured Claims against the Non-Holdco Debtors, and the Plan Funds will allow the Plan Administrator to perform its obligations under the Plan, and to wind down the Post-Effective Date Debtors' estates.

The Purchaser will also assume certain liabilities under the Asset Purchase Agreement including, without limitation, all Cure Costs pertaining to Assigned Contracts, certain specified employee related liabilities, Administrative Expense Claims arising in the ordinary course of the Debtors' business owed to customers, suppliers, vendors, contractors and employees, certain Priority Tax and Priority Non-Tax claims, and the claims of secured creditors other than the First Lien Lenders and the Second Lien Lenders (all as more particularly described in the Asset Purchase Agreement).  The claims of Mohamed Yacoub against the Debtors are not liabilities that are being assumed by the Purchaser under the Asset Purchase Agreement.

The Purchaser is also expected to offer employment to essentially all of the Debtors' employees.

Under the Asset Purchase Agreement, the Debtors retain certain excluded assets, as more particularly described in the Asset Purchase Agreement, which include, without limitation, contracts that are not assigned to the Purchaser, corporate charters and other corporate organizational documents, equity interests in the Debtors, data and records relevant to tax issues.  These excluded assets are not expected to have any material value to the Post-Effective Date Debtors; rather, they will be pertinent to the Plan Administrator in winding down the affairs of the Post-Effective Date Debtors.  Under the Asset Purchase Agreement, any assets related to any employee benefit plan that is not assigned to the Purchaser are also among the excluded assets.  Such assets will not be transferred to the Purchaser, rather, such assets will remain associated with the employee benefit plan to which they pertain, for the benefit of the beneficiaries of the employee benefit plan; such assets are not property of the Debtors' estates.

Under the Plan, the Second Lien Lenders have agreed that funds will be provided by the Purchaser to the Debtors in order for the holders of General Unsecured Claims to share pro rata in the Unsecured Claims Fund.  Holders of General Unsecured Claims would not

otherwise be entitled to any payment in the Chapter 11 Cases unless the valuation of the Debtors exceeded the sum of at least approximately $380 million, comprised of (i) the first lien debt (approximately $141.5 million), (ii) the second lien debt (approximately $196.5 million), plus accrued and unpaid post-petition interest (which would have to be paid before General Unsecured Claims receive a recovery) in excess of approximately $17 million, and (iii) at least $25 million in accrued and unpaid administrative expense claims and priority claims. The Debtors do not believe that the valuation of their businesses exceeds $380 million.

The Committee asserts that there are assets being sold to the Purchaser that are not encumbered by the liens of the secured lenders (possibly including Avoidance Actions (although the secured lenders received adequate protection liens on Avoidance Actions under the Cash Collateral Orders)). There are, however, accrued and unpaid administrative expense claims and priority claims likely in excess of $25 million. Moreover, absent the Plan, the Second Lien Lenders could have a sizable superpriority claim under Bankruptcy Code section 507(b) (as previously allowed by the Cash Collateral Orders). All of these unpaid sums would have priority over General Unsecured Claims. Accordingly, the value of any unencumbered assets would have to exceed at least $25 million (and likely be much more than that) before holders of General Unsecured Claims would obtain any recovery from such assets. The Debtors do not believe that the value of any such unencumbered assets, including Avoidance Actions, exceeds the amount of accrued and unpaid administrative expense claims, priority claims, and superpriority claims in favor of the Second Lien Lenders. In addition, the Purchaser is paying significant additional consideration for all of the assets, encumbered and unencumbered, through the payment or assumption of numerous liabilities and/or claims. Accordingly, any unencumbered assets are not a source of recovery for General Unsecured Claims, and it is appropriate to utilize the proceeds of such allegedly unencumbered assets to satisfy administrative claims and priority claims. In all events, General Unsecured Claims receive more under the Plan than they would otherwise receive.

**D.** **Material Terms of the New Notes Issued by the Purchaser**

On the Effective Date, the Purchaser will issue the Newco First Lien Loan Notes, in the form and substance contained in the Plan Supplement as a Plan Document, and on terms substantially similar to those contained on schedule 1 of the Plan. The Newco First Lien Loan Notes will be included in the Closing Consideration Amount paid by the Purchaser to the Debtors for distribution to holders of First Lien Lender Claims on account of the First Lien Lender Claims in accordance with the Plan. In summary, and qualified fully by the Newco First Lien Loan Notes, the Newco First Lien Loan Notes will be issued in the aggregate principal amount of $141,528,677, require quarterly payment of cash interest at the rate equal to The London Interbank Offered Rate ("LIBOR") plus 7% per annum, and will mature four (4) years from the Effective Date. The Purchaser will also be required to make amortization payments on account of the Newco First Lien Loan Notes of $1,000,000 per quarter for the final three (3) quarters of 2011 and $2,000,000 per quarter thereafter, until maturity. The Newco First Lien Loan Notes will also contain certain financial covenants. In accordance with the provisions of the Newco First Lien Loan Documents, the Newco First Lien Loan Notes will be secured by liens that are retained on substantially all of the property that secured the First Lien Lender Claims as of the Petition Date.

On the Effective Date, the Purchaser will issue the Newco Second Lien Loan Notes, in the form and substance contained in the Plan Supplement as a Plan Document, and on terms substantially similar to those contained on schedule 2 of the Plan. The Newco Second Lien Loan Notes will be included in the Closing Consideration Amount paid by the Purchaser to the Debtors for distribution to holders of Second Lien Lender Claims on account of the Second Lien Lender Claims in accordance with the Plan. In summary, and qualified fully by the terms of the Newco Second Lien Loan Notes when issued, the Newco Second Lien Loan Notes will be issued in the aggregate principal amount of $140,000,000, accrue interest at a rate up to LIBOR plus 14% per annum, subject to certain conditions which may require the Cash payment of interest, and will mature four and one-half (4 1/2) years from the Effective Date. The Newco Second Lien Loan Notes do not have any scheduled amortization payments prior to maturity, but contain certain call protections for the benefit of the holders of the Newco Second Lien Loan Notes. In accordance with the provisions of the Newco Second Lien Loan Documents, the Newco Second Lien Loan Notes will be secured by liens that are retained on substantially all of the property that secured the First Lien Lender Claims as of the Petition Date.

The New Notes will, to the extent necessary, be issued and distributed pursuant to section 1145 of the Bankruptcy Code. As such, the New Notes should be exempt from registration pursuant to the Securities Act of 1933. For further information regarding securities law in connection with the issuance of the New Notes, please see Article XIII "SECURITIES LAW MATTERS" below.

**E.** **Material Terms of the Newco Preferred Equity Interests**

On the Effective Date, the Purchaser will issue the Newco Preferred Equity Interests. The Newco Preferred Equity Interests will be included in the Closing Consideration Amount paid by the Purchaser to the Debtors for distribution to holders of Second Lien Lender Secured Claims on account of the Second Lien Lender Secured Claims in accordance with the

Plan.  In summary, and qualified fully by the terms of the Newco Preferred Equity Interests when issued, the Newco Preferred Equity Interests will be issued with an initial liquidation preference of $30 million, have no stated maturity date, and be entitled to receive a 15% preferred distribution which shall compound and accrue quarterly.

The Newco Preferred Equity Interests will be issued and distributed pursuant to section 1145 of the Bankruptcy Code.  As such, the Newco Preferred Equity Interests should be exempt from registration pursuant to the Securities Act of 1933.  For further information regarding securities law in connection with the issuance of the Newco Preferred Equity Interests, please see Article XIII "SECURITIES LAW MATTERS" below.

**F.      Resolution of PBGC Claims**

Under the provisions of the Sale Transaction, the  Purchaser will be purchasing all of the Debtors assets, but the Purchaser will not be assuming the obligations under the Pension Plan.  The Pension Plan is currently underfunded in the approximate amount of $32 million based on actuarial calculations as of December 31, 2009.  All contributions to the Pension Plan required to be paid during the calendar year 2010 have been paid by the Debtors.

If the Purchaser resolves the PBGC Claims with the PBGC, then it is anticipated that the PBGC Claims will not be treated under Class 5C of the Plan, the PBGC will assert no claims against the Debtors or the Post-Effective Date Debtors, there shall be no recovery against the Debtors or the Post-Effective Date Debtors on account of the Pension Plan or the PBGC Claims, and the PBGC will initiate an involuntary termination of the Pension Plan pursuant to 29 U.S.C. § 1342.

Should the PBGC and the Purchaser fail to otherwise resolve the PBGC Claims, the PBGC Claims will be treated in Class 5C of the Plan and none of the Debtors, the Post-Effective Date Debtors, the Purchaser, or the Plan Administrator will have further liability to any party on account of the PBGC Claims beyond the distributions to be made by the Plan Administrator on account of the PBGC Claims pursuant to Class 5C of the Plan.  In this circumstance, because The Relizon Company will have no means to continue to fund the Pension Plan upon consummation of the Sale Transaction, it is possible that the PBGC will initiate an involuntary termination of the Pension Plan pursuant to 29 U.S.C. § 1342, or that a distressed termination of the Pension Plan might be sought under 29 U.S.C. § 1341(c).

Because either an involuntary or a distress termination of the Pension Plan is anticipated, at some point the PBGC will take over the Pension Plan as trustee, which is ordinarily accomplished by agreement between the PBGC and the administrative committee or its successor.  The Debtors anticipate that the Pension Plan Administrative Committee, or a successor committee, or a substitute fiduciary will administer the Pension Plan until the PBGC takes over the Pension Plan as trustee.  Accordingly, the Debtors and the Pension Plan Administrative Committee are discussing with the PBGC the administration of the Pension Plan after the Effective Date of the Plan until the PBGC takes over the Pension Plan as trustee.  In accordance with 29 U.S.C. § 403(c), expenses of administering the Pension Plan after the Effective Date of the Plan, which may include the expenses of counsel and other professional advisors, will be paid from assets of the Pension Plan.  Neither the Debtors, the Post-Effective

Date Debtors, the Plan Administrator nor the Purchaser shall be liable for post-Effective Date expenses of administering the Pension Plan.

## G.    Plan Releases and Third Party Releases.

Sections 13.2, 13.3, 13.4, and 13.7 of the Plan provide for certain releases of claims, exculpations, and injunctions. These provisions may affect claims that theoretically could be raised against the Purchaser, the Second Lien Administrative Agent, Perseus, and other parties, including by the Debtors. The Debtors believe that such provisions are fair, equitable, and appropriate for several reasons.

First, all of the parties benefiting from the releases are providing substantial benefits to all parties in interest through the Plan. Under the Plan, the Purchaser will allow the Debtors to satisfy over $310 million of secured debt that otherwise would have priority rights against substantially all assets of the Debtors. In part through Perseus' capitalization of the Purchaser, meaningful funds will be provided by the Purchaser to the Post-Effective Date Debtors to fund the Administrative Expense Claim Reserve and the Unsecured Claim Fund. Absent this capitalization of Purchaser, it is possible that administrative and priority claims might not be paid in full, and highly probable that unsecured creditors would receive little to no distribution at all. In addition, as discussed above, while the Second Lien Lenders have liens on substantially all of the Debtors' assets, and given that the value of the Debtors does not exceed the amount of the Second Lien Lender Claims, the Second Lien Lenders would be entitled to receive distributions on account of all of the Debtors' assets, and exceedingly little, or more likely no, value or distributions would be left for General Unsecured Creditors. However, as a result of the agreement reached among the Second Lien Administrative Agent, the Debtors and Perseus, the Second Lien Lenders are expected to agree to forego a portion of their distribution so that distributions may be made to other classes pursuant to the Plan.

Even more importantly, in these difficult economic times and in the extremely competitive environment in which the Company (and following the Effective Date the Purchaser) competes, it is crucial that the Purchaser be able to focus intently on continuing the high quality of the Debtors' business, growing market share, and otherwise implementing the Transformation Plan. The Purchaser's ability to devote due and proper focus to these matters could be adversely affected if the Purchaser emerges under a cloud of potential litigation. Accordingly, in the interests of realizing a fresh start and working off a clean slate, the parties determined that these provisions of the Plan carry significant benefits that far outweigh any costs.

Ultimately, these provisions of the Plan are (i) essential to the success of the Debtors' Chapter 11 Cases, (ii) based on a critical financial contribution by the affected parties, (iii) necessary to make the Plan feasible, and (iv) fair to all creditors.

# VII.

# SELECTED FINANCIAL INFORMATION

## A.    Consolidated and Year-to-Date Annual Financial Information for the Debtors.

| ASSETS (in thousands) | December 31, 2009 | September 30, 2010 |
|---|---|---|
| CURRENT ASSETS: | | |
| CASH | $29,249 | $18,655 |
| ACCOUNTS RECEIVABLE , NET | $78,693 | $72,928 |
| INVENTORIES | $30,332 | $27,208 |
| INCOME TAX RECEIVABLE | $3,131 | $673 |
| PREPAIDS AND OTHER CURRENT ASSETS | $11,335 | $10,537 |
| TOTAL CURRENT ASSETS | $152,740 | $130,001 |
| | | |
| PROPERTY, PLANT  & EQUIPMENT (NET) | $55,279 | $49,868 |
| GOODWILL | $133,989 | $133,295 |
| OTHER ASSETS | $17,942 | $13,990 |
| INTANGIBLE ASSETS (NET) | $52,074 | $39,391 |
| | | |
| TOTAL ASSETS | $412,026 | $366,545 |
| | | |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | |
| | | |
| CURRENT LIABILITIES: | | |
| CURRENT PORTION - LT DEBT | $49,429 | $74,190 |
| ACCOUNTS PAYABLE | $33,216 | $42,713 |
| ACCRUED LIABILITIES | $40,906 | $36,264 |
| TOTAL CURRENT LIABILITIES | $123,551 | $153,167 |
| | | |
| LONG-TERM DEBT, LESS CURRENT MATURITIES | $297,598 | $265,388 |
| DEFERRED INCOME TAXES | $5,213 | $3,052 |
| PENSION AND POSTRETIREMENT BENEFIT LIABILITIES | $34,413 | $34,099 |
| OTHER LONG-TERM LIABILITIES | $12,083 | $10,872 |
| | | |
| TOTAL LIABILITIES | $472,858 | $466,578 |
| | | |
| TOTAL STOCKHOLDERS' DEFICT | ($60,832) | ($100,033) |
| | | |
| TOTAL LIABILITIES & STOCKHOLDERS' EQUITY | $412,026 | $366,545 |

| Consolidated Statement of Income (in 000s) | | | |
|---|---|---|---|
| | | Fiscal Year Ending  2009 | 9 months Ending September 30, 2010 |
| | | | |
| NET REVENUES | | $661,534 | $433,281 |
| COSTS OF GOODS AND SERVICES | | $453,270 | $295,914 |
| GROSS PROFIT | | **$208,264** | **$137,367** |

| | | |
|---|---|---|
| SALES, GENERAL AND ADMINISTRATIVE EXPENSES | $165,366 | $109,300 |
| AMORTIZATION OF INTANGIBLES | $17,001 | $12,685 |
| RESTRUCTURING  EXPENSES | $19,594 | $12,044 |
| OPERATING INCOME | $6,303 | $3,308 |
| | | |
| OTHER INCOME (EXPENSE): | | |
| INTEREST INCOME (EXPENSE); NET | ($52,588) | ($42,430) |
| INCOME (LOSS) FROM CONTINUING OPERATIONS, BEFORE BENEFIT FOR INCOME TAXES | ($46,285) | ($39,122) |
| INCOME TAX PROVISION | $ 1,331 | $178 |
| | | |
| NET  (LOSS) | ($58,756) | (38,944) |

# VIII.

# FINANCIAL PROJECTIONS AND ASSUMPTIONS

## A.  Purpose and Objectives.

The long term plan for the Debtors' business, as sold to the Purchaser, (the "Business Plan") and the underlying projections and assumptions serve as the basis for the Plan. The Debtors believe that the assumptions that underlie the projections are reasonable under the circumstances.  The Debtors have prepared the projected operating and financial results (the "Projections") on a consolidated basis for the Purchaser for the period ending five years from the Effective Date.  The Projections, and a summary of significant assumptions related thereto, are attached to this Disclosure Statement as **Exhibit C.**

## B.  Consolidated Pro Forma Balance Sheet.

The Debtors, in consultation with the Second Lien Administrative Agent and Perseus, have prepared a consolidated pro forma balance sheet of the Purchaser (the "Pro Forma Balance Sheet").  The Pro Forma Balance Sheet is attached hereto as **Exhibit D** and reflects the Projections with respect to the consolidated financial position of the Purchaser assuming the effects of certain transactions that will occur in connection with and upon consummation of the Plan.

## C.  Funds Necessary upon the Effectiveness of the Plan.

The Debtors estimate that, after the sale of their assets to the Purchaser, and the distribution of the New Notes and the Newco Preferred Equity Interests to the secured creditors, as applicable, the amount of the Plan Funds will be sufficient in order to make the payments by the Debtors contemplated pursuant to the Plan.  The Debtors anticipate making all the required distributions contemplated by the Plan from the Plan Funds.

# IX.

## THE CHAPTER 11 CASES

**A.     Commencement of the Chapter 11 Cases.**

On September 29, 2010, Workflow and its affiliated Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, the Honorable Stephen C. St. John, presiding.

**B.     Continuation of Business after the Petition Date.**

Since the Petition Date, the Debtors have continued to operate their businesses and manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors have sought Bankruptcy Court approval for all transactions that were outside the ordinary course of their businesses.  As discussed in this section, during the period immediately following the Petition Date, the Debtors sought and obtained authority from the Bankruptcy Court with respect to a number of matters deemed by the Debtors to be essential to their smooth and efficient transition into chapter 11 and the stabilization of their operations. The descriptions of such matters contained herein are summaries only, and are qualified in their entirety by the provisions of the relevant orders entered by the Bankruptcy Court.

(i)     **Cash Collateral.**

By order entered on October 1, 2010 (the "First Interim Cash Collateral Order"), the Bankruptcy Court authorized the immediate use of Cash Collateral, with the consent of the First Lien Lenders and the Second Lien Lenders, on an emergency and interim basis, through October 8, 2010, subject to certain limitations as to a Cash Collateral budget and regarding providing adequate protection to the First Lien Lenders and the Second Lien Lenders.  By order entered on October 8, 2010 (the "Second Interim Cash Collateral Order"), with the consent of the First Lien Lenders and the Second Lien Lenders, the Bankruptcy Court authorized the further use of Cash Collateral through October 28, 2010.  By order entered on October 29, 2010 (the "Third Interim Cash Collateral Order"), with the consent of the First Lien Lenders and the Second Lien Lenders, the Bankruptcy Court authorized the further use of Cash Collateral through December 1, 2010.  On December 2, 2010, the Court entered an order (the "December 2 Order") extending the Debtors' use of Cash Collateral on the terms of the Third Interim Cash Collateral Order until December 16, 2010.  By order entered on December 16, 2010, with the consent of the First Lien Lenders and the Second Lien Lenders, the Bankruptcy Court authorized the use of Cash Collateral on a final basis through February 4, 2011, subject to extension (the "Final Cash Collateral Order", and together with the First Interim Cash Collateral Order, the Second Interim Cash Collateral Order, the Third Interim Cash Collateral Order and the December 2 Order, the "Cash Collateral Orders").

Pursuant to the Cash Collateral Orders, the Bankruptcy Court granted the First Lien Lenders and the Second Lien Lenders, to the extent of any diminution in value of the Cash Collateral, replacement liens in essentially all property acquired by the Debtors after the Petition Date and superpriority administrative expense claims.  The Bankruptcy Court also authorized the

Debtors to pay current interest to the First Lien Lenders on a monthly basis, and for interest to accrue in regard to the Second Lien Lenders subject to 506(b) of the Bankruptcy Code, both at the default rate. The Debtors also agreed to pay the legal and professional fees of the First Lien Administrative Agent and the Second Lien Administrative Agent on a current basis, subject to caps on the aggregate amount of legal fees to be paid, but not accrued, in a cash collateral period. In the Cash Collateral Orders, the Debtors also acknowledged the validity, priority, perfection, enforceability and principal amount of the liens and claims of the First Lien Lenders and the Second Lien Lenders, and waived the right to seek to avoid payments made prior to the Petition Date, subject to the rights of the Committee to review and challenge such issues.

(ii)     **Business Operations and Employee-Related Relief.**

On October 1, 2010, the Bankruptcy Court entered orders granting the Debtors "first day" relief pertaining to the Debtors' ability to operate as smoothly as possible while in Chapter 11, including among other things: (i) authorizing the Debtors to continue to use their existing cash management system; (ii) authorizing the Debtors to pay certain prepetition obligations owing to the Debtors' employees; (iii) prohibiting the Debtors' utility companies from altering, refusing or discontinuing service as long as the Debtors complied with certain deposit guidelines; (iv) authorizing the Debtors to continue to maintain existing insurance arrangements; and (v) authorizing the Debtors to pay certain prepetition trust fund taxes owed to taxing authorities in the ordinary course of business.

Additionally, on October 1, 2010, the Bankruptcy Court also entered orders authorizing the Debtors to honor, in their discretion, their prepetition obligations to (i) customers under certain customer programs and to otherwise continue prepetition customer program practices in the ordinary course of business; (ii) shippers and warehousemen; and (iii) certain critical vendors. As of December 31, 2010, the Debtors had paid approximately (i) $16 million to customers under customer programs ~~including~~**and** payments to reseller vendors; (ii) approximately $1.8 million to shippers and warehouseman; and (iii) approximately $3.4 million to critical vendors. Without these payments to these essential creditors, the going concern value of the Debtors' businesses would have deteriorated significantly, seriously jeopardizing the Debtors' ability to operate in Chapter 11 and to preserve all value available for the benefit of all stakeholders.

The relief obtained in these first day orders has been instrumental in allowing the Debtors to maintain their customer and vendor relationships, which has allowed the Debtors to maintain the going concern value of their businesses for the benefit of all creditors. The First Lien Lenders, the Second Lien Lenders and the Committee have monitored the Debtors' payments made under these first day orders.

(iii)     **Resolution of Issues Among Debtors, Second Lien Lenders and Perseus**

On November 16, 2010, the Motion of Silver Point Finance, LLC, as Administrative Agent Under the Second Lien Credit Agreement, Pursuant to Section 1121(d) of the Bankruptcy Code to (I) Terminate the Debtors' Exclusive Periods to File a Plan of Reorganization and Solicit Acceptances Thereto or, in the Alternative, (II) Authorize and Direct a Sale of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code (the "Motion to

Terminate") was filed.  The Motion to Terminate sought to terminate the Debtors' exclusive right to file a plan of reorganization under section 1121 of the Bankruptcy Code.  This matter was set for hearing on November 30, 2010 and was heard concurrently with the Debtors' Motion to use Cash Collateral on a final basis.  After a hearing on both motions, the Bankruptcy Court denied the Motion to Terminate, but continued the hearing on the Motion to Terminate until December 15, 2010, and issued the December 2 Order, extending the Debtors' use of Cash Collateral through December 16, 2010.

After the Bankruptcy Court's rulings on Motion to Terminate and the initial final hearing on the use of cash collateral on November 30, 2010, an agreement in principle was negotiated at arm's length and reached among the Debtors, the Second Lien Administrative Agent and Perseus regarding a sale of the Debtors' assets to Purchaser, and the general structure of a Chapter 11 plan.

The agreement in principle allowed the parties to essentially eliminate the litigation that was pending and was anticipated to arise among them regarding the disposition of the Debtors, and to concentrate more constructively on a fair resolution of their disagreements.  Specifically, it permitted the Debtors to use Cash Collateral on a consensual basis, and adjourned the Second Lien Administrative Agent's Motion to Terminate.  The parties believe that their resulting agreement will save significant litigation expenses on all sides, is fair and equitable to all parties in interests, and allows the Debtors' business to continue, thereby preserving jobs and business for the Debtors' suppliers.  The parties' agreement in principle is embodied in the Plan and in the Asset Purchase Agreement.

## C.    Representation of the Debtors

In September 2010, the Debtors retained McGuireWoods LLP to provide legal advice with respect to various corporate, restructuring and bankruptcy matters.  The Debtors retained Tavenner & Beran PLC to serve as bankruptcy co-counsel and conflicts counsel.  The Debtors also employed Kaufman & Canoles, P.C. as special corporate counsel.

The Debtors also obtained approval from the Bankruptcy Court to retain FTI Consulting as the Debtors' restructuring and financial advisors.

From the Petition Date through December 31, 2010, these professionals have incurred fees and expenses totaling approximately $4,000,000.  The Debtors also engaged certain other professionals, including ordinary course professionals, during these Chapter 11 Cases.

## D.    Formation and Representation of the Committee

On October 5, 2010, the U.S. Trustee appointed the Committee.  The Committee retained as counsel the law firm of Venable LLP.  The Committee retained Protiviti Inc. to serve as its financial advisory firm in the Debtors' Chapter 11 Cases.

From the Petition Date through December 31, 2010, the Committee's professionals have incurred fees and expenses of approximately $1,000,000.

The current members of the Committee are:

| | |
|---|---|
| Novation, LLC | The Carlyle Group |
| Business Card Service, Inc. (BCSI) | Baptist Memorial Health Care Corporation |
| Mr. Mohamed Yacoub | |

## E.    Representation of the First Lien Administrative Agent

Credit Suisse, as administrative agent under the First Lien Credit Agreement, retained Wilmer Cutler Pickering Hale and Dorr LLP and Peter G. Zemanian as legal counsel. The First Lien Administrative Agent also retained Alvarez & Marsal Holdings, LLC as its financial advisor.

From the Petition Date through December 31, 2010, the First Lien Administrative Agent has incurred professional fees and expenses of approximately $1,250,000.

## F.    Representation of the Second Lien Administrative Agent

Silver Point Finance, LLC, as administrative agent under the Second Lien Credit Agreement, retained Fried, Frank, Harris, Shriver & Jacobson LLP and Hunton & Williams LLP as legal counsel. The Second Lien Administrative Agent also retained Perella Weinberg Partners L.P. as its financial advisor.

From the Petition Date through December 31, 2010, the Second Lien Administrative Agent has incurred professional fees and expenses of approximately $2,750,000.

## G.    Matters Relating to Unexpired Leases and Executory Contracts

Section 365 of the Bankruptcy Code grants a debtor the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases.

On the Petition Date, the Debtors filed a motion seeking Bankruptcy Court approval to reject certain unexpired leases of nonresidential real property. That motion was heard on October 27, 2010, and the Bankruptcy Court granted the relief requested in this motion and these leases were rejected. The Plan contemplates that on the Effective Date, in accordance with the terms of the Asset Purchase Agreement, all unexpired contracts and nonresidential leases of real property that are listed on Schedule 2.2(f) to the Asset Purchase Agreement will be assumed by the Debtors and assigned to the Purchaser.

## H.    Exclusivity

Pursuant to sections 1121(b) and (c)(3) of the Bankruptcy Code, the Debtors have a certain amount of time within which (a) to file their Plan (the "Filing Period"); and (b) to solicit acceptances of their timely filed Plan (the "Solicitation Period") before other parties in interest are permitted to file plans. The Debtors filed a Plan on the Petition Date. Accordingly, the Debtors have, subject to further extensions or termination by the Bankruptcy Court, 180 days from the Petition Date to obtain acceptance of the Plan.

## I.     Claims Administration

### (i)     Schedules and Bar Dates.

On October 28, 2010, after having received an extension from the Bankruptcy Court, the Debtors filed their respective Schedules.  The aggregate scheduled liabilities for the Debtors were approximately $475 million.  Based upon a preliminary analysis of filed proofs of claim conducted by the Debtors, a significant amount of the asserted claims represent duplicate or otherwise redundant claims and accordingly, a significant amount of claims that have been filed are subject to disallowance by the Bankruptcy Court.  While it is likely that only a small portion of the filed claims will be allowed, the claims resolution process is in its nascent stages and the resolution and allowance of such claims remain subject to determination of the Bankruptcy Court.

By order dated October 8, 2010 (the "Bar Date Order"), the Bankruptcy Court fixed December 8, 2010 at 5:00 p.m. Prevailing Pacific Time (the "Bar Date") as the deadline for all non-governmental unit holders of alleged Claims against the Debtors to file proofs of claim against the Debtors and March 28, 2011 at 5:00 p.m. Prevailing Pacific Time (the "Governmental Bar Date") as the deadline for all governmental units to file proofs of claim against the Debtors.  The Bar Date Order also approved the form of publication notice (the "Bar Date Notice") and the form of the proof of claim to be utilized by creditors.  The Bar Date Notice was published on October 13, 2010 in the Virginian-Pilot and the Dayton Daily News and on October 14, 2010 in USA Today (National Edition).

Pursuant to the Bar Date Order, claims associated with the rejection of an executory contract or unexpired lease must be filed by the later of the Bar Date or 30 days from the notice of the order rejecting the executory contract or unexpired lease.  With respect to claims affected by amended schedules, such claims must be filed by the later of the Bar Date or 30 days from the notice of the amended schedules, and only if such schedule amendment affects such claim as described in the Bar Date Order.

### (ii)     Claim Objections.

In the ordinary course of business, the Debtors maintain books and records (the "Books and Records") that reflect, among other things, the Debtors' liabilities and the amounts owed to their creditors in connection with such liabilities.  The Debtors and their professionals have preliminarily started the process of reviewing the proofs of claim submitted in the Chapter 11 Cases, including any supporting documentation, and comparing the Claims asserted in the proofs of claim with the Books and Records to determine the validity of such Claims.

The Debtors anticipate that either they, pre-confirmation, or the Plan Administrator, post-confirmation, will file objections that will reduce the amount of Claims against the Debtors.  From and after the Effective Date, only the Plan Administrator will have the right to assert Claims Objections.  The Debtors are continuing to examine all of the Claims and anticipate filing claims objections during the pendency of these Chapter 11 Cases.

# X.

## LITIGATION PENDING AGAINST THE DEBTORS

**A.      Litigation.**

The Company is involved in legal proceedings from time to time incidental to the ordinary conduct of its business.  Litigation is subject to many uncertainties, and the outcome of individual matters is not predictable with assurance.  It is reasonably possible that the final resolution of any litigation could require the Company to make additional expenditures in excess of reserves that may have been established on account of such litigation.  In the ordinary course of business, various claims, suits and complaints have been filed against the Company in addition to the one specifically referred to below.  There is no litigation currently pending that the Company believes is material.  Although the final resolution of any such litigation matters could have a material effect on the Company's operating results for a particular reporting period, the Company believes that the litigation should not materially affect its consolidated financial position.

Prior to the Petition Date, Workflow Solutions LLC, among others, was a defendant in a lawsuit captioned e-LYNXX Corporation v. Innerworkings, Inc., et al., Civ. Action No. 2:10-cv-299, pending in the United States District Court for the Eastern District of Texas.  The suit asserts that the Company infringed and continues to infringe on certain U.S. patents to which e-LYNXX Corporation holds the rights (the "Patent Claims").  Upon the Debtors seeking bankruptcy protection, the Patent Claims were stayed by section 362 of the Bankruptcy Code.  On or about October 5, 2010, the Debtors filed a Suggestion of Bankruptcy in that case.  In general, the patents at issue in that case concern the automated system by which a candidate is selected from a pool of potential vendors using specific job criteria.  The suit seeks a permanent injunction against the Company's alleged infringement, an unspecified amount of compensatory damages, treble damages pursuant to 35 U.S.C. § 284, attorney's fees pursuant to 35 U.S.C. § 285, costs, and pre- and post-judgment interest.  ~~No trial date has been set.  The Company intends to vigorously defend against these Patent Claims and believes that it has a complete defense to the Patent Claims~~**On December 14, 2010, e-LYNXX filed a notice of voluntary dismissal of the action, and re-filed the action on that date in Pennsylvania against all of the defendants except Workflow Solutions LLC.  On December 8, 2010, e-LYNNX filed a general unsecured claim against Workflow Solutions LLC in the amount of $26,480,000 on account of the Patent Claims (the "e-LYNXX Claim").  On January 12, 2010, the Debtors filed an objection to the e-LYNXX Claim seeking to disallow it in its entirety.  The Debtors believe the e-LYNXX Claim is entirely without merit**.  In the event that the ~~Patent Claims become Allowed Claims against the Debtors, they~~**e-LYNXX Claim becomes an Allowed Claim against the Debtors, it** will be treated in accordance with Class 5A as General Unsecured Claims against the Non-Holdco Debtors.

# XI.

## SUMMARY OF THE CHAPTER 11 PLAN

### A.    Introduction.

The following is a summary of certain terms and provisions of the Plan.  This summary of the Plan is qualified in its entirety by reference to the full text of the Plan, which is annexed to this Disclosure Statement as **Exhibit A**.

### B.    General Description of the Treatment of Claims and Equity Interests.

The classes of Claims against and Equity Interests in, with respect to and to the extent applicable for, each Debtor will be treated under the Plan as follows:

(i)              **Class 1 – Priority Non-Tax Claims.**

(a)              Treatment.  Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of each Allowed Priority Non-Tax Claim, each Allowed Priority Non-Tax Claim will be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Claim entitles the holder in respect of such Claim will be fully reinstated and retained, and such Allowed Priority Non-Tax Claim (including any amounts to which such holder is entitled pursuant to section 1124(2) of the Bankruptcy Code) will be paid in full in accordance with such reinstated rights on the Effective Date or may be assumed and paid by the Purchaser and may be paid at the Purchaser's election in the ordinary course of business.

(b)              Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 16.2 of the Plan, the distributions provided in Section 5.1 of the Plan to holders of Allowed Priority Non-Tax Claims (when distributed to holders of Allowed Priority Non-Tax Claims in accordance with the Plan) are in full settlement and release of each holder's Priority Non-Tax Claim and all other Claims of such holder against any and all of the Debtors, if any, of such holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such Priority Non-Tax Claim was based.  Class 1 is unimpaired.

(ii)              **Class 2 – First Lien Lender Claims.**

(a)              Treatment.  The First Lien Lender Claims will be deemed Allowed in full in the aggregate amount of $141,528,677 (the "First Lien Lender Principal Claim") plus any accrued but unpaid post-petition interest through the Effective Date at the rate payable as provided in the Cash Collateral Orders (the "First Lien Lender Interest Claim"), and will not be subject to avoidance, setoff, off-set, recoupment, subordination (whether contractual, equitable or otherwise), recharacterization, disallowance, disgorgement, impairment, defenses, Claims, Causes of Action, suits, counterclaims, cross-claims, reduction or any other challenges under any applicable law or regulation by any person or entity.  All payments received by the First Lien Secured Parties from the Debtors during the Chapter 11 Cases will be retained by the First Lien Secured Parties and deemed interest payments or payments of reasonable professional fees, as applicable, and not reduction in principal.  In full and final satisfaction of each Allowed First

Lien Lender Claim, each holder of an Allowed First Lien Lender Claim will receive, on the Effective Date (i) in respect of the First Lien Lender Principal Claim, (via an exchange) its Pro Rata Share of the Newco First Lien Loan Notes and the Newco First Lien Administrative Agent, on behalf of each holder of an Allowed First Lien Lender Claim, will retain the liens which secured the First Lien Lender Claims as of the Petition Date by means of the Newco First Lien Loan Notes being secured by first priority liens on the assets of the Purchaser in accordance with the provisions of the Newco First Lien Loan Documents; under the Newco First Lien Loan Notes, each holder of an Allowed First Lien Lender Claim will receive deferred cash payments in the amounts and on the terms indicated on Schedule 1 attached to the Plan, and (ii) in respect of the First Lien Lender Interest Claim, cash in the amount of such interest, as provided in Section 6.2(f) of the Plan.

(b) Distribution. All distributions on account of the First Lien Lender Interest Claim will be made on the Effective Date to the First Lien Administrative Agent, and all other distributions on account of the First Lien Lender Claims will be made on the Effective Date to the Newco First Lien Administrative Agent, or its designee, which will serve as the designee for purposes of making distributions under the Plan to holders of First Lien Lender Claims. The Debtors will pay the Newco First Lien Administrative Agent and the Newco First Lien Administrative Agent its fees and expenses for making distributions under the Plan incurred through the Effective Date to holders of the First Lien Lender Claims.

(c) Full Settlement. As more specifically set forth in, and without in any way limiting, Section 16.2 of the Plan, the consideration provided in Section 5.2 of the Plan to the holders of First Lien Lender Claims are in full settlement and release of each holder's First Lien Lender Claim and all other Claims against any and all of the Debtors, if any, of such holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such First Lien Lender Claim was based. Class 2 is impaired.

(iii) **Class 3 – Second Lien Lender Secured Claims.**

(a) Treatment. The Second Lien Lender Secured Claims will be deemed Allowed in the aggregate amount of $170,000,000 and will not be subject to avoidance, setoff, off-set, recoupment, subordination (whether contractual, equitable or otherwise), recharacterization, disallowance, disgorgement, impairment, defenses, Claims, Causes of Action, suits, counterclaims, cross-claims, reduction or any other challenges under any applicable law or regulation by any person or entity. All payments received by the Second Lien Secured Parties as adequate protection from the Debtors during the Chapter 11 Cases will be retained by the Second Lien Secured Parties and will not be deemed a reduction in principal. In full and final satisfaction of each Allowed Second Lien Secured Lender Claim, each holder of an Allowed Second Lien Lender Secured Claim will receive (via an exchange) its Pro Rata Share of (i) the Newco Preferred Equity Interests, and (ii) the Newco Second Lien Loan Notes and the Second Lien Administrative Agent, on behalf of each holder of an Allowed Second Lien Secured Lender Claim, will retain the liens which secured the Second Lien Lender Secured Claims as of the Petition Date by means of the Newco Second Lien Loan Notes being secured by second priority liens on the assets of the Purchaser in accordance with the provisions of the Newco Second Lien Loan Documents; under the Newco Second Lien Loan Notes, each holder of an

Allowed Second Lien Lender Secured Claim will receive deferred cash payments in the amounts and on the terms indicated on Schedule 2 attached to the Plan.

(b)        Distribution.  All distributions on account of the Second Lien Lender Secured Claims will be made on the Effective Date to the Newco Second Lien Administrative Agent or its designee, which will serve as the designee for purposes of making distributions under the Plan to holders of Second Lien Lender Secured Claims.  The Debtors will pay the Newco Second Lien Administrative Agent its fees and expenses for making distributions under the Plan incurred through the Effective Date to holders of the Second Lien Lender Secured Claims.

(c)        Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 16.2 of the Plan, the consideration provided in Section 5.3 of the Plan to the holders of Second Lien Lender Secured Claims are in full settlement and release of each holder's Second Lien Lender Secured Claim against any and all of the Debtors, if any.  Class 3 is impaired.

(iv)        **Class 4 – Other Secured Claims.**

(a)        Treatment.  Except to the extent that the holder agrees to less favorable treatment, each holder of an Allowed Other Secured Claim against any Debtor will, at the sole option of the Purchaser and subject to such holder's realization of any rights of setoff, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, (i) retain its lien in such property, or the proceeds of such property, securing such Allowed Other Secured Claim and be paid by the Purchaser in the ordinary course of business in accordance with the terms existing between the Debtors and such holder with respect to such Allowed Other Secured Claim prior to the Petition Date; (ii) retain its lien in such property, or the proceeds of such property, securing such Allowed Other Secured Claim and receive deferred cash payments from the Purchaser totaling at least the amount of such Allowed Other Secured Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in each Debtor's interest in such property, or (iii) be transferred the collateral securing such Claim, each in full and complete satisfaction of such Claim.

(b)        Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 16.2 of the Plan, the consideration provided in Section 5.4 of the Plan to the holders of Other Secured Claims are in full settlement and release of each holder's Other Secured Claim and all other Claims against any and all of the Debtors, if any, of such holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such Other Secured Claim was based.  Class 4 is impaired.

(v)        **Class 5A – General Unsecured Claims against Non-Holdco Debtors.**

(a)        Treatment.  Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of each such Allowed General Unsecured Claim against a Non-Holdco Debtor, each holder of an Allowed General Unsecured Claim against a

Non-Holdco Debtor (other than those Claims classified in Class 5C) will receive its Pro Rata Share of the Unsecured Claims Fund.

(b)         Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 16.2 of the Plan, the consideration provided in Section 5.5 of the Plan (and the payment or transfer of such consideration to the Unsecured Claim Fund) to the holders of General Unsecured Claims are in full settlement and release of each holder's General Unsecured Claim and all other Claims against any and all of the Debtors, if any, of such holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such General Unsecured Claim was based.  Class 5A is impaired.

(vi)         **Class 5B– General Unsecured Claims against Holdco Debtors.**

Holders of Claims in Class 5B will not receive or retain any property under the Plan on account of the General Unsecured Claims against Holdco Debtors.

(vii)         **Class 5C– Multi-Debtor General Unsecured Claims**

(a)         Treatment.  Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of each such Multi-Debtor General Unsecured Claim, each holder of an Allowed Multi-Debtor General Unsecured Claim will receive its Pro Rata Share of the Unsecured Claims Fund; provided, however, that if at least two-thirds in aggregate dollar amount and more than one-half in the aggregate number of the Allowed Claims in Class 5A that vote, vote to accept the Plan, each of the holders of the Second Lien Lender Deficiency Claim will be deemed to agree to accept the aggregate amount of $10 on account of all of their Class 5C Claims to be paid to the Second Lien Administrative Agent; provided further, however, that, with the consent of the Debtors, the Purchaser, Perseus, and the Second Lien Administrative Agent, the PBGC may agree to receive a different treatment on account of the PBGC Claims, which will be in full and final satisfaction and settlement of such PBGC Claims.  By way of clarification, any such satisfaction and settlement shall provide for the release of all Claims and potential claims against any of the Debtors, the Purchaser, and their respective Related Parties (including, without limitation, any claims or potential claims relating to alleged control group or alter ego status) which are or were held by the PBGC pertaining to, arising from, or in connection with the Pension Plan or otherwise

(b)         Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 16.2 of the Plan, the consideration provided in  Section 5.65.7 of the Plan (and the payment or transfer of such consideration to the Unsecured Claim Fund) to the holders of Multi-Debtor General Unsecured Claims are in full settlement and release of each holder's Multi-Debtor General Unsecured Claim and all other Claims against any and all of the Debtors, if any, of such holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such Multi-Debtor General Unsecured Claim was based. Class 5C is impaired.

(viii)         **Class 6 – Intercompany Claims.**

All Intercompany Claims will be cancelled as of the Effective Date, and holders thereof will not receive a distribution under the Plan in respect of such Claims.

(ix)        **Class 7 – WF Equity Interests.**

Each holder of a WF Equity Interest will not receive or retain any Property under the Plan on account of such WF Equity Interest. Upon the termination of the Plan Administrator in accordance with Section 9.7 of the Plan, all WF Equity Interests will be deemed cancelled.

(x)        **Deemed Satisfaction of Secondary Liability Claims.**

All Secondary Liability Claims will be allowed in the amount of zero dollars ($0.00) and deemed satisfied in full as a result of Plan Distributions made on the underlying Allowed Claim pursuant to Article V. From and after the Effective Date, no Secondary Liability Claims will be of further force or effect.

(xi)        **Insurance Policies.**

Notwithstanding anything to the contrary in the Plan, all insurance agreements that are not assigned to and assumed by the Purchaser, and all obligations of the Debtors and the counterparties thereto shall be unaffected by the Plan and shall remain enforceable according to their terms and applicable law; provided, however, such agreements may be terminated at the discretion of the Debtors, Post-Effective Date Debtors, or the Plan Administrator.

**C.     Provisions for Treatment of Unclassified Claims under the Plan.**

(i)        **Unclassified Claims.**

Administrative Expense Claims and Priority Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively. Administrative Expense Claims and Priority Tax Claims are not designated as classes of Claims for the purposes of the Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

(ii)        **Treatment of Administrative Expense Claims.**

All Administrative Expense Claims will be treated as follows:

(a)        Time for Filing Administrative Expense Claims.

The holder of an Administrative Expense Claim, other than (i) a Fee Claim; (ii) a liability incurred and payable after the Petition Date in the ordinary course of business to customers, suppliers, vendors, contractors or employees by a Debtor (which is assumed by the Purchaser pursuant to section 6.2(e) of the Plan); (iii) a Section 503(b)(9) Claim; or (iv) an Administrative Expense Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve on the Debtors, the Committee, and the U.S. Trustee, notice of such Administrative Expense Claim by the Administrative Expense Claim Bar Date for such Administrative Expense Claims that have accrued or are anticipated to accrue on or before February 28, 2011. Any estimated Administrative Expense Claim that is filed on account of an anticipated Administrative Expense Claim will establish the maximum allowable amount of such Administrative Expense Claim. Such notice must include at a minimum (A) the name of the

Debtor(s) which are purported to be liable for the Claim, (B) the name of the holder of the Claim, (C) the amount of the Claim, and (D) the basis of the Claim (including any documentation evidencing or supporting such Claim).  **THE FAILURE TO FILE A NOTICE OF ADMINISTRATIVE EXPENSE CLAIM ON OR BEFORE THE ADMINISTRATIVE EXPENSE CLAIM BAR DATE AND THE FAILURE TO SERVE SUCH NOTICE TIMELY AND PROPERLY WILL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED AND DISALLOWED WITHOUT FURTHER ORDER OF THE BANKRUPTCY COURT**.  **IF FOR ANY REASON ANY SUCH ADMINISTRATIVE EXPENSE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM WILL IN NO EVENT HAVE RECOURSE OF ANY KIND TO ANY PROPERTY DISTRIBUTED PURSUANT TO THE PLAN.**

(b) Time for Filing Fee Claims.

Each Professional who holds or asserts a Fee Claim will be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Fee Application within twenty (20) days after the Effective Date or such other specific date as may be established by the Bankruptcy Court.  **THE FAILURE TO FILE TIMELY AND SERVE SUCH FEE APPLICATION WILL RESULT IN THE FEE CLAIM BEING FOREVER BARRED**.

(c) Time for Filing Section 503(b)(9) Claims.

In accordance with the Bar Date Order, the deadline for filing a Section 503(b)(9) Claim was December 8, 2010 at 5:00 p.m., Prevailing Pacific Time.  **THE FAILURE TO SUBMIT SUCH REQUEST BY THE BAR DATE WILL RESULT IN THE SECTION 503(b)(9) CLAIM BEING DEEMED DISALLOWED AS AN ADMINISTRATIVE EXPENSE CLAIM**.  Such disallowance does not prevent such Claim from being Allowed as a Claim other than as an Administrative Expense Claim to the extent otherwise allowable.

(d) Allowance of Administrative Expense Claims, Fee Claims and Section 503(b)(9) Claims.

An Administrative Expense Claim (other than a Fee Claim or Section 503(b)(9) Claim) with respect to which notice has been properly and timely filed and served pursuant to Section 6.2(a) of the Plan, or a Section 503(b)(9) Claim with respect to which a request for allowance has been properly filed and served pursuant to Section 6.2(c) of the Plan, will become an Allowed Administrative Expense Claim if no objection is filed within thirty (30) days after the later of (i) the Effective Date, or (ii) the date of service of the applicable notice of Administrative Expense Claim or such later date as may be approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing.  If an objection is filed within such 30-day period (or any extension thereof), the Administrative Expense Claim will become an Allowed Administrative Expense Claim only to the extent allowed by Final Order or by mutual agreement among the parties.  A Fee Claim in respect of which a Fee Application has been properly filed and served pursuant to Section 6.2(b) of the Plan will become an Allowed Administrative Expense Claim only to the extent allowed by Final Order.

(e)                Payment of Allowed Administrative Expense Claims.

On the Distribution Date, all unpaid Administrative Expense Claims of the Debtors arising in the ordinary course of the Debtors' business to customers, suppliers, vendors, contractors or employees during the pendency of the Chapter 11 Cases and all Section 503(b)(9) Claims will be assumed pursuant to the terms of the Asset Purchase Agreement and paid by the Purchaser and may be paid at the Purchaser's election in the ordinary course of business; provided that all other Administrative Expense Claims, including the Fee Claims, will not be assumed by the Purchaser and will be paid by the Plan Administrator from the Administrative Expense Claim Reserve on the applicable Distribution Date; provided, further, however, that such treatment will not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim; provided, further, however, that all fees and expenses of counsel and other advisors to the First Lien Administrative Agent and the Second Lien Administrative Agent will constitute Allowed Administrative Expense Claims and will be paid by the Debtors without the necessity to file a proof of claim or file any application to receive any approval from the Bankruptcy Court. For purposes of determining the amount of the Administrative Expense Claim Reserve, at least five (5) days prior to the Effective Date, each Professional who holds or asserts a Fee Claim will be required to provide the Debtors and Purchaser with an estimate of the total amount of its Fee Claim. Upon the Effective Date, none of the Debtors, the Post-Effective Date Debtors, or the Plan Administrator will have any obligation or liability on account of any Administrative Expense Claims assumed by the Purchaser. Upon the Effective Date, the Purchaser shall not have any obligation or liability on account of any Administrative Expense Claims other than the funding of the Administrative Expense Claims Reserve and the Administrative Expense Claims that are assumed by the Purchaser in accordance with the terms of 6.2(e) of the Plan and the Asset Purchase Agreement.

(f)                Payment of Amounts Accrued But Unpaid.

Notwithstanding anything else contained in the Plan, on the Effective Date, or as soon as practicable thereafter, any accrued but unpaid interest at the rate provided in the Cash Collateral Orders and reasonable professional fees to be paid to the First Lien Administrative Agent, and unpaid reasonable professional fees to be paid to the Second Lien Administrative Agent during the pendency of the Debtors' Chapter 11 Cases pursuant to the Cash Collateral Orders will be paid in Cash by the Plan Administrator from the Administrative Expense Claims Reserve in accordance with the terms of the Cash Collateral Orders and without the necessity of First Lien Administrative Agent or Second Lien Administrative Agent being required to seek approval of such payment from the Bankruptcy Court.

(iii)          **Treatment of Priority Tax Claims.**

(a)                Unless otherwise agreed with a holder of an Allowed Priority Tax Claim, the Debtors, in their sole discretion, may choose whether Allowed Priority Tax Claims will be paid either: (1) in Cash, in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest from the Effective Date at a fixed annual rate equal to five percent (5%) and paid in regular installments of equal amount over a period not exceeding five (5) years from the Petition Date; or (2) in full in Cash on, or as soon thereafter as is reasonably practicable,

the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim. The Debtors reserve the right to prepay, without penalty, at any time under option (1) above. Priority Tax Claims may also be assumed and paid by Purchaser at Purchaser's election.

(b)     The Confirmation Order will, among other things, enjoin any holder of an Allowed Tax Claim from commencing or continuing any action or proceeding against any responsible person, officer or director of the Debtors that otherwise would be liable to such holder for payment of a Tax Claim so long as the Debtors are in compliance with Section 6.3 of the Plan. So long as the holder of an Allowed Tax Claim is enjoined from commencing or continuing any action or proceeding against any responsible person, officer or director under the Plan or pursuant to the Confirmation Order, the statute of limitations for commencing or continuing any such action or proceeding will be tolled.

## D.     Acceptance or Rejection of the Plan; Effect of Rejection by One or More Classes of Claims or Equity Interests

### (i)          **Classes Entitled to Vote.**

Only holders of Claims in the following classes are permitted to vote on the Plan: Class 2 (First Lien Lender Claims); Class 3 (Second Lien Lender Secured Claims); Class 4 (Other Secured Claims); Class 5A (General Unsecured Claims of Non-Holdco Debtors); and Class 5C (Multi-Debtor General Unsecured Claims).

### (ii)          **Class Acceptance Requirement.**

A class of Claims will have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such class that have voted on the Plan.

### (iii)          **Tabulation of Votes on a Non-Consolidated Basis.**

The Balloting Agent will tabulate all votes on the Plan on a non-consolidated basis by class and by Debtor.

### (iv)          **Separate Plan for Each Debtor.**

The Plan constitutes a joint chapter 11 plan of reorganization proposed with respect to each Debtor and, accordingly, the classifications set forth in Classes 1 through 7 will be deemed to apply to each of the Debtors separately, as applicable. For example, without limitation and for illustration purposes only, WF Capital is not a borrower or a guarantor on the First Lien Loan Documents or the Second Lien Loan Documents; therefore the WF Capital Plan does not contain a Class 2 or Class 3 as WF Capital has no creditors that would be classified in Class 2 or Class 3. In the event that the Bankruptcy Court determines that the Plan is not confirmable with respect to any particular Debtor, the Debtors, with the consent of the Purchaser, Perseus and the Second Lien Administrative Agent, which consent will not be unreasonably withheld, reserve the right to sever such Debtor from the Plan and proceed to confirm and consummate the Plan with respect to all other Debtors.

<u>(v)</u>　　　　　**Cramdown.**

If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a) of the Bankruptcy Code, <u>except</u> subsection (8) thereof, the Plan will be treated as a request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the failure to satisfy the requirements of section 1129(a)(8), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each class of Claims that is impaired under, and has not accepted, the Plan.

**E.　　Means for Implementation of the Plan.**

<u>(i)</u>　　　　　**Sale of Assets, Consummation of Sale Transaction and Distribution of New Notes and Newco Preferred Equity Interests.**

On the Effective Date, the Debtors will consummate the Sale Transaction and, among other things, the Purchased Assets including the Assigned Contracts, will be transferred to the Purchaser free and clear of all liens, Claims, interests and encumbrances, other than Permitted Liens (as defined and provided in the Asset Purchase Agreement), pursuant to the terms of the Asset Purchase Agreement and the Confirmation Order.  In consideration of the Purchased Assets, the Purchaser will execute and deliver the New Notes and the Newco Preferred Equity Interests to the Debtors, and the Debtors will distribute the Newco First Lien Loan Notes to the Newco First Lien Administrative Agent in satisfaction of the First Lien Lender Claims, and the Debtors will distribute the Newco Second Lien Loan Notes and the Newco Preferred Equity Interests to the Newco Second Lien Administrative Agent in satisfaction of the Second Lien Lender Secured Claims.  The New Notes will be secured by the assets of the Purchaser, in accordance with the provisions of the Newco First Lien Loan Documents and the Newco Second Lien Loan Documents.  The Newco Intercreditor Agreement will govern the relative priorities and rights between the holders of the Newco First Lien Loan Notes and the Newco Second Lien Loan Notes.  On the Effective Date, upon the consummation of the Sale Transaction, the Newco First Lien Loan Notes, the Newco Second Lien Loan Notes, the Newco Preferred Equity Interests, the Newco First Lien Loan Documents, the Newco Second Lien Loan Documents and the Newco Intercreditor Agreement will each be executed and delivered by the Purchaser and will be in full force and effect according to its terms.

<u>(ii)</u>　　　　　**Certain Transactions On the Effective Date.**

The Debtors will, on the Effective Date, (a) consummate the Sale Transaction; (b) distribute the New Notes and the Newco Preferred Equity Interests; (c) implement all settlements and compromises as set forth in or contemplated by the Plan; (d) amend and restate their constituent documents in accordance with the terms of the Plan; and (e) execute, deliver, and perform all obligations under the Plan Documents.

<u>(iii)</u>　　　　　**Appointment of Plan Administrator.**

On the Effective Date, the Plan Administrator will be appointed and will act in accordance with the provisions of the Plan, including, without limitation, the provisions of Article IX of the Plan.  On the Effective Date, the Plan Funds will be established from the

Closing Consideration Amount and will be under the control of the Plan Administrator in accordance with the terms of the Plan.

(iv)     **Unsecured Claims Fund.**

On the Effective Date, the Unsecured Claims Fund will be established in the amount of $1 million ($1,000,000) from the Plan Funds.  The Plan Administrator will administer the Unsecured Claims Fund in accordance with the provisions of the Plan and the Confirmation Order.  The Unsecured Claims Fund will be the sole source of funding of distributions to be made to the holders of Allowed Claims in Class 5A and 5C.

(v)     **Cancellation of Notes and Equity Interests.**

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing indebtedness of the Debtors and Equity Interests will be cancelled, and the obligations of the Debtors thereunder or in any way related thereto will be discharged.  On the Effective Date, The Relizon Company's participation in the First Lien Credit Facility will be deemed to be retired and satisfied in full.

(vi)     **Corporate Action.**

(a)     The entry of the Confirmation Order will constitute authorization for the Debtors or the Plan Administrator (as the case may be) to take or cause to be taken all corporate actions necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date and all such actions taken or caused to be taken will be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including without limitation, any action required by the stockholders or directors of the Debtors, including, among other things, (i) the adoption or amendment of any organizational documents; (ii) the modification, termination or cancellation of any outstanding instrument, document or agreement as required by the Plan; (iii) the modification, termination or cancellation of any Equity Interest of the Debtors, as required by the Plan; (iv) the appointment of the Plan Administrator; (v) the distribution of the New Notes and the Newco Preferred Equity Interests; (vi) all transfers of Assets that are to occur pursuant to the Plan; (vii) the making of all Plan Distributions; (viii) the implementation of all settlements and compromises as set forth in or contemplated by the Plan; (ix) performance and consummation of the Asset Purchase Agreement and consummation of the Sale Transaction; and (x) executing and/or entering into any and all transactions, contracts, or arrangements permitted by applicable law, order, rule or regulation.

(b)     The officers of the Debtors or the Post-Effective Date Debtors (as the case may be) are authorized and directed to do all things and to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Plan and to take all necessary action required in connection therewith, in the name of and on behalf of the Debtors.

(c)     The constituent documents of all of the Post-Effective Date Debtors will, as of the Effective Date, be amended to prohibit the issuance of non-voting equity securities by such Debtor as required by section 1123(a)(6) of the Bankruptcy Code.  Following

the Effective Date, the Post-Effective Date Debtors will be entitled to issue non-voting securities that are not equity securities, in their sole discretion, and will be entitled to issue non-voting equity securities if the constituent documents are properly amended in the ordinary course after the Effective Date.

(vii) **Continued Corporate Existence of the Debtors.**

Each of the Debtors will continue to exist after the Effective Date as a separate entity, with all the powers available to such legal entity, in accordance with applicable law and pursuant to their constituent documents, as modified by the Plan. On or after the Effective Date, the Post-Effective Date Debtors may, within the Plan Administrator's sole and exclusive discretion, take such action as permitted by applicable law, their constituent documents, and the Plan Documents, as they determine is reasonable and appropriate, including (a) causing any or all of the Post-Effective Date Debtors to be dissolved or merged, combined, consolidated or converted into one or more of the other Post-Effective Date Debtors or other legal entities; (b) liquidating and dissolving any of the Post-Effective Date Debtors; and (c) changing the legal name of any of the Post-Effective Date Debtors. New Equity Interests in any such Post-Effective Date Debtors, on terms determined by the Plan Administrator, will be deemed to have been issued, as of the Effective Date, by such Post-Effective Date Debtors to its immediate parent as of the Petition Date or the Plan Administrator, as necessary and as applicable.

Upon the filing with the Bankruptcy Court, by the Plan Administrator, of a request to close the Bankruptcy Cases and upon the entry of a final decree, each of the Debtors will be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; provided, however, that the Plan Administrator may file on behalf of each Debtor, with the office of the applicable secretary of state, a certificate of dissolution. From and after the Effective Date, each of the Debtors will not be required to file any document, or take any other action, to withdraw its business operation from any state in which it was previously conducting its business operations. On the date the Debtors are dissolved in accordance with the Plan, the common stock certificates and other instruments evidencing WF Equity Interests will be deemed cancelled without further act or action under any applicable agreement, law, regulation, order or rule, and the Equity Interests in the Debtors evidenced thereby will be extinguished.

(viii) **Reserved.**

(ix) **Revesting of Assets.**

Except as otherwise provided in the Plan, the Plan Documents, or in any agreements contemplated under the Plan, on the Effective Date all Excluded Assets (but no other assets) will vest in the Post-Effective Date Debtors free and clear of all Claims, liens, charges, encumbrances, or other interests. However, property that the Post-Effective Date Debtors hold will be held in trust solely for the benefit of entities that are entitled under the Plan to receive that property or the net proceeds from the liquidation of that property.

(x) **Assumption of Priority Claims by Purchaser.**

On the Effective Date, the Purchaser will assume the obligations to pay Priority Tax Claims and Priority Non-Tax Claims listed on the Assumed Priority Claim Schedule. Upon the Effective Date, the Purchaser will be solely liable for the payment of all such Priority Tax Claims and Priority Non-Tax Claims listed on the Assumed Priority Claim Schedule in accordance with the terms of the Plan. Upon the Effective Date, none of the Debtors, the Post-Effective Date Debtors, or the Plan Administrator will have any obligation or liability on account of any such assumed Priority Tax Claims and Priority Non-Tax Claims.

(xi)     **Release of Liens.**

Except as otherwise provided in the Plan (including, without limitation, the retention of liens described in Sections 5.2(a) and 5.3(a) of the Plan) or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Plan Distributions made pursuant to the Plan, all interests, mortgages, deeds of trust, liens or other security interests against the property of any Estate will be fully released.

Except as otherwise provided in the Asset Purchase Agreement, on the Effective Date all Purchased Assets will be transferred to the Purchaser free and clear of all Claims or encumbrances pursuant to sections 105, 363, 365, 1123 and 1141(c) of the Bankruptcy Code.

(xii)     **Substantive Consolidation.**

In the event that at or before the Confirmation Hearing, the Bankruptcy Court concludes, pursuant to Bankruptcy Code sections 105(a) and 1123(a)(5)(C), that substantive consolidation of one or more of the Debtors with one or more of the other Debtors is appropriate, and the Debtors, with the consent of Purchaser and the Second Lien Administrative Agent, which consent will not unreasonably be withheld, reserve the right to request such consolidation, then, unless otherwise ordered by the Bankruptcy Court, all property, rights, and Claims of the substantively consolidated Debtors and their respective Estates, and all Claims against the substantively consolidated Debtors and their respective Estates will be deemed pooled on the Effective Date for purposes of allowance, treatment, and Plan Distributions under the Plan and multiple proofs of Claim on account of any Claim upon which any of the substantively consolidated Debtors are co-obligors or guarantors or otherwise may be contingently liable will, without necessity of objection by any party, be deemed to constitute a single proof of Claim entitled to a single satisfaction from the substantively consolidated Estates in accordance with the terms of the Plan; the duplicative Claims being otherwise deemed disallowed; provided, however, that the Purchaser or Second Lien Administrative Agent may withhold their consent in their sole discretion if any such substantive consolidation negatively affects the treatment provided to the First Lien Secured Parties, the Second Lien Secured Parties or Purchaser**. No request for substantive consolidation has been made as of the date hereof, and no request for substantive consolidation that is made shall be of any effect unless and until it is ordered by the Bankruptcy Court**.

(xiii)     **Initial Boards of Directors and Officers.**

On the Effective Date, the charters and by-laws of each Debtor will be deemed amended, to the extent necessary, to require only one director and only one officer, who will be the same person. Such person will be the Plan Administrator, or its designee.

<u>(xiv)</u>　　　　　　**Remittance of Excess Plan Funds to the Purchaser.**

After the discharge by the Plan Administrator of all of its duties under the Plan, all Plan Funds, if any, remaining after the payment of all parties by the Plan Administrator in accordance with terms of the Plan, and after payment by the Plan Administrator of all of its expenses as provided in the Plan, will be remitted and absolutely assigned by the Plan Administrator to the Purchaser.

<u>(xv)</u>　　　　　　**Exemption from Securities Laws.**

The issuance of the New Notes and the Newco Preferred Equity Interests in exchange for claims or interests will be, to the maximum extent provided in section 1145 of the Bankruptcy Code and under other applicable nonbankruptcy law, exempt from registration under any applicable federal or state securities laws, including under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder, and the Debtors believe the Purchaser will not be subject to the reporting requirements of the Securities Exchange Act of 1934. The New Notes and the Newco Preferred Equity Interests issued in connection with the Plan in reliance on section 1145 of the Bankruptcy Code may be freely transferred, subject to any restrictions contained in the governing documents for each instrument, unless the recipients are underwriters as provided in section 1145 of the Bankruptcy Code. Nothing in the Plan is intended to preclude the Securities and Exchange Commission from performing its statutory duties regarding any person or entity in any forum with proper jurisdiction.

**F.　　The Plan Administrator**

<u>(i)</u>　　　　　　**Generally.**

The powers, authority, responsibilities and duties of the Plan Administrator are set forth in the Plan.

<u>(ii)</u>　　　　　　**Appointment of the Plan Administrator.**

On the Effective Date the Plan Administrator will be appointed. The Plan Administrator will be selected by the Committee so long as the Committee does not file an objection or otherwise oppose the Plan. Should the Committee file an objection or otherwise oppose the Plan, the Debtors will select the Plan Administrator. The Plan Administrator will have all powers, rights, duties and protections afforded the Plan Administrator under the Plan. All payments required or permitted to be made by the Plan Administrator or the Post-Effective Date Debtors under the Plan, including, without limitation, post-Effective Date operating expenses and the Plan Administrator Reserve, will be made from the Plan Funds. The Plan Administrator will use the Plan Administrator Reserve to fund the post-Effective Date operating and wind-down expenses of the Debtors, including to pay its professional fees.

<u>(iii)</u>　　　　　　**Funding Expenses of the Plan Administrator.**

On and after the Effective Date, the Plan Funds will be under the direction and control of the Plan Administrator. The Plan Administrator will disburse the Plan Funds, without further application to or order of the Bankruptcy Court, to (a) satisfy the obligations of the Plan Administrator and the Post-Effective Date Debtors after the Effective Date incurred in accordance with the provisions of the Plan and the Confirmation Order, (b) pay the expenses from the Plan Administrator Reserve, and (c) make the Plan Distributions. Professional fees and other wind-down expenses incurred by the Plan Administrator from and after the Effective Date in connection with the consummation and implementation of the Plan will be paid in the ordinary course of business by the Plan Administrator from the Plan Administrator Reserve, without further application to or order of the Bankruptcy Court. Any dispute regarding compensation will be resolved by agreement of the parties or if the parties are unable to agree, as determined by the Bankruptcy Court. The Plan Administrator Reserve will be the sole source of funding of distributions to pay the expenses of the Plan Administrator and any professionals retained by the Plan Administrator.

(iv) **Service and Removal.**

If the Plan Administrator resigns or is terminated, the U.S. Trustee will select a new Plan Administrator, subject to Bankruptcy Court approval.

(v) **Authority.**

The Plan Administrator will have the authority and right on behalf of the Post-Effective Date Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

(a) control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors;

(b) receive, hold and disburse the Plan Funds in accordance with the provisions of the Plan;

(c) make Plan Distributions to holders of Allowed Claims in accordance with the Plan;

(d) administer the Excluded Assets;

(e) exercise its reasonable business judgment to direct and control the wind down, liquidation and/or abandoning of the assets of the Post-Effective Date Debtors;

(f) retain and pay professionals to assist in performing its duties under the Plan;

(g) maintain the books and records and accounts of the Post-Effective Date Debtors;

(h)  invest Cash constituting the Plan Funds;

(i)  incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator;

(j)  administer each Post-Effective Date Debtor's tax obligations, including (i) filing and paying tax returns, (ii) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of such Debtor ending after the Petition Date through the liquidation of such Debtor as determined under applicable tax laws and (iii) representing the interest and account of each Debtor or its estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(k)  take all action necessary to liquidate and dissolve each of the Post-Effective Date Debtors;

(l)  prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Post-Effective Date Debtors that are required by any Governmental Unit or applicable law;

(m)  cooperate with The Workflow Management Benefit Plan Administrative Committee, or any successor thereto, pertaining to the Pension Plan, provided that neither **the Purchaser,** the Plan Administrator nor the Post-Effective Date Debtors will have any liability or responsibility to make payments or contributions to the Pension Plan or on account of the PBGC Claims, other than as provided in Class 5C of the Plan; and

(n)  remit any remaining Plan Funds to the Purchaser, in accordance with the provisions of Section 8.14 of the Plan.

(vi)  **Plan Distribution Withholding.**

The Plan Administrator may withhold from amounts distributable to any Person any and all amounts, determined in the Plan Administrator's sole discretion, to be required by the Plan, any law, regulation, rule, ruling, directive or other governmental requirement.

(vii)  **Termination of the Plan Administrator.**

The duties, responsibilities and powers of the Plan Administrator will terminate upon (a) the completion of its duties under the Plan, (b) the completion of the administration of, and distributions on account of, all Claims under the Plan, and (c) the closing of the Chapter 11 Cases.

(viii)  **Plan Administrator Post-Effective Date.**

**Except as otherwise provided in Section 9.8 of the Plan, the Plan Administrator, together with its officers, directors, employees, agents, and representatives,**

are exculpated pursuant to the Plan by all Persons, Entities, holders of Claims and Equity Interests, and all other parties in interest, from any and all Causes of Action arising out of the discharge by the Plan Administrator of the powers and duties conferred upon the Plan Administrator by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in the furtherance of the Plan, or applicable law, **except** solely for actions or omissions arising out of the Plan Administrator's willful misconduct or gross negligence. No holder of a Claim or an Equity Interest, or representative thereof, will have or pursue any Cause of Action (a) against the Plan Administrator or its officers, directors, employees, agents, and representatives for making Plan Distributions in accordance with the Plan, or (b) against any holder of a Claim for receiving or retaining Plan Distributions as provided for by the Plan. Nothing contained in Section 9.8 of the Plan will preclude or impair any holder of an Allowed Claim or Allowed Equity Interest from bringing an action in the Bankruptcy Court against any Debtor or Post-Effective Date Debtor to compel the making of Plan Distributions contemplated by the Plan on account of such Claim or Equity Interest.

## G.     Plan Distribution Provisions

### (i)                    Sources of Cash for Plan Distributions.

All Cash necessary for the Plan Administrator to make payments and Plan Distributions will be obtained from the Plan Funds.

### (ii)                   Investment of Funds Held by the Plan Administrator; Tax Reporting by the Plan Administrator.

The Plan Administrator may, but will not be required to, invest any funds held by the Plan Administrator pending the distribution of such funds pursuant to the Plan in investments that are exempt from federal, state, and local taxes. Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Plan Administrator of a private letter ruling if the Plan Administrator so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Administrator), the Plan Administrator may (a) treat the funds and other property held by it as held in a single trust for federal income tax purposes in accordance with the trust provisions of the Internal Revenue Code (sections 641 et seq.), and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

### (iii)                  Timing of Plan Distributions.

Except as otherwise provided in the Plan, without in any way limiting Article XI of the Plan, payments and distributions in respect of Allowed Claims will be made by the Plan Administrator on the relevant Distribution Date, provided, however, that (a) payments and distributions in respect of the Allowed First Lien Lender Claims will be made on the Effective Date in accordance with Section 5.2 of the Plan, (b) payments and distributions in respect of the Allowed Second Lien Lender Secured Claims will be made on the Effective Date in accordance with Section 5.3 of the Plan, and (c) payments and distributions in respect of the Allowed Class

5A and 5C Claims will be made on the Unsecured Claims Initial Distribution Date or a Periodic Distribution Date in accordance with Section 10.5 of the Plan.

For federal income tax purposes, <u>except</u> to the extent a Plan Distribution is made in connection with reinstatement of an obligation pursuant to section 1124 of the Bankruptcy Code, a Plan Distribution will be allocated first to the principal amount of a Claim and then, to the extent the Plan Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

(iv) **Unsecured Claims Fund.**

(a) Estimation.

For purposes of effectuating the reserve provisions of the Plan and the allocations and distributions to holders of Allowed Class 5A and 5C Claims, the Bankruptcy Court will, on or prior to the Unsecured Claims Initial Distribution Date, pursuant to Section 11.6 of the Plan, fix or liquidate the amount of any Contested Class 5A or Class 5C Claim, in which event the amount so fixed will be deemed the Allowed amount of such Claim for purposes of the Plan or, in lieu thereof, the Court will determine the Maximum Allowable Amount. The Bankruptcy Court's entry of an estimation order may limit the distribution to be made on individual Contested Claims, regardless of the amount finally Allowed on account of such Contested Claims, and no holder will have recourse against the Debtors or the Plan Administrator as such holder's sole recovery will be from the Unsecured Claims Cash Amount.

(b) Creation of Unsecured Claims Fund.

Upon the occurrence of the Effective Date, the Plan Administrator will deposit the Unsecured Claims Cash Amount in the Unsecured Claims Fund. The Unsecured Claims Fund and all amounts therein (including any interest actually earned thereon) will be maintained by the Plan Administrator for distribution in accordance with Section 10.5 of the Plan to holders of Allowed Class 5A and Class 5C Claims.

(v) **Distributions After Allowance of Contested Class 5A and Class 5C Claims.**

Distributions to each holder of a Contested Class 5A and Class 5C Claim, to the extent that such General Unsecured Claim ultimately becomes an Allowed General Unsecured Claim, will be made in accordance with the provisions of the Plan. From and after the Unsecured Claims Initial Distribution Date, as soon as practicable after the date that the order or judgment of the Court allowing any Contested General Unsecured Claim becomes a Final Order, the Plan Administrator will distribute to the holder of such Allowed General Unsecured Claim its Pro Rata Share of the Unsecured Claims Fund, based on the Maximum Allowable Amount of all the then Contested Class 5A or Class 5C Claims, on the next Periodic Distribution Date that is at least fifteen (15) days after the date of such Final Order. All amounts actually earned in respect of the Unsecured Claims Cash Amount (including all interest) will be for the benefit of holders of Allowed General Unsecured Claims.

(vi)     **Distributions After Disallowance of Contested Class 5A or Class 5C Claims.**

Holders of Allowed General Unsecured Claims that receive an initial distribution after allowance of such holder's General Unsecured Claim as set forth in Section 10.5 of the Plan, may receive subsequent distributions if and to the extent that other Class 5A or Class 5C Claims are disallowed or expunged, as follows: on a Periodic Distribution Date, each holder of an Allowed Class 5A or Class 5C Claim that has previously received any distributions pursuant to Section 10.5 of the Plan, will receive a distribution in an amount equal to the difference, if any, between such holder's Pro Rata Share of the Unsecured Claims Fund and the aggregate payments previously paid to such holder under Section 10.5 of the Plan (excluding interest) and any interest actually earned thereon, (except for a final distribution after all Contested Class 5A or Class 5C Claims are either Allowed or expunged) until all Contested Class 5A or Class 5C Claims have been Allowed or expunged, in whole or part, and no additional distribution will be made prior thereto. The Plan Administrator may, in their discretion, make each Periodic Distribution Date more frequent than every month. If after all Contested Claims are resolved and all distributions are made in accordance with Section 10.5 of the Plan, at least $5,000 remains in the Unsecured Claims Fund, each holder of an Allowed General Unsecured Claim will receive its Pro Rata Share of the remaining Cash. If less than $5,000 remains, such amount will be returned to the Purchaser.

(vii)     **Address for Delivery of Plan Distributions/Unclaimed Distributions.**

Subject to Bankruptcy Rule 9010, any Plan Distribution or delivery to a holder of an Allowed Claim will be made at the address of such holder as set forth (a) in the Schedules, (b) on the proof of Claim filed by such holder, (c) in any notice of assignment filed with the Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e) or (d) in any notice served by such holder giving details of a change of address. If any Plan Distribution is returned to the Plan Administrator as undeliverable, no Plan Distributions will be made to such holder unless the Plan Administrator is notified of such holder's then current address within ninety (90) days after such Plan Distribution was returned. After such date, if such notice was not provided, a holder will have forfeited its right to such Plan Distribution, and the undeliverable Plan Distributions will be returned to the Plan Administrator. Supplemental Plan Distributions may be made from time to time at the discretion of the Plan Administrator.

Notwithstanding any provisions in the Plan to the contrary, the First Lien Loan Documents and the Second Lien Loan Documents will continue in effect only to the extent necessary to allow Plan Distributions on account of the Allowed First Lien Lender Claims and the Allowed Second Lien Lender Claims.

(viii)     **Time Bar to Cash Payments.**

Checks issued in respect of Allowed Claims will be null and void if not negotiated within one hundred and eighty (180) days after the date of issuance thereof. Requests for reissuance of any voided check will be made directly to the Plan Administrator by the holder of the Allowed Claim to whom such check was originally issued. Any Claim in respect of such a voided check will be made within one hundred and eighty (180) days after the date of issuance of

such check. If no request is made as provided in the preceding sentence, any Claims in respect of such void check will be discharged and forever barred and such unclaimed Plan Distribution will revert to the Post-Effective Date Debtors, provided that an unclaimed Plan Distribution of a holder of a Class 5A claim shall remain part of the Unsecured Claims Fund to be treated in accordance with the provisions of the Plan.

(ix)   <b><u>Manner of Payment under the Plan.</u></b>

Unless the Person receiving a Plan Distribution agrees otherwise, any Plan Distribution to be made in Cash under the Plan will be made, at the election of the Plan Administrator, by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors may, in addition to the foregoing, be made, at the option of the Plan Administrator, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. Notwithstanding the foregoing sentence or any other provision of the Plan to the contrary, Cash paid on account of First Lien Lender Claims or otherwise available to the First Lien Administrative Agent or the Second Lien Administrative Agent will be made on the Effective Date by wire transfer to the First Lien Administrative Agent or the Second Lien Administrative Agent, as applicable.

(x)   <b><u>Minimum and Fractional Distributions.</u></b>

Any other provision of the Plan notwithstanding, the Plan Administrator will not be required to make distributions or payments on account of any Allowed Claim of less than $50 (whether Cash or otherwise), and will likewise not be required to make distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment will be rounded to the nearest whole dollar (with any amount equal to or less than one-half dollar to be rounded down).

(xi)   <b><u>Surrender and Cancellation of Instruments.</u></b>

Unless otherwise provided in the Plan, as a condition to receiving any Plan Distribution, on or before the Distribution Date, the holder of an Allowed Claim evidenced by a certificate, instrument or note, other than any such certificate, instrument or note that is being reinstated or being left unimpaired under the Plan, will (i) surrender such certificate, instrument or note representing such Claim, and (ii) execute and deliver such other documents as may be necessary to effectuate the Plan in the sole determination of the Plan Administrator. Such certificate, instrument or note, will thereafter be cancelled and extinguished. The Plan Administrator will have the right to withhold any Plan Distribution to be made to or on behalf of any holder of such Claims unless and until (a) such certificates, instruments or notes are surrendered, or (b) any relevant holder provides to the Plan Administrator an affidavit of loss or such other documents as may be required by the Plan Administrator together with an appropriate indemnity in the customary form. Any such holder who fails to surrender such certificates, instruments or notes, or otherwise fails to deliver an affidavit of loss and indemnity prior to the second anniversary of the Effective Date, will be deemed to have forfeited its Claims and will not participate in any Plan Distribution. All property in respect of such forfeited Claims will revert to the Post-Effective Date Debtors.

**H.     Procedures for Resolving and Treating Contested Claims**

(i)                    **Prosecution of Contested Claims.**

After the Effective Date, only the Plan Administrator may object to the allowance of Contested Claims, and Purchaser will reasonably cooperate with the Plan Administrator with respect to any such objections to the allowance of Contested Claims; provided, however, that Purchaser may elect to assume responsibility to object to and settle (in consultation with the Plan Administrator and on notice and a hearing) any Contested Claim if Purchaser believes in good faith that the prosecution and/or resolution of any Contested Claim may have a material impact on Purchaser's business.  All objections that are filed and prosecuted as provided in the Plan will be litigated to Final Order or compromised and settled in accordance with Section 11.3 of the Plan.  Notwithstanding any authority to the contrary, an objection to a Claim will be deemed properly served on the holder of a Claim if the Plan Administrator effects service in any of the following manners: (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (b) to the extent counsel for a holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto; or (c) by first class mail, postage prepaid, on any counsel that has appeared on behalf of any holder of a Claim in the Chapter 11 Cases.

(ii)                   **Objection Deadline.**

As soon as practicable, but in no event later than one hundred and eighty (180) days after the Effective Date (subject to being extended by the order of the Bankruptcy Court upon motion of the Plan Administrator without notice or a hearing), objections to Claims will be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made.

(iii)                  **Claims Settlement.**

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Plan Administrator will have authority to settle, compromise and pay in accordance with the Plan all Claims and Causes of Action without further review or approval of the Bankruptcy Court.

(iv)                  **Entitlement to Plan Distributions Upon Allowance.**

Notwithstanding any other provision of the Plan, and subject to Section 11.3 of the Plan, if any portion of a Claim is a Contested Claim, no Plan Distribution provided hereunder will be made on account of such Claim unless and until such Claim becomes an Allowed Claim that is not a Contested Claim, subject to the setoff rights as provided in Section 16.13 of the Plan. When a Claim that is not an Allowed Claim as of the Effective Date becomes an Allowed Claim the holder of such Allowed Claim will thereupon become entitled to receive the Plan Distributions in respect of such Claim the same as though such Claim had been an Allowed Claim on the Effective Date.

(v)                   **Contested Claims Reserve.**

The Plan Administrator may establish a Contested Claims Reserve in a segregated account for the purpose of effectuating Plan Distributions to the holders of Contested Claims pending the allowance or disallowance of such Claims in accordance with the Plan.

(vi)     **Estimation of Claims.**

The Debtors (prior to the Effective Date) or the Plan Administrator (subsequent to the Effective Date) may at any time request that the Bankruptcy Court estimate any contingent, unliquidated or Contested Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Plan Administrator previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Claim, the amount so estimated will constitute (a) the Allowed amount of such Claim, which will be classified as a General Unsecured Claim; (b) a maximum limitation on such Claim; or (c) in the event such Claim is estimated in connection with the estimation of other Claims, a maximum limitation on the aggregate amount of Allowed Claims on account of Claims so estimated.  In the event that the Bankruptcy Court estimates any unliquidated or Contested Claim, the amount so estimated will constitute (a) the Allowed amount of such Contested Claim; (b) a maximum limitation on such Contested Claim; or (c) in the event such Contested Claim is estimated in connection with the estimation of other Contested Claims within the same Class, a maximum limitation on the aggregate amount of Allowed Claims on account of such Contested Claims so estimated.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, or on more than one such Claim within a Class of Claims, as applicable, the Debtors or the Plan Administrator may pursue supplementary proceedings to object to the allowance of such Claims.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or otherwise resolved by any mechanism approved by the Bankruptcy Court including the provisions in the Plan, including section 11.3 of the Plan.  For the avoidance of doubt, Section 11.6 of the Plan will not apply to the First Lien Lender Claims, the Second Lien Lender Claims, or to any amounts payable under the Plan to the First Lien Lenders, the First Lien Administrative Agent, the Second Lien Lenders, or the Second Lien Administrative Agent.

(vii)     **No Recourse Against the Debtors, the Purchaser or the Post-Effective Date Debtors.**

Any holder of a Contested Claim that ultimately becomes an Allowed Claim will be entitled to receive its applicable Plan Distribution under the Plan solely from any Contested Claim Reserve established on account of such Contested Claims.  In no event will any holder of a Contested Claim have any recourse with respect to Plan Distributions made, or to be made, under the Plan to holders of such Claims, to any Debtor, the Purchaser or the Post-Effective Date Debtors on account of such Contested Claim, regardless of whether such Contested Claim will ultimately become an Allowed Claim, and regardless of whether sufficient Cash or other property remains available for distribution in the Contested Claim Reserve established on

account of such Contested Claims at the time such Claim becomes entitled to receive a Plan Distribution under the Plan.

## I. Treatment of Executory Contracts and Unexpired Leases

(i)     **Assumption and Rejection of Executory Contracts and Unexpired Leases.**

(a)     The Assigned Contracts will be assumed and assigned to the Purchaser pursuant to the provisions of section 365 of the Bankruptcy Code effective as of and subject to the occurrence of the Effective Date, unless another date is specified in the Plan. "Assigned Contracts" means all executory contracts and unexpired leases of the Debtors listed on schedule 2.2(f) of the Seller's disclosure schedules to the Asset Purchase Agreement, ~~which schedule~~**and a list of such contracts and leases** will be contained in the Plan Supplement, except for the Excluded Contracts and Retained Contracts.  "Retained Contracts" means all contracts listed on schedule 2.3(b)(ii) of the Seller's disclosure schedules to the Asset Purchase Agreement, which **list** will be contained in the Plan Supplement.  The Debtors will assume any Retained Contracts that are executory.  Each executory contract and unexpired lease to be assumed, or assumed and assigned, will include modifications, amendments, supplements, restatements or other similar agreements made directly or indirectly by any agreement, instrument or other document that affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on the schedule to the Disclosure Statement or any "Schedule of Rejected Executory Contracts and Unexpired Leases."

(b)     The Plan will constitute a motion to reject such executory contracts and unexpired leases as set forth in the schedule to the Disclosure Statement or any subsequently filed Schedule of Rejected Executory Contracts and Unexpired Leases as of the effective date denoted on the Schedule of Rejected Executory Contracts and Unexpired Leases.  Entry of the Confirmation Order by the clerk of the Bankruptcy Court will constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code, subject to the occurrence of the Effective Date, and a finding by the Bankruptcy Court that each such rejected agreement, executory contract or unexpired lease is burdensome and that the rejection thereof is in the best interests of the Debtors and their estates.  Each executory contract and unexpired lease to be rejected shall include all modifications, amendments, supplements, restatements or other similar agreements made directly or indirectly by any agreement, instrument or other document that affects such rejected executory contract or unexpired lease.

(c)     The Plan will constitute a motion to assume and assign the Assigned Contracts to the Purchaser pursuant to Section 12.1 of the Plan, and the Debtors and Post-Effective Date Debtors will have no liability thereunder, except as is specifically provided in the Plan.  The Plan will constitute a motion to assume any Retained Contracts to the extent executory.  Entry of the Confirmation Order by the clerk of the Bankruptcy Court will constitute approval of the assumption and assignment of the Assigned Contracts, and the assumption of any Retained Contracts that are executory, pursuant to sections 365(a), (b) and (f) of the Bankruptcy Code, and a finding by the Bankruptcy Court that the requirements of section 365(f) of the Bankruptcy Code have been satisfied.  Other than the Assumed Liabilities, Permitted Liens (as defined in the Asset Purchase Agreement) and the funding of the Plan Funds, the Purchaser will

have no liability on account of any Claims or otherwise pursuant to the Plan under applicable federal or state law, including, but not limited to, successor or transferee liability.

(d)          Any non-Debtor counterparty to an agreement, contract or unexpired lease to be assumed, or assumed and assigned, who disputes the assumption, or assumption and assignment, of an executory contract or unexpired lease must file with the Bankruptcy Court, and serve upon the Debtors, a written objection to the assumption, or assumption and assignment, of an executory contract or unexpired lease, which objection will set forth the basis for the dispute by no later than two (2) days prior to the Confirmation Hearing. The failure to timely object will be deemed a waiver of any and all objections to the assumption, or assumption and assignment, of executory contracts and leases as set forth in the Plan or as otherwise designated as being assumed or assumed and assigned in Section 12.1 of the Plan. The inclusion of a contract or lease on any list or schedule of rejected contracts, Assigned Contracts or Retained Contracts is not an admission by the Debtors that such contract is executory, and the Debtors reserve all rights in regard thereto.

(ii)          **Cure Costs.**

The provisions (if any) of each executory contract or unexpired lease to be assumed, or assumed and assigned, under the Plan which are or may be in default will be satisfied solely by Cure Costs. A "Schedule of Cure Costs" will be contained in the Plan Supplement (and may be amended from time to time thereafter) and will set forth the Cure Costs for each agreement which the Debtors believe a Cure Cost must be satisfied as a condition to the assumption, or assumption and assignment, of such agreement. If an executory contract or unexpired lease to be assumed, or assumed and assigned, under the Plan does not have a Cure Cost, it will not be identified on the Schedule of Cure Costs. Any non-Debtor counterparty to an agreement being assumed, or assumed and assigned, under the Plan who disputes the scheduled Cure Costs (or objects to the omission of a scheduled Cure Costs) must file with the Bankruptcy Court, and serve upon the Debtors and the Committee, by no later than two (2) days prior to the Confirmation Hearing, a written objection to the proposed Cure Costs, which objection will set forth the basis for the dispute, **and** the alleged correct Cure Cost. If a non-Debtor counterparty fails to file and serve an objection which complies with the foregoing, the Cure Costs set forth on the "Schedule of Cure Costs" will be binding on the non-Debtor counterparty, and the non-Debtor counterparty will be deemed to have waived any and all objections to the assumption, or assumption and assignment, of the relevant agreement as proposed by the Debtors. In the event of a dispute regarding the assumption, or assumption and assignment, of an executory contract or unexpired lease, the provision of Cure Costs to the counterparty of the executory contract or unexpired lease will occur as soon as reasonably practicable following the entry of a Final Order or mutual agreement resolving such dispute. Under the provisions of the Asset Purchase Agreement, the Cure Costs for Assigned Contracts listed on the Schedule of Cure Costs (and no other Cure Costs) are assumed by, and will be the sole liability of, the Purchaser, and none of the Debtors, the Post-Effective Date Debtors or the Plan Administrator will have any liability for the payment of such Cure Costs to any party.

(iii)          **Claims Arising from Rejected Contracts.**

Rejection Damage Claims must be submitted to the Claims Agent, with copies to counsel for the Debtors, on the later of December 8, 2010 and the first Business Day that is thirty (30) days following the effective date of the rejection of such executory contract or unexpired lease. Properly submitted Rejection Damage Claims will be treated in accordance with Class 5A or Class 5B, as applicable, under the Plan. All Rejection Damage Claims will be subject to objection by the Post-Effective Date Debtors. Any Rejection Damage Claims that are not properly submitted pursuant to Section 12.3 of the Plan will forever be barred from assertion and will not be enforceable against the Post-Effective Date Debtors, their respective Estates, Affiliates or Assets.

## J.     Settlements And Compromises

### (i)                    <u>Compromise and Settlement.</u>

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Allowed Equity Interests and their respective Plan Distributions and treatments hereunder take into account for and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code, substantive consolidation or otherwise. As of the Effective Date, any and all such rights described in the preceding sentence are settled, compromised and released pursuant hereto. The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (a) in the best interests of the Debtors and their Estates, (b) fair, equitable and reasonable, (c) made in good faith and (d) approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019. In addition, the allowance, classification and treatment of Allowed Claims take into account any Causes of Action, Claims or counterclaims, whether under the Bankruptcy Code or otherwise under applicable law, that may exist: (a) between the Debtors and the Releasing Parties; and (b) as between the Releasing Parties (to the extent set forth in the Third Party Release). As of the Effective Date, any and all such Causes of Action, Claims and counterclaims are settled, compromised and released pursuant hereto. The Confirmation Order will approve all such releases of contractual, legal and equitable subordination rights, Causes of Action, Claims and counterclaims against each such Releasing Party that are satisfied, compromised and settled pursuant hereto.

Notwithstanding anything to the contrary in this Plan, if the equity commitment agreement between Perseus, the Purchaser and the Second Lien Administrative Agent is terminated as a result of Perseus' breach of that agreement (subject to any applicable rights of cure) or if Perseus does not fund the Perseus Contribution (as such term is defined in the Asset Purchase Agreement) in a circumstance other than one in which Perseus is excused from funding under the terms of the documents providing for such equity commitment, then all of the benefits, releases, consent rights and any other benefits provided to Perseus under the terms of the Plan shall be eliminated.

### (ii)                   <u>Releases by the Debtors.</u>

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE AND IMMEDIATELY PRIOR TO THE CLOSING OF THE SALE TRANSACTION AND THE REVESTING OF THE EXCLUDED ASSETS WITH THE POST-EFFECTIVE DATE DEBTORS (SUCH THAT NEITHER PURCHASER NOR THE POST-EFFECTIVE DATE DEBTORS WILL RECEIVE ANY CAUSE OF ACTION RELEASED HEREUNDER), FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE DEBTOR RELEASEES, INCLUDING, WITHOUT LIMITATION: (A) THE DISCHARGE OF DEBT AND ALL OTHER GOOD AND VALUABLE CONSIDERATION PAID PURSUANT TO THE PLAN OR OTHERWISE; AND (B) THE SERVICES OF THE DEBTORS' PRESENT AND FORMER OFFICERS AND DIRECTORS IN FACILITATING THE IMPLEMENTATION OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, EACH OF THE DEBTORS SHALL PROVIDE A FULL DISCHARGE AND RELEASE TO THE DEBTOR RELEASEES (AND EACH SUCH DEBTOR RELEASEE SO RELEASED SHALL BE DEEMED RELEASED AND DISCHARGED BY THE DEBTORS) AND EACH SUCH DEBTOR RELEASEE'S RESPECTIVE ASSETS FROM ANY AND ALL CLAIMS, CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, INCLUDING, WITHOUT LIMITATION, THOSE THAT ANY OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR EQUITY INTEREST OR OTHER PERSON OR ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT FOR OR ON BEHALF OF ANY OF THE DEBTORS OR ANY OF THEIR ESTATES AND FURTHER INCLUDING THOSE IN ANY WAY RELATED TO OR ARISING OUT OF THE CHAPTER 11 CASES, THE PLAN, THE DISCLOSURE STATEMENT, OR THE PRE-PETITION OR POST-PETITION OPERATION OR ACTIVITIES OF THE DEBTORS; <u>PROVIDED</u>, <u>HOWEVER,</u> THAT THE FOREGOING RELEASES WILL NOT APPLY TO ANY PERSON OR ENTITY WHO, IN CONNECTION WITH ANY ACT OR OMISSION BY THE DEBTORS OR THEIR BUSINESSES, HAS BEEN OR IS HEREAFTER FOUND BY ANY FINAL ORDER OR ANY COURT TRUBUNAL TO HAVE COMMITTED ACTUAL FRAUD; <u>PROVIDED FURTHER</u>, <u>HOWEVER</u>, THAT THE FOREGOING RELEASES SHALL NOT APPLY TO THE FORMER SHAREHOLDER NOTES.**

**ENTRY OF THE CONFIRMATION ORDER WILL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, OF THE DEBTOR**

RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, WILL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (A) IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES, REPRESENTING GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (B) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS; (C) FAIR, EQUITABLE, AND REASONABLE; (D) APPROVED AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (E) A BAR TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS ASSERTING ANY CLAIM RELEASED BY THE DEBTOR RELEASE AGAINST ANY OF THE DEBTOR RELEASEES OR THEIR RESPECTIVE PROPERTY.

THE POST-EFFECTIVE DATE DEBTORS AND THE PURCHASER WILL BE BOUND, TO THE SAME EXTENT THE DEBTORS ARE BOUND, BY THE RELEASES SET FORTH ABOVE.

(iii)    **Third Party Release.**

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, ON THE EFFECTIVE DATE, EFFECTIVE AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES WILL PROVIDE A FULL DISCHARGE AND RELEASE (AND EACH PERSON OR ENTITY SO RELEASED WILL BE DEEMED RELEASED BY THE RELEASING PARTIES) TO THE DEBTORS, POST-EFFECTIVE DATE DEBTORS, THE DEBTOR RELEASEES, AND THEIR RESPECTIVE ASSETS FROM ANY AND ALL CLAIMS, CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, INCLUDING THOSE IN ANY WAY RELATED TO OR ARISING OUT OF THE CHAPTER 11 CASES, THE PLAN, THE DISCLOSURE STATEMENT, OR THE PRE-PETITION OR POST-PETITION OPERATION OR ACTIVITIES OF THE DEBTORS; <u>PROVIDED, HOWEVER</u>, THAT THE FOREGOING THIRD PARTY RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE THE PURCHASER FROM ITS OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT OR THE PLAN; <u>PROVIDED, FURTHER HOWEVER,</u> THAT THE FOREGOING RELEASES WILL NOT APPLY TO ANY ACT OR OMISSION THAT HAS BEEN OR IS HEREAFTER FOUND BY ANY FINAL ORDER OR ANY COURT TRUBUNAL TO CONSTITUTE ACTUAL FRAUD.

THE THIRD PARTY RELEASE WILL HAVE NO EFFECT ON THE CLAIMS OF THE RELEASEES TREATED UNDER THE PLAN, TO THE EXTENT OF

ALLOWANCE OF CLAIMS AND SATISFACTION OF CLAIMS PURSUANT TO THE PLAN.

**ENTRY OF THE CONFIRMATION ORDER WILL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, *AND FURTHER*, WILL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (A) IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE THIRD PARTY RELEASEES, REPRESENTING GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (B) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS; (C) FAIR, EQUITABLE, AND REASONABLE; (D) APPROVED AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (E) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED BY THE THIRD PARTY RELEASE AGAINST ANY OF THE THIRD PARTY RELEASEES OR THEIR PROPERTY.**

     *(iv)*        **Exculpation.**

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties will neither have nor incur any liability to any Person or Entity for any prepetition or postpetition act taken or omitted to be taken in connection with or related to formulating, negotiating, preparing, disseminating, implementing, administering the Plan, the Plan Supplement, the Disclosure Statement, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any other prepetition or post-petition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the Chapter 11 Cases, or confirming or consummating the Plan; provided, however, that the foregoing provisions of Section 13.4 of the Plan will have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided further, that each Exculpated Party will be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents; provided still further, that the foregoing Exculpation will not apply to any acts or omissions expressly set forth in and preserved by the Plan or Plan Supplement.

     (v)        **Reserved.**

     (vi)        **Maintenance of Set-off Rights.**

After the Effective Date the Plan Administrator, subject to Sections 13.2, 13.3, 13.4 and 13.7 of the Plan, will retain all rights to assert any set-off rights which are Excluded Assets solely in response to any General Unsecured Claims asserted by Holders of Claims in Class 5A.

     *(vii)*        **INJUNCTION.**

Upon the Confirmation Date, Bankruptcy Code section 1141 will become applicable with respect to the Plan. In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors. Bankruptcy Code section 1141 nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Equity Interests of creditors, equity security holders, and of general partners of the Debtors. Accordingly, no entity holding a Claim, lien, charge, encumbrance, or other interest may receive any payment from, or seek recourse against, any property other than property of the Post-Effective Date Debtors as provided in the Plan, and all persons and entities are permanently enjoined and prohibited from taking any actions to the contrary. As of the Confirmation Date, all parties are precluded from asserting against any property that is to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, or Equity Interests based upon any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in the Plan or the Confirmation Order.

**FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER. FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE DEBTORS, THE PURCHASER, PERSEUS, THE COMMITTEE, THE SECOND LIEN ADMINISTRATIVE AGENT, THE FIRST LIEN LENDERS THAT VOTE IN FAVOR OF THE PLAN, THE SECOND LIEN LENDERS THAT VOTE IN FAVOR OF THE PLAN, AND TO THE EXTENT THE FIRST LIEN ADMINISTRATIVE AGENT DOES NOT FILE AN OBJECTION OR OTHERWISE OPPOSE THE PLAN, THE FIRST LIEN AGENT, AND THEIR SUCCESSORS AND ASSIGNS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, OFFICERS, DIRECTORS, MANAGED FUNDS, INVESTMENT ADVISORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, PARTNERS, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING IN ITS INDIVIDUAL CAPACITY AS SUCH), AND THEIR ASSETS, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.** ~~BY ACCEPTING PLAN DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM RECEIVING PLAN DISTRIBUTIONS PURSUANT TO THE PLAN WILL BE DEEMED TO HAVE SPECIFICALLY CONSENTED TO THE INJUNCTIONS SET FORTH IN THIS SECTION 13.7.~~

**K.** **Conditions Precedent To Confirmation Of The Plan And The Occurrence Of The Effective Date**

(i) **Conditions Precedent to Confirmation.**

The following are conditions precedent to confirmation of the Plan:

(a)          <u>Disclosure Statement</u>.  The Disclosure Statement Order will have been entered by the Bankruptcy Court in form and substance reasonably acceptable to the Debtors, Perseus, the Second Lien Administrative Agent and Purchaser;

(b)          <u>Plan Documents</u>.  All documents and agreements contemplated by, related to or necessary to the Plan, including the Plan, the Confirmation Order, and the Plan Documents, will be in a form and substance satisfactory or reasonably satisfactory, as the case may be and as specified in the definitions of such terms, to each of the Entities identified as necessary to approve the form and substance of such document as reasonably satisfactory to such Entity pursuant to the Plan;

(c)          <u>Newco First Lien Loan Documents</u>.  The Newco First Lien Loan Documents will be in form and substance reasonably satisfactory to Perseus, Purchaser, the Newco First Lien Administrative Agent, the Second Lien Administrative Agent and the Newco Second Lien Administrative Agent, as the case may be and as specified in the definitions of such terms; and

(d)          <u>Newco Second Lien Loan Documents</u>.  The Newco Second Lien Loan Documents will be in form and substance reasonably satisfactory to Perseus, Purchaser, the Second Lien Administrative Agent and the Newco Second Lien Administrative Agent, as the case may be and as specified in the definitions of such terms.

(ii)          **Conditions Precedent to the Occurrence of the Effective Date.**

The following are conditions precedent to the occurrence of the Effective Date:

(a)          The Confirmation Order will have been entered by the clerk of the Bankruptcy Court, will be acceptable to the Debtors, Perseus, the Second Lien Administrative Agent and Purchaser, and will be in full force and effect and is a Final Order;

(b)          Payment on account of any Administrative Expense Claims that are assumed by the Purchaser shall not exceed ~~an aggregate amount~~**amounts** indicated by the Debtors in the Plan Supplement, and the Administrative Expense Claim Reserve shall not exceed an amount indicated by the Debtors in the Plan Supplement; provided, however, in each case such amounts indicated in the Plan Supplement shall be acceptable to Purchaser in its sole discretion;

(c)          There is sufficient available Cash to make all payments to be made on the Effective Date;

(d)          Closing of the Sale Transaction (including, without limitation, the satisfaction or waiver of all of the conditions to closing provided for in the Asset Purchase Agreement);

(e)     All necessary consents, authorizations and approvals will have been given for the transfers of property and the payments required to be made on the Effective Date, including, without limitation, satisfaction or waiver of all conditions to the obligations of the Debtors under the Plan and the Plan Documents; and

(f)     The Effective Date will have occurred on or prior to May 16, 2011 (such date may be extended with the written consent of Perseus, the Purchaser and the Second Lien Administrative Agent).

(iii)     **Waiver of Conditions.**

The Debtors, with the written consent of Perseus, the Purchaser and the Second Lien Administrative Agent may waive any one or more of the conditions set forth in Section 14.1 or Section 14.2(a), (b), (c) or (e) in a writing executed by each of them without notice or order of the Bankruptcy Court and without notice to any parties in interest. Perseus, the Purchaser and the Second Lien Administrative Agent may waive the condition set forth in Section 14.2(f) in a writing executed by each of them without notice or order of the Bankruptcy Court and without notice to any parties in interest.

(iv)     **Effect of Non-Occurrence of the Effective Date.**

If the Effective Date will not occur, the Plan will be null and void and nothing contained in the Plan will: (a) constitute a waiver or release of any Claims against or Equity Interests in a Debtor; (b) prejudice in any manner the rights of any party-in-interest; or (c) constitute an admission, acknowledgement, offer or undertaking by the Debtors or any other party-in-interest.

**L.     Retention of Jurisdiction**

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code the Bankruptcy Court will retain and will have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) that relates to the following:

(a)     To hear and determine any and all motions or applications pending on the Confirmation Date or thereafter brought in accordance with Article XII of the Plan for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases to which any of the Debtors is a party or with respect to which any of the Debtors may be liable, and to hear and determine any and all Claims and any related disputes (including, without limitation, the exercise or enforcement of setoff or recoupment rights, or rights against any third party or the property of any third party resulting therefrom or from the expiration, termination or liquidation of any executory contract or unexpired lease);

(b)     To determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective

Date or that, pursuant to the Plan, may be instituted by the Plan Administrator or the Debtors, as applicable, after the Effective Date;

(c)     To hear and determine any objections to the allowance of Claims, whether filed, asserted, or made before or after the Effective Date, including, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow, disallow or estimate any Contested Claim in whole or in part;

(d)     To issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

(e)     To consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(f)     To hear and determine all Fee Applications and applications for allowances of compensation and reimbursement of any other fees and expenses authorized to be paid or reimbursed under the Plan or the Bankruptcy Code;

(g)     To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Plan, the Sale Transaction, the Plan Documents or their interpretation, implementation, enforcement, or consummation;

(h)     To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Confirmation Order (and all exhibits to the Plan) or its interpretation, implementation, enforcement, or consummation;

(i)     To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or Cause of Action by, on behalf of, or against the Estates;

(j)     To determine such other matters that may be set forth in the Plan, or the Confirmation Order, or that may arise in connection with the Plan, or the Confirmation Order;

(k)     To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which the Post-Effective Date Debtors, the Debtors in Possession, or the Plan Administrator may be liable, directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(l)     To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with any setoff and/or recoupment rights of the Debtors or any Person under the Plan;

(m)     To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with Causes of Action of or against the Debtors commenced by the Plan Administrator, the Debtors or any third parties, as applicable, before or after the Effective Date;

(n)     To enter an order or final decree closing the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(o)     To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of the Plan or the Confirmation Order; and

(p)     To hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code.

## M.   Miscellaneous Provisions

(i)               **Payment of Statutory Fees.**

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid by the Debtors on or before the Effective Date.

(ii)              **Satisfaction of Claims.**

The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan will be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any accrued postpetition interest, against the Debtors and the Debtors in Possession, or any of their Estates, Assets, properties, or interests in property.  Except as otherwise provided in the Plan, on the Effective Date, all Claims against and Equity Interests in the Debtors and the Debtors in Possession will be satisfied, discharged, and released in full.  The Post-Effective Date Debtors will not be responsible for any pre-Effective Date obligations of the Debtors or the Debtors in Possession, except those expressly assumed by any Post-Effective Date Debtor(s), as applicable.  Except as otherwise provided in the Plan, all Persons and Entities will be precluded and forever barred from asserting against the Post-Effective Date Debtors, their respective successors or assigns, or their Estates, Assets, properties, or interests in property any event, occurrence, condition, thing, or other or further Claims or Causes of Action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

(iii)             **Notices.**

Any notices, requests, and demands required or permitted to be provided under the Plan, in order to be effective, will be in writing and, unless otherwise expressly provided in

the Plan, will be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**If to the Debtors:**

Workflow Management, Inc.
Attention: L. Scott Seymour, General Counsel
150 West Main Street
Post Office Box 3037
Norfolk, Virginia 23514
T (757) 624.3000
F (757) 624.3169

– and –

McGuireWoods LLP
Douglas M. Foley, Esq.
Patrick L. Hayden, Esq.
9000 World Trade Center
101 West Main Street
Norfolk, Virginia 23510
Telephone: (757) 640-3700
Facsimile: (757) 640-3701

**If to First Lien Administrative Agent:**

Credit Suisse AG, Cayman Islands Branch,
as First Lien Administrative Agent (Workflow)
Attn: Megan Kane
11 Madison Avenue
New York, New York 10010
Telephone: (212) 325-1690
Facsimile: (917) 326-8227

– and –

Wilmer Cutler Pickering Hale and Dorr LLP
Philip D. Anker, Esq.
George W. Shuster, Jr., Esq.
399 Park Avenue
New York, New York 10022
Telephone: (212) 880-8890
Facsimile: (212) 230-8888

**If to Second Lien Administrative Agent:**

Silver Point Finance, LLC
Attn: John Kneisley
Two Greenwich Plaza, 1st Floor
Greenwich, CT 06830
Telephone: (203) 542-4267
Facsimile: (203) 542-4367

– and –

Fried, Frank, Harris, Shriver & Jacobson LLP
Gary L. Kaplan, Esq.
Peter Siroka, Esq.
One New York Plaza
New York, New York 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000

– and –

Hunton & Williams LLP
Benjamin C. Ackerly, Esq.
Tara L. Elgie, Esq.
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA  23219-4074

**If to the Plan Administrator:**

_____
_____

**If to the Purchaser:**

Workflow Holdings, LLC
Attn: John Kneisley
Two Greenwich Plaza, 1st Floor
Greenwich, CT 06830
Attention: John Kneisley
Telephone: (203) 542-4267
Fax: (203)-542-4367

(iv)            **Headings.**

The headings used in the Plan are inserted for convenience only, and neither constitutes a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

(v)        **Governing Law.**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of New York, without giving effect to the conflicts of laws principles thereof, will govern the construction of the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise expressly provided in such instruments, agreements or documents.

(vi)        **Expedited Determination.**

The Plan Administrator is hereby authorized to file a request for expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed with respect to the Debtors.

(vii)        **Exemption from Transfer Taxes.**

Each director or officer of each Debtor will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan and the Asset Purchase Agreement. The secretary and any assistant secretary of each Debtor will be authorized to certify or attest to any of the foregoing actions. Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer from a Debtor to the Post-Effective Date Debtors, the Purchaser or any other person or Entity pursuant to the Plan, including the following will not be subject to any stamp tax, real estate transfer tax or similar tax, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment: (a) the Sale Transaction; (b) the creation of any mortgage, deed of trust, lien or other security interest; (c) the making or assignment of any lease or sublease; (d) the granting or recording of any lien or mortgage on any property under the Newco First Lien Credit Agreement or the Newco Second Lien Credit Agreement or (e) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including (1) any merger agreements; (2) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (3) deeds; (4) bills of sale or (5) assignments executed in connection with the Plan.

(viii)        **Retiree Benefits.**

The Debtors provide no retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code); accordingly, the Plan complies with section 1129(a)(13) of the Bankruptcy Code.

(ix)        **Notice of Entry of Confirmation Order and Relevant Dates.**

Promptly upon entry of the Confirmation Order, the Debtors will publish as directed by the Bankruptcy Court and serve on all known parties in interest and holders of Claims and Equity Interests, notice of the entry of the Confirmation Order and all relevant deadlines and dates under the Plan.

(x)        **Interest and Attorneys' Fees.**

(a)        Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in the Plan, the Confirmation Order or as otherwise required by the Bankruptcy Court or by applicable law.

(b)        Except as set forth in the Plan or as ordered by the Bankruptcy Court, no award or reimbursement of attorneys' fees or related expenses or disbursements will be allowed on, or in connection with, any Claim.

(xi)        **Modification of the Plan.**

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtors at any time before confirmation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors will have complied with section 1125 of the Bankruptcy Code. The Debtors, with the written consent of the Purchaser, Perseus, and the Second Lien Administrative Agent, may modify the Plan at any time after confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications. A holder of a Claim that has accepted the Plan will be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such holder.

(xii)        **Revocation of Plan.**

(a)        The Debtors, with the written consent of the Purchaser, Perseus, and the Second Lien Administrative Agent, reserve the right to revoke and withdraw the Plan or to adjourn the Confirmation Hearing with respect to any one or more of the Debtors prior to the occurrence of the Effective Date. If the Debtors, with the written consent of Purchaser and the Second Lien Administrative Agent, revoke or withdraw the Plan with respect to any one or more of the Debtors, or if the Effective Date does not occur as to any Debtor, then, as to such Debtor, the Plan and all settlements and compromises set forth in the Plan and not otherwise approved by a separate Final Order will be deemed null and void and nothing contained in the Plan and no acts taken in preparation for consummation of the Plan will be deemed to constitute a waiver or release of any Claims against or Equity Interests in such Debtor or to prejudice in any manner the rights of any of the Debtors or any other Person in any other further proceedings involving such Debtor.

(b)        In the event that the Debtors, with the written consent of Purchaser and the Second Lien Administrative Agent, choose to adjourn the Confirmation Hearing with respect to any one or more of the Debtors, the Debtors reserve the right to proceed with confirmation of the Plan with respect to those Debtors in relation to which the Confirmation Hearing has not been adjourned. With respect

to those Debtors with respect to which the Confirmation Hearing has been adjourned, the Debtors reserve the right, with the written consent of Purchaser and the Second Lien Administrative Agent to amend, modify, revoke or withdraw the Plan and/or submit any new plan of reorganization at such times and in such manner as they consider appropriate, subject to the provisions of the Bankruptcy Code.

(xiii)      **Setoff Rights.**

Except as otherwise provided in the Plan, in the event that any Debtor has a Claim of any nature whatsoever against the holder of a Claim against such Debtor, then such Debtor or the Plan Administrator may, but is not required to, set off against the Claim (and any payments or other Plan Distributions to be made in respect of such Claim hereunder) such Debtor's Claim against such holder. Neither the failure to set off nor the allowance of any Claim under the Plan will constitute a waiver or release of any Claims that any Debtor may have against the holder of any Claim.

(xiv)      **Compliance with Tax Requirements.**

In connection with the Plan, the Debtors and the Plan Administrator, as applicable, will comply with all withholding and reporting requirements imposed by federal, state, local, and foreign taxing authorities and all Plan Distributions hereunder will be subject to such withholding and reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim or Equity Interest that is to receive a Plan Distribution will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, including income, withholding and other tax obligations, on account of such Plan Distribution. The Plan Administrator has the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to the Plan Administrator for payment of any such tax obligations.

(xv)      **Rates.**

The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.

(xvi)      **Binding Effect.**

The Plan will be binding upon the Post-Effective Date Debtors, the holders of all Claims and Equity Interests, parties in interest, Persons and Entities and their respective successors and assigns.  To the extent any provision of the Disclosure Statement or any other solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan will be binding and conclusive.

(xvii)      **Severability.**

**IN THE EVENT THE BANKRUPTCY COURT DETERMINES THAT ANY PROVISION OF THE PLAN IS UNENFORCEABLE EITHER ON ITS FACE OR AS APPLIED TO ANY CLAIM OR EQUITY INTEREST OR TRANSACTION, THE**

**DEBTORS MAY MODIFY THE PLAN IN ACCORDANCE WITH SECTION 16.11 OF THE PLAN SO THAT SUCH PROVISION WILL NOT BE APPLICABLE TO THE HOLDER OF ANY SUCH CLAIM OR EQUITY INTEREST OR TRANSACTION. SUCH A DETERMINATION OF UNENFORCEABILITY WILL NOT (A) LIMIT OR AFFECT THE ENFORCEABILITY AND OPERATIVE EFFECT OF ANY OTHER PROVISION OF THE PLAN OR (B) REQUIRE THE RESOLICITATION OF ANY ACCEPTANCE OR REJECTION OF THE PLAN**.

      (xviii)        **No Admissions.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER CAUSES OF ACTION OR THREATENED CAUSES OF ACTIONS, THE PLAN WILL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THE PLAN WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR WILL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, AND OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS OR THEIR AFFILIATES, AS DEBTORS AND DEBTORS IN POSSESSION IN THESE CHAPTER 11 CASES**.

      (xix)        **Dissolution of the Committee.**

Effective on the Effective Date, the Committee will dissolve automatically, whereupon its members, professionals, and agents will be exculpated from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to applications for Fee Claims or reimbursement of expenses incurred as a member of the Committee.

**XII.**

**RISK FACTORS**

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT, THE DOCUMENTS DELIVERED TOGETHER WITH THIS DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT. THE RISK FACTORS SET FORTH BELOW SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION OR AN INVESTMENT IN THE SECURITIES OF THE REORGANIZED DEBTORS.

**A.** **Parties-in-Interest may Object To Debtors' Classification of Claims and Equity Interests**.

Section 1122 of the Bankruptcy Code provides that a plan may place a Claim or Equity Interest in a particular class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such class. The Debtors believe that the classification of Claims under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created eight classes of Claims (including subclasses), each encompassing Claims that are substantially similar to the other Claims in each such class and one Class of Equity Interests. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**B.** **The Risk of Non-confirmation of the Plan.**

In order for the Plan to become effective the Debtors, like any other chapter 11 debtors, must obtain confirmation of the Plan through the Bankruptcy Court, and then successfully implement the Plan. The foregoing process requires the Debtors to (a) meet certain statutory requirements with respect to the adequacy of this Disclosure Statement; (b) solicit and obtain certain creditor acceptances of the Plan; and (c) fulfill other statutory conditions with respect to the confirmation of the Plan. The Debtors may or may not receive the requisite acceptances to confirm the Plan. If the requisite acceptances of the Plan are received, the Debtors will seek confirmation of the Plan by the Bankruptcy Court. If the requisite acceptances are not received, the Debtors will nevertheless seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code as long as at least one impaired Class has accepted the Plan (determined without including the acceptance of any "insider" in such impaired Class). Even if the requisite acceptances of the Plan are received, or the Debtors are able to seek a "cramdown" confirmation, the Bankruptcy Court may not confirm the Plan as proposed. A holder of a Claim could challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code. Even if the Bankruptcy Court determined that the balloting procedures and results were appropriate, the Bankruptcy Court could decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. Specifically, section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that: (a) confirmation of the Debtors' Plan is not likely to be followed by a liquidation or a need for further financial reorganization of the Debtors (unless such liquidation is proposed in the Plan); (b) the value of distributions to holders of Claims within an impaired Class will not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code; and (c) in the event of a "cramdown" confirmation, the Plan "does not unfairly discriminate" and is "fair and equitable" with respect to non-accepting Classes. The Bankruptcy Court may determine that the Plan does not satisfy one or more of these applicable requirements, in which case the Plan could not be confirmed by the Bankruptcy Court.

**C.** **Risk of Non-Occurrence of Effective Date.**

Although the Debtors anticipate that the Effective Date will occur soon after the Confirmation Date, if any, there can be no assurance as to such timing. If each of the conditions

precedent to the Plan becoming effective has not been satisfied or duly waived, the Confirmation Order may be vacated, in which event the Plan would be deemed null and void.

**D.      The Failure to Close the Sale Transaction.**

The Debtors currently anticipate that they will be able to close the Sale Transaction with Purchaser. The Effective Date of the Plan cannot occur until the Sale Transaction closes. However, there are many factors outside of the Debtors' control which may influence the ability for the Sale Transaction to close. Moreover, it is possible that the Debtors may not be able to meet various closing conditions, and that the Purchaser would elect to cancel the Sale Transaction as a result of these failures. Consequently, the Debtors can provide no assurance that they will be successful in consummating the Sale Transaction.

**E.      Risk that Claims Will Be Higher than Estimated.**

The projected distributions and recoveries set forth in this Disclosure Statement and the Liquidation Analysis (defined below) are based on the Debtors' initial estimate of Allowed Claims, without yet having undertaken a substantive review of all filed Claims. The actual amount at which such Claims are ultimately Allowed may differ from these estimates. The Debtors project that the Claims asserted against them will be resolved in and reduced to an amount that approximates their estimates contained in this Disclosure Statement. There can be no assurance, however, that the Debtors' estimates will prove accurate. Should these estimates prove wrong, the recoveries on Claims may be reduced.

**F.      Liquidity Risks Prior to Consummation of the Plan.**

The public disclosure of the Debtors' Chapter 11 Cases has impaired the Debtors ability to maintain normal credit terms with a limited number of their suppliers. As a result, the Debtors have been required to pay Cash on delivery or in advance to a limited number of vendors and have experienced restrictions on the availability of trade credit, which has further reduced the Debtors' liquidity. If liquidity further deteriorates, the Debtors' suppliers could refuse to provide key products and services to the Debtors.

**G.      Continuing Leverage and Ability to Service Debt.**

Although the consummation of the Plan will significantly reduce the debt service obligations of the business, the Purchaser will continue to have debt service obligations. It is anticipated that the Purchaser will be able to meet its anticipated future operating expenses, capital expenditures and debt service obligations. However, the ability of the Purchaser to meet its debt service obligations will depend on a number of factors, including future operating performance and its ability to achieve the Business Plan. These factors will be affected by general economic, financial, competitive, regulatory, business and other factors beyond the Purchaser's control. The Projections reflect the most recent data collected in connection with the Purchaser's proposed Business Plan. The Business Plan relies upon the success of the Purchaser's business strategy and assumes increases in revenues over the course of the Business Plan. However, there can be no assurance that such strategy will be successful or, even if successful, that it will have the effects upon sales and earnings that are reflected in and anticipated by the Projections. Although the Purchaser believes that their Projections are

achievable if all assumptions are met, and that those assumptions are reasonable, there can be no assurance that the results set forth in such Projections will be obtained.

**H.**  **Risk of Loss of Senior Executives**

   **The Purchaser has not made agreements with the any of Company's current Chief Executive Officer, President, Chief Financial Officer, and General Counsel to continue working in the business for the Purchaser after the closing. The Company is not aware of the Purchaser's plans to fill these positions if no agreements are reached with these executives, or what impact the loss of these executives will have on the Purchaser's ability to execute on its proposed Business Plan.**

**I.**  ~~H.~~ **The Purchaser's Actual Financial Results May Vary Significantly from the Projections Included in this Disclosure Statement.**

   The Projections included in this Disclosure Statement are dependent upon the numerous assumptions contained therein. The significant assumptions underlying the Projections are discussed in greater detail in the Disclosure Statement under "Financial Projections and Assumptions." Many of these assumptions are beyond the control of the Purchaser and may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the Projections may adversely affect the financial results of the Purchaser. Although the Purchaser believes that the Projections and assumptions are reasonable, variations between the actual financial results and those projected may be material.

**J.**  ~~I.~~ **Inherent Uncertainty of Projections.**

   Although the Projections suggest that the Purchaser will be able to meet all of their financial obligations following consummation of the Plan, the Projections are "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Because the actual results achieved throughout the periods covered by the Projections may vary from the projected results, the Projections should not be relied upon as a guaranty, representation, or other assurance of the actual results that will occur. Moreover, the Projections are dependent on certain assumptions that are an integral part of the Projections, regarding (among other things): (i) confirmation and consummation of the Plan in accordance with its terms; (ii) industry performance; (iii) general business and economic conditions; (iv) competition; (v) the ability of the Purchaser to obtain and maintain certain terms with vendors; (vi) service providers and customers; (vii) the continued supply and replenishment of inventory at assumed prices; (viii) the ability of the Purchaser to attract, motivate and retain key employees and; (ix) other matters, many of which are beyond the control of the Purchaser, and some or all of which may not materialize. In addition, unanticipated events and circumstances occurring subsequent to the date of this Disclosure Statement may affect the actual financial results of the Purchaser's operations.

   If the actual financial results of the Purchaser's operations differ from the Projections, the Purchaser may lack sufficient liquidity to continue as going concerns as planned

after the Effective Date.  These factors may adversely affect the Purchaser's ability to pay the holders of certain Claims the amount that such holders are entitled to be paid under the Plan.

**K.      ~~J.~~ General Economic Conditions.**

The Debtors' business operations have historically been, and the Purchaser's business operations may in the future be, materially affected by adverse conditions in the financial markets and depressed economic conditions generally.  The current economic downturn in the businesses in which the Debtors operate has substantially reduced demand for products and resulted in decreased sales volumes.  Recently, concerns over inflation, energy costs, the availability and cost of credit and the instability of financial and credit markets in the United States and worldwide have contributed to increased volatility and diminished expectations for the global economy and markets.  These factors, combined with volatile raw material prices, declining business and consumer confidence, increased unemployment and continuing financial market fluctuations, have precipitated the worldwide economic crisis that could continue for an extended period of time.  The global crisis has adversely affected the Debtors' business operations because of a reduction in worldwide demand for their products.  Moreover, many of the Debtors' customers and suppliers rely on access to credit to adequately fund their own operations.  Disruptions in financial markets and economic slowdown may adversely impact the ability of customers to finance the future purchase of products from the Purchaser, as well as the creditworthiness of those customers.  These same factors may also impact the ability and willingness of suppliers to provide the Purchaser with materials for their business.

**L.      ~~K.~~ External Factors Beyond the Purchaser's Control May Cause Fluctuations in Demand for their Products and in the Purchaser's Prices and Margins.**

External factors beyond the Purchaser's control may cause volatility in the price of raw materials and other operating costs, as well as significant fluctuations in demand for the Purchaser's products, and can magnify the impact of economic cycles on the businesses.  Examples of external factors include:

- supply of and demand for raw materials;
- increases in the cost of postage or other shipping costs;
- changes in customer buying patterns and demand for the Purchaser's products;
- general economic conditions;
- domestic and international events and circumstances;
- competitor actions;
- governmental regulation; and
- severe weather and natural disasters.

The volatility and relatively elevated level of prices for raw materials may impact the factors cited above and others may contribute to a slowdown in the business cycle or impact economic recovery, reducing demand and lowering operating rates and, ultimately, reducing the margins of the Purchaser.

# XIII.

## SECURITIES LAW MATTERS

**A.     Issuance of New Notes and Newco Preferred Equity Interests**

The issuance of the New Notes and the Newco Preferred Equity Interests, or their distribution to the holders of Class 2 and Class 3 Claims, may constitute the offer or sale of securities contemplated by the Securities Act of 1933, as amended (the "Securities Act"). To the extent that the issuance of the New Notes and/or the Newco Preferred Equity Interests would be considered the offer or sale of securities under the Securities Act, the Debtors believe that distribution of the New Notes and the Newco Preferred Equity Interests would be exempt from the Securities Act. Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities under a plan of reorganization from registration under section 5 of the Securities Act and state securities laws if three principal requirements are satisfied: (i) the securities must be offered or sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against the debtor or interests in the debtor; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor, or principally in exchange for such claim or interest and partly for cash or property. To the extent that the distribution of the New Notes and the Newco Preferred Equity Interests is considered to be the offer or sale of securities, the Debtors believe that the distribution of the New Notes to the holders of Class 2 and Class 3 Claims and the distribution of the Newco Preferred Equity Interests to the holders of Class 3 Claims satisfies the requirements of section 1145(a)(1) of the Bankruptcy Code (because, for purposes of Section 1145(a)(1) of the Bankruptcy Code, the Purchaser is a successor to the Debtors), and are, therefore, exempt from registration under the Securities Act and state securities laws.

**B.     Subsequent Transfers of New Notes and Newco Preferred Equity Interests**

To the extent that the issuance of the New Notes and/or the Newco Preferred Equity Interests would be considered the offer or sale of securities under the Securities Act, and would require compliance with the Securities Act in the absence of section 1145 of the Bankruptcy Code, the New Notes to be made by Purchaser and the Newco Preferred Equity Interests to be issued by the Purchaser, and then distributed pursuant to the Plan, may be freely transferred by most recipients following the initial issuance by the Purchaser and distribution under the Plan, subject to any restrictions contained in the governing documents for each instrument. All resales and subsequent transfers by the beneficial holders of the New Notes and the Newco Preferred Equity Interests are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" with respect to such securities. Section 1145(b) of the Bankruptcy Code defines four types of "underwriters":

(i)      persons who purchase a claim against, an interest in, or a claim for an administrative expense against the debtor with a view to distributing any security received in exchange for such claim or interest;

(ii)     persons who offer to sell securities offered under a plan for the holders of such securities;

(iii)    persons who offer to buy such securities from the holders of such securities, if the offer to buy is:

(A)     with a view to distributing such securities; and

(B)      under an agreement made in connection with the plan, the consummation of the plan, or with the offer or sale of securities under the plan; or

(iv)     a person who is an "issuer" with respect to the securities as the term "issuer" is defined in section 2(11) of the Securities Act.

Under section 2(11) of the Securities Act, an "issuer" includes any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control of the issuer.

To the extent that persons who receive the New Notes or Newco Preferred Equity Interests pursuant to the Plan are deemed to be "underwriters," resales by such persons, assuming such New Notes and/or Newco Preferred Equity Interests would be required to comply with the Securities Act, would not be exempted absent section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Persons deemed to be underwriters may, however, be permitted to sell such New Notes or Newco Preferred Equity Interests without registration pursuant to the provisions of Rule 144 under the Securities Act, although such sales may be difficult if the Purchaser is not required to make public disclosure of financial information. These rules may permit the public sale of securities received by "underwriters" if current information regarding the issuer is publicly available and if volume limitations and certain other conditions are met.

Whether or not any particular person would be deemed to be an "underwriter" with respect to the beneficial interests in the New Notes or the Newco Preferred Equity Interests would depend upon various facts and circumstances applicable to that person. Accordingly, the Debtors express no view as to whether any particular person receiving beneficial interests in the New Notes and/or Newco Preferred Equity Interests would be an "underwriter" with respect to such New Notes.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER, NONE OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE DISTRIBUTED UNDER THE PLAN. The Debtors recommend that potential recipients of the New Notes and/or Newco Preferred Equity Interests consult their own counsel concerning whether they may freely trade their New Notes and/or the Newco Preferred Equity Interests.

# XIV.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

The following discussion is a summary of certain U.S. federal income tax consequences expected to result from the implementation of the Plan. This discussion is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), as in effect on the date of this Disclosure Statement and on U.S. Treasury Regulations in effect (or in certain cases, proposed) on the date of this Disclosure Statement, as well as judicial and administrative interpretations thereof available on or before such date. All of the foregoing are subject to change, which change could apply retroactively and could affect the tax consequences described below. There can be no assurance that the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed below, and no ruling from the IRS has been or is expected to be sought with respect to any issues which may arise under the Plan.

The following summary is for general information only and discusses certain U.S. federal income tax consequences of the Plan to the Debtors, and to "U.S. Holders" of Allowed Claims or Equity Interests (sometimes referred to as "Stock") by virtue of their treatment under the Plan. For purposes of this summary, a "U.S. Holder" is a beneficial owner of Stock or indebtedness that, for U.S. federal income tax purposes, is: (a) a citizen or resident of the United States; (b) a partnership or corporation created or organized in or under the laws of the United States or any state thereof (including the District of Columbia); (c) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (d) a trust if such trust validly elects to be treated as a United States person for U.S. federal income tax purposes, or if (I) a court within the United States is able to exercise primary supervision over its administration and (II) one or more United States persons have the authority to control all of the substantial decisions of such trust. This summary does not purport to address all of the U.S. federal income tax consequences that may be applicable to any particular holder. The tax treatment of a U.S. Holder of Allowed Claims or Equity Interests as the case may be, may vary depending upon such holder's particular situation. The following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtors and the U.S. Holders of Allowed Claims or Equity Interests. This summary does not address tax considerations applicable to holders that may be subject to special tax rules, such as financial institutions, insurance companies, real estate investment trusts, regulated investment companies, grantor trusts, dealers or traders in securities or currencies, tax-exempt entities, persons that hold an equity interest or a security in a Debtor as a position in a "straddle" or as part of a "hedging," "conversion" or "integrated" transaction for U.S. federal income tax purposes, persons that have a "functional currency" other than the U.S. dollar, persons who acquired an equity interest or a security in a Debtor in connection with the performance of services and persons who are not United States persons (as defined in the Internal Revenue Code).

If a partnership (or any other entity treated as a partnership for U.S. federal income tax purposes) holds Allowed Claims, Equity Interests, Stock or indebtedness, the tax treatment of a partner in such partnership generally will depend on the status of the partner and the activities of the partnership. Any such partner should consult its tax advisor as to its tax consequences.

EACH HOLDER OF AN ALLOWED CLAIM OR EQUITY INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

## INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE

PURSUANT TO INTERNAL REVENUE SERVICE CIRCULAR 230, WE HEREBY INFORM YOU THAT THE DESCRIPTION SET FORTH HEREIN WITH RESPECT TO U.S. FEDERAL TAX ISSUES WAS NOT INTENDED OR WRITTEN TO BE USED, AND SUCH DESCRIPTION CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING ANY PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER UNDER THE U.S. INTERNAL REVENUE CODE. THIS DESCRIPTION WAS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE PLAN BY THE DEBTORS. THIS DESCRIPTION IS LIMITED TO THE U.S. FEDERAL TAX ISSUES DESCRIBED HEREIN. IT IS POSSIBLE THAT ADDITIONAL ISSUES MAY EXIST THAT COULD AFFECT THE U.S. FEDERAL TAX TREATMENT OF THE MATTER THAT IS THE SUBJECT OF THE DESCRIPTION NOTED HEREIN, AND THIS DESCRIPTION DOES NOT CONSIDER OR PROVIDE ANY CONCLUSIONS WITH RESPECT TO ANY SUCH ADDITIONAL ISSUES. TAXPAYERS SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

(i) **Consequences to Holders of General Unsecured Claims against the Holdco Debtors and Intercompany Claims**

Holders of General Unsecured Claims against the Holdco Debtors and Intercompany Claims will receive no distribution on account of such Claims. A Holder of a General Unsecured Claim against a Holdco Debtor or Intercompany Claim should be entitled to a loss deduction provided that such deduction was not previously claimed by such holder and provided such holder has a tax basis in its General Unsecured Claim or Intercompany Claim. The loss realized on the cancellation of its General Unsecured Claim or Intercompany Claim should be a capital loss under Internal Revenue Code Section 165 if such claim is treated as a "security" under Internal Revenue Code section 165(g)(2). If the General Unsecured Claim or Intercompany Claim is not treated as a "security" under Internal Revenue Code Section 165(g)(2), the loss realized on the cancellation of its General Unsecured Claim or Intercompany Claim may be a capital loss or an ordinary loss under Internal Revenue Code Section 166, depending on the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed.

(ii) **Consequences to Holders of General Unsecured Claims of the Non-Holdco Debtors and Multi-Debtor General Unsecured Claims**

Pursuant to the Plan, holders of General Unsecured Claims against the Non-Holdco Debtors and the Multi-Debtor General Unsecured Claims (collectively the "Unsecured Claims") will be surrendered for Cash. This will be treated as a taxable exchange under Section 1001 of the Internal Revenue Code. Accordingly, holders of the Unsecured Claims should

recognize gain or loss equal to the difference between: (i) the amount of any Cash received in exchange for the Unsecured Claims; and (ii) the holder's adjusted basis, if any, in the Unsecured Claims. Such gain or loss should be capital in nature so long as the Unsecured Claims are held as capital assets (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the Unsecured Claims were held for more than one year. To the extent that a portion of the Cash received in exchange for the Unsecured Claims is allocable to accrued but untaxed interest, the holder may recognize ordinary income. See "Accrued But Untaxed Interest" below.

### (iii)    Consequences to the First Lien Lender Claims and the Second Lien Lender Secured Claims

In general, an exchange of existing indebtedness for property (including a new debt instrument) that differs materially either in kind or extent is a taxable event for purposes of the Internal Revenue Code. Unless a nonrecognition provision of the Internal Revenue Code applies, a U.S. Holder of existing indebtedness that participates in such a taxable exchange generally will recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference, if any, between (i) the amount realized attributable to the property that the U.S. Holder receives and (ii) the U.S. Holder's adjusted tax basis in the existing indebtedness exchanged. It is expected that, pursuant to the Plan, holders of the First Lien Lender Claims and Second Lien Lender Claims will receive property (including new debt instruments) that will differ materially either in kind or extent from the Claims exchanged therefor. Accordingly, it is expected that the exchange of a First Lien Lender Claim or a Second Lien Lender Claim by a U.S. Holder pursuant to the Plan will constitute a taxable event for purposes of the Internal Revenue Code. As a result, a U.S. Holder of a First Lien Lender Claim or a Second Lien Lender Claim that receives property in exchange for its Claim pursuant to the Plan is expected to recognize gain or loss for U.S. federal income tax purposes in an amount equal to the difference between (a) the fair market value of the property (including new debt instruments) that the U.S. Holder receives and (b) the U.S. Holder's adjusted tax basis in the First Lien Lender Claim or the Second Lien Lender Claim exchanged therefor. Subject to the discussions under "Treatment of Accrued Interest" and "Market Discount" below, gain or loss recognized by a U.S. Holder upon exchange of a First Lien Lender Claim or Second Lender Claim generally will be capital gain or loss and will be long-term capital gain or loss if, at the time of the exchange, the First Lien Lender Claim or Second Lender Claim has been held by the U.S. Holder for more than one year.

### (iv)    Treatment of Accrued Interest

To the extent that any amount received under the Plan by a U.S. Holder is attributable to accrued but unpaid interest with respect to such U.S. Holder's Claim, such amount should be taxable to the U.S. Holder as ordinary interest income, if such accrued interest has not been previously included in the U.S. Holder's gross income for U.S. federal income tax purposes. Conversely, a U.S. Holder may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for bad debts) to the extent that any accrued interest was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.

The extent to which amounts received by a holder will be attributable to accrued but unpaid interest is unclear. Under the Plan, the aggregate consideration to be distributed to

holders of Allowed Claims in each Class will be treated as first satisfying an amount equal to the stated principal amount of the Allowed Claim for such holders and any remaining consideration as satisfying accrued, but unpaid, interest, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a bankruptcy plan is binding for U.S. federal income tax purposes. However, the IRS could take the position that the consideration received by a holder should be allocated in some way other than as provided in the Plan. Holders of Claims should consult their own tax advisors regarding the proper allocation of the consideration received by them under the Plan.

(v)    **Market Discount**

U.S. Holders who exchange their Claims for Cash may be affected by the "market discount" provisions of Internal Revenue Code Sections 1276 through 1278. Under these rules, some or all of the gain realized by a U.S. Holder may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on such Claim, that accrued during the U.S. Holder's holding period for such claim and was not previously included in the U.S. Holder's gross income.

In general, a U.S. Holder of a "bond" (as defined in Internal Revenue Code Section 1278) with a fixed original maturity of more than one year that acquired the bond on the secondary market (or, in certain circumstances, upon original issuance) is considered to have acquired such bond with "market discount" if the bond's stated redemption price at maturity (or revised issue price, in the case of a bond issued with "original issue discount" for U.S. federal income tax purposes) exceeds the tax basis of the bond in the U.S. Holder's hands immediately after its acquisition. However, a bond will not be considered to have market discount if such excess is less than a statutory *de minimis* amount equal to 0.25 percent of the bond's stated redemption price at maturity (or revised issue price, in the case of a debt obligation issued with original issue discount).

Under these rules, any gain recognized by a U.S. Holder on the taxable disposition of a Claim pursuant to the Plan (determined in the manner described above) that was acquired with market discount would be treated as ordinary income to the extent of the market discount that accrued thereon while the applicable Claim was considered to be held by the U.S. Holder (unless the U.S Holder elected to include market discount on the applicable Claim in income as it accrued).

(vi)   **Consequences to Holders of Equity Interests**

Holders of Equity Interests that are cancelled pursuant to the Plan should be allowed a worthless stock deduction (unless such holder had previously claimed a worthless stock deduction with respect to any Equity Interests and assuming that the taxable year that includes the Plan is the same taxable year in which such stock first became worthless) in an amount equal to the holder's adjusted basis in the Equity Interests. A worthless stock deduction is a deduction allowed to a holder of a corporation's stock for the taxable year in which such stock becomes worthless. If the holder held Equity Interests as a capital asset, the loss will be treated as a loss from the sale or exchange of such capital asset.

(vii) **Information Reporting and Backup Withholding**

Under the backup withholding rules, a holder of a Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless that holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax.

The Debtors will withhold all amounts required by law to be withheld from payments of interest and dividends. Debtor will comply with all applicable reporting requirements of the Internal Revenue Code.

THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

(viii) **Certain U.S. Federal Income Tax Consequences To Debtors**

For U.S. federal income tax purposes, the Sale Transaction should constitute a taxable sale of a portion of the Purchased Assets to the Purchaser and a contribution by the Debtors of the remaining portion of the Purchased Assets to Purchaser in exchange for membership interests in Purchaser in a transaction governed by Internal Revenue Code Section 721, followed by a sale of Debtors' membership interests in Purchaser to the Second Lien Lenders. The Debtors will recognize gain or loss on the sale of the portion of the Purchased Assets treated as sold to the Purchaser and on the sale of the Debtors' membership interests in Purchaser treated as sold to the Second Lien Lenders in an aggregate amount equal to the difference between: (i) the fair market value of the sale proceeds and the Assumed Liabilities; and (ii) the Debtors' adjusted basis in the Purchased Assets. The Company has very significant net operating losses and other tax attributes, and the Company believes that it has sufficient net operating losses and other tax attributes to shelter any gain that may be recognized in connection with the Sale Transaction.

THE ABOVE SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL, PURPOSES ONLY. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL OR FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

# XV.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have evaluated numerous alternatives to the Plan, including, without limitation, the reorganization of the Debtors' business without a sale of the Debtors as a going concern, either as an entirety or on limited bases, and the liquidation of the Debtors. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries of holders of all Claims to the extent possible. The following discussion provides a summary of the analysis supporting the conclusion that a liquidation of the Debtors or an alternative plan of reorganization for the Debtors will not provide higher value to holders of Claims and Equity Interests.

## A.      Liquidation Under Chapter 7 of the Bankruptcy Code.

If no plan of reorganization can be confirmed, the Chapter 11 Cases of the Debtors may be converted to cases under chapter 7, in which event a trustee would be elected or appointed to liquidate the properties and interests in property of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for under the Plan because of (1) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee for bankruptcy and professional advisors to such trustee; (2) the erosion in value of the business as a going concern and the assets of the business in the context of the expeditious liquidation required under chapter 7 and the "forced sale" environment in which such a liquidation would likely occur; (3) the adverse effects on the salability of business segments as a result of the likely departure of key employees and the loss of customers; and (4) the substantial increases in claims which would have to be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases. Attached hereto as **Exhibit E** is a liquidation analysis on which the Debtors base this belief. The liquidation analysis was conducted as of September 30, 2010, and the Debtors believe that the analysis would be the same in all material respects as of the date hereof, and as of the effectiveness of the Plan.     Accordingly, the Debtors have determined that confirmation of the Plan will provide each holder of a Claim or Equity Interest with at least as much as it would receive pursuant to liquidation of the Debtors under chapter 7.

Section 1129(a)(7) of the Bankruptcy Code provides that with respect to impaired classes, each holder of a claim or interest of such class must receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount such holder would so receive or retain if the debtor liquidated under chapter 7 of this title on such date. As the Plan provides each holder of a Claim or Equity Interest with at least as much as it would receive pursuant to liquidation of the Debtors under chapter 7, the Plan satisfies section 1129(a)(7).

**B.** **Alternative Plans of Reorganization.**

If the Plan is not confirmed, any other party in interest could undertake to formulate a different plan of reorganization. Such a plan of reorganization might involve either (x) a reorganization of the capital structure and continuation of the business of the Debtors, (y) the sale of the Debtors as a going concern or (z) an orderly liquidation of the properties and interests in property of the Debtors. With respect to an alternative plan of reorganization, the Debtors have examined various other alternatives in connection with the process involved in the formulation and development of the Plan. The Debtors believe that the Plan, as described herein, enables holders of Claims and Equity Interests to realize the best recoveries under the present circumstances. If the Debtors undertook a different going concern sale, there is no assurance that unsecured creditors would receive a meaningful distribution on their claims. In a liquidation of the Debtors under chapter 11, the properties and interests in property would be sold in a more orderly fashion and over a more extended period of time than in a liquidation under chapter 7, probably resulting in marginally greater recoveries than in a chapter 7 case. Further, if a trustee were not appointed, since one is not required in a chapter 11 case, the expenses for professional fees would most likely be lower than in a chapter 7 case. However, although preferable to a chapter 7 liquidation, the Debtors believe that a liquidation under chapter 11 for the Debtors is a much less attractive alternative to holders of Claims and Equity Interests than the Plan because the recovery realized by holders of Claims and Equity Interests under the Plan is likely to be greater than the recovery under a chapter 11 liquidation.

**XVI.**

**CONCLUSION**

The Debtors, the Second Lien Administrative Agent, and Perseus believe that the Plan is in the best interest of all holders of Claims and Equity Interests, and urge all holders of impaired Claims and Equity Interests in the Debtors to vote to accept the Plan and to evidence such acceptance by returning their Ballots in accordance with the instructions accompanying the Disclosure Statement.

Dated:  January ——,**14,** 2011                    Respectfully submitted,

                                                 **WORKFLOW MANAGEMENT, INC.**

                                                 By:_____
                                                 Name:
                                                 Title:

                                                 **WORKFLOW HOLDINGS CORPORATION**

                                                  By:_____
                                                 Name:

Title:

**WORKFLOW SOLUTIONS LLC**

By:_____
Name:
Title:

**WORKFLOW DIRECT, INC.**

By:_____
Name:
Title:

**WF CAPITAL HOLDINGS, INC.**

By:_____
Name:
Title:

**WF HOLDINGS, INC.**

By:_____
Name:
Title:

**WORKFLOW OF FLORIDA, INC.**

By:_____
Name:
Title:

**WORKFLOW MANAGEMENT
ACQUISITION II CORP.**

By:_____
Name:
Title:

**WFIH, INC.**

By:_____
Name:
Title:


**WFMI, INC.**

By:_____
Name:
Title:


**THE RELIZON COMPANY**

By:_____
Name:
Title:


**RELIZON KNE INC.**

By:_____
Name:
Title:


**RELIZON SNE INC.**

By:_____
Name:
Title:


**OLD FGS, INC.**

By:_____
Name:
Title:


**OLD UE, LLC**

By:_____
Name:
Title:


**SFI OF PUERTO RICO, INC.**

By:_____
Name:
Title:


**RELIZON WISCONSIN INC.**


By:_____
Name:
Title:


**RELIZON (TEXAS) LTD.  LLP**


By:_____
Name:
Title:




**RELIZON DE MEXICO INC.**


By:_____
Name:
Title:


**FORMCRAFT HOLDINGS GENERAL PARTNER, INC.**


By:_____
Name:
Title:


**FORMCRAFT HOLDINGS LIMITED PARTNER, INC.**


By:_____
Name:
Title:

# SCHEDULE 1

## DEFINED TERMS

## <u>GLOSSARY OF DEFINED TERMS</u>

**1.1.** "**Administrative Expense Claim**" means any right to payment constituting a cost or expense of administration of any of the Chapter 11 Cases under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary post-petition costs and expenses of preserving the Debtors' estates, any actual and necessary post-petition costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Chapter 11 Cases including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, and any allowances of compensation and reimbursement of expenses to the extent allowed by Final Order under section 330 or 503 of the Bankruptcy Code.

**1.2.** "**Administrative Expense Claim Bar Date**" means February 11, 2011, or such other specific date as may be established by the Bankruptcy Court.

**1.3.** "**Administrative Expense Claim Reserve**" means the portion of the Plan Funds to be used for distribution to holders of (i) Priority Tax Claims that are not assumed by the Purchaser as provided in Section 8.10, (ii) Priority Non-Tax Claims that are not assumed by the Purchaser as provided in Section 8.10, and (iii) Administrative Expense Claims that are not assumed by the Purchaser as provided in Section 6.2(e).

**1.4.** "**Affiliate**" means, with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

**1.5.** "**Allowed**" means, with respect to a Claim: (i) any Claim against any Debtor which has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed, (ii) any timely filed, liquidated, non-contingent Claim as to which the time for objection permitted by the Plan has expired and no objection has been interposed, or (iii) any Claim expressly allowed by a Final Order or by agreement in accordance with the provisions of the Plan, including, without limitation, Section 11.3 of the Plan.

**1.6.** "**Asset Purchase Agreement**" means that certain Asset Purchase Agreement by and among WFMI and its Debtor affiliates signatories thereto, and the Purchaser, dated ~~———,~~ ~~201 ,~~**January 14, 2011,** in the form attached hereto as Exhibit B, as further amended, supplemented or modified from time to time.

**1.7.** "**Assets**" means, with respect to any Debtor, all of such Debtor's right, title and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

**1.8.** "**Assigned Contracts**" shall have the meaning given in Section 12.1 of the Plan.

**1.9.** "**Assumed Liabilities**" has the meaning set forth in the Asset Purchase Agreement.

**1.10.** "**Assumed Priority Claim Schedule**" means the schedule delivered by the Purchaser to the Debtors on the Effective Date that denotes the Priority Tax Claims and Priority Non-Tax Claims that are being assumed by the Purchaser upon the closing of the Sale Transaction.

**1.11.** "**Avoidance Actions**" means all Causes of Action of the Estates that arise under section 544, 545, 547, 548, 549, 550, 551 and/or 553 of the Bankruptcy Code.

**1.12.** "**Ballot**" means those certain ballots that are sent to holders of Claims and Equity Interests for purposes of voting on the Plan.

**1.13.** "**Balloting Agent**" means Kurtzman Carson Consultants LLC.

**1.14.** "**Bankruptcy Code**" means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

**1.15.** "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Virginia, Norfolk Division, or such other court having jurisdiction over the Chapter 11 Cases.

**1.16.** "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code and as applicable to the Chapter 11 Cases.

**1.17.** "**Borrower**" means Workflow Management, Inc.

**1.18.** "**Business Day**" means any day other than a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close for business in New York, New York.

**1.19.** "**Cash**" means legal tender of the United States of America.

**1.20.** "**Cash Collateral Orders**" means the orders of the Bankruptcy Court, dated October 1, 2010, October 8, 2010, October 29, 2010, and December 2, 2010 granting the Debtors authority to use cash collateral on an interim basis, the order of the Bankruptcy Court dated December 16, 2010, granting the Debtors authority to use cash collateral on a final basis, as such order may be amended or extended in accordance with the terms thereof, and any further orders that may be entered regarding the use of cash collateral.

**1.21.** "**Causes of Action**" means all claims, rights, actions, causes of action, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, asserted or unasserted, arising in law, equity or otherwise.

**1.22.** "**Chapter 11 Cases**" means the cases commenced under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court with respect to each of the Debtors styled as In re Workflow Management, Inc., et al., Chapter 11 Case No. 10-74617 (SCS), Jointly Administered.

**1.23.** "**Claim**" means (a) any right to payment, whether or not such right is known or unknown, reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is known or unknown, reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

**1.24.** "**Claims Agent**" means Kurtzman Carson Consultants LLC.

**1.25.** "**Closing Consideration Amount**" has the meaning set forth in the Asset Purchase Agreement, which shall include the Plan Funds.

**1.26.** "**Committee**" means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases.

**1.27.** "**Confirmation Date**" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

**1.28.** "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court, as it may be continued from time to time, to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

**1.29.** "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan, which shall be in form and substance acceptable to the Debtors, the Purchaser, Perseus, and the Second Lien Administrative Agent.

**1.30.** "**Contested Claim**" means any Claim that is not an Allowed Claim or a Disallowed Claim, provided that, for the avoidance of doubt, the First Lien Lender Claims and the Second Lien Lender Claims shall not be Contested Claims.

**1.31.** "**Contested Claims Reserve**" means a reserve of Cash that may be established in accordance with Section 11.5 of the Plan.

**1.32.** "**CS**" means Credit Suisse AG, Cayman Islands Branch.

**1.33.** "**Cure Cost**" means the distribution within a reasonable period of time following the Effective Date of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption (or assumption and assignment) of an executory contract or unexpired lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties, under such executory contract or unexpired lease, to the

extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

**1.34.** "**Debtors**" means, collectively, WF Capital, and its direct and indirect subsidiaries, that are debtors in the Chapter 11 Cases as identified on <u>Exhibit A</u> annexed hereto.

**1.35.** "**Debtor Release**" means the release given by the Debtors to the Debtor Releasees set forth in Section 13.2 of the Plan.

**1.36.** "**Debtor Releasees**" means, collectively, (a) all current and former officers and directors of the Debtors, (b) all Related Parties of the Debtors, and (c) and the Third Party Releasees.

**1.37.** "**Debtor-in-Possession**" means any Debtor, in its capacity as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**1.38.** "**Disallowed**" when used with respect to a Claim, means a Claim, or such portion of a Claim, (a) that has been disallowed by a Final Order, including, without limitation, any Claims that are disallowed by failing to comply with the Bankruptcy Court's order establishing the bar date for filing proofs of Claim, or (b) which were included on the Schedules as disputed or contingent and for which no contrary proof of Claim was timely filed.

**1.39.** "**Disclosure Statement**" means the Disclosure Statement filed with respect to the Plan, as it may be amended or modified from time to time.

**1.40.** "**Disclosure Statement Order**" means the order entered by the Bankruptcy Court, in form and substance reasonably acceptable to the Debtors, Perseus, the Purchaser and the Second Lien Administrative Agent, (a) approving the Disclosure Statement as containing adequate information required under section 1125 of the Bankruptcy Code, (b) authorizing the use of the Disclosure Statement for soliciting votes on the Plan, and (c) authorizing the Debtors to execute the Asset Purchase Agreement and incur the fee reimbursement obligations contemplated thereunder.

**1.41.** "**Distribution Date**" means, with respect to any Claim, (i) the Effective Date or a date that is as soon as reasonably practicable after the Effective Date, if such Claim is then an Allowed Claim, (ii) a date that is as soon as reasonably practicable after the date such Claim becomes Allowed, if not Allowed on the Effective Date; or (iii) the date of payment otherwise prescribed in the Plan.

**1.42.** "**Effective Date**" means a date selected by the Debtors which must be a Business Day that is no later than thirty (30) Business Days after all of the conditions specified in Section 14.2 of the Plan have been satisfied or waived (to the extent subject to waiver).

**1.43.** "**Entity**" means any person or organization created by law, including, without limitation, any individual, company, corporation, limited liability company, partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, or government or any political subdivision thereof.

**1.44.** "**Equity Interest**" means any outstanding ownership interest in any of the Debtors, including without limitation, interests evidenced by common or preferred stock, partnership interests, membership interests, warrants and options or other rights to purchase or otherwise receive any ownership interest in any of the Debtors and any right to payment or compensation based upon any such interest, whether or not such interest is owned by the holder of such right to payment or compensation.

**1.45.** "**Estate**" means the estate of any Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

**1.46.** "**Excluded Assets**" has the meaning set forth in the Asset Purchase Agreement.

**1.47.** "**Excluded Contracts**" means (i) contracts and leases listed in a schedule to the Disclosure Statement and any subsequently filed "Schedule of Rejected Executory Contracts and Unexpired Leases" to be filed by the Debtors as part of the Plan Supplement with the Bankruptcy Court at least ~~seven~~**ten** (7**10**) days before the date of the Confirmation Hearing; (ii) all executory contracts and unexpired leases that are the subject of a pending motion before the Bankruptcy Court or which have been rejected by order of the Bankruptcy Court entered before the Effective Date; and (iii) any executory contract or unexpired lease that is the subject of a dispute over the amount or manner of cure pursuant to Article 12 of the Plan and for which the Debtors make a motion to reject such contract or lease at any time based upon the existence of such dispute or the resolution of such dispute. The Debtors reserve the right to amend the schedule to the Disclosure Statement or any "Schedule of Rejected Executory Contracts and Unexpired Leases" at least two (2) days before the date of the Confirmation Hearing.

**1.48.** "**Exculpated Parties**" means each of (a) the Debtors, (b) the Post-Effective Date Debtors, (c) the Debtor Releasees, and (d) the Committee and its members (solely in their capacities as members of the Committee).

**1.49.** "**Fee Application**" means an application for allowance and payment of a Fee Claim.

**1.50.** "**Fee Claim**" means a Claim of a Professional.

**1.51.** "**Final Order**" means (a) an order or judgment of the Bankruptcy Court or any other court or adjudicative body as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing are then pending, or (b) in the event that an appeal, writ of certiorari, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court or any other court or adjudicative body shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order.

**1.52.** "**First Lien Administrative Agent**" means CS, in its capacity as administrative agent for the First Lien Secured Parties pursuant to the First Lien Loan Documents.

**1.53.** "**First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as of November 30, 2005, between Workflow Management, Inc., as borrower, the First Lien Lenders and the First Lien Administrative Agent, as amended from time to time.

**1.54.** "**First Lien Credit Facility**" means the Term Loan Facility and the Revolving Credit Facility made available pursuant to the First Lien Loan Documents.

**1.55.** "**First Lien Guaranties**" means the Guaranties entered into by the Guarantors in favor of the First Lien Administrative Agent for the benefit of the First Lien Secured Parties on account of the First Lien Lender Claims, as amended from time to time.

**1.56.** "**First Lien Guaranty Claims**" means any and all Claims against the Guarantors arising from or in connection with the First Lien Guaranties.

**1.57.** "**First Lien Lender Claims**" means any and all Claims, including, without limitation, the First Lien Guaranty Claims, against any of the Debtors arising from or in connection with the First Lien Loan Documents, which shall be Allowed as set forth in Section 5.2(a) of the Plan.

**1.58.** "**First Lien Lender Interest Claim**" has the meaning set forth in section 5.2(a) of the Plan.

**1.59.** "**First Lien Lender Principal Claim**" has the meaning set forth in section 5.2(a) of the Plan.

**1.60.** "**First Lien Lenders**" means the lenders who are party, from time to time, to the First Lien Credit Agreement.

**1.61.** "**First Lien Loan Documents**" means the First Lien Credit Agreement, the notes which evidence the loans under the First Lien Credit Facility, the fee letters referred to in the First Lien Credit Agreement, the First Lien Pledge Agreement, the First Lien Guaranties, the First Lien Mortgages, any outstanding Letters of Credit, and the Intercreditor Agreement, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto, as any such documents are amended from time to time.

**1.62.** "**First Lien Mortgages**" means any mortgage recorded in favor of the First Lien Administrative Agent which secures the First Lien Lender Claims, as amended from time to time.

**1.63.** "**First Lien Pledge Agreement**" means that certain Pledge and Security Agreement dated as of November 30, 2005, granting a first priority security interest in substantially all of the personal property assets of the Loan Parties, by each Loan Party in favor of the First Lien Administrative Agent for the benefit of the First Lien Secured Parties, together with all documents, instruments and agreements executed or entered into in connection therewith, as amended from time to time.

**1.64.** "**First Lien Secured Parties**" means the First Lien Administrative Agent, the First Lien Lenders and the Issuer.

**1.65.** "**Former Shareholder Notes**" means those certain promissory notes made by certain former shareholders of the Debtors payable to certain of the Debtors in the original aggregate principal amount of approximately $2,352,872.

**1.66.** "**General Unsecured Claim**" means any unsecured Claim against a Debtor, other than an Administrative Expense Claim, an Intercompany Claim, a Priority Tax Claim, or a Priority Non-Tax Claim.

**1.67.** "**Governmental Unit**" shall have the meaning assigned to such term in section 101(27) of the Bankruptcy Code.

**1.68.** "**Guarantors**" means each of Workflow Holdings Corporation; WF Holdings, Inc.; Workflow Direct, Inc.; Workflow Management Acquisition II Corp.; WFIH, Inc.; WFMI, Inc.; Workflow of Florida, Inc.; Workflow Solutions LLC; SFI of Puerto Rico, Inc.; Old FGS, Inc.; Old UE, LLC; The Relizon Company; Relizon Wisconsin Inc.; Relizon (Texas) Ltd., LLP; Relizon SNE Inc.; Relizon KNE Inc.; Relizon de Mexico Inc.; Formcraft Holdings General Partner, Inc.; and Formcraft Holdings Limited Partner, Inc.

**1.69.** "**Guaranty**" means any guaranty by one or more Debtors of an obligation of any other Debtor.

**1.70.** "**Holdco Debtors**" means WF Capital Holdings, Inc., WF Holdings, Inc., and Workflow Holdings Corporation.

**1.71.** "**Insider**" means with respect to any Person, all Persons that would fall within the definition assigned to such terms in section 101(31) of the Bankruptcy Code.

**1.72.** "**Intercompany Claim**" means any Claim held by any Debtor against any other Debtor that occurred or came into existence prior to the Petition Date.

**1.73.** "**Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of November 30, 2005, as amended April 30, 2009, by and between the First Lien Administrative Agent and the Second Lien Administrative Agent, and acknowledged by each Loan Party, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto.

**1.74.** "**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended, and any applicable rulings, regulations (including temporary and proposed regulations) promulgated thereunder, judicial decisions, and notices, announcements, and other releases of the United States Treasury Department or the IRS.

**1.75.** "**IRS**" means the United States Internal Revenue Service.

1.76.   "**Issuer**" means CS, as issuer of the outstanding Letters of Credit under the Letter of Credit Subfacility.

1.77.   "**Letter of Credit Subfacility**" means the Letter of Credit subfacility under, and that forms a part of, the Revolving Credit Facility under the First Lien Credit Agreement.

1.78.   "**Letters of Credit**" means any letters of credit issued by the Issuer under the Letter of Credit Subfacility, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto.

1.79.   "**Loan Parties**" means the Guarantors and the Borrower.

1.80.   "**Maximum Allowable Amount**" means, with respect to any Contested Claim in Class 5A or Class 5C, the least of the amounts (a) set forth in the proof(s) of Claim filed by the holder thereof, (b) determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction as the maximum fixed amount of such Class 5A or Class 5C Claim or as the estimated amount of such Class 5A or Class 5C Claim for allowance, distribution, and reserve purposes, (c) in the case of a proof of Claim filed in an unliquidated, undetermined, or contingent amount, as determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction, or (d) as agreed upon, in writing, by the holder of such Contested Claim and the Debtors or Plan Administrator, as the case may be.

1.81.   "**Multi-Debtor General Unsecured Claims**" means any General Unsecured Claim which is asserted by the holder of such Claim against WF Holdings, Inc. and all of its direct and indirect subsidiary Debtors, including, without limitation, the Second Lien Lender Deficiency Claims and the PBGC Claims.

1.82.   "**Newco**" means Workflow Holdings LLC.

1.83.   "**Newco First Lien Administrative Agent**" means an entity to be identified in the Plan Supplement.

1.84.   "**Newco First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as of the Effective Date, between Purchaser, as borrower, the Newco First Lien Lenders and the Newco First Lien Administrative Agent, in the form contained in the Plan Supplement as a Plan Document, as amended from time to time, which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, Newco First Lien Administrative Agent and the Second Lien Administrative Agent.

1.85.   "**Newco First Lien Lenders**" means the lenders that are party to the Newco First Lien Credit Agreement from time to time.

1.86.   "**Newco First Lien Loan Documents**" means the Newco First Lien Credit Agreement, the Newco First Lien Loan Notes which evidence the loans made under the Newco First Lien Credit Agreement, the Newco First Lien Pledge Agreement, the Newco First Lien Mortgages, and the Newco Intercreditor Agreement, as any such documents are amended from time to time, each of which shall be in form and substance reasonably acceptable to Perseus, the

Purchaser, the Newco First Lien Administrative Agent and the Second Lien Administrative Agent.

**1.87.** "**Newco First Lien Mortgages**" means any mortgage recorded in favor of the Newco First Lien Administrative Agent, which secures the obligations under the Newco First Lien Credit Agreement, which shall grant a first priority lien on the property that is the subject of the mortgage in favor of the Newco First Lien Administrative Agent on behalf of the Newco First Lien Lenders, and which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, the Newco First Lien Administrative Agent, and the Second Lien Administrative Agent.

**1.88.** "**Newco First Lien Loan Notes**" means the notes made by Purchaser, in the form contained in the Plan Supplement as a Plan Document, that evidence the payment obligations of Purchaser under the Newco First Lien Credit Agreement, which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, the Newco First Lien Administrative Agent and the Second Lien Administrative Agent.

**1.89.** "**Newco First Lien Pledge Agreement**" means that certain Pledge and Security Agreement dated as of the Effective Date, granting a first priority security interest in substantially all of the personal property assets of Purchaser, by Purchaser in favor of the Newco First Lien Administrative Agent for the benefit of the Newco First Lien Secured Parties, together with all documents, instruments and agreements executed or entered into in connection therewith, as amended from time to time, which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, the Newco First Lien Administrative Agent and the Second Lien Administrative Agent.

**1.90.** "**Newco First Lien Secured Parties**" means the Newco First Lien Administrative Agent, and the Newco First Lien Lenders.

**1.91.** "**Newco Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of the Effective Date, by and between the Newco First Lien Administrative Agent and the Newco Second Lien Administrative Agent, and acknowledged by Purchaser, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto, which shall be in form and substance reasonably acceptable to the Purchaser, the Newco First Lien Administrative Agent and the Newco Second Lien Administrative Agent.

**1.92.** "**Newco Preferred Equity Interests**" means the preferred Equity Interests issued by Newco, which shall (i) have an initial stated liquidation value of $30 million, (ii) have no stated maturity, and (iii) be entitled to receive a 15% preferred distribution which shall compound and accrue quarterly.

**1.93.** "**Newco Second Lien Administrative Agent**" means Silver Point.

**1.94.** "**Newco Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of the Effective Date, between Purchaser, as borrower, the Newco Second Lien Lenders and the Newco Second Lien Administrative Agent, in the form contained in the Plan Supplement as a Plan Document, as amended from time to time, which shall be in form and

substance reasonably acceptable to Perseus, the Purchaser, and the Second Lien Administrative Agent.

**1.95.** "**Newco Second Lien Lenders**" means the lenders that are party to the Newco Second Lien Credit Agreement from time to time.

**1.96.** "**Newco Second Lien Loan Documents**" means the Newco Second Lien Credit Agreement, the Newco Second Lien Loan Notes which evidence the loans made under the Newco Second Lien Credit Agreement, the Newco Second Lien Pledge Agreement, the Newco Second Lien Mortgages, and the Newco Intercreditor Agreement, as any such documents are amended from time to time, each of which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, and the Second Lien Administrative Agent.

**1.97.** "**Newco Second Lien Mortgages**" means any mortgage recorded in favor of the Newco Second Lien Administrative Agent, which secures the obligations under the Newco Second Lien Credit Agreement, which shall grant a second priority lien on the property that is the subject of the mortgage in favor of the Newco Second Lien Administrative Agent on behalf of the Newco Second Lien Lenders, and which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, and the Second Lien Administrative Agent.

**1.98.** "**Newco Second Lien Loan Notes**" means the notes made by Purchaser, in the form contained in the Plan Supplement as a Plan Document, that evidence the payment obligations of Purchaser under the Newco Second Lien Credit Agreement, which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, and the Second Lien Administrative Agent.

**1.99.** "**Newco Second Lien Pledge Agreement**" means that certain Pledge and Security Agreement dated as of the Effective Date, granting a second priority security interest in substantially all of the personal property assets of Purchaser, by Purchaser in favor of the Newco Second Lien Administrative Agent for the benefit of the Newco Second Lien Secured Parties, together with all documents, instruments and agreements executed or entered into in connection therewith, as amended from time to time, which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, and the Second Lien Administrative Agent.

**1.100.** "**Newco Second Lien Secured Parties**" means the Newco Second Lien Administrative Agent, and the Newco Second Lien Lenders.

**1.101.** "**New Notes**" means the Newco First Lien Loan Notes and the Newco Second Lien Loan Notes.

**1.102.** "**Non-Holdco Debtors**" means each of the Debtors, except WF Capital Holdings, Inc., WF Holdings, Inc., and Workflow Holdings Corporation.

**1.103.** "**Notice of Confirmation**" means the notice of entry of the Confirmation Order to be filed with the Bankruptcy Court and mailed by the Claims Agent to holders of Claims and Equity Interests.

**1.104.** "**Objection Deadline**" means the deadline for filing objections to Claims as set forth in Section 11.2 of the Plan.

**1.105.** "**Ohio Development Loan**" means that certain loan made pursuant to a loan agreement between The Relizon Company and the State of Ohio Director of Development, dated as of January 31, 2003, in the original principal amount of $800,000, which matures on January 31, 2013 and is secured pursuant to the Ohio Security Agreement.

**1.106.** "**Ohio Equipment**" means that certain equipment securing the Ohio Development Loan pursuant to the Ohio Security Agreement.

**1.107.** "**Ohio Security Agreement**" means that certain Security Agreement between The Relizon Company and the State of Ohio Director of Development, dated as of January 31, 2003, which grants a first priority security interest and lien in the Ohio Equipment, and provides a negative covenant precluding the encumbrance of the Ohio Equipment by any other security interest or lien.

**1.108.** "**Other Secured Claims**" means all Secured Claims other than the First Lien Lender Claims and the Second Lien Lender Claims, and including, without limitation, the Ohio Development Loan.

**1.109.** "**PBGC**" means the Pension Benefit Guaranty Corporation.

**1.110.** "**PBGC Claims**" means any and all Claims against any of the Debtors which are or were held by the PBGC pertaining to, arising from, or in connection with the Pension Plan or otherwise.

**1.111.** "**Pension Plan**" means The Relizon Company Retirement Plan, an ERISA-qualified defined benefit retirement plan effective as of January 1, 2001.

**1.112.** "**Periodic Distribution Date**" means (a) initially, the first Business Day that is one full month after the Unsecured Claims Initial Distribution Date and (b) subsequently, a Business Day designated by the Plan Administrator that occurs in the month that is one full month after the immediately preceding Periodic Distribution Date, or in the case of either (a) or (b), such earlier or later date established by the Bankruptcy Court or designated as such by the Plan Administrator in its reasonable discretion in a filing with the Bankruptcy Court.

**1.113.** "**Perseus**" means Perseus, L.L.C., Perseus Partners VII, L.P., Perseus Acquisition/Recapitalization Fund, L.L.C., Perseus 2000 Expansion, L.L.C., WF Holdings Co-Investment, L.P. and Perseus Market Opportunity Fund, L.P., and each of their respective present and former officers, directors, managers and employees.

**1.114.** "**Person**" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, unincorporated organization, governmental entity, or political subdivision thereof, or any other entity.

**1.115.** "**Petition Date**" means September 29, 2010.

**1.116.** "**Plan**" means the third amended joint chapter 11 plan of reorganization, either in its present form or as it may be amended, supplemented, or otherwise modified from time to time, and the exhibits and schedules hereto, as the same may be in effect at the time such reference becomes operative.

**1.117.** "**Plan Administrator**" means the Entity to be granted the authority and charged with the responsibilities of the "Plan Administrator" under the Plan.

**1.118.** "**Plan Administrator Reserve**" means the reserve created to fund the costs and expenses necessary to administer and perform the contemplated functions of the Plan Administrator under the Plan including, without limitation, the reasonable fees and expenses of professionals retained by the Plan Administrator and the payment of post-Effective Date costs and wind-down expenses.

**1.119.** "**Plan Distribution**" means the payment or distribution under the Plan of Cash, Assets, or instruments evidencing an obligation under the Plan to the holder of an Allowed Claim.

**1.120.** "**Plan Documents**" means the Newco First Lien Credit Agreement, the Newco First Lien Loan Notes, the Newco Second Lien Credit Agreement, the Newco Second Lien Loan Notes and any other documents designated as Plan Documents by the Debtors, with the consent of Perseus, the Purchaser and the Second Lien Administrative Agent; provided, however, that the Plan Documents may not be amended **on or** after **one (1) Business Day before** the Voting Deadline in a manner that is material and adverse to the First Lien Lenders without the consent of the First Lien Administrative Agent, which consent shall not be unreasonably withheld, or if the First Lien Administrative Agent withholds its consent, then the Plan Documents may not be amended **in a manner that is material and adverse to the First Lien Lenders** without the consent of the holders of two-thirds **in dollar amount** of the First Lien Lender Principal Claim**; provided further that any such amended Plan Documents shall be promptly served upon the First Lien Administrative Agent**.

**1.121.** "**Plan Funds**" means the aggregate amount of (a) the Administrative Expense Claims Reserve in an amount to be agreed upon on or before the Effective Date by the Debtors and Purchaser which is sufficient to pay in full all Priority Tax Claims, Priority Non-Tax Claims, and Allowed Administrative Expense Claims, not assumed by Purchaser and which will be calculated based upon the aggregate of (i) the total amount of Allowed Priority Tax Claims not assumed by the Purchaser, (ii) the total amount of Allowed Priority Non-Tax Claims not assumed by the Purchaser, (iii) estimates for all Fee Claims as provided for in the Plan, (iv) the requests for payment of Administrative Expense Claims, not assumed by the Purchaser, filed prior to the Administrative Expense Claim Bar Date, and (v) the amounts payable to the First Lien Administrative Agent and the Second Lien Administrative Agent pursuant to Section 6.2(f) of the Plan; (b) the Unsecured Claims Fund in the amount of $1 million ($1,000,000) for distribution to holders of Allowed Claims in Class 5A and 5C; and (c) the Plan Administrator Reserve in the amount of $125,000.

**1.122.** "**Plan Supplement**" means the Plan Documents, the Schedule of Cure Costs, the Schedule of Rejected Executory Contracts and Unexpired Leases, the list of Retained Contracts,

the list of Assigned Contracts, the designation of the Newco First Lien Administrative Agent and any other item designated as part of the Plan Supplement by the Debtors, with the consent of Perseus, the Purchaser and the Second Lien Administrative Agent.

1.123. "**Post-Effective Date Debtors**" means the Debtors subsequent to the Effective Date of the Plan.

1.124. "**Prepetition Agents**" means the First Lien Administrative Agent and the Second Lien Administrative Agent.

1.125. "**Prepetition Collateral**" means the Prepetition Personal Property Collateral and the Prepetition Real Property Collateral.

1.126. "**Prepetition Personal Property Collateral**" means the personal property collateral pledged pursuant to the First Lien Pledge Agreement and the Second Lien Pledge Agreement.

1.127. "**Prepetition Real Property Collateral**" means the real property collateral pledged pursuant to the First Lien Mortgages and the Second Lien Mortgages.

1.128. "**Prepetition Secured Parties**" means the First Lien Secured Parties and the Second Lien Secured Parties.

1.129. "**Priority Non-Tax Claim**" means any Claim entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

1.130. "**Priority Tax Claim**" means any Claim, whether secured or unsecured, entitled to priority under section 507(a)(8) of the Bankruptcy Code.

1.131. "**Professional**" means a Person retained or to be compensated for services rendered or costs incurred on or after the Petition Date and on or prior to the Effective Date pursuant to sections 327, 328, 329, 330, 331, or 1103 of the Bankruptcy Code or otherwise entitled to compensation as estate professionals in these Chapter 11 Cases.

1.132. "**Pro Rata Share**" means, for any Allowed Claim or Allowed Equity Interest of any class, the proportion that such Allowed Claim or Allowed Equity Interest bears to the aggregate amount of all Claims or Equity Interests of such class or classes, as applicable, including Contested Claims or Equity Interests, but excluding Disallowed Claims, as calculated by the Plan Administrator; or as determined or estimated by the Bankruptcy Court, as the case may be.

1.133. "**Purchased Assets**" shall have the meaning set forth in the Asset Purchase Agreement and shall include Avoidance Actions.

1.134. "**Purchaser**" means Newco or its assignee as permitted under the Asset Purchase Agreement.

**1.135.**   "**Rejection Damage Claim**" means any Claim arising out of the rejection of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

**1.136.**   "**Related Parties**" means, with respect to a Person, all of such Person's affiliates, and all of such Person's and such Person's affiliates' officers, directors, principals, shareholders, parents, subsidiaries, members, managers, auditors, accountants, financial advisors, predecessors, successors, servants, agents, counsel, attorneys, partners, insurers, underwriters, administrators, executors, representatives or assigns, whether past or present.

**1.137.**   "**Releasing Parties**" means the Second Lien Administrative Agent, Perseus, holders of Claims who vote to accept the Plan and, to the extent the First Lien Administrative Agent does not file an objection or otherwise oppose the Plan, the First Lien Administrative Agent.

**1.138.**   "**Retained Contracts**" shall have the meaning given in Section 12.1 of the Plan.

**1.139.**   "**Revolver A**" means that portion of the Revolving Credit Facility which matures May 31, 2011.

**1.140.**   "**Revolver B**" means that portion of the Revolving Credit Facility which matured November 30, 2010.

**1.141.**   "**Revolving Credit Facility**" means the revolving loan facility established pursuant to the First Lien Credit Agreement.

**1.142.**   "**Sale Transaction**" means that certain transaction between the Debtors and the Purchaser as set forth in the Asset Purchase Agreement.

**1.143.**   "**Schedules**" means the schedules of assets and liabilities and list of Equity Interests and the statements of financial affairs filed by each of the Debtors with the Bankruptcy Court, as required by section 521 of the Bankruptcy Code and in conformity with the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be amended or supplemented by the Debtors from time to time in accordance with Bankruptcy Rule 1009.

**1.144.**   "**Second Lien Administrative Agent**" means Silver Point, in its capacity as successor administrative agent for the Second Lien Secured Parties pursuant to the Second Lien Loan Documents.

**1.145.**   "**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of November 30, 2005, between Workflow Management, Inc., as borrower, the Second Lien Lenders and the Second Lien Administrative Agent, as amended from time to time.

**1.146.**   "**Second Lien Credit Facility**" means the term loan facility established pursuant to the Second Lien Credit Agreement.

**1.147.** "**Second Lien Guaranties**" means the Guaranties entered into by the Guarantors in favor of the Second Lien Administrative Agent, for the benefit of the Second Lien Secured Parties on account of the Second Lien Lender Claims, as amended from time to time.

**1.148.** "**Second Lien Guaranty Claims**" means any and all Claims against the Guarantors arising from or in connection with the Second Lien Guaranties.

**1.149.** "**Second Lien Lender Claims**" means the Claims, including the Second Lien Guaranty Claims, against any of the Debtors arising from or in connection with the Second Lien Loan Documents, which shall be Allowed in the aggregate amount of $196,396,149.34.

**1.150.** "**Second Lien Lender Deficiency Claims**" means the portion of the Second Lien Lender Claims that do not constitute Secured Claims, as provided for in, and determined in accordance with, section 506(a) of the Bankruptcy Code, which shall be treated in Class 5C hereof. The Allowed Second Lien Lender Deficiency Claim is the amount which is the aggregate amount of the Allowed Second Lien Lender Claims less the aggregate amount of the Allowed Second Lien Lender Secured Claims.

**1.151.** "**Second Lien Lender Secured Claims**" means the $170,000,000.00 portion of the Second Lien Lender Claims that are Secured Claims, as provided for in, and determined in accordance with, section 506(a) of the Bankruptcy Code pursuant to the Plan.

**1.152.** "**Second Lien Lenders**" means the lenders that are party, from time to time, to the Second Lien Credit Agreement.

**1.153.** "**Second Lien Loan Documents**" means the Second Lien Credit Agreement, the notes which evidence the loans outstanding under the Second Lien Credit Facility, the fee letter referred to in the Second Lien Credit Agreement, the Second Lien Pledge Agreement, the Second Lien Guaranties, the Second Lien Mortgages, and the Intercreditor Agreement, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto, as any such documents are amended from time to time.

**1.154.** "**Second Lien Mortgages**" means any mortgage recorded in favor of the Second Lien Administrative Agent which secures the Second Lien Lender Claims, as amended from time to time.

**1.155.** "**Second Lien Pledge Agreement**" means that certain Pledge and Security Agreement dated as of November 30, 2005, granting a second priority security interest in substantially all of the personal property assets of the Loan Parties, by each Loan Party in favor of the Second Lien Administrative Agent, for the benefit of the Second Lien Secured Parties, together with all documents, instruments and agreements executed or entered into in connection therewith, as amended from time to time.

**1.156.** "**Second Lien Secured Parties**" means the Second Lien Administrative Agent and the Second Lien Lenders.

**1.157.** "**Secondary Liability Claim**" means a Claim that arises from a Guaranty or a Debtor otherwise being jointly, severally or secondarily liable for, any contractual, tort or other

obligation of another Debtor, including any Claim based on: (a) guaranties of collection, payment or performance; (b) indemnity bonds, obligations to indemnify or obligations to hold harmless; (c) performance bonds; (d) contingent liabilities arising out of contractual obligations or out of undertakings (including any assignment or other transfer) with respect to leases, operating agreements or other similar obligations made or given by a Debtor relating to the obligations or performance of another Debtor; (e) vicarious liability; (f) liabilities arising out of piercing the corporate veil, alter ego liability or similar legal theories; or (g) any other joint or several liability that any Debtor may have in respect of any obligation that is the basis of a Claim.

**1.158.** "**Section 503(b)(9) Bar Date**" means the deadline for the filing of Section 503(b)(9) Claims established pursuant to an order of the Bankruptcy Court.

**1.159.** "**Section 503(b)(9) Claims**" means any Claims against any of the Debtors entitled to administrative expense status pursuant to section 503(b)(9) of the Bankruptcy Code.

**1.160.** "**Secured Claim**" means (a) a Claim secured by a lien on any Assets, which lien is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, and which is duly established in the Chapter 11 Cases, but only to the extent of the value of the holder's interest in the collateral that secures payment of the Claim; (b) a Claim against any Debtor that is subject to a valid right of setoff under section 553 of the Bankruptcy Code, but only to the extent of the Allowed amount subject to setoff as provided in section 506(a) of the Bankruptcy Code; and (c) a Claim deemed or treated under the Plan as a Secured Claim; provided, that, to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as a General Unsecured Claim unless, in any such case the class of which Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

**1.161.** "**Silver Point**" means Silver Point Finance LLC.

**1.162.** "**Subordinated Claim**" means a Claim against any Debtor subordinated by a Final Order.

**1.163.** "**Term Loan Facility**" means the term loan facility established pursuant to the First Lien Credit Agreement.

**1.164.** "**Third Party Release**" means the release set forth in Section 13.3 of the Plan.

**1.165.** "**Third Party Releasees**" means, collectively, the Second Lien Administrative Agent, each of the Second Lien Lenders that vote in favor of the Plan, the Purchaser, Perseus, each of the First Lien Lenders that vote in favor of the Plan, ~~the Related Parties of each of the foregoing~~ and, to the extent the First Lien Administrative Agent does not file an objection or otherwise oppose the Plan, the First Lien Administrative Agent**, and** the Related Parties of each of the foregoing.

**1.166.** "**Unsecured Claims Cash Amount**" means $1 million ($1,000,000) in Cash of the Plan Funds, which shall make up the Unsecured Claims Fund.

**1.167.** "**Unsecured Claims Fund**" means the Unsecured Claims Cash Amount that shall be held in a segregated interest bearing account to be established by the Plan Administrator on the Effective Date for the purpose of making distributions to holders of Class 5A and Class 5C Allowed Claims pursuant to Sections 10.5 and 10.6 of the Plan.

**1.168.** "**Unsecured Claims Initial Distribution Date**" means the date that is the two month anniversary of the Effective Date.

**1.169.** "**U.S. Trustee**" means the Office of the United States Trustee for Region 4.

**1.170.** "**Voting Deadline**" means the deadline for voting on the Plan, as defined in the Disclosure Statement.

**1.171.** "**Voting Record Date**" means the date established by the Bankruptcy Court as the record date for voting on the Plan.

**1.172.** "**WF Capital**" means WF Capital Holdings, Inc., a Delaware corporation, one of the Debtors and Debtors in Possession in the Chapter 11 Cases.

**1.173.** "**WF Capital/BB&T Note**" means the note made by WF Capital payable to Branch Banking & Trust Company, dated as of December 31, 2008, in the amount of approximately $20 million (not including accrued, and unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

**1.174.** "**WF Capital/Perseus Convertible Note**" means the amended and restated convertible note dated as of March 4, 2008, and made by WF Capital payable to Perseus Partners VII, L.P., in the amount of approximately $58.4 million (including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto, which note is convertible, at the note holder's option, to WF Equity Interests.

**1.175.** "**WF Capital/Perseus Interest Note**" means the demand note made by WF Capital payable to Perseus Market Opportunity Fund, L.P., in the amount of approximately $302,000 (including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

**1.176.** "**WF Equity Interests**" means all Equity Interests in any of the Debtors.

**1.177.** "**WF Holdings/Carlyle Note**" means the subordinated promissory note made by WF Holdings, Inc. payable to Carlyle Partners III, L.P., as holder representative for the benefit of the beneficial holders identified on Schedule I thereto, dated December 21, 2006, in the amount of approximately $12,500,000 (including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

**1.178.** "**WFMI**" means Workflow Management Inc.

**1.179.** "**Workflow Management/Perseus Note**" means the promissory note dated February 9, 2010, and made by Workflow Management, Inc. payable to Perseus, L.L.C., which was subsequently assigned by Perseus, L.L.C. to Perseus Market Opportunity Fund, L.P., in the amount of approximately $1.1 million (including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

## SCHEDULE 2

## LIST OF DEBTORS

| ENTITY | CASE NO. | ID NUMBER |
|---|---|---|
| FORMCRAFT HOLDINGS GENERAL PARTNER, INC. | 10-74631 | 52-2255683 |
| FORMCRAFT HOLDINGS LIMITED PARTNER, INC. | 10-74630 | 52-2255684 |
| OLD FGS, INC. | 10-74615 | 22-3171438 |
| RELIZON DE MEXICO INC. | 10-74628 | 20-3686996 |
| RELIZON KNE INC. | 10-74632 | 51-0413935 |
| RELIZON SNE INC. | 10-74629 | 51-0414537 |
| RELIZON (TEXAS) LTD., LLP | 10-74635 | 76-0566437 |
| RELIZON WISCONSIN INC. | 10-74633 | 39-1818440 |
| SFI OF PUERTO RICO, INC. | 10-74626 | 52-2103413 |
| THE RELIZON COMPANY | 10-74618 | 52-2254702 |
| OLD UE, LLC | 10-74616 | 54-1894060 |
| WF CAPITAL HOLDINGS, INC. | 10-74614 | 42-1685548 |
| WF HOLDINGS, INC. | 10-74620 | 20-0969106 |
| WFIH, INC. | 10-74623 | 20-2010527 |
| WFMI, INC. | 10-74622 | 52-2164282 |
| WORKFLOW DIRECT, INC. | 10-74627 | 95-3817497 |
| WORKFLOW HOLDINGS CORPORATION | 10-74621 | 20-3839217 |
| WORKFLOW MANAGEMENT ACQUISITION II CORP. | 10-74625 | 52-2242039 |
| WORKFLOW MANAGEMENT, INC. | 10-74617 | 06-1507104 |
| WORKFLOW OF FLORIDA, INC. | 10-74624 | 52-2164281 |
| WORKFLOW SOLUTIONS LLC | 10-74619 | 54-1893769 |

**SCHEDULE 3**

**SCHEDULE OF REJECTED EXECUTORY**

**CONTRACTS AND UNEXPIRED LEASES**

[To Be Provided In Plan Supplement]

**EXHIBIT A**

**THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION**

[Filed Concurrently Herewith]

**EXHIBIT B**

**<u>DISCLOSURE STATEMENT ORDER</u>**
**<u>AND</u>**
**<u>NOTICE OF THE CONFIRMATION HEARING</u>**

[To Be Provided]

**EXHIBIT C**

**PROJECTIONS AND SUMMARY OF SIGNIFICANT ASSUMPTIONS**

**EXHIBIT D**

**PRO FORMA BALANCE SHEETS**

# EXHIBIT E

# <u>LIQUIDATION ANALYSIS</u>

Document comparison by Workshare Professional on Tuesday, January 18, 2011
7:06:09 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://DMSPROXY/Active/28504223/7 |
| Description | #28504223v7<Active> - WF DS for Third Amended Plan |
| Document 2 ID | interwovenSite://DMSPROXY/Active/28504223/10 |
| Description | #28504223v10<Active> - WF DS for Third Amended Plan |
| Rendering set | MW Standard |

| Legend: | |
|---|---|
| **<u>Insertion</u>** | |
| ~~Deletion~~ | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 69 |
| Deletions | 52 |
| Moved from | 1 |
| Moved to | 1 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 123 |

**<u>Exhibit C</u>**

(Blacklined Asset Purchase Agreement)

**ASSET PURCHASE AND SALE AGREEMENT**

**by and between**

**WF CAPITAL HOLDINGS, INC.**

**WF HOLDINGS, INC.,**

**WORKFLOW HOLDINGS CORPORATION,**

**WORKFLOW MANAGEMENT, INC.,**

**WFMI, INC.,**

**WORKFLOW SOLUTIONS LLC,**

**WFIH, INC.,**

**OLD FGS, INC.,**

**OLD UE, LLC,**

**THE RELIZON COMPANY,**

**WORKFLOW OF FLORIDA INC.,**

**WORKFLOW MANAGEMENT ACQUISITION II CORP,**

**SFI OF PUERTO RICO, INC.,**

**WORKFLOW DIRECT, INC.,**

**RELIZON DE MÉXICO INC.,**

**RELIZON SNE INC.,**

**FORMCRAFT HOLDINGS LIMITED PARTNER, INC.,**

**FORMCRAFT HOLDINGS GENERAL PARTNER, INC.**

**RELIZON KNE INC.,**

**RELIZON WISCONSIN INC.**

**RELIZON TEXAS LTD., LLP**

**AND**

**WORKFLOW HOLDINGS, LLC**

**Dated: ~~[January~~ ~~____]~~, ~~20~~ 2011**

**TABLE OF CONTENTS**

ARTICLE I Definitions and Rules of Construction ................................................................. 2
   1.1.   Definitions. ................................................................................................................ 2
   1.2.   Rules of Construction. ............................................................................................ ~~13~~2
ARTICLE II Purchase and Sale ............................................................................................ ~~13~~2
   2.1.   Closing. .................................................................................................................. ~~13~~2
   2.2.   Sale and Purchase of the Purchased Assets ........................................................... ~~13~~2
   2.3.   Excluded Assets ...................................................................................................... ~~15~~2
   2.4.   Assumption of Liabilities. ...................................................................................... ~~16~~2
   2.5.   Retained Liabilities. ............................................................................................... ~~17~~2
   2.6.   Purchase Price ........................................................................................................ ~~18~~2
   2.7.   Allocation of Purchase Price ................................................................................. ~~18~~2
   2.8.   Non-Assignment of Assigned Contracts ................................................................ ~~18~~2
   2.9.   Designation of Assigned Contracts ........................................................................ ~~18~~2
ARTICLE III Representations and Warranties of Sellers ....................................................... ~~19~~2
   3.1.   Organization and Power. ........................................................................................ ~~19~~2
   3.2.   Authorization and Enforceability. .......................................................................... ~~19~~2
   3.3.   No Violation ........................................................................................................... ~~20~~2
   3.4.   Governmental Authorizations and Consents. ......................................................... ~~20~~2
   3.5.   Financial Statements. ............................................................................................. ~~20~~2
   3.6.   Assets. .................................................................................................................... ~~21~~2
   3.7.   Compliance with Laws .......................................................................................... ~~21~~2
   3.8.   Environmental Matters. .......................................................................................... ~~21~~2
   3.9.   Certain Transactions. ............................................................................................. ~~22~~2
   3.10.  No Brokers ............................................................................................................. ~~22~~2
ARTICLE IV Representations and Warranties of Buyer ........................................................ ~~22~~2
   4.1.   Organization and Power. ........................................................................................ ~~22~~2
   4.2.   Authorization. ........................................................................................................ ~~22~~2
   4.3.   Enforceability ........................................................................................................ ~~22~~2
   4.4.   No Violation. .......................................................................................................... ~~22~~2
   4.5.   Governmental Authorizations and Consents. ......................................................... ~~23~~2
   4.6.   Litigation. .............................................................................................................. ~~23~~2
   4.7.   No Brokers. ............................................................................................................ ~~23~~2
ARTICLE V Covenants ........................................................................................................ ~~23~~2
   5.1.   Conduct of Sellers Conducting the Business. ........................................................ ~~23~~2
   5.2.   Access to Information Prior to the Closing ............................................................ ~~25~~2
   5.3.   Certain Tax Matters. .............................................................................................. ~~25~~2
   5.4.   Public Announcements .......................................................................................... ~~26~~2
   5.5.   Reasonable Best Efforts. ........................................................................................ ~~26~~2
   5.6.   Post-Closing Access .............................................................................................. ~~26~~2
   5.7.   Seller's Employment and Benefit Plan Covenants. ............................................... ~~26~~2
   5.8.   Liens. ..................................................................................................................... ~~27~~2
ARTICLE VI Conditions to Closing ..................................................................................... ~~27~~2
   6.1.   Conditions to All Parties' Obligations. .................................................................. ~~27~~2
   6.2.   Conditions to Sellers' Obligations. ........................................................................ ~~28~~2
   6.3.   Conditions to Buyer's Obligations. ........................................................................ ~~28~~2

ARTICLE VII Deliveries by Sellers at Closing .......................................................... ~~29~~2

7.1.  Officer's Certificate. ..................................................................................... ~~29~~2

7.2.  Transfer Documents. ..................................................................................... ~~29~~2

7.3.  Assignment and Assumption Agreements ..................................................... ~~29~~2

7.4.  Receipt .......................................................................................................... ~~29~~2

7.5.  Further Instruments. ..................................................................................... ~~29~~2

ARTICLE VIII Deliveries by Buyer at Closing ........................................................ ~~29~~2

8.1.  Officer's Certificate. ..................................................................................... ~~29~~2

8.2.  Assignment and Assumption Agreements ..................................................... ~~29~~2

8.3.  Transfer Documents. ..................................................................................... ~~30~~2

8.4.  Closing Consideration Amount ..................................................................... ~~30~~2

8.5.  Note Documentation. ..................................................................................... ~~30~~2

8.6.  Further Instruments. ..................................................................................... ~~30~~2

ARTICLE IX Termination ........................................................................................ ~~30~~2

9.1.  Termination. .................................................................................................. ~~30~~2

9.2.  Effect of Termination .................................................................................... ~~31~~2

ARTICLE X Miscellaneous ...................................................................................... ~~31~~2

10.1.  Expenses. ..................................................................................................... ~~31~~2

10.2.  Notices. ........................................................................................................ ~~31~~2

10.3.  Governing Law. ........................................................................................... ~~32~~2

10.4.  Entire Agreement. ........................................................................................ ~~32~~2

10.5.  Severability .................................................................................................. ~~32~~2

10.6.  Amendment .................................................................................................. ~~32~~2

10.7.  Effect of Waiver or Consent ........................................................................ ~~32~~2

10.8.  Parties in Interest; Limitation on Rights of Others ...................................... ~~33~~2

10.9.  Assignability. ............................................................................................... ~~33~~2

10.10. Jurisdiction; Court Proceedings; Waiver of Jury Trial ................................ ~~33~~2

10.11. No Other Duties. ......................................................................................... ~~33~~2

10.12. Reliance on Counsel and Other Advisors .................................................... ~~33~~2

10.13. Remedies.. .................................................................................................... ~~34~~2

10.14. Specific Performance ................................................................................... ~~34~~2

10.15. Bulk Transfer Laws. .................................................................................... ~~34~~2

10.16. Survival ....................................................................................................... ~~34~~2

10.17. Counterparts ................................................................................................ ~~34~~2

10.18. Further Assurance. ....................................................................................... ~~34~~2

7940279

<u>Exhibits</u>

Exhibit A            **<u>Bankruptcy</u>** Plan ~~of Reorganization~~

# ASSET PURCHASE AND SALE AGREEMENT

ASSET PURCHASE AND SALE AGREEMENT, dated as of [~~January ____~~, ~~20~~ **2011** by and among WF Capital Holdings, Inc., a Delaware corporation ("WF Capital"), WF Holdings, Inc., a Delaware corporation, Workflow Holdings Corporation, a Delaware corporation, Workflow Management, Inc., a Delaware corporation ("WMI"), WFMI, Inc., a Delaware corporation, Workflow Solutions LLC, a Delaware limited liability company, WFIH, Inc., a Delaware corporation, Old FGS, Inc., a New Jersey corporation, Old UE, LLC, a Delaware limited liability company, The Relizon Company, a Delaware corporation, Workflow of Florida Inc., a Delaware corporation, Workflow Management Acquisition II Corp, a Delaware corporation, SFI of Puerto Rico, Inc., a Delaware corporation, Workflow Direct, Inc., a California corporation, Relizon de México Inc., a Delaware corporation, Relizon SNE Inc., a Delaware corporation, Formcraft Holdings Limited Partner, Inc., a Delaware corporation, Formcraft Holdings General Partner, Inc., a Delaware corporation, Relizon KNE Inc., a Delaware corporation, Relizon Wisconsin Inc., a Wisconsin corporation and Relizon Texas Ltd., LLP, a Texas limited liability partnership (collectively, "Sellers") and Workflow Holdings, LLC, a Delaware limited liability company ("Buyer").

## RECITALS

WHEREAS, as of the date hereof, WMI is borrower under, and the other Sellers (other than WF Capital) are guarantors of (i) that certain first lien credit agreement, dated as of November 30, 2005, which established a term loan facility and a revolving credit facility (collectively, as amended from time to time, the "First Lien Credit Facility") and (ii) that certain second lien credit agreement, dated as of December 19, 2005, which established a second lien credit facility (as amended from time to time, the "Second Lien Credit Facility");

WHEREAS, on the Petition Date, Sellers filed voluntary petitions for relief (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, case number 10-74617(SCS);

WHEREAS, in connection with the Chapter 11 Cases, Sellers have filed a ~~second~~**third** amended joint Chapter 11 plan, attached hereto as **Exhibit A** (as the same may be amended, supplemented or modified from time to time in accordance with the terms therein, the "Bankruptcy Plan");

WHEREAS, pursuant to the Bankruptcy Plan, Buyer has agreed to acquire the Purchased Assets and assume the Assumed Liabilities in exchange for which Buyer will pay consideration which includes, among other things, the ~~issuance~~**delivery** of the Newco First Lien Loan Notes ~~and~~**,** the Newco Second Lien Loan Notes **and the Newco Preferred Units** to Sellers;

WHEREAS, pursuant to the Bankruptcy Plan, Buyer has agreed to secure the Newco First Lien Loan Notes with a first priority lien on substantially all of Buyer's assets, including the Purchased Assets, and Buyer has agreed to secure the Newco Second Lien Loan Notes with a second priority lien on substantially all of Buyer's assets, including the Purchased Assets; and

WHEREAS, pursuant to the Bankruptcy Plan, Sellers will distribute the Newco First Lien Loan Notes to the First Lien Lenders and the Newco Second Lien Loan Notes ~~to the First Lien Lenders~~ and **the Newco Preferred Units to** the Second Lien Lenders in exchange for the satisfaction of Sellers obligations under the First Lien Credit Facility and the Second Lien Credit Facility**, respectively**.

NOW THEREFORE, in consideration of the premises and the representations, warranties and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereby agree as follows:

ARTICLE I
Definitions and Rules of Construction

1.1.    <u>Definitions</u>.

As used in this Agreement, the following terms shall have the meanings set forth below:

"<u>Accounts Receivable</u>" means (a) all trade accounts receivable and other rights to payment from customers of Sellers with respect to the Business and (b) any claim, remedy or other right related to the foregoing.

"<u>ACMs</u>" has the meaning set forth in the definition of "Hazardous Materials."

"<u>Additional Retained Contracts</u>" has the meaning set forth in Section 2.3(b).

"<u>Administrative Expense Claims Reserve</u>" has the meaning given to such term in the Bankruptcy Plan.

"<u>Affiliate</u>" means, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"<u>Agreement</u>" means this Asset Purchase and Sale Agreement, as it may be amended from time to time.

"<u>Ancillary Documents</u>" means the documents being executed and delivered in connection with this Agreement and the transactions contemplated hereby.

"<u>Assets</u>" of any Person means all assets and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible, wherever situated and by whomever possessed), including the goodwill related thereto, operated, owned or leased by such Person.

"Assignment and Assumption Agreements" has the meaning set forth in Section 8.2.

"Assigned Contracts" has the meaning set forth in Section 2.2(f).

"Assumed Liabilities" has the meaning set forth in Section 2.4.

"Assumed Plans and Benefits" has the meaning set forth in Section 5.7(b).

"Avoidance Actions" has the meaning set forth in Section 2.2(o).

"Bankruptcy Code" means title 11 of the United States Code, as amended from time to time and applicable to the Chapter 11 Cases.

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Virginia, Norfolk Division.

"Bankruptcy Plan" has the meaning set forth in the Recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Business" means the provision of printed business documents, print-related and logistical services and promotional marketing solutions by Sellers and any other business activities of Sellers as currently conducted and as contemplated to be conducted by Sellers.

"Business Day" means any day other than a Saturday, Sunday or day on which banks are closed in New York, New York. If any period expires on a day which is not a Business Day or any event or condition is required by the terms of this Agreement to occur or be fulfilled on a day which is not a Business Day, such period shall expire or such event or condition shall occur or be fulfilled, as the case may be, on the next succeeding Business Day.

"Business Intellectual Property" means all Intellectual Property used or held for use by Sellers in connection with the Business whether owned or licensed from third parties.

"Buyer" has the meaning set forth in the Preamble.

"Buyer Disclosure Schedule" means the disclosure schedule of even date herewith delivered by Buyer to Sellers in connection with the execution and delivery of this Agreement.

"Buyer Fundamental Representations" shall mean the representations and warranties contained in Section 4.1., Section 4.2 and Section 4.3.

"Buyer Material Adverse Effect" means a material adverse effect on the ability of Buyer to consummate the Contemplated Transactions.

"Cash Collateral Order" has the meaning set forth in the Bankruptcy Plan.

"Chapter 11 Cases" has the meaning set forth in the Recitals.

"Claims" has the meaning set forth in Section 2.2(l).

"Closing" has the meaning set forth in Section 2.1.

"Closing Consideration Amount" has the meaning set forth in Section 2.6.

"Closing Date" has the meaning set forth in Section 2.1.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of subsequent superseding federal revenue Laws.

"Confirmation Order" has the meaning set forth in the Bankruptcy Plan.

"Consultant" means all persons (other than employees of Sellers) who are or have been engaged as consultants by Sellers or who otherwise provide services to Sellers under a contractual arrangement.

"Contemplated Transactions" means the transactions contemplated by this Agreement and the Ancillary Documents.

"Contract" means any agreement, contract, license, arrangement, understanding, obligation or commitment to which a party is bound or to which its assets or properties are subject, whether oral or written, and any amendments and supplements thereto.

"Copyrights" means all registered and unregistered United States and non-United States copyrights, including copyrights in Software.

"Cure Cost" has the meaning set forth in the Bankruptcy Plan.

"Disclosure Statement Order" has the meaning set forth in the Bankruptcy Plan.

"Effective Date" has the meaning set forth in the Bankruptcy Plan.

"Employee" means any employee of Sellers as of the Closing, other than employees listed in Section 1.1(a) **of** the Seller Disclosure Schedule.

"End Date" has the meaning set forth in Section 9.1(f).

"Environmental Laws" means any applicable federal, state or local law, statute, ordinance, rule or regulation governing Environmental Matters and all applicable judicial and administrative decisions, orders and decrees relating to Environmental Matters.

"Environmental Matter" means any matter arising out of, relating to, or resulting from pollution, contamination, protection of the environment, human health and any matters relating to emissions, discharges, disseminations, releases or threatened releases, of Hazardous Materials into the air (indoor and outdoor), surface water, groundwater, soil, land surface or subsurface, buildings, facilities, real or personal property or fixtures or otherwise arising out of, relating to, or resulting from the manufacture, processing, distribution, use, treatment, storage, disposal, transport, handling, release or threatened release of Hazardous Materials.

"Environmental Permits" has the meaning set forth in Section 3.8(a).

"ERISA" means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time, as well as any rules and regulations promulgated thereunder and any corresponding provisions of subsequent superseding federal Laws relating to retirement matters, as from time to time in effect.

"ERISA Affiliate" means a corporation which is or was at any time a member of a controlled group of corporations with Sellers within the meaning of Code Section 414(b), a trade or business which is or was under common control with Sellers within the meaning of Code Section 414(c), or a member of an affiliated service group with Sellers within the meaning of Code Sections 414(m) or (o).

"Estate" means the estate of any Seller created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

"Excluded Assets" has the meaning set forth in Section 2.3(b).

"Event" means any event, change, development, effect, condition, circumstance, matter, occurrence or state of facts.

"Facilities" means all real property owned, leased, or operated by Sellers in connection with the Business and any buildings, facilities, machinery, equipment, furniture, leasehold and other improvements, fixtures, vehicles, structures, any related capital items and other tangible property located on, in, under or above such real property of Sellers.

"Final Order" has the meaning set forth in the Bankruptcy Plan.

"Financial Statements" has the meaning set forth in Section 3.5(a).

"First Lien Credit Facility" has the meaning set forth in the Recitals.

"First Lien Lenders" means the lenders under the First Lien Credit Facility, from time to time.

"Former Shareholder Notes" means those certain promissory notes made by certain former shareholders of Sellers payable to certain Sellers in the original aggregate principal amount of approximately $2,352,872.

"GAAP" means generally accepted accounting principles in the United States of America in effect from time to time.

"Governmental Authority" means any nation or government, any foreign or domestic federal, state, county, municipal or other political instrumentality or subdivision thereof and any foreign or domestic entity or body exercising executive, legislative, judicial, regulatory, administrative or taxing functions of or pertaining to government, including any court.

"Governmental Consents" has the meaning set forth in Section 3.4.

"Hazardous Materials" means any materials or substances defined as toxic, hazardous, extremely hazardous or words of similar import, under, any applicable Environmental Law (including petroleum or any by-products or fractions thereof, lead, asbestos and asbestos-containing materials ("ACMs"), polychlorinated biphenyls ("PCBs") and PCB-containing equipment, radon and urea formaldehyde foam insulation).

"Indebtedness" means all obligations and indebtedness of the Business (a) for borrowed money (other than trade debt and other similar liabilities incurred in the ordinary course of business), (b) evidenced by a note, bond, debenture or similar instrument, (c) created or arising under any capital lease, conditional sale, earn out or other arrangement for the deferral of purchase price of any property, (d) under letters of credit, banker's acceptances or similar credit transactions, (e) for any other Person's obligation or indebtedness of the same type as any of the foregoing, whether as obligor, guarantor or otherwise, (f) for interest on any of the foregoing and/or (g) for any premiums, prepayment or termination fees, expenses or breakage costs due upon prepayment of any of the foregoing.

"Intellectual Property" means Patents, Copyrights, Trademarks, Trade Secrets, Software and Technology, and all rights therein arising under any Law.

"Knowledge of Sellers" means the actual knowledge possessed by Scott Seymour, Paul Bogutsky, Dave Davis, Brian Leitch, Dean Truitt, ~~Earnest~~**Ernest** Miller, Bill Antoskiewicz, Rob ~~Wittington~~**Whittington**, Kelly Whitt, Thomas Rizzi or Robert Abbonizio.

"Laws" means all laws, Orders, statutes, codes, regulations, ordinances, decrees, rules, or other requirements with similar effect of any Governmental Authority.

"Liability" means, with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise and whether or not the same is required to be accrued on the financial statements of such Person.

"Lien" means any lien, statutory or otherwise, security interest, mortgage, deed of trust, option, priority, pledge, charge, right of first refusal, easement, right-of-way, encroachment, license to a third party, lease to a third parties or other encumbrance or similar right of others, or any agreement to give any of the foregoing.

"Litigation" means any claim, action, suit, audit, inquiry, proceeding or governmental investigation.

"Material Adverse Effect" means (a) any Event which has a material adverse effect on the business, condition (financial or otherwise), assets, liabilities or results of operation of the Business taken as a whole, provided, that any effect resulting from any of the following shall not be considered when determining whether a Material Adverse Effect shall have occurred:  (i) changes in general economic conditions, (ii) the announcement of this Agreement, (iii) changes in GAAP applicable to the Business, (iv) acts of terrorism, armed hostilities or war, (v) changes resulting from any natural disasters or other force majeure events, or (vi) changes in Law or interpretations thereof (after the date hereof) by any Governmental Authority; provided,

that in the case of each of the foregoing clauses (i), (iii), (iv), (v) or (vi), such event does not disproportionately impact the Business taken as a whole, relative to the other participants in the industries in which Sellers operate or (b) any Event that prevents or would be reasonably expected to prevent consummation of the Contemplated Transactions or the performance by the Business or Sellers of any of their material obligations under this Agreement.

"Most Recent Audited Financial Statements" has the meaning set forth in Section 3.5(a).

"Most Recent Unaudited Financial Statements" has the meaning set forth in Section 3.5(a).

"Newco First Lien Credit Agreement" means that certain first lien credit agreement, to be dated as of the Closing Date, among Buyer, as borrower, the Newco First Lien Lenders party thereto and the administrative agent party thereto, as amended from time to time and as such term is defined in the Bankruptcy Plan.

"Newco First Lien Lenders" means the lenders that are party to the Newco First Lien Credit Agreement from time to time and as such term is defined in the Bankruptcy Plan.

"Newco First Lien Loan Notes" means the notes made by Buyer that evidence the payment obligations of Buyer under the Newco First Lien Credit Agreement secured by a first lien on substantially all of the assets of Buyer as contemplated in the Newco First Lien Credit Agreement and as such term is defined in the Bankruptcy Plan.

"Newco Preferred Units" means the perpetual preferred units issued by Buyer, with an initial stated liquidation value of $30 million and a 15% preferred distribution.

"Newco Second Lien Credit Agreement" means that certain second lien credit agreement, to be dated as of the Closing Date, among Buyer, as borrower, the Newco Second Lien Lenders party thereto and the administrative agent party thereto, as amended from time to time and as such term is defined in the Bankruptcy Plan.

"Newco Second Lien Lenders" means the lenders that are party to the Newco Second Lien Credit Agreement from time to time and as such term is defined in the Bankruptcy Plan.

"Newco Second Lien Loan Notes" means the notes made by Buyer that evidence the payment obligations of Buyer under the Newco Second Lien Credit Agreement secured by a second lien on substantially all of the assets of Buyer as contemplated in the Newco Second Lien Credit Agreement and as such term is defined in the Bankruptcy Plan.

"Ohio Development Loan" means that certain loan made pursuant to a loan agreement between The Relizon Company and the State of Ohio Director of Development, dated as of January 31, 2003, in the original principal amount of $800,000, which matures on January 31, 2013.

"Orders" means all judgments, orders, writs, injunctions, decisions, rulings, decrees and awards of any Governmental Authority.

"Patents" means all United States and non-United States patents and applications therefore, including provisionals, divisions, reissues, continuations, continuations-in-part, reexaminations, renewals and extensions of the foregoing, and statutory invention registrations, utility models and utility model applications.

"PCBs" has the meaning set forth in the definition of "Hazardous Materials."

"PBGC" has the meaning set forth in the definition of "Pension Plan Liabilities."

"Pension Plan" has the meaning set forth in the definition of "Pension Plan Liabilities."

"Pension Plan Liabilities" means any Liability arising out of or relating to the Relizon Company Retirement Plan and the Pension Plan for Employees of Relizon Canada Inc. (the "Pension Plan"), including without limitation any Liability for (i) contributions to the Pension Plans, (ii) any underfunding of the Pension Plans (whether arising before or after the Closing), (iii) premiums payable pursuant to Section 4006 of ERISA, including termination premiums, with respect to the Pension Plan, (iv) taxes or other penalties relating to the Pension Plan(s) or (v) to the Pension Benefit Guaranty Corporation ("PBGC") relating to the Pension Plans.

"Permits" has the meaning set forth in Section 2.2(g).

"Permitted Lien" means any (i) Lien in respect of Taxes, if due, the validity of which is being contested in good faith by appropriate proceedings during which collection or enforcement is stayed, (ii) mechanics', carriers', workmen's, repairmen's or other like Liens arising or incurred in the ordinary course of business, (iii) with respect to leasehold interests, mortgages and other Liens incurred, created, assumed or permitted to exist and arising by, through or under a landlord or owner of the leased real property, (iv) Liens incurred in the ordinary course of business in connection with worker's compensation, unemployment insurance and other types of social security, (v) Liens securing claims of creditors treated in Class 4 of the Bankruptcy Plan, and (vi) Liens listed in Section 1.1(b) of the Seller Disclosure Schedule.

"Perseus" means, as applicable, any or all of Perseus, L.L.C., Perseus Partners VII, L.P., Perseus Acquisition/Recapitalization Fund, L.L.C., Perseus 2000 Expansion, L.L.C., WF Holdings Co-Investment, L.P. and Perseus Market Opportunity Fund, L.P., and each of their respective present and former officers, directors, managers and employees.

"Perseus Contribution" means the capital contribution by Perseus to Buyer in an amount equal to $12.5 million.

"Person" means any individual, person, entity, general partnership, limited partnership, limited liability partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, association, foreign trust or foreign business organization and

the heirs, executors, administrators, legal representatives, successors and assigns of the "Person" when the context so permits.

"Petition Date" means September 29, 2010, the date on which Sellers filed with the Bankruptcy Court their petitions commencing the Chapter 11 Cases.

"Plan" or "Plans" means all employee benefit plans (as defined in Section 3(3) of ERISA) and all bonus, stock option, stock purchase, other equity-based profit sharing, savings, disability, incentive, deferred compensation, retirement, severance, retention, pension, change in control or other employee benefit plans or programs and all employment or compensation agreements, for the benefit of, or relating to, current employees and former employees, with respect to the Business, of Sellers or any ERISA Affiliate, or with respect to which Sellers or any of their Subsidiaries could have any Liability.

"Plan Administrator" has the meaning set forth in the Bankruptcy Plan.

"Plan Funds" has the meaning set forth in the Bankruptcy Plan.

"Plan Supplement" has the meaning set forth in the Bankruptcy Plan.

"Pre-Closing Taxes" means any Taxes of or relating to the Purchased Assets (i) for any taxable period ending on or before the Closing Date, or (ii) allocable to the portion of Straddle Period ending on and including the Closing Date. Taxes with respect to a Straddle Period shall be allocated to the portion of the Straddle Period ending on the Closing Date to the extent feasible, on a specific identification basis, according to the date of the event or transaction giving rise to the Tax, and with respect to periodically assessed ad valorem Taxes and Taxes not otherwise feasibly allocable to specific transactions or events, in proportion to the number of days in such Straddle Period occurring through the Closing Date compared to the total number of days in such Straddle Period.

"Purchased Assets" has the meaning set forth in Section 2.2.

"Rejected Contracts" has the meaning set forth in Section 2.3(b).

"Retained Liabilities" has the meaning set forth in Section 2.5.

"Retained Notes" means the WF Capital/BB&T Note, the WF Holdings/Carlyle Note, WF Capital/Perseus Convertible Note, the WF Capital/Perseus Interest Note and the Workflow Management/Perseus Note.

"Second Lien Credit Facility" has the meaning set forth in the Recitals.

"Second Lien Lenders" means the lenders under the Second Lien Credit Facility, from time to time.

"Sellers" has the meaning set forth in the Preamble.

"Seller Disclosure Schedule" means the disclosure schedule of even date herewith delivered by Seller in connection with the execution and delivery of this Agreement**, as may be further amended in compliance with this Agreement after the date hereof**.

"Seller Fundamental Representations" shall mean the representations and warranties contained in Section 3.1 and Section 3.2.

"Seller Transaction Expenses" means all fees, costs and expenses incurred or to be paid by Sellers or the Business in connection with the Contemplated Transactions, including fees and disbursements of counsel, financial advisors, Consultants and accountants, and filing fees and expenses incurred by Sellers or the Business in connection with any filing by Sellers or the Business with a Governmental Authority.

"Software" means the manifestation, in tangible or physical (including digital) form, including in magnetic media, firmware, and documentation, of computer programs and databases, including data therein, such computer programs and databases to include, but not limited to, management information systems and personal computer programs, websites and content therein. The tangible manifestation of such programs may be in the form of, among other things, source code, flow diagrams, listings, object code and microcode. Software does not include any Technology.

"Straddle Period" means any taxable period that includes, but does not end on, the Closing Date.

"Subsidiary" means, with respect to any Person, any corporation or other organization, whether incorporated or unincorporated, (a) of which such Person or any other Subsidiary of such Person is a general partner (excluding partnerships, the general partnership interests of which held by such Person or any Subsidiary of such Person do not have a majority of the voting interests in such partnership), or (b) at least a majority of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries, or by such Person and one or more of its Subsidiaries.

"Tax" or "Taxes" means all federal, state, local and foreign income, profits, franchise, gross receipts, environmental, customs duty, capital stock, severances, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise production, value added, occupancy, Transfer Taxes, and other taxes, duties or assessments of any nature whatsoever, together with all interest, penalties or additions to tax attributable to such taxes and any Liability arising under any tax sharing agreement or any Liability for Taxes of another Person by Contract, as a transferee or successor, under Treasury Regulation §1.1502-6 or analogous state, local or foreign Law, whether disputed or not.

"Tax Return" means any report, return, statement or other written information (including elections, declarations, disclosures, schedules, estimates and information returns) supplied by or required to be supplied by Sellers to a Taxing Authority in connection with any Taxes and any schedule or attachment thereto and amendment thereof.

"Taxing Authority" means any government or any subdivision, agency, commission or authority thereof, or any quasi-governmental or private body, having jurisdiction over the assessment, determination, collection or other imposition of Taxes.

"Technology" means all types of technology, technical information, know-how, and data, whether or not reduced to tangible or physical form, whether a Trade Secret or not, including: product definitions and designs; inventions; research and development; engineering, manufacturing, process, test, quality control, procurement, and service specifications, procedures, processes, standards, and reports; blueprints; drawings; materials specifications, procedures, standards, and lists; catalogs; technical information and data relating to marketing and sales activity; and formulae. Technology does not include any Software.

"Trade Secrets" means information, unpatented inventions, discoveries, data and any other intangible items in any form that are considered to be proprietary information by the owner, is maintained on a confidential or secret basis by the owner, and is not generally known to other parties.

"Trademarks" means all United States and non-United States trademarks, service marks, trade names, brand names, trade dress, domain names and other identifiers of source or goodwill, together with all registrations and applications for registration thereof, and all goodwill associated therewith.

"Transfer Documents" has the meaning set forth in Section 7.2.

"Transfer Taxes" means all transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with the sale of the Purchased Assets (including any transfer or similar Tax imposed by any Governmental Authority). For the avoidance of doubt, Transfer Taxes do not include any taxes based upon or measured by income or gains, which shall be paid entirely by Seller.

"Treasury Regulations" means the regulations promulgated under the Code, as amended from time to time (including any successor regulations).

"WF Capital" has the meaning set forth in the Preamble.

"WF Capital/BB&T Note" means the note made by WF Capital payable to Branch Banking & Trust Company, dated as of December 31, 2008, in the amount of approximately $20 million (not including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

"WF Capital/Perseus Convertible Note" means the amended and restated convertible note dated as of March 4, 2008, and made by WF Capital payable to Perseus Partners VII, L.P., in the amount of approximately $58.4 million (including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto, which note is convertible, at the note holder's option, to equity of Sellers.

"WF Capital/Perseus Interest Note" means the demand note made by WF Capital payable to Perseus Market Opportunity Fund, L.P., in the amount of approximately $302,000

(including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

"WF Holdings/Carlyle Note" means the subordinated promissory note made by WF Holdings, Inc. payable to Carlyle Partners III, L.P., as holder representative for the benefit of the beneficial holders identified on Schedule I thereto, dated December 21, 2006, in the amount of approximately $12,500,000 (including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

"WMI" has the meaning set forth in the Preamble.

"Workflow Management/Perseus Note" means the promissory note dated February 9, 2010, and made by WMI payable to Perseus, L.L.C., which was subsequently assigned by Perseus, L.L.C. to Perseus Market Opportunity Fund, L.P., in the amount of approximately $1.1 million (including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

    1.2.   Rules of Construction.

Unless the context otherwise requires:

(a)    A capitalized term has the meaning assigned to it;

(b)    An accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(c)    References in the singular or to "him," "her," "it," "itself," or other like references, and references in the plural or the feminine or masculine reference, as the case may be, shall also, when the context so requires, be deemed to include the plural or singular, or the masculine or feminine reference, as the case may be;

(d)    References to Articles, Sections and Exhibits shall refer to articles, sections and exhibits of this Agreement, unless otherwise specified;

(e)    The headings in this Agreement are for convenience and identification only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision thereof;

(f)    This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party that drafted and caused this Agreement to be drafted;

(g)    All monetary figures shall be in United States dollars unless otherwise specified;

(h)    References to "including" in this Agreement shall mean "including, without limitation," whether or not so specified; and

(i)     The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other theory extends and such phrase shall not mean "if."

ARTICLE II
Purchase and Sale

2.1.    Closing.

The closing of the Contemplated Transactions (the "Closing") will take place at the offices of Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, NY 10004, at 10:00 A.M. local time on the second Business Day immediately following the day on which the last of the conditions set forth in Article VI (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions) are satisfied or waived in accordance with this Agreement, or on such other date as Buyer and Sellers may otherwise agree. For the avoidance of doubt, it is intended by the parties hereto that the Closing shall occur simultaneously with the Effective Date of the Bankruptcy Plan.  The day on which the Closing actually occurs is referred to herein as the "Closing Date."

2.2.    Sale and Purchase of the Purchased Assets.

Subject to the terms and conditions set forth in this Agreement, at the Closing, Sellers shall sell, transfer, assign and deliver (or cause to be sold, transferred, assigned and delivered) to Buyer, and Buyer (or such other entity **or entities** designated by Buyer **in compliance with Section 10.9**) shall purchase and acquire, all of Sellers' right, title and interest in and to the Purchased Assets.  For purposes of this Agreement, "Purchased Assets" shall mean all of Sellers' right, title and interest in and to all of the Assets that are owned by Sellers, other than the Excluded Assets, together with such changes, deletions or additions occurring between the date hereof and the Closing Date in compliance with this Agreement, including the following Assets:

(a)     All fee-owned real property, leaseholds, subleaseholds, and other interests of Sellers in the real property listed in Section 2.2(a) of the Seller Disclosure Schedule, in each case, including all structures, improvements and fixtures located thereon and all rights of way, other rights, privileges, licenses, easements and appurtenances belonging or appertaining thereto;

(b)     All Accounts Receivable;

(c)     All inventories of raw materials and supplies, manufactured and purchased parts, work-in-process, finished goods and spare parts, that are owned, leased or licensed by Sellers, including, without limitation, all such inventory which may be in transit or in the possession of any third party;

(d)     All machinery, equipment, molds, tools, furniture and furnishings, leasehold improvements, goods, vehicles, office equipment and supplies, computers and related equipment, telephones, telecopiers, and other fixed assets of any kind, that are owned, leased or licensed by Sellers;

(e)     Other than as listed in Section 2.2(e) of the Seller Disclosure Schedule, all Business Intellectual Property, together with the right to sue and obtain damages and equitable relief for past, present and future infringement, misappropriation, dilution or violation thereof or unfair competition therewith, and all other intangible rights and property, including going concern value, and all goodwill associated therewith;

(f)     All Contracts of Sellers listed in Section 2.2(f) of the Seller Disclosure Schedule (the "<u>Assigned Contracts</u>");

(g)     All franchises, approvals, permits, licenses, orders, registrations, certificates and other government authorizations and approvals (collectively, the "<u>Permits</u>") issued to, owned, used or possessed by Sellers;

(h)     All rights of Sellers to receive mail (including e-mail) and other communications (including, without limitation, mail (including e-mail) and communications from customers, suppliers, distributors, agents and others);

(i)     All rights of Sellers to use the telephone numbers, telecopier numbers, Internet website domain names and e-mail addresses;

(j)     All records, ledgers, files, documents, surveys, plans, catalogs, technical information, pricing sheets, instructions and manuals, employee handbooks, correspondence, customer and supplier lists, drawings, specifications, display, advertising and promotional materials, equipment and parts lists, dealer and distributor lists, labels and packaging materials, computer data and software, studies, reports, data and other printed, written or electronically-stored materials of whatever nature of Sellers, and all records, files and original documents relating to registration and applications for registration of Business Intellectual Property owned, leased or licensed by Seller;

(k)     All rights of Sellers relating to deposits and prepaid expenses, claims for refunds, premiums and rights to offset in respect thereof;

(l)     All claims, rights, and with respect to legal actions, causes of action, rights to refunds, rights of recovery, rights of set off and rights of recoupment of any kind, of Sellers (collectively "<u>Claims</u>");

(m)     All unexpired, transferable warranties, indemnities or guarantees from any third party with respect to the Purchased Assets, including any item of real property, personal property or equipment, or the Business;

(n)     All cash and cash equivalents (including marketable securities and short term investments) of Sellers;

(o)     All causes of action of the Estates that arise under section 544, 545, 547, 548, 549, 550, 551 and/or 553 of the Bankruptcy Code (collectively "<u>Avoidance Actions</u>");

(p)     All goodwill associated with the Business, together with the right to represent to third parties that Buyer is the successor to the Business;

(q)     All insurance benefits, including rights and proceeds, of Sellers, in each case, to the extent used in, or to the extent related to, arising from or primarily relating to the Purchased Assets or the Assumed Liabilities prior to the Closing Date;

(r)     All rights to refunds of Taxes paid by Sellers;

(s)     The Former Shareholder Notes; provided, however, that on and as of the Closing, and provided that, unless Perseus is excused under the terms of the documents providing for the Perseus Contribution, Perseus has funded the Perseus Contribution, Buyer shall irrevocably release and waive 50% of the outstanding principal amount of each of the Former Shareholder Notes and all interest thereon ~~such principal~~ as of the Closing; and

(t)     All other assets, properties and rights of Sellers, other than the Excluded Assets.

For the avoidance of doubt, all Claims and Avoidance Actions affected by a release, waiver, exculpation, or injunction under Article XIII of the form of the Bankruptcy Plan attached hereto shall be transferred to Buyer subject to and after giving effect to such releases, waivers, exculpations, and injunctions.  Moreover, if the final form of the Bankruptcy Plan confirmed in the Chapter 11 Cases is modified in a fashion that alters the terms or scope of Article XIII in any way, then Buyer shall be deemed to release and waive on and effective as of the Closing any and all Claims or Avoidance Actions affected by such modifications of the Bankruptcy Plan.

2.3.   <u>Excluded Assets</u>.

(a)     Notwithstanding anything in this Agreement to the contrary, Sellers shall not sell, transfer, assign or deliver to Buyer any of their rights, titles to or interests in any of the Excluded Assets.

(b)     For purposes of this Agreement, "<u>Excluded Assets</u>" mean the following:

(i)  All Contracts of Sellers listed in the Plan Supplement on the "Schedule of Rejected Executory Contracts and Unexpired Leases" or on any other list of rejected contracts or leases filed with the Bankruptcy Court (the "<u>Rejected Contracts</u>");

(ii)  All Contracts of Sellers listed in Section 2.3(b)(ii) of the Seller Disclosure Schedule including ~~all~~**certain** insurance Contracts (the "<u>Additional Retained Contracts</u>");

(iii)  All consideration received by, and all rights of, Sellers pursuant to this Agreement;

(iv)  All assets that relate to any Plan retained by Sellers pursuant to Section 2.5(c);

(v)  All entity charters, operating agreements, limited partnership agreements, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute

books, stock transfer books and other documents relating to the organization, maintenance, and existence of Sellers as entities;

(vi) All causes of action solely with respect to claims for any right of setoff against unsecured creditors of Sellers who have asserted a claim against Sellers in the Chapter 11 Cases;

(vii) All equity interests in and of Sellers;

(viii) All legal or beneficial interests in the share capital of any Affiliate of Sellers, including associated stock registers and similar records;

(ix) All data and records to the extent relating to Tax liabilities, potential Tax liabilities, or refunds of Taxes of Sellers; provided, that Sellers shall provide copies of all such data and records to Buyer; and

(x) All other assets or properties listed in Section 2.3(b)(x) of the Seller Disclosure Schedule.

2.4. <u>Assumption of Liabilities</u>.

Effective as of the Closing, Sellers shall not have any liability or obligation with respect to, and Buyer shall assume and thereafter pay, perform and discharge when due, only the following liabilities and obligations of Sellers to the extent relating to or arising from, the Purchased Assets and the Business (collectively, the "<u>Assumed Liabilities</u>"):

(a) all obligations and liabilities of Sellers with respect to the Assigned Contracts that arise after the Petition Date, relate to periods following the Petition Date and are to be observed, paid, discharged, or performed, as the case may be, in each case at any time after the Petition Date and all "Cure Costs" listed in Section 2.4(a) of the Seller Disclosure Schedule (and, for the avoidance of doubt, no other Cure Costs) imposed in the Bankruptcy Plan with respect to such Assigned Contracts required to be paid under the terms of the Bankruptcy Plan and applicable law;

(b) all employee-related Liabilities and obligations of Sellers incurred prior to the Closing or arising out of or relating to any event, action or inaction occurring prior to the Closing, including all Liabilities and obligations of Sellers arising under the Plans or relating to payroll, vacation, sick leave, disability, healthcare, workers' compensation and unemployment benefits of any kind, prior to the Closing, in each case only if and to the extent listed in Section 2.4(b) of the Seller Disclosure Schedule;

(c) all Administrative Expense Claims (as defined in the Bankruptcy Plan) arising in the ordinary course of Sellers' business during the pendency of the Chapter 11 Cases and all Section 503(b)(9) Claims (as defined in the Bankruptcy Plan) each as contemplated by and in compliance with Section 6.2(e) of the Bankruptcy Plan (which shall not include any other Administrative Expense Claims, including the Fee Claims (as defined in the Bankruptcy Plan));

(d)     those certain Priority Non-Tax Claims (as defined in the Bankruptcy Plan) and Priority Tax Claims (as defined in the Bankruptcy Plan) identified by Buyer prior to Closing in accordance with Section 8.10 of the Bankruptcy Plan;

(e)     the Ohio Development Loan and the claims of all of the creditors treated in Class 4 of the Bankruptcy Plan;  and

(f)     the obligations and liabilities of Sellers with respect to the payment of accrued but unpaid base salaries and regular wages of Employees (together with all earned and accrued amounts payable under any variable compensation or production based incentive compensation or "bonus" program currently in effect for members of Sellers' sales and sale operations departments and other employment based reimbursable expenses incurred in the ordinary course of business and pursuant to Seller's programs existing on the date hereof) in respect of periods of employment before and following the Closing.

Notwithstanding anything to the contrary contained in this Agreement, Buyer shall not have any liability or obligation with respect to, shall not assume or agree to pay, perform or discharge, and shall not be deemed by virtue of the execution and delivery of this Agreement or any document delivered at the Closing pursuant to this Agreement, or as a result of the consummation of the Contemplated Transactions, to have assumed, or to have agreed to pay, perform or discharge, any liability, obligation or indebtedness of Sellers or any of their Affiliates, whether primary or secondary, direct or indirect, known or unknown, asserted or unasserted, due or to become due, accrued, absolute, contingent or otherwise, and whether arising prior to, on or after the Closing Date, other than the Assumed Liabilities.

2.5.    Retained Liabilities.

Notwithstanding any other provision of this Agreement, Sellers shall retain and Buyer shall not assume, agree to pay, perform or discharge any Liabilities or obligations of Sellers other than the Assumed Liabilities (such liabilities not assumed by Buyer, collectively, the "Retained Liabilities").   "Retained Liabilities" shall include, without limitation, the following:

(a)     The obligations and liabilities of Sellers for any Taxes, including without limitation any liabilities of Sellers on account of any taxes based upon or measured by income or gain, and including any Taxes based upon or measured by income or gain with respect to the transactions contemplated herein, and any liabilities with respect to the Purchased Assets for any Pre-Closing Taxes;

(b)     Any Liabilities of Sellers arising pursuant to this Agreement and all Seller Transaction Expenses;

(c)     All employee-related Liabilities and obligations of Sellers incurred prior to the Closing or arising out of or relating to any event, action or inaction occurring prior to the Closing, including all Liabilities and obligations of Sellers arising under the Plans or relating to payroll, vacation, sick leave, workers' compensation and unemployment benefits of any kind,

prior to the Closing, in each case other than the Liabilities listed in Section 2.4(b) of the Seller Disclosure Schedule;

(d)     Any Liabilities of Sellers in connection with any Litigation relating to facts or events occurring on or prior to the Closing Date;

(e)     Any Liabilities of Sellers relating to, arising out of or incurred in connection with any of the Excluded Assets;

(f)     Any Liabilities of Sellers arising under Environmental Laws and relating to the ownership or operation of the Business or the ownership, use, possession or condition of the Purchased Assets on or prior to the Closing Date;

(g)     Any Liabilities of Sellers for Indebtedness (other than with respect to the Ohio Development Loan and capital leases listed as Assigned Contracts in Section 2.2(f) of the Seller Disclosure Schedule);

(h)     Other than Cure Costs listed in Section 2.4(a) of the Seller Disclosure Schedule, with respect to the Assigned Contracts required to be paid under the Bankruptcy Plan and applicable law, any Liabilities arising out of or resulting from any breach by Sellers under any Contract related to the Business;

(i)     Other than employee-related liabilities assumed pursuant to Section 2.4(b) above, any Liabilities of Sellers for personal injury or property damage, whether in contract, tort, strict liability or under any other theory;

(j)     Any Liabilities of Sellers to make loans to any officer, director, employee or agent of Sellers which have not been fulfilled;

(k)     The Pension Plan Liabilities;

(l)     The Retained Notes; and

(m)     Any and all other Liabilities of Sellers arising out of or relating to periods prior to the Closing.

2.6.     Purchase Price. The purchase price to be paid by Buyer to Sellers at the Closing for the Purchased Assets and the assumption of the Assumed Liabilities shall be (i) payment in full of the amount of the Plan Funds in immediately available funds, plus (ii) the issuance to Seller of the Newco First Lien Loan Notes, the Newco Second Lien Loan Notes and the Newco Preferred Units (such combined amount, the "Closing Consideration Amount").

2.7.　　Allocation of Purchase Price. Buyer shall determine the applicable tax allocation of the Purchase Price and any Assumed Liabilities among the Purchased Assets and shall provide Sellers with a copy of such allocation for Sellers' review and approval (such approval not to be unreasonably withheld). Sellers agree to be bound by such allocation for purposes of filing U.S. federal income Tax Returns required to be filed by them. In the event this allocation is disputed by any taxing authority, the party receiving notice of the dispute shall promptly notify the other party regarding resolution of the dispute.

2.8.　　Non-Assignment of Assigned Contracts. Notwithstanding anything contained herein to the contrary, this Agreement shall not constitute an agreement to assign any Assigned Contracts if, notwithstanding the provisions of Section 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without the consent of the third party thereto, would constitute a material breach thereof or in any way materially adversely affect the rights of Sellers or Buyer, as the assignee of such Assigned Contracts, as the case may be, thereunder.

2.9.　　Designation of Assigned Contracts **and Assumed Plans and Benefits**. Subject to Seller's ability to effectuate any such change in accordance with the Bankruptcy Plan, Buyer shall have the option, **(A) subject to subparagraph (B) of this Section 2.9,** exercisable until two (2) days prior to the Confirmation Hearing (as defined in the Bankruptcy Plan) to designate in writing any executory Contract (i) as an Assigned Contract (and therefore no longer a Rejected Contract) or (ii) a Rejected Contract (and therefore no longer an Assigned Contract), and in each case the applicable portions of the Seller Disclosure Schedule shall be deemed to be amended to reflect such designation. ~~Any~~**, and any** executory Contract designated as an Assigned Contract or a Rejected Contract, as applicable, pursuant to this Section 2.9 shall be understood and agreed to be an Assigned Contract or a Rejected Contract, as applicable, for all purposes under this Agreement as if such Contract were an Assigned Contract or a Rejected Contract, as applicable, as of the date of this Agreement.~~ ~~**and (B) exercisable until the later of ten (10) days prior to the Confirmation Hearing (as defined in the Bankruptcy Plan)(provided, that if such tenth day prior to the Confirmation Hearing is not a Business Day, the relevant date shall be the immediately preceding Business Day) and February 7, 2011 (x) to amend Schedule 1.1(a) to add employees of Sellers and (y) to amend Schedule 2.4(b) to remove Assumed Plans and Benefits and other liabilities set forth in such Schedule (except as otherwise expressly provided therein).**

ARTICLE III
Representations and Warranties of Sellers

Except as set forth in the Seller Disclosure Schedule (it being agreed that any matter disclosed in the Seller Disclosure Schedule with respect to a particular representation, warranty or covenant contained herein shall be deemed to be a disclosure with respect to all other applicable representations, warranties and covenants contained in this Agreement if the applicability of such disclosure to any other applicable representation, warranty or covenant would be reasonably apparent on its face to a Person reviewing the Seller Disclosure Schedule, regardless of whether an explicit reference to such other representation or warranty or covenant is made), Sellers, jointly and severally, hereby represent and warrant as of the date hereof and on and as of the Closing Date as follows:

3.1.    <u>Organization and Power</u>. Sellers are duly organized, validly existing and in good standing under the Laws of their respective jurisdiction of incorporation or formation.  Sellers have full power and authority to execute, deliver and perform this Agreement and the Ancillary Documents to which they are party and to consummate the Contemplated Transactions, subject to the entry of the Disclosure Statement Order and the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Rules 6004(h) and 3020(e) of the Bankruptcy Rules. Sellers have all power (corporate or otherwise) and authority, and possess all governmental licenses, permits, authorizations and approvals, necessary to enable Sellers to own or lease and to operate their respective properties and assets with respect to the Business and carry on the Business as currently conducted, except such power, authority, licenses, permits, authorizations and approvals the absence of which would not have, or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.2.    <u>Authorization and Enforceability</u>. The execution and delivery of this Agreement and the Ancillary Documents to which Sellers are a party and the performance by Sellers of the Contemplated Transactions that are required to be performed by Sellers have been duly authorized by all necessary action of Sellers and no other corporate proceedings on the part of Sellers (including, without limitation, any shareholder vote or approval) are necessary to authorize the execution, delivery and performance of this Agreement and the Ancillary Documents to which Sellers are a party or the consummation of the Contemplated Transactions that are required to be performed by Sellers, and will be, at the Closing, duly authorized, executed and delivered by Sellers and constitute, or as of the Closing Date will constitute, valid and legally binding agreements of Sellers enforceable against Sellers in accordance with their terms, subject to the entry of the Disclosure Statement Order and the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Rules 6004(h) and 3020(e) of the Bankruptcy Rules, and subject to bankruptcy, insolvency, reorganization and other Laws of general applicability relating to or affecting creditors' rights and to general equity principles.

3.3.    <u>No Violation</u>. The execution and delivery by Sellers of this Agreement and the Ancillary Documents to which Sellers are a party, the consummation of the Contemplated Transactions that are required to be performed by Sellers and the compliance with the terms of this Agreement and the Ancillary Documents to which Sellers are a party, subject to the entry of the Disclosure Statement Order and the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Rules 6004(h) and 3020(e) of the Bankruptcy Rules, will not (a) conflict with or violate any provision of the certificate of incorporation, bylaws or similar organizational documents of Sellers, (b) with the exception of compliance with any requirement to obtain consent or give notice to assign, result in any violation of or default, give rise to a right of termination, cause the forfeiture of any right under any provision of any material Assigned Contracts, (c) assuming that all consents, approvals and authorizations contemplated by Section 3.4 have been obtained and all filings described therein have been made, conflict with or violate in any material respect any Law applicable to the Business, or (d) result in the creation of, or require the creation of, any Lien upon any of the Purchased Assets.

3.4.    <u>Governmental Authorizations and Consents</u>. No consents, licenses, approvals or authorizations of, or registrations, declarations or filings with, any Governmental Authority ("<u>Governmental Consents</u>") are required to be obtained or made by Sellers in connection with

the execution, delivery, performance, validity and enforceability of this Agreement or any Ancillary Documents to which Sellers are, or are to be, a party or the consummation by Sellers of the Contemplated Transactions, other than (a) consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court, including the entry of the Disclosure Statement Order and the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Rules 6004(h) and 3020(e) of the Bankruptcy Rules, and (b) Governmental Consents listed in Section 3.4 of the Seller Disclosure Schedule.

3.5.    Financial Statements.

(a)    In General.  Section 3.5(a) of the Seller Disclosure Schedule sets forth the following financial statements (the "Financial Statements"): (i) the audited consolidated balance sheet of ~~the Business~~**WF Holdings, Inc. and its Subsidiaries consistent with the Seller Disclosure Schedules** as of December 31, 2008 and as of December 31, 2009 and the related statements of income, changes in equity and cash flows for the years ending December 31, 2008 and as of December 31, 2009 (the "Most Recent Audited Financial Statements") and (ii) the unaudited consolidated balance sheet of ~~the Business~~**WF Holdings, Inc. and its Subsidiaries consistent with the Seller Disclosure Schedules** as of September 30, 2010 and the related unaudited statements of operations and cash flows, respectively, for the nine-month period ended on such date (the "Most Recent Unaudited Financial Statements").  Except as set forth in Section 3.5~~(a)~~ of the Seller Disclosure Schedule, each of the Financial Statements has been prepared in accordance with GAAP applied on a basis consistent with prior periods and fairly presents in all material respects the consolidated financial condition of ~~the Business~~**WF Holdings, Inc. and its Subsidiaries consistent with the Seller Disclosure Schedules** as of its respective date and the consolidated results of operations and shareholders' equity, or cash flows, as the case may be, of ~~the Business~~**WF Holdings, Inc. and its Subsidiaries consistent with the Seller Disclosure Schedules** for the period covered thereby, subject, in the case of the Most Recent Unaudited Financial Statements, to the absence of footnote disclosure and to normal end-of-period adjustments.

(b)    No Undisclosed Liabilities.  Except as reflected in the Most Recent Unaudited Financial Statements or as set forth in Section 3.5(b) of the Seller Disclosure Schedule, Sellers have no Liabilities with respect to the Business (whether or not the subject of any other representation or warranty hereunder) except for Liabilities that may have arisen in the ordinary course of business since the date of the Most Recent Audited Financial Statements and which do not have, and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect.

3.6.    Assets.  Sellers have or, in the case of assets acquired, leased or licensed after the date of this Agreement not in violation of this Agreement, as of the Closing Date will have, good and valid title to or valid leasehold or sublease interests or other comparable contract rights in or relating to all of the Purchased Assets. Upon the Closing, all the Purchased Assets shall be free and clear of all Liens, except for Permitted Liens.  The Purchased Assets and the Excluded Assets, include all material tangible and intangible assets, property and rights owned or held by Sellers.

3.7.    Compliance with Laws. The Business is not, or during the past three (3) years has not been, in violation of in any material respect, and, to the Knowledge of Sellers, no event has occurred or circumstance exists that (with or without notice or lapse of time) would constitute or result in a violation in any material respect by the Business of, or failure on the part of the Business to comply with in any material respect, any material Law that is or was applicable to the conduct or operation of the Business or the ownership or use of any of the Purchased Assets. Sellers (a) hold all material Permits necessary for the lawful conduct of the Business and (b) are in material compliance with the terms of all such Permits.

3.8.    Environmental Matters.

(a)    Except as disclosed in Section 3.8(a) of the Seller Disclosure Schedule, with respect to the Business, to the Knowledge of Sellers, Sellers (i) are, and at all times have been, in compliance in all material respects with all applicable Environmental Laws, and (ii) have obtained, and are in compliance in all material respects with, all permits, licenses, authorizations, registrations and other governmental consents required by applicable Environmental Laws ("Environmental Permits"), and have made all appropriate filings for issuance or renewal of such Environmental Permits.

(b)    Except as disclosed in Section 3.8(b) of the Seller Disclosure Schedule, with respect to the Business, to the Knowledge of Sellers, there is no contamination of, and there have been no releases or, threatened releases of Hazardous Materials at the Facilities or any real property formerly owned, leased or operated by Sellers (or any predecessor of Sellers); in each case, that (i) would require notification to governmental entities, investigation and/or remediation pursuant to any Environmental Laws or (ii) would be reasonably likely to give rise to material liabilities pursuant to any Environmental Laws

(c)    Except as disclosed in Section 3.8(c) of the Seller Disclosure Schedule, with respect to the Business, to the Knowledge of Sellers, there are no past or present conditions, events, circumstances, facts, activities, practices, incidents, actions, omissions or plans that may (i) interfere with or prevent continued material compliance by Sellers with Environmental Laws and the requirements of Environmental Permits or (ii) give rise to any material liability or other obligation under any Environmental Laws.    This Section 3.8(c) shall not apply to any requirements or liability imposed by regulations or amendments to Environmental Laws which become effective after the date hereof.

3.9.    Certain Transactions. With respect only to the Assigned Contracts, except as set forth on Schedule 3.9 of Sellers Disclosure Schedule, there are no Contracts between Sellers or any of their Affiliates on the one hand, and any of the officers or employees of the Business (other than for services as officers or employees), on the other hand, including without limitation, any Contract providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from, any of such person.

3.10.    No Brokers. None of Sellers, any of their Affiliates or any of their directors, officers, employees or agents, has employed or incurred any Liability to any broker, finder, employee or agent for any brokerage fees, finder's fees, commissions or other amounts with

respect to this Agreement, the Ancillary Documents or the Contemplated Transactions for which Buyer will become liable.

ARTICLE IV
Representations and Warranties of Buyer

Buyer hereby represents and warrants to Sellers as of the date hereof and on and as of the Closing Date as follows:

4.1.　<u>Organization and Power</u>. Buyer is a limited liability company duly formed, validly existing and in good standing under the Laws of the state of Delaware and has full power and authority to execute and deliver this Agreement and the Ancillary Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the Contemplated Transactions.

4.2.　<u>Authorization</u>. Buyer has duly authorized the execution and delivery of this Agreement and the Ancillary Documents to which it is a party and the performance of its obligations hereunder and thereunder.

4.3.　<u>Enforceability</u>. This Agreement and each of the Ancillary Documents constitute, or when executed and delivered will constitute, the valid and legally binding obligation of Buyer, enforceable in accordance with its terms, except as such enforceability may be limited by equitable principles and by applicable bankruptcy, insolvency, reorganization, arrangement, moratorium or similar Laws relating to or affecting the rights of creditors generally.

4.4.　<u>No Violation</u>. The execution, delivery and performance of this Agreement and the Ancillary Documents executed or to be executed by Buyer pursuant to this Agreement, and the consummation of the Contemplated Transactions will not (i) conflict with or violate any provision of the organizational documents of Buyer, (ii) conflict with or violate in any material respect any provision of any Law applicable to Buyer or by which Buyer or its properties are bound or affected, or (iii) breach any provision of any contract or agreement to which Buyer is a party.

4.5.　<u>Governmental Authorizations and Consents</u>. No Governmental Consents are required to be obtained or made by Buyer in connection with the execution, delivery, performance, validity and enforceability of this Agreement or any Ancillary Documents to which it is a party, other than Governmental Consents set forth in Section 4.5 of the Buyer Disclosure Schedule.

4.6.　<u>Litigation</u>. There is no Litigation pending or, to the knowledge of Buyer, threatened against or involving Buyer which questions the validity of this Agreement or any of the Ancillary Documents to which it is a party or seeks to prohibit, enjoin or otherwise challenge Buyer's ability to consummate the Contemplated Transactions.

4.7.　<u>No Brokers</u>. Other than Perella Weinberg Partners, no agent, broker, Person or firm acting on behalf of Buyer or its Affiliates is, or will be, entitled to any commission or broker's or finder's fees from any of the parties hereto, or from any Affiliate of any of the parties hereto, in connection with any of the transactions contemplated herein.

## ARTICLE V
## Covenants

5.1.    Conduct of Sellers Conducting the Business.

(a)    Except as otherwise expressly contemplated by this Agreement or as required by order of the Bankruptcy Court or with respect to matters inherent in the filing of petitions for relief under chapter 11 of the Bankruptcy Code, during the period from the date hereof to the Closing Date, Sellers shall conduct the Business in the ordinary course, consistent with past practice, and to the extent consistent therewith (i) use reasonable best efforts to maintain the Business and the Purchased Assets and to preserve Sellers current relationships with customers, employees, suppliers and others having business dealings with Sellers with respect to the Business, (ii) use reasonable best efforts to perform and comply with Sellers' Contracts and to comply with applicable Laws, (iii) maintain Sellers' books and records in the usual, regular and ordinary manner, on a basis consistent with past practice, and (iv) use reasonable best efforts to preserve the goodwill and ongoing operations of the Business.

(b)    Without limiting the generality of the foregoing, except as otherwise expressly contemplated by this Agreement, during the period from the date hereof to the Closing Date, Sellers shall not, without Buyer's prior written consent:

(i)    divest, sell, transfer, lease, license, abandon, allow to lapse, mortgage, pledge or otherwise dispose of, or encumber, or agree to divest, sell, transfer, lease, license, abandon, allow to lapse, mortgage, pledge or otherwise dispose of, or encumber, any Purchased Assets, other than (x) the sales of products or services in the ordinary course of business consistent with past practice, (y) obsolete assets disposed of in the ordinary course of business consistent with past practice or (z) Permitted Liens;

(ii)    take any action or fail to take any action, individually or in a series of actions or inactions, outside the ordinary course of business, that would reasonably be expected to diminish the value of the Purchased Assets in any material respect;

(iii)    amend, renew, terminate or waive any material Permit or any material Assigned Contract or any provision thereof;

(iv)    enter into any new material Contract with respect to the Business that would have been an Assigned Contract  if it had existed on the date hereof;

(v)    enter into any Contract that purports to limit, curtail or restrict in any material manner the Business, or the Persons with whom it or its existing or future Affiliates can compete or to whom it or its existing or future Affiliates can sell products or deliver services, or the acquisition of any business;

(vi)    incur**, create** or ~~suffer to exist~~**assume** any Indebtedness except as listed on Section 5.1(b)(vi) of the Seller Disclosure Schedule;

(vii)    acquire any assets that are material, individually or in the aggregate, to the Business, except purchases of raw materials, inventory, prepaid assets and fixed assets in the ordinary course of business consistent with past practice;

(viii)    enter into or adopt any employee benefit plan or employment or severance agreement, or amend any Plan, except (x) to the extent required by Law (including without limitation, required amendments to any Plan or agreement in order to comply with Section 409A of the Internal Revenue Code), (y) employment agreements (other than for executive officers) entered into in the ordinary course of business with an annual base compensation, in each case, of no more than $100,000 or (z) as expressly contemplated by this Agreement;

(ix)    hire any new officers or terminate the services of any existing officers, make any change in the rate of compensation, commission, bonus, or other direct or indirect remuneration payable, or agree to pay, conditionally or otherwise, any bonus, incentive, retention, change in control payment or other compensation, retirement, welfare, fringe or severance benefit or vacation pay, to or in respect of any employee, officer or director of Seller, except (x) in connection with promotions or periodic reviews of employees (but not directors or officers) in the ordinary course of business or (y) to the extent required by any Plan listed in Section 2.4(b) of the Seller Disclosure Schedule (including without limitation, required amendments to any Plan or agreement in order to comply with Section 409A of the Internal Revenue Code);

(x)    file or cause to be filed any amended Tax Return with respect to the Business other than in the ordinary course of business consistent with past practice, make any Tax election, or agree to extend the statute of limitations in respect of any Taxes, or settle any material Tax liability which is the subject of dispute between Sellers and a Governmental Authority;

(xi)    increase the amount reserved or reserve any new amounts for payment of any contingent Tax liability except in the ordinary course and in a manner consistent with past practice;

(xii)    change accounting policies of the Business except to the extent required to conform with GAAP;

(xiii)    change its fiscal year;

(xiv)    initiate any material Litigation relating to the Business seeking damages in excess of $250,000, or settle or compromise any pending or threatened Litigation relating to the Business (other than in connection with the objection process for unsecured claims);

(xv)    make or commit to make any capital expenditures with respect to the Business, other than capital expenditures in the budget of Sellers provided to Buyer and made in the ordinary course of business;

(xvi)   waive any of the rights of Sellers under the confidentiality or non-compete provisions of any agreements, or enter into confidentiality or non-compete agreements under which Sellers are the obligors, other than in the ordinary course of business consistent with past practice;

(xvii)   take any action or omit to take any action which would cause any representation or warranty made by Sellers in this Agreement or any Ancillary Document to be or become untrue in any material respect (disregarding for these purposes any material adverse effect or materiality (or any correlative term) contained therein); or

(xviii)  authorize, agree, resolve or consent to any of the foregoing.

5.2.    <u>Access to Information Prior to the Closing</u>. During the period from the date hereof through the Closing Date, Sellers shall give Buyer and its authorized representatives reasonable access during regular business hours to all offices, facilities, properties, agreements, books and records and personnel of the Business as Buyer may reasonably request; <u>provided</u>, that (a) Buyer and its representatives shall take such action as is deemed necessary in the reasonable judgment of Sellers to schedule such access and visits through a designated officer of Sellers and in such a way as to avoid disrupting in any material respect the normal operation of the Business, (b) Sellers shall not be required to take any action which would constitute a waiver of the attorney-client or other privilege and (c) Sellers need not supply Buyer with any information which, in the reasonable judgment of Sellers after consulting with outside counsel, Sellers are under a contractual or legal obligation not to supply; <u>provided</u>, that Sellers will use their reasonable best efforts to enable Buyer to have access to such information. For the avoidance of doubt, nothing in this Section 5.2 or elsewhere in this Agreement is intended to or shall create any due diligence condition to Buyer's obligations under this Agreement.

5.3.    <u>Certain Tax Matters</u>.

(a)    <u>Tax Return Preparation</u>.  Sellers shall prepare, or cause to be prepared, and file, or cause to be filed, on a timely basis all Tax Returns of the Business that are due after the Closing Date and that reflect any liability for Sellers' Taxes, including any Taxes incurred in connection with the Contemplated Transactions.  All such Tax Returns shall be prepared in a manner consistent with past practice of Sellers; provided, that Sellers determine, with the advice of counsel or a tax attorney, that there is at least "substantial authority," within the meaning of Section 6662(d)(2)(B)(i) of the Code, for taking such a position.  Except as any such Tax may constitute an Assumed Liability, and except as provided in the Bankruptcy Plan, Sellers shall timely pay all Taxes shown due with respect to Tax Returns filed pursuant to this Section.

(b)    <u>Transfer Taxes</u>. This Agreement is being entered into by Sellers and Buyer in connection with the Bankruptcy Plan filed by Sellers in connection with the Chapter 11 Cases. Pursuant to Section 1146(e<u>a</u>) of the Bankruptcy Code, no Transfer Taxes shall be payable with respect to this Agreement or the sale of the Purchased Assets to Buyer.  However, in the event that any such taxes and fees are required to be paid notwithstanding Section 1146(e<u>a</u>) of the Bankruptcy Code, such taxes and fees shall be the responsibility of Seller. The party required by Law to do so will file all necessary Tax Returns and other documentation with respect to all such

Transfer Taxes and, if required by applicable Law, the other parties will, and will cause their Affiliates to, join in the execution of any such Tax Returns and other documentation.

5.4. <u>Public Announcements</u>. The initial press release regarding this Agreement and the Contemplated Transactions shall be made at such time and in such form as Buyer and Sellers agree, <u>provided</u> that in the event that the parties cannot agree, either party shall be permitted to make any disclosure required by Law. Prior to the Closing, neither Buyer nor Sellers will issue or make any subsequent press release or public statement with respect to this Agreement or the Contemplated Transactions without the prior consent of Buyer and Sellers, except as may be required by Law; <u>provided,</u> that the party proposing to issue any press release or similar public announcement or communication in compliance with any such disclosure obligations shall use reasonable best efforts to consult in good faith with the other party before doing so.

5.5. <u>Reasonable Best Efforts</u>. Subject to the terms and conditions set forth herein and to applicable legal requirements, each of the parties shall cooperate and use their respective reasonable best efforts to take, or cause to be taken, all appropriate action, and do, or cause to be done, and assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Contemplated Transactions, including the satisfaction of the respective conditions set forth in <u>Article VI</u> and obtaining the approvals, if any, from the Governmental Authorities listed in Section 5.5 of the Seller Disclosure Schedule.

5.6. <u>Post-Closing Access</u>. Following the Closing, (i) Buyer shall grant the Plan Administrator and its representatives reasonable access during regular business hours to information reasonably requested by the Plan Administrator and certain personnel of the Business for purposes of administering the Bankruptcy Plan and (ii) Buyer shall otherwise reasonably cooperate with the Plan Administrator in its administration of the "Post-Effective Date Debtors" pursuant to the Bankruptcy Plan.

5.7. <u>Seller's Employment and Benefit Plan Covenants</u>.

(a) Buyer will make offers of employment, effective immediately following the Closing, to Employees; provided, that**, subject to Section 2.9 hereof,** Buyer may (following consultation with and upon the advice of management of Sellers) amend the list of Employees who will receive offers of employment pursuant to this Section 5.7(a); provided, that Buyer shall be responsible for paying any liability arising from the WARN Act or other employment Law resulting from Buyer's amendment of the list of Employees to be offered employment.

(b) Effective immediately after the Closing, Sellers shall cease to be participating employers in all Plans that Buyer has assumed pursuant to Section 2.4(b) (the "<u>Assumed Plans and Benefits</u>") and shall cease to have any obligations with respect to Employees or the Assumed Plans and Benefits. Buyer shall be liable for any and all obligations with respect Employees under the Assumed Plans and Benefits with respect to periods following the Closing Date.

(c)     In the event that, following the Closing Date, Buyer terminates any Employee in such a manner, or takes any other action, so as to cause the application of the WARN Act to the transactions described in this Agreement, then Buyer shall be solely responsible for any WARN Act liability so incurred.  This Section 5.7(c) shall survive Closing indefinitely.

(d)     Sellers agree to provide Buyer with an updated list of Employees as of January 5, 2011 (with updates thereafter as reasonably requested by Buyer).

5.8.    <u>Liens</u>.  Buyer shall secure the payment of the Newco First Lien Loan Notes with a first priority lien on all of Buyer's assets, including the Purchased Assets (unless limited by applicable Law or if such liens would, in the opinion Buyer, result in adverse tax consequences or undue costs relative to the value of such collateral), in accordance with the terms of the Newco First Lien Credit Agreement, and Buyer shall secure the payment of the Newco Second Lien Loan Notes with a second priority lien on all of Buyer's assets, including the Purchased Assets (unless limited by applicable Law or if such liens would, in the opinion Buyer, result in adverse tax consequences or undue costs relative to the value of such collateral), in accordance with the terms of the Newco Second Lien Credit Agreement.

**<u>5.9.    Intellectual Property Covenants. Promptly following the Closing, each Seller shall amend its respective certificate of incorporation or similar organizational document and take all other actions necessary so as to change its corporate name to a name not using the terms "Workflow", "Relizon" or "Formcraft." From and after the Closing, Sellers shall use reasonable efforts to have the caption of the Chapter 11 Cases changed in a manner consistent with the changes contemplated by this Section 5.9 and shall otherwise make no further use of the terms "Workflow", "Relizon" or "Formcraft" or the Business Intellectual Property assumed by Buyer pursuant to Section 2.2(e).</u>**

ARTICLE VI
Conditions to Closing

6.1.    <u>Conditions to All Parties' Obligations</u>.

The obligations of the parties to consummate the Contemplated Transactions are subject to the fulfillment prior to or at the Closing of the following condition (which may be waived by the parties):

(a)     <u>No Injunction</u>.  No Governmental Authority or federal or state court of competent jurisdiction shall have issued, enforced or entered any statute, rule, regulation, order, decree, judgment, or injunction (whether temporary, preliminary or permanent), in any case which is in effect and which prevents or prohibits consummation of the Contemplated Transactions.

(b)     <u>Approval Order</u>. The Disclosure Statement Order shall have been entered by the Bankruptcy Court.

(c)     <u>Confirmation Order and Bankruptcy Plan</u>.  The Confirmation Order shall have been entered ~~into~~ by the Bankruptcy Court, and shall be a Final Order; provided, however

that the requirement that the Confirmation Order be a Final Order may be waived by Buyer.  The conditions to confirmation and the conditions to the Effective Date of the Bankruptcy Plan shall have been satisfied or waived, with the consent of Buyer, in accordance with the Bankruptcy Plan.

6.2.    Conditions to Sellers' Obligations.

The obligations of Sellers to consummate the Contemplated Transactions are subject to the fulfillment at or prior to the Closing of each of the following conditions (any or all of which may be waived in whole or in part by Sellers):

(a)    Representations and Warranties.  The representations and warranties of Buyer in this Agreement (other than the Buyer Fundamental Representations) shall be true and correct (without regard to any qualifications as to materiality or material adverse effect (or any correlative term) contained in such representations and warranties) as of the date when made and as of the Closing Date, except (i) for representations and warranties made as of a specified date, which shall be measured only as of such specified date, and (ii) where the failure to be true and correct, individually or in the aggregate, has not had, and would not reasonably be expected to have, a Buyer Material Adverse Effect.  Each of the Buyer Fundamental Representations shall be true and correct in all respects as of the date when made and as of the Closing Date, except for representations and warranties made as of a specified date, which shall be measured only as of such specified date.

(b)    Performance.  Buyer shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be so performed or complied with by Buyer at or prior to the Closing.

(c)    Deliveries.  Sellers shall have received the deliveries contemplated by Article VIII.

6.3.    Conditions to Buyer's Obligations.

The obligations of Buyer to consummate the Contemplated Transactions are subject to the fulfillment at or prior to the Closing of each of the following conditions (any or all of which may be waived in whole or in part by Buyer):

(a)    Representations and Warranties.    Each of the representations and warranties of Sellers in this Agreement (other than the Seller Fundamental Representations) shall be true and correct (without regard to any qualifications as to materiality or material adverse effect (or any correlative term) contained in such representations and warranties) as of the date when made and as of the Closing Date, except (i) for representations and warranties made as of a specified date, which shall be measured only as of such specified date, and (ii) where the failure to be true and correct, individually or in the aggregate, has not had, and would not reasonably be expected to have, a Material Adverse Effect.  Each of the Seller Fundamental Representations shall be true and correct in all respects as of the date when made and as of the Closing Date, except for representations and warranties made as of a specified date, which shall be measured only as of such specified date.

(b)   Performance.  Sellers shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be so performed or complied with by Sellers at or prior to the Closing.

(c)   Deliveries.  Buyer shall have received the deliveries contemplated by Article VII.

(d)   Perseus Contribution. The Perseus Contribution shall have been made.

ARTICLE VII
Deliveries by Sellers at Closing

On the Closing Date, Sellers shall deliver or cause to be delivered to Buyer:

7.1.   Officer's Certificate.  An officer's certificate signed by a senior officer of Sellers to the effect that the conditions set forth in Sections 6.3(a) and 6.3(b) have been satisfied.

7.2.   Transfer Documents. Duly executed bills of sale, real property transfer deeds, patent and trademark assignments and similar documents in a form reasonably agreed to by Buyer and Sellers (the "Transfer Documents"), together with any reasonably necessary transfer declarations or other filings, and such other instruments of transfer, sale, conveyance and assignment, in form and substance as Buyer shall reasonably request, to vest in Buyer good and valid title to the Purchased Assets.

7.3.   Assignment and Assumption Agreements. Duly executed counterparts to the Assignment and Assumption Agreements.

7.4.   Receipt. Sellers shall deliver to Buyer a receipt for the Closing Consideration Amount.

7.5.   Further Instruments. Such documents of further assurance reasonably necessary and typical for transactions similar to the Contemplated Transactions in order to complete the Contemplated Transactions.

ARTICLE VIII
Deliveries by Buyer at Closing

On the Closing Date, Buyer shall deliver or cause to be delivered to Sellers:

8.1.   Officer's Certificate. A certificate signed by a senior officer of Buyer to the effect that the conditions set forth in Sections 6.2(a) and 6.2(b) have been satisfied.

8.2.   Assignment and Assumption Agreements. Duly executed assignment and assumption agreements, substantially in a form reasonably agreed to by Buyer and Sellers (the "Assignment and Assumption Agreements"), evidencing the assumption by Buyer of the Assumed Liabilities in accordance with the terms herein.

8.3.   Transfer Documents. Duly executed counterparts to the Transfer Documents.

8.4.    <u>Closing Consideration Amount</u>. The Closing Consideration Amount with the cash portion of such amount transferred by wire transfer of immediately available funds to the account designated by Sellers.

8.5.    <u>Note Documentation</u>.  Documentation evidencing the execution and delivery of the documentation (including documentation evidencing the granting and perfection of all security interests and Liens granted therein) relating to the Newco First Lien Credit Agreement and the Newco Second Lien Credit Agreement.

8.6.    <u>Further Instruments</u>. Such documents of further assurance reasonably necessary and typical for transactions similar to the Contemplated Transactions in order to complete the Contemplated Transactions.

ARTICLE IX<br>Termination

9.1.    <u>Termination</u>.  This Agreement may be terminated and the transactions contemplated hereby may be abandoned:

(a)    at any time, by mutual written agreement of Sellers and Buyer; or

(b)    by Buyer, at any time prior to the Closing, if (i) Sellers are in breach, in any material respect, of the representations, warranties or covenants made by Sellers in this Agreement, (ii) such breach is not cured within ten (10) days of written notice of such breach from Buyer (to the extent such breach is curable) and (iii) such breach, if not cured, would render the conditions set forth in Section 6.3 incapable of being satisfied; or

(c)    by Sellers, at any time prior to the Closing, if (i) Buyer is in breach, in any material respect, of the representations, warranties or covenants made by Buyer in this Agreement, (ii) such breach is not cured within ten (10) days of written notice of such breach from Seller (to the extent such breach is curable) and (iii) such breach, if not cured, would render the conditions set forth in Section 6.2 incapable of being satisfied; or

(d)    [Intentionally Omitted]**by Buyer, at any time prior to the Closing, if Perseus does not fund the Perseus Contribution by the close of business on the Closing Date or upon written notice from Perseus that Perseus will not make the Perseus Contribution; or**

(e)    by Sellers, in the event that the boards of directors of Sellers in the exercise of their fiduciary duties determine that it is in the best interest of the bankruptcy estates of Sellers not to consummate the Contemplated Transactions; provided, that such determination is made as a result of the receipt by Sellers of a bona fide written alternative proposal that is supported by committed financing that such boards of directors determine in good faith has at least an equivalent likelihood of closing as the transactions contemplated by the Bankruptcy Plan and will result in payment in full in cash of all First Lien Lender Claims, Second Lien Lender Claims, Secured Claims, Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims, and provides funds to General Unsecured Claims in excess of the Unsecured Claims Fund all as defined in the Bankruptcy Plan; or

(f)     by Buyer, at any time after May 16, 2011 (the "<u>End Date</u>") if the Closing shall not have occurred on or prior to such date.

9.2.   <u>Effect of Termination</u>. In the event of the termination of this Agreement and the abandonment of the Contemplated Transactions, written notice thereof shall be given by a terminating party to the other parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned without further action by any of the parties.  If this Agreement is terminated pursuant to Section 9.1, no party hereto shall have any obligation or liability to the other parties hereto; <u>provided</u>, that nothing herein shall relieve a defaulting or breaching party from any liability or damages arising out of its breach of any provision of this Agreement.

ARTICLE X
<u>Miscellaneous</u>

10.1.  <u>Expenses</u>. The monthly fees and expenses incurred by Perella Weinberg Partners and legal fees and expenses incurred by each of Fried, Frank, Harris, Shriver & Jacobson LLP and Hunton & Williams LLP **<u>incurred through the Closing Date</u>** shall be paid by Sellers, whether or not the Contemplated Transactions are consummated **<u>so long as there is no breach of this Agreement by the Buyer</u>**.  For the avoidance of doubt, all Seller Transaction Expenses shall be borne by Sellers and none shall be borne by, or be the responsibility of, Buyer.

10.2.  <u>Notices</u>. All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed to have been duly given or made (a) as of the date delivered, if delivered personally, (b) on the date the delivering party receives confirmation, if delivered by facsimile or email .pdf, (c) three (3) Business Days after being mailed by registered or certified mail (postage prepaid, return receipt requested) or (d) one (1) Business Day after being sent by overnight courier (providing proof of delivery), to the parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10.2):

If to Seller:      Workflow Management, Inc.
150 West Main Street
Post Office Box 3037
Norfolk, Virginia 23514
Attention: L. Scott Seymour
Fax: (757) 624.3169

With a copy (which shall not constitute notice) to:

McGuireWoods LLP
9000 World Trade Center
101 West Main Street
Norfolk, Virginia 23510
Attention: Douglas M. Foley, Esq.
Fax: (757) 640-3701

If to Buyer:      Silver Point Finance, LLC

Two Greenwich Plaza, 1st Floor
Greenwich, CT 06830
Attention: John Kneisley
Fax: (203)-542-4367

With a copy (which shall not constitute notice) to:

Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, New York 10004
Attention: Gary Kaplan, Esq. and David Shaw, Esq.
Fax: (212) 859-4000

10.3. <u>Governing Law</u>. This Agreement shall in all respects be governed by, and construed in accordance with, the Laws (excluding conflict of laws rules and principles) of the State of New York applicable to agreements made and to be performed entirely within such State, including all matters of construction, validity and performance.

10.4. <u>Entire Agreement</u>. This Agreement, together with the Exhibits hereto, the Seller Disclosure Schedule, the Buyer Disclosure Schedule, the Ancillary Documents and the Bankruptcy Plan, constitute the entire agreement of the parties relating to the subject matter hereof and supersede all prior contracts or agreements, whether oral or written.

10.5. <u>Severability</u>. Should any provision of this Agreement or the application thereof to any Person or circumstance be held invalid or unenforceable to any extent: (a) such provision shall be ineffective to the extent, and only to the extent, of such unenforceability or prohibition and shall be enforced to the greatest extent permitted by Law, (b) such unenforceability or prohibition in any jurisdiction shall not invalidate or render unenforceable such provision as applied (i) to other Persons or circumstances or (ii) in any other jurisdiction, and (c) such unenforceability or prohibition shall not affect or invalidate any other provision of this Agreement.

10.6. <u>Amendment</u>. Neither this Agreement nor any of the terms hereof may be terminated, amended, supplemented or modified orally, but only by an instrument in writing signed by Buyer and Seller; <u>provided</u> that the observance of any provision of this Agreement may be waived in writing by the party that will lose the benefit of such provision as a result of such waiver.

10.7. <u>Effect of Waiver or Consent</u>. No waiver or consent, express or implied, by any party to or of any breach or default by any party in the performance by such party of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such party of the same or any other obligations of such party hereunder. No single or partial exercise of any right or power, or any abandonment or discontinuance of steps to enforce any right or power, shall preclude any other or further exercise thereof or the exercise of any other right or power. Failure on the part of a party to complain of any act of any party or to declare any party in default, irrespective of how long such failure

continues, shall not constitute a waiver by such party of its rights hereunder until the applicable statute of limitation period has run.

10.8. <u>Parties in Interest; Limitation on Rights of Others</u>. The terms of this Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective legal representatives, successors and permitted assigns. Nothing in this Agreement, whether express or implied, shall be construed to give any Person (other than the parties hereto and their respective legal representatives, successors and permitted assigns and as expressly provided herein) any legal or equitable right, remedy or claim under or in respect of this Agreement or any covenants, conditions or provisions contained herein, as a third party beneficiary or otherwise.

10.9. <u>Assignability</u>. This Agreement shall not be assigned by Sellers without the prior written consent of Buyer. Prior to Closing, this Agreement shall not be assigned by Buyer without the prior written consent of Sellers; <u>provided</u>, that Buyer may assign its rights and obligations under this Agreement without such required consent to an Affiliate of Buyer, which assignment shall not relieve Buyer of its obligations hereunder.

10.10. <u>Jurisdiction; Court Proceedings; Waiver of Jury Trial</u>. Any Litigation against any party to this Agreement arising out of or in any way relating to this Agreement shall be brought in the Bankruptcy Court and each of the parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court for the purpose of any such Litigation; <u>provided</u>, that a final judgment in any such Litigation shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. **Each party irrevocably and unconditionally agrees not to assert (a) any objection which it may ever have to the laying of venue of any such Litigation in the Bankruptcy Court, (b) any claim that any such Litigation brought in any such court has been brought in an inconvenient forum and (c) any claim that such court does not have jurisdiction with respect to such Litigation.** To the extent that service of process by mail is permitted by applicable Law, each party irrevocably consents to the service of process in any such Litigation in such courts by the mailing of such process by registered or certified mail, postage prepaid, at its address for notices provided for herein. **Each party irrevocably and unconditionally waives any right to a trial by jury and agrees that any of them may file a copy of this paragraph with any court as written evidence of the knowing, voluntary and bargained-for agreement among the parties irrevocably to waive its right to trial by jury in any Litigation.**

10.11. <u>No Other Duties</u>. The only duties and obligations of the parties under this Agreement are as specifically set forth in this Agreement, and no other duties or obligations shall be implied in fact, Law or equity, or under any principle of fiduciary obligation.

10.12. <u>Reliance on Counsel and Other Advisors</u>. Each party has consulted such legal, financial, technical or other expert as it deems necessary or desirable before entering into this Agreement. Each party represents and warrants that it has read, knows, understands and agrees with the terms and conditions of this Agreement.

10.13. <u>Remedies</u>. All remedies, either under this Agreement or by Law or otherwise afforded to the parties hereunder, shall be cumulative and not alternative, and any Person having any rights under any provision of this Agreement will be entitled to enforce such rights

specifically, to recover damages by reason of any breach of this Agreement and to exercise all other rights granted by Law, equity or otherwise.

10.14. <u>Specific Performance</u>.  The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, the parties agree that, in addition to any other remedies, each party shall be entitled to enforce the terms of this Agreement by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy and without regards to anything to the contrary contained in applicable Law.  Each party hereby waives any requirement for the securing or posting of any bond in connection with such remedy.  Each party further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of this Agreement.

10.15. <u>Bulk Transfer Laws</u>.  Buyer hereby waives compliance by Sellers and their Affiliates with the provisions of any so-called "bulk transfer law" of any jurisdiction in connection with the sale of the Purchased Assets.

10.16. <u>Survival</u>.  The representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall expire as of the Closing.

10.17. <u>Counterparts</u>.  This Agreement may be executed by facsimile or email .pdf signatures and in any number of counterparts with the same effect as if all signatory parties had signed the same document.  All counterparts shall be construed together and shall constitute one and the same instrument.

10.18. <u>Further Assurance</u>.  If at any time after the Closing any further action is necessary or desirable to fully effect the transactions contemplated by this Agreement or any other of the Ancillary Documents, each of the parties shall take such further action (including the execution and delivery of such further instruments and documents) as any other party reasonably may request.

*(Signature pages follow)*

IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase and Sale Agreement to be duly executed and delivered in its name and on its behalf, all as of the day and year first above written.

**BUYER:**

WORKFLOW HOLDINGS, LLC

By:  Silver Point Capital, L.P., its non-member manager

By: Silver Point Capital Management, LLC, its general partner

By: _____

Name: David Steinmetz

Title: Chief Financial Officer

IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase and Sale Agreement to be duly executed and delivered in its name and on its behalf, all as of the day and year first above written.

**[SELLERS]:**

**WF CAPITAL HOLDINGS, INC.**


By:_____
Name:
Title:

**WF HOLDINGS, INC.**


**By:** _____
**Name:**
**Title:**

**WF HOLDINGS CORPORATION**


**By:** _____
**Name:**
**Title:**

**WORKFLOW MANAGEMENT, INC.**


**By:** _____
**Name:**
**Title:**

**WFMI, INC.**


**By:** _____
**Name:**
**Title:**

**IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase and Sale Agreement to be duly executed and delivered in its name and on its behalf, all as of the day and year first above written.**

**SELLERS:**

**WORKFLOW SOLUTIONS LLC**

**By:** _____
**Name:**
**Title:**

**WFIH, INC.**

**By:** _____
**Name:**
**Title:**

**OLD FGS, INC.**

**By:** _____
**Name:**
**Title:**

**OLD UE, LLC**

**By:** _____
**Name:**
**Title:**

**THE RELIZON COMPANY**

**By:** _____
**Name:**
**Title:**

**IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase and Sale Agreement to be duly executed and delivered in its name and on its behalf, all as of the day and year first above written.**

**SELLERS:**

**WORKFLOW OF FLORIDA INC.**

**By:** _____
**Name:**
**Title:**

**WORKFLOW MANAGEMENT ACQUISITION II CORP**

**By:** _____
**Name:**
**Title:**

**SFI OF PUERTO RICO, INC.**

**By:** _____
**Name:**
**Title:**

**WORKFLOW DIRECT, INC.**

**By:** _____
**Name:**
**Title:**

**IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase and Sale Agreement to be duly executed and delivered in its name and on its behalf, all as of the day and year first above written.**

**SELLERS:**

**RELIZON DE MÉXICO INC.**

**By:** _____
**Name:**
**Title:**

**RELIZON SNE INC.**

**By:** _____
**Name:**
**Title:**

**FORMCRAFT HOLDINGS LIMITED PARTNER, INC.**

**By:** _____
**Name:**
**Title:**

**FORMCRAFT HOLDINGS GENERAL PARTNER, INC.**

**By:** _____
**Name:**
**Title:**

**RELIZON KNE INC.**

**By:** _____
**Name:**
**Title:**

**IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase and Sale Agreement to be duly executed and delivered in its name and on its behalf, all as of the day and year first above written.**

**SELLERS:**

**RELIZON WISCONSIN INC.**


**By:** _____
**Name:**
**Title:**

**IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase and Sale Agreement to be duly executed and delivered in its name and on its behalf, all as of the day and year first above written.**

**SELLERS:**

**RELIZON TEXAS LTD., LLP**

**By:     Formcraft Holdings General Partner, Inc.,
            General Partner**

**            By:_____
            Name:
            Title:**

# EXHIBIT A

## BANKRUPTCY PLAN

**[Attached]**

7940279

Document comparison by Workshare Professional on Tuesday, January 18, 2011
12:28:38 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:/Documents and Settings/bgharris/Desktop/workflow/APA Clean (FF Draft 12.29).doc |
| Description | APA Clean (FF Draft 12.29) |
| Document 2 ID | file://C:/Documents and Settings/bgharris/Local Settings/Temporary Internet Files/OLK1B/Workflow APA (clean).doc |
| Description | Workflow APA (clean) |
| Rendering set | MW Standard |

| Legend: | |
|---|---|
| **<u>Insertion</u>** | |
| ~~Deletion~~ | |
| ~~Moved from~~ | |
| <u>Moved to</u> | |
| Style change | |
| Format change | |
| ~~Moved deletion~~ | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 173 |
| Deletions | 109 |
| Moved from | 1 |
| Moved to | 1 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 284 |