**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

| | | |
|---|---|---|
| In re: | ) | **Chapter 11** |
| | ) | |
| **WORKFLOW MANAGEMENT INC.,** | ) | |
| <u>et al</u>., | ) | **Case No. 10-74617 (SCS)** |
| | ) | |
| **Debtors**. | ) | **(Jointly Administered)** |
| | ) | |

---

**THIRD AMENDED JOINT CHAPTER 11 PLAN**
**OF WORKFLOW MANAGEMENT, INC.**
**AND ITS AFFILIATED DEBTORS**

---

Dated:  January 21, 2011

McGUIREWOODS LLP
Douglas M. Foley (VSB No. 34364)
Patrick L. Hayden (VSB No. 30351)
9000 World Trade Center
101 West Main Street
Norfolk, Virginia 23510
(757) 640-3700

TAVENNER & BERAN, PLC
Lynn L. Tavenner (VSB No. 30083)
Paula S. Beran (VSB No. 34679)
20 North Eighth Street
Second Floor
Richmond, Virginia 23219
(804) 783-8300

Attorneys for the Debtors and
Debtors in Possession

# TABLE OF CONTENTS

**Page**

ARTICLE I.        DEFINITIONS ................................................................................. 1

ARTICLE II.       INTERPRETATION AND APPLICATION ................................. 18

    2.1    Interpretation ................................................................................. 18

    2.2    Application of Definitions and Rules of Construction Contained in the
Bankruptcy Code .......................................................................... 18

    2.3    Other Terms .................................................................................. 19

    2.4    Incorporation of Plan Documents ................................................. 19

ARTICLE III.      CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ................ 19

    3.1    Administrative Expense Claims and Tax Claims ............................... 19

    3.2    Claims and Equity Interests .......................................................... 19

    3.3    Separate Classification of Other Secured Claims ............................. 20

ARTICLE IV.       IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND
EQUITY INTERESTS .................................................................... 20

    4.1    Impaired and Unimpaired Classes of Claims .................................. 21

    4.2    Impairment Controversies ............................................................ 21

    4.3    Classification Controversies ......................................................... 21

ARTICLE V.        PROVISIONS FOR TREATMENT OF CLAIMS AND EQUITY
INTERESTS UNDER THE PLAN ................................................... 21

    5.1    Class 1 – Priority Non-Tax Claims ............................................... 21

    5.2    Class 2 – First Lien Lender Claims ................................................ 22

    5.3    Class 3 – Second Lien Lender Secured Claims ............................... 22

    5.4    Class 4 – Other Secured Claims .................................................... 23

    5.5    Class 5A – General Unsecured Claims against Non-Holdco Debtors ........ 24

    5.6    Class 5B– General Unsecured Claims against Holdco Debtors .............. 24

    5.7    Class 5C– Multi-Debtor General Unsecured Claims ........................ 24

    5.8    Class 6 – Intercompany Claims .................................................... 25

    5.9    Class 7 – WF Equity Interests ...................................................... 25

    5.10   Deemed Satisfaction of Secondary Liability Claims ........................ 25

    5.11   Insurance Policies ........................................................................ 25

ARTICLE VI.       PROVISIONS FOR TREATMENT OF UNCLASSIFIED CLAIMS
UNDER THE PLAN ....................................................................... 25

## TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 6.1 | Unclassified Claims | 25 |
| 6.2 | Treatment of Administrative Expense Claims | 26 |
| 6.3 | Treatment of Priority Tax Claims | 28 |
| ARTICLE VII. | ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY INTERESTS | 28 |
| 7.1 | Classes Entitled to Vote | 28 |
| 7.2 | Class Acceptance Requirement | 28 |
| 7.3 | Tabulation of Votes on a Non-Consolidated Basis | 29 |
| 7.4 | Separate Plan for Each Debtor | 29 |
| 7.5 | Cramdown | 29 |
| ARTICLE VIII. | MEANS FOR IMPLEMENTATION OF THE PLAN | 29 |
| 8.1 | Sale of Assets, Consummation of Sale Transaction and Distribution of New Notes and Newco Preferred Equity Interests | 29 |
| 8.2 | Certain Transactions On the Effective Date | 30 |
| 8.3 | Appointment of Plan Administrator | 30 |
| 8.4 | Unsecured Claims Fund | 30 |
| 8.5 | Cancellation of Notes and Equity Interests | 30 |
| 8.6 | Corporate Action | 30 |
| 8.7 | Continued Corporate Existence of the Debtors | 31 |
| 8.8 | Reserved | 32 |
| 8.9 | Revesting of Assets | 32 |
| 8.10 | Assumption of Priority Claims by Purchaser | 32 |
| 8.11 | Release of Liens | 32 |
| 8.12 | Substantive Consolidation | 33 |
| 8.13 | Initial Boards of Directors and Officers | 33 |
| 8.14 | Remittance of Excess Plan Funds to the Purchaser | 33 |
| 8.15 | Exemption from Securities Laws | 33 |
| ARTICLE IX. | THE PLAN ADMINISTRATOR | 34 |
| 9.1 | Generally | 34 |
| 9.2 | Appointment of the Plan Administrator | 34 |

# TABLE OF CONTENTS
(continued)

**Page**

9.3     Funding Expenses of the Plan Administrator ..................................... 34

9.4     Service and Removal. ........................................................................ 35

9.5     Authority. .......................................................................................... 35

9.6     Plan Distribution Withholding. ......................................................... 36

9.7     Termination of the Plan Administrator .............................................. 36

9.8     Plan Administrator Post-Effective Date............................................. 36

ARTICLE X.        PLAN DISTRIBUTION PROVISIONS........................... 37

10.1    Sources of Cash for Plan Distributions .............................................. 37

10.2    Investment of Funds Held by the Plan Administrator; Tax Reporting by
        the Plan Administrator ....................................................................... 37

10.3    Timing of Plan Distributions ............................................................. 37

10.4    Unsecured Claims Fund...................................................................... 37

10.5    Distributions After Allowance of Contested Class 5A and Class 5C Claims...... 38

10.6    Distributions After Disallowance of Contested Class 5A or Class 5C
        Claims. ............................................................................................... 38

10.7    Address for Delivery of Plan Distributions/Unclaimed Distributions ................ 39

10.8    Time Bar to Cash Payments................................................................ 39

10.9    Manner of Payment under the Plan..................................................... 39

10.10   Minimum and Fractional Distributions............................................... 40

10.11   Surrender and Cancellation of Instruments........................................ 40

ARTICLE XI.       PROCEDURES FOR RESOLVING AND TREATING CONTESTED
                  CLAIMS ................................................................................. 40

11.1    Prosecution of Contested Claims ....................................................... 40

11.2    Objection Deadline ............................................................................ 41

11.3    Claims Settlement .............................................................................. 41

11.4    Entitlement to Plan Distributions Upon Allowance........................... 41

11.5    Contested Claims Reserve ................................................................. 41

11.6    Estimation of Claims.......................................................................... 41

11.7    No Recourse Against the Debtors, the Purchaser or the Post-Effective
        Date Debtors ...................................................................................... 42

ARTICLE XII.      TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
                  LEASES.................................................................................. 43

# TABLE OF CONTENTS

(continued)

**Page**

| | | |
|---|---|---|
| 12.1 | Assumption and Rejection of Executory Contracts and Unexpired Leases | 43 |
| 12.2 | Cure Costs | 44 |
| 12.3 | Claims Arising from Rejected Contracts | 44 |
| ARTICLE XIII. | SETTLEMENTS AND COMPROMISES | 45 |
| 13.1 | Compromise and Settlement | 45 |
| 13.2 | Releases by the Debtors. | 45 |
| 13.3 | Third Party Release | 47 |
| 13.4 | Exculpation | 48 |
| 13.5 | Reserved | 49 |
| 13.6 | Maintenance of Set-off Rights. | 49 |
| 13.7 | INJUNCTION | 49 |
| ARTICLE XIV. | CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE OCCURRENCE OF THE EFFECTIVE DATE | 50 |
| 14.1 | Conditions Precedent to Confirmation | 50 |
| 14.2 | Conditions Precedent to the Occurrence of the Effective Date | 50 |
| 14.3 | Waiver of Conditions | 51 |
| 14.4 | Effect of Non-Occurrence of the Effective Date | 51 |
| ARTICLE XV. | RETENTION OF JURISDICTION | 51 |
| ARTICLE XVI. | MISCELLANEOUS PROVISIONS | 53 |
| 16.1 | Payment of Statutory Fees | 53 |
| 16.2 | Satisfaction of Claims | 53 |
| 16.3 | Notices | 54 |
| 16.4 | Headings | 56 |
| 16.5 | Governing Law | 56 |
| 16.6 | Expedited Determination | 56 |
| 16.7 | Exemption from Transfer Taxes | 56 |
| 16.8 | Retiree Benefits | 57 |
| 16.9 | Notice of Entry of Confirmation Order and Relevant Dates | 57 |
| 16.10 | Interest and Attorneys' Fees | 57 |
| 16.11 | Modification of the Plan | 57 |

## TABLE OF CONTENTS
(continued)

**Page**

16.12  Revocation of Plan ................................................................................ 57

16.13  Setoff Rights ........................................................................................ 58

16.14  Compliance with Tax Requirements ..................................................... 58

16.15  Rates .................................................................................................... 58

16.16  Binding Effect ...................................................................................... 58

16.17  Severability .......................................................................................... 59

16.18  No Admissions ..................................................................................... 59

16.19  Dissolution of the Committee .............................................................. 59

Workflow Management, Inc., and its affiliated debtors in the above-captioned jointly administered chapter 11 cases (the "Debtors"), hereby propose the following third amended joint chapter 11 plan of reorganization:

# ARTICLE I.

# DEFINITIONS

In this Plan, the following definitions apply:

**1.1.**   "**Actionable Avoidance Actions**" means the Avoidance Actions that are not vetoed by the Purchaser pursuant to the following sentence. The Purchaser shall have the right, in its sole and absolute discretion and in good faith, to veto the pursuit of Avoidance Actions by the Plan Administrator against any party if the Purchaser believes that such pursuit could have an adverse effect on the business or operations of the Purchaser. Notwithstanding the foregoing, the Purchaser may not exercise its veto right against former trade or business creditors of the Debtors who are not currently doing business with the Debtors and are not contemplated to be doing business with the Debtors or the Purchaser in the future.

**1.2.**   "**Administrative Expense Claim**" means any right to payment constituting a cost or expense of administration of any of the Chapter 11 Cases under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary post-petition costs and expenses of preserving the Debtors' estates, any actual and necessary post-petition costs and expenses of operating the Debtors' businesses, any indebtedness or obligations incurred or assumed by the Debtors, as debtors in possession, during the Chapter 11 Cases including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, and any allowances of compensation and reimbursement of expenses to the extent allowed by Final Order under section 330 or 503 of the Bankruptcy Code.

**1.3.**   "**Administrative Expense Claim Bar Date**" means February 18, 2011, or such other specific date as may be established by the Bankruptcy Court.

**1.4.**   "**Administrative Expense Claim Reserve**" means the portion of the Plan Funds to be used for distribution to holders of (i) Priority Tax Claims that are not assumed by the Purchaser as provided in Section 8.10, (ii) Priority Non-Tax Claims that are not assumed by the Purchaser as provided in Section 8.10, and (iii) Administrative Expense Claims that are not assumed by the Purchaser as provided in Section 6.2(e).

**1.5.**   "**Affiliate**" means, with respect to any Person, all Persons that would fall within the definition assigned to such term in section 101(2) of the Bankruptcy Code, if such Person was a debtor in a case under the Bankruptcy Code.

**1.6.**   "**Allowed**" means, with respect to a Claim: (i) any Claim against any Debtor which has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of Claim has been filed, (ii) any timely filed, liquidated, non-contingent Claim as to which the time for objection permitted by the Plan has expired and no objection has been interposed, or (iii) any Claim expressly allowed by a

Final Order or by agreement in accordance with the provisions of the Plan, including, without limitation, Section 11.3 of the Plan.

1.7.    "**Asset Purchase Agreement**"  means that certain Asset Purchase Agreement by and among WFMI and its Debtor affiliates signatories thereto, and the Purchaser, dated January 21, 2011, in the form attached hereto as Exhibit B, as further amended, supplemented or modified from time to time.

1.8.    "**Assets**" means, with respect to any Debtor, all of such Debtor's right, title and interest of any nature in property of any kind, wherever located, as specified in section 541 of the Bankruptcy Code.

1.9.    "**Assigned Contracts**" shall have the meaning given in Section 12.1 of the Plan.

1.10.    "**Assumed Liabilities**" has the meaning set forth in the Asset Purchase Agreement.

1.11.    "**Assumed Priority Claim Schedule**" means the schedule delivered by the Purchaser to the Debtors on the Effective Date that denotes the Priority Tax Claims and Priority Non-Tax Claims that are being assumed by the Purchaser upon the closing of the Sale Transaction.

1.12.    "**Avoidance Action Recovery Amount**" means the amount of all recoveries including any settlements by the Plan Administrator on the Actionable Avoidance Actions.

1.13.    "**Avoidance Actions**" means all Causes of Action of the Estates that arise under section 544, 545, 547, 548, 549, 550, 551 and/or 553 of the Bankruptcy Code.

1.14.    "**Ballot**" means those certain ballots that are sent to holders of Claims and Equity Interests for purposes of voting on the Plan.

1.15.    "**Balloting Agent**" means Kurtzman Carson Consultants LLC.

1.16.    "**Bankruptcy Code**" means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

1.17.    "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Virginia, Norfolk Division, or such other court having jurisdiction over the Chapter 11 Cases.

1.18.    "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure, as prescribed by the United States Supreme Court pursuant to section 2075 of title 28 of the United States Code and as applicable to the Chapter 11 Cases.

1.19.    "**Borrower**" means Workflow Management, Inc.

2

**1.20.** "**Business Day**" means any day other than a Saturday, a Sunday or any other day on which commercial banks are required or authorized to close for business in New York, New York.

**1.21.** "**Cash**" means legal tender of the United States of America.

**1.22.** "**Cash Collateral Orders**" means the orders of the Bankruptcy Court, dated October 1, 2010, October 8, 2010, October 29, 2010, and December 2, 2010 granting the Debtors authority to use cash collateral on an interim basis, the order of the Bankruptcy Court dated December 16, 2010, granting the Debtors authority to use cash collateral on a final basis, as such order may be amended or extended in accordance with the terms thereof, and any further orders that may be entered regarding the use of cash collateral.

**1.23.** "**Causes of Action**" means all claims, rights, actions, causes of action, liabilities, obligations, suits, debts, remedies, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages or judgments, whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, foreseen or unforeseen, asserted or unasserted, arising in law, equity or otherwise.

**1.24.** "**Chapter 11 Cases**" means the cases commenced under chapter 11 of the Bankruptcy Code pending before the Bankruptcy Court with respect to each of the Debtors styled as <u>In re Workflow Management, Inc., et al.</u>, Chapter 11 Case No. 10-74617 (SCS), Jointly Administered.

**1.25.** "**Claim**" means (a) any right to payment, whether or not such right is known or unknown, reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is known or unknown, reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.

**1.26.** "**Claims Agent**" means Kurtzman Carson Consultants LLC.

**1.27.** "**Closing Consideration Amount**" has the meaning set forth in the Asset Purchase Agreement, which shall include the Plan Funds.

**1.28.** "**Committee**" means the official committee of unsecured creditors appointed by the U.S. Trustee in the Chapter 11 Cases.

**1.29.** "**Committee Parties**" means the Committee, its members (solely in their capacities as members of the Committee) and the Committee's attorneys and financial advisors.

**1.30.** "**Confirmation Date**" means the date on which the clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

**1.31.** "**Confirmation Hearing**" means the hearing held by the Bankruptcy Court, as it may be continued from time to time, to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

**1.32.** "**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan, which shall be in form and substance acceptable to the Debtors, the Purchaser, Perseus, and the Second Lien Administrative Agent.

**1.33.** "**Contested Claim**" means any Claim that is not an Allowed Claim or a Disallowed Claim, provided that, for the avoidance of doubt, the First Lien Lender Claims and the Second Lien Lender Claims shall not be Contested Claims.

**1.34.** "**Contested Claims Reserve**" means a reserve of Cash that may be established in accordance with Section 11.5 of the Plan.

**1.35.** "**CS**" means Credit Suisse AG, Cayman Islands Branch.

**1.36.** "**Cure Cost**" means the distribution within a reasonable period of time following the Effective Date of Cash, or such other property as may be agreed upon by the parties or ordered by the Bankruptcy Court, with respect to the assumption (or assumption and assignment) of an executory contract or unexpired lease, pursuant to section 365(b) of the Bankruptcy Code, in an amount equal to all unpaid monetary obligations, without interest, or such other amount as may be agreed upon by the parties, under such executory contract or unexpired lease, to the extent such obligations are enforceable under the Bankruptcy Code and applicable non-bankruptcy law.

**1.37.** "**Debtors**" means, collectively, WF Capital, and its direct and indirect subsidiaries, that are debtors in the Chapter 11 Cases as identified on Exhibit A annexed hereto.

**1.38.** "**Debtor Release**" means the release given by the Debtors to the Debtor Releasees set forth in Section 13.2 of the Plan.

**1.39.** "**Debtor Releasees**" means, collectively, (a) all current and former officers and directors of the Debtors, (b) all Related Parties of the Debtors, (c) the Committee Parties, and (d) and the Third Party Releasees.

**1.40.** "**Debtor-in-Possession**" means any Debtor, in its capacity as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

**1.41.** "**Disallowed**" when used with respect to a Claim, means a Claim, or such portion of a Claim, (a) that has been disallowed by a Final Order, including, without limitation, any Claims that are disallowed by failing to comply with the Bankruptcy Court's order establishing the bar date for filing proofs of Claim, or (b) which were included on the Schedules as disputed or contingent and for which no contrary proof of Claim was timely filed.

**1.42.** "**Disclosure Statement**" means the Disclosure Statement filed with respect to the Plan, as it may be amended or modified from time to time.

4

**1.43.** "**Disclosure Statement Order**" means the order entered by the Bankruptcy Court, in form and substance reasonably acceptable to the Debtors, Perseus, the Purchaser and the Second Lien Administrative Agent, (a) approving the Disclosure Statement as containing adequate information required under section 1125 of the Bankruptcy Code, (b) authorizing the use of the Disclosure Statement for soliciting votes on the Plan, and (c) authorizing the Debtors to execute the Asset Purchase Agreement and incur the fee reimbursement obligations contemplated thereunder.

**1.44.** "**Distribution Date**" means, with respect to any Claim, (i) the Effective Date or a date that is as soon as reasonably practicable after the Effective Date, if such Claim is then an Allowed Claim, (ii) a date that is as soon as reasonably practicable after the date such Claim becomes Allowed, if not Allowed on the Effective Date; or (iii) the date of payment otherwise prescribed in the Plan.

**1.45.** "**Effective Date**" means a date selected by the Debtors which must be a Business Day that is no later than thirty (30) Business Days after all of the conditions specified in Section 14.2 of the Plan have been satisfied or waived (to the extent subject to waiver).

**1.46.** "**Entity**" means any person or organization created by law, including, without limitation, any individual, company, corporation, limited liability company, partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, or government or any political subdivision thereof.

**1.47.** "**Equity Interest**" means any outstanding ownership interest in any of the Debtors, including without limitation, interests evidenced by common or preferred stock, partnership interests, membership interests, warrants and options or other rights to purchase or otherwise receive any ownership interest in any of the Debtors and any right to payment or compensation based upon any such interest, whether or not such interest is owned by the holder of such right to payment or compensation.

**1.48.** "**Estate**" means the estate of any Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

**1.49.** "**Excluded Assets**" has the meaning set forth in the Asset Purchase Agreement.

**1.50.** "**Excluded Contracts**" means (i) contracts and leases listed in a schedule to the Disclosure Statement and any subsequently filed "Schedule of Rejected Executory Contracts and Unexpired Leases" to be filed by the Debtors as part of the Plan Supplement with the Bankruptcy Court at least ten (10) days before the date of the Confirmation Hearing; (ii) all executory contracts and unexpired leases that are the subject of a pending motion before the Bankruptcy Court or which have been rejected by order of the Bankruptcy Court entered before the Effective Date; and (iii) any executory contract or unexpired lease that is the subject of a dispute over the amount or manner of cure pursuant to Article 12 of the Plan and for which the Debtors make a motion to reject such contract or lease at any time based upon the existence of such dispute or the resolution of such dispute.  The Debtors reserve the right to amend the schedule to the Disclosure Statement or any "Schedule of Rejected Executory Contracts and Unexpired Leases" at least two (2) days before the date of the Confirmation Hearing.

5

**1.51.** "**Exculpated Parties**" means each of (a) the Debtors, (b) the Post-Effective Date Debtors, (c) the Debtor Releasees, and (d) the Committee Parties.

**1.52.** "**Fee Application**" means an application for allowance and payment of a Fee Claim.

**1.53.** "**Fee Claim**" means a Claim of a Professional.

**1.54.** "**Final Order**" means (a) an order or judgment of the Bankruptcy Court or any other court or adjudicative body as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing is then pending, or (b) in the event that an appeal, writ of certiorari, reargument, or rehearing thereof has been sought, such order of the Bankruptcy Court or any other court or adjudicative body shall have been affirmed by the highest court to which such order was appealed, or certiorari has been denied, or from which reargument or rehearing was sought, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; provided, that no order shall fail to be a Final Order solely because of the possibility that a motion pursuant to section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed with respect to such order.

**1.55.** "**First Lien Administrative Agent**" means CS, in its capacity as administrative agent for the First Lien Secured Parties pursuant to the First Lien Loan Documents.

**1.56.** "**First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as of November 30, 2005, between Workflow Management, Inc., as borrower, the First Lien Lenders and the First Lien Administrative Agent, as amended from time to time.

**1.57.** "**First Lien Credit Facility**" means the Term Loan Facility and the Revolving Credit Facility made available pursuant to the First Lien Loan Documents.

**1.58.** "**First Lien Guaranties**" means the Guaranties entered into by the Guarantors in favor of the First Lien Administrative Agent for the benefit of the First Lien Secured Parties on account of the First Lien Lender Claims, as amended from time to time.

**1.59.** "**First Lien Guaranty Claims**" means any and all Claims against the Guarantors arising from or in connection with the First Lien Guaranties.

**1.60.** "**First Lien Lender Claims**" means any and all Claims, including, without limitation, the First Lien Guaranty Claims, against any of the Debtors arising from or in connection with the First Lien Loan Documents, which shall be Allowed as set forth in Section 5.2(a) of the Plan.

**1.61.** "**First Lien Lender Interest Claim**" has the meaning set forth in section 5.2(a) of the Plan.

**1.62.** "**First Lien Lender Principal Claim**" has the meaning set forth in section 5.2(a) of the Plan.

**1.63.** "**First Lien Lenders**" means the lenders who are party, from time to time, to the First Lien Credit Agreement.

**1.64.** "**First Lien Loan Documents**" means the First Lien Credit Agreement, the notes which evidence the loans under the First Lien Credit Facility, the fee letters referred to in the First Lien Credit Agreement, the First Lien Pledge Agreement, the First Lien Guaranties, the First Lien Mortgages, any outstanding Letters of Credit, and the Intercreditor Agreement, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto, as any such documents are amended from time to time.

**1.65.** "**First Lien Mortgages**" means any mortgage recorded in favor of the First Lien Administrative Agent which secures the First Lien Lender Claims, as amended from time to time.

**1.66.** "**First Lien Pledge Agreement**" means that certain Pledge and Security Agreement dated as of November 30, 2005, granting a first priority security interest in substantially all of the personal property assets of the Loan Parties, by each Loan Party in favor of the First Lien Administrative Agent for the benefit of the First Lien Secured Parties, together with all documents, instruments and agreements executed or entered into in connection therewith, as amended from time to time.

**1.67.** "**First Lien Secured Parties**" means the First Lien Administrative Agent, the First Lien Lenders and the Issuer.

**1.68.** "**Former Shareholder Notes**" means those certain promissory notes made by certain former shareholders of the Debtors payable to certain of the Debtors in the original aggregate principal amount of approximately $2,352,872.

**1.69.** "**General Unsecured Claim**" means any unsecured Claim against a Debtor, other than an Administrative Expense Claim, an Intercompany Claim, a Priority Tax Claim, or a Priority Non-Tax Claim.

**1.70.** "**Governmental Unit**" shall have the meaning assigned to such term in section 101(27) of the Bankruptcy Code.

**1.71.** "**Guarantors**" means each of Workflow Holdings Corporation; WF Holdings, Inc.; Workflow Direct, Inc.; Workflow Management Acquisition II Corp.; WFIH, Inc.; WFMI, Inc.; Workflow of Florida, Inc.; Workflow Solutions LLC; SFI of Puerto Rico, Inc.; Old FGS, Inc.; Old UE, LLC; The Relizon Company; Relizon Wisconsin Inc.; Relizon (Texas) Ltd., LLP; Relizon SNE Inc.; Relizon KNE Inc.; Relizon de Mexico Inc.; Formcraft Holdings General Partner, Inc.; and Formcraft Holdings Limited Partner, Inc.

**1.72.** "**Guaranty**" means any guaranty by one or more Debtors of an obligation of any other Debtor.

**1.73.** "**Holdco Debtors**" means WF Capital Holdings, Inc., WF Holdings, Inc., and Workflow Holdings Corporation.

**1.74.** "**Insider**" means with respect to any Person, all Persons that would fall within the definition assigned to such terms in section 101(31) of the Bankruptcy Code.

**1.75.** "**Intercompany Claim**" means any Claim held by any Debtor against any other Debtor that occurred or came into existence prior to the Petition Date.

**1.76.** "**Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of November 30, 2005, as amended April 30, 2009, by and between the First Lien Administrative Agent and the Second Lien Administrative Agent, and acknowledged by each Loan Party, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto.

**1.77.** "**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended, and any applicable rulings, regulations (including temporary and proposed regulations) promulgated thereunder, judicial decisions, and notices, announcements, and other releases of the United States Treasury Department or the IRS.

**1.78.** "**IRS**" means the United States Internal Revenue Service.

**1.79.** "**Issuer**" means CS, as issuer of the outstanding Letters of Credit under the Letter of Credit Subfacility.

**1.80.** "**Letter of Credit Subfacility**" means the Letter of Credit subfacility under, and that forms a part of, the Revolving Credit Facility under the First Lien Credit Agreement.

**1.81.** "**Letters of Credit**" means any letters of credit issued by the Issuer under the Letter of Credit Subfacility, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto.

**1.82.** "**Loan Parties**" means the Guarantors and the Borrower.

**1.83.** "**Maximum Allowable Amount**" means, with respect to any Contested Claim in Class 5A or Class 5C, the least of the amounts (a) set forth in the proof(s) of Claim filed by the holder thereof, (b) determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction as the maximum fixed amount of such Class 5A or Class 5C Claim or as the estimated amount of such Class 5A or Class 5C Claim for allowance, distribution, and reserve purposes, (c) in the case of a proof of Claim filed in an unliquidated, undetermined, or contingent amount, as determined by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction, or (d) as agreed upon, in writing, by the holder of such Contested Claim and the Debtors or Plan Administrator, as the case may be.

**1.84.** "**Multi-Debtor General Unsecured Claims**" means any General Unsecured Claim which is asserted by the holder of such Claim against WF Holdings, Inc. and all of its direct and indirect subsidiary Debtors, including, without limitation, the Second Lien Lender Deficiency Claims and the PBGC Claims.

**1.85.** "**Newco**" means Workflow Holdings LLC.

**1.86.**  "**Newco First Lien Administrative Agent**" means an entity to be identified in the Plan Supplement.

**1.87.**  "**Newco First Lien Credit Agreement**" means that certain First Lien Credit Agreement, dated as of the Effective Date, between Purchaser, as borrower, the Newco First Lien Lenders and the Newco First Lien Administrative Agent, in the form contained in the Plan Supplement as a Plan Document, as amended from time to time, which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, Newco First Lien Administrative Agent and the Second Lien Administrative Agent.

**1.88.**  "**Newco First Lien Lenders**" means the lenders that are party to the Newco First Lien Credit Agreement from time to time.

**1.89.**  "**Newco First Lien Loan Documents**" means the Newco First Lien Credit Agreement, the Newco First Lien Loan Notes which evidence the loans made under the Newco First Lien Credit Agreement, the Newco First Lien Pledge Agreement, the Newco First Lien Mortgages, and the Newco Intercreditor Agreement, as any such documents are amended from time to time, each of which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, the Newco First Lien Administrative Agent and the Second Lien Administrative Agent.

**1.90.**  "**Newco First Lien Mortgages**" means any mortgage recorded in favor of the Newco First Lien Administrative Agent, which secures the obligations under the Newco First Lien Credit Agreement, which shall grant a first priority lien on the property that is the subject of the mortgage in favor of the Newco First Lien Administrative Agent on behalf of the Newco First Lien Lenders, and which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, the Newco First Lien Administrative Agent, and the Second Lien Administrative Agent.

**1.91.**  "**Newco First Lien Loan Notes**" means the notes made by Purchaser, in the form contained in the Plan Supplement as a Plan Document, that evidence the payment obligations of Purchaser under the Newco First Lien Credit Agreement, which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, the Newco First Lien Administrative Agent and the Second Lien Administrative Agent.

**1.92.**  "**Newco First Lien Pledge Agreement**" means that certain Pledge and Security Agreement dated as of the Effective Date, granting a first priority security interest in substantially all of the personal property assets of Purchaser, by Purchaser in favor of the Newco First Lien Administrative Agent for the benefit of the Newco First Lien Secured Parties, together with all documents, instruments and agreements executed or entered into in connection therewith, as amended from time to time, which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, the Newco First Lien Administrative Agent and the Second Lien Administrative Agent.

**1.93.**  "**Newco First Lien Secured Parties**" means the Newco First Lien Administrative Agent, and the Newco First Lien Lenders.

**1.94.** "**Newco Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of the Effective Date, by and between the Newco First Lien Administrative Agent and the Newco Second Lien Administrative Agent, and acknowledged by Purchaser, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto, which shall be in form and substance reasonably acceptable to the Purchaser, the Newco First Lien Administrative Agent and the Newco Second Lien Administrative Agent.

**1.95.** "**Newco Preferred Equity Interests**" means the preferred Equity Interests issued by Newco, which shall (i) have an initial stated liquidation value of $30 million, (ii) have no stated maturity, and (iii) be entitled to receive a 15% preferred distribution which shall compound and accrue quarterly.

**1.96.** "**Newco Second Lien Administrative Agent**" means Silver Point.

**1.97.** "**Newco Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of the Effective Date, between Purchaser, as borrower, the Newco Second Lien Lenders and the Newco Second Lien Administrative Agent, in the form contained in the Plan Supplement as a Plan Document, as amended from time to time, which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, and the Second Lien Administrative Agent.

**1.98.** "**Newco Second Lien Lenders**" means the lenders that are party to the Newco Second Lien Credit Agreement from time to time.

**1.99.** "**Newco Second Lien Loan Documents**" means the Newco Second Lien Credit Agreement, the Newco Second Lien Loan Notes which evidence the loans made under the Newco Second Lien Credit Agreement, the Newco Second Lien Pledge Agreement, the Newco Second Lien Mortgages, and the Newco Intercreditor Agreement, as any such documents are amended from time to time, each of which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, and the Second Lien Administrative Agent.

**1.100.** "**Newco Second Lien Mortgages**" means any mortgage recorded in favor of the Newco Second Lien Administrative Agent, which secures the obligations under the Newco Second Lien Credit Agreement, which shall grant a second priority lien on the property that is the subject of the mortgage in favor of the Newco Second Lien Administrative Agent on behalf of the Newco Second Lien Lenders, and which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, and the Second Lien Administrative Agent.

**1.101.** "**Newco Second Lien Loan Notes**" means the notes made by Purchaser, in the form contained in the Plan Supplement as a Plan Document, that evidence the payment obligations of Purchaser under the Newco Second Lien Credit Agreement, which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, and the Second Lien Administrative Agent.

**1.102.** "**Newco Second Lien Pledge Agreement**" means that certain Pledge and Security Agreement dated as of the Effective Date, granting a second priority security interest in substantially all of the personal property assets of Purchaser, by Purchaser in favor of the Newco

Second Lien Administrative Agent for the benefit of the Newco Second Lien Secured Parties, together with all documents, instruments and agreements executed or entered into in connection therewith, as amended from time to time, which shall be in form and substance reasonably acceptable to Perseus, the Purchaser, and the Second Lien Administrative Agent.

**1.103.** "**Newco Second Lien Secured Parties**" means the Newco Second Lien Administrative Agent, and the Newco Second Lien Lenders.

**1.104.** "**New Notes**" means the Newco First Lien Loan Notes and the Newco Second Lien Loan Notes.

**1.105.** "**Non-Holdco Debtors**" means each of the Debtors, except WF Capital Holdings, Inc., WF Holdings, Inc., and Workflow Holdings Corporation.

**1.106.** "**Notice of Confirmation**" means the notice of entry of the Confirmation Order to be filed with the Bankruptcy Court and mailed by the Claims Agent to holders of Claims and Equity Interests.

**1.107.** "**Objection Deadline**" means the deadline for filing objections to Claims as set forth in Section 11.2 of the Plan.

**1.108.** "**Ohio Development Loan**" means that certain loan made pursuant to a loan agreement between The Relizon Company and the State of Ohio Director of Development, dated as of January 31, 2003, in the original principal amount of $800,000, which matures on January 31, 2013 and is secured pursuant to the Ohio Security Agreement.

**1.109.** "**Ohio Equipment**" means that certain equipment securing the Ohio Development Loan pursuant to the Ohio Security Agreement.

**1.110.** "**Ohio Security Agreement**" means that certain Security Agreement between The Relizon Company and the State of Ohio Director of Development, dated as of January 31, 2003, which grants a first priority security interest and lien in the Ohio Equipment, and provides a negative covenant precluding the encumbrance of the Ohio Equipment by any other security interest or lien.

**1.111.** "**Other Secured Claims**" means all Secured Claims other than the First Lien Lender Claims and the Second Lien Lender Claims, and including, without limitation, the Ohio Development Loan.

**1.112.** "**PBGC**" means the Pension Benefit Guaranty Corporation.

**1.113.** "**PBGC Claims**" means any and all Claims against any of the Debtors which are or were held by the PBGC pertaining to, arising from, or in connection with the Pension Plan or otherwise.

**1.114.** "**Pension Plan**" means The Relizon Company Retirement Plan, an ERISA-qualified defined benefit retirement plan effective as of January 1, 2001.

**1.115.** "**Periodic Distribution Date**" means (a) initially, the first Business Day that is one full month after the Unsecured Claims Initial Distribution Date and (b) subsequently, a Business Day designated by the Plan Administrator that occurs in the month that is one full month after the immediately preceding Periodic Distribution Date, or in the case of either (a) or (b), such earlier or later date established by the Bankruptcy Court or designated as such by the Plan Administrator in its reasonable discretion in a filing with the Bankruptcy Court.

**1.116.** "**Perseus**" means Perseus, L.L.C., Perseus Partners VII, L.P., Perseus Acquisition/Recapitalization Fund, L.L.C., Perseus 2000 Expansion, L.L.C., WF Holdings Co-Investment, L.P. and Perseus Market Opportunity Fund, L.P., and each of their respective present and former officers, directors, managers and employees.

**1.117.** "**Person**" means an individual, corporation, partnership, limited liability company, joint venture, trust, estate, unincorporated association, unincorporated organization, governmental entity, or political subdivision thereof, or any other entity.

**1.118.** "**Petition Date**" means September 29, 2010.

**1.119.** "**Plan**" means this third amended joint chapter 11 plan of reorganization, either in its present form or as it may be amended, supplemented, or otherwise modified from time to time, and the exhibits and schedules hereto, as the same may be in effect at the time such reference becomes operative.

**1.120.** "**Plan Administrator**" means the Entity to be granted the authority and charged with the responsibilities of the "Plan Administrator" under the Plan.

**1.121.** "**Plan Administrator Reserve**" means the reserve created to fund the costs and expenses necessary to administer and perform the contemplated functions of the Plan Administrator under the Plan including, without limitation, the reasonable fees and expenses of professionals retained by the Plan Administrator and the payment of post-Effective Date costs and wind-down expenses.

**1.122.** "**Plan Distribution**" means the payment or distribution under the Plan of Cash, Assets, or instruments evidencing an obligation under the Plan to the holder of an Allowed Claim.

**1.123.** "**Plan Documents**" means the Newco First Lien Credit Agreement, the Newco First Lien Loan Notes, the Newco Second Lien Credit Agreement, the Newco Second Lien Loan Notes and any other documents designated as Plan Documents by the Debtors, with the consent of Perseus, the Purchaser and the Second Lien Administrative Agent; provided, however, that the Plan Documents may not be amended on or after one (1) Business Day before the Voting Deadline in a manner that is material and adverse to the First Lien Lenders without the consent of the First Lien Administrative Agent, which consent shall not be unreasonably withheld, or if the First Lien Administrative Agent withholds its consent, then the Plan Documents may not be amended in a manner that is material and adverse to the First Lien Lenders without the consent of the holders of two-thirds in dollar amount of the First Lien Lender Principal Claim; provided further that any such amended Plan Documents shall be promptly served upon the First Lien Administrative Agent.

**1.124.** "**Plan Funds**" means the aggregate amount of (a) the Administrative Expense Claims Reserve in an amount to be agreed upon on or before the Effective Date by the Debtors and Purchaser which is sufficient to pay in full all Priority Tax Claims, Priority Non-Tax Claims, and Allowed Administrative Expense Claims, not assumed by Purchaser and which will be calculated based upon the aggregate of (i) the total amount of Allowed Priority Tax Claims not assumed by the Purchaser, (ii) the total amount of Allowed Priority Non-Tax Claims not assumed by the Purchaser, (iii) estimates for all Fee Claims as provided for in the Plan, (iv) the requests for payment of Administrative Expense Claims, not assumed by the Purchaser, filed prior to the Administrative Expense Claim Bar Date, and (v) the amounts payable to the First Lien Administrative Agent and the Second Lien Administrative Agent pursuant to Section 6.2(f) of the Plan; (b) the Unsecured Claims Fund in the amount of $2 million ($2,000,000) plus the value of the Actionable Avoidance Actions for distribution to holders of Allowed Claims in Class 5A and 5C; and (c) the Plan Administrator Reserve in the amount of $400,000.

**1.125.** "**Plan Supplement**" means the Plan Documents, the Schedule of Cure Costs, the Schedule of Rejected Executory Contracts and Unexpired Leases, the list of Retained Contracts, the list of Assigned Contracts, the designation of the Newco First Lien Administrative Agent and any other item designated as part of the Plan Supplement by the Debtors, with the consent of Perseus, the Purchaser and the Second Lien Administrative Agent.

**1.126.** "**Post-Effective Date Debtors**" means the Debtors subsequent to the Effective Date of the Plan.

**1.127.** "**Prepetition Agents**" means the First Lien Administrative Agent and the Second Lien Administrative Agent.

**1.128.** "**Prepetition Collateral**" means the Prepetition Personal Property Collateral and the Prepetition Real Property Collateral.

**1.129.** "**Prepetition Personal Property Collateral**" means the personal property collateral pledged pursuant to the First Lien Pledge Agreement and the Second Lien Pledge Agreement.

**1.130.** "**Prepetition Real Property Collateral**" means the real property collateral pledged pursuant to the First Lien Mortgages and the Second Lien Mortgages.

**1.131.** "**Prepetition Secured Parties**" means the First Lien Secured Parties and the Second Lien Secured Parties.

**1.132.** "**Priority Non-Tax Claim**" means any Claim entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7) or (9) of the Bankruptcy Code.

**1.133.** "**Priority Tax Claim**" means any Claim, whether secured or unsecured, entitled to priority under section 507(a)(8) of the Bankruptcy Code.

**1.134.** "**Professional**" means a Person retained or to be compensated for services rendered or costs incurred on or after the Petition Date and on or prior to the Effective Date

pursuant to sections 327, 328, 329, 330, 331, or 1103 of the Bankruptcy Code or otherwise entitled to compensation as estate professionals in these Chapter 11 Cases.

1.135.  "**Pro Rata Share**" means, for any Allowed Claim or Allowed Equity Interest of any class, the proportion that such Allowed Claim or Allowed Equity Interest bears to the aggregate amount of all Claims or Equity Interests of such class or classes, as applicable, including Contested Claims or Equity Interests, but excluding Disallowed Claims, as calculated by the Plan Administrator; or as determined or estimated by the Bankruptcy Court, as the case may be.

1.136.  "**Purchased Assets**" shall have the meaning set forth in the Asset Purchase Agreement.

1.137.  "**Purchaser**" means Newco or its assignee as permitted under the Asset Purchase Agreement.

1.138.  "**Rejection Damage Claim**" means any Claim arising out of the rejection of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

1.139.  "**Related Parties**" means, with respect to a Person, all of such Person's affiliates, and all of such Person's and such Person's affiliates' officers, directors, principals, shareholders, parents, subsidiaries, members, managers, auditors, accountants, financial advisors, predecessors, successors, servants, agents, counsel, attorneys, partners, insurers, underwriters, administrators, executors, representatives or assigns, whether past or present.

1.140.  "**Releasing Parties**" means the Second Lien Administrative Agent, Perseus, holders of Claims who vote to accept the Plan and, to the extent the First Lien Administrative Agent does not file an objection or otherwise oppose the Plan, the First Lien Administrative Agent.

1.141.  "**Retained Contracts**" shall have the meaning given in Section 12.1 of the Plan.

1.142.  "**Revolver A**" means that portion of the Revolving Credit Facility which matures May 31, 2011.

1.143.  "**Revolver B**" means that portion of the Revolving Credit Facility which matured November 30, 2010.

1.144.  "**Revolving Credit Facility**" means the revolving loan facility established pursuant to the First Lien Credit Agreement.

1.145.  "**Sale Transaction**" means that certain transaction between the Debtors and the Purchaser as set forth in the Asset Purchase Agreement.

1.146.  "**Schedules**" means the schedules of assets and liabilities and list of Equity Interests and the statements of financial affairs filed by each of the Debtors with the Bankruptcy Court, as required by section 521 of the Bankruptcy Code and in conformity with the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may

14

be amended or supplemented by the Debtors from time to time in accordance with Bankruptcy Rule 1009.

**1.147.** "**Second Lien Administrative Agent**" means Silver Point, in its capacity as successor administrative agent for the Second Lien Secured Parties pursuant to the Second Lien Loan Documents.

**1.148.** "**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement, dated as of November 30, 2005, between Workflow Management, Inc., as borrower, the Second Lien Lenders and the Second Lien Administrative Agent, as amended from time to time.

**1.149.** "**Second Lien Credit Facility**" means the term loan facility established pursuant to the Second Lien Credit Agreement.

**1.150.** "**Second Lien Guaranties**" means the Guaranties entered into by the Guarantors in favor of the Second Lien Administrative Agent, for the benefit of the Second Lien Secured Parties on account of the Second Lien Lender Claims, as amended from time to time.

**1.151.** "**Second Lien Guaranty Claims**" means any and all Claims against the Guarantors arising from or in connection with the Second Lien Guaranties.

**1.152.** "**Second Lien Lender Claims**" means the Claims, including the Second Lien Guaranty Claims, against any of the Debtors arising from or in connection with the Second Lien Loan Documents, which shall be Allowed in the aggregate amount of $196,396,149.34.

**1.153.** "**Second Lien Lender Deficiency Claims**" means the portion of the Second Lien Lender Claims that do not constitute Secured Claims, as provided for in, and determined in accordance with, section 506(a) of the Bankruptcy Code, which shall be treated in Class 5C hereof.  The Allowed Second Lien Lender Deficiency Claim is the amount which is the aggregate amount of the Allowed Second Lien Lender Claims less the aggregate amount of the Allowed Second Lien Lender Secured Claims.

**1.154.** "**Second Lien Lender Secured Claims**" means the $170,000,000.00 portion of the Second Lien Lender Claims that are Secured Claims, as provided for in, and determined in accordance with, section 506(a) of the Bankruptcy Code pursuant to the Plan.

**1.155.** "**Second Lien Lenders**" means the lenders that are party, from time to time, to the Second Lien Credit Agreement.

**1.156.** "**Second Lien Loan Documents**" means the Second Lien Credit Agreement, the notes which evidence the loans outstanding under the Second Lien Credit Facility, the fee letter referred to in the Second Lien Credit Agreement, the Second Lien Pledge Agreement, the Second Lien Guaranties, the Second Lien Mortgages, and the Intercreditor Agreement, together with all documents, instruments and agreements executed or entered into in connection therewith, and any amendments thereto, as any such documents are amended from time to time.

**1.157.** "**Second Lien Mortgages**" means any mortgage recorded in favor of the Second Lien Administrative Agent which secures the Second Lien Lender Claims, as amended from time to time.

**1.158.** "**Second Lien Pledge Agreement**" means that certain Pledge and Security Agreement dated as of November 30, 2005, granting a second priority security interest in substantially all of the personal property assets of the Loan Parties, by each Loan Party in favor of the Second Lien Administrative Agent, for the benefit of the Second Lien Secured Parties, together with all documents, instruments and agreements executed or entered into in connection therewith, as amended from time to time.

**1.159.** "**Second Lien Secured Parties**" means the Second Lien Administrative Agent and the Second Lien Lenders.

**1.160.** "**Secondary Liability Claim**" means a Claim that arises from a Guaranty or a Debtor otherwise being jointly, severally or secondarily liable for, any contractual, tort or other obligation of another Debtor, including any Claim based on: (a) guaranties of collection, payment or performance; (b) indemnity bonds, obligations to indemnify or obligations to hold harmless; (c) performance bonds; (d) contingent liabilities arising out of contractual obligations or out of undertakings (including any assignment or other transfer) with respect to leases, operating agreements or other similar obligations made or given by a Debtor relating to the obligations or performance of another Debtor; (e) vicarious liability; (f) liabilities arising out of piercing the corporate veil, alter ego liability or similar legal theories; or (g) any other joint or several liability that any Debtor may have in respect of any obligation that is the basis of a Claim.

**1.161.** "**Section 503(b)(9) Bar Date**" means the deadline for the filing of Section 503(b)(9) Claims established pursuant to an order of the Bankruptcy Court.

**1.162.** "**Section 503(b)(9) Claims**" means any Claims against any of the Debtors entitled to administrative expense status pursuant to section 503(b)(9) of the Bankruptcy Code.

**1.163.** "**Secured Claim**" means (a) a Claim secured by a lien on any Assets, which lien is valid, perfected, and enforceable under applicable law and is not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law, and which is duly established in the Chapter 11 Cases, but only to the extent of the value of the holder's interest in the collateral that secures payment of the Claim; (b) a Claim against any Debtor that is subject to a valid right of setoff under section 553 of the Bankruptcy Code, but only to the extent of the Allowed amount subject to setoff as provided in section 506(a) of the Bankruptcy Code; and (c) a Claim deemed or treated under the Plan as a Secured Claim; provided, that, to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as a General Unsecured Claim unless, in any such case the class of which Claim is a part makes a valid and timely election in accordance with section 1111(b) of the Bankruptcy Code to have such Claim treated as a Secured Claim to the extent allowed.

**1.164.** "**Silver Point**" means Silver Point Finance LLC.

**1.165.** "**Subordinated Claim**" means a Claim against any Debtor subordinated by a Final Order.

**1.166.** "**Term Loan Facility**" means the term loan facility established pursuant to the First Lien Credit Agreement.

**1.167.** "**Third Party Release**" means the release set forth in Section 13.3 of the Plan.

**1.168.** "**Third Party Releasees**" means, collectively, the Second Lien Administrative Agent, each of the Second Lien Lenders that vote in favor of the Plan, the Purchaser, Perseus, each of the First Lien Lenders that vote in favor of the Plan, and, to the extent the First Lien Administrative Agent does not file an objection or otherwise oppose the Plan, the First Lien Administrative Agent, and the Related Parties of each of the foregoing.

**1.169.** "**Unsecured Claims Cash Amount**" means $2 million ($2,000,000) in Cash of the Plan Funds, which shall make up the Unsecured Claims Fund.

**1.170.** "**Unsecured Claims Fund**" means the Unsecured Claims Cash Amount and the Avoidance Action Recovery Amount that shall be held in a segregated interest bearing account to be established by the Plan Administrator on the Effective Date for the purpose of making distributions to holders of Class 5A and Class 5C Allowed Claims pursuant to Sections 10.5 and 10.6 of the Plan.

**1.171.** "**Unsecured Claims Initial Distribution Date**" means the date that is the two month anniversary of the Effective Date.

**1.172.** "**U.S. Trustee**" means the Office of the United States Trustee for Region 4.

**1.173.** "**Voting Deadline**" means the deadline for voting on the Plan, as defined in the Disclosure Statement.

**1.174.** "**Voting Record Date**" means the date established by the Bankruptcy Court as the record date for voting on the Plan.

**1.175.** "**WF Capital**" means WF Capital Holdings, Inc., a Delaware corporation, one of the Debtors and Debtors in Possession in the Chapter 11 Cases.

**1.176.** "**WF Capital/BB&T Note**" means the note made by WF Capital payable to Branch Banking & Trust Company, dated as of December 31, 2008, in the amount of approximately $20 million (not including accrued, and unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

**1.177.** "**WF Capital/Perseus Convertible Note**" means the amended and restated convertible note dated as of March 4, 2008, and made by WF Capital payable to Perseus Partners VII, L.P., in the amount of approximately $58.4 million (including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto, which note is convertible, at the note holder's option, to WF Equity Interests.

17

**1.178.** "**WF Capital/Perseus Interest Note**" means the demand note made by WF Capital payable to Perseus Market Opportunity Fund, L.P., in the amount of approximately $302,000 (including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

**1.179.** "**WF Equity Interests**" means all Equity Interests in any of the Debtors.

**1.180.** "**WF Holdings/Carlyle Note**" means the subordinated promissory note made by WF Holdings, Inc. payable to Carlyle Partners III, L.P., as holder representative for the benefit of the beneficial holders identified on Schedule I thereto, dated December 21, 2006, in the amount of approximately $12,500,000 (including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

**1.181.** "**WFMI**" means Workflow Management Inc.

**1.182.** "**Workflow Management/Perseus Note**" means the promissory note dated February 9, 2010, and made by Workflow Management, Inc. payable to Perseus, L.L.C., which was subsequently assigned by Perseus, L.L.C. to Perseus Market Opportunity Fund, L.P., in the amount of approximately $1.1 million (including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

## ARTICLE II.

## INTERPRETATION AND APPLICATION

2.1 <u>**Interpretation**</u>.

Unless otherwise specified, all section, article, exhibit and schedule references in the Plan are to the respective section in, article of, or exhibit or schedule to, the Plan, as the same may be amended, waived, or modified from time to time. Words denoting the singular number shall include the plural number and vice versa, as appropriate, and words denoting one gender shall include the other gender. The Disclosure Statement may be referred to for purposes of interpretation to the extent any term or provision of the Plan is determined by the Bankruptcy Court to be ambiguous.

2.2 <u>**Application of Definitions and Rules of Construction Contained in the Bankruptcy Code**</u>.

Words and terms defined in section 101 of the Bankruptcy Code have the same meanings when used in the Plan, unless a different definition is set forth in Article I hereof. The rules of construction contained in section 102 of the Bankruptcy Code, other than section 102(5) of the Bankruptcy Code, apply to the construction of the Plan. For the purposes of construction of the Plan, "or" is disjunctive.

2.3 **Other Terms**.

The words "herein," "hereof," "hereto," "hereunder," and others of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. The word "including" when used herein shall mean "including without limitation" in each instance.

2.4 **Incorporation of Plan Documents**.

All appendices, exhibits and schedules to the Plan and all Plan Documents are incorporated into the Plan by this reference and are a part of the Plan as if set forth in full herein. All Plan Documents shall be filed with the Bankruptcy Court as part of the Plan Supplement not less than ten (10) days prior to the commencement of the Confirmation Hearing or at such other time as established by the Bankruptcy Court, provided, however, that any Plan Documents that are or may be subject to confidentiality provisions or otherwise contain confidential or propriety information may be filed in redacted form or under seal.

Holders of Claims and Equity Interests may obtain a copy of the Plan Documents (in redacted form, as applicable, and excluding any Plan Documents that are filed under seal), once filed, by a written request sent to the following address:

> Workflow Ballot Processing Center
> c/o Kurtzman Carson Consultants LLC
> 2335 Alaska Ave
> El Segundo, CA 90245-4808
> T: (866) 967-1786
> www.kccllc.net/workflow

## ARTICLE III.

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

Except as otherwise provided herein, for the purposes of organization, voting and all confirmation matters, all Claims and all Equity Interests in the Debtors will be classified as set forth in this Article III.

3.1 **Administrative Expense Claims and Tax Claims**.

As provided by section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims will not be classified under the Plan, and will instead be treated separately as unclassified Claims on the terms set forth in Article VI.

3.2 **Claims and Equity Interests**.

The Claims against and the Equity Interests in, with respect to and to the extent applicable for, each Debtor are classified under the Plan as follows:

(a)    Class 1 – Priority Non-Tax Claims

19

Class 1 shall consist of all Priority Non-Tax Claims.

(b)      Class 2 – First Lien Lender Claims

Class 2 shall consist of all First Lien Lender Claims.

(c)      Class 3 – Second Lien Lender Secured Claims

Class 3 shall consist of the Second Lien Lender Secured Claims.

(d)      Class 4 – Other Secured Claims

Class 4 shall consist of all Other Secured Claims.

(e)      Class 5A – General Unsecured Claims against the Non-Holdco Debtors

Class 5A shall consist of all General Unsecured Claims against the Non-Holdco Debtors, other than the PBGC Claims and the Second Lien Lender Deficiency Claims.

(f)      Class 5B – General Unsecured Claims against the Holdco Debtors

Class 5B shall consist of all General Unsecured Claims against the Holdco Debtors, other than the PBGC Claims and the Second Lien Lender Deficiency Claims.

(g)      Class 5C – Multi-Debtor General Unsecured Claims

Class 5C shall consist of all Multi-Debtor General Unsecured Claims against the Debtors.

(h)      Class 6 – Intercompany Claims

Class 6 shall consist of all Intercompany Claims.

(i)      Class 7 –WF Equity Interests

Class 7 shall consist of all WF Equity Interests.

3.3      **Separate Classification of Other Secured Claims**.

Although all Other Secured Claims against the Debtors have been placed in a single class for purposes of nomenclature, each such Other Secured Claim shall be treated as a separate class for purposes of voting on the Plan and receiving Plan Distributions.

## ARTICLE IV.

## IDENTIFICATION OF IMPAIRED CLASSES OF CLAIMS AND EQUITY INTERESTS

4.1    **Impaired and Unimpaired Classes of Claims**.

Priority Non-Tax Claims are not impaired under the Plan.  All other classes of Claims and Equity Interests are impaired under the Plan.

4.2    **Impairment Controversies**.

If a controversy arises as to whether any Claim or Equity Interest, or any class of Claims or Equity Interests, is impaired under the Plan, the Bankruptcy Court shall, after upon notice and motion, determine such controversy at the Confirmation Hearing.

4.3    **Classification Controversies**.

If a controversy arises as to whether any Claim or Equity Interest, or any class of Claims or Equity Interests, is properly classified under the Plan, the Bankruptcy Court shall, upon motion and notice, determine such controversy at the Confirmation Hearing.  If the Bankruptcy Court finds the classification of such Claim or Equity Interest, or any class of Claims or Equity Interests, is improper, such Claims or Equity Interests shall be reclassified and the ballots previously cast by the holders of such Claims or Equity Interests shall be counted in, and the Claim or Equity Interest shall receive the treatment prescribed in, the class in which the Bankruptcy Court determines such Claims or Equity Interests should have been classified, without the necessity of resoliciting votes on the Plan.

**ARTICLE V.**

**PROVISIONS FOR TREATMENT OF CLAIMS
AND EQUITY INTERESTS UNDER THE PLAN**

The classes of Claims against and Equity Interests in, with respect to and to the extent applicable for, each Debtor shall be treated under the Plan as follows:

5.1    **Class 1 – Priority Non-Tax Claims**.

(a)    Treatment.  Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of each Allowed Priority Non-Tax Claim, each Allowed Priority Non-Tax Claim shall be unimpaired under the Plan, and, pursuant to section 1124 of the Bankruptcy Code, all of the legal, equitable and contractual rights to which such Claim entitles the holder in respect of such Claim shall be fully reinstated and retained, and such Allowed Priority Non-Tax Claim (including any amounts to which such holder is entitled pursuant to section 1124(2) of the Bankruptcy Code) shall be paid in full in accordance with such reinstated rights on the Effective Date or may be assumed and paid by the Purchaser and may be paid at the Purchaser's election in the ordinary course of business.

(b)    Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 16.2 of the Plan, the distributions provided in this Section 5.1 to holders of Allowed Priority Non-Tax Claims (when distributed to holders of Allowed Priority Non-Tax Claims in accordance with the Plan) are in full settlement and release of each holder's Priority Non-Tax Claim and all other Claims of such holder against any and all of the Debtors, if any, of

such holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such Priority Non-Tax Claim was based.  Class 1 is unimpaired.

5.2 **Class 2 – First Lien Lender Claims**.

(a) Treatment.  The First Lien Lender Claims shall be deemed Allowed in full in the aggregate amount of $141,528,677 (the "First Lien Lender Principal Claim") plus any accrued but unpaid post-petition interest through the Effective Date at the rate payable as provided in the Cash Collateral Orders (the "First Lien Lender Interest Claim"), and will not be subject to avoidance, setoff, off-set, recoupment, subordination (whether contractual, equitable or otherwise), recharacterization, disallowance, disgorgement, impairment, defenses, Claims, Causes of Action, suits, counterclaims, cross-claims, reduction or any other challenges under any applicable law or regulation by any person or entity.  All payments received by the First Lien Secured Parties from the Debtors during the Chapter 11 Cases shall be retained by the First Lien Secured Parties and deemed interest payments or payments of reasonable professional fees, as applicable, and not reduction in principal.  In full and final satisfaction of each Allowed First Lien Lender Claim, each holder of an Allowed First Lien Lender Claim shall receive, on the Effective Date  (i) in respect of the First Lien Lender Principal Claim, (via an exchange)  its Pro Rata Share of the Newco First Lien Loan Notes and the Newco First Lien Administrative Agent, on behalf of each holder of an Allowed First Lien Lender Claim, shall retain the liens which secured the First Lien Lender Claims as of the Petition Date by means of the Newco First Lien Loan Notes being secured by first priority liens on the assets of the Purchaser in accordance with the provisions of the Newco First Lien Loan Documents; under the Newco First Lien Loan Notes, each holder of an Allowed First Lien Lender Claim shall receive deferred cash payments in the amounts and on the terms indicated on Schedule 1 attached to the Plan, and (ii) in respect of the First Lien Lender Interest Claim, cash in the amount of such interest, as provided in Section 6.2(f) of the Plan.

(b) Distribution.  All distributions on account of the First Lien Lender Interest Claim shall be made on the Effective Date to the First Lien Administrative Agent, and all other distributions on account of the First Lien Lender Claims shall be made on the Effective Date to the Newco First Lien Administrative Agent, or its designee, which shall serve as the designee for purposes of making distributions under the Plan to holders of First Lien Lender Claims.  The Debtors shall pay the Newco First Lien Administrative Agent and the Newco First Lien Administrative Agent its fees and expenses for making distributions under the Plan incurred through the Effective Date to holders of the First Lien Lender Claims.

(c) Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 16.2 of the Plan, the consideration provided in this Section 5.2 to the holders of First Lien Lender Claims are in full settlement and release of each holder's First Lien Lender Claim and all other Claims against any and all of the Debtors, if any, of such holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such First Lien Lender Claim was based.  Class 2 is impaired.

5.3 **Class 3 – Second Lien Lender Secured Claims**.

(a)    Treatment.  The Second Lien Lender Secured Claims shall be deemed Allowed in the aggregate amount of $170,000,000 and shall not be subject to avoidance, setoff, off-set, recoupment, subordination (whether contractual, equitable or otherwise), recharacterization, disallowance, disgorgement, impairment, defenses, Claims, Causes of Action, suits, counterclaims, cross-claims, reduction or any other challenges under any applicable law or regulation by any person or entity.  All payments received by the Second Lien Secured Parties as adequate protection from the Debtors during the Chapter 11 Cases shall be retained by the Second Lien Secured Parties and shall not be deemed a reduction in principal.  In full and final satisfaction of each Allowed Second Lien Secured Lender Claim, each holder of an Allowed Second Lien Lender Secured Claim shall receive (via an exchange) its Pro Rata Share of (i) the Newco Preferred Equity Interests, and (ii) the Newco Second Lien Loan Notes and the Second Lien Administrative Agent, on behalf of each holder of an Allowed Second Lien Secured Lender Claim, shall retain the liens which secured the Second Lien Lender Secured Claims as of the Petition Date by means of the Newco Second Lien Loan Notes being secured by second priority liens on the assets of the Purchaser in accordance with the provisions of the Newco Second Lien Loan Documents; under the Newco Second Lien Loan Notes, each holder of an Allowed Second Lien Lender Secured Claim shall receive deferred cash payments in the amounts and on the terms indicated on Schedule 2 attached to the Plan.

(b)    Distribution.  All distributions on account of the Second Lien Lender Secured Claims shall be made on the Effective Date to the Newco Second Lien Administrative Agent or its designee, which shall serve as the designee for purposes of making distributions under the Plan to holders of Second Lien Lender Secured Claims.  The Debtors shall pay the Newco Second Lien Administrative Agent its fees and expenses for making distributions under the Plan incurred through the Effective Date to holders of the Second Lien Lender Secured Claims.

(c)    Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 16.2 of the Plan, the consideration provided in this Section 5.3 to the holders of Second Lien Lender Secured Claims are in full settlement and release of each holder's Second Lien Lender Secured Claim against any and all of the Debtors, if any.  Class 3 is impaired.

5.4    **Class 4 – Other Secured Claims**.

(a)    Treatment.  Except to the extent that the holder agrees to less favorable treatment, each holder of an Allowed Other Secured Claim against any Debtor shall, at the sole option of the Purchaser and subject to such holder's realization of any rights of setoff, in full and complete satisfaction, settlement and release of and in exchange for such Allowed Claim, (i) retain its lien in such property, or the proceeds of such property, securing such Allowed Other Secured Claim and be paid by the Purchaser in the ordinary course of business in accordance with the terms existing between the Debtors and such holder with respect to such Allowed Other Secured Claim prior to the Petition Date; (ii) retain its lien in such property, or the proceeds of such property, securing such Allowed Other Secured Claim and receive deferred cash payments from the Purchaser totaling at least the amount of such Allowed Other Secured Claim, of a value, as of the Effective Date, of at least the value of such holder's interest in each Debtor's interest in such property, or (iii) be transferred the collateral securing such Claim, each in full and complete satisfaction of such Claim.

23

(b)     Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 16.2 of the Plan, the consideration provided in this Section 5.4 to the holders of Other Secured Claims are in full settlement and release of each holder's Other Secured Claim and all other Claims against any and all of the Debtors, if any, of such holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such Other Secured Claim was based.  Class 4 is impaired.

5.5     **Class 5A – General Unsecured Claims against Non-Holdco Debtors**.

(a)     Treatment.  Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of each such Allowed General Unsecured Claim against a Non-Holdco Debtor, each holder of an Allowed General Unsecured Claim against a Non-Holdco Debtor (other than those Claims classified in Class 5C) shall receive its Pro Rata Share of the Unsecured Claims Fund.

(b)     Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 16.2 of the Plan, the consideration provided in this Section 5.5 (and the payment or transfer of such consideration to the Unsecured Claim Fund) to the holders of General Unsecured Claims are in full settlement and release of each holder's General Unsecured Claim and all other Claims against any and all of the Debtors, if any, of such holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such General Unsecured Claim was based.  Class 5A is impaired.

5.6     **Class 5B– General Unsecured Claims against Holdco Debtors**.

Holders of Claims in Class 5B shall not receive or retain any property under the Plan on account of the General Unsecured Claims against Holdco Debtors.

5.7     **Class 5C– Multi-Debtor General Unsecured Claims**

(a)     Treatment.  Except to the extent that the holder agrees to less favorable treatment, in full and final satisfaction of each such Multi-Debtor General Unsecured Claim, each holder of an Allowed Multi-Debtor General Unsecured Claim shall receive its Pro Rata Share of the Unsecured Claims Fund; provided, however, that so long as the Committee affirmatively supports the Plan and does not object to or otherwise oppose the Plan, the holders of the Second Lien Lender Deficiency Claim shall be deemed to agree to accept the aggregate amount of $10 on account of all of their Class 5C Claims to be paid to the Second Lien Administrative Agent; provided further, however, that, with the consent of the Debtors, the Purchaser, Perseus, and the Second Lien Administrative Agent, the PBGC may agree to receive a different treatment on account of the PBGC Claims, which shall be in full and final satisfaction and settlement of such PBGC Claims.  By way of clarification, any such satisfaction and settlement shall provide for the release of all Claims and potential claims against any of the Debtors, the Purchaser, and their respective Related Parties (including, without limitation, any claims or potential claims relating to alleged control group or alter ego status) which are or were held by the PBGC pertaining to, arising from, or in connection with the Pension Plan or otherwise.

(b)     Full Settlement.  As more specifically set forth in, and without in any way limiting, Section 16.2 of the Plan, the consideration provided in this Section 5.7 (and the payment or transfer of such consideration to the Unsecured Claim Fund) to the holders of Multi-Debtor General Unsecured Claims are in full settlement and release of each holder's Multi-Debtor General Unsecured Claim and all other Claims against any and all of the Debtors, if any, of such holder directly or indirectly related to or arising out of the transactions, agreements or instruments upon which such Multi-Debtor General Unsecured Claim was based.  Class 5C is impaired.

5.8     **Class 6 – Intercompany Claims**.

All Intercompany Claims shall be cancelled as of the Effective Date, and holders thereof shall not receive a distribution under the Plan in respect of such Claims.

5.9     **Class 7 – WF Equity Interests**.

Each holder of a WF Equity Interest shall not receive or retain any Property under the Plan on account of such WF Equity Interest.  Upon the termination of the Plan Administrator in accordance with Section 9.7 of the Plan, all WF Equity Interests shall be deemed cancelled.

5.10     **Deemed Satisfaction of Secondary Liability Claims**.

All Secondary Liability Claims shall be allowed in the amount of zero dollars ($0.00) and deemed satisfied in full as a result of Plan Distributions made on the underlying Allowed Claim pursuant to Article V.  From and after the Effective Date, no Secondary Liability Claims shall be of further force or effect.

5.11     **Insurance Policies**.

Notwithstanding anything to the contrary in the Plan, all insurance agreements that are not assigned to and assumed by the Purchaser, and all obligations of the Debtors and the counterparties thereto shall be unaffected by the Plan and shall remain enforceable according to their terms and applicable law; provided, however, such agreements may be terminated at the discretion of the Debtors, Post-Effective Date Debtors, or the Plan Administrator.

## ARTICLE VI.

## PROVISIONS FOR TREATMENT
## OF UNCLASSIFIED CLAIMS UNDER THE PLAN

6.1     **Unclassified Claims**.

Administrative Expense Claims and Priority Tax Claims are treated in accordance with sections 1129(a)(9)(A) and 1129(a)(9)(C) of the Bankruptcy Code, respectively.  Administrative Expense Claims and Priority Tax Claims are not designated as classes of Claims for the purposes of the Plan or for the purposes of sections 1123, 1124, 1125, 1126 or 1129 of the Bankruptcy Code.

6.2   **Treatment of Administrative Expense Claims**.

All Administrative Expense Claims shall be treated as follows:

(a)   Time for Filing Administrative Expense Claims.

The holder of an Administrative Expense Claim, other than (i) a Fee Claim; (ii) a liability incurred and payable after the Petition Date in the ordinary course of business to customers, suppliers, vendors, contractors or employees by a Debtor (which is assumed by the Purchaser pursuant to section 6.2(e) of the Plan); (iii) a Section 503(b)(9) Claim; or (iv) an Administrative Expense Claim that has been Allowed on or before the Effective Date, must file with the Bankruptcy Court and serve on the Debtors, the Committee, and the U.S. Trustee, notice of such Administrative Expense Claim by the Administrative Expense Claim Bar Date for such Administrative Expense Claims that have accrued or are anticipated to accrue on or before March 7, 2011.  Any estimated Administrative Expense Claim that is filed on account of an anticipated Administrative Expense Claim will establish the maximum allowable amount of such Administrative Expense Claim.   Such notice must include at a minimum (A) the name of the Debtor(s) which are purported to be liable for the Claim, (B) the name of the holder of the Claim, (C) the amount of the Claim, and (D) the basis of the Claim (including any documentation evidencing or supporting such Claim).  **THE FAILURE TO FILE A NOTICE OF ADMINISTRATIVE EXPENSE CLAIM ON OR BEFORE THE ADMINISTRATIVE EXPENSE CLAIM BAR DATE AND THE FAILURE TO SERVE SUCH NOTICE TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED AND DISALLOWED WITHOUT FURTHER ORDER OF THE BANKRUPTCY COURT**.  **IF FOR ANY REASON ANY SUCH ADMINISTRATIVE EXPENSE CLAIM IS INCAPABLE OF BEING FOREVER BARRED AND DISALLOWED, THEN THE HOLDER OF SUCH CLAIM SHALL IN NO EVENT HAVE RECOURSE OF ANY KIND TO ANY PROPERTY DISTRIBUTED PURSUANT TO THE PLAN.**

(b)   Time for Filing Fee Claims.

Each Professional who holds or asserts a Fee Claim shall be required to file with the Bankruptcy Court, and serve on all parties required to receive notice, a Fee Application within twenty (20) days after the Effective Date or such other specific date as may be established by the Bankruptcy Court.  **THE FAILURE TO FILE TIMELY AND SERVE SUCH FEE APPLICATION SHALL RESULT IN THE FEE CLAIM BEING FOREVER BARRED**.

(c)   Time for Filing Section 503(b)(9) Claims.

In accordance with the Bar Date Order, the deadline for filing a Section 503(b)(9) Claim was December 8, 2010 at 5:00 p.m., Prevailing Pacific Time.  **THE FAILURE TO SUBMIT SUCH REQUEST BY THE BAR DATE SHALL RESULT IN THE SECTION 503(b)(9) CLAIM BEING DEEMED DISALLOWED AS AN ADMINISTRATIVE EXPENSE CLAIM**.  Such disallowance does not prevent such Claim from being Allowed as a Claim other than as an Administrative Expense Claim to the extent otherwise allowable.

(d)     Allowance of Administrative Expense Claims, Fee Claims and Section 503(b)(9) Claims.

An Administrative Expense Claim (other than a Fee Claim or Section 503(b)(9) Claim) with respect to which notice has been properly and timely filed and served pursuant to Section 6.2(a) of the Plan, or a Section 503(b)(9) Claim with respect to which a request for allowance has been properly filed and served pursuant to Section 6.2(c) of the Plan, shall become an Allowed Administrative Expense Claim if no objection is filed within thirty (30) days after the later of (i) the Effective Date, or (ii) the date of service of the applicable notice of Administrative Expense Claim or such later date as may be approved by the Bankruptcy Court on motion of a party in interest, without notice or a hearing.  If an objection is filed within such 30-day period (or any extension thereof), the Administrative Expense Claim shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order or by mutual agreement among the parties.  A Fee Claim in respect of which a Fee Application has been properly filed and served pursuant to Section 6.2(b) of the Plan shall become an Allowed Administrative Expense Claim only to the extent allowed by Final Order.

(e)     Payment of Allowed Administrative Expense Claims.

On the Distribution Date, all unpaid Administrative Expense Claims of the Debtors arising in the ordinary course of the Debtors' business to customers, suppliers, vendors, contractors or employees during the pendency of the Chapter 11 Cases and all Section 503(b)(9) Claims shall be assumed pursuant to the terms of the Asset Purchase Agreement and paid by the Purchaser and may be paid at the Purchaser's election in the ordinary course of business; provided that all other Administrative Expense Claims, including the Fee Claims, shall not be assumed by the Purchaser and will be paid by the Plan Administrator from the Administrative Expense Claim Reserve on the applicable Distribution Date; provided, further, however, that such treatment shall not provide a return to such holder having a present value as of the Effective Date in excess of such holder's Allowed Administrative Expense Claim;  provided, further, however, that all fees and expenses of counsel and other advisors to the First Lien Administrative Agent and the Second Lien Administrative Agent shall constitute Allowed Administrative Expense Claims and shall be paid by the Debtors without the necessity to file a proof of claim or file any application to receive any approval from the Bankruptcy Court.  For purposes of determining the amount of the Administrative Expense Claim Reserve, at least five (5) days prior to the Effective Date, each Professional who holds or asserts a Fee Claim shall be required to provide the Debtors and Purchaser with an estimate of the total amount of its Fee Claim.  Upon the Effective Date, none of the Debtors, the Post-Effective Date Debtors, or the Plan Administrator shall have any obligation or liability on account of any Administrative Expense Claims assumed by the Purchaser.  Upon the Effective Date, the Purchaser shall not have any obligation or liability on account of any Administrative Expense Claims other than the funding of the Administrative Expense Claims Reserve and the Administrative Expense Claims that are assumed by the Purchaser in accordance with the terms hereof and the Asset Purchase Agreement.

(f)     Payment of Amounts Accrued But Unpaid.

Notwithstanding anything else contained in the Plan, on the Effective Date, or as soon as practicable thereafter, any accrued but unpaid interest at the rate provided in the Cash Collateral Orders and reasonable professional fees to be paid to the First Lien Administrative Agent, and unpaid reasonable professional fees to be paid to the Second Lien Administrative Agent during the pendency of the Debtors' Chapter 11 Cases pursuant to the Cash Collateral Orders shall be paid in Cash by the Plan Administrator from the Administrative Expense Claims Reserve in accordance with the terms of the Cash Collateral Orders and without the necessity of First Lien Administrative Agent or Second Lien Administrative Agent being required to seek approval of such payment from the Bankruptcy Court.

6.3 **Treatment of Priority Tax Claims**.

(a) Unless otherwise agreed with a holder of an Allowed Priority Tax Claim, the Debtors, in their sole discretion, may choose whether Allowed Priority Tax Claims will be paid either: (1) in Cash, in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest from the Effective Date at a fixed annual rate equal to five percent (5%) and paid in regular installments of equal amount over a period not exceeding five (5) years from the Petition Date; or (2) in full in Cash on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim.  The Debtors reserve the right to prepay, without penalty, at any time under option (1) above. Priority Tax Claims may also be assumed and paid by Purchaser at Purchaser's election.

(b) The Confirmation Order shall, among other things, enjoin any holder of an Allowed Tax Claim from commencing or continuing any action or proceeding against any responsible person, officer or director of the Debtors that otherwise would be liable to such holder for payment of a Tax Claim so long as the Debtors are in compliance with Section 6.3 of the Plan.  So long as the holder of an Allowed Tax Claim is enjoined from commencing or continuing any action or proceeding against any responsible person, officer or director under the Plan or pursuant to the Confirmation Order, the statute of limitations for commencing or continuing any such action or proceeding shall be tolled.

## ARTICLE VII.

### ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY INTERESTS

7.1 **Classes Entitled to Vote**.

Only holders of Claims in the following classes are permitted to vote on the Plan: Class 2 (First Lien Lender Claims); Class 3 (Second Lien Lender Secured Claims); Class 4 (Other Secured Claims); Class 5A (General Unsecured Claims of Non-Holdco Debtors); and Class 5C (Multi-Debtor General Unsecured Claims).

7.2 **Class Acceptance Requirement**.

A class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such class that have voted on the Plan.

### 7.3   **Tabulation of Votes on a Non-Consolidated Basis**.

The Balloting Agent will tabulate all votes on the Plan on a non-consolidated basis by class and by Debtor.

### 7.4   **Separate Plan for Each Debtor**.

The Plan constitutes a joint chapter 11 plan of reorganization proposed with respect to each Debtor and, accordingly, the classifications set forth in Classes 1 through 7 shall be deemed to apply to each of the Debtors separately, as applicable.  For example, without limitation and for illustration purposes only, WF Capital is not a borrower or a guarantor on the First Lien Loan Documents or the Second Lien Loan Documents; therefore the WF Capital Plan does not contain a Class 2 or Class 3 as WF Capital has no creditors that would be classified in Class 2 or Class 3.  In the event that the Bankruptcy Court determines that the Plan is not confirmable with respect to any particular Debtor, the Debtors, with the consent of the Purchaser, Perseus and the Second Lien Administrative Agent, which consent will not be unreasonably withheld, reserve the right to sever such Debtor from the Plan and proceed to confirm and consummate the Plan with respect to all other Debtors.

### 7.5   **Cramdown**.

If all applicable requirements for confirmation of the Plan are met as set forth in section 1129(a) of the Bankruptcy Code, except subsection (8) thereof, the Plan shall be treated as a request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code, notwithstanding the failure to satisfy the requirements of section 1129(a)(8), on the basis that the Plan is fair and equitable and does not discriminate unfairly with respect to each class of Claims that is impaired under, and has not accepted, the Plan.

## ARTICLE VIII.

## MEANS FOR IMPLEMENTATION OF THE PLAN

### 8.1   **Sale of Assets, Consummation of Sale Transaction and Distribution of New Notes and Newco Preferred Equity Interests**

On the Effective Date, the Debtors shall consummate the Sale Transaction and, among other things, the Purchased Assets including the Assigned Contracts, shall be transferred to the Purchaser free and clear of all liens, Claims, interests and encumbrances, other than Permitted Liens (as defined and provided in the Asset Purchase Agreement), pursuant to the terms of the Asset Purchase Agreement and the Confirmation Order.  In consideration of the Purchased Assets, the Purchaser shall execute and deliver the New Notes and the Newco Preferred Equity Interests to the Debtors, and the Debtors shall distribute the Newco First Lien Loan Notes to the Newco First Lien Administrative Agent in satisfaction of the First Lien Lender Claims, and the Debtors shall distribute the Newco Second Lien Loan Notes and the Newco

Preferred Equity Interests to the Newco Second Lien Administrative Agent in satisfaction of the Second Lien Lender Secured Claims.  The New Notes shall be secured by the assets of the Purchaser, in accordance with the provisions of the Newco First Lien Loan Documents and the Newco Second Lien Loan Documents.  The Newco Intercreditor Agreement shall govern the relative priorities and rights between the holders of the Newco First Lien Loan Notes and the Newco Second Lien Loan Notes.  On the Effective Date, upon the consummation of the Sale Transaction, the Newco First Lien Loan Notes, the Newco Second Lien Loan Notes, the Newco Preferred Equity Interests, the Newco First Lien Loan Documents, the Newco Second Lien Loan Documents and the Newco Intercreditor Agreement shall each be executed and delivered by the Purchaser and shall be in full force and effect according to its terms.

8.2    **Certain Transactions On the Effective Date**.

The Debtors shall, on the Effective Date (i) consummate the Sale Transaction; (ii) distribute the New Notes and the Newco Preferred Equity Interests; (iii) implement all settlements and compromises as set forth in or contemplated by the Plan; (iv) amend and restate their constituent documents in accordance with the terms of the Plan; and (v) execute, deliver, and perform all obligations under the Plan Documents.

8.3    **Appointment of Plan Administrator.**

On the Effective Date, the Plan Administrator shall be appointed and shall act in accordance with the provisions of the Plan, including, without limitation, the provisions of Article IX of the Plan.  On the Effective Date, the Plan Funds shall be established from the Closing Consideration Amount and shall be under the control of the Plan Administrator in accordance with the terms of the Plan.

8.4    **Unsecured Claims Fund.**

On the Effective Date, the Unsecured Claims Fund will be established in the amount of $2 million ($2,000,000) from the Plan Funds.  The Plan Administrator will administer the Unsecured Claims Fund, including the Avoidance Action Recovery Amount, in accordance with the provisions of the Plan and the Confirmation Order.  The Unsecured Claims Fund will be the sole source of funding of distributions to be made to the holders of Allowed Claims in Class 5A and 5C.

8.5    **Cancellation of Notes and Equity Interests**

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing indebtedness of the Debtors and Equity Interests shall be cancelled, and the obligations of the Debtors thereunder or in any way related thereto shall be discharged.  On the Effective Date, The Relizon Company's participation in the First Lien Credit Facility shall be deemed to be retired and satisfied in full.

8.6    **Corporate Action**.

(a)    The entry of the Confirmation Order shall constitute authorization for the Debtors or the Plan Administrator (as the case may be) to take or cause to be taken all corporate

actions necessary or appropriate to implement all provisions of, and to consummate, the Plan prior to, on and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act or action under any applicable law, order, rule or regulation, including without limitation, any action required by the stockholders or directors of the Debtors, including, among other things, (i) the adoption or amendment of any organizational documents; (ii) the modification, termination or cancellation of any outstanding instrument, document or agreement as required by the Plan; (iii) the modification, termination or cancellation of any Equity Interest of the Debtors, as required by the Plan; (iv) the appointment of the Plan Administrator; (v) the distribution of the New Notes and the Newco Preferred Equity Interests; (vi) all transfers of Assets that are to occur pursuant to the Plan; (vii) the making of all Plan Distributions; (viii) the implementation of all settlements and compromises as set forth in or contemplated by the Plan; (ix) performance and consummation of the Asset Purchase Agreement and consummation of the Sale Transaction; and (x) executing and/or entering into any and all transactions, contracts, or arrangements permitted by applicable law, order, rule or regulation.

(b)     The officers of the Debtors or the Post-Effective Date Debtors (as the case may be) are authorized and directed to do all things and to execute and deliver all agreements, documents, instruments, notices and certificates as are contemplated by the Plan and to take all necessary action required in connection therewith, in the name of and on behalf of the Debtors.

(c)     The constituent documents of all of the Post-Effective Date Debtors shall, as of the Effective Date, be amended to prohibit the issuance of non-voting equity securities by such Debtor as required by section 1123(a)(6) of the Bankruptcy Code.  Following the Effective Date, the Post-Effective Date Debtors shall be entitled to issue non-voting securities that are not equity securities, in their sole discretion, and shall be entitled to issue non-voting equity securities if the constituent documents are properly amended in the ordinary course after the Effective Date.

8.7     **Continued Corporate Existence of the Debtors**.

Each of the Debtors shall continue to exist after the Effective Date as a separate entity, with all the powers available to such legal entity, in accordance with applicable law and pursuant to their constituent documents, as modified by the Plan.  On or after the Effective Date, the Post-Effective Date Debtors may, within the Plan Administrator's sole and exclusive discretion, take such action as permitted by applicable law, their constituent documents, and the Plan Documents, as they determine is reasonable and appropriate, including (a) causing any or all of the Post-Effective Date Debtors to be dissolved or merged, combined, consolidated or converted into one or more of the other Post-Effective Date Debtors or other legal entities; (b) liquidating and dissolving any of the Post-Effective Date Debtors; and (c) changing the legal name of any of the Post-Effective Date Debtors.  New Equity Interests in any such Post-Effective Date Debtors, on terms determined by the Plan Administrator, shall be deemed to have been issued, as of the Effective Date, by such Post-Effective Date Debtors to its immediate parent as of the Petition Date or the Plan Administrator, as necessary and as applicable.

Upon the filing with the Bankruptcy Court, by the Plan Administrator, of a request to close the Bankruptcy Cases and upon the entry of a final decree, each of the Debtors

will be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Debtors or payments to be made in connection therewith; provided, however, that the Plan Administrator may file on behalf of each Debtor, with the office of the applicable secretary of state, a certificate of dissolution. From and after the Effective Date, each of the Debtors shall not be required to file any document, or take any other action, to withdraw its business operation from any state in which it was previously conducting its business operations. On the date the Debtors are dissolved in accordance with the Plan, the common stock certificates and other instruments evidencing WF Equity Interests will be deemed cancelled without further act or action under any applicable agreement, law, regulation, order or rule, and the Equity Interests in the Debtors evidenced thereby will be extinguished.

8.8     **Reserved.**

8.9     **Revesting of Assets**.

Except as otherwise provided in the Plan, the Plan Documents, or in any agreements contemplated under the Plan, on the Effective Date all Excluded Assets (but no other assets) will vest in the Post-Effective Date Debtors free and clear of all Claims, liens, charges, encumbrances, or other interests. However, property that the Post-Effective Date Debtors hold will be held in trust solely for the benefit of entities that are entitled under the Plan to receive that property or the net proceeds from the liquidation of that property.

8.10    **Assumption of Priority Claims by Purchaser**.

On the Effective Date, the Purchaser shall assume the obligations to pay Priority Tax Claims and Priority Non-Tax Claims listed on the Assumed Priority Claim Schedule. Upon the Effective Date, the Purchaser shall be solely liable for the payment of all such Priority Tax Claims and Priority Non-Tax Claims listed on the Assumed Priority Claim Schedule in accordance with the terms of the Plan. Upon the Effective Date, none of the Debtors, the Post-Effective Date Debtors, or the Plan Administrator shall have any obligation or liability on account of any such assumed Priority Tax Claims and Priority Non-Tax Claims.

8.11    **Release of Liens**.

Except as otherwise provided in the Plan (including, without limitation, the retention of liens described in Sections 5.2(a) and 5.3(a) of the Plan) or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Plan Distributions made pursuant to the Plan, all interests, mortgages, deeds of trust, liens or other security interests against the property of any Estate will be fully released.

Except as otherwise provided in the Asset Purchase Agreement, on the Effective Date all Purchased Assets shall be transferred to the Purchaser free and clear of all Claims or encumbrances pursuant to sections 105, 363, 365, 1123 and 1141(c) of the Bankruptcy Code.

8.12   **Substantive Consolidation**.

In the event that at or before the Confirmation Hearing, the Bankruptcy Court concludes, pursuant to Bankruptcy Code sections 105(a) and 1123(a)(5)(C), that substantive consolidation of one or more of the Debtors with one or more of the other Debtors is appropriate, and the Debtors, with the consent of Purchaser and the Second Lien Administrative Agent, which consent shall not unreasonably be withheld,  reserve the right to request such consolidation, then, unless otherwise ordered by the Bankruptcy Court, all property, rights, and Claims of the substantively consolidated Debtors and their respective Estates, and all Claims against the substantively consolidated Debtors and their respective Estates shall be deemed pooled on the Effective Date for purposes of allowance, treatment, and Plan Distributions under the Plan and multiple proofs of Claim on account of any Claim upon which any of the substantively consolidated Debtors are co-obligors or guarantors or otherwise may be contingently liable shall, without necessity of objection by any party, be deemed to constitute a single proof of Claim entitled to a single satisfaction from the substantively consolidated Estates in accordance with the terms of the Plan; the duplicative Claims being otherwise deemed disallowed; provided, however, that the Purchaser or Second Lien Administrative Agent may withhold their consent in their sole discretion if any such substantive consolidation negatively affects the treatment provided to the First Lien Secured Parties, the Second Lien Secured Parties or Purchaser.  No request for substantive consolidation has been made as of the date hereof, and no request for substantive consolidation that is made shall be of any effect unless and until it is ordered by the Bankruptcy Court.

8.13   **Initial Boards of Directors and Officers**.

On the Effective Date, the charters and by-laws of each Debtor shall be deemed amended, to the extent necessary, to require only one director and only one officer, who shall be the same person.  Such person shall be the Plan Administrator, or its designee.

8.14   **Remittance of Excess Plan Funds to the Purchaser.**

After the discharge by the Plan Administrator of all of its duties under the Plan, all Plan Funds, if any, remaining after the payment of all parties by the Plan Administrator in accordance with terms of the Plan, and after payment by the Plan Administrator of all of its expenses as provided in the Plan, will be remitted and absolutely assigned by the Plan Administrator to the Purchaser.

8.15   **Exemption from Securities Laws**.

The issuance of the New Notes and the Newco Preferred Equity Interests in exchange for claims or interests will be, to the maximum extent provided in section 1145 of the Bankruptcy Code and under other applicable nonbankruptcy law, exempt from registration under any applicable federal or state securities laws, including under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder, and the Debtors believe the Purchaser will not be subject to the reporting requirements of the Securities Exchange Act of 1934.  The New Notes and the Newco Preferred Equity Interests issued in connection with the Plan in reliance on section 1145 of the Bankruptcy Code may be freely transferred, subject to

any restrictions contained in the governing documents for each instrument, unless the recipients are underwriters as provided in section 1145 of the Bankruptcy Code.  Nothing in the Plan is intended to preclude the Securities and Exchange Commission from performing its statutory duties regarding any person or entity in any forum with proper jurisdiction.

## ARTICLE IX.

## THE PLAN ADMINISTRATOR

9.1    **Generally**.

The powers, authority, responsibilities and duties of the Plan Administrator are set forth herein.

9.2    **Appointment of the Plan Administrator**.

On the Effective Date the Plan Administrator will be appointed.  The Plan Administrator shall be selected by the Committee so long as the Committee does not file an objection or otherwise oppose the Plan.  Should the Committee file an objection or otherwise oppose the Plan, the Debtors shall select the Plan Administrator.  The Plan Administrator shall have all powers, rights, duties and protections afforded the Plan Administrator under the Plan.  All payments required or permitted to be made by the Plan Administrator or the Post-Effective Date Debtors under the Plan, including, without limitation, post-Effective Date operating expenses and the Plan Administrator Reserve, shall be made from the Plan Funds.  The Plan Administrator shall use the Plan Administrator Reserve to fund the post-Effective Date operating and wind-down expenses of the Debtors, including to pay its professional fees.

9.3    **Funding Expenses of the Plan Administrator**.

On and after the Effective Date, the Plan Funds shall be under the direction and control of the Plan Administrator.  The Plan Administrator shall disburse the Plan Funds, without further application to or order of the Bankruptcy Court, to (i) satisfy the obligations of the Plan Administrator and the Post-Effective Date Debtors after the Effective Date incurred in accordance with the provisions of the Plan and the Confirmation Order, (ii) pay the expenses from the Plan Administrator Reserve, and (iii) make the Plan Distributions.  Professional fees and other wind-down expenses incurred by the Plan Administrator from and after the Effective Date in connection with the consummation and implementation of the Plan shall be paid in the ordinary course of business by the Plan Administrator from the Plan Administrator Reserve, without further application to or order of the Bankruptcy Court.  Any dispute regarding compensation shall be resolved by agreement of the parties or if the parties are unable to agree, as determined by the Bankruptcy Court.  The Plan Administrator Reserve will be the sole source of funding of distributions to pay the expenses of the Plan Administrator and any professionals retained by the Plan Administrator; provided, however, that the Plan Administrator is authorized (but not required) to retain counsel to assert Actionable Avoidance Actions on a contingency basis, which counsel may be paid from amounts recovered on account of such Actionable Avoidance Actions.

9.4     **Service and Removal**.

          If the Plan Administrator resigns or is terminated, the U.S. Trustee shall select a new Plan Administrator, subject to Bankruptcy Court approval.

9.5     **Authority**.

          The Plan Administrator shall have the authority and right on behalf of the Post-Effective Date Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

          (a)     control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors;

          (b)     receive, hold and disburse the Plan Funds in accordance with the provisions of the Plan;

          (c)     make Plan Distributions to holders of Allowed Claims in accordance with the Plan;

          (d)     administer the Excluded Assets;

          (e)     take such actions as may be necessary or appropriate to pursue and recover on the Actionable Avoidance Actions including filing appropriate actions or proceedings in the Bankruptcy Court or otherwise in connection therewith and settling any such Actionable Avoidance Actions with or without litigation;

          (f)     exercise its reasonable business judgment to direct and control the wind down, liquidation and/or abandoning of the assets of the Post-Effective Date Debtors;

          (g)     retain and pay professionals to assist in performing its duties under the Plan;

          (h)     maintain the books and records and accounts of the Post-Effective Date Debtors;

          (i)     invest Cash constituting the Plan Funds;

          (j)     incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator;

          (k)     administer each Post-Effective Date Debtor's tax obligations, including (a) filing and paying tax returns, (b) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of such Debtor ending after the Petition Date through the liquidation of such Debtor as determined under applicable tax laws and (c) representing the interest and account of

35

each Debtor or its estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(l)    take all action necessary to liquidate and dissolve each of the Post-Effective Date Debtors;

(m)    prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Post-Effective Date Debtors that are required by any Governmental Unit or applicable law;

(n)    cooperate with The Workflow Management Benefit Plan Administrative Committee, or any successor thereto, pertaining to the Pension Plan, provided that neither the Purchaser, the Plan Administrator nor the Post-Effective Date Debtors will have any liability or responsibility to make payments or contributions to the Pension Plan or on account of the PBGC Claims, other than as provided in Class 5C of the Plan; and

(o)    remit any remaining Plan Funds to the Purchaser, in accordance with the provisions of Section 8.14 of the Plan.

9.6    **Plan Distribution Withholding**.

The Plan Administrator may withhold from amounts distributable to any Person any and all amounts, determined in the Plan Administrator's sole discretion, to be required by the Plan, any law, regulation, rule, ruling, directive or other governmental requirement.

9.7    **Termination of the Plan Administrator.**

The duties, responsibilities and powers of the Plan Administrator will terminate upon (i) the completion of its duties under the Plan, (ii) the completion of the administration of, and distributions on account of, all Claims under the Plan, and (iii) the closing of the Chapter 11 Cases.

9.8    **Plan Administrator Post-Effective Date**.

**Except as otherwise provided in this Section 9.8, the Plan Administrator, together with its officers, directors, employees, agents, and representatives, are exculpated pursuant to the Plan by all Persons, Entities, holders of Claims and Equity Interests, and all other parties in interest, from any and all Causes of Action arising out of the discharge by the Plan Administrator of the powers and duties conferred upon the Plan Administrator by the Plan, any Final Order of the Bankruptcy Court entered pursuant to or in the furtherance of the Plan, or applicable law, except solely for actions or omissions arising out of the Plan Administrator's willful misconduct or gross negligence. No holder of a Claim or an Equity Interest, or representative thereof, shall have or pursue any Cause of Action (a) against the Plan Administrator or its officers, directors, employees, agents, and representatives for making Plan Distributions in accordance with the Plan, or (b) against any holder of a Claim for receiving or retaining Plan Distributions as provided for by the Plan. Nothing contained in this Section 9.8 shall preclude or impair any holder of an Allowed Claim or Allowed Equity Interest from bringing an action in the Bankruptcy**

**Court against any Debtor or Post-Effective Date Debtor to compel the making of Plan Distributions contemplated by the Plan on account of such Claim or Equity Interest**.

## ARTICLE X.

## PLAN DISTRIBUTION PROVISIONS

10.1   **Sources of Cash for Plan Distributions**.

All Cash necessary for the Plan Administrator to make payments and Plan Distributions shall be obtained from the Plan Funds.

10.2   **Investment of Funds Held by the Plan Administrator; Tax Reporting by the Plan Administrator**.

The Plan Administrator may, but shall not be required to, invest any funds held by the Plan Administrator pending the distribution of such funds pursuant to the Plan in investments that are exempt from federal, state, and local taxes.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Plan Administrator of a private letter ruling if the Plan Administrator so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Plan Administrator), the Plan Administrator may (a) treat the funds and other property held by it as held in a single trust for federal income tax purposes in accordance with the trust provisions of the Internal Revenue Code (sections 641 et seq.), and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

10.3   **Timing of Plan Distributions**.

Except as otherwise provided in the Plan, without in any way limiting Article XI of the Plan, payments and distributions in respect of Allowed Claims will be made by the Plan Administrator on the relevant Distribution Date, provided, however, that (i) payments and distributions in respect of the Allowed First Lien Lender Claims will be made on the Effective Date in accordance with Section 5.2 of the Plan, (ii) payments and distributions in respect of the Allowed Second Lien Lender Secured Claims will be made on the Effective Date in accordance with Section 5.3 of the Plan, and (iii) payments and distributions in respect of the Allowed Class 5A and 5C Claims will be made on the Unsecured Claims Initial Distribution Date or a Periodic Distribution Date in accordance with Section 10.5 of the Plan.

For federal income tax purposes, except to the extent a Plan Distribution is made in connection with reinstatement of an obligation pursuant to section 1124 of the Bankruptcy Code, a Plan Distribution will be allocated first to the principal amount of a Claim and then, to the extent the Plan Distribution exceeds the principal amount of the Claim, to the portion of the Claim representing accrued but unpaid interest.

10.4   **Unsecured Claims Fund**.

(a)   Estimation.

37

For purposes of effectuating the reserve provisions of the Plan and the allocations and distributions to holders of Allowed Class 5A and 5C Claims, the Bankruptcy Court will, on or prior to the Unsecured Claims Initial Distribution Date, pursuant to Section 11.6 of the Plan, fix or liquidate the amount of any Contested Class 5A or Class 5C Claim, in which event the amount so fixed will be deemed the Allowed amount of such Claim for purposes of the Plan or, in lieu thereof, the Court will determine the Maximum Allowable Amount. The Bankruptcy Court's entry of an estimation order may limit the distribution to be made on individual Contested Claims, regardless of the amount finally Allowed on account of such Contested Claims, and no holder shall have recourse against the Debtors or the Plan Administrator as such holder's sole recovery shall be from the Unsecured Claims Cash Amount.

(b)    Creation of Unsecured Claims Fund.

Upon the occurrence of the Effective Date, the Plan Administrator shall deposit the Unsecured Claims Cash Amount in the Unsecured Claims Fund. The Avoidance Action Recovery Amount will be deposited in the Unsecured Claims Fund as and when received. The Unsecured Claims Fund and all amounts therein (including any interest actually earned thereon) shall be maintained by the Plan Administrator for distribution in accordance with Section 10.5 of the Plan to holders of Allowed Class 5A and Class 5C Claims.

10.5    **Distributions After Allowance of Contested Class 5A and Class 5C Claims**.

Distributions to each holder of a Contested Class 5A and Class 5C Claim, to the extent that such General Unsecured Claim ultimately becomes an Allowed General Unsecured Claim, will be made in accordance with the provisions of the Plan. From and after the Unsecured Claims Initial Distribution Date, as soon as practicable after the date that the order or judgment of the Court allowing any Contested General Unsecured Claim becomes a Final Order, the Plan Administrator will distribute to the holder of such Allowed General Unsecured Claim its Pro Rata Share of the Unsecured Claims Fund, based on the Maximum Allowable Amount of all the then Contested Class 5A or Class 5C Claims, on the next Periodic Distribution Date that is at least fifteen (15) days after the date of such Final Order. All amounts actually earned in respect of the Unsecured Claims Cash Amount (including all interest) shall be for the benefit of holders of Allowed General Unsecured Claims.

10.6    **Distributions After Disallowance of Contested Class 5A or Class 5C Claims**.

Holders of Allowed General Unsecured Claims that receive an initial distribution after allowance of such holder's General Unsecured Claim as set forth in Section 10.5 of the Plan, may receive subsequent distributions if and to the extent that other Class 5A or Class 5C Claims are disallowed or expunged, as follows: on a Periodic Distribution Date, each holder of an Allowed Class 5A or Class 5C Claim that has previously received any distributions pursuant to Section 10.5 of the Plan, shall receive a distribution in an amount equal to the difference, if any, between such holder's Pro Rata Share of the Unsecured Claims Fund and the aggregate payments previously paid to such holder under Section 10.5 of the Plan (excluding interest) and any interest actually earned thereon, (except for a final distribution after all Contested Class 5A or Class 5C Claims are either Allowed or expunged) until all Contested Class 5A or Class 5C Claims have been Allowed or expunged, in whole or part, and no additional distribution will be

38

made prior thereto.  The Plan Administrator may, in their discretion, make each Periodic
Distribution Date more frequent than every month.  If after all Contested Claims are resolved and
all distributions are made in accordance with Section 10.5 of the Plan, at least $5,000 remains in
the Unsecured Claims Fund, each holder of an Allowed General Unsecured Claim shall receive
its Pro Rata Share of the remaining Cash.  If less than $5,000 remains, such amount shall be
returned to the Purchaser.

10.7     **Address for Delivery of Plan Distributions/Unclaimed Distributions**.

Subject to Bankruptcy Rule 9010, any Plan Distribution or delivery to a holder of
an Allowed Claim shall be made at the address of such holder as set forth (a) in the Schedules,
(b) on the proof of Claim filed by such holder, (c) in any notice of assignment filed with the
Bankruptcy Court with respect to such Claim pursuant to Bankruptcy Rule 3001(e) or (d) in any
notice served by such holder giving details of a change of address.  If any Plan Distribution is
returned to the Plan Administrator as undeliverable, no Plan Distributions shall be made to such
holder unless the Plan Administrator is notified of such holder's then current address within
ninety (90) days after such Plan Distribution was returned.  After such date, if such notice was
not provided, a holder shall have forfeited its right to such Plan Distribution, and the
undeliverable Plan Distributions shall be returned to the Plan Administrator.  Supplemental Plan
Distributions may be made from time to time at the discretion of the Plan Administrator.

Notwithstanding any provisions in the Plan to the contrary, the First Lien Loan
Documents and the Second Lien Loan Documents will continue in effect only to the extent
necessary to allow Plan Distributions on account of the Allowed First Lien Lender Claims and
the Allowed Second Lien Lender Claims.

10.8     **Time Bar to Cash Payments**.

Checks issued in respect of Allowed Claims shall be null and void if not
negotiated within one hundred and eighty (180) days after the date of issuance thereof.  Requests
for reissuance of any voided check shall be made directly to the Plan Administrator by the holder
of the Allowed Claim to whom such check was originally issued.  Any Claim in respect of such a
voided check shall be made within one hundred and eighty (180) days after the date of issuance
of such check. If no request is made as provided in the preceding sentence, any Claims in respect
of such void check shall be discharged and forever barred and such unclaimed Plan Distribution
shall revert to the Post-Effective Date Debtors, provided that an unclaimed Plan Distribution of a
holder of a Class 5A claim shall remain part of the Unsecured Claims Fund to be treated in
accordance with the provisions of the Plan.

10.9     **Manner of Payment under the Plan**.

Unless the Person receiving a Plan Distribution agrees otherwise, any Plan
Distribution to be made in Cash under the Plan shall be made, at the election of the Plan
Administrator, by check drawn on a domestic bank or by wire transfer from a domestic bank.
Cash payments to foreign creditors may, in addition to the foregoing, be made, at the option of
the Plan Administrator, in such funds and by such means as are necessary or customary in a
particular foreign jurisdiction.  Notwithstanding the foregoing sentence or any other provision of

the Plan to the contrary, Cash paid on account of First Lien Lender Claims or otherwise available to the First Lien Administrative Agent or the Second Lien Administrative Agent will be made on the Effective Date by wire transfer to the First Lien Administrative Agent or the Second Lien Administrative Agent, as applicable.

10.10  **Minimum and Fractional Distributions**.

Any other provision of the Plan notwithstanding, the Plan Administrator will not be required to make distributions or payments on account of any Allowed Claim of less than $50 (whether Cash or otherwise), and will likewise not be required to make distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment will be rounded to the nearest whole dollar (with any amount equal to or less than one-half dollar to be rounded down).

10.11  **Surrender and Cancellation of Instruments**.

Unless otherwise provided in the Plan, as a condition to receiving any Plan Distribution, on or before the Distribution Date, the holder of an Allowed Claim evidenced by a certificate, instrument or note, other than any such certificate, instrument or note that is being reinstated or being left unimpaired under the Plan, shall (i) surrender such certificate, instrument or note representing such Claim, and (ii) execute and deliver such other documents as may be necessary to effectuate the Plan in the sole determination of the Plan Administrator.  Such certificate, instrument or note, shall thereafter be cancelled and extinguished.  The Plan Administrator shall have the right to withhold any Plan Distribution to be made to or on behalf of any holder of such Claims unless and until (a) such certificates, instruments or notes are surrendered, or (b) any relevant holder provides to the Plan Administrator an affidavit of loss or such other documents as may be required by the Plan Administrator together with an appropriate indemnity in the customary form.  Any such holder who fails to surrender such certificates, instruments or notes, or otherwise fails to deliver an affidavit of loss and indemnity prior to the second anniversary of the Effective Date, shall be deemed to have forfeited its Claims and shall not participate in any Plan Distribution.  All property in respect of such forfeited Claims shall revert to the Post-Effective Date Debtors.

## ARTICLE XI.

## PROCEDURES FOR RESOLVING
## AND TREATING CONTESTED CLAIMS

11.1  **Prosecution of Contested Claims**.

After the Effective Date, only the Plan Administrator may object to the allowance of Contested Claims, and Purchaser shall reasonably cooperate with the Plan Administrator with respect to any such objections to the allowance of Contested Claims; provided, however, that Purchaser may elect to assume responsibility to object to and settle (in consultation with the Plan Administrator and on notice and a hearing) any Contested Claim if Purchaser believes in good faith that the prosecution and/or resolution of any Contested Claim may have a material impact on Purchaser's business.  All objections that are filed and prosecuted as provided herein shall be

litigated to Final Order or compromised and settled in accordance with Section 11.3 of the Plan. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the holder of a Claim if the Plan Administrator effects service in any of the following manners: (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (b) to the extent counsel for a holder of a Claim is unknown, by first class mail, postage prepaid, on the signatory on the proof of Claim or other representative identified on the proof of Claim or any attachment thereto; or (c) by first class mail, postage prepaid, on any counsel that has appeared on behalf of any holder of a Claim in the Chapter 11 Cases.

### 11.2    **Objection Deadline**.

As soon as practicable, but in no event later than one hundred and eighty (180) days after the Effective Date (subject to being extended by the order of the Bankruptcy Court upon motion of the Plan Administrator without notice or a hearing), objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made.

### 11.3    **Claims Settlement**.

Notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Plan Administrator shall have authority to settle, compromise and pay, as applicable, in accordance with the Plan all Claims and Causes of Action including any Actionable Avoidance Actions without further review or approval of the Bankruptcy Court.

### 11.4    **Entitlement to Plan Distributions Upon Allowance**.

Notwithstanding any other provision hereof, and subject to Section 11.3 of the Plan, if any portion of a Claim is a Contested Claim, no Plan Distribution provided hereunder shall be made on account of such Claim unless and until such Claim becomes an Allowed Claim that is not a Contested Claim, subject to the setoff rights as provided in Section 16.13 of the Plan. When a Claim that is not an Allowed Claim as of the Effective Date becomes an Allowed Claim the holder of such Allowed Claim shall thereupon become entitled to receive the Plan Distributions in respect of such Claim the same as though such Claim had been an Allowed Claim on the Effective Date.

### 11.5    **Contested Claims Reserve**.

The Plan Administrator may establish a Contested Claims Reserve in a segregated account for the purpose of effectuating Plan Distributions to the holders of Contested Claims pending the allowance or disallowance of such Claims in accordance with the Plan.

### 11.6    **Estimation of Claims**.

The Debtors (prior to the Effective Date) or the Plan Administrator (subsequent to the Effective Date) may at any time request that the Bankruptcy Court estimate any contingent, unliquidated or Contested Claim pursuant to section 502(c) of the Bankruptcy Code, regardless

of whether the Debtor or the Plan Administrator previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any Claim, the amount so estimated shall constitute (a) the Allowed amount of such Claim, which shall be classified as a General Unsecured Claim; (b) a maximum limitation on such Claim; or (c) in the event such Claim is estimated in connection with the estimation of other Claims, a maximum limitation on the aggregate amount of Allowed Claims on account of Claims so estimated.  In the event that the Bankruptcy Court estimates any unliquidated or Contested Claim, the amount so estimated shall constitute (a) the Allowed amount of such Contested Claim; (b) a maximum limitation on such Contested Claim; or (c) in the event such Contested Claim is estimated in connection with the estimation of other Contested Claims within the same Class, a maximum limitation on the aggregate amount of Allowed Claims on account of such Contested Claims so estimated.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, or on more than one such Claim within a Class of Claims, as applicable, the Debtors or the Plan Administrator may pursue supplementary proceedings to object to the allowance of such Claims.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or otherwise resolved by any mechanism approved by the Bankruptcy Court including the provisions in the Plan, including section 11.3 of the Plan.  For the avoidance of doubt, Section 11.6 of the Plan shall not apply to the First Lien Lender Claims, the Second Lien Lender Claims, or to any amounts payable under the Plan to the First Lien Lenders, the First Lien Administrative Agent, the Second Lien Lenders, or the Second Lien Administrative Agent.

11.7    **No Recourse Against the Debtors, the Purchaser or the Post-Effective Date Debtors**.

Any holder of a Contested Claim that ultimately becomes an Allowed Claim shall be entitled to receive its applicable Plan Distribution under the Plan solely from any Contested Claim Reserve established on account of such Contested Claims.  In no event shall any holder of a Contested Claim have any recourse with respect to Plan Distributions made, or to be made, under the Plan to holders of such Claims, to any Debtor, the Purchaser or the Post-Effective Date Debtors on account of such Contested Claim, regardless of whether such Contested Claim shall ultimately become an Allowed Claim, and regardless of whether sufficient Cash or other property remains available for distribution in the Contested Claim Reserve established on account of such Contested Claims at the time such Claim becomes entitled to receive a Plan Distribution under the Plan.

# ARTICLE XII.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 12.1    <u>Assumption and Rejection of Executory Contracts and Unexpired Leases</u>.

(a)    The Assigned Contracts shall be assumed and assigned to the Purchaser pursuant to the provisions of section 365 of the Bankruptcy Code effective as of and subject to the occurrence of the Effective Date, unless another date is specified in the Plan. "Assigned Contracts" means all executory contracts and unexpired leases of the Debtors listed on schedule 2.2(f) of the Seller's disclosure schedules to the Asset Purchase Agreement, and a list of such contracts and leases will be contained in the Plan Supplement, except for the Excluded Contracts and Retained Contracts. "Retained Contracts" means all contracts listed on schedule 2.3(b)(ii) of the Seller's disclosure schedules to the Asset Purchase Agreement, which list will be contained in the Plan Supplement. The Debtors will assume any Retained Contracts that are executory. Each executory contract and unexpired lease to be assumed, or assumed and assigned, shall include modifications, amendments, supplements, restatements or other similar agreements made directly or indirectly by any agreement, instrument or other document that affects such executory contract or unexpired lease, without regard to whether such agreement, instrument or other document is listed on the schedule to the Disclosure Statement or any "Schedule of Rejected Executory Contracts and Unexpired Leases."

(b)    The Plan shall constitute a motion to reject such executory contracts and unexpired leases as set forth in the schedule to the Disclosure Statement or any subsequently filed Schedule of Rejected Executory Contracts and Unexpired Leases as of the effective date denoted on the Schedule of Rejected Executory Contracts and Unexpired Leases. Entry of the Confirmation Order by the clerk of the Bankruptcy Court shall constitute approval of such rejections pursuant to section 365(a) of the Bankruptcy Code, subject to the occurrence of the Effective Date, and a finding by the Bankruptcy Court that each such rejected agreement, executory contract or unexpired lease is burdensome and that the rejection thereof is in the best interests of the Debtors and their estates. Each executory contract and unexpired lease to be rejected shall include all modifications, amendments, supplements, restatements or other similar agreements made directly or indirectly by any agreement, instrument or other document that affects such rejected executory contract or unexpired lease.

(c)    The Plan shall constitute a motion to assume and assign the Assigned Contracts to the Purchaser pursuant to this Section 12.1, and the Debtors and Post-Effective Date Debtors shall have no liability thereunder, except as is specifically provided in the Plan. The Plan will constitute a motion to assume any Retained Contracts to the extent executory. Entry of the Confirmation Order by the clerk of the Bankruptcy Court shall constitute approval of the assumption and assignment of the Assigned Contracts, and the assumption of any Retained Contracts that are executory, pursuant to sections 365(a), (b) and (f) of the Bankruptcy Code, and a finding by the Bankruptcy Court that the requirements of section 365(f) of the Bankruptcy Code have been satisfied. Other than the Assumed Liabilities, Permitted Liens (as defined in the Asset Purchase Agreement) and the funding of the Plan Funds, the Purchaser shall have no liability on account of any Claims or otherwise pursuant to the Plan under applicable federal or state law, including, but not limited to, successor or transferee liability.

(d)      Any non-Debtor counterparty to an agreement, contract or unexpired lease to be assumed, or assumed and assigned, who disputes the assumption, or assumption and assignment, of such executory contract or unexpired lease must file with the Bankruptcy Court, and serve upon the Debtors, a written objection to the assumption, or assumption and assignment, of an executory contract or unexpired lease, which objection shall set forth the basis for the dispute by no later than two (2) days prior to the Confirmation Hearing.  The failure to timely object shall be deemed a waiver of any and all objections to the assumption, or assumption and assignment, of executory contracts and leases as set forth herein or as otherwise designated as being assumed or assumed and assigned in this Section 12.1.  The inclusion of a contract or lease on any list or schedule of rejected contracts, Assigned Contracts or Retained Contracts is not an admission by the Debtors that such contract is executory, and the Debtors reserve all rights in regard thereto.

12.2    **Cure Costs**.

The provisions (if any) of each executory contract or unexpired lease to be assumed, or assumed and assigned, under the Plan which are or may be in default shall be satisfied solely by Cure Costs.  A "Schedule of Cure Costs" shall be contained in the Plan Supplement (and may be amended from time to time thereafter) and shall set forth the Cure Costs for each agreement which the Debtors believe a Cure Cost must be satisfied as a condition to the assumption, or assumption and assignment, of such agreement.  If an executory contract or unexpired lease to be assumed, or assumed and assigned, under the Plan does not have a Cure Cost, it will not be identified on the Schedule of Cure Costs.  Any non-Debtor counterparty to an agreement being assumed, or assumed and assigned, under the Plan who disputes the scheduled Cure Costs (or objects to the omission of a scheduled Cure Costs) must file with the Bankruptcy Court, and serve upon the Debtors and the Committee, by no later than two (2) days prior to the Confirmation Hearing, a written objection to the proposed Cure Costs, which objection shall set forth the basis for the dispute and the alleged correct Cure Cost.  If a non-Debtor counterparty fails to file and serve an objection which complies with the foregoing, the Cure Costs set forth on the "Schedule of Cure Costs" shall be binding on the non-Debtor counterparty, and the non-Debtor counterparty shall be deemed to have waived any and all objections to the assumption, or assumption and assignment, of the relevant agreement as proposed by the Debtors.  In the event of a dispute regarding the assumption, or assumption and assignment, of an executory contract or unexpired lease, the provision of Cure Costs to the counterparty of the executory contract or unexpired lease shall occur as soon as reasonably practicable following the entry of a Final Order or mutual agreement resolving such dispute.  Under the provisions of the Asset Purchase Agreement, the Cure Costs for Assigned Contracts listed on the Schedule of Cure Costs (and no other Cure Costs) are assumed by, and shall be the sole liability of, the Purchaser, and none of the Debtors, the Post-Effective Date Debtors or the Plan Administrator shall have any liability for the payment of such Cure Costs to any party.

12.3    **Claims Arising from Rejected Contracts**.

Rejection Damage Claims must be submitted to the Claims Agent, with copies to counsel for the Debtors, on the later of December 8, 2010 and the first Business Day that is thirty (30) days following the effective date of the rejection of such executory contract or unexpired lease.  Properly submitted Rejection Damage Claims shall be treated in accordance with Class

5A or Class 5B, as applicable, under the Plan.  All Rejection Damage Claims shall be subject to objection by the Post-Effective Date Debtors.  Any Rejection Damage Claims that are not properly submitted pursuant to this Section 12.3 will forever be barred from assertion and shall not be enforceable against the Post-Effective Date Debtors, their respective Estates, Affiliates or Assets.

## ARTICLE XIII.

## SETTLEMENTS AND COMPROMISES

13.1    **Compromise and Settlement**.

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Allowed Equity Interests and their respective Plan Distributions and treatments hereunder take into account for and conform to the relative priority and rights of the Claims and Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) and (c) of the Bankruptcy Code, substantive consolidation or otherwise.  As of the Effective Date, any and all such rights described in the preceding sentence are settled, compromised and released pursuant hereto.  The Confirmation Order shall constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (a) in the best interests of the Debtors and their Estates, (b) fair, equitable and reasonable, (c) made in good faith and (d) approved by the Bankruptcy Court pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019.  In addition, the allowance, classification and treatment of Allowed Claims take into account any Causes of Action, Claims or counterclaims, whether under the Bankruptcy Code or otherwise under applicable law, that may exist: (a) between the Debtors and the Releasing Parties; and (b) as between the Releasing Parties (to the extent set forth in the Third Party Release).  As of the Effective Date, any and all such Causes of Action, Claims and counterclaims are settled, compromised and released pursuant hereto.  The Confirmation Order will approve all such releases of contractual, legal and equitable subordination rights, Causes of Action, Claims and counterclaims against each such Releasing Party that are satisfied, compromised and settled pursuant hereto.

Notwithstanding anything to the contrary in this Plan, if the equity commitment agreement between Perseus, the Purchaser and the Second Lien Administrative Agent is terminated as a result of Perseus' breach of that agreement (subject to any applicable rights of cure) or if Perseus does not fund the Perseus Contribution (as such term is defined in the Asset Purchase Agreement) in a circumstance other than one in which Perseus is excused from funding under the terms of the documents providing for such equity commitment, then all of the benefits, releases, consent rights and any other benefits provided to Perseus under the terms of the Plan shall be eliminated.

13.2    **Releases by the Debtors**.

**NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE**

EFFECTIVE DATE AND IMMEDIATELY PRIOR TO THE CLOSING OF THE SALE TRANSACTION AND THE REVESTING OF THE EXCLUDED ASSETS WITH THE POST-EFFECTIVE DATE DEBTORS (SUCH THAT NEITHER PURCHASER NOR THE POST-EFFECTIVE DATE DEBTORS WILL RECEIVE ANY CAUSE OF ACTION RELEASED HEREUNDER), FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE DEBTOR RELEASEES, INCLUDING, WITHOUT LIMITATION: (A) THE DISCHARGE OF DEBT AND ALL OTHER GOOD AND VALUABLE CONSIDERATION PAID PURSUANT TO THE PLAN OR OTHERWISE; AND (B) THE SERVICES OF THE DEBTORS' PRESENT AND FORMER OFFICERS AND DIRECTORS IN FACILITATING THE IMPLEMENTATION OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, EACH OF THE DEBTORS SHALL PROVIDE A FULL DISCHARGE AND RELEASE TO THE DEBTOR RELEASEES (AND EACH SUCH DEBTOR RELEASEE SO RELEASED SHALL BE DEEMED RELEASED AND DISCHARGED BY THE DEBTORS) AND EACH SUCH DEBTOR RELEASEE'S RESPECTIVE ASSETS FROM ANY AND ALL CLAIMS, CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, INCLUDING, WITHOUT LIMITATION, THOSE THAT ANY OF THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR EQUITY INTEREST OR OTHER PERSON OR ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT FOR OR ON BEHALF OF ANY OF THE DEBTORS OR ANY OF THEIR ESTATES AND FURTHER INCLUDING THOSE IN ANY WAY RELATED TO OR ARISING OUT OF THE CHAPTER 11 CASES, THE PLAN, THE DISCLOSURE STATEMENT, OR THE PRE-PETITION OR POST-PETITION OPERATION OR ACTIVITIES OF THE DEBTORS; <u>PROVIDED</u>, <u>HOWEVER,</u> THAT THE FOREGOING RELEASES SHALL NOT APPLY TO ANY PERSON OR ENTITY WHO, IN CONNECTION WITH ANY ACT OR OMISSION BY THE DEBTORS OR THEIR BUSINESSES, HAS BEEN OR IS HEREAFTER FOUND BY ANY FINAL ORDER OR ANY COURT TRUBUNAL TO HAVE COMMITTED ACTUAL FRAUD; <u>PROVIDED FURTHER</u>, <u>HOWEVER</u>, THAT THE FOREGOING RELEASES SHALL NOT APPLY TO ANY AVOIDANCE ACTIONS (OTHER THAN ANY AVOIDANCE ACTIONS AGAINST ANY THIRD PARTY RELEASEE (BUT WITH RESPECT TO RELATED PARTIES OF THIRD PARTY RELEASEES, ONLY IN SUCH RELATED PARTY'S CAPACITY AS A RELATED PARTY OF SUCH THIRD PARTY RELEASEE), ANY OF THE DEBTORS PROFESSIONALS RETAINED DURING THE PENDENCY OF THE CHAPTER 11 CASES, OR ANY CURRENT OR FORMER OFFICERS OR DIRECTORS

OF THE DEBTORS); **PROVIDED FURTHER**, **HOWEVER**, THAT THE FOREGOING RELEASES SHALL NOT APPLY TO THE FORMER SHAREHOLDER NOTES.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASE IS: (A) IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES, REPRESENTING GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (B) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS; (C) FAIR, EQUITABLE, AND REASONABLE; (D) APPROVED AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (E) A BAR TO THE DEBTORS OR THE POST-EFFECTIVE DATE DEBTORS ASSERTING ANY CLAIM RELEASED BY THE DEBTOR RELEASE AGAINST ANY OF THE DEBTOR RELEASEES OR THEIR RESPECTIVE PROPERTY.

THE POST-EFFECTIVE DATE DEBTORS AND THE PURCHASER SHALL BE BOUND, TO THE SAME EXTENT THE DEBTORS ARE BOUND, BY THE RELEASES SET FORTH ABOVE.

13.3    **Third Party Release**.

NOTWITHSTANDING ANYTHING CONTAINED IN THE PLAN TO THE CONTRARY, ON THE EFFECTIVE DATE, EFFECTIVE AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES SHALL PROVIDE A FULL DISCHARGE AND RELEASE (AND EACH PERSON OR ENTITY SO RELEASED SHALL BE DEEMED RELEASED BY THE RELEASING PARTIES) TO THE DEBTORS, POST-EFFECTIVE DATE DEBTORS, THE DEBTOR RELEASEES, AND THEIR RESPECTIVE ASSETS FROM ANY AND ALL CLAIMS, CAUSES OF ACTION AND ANY OTHER DEBTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, ACTIONS, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER ARISING, IN LAW, AT EQUITY, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, BASED IN WHOLE OR IN PART UPON ANY ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE OR CIRCUMSTANCES EXISTING OR TAKING PLACE PRIOR TO OR ON THE EFFECTIVE DATE ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, INCLUDING THOSE IN ANY WAY RELATED TO OR ARISING OUT OF THE CHAPTER 11 CASES, THE PLAN, THE DISCLOSURE STATEMENT, OR THE PRE-PETITION OR POST-PETITION OPERATION OR ACTIVITIES OF THE DEBTORS; **PROVIDED, HOWEVER**, THAT THE FOREGOING THIRD PARTY RELEASE SHALL NOT OPERATE TO WAIVE OR RELEASE THE PURCHASER FROM ITS OBLIGATIONS UNDER THE ASSET PURCHASE AGREEMENT OR THE PLAN; **PROVIDED, FURTHER HOWEVER,**

**THAT THE FOREGOING RELEASES WILL NOT APPLY TO ANY ACT OR OMISSION THAT HAS BEEN OR IS HEREAFTER FOUND BY ANY FINAL ORDER OR ANY COURT TRUBUNAL TO CONSTITUTE ACTUAL FRAUD.**

**THE THIRD PARTY RELEASE SHALL HAVE NO EFFECT ON THE CLAIMS OF THE RELEASEES TREATED UNDER THE PLAN, TO THE EXTENT OF ALLOWANCE OF CLAIMS AND SATISFACTION OF CLAIMS PURSUANT TO THE PLAN.**

**ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019 OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, _AND FURTHER_, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (A) IN EXCHANGE FOR GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE THIRD PARTY RELEASEES, REPRESENTING GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (B) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS; (C) FAIR, EQUITABLE, AND REASONABLE; (D) APPROVED AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (E) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED BY THE THIRD PARTY RELEASE AGAINST ANY OF THE THIRD PARTY RELEASEES OR THEIR PROPERTY**.

13.4    **Exculpation**.

Notwithstanding anything contained in the Plan to the contrary, the Exculpated Parties shall neither have nor incur any liability to any Person or Entity for any prepetition or postpetition act taken or omitted to be taken in connection with or related to formulating, negotiating, preparing, disseminating, implementing, administering the Plan, the Plan Supplement, the Disclosure Statement, or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any other prepetition or post-petition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the Chapter 11 Cases, or confirming or consummating the Plan; provided, however, that the foregoing provisions of this Section 13.4 shall have no effect on the liability of any Person or Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided further, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its duties pursuant to, or in connection with, the above referenced documents; provided still further, that the foregoing Exculpation shall not apply to any acts or omissions expressly set forth in and preserved by the Plan or Plan Supplement; provided, further, however, that nothing in Section 13.4 of the Plan shall exculpate any party from any Actionable Avoidance Action other than Avoidance Actions released pursuant to Section 13.2 of the Plan.

13.5    **Reserved.**

13.6    **Maintenance of Set-off Rights.**

After the Effective Date the Plan Administrator, subject to Sections 13.2, 13.3, 13.4 and 13.7 of the Plan, shall retain all rights to assert any set-off rights which are Excluded Assets solely in response to any General Unsecured Claims asserted by Holders of Claims in Class 5A.

13.7    **INJUNCTION**.

Upon the Confirmation Date, Bankruptcy Code section 1141 shall become applicable with respect to the Plan.  In accordance with Bankruptcy Code section 1141(d)(3), the Plan does not discharge the Debtors.  Bankruptcy Code section 1141 nevertheless provides, among other things, that the property dealt with by the Plan is free and clear of all Claims and Equity Interests of creditors, equity security holders, and of general partners of the Debtors. Accordingly, no entity holding a Claim, lien, charge, encumbrance, or other interest may receive any payment from, or seek recourse against, any property other than property of the Post-Effective Date Debtors as provided in the Plan, and all persons and entities are permanently enjoined and prohibited from taking any actions to the contrary.  As of the Confirmation Date, all parties are precluded from asserting against any property that is to be distributed under the Plan any Claims, rights, Causes of Action, liabilities, or Equity Interests based upon any act, omission, transaction, or other activity that occurred before the Confirmation Date except as expressly provided in the Plan or the Confirmation Order.

**FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.   FROM AND AFTER THE EFFECTIVE DATE, ALL PERSONS AND ENTITIES ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING IN ANY MANNER AGAINST THE DEBTORS, THE PURCHASER, PERSEUS, THE COMMITTEE, THE SECOND LIEN ADMINISTRATIVE AGENT, THE FIRST LIEN LENDERS THAT VOTE IN FAVOR OF THE PLAN, THE SECOND LIEN LENDERS THAT VOTE IN FAVOR OF THE PLAN, AND TO THE EXTENT THE FIRST LIEN ADMINISTRATIVE AGENT DOES NOT FILE AN OBJECTION OR OTHERWISE OPPOSE THE PLAN, THE FIRST LIEN AGENT, AND THEIR SUCCESSORS AND ASSIGNS, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER MEMBERS, OFFICERS, DIRECTORS, MANAGED FUNDS, INVESTMENT ADVISORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, PARTNERS, AFFILIATES AND REPRESENTATIVES (EACH OF THE FOREGOING IN ITS INDIVIDUAL CAPACITY AS SUCH), AND THEIR ASSETS, AS THE CASE MAY BE, ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY CLAIM, DEMAND, LIABILITY, OBLIGATION, DEBT, RIGHT, CAUSE OF ACTION, INTEREST OR REMEDY RELEASED OR TO BE RELEASED PURSUANT TO THE PLAN OR THE CONFIRMATION ORDER.**

# ARTICLE XIV.

## CONDITIONS PRECEDENT TO
## CONFIRMATION OF THE PLAN AND
## THE OCCURRENCE OF THE EFFECTIVE DATE

14.1    **Conditions Precedent to Confirmation**.

The following are conditions precedent to confirmation of the Plan:

(a)    Disclosure Statement.  The Disclosure Statement Order shall have been entered by the Bankruptcy Court in form and substance reasonably acceptable to the Debtors, Perseus, the Second Lien Administrative Agent and Purchaser;

(b)    Plan Documents.  All documents and agreements contemplated by, related to or necessary to the Plan, including the Plan, the Confirmation Order, and the Plan Documents, shall be in a form and substance satisfactory or reasonably satisfactory, as the case may be and as specified in the definitions of such terms, to each of the Entities identified as necessary to approve the form and substance of such document as reasonably satisfactory to such Entity pursuant to the Plan;

(c)    Newco First Lien Loan Documents.  The Newco First Lien Loan Documents shall be in form and substance reasonably satisfactory to Perseus, Purchaser, the Newco First Lien Administrative Agent, the Second Lien Administrative Agent and the Newco Second Lien Administrative Agent, as the case may be and as specified in the definitions of such terms; and

(d)    Newco Second Lien Loan Documents.  The Newco Second Lien Loan Documents shall be in form and substance reasonably satisfactory to Perseus, Purchaser, the Second Lien Administrative Agent and the Newco Second Lien Administrative Agent, as the case may be and as specified in the definitions of such terms.

14.2    **Conditions Precedent to the Occurrence of the Effective Date**.

The following are conditions precedent to the occurrence of the Effective Date:

(a)    The Confirmation Order shall have been entered by the clerk of the Bankruptcy Court, shall be acceptable to the Debtors, Perseus, the Second Lien Administrative Agent and Purchaser, and shall be in full force and effect and shall be a Final Order;

(b)    Payment on account of any Administrative Expense Claims that are assumed by the Purchaser shall not exceed amounts indicated by the Debtors in the Plan Supplement, and the Administrative Expense Claim Reserve shall not exceed an amount indicated by the Debtors in the Plan Supplement; provided, however, in each case such amounts indicated in the Plan Supplement shall be acceptable to Purchaser in its sole discretion;

(c)    There is sufficient available Cash to make all payments to be made on the Effective Date;

(d)      Closing of the Sale Transaction (including, without limitation, the satisfaction or waiver of all of the conditions to closing provided for in the Asset Purchase Agreement);

(e)      All necessary consents, authorizations and approvals shall have been given for the transfers of property and the payments required to be made on the Effective Date, including, without limitation, satisfaction or waiver of all conditions to the obligations of the Debtors under the Plan and the Plan Documents; and

(f)      The Effective Date shall have occurred on or prior to May 16, 2011 (such date may be extended with the written consent of Perseus, the Purchaser and the Second Lien Administrative Agent).

14.3    **Waiver of Conditions**.

The Debtors, with the written consent of Perseus, the Purchaser and the Second Lien Administrative Agent may waive any one or more of the conditions set forth in Section 14.1 or Section 14.2(a), (b), (c) or (e) in a writing executed by each of them without notice or order of the Bankruptcy Court and without notice to any parties in interest.  Perseus, the Purchaser and the Second Lien Administrative Agent may waive the condition set forth in Section 14.2(f) in a writing executed by each of them without notice or order of the Bankruptcy Court and without notice to any parties in interest.

14.4    **Effect of Non-Occurrence of the Effective Date**.

If the Effective Date shall not occur, the Plan shall be null and void and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Equity Interests in a Debtor; (b) prejudice in any manner the rights of any party-in-interest; or (c) constitute an admission, acknowledgement, offer or undertaking by the Debtors or any other party-in-interest.

## ARTICLE XV.

## RETENTION OF JURISDICTION

Pursuant to sections 105(a) and 1142 of the Bankruptcy Code the Bankruptcy Court shall retain and shall have exclusive jurisdiction over any matter (a) arising under the Bankruptcy Code, (b) arising in or related to the Chapter 11 Cases or the Plan, or (c) that relates to the following:

(i)      To hear and determine any and all motions or applications pending on the Confirmation Date or thereafter brought in accordance with Article XII hereof for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases to which any of the Debtors is a party or with respect to which any of the Debtors may be liable, and to hear and determine any and all Claims and any related disputes (including, without limitation, the exercise or enforcement of setoff or recoupment rights, or rights against any third party or

the property of any third party resulting therefrom or from the expiration, termination or liquidation of any executory contract or unexpired lease);

(ii)      To determine any and all adversary proceedings, applications, motions, and contested or litigated matters that may be pending on the Effective Date or that, pursuant to the Plan, may be instituted by the Plan Administrator or the Debtors, as applicable, after the Effective Date, including the Actionable Avoidance Actions;

(iii)     To hear and determine any objections to the allowance of Claims, whether filed, asserted, or made before or after the Effective Date, including, without express or implied limitation, to hear and determine any objections to the classification of any Claim and to allow, disallow or estimate any Contested Claim in whole or in part;

(iv)     To issue such orders in aid of execution of the Plan to the extent authorized or contemplated by section 1142 of the Bankruptcy Code;

(v)      To consider any modifications of the Plan, remedy any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(vi)     To hear and determine all Fee Applications and applications for allowances of compensation and reimbursement of any other fees and expenses authorized to be paid or reimbursed under the Plan or the Bankruptcy Code;

(vii)    To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Plan, the Sale Transaction, the Plan Documents or their interpretation, implementation, enforcement, or consummation;

(viii)   To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with the Confirmation Order (and all exhibits to the Plan) or its interpretation, implementation, enforcement, or consummation;

(ix)     To the extent that Bankruptcy Court approval is required, to consider and act on the compromise and settlement of any Claim or Cause of Action by, on behalf of, or against the Estates;

(x)      To determine such other matters that may be set forth in the Plan, or the Confirmation Order, or that may arise in connection with the Plan, or the Confirmation Order;

(xi)     To hear and determine matters concerning state, local, and federal taxes, fines, penalties, or additions to taxes for which the Post-Effective Date Debtors, the Debtors in Possession, or the Plan Administrator may be liable,

directly or indirectly, in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(xii)    To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with any setoff and/or recoupment rights of the Debtors or any Person under the Plan;

(xiii)    To hear and determine all controversies, suits, and disputes that may relate to, impact upon, or arise in connection with Causes of Action of or against the Debtors commenced by the Plan Administrator, the Debtors or any third parties, as applicable, before or after the Effective Date;

(xiv)    To enter an order or final decree closing the Chapter 11 Cases or converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(xv)    To issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation, implementation or enforcement of the Plan or the Confirmation Order; and

(xvi)    To hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code.

# ARTICLE XVI.

## MISCELLANEOUS PROVISIONS

16.1    **Payment of Statutory Fees**.

All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid by the Debtors on or before the Effective Date.

16.2    **Satisfaction of Claims**.

The rights afforded in the Plan and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any accrued postpetition interest, against the Debtors and the Debtors in Possession, or any of their Estates, Assets, properties, or interests in property.  Except as otherwise provided herein, on the Effective Date, all Claims against and Equity Interests in the Debtors and the Debtors in Possession shall be satisfied, discharged, and released in full.  The Post-Effective Date Debtors shall not be responsible for any pre-Effective Date obligations of the Debtors or the Debtors in Possession, except those expressly assumed by any Post-Effective Date Debtor(s), as applicable.  Except as otherwise provided herein, all Persons and Entities shall be precluded and forever barred from asserting against the Post-Effective Date Debtors, their respective successors or assigns, or their Estates, Assets, properties, or interests in property any event, occurrence, condition, thing, or

other or further Claims or Causes of Action based upon any act, omission, transaction, or other activity of any kind or nature that occurred or came into existence prior to the Effective Date, whether or not the facts of or legal bases therefore were known or existed prior to the Effective Date.

      16.3   **Notices**.

      Any notices, requests, and demands required or permitted to be provided under the Plan, in order to be effective, shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

      **If to the Debtors:**

      Workflow Management, Inc.
      Attention: L. Scott Seymour, General Counsel
      150 West Main Street
      Post Office Box 3037
      Norfolk, Virginia 23514
      T (757) 624.3000
      F (757) 624.3169

      – and –

      McGuireWoods LLP
      Douglas M. Foley, Esq.
      Patrick L. Hayden, Esq.
      9000 World Trade Center
      101 West Main Street
      Norfolk, Virginia 23510
      Telephone: (757) 640-3700
      Facsimile: (757) 640-3701

      **If to First Lien Administrative Agent:**

      Credit Suisse AG, Cayman Islands Branch,
      as First Lien Administrative Agent (Workflow)
      Attn: Megan Kane
      11 Madison Avenue
      New York, New York  10010
      Telephone: (212) 325-1690
      Facsimile: (917) 326-8227

      – and –

      Wilmer Cutler Pickering Hale and Dorr LLP

Philip D. Anker, Esq.
George W. Shuster, Jr., Esq.
399 Park Avenue
New York, New York  10022
Telephone: (212) 880-8890
Facsimile: (212) 230-8888

**If to Second Lien Administrative Agent:**

Silver Point Finance, LLC
Attn: John Kneisley
Two Greenwich Plaza, 1st Floor
Greenwich, CT 06830
Telephone: (203) 542-4267
Facsimile: (203) 542-4367

– and –

Fried, Frank, Harris, Shriver & Jacobson LLP
Gary L. Kaplan, Esq.
Peter Siroka, Esq.
One New York Plaza
New York, New York 10004
Telephone: (212) 859-8000
Facsimile: (212) 859-4000

– and –

Hunton & Williams LLP
Benjamin C. Ackerly, Esq.
Tara L. Elgie, Esq.
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA  23219-4074

**If to the Plan Administrator:**

_____
_____

**If to the Purchaser:**

Workflow Holdings, LLC
Attn: John Kneisley
Two Greenwich Plaza, 1st Floor
Greenwich, CT 06830

Attention: John Kneisley
Telephone: (203) 542-4267
Fax: (203)-542-4367

16.4   **Headings**.

The headings used in the Plan are inserted for convenience only, and neither constitutes a portion of the Plan nor in any manner affect the construction of the provisions of the Plan.

16.5   **Governing Law**.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules), the laws of the State of New York, without giving effect to the conflicts of laws principles thereof, shall govern the construction of the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as otherwise expressly provided in such instruments, agreements or documents.

16.6   **Expedited Determination**.

The Plan Administrator is hereby authorized to file a request for expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed with respect to the Debtors.

16.7   **Exemption from Transfer Taxes**.

Each director or officer of each Debtor will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan and the Asset Purchase Agreement.  The secretary and any assistant secretary of each Debtor will be authorized to certify or attest to any of the foregoing actions.  Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer from a Debtor to the Post-Effective Date Debtors, the Purchaser or any other person or Entity pursuant to the Plan, including the following will not be subject to any stamp tax, real estate transfer tax or similar tax, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment: (a) the Sale Transaction; (b) the creation of any mortgage, deed of trust, lien or other security interest; (c) the making or assignment of any lease or sublease; (d) the granting or recording of any lien or mortgage on any property under the Newco First Lien Credit Agreement or the Newco Second Lien Credit Agreement or (e) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including (1) any merger agreements; (2) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (3) deeds; (4) bills of sale or (5) assignments executed in connection with the Plan.

56

16.8    **Retiree Benefits**.

The Debtors provide no retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code); accordingly, the Plan complies with section 1129(a)(13) of the Bankruptcy Code.

16.9    **Notice of Entry of Confirmation Order and Relevant Dates**.

Promptly upon entry of the Confirmation Order, the Debtors shall publish as directed by the Bankruptcy Court and serve on all known parties in interest and holders of Claims and Equity Interests, notice of the entry of the Confirmation Order and all relevant deadlines and dates under the Plan.

16.10    **Interest and Attorneys' Fees**.

(a)    Interest accrued after the Petition Date will accrue and be paid on Claims only to the extent specifically provided for in the Plan, the Confirmation Order or as otherwise required by the Bankruptcy Court or by applicable law.

(b)    Except as set forth in the Plan or as ordered by the Bankruptcy Court, no award or reimbursement of attorneys' fees or related expenses or disbursements shall be allowed on, or in connection with, any Claim.

16.11    **Modification of the Plan**.

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtors at any time before confirmation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code. The Debtors, with the written consent of the Purchaser, Perseus, and the Second Lien Administrative Agent, may modify the Plan at any time after confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications. A holder of a Claim that has accepted the Plan shall be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Equity Interest of such holder.

16.12    **Revocation of Plan**.

(a)    The Debtors, with the written consent of the Purchaser, Perseus, and the Second Lien Administrative Agent, reserve the right to revoke and withdraw the Plan or to adjourn the Confirmation Hearing with respect to any one or more of the Debtors prior to the occurrence of the Effective Date. If the Debtors, with the written consent of Purchaser and the Second Lien Administrative Agent, revoke or withdraw the Plan with respect to any one or more of the Debtors, or if the Effective Date does not occur as to any Debtor, then, as to such Debtor, the Plan and all settlements and compromises set forth in the Plan and not otherwise approved by a separate Final Order shall be deemed null and void and nothing contained herein and no acts

taken in preparation for consummation of the Plan shall be deemed to constitute a waiver or release of any Claims against or Equity Interests in such Debtor or to prejudice in any manner the rights of any of the Debtors or any other Person in any other further proceedings involving such Debtor.

(b)     In the event that the Debtors, with the written consent of Purchaser and the Second Lien Administrative Agent, choose to adjourn the Confirmation Hearing with respect to any one or more of the Debtors, the Debtors reserve the right to proceed with confirmation of the Plan with respect to those Debtors in relation to which the Confirmation Hearing has not been adjourned.  With respect to those Debtors with respect to which the Confirmation Hearing has been adjourned, the Debtors reserve the right, with the written consent of Purchaser and the Second Lien Administrative Agent to amend, modify, revoke or withdraw the Plan and/or submit any new plan of reorganization at such times and in such manner as they consider appropriate, subject to the provisions of the Bankruptcy Code.

16.13   **Setoff Rights**.

Except as otherwise provided in the Plan, in the event that any Debtor has a Claim of any nature whatsoever against the holder of a Claim against such Debtor, then such Debtor or the Plan Administrator, may, but is not required to, set off against the Claim (and any payments or other Plan Distributions to be made in respect of such Claim hereunder) such Debtor's Claim against such holder. Neither the failure to set off nor the allowance of any Claim under the Plan shall constitute a waiver or release of any Claims that any Debtor may have against the holder of any Claim.

16.14   **Compliance with Tax Requirements**.

In connection with the Plan, the Debtors and the Plan Administrator, as applicable, shall comply with all withholding and reporting requirements imposed by federal, state, local, and foreign taxing authorities and all Plan Distributions hereunder shall be subject to such withholding and reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim or Equity Interest that is to receive a Plan Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any government unit, including income, withholding and other tax obligations, on account of such Plan Distribution.  The Plan Administrator has the right, but not the obligation, to not make a Plan Distribution until such holder has made arrangements satisfactory to the Plan Administrator for payment of any such tax obligations.

16.15   **Rates**.

The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Effective Date.

16.16   **Binding Effect**.

The Plan shall be binding upon the Post-Effective Date Debtors, the holders of all Claims and Equity Interests, parties in interest, Persons and Entities and their respective successors and assigns.  To the extent any provision of the Disclosure Statement or any other

solicitation document may be inconsistent with the terms of the Plan, the terms of the Plan shall be binding and conclusive.

16.17  **Severability**.

IN THE EVENT THE BANKRUPTCY COURT DETERMINES THAT ANY PROVISION OF THE PLAN IS UNENFORCEABLE EITHER ON ITS FACE OR AS APPLIED TO ANY CLAIM OR EQUITY INTEREST OR TRANSACTION, THE DEBTORS MAY MODIFY THE PLAN IN ACCORDANCE WITH SECTION 16.11 OF THE PLAN SO THAT SUCH PROVISION SHALL NOT BE APPLICABLE TO THE HOLDER OF ANY SUCH CLAIM OR EQUITY INTEREST OR TRANSACTION. SUCH A DETERMINATION OF UNENFORCEABILITY SHALL NOT (A) LIMIT OR AFFECT THE ENFORCEABILITY AND OPERATIVE EFFECT OF ANY OTHER PROVISION OF THE PLAN OR (B) REQUIRE THE RESOLICITATION OF ANY ACCEPTANCE OR REJECTION OF THE PLAN.

16.18  **No Admissions**.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER CAUSES OF ACTION OR THREATENED CAUSES OF ACTIONS, THE PLAN SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.  THE PLAN SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, AND OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS OR THEIR AFFILIATES, AS DEBTORS AND DEBTORS IN POSSESSION IN THESE CHAPTER 11 CASES.

16.19  **Dissolution of the Committee**.

Effective on the Effective Date, the Committee shall dissolve automatically, whereupon its members, professionals, and agents shall be exculpated from any further duties and responsibilities in the Chapter 11 Cases and under the Bankruptcy Code, except with respect to applications for Fee Claims or reimbursement of expenses incurred as a member of the Committee.

Dated:  January 21, 2011                    Respectfully submitted,

                                            **WORKFLOW MANAGEMENT, INC.**


                                            By: s/ David M. Davis
                                            Name:  David M. Davis
                                            Title:   Chairman of the Board, CEO

**WORKFLOW HOLDINGS CORPORATION**

By: s/ David M. Davis
Name:  David M. Davis
Title:    Chairman of Board, President, CRO & CEO

**WORKFLOW SOLUTIONS LLC**

By: s/ Paul H. Bogutsky
Name:  Paul H. Bogutsky
Title:    CFO, Executive VP & Treasurer

**WORKFLOW DIRECT, INC.**

By: s/ David M. Davis
Name:  David M. Davis
Title:    President, CRO & CEO

**WF CAPITAL HOLDINGS, INC.**

By: s/ David M. Davis
Name:  David M. Davis
Title:    Chairman of Board, President, CRO & CEO

**WF HOLDINGS, INC.**

By: s/ David M. Davis
Name:  David M. Davis
Title:    Chairman of Board, President, CRO & CEO

**WORKFLOW OF FLORIDA, INC.**

By: s/ David M. Davis
Name:  David M. Davis
Title:    President, CRO & CEO

**WORKFLOW MANAGEMENT
ACQUISITION II CORP.**

By: s/ David M. Davis
Name:  David M. Davis
Title:    President, CRO & CEO

**WFIH, INC.**

By: s/ David M. Davis
Name: David M. Davis
Title: President, CRO & CEO

**WFMI, INC.**

By: s/ David M. Davis
Name: David M. Davis
Title: President, CRO & CEO

**THE RELIZON COMPANY**

By: s/ Paul H. Bogutsky
Name: Paul H. Bogutsky
Title: CFO, Executive VP & Treasurer

**RELIZON KNE INC.**

By: s/ Paul H. Bogutsky
Name: Paul H. Bogutsky
Title: CFO, VP & Treasurer

**RELIZON SNE INC.**

By: s/ Paul H. Bogutsky
Name: Paul H. Bogutsky
Title: CFO, VP & Treasurer

**OLD FGS, INC.**

By: s/ David M. Davis
Name: David M. Davis
Title: President, CRO & CEO

**OLD UE, LLC**

By: s/ David M. Davis
Name: David M. Davis
Title: President, CRO & CEO

**SFI OF PUERTO RICO, INC.**

By:  s/ Paul H. Bogutsky
Name:  Paul H. Bogutsky
Title:   CFO, VP & Treasurer

**RELIZON WISCONSIN INC.**

By:  s/ Paul H. Bogutsky
Name:  Paul H. Bogutsky
Title:   CFO, VP & Treasurer

**RELIZON (TEXAS) LTD.  LLP**

By:  s/ Paul H. Bogutsky
Name:  Paul H. Bogutsky
Title:   CFO, VP & Treasurer

**RELIZON DE MEXICO INC.**

By:  s/ Paul H. Bogutsky
Name:  Paul H. Bogutsky
Title:   CFO, VP & Treasurer

**FORMCRAFT HOLDINGS GENERAL PARTNER, INC.**

By:  s/ Paul H. Bogutsky
Name:  Paul H. Bogutsky
Title:   CFO, VP & Treasurer

**FORMCRAFT HOLDINGS LIMITED PARTNER, INC.**

By:  s/ Paul H. Bogutsky
Name:  Paul H. Bogutsky
Title:   CFO, VP & Treasurer

# EXHIBIT A

## DEBTORS

| ENTITY | CASE NO. | ID NUMBER |
|---|---|---|
| FORMCRAFT HOLDINGS GENERAL PARTNER, INC. | 10-74631 | 52-2255683 |
| FORMCRAFT HOLDINGS LIMITED PARTNER, INC. | 10-74630 | 52-2255684 |
| OLD FGS, INC. | 10-74615 | 22-3171438 |
| RELIZON DE MEXICO INC. | 10-74628 | 20-3686996 |
| RELIZON KNE INC. | 10-74632 | 51-0413935 |
| RELIZON SNE INC. | 10-74629 | 51-0414537 |
| RELIZON (TEXAS) LTD., LLP | 10-74635 | 76-0566437 |
| RELIZON WISCONSIN INC. | 10-74633 | 39-1818440 |
| SFI OF PUERTO RICO, INC. | 10-74626 | 52-2103413 |
| THE RELIZON COMPANY | 10-74618 | 52-2254702 |
| OLD UE, LLC | 10-74616 | 54-1894060 |
| WF CAPITAL HOLDINGS, INC. | 10-74614 | 42-1685548 |
| WF HOLDINGS, INC. | 10-74620 | 20-0969106 |
| WFIH, INC. | 10-74623 | 20-2010527 |
| WFMI, INC. | 10-74622 | 52-2164282 |
| WORKFLOW DIRECT, INC. | 10-74627 | 95-3817497 |
| WORKFLOW HOLDINGS CORPORATION | 10-74621 | 20-3839217 |
| WORKFLOW MANAGEMENT ACQUISITION II CORP. | 10-74625 | 52-2242039 |
| WORKFLOW MANAGEMENT, INC. | 10-74617 | 06-1507104 |
| WORKFLOW OF FLORIDA, INC. | 10-74624 | 52-2164281 |
| WORKFLOW SOLUTIONS LLC | 10-74619 | 54-1893769 |

# EXHIBIT B

## ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AND SALE AGREEMENT**

**by and between**

**WF CAPITAL HOLDINGS, INC.,**

**WF HOLDINGS, INC.,**

**WORKFLOW HOLDINGS CORPORATION,**

**WORKFLOW MANAGEMENT, INC.,**

**WFMI, INC.,**

**WORKFLOW SOLUTIONS LLC,**

**WFIH, INC.,**

**OLD FGS, INC.,**

**OLD UE, LLC,**

**THE RELIZON COMPANY,**

**WORKFLOW OF FLORIDA INC.,**

**WORKFLOW MANAGEMENT ACQUISITION II CORP,**

**SFI OF PUERTO RICO, INC.,**

**WORKFLOW DIRECT, INC.,**

**RELIZON DE MÉXICO INC.,**

**RELIZON SNE INC.,**

**FORMCRAFT HOLDINGS LIMITED PARTNER, INC.,**

**FORMCRAFT HOLDINGS GENERAL PARTNER, INC.,**

**RELIZON KNE INC.,**

**RELIZON WISCONSIN INC. ,**

**RELIZON TEXAS LTD., LLP**

**AND**

**WORKFLOW HOLDINGS, LLC**

**Dated:  January 21, 2011**

# TABLE OF CONTENTS

ARTICLE I Definitions and Rules of Construction ...................................................................2
  1.1.   Definitions. ................................................................................................................2
  1.2.   Rules of Construction. ............................................................................................12
ARTICLE II Purchase and Sale ...............................................................................................13
  2.1.   Closing. ....................................................................................................................13
  2.2.   Sale and Purchase of the Purchased Assets. .........................................................13
  2.3.   Excluded Assets. .....................................................................................................15
  2.4.   Assumption of Liabilities. .......................................................................................16
  2.5.   Retained Liabilities. ................................................................................................17
  2.6.   Purchase Price. ........................................................................................................18
  2.7.   Allocation of Purchase Price ..................................................................................18
  2.8.   Non-Assignment of Assigned Contracts .................................................................19
  2.9.   Designation of Assigned Contracts .........................................................................19
ARTICLE III Representations and Warranties of Sellers .........................................................19
  3.1.   Organization and Power. ........................................................................................20
  3.2.   Authorization and Enforceability. ..........................................................................20
  3.3.   No Violation ............................................................................................................20
  3.4.   Governmental Authorizations and Consents. .........................................................21
  3.5.   Financial Statements. ..............................................................................................21
  3.6.   Assets. ......................................................................................................................22
  3.7.   Compliance with Laws ...........................................................................................22
  3.8.   Environmental Matters. ..........................................................................................22
  3.9.   Certain Transactions. ..............................................................................................22
  3.10.  No Brokers. .............................................................................................................23
ARTICLE IV Representations and Warranties of Buyer ...........................................................23
  4.1.   Organization and Power .........................................................................................23
  4.2.   Authorization. ..........................................................................................................23
  4.3.   Enforceability .........................................................................................................23
  4.4.   No Violation. ............................................................................................................23
  4.5.   Governmental Authorizations and Consents. .........................................................23
  4.6.   Litigation. ................................................................................................................23
  4.7.   No Brokers. ..............................................................................................................24
ARTICLE V Covenants .............................................................................................................24
  5.1.   Conduct of Sellers Conducting the Business. .........................................................24
  5.2.   Access to Information Prior to the Closing ............................................................26
  5.3.   Certain Tax Matters. ...............................................................................................26
  5.4.   Public Announcements ............................................................................................27
  5.5.   Reasonable Best Efforts. .........................................................................................27
  5.6.   Post-Closing Access ................................................................................................27
  5.7.   Seller's Employment and Benefit Plan Covenants. .................................................27
  5.8.   Liens.. ......................................................................................................................28
ARTICLE VI Conditions to Closing ..........................................................................................28
  6.1.   Conditions to All Parties' Obligations....................................................................28
  6.2.   Conditions to Sellers' Obligations..........................................................................29
  6.3.   Conditions to Buyer's Obligations. .........................................................................29

ARTICLE VII Deliveries by Sellers at Closing ...................................................................30
7.1.   Officer's Certificate. ..............................................................................................30
7.2.   Transfer Documents ...............................................................................................30
7.3.   Assignment and Assumption Agreements ...............................................................30
7.4.   Receipt ...................................................................................................................30
7.5.   Further Instruments. ..............................................................................................30
ARTICLE VIII Deliveries by Buyer at Closing ...................................................................30
8.1.   Officer's Certificate. ..............................................................................................30
8.2.   Assignment and Assumption Agreements ...............................................................30
8.3.   Transfer Documents ...............................................................................................31
8.4.   Closing Consideration Amount ..............................................................................31
8.5.   Note Documentation. .............................................................................................31
8.6.   Further Instruments. ..............................................................................................31
ARTICLE IX Termination ..................................................................................................31
9.1.   Termination. ...........................................................................................................31
9.2.   Effect of Termination .............................................................................................32
ARTICLE X Miscellaneous .................................................................................................32
10.1.   Expenses. ..............................................................................................................32
10.2.   Notices. ................................................................................................................32
10.3.   Governing Law. ....................................................................................................33
10.4.   Entire Agreement ..................................................................................................33
10.5.   Severability ...........................................................................................................33
10.6.   Amendment ...........................................................................................................33
10.7.   Effect of Waiver or Consent ..................................................................................33
10.8.   Parties in Interest; Limitation on Rights of Others ................................................34
10.9.   Assignability .........................................................................................................34
10.10.   Jurisdiction; Court Proceedings; Waiver of Jury Trial .........................................34
10.11.   No Other Duties. ..................................................................................................34
10.12.   Reliance on Counsel and Other Advisors .............................................................34
10.13.   Remedies.. ...........................................................................................................35
10.14.   Specific Performance ...........................................................................................35
10.15.   Bulk Transfer Laws. ............................................................................................35
10.16.   Survival ...............................................................................................................35
10.17.   Counterparts.........................................................................................................35
10.18.   Further Assurance.................................................................................................35

<u>Exhibits</u>

Exhibit A                          Bankruptcy Plan

## ASSET PURCHASE AND SALE AGREEMENT

ASSET PURCHASE AND SALE AGREEMENT, dated as of January 21, 2011 by and among WF Capital Holdings, Inc., a Delaware corporation ("WF Capital"), WF Holdings, Inc., a Delaware corporation, Workflow Holdings Corporation, a Delaware corporation, Workflow Management, Inc., a Delaware corporation ("WMI"), WFMI, Inc., a Delaware corporation, Workflow Solutions LLC, a Delaware limited liability company, WFIH, Inc., a Delaware corporation, Old FGS, Inc.,  a New Jersey corporation, Old UE, LLC, a Delaware limited liability company, The Relizon Company, a Delaware corporation, Workflow of Florida Inc., a Delaware corporation, Workflow Management Acquisition II Corp, a Delaware corporation, SFI of Puerto Rico, Inc., a Delaware corporation, Workflow Direct, Inc., a California corporation, Relizon de México Inc., a Delaware corporation, Relizon SNE Inc., a Delaware corporation, Formcraft Holdings Limited Partner, Inc., a Delaware corporation, Formcraft Holdings General Partner, Inc., a Delaware corporation, Relizon KNE Inc., a Delaware corporation, Relizon Wisconsin Inc., a Wisconsin corporation and Relizon Texas Ltd., LLP, a Texas limited liability partnership (collectively, "Sellers") and Workflow Holdings, LLC, a Delaware limited liability company ("Buyer").

## RECITALS

WHEREAS, as of the date hereof, WMI is borrower under, and the other Sellers (other than WF Capital) are guarantors of (i) that certain first lien credit agreement, dated as of November 30, 2005, which established a term loan facility and a revolving credit facility (collectively, as amended from time to time, the "First Lien Credit Facility") and (ii) that certain second lien credit agreement, dated as of December 19, 2005, which established a second lien credit facility (as amended from time to time, the "Second Lien Credit Facility");

WHEREAS, on the Petition Date, Sellers filed voluntary petitions for relief (the "Chapter 11 Cases") under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, case number 10-74617(SCS);

WHEREAS, in connection with the Chapter 11 Cases, Sellers have filed a third amended joint Chapter 11 plan, attached hereto as **Exhibit A** (as the same may be amended, supplemented or modified from time to time in accordance with the terms therein, the "Bankruptcy Plan");

WHEREAS, pursuant to the Bankruptcy Plan, Buyer has agreed to acquire the Purchased Assets and assume the Assumed Liabilities in exchange for which Buyer will pay consideration which includes, among other things, the delivery of the Newco First Lien Loan Notes, the Newco Second Lien Loan Notes and the Newco Preferred Units to Sellers;

WHEREAS, pursuant to the Bankruptcy Plan, Buyer has agreed to secure the Newco First Lien Loan Notes with a first priority lien on substantially all of Buyer's assets, including the Purchased Assets, and Buyer has agreed to secure the Newco Second Lien Loan Notes with a second priority lien on substantially all of Buyer's assets, including the Purchased Assets; and

WHEREAS, pursuant to the Bankruptcy Plan, Sellers will distribute the Newco First Lien Loan Notes to the First Lien Lenders and the Newco Second Lien Loan Notes and the Newco

Preferred Units to the Second Lien Lenders in exchange for the satisfaction of Sellers obligations under the First Lien Credit Facility and the Second Lien Credit Facility, respectively.

NOW THEREFORE, in consideration of the premises and the representations, warranties and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereby agree as follows:

ARTICLE I
Definitions and Rules of Construction

1.1.    Definitions.

As used in this Agreement, the following terms shall have the meanings set forth below:

"Accounts Receivable" means (a) all trade accounts receivable and other rights to payment from customers of Sellers with respect to the Business and (b) any claim, remedy or other right related to the foregoing.

"ACMs" has the meaning set forth in the definition of "Hazardous Materials."

"Additional Retained Contracts" has the meaning set forth in Section 2.3(b).

"Administrative Expense Claims Reserve" has the meaning given to such term in the Bankruptcy Plan.

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Agreement" means this Asset Purchase and Sale Agreement, as it may be amended from time to time.

"Ancillary Documents" means the documents being executed and delivered in connection with this Agreement and the transactions contemplated hereby.

"Assets" of any Person means all assets and properties of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible, wherever situated and by whomever possessed), including the goodwill related thereto, operated, owned or leased by such Person.

"Assignment and Assumption Agreements" has the meaning set forth in Section 8.2.

"Assigned Contracts" has the meaning set forth in Section 2.2(f).

"Assumed Liabilities" has the meaning set forth in Section 2.4.

"Assumed Plans and Benefits" has the meaning set forth in Section 5.7(b).

"Avoidance Actions" has the meaning set forth in Section 2.3(b)(xi).

"Bankruptcy Code" means title 11 of the United States Code, as amended from time to time and applicable to the Chapter 11 Cases.

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Virginia, Norfolk Division.

"Bankruptcy Plan" has the meaning set forth in the Recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Business" means the provision of printed business documents, print-related and logistical services and promotional marketing solutions by Sellers and any other business activities of Sellers as currently conducted and as contemplated to be conducted by Sellers.

"Business Day" means any day other than a Saturday, Sunday or day on which banks are closed in New York, New York.  If any period expires on a day which is not a Business Day or any event or condition is required by the terms of this Agreement to occur or be fulfilled on a day which is not a Business Day, such period shall expire or such event or condition shall occur or be fulfilled, as the case may be, on the next succeeding Business Day.

"Business Intellectual Property" means all Intellectual Property used or held for use by Sellers in connection with the Business whether owned or licensed from third parties.

"Buyer" has the meaning set forth in the Preamble.

"Buyer Disclosure Schedule" means the disclosure schedule of even date herewith delivered by Buyer to Sellers in connection with the execution and delivery of this Agreement.

"Buyer Fundamental Representations" shall mean the representations and warranties contained in Section 4.1., Section 4.2 and Section 4.3.

"Buyer Material Adverse Effect" means a material adverse effect on the ability of Buyer to consummate the Contemplated Transactions.

"Cash Collateral Order" has the meaning set forth in the Bankruptcy Plan.

"Chapter 11 Cases" has the meaning set forth in the Recitals.

"Claims" has the meaning set forth in Section 2.2(l).

"Closing" has the meaning set forth in Section 2.1.

"Closing Consideration Amount" has the meaning set forth in Section 2.6.

"Closing Date" has the meaning set forth in Section 2.1.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, or corresponding provisions of subsequent superseding federal revenue Laws.

"Confirmation Order" has the meaning set forth in the Bankruptcy Plan.

"Consultant" means all persons (other than employees of Sellers) who are or have been engaged as consultants by Sellers or who otherwise provide services to Sellers under a contractual arrangement.

"Contemplated Transactions" means the transactions contemplated by this Agreement and the Ancillary Documents.

"Contract" means any agreement, contract, license, arrangement, understanding, obligation or commitment to which a party is bound or to which its assets or properties are subject, whether oral or written, and any amendments and supplements thereto.

"Copyrights" means all registered and unregistered United States and non-United States copyrights, including copyrights in Software.

"Cure Cost" has the meaning set forth in the Bankruptcy Plan.

"Disclosure Statement Order" has the meaning set forth in the Bankruptcy Plan.

"Effective Date" has the meaning set forth in the Bankruptcy Plan.

"Employee" means any employee of Sellers as of the Closing, other than employees listed in Section 1.1(a) of the Seller Disclosure Schedule.

"End Date" has the meaning set forth in Section 9.1(f).

"Environmental Laws" means any applicable federal, state or local law, statute, ordinance, rule or regulation governing Environmental Matters and all applicable judicial and administrative decisions, orders and decrees relating to Environmental Matters.

"Environmental Matter" means any matter arising out of, relating to, or resulting from pollution, contamination, protection of the environment, human health and any matters relating to emissions, discharges, disseminations, releases or threatened releases, of Hazardous Materials into the air (indoor and outdoor), surface water, groundwater, soil, land surface or subsurface, buildings, facilities, real or personal property or fixtures or otherwise arising out of, relating to, or resulting from the manufacture, processing, distribution, use, treatment, storage, disposal, transport, handling, release or threatened release of Hazardous Materials.

"Environmental Permits" has the meaning set forth in Section 3.8(a).

"ERISA" means the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time, as well as any rules and regulations promulgated thereunder and any corresponding provisions of subsequent superseding federal Laws relating to retirement matters, as from time to time in effect.

"ERISA Affiliate" means a corporation which is or was at any time a member of a controlled group of corporations with Sellers within the meaning of Code Section 414(b), a trade or business which is or was under common control with Sellers within the meaning of Code Section 414(c), or a member of an affiliated service group with Sellers within the meaning of Code Sections 414(m) or (o).

"Estate" means the estate of any Seller created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

"Excluded Assets" has the meaning set forth in Section 2.3(b).

"Event" means any event, change, development, effect, condition, circumstance, matter, occurrence or state of facts.

"Facilities" means all real property owned, leased, or operated by Sellers in connection with the Business and any buildings, facilities, machinery, equipment, furniture, leasehold and other improvements, fixtures, vehicles, structures, any related capital items and other tangible property located on, in, under or above such real property of Sellers.

"Final Order" has the meaning set forth in the Bankruptcy Plan.

"Financial Statements" has the meaning set forth in Section 3.5(a).

"First Lien Credit Facility" has the meaning set forth in the Recitals.

"First Lien Lenders" means the lenders under the First Lien Credit Facility, from time to time.

"Former Shareholder Notes" means those certain promissory notes made by certain former shareholders of Sellers payable to certain Sellers in the original aggregate principal amount of approximately $2,352,872.

"GAAP" means generally accepted accounting principles in the United States of America in effect from time to time.

"Governmental Authority" means any nation or government, any foreign or domestic federal, state, county, municipal or other political instrumentality or subdivision thereof and any foreign or domestic entity or body exercising executive, legislative, judicial, regulatory, administrative or taxing functions of or pertaining to government, including any court.

"Governmental Consents" has the meaning set forth in Section 3.4.

"Hazardous Materials" means any materials or substances defined as toxic, hazardous, extremely hazardous or words of similar import, under, any applicable Environmental Law (including petroleum or any by-products or fractions thereof, lead, asbestos and asbestos-containing materials ("ACMs"), polychlorinated biphenyls ("PCBs") and PCB-containing equipment, radon and urea formaldehyde foam insulation).

"Indebtedness" means all obligations and indebtedness of the Business (a) for borrowed money (other than trade debt and other similar liabilities incurred in the ordinary course of business), (b) evidenced by a note, bond, debenture or similar instrument, (c) created or arising under any capital lease, conditional sale, earn out or other arrangement for the deferral of purchase price of any property, (d) under letters of credit, banker's acceptances or similar credit transactions, (e) for any other Person's obligation or indebtedness of the same type as any of the foregoing, whether as obligor, guarantor or otherwise, (f) for interest on any of the foregoing and/or (g) for any premiums, prepayment or termination fees, expenses or breakage costs due upon prepayment of any of the foregoing.

"Intellectual Property" means Patents, Copyrights, Trademarks, Trade Secrets, Software and Technology, and all rights therein arising under any Law.

"Knowledge of Sellers" means the actual knowledge possessed by Scott Seymour, Paul Bogutsky, Dave Davis, Brian Leitch, Dean Truitt, Ernest Miller, Bill Antoskiewicz, Rob Whittington, Kelly Whitt, Thomas Rizzi or Robert Abbonizio.

"Laws" means all laws, Orders, statutes, codes, regulations, ordinances, decrees, rules, or other requirements with similar effect of any Governmental Authority.

"Liability" means, with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise and whether or not the same is required to be accrued on the financial statements of such Person.

"Lien" means any lien, statutory or otherwise, security interest, mortgage, deed of trust, option, priority, pledge, charge, right of first refusal, easement, right-of-way, encroachment, license to a third party, lease to a third parties or other encumbrance or similar right of others, or any agreement to give any of the foregoing.

"Litigation" means any claim, action, suit, audit, inquiry, proceeding or governmental investigation.

"Material Adverse Effect" means (a) any Event which has a material adverse effect on the business, condition (financial or otherwise), assets, liabilities or results of operation of the Business taken as a whole, provided, that any effect resulting from any of the following shall not be considered when determining whether a Material Adverse Effect shall have occurred:  (i) changes in general economic conditions, (ii) the announcement of this Agreement, (iii) changes in GAAP applicable to the Business, (iv) acts of terrorism, armed hostilities or war, (v) changes resulting from any natural disasters or other force majeure events, or (vi) changes in Law or interpretations thereof (after the date hereof) by any Governmental Authority; provided,

that in the case of each of the foregoing clauses (i), (iii), (iv), (v) or (vi), such event does not disproportionately impact the Business taken as a whole, relative to the other participants in the industries in which Sellers operate or (b) any Event that prevents or would be reasonably expected to prevent consummation of the Contemplated Transactions or the performance by the Business or Sellers of any of their material obligations under this Agreement.

"Most Recent Audited Financial Statements" has the meaning set forth in Section 3.5(a).

"Most Recent Unaudited Financial Statements" has the meaning set forth in Section 3.5(a).

"Newco First Lien Credit Agreement" means that certain first lien credit agreement, to be dated as of the Closing Date, among Buyer, as borrower, the Newco First Lien Lenders party thereto and the administrative agent party thereto, as amended from time to time and as such term is defined in the Bankruptcy Plan.

"Newco First Lien Lenders" means the lenders that are party to the Newco First Lien Credit Agreement from time to time and as such term is defined in the Bankruptcy Plan.

"Newco First Lien Loan Notes" means the notes made by Buyer that evidence the payment obligations of Buyer under the Newco First Lien Credit Agreement secured by a first lien on substantially all of the assets of Buyer as contemplated in the Newco First Lien Credit Agreement and as such term is defined in the Bankruptcy Plan.

"Newco Preferred Units" means the perpetual preferred units issued by Buyer, with an initial stated liquidation value of $30 million and a 15% preferred distribution.

"Newco Second Lien Credit Agreement" means that certain second lien credit agreement, to be dated as of the Closing Date, among Buyer, as borrower, the Newco Second Lien Lenders party thereto and the administrative agent party thereto, as amended from time to time and as such term is defined in the Bankruptcy Plan.

"Newco Second Lien Lenders" means the lenders that are party to the Newco Second Lien Credit Agreement from time to time and as such term is defined in the Bankruptcy Plan.

"Newco Second Lien Loan Notes" means the notes made by Buyer that evidence the payment obligations of Buyer under the Newco Second Lien Credit Agreement secured by a second lien on substantially all of the assets of Buyer as contemplated in the Newco Second Lien Credit Agreement and as such term is defined in the Bankruptcy Plan.

"Ohio Development Loan" means that certain loan made pursuant to a loan agreement between The Relizon Company and the State of Ohio Director of Development, dated as of January 31, 2003, in the original principal amount of $800,000, which matures on January 31, 2013.

"Orders" means all judgments, orders, writs, injunctions, decisions, rulings, decrees and awards of any Governmental Authority.

"Patents" means all United States and non-United States patents and applications therefore, including provisionals, divisions, reissues, continuations, continuations-in-part, reexaminations, renewals and extensions of the foregoing, and statutory invention registrations, utility models and utility model applications.

"PCBs" has the meaning set forth in the definition of "Hazardous Materials."

"PBGC" has the meaning set forth in the definition of "Pension Plan Liabilities."

"Pension Plan" has the meaning set forth in the definition of "Pension Plan Liabilities."

"Pension Plan Liabilities" means any Liability arising out of or relating to the Relizon Company Retirement Plan and the Pension Plan for Employees of Relizon Canada Inc. (the "Pension Plan"), including without limitation any Liability for (i) contributions to the Pension Plans, (ii) any underfunding of the Pension Plans (whether arising before or after the Closing), (iii) premiums payable pursuant to Section 4006 of ERISA, including termination premiums, with respect to the Pension Plan, (iv) taxes or other penalties relating to the Pension Plan(s) or (v) to the Pension Benefit Guaranty Corporation ("PBGC") relating to the Pension Plans.

"Permits" has the meaning set forth in Section 2.2(g).

"Permitted Lien" means any (i) Lien in respect of Taxes, if due, the validity of which is being contested in good faith by appropriate proceedings during which collection or enforcement is stayed, (ii) mechanics', carriers', workmen's, repairmen's or other like Liens arising or incurred in the ordinary course of business, (iii) with respect to leasehold interests, mortgages and other Liens incurred, created, assumed or permitted to exist and arising by, through or under a landlord or owner of the leased real property, (iv) Liens incurred in the ordinary course of business in connection with worker's compensation, unemployment insurance and other types of social security, (v) Liens securing claims of creditors treated in Class 4 of the Bankruptcy Plan, and (vi) Liens listed in Section 1.1(b) of the Seller Disclosure Schedule.

"Perseus" means, as applicable, any or all of Perseus, L.L.C., Perseus Partners VII, L.P., Perseus Acquisition/Recapitalization Fund, L.L.C., Perseus 2000 Expansion, L.L.C., WF Holdings Co-Investment, L.P. and Perseus Market Opportunity Fund, L.P., and each of their respective present and former officers, directors, managers and employees.

"Perseus Contribution" means the capital contribution by Perseus to Buyer in an amount equal to $12.5 million.

"Person" means any individual, person, entity, general partnership, limited partnership, limited liability partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, association, foreign trust or foreign business organization and

the heirs, executors, administrators, legal representatives, successors and assigns of the "Person" when the context so permits.

"Petition Date" means September 29, 2010, the date on which Sellers filed with the Bankruptcy Court their petitions commencing the Chapter 11 Cases.

"Plan" or "Plans" means all employee benefit plans (as defined in Section 3(3) of ERISA) and all bonus, stock option, stock purchase, other equity-based profit sharing, savings, disability, incentive, deferred compensation, retirement, severance, retention, pension, change in control or other employee benefit plans or programs and all employment or compensation agreements, for the benefit of, or relating to, current employees and former employees, with respect to the Business, of Sellers or any ERISA Affiliate, or with respect to which Sellers or any of their Subsidiaries could have any Liability.

"Plan Administrator" has the meaning set forth in the Bankruptcy Plan.

"Plan Funds" has the meaning set forth in the Bankruptcy Plan.

"Plan Supplement" has the meaning set forth in the Bankruptcy Plan.

"Pre-Closing Taxes" means any Taxes of or relating to the Purchased Assets (i) for any taxable period ending on or before the Closing Date, or (ii) allocable to the portion of Straddle Period ending on and including the Closing Date. Taxes with respect to a Straddle Period shall be allocated to the portion of the Straddle Period ending on the Closing Date to the extent feasible, on a specific identification basis, according to the date of the event or transaction giving rise to the Tax, and with respect to periodically assessed ad valorem Taxes and Taxes not otherwise feasibly allocable to specific transactions or events, in proportion to the number of days in such Straddle Period occurring through the Closing Date compared to the total number of days in such Straddle Period.

"Purchased Assets" has the meaning set forth in Section 2.2.

"Rejected Contracts" has the meaning set forth in Section 2.3(b).

"Retained Liabilities" has the meaning set forth in Section 2.5.

"Retained Notes" means the WF Capital/BB&T Note, the WF Holdings/Carlyle Note, WF Capital/Perseus Convertible Note, the WF Capital/Perseus Interest Note and the Workflow Management/Perseus Note.

"Second Lien Credit Facility" has the meaning set forth in the Recitals.

"Second Lien Lenders" means the lenders under the Second Lien Credit Facility, from time to time.

"Sellers" has the meaning set forth in the Preamble.

"Seller Disclosure Schedule" means the disclosure schedule of even date herewith delivered by Seller in connection with the execution and delivery of this Agreement, as may be further amended in compliance with this Agreement after the date hereof.

"Seller Fundamental Representations" shall mean the representations and warranties contained in Section 3.1 and Section 3.2.

"Seller Transaction Expenses" means all fees, costs and expenses incurred or to be paid by Sellers or the Business in connection with the Contemplated Transactions, including fees and disbursements of counsel, financial advisors, Consultants and accountants, and filing fees and expenses incurred by Sellers or the Business in connection with any filing by Sellers or the Business with a Governmental Authority.

"Software" means the manifestation, in tangible or physical (including digital) form, including in magnetic media, firmware, and documentation, of computer programs and databases, including data therein, such computer programs and databases to include, but not limited to, management information systems and personal computer programs, websites and content therein.  The tangible manifestation of such programs may be in the form of, among other things, source code, flow diagrams, listings, object code and microcode.  Software does not include any Technology.

"Straddle Period" means any taxable period that includes, but does not end on, the Closing Date.

"Subsidiary" means, with respect to any Person, any corporation or other organization, whether incorporated or unincorporated, (a) of which such Person or any other Subsidiary of such Person is a general partner (excluding partnerships, the general partnership interests of which held by such Person or any Subsidiary of such Person do not have a majority of the voting interests in such partnership), or (b) at least a majority of the securities or other interests of which having by their terms ordinary voting power to elect a majority of the board of directors or others performing similar functions with respect to such corporation or other organization is directly or indirectly owned or controlled by such Person or by any one or more of its Subsidiaries, or by such Person and one or more of its Subsidiaries.

"Tax" or "Taxes" means all federal, state, local and foreign income, profits, franchise, gross receipts, environmental, customs duty, capital stock, severances, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise production, value added, occupancy, Transfer Taxes, and other taxes, duties or assessments of any nature whatsoever, together with all interest, penalties or additions to tax attributable to such taxes and any Liability arising under any tax sharing agreement or any Liability for Taxes of another Person by Contract, as a transferee or successor, under Treasury Regulation §1.1502-6 or analogous state, local or foreign Law, whether disputed or not.

"Tax Return" means any report, return, statement or other written information (including elections, declarations, disclosures, schedules, estimates and information returns) supplied by or required to be supplied by Sellers to a Taxing Authority in connection with any Taxes and any schedule or attachment thereto and amendment thereof.

"Taxing Authority" means any government or any subdivision, agency, commission or authority thereof, or any quasi-governmental or private body, having jurisdiction over the assessment, determination, collection or other imposition of Taxes.

"Technology" means all types of technology, technical information, know-how, and data, whether or not reduced to tangible or physical form, whether a Trade Secret or not, including: product definitions and designs; inventions; research and development; engineering, manufacturing, process, test, quality control, procurement, and service specifications, procedures, processes, standards, and reports; blueprints; drawings; materials specifications, procedures, standards, and lists; catalogs; technical information and data relating to marketing and sales activity; and formulae. Technology does not include any Software.

"Trade Secrets" means information, unpatented inventions, discoveries, data and any other intangible items in any form that are considered to be proprietary information by the owner, is maintained on a confidential or secret basis by the owner, and is not generally known to other parties.

"Trademarks" means all United States and non-United States trademarks, service marks, trade names, brand names, trade dress, domain names and other identifiers of source or goodwill, together with all registrations and applications for registration thereof, and all goodwill associated therewith.

"Transfer Documents" has the meaning set forth in Section 7.2.

"Transfer Taxes" means all transfer, documentary, sales, use, stamp, registration and other such Taxes and fees (including any penalties and interest) incurred in connection with the sale of the Purchased Assets (including any transfer or similar Tax imposed by any Governmental Authority). For the avoidance of doubt, Transfer Taxes do not include any taxes based upon or measured by income or gains, which shall be paid entirely by Seller.

"Treasury Regulations" means the regulations promulgated under the Code, as amended from time to time (including any successor regulations).

"WF Capital" has the meaning set forth in the Preamble.

"WF Capital/BB&T Note" means the note made by WF Capital payable to Branch Banking & Trust Company, dated as of December 31, 2008, in the amount of approximately $20 million (not including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

"WF Capital/Perseus Convertible Note" means the amended and restated convertible note dated as of March 4, 2008, and made by WF Capital payable to Perseus Partners VII, L.P., in the amount of approximately $58.4 million (including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto, which note is convertible, at the note holder's option, to equity of Sellers.

"WF Capital/Perseus Interest Note" means the demand note made by WF Capital payable to Perseus Market Opportunity Fund, L.P., in the amount of approximately $302,000

(including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

"WF Holdings/Carlyle Note" means the subordinated promissory note made by WF Holdings, Inc. payable to Carlyle Partners III, L.P., as holder representative for the benefit of the beneficial holders identified on Schedule I thereto, dated December 21, 2006, in the amount of approximately $12,500,000 (including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

"WMI" has the meaning set forth in the Preamble.

"Workflow Management/Perseus Note" means the promissory note dated February 9, 2010, and made by WMI payable to Perseus, L.L.C., which was subsequently assigned by Perseus, L.L.C. to Perseus Market Opportunity Fund, L.P., in the amount of approximately $1.1 million (including accrued, but unpaid interest as of September 30, 2010), and any other documents appurtenant thereto, as applicable, and any amendments thereto.

    1.2.   Rules of Construction.

Unless the context otherwise requires:

(a)    A capitalized term has the meaning assigned to it;

(b)    An accounting term not otherwise defined has the meaning assigned to it in accordance with GAAP;

(c)    References in the singular or to "him," "her," "it," "itself," or other like references, and references in the plural or the feminine or masculine reference, as the case may be, shall also, when the context so requires, be deemed to include the plural or singular, or the masculine or feminine reference, as the case may be;

(d)    References to Articles, Sections and Exhibits shall refer to articles, sections and exhibits of this Agreement, unless otherwise specified;

(e)    The headings in this Agreement are for convenience and identification only and are not intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision thereof;

(f)    This Agreement shall be construed without regard to any presumption or other rule requiring construction against the party that drafted and caused this Agreement to be drafted;

(g)    All monetary figures shall be in United States dollars unless otherwise specified;

(h)    References to "including" in this Agreement shall mean "including, without limitation," whether or not so specified; and

(i)     The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other theory extends and such phrase shall not mean "if."

ARTICLE II
Purchase and Sale

2.1.    Closing.

The closing of the Contemplated Transactions (the "Closing") will take place at the offices of Fried, Frank, Harris, Shriver & Jacobson LLP, One New York Plaza, New York, NY 10004, at 10:00 A.M. local time on the second Business Day immediately following the day on which the last of the conditions set forth in Article VI (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of those conditions) are satisfied or waived in accordance with this Agreement, or on such other date as Buyer and Sellers may otherwise agree. For the avoidance of doubt, it is intended by the parties hereto that the Closing shall occur simultaneously with the Effective Date of the Bankruptcy Plan.  The day on which the Closing actually occurs is referred to herein as the "Closing Date."

2.2.    Sale and Purchase of the Purchased Assets.

Subject to the terms and conditions set forth in this Agreement, at the Closing, Sellers shall sell, transfer, assign and deliver (or cause to be sold, transferred, assigned and delivered) to Buyer, and Buyer (or such other entity or entities designated by Buyer in compliance with Section 10.9) shall purchase and acquire, all of Sellers' right, title and interest in and to the Purchased Assets.  For purposes of this Agreement, "Purchased Assets" shall mean all of Sellers' right, title and interest in and to all of the Assets that are owned by Sellers, other than the Excluded Assets, together with such changes, deletions or additions occurring between the date hereof and the Closing Date in compliance with this Agreement, including the following Assets:

(a)     All fee-owned real property, leaseholds, subleaseholds, and other interests of Sellers in the real property listed in Section 2.2(a) of the Seller Disclosure Schedule, in each case, including all structures, improvements and fixtures located thereon and all rights of way, other rights, privileges, licenses, easements and appurtenances belonging or appertaining thereto;

(b)     All Accounts Receivable;

(c)     All inventories of raw materials and supplies, manufactured and purchased parts, work-in-process, finished goods and spare parts, that are owned, leased or licensed by Sellers, including, without limitation, all such inventory which may be in transit or in the possession of any third party;

(d)     All machinery, equipment, molds, tools, furniture and furnishings, leasehold improvements, goods, vehicles, office equipment and supplies, computers and related equipment, telephones, telecopiers, and other fixed assets of any kind, that are owned, leased or licensed by Sellers;

(e)     Other than as listed in Section 2.2(e) of the Seller Disclosure Schedule, all Business Intellectual Property, together with the right to sue and obtain damages and equitable relief for past, present and future infringement, misappropriation, dilution or violation thereof or unfair competition therewith, and all other intangible rights and property, including going concern value, and all goodwill associated therewith;

(f)     All Contracts of Sellers listed in Section 2.2(f) of the Seller Disclosure Schedule (the "Assigned Contracts");

(g)     All franchises, approvals, permits, licenses, orders, registrations, certificates and other government authorizations and approvals (collectively, the "Permits") issued to, owned, used or possessed by Sellers;

(h)     All rights of Sellers to receive mail (including e-mail) and other communications (including, without limitation, mail (including e-mail) and communications from customers, suppliers, distributors, agents and others);

(i)     All rights of Sellers to use the telephone numbers, telecopier numbers, Internet website domain names and e-mail addresses;

(j)     All records, ledgers, files, documents, surveys, plans, catalogs, technical information, pricing sheets, instructions and manuals, employee handbooks, correspondence, customer and supplier lists, drawings, specifications, display, advertising and promotional materials, equipment and parts lists, dealer and distributor lists, labels and packaging materials, computer data and software, studies, reports, data and other printed, written or electronically-stored materials of whatever nature of Sellers, and all records, files and original documents relating to registration and applications for registration of Business Intellectual Property owned, leased or licensed by Seller;

(k)     All rights of Sellers relating to deposits and prepaid expenses, claims for refunds, premiums and rights to offset in respect thereof;

(l)     All claims, rights, and with respect to legal actions, causes of action, rights to refunds, rights of recovery, rights of set off and rights of recoupment of any kind, of Sellers;

(m)     All unexpired, transferable warranties, indemnities or guarantees from any third party with respect to the Purchased Assets, including any item of real property, personal property or equipment, or the Business;

(n)     All cash and cash equivalents (including marketable securities and short term investments) of Sellers;

(o)     All goodwill associated with the Business, together with the right to represent to third parties that Buyer is the successor to the Business;

(p)     All insurance benefits, including rights and proceeds, of Sellers, in each case, to the extent used in, or to the extent related to, arising from or primarily relating to the Purchased Assets or the Assumed Liabilities prior to the Closing Date;

(q)    All rights to refunds of Taxes paid by Sellers;

(r)    The Former Shareholder Notes; provided, however, that on and as of the Closing, and provided that, unless Perseus is excused under the terms of the documents providing for the Perseus Contribution, Perseus has funded the Perseus Contribution, Buyer shall irrevocably release and waive 50% of the outstanding principal amount of each of the Former Shareholder Notes and all interest thereon as of the Closing; and

(s)    All other assets, properties and rights of Sellers, other than the Excluded Assets.

For the avoidance of doubt, all of the Purchased Assets, including without limitation all items set forth above in Section 2.2(a)-(s), except Section 2.2(r), affected by a release, waiver, exculpation, or injunction under Article XIII of the form of the Bankruptcy Plan attached hereto shall be transferred to Buyer subject to and after giving effect to such releases, waivers, exculpations, and injunctions, it being all parties' intent that all matters subject to a release, waiver, exculpation, or injunction under Article XIII of the form of the Bankruptcy Plan attached hereto be forever released, waived, exculpated, and enjoined, and therefore unassertable in the hands of any party, including without limitation the Buyer.  Moreover, if the final form of the Bankruptcy Plan confirmed in the Chapter 11 Cases is modified in a fashion that alters the terms or scope of Article XIII in any way, then Buyer shall be deemed to release and waive on and effective as of the Closing any and all of the Purchased Assets that would otherwise be subject to releases, waivers, exculpations, and injunctions, including without limitation all items set forth above in Section 2.2(a)-(s), except Section 2.2(r), affected by such modifications of the Bankruptcy Plan.

2.3.    Excluded Assets.

(a)    Notwithstanding anything in this Agreement to the contrary, Sellers shall not sell, transfer, assign or deliver to Buyer any of their rights, titles to or interests in any of the Excluded Assets.

(b)    For purposes of this Agreement, "Excluded Assets" mean the following:

(i) All Contracts of Sellers listed in the Plan Supplement on the "Schedule of Rejected Executory Contracts and Unexpired Leases" or on any other list of rejected contracts or leases filed with the Bankruptcy Court (the "Rejected Contracts");

(ii) All Contracts of Sellers listed in Section 2.3(b)(ii) of the Seller Disclosure Schedule including certain insurance Contracts (the "Additional Retained Contracts");

(iii) All consideration received by, and all rights of, Sellers pursuant to this Agreement;

(iv) All assets that relate to any Plan retained by Sellers pursuant to Section 2.5(c);

(v) All entity charters, operating agreements, limited partnership agreements, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books and other documents relating to the organization, maintenance, and existence of Sellers as entities;

(vi) All causes of action solely with respect to claims for any right of setoff against unsecured creditors of Sellers who have asserted a claim against Sellers in the Chapter 11 Cases;

(vii) All equity interests in and of Sellers;

(viii) All legal or beneficial interests in the share capital of any Affiliate of Sellers, including associated stock registers and similar records;

(ix)All data and records to the extent relating to Tax liabilities, potential Tax liabilities, or refunds of Taxes of Sellers; provided, that Sellers shall provide copies of all such data and records to Buyer;

(x) All other assets or properties listed in Section 2.3(b)(x) of the Seller Disclosure Schedule; and

(xi) All causes of action of the Estates that arise under section 544, 545, 547, 548, 549, 550, 551 and/or 553 of the Bankruptcy Code (collectively "Avoidance Actions").

2.4.    Assumption of Liabilities.

Effective as of the Closing, Sellers shall not have any liability or obligation with respect to, and Buyer shall assume and thereafter pay, perform and discharge when due, only the following liabilities and obligations of Sellers to the extent relating to or arising from, the Purchased Assets and the Business (collectively, the "Assumed Liabilities"):

(a)    all obligations and liabilities of Sellers with respect to the Assigned Contracts that arise after the Petition Date, relate to periods following the Petition Date and are to be observed, paid, discharged, or performed, as the case may be, in each case at any time after the Petition Date and all "Cure Costs" listed in Section 2.4(a) of the Seller Disclosure Schedule (and, for the avoidance of doubt, no other Cure Costs) imposed in the Bankruptcy Plan with respect to such Assigned Contracts required to be paid under the terms of the Bankruptcy Plan and applicable law;

(b)    all employee-related Liabilities and obligations of Sellers incurred prior to the Closing or arising out of or relating to any event, action or inaction occurring prior to the Closing, including all Liabilities and obligations of Sellers arising under the Plans or relating to payroll, vacation, sick leave, disability, healthcare, workers' compensation and unemployment benefits of any kind, prior to the Closing, in each case only if and to the extent listed in Section 2.4(b) of the Seller Disclosure Schedule;

(c)     all Administrative Expense Claims (as defined in the Bankruptcy Plan) arising in the ordinary course of Sellers' business during the pendency of the Chapter 11 Cases and all Section 503(b)(9) Claims (as defined in the Bankruptcy Plan) each as contemplated by and in compliance with Section 6.2(e) of the Bankruptcy Plan (which shall not include any other Administrative Expense Claims, including the Fee Claims (as defined in the Bankruptcy Plan));

(d)     those certain Priority Non-Tax Claims (as defined in the Bankruptcy Plan) and Priority Tax Claims (as defined in the Bankruptcy Plan) identified by Buyer prior to Closing in accordance with Section 8.10 of the Bankruptcy Plan;

(e)     the Ohio Development Loan and the claims of all of the creditors treated in Class 4 of the Bankruptcy Plan;  and

(f)     the obligations and liabilities of Sellers with respect to the payment of accrued but unpaid base salaries and regular wages of Employees (together with all earned and accrued amounts payable under any variable compensation or production based incentive compensation or "bonus" program currently in effect for members of Sellers' sales and sale operations departments and other employment based reimbursable expenses incurred in the ordinary course of business and pursuant to Seller's programs existing on the date hereof) in respect of periods of employment before and following the Closing.

Notwithstanding anything to the contrary contained in this Agreement, Buyer shall not have any liability or obligation with respect to, shall not assume or agree to pay, perform or discharge, and shall not be deemed by virtue of the execution and delivery of this Agreement or any document delivered at the Closing pursuant to this Agreement, or as a result of the consummation of the Contemplated Transactions, to have assumed, or to have agreed to pay, perform or discharge, any liability, obligation or indebtedness of Sellers or any of their Affiliates, whether primary or secondary, direct or indirect, known or unknown, asserted or unasserted, due or to become due, accrued, absolute, contingent or otherwise, and whether arising prior to, on or after the Closing Date, other than the Assumed Liabilities.

2.5.   Retained Liabilities.

Notwithstanding any other provision of this Agreement, Sellers shall retain and Buyer shall not assume, agree to pay, perform or discharge any Liabilities or obligations of Sellers other than the Assumed Liabilities (such liabilities not assumed by Buyer, collectively, the "Retained Liabilities").   "Retained Liabilities" shall include, without limitation, the following:

(a)     The obligations and liabilities of Sellers for any Taxes, including without limitation any liabilities of Sellers on account of any taxes based upon or measured by income or gain, and including any Taxes based upon or measured by income or gain with respect to the transactions contemplated herein, and any liabilities with respect to the Purchased Assets for any Pre-Closing Taxes;

(b)     Any Liabilities of Sellers arising pursuant to this Agreement and all Seller Transaction Expenses;

(c)     All employee-related Liabilities and obligations of Sellers incurred prior to the Closing or arising out of or relating to any event, action or inaction occurring prior to the Closing, including all Liabilities and obligations of Sellers arising under the Plans or relating to payroll, vacation, sick leave, workers' compensation and unemployment benefits of any kind, prior to the Closing, in each case other than the Liabilities listed in Section 2.4(b) of the Seller Disclosure Schedule;

(d)     Any Liabilities of Sellers in connection with any Litigation relating to facts or events occurring on or prior to the Closing Date;

(e)     Any Liabilities of Sellers relating to, arising out of or incurred in connection with any of the Excluded Assets;

(f)     Any Liabilities of Sellers arising under Environmental Laws and relating to the ownership or operation of the Business or the ownership, use, possession or condition of the Purchased Assets on or prior to the Closing Date;

(g)     Any Liabilities of Sellers for Indebtedness (other than with respect to the Ohio Development Loan and capital leases listed as Assigned Contracts in Section 2.2(f) of the Seller Disclosure Schedule);

(h)     Other than Cure Costs listed in Section 2.4(a) of the Seller Disclosure Schedule, with respect to the Assigned Contracts required to be paid under the Bankruptcy Plan and applicable law, any Liabilities arising out of or resulting from any breach by Sellers under any Contract related to the Business;

(i)     Other than employee-related liabilities assumed pursuant to Section 2.4(b) above, any Liabilities of Sellers for personal injury or property damage, whether in contract, tort, strict liability or under any other theory;

(j)     Any Liabilities of Sellers to make loans to any officer, director, employee or agent of Sellers which have not been fulfilled;

(k)     The Pension Plan Liabilities;

(l)     The Retained Notes; and

(m)     Any and all other Liabilities of Sellers arising out of or relating to periods prior to the Closing.

2.6.   <u>Purchase Price</u>. The purchase price to be paid by Buyer to Sellers at the Closing for the Purchased Assets and the assumption of the Assumed Liabilities shall be (i) payment in full of the amount of the Plan Funds in immediately available funds, plus (ii) the issuance to Seller of the Newco First Lien Loan Notes, the Newco Second Lien Loan Notes and the Newco Preferred Units (such combined amount, the "<u>Closing Consideration Amount</u>").

2.7.   <u>Allocation of Purchase Price</u>. Buyer shall determine the applicable tax allocation of the Purchase Price and any Assumed Liabilities among the Purchased Assets and shall provide

Sellers with a copy of such allocation for Sellers' review and approval (such approval not to be unreasonably withheld). Sellers agree to be bound by such allocation for purposes of filing U.S. federal income Tax Returns required to be filed by them. In the event this allocation is disputed by any taxing authority, the party receiving notice of the dispute shall promptly notify the other party regarding resolution of the dispute.

2.8.    <u>Non-Assignment of Assigned Contracts</u>. Notwithstanding anything contained herein to the contrary, this Agreement shall not constitute an agreement to assign any Assigned Contracts if, notwithstanding the provisions of Section 363 and 365 of the Bankruptcy Code, an attempted assignment thereof, without the consent of the third party thereto, would constitute a material breach thereof or in any way materially adversely affect the rights of Sellers or Buyer, as the assignee of such Assigned Contracts, as the case may be, thereunder.

2.9.    <u>Designation of Assigned Contracts and Assumed Plans and Benefits</u>. Subject to Seller's ability to effectuate any such change in accordance with the Bankruptcy Plan, Buyer shall have the option, (A) subject to subparagraph (B) of this Section 2.9, exercisable until two (2) days prior to the Confirmation Hearing (as defined in the Bankruptcy Plan) to designate in writing any executory Contract (i) as an Assigned Contract (and therefore no longer a Rejected Contract) or (ii) a Rejected Contract (and therefore no longer an Assigned Contract), and in each case the applicable portions of the Seller Disclosure Schedule shall be deemed to be amended to reflect such designation, and any executory Contract designated as an Assigned Contract or a Rejected Contract, as applicable, pursuant to this Section 2.9 shall be understood and agreed to be an Assigned Contract or a Rejected Contract, as applicable, for all purposes under this Agreement as if such Contract were an Assigned Contract or a Rejected Contract, as applicable, as of the date of this Agreement and (B) exercisable until the later of ten (10) days prior to the date of the Confirmation Hearing (as defined in the Bankruptcy Plan) as provided in the Disclosure Statement Order (<u>provided</u>, that if such tenth day prior to the date of the Confirmation Hearing is not a Business Day, the relevant date shall be the immediately preceding Business Day) and February 14, 2011 (x) to amend Schedule 1.1(a) to add employees of Sellers and (y) to amend Schedule 2.4(b) to remove Assumed Plans and Benefits and other liabilities set forth in such Schedule (except as otherwise expressly provided therein).

2.10.    <u>Avoidance Actions Subject to Veto</u>.    As set forth in the Bankruptcy Plan, prosecution of any Avoidance Actions shall be subject to veto by the Buyer.  For the avoidance of doubt, the Buyer will veto prosecution of any Avoidance Actions subject to release under section 13.2 of the form of the Bankruptcy Plan attached hereto whether or not the final form of the Bankruptcy Plan confirmed in the Chapter 11 Cases is modified in a fashion that alters the terms or scope of section 13.2 of the Bankruptcy Plan in any way (other than pursuant to the last paragraph of section 13.1 of the Bankruptcy Plan), including without limitation any Avoidance Actions against Perseus and Perseus' Related Parties (as defined in the Bankruptcy Plan) that are subject to release under section 13.2 of the form of the Bankruptcy Plan attached hereto.

ARTICLE III
Representations and Warranties of Sellers

Except as set forth in the Seller Disclosure Schedule (it being agreed that any matter disclosed in the Seller Disclosure Schedule with respect to a particular representation, warranty

or covenant contained herein shall be deemed to be a disclosure with respect to all other applicable representations, warranties and covenants contained in this Agreement if the applicability of such disclosure to any other applicable representation, warranty or covenant would be reasonably apparent on its face to a Person reviewing the Seller Disclosure Schedule, regardless of whether an explicit reference to such other representation or warranty or covenant is made), Sellers, jointly and severally, hereby represent and warrant as of the date hereof and on and as of the Closing Date as follows:

3.1.   <u>Organization and Power</u>. Sellers are duly organized, validly existing and in good standing under the Laws of their respective jurisdiction of incorporation or formation. Sellers have full power and authority to execute, deliver and perform this Agreement and the Ancillary Documents to which they are party and to consummate the Contemplated Transactions, subject to the entry of the Disclosure Statement Order and the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Rules 6004(h) and 3020(e) of the Bankruptcy Rules. Sellers have all power (corporate or otherwise) and authority, and possess all governmental licenses, permits, authorizations and approvals, necessary to enable Sellers to own or lease and to operate their respective properties and assets with respect to the Business and carry on the Business as currently conducted, except such power, authority, licenses, permits, authorizations and approvals the absence of which would not have, or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

3.2.   <u>Authorization and Enforceability</u>. The execution and delivery of this Agreement and the Ancillary Documents to which Sellers are a party and the performance by Sellers of the Contemplated Transactions that are required to be performed by Sellers have been duly authorized by all necessary action of Sellers and no other corporate proceedings on the part of Sellers (including, without limitation, any shareholder vote or approval) are necessary to authorize the execution, delivery and performance of this Agreement and the Ancillary Documents to which Sellers are a party or the consummation of the Contemplated Transactions that are required to be performed by Sellers, and will be, at the Closing, duly authorized, executed and delivered by Sellers and constitute, or as of the Closing Date will constitute, valid and legally binding agreements of Sellers enforceable against Sellers in accordance with their terms, subject to the entry of the Disclosure Statement Order and the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Rules 6004(h) and 3020(e) of the Bankruptcy Rules, and subject to bankruptcy, insolvency, reorganization and other Laws of general applicability relating to or affecting creditors' rights and to general equity principles.

3.3.   <u>No Violation</u>. The execution and delivery by Sellers of this Agreement and the Ancillary Documents to which Sellers are a party, the consummation of the Contemplated Transactions that are required to be performed by Sellers and the compliance with the terms of this Agreement and the Ancillary Documents to which Sellers are a party, subject to the entry of the Disclosure Statement Order and the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Rules 6004(h) and 3020(e) of the Bankruptcy Rules, will not (a) conflict with or violate any provision of the certificate of incorporation, bylaws or similar organizational documents of Sellers, (b) with the exception of compliance with any requirement to obtain consent or give notice to assign, result in any violation of or default,

give rise to a right of termination, cause the forfeiture of any right under any provision of any material Assigned Contracts, (c) assuming that all consents, approvals and authorizations contemplated by Section 3.4 have been obtained and all filings described therein have been made, conflict with or violate in any material respect any Law applicable to the Business, or (d) result in the creation of, or require the creation of, any Lien upon any of the Purchased Assets.

3.4.    <u>Governmental Authorizations and Consents</u>. No consents, licenses, approvals or authorizations of, or registrations, declarations or filings with, any Governmental Authority ("<u>Governmental Consents</u>") are required to be obtained or made by Sellers in connection with the execution, delivery, performance, validity and enforceability of this Agreement or any Ancillary Documents to which Sellers are, or are to be, a party or the consummation by Sellers of the Contemplated Transactions, other than (a) consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court, including the entry of the Disclosure Statement Order and the Confirmation Order and the expiration, or waiver by the Bankruptcy Court, of the 14-day period set forth in Rules 6004(h) and 3020(e) of the Bankruptcy Rules, and (b) Governmental Consents listed in Section 3.4 of the Seller Disclosure Schedule.

3.5.    <u>Financial Statements</u>.

(a)    <u>In General</u>.  Section 3.5(a) of the Seller Disclosure Schedule sets forth the following financial statements (the "<u>Financial Statements</u>"): (i) the audited consolidated balance sheet of WF Holdings, Inc. and its Subsidiaries consistent with the Seller Disclosure Schedules as of December 31, 2008 and as of December 31, 2009 and the related statements of income, changes in equity and cash flows for the years ending December 31, 2008 and as of December 31, 2009 (the "<u>Most Recent Audited Financial Statements</u>") and (ii) the unaudited consolidated balance sheet of WF Holdings, Inc. and its Subsidiaries consistent with the Seller Disclosure Schedules as of September 30, 2010 and the related unaudited statements of operations and cash flows, respectively, for the nine-month period ended on such date (the "<u>Most Recent Unaudited Financial Statements</u>").  Except as set forth in Section 3.5 of the Seller Disclosure Schedule, each of the Financial Statements has been prepared in accordance with GAAP applied on a basis consistent with prior periods and fairly presents in all material respects the consolidated financial condition of WF Holdings, Inc. and its Subsidiaries consistent with the Seller Disclosure Schedules as of its respective date and the consolidated results of operations and shareholders' equity, or cash flows, as the case may be, of WF Holdings, Inc. and its Subsidiaries consistent with the Seller Disclosure Schedules for the period covered thereby, subject, in the case of the Most Recent Unaudited Financial Statements, to the absence of footnote disclosure and to normal end-of-period adjustments.

(b)    <u>No Undisclosed Liabilities</u>.  Except as reflected in the Most Recent Unaudited Financial Statements or as set forth in Section 3.5(b) of the Seller Disclosure Schedule, Sellers have no Liabilities with respect to the Business (whether or not the subject of any other representation or warranty hereunder) except for Liabilities that may have arisen in the ordinary course of business since the date of the Most Recent Audited Financial Statements and which do not have, and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect.

3.6.   <u>Assets</u>.  Sellers have or, in the case of assets acquired, leased or licensed after the date of this Agreement not in violation of this Agreement, as of the Closing Date will have, good and valid title to or valid leasehold or sublease interests or other comparable contract rights in or relating to all of the Purchased Assets. Upon the Closing, all the Purchased Assets shall be free and clear of all Liens, except for Permitted Liens.  The Purchased Assets and the Excluded Assets, include all material tangible and intangible assets, property and rights owned or held by Sellers.

3.7.   <u>Compliance with Laws</u>. The Business is not, or during the past three (3) years has not been, in violation of in any material respect, and, to the Knowledge of Sellers, no event has occurred or circumstance exists that (with or without notice or lapse of time) would constitute or result in a violation in any material respect by the Business of, or failure on the part of the Business to comply with in any material respect, any material Law that is or was applicable to the conduct or operation of the Business or the ownership or use of any of the Purchased Assets. Sellers (a) hold all material Permits necessary for the lawful conduct of the Business and (b) are in material compliance with the terms of all such Permits.

3.8.   <u>Environmental Matters</u>.

(a)   Except as disclosed in Section 3.8(a) of the Seller Disclosure Schedule, with respect to the Business, to the Knowledge of Sellers, Sellers (i) are, and at all times have been, in compliance in all material respects with all applicable Environmental Laws, and (ii) have obtained, and are in compliance in all material respects with, all permits, licenses, authorizations, registrations and other governmental consents required by applicable Environmental Laws ("<u>Environmental Permits</u>"), and have made all appropriate filings for issuance or renewal of such Environmental Permits.

(b)   Except as disclosed in Section 3.8(b) of the Seller Disclosure Schedule, with respect to the Business, to the Knowledge of Sellers, there is no contamination of, and there have been no releases or, threatened releases of Hazardous Materials at the Facilities or any real property formerly owned, leased or operated by Sellers (or any predecessor of Sellers); in each case, that (i) would require notification to governmental entities, investigation and/or remediation pursuant to any Environmental Laws or (ii) would be reasonably likely to give rise to material liabilities pursuant to any Environmental Laws

(c)   Except as disclosed in Section 3.8(c) of the Seller Disclosure Schedule, with respect to the Business, to the Knowledge of Sellers, there are no past or present conditions, events, circumstances, facts, activities, practices, incidents, actions, omissions or plans that may (i) interfere with or prevent continued material compliance by Sellers with Environmental Laws and the requirements of Environmental Permits or (ii) give rise to any material liability or other obligation under any Environmental Laws.  This Section 3.8(c) shall not apply to any requirements or liability imposed by regulations or amendments to Environmental Laws which become effective after the date hereof.

3.9.   <u>Certain Transactions</u>. With respect only to the Assigned Contracts, except as set forth on Schedule 3.9 of Sellers Disclosure Schedule, there are no Contracts between Sellers or any of their Affiliates on the one hand, and any of the officers or employees of the Business

(other than for services as officers or employees), on the other hand, including without limitation, any Contract providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from, any of such person.

3.10.   No Brokers. None of Sellers, any of their Affiliates or any of their directors, officers, employees or agents, has employed or incurred any Liability to any broker, finder, employee or agent for any brokerage fees, finder's fees, commissions or other amounts with respect to this Agreement, the Ancillary Documents or the Contemplated Transactions for which Buyer will become liable.

ARTICLE IV
Representations and Warranties of Buyer

Buyer hereby represents and warrants to Sellers as of the date hereof and on and as of the Closing Date as follows:

4.1.   Organization and Power. Buyer is a limited liability company duly formed, validly existing and in good standing under the Laws of the state of Delaware and has full power and authority to execute and deliver this Agreement and the Ancillary Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the Contemplated Transactions.

4.2.   Authorization. Buyer has duly authorized the execution and delivery of this Agreement and the Ancillary Documents to which it is a party and the performance of its obligations hereunder and thereunder.

4.3.   Enforceability. This Agreement and each of the Ancillary Documents constitute, or when executed and delivered will constitute, the valid and legally binding obligation of Buyer, enforceable in accordance with its terms, except as such enforceability may be limited by equitable principles and by applicable bankruptcy, insolvency, reorganization, arrangement, moratorium or similar Laws relating to or affecting the rights of creditors generally.

4.4.   No Violation. The execution, delivery and performance of this Agreement and the Ancillary Documents executed or to be executed by Buyer pursuant to this Agreement, and the consummation of the Contemplated Transactions will not (i) conflict with or violate any provision of the organizational documents of Buyer, (ii) conflict with or violate in any material respect any provision of any Law applicable to Buyer or by which Buyer or its properties are bound or affected, or (iii) breach any provision of any contract or agreement to which Buyer is a party.

4.5.   Governmental Authorizations and Consents. No Governmental Consents are required to be obtained or made by Buyer in connection with the execution, delivery, performance, validity and enforceability of this Agreement or any Ancillary Documents to which it is a party, other than Governmental Consents set forth in Section 4.5 of the Buyer Disclosure Schedule.

4.6.   Litigation. There is no Litigation pending or, to the knowledge of Buyer,

threatened against or involving Buyer which questions the validity of this Agreement or any of the Ancillary Documents to which it is a party or seeks to prohibit, enjoin or otherwise challenge Buyer's ability to consummate the Contemplated Transactions.

4.7.    No Brokers. Other than Perella Weinberg Partners, no agent, broker, Person or firm acting on behalf of Buyer or its Affiliates is, or will be, entitled to any commission or broker's or finder's fees from any of the parties hereto, or from any Affiliate of any of the parties hereto, in connection with any of the transactions contemplated herein.

ARTICLE V
Covenants

5.1.    Conduct of Sellers Conducting the Business.

(a)    Except as otherwise expressly contemplated by this Agreement or as required by order of the Bankruptcy Court or with respect to matters inherent in the filing of petitions for relief under chapter 11 of the Bankruptcy Code, during the period from the date hereof to the Closing Date, Sellers shall conduct the Business in the ordinary course, consistent with past practice, and to the extent consistent therewith (i) use reasonable best efforts to maintain the Business and the Purchased Assets and to preserve Sellers current relationships with customers, employees, suppliers and others having business dealings with Sellers with respect to the Business, (ii) use reasonable best efforts to perform and comply with Sellers' Contracts and to comply with applicable Laws, (iii) maintain Sellers' books and records in the usual, regular and ordinary manner, on a basis consistent with past practice, and (iv) use reasonable best efforts to preserve the goodwill and ongoing operations of the Business.

(b)    Without limiting the generality of the foregoing, except as otherwise expressly contemplated by this Agreement, during the period from the date hereof to the Closing Date, Sellers shall not, without Buyer's prior written consent:

(i)    divest, sell, transfer, lease, license, abandon, allow to lapse, mortgage, pledge or otherwise dispose of, or encumber, or agree to divest, sell, transfer, lease, license, abandon, allow to lapse, mortgage, pledge or otherwise dispose of, or encumber, any Purchased Assets, other than (x) the sales of products or services in the ordinary course of business consistent with past practice, (y) obsolete assets disposed of in the ordinary course of business consistent with past practice or (z) Permitted Liens;

(ii)    take any action or fail to take any action, individually or in a series of actions or inactions, outside the ordinary course of business, that would reasonably be expected to diminish the value of the Purchased Assets in any material respect;

(iii)    amend, renew, terminate or waive any material Permit or any material Assigned Contract or any provision thereof;

(iv)    enter into any new material Contract with respect to the Business that would have been an Assigned Contract if it had existed on the date hereof;

(v)     enter into any Contract that purports to limit, curtail or restrict in any material manner the Business, or the Persons with whom it or its existing or future Affiliates can compete or to whom it or its existing or future Affiliates can sell products or deliver services, or the acquisition of any business;

(vi)     incur, create or assume any Indebtedness except as listed on Section 5.1(b)(vi) of the Seller Disclosure Schedule;

(vii)     acquire any assets that are material, individually or in the aggregate, to the Business, except purchases of raw materials, inventory, prepaid and fixed assets in the ordinary course of business consistent with past practice;

(viii)     enter into or adopt any employee benefit plan or employment or severance agreement, or amend any Plan, except (x) to the extent required by Law (including without limitation, required amendments to any Plan or agreement in order to comply with Section 409A of the Internal Revenue Code), (y) employment agreements (other than for executive officers) entered into in the ordinary course of business with an annual base compensation, in each case, of no more than $100,000 or (z) as expressly contemplated by this Agreement;

(ix)     hire any new officers or terminate the services of any existing officers, make any change in the rate of compensation, commission, bonus, or other direct or indirect remuneration payable, or agree to pay, conditionally or otherwise, any bonus, incentive, retention, change in control payment or other compensation, retirement, welfare, fringe or severance benefit or vacation pay, to or in respect of any employee, officer or director of Seller, except (x) in connection with promotions or periodic reviews of employees (but not directors or officers) in the ordinary course of business or (y) to the extent required by any Plan listed in Section 2.4(b) of the Seller Disclosure Schedule (including without limitation, required amendments to any Plan or agreement in order to comply with Section 409A of the Internal Revenue Code);

(x)     file or cause to be filed any amended Tax Return with respect to the Business other than in the ordinary course of business consistent with past practice, make any Tax election, or agree to extend the statute of limitations in respect of any Taxes, or settle any material Tax liability which is the subject of dispute between Sellers and a Governmental Authority;

(xi)     increase the amount reserved or reserve any new amounts for payment of any contingent Tax liability except in the ordinary course and in a manner consistent with past practice;

(xii)     change accounting policies of the Business except to the extent required to conform with GAAP;

(xiii)     change its fiscal year;

(xiv)     initiate any material Litigation relating to the Business seeking damages in excess of $250,000, or settle or compromise any pending or threatened Litigation

relating to the Business (other than in connection with the objection process for unsecured claims);

(xv)    make or commit to make any capital expenditures with respect to the Business, other than capital expenditures in the budget of Sellers provided to Buyer and made in the ordinary course of business;

(xvi)    waive any of the rights of Sellers under the confidentiality or non-compete provisions of any agreements, or enter into confidentiality or non-compete agreements under which Sellers are the obligors, other than in the ordinary course of business consistent with past practice;

(xvii)   take any action or omit to take any action which would cause any representation or warranty made by Sellers in this Agreement or any Ancillary Document to be or become untrue in any material respect (disregarding for these purposes any material adverse effect or materiality (or any correlative term) contained therein); or

(xviii)  authorize, agree, resolve or consent to any of the foregoing.

5.2.    Access to Information Prior to the Closing. During the period from the date hereof through the Closing Date, Sellers shall give Buyer and its authorized representatives reasonable access during regular business hours to all offices, facilities, properties, agreements, books and records and personnel of the Business as Buyer may reasonably request; provided, that (a) Buyer and its representatives shall take such action as is deemed necessary in the reasonable judgment of Sellers to schedule such access and visits through a designated officer of Sellers and in such a way as to avoid disrupting in any material respect the normal operation of the Business, (b) Sellers shall not be required to take any action which would constitute a waiver of the attorney-client or other privilege and (c) Sellers need not supply Buyer with any information which, in the reasonable judgment of Sellers after consulting with outside counsel, Sellers are under a contractual or legal obligation not to supply; provided, that Sellers will use their reasonable best efforts to enable Buyer to have access to such information. For the avoidance of doubt, nothing in this Section 5.2 or elsewhere in this Agreement is intended to or shall create any due diligence condition to Buyer's obligations under this Agreement.

5.3.    Certain Tax Matters.

(a)    Tax Return Preparation.  Sellers shall prepare, or cause to be prepared, and file, or cause to be filed, on a timely basis all Tax Returns of the Business that are due after the Closing Date and that reflect any liability for Sellers' Taxes, including any Taxes incurred in connection with the Contemplated Transactions.  All such Tax Returns shall be prepared in a manner consistent with past practice of Sellers; provided, that Sellers determine, with the advice of counsel or a tax attorney, that there is at least "substantial authority," within the meaning of Section 6662(d)(2)(B)(i) of the Code, for taking such a position.  Except as any such Tax may constitute an Assumed Liability, and except as provided in the Bankruptcy Plan, Sellers shall timely pay all Taxes shown due with respect to Tax Returns filed pursuant to this Section.

(b)    Transfer Taxes. This Agreement is being entered into by Sellers and Buyer in connection with the Bankruptcy Plan filed by Sellers in connection with the Chapter 11 Cases.

Pursuant to Section 1146(a) of the Bankruptcy Code, no Transfer Taxes shall be payable with respect to this Agreement or the sale of the Purchased Assets to Buyer.  However, in the event that any such taxes and fees are required to be paid notwithstanding Section 1146(a) of the Bankruptcy Code, such taxes and fees shall be the responsibility of Seller. The party required by Law to do so will file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes and, if required by applicable Law, the other parties will, and will cause their Affiliates to, join in the execution of any such Tax Returns and other documentation.

5.4.   <u>Public Announcements</u>. The initial press release regarding this Agreement and the Contemplated Transactions shall be made at such time and in such form as Buyer and Sellers agree, <u>provided</u> that in the event that the parties cannot agree, either party shall be permitted to make any disclosure required by Law.  Prior to the Closing, neither Buyer nor Sellers will issue or make any subsequent press release or public statement with respect to this Agreement or the Contemplated Transactions without the prior consent of Buyer and Sellers, except as may be required by Law; <u>provided</u>, that the party proposing to issue any press release or similar public announcement or communication in compliance with any such disclosure obligations shall use reasonable best efforts to consult in good faith with the other party before doing so.

5.5.   <u>Reasonable Best Efforts</u>.  Subject to the terms and conditions set forth herein and to applicable legal requirements, each of the parties shall cooperate and use their respective reasonable best efforts to take, or cause to be taken, all appropriate action, and do, or cause to be done, and assist and cooperate with the other parties in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the Contemplated Transactions, including the satisfaction of the respective conditions set forth in <u>Article VI</u> and obtaining the approvals, if any, from the Governmental Authorities listed in Section 5.5 of the Seller Disclosure Schedule.

5.6.   <u>Post-Closing Access</u>. Following the Closing, (i) Buyer shall grant the Plan Administrator and its representatives reasonable access during regular business hours to information reasonably requested by the Plan Administrator and certain personnel of the Business for purposes of administering the Bankruptcy Plan and (ii) Buyer shall otherwise reasonably cooperate with the Plan Administrator in its administration of the "Post-Effective Date Debtors" pursuant to the Bankruptcy Plan.

5.7.   <u>Seller's Employment and Benefit Plan Covenants</u>.

(a)   Buyer will make offers of employment, effective immediately following the Closing, to Employees; provided, that, subject to Section 2.9 hereof, Buyer may (following consultation with and upon the advice of management of Sellers) amend the list of Employees who will receive offers of employment pursuant to this Section 5.7(a); provided, that Buyer shall be responsible for paying any liability arising from the WARN Act or other employment Law resulting from Buyer's amendment of the list of Employees to be offered employment.

(b)   Effective immediately after the Closing, Sellers shall cease to be participating employers in all Plans that Buyer has assumed pursuant to Section 2.4(b) (the "<u>Assumed Plans and Benefits</u>") and shall cease to have any obligations with respect to Employees or the Assumed Plans and Benefits.  Buyer shall be liable for any and all obligations

with respect Employees under the Assumed Plans and Benefits with respect to periods following the Closing Date.

(c)     In the event that, following the Closing Date, Buyer terminates any Employee in such a manner, or takes any other action, so as to cause the application of the WARN Act to the transactions described in this Agreement, then Buyer shall be solely responsible for any WARN Act liability so incurred.  This Section 5.7(c) shall survive Closing indefinitely.

(d)     Sellers agree to provide Buyer with an updated list of Employees as of January 5, 2011 (with updates thereafter as reasonably requested by Buyer).

5.8.    Liens.  Buyer shall secure the payment of the Newco First Lien Loan Notes with a first priority lien on all of Buyer's assets, including the Purchased Assets (unless limited by applicable Law or if such liens would, in the opinion Buyer, result in adverse tax consequences or undue costs relative to the value of such collateral), in accordance with the terms of the Newco First Lien Credit Agreement, and Buyer shall secure the payment of the Newco Second Lien Loan Notes with a second priority lien on all of Buyer's assets, including the Purchased Assets (unless limited by applicable Law or if such liens would, in the opinion Buyer, result in adverse tax consequences or undue costs relative to the value of such collateral), in accordance with the terms of the Newco Second Lien Credit Agreement.

5.9.    Intellectual Property Covenants. Promptly following the Closing, each Seller shall amend its respective certificate of incorporation or similar organizational document and take all other actions necessary so as to change its corporate name to a name not using the terms "Workflow", "Relizon" or "Formcraft." From and after the Closing, Sellers shall use reasonable efforts to have the caption of the Chapter 11 Cases changed in a manner consistent with the changes contemplated by this Section 5.9 and shall otherwise make no further use of the terms "Workflow", "Relizon" or "Formcraft" or the Business Intellectual Property assumed by Buyer pursuant to Section 2.2(e).

ARTICLE VI
Conditions to Closing

6.1.    Conditions to All Parties' Obligations.

The obligations of the parties to consummate the Contemplated Transactions are subject to the fulfillment prior to or at the Closing of the following condition (which may be waived by the parties):

(a)     No Injunction.  No Governmental Authority or federal or state court of competent jurisdiction shall have issued, enforced or entered any statute, rule, regulation, order, decree, judgment, or injunction (whether temporary, preliminary or permanent), in any case which is in effect and which prevents or prohibits consummation of the Contemplated Transactions.

(b)     Approval Order. The Disclosure Statement Order shall have been entered by the Bankruptcy Court.

(c)     <u>Confirmation Order and Bankruptcy Plan</u>.  The Confirmation Order shall have been entered by the Bankruptcy Court, and shall be a Final Order; provided, however that the requirement that the Confirmation Order be a Final Order may be waived by Buyer.  The conditions to confirmation and the conditions to the Effective Date of the Bankruptcy Plan shall have been satisfied or waived, with the consent of Buyer, in accordance with the Bankruptcy Plan.

6.2.     <u>Conditions to Sellers' Obligations</u>.

The obligations of Sellers to consummate the Contemplated Transactions are subject to the fulfillment at or prior to the Closing of each of the following conditions (any or all of which may be waived in whole or in part by Sellers):

(a)     <u>Representations and Warranties</u>.  The representations and warranties of Buyer in this Agreement (other than the Buyer Fundamental Representations) shall be true and correct (without regard to any qualifications as to materiality or material adverse effect (or any correlative term) contained in such representations and warranties) as of the date when made and as of the Closing Date, except (i) for representations and warranties made as of a specified date, which shall be measured only as of such specified date, and (ii) where the failure to be true and correct, individually or in the aggregate, has not had, and would not reasonably be expected to have, a Buyer Material Adverse Effect.  Each of the Buyer Fundamental Representations shall be true and correct in all respects as of the date when made and as of the Closing Date, except for representations and warranties made as of a specified date, which shall be measured only as of such specified date.

(b)     <u>Performance</u>.  Buyer shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be so performed or complied with by Buyer at or prior to the Closing.

(c)     <u>Deliveries</u>.  Sellers shall have received the deliveries contemplated by Article VIII.

6.3.     <u>Conditions to Buyer's Obligations</u>.

The obligations of Buyer to consummate the Contemplated Transactions are subject to the fulfillment at or prior to the Closing of each of the following conditions (any or all of which may be waived in whole or in part by Buyer):

(a)     <u>Representations and Warranties</u>.     Each of the representations and warranties of Sellers in this Agreement (other than the Seller Fundamental Representations) shall be true and correct (without regard to any qualifications as to materiality or material adverse effect (or any correlative term) contained in such representations and warranties) as of the date when made and as of the Closing Date, except (i) for representations and warranties made as of a specified date, which shall be measured only as of such specified date, and (ii) where the failure to be true and correct, individually or in the aggregate, has not had, and would not reasonably be expected to have, a Material Adverse Effect.  Each of the Seller Fundamental Representations shall be true and correct in all respects as of the date when made and as of the Closing Date,

except for representations and warranties made as of a specified date, which shall be measured only as of such specified date.

(b)   <u>Performance</u>.  Sellers shall have performed and complied in all material respects with all agreements and covenants required by this Agreement to be so performed or complied with by Sellers at or prior to the Closing.

(c)   <u>Deliveries</u>.  Buyer shall have received the deliveries contemplated by Article VII.

(d)   <u>Perseus Contribution</u>. The Perseus Contribution shall have been made.

ARTICLE VII
<u>Deliveries by Sellers at Closing</u>

On the Closing Date, Sellers shall deliver or cause to be delivered to Buyer:

7.1.   <u>Officer's Certificate</u>.  An officer's certificate signed by a senior officer of Sellers to the effect that the conditions set forth in Sections 6.3(a) and 6.3(b) have been satisfied.

7.2.   <u>Transfer Documents</u>. Duly executed bills of sale, real property transfer deeds, patent and trademark assignments and similar documents in a form reasonably agreed to by Buyer and Sellers (the "<u>Transfer Documents</u>"), together with any reasonably necessary transfer declarations or other filings, and such other instruments of transfer, sale, conveyance and assignment, in form and substance as Buyer shall reasonably request, to vest in Buyer good and valid title to the Purchased Assets.

7.3.   <u>Assignment and Assumption Agreements</u>. Duly executed counterparts to the Assignment and Assumption Agreements.

7.4.   <u>Receipt</u>. Sellers shall deliver to Buyer a receipt for the Closing Consideration Amount.

7.5.   <u>Further Instruments</u>. Such documents of further assurance reasonably necessary and typical for transactions similar to the Contemplated Transactions in order to complete the Contemplated Transactions.

ARTICLE VIII
<u>Deliveries by Buyer at Closing</u>

On the Closing Date, Buyer shall deliver or cause to be delivered to Sellers:

8.1.   <u>Officer's Certificate</u>. A certificate signed by a senior officer of Buyer to the effect that the conditions set forth in Sections 6.2(a) and 6.2(b) have been satisfied.

8.2.   <u>Assignment and Assumption Agreements</u>. Duly executed assignment and assumption agreements, substantially in a form reasonably agreed to by Buyer and Sellers (the

"Assignment and Assumption Agreements"), evidencing the assumption by Buyer of the Assumed Liabilities in accordance with the terms herein.

8.3.    Transfer Documents. Duly executed counterparts to the Transfer Documents.

8.4.    Closing Consideration Amount. The Closing Consideration Amount with the cash portion of such amount transferred by wire transfer of immediately available funds to the account designated by Sellers.

8.5.    Note Documentation.  Documentation evidencing the execution and delivery of the documentation (including documentation evidencing the granting and perfection of all security interests and Liens granted therein) relating to the Newco First Lien Credit Agreement and the Newco Second Lien Credit Agreement.

8.6.    Further Instruments. Such documents of further assurance reasonably necessary and typical for transactions similar to the Contemplated Transactions in order to complete the Contemplated Transactions.

ARTICLE IX
Termination

9.1.    Termination. This Agreement may be terminated and the transactions contemplated hereby may be abandoned:

(a)    at any time, by mutual written agreement of Sellers and Buyer; or

(b)    by Buyer, at any time prior to the Closing, if (i) Sellers are in breach, in any material respect, of the representations, warranties or covenants made by Sellers in this Agreement, (ii) such breach is not cured within ten (10) days of written notice of such breach from Buyer (to the extent such breach is curable) and (iii) such breach, if not cured, would render the conditions set forth in Section 6.3 incapable of being satisfied; or

(c)    by Sellers, at any time prior to the Closing, if (i) Buyer is in breach, in any material respect, of the representations, warranties or covenants made by Buyer in this Agreement, (ii) such breach is not cured within ten (10) days of written notice of such breach from Seller (to the extent such breach is curable) and (iii) such breach, if not cured, would render the conditions set forth in Section 6.2 incapable of being satisfied; or

(d)    by Buyer, at any time prior to the Closing, if Perseus does not fund the Perseus Contribution by the close of business on the Closing Date or upon written notice from Perseus that Perseus will not make the Perseus Contribution; or

(e)    by Sellers, in the event that the boards of directors of Sellers in the exercise of their fiduciary duties determine that it is in the best interest of the bankruptcy estates of Sellers not to consummate the Contemplated Transactions; provided, that such determination is made as a result of the receipt by Sellers of a bona fide written alternative proposal that is supported by committed financing that such boards of directors determine in good faith has at least an equivalent likelihood of closing as the transactions contemplated by the Bankruptcy Plan

and will result in payment in full in cash of all First Lien Lender Claims, Second Lien Lender Claims, Secured Claims, Administrative Expense Claims, Priority Tax Claims and Priority Non-Tax Claims, and provides funds to General Unsecured Claims in excess of the Unsecured Claims Fund all as defined in the Bankruptcy Plan; or

        (f)     by Buyer, at any time after May 16, 2011 (the "<u>End Date</u>") if the Closing shall not have occurred on or prior to such date.

        9.2.    <u>Effect of Termination</u>. In the event of the termination of this Agreement and the abandonment of the Contemplated Transactions, written notice thereof shall be given by a terminating party to the other parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned without further action by any of the parties. If this Agreement is terminated pursuant to Section 9.1, no party hereto shall have any obligation or liability to the other parties hereto; <u>provided</u>, that nothing herein shall relieve a defaulting or breaching party from any liability or damages arising out of its breach of any provision of this Agreement.

ARTICLE X
<u>Miscellaneous</u>

        10.1.    <u>Expenses</u>. The monthly fees and expenses incurred by Perella Weinberg Partners and legal fees and expenses incurred by each of Fried, Frank, Harris, Shriver & Jacobson LLP and Hunton & Williams LLP incurred through the Closing Date shall be paid by Sellers, whether or not the Contemplated Transactions are consummated so long as there is no breach of this Agreement by the Buyer. For the avoidance of doubt, all Seller Transaction Expenses shall be borne by Sellers and none shall be borne by, or be the responsibility of, Buyer.

        10.2.    <u>Notices</u>. All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed to have been duly given or made (a) as of the date delivered, if delivered personally, (b) on the date the delivering party receives confirmation, if delivered by facsimile or email .pdf, (c) three (3) Business Days after being mailed by registered or certified mail (postage prepaid, return receipt requested) or (d) one (1) Business Day after being sent by overnight courier (providing proof of delivery), to the parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 10.2):

        If to Seller:        Workflow Management, Inc.
                              150 West Main Street
                              Post Office Box 3037
                              Norfolk, Virginia 23514
                              Attention: L. Scott Seymour
                              Fax: (757) 624.3169

        With a copy (which shall not constitute notice) to:

                              McGuireWoods LLP
                              9000 World Trade Center
                              101 West Main Street

Norfolk, Virginia 23510
Attention: Douglas M. Foley, Esq.
Fax: (757) 640-3701

If to Buyer:          Silver Point Finance, LLC
                      Two Greenwich Plaza, 1st Floor
                      Greenwich, CT 06830
                      Attention: John Kneisley
                      Fax: (203)-542-4367

With a copy (which shall not constitute notice) to:

                      Fried, Frank, Harris, Shriver & Jacobson LLP
                      One New York Plaza
                      New York, New York 10004
                      Attention:  Gary Kaplan, Esq. and David Shaw, Esq.
                      Fax:  (212) 859-4000

10.3.   <u>Governing Law</u>. This Agreement shall in all respects be governed by, and construed in accordance with, the Laws (excluding conflict of laws rules and principles) of the State of New York applicable to agreements made and to be performed entirely within such State, including all matters of construction, validity and performance.

10.4.   <u>Entire Agreement</u>. This Agreement, together with the Exhibits hereto, the Seller Disclosure Schedule, the Buyer Disclosure Schedule, the Ancillary Documents and the Bankruptcy Plan, constitute the entire agreement of the parties relating to the subject matter hereof and supersede all prior contracts or agreements, whether oral or written.

10.5.   <u>Severability</u>. Should any provision of this Agreement or the application thereof to any Person or circumstance be held invalid or unenforceable to any extent: (a) such provision shall be ineffective to the extent, and only to the extent, of such unenforceability or prohibition and shall be enforced to the greatest extent permitted by Law, (b) such unenforceability or prohibition in any jurisdiction shall not invalidate or render unenforceable such provision as applied (i) to other Persons or circumstances or (ii) in any other jurisdiction, and (c) such unenforceability or prohibition shall not affect or invalidate any other provision of this Agreement.

10.6.   <u>Amendment</u>. Neither this Agreement nor any of the terms hereof may be terminated, amended, supplemented or modified orally, but only by an instrument in writing signed by Buyer and Seller; <u>provided</u> that the observance of any provision of this Agreement may be waived in writing by the party that will lose the benefit of such provision as a result of such waiver.

10.7.   <u>Effect of Waiver or Consent</u>. No waiver or consent, express or implied, by any party to or of any breach or default by any party in the performance by such party of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other

breach or default in the performance by such party of the same or any other obligations of such party hereunder.  No single or partial exercise of any right or power, or any abandonment or discontinuance of steps to enforce any right or power, shall preclude any other or further exercise thereof or the exercise of any other right or power.  Failure on the part of a party to complain of any act of any party or to declare any party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder until the applicable statute of limitation period has run.

10.8.   Parties in Interest; Limitation on Rights of Others. The terms of this Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective legal representatives, successors and permitted assigns.  Nothing in this Agreement, whether express or implied, shall be construed to give any Person (other than the parties hereto and their respective legal representatives, successors and permitted assigns and as expressly provided herein) any legal or equitable right, remedy or claim under or in respect of this Agreement or any covenants, conditions or provisions contained herein, as a third party beneficiary or otherwise.

10.9.   Assignability. This Agreement shall not be assigned by Sellers without the prior written consent of Buyer.  Prior to Closing, this Agreement shall not be assigned by Buyer without the prior written consent of Sellers; provided, that Buyer may assign its rights and obligations under this Agreement without such required consent to an Affiliate of Buyer, which assignment shall not relieve Buyer of its obligations hereunder.

10.10.   Jurisdiction; Court Proceedings; Waiver of Jury Trial. Any Litigation against any party to this Agreement arising out of or in any way relating to this Agreement shall be brought in the Bankruptcy Court and each of the parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court for the purpose of any such Litigation; provided, that a final judgment in any such Litigation shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.  **Each party irrevocably and unconditionally agrees not to assert (a) any objection which it may ever have to the laying of venue of any such Litigation in the Bankruptcy Court, (b) any claim that any such Litigation brought in any such court has been brought in an inconvenient forum and (c) any claim that such court does not have jurisdiction with respect to such Litigation.**  To the extent that service of process by mail is permitted by applicable Law, each party irrevocably consents to the service of process in any such Litigation in such courts by the mailing of such process by registered or certified mail, postage prepaid, at its address for notices provided for herein.  **Each party irrevocably and unconditionally waives any right to a trial by jury and agrees that any of them may file a copy of this paragraph with any court as written evidence of the knowing, voluntary and bargained-for agreement among the parties irrevocably to waive its right to trial by jury in any Litigation.**

10.11.   No Other Duties. The only duties and obligations of the parties under this Agreement are as specifically set forth in this Agreement, and no other duties or obligations shall be implied in fact, Law or equity, or under any principle of fiduciary obligation.

10.12.   Reliance on Counsel and Other Advisors. Each party has consulted such legal, financial, technical or other expert as it deems necessary or desirable before entering into this

Agreement.  Each party represents and warrants that it has read, knows, understands and agrees with the terms and conditions of this Agreement.

10.13. <u>Remedies</u>.  All remedies, either under this Agreement or by Law or otherwise afforded to the parties hereunder, shall be cumulative and not alternative, and any Person having any rights under any provision of this Agreement will be entitled to enforce such rights specifically, to recover damages by reason of any breach of this Agreement and to exercise all other rights granted by Law, equity or otherwise.

10.14. <u>Specific Performance</u>.  The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached.  Accordingly, the parties agree that, in addition to any other remedies, each party shall be entitled to enforce the terms of this Agreement by a decree of specific performance without the necessity of proving the inadequacy of money damages as a remedy and without regards to anything to the contrary contained in applicable Law.  Each party hereby waives any requirement for the securing or posting of any bond in connection with such remedy.  Each party further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of this Agreement.

10.15. <u>Bulk Transfer Laws</u>.  Buyer hereby waives compliance by Sellers and their Affiliates with the provisions of any so-called "bulk transfer law" of any jurisdiction in connection with the sale of the Purchased Assets.

10.16. <u>Survival</u>.  The representations and warranties in this Agreement or in any instrument delivered pursuant to this Agreement shall expire as of the Closing.

10.17. <u>Counterparts</u>.  This Agreement may be executed by facsimile or email .pdf signatures and in any number of counterparts with the same effect as if all signatory parties had signed the same document.  All counterparts shall be construed together and shall constitute one and the same instrument.

10.18. <u>Further Assurance</u>.  If at any time after the Closing any further action is necessary or desirable to fully effect the transactions contemplated by this Agreement or any other of the Ancillary Documents, each of the parties shall take such further action (including the execution and delivery of such further instruments and documents) as any other party reasonably may request.

*(Signature pages follow)*

IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase and Sale Agreement to be duly executed and delivered in its name and on its behalf, all as of the day and year first above written.

**BUYER:**

WORKFLOW HOLDINGS, LLC

By:  Silver Point Capital, L.P., its non-member manager

> By: Silver Point Capital Management, LLC, its general partner
> By: _____
>     Name: David Steinmetz
>     Title: Chief Financial Officer

IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase and Sale Agreement to be duly executed and delivered in its name and on its behalf, all as of the day and year first above written.

**SELLERS:**

WF CAPITAL HOLDINGS, INC.

By:_____
Name:
Title:

WF HOLDINGS, INC.

By:_____
Name:
Title:

WORKFLOW HOLDINGS CORPORATION

By:_____
Name:
Title:

WORKFLOW MANAGEMENT, INC.

By:_____
Name:
Title:

WFMI, INC.

By:_____
Name:
Title:

     IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase and Sale Agreement to be duly executed and delivered in its name and on its behalf, all as of the day and year first above written.

**SELLERS:**

WORKFLOW SOLUTIONS LLC


By:_____
Name:
Title:


WFIH, INC.


By:_____
Name:
Title:


OLD FGS, INC.


By:_____
Name:
Title:


OLD UE, LLC


By:_____
Name:
Title:


THE RELIZON COMPANY


By:_____
Name:
Title:

IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase and Sale Agreement to be duly executed and delivered in its name and on its behalf, all as of the day and year first above written.

**SELLERS:**

WORKFLOW OF FLORIDA INC.


By:_____
Name:
Title:


WORKFLOW MANAGEMENT ACQUISITION II CORP


By:_____
Name:
Title:

SFI OF PUERTO RICO, INC.


By:_____
Name:
Title:

WORKFLOW DIRECT, INC.


By:_____
Name:
Title:

IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase and Sale Agreement to be duly executed and delivered in its name and on its behalf, all as of the day and year first above written.

**SELLERS:**

RELIZON DE MÉXICO INC.


By:_____
Name:
Title:

RELIZON SNE INC.


By:_____
Name:
Title:

FORMCRAFT HOLDINGS
LIMITED PARTNER, INC.


By:_____
Name:
Title:

FORMCRAFT HOLDINGS
GENERAL PARTNER, INC.


By:_____
Name:
Title:

RELIZON KNE INC.


By:_____
Name:
Title:

IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase and Sale Agreement to be duly executed and delivered in its name and on its behalf, all as of the day and year first above written.

**SELLERS:**

RELIZON WISCONSIN INC.


By:_____
Name:
Title:

IN WITNESS WHEREOF, each of the parties hereto has caused this Asset Purchase and Sale Agreement to be duly executed and delivered in its name and on its behalf, all as of the day and year first above written.

**SELLERS:**

RELIZON TEXAS LTD., LLP

By:     Formcraft Holdings General Partner, Inc.,
        General Partner

        By:_____
        Name:
        Title:

## EXHIBIT A

**BANKRUPTCY PLAN**

**[Attached]**

/28882143.2

## SCHEDULE 1

## Workflow Management, Inc.

## First Lien Term Loan Plan Treatment Term Sheet

**New First Lien Term Loan Term Sheet**

| | |
|---|---|
| Borrower: | Purchaser |
| Guarantors: | Any future domestic subsidiaries of Purchaser |
| Ranking: | First lien senior secured obligation |
| Term Loan Amount: | $141,528,677 first lien term loan |
| Interest: | LIBOR plus 7.00%, which shall be paid in Cash at least quarterly in arrears |
| LIBOR Floor: | 3.00% |
| Maturity: | Four (4) years from the Effective Date |
| Amortization: | Principal payments will be made quarterly in the amount of: (i) $1,000,000 per fiscal quarter on the last business day of each fiscal quarter of 2011, commencing with the quarter ended June 30, 2011; and (ii) $2,000,000 per fiscal quarter on the last business day of each fiscal quarter thereafter until maturity. |
| Mandatory Prepayments: | Mandatory prepayments will be the following: (i) 50% annual excess free cash flow sweep; (ii) 100% from non-permitted debt; (iii) 100% from asset sales and insurance proceeds, subject to a 365-day reinvestment period and other terms and conditions. |
| Financial Ratio Covenants: | Financial ratio covenants will be: (i) maximum ratio of total debt to adjusted EBITDA (ii) minimum ratio of EBITDA to cash interest |

## **SCHEDULE 2**

### **Workflow Management, Inc.**

### **Second Lien Lender Secured Claims Plan Treatment Term Sheet**

**New Second Lien Credit Facility Term Sheet**

| | |
|---|---|
| Borrower: | Purchaser |
| Guarantors: | Any future domestic subsidiaries of Purchaser |
| Ranking: | Second lien senior secured obligation |
| Multi-Tranche Term Loan: | Second lien term loan in the aggregate amount of $140 million (the "New Second Lien Term Loan").  The New Second Lien Term Loan may be comprised of a to-be-determined dollar amount of tranche A term loan (the "Tranche A Second Lien Term Loan") and a to-be-determined dollar amount of tranche B term loan (the "Tranche B Second Lien Term Loan") each of which shall be treated pari passu, except that, upon the occurrence of an event of a default, all payments shall be applied first to pay in full all principal, accrued interest and call protection under the Tranche A Second Lien Term Loan before any payments are applied to the Tranche B Second Lien Term Loan. |
| Interest: | LIBOR plus 14.00% payable at least quarterly in arrears, subject to the following: |
| | (i) Interest shall be payable in kind unless (x) the cash balance is greater than or equal to $12.5 million (after giving pro forma effect to the prospective interest payment) and (y) LTM Adjusted EBITDA (to be defined)  is greater than or equal to $37.5 million (collectively, the "Cash Interest Conditions"). |
| | (ii) If the Cash Interest Conditions are satisfied as of the most recent month end for which financial statements are available, interest shall be payable (x) 5.00% in cash and (y) LIBOR plus 9.00% in kind. |
| | (iii) After the first anniversary of the Effective Date, if (A) the Cash Interest Conditions are satisfied, (B) the Adjusted Cash Balance (as defined below) is greater than or equal to $25 million and (C) the ratio of LTM Adjusted EBITDA to cash debt service payments (First and Second Lien cash interest payments and First Lien quarterly scheduled amortization payments) exceeds 2.0:1.0 (after giving effect to the prospective interest payment) (the "2x Test"), then interest shall be payable (x) 11.00% in cash and (y) the remainder in kind (calculated as described in (iv) below); provided, that if the 2x Test is not satisfied, the portion of interest payable in cash shall be decreased to the amount at which the 2x Test is satisfied (subject to a minimum of 5.00% if the Cash Interest Conditions are satisfied). |
| | (iv) If cash interest is being paid at 5.00%, interest payable in kind shall be LIBOR plus 9.00%; if cash interest is being paid at 11.00%, interest payable in kind shall be LIBOR plus 1.00%; if cash interest is being paid at an amount greater than 5.00% but less than 11.00%, the all-in yield shall be adjusted by adjusting the spread over LIBOR of |

|  | the portion of interest paid in kind in inverse proportion to the amount by which such cash interest payments exceed 5.00%.  For example, if cash interest is being paid at 8.00% (midway between 5.00% and 11.00%), interest payable in kind shall be LIBOR plus 5.00% (midway between 1.00% and 9.00%) for an all-in minimum yield of 16.00%.<br><br>(v) Adjusted Cash Balance means cash on hand plus the cumulative amount of excess cash flow payments applied to the first lien term loan since the Effective Date.<br><br>(vi) Cash and payable-in-kind interest payments may be allocated differently between the Tranche A and Tranche B Second Lien Term Loans and in the aggregate will not exceed the total amount of cash and payable-in-kind interest paid pursuant to the foregoing provisions. |
|---|---|
| LIBOR Floor: | 3.00% |
| Call Protection: | Prepayment of the New Second Lien Term Loan will be permitted at any time after the second anniversary of the Effective Date, in whole or in part, at a redemption price (calculated on the basis of the then outstanding principal amount, including any paid-in-kind interest) equal to the amounts listed below:<br><br>On or after the second and prior to the third anniversary of the Effective Date: 107.5%<br><br>On or after the third and prior to the fourth anniversary of the Effective Date: 103.75%<br><br>On or after the fourth anniversary of the Effective Date: 100%<br><br>If prepayment of the New Second Lien Term Loan is made, in whole or in part, on or before the second anniversary of the Effective Date, the borrower shall pay a redemption price equal to (i) 100% of the then outstanding principal of the amount prepaid (including any paid-in-kind interest), plus (ii) all accrued and unpaid interest on the amount prepaid to such redemption date, plus (iii) a make-whole premium defined as an amount equal to the present value of (A) the remaining payments of interest on the amount prepaid (other than accrued and unpaid interest on the amount prepaid to the date of redemption) from the redemption date through and including the second anniversary of the Effective Date and (B) 7.5% of the amount that would be prepaid (including any paid-in-kind interest) as of the second anniversary of the Effective Date, using an annual discount factor (applied quarterly) equal to the applicable treasury rate plus 50 basis points; provided, however, that if there is a sale of Purchaser that is undertaken without the consent of Perseus, on or before the second anniversary of the Effective Date, then, notwithstanding anything herein, prepayment of the New Second Lien Term Loan on |

| | or before the second anniversary will be permitted at a redemption price (calculated on the basis of the then outstanding principal amount including any paid-in-kind interest) equal to 110%; <u>provided</u>, <u>further</u>, that in no case shall the make-whole premium be less than zero. |
|---|---|
| Maturity: | Four and a half (4.5) years from the Effective Date. |
| Amortization: | None |
| Mandatory Prepayments: | No mandatory prepayments until the First Lien Credit Facility is repaid in full.  After such repayment, mandatory prepayments shall be:<br><br>(i) 50% annual free excess cash flow sweep;<br><br>(ii) 100% from non-permitted debt;<br><br>(iii) 100% from asset sales and insurance proceeds, subject to a 365-day reinvestment period and other conditions. |
| Financial Ratio Covenants: | Same as First Lien Credit Facility |

\28784402.4