## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
## NORFOLK DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Workflow Management Inc., et al., | ) | Case No. 10-74617 (SCS) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

### OBJECTION OF RELIZON HOLDINGS, LLC TO CONFIRMATION OF THE DEBTORS' THIRD AMENDED JOINT CHAPTER 11 PLAN

Relizon Holdings, LLC, a holding company that is wholly-owned by investment funds sponsored and managed by The Carlyle Group ("Carlyle")[1] and a creditor of WF Holdings, Inc. ("WF Holdings"), files this objection (the "Objection") to confirmation of the Debtors' Third Amended Joint Chapter 11 Plan (the "Plan").

### Summary

1.      The Plan has at least three fundamental flaws with respect to the proposed treatment of Carlyle's claim.  First, it proposes to transfer substantial value to Perseus, a structurally subordinate creditor to Carlyle and interest holder, in violation of the absolute priority rule.  Second, it proposes to effect a de facto substantive consolidation of various Debtors with Carlyle's obligor to the detriment of Carlyle.  Third, the Plan improperly provides

Richard E. Biemiller, Esquire (VSB No. 29017)
Wolcott Rivers Gates
Convergence Center IV
301 Bendix Road, Suite 500
Virginia Beach, VA 23452
Phone:  (757) 497-6633
Fax:  (757) 554-0248
*Co-Counsel for Relizon Holdings, LLC, a holding
company wholly-owned by investment funds
sponsored and managed by The Carlyle Group*

Douglas Bacon, Esquire
Alice Decker Burke, Esquire
Matthew Warren, Esquire
Latham & Watkins LLP
233 S. Wacker Drive
Chicago, IL 60606
Phone:  (312) 876-7700
Fax:  (312) 993-9767
*Co-Counsel for Relizon Holdings, LLC, a holding
company wholly-owned by investment funds
sponsored and managed by The Carlyle Group*

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

for a release to Perseus from WF Holdings without any consideration.

## Background

2.       Debtor Workflow Management, Inc. is the primary operating company of the Debtors.  Workflow Management, Inc. is a wholly owned subsidiary of Workflow Holdings Corporation (Delaware), which is itself a wholly owned subsidiary of WF Holdings.  WF Holdings is in turn a wholly owned subsidiary of the ultimate Debtor parent company, WF Capital Holdings, Inc.  A copy of the Debtors' organizational chart is contained within the Disclosure Statement Relating to the Third Amendment Joint Chapter 11 Plan (the "Disclosure Statement") at Pg. 18, and a copy is attached hereto as Exhibit A for ease of reference.

3.       According to the Debtors' schedules of assets and liabilities for each Debtor entity, the lowest-tier holding company, Workflow Holdings Corporation (Delaware), has no assets, and no liabilities other than guaranties of the obligations owed to the First Lien Secured Parties and the Second Lien Secured Parties (together, the "Secured Lenders").  WF Holdings, as the intermediate holding company of the Debtors, has assets in the form of two notes receivable, owed by Perseus, worth a total of $3,251,318.00, which are referred to in the Plan as the "Former Shareholder Notes," and liabilities in the form of guaranties of the obligations owed to the Secured Lenders and a note owing to Carlyle's wholly-owned entity Relizon Holdings, LLC in the amount of $12.5 million.[2]  WF Capital Holdings, Inc., as the ultimate parent company of the Debtors, has no assets, and alleged liabilities to Perseus in the amount of approximately $78 million.  Perseus also owns nearly all of the common stock of the Debtors.  Disclosure Statement at § V.C.(i).

4.       Under the Plan, Perseus has been given the exclusive opportunity to invest in Newco.  If the Plan is confirmed and the Asset Sale consummated, then Perseus will receive

---

[2] According to the schedules and statements of WF Holdings, Carlyle is owed $11.3 million. Carlyle estimates the actual amount owed, including accrued and unpaid interest, as approximately $12.5 million. The Plan also defines Carlyle's note claim as being worth $12.5 million as the "WF Holdings/Carlyle Note." Plan at § 1.180.

CH\1221059.11

41.5% of the equity in Newco for a purported investment of $12.5 million. Disclosure Statement at § VI.B.iii.

5.      Perseus also receives a release from certain of its obligations under the Former Shareholder Notes. The Former Shareholder Notes are the primary assets of WF Holdings. Pursuant to the terms of the Asset Purchase Agreement at Section 2.2(r), the Former Shareholder Notes will transfer to Newco as purchased assets upon the closing of the sale to Newco. Asset Purchase Agreement at § 2.2(r). However, subsequent to closing of the sale to Newco, more than half (50% of the principal owed and all of the accrued but unpaid interest) of the amounts owing to Newco by Perseus on account of the Former Shareholder Notes will be forgiven. Asset Purchase Agreement at § 2.2(r).

6.      Additionally, the Plan provides for a release of Perseus from the Debtors and from third parties and a Court finding that the third party release and the Debtors release are in exchange for "good and valuable consideration." Plan at §§ 13.2, 13.3. Perseus is also apparently slated to receive a payment on account of a "portion" of management fees that accrued prior to the bankruptcy, in an amount that appears to be $500,000.

7.      Pursuant to the terms of the Plan, the claims of the Secured Lenders will be fully satisfied upon the Effective Date of the Plan. Plan at §§ 5.2, 5.3, 5.4. Therefore, the largest, and presumably the only, remaining claim to the assets of WF Holdings (including the Former Shareholder Notes) is that of Carlyle.

## Objection

**A.      Perseus Should Not Receive Value Ahead of Carlyle In Violation of the Absolute Priority Rule.**

8.     Upon satisfaction of the claims of the Secured Parties as provided in the Plan, Carlyle is the primary, and potentially the only, creditor of WF Holdings.[3]  Perseus is the primary creditor of the ultimate parent company of the Debtors as well as the owner of substantially all of the Debtors' ultimate Parent's equity.  Therefore, Perseus' claim against the assets of WF Holdings is structurally subordinate to Carlyle's claim against those assets, and the value delivered to Perseus on account of either Perseus' claims against, or its equity interests in, the ultimate Parent violates the absolute priority rule.

9.     Section 1129(b)(1) provides that a plan may only be confirmed over the non-acceptance of a class of impaired claims if "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  11 U.S.C. § 1129(b)(1) (2011).  Section 1129(b)(2)(B) provides that for a plan to be fair and equitable with respect to a class of unsecured claims that has not accepted the plan, the plan must either provide that the allowed value of each claim is to be paid in full or, in the alternative, that "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." Id. at § 1129(b)(2).  The latter condition incorporates the absolute priority rule. Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 442 (1999); Travelers Insurance Company v. Bryson Properties (In re Bryson Properties, XVIII), 961 F.2d 496, 502 (4th Cir. 1992).  "In short, the absolute priority rule commonly means that a junior class of creditors - such as equity holders - cannot receive any property under the plan if a senior class of creditors-such as general unsecured creditors-are not paid in full." In re Deep River Warehouse, Inc., 2005 Bankr. LEXIS 1090, *38 n.11 (Bankr. M.D.N.C. 2005); see also 203 N. LaSalle, 526 U.S. at 444; and In re Bryson Properties, XVIII, 961 F.2d at 502.

---

[3] The Pension Benefit Guarantee Corporation has filed a proof of claim against all Debtor entities; however, the Plan contemplates that the PBGC claims are separately classified (Class 5-C).  Carlyle understands that settlement discussions are ongoing.

CH\1221059.11

10.     Despite the fact that Perseus is entirely subordinate to Carlyle, the Plan provides for Perseus to receive a substantial recovery while Carlyle receives nothing. Perhaps most significantly, Perseus is receiving the exclusive opportunity to acquire 41.5% of the equity in Newco. The Supreme Court and the Fourth Circuit have both held that such an exclusive opportunity to invest constitutes property and that providing former equity owners with such property violates the absolute priority rule, as discussed more fully below. See 203 N. LaSalle, 526 U.S. at 454; In re Bryson Properties, XVII, 961 F.2d at 504. This, in itself, prevents confirmation of the plan.

11.     Moreover, upon a very close read of the Plan and the accompanying Asset Purchase Agreement, Perseus is also getting substantial value on account of relief from a significant portion of the Former Shareholder Notes, while Carlyle will be left with zero recovery. Pursuant to the terms of the Asset Purchase Agreement at Section 2.2(r), Perseus will receive a reduction of one-half of the principal, and all of the accrued and unpaid interest, owing under the Former Shareholder Notes if such obligations are forgiven by Newco as is provided in the Asset Purchase Agreement. If the Former Shareholder Notes were to remain the property of WF Holdings, however, Perseus would remain obligated for the full amount. This reduction in obligations will effectively reduce Perseus' touted $12.5 million investment in Newco by approximately $2 million.

12.     The Disclosure Statement and Plan do not convey any of the subtleties of the effect that the treatment of the Former Shareholder Notes would have on the economics of the proposed transaction. The Disclosure Statement and Plan define the "Former Shareholder Notes" solely for purposes of the release section, without mentioning anything about their transfer to Newco, much less the favorable (from Perseus' perspective) treatment afforded Perseus vis-à-vis forgiveness of more than one-half the obligations owed under the Former Shareholder Notes by Newco. In order to ascertain the treatment of the Former Shareholder

5

Notes, one must follow the proposed transaction all the way through to the fine print of the "purchased assets" description in the Asset Purchase Agreement.

13.     Perseus and/or the Debtors may contend that the transfer and forgiveness of the Former Shareholder Notes is not a windfall for Perseus or a loss to Carlyle because, if the Former Shareholder Notes remained in the estate, the Former Shareholder Notes would be subject to Perseus' alleged setoff rights with respect to unscheduled and unsubstantiated claims for unpaid management fees.  Perseus filed a proof of claim alleging rights of setoff against the Former Shareholder Notes for fees allegedly owed to it under a management agreement with WF Holdings.  See Proof of Claim #1157, filed 12/7/10.  However, the Plan and Disclosure Statement do not provide that the Former Shareholder Notes are subject to any setoff with fees owed under any management agreement.  In fact, there is no mention of any management agreement, or any alleged rights of setoff with respect thereto, in the Disclosure Statement or Plan.  Moreover, the Pro Forma Balance Sheet for Newco (Exhibit D to the Disclosure Statement) reflects a liability of $2.7 million of "accrued sponsor management fees," and also paying a "portion" of the accrued sponsor management fees in cash, each implying that prior management fees owed to Perseus are not being left behind as a claim against the estate.  See United States v. Continental Airlines (In re Continental Airlines), 134 F.3d 536 (3d Cir. 1988) (creditor is not permitted to exercise a right of setoff if the exercise is contrary to the terms of a confirmed plan that provides for payment of the claim on other terms).  Regardless, if the Former Shareholder Notes are transferred to Newco, as currently proposed by the Plan, then there would be no setoff rights since mutuality would be extinguished and WF Holdings would simply have a potential outstanding liability to Perseus on account of the alleged management fees.

14.     Setoff rights are not permissible if a claim has been disallowed, 11 U.S.C. § 553(a)(1), and neither the Plan nor the Disclosure Statement contain any provisions suggesting the claimed management fee has been assessed or investigated.  A creditor's burden with respect

6

to the validity of a proof of claim is heightened when the creditor is an "insider" of the debtor corporation.  Stancil v. Harford Sands Inc. (In re Hartford Sands Inc.), 372 F.3d 637, 640-41 (4th Cir. 2004) (citing Pepper v. Litton, 308 U.S. 295, 306 (1939)).  "An insider's dealings with a bankrupt corporation are ordinarily subject to 'rigorous' or 'strict' scrutiny."  Id. (citations omitted).  Indeed, § 502(b)(4) expressly provides that a claim will not be allowed if "such claim is for services of an insider . . . [to the extent that] such claim exceeds the reasonable value of such services."  11 U.S.C. § 502(b)(4).  Here the alleged management fee appears at first blush to be far in excess of the reasonable value of any services that could be provided to a non-operating holding company.  To date, the only parties who may have considered the bona fides of the management fee claim are the Debtors, who are under the control of Perseus.

15.    Additionally, upon a close comparison of various incarnations of Exhibit D to the Disclosure Statement, it appears that Perseus will also receive a $500,000 payment on account of a "portion" of management fees that accrued prior to the bankruptcy, although this is by no means clear from the Plan or the Disclosure Statement.  Exhibit D to Disclosure Statement of the Third Amended Plan [Docket No. 718], as compared to Exhibit D of the Disclosure Statement for the Second Amended Plan [Docket No. 637].

16.    In sum, under the Plan, Perseus is receiving the exclusive right to acquire a substantial portion of the equity of Newco, significant benefits on account of the Former Shareholder Notes and payment of alleged accrued management fees.  Meanwhile, Carlyle, a dissenting creditor senior to Perseus in all respects, is left with a $0 recovery.  This allocation of value violates the absolute priority rule, as incorporated by 11 U.S.C. 1129(b)(2)(B), an prevents confirmation of the Plan.

**B.    Perseus Has Not Demonstrated that It Meets the "New Value" Exception for Receiving Value Ahead of Carlyle under the Plan.**

17.    Perseus may assert that the value it is allocated under the Plan is not on account of
its claims or interests, but rather in return for "new value" that Perseus is contributing to Newco.
Such an assertion must fail.  Favorable treatment of existing equity is not *per se* barred under
bankruptcy plans, so long as the existing equity has provided "new value" in exchange for its
treatment *and* the amount of the new value has been subject to a "market test."  See <u>203 N.
LaSalle</u>, 526 U.S. at 438.  Yet neither the Plan, nor Perseus, have attempted to meet the
requirements for demonstrating "new value" was contributed in exchange for the benefits to
Perseus and as a result the Plan cannot be confirmed.

18.    In <u>203 N. LaSalle</u>, the United States Supreme Court addressed a plan under which
the former equity owners of the debtor received value, allegedly on account of new value
contributed by such former equity owners, while a senior dissenting class remained impaired.
526 U.S. at 434.  The Court found that such a plan cannot be confirmed if the former equity
owners "failed to provide the greatest possible addition to the bankruptcy estate" or "obtained or
preserved an ownership interest for less than someone else would have paid."  <u>Id</u>. at 453-54.  The
Court found that the plan at issue was "doomed… by its provision for vesting equity in the
reorganized business in the [former equity owners] without extending an opportunity to anyone
else either to compete for that equity or to propose a competing reorganization plan."  <u>Id</u>. at 454.
Citing the Fourth Circuit's opinion in <u>In re Bryson Properties, XVII</u>, the Supreme Court noted
that to hold otherwise would permit the former equity owners to recover "on account of" those
equity interests because the exclusive opportunity to acquire equity in the new company should
itself be considered an item of property.  <u>Id</u>. (citing <u>In re Bryson Properties, XVII</u>, 961 F.2d at
504); <u>see also</u> <u>In re Deep River Warehouse</u>, 2005 Bankr. LEXIS at *38 n.11 ("Accordingly,
whenever a former junior claimant realizes some premium based on the claimant's former
position, then the absolute priority rule is violated.").

19.    The Court in 203 N. LaSalle did not rule out the possibility that a "new value"

corollary to the absolute priority rule exists – the Court did not consider the issue.  However,

because the exclusive right to receive equity itself constitutes a valuable property right which

would violate the absolute priority rule if given to a creditor or equity holder below an impaired

dissenting creditor,  the Court concluded that "plans providing junior interest holders with

exclusive opportunities free from competition and without benefit of market valuation fall within

the prohibition of § 1129(b)(2)(B)(ii)." 203 N. LaSalle, 526 U.S. at 457; see also In re Deep

River Warehouse, 2005 Bankr. LEXIS at *38 n.11 ("The market test ensures that a new value

contributor does not receive a greater value in the reorganized venture than the consideration

paid.").

20.    A plan proponent must provide evidence to meet its burden of establishing that a

plan fulfills the absolute priority rule when former equity holders are receiving value allegedly

on account of new contributions.  The evidence must show that the direct and indirect benefits to

a debtor of the value being given are of a greater value than the amount distributed under the

plan.  See In re Young Broadcasting Inc., 430 B.R. 99, 106 (Bankr. S.D.N.Y. 2010) (denying

confirmation of a plan proposed by the unsecured creditors' committee due to insufficient

evidence that the new value offered by old equity was of a greater value than the interest to be

distributed to old equity under the plan).  Without evidence such as an auction allowing others to

bid or termination of exclusivity to permit competing plans to be proposed, a plan that allows

existing shareholders to receive value on account of such interests may not be confirmed.  See

203 N. LaSalle, 526 U.S. at 457; In re Global Ocean Carriers Ltd., 251 B.R. 31, 52 (Bankr. D.

Del. 2000) (finding that the debtors' plan violated the absolute priority rule by allowing the

"existing controlling shareholder to determine, without the benefit of a public auction or

competing plans, who will own the equity of [the reorganized entity]  and how much they will

pay for the privilege" and that "[t]o avoid this result the Debtors must subject the 'exclusive opportunity'…to the market place test.").

21.    Under the Plan, Perseus is afforded the exclusive right to purchase 41.5% of the equity in Newco for a purported $12.5 million investment.  Neither the Plan nor the Disclosure Statement provide any discussion of any sale or marketing process for the 41.5% stake in Newco.  As the grant of an "exclusive" right to invest to existing equity holders is a hallmark of a plan of reorganization that requires the "market test" necessitated by 203 N. LaSalle, the Debtors are required to (i) establish through competent evidence that $12.5 million (or a "net value" of less than $10 million, taking into account the forgiveness of debt and other benefits being given to Perseus under the Asset Purchase Agreement) is the "greatest possible addition to the bankruptcy estate" for the 41.5% share of Newco, and (ii) establish that such investment was subjected to a "market test." See 203 N. LaSalle, 526 U.S. at 453, 458. There is nothing in the Disclosure Statement that even attempts to meet this burden.

22.    Neither Perseus nor the Debtors have met the requirements of the "market test" in 203 N. LaSalle, and the Plan cannot be confirmed without a robust marketing process to justify the value that Perseus has contributed – actually contributed, taking into account all the fine print in the Asset Purchase Agreement and Plan - that merits the use of the "new value" exception.

23.    The fact that the Debtors have opted to complete this reorganization by structuring it in some respects as an "asset sale" pursuant to the Plan does not alter the proscriptions of the absolute priority rule or the requirements for demonstrating appropriate consideration for "new value", for doing so would be to improperly exalt form over substance. "A bankruptcy court's equitable powers have long included the ability to look beyond form to substance." Fairchild Dornier GMBH v. Official Comm. of Unsecured Creditors (In re Dornier Aviation (N. Am), Inc., 453 F.3d 225, 233 (4th Cir. 2006) (citing Pepper v. Litton, 308 U.S. 295, 305 (1939); see also In re Shady Grove Tech Ctr. Assocs. Ltd. P'ship, 216 B.R. 386, 391 (Bankr.

CH\1221059.11

D. Md. 1998) ("This court will not elevate form over substance.").  The Debtors and Perseus

should not be permitted to complete an end run around the Bankruptcy Code's requirements and

Supreme Court case law by incorporating a sale of assets with a reorganization.

**C.     The Value Transfer To Perseus Is Not Permissible Even If "Gifted" From the Secured Lenders**

24.     Perseus, and perhaps the Secured Lenders, may contend that the transfer of

property from WF Holdings to Perseus does not violate the absolute priority rule because the

Secured Lenders hold a first-priority claim on all of the Debtors' assets, ahead of Carlyle, and

have consented to the terms of the Plan.  Thus, the argument may go, any transfers of property to

Perseus' are essentially a transfer by the Secured Lenders, not by WF Holdings, and thereby the

Secured Lenders are essentially "gifting" the favorable treatment to Perseus and leapfrogging

Carlyle's claim (via WF Holdings) to such property.   But as the Second Circuit recently ruled in

Dish Network Corporation v. DBSD North America, Inc. (In re DBSD North America, Inc.),

plans of reorganization that include "gifts" to junior creditors and interest holders by senior

creditors that "pass over" intermediate creditors violate the absolute priority rule and are not

permissible.  No. 10-1175, 2010 U.S. App. LEXIS 27007 (2d Cir. Feb. 7, 2011).   According to

the Second Circuit, it is irrelevant to an analysis of absolute priority whether the bankruptcy

court valued the estates at less than the value of the secured claims, because the absolute priority

rule does not limit itself to unsecured property:

> The Code extends the absolute priority rule to "any property," 11 U.S.C. §
> 1129(b)(2)(B)(ii), not "any property not covered by a senior creditor's lien." The
> Code focuses entirely on who "receive[s]" or "retain[s]" the property "under the
> plan," id., not on who *would* receive it under a liquidation plan. And it applies the
> rule to any distribution "under the plan on account of" a junior interest, *id.*,
> regardless of whether the distribution could have been made outside the plan, and
> regardless of whether other reasons might support the distribution in addition to
> the junior interest.

Id. at *40.

CH\1221059.11

25.    As the Second Circuit noted, there are strong policy reasons for the absolute

priority rule to be respected in the context of "gifts" in plans of reorganization; where, as here,

the existing equity will receive the exclusive right to purchase 41.5% of the equity in the post-

reorganization entity, while the unsecured creditors at the operating level will receive cents on

the dollar (and unsecured creditors at the holding company level, such as Carlyle, will receive

$0), there is a strong reason for concern that existing equity's insider status affords them the

opportunity for "self-enrichment at the expense of creditors." Id. at *47.    Moreover, the

exclusive right to bid on the 41.5% equity interest in Newco could not be a "gift" to Perseus

from the Secured Lenders because such an opportunity was never the Secured Lenders to give.

**D.    The Plan's Classification Scheme, and the Plan Administrator's Role in that Scheme, Violate the Bankruptcy Code and Prevent Confirmation of the Plan.**

26.    The Plan classifies Carlyle in Class 5-B, together with all creditors of all holding

companies, not just creditors of WF Holdings.  Plan at § 3.2(f).  This classification scheme

results in the Plan being unconfirmable for three reasons.  First, it impermissibly classifies claims

together that are not substantially similar, in direct violation of 11 U.S.C. § 1122.  Second, the

Plan fails to provide for the same treatment of all claims within Class 5-B, in direct violation of

11 U.S.C. § 1123(a)(4).  Third, the classification scheme amounts to a de facto partial

substantive consolidation that the Debtors have not only failed to justify (and indeed cannot

justify), but which the Debtors have stated in the Plan they are *not* seeking.   The result of this

classification scheme is to create a dysfunctional and conflicted Plan Administrator who will not

represent the interests of WF Holdings as a post-effective date Debtor.

*(i)    The Classification Scheme Violates 11 U.S.C. § 1122 and As a Result the Plan
Cannot Be Confirmed*

27.    The Plan classifies all general unsecured claims against the three Holdco Debtors

together in Class 5B.  Plan at § 3.2(f).  The "Holdco Debtors" include WF Capital Holdings, Inc.,

WF Holdings, Inc., and Workflow Holdings Corporation.  Plan at § 1.73.  The Plan asserts that

substantive consolidation is *not* being requested. Plan at § 8.12. Yet if there is no substantive

consolidation then this classification scheme plainly violates 11 U.S.C. § 1122(a) and prevents

confirmation of the Plan. See In re Frascella Enterprises, Inc., 360 B.R. 435, 441 (Bankr. E.D.

Pa. 2007) ("As a plan may only be confirmed if it complies with all applicable provisions of the

Bankruptcy Code, 11 U.S.C. § 1129(a)(1), improper classification is an impediment to

confirmation.").

28.    Section 1122 of the Bankruptcy Code requires that "a plan may place a claim or

an interest in a particular class only if such claim or interest is substantially similar to the other

claims or interests of such class." 11 U.S.C. § 1122(a). The Bankruptcy Code does not define or

elaborate on the phrase "substantially similar." See 7 Collier on Bankruptcy 1122.03(a)(3) (16th

ed. rev.). "The House and Senate Reports, however, both took the position that section 1122

codified the then-current body of case law, and therefore the term 'substantially similar' must be

construed to mean similar in legal character or effect as a claim against the debtor's assets or as

an interest in the debtor." Id. "The similarity of claims is not judged . . . by comparing creditor

claims *inter se*. Rather, the issue is whether the claims in a class have the same or similar legal

status in relation to the debtor." In re Piece Goods Shops Co., L.P., 188 B.R. 778, 788 (Bankr.

M.D.N.C. 1995) (citing In re AOV Industries, Inc., 792 F.2d 1140, 1150 (D.C. Cir. 1986).

The claims of Carlyle and Perseus in Class 5-B are not similar in legal character because

Carlyle's claim is against WF Holdings, Inc. and Perseus' claim is against WF Capital Holdings,

Inc. Claims against different legal entities, with materially different balance sheets, cannot be

legally the same in the absence of substantive consolidation of the entities which the claims are

against. Holding otherwise would eviscerate the entire nature of corporate identity and

separateness. As a result, the Plan's classification scheme fails to comply with 11 U.S.C. §

1122(a) and prohibits confirmation of the Plan.

CH\1221059.11

> (ii)   *The Plan Violates 11 U.S.C. § 1123(a)(4) and As a Result the Plan Cannot Be Confirmed*

29.     After impermissibly classifying Carlyle's claim as part of Class 5-B, the Plan then

proceeds to violate 11 U.S.C. § 1123(a)(4) by treating claims within Class 5-B differently.  As

discussed above, Perseus stands to receive preferential treatment under the terms of the Plan.

But unless Perseus is providing equivalent or greater "new value" – which, as discussed above,

neither Perseus nor the Debtors can demonstrate – then Perseus must be receiving the benefits

directed to them under the Plan on account of their interests or claims.  If the latter, then the Plan

violates 11 U.S.C. § 1123(a)(4) which requires that a plan may only be confirmed if it will

"provide the same treatment for each class of claims or interest of a particular class, unless the

holder of a particular claim or interest agrees to less favorable treatment of such particular claim

or interest." 11 U.S.C. § 1123(a)(4).

30.     Carlyle has not consented to less favorable treatment than Perseus.  As a result,

the Plan fails to comply with 11 U.S.C. § 1123(a)(4) and such failure results in yet another

independent grounds for denying confirmation.

> (iii)   *The Plan Improperly Effects a Substantive Consolidation of the Debtors*

>> (a)   *The Plan Includes a Scheme to Effectuate a Partial Substantive Consolidation at the Expense of WF Holdings and Carlyle*

31.     The Plan effectuates a <u>de facto</u> partial substantive consolidation of the Debtor

entities by grouping claims and assets of the three Holdco Debtors, and then permitting the assets

of WF Holdings to be used to pay the liabilities of other Debtor entities.  The Former

Shareholder Notes, the primary asset of WF Holdings, are sold to Newco under the Plan and the

Asset Purchase Agreement.  Yet the value obtained for the Former Shareholder Notes does not

flow back to WF Holdings – and therefore Carlyle – but instead to the creditors of other Debtors.

32.     Perhaps even worse, the Plan provides that the Plan Administrator will have the

authority to bring potentially lucrative Avoidance Actions on behalf of WF Holdings, but that

any recovery from WF Holdings's Avoidance Actions will flow to the creditors of other Debtors

instead of to WF Holdings. The Plan Administrator is authorized to make distributions of "Plan

Funds" to holders of Allowed Claims in Class 5-A and Class 5-C. Plan at § 9.5. The definition

of "Plan Funds" includes "the value of the Actionable Avoidance Actions for distribution to

holders of Allowed Claims in Class 5-A and 5-C." Plan at § 1.124. "Avoidance Actions" is

defined as "all Causes of Action of the Estates that arise under section 544, 545, 547, 548, 549,

550, 551 and/or 553 of the Bankruptcy Code." Plan at § 1.13. An "Actionable Avoidance

Action" is an Avoidance Action that Newco has not vetoed pursuant to its rights under the Plan

to veto any Avoidance Action that could adversely affect the business or operations of Newco.

Plan at § 1.1. "Estate" includes WF Holdings, but the creditors of WF Holdings are not in Class

5-A or Class 5-C, so they will not get any benefit from Actionable Avoidance Actions that

belong to WF Holdings. Plan at § 1.48. Perhaps more damaging, the Asset Purchase Agreement

provides that Newco will veto any Avoidance Actions brought against Perseus – an insider of

Newco. APA at §2.10.

33.    Thus, the Plan Administrator may freely sue and obtain recoveries on account of

actions that belong to WF Holdings. The Plan provides that the Plan Administrator will then

distribute any recoveries on account of such claims to essentially everybody *but* the creditors of

WF Holdings. As with the Former Shareholder Notes, the Plan has developed a scheme that

essentially strips away these assets of WF Holdings and completely prohibits any chance at a

recovery by the creditors of WF Holdings – namely Carlyle.

34.    Perhaps because of the blatant unfairness of this scheme, the Plan does not request

substantive consolidation, nor have the Debtors made any attempt to justify the de facto partial

substantive consolidation that the Plan would effectuate. See Plan at § 8.12. Rather, the Debtors

simply "reserve the right" to do so in Section 8.12 of the Plan. The Debtors have not and cannot

CH\1221059.11

meet the high burden required in order to effectuate any substantive consolidation, and they

cannot be allowed to do by fiat what they cannot do procedurally under the Bankruptcy Code.

(b)    <em>The Debtors Cannot Justify Substantive Consolidation</em>

35.    Although the Fourth Circuit has not expressly ruled on the standard to be applied

with respect to substantive consolidation, many courts, including the bankruptcy court for the

Eastern District of Virginia, have adopted the widely-used test developed by the Second Circuit

in <u>Union Savings Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Banking</u>

<u>Company, Ltd.)</u>, 860 F.2d 515, 518 (2d Cir. 1998).  <u>See, e.g.</u>, <u>In re Fas Mart Convenience Stores,</u>

<u>Inc.</u>, 320 B.R. 587, 594 (Bankr. E.D. Va. 2004); <u>In re John Paul Smith</u>, Case No. 08-04530-8-

JRL, 2009 Bankr. LEXIS 1225 (Bankr. E.D.N.C. April 29, 2009); <u>In re Eagle Creek Subdivision,</u>

<u>LLC</u>, 407 B.R. 206 (Bankr. E.D.N.C. 2008); <u>In re Convalescent Ctr. of Roanoke Rapids, Inc.</u>,

Case No. 06-00310-8-RDD, 2006 Bankr. LEXIS 4484 (Bankr. E.D.N.C. Aug. 7, 2006).  The test

under <u>Augie/Restivo</u> "requires analysis of two factors: '(i) whether creditors dealt with the

entities as a single economic unit and did not rely on their separate identity in extending credit'

and '(ii) whether the affairs of the debtors are so entangled that consolidation will benefit all

creditors.'"  <u>In re Fas Mart Convenience Stores, Inc.</u>, 320 B.R. at 587 (quoting <u>Augie/Restivo</u>,

860 F.2d at 518) (internal quotations omitted).

36.    "Substantive consolidation is extraordinary relief that is not expressly authorized

by the Bankruptcy Code.  Rather, such relief is authorized pursuant to the court's general powers

under § 105 but is reserved for the rare situation in which administration of a set of cases would

unjustly disturb the rigid corporate boundaries that separate them."  <u>In re Eagle Creek</u>

<u>Subdivision, LLC</u>, 407 B.R. at 210.  "Because it forces creditors of one debtor to assume an

equal priority position with creditors of less solvent debtors, substantive consolidation should be

used 'sparingly.'"  <u>Id</u>. at 208 (quoting <u>Augie/Restivo</u>, 860 F.2d at 518); <u>see also</u> <u>In re Fas Mart</u>

16

Convenience Stores, Inc., 320 B.R. at 587 ("Substantive consolidation should be 'used sparingly'
to prevent injustice.").

37.     In the case of WF Holdings, the extraordinary relief of substantive consolidation
is not warranted.  The Debtors have not even attempted to demonstrate that creditors of WF
Holdings dealt with the Holdco Debtors as a single economic unit and did not rely on their
separate identity in extending credit or that the affairs of the Debtors are so entangled that
consolidation will benefit all creditors.  In fact, the creditors of WF Holdings – Carlyle – did not.
WF Holdings has substantial assets that the other Holdco Debtors do not have and a materially
different balance sheet than any of the other Debtors.  Carlyle bargained for a contractual claim
against WF Holdings.  WF Holdings may also have substantial and varying causes of action,
particularly against Perseus, that should survive confirmation and benefit WF Holdings.
Substantively consolidating WF Holdings with the other Debtor entities would eviscerate any
potential for recovery by Carlyle, despite the fact that Carlyle is the primary remaining creditor
of WF Holdings, and the Former Shareholder Notes are an asset specific to WF Holdings.

38.     As detailed above,  the implications of this de facto partial substantive
consolidation do not stop at confirmation. Following confirmation, the Plan Administrator will
prosecute claims on behalf of the all Debtors - including WF Holdings.  The Plan Administrator
should be directed pursuant to the Plan to seek to prosecute actions with merit regardless of
which Debtor entity holds the potential claim, or whether such actions are against Perseus, and to
distribute the proceeds of any such actions to the creditors of that Debtor entity before
distributing to creditors of any other entity.

39.     Perhaps the fact that the Debtors could never meet the high burden required for
substantive consolidation explains why the Debtors have chosen to try to effectuate a de facto
substantive consolidation, but not expressly request it from this Court.  The Plan's backdoor
substantive consolidation is not only hidden, but also a blatantly unfair partial substantive

17

consolidation that essentially strips every single asset from WF Holdings for the sole benefit of other Debtors' creditors.

40.    The Debtors and Perseus may argue that substantive consolidation concerns are of no practical significance, because Class 5-B is scheduled to receive no distribution whatsoever. But this assertion would turn the situation on its head since the reason Class 5-B – including Carlyle- is scheduled to receive no distribution is because the Debtors and Perseus have stripped away all of WF Holdings' assets for the benefit of creditors of other Debtor entities. The Debtors' effort to try to slide through a blatantly unfair substantive consolidation scheme (and to further preserve a right to formerly substantively consolidate at any time with a stroke of a pen through a purported "reservation of rights" in the Plan) without further notice, approval from this Court, or any evidence to justify such a course of action, should be prohibited.

   (c)    *The Role of the Plan Administrator in the Plan is Conflicted and Dysfunctional*

41.    The Debtors' scheme to effectuate a partial substantive consolidation without requesting permission from this Court, and in a manner directly adverse to WF Holdings, also results in a conflicted and dysfunctional Plan Administrator. As noted above, the Plan Administrator will have the power to bring suits on behalf of WF Holdings. Yet, the Plan Administrator appears to owe no duties to the creditors of WF Holdings and has no reason to protect the interests of the creditors of WF Holdings. Instead, the Plan Administrator will likely be tasked with harvesting value from Carlyle's obligor for the benefit of other creditors.

42.    This result is untenable, particularly because of the potentially lucrative actions that may be brought by WF Holdings. The Plan Administrator should be clearly instructed that the Plan Administrator owes duties directly to the creditors of WF Holdings, that the Plan Administrator must keep the creditors of WF Holdings apprised of the Plan Administrator's actions as those actions relate to the assets or liabilities of WF Holdings, and that any recovery on account of the assets or actions of WF Holdings should flow only to the creditors of WF

Holdings until such creditors are paid in full. Further, because actions against Perseus could not

possibly adversely affect the business of Newco, all Avoidance Actions that WF Holdings

possesses against Perseus should be expressly carved out from Newco's veto rights under the

Plan or the Asset Purchase Agreement and permitted to proceed.

**E.     The Releases Granted to Perseus Are Unjustifiable and Are Detrimental To WF Holdings.**

43.     The Plan provides Perseus with a broad release from the Debtors, including WF

Holdings, as well as a release from third parties. Plan at §§ 13.2, 13.3. The Plan baldly asserts

that the consideration paid for this valuable release is "(A) the discharge of debt and all other

good and valuable consideration paid pursuant to the Plan or otherwise; and (B) the services of

the Debtors' present and former officers and directors in facilitating the implementation of the

transactions contemplated by the Plan." Plat at § 13.2. Such a release is entirely unjustified with

respect to WF Holdings and is particularly harmful to WF Holdings.

44.     WF Holdings may have significant actions against Perseus. As noted above, the

proof of claim filed by Perseus asserts that Perseus was operating under a management

agreement pursuant to which Perseus was receiving significant payments from WF Holdings on

account of Perseus' management skills prior to the company being managed into bankruptcy.

See Proof of Claim #1157, filed 12/7/10. It is entirely unclear whether any independent party

has examined these payments under, for example, a fraudulent conveyance theory. Certainly, the

management fee appears to be extraordinary given that WF Holdings is simply an intermediate

holding company. Moreover, it is unclear whether any independent party has examined the

transaction pursuant to which Perseus became liable on the Former Shareholder Notes – or

examined the value that Perseus obtained in exchange for taking on this liability.

45.     WF Holdings should not release Perseus from these or any other claims or causes

of action – particularly since it appears that no consideration was paid by Perseus in exchange for

this release when considering what value was given for the release to Perseus.  Any discharge of

debt owed by Perseus, which was subordinated to all other debt, including the debt owed to

Carlyle, should not be taken into account when considering whether value was exchanged for a

release to Perseus.  Nor should Newco have the ability to veto, or the Plan or Asset Purchase

Agreement provide for a veto, of any Avoidance Action that may be brought against Perseus

given that Perseus is the controlling shareholder of the Debtors and an insider of Newco.

     46.    As a result, this Court should find that the releases contained in the Plan that

affect WF Holdings do not apply to Perseus and are not provided by WF Holdings, and that the

veto rights of Newco do not apply to any Avoidance Actions brought against Perseus by WF

Holdings.  Additionally, this Court should expressly hold that any recovery by WF Holdings on

account of any causes of action should flow to WF Holdings, and only WF Holdings, until the

creditors of WF Holdings are paid in full.

     WHEREFORE, Carlyle requests that the Bankruptcy Court deny confirmation of the

Plan, and grant such other and further relief as is just and proper.

Dated: February 17, 2011

                /s/ Richard E. Biemiller           .
                Richard E. Biemiller, Esquire
                Wolcott Rivers Gates
                Convergence Center IV
                301 Bendix Road, Suite 500
                Virginia Beach, VA 23452
                Phone:  (757) 497-6633
                Fax:  (757) 554-0248
                -and-
                Douglas Bacon (*pro hac vice* pending)
                Alice Decker Burke
                Matthew Warren
                LATHAM & WATKINS LLP
                233 S. Wacker Dr.
                Chicago, Illinois  60606
                Telephone:  (312) 876-7700
                Facsimile:  (312) 993-9767
                *Counsel for Relizon Holdings, LLC, a holding company*
                *wholly-owned by investment funds sponsored and*
                *managed by The Carlyle Group*

## CERTIFICATE OF SERVICE

I certify that on this 17th day of February, 2011, I sent a true copy of the foregoing objection by either first class or electronic mail to the following parties:

Douglas M. Foley, Esquire
McGuire Woods LLP
9000 World Trade Center
101 West Main Street
Norfolk, VA 23510
*Counsel for the Debtors and*
*Debtors in Possession*
Email: workflowservice@mcguirewoods.com

Benjamin C. Ackerly, Esquire
Hunton & Williams LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
*Counsel for the Second Lien Administrative*
*Agent*
Email: backerly@hunton.com

Philip D. Anker, Esquire
Wilmer Cutler Pickering Hale & Dorr LLP
399 Park Avenue
New York, NY 10022
*Counsel for the First Lien Administrative Agent*
Email: Philip.anker@wilmerhale.com
Email: George.shuster@wilmerhale.com
Email: Kathryn.bennett@wilmerhale.com

Richard L. Wasserman, Esquire
Venable LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
*Counsel for the Unsecured Creditors*
*Committee*
Email: rlwasserman@venable.com

Peter Zemanian, Esquire
233 East City Hall Ave., Ste. 201
Norfolk, VA 23510
*Counsel for the First Lien Administrative Agent*
Email: pete@zemanianlaw.com

Lawrence A. Katz, Esquire
Venable LLP
8010 Towers Crescent Dr., Ste. 300
Vienna, VA 22182
*Counsel for the Unsecured Creditors*
*Committee*
Email: lakatz@venable.com

Gary L. Kaplan, Esquire
Peter B. Siroka, Esquire
Fried, Frank, Harris, Shriver & Jacobson LLP
One New York Plaza
New York, NY 10004
*Counsel for the Second Lien Administrative Agent*
Email: gary.kaplan@friedfrank.com
Email: peter.siroka@friedfrank.com

Office of the United States Trustee
200 Granby Street, Room 625
Norfolk, VA 23510
Email:USTPRegion04.NO.ECF@usdog.gov

/s/ Richard E. Biemiller                 .

CH\1221059.11

## Exhibit A

**Organizational Chart**

Workflow Organizational Chart



**WF CAPITAL HOLDINGS, INC.**
(Delaware)

**WF HOLDINGS, INC.**
(Delaware)

Common stock:
3.1% - Employee Restricted Shareholders
96.9% - WF Capital Holdings, Inc.

100%

**WORKFLOW HOLDINGS CORPORATION**
(Delaware)

100%

**WORKFLOW MANAGEMENT, INC.**
(Delaware)

100% Preferred Stock — **WFMI, Inc.** (Delaware)
180% Common Stock

100% — **Workflow Solutions LLC** (Delaware)

100% — **WFIH, Inc.** (Delaware)

100% — **Old FGS, Inc.** (New Jersey)

100% — **Old UE, LLC** (Delaware)

100% — **The Relizon Company** (Delaware) (formerly TRCAS Acquisition Corp.)

100% — **Workflow of Florida Inc.** (Delaware)

**Workflow Management Acquisition II Corp**

100% — **SFI of Puerto Rico, Inc.** (Delaware)

100% — **Workflow Direct, Inc.** (California)

100% — **Relizon de México Inc.** (Delaware)

100% — **Relizon SNE Inc.** (Delaware)

100% — **Formcraft Holdings Limited Partner, Inc.** (Delaware)

100% — **Formcraft Holdings General Partner, Inc.** (Delaware)

100% — **Relizon KNE Inc.** (Delaware)

Non-Debtor
100% — **CLNE Leasing Company** (Nova Scotia, Canada)

100% — **Relizon Wisconsin Inc.** (Wisconsin)

99% / 1% — **Relizon Texas Ltd., LLP** (Texas)