Douglas M. Foley (VSB No. 34364)
Patrick L. Hayden (VSB No. 30351)
McGUIREWOODS LLP
9000 World Trade Center
101 West Main Street
Norfolk, Virginia, 23510
(757) 640-3700

– and –

Lynn L. Tavenner, Esq. (VSB No. 30083)
Paula S. Beran, Esq. (VSB No. 34679)
TAVENNER & BERAN, PLC
20 North Eighth Street
Second Floor
Richmond, Virginia 23219

Counsel for Debtors and
Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF VIRGINIA
## NORFOLK DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **WORKFLOW MANAGEMENT INC.,** | ) | |
| <u>et al.</u>, | ) | **Case No. 10-74617 (SCS)** |
| | ) | |
| **Debtors**. | ) | **(Jointly Administered)** |
| | ) | |

## NOTICE OF FILING OF CERTAIN AMENDED PLAN SUPPLEMENT DOCUMENTS, DESIGNATION OF ADDITIONAL PLAN DOCUMENT AND DESIGNATION OF PLAN ADMINISTRATOR RELATING TO THIRD AMENDED JOINT CHAPTER 11 PLAN OF WORKFLOW MANAGEMENT, INC. AND ITS AFFILIATED DEBTORS

PLEASE TAKE NOTICE that, pursuant to Section 2.4 of the Third Amended

Joint Chapter 11 Plan of Workflow Management, Inc. and its Affiliated Debtors (as may be

amended and/or modified, the "Plan"), proposed by the debtors and debtors in possession in the

above-captioned cases (collectively, the "Debtors"), annexed hereto are certain amended Plan

Documents,[1] the designation of an additional Plan Document (pursuant to Section 1.123 of the

Plan), and the designation of the Plan Administrator, each relating to the Plan and/or to be

---

[1] All capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

executed, delivered, assumed and/or performed in connection with the consummation of the

Plan, subject to the occurrence of the Effective Date, which comprise amendments and additions

to the Plan Supplement.  The Plan Supplement was filed on February 14, 2011. (Docket No.

794).

PLEASE TAKE FURTHER NOTICE that the Debtors are filing the following

amended Plan Documents and designations attached as exhibits to this Notice (or substantially

final forms thereof):

1. An Amended Exhibit F of the Plan Supplement (Newco First Lien Credit Agreement) with a blackline comparison to the version filed on February 14, 2011 (Exhibit F);

2. An Amended Exhibit G of the Plan Supplement (Newco First Lien Form Notes) with a blackline comparison to the version filed on February 14, 2011 (Exhibit G);

3. An Amended Exhibit H of the Plan Supplement (Newco Second Lien Credit Agreement) with a blackline comparison to the version filed on February 14, 2011 (Exhibit H);

4. An Amended Exhibit I of the Plan Supplement (Newco Second Lien Form Notes) with a blackline comparison to the version filed on February 14, 2011 (Exhibit I);

5. The Intercreditor Agreement among the Newco First Lien Secured Parties, Newco Second Lien Secured Parties, and the Purchaser (Exhibit L); and

6. Designation of the Plan Administrator (Exhibit M).

PLEASE TAKE FURTHER NOTICE that the Debtors hereby reserve all rights to

amend, revise or supplement any of the documents and designations contained in this Plan

Supplement at any time before the Effective Date of the Plan, or any such other date as may be

permitted by the Plan or by Order of this Court.

PLEASE TAKE FURTHER NOTICE that the entire Plan Supplement, as

amended, is available on the Claims Agents' website at http://www.kccllc.net/Workflow or on

the Court's website at http://www.vaeb.uscourts.gov.

PLEASE TAKE FURTHER NOTICE that a copy of the Plan Supplement, as

amended, also may be obtained by written request (at your cost) to the Claims Agent at the

following address and telephone number: Workflow Claims Processing, c/o Kurtzman Carson

Consultants LLC, 2335 Alaska Ave., El Segundo, CA 90245, or calling the Claims Agent at

(877) 565-8217.

Dated: Norfolk, Virginia                      WORKFLOW MANAGEMENT, INC., et al.
       February 17, 2011

                                              /s/ Patrick L. Hayden
                                              Douglas M. Foley (VSB No. 34364)
                                              Patrick L. Hayden (VSB No. 30351)
                                              McGUIREWOODS LLP
                                              9000 World Trade Center
                                              101 West Main Street
                                              Norfolk, Virginia, 23510
                                              (757) 640-3700

                                              - and -

                                              Lynn L. Tavenner, Esq. (VSB No. 30083)
                                              Paula S. Beran, Esq. (VSB No. 34679)
                                              TAVENNER & BERAN, PLC
                                              20 North Eighth Street
                                              Second Floor
                                              Richmond, Virginia 23219

                                              Attorneys for the Debtors
                                              and Debtors in Possession

**<u>Exhibit F</u>**
(Amended Newco First Lien Credit Agreement with Blackline)

**FF DRAFT 2/17/11**

FIRST LIEN CREDIT AGREEMENT,

dated as of [●], 2011,

among

WORKFLOWONE LLC,

as the Borrower,

VARIOUS FINANCIAL INSTITUTIONS AND OTHER PERSONS FROM TIME TO TIME
PARTIES HERETO,

as the Lenders,

and

THE BANK OF NEW YORK MELLON,
as the Administrative Agent.

7956804

ARTICLE I  DEFINITIONS AND ACCOUNTING TERMS ....................................................... 2

    SECTION 1.1  Defined Terms ................................................................................................. 2

    SECTION 1.2  Use of Defined Terms .................................................................................. 26

    SECTION 1.3  Cross-References .......................................................................................... 26

    SECTION 1.4  Accounting and Financial Determinations ................................................. 26

ARTICLE II  LOANS, CLOSING RATE AND NOTES ........................................................... 27

    SECTION 2.1  Loans ........................................................................................................... 27

    SECTION 2.2  Closing Rate ................................................................................................ 27

    SECTION 2.3  Continuation and Conversion Elections ..................................................... 27

    SECTION 2.4  Funding ........................................................................................................ 27

    SECTION 2.5  Register; Notes ............................................................................................ 28

ARTICLE III  REPAYMENTS, PREPAYMENTS, INTEREST AND FEES ........................... 28

    SECTION 3.1  Repayments and Prepayments; Application .............................................. 28

        SECTION 3.1.1  Repayments and Prepayments ........................................................ 29

        SECTION 3.1.2  Application ......................................................................................... 31

    SECTION 3.2  Interest Provisions ...................................................................................... 31

        SECTION 3.2.1  Rates .................................................................................................. 31

        SECTION 3.2.2  Post-Default Rates .............................................................................. 31

        SECTION 3.2.3  Payment Dates .................................................................................... 32

    SECTION 3.3  Fees   ............................................................................................................ 32

        SECTION 3.3.1  Administrative Agent's Fee ................................................................ 32

ARTICLE IV  CERTAIN LIBO RATE AND OTHER PROVISIONS ...................................... 32

    SECTION 4.1  LIBO Rate Lending Unlawful ................................................................... 32

    SECTION 4.2  Deposits Unavailable ................................................................................. 33

    SECTION 4.3  Increased LIBO Rate Loan Costs, etc ...................................................... 33

    SECTION 4.4  Funding Losses .......................................................................................... 33

    SECTION 4.5  Increased Capital Costs ............................................................................. 34

    SECTION 4.6  Taxes   ......................................................................................................... 34

    SECTION 4.7  Payments, Computations; Proceeds of Collateral, etc ............................. 37

    SECTION 4.8  Sharing of Payments .................................................................................. 38

    SECTION 4.9  Setoff ........................................................................................................... 38

    SECTION 4.10  Replacement of Lenders ........................................................................... 38

SECTION 4.11  Change in Lending Office....................................................................... 39

ARTICLE V  CONDITIONS TO EXCHANGE OF LOANS......................................................40

SECTION 5.1  Resolutions, etc ...................................................................................... 40

SECTION 5.2  Entry of Confirmation Order and Consummation of Transactions......... 40

SECTION 5.3  Delivery of Notes ................................................................................... 41

SECTION 5.4  Guarantees .............................................................................................. 41

SECTION 5.5  Security Agreements .............................................................................. 41

SECTION 5.6  Intellectual Property Security Agreements ............................................ 42

SECTION 5.7  Filing Agent, etc..................................................................................... 42

SECTION 5.8  Intercreditor Agreement ......................................................................... 42

SECTION 5.9  Patriot Act Disclosures........................................................................... 42

SECTION 5.10  Compliance with Warranties, No Default, etc ...................................... 42

ARTICLE VI  REPRESENTATIONS AND WARRANTIES ....................................................42

SECTION 6.1  Organization, etc .................................................................................... 43

SECTION 6.2  Due Authorization, Non-Contravention, Defaults etc. .......................... 43

SECTION 6.3  Government Approval, Regulation, etc .................................................. 43

SECTION 6.4  Validity, etc ............................................................................................ 44

SECTION 6.5  Financial Information .............................................................................. 44

SECTION 6.6  Litigation, Labor Controversies, etc ...................................................... 44

SECTION 6.7  Subsidiaries ............................................................................................ 44

SECTION 6.8  Ownership of Properties......................................................................... 44

SECTION 6.9  Taxes ...................................................................................................... 44

SECTION 6.10  Employee Benefit Plans ....................................................................... 45

SECTION 6.11  Environmental Warranties .................................................................... 45

SECTION 6.12  Regulations U and X ............................................................................ 46

SECTION 6.13  Labor Matters ....................................................................................... 46

SECTION 6.14  Compliance with Laws.......................................................................... 46

SECTION 6.15  Deposit Account and Cash Management Accounts............................... 46

SECTION 6.16  Insurance ............................................................................................... 46

SECTION 6.17  Material Contracts ................................................................................ 47

ARTICLE VII  COVENANTS ..............................................................................................47

SECTION 7.1  Affirmative Covenants ........................................................................... 47

SECTION 7.1.1  Financial Information, Reports, Notices, etc. .......................... 47

17437108

SECTION 7.1.2  Maintenance of Existence; Compliance with Contracts,
Laws, etc .................................................................... 49

SECTION 7.1.3  Maintenance of Properties ....................................... 49

SECTION 7.1.4  Insurance ................................................................ 49

SECTION 7.1.5  Books and Records................................................... 50

SECTION 7.1.6  Environmental Law Covenant ................................. 50

SECTION 7.1.7  Future Guarantors, Security, etc .............................. 50

SECTION 7.1.8  Cash Management................................................... 51

SECTION 7.1.9  Maintenance of Corporate Separateness ................. 51

SECTION 7.1.10  Landlord's Agreements and Bailee Letters............. 52

SECTION 7.1.11  Mortgages and Insurance ..................................... 52

SECTION 7.2  Negative Covenants ........................................................ 52

SECTION 7.2.1  Business Activities................................................. 52

SECTION 7.2.2  Indebtedness.......................................................... 52

SECTION 7.2.3  Liens...................................................................... 54

SECTION 7.2.4  Financial Condition and Operations ....................... 56

SECTION 7.2.5  Investments ........................................................... 58

SECTION 7.2.6  Restricted Payments, etc ....................................... 59

SECTION 7.2.7  Capital Expenditures ............................................. 60

SECTION 7.2.8  Issuance of Capital Securities ............................... 60

SECTION 7.2.9  Consolidation, Merger; Permitted Acquisitions, etc. .............. 61

SECTION 7.2.10  Permitted Dispositions ......................................... 61

SECTION 7.2.11  Modification of Certain Agreements ..................... 62

SECTION 7.2.12  Transactions with Affiliates ................................. 63

SECTION 7.2.13  Restrictive Agreements, etc ................................. 63

SECTION 7.2.14  Sale and Leaseback ............................................. 64

SECTION 7.2.15  Pension Plans ...................................................... 64

SECTION 7.2.16  No Payment or Prepayment of Certain Indebtedness ............ 64

ARTICLE VIII  EVENTS OF DEFAULT ..................................................65

SECTION 8.1  Listing of Events of Default................................................ 65

SECTION 8.1.1  Non-Payment of Obligations ................................. 65

SECTION 8.1.2  Non-Performance of Certain Covenants and Obligations........ 65

SECTION 8.1.3  Non-Performance of Other Covenants and Obligations .......... 65

17437108

SECTION 8.1.4  Default on Other Indebtedness....................................................65

SECTION 8.1.5  Judgments....................................................................................65

SECTION 8.1.6  Change in Control .......................................................................66

SECTION 8.1.7  Bankruptcy, Insolvency, etc........................................................66

SECTION 8.1.8  Impairment of Security, etc.........................................................66

SECTION 8.2  Action if Bankruptcy.............................................................................66

SECTION 8.3  Action if Other Event of Default...........................................................67

ARTICLE IX  THE ADMINISTRATIVE AGENT .............................................................67

SECTION 9.1  Actions. ..................................................................................................67

SECTION 9.2  Exculpation ............................................................................................68

SECTION 9.3  Successor.................................................................................................70

SECTION 9.4  Loans by the Administrative Agent ........................................................71

SECTION 9.5  Credit Decisions .....................................................................................71

SECTION 9.6  Copies, etc ..............................................................................................71

SECTION 9.7  Reliance by Administrative Agent ..........................................................71

SECTION 9.8  Defaults ..................................................................................................72

SECTION 9.9  Posting of Approved Electronic Communications..................................72

SECTION 9.10  Proofs of Claim ....................................................................................73

ARTICLE X  MISCELLANEOUS PROVISIONS ...............................................................74

SECTION 10.1  Waivers, Amendments, etc ..................................................................74

SECTION 10.2  Notices; Time.......................................................................................76

SECTION 10.3  Payment of Costs and Expenses...........................................................76

SECTION 10.4  Indemnification ....................................................................................77

SECTION 10.5  Survival ................................................................................................78

SECTION 10.6  Severability ..........................................................................................78

SECTION 10.7  Headings................................................................................................78

SECTION 10.8  Execution in Counterparts, Effectiveness, etc .....................................78

SECTION 10.9  Governing Law; Entire Agreement.......................................................78

SECTION 10.10  Successors and Assigns......................................................................78

SECTION 10.11  Sale and Transfer of Loans; Participations in Loans; Notes...............78

SECTION 10.12  Other Transactions .............................................................................82

SECTION 10.13  Forum Selection and Consent to Jurisdiction ....................................82

SECTION 10.14  Waiver of Jury Trial............................................................................82

17437108

iv

SECTION 10.15  Confidentiality. ................................................................................ 83

SECTION 10.16  Counsel Representation...................................................................... 84

SECTION 10.17  Patriot Act ......................................................................................... 84

SECTION 10.18  Authorization of Administrative Agent ............................................ 84

17437108

SCHEDULE I        -    Disclosure Schedule
SCHEDULE II       -    Percentages and Amounts; LIBOR Office; Domestic Office
SCHEDULE III      -    Specified EBITDA

EXHIBIT A         -    Form of Note
EXHIBIT B         -    Form of Continuation/Conversion Notice
EXHIBIT C         -    Form of Lender Assignment Agreement
EXHIBIT D         -    Form of Compliance Certificate
EXHIBIT E-1       -    Form of Parent Guaranty
EXHIBIT E-2       -    Form of Subsidiary Guaranty
EXHIBIT F         -    Form of Pledge and Security Agreement
EXHIBIT G         -    Form of Intercreditor Agreement
EXHIBIT H         -    Form of Mortgage

## FIRST LIEN CREDIT AGREEMENT

THIS FIRST LIEN CREDIT AGREEMENT, dated as of [●], 2011, is among WORKFLOWONE LLC, a Delaware limited liability company (the "Borrower"), the various financial institutions and other Persons from time to time parties hereto (the "Lenders") and THE BANK OF NEW YORK MELLON as the administrative agent (in such capacity, the "Administrative Agent"), for the Lenders.

## W I T N E S S E T H:

WHEREAS, on September 29, 2010, WF Capital Holdings, Inc. and its subsidiaries (collectively, "Bankruptcy Debtors") filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§101-1532, as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia, Norfolk Division (the "Bankruptcy Court"), jointly administered as In re Workflow Management, Inc., et al., Chapter 11 Case No. 10-74617 (SCS) and continued in the possession of their property and in the management of their businesses pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code (the "Bankruptcy Cases");

WHEREAS, on January 21, 2011, the Bankruptcy Debtors filed with the Bankruptcy Court a Third Amended Joint Chapter 11 Plan of Workflow Management, Inc. and its Affiliated Debtors (the "Plan") and a disclosure statement;

WHEREAS, the Plan contemplates, among other things: (i) the transfer of substantially all assets of the Bankruptcy Debtors to Workflow Holdings LLC, a Delaware limited liability company (the "Parent"), or to another entity or entities designated by Parent, pursuant to the Asset Purchase and Sale Agreement, dated as of January 21, 2011, by and among the Bankruptcy Debtors as Sellers and Parent as Buyer, as amended, supplemented, amended and restated or otherwise modified from time to time prior to the Effective Date and, as permitted hereunder, thereafter (the "Asset Purchase Agreement"); (ii) the cancellation of all Indebtedness outstanding under the First Lien Credit Agreement (as defined in the Plan, and referred to herein as the "Pre-Petition First Lien Credit Agreement") in exchange for the issuance of Loans hereunder; and (iii) the cancellation of all Indebtedness outstanding under the Second Lien Credit Agreement (as defined in the Plan, and referred to herein as the "Pre-Petition Second Lien Credit Agreement") in exchange for the issuance of (x) the Second Lien Loans under the Second Lien Credit Agreement and (y) the Newco Preferred Units (as defined in the Plan);

WHEREAS, Parent owns all of the Capital Securities of Borrower and has designated[1] Borrower to purchase substantially all of the assets of the Bankruptcy Debtors pursuant to the Asset Purchase Agreement;

WHEREAS, on [●], 2011, the Bankruptcy Court entered the order confirming the Plan (the "Confirmation Order") pursuant to which, among other things, the Bankruptcy Court approved the transactions contemplated by the Plan;

---

[1] To be designated in bill of sale or by resolution.

WHEREAS, on the date hereof (the "Effective Date"), concurrently with the effectiveness of this Agreement, the Plan shall become effective in accordance with its terms;

WHEREAS, in connection with the transactions contemplated by the Plan and by operation of the Confirmation Order, on the Effective Date, each lender under the Pre-Petition First Lien Credit Agreement shall receive (via an exchange) its Pro Rata Share (as defined in the Plan) of the Loans (the "Exchange of Loans") and shall become a Lender hereunder, subject to all of the rights and obligations of a Lender hereunder without any further action on the part of such Lender; and

WHEREAS, the Parent and each Subsidiary of the Borrower, which is or hereafter becomes a party hereto as a Guarantor, is or will be affiliated, is or will be engaged in interrelated businesses, and is or will derive substantial direct and indirect benefit from extensions of credit to the Borrower.

NOW, THEREFORE, the parties hereto agree as follows.

ARTICLE I
DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.1   Defined Terms.  The following terms (whether or not underscored) when used in this Agreement, including its preamble and recitals, shall, except where the context otherwise requires, have the following meanings (such meanings to be equally applicable to the singular and plural forms thereof):

"Account Debtor" means any Person who is or who may become obligated under, with respect to, or on account of, an account, chattel paper, or a general intangible or intangible, as applicable, in each case, as such term is defined under the UCC.

"Administrative Agent" is defined in the preamble and includes each other Person appointed as the successor Administrative Agent pursuant to Section 9.3.

"Affected Lender" is defined in Section 4.10.

"Affiliate" of any Person means any other Person which, directly or indirectly, controls, is controlled by or is under common control with such Person.  "Control" of a Person means the power, directly or indirectly,

(a)  to vote 10% or more of the Capital Securities (on a fully diluted basis) of such Person having ordinary voting power for the election of directors, managing members or general partners (as applicable); or

(b)  to direct or cause the direction of the management and policies of such Person (whether by contract or otherwise).

"Agreement" means, on any date, this First Lien Credit Agreement as originally in effect on the Effective Date and as thereafter from time to time amended, supplemented, amended and restated or otherwise modified from time to time and in effect on such date.

2

"<u>Alternate Base Rate</u>" means, on any date and with respect to all Base Rate Loans, a fluctuating rate of interest per annum (rounded upward, if necessary, to the next highest 1/16 of 1%) equal to the higher of

      (a)  the Base Rate in effect on such day; and

      (b)  the Federal Funds Rate in effect on such day plus ½ of 1%.

Changes in the rate of interest on that portion of any Loans maintained as Base Rate Loans will take effect simultaneously with each change in the Alternate Base Rate.

"<u>Applicable Margin</u>" means, with respect to (1) all Loans maintained as LIBO Rate Loans, 7.00%, and (2) all Loans maintained as Base Rate Loans, 6.00%.

"<u>Approved Fund</u>" means any Person (other than a natural Person) that (a) is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business, and (b) is administered or managed by a Lender, an Affiliate of a Lender or a Person or an Affiliate of a Person that administers or manages a Lender.

"<u>Assignee Lender</u>" means each future Lender which signs a Lender Assignment Agreement pursuant to <u>Section 10.11</u>.

"<u>Asset Purchase Agreement</u>" is defined in the <u>third recital</u>.

"<u>Authorized Officer</u>" means, relative to any Obligor, those of its officers, general partners or managing members (as applicable) whose signatures and incumbency shall have been certified to the Administrative Agent pursuant to <u>Section 5.1(b)</u>.

"<u>Bankruptcy Cases</u>" is defined in the <u>first recital</u>.

"<u>Bankruptcy Code</u>" is defined in the <u>first recital</u>.

"<u>Bankruptcy Court</u>" is defined in the <u>first recital</u>.

"<u>Bankruptcy Debtors</u>" is defined in the <u>first recital</u>.

"<u>Base Rate</u>" means, at any time, an annual rate equal to the greater of (a) 4.00% and (b) the rate of interest then most recently established by the Administrative Agent in New York as its base rate for Dollars loaned in the United States.  The Base Rate is not necessarily intended to be the lowest rate of interest determined by the Administrative Agent in connection with extensions of credit.

"<u>Base Rate Loan</u>" means a Loan bearing interest at a fluctuating rate determined by reference to the Alternate Base Rate.

"<u>Borrower</u>" is defined in the <u>preamble</u>.

"Business Day" means (a) any day which is neither a Saturday nor Sunday nor a legal holiday on which banks are authorized or required to be closed in New York, New York and (b) relative to the making, continuing, prepaying or repaying of any LIBO Rate Loans, any day which is a Business Day described in clause (a) above, and which is also a day on which dealings in Dollars are carried on in the London interbank Eurodollar market.

"Capital Expenditures" means, for any period, (a) the aggregate amount of all expenditures of the Borrower and its Subsidiaries for fixed or capital assets made during such period which, in accordance with GAAP, would have been (or in accordance with GAAP, should be) classified as capital expenditures, including the capitalized portion of any Capitalized Lease Liabilities (determined in accordance with GAAP) incurred by the Borrower and its Subsidiaries during such period, less (b) the aggregate amount of expenditures to replace capital assets with Net Disposition Proceeds or Net Casualty Proceeds pursuant to clause (c) of Section 3.1.1; provided, however that Capital Expenditures shall not include expenditures made in connection with the replacement, substitution or restoration of assets to the extent financed with awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced.

"Capital Securities" means, with respect to any Person, all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of such Person's capital (including all capital stock, partnership, membership or other equity interests in such Person), whether now outstanding or issued after the Effective Date and whether or not certificated.

"Capitalized Lease Liabilities" means, with respect to any Person, all monetary obligations of such Person and its Subsidiaries under any leasing or similar arrangement which have been (or, in accordance with GAAP, should be) classified as capitalized leases, and for purposes of each Loan Document the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP, and the stated maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a premium or a penalty.

"Cash Equivalent Investment" means, at any time:

(a)  any direct obligation of (or unconditionally guaranteed by) the United States or a State thereof (or any agency or political subdivision thereof, to the extent such obligations are supported by the full faith and credit of the United States or a State thereof) maturing not more than one year after such time;

(b)  commercial paper maturing not more than 270 days from the date of issue, which is issued by a corporation (other than an Affiliate of any Obligor) organized under the laws of any State of the United States or of the District of Columbia, and rated A-1 or higher by S&P or P-1 or higher by Moody's;

(c)  any certificate of deposit, time deposit or bankers acceptance, maturing not more than one year after its date of issuance, which is issued by any bank organized under the laws of the United States (or any State thereof), and which has (x) a credit

4

rating of A2 or higher from Moody's or A or higher from S&P and (y) a combined capital and surplus greater than $500,000,000;

(d) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (c) of this definition;

(e) money market funds that (i) purport to comply generally with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by S&P or Aaa by Moody's or carrying an equivalent rating by a national recognized rating agency, and (iii) have portfolio assets of at least $5,000,000,000; or

(f) any repurchase agreement having a term of 30 days or less entered into with any Lender or any commercial banking institution satisfying the criteria set forth in clause (c) which

(i) is secured by a fully perfected security interest in any obligation of the type described in clause (a), and

(ii) has a market value at the time such repurchase agreement is entered into of not less than 100% of the repurchase obligation of such commercial banking institution thereunder.

"Casualty Event" means the damage, destruction or condemnation, as the case may be, of property of any Person or any of its Subsidiaries.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"CERCLIS" means the Comprehensive Environmental Response, Compensation and Liability Information System database.

"Change in Control" means:

(a) the failure of Parent at any time to directly own beneficially and of record on a fully diluted basis 100% of the outstanding Capital Securities of the Borrower, such Capital Securities to be held free and clear of all Liens (other than Liens granted under a Loan Document or a Second Lien Loan Document); or

(b) an event by which any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act) other than the Permitted Holders is or becomes the beneficial owner of Capital Securities of the Parent representing more than 50% of the economic power of the total outstanding Capital Securities of the Parent.

"Closing Date" means the Effective Date.

"Code" means the Internal Revenue Code of 1986, and the regulations thereunder, in each case as amended, reformed or otherwise modified from time to time.

"Collections" means all cash, checks, notes, instruments and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds and tax refunds) of the Borrower and its Subsidiaries.

"Communications" is defined in clause (a) of Section 9.9.

"Compliance Certificate" means a certificate duly completed and executed by an Authorized Officer of the Borrower, substantially in the form of Exhibit D hereto, together with such changes thereto as the Administrative Agent may (acting at the written request of the Required Lenders) from time to time request for the purpose of monitoring the Borrower's compliance with the financial covenants contained herein.

"Confirmation Order" is defined in the fifth recital.

"Contingent Liability" means any agreement, undertaking or arrangement by which any Person guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or otherwise to invest in, a debtor, or otherwise to assure a creditor against loss) the Indebtedness (or, solely for purposes of the definition of Investment, other obligations) of any other Person (other than by endorsements of instruments in the course of collection), or guarantees the payment of dividends or other distributions upon the Capital Securities of any other Person.  The amount of any Person's obligation under any Contingent Liability shall (subject to any limitation set forth therein) be deemed to be the outstanding principal amount of the debt, obligation or other liability guaranteed thereby.

"Continuation/Conversion Notice" means a notice of continuation or conversion and certificate duly executed by an Authorized Officer of the Borrower, substantially in the form of Exhibit B hereto.

"Control Agreement" means an agreement in form and substance reasonably satisfactory to the Administrative Agent which provides for the Administrative Agent to have "control" (as defined in Section 8-106 of the UCC, as such term relates to investment property (other than certificated securities or commodity contracts), or as used in Section 9-106 of the UCC, as such term relates to commodity contracts, or as used in Section 9-104(a) of the UCC, as such term relates to deposit accounts).

"Controlled Group" means all members of a controlled group of corporations and all members of a controlled group of trades or businesses (whether or not incorporated) under common control which, together with the Borrower, are treated as a single employer under Section 414(b) or 414(c) of the Code or Section 4001 of ERISA.

"Copyright Security Agreement" means any Copyright Security Agreement executed and delivered by any Obligor in substantially the form of Exhibit C to the Security Agreement, as amended, supplemented, amended and restated or otherwise modified from time to time.

"Debt Issuance" means the issuance of any Indebtedness within the meaning of clauses (a) and (c) of the definition thereof by the Borrower or any of its Subsidiaries.

"<u>Default</u>" means any Event of Default or any condition, occurrence or event which, after notice or lapse of time or both, would constitute an Event of Default.

"<u>Deposit Account</u>" means a "deposit account" as that term is defined in Section 9-102(a) of the UCC.

"<u>Disclosure Schedule</u>" means the Disclosure Schedule attached hereto as <u>Schedule I</u>, as it may be amended, supplemented, amended and restated or otherwise modified from time to time by the Borrower with the written consent of the Required Lenders.

"<u>Disposition</u>" (or similar words such as "<u>Dispose</u>") means any sale, transfer, lease, sale-leaseback, contribution or other conveyance (including by way of merger) of, or the granting of options, warrants or other rights to, any of the Borrower's or its Subsidiaries' assets (including accounts receivable and Capital Securities of Subsidiaries) to any other Person (other than to another Obligor) in a single transaction or series of transactions.

"<u>Dollar</u>" and the sign "<u>$</u>" mean lawful money of the United States.

"<u>Domestic Office</u>" means the office of a Lender designated as its "Domestic Office" on <u>Schedule II</u> hereto or in a Lender Assignment Agreement, or such other office within the United States as may be designated from time to time by written notice from such Lender to the Administrative Agent and the Borrower.

"<u>Earnout Payment</u>" means in connection with any Permitted Acquisition, any portion of the purchase price for such acquisition which is (a) deferred to a date after the closing date therefor and (b) is contingent upon the performance of the business being acquired pursuant to such Permitted Acquisition.

"<u>EBITDA</u>" means, for any applicable period, Net Income for such period, <u>plus</u>, to the extent deducted in determining Net Income for such period, the sum, without duplication, of:

    (a)  income and state franchise Tax expense;

    (b)  interest expense, together with (i) amortization or write-off of debt discount and debt issuance costs and commissions, discounts and other fees and charges associated with Indebtedness (including administrative fees and charges with respect to the Obligations and the Second Lien Loans), and (ii) prepayment penalties, make-whole payments or call premiums payable on prepayment of Indebtedness;

    (c)  depreciation and amortization expense;

    (d)  any (i) extraordinary expenses or losses (including whether or not otherwise includable in the Parent's statement of Net Income for such period) or (ii) losses on sales or write-offs of assets outside of the ordinary course of business);

(e) any unusual non-cash or other non-cash charges, expenses or losses, including any inventory revaluations resulting from the Transactions and any non-cash write-offs required to be made under FASB ASC Topic 350, and any non-cash charges, fees, payments, expenses or losses accrued in connection with the consummation of the Plan (including all fresh start accounting adjustments), in each case incurred during such period;

(f) (x) restructuring and integration costs of the Borrower and its Subsidiaries, including but not limited to severance costs, plant moving costs, central sourcing costs, lease termination costs, and professional advisory fees incurred in connection with the adoption and execution of restructuring integration initiatives and the restructuring and refinancing of the Borrower's debt incurred during such period, and (y) any non-recurring expenses or losses consisting of (a) losses from extinguishment of debt, casualty (including fire, earthquake, hurricane, terrorism or other force majeure events), condemnation and expropriation and (b) other non-recurring losses which are set forth as such in the income statement of the Parent; provided that such costs, expenses or losses referred to in this clause (f) shall only be included to the extent in the aggregate they are equal to or less than $15,000,000 for any four-quarter period;

(g) transaction fees and expenses related to the Transactions paid by any Obligor;

(h) all fees and expenses (including management fees) accrued, or permitted hereunder to be paid and actually paid by any Obligor, for such period pursuant to the LLC Agreement and the Management Agreements, as in effect on the date hereof or as amended, modified or supplemented as permitted hereby;

(i) reasonable transaction fees and expenses incurred by any Obligor in connection with Permitted Acquisitions;

(j) [reserved];

(k) write-offs, reserves or allowances of notes receivable from current and former officers, founders, and direct or indirect shareholders of the Borrower and its Subsidiaries, in a principal amount not to exceed $3,000,000 (plus accrued and unpaid interest) in the aggregate over the term of this Agreement;

(l) costs and expenses of outside professionals engaged by the Borrower and its Subsidiaries at the request of the Lenders or Second Lien Lenders, and outside professionals engaged by the Lenders and Second Lien Lenders at the expense of the Borrower and its Subsidiaries;

(m) expenses related to the issuance of equity-based compensation;

(n) reasonable fees (including reasonable legal fees and other similar advisory and consulting fees, administrative fees and working fees), charges, payments and

expenses accrued or paid by any Obligor in connection with the consummation of the Plan;

(o)  reasonable fees paid to the Administrative Agent pursuant to the Fee Letter; and

(p)  any letter of credit fees, to the extent paid by any Obligor in cash;

minus, to the extent included in Net Income for such period, the sum, without duplication, of:

(i)  interest income (except to the extent deducted in determining interest expense);

(ii)  any extraordinary or non-recurring income or gains (including whether or not otherwise includable in the Parent's statement of Net Income for such period, gains on the sales of assets outside the ordinary course of business); and

(iii)  any unusual non-cash or other non-cash income;

provided that, for purposes of Section 7.2.4, and notwithstanding any provision of Section 1.4(b) to the contrary, calculations of EBITDA for any period shall be adjusted to exclude items otherwise properly included to the extent such items relate to assets Disposed in such period, on a *pro forma* basis as if such asset was Disposed on the first day of such period; and

provided further that, notwithstanding the foregoing provisions of this definition of EBITDA, (i) the quarterly EBITDA of the Borrower and its Subsidiaries for each Fiscal Quarter ending on September 30, 2010 and December 31, 2010 and (ii) the EBITDA of the Borrower and its Subsidiaries for the period commencing on January 1, 2011 until the Closing Date, and with respect to clauses (i) and (ii), together with all itemized additions and deductions thereto, shall be as set forth in Schedule III hereto.

"Effective Date" is defined in the sixth recital.

"Eligible Assignee" means any Person (other than an Ineligible Assignee).

"Emigsville Property" means the real property owned by the Borrower, located in York County, Pennsylvania and commonly known as 325 Busser Road, Emigsville, Pennsylvania.

"Employee Benefit Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA that is maintained for employees of the Borrower or any member of the Borrower's Controlled Group.

"Environmental Laws" means all applicable foreign, federal, state, provincial or local statutes, laws, ordinances, codes, rules and regulations (including consent decrees and administrative orders) relating to public health and safety and protection of the environment.

9

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto of similar import, together with the regulations thereunder, in each case as in effect from time to time.  References to sections of ERISA also refer to any successor sections thereto.

"Event of Default" is defined in Section 8.1.

"Excess Cash Flow" means, for any Fiscal Year, the result of the following calculation:

(a)  EBITDA for such period;

plus

(b)  the absolute value of any net decrease in Working Capital for such period;

less

(c)  the sum (without duplication) for such period of the following:

(i)  the aggregate amount of (A) all regularly scheduled or mandatorily repayable principal payments of Indebtedness (including the Loans) made during such Fiscal Year, (B) all optional prepayments of Indebtedness permitted hereby (other than the Loans) during such Fiscal Year (including any call premiums paid in cash upon repayment of such Indebtedness) and (C) the portion of any regularly scheduled payments with respect to Capital Lease Liabilities allocable to principal;

(ii)  cash payments made with respect to Capital Expenditures (to the extent permitted hereunder and not funded with debt or equity issuances);

(iii)  all federal, state, local and foreign income, franchise or other similar taxes to the extent paid by the Parent and its Subsidiaries in cash (including any future payments of past-priority taxes assumed from the Bankruptcy Debtors for any past, present or current periods) and, to the extent not duplicative thereof, Restricted Payments made for the purposes described in clause (b)(iii) of Section 7.2.6;

(iv)  interest expense to the extent paid in cash during such Fiscal Year;

(v)  to the extent actually paid in cash during such Fiscal Year, Earnout Payments (to the extent not funded with debt or equity issuances);

(vi)  the absolute value of any net increase in Working Capital for such period;

(vii)  cash payments to the extent (A) actually paid in cash during such period and (B) added back to EBITDA for such period under clauses (d), (f), (g), (h), (i), (l), (n), (o) and (p) of the definition of EBITDA; and

(viii)  cash payments made with respect to Permitted Acquisitions and Investments permitted under Section 7.2.5 (except to the extent funded with debt or equity issuances); and

(ix) cash payments made pursuant to the Transactions.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Exchange of Loans" is defined in the seventh recital.

"Exemption Certificate" is defined in clause (e) of Section 4.6.

"FATCA" means Sections 1471 through 1474 of the Code.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal for each day during such period to

(a)  the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York; or

(b)  if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"Fee Letter" means the confidential letter, dated February 2, 2011, between the Administrative Agent and the Borrower.

"Filing Agent" is defined in Section 5.7.

"Filing Statements" is defined in Section 5.7.

"Fiscal Quarter" means a quarter ending on the last day of March, June, September or December.

"Fiscal Year" means any period of twelve consecutive calendar months ending on December 31; references to a Fiscal Year with a number corresponding to any calendar year (e.g., the "2011 Fiscal Year") refer to the Fiscal Year ending on December 31 of such calendar year.

"Foreign Pledge Agreement" means any supplemental pledge agreement governed by the laws of a jurisdiction other than the United States or a State thereof executed and delivered by the Borrower or any of its Subsidiaries pursuant to the terms of this Agreement, in form and substance reasonably satisfactory to the Administrative Agent, as may be necessary or desirable under the laws of organization or incorporation of a Subsidiary to further protect or perfect the Lien on and security interest in any Collateral (as defined in the Security Agreement).

"Foreign Subsidiary" means any Subsidiary that is not incorporated or organized under the laws of the United States, a state thereof or the District of Columbia and any Subsidiary of such a Foreign Subsidiary.

"F.R.S. Board" means the Board of Governors of the Federal Reserve System or any successor thereto.

"GAAP" is defined in Section 1.4.

"Goshen Property" means the real property owned by the Borrower, located in Elkhart County, Indiana and commonly known as 1302 Eisenhower Drive North, Goshen, Indiana.

"Governmental Authority" means the government of the United States, any other nation, or any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other Person exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Granting Lender" is defined in clause (g) of Section 10.11.

"Guarantor" means, collectively, the Parent, each Subsidiary Guarantor and each other Person party to a Guaranty.

"Guaranty" means, as applicable, the Parent Guaranty, any Subsidiary Guaranty and any other document delivered by a U.S. Subsidiary of the Borrower whereby such U.S. Subsidiary becomes liable for the Obligations.

"Hazardous Material" means

      (a)  any "hazardous substance", as defined by CERCLA;

      (b)  any "hazardous waste", as defined by the RCRA; or

      (c)  any pollutant or contaminant or hazardous, dangerous or toxic chemical, material or substance (including any petroleum product) within the meaning of any other applicable Environmental Law relating to or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material, all as amended.

"Hedging Obligations" means, with respect to any Person, all liabilities of such Person under currency exchange agreements, interest rate swap agreements, interest rate cap agreements and interest rate collar agreements, and all other agreements or arrangements designed to protect such Person against fluctuations in interest rates or currency exchange rates.

"herein", "hereof", "hereto", "hereunder" and similar terms contained in any Loan Document refer to such Loan Document as a whole and not to any particular Section, paragraph or provision of such Loan Document.

"Hypothetical Tax Rate" means, for any taxable year, the greater of the highest marginal rate of combined federal, state and local income tax (including any Medicare contribution taxes imposed on net investment income) payable by (i) an individual resident in New York City and (ii) a corporation resident in New York City whose sole assets are the membership interests of the Parent that are held by such corporation, in each case taking into account the particular character of the income involved (e.g., capital gain or ordinary income) and taking into account the deductibility of state and local income taxes in computing federal income tax liability.

"including" and "include" means including without limiting the generality of any description preceding such term, and, for purposes of each Loan Document, the parties hereto agree that the rule of ejusdem generis shall not be applicable to limit a general statement, which is followed by or referable to an enumeration of specific matters, to matters similar to the matters specifically mentioned.

"Indebtedness" of any Person means:

(a)  all obligations of such Person for borrowed money or advances and all obligations of such Person evidenced by bonds, debentures, notes or similar instruments or upon which interest payments are customarily made;

(b)  all obligations, contingent or otherwise, relative to the face amount of all letters of credit, whether or not drawn, banker's acceptances, performance, surety or appeal bonds (or similar obligations) issued for the account of such Person;

(c)  all Capitalized Lease Liabilities of such Person;

(d)  all reimbursement, payment or other obligations or liabilities of such Person created or arising under any conditional sale or title retention agreement with respect to property used or acquired by such Person;

(e)  for purposes of Section 8.1.4 only, all other items which, in accordance with GAAP, would be included as liabilities on the balance sheet of such Person as of the date at which Indebtedness is to be determined;

(f)  net Hedging Obligations of such Person;

(g)  whether or not so included as liabilities in accordance with GAAP, all obligations of such Person to pay the deferred purchase price of property or services (including all reimbursement, payment or other obligations or liabilities of such Person created or arising under any conditional sale or title retention agreement with respect to property used or acquired by such Person) (excluding trade accounts payable in the ordinary course of business and not outstanding for more than 120 days after such payable was due unless, if such payable is outstanding more than 120 days after such payable was due, they are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted) of the date of purchase of such goods and services (including all reimbursement, payment or other obligations or liabilities of such Person created or arising under any conditional sale or title retention agreement with respect to property used or acquired by such Person), and indebtedness secured by (or for

13

which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien on property owned or being acquired by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(h)  obligations arising under Synthetic Leases;

(i)  all Contingent Liabilities of such Person; and

(j)  all obligations referred to in clauses (a) through (i) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person.

The Indebtedness of any Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such Person, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Liabilities" is defined in Section 10.4.

"Indemnified Parties" is defined in Section 10.4.

"Ineligible Assignee" means a natural Person, the Parent, any Subsidiary of Parent and Perseus.

"Intercreditor Agreement" means the Intercreditor Agreement, dated the date hereof and substantially in the form of Exhibit G hereto, executed and delivered by the Administrative Agent, the administrative agent under the Second Lien Credit Agreement and the Obligors pursuant to the terms of this Agreement, as amended, supplemented, amended and restated, replaced or otherwise modified from time to time.

"Interest Coverage Ratio" means, as of the last day of any Fiscal Quarter, the ratio computed for the period consisting of such Fiscal Quarter and each of the three immediately preceding Fiscal Quarters of:

(a)  EBITDA (for all such Fiscal Quarters)

to

(b)  the sum (for all such Fiscal Quarters) of Interest Expense;

provided that for purposes of calculating the Interest Coverage Ratio for each of the following Fiscal Quarters of the 2011 Fiscal Year, Interest Expense shall be calculated as follows: (i) with respect to the third Fiscal Quarter of such Fiscal Year, the amount of Interest Expense for such Fiscal Quarter and the immediately preceding Fiscal Quarter multiplied by two; and (ii) with respect to the fourth Fiscal Quarter of such Fiscal Year, the amount of Interest

Expense for such Fiscal Quarter and the two immediately preceding Fiscal Quarters multiplied by one and one-third.

"Interest Expense" means, for any applicable period, (a) the aggregate cash interest expense of the Parent and its Subsidiaries for such applicable period, including the portion of any payments made in respect of Capitalized Lease Liabilities allocable to interest expense but excluding (to the extent otherwise included in the definition of Interest Expense) (i) amortization of deferred financing costs, (ii) make-whole payments or call premiums paid or payable in cash upon repayment of Indebtedness and (iii) any interest capitalized or paid in kind; less (b) the aggregate interest income received by Parent and its Subsidiaries for such applicable period.

"Interest Period" means, relative to any LIBO Rate Loan, the period beginning on (and including) the date on which such LIBO Rate Loan is made or continued as, or converted into, a LIBO Rate Loan pursuant to Sections 2.2 or 2.3 and shall end on (but exclude) the day which numerically corresponds to such date one, two, three or six months thereafter (or, if such month has no numerically corresponding day, on the last Business Day of such month), in either case as the Borrower may select in its relevant notice pursuant to Sections 2.2 or 2.3; provided, that,

> (a)  the Borrower shall not be permitted to select Interest Periods to be in effect at any one time which have expiration dates occurring on more than ten different dates;

> (b)  if such Interest Period would otherwise end on a day which is not a Business Day, such Interest Period shall end on the next following Business Day (unless such next following Business Day is the first Business Day of a calendar month, in which case such Interest Period shall end on the Business Day next preceding such numerically corresponding day); and

> (c)  no Interest Period for any Loan may end later than the Stated Maturity Date for such Loan.

"Investment" means, relative to any Person,

> (a)  any loan, advance or extension of credit made by such Person to any other Person, including the purchase by such Person of any bonds, notes, debentures or other debt securities of any other Person;

> (b)  Contingent Liabilities in favor of any other Person; and

> (c)  any Capital Securities held by such Person in any other Person.

The amount of any Investment shall be the original principal or capital amount thereof less all returns of principal or capital thereon and shall, if made by the transfer or exchange of property other than cash, be deemed to have been made in an original principal or capital amount equal to the fair market value of such property at the time of such Investment.

"Lender Assignment Agreement" means an assignment agreement substantially in the form of Exhibit C hereto.

"Lenders" is defined in the preamble.

"Lender's Environmental Liability" means any and all losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, costs, judgments, suits, proceedings, damages, (including consequential damages), disbursements or expenses of any kind or nature whatsoever (including reasonable attorneys' fees and expenses at trial and appellate levels and experts' fees and disbursements and expenses incurred in investigating, defending against or prosecuting any litigation, claim or proceeding) which may at any time be imposed upon, incurred by or asserted or awarded against the Administrative Agent or any Lender or any of such Person's Affiliates, shareholders, directors, officers, employees, and agents in connection with or arising from:

      (a)  any Hazardous Material on, in, under or migrating from all or any portion of any property of the Borrower or any of its Subsidiaries or the groundwater thereunder to the extent caused by Releases from the Borrower's or any of its Subsidiaries' or any of their respective predecessors' properties;

      (b)  any misrepresentation, inaccuracy or breach of any warranty, contained or referred to in Section 6.11;

      (c)  any violation or claim of violation by the Borrower or any of its Subsidiaries of any Environmental Laws; or

      (d)  the imposition of any Lien for damages caused by, or the recovery of any costs with respect to, the cleanup, Release of Hazardous Material by the Borrower or any of its Subsidiaries, or in connection with any property owned by the Borrower or any of its Subsidiaries.

"LIBO Rate" means, relative to any Interest Period for LIBO Rate Loans, an annual rate equal to the greater of (i) 3.00% and (ii) the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the beginning of the relevant Interest Period by reference to the British Bankers' Association Interest Settlement Rates for deposits in Dollars (as set forth by the Bloomberg Information Service or any successor thereto or any other service selected by the Administrative Agent which has been nominated by the British Bankers' Association as an authorized information vendor for the purpose of displaying such rates) for a period equal to such Interest Period; provided that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this clause (ii), the interest rate determined in accordance with this clause (ii) shall be the interest rate per annum determined by the Administrative Agent to be the average of the rates per annum at which deposits in Dollars are offered for such relevant Interest Period to major banks in the London interbank market in London, England by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the beginning of such Interest Period.

"LIBO Rate Loan" means a Loan bearing interest, at all times during an Interest Period applicable to such Loan, at a rate of interest determined by reference to the LIBO Rate (Reserve Adjusted).

"LIBO Rate (Reserve Adjusted)" means, relative to any Loan to be made, continued or maintained as, or converted into, a LIBO Rate Loan for any Interest Period, a rate per annum determined pursuant to the following formula:

$$\text{LIBO Rate (Reserve Adjusted)} = \frac{\text{LIBO Rate}}{1.00 - \text{LIBOR Reserve Percentage}}$$

The LIBO Rate (Reserve Adjusted) for any Interest Period for LIBO Rate Loans will be determined by the Administrative Agent on the basis of the LIBOR Reserve Percentage in effect two Business Days before the first day of such Interest Period.

"LIBOR Office" means the office of a Lender designated as its "LIBOR Office" on Schedule II hereto or in a Lender Assignment Agreement, or such other office designated from time to time by written notice from such Lender to the Borrower and the Administrative Agent, whether or not outside the United States, which shall be making or maintaining the LIBO Rate Loans of such Lender.

"LIBOR Reserve Percentage" means, relative to any Interest Period for LIBO Rate Loans, the reserve percentage (expressed as a decimal) equal to the maximum aggregate reserve requirements (including all basic, emergency, supplemental, marginal and other reserves and taking into account any transitional adjustments or other scheduled changes in reserve requirements) specified under regulations issued from time to time by the F.R.S. Board and then applicable to assets or liabilities consisting of or including "Eurocurrency Liabilities", as currently defined in Regulation D of the F.R.S. Board, having a term approximately equal or comparable to such Interest Period.

"Lien" means any security interest, mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), charge against or security interest in property, or other priority or preferential arrangement of any kind or nature whatsoever, including any conditional sale or title retention arrangement, any Capitalized Lease Liability and any assignment, deposit arrangement or financing lease intended as security.

"Livermore Property" means the real property owned by the Borrower, located in Alameda County, California and commonly known as 5775 Brisa Street, Livermore, California.

"LLC Agreement" means the Amended and Restated Limited Liability Company Agreement, dated [●], 2011, among the Parent and the other parties thereto, as amended, supplemented, amended and restated or otherwise modified from time to time.

"Loan Documents" means, collectively, this Agreement, the Notes, any Rate Protection Agreement, the Fee Letter, each agreement pursuant to which the Administrative Agent is granted a Lien to secure all or any part of the Obligations, each Guaranty, the Intercreditor Agreement and each other agreement, certificate, document or instrument delivered in connection with any Loan Document, whether or not specifically mentioned herein or therein.

"Loans" is defined in Section 2.1.

"Management Agreements" means the Management Agreements, dated as of the Effective Date, among Silver Point Capital, L.P. and Perseus and the Borrower, as amended, supplemented, amended and restated or otherwise modified from time to time as permitted hereunder.

"Material Adverse Effect" means a material adverse effect on (a) the business, condition (financial or otherwise), operations, performance or properties of the Parent and its Subsidiaries taken as a whole, (b) the rights and remedies of any Secured Party under any Loan Document, (c) the ability of any Obligor to perform its Obligations under any Loan Document, (d) the legality, validity or enforceability of this Agreement or any other Loan Document or (e) the validity, perfection or priority of Liens with respect to any material portion of the collateral in favor of the Administrative Agent for the benefit of the Secured Parties (other than any material adverse effect that has occurred as a result of the Bankruptcy Cases and related proceedings).

"Moody's" means Moody's Investors Service, Inc.

"Mortgage" means each mortgage, deed of hypothec, debenture, pledge, deed of trust or agreement executed and delivered by any Obligor in favor of the Administrative Agent for the benefit of the Secured Parties pursuant to the requirements of this Agreement substantially in the form set forth in Exhibit H hereto (with such changes as are reasonably satisfactory to the Administrative Agent), under which a Lien is granted on the real property and fixtures described therein, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"Net Casualty Proceeds" means, with respect to any Casualty Event, the amount of any insurance proceeds or condemnation awards received by the Parent, the Borrower or any of its Subsidiaries in connection with such Casualty Event (net of all reasonable and customary collection expenses thereof), but excluding any proceeds or awards required to be paid to a creditor (other than the Lenders) which holds a first priority Lien permitted pursuant to this Agreement on the property which is the subject of such Casualty Event minus the sum of (i) all taxes actually paid or estimated by the Borrower to be payable in cash within the 12 months following the date of such Casualty Event and (ii) to the extent not excluded above, payments made by the Borrower or its Subsidiaries to retire Indebtedness (other than the Loans) where payment of such Indebtedness is required in connection with such Casualty Event; provided that, if the amount of any estimated taxes pursuant to clause (i) exceeds the amount of taxes actually required to be paid in cash in respect of such Casualty Event, the aggregate amount of such excess shall constitute Net Casualty Proceeds.

"Net Debt Proceeds" means the cash proceeds received by the Borrower or its Subsidiaries from any Debt Issuance by the Borrower or any Subsidiary not otherwise permitted pursuant to the terms of Section 7.2.2 (net of underwriting discounts and commissions and other reasonable fees, expenses and costs associated therewith including, without limitation, those of attorneys, accountants and other professionals).

"Net Disposition Proceeds" means the gross cash proceeds received by the Borrower or its Subsidiaries from any Disposition other than those pursuant to clauses (a), (b) (but not to the extent clause (b) references Section 7.2.14), (c), (d) and (e) of Section 7.2.10 and any cash

payment received in respect of promissory notes or other non-cash consideration delivered to the Borrower or its Subsidiaries in respect thereof, minus the sum of (i) all reasonable and customary legal, investment banking, brokerage, accounting and other similar professional fees and expenses incurred in connection with such Disposition, (ii) all taxes actually paid or estimated by the Borrower to be payable in cash within the 12 months following the date of such Disposition, and (iii) payments made by the Borrower or its Subsidiaries to retire Indebtedness (other than the Loans) secured by a Lien permitted pursuant to Section 7.2.3 (and such Lien is senior to the Liens created under the Loan Documents) where payment of such Indebtedness is required in connection with such Disposition; provided that, if the amount of any estimated taxes pursuant to clause (ii) exceeds the amount of taxes actually required to be paid in cash in respect of such Disposition, the aggregate amount of such excess shall constitute Net Disposition Proceeds.

"Net Income" means, for any period, the aggregate of all amounts which would be included as net income (or loss) on the consolidated financial statements of the Parent and its Subsidiaries for such period.

"Non-Excluded Taxes" means any Taxes imposed, deducted or withheld with respect to any Secured Party on payments under this Agreement or any Loan Document other than (i) net income and franchise Taxes imposed by any Governmental Authority under the laws of which such Secured Party is organized or in which it maintains its principal office or its applicable lending office, (ii) any U.S. federal withholding tax imposed under FATCA, (iii) Taxes imposed as a result of a present or former connection between such Secured Party and the jurisdiction imposing such Taxes, but excluding any such connection arising from such Secured Party's exercise of its rights or performance of its obligations pursuant to or in respect of this Agreement or any Loan Document, (iv) any branch profits tax imposed by the United States or any comparable tax imposed by any foreign jurisdiction and (v) any Other Taxes.

"Non-U.S. Lender" means any Lender that is not a "United States person", as defined under Section 7701(a)(30) of the Code.

"Note" means a promissory note of the Borrower payable to any Lender, in the form of Exhibit A hereto (as such promissory note may be amended, endorsed or otherwise modified from time to time), evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from outstanding Loans, and also means all other promissory notes accepted from time to time in substitution therefor or renewal thereof.

"Obligations" means all obligations (monetary or otherwise, whether absolute or contingent, matured or unmatured) of the Borrower and each other Obligor to the Secured Parties arising under or in connection with a Loan Document, including, but not limited to, the principal of and premium, if any, and interest (including interest accruing (or which would have accrued) during the pendency of any proceeding of the type described in Section 8.1.7, whether or not allowed in such proceeding) on the Loans as well as all Fees and expenses (including attorneys' fees and expenses) and indemnity payable to the Secured Parties hereunder.

"Obligor" means, as the context may require, the Borrower and each other Person (other than a Secured Party) obligated under any Loan Document.

"Organic Document" means, relative to any Obligor, as applicable, its certificate or articles of incorporation, articles and memorandum of association, by-laws, certificate of partnership, partnership agreement, certificate of formation, limited liability agreement, operating agreement and all shareholder agreements, voting trusts and similar arrangements applicable to any of such Obligor's Capital Securities.

"Other Taxes" means any and all present or future stamp, documentary or similar Taxes, or any other excise or property Taxes or similar levies that arise on account of any payment made or required to be made under any Loan Document or from the execution, delivery, registration, recording or enforcement of, or otherwise with respect to, any Loan Document, but excluding, for the avoidance of doubt, any Taxes arising in connection with any transfer, assignment or participation of any rights or obligations under this Agreement, or any change in lending office by any Lender, except if such transfer, assignment, participation or change in lending office is done at the request of Borrower.

"Parent" is defined in the third recital.

"Parent Guaranty" means the guaranty, dated as of the date hereof, executed and delivered by an Authorized Officer of the Parent pursuant to the terms of this Agreement, substantially in the form of Exhibit E-1 hereto, as amended, supplemented, amended and restated or otherwise modified from time to time.

"Participant" is defined in clause (d) of Section 10.11.

"Patent Security Agreement" means any Patent Security Agreement executed and delivered by any Obligor in substantially the form of Exhibit A to the Security Agreement, as amended, supplemented, amended and restated or otherwise modified.

"Patriot Act" means the USA PATRIOT ACT (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as amended and supplemented from time to time.

"PBGC" means the Pension Benefit Guaranty Corporation and any Person succeeding to any or all of its functions under ERISA.

"PBGC Settlement" means the settlement agreement, if any, with PBGC.

"Pension Plan" means a "pension plan", as such term is defined in Section 3(2) of ERISA, which is subject to Title IV of ERISA, and to which the Borrower or any corporation, trade or business that is, along with the Borrower, a member of a Controlled Group, may have liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

"Percentage" means, relative to any Lender, the percentage set forth opposite its name on Schedule II hereto or set forth in a Lender Assignment Agreement, as such percentage may be adjusted from time to time (x) in accordance with Section 4.8 or (y) pursuant to Lender Assignment Agreements executed by such Lender and its Assignee Lender and delivered pursuant to Section 10.11.

"Permitted Acquisition" means an acquisition (whether pursuant to an acquisition of Capital Securities, assets or otherwise) by the Borrower or any Subsidiary from any Person in which the following conditions are satisfied:

(a)  the Borrower shall have submitted to the Administrative Agent at least 20 days prior to the consummation of such acquisition, a business description of the business or assets being acquired, the financial statements of the business or assets being acquired and a summary of the terms of the acquisition, all in reasonable detail;

(b)  the assets, Capital Securities or business being acquired, will be located, incorporated and/or doing business in the United States;

(c)  Borrower shall have delivered a certificate certifying that before and after giving effect to such acquisition, the representations and warranties set forth in each Loan Document shall, in each case, be true and correct in all material respects with the same effect as if then made (unless stated to relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date) and no Default has occurred and is continuing; and

(d)  the Borrower shall have delivered to the Administrative Agent a Compliance Certificate for the period of four full Fiscal Quarters immediately preceding such acquisition (prepared in good faith and in a manner and using such methodology which is consistent with the most recent financial statements delivered pursuant to Section 7.1.1) giving pro forma effect to the consummation of such acquisition as if such Permitted Acquisition had occurred on the first day of the period of four Fiscal Quarters ending on the last day of the most recently ended Fiscal Quarter ending at least 45 days prior to the date of such Permitted Acquisition.

"Permitted Holders" means (i) Perseus, (ii) any Person that holds the Capital Securities of the Parent as of the Closing Date and (iii) the respective affiliates of the Persons referred to in the foregoing clauses (i) and (ii).

"Perseus" means Perseus, L.L.C. and its Affiliates.

"Person" means any natural person, corporation, limited liability company, partnership, joint venture, association, trust or unincorporated organization, Governmental Authority or any other legal entity, whether acting in an individual, fiduciary or other capacity.

"Plan" is defined in the second recital.

"Platform" is defined in clause (b) of Section 9.9.

"Purchase Card Agreements" means any arrangement by any Obligor to provide company-paid credit cards to employees that permit such employees to make purchases on behalf of such Obligor of supplies or services used in the ordinary course of business by such Obligor, including in respect of ordinary course, business related travel and entertainment expenses.

"Quarterly Payment Date" means the last Business Day of March, June, September and December.

"Rate Protection Agreement" means, collectively, any interest rate swap, cap, collar or similar agreement entered into by the Borrower or any of its Subsidiaries under which the counterparty of such agreement is (or at the time such agreement was entered into, was) a Lender or an Affiliate of a Lender.

"RCRA" means the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., as amended.

"Register" is defined in clause (a) of Section 2.5.

"Release" means a "release", as such term is defined in CERCLA or any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material in the indoor or outdoor environment, including the movement of Hazardous Material through or in the air, soil, surface water, ground water or property.

"Replacement Lender" is defined in Section 4.10.

"Replacement Notice" is defined in Section 4.10.

"Required Lenders" means, at any time, Lenders holding more than 50% of the aggregate principal amount of the then outstanding Loans.

"Restricted Payment" means (i) the declaration or payment of any dividend (other than dividends payable solely in Capital Securities (that are not mandatorily redeemable prior to one year and one day after the Stated Maturity Date) of the Borrower or any Subsidiary) on, or the making of any payment or distribution on account of, or setting apart assets for a sinking or other analogous fund for the purchase, redemption, defeasance, retirement or other acquisition of, any class of Capital Securities of the Borrower or any Subsidiary or any warrants, options or other right or obligation to purchase or acquire any such Capital Securities, whether now or hereafter outstanding, or (ii) the making of any other distribution in respect of such Capital Securities, in each case either directly or indirectly, whether in cash, property or obligations of the Borrower or any Subsidiary or otherwise.

"S&P" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc.

"SEC" means the Securities and Exchange Commission.

"Second Lien Credit Agreement" means the Second Lien Credit Agreement, dated as of the date hereof, among the Borrower, the various financial institutions and other Persons from time to time party thereto as lenders, Silver Point, as the administrative agent and the other Persons party thereto as agents, as amended, supplemented, amended and restated, refinanced or otherwise modified from time to time in accordance with Section 7.2.11.

"Second Lien Lender" means each "Lender" as defined in the Second Lien Credit Agreement (or such corresponding term in the event the Second Lien Credit Agreement is refinanced in accordance with the terms hereof).

"Second Lien Loan Documents" means the "Loan Documents" as defined in the Second Lien Credit Agreement (or such corresponding term in the event the Second Lien Credit Agreement is refinanced in accordance with the terms hereof).

"Second Lien Loans" means the "Loans" as defined in the Second Lien Credit Agreement (or such corresponding term in the event the Second Lien Credit Agreement is refinanced in accordance with the terms hereof).

"Secured Parties" means, collectively, the Lenders, the Administrative Agent, each counterparty to a Rate Protection Agreement that is (or at the time such Rate Protection Agreement was entered into, was) a Lender or an Affiliate thereof and (in each case) each of their respective successors, transferees and assigns.

"Security Agreement" means the Pledge and Security Agreement executed and delivered by an Authorized Officer of the Parent and its Subsidiaries, substantially in the form of Exhibit F hereto, together with any supplemental Foreign Pledge Agreement delivered pursuant to the terms of this Agreement, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"Silver Point" means Silver Point Finance LLC.

"SPC" is defined in clause (g) of Section 10.11.

"Special Required Lenders" means, at any time, Lenders holding more than 50% of the aggregate principal amount of then outstanding Loans, which includes at least one Lender that is not managed or controlled by, and is not an Affiliate of, Silver Point Capital, L.P. and which holds more than 3% of the aggregate principal amount of then outstanding Loans.

"Stated Maturity Date" means [•], 2015.

"Subsidiary" means, with respect to any Person, any other Person of which more than 50% of the outstanding Voting Securities of such other Person (irrespective of whether at the time Capital Securities of any other class or classes of such other Person shall or might have voting power upon the occurrence of any contingency) is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more other Subsidiaries of such Person, or by one or more other Subsidiaries of such Person.  Unless the context otherwise specifically requires, the term "Subsidiary" shall be a reference to a Subsidiary of the Borrower.

"Subsidiary Guarantor" means each U.S. Subsidiary of the Borrower that has executed and delivered to the Administrative Agent the Subsidiary Guaranty (including by means of a delivery of a supplement thereto).

"Subsidiary Guaranty" means the subsidiary guaranty executed and delivered by an Authorized Officer of each U.S. Subsidiary pursuant to the terms of this Agreement,

substantially in the form of <u>Exhibit E-2</u> hereto, as amended, supplemented, amended and restated or otherwise modified from time to time.

"<u>Synthetic Lease</u>" means, as applied to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is not a capital lease in accordance with GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for federal income tax purposes, other than any such lease under which that Person is the lessor.

"<u>Taxes</u>" means all taxes, duties, levies, imposts, charges, assessments, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, and all interest, penalties or similar liabilities with respect thereto.

"<u>Termination Date</u>" means the date on which all Obligations have been paid in full in cash.

"<u>Terrorism Laws</u>" means any of the following (a) Executive Order 13224 issued by the President of the United States, (b) the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations), (c) the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations), (d) the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations), (e) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 (as it may be subsequently codified), (f) all other present and future legal requirements of any Governmental Authority addressing, relating to, or attempting to eliminate, terrorist acts and acts of war and (g) any regulations promulgated pursuant thereto or pursuant to any legal requirements of any Governmental Authority governing terrorist acts or acts of war.

"<u>Total Debt</u>" means, on any date of determination, the outstanding principal amount of all Indebtedness of the Parent and its Subsidiaries of the type referred to in <u>clause (a)</u> (which, in the case of the Loans, shall be deemed to equal the aggregate outstanding principal amount of the Loans outstanding on the last day of the Fiscal Quarter ending on or immediately preceding the date of determination), <u>clause (c)</u> and <u>clause (g)</u>, in each case of the definition of "Indebtedness" (exclusive of (x) intercompany Indebtedness between the Parent and its Subsidiaries and (y) any Preferred Units (as defined in the LLC Agreement)) and any Contingent Liability in respect of any of the foregoing.

"<u>Total Leverage Ratio</u>" means, as of the last day of any Fiscal Quarter, the ratio of

      (a)  Total Debt outstanding on the last day of such Fiscal Quarter,

<u>to</u>

      (b)  EBITDA computed for the period consisting of such Fiscal Quarter and each of the three immediately preceding Fiscal Quarters.

"<u>Trademark Security Agreement</u>" means any Trademark Security Agreement executed and delivered by any Obligor substantially in the form of Exhibit B to the Security Agreement, as amended, supplemented, amended and restated or otherwise modified from time to time.

"<u>Transactions</u>" means, collectively, (a) the consummation of the Plan and the other transactions contemplated by the Plan to be consummated on the Closing Date (including, without limitation, transactions contemplated by the Asset Purchase Agreement), (b) the entering into by the Obligors of the Loan Documents and the Second Lien Loan Documents to which they are intended to be a party, and the Exchange of Loans on the Closing Date, (c) the issuance of the Class A Common Units, Class B Common Units and the Preferred Units (each as defined in, and pursuant to, the LLC Agreement), (d) the satisfaction of all Indebtedness required to be paid pursuant to the Plan, (e) the payment of the fees and expenses incurred in connection with the consummation of the foregoing that are required to be paid on the Closing Date and (f) any payments made pursuant to the PBGC Settlement.

"<u>Transaction Documents</u>" means, collectively, the Loan Documents, Second Lien Loan Documents, the Plan, the Asset Purchase Agreement, the LLC Agreement, the Management Agreements, and each other document delivered in connection therewith, whether or not specifically mentioned herein or therein, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"<u>type</u>" means, relative to any Loan, the portion thereof, if any, being maintained as a Base Rate Loan or a LIBO Rate Loan.

"<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in the State of New York; <u>provided</u> that, if, with respect to any Filing Statement or by reason of any provisions of law, the perfection or the effect of perfection or non-perfection of the security interests granted to the Administrative Agent pursuant to the applicable Loan Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, then "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of each Loan Document and any Filing Statement relating to such perfection or effect of perfection or non-perfection.

"<u>United States</u>" or "<u>U.S.</u>" means the United States of America, its fifty states and the District of Columbia.

"<u>Unrestricted</u>" means, when referring to cash and Cash Equivalent Investments of the Borrower and its Subsidiaries, that such cash and Cash Equivalent Investments (i) do not appear (and are not required to appear) as "restricted" on a balance sheet of the Borrower and its Subsidiaries (unless the restrictions causing such appearance or required appearance are solely pursuant to the Loan Documents); (ii) are not subject to any Lien of any Person other than Liens permitted under <u>clauses (a)</u>, <u>(e)</u>, <u>(g)</u>, <u>(i)</u>, <u>(j)</u>, <u>(m)</u>, and <u>(p)</u> of <u>Section 7.2.3</u>; and (iii) are otherwise generally available for use by the Borrower and its Subsidiaries.

"<u>U.S. Subsidiary</u>" means any Subsidiary that is incorporated or organized under the laws of the United States, a state thereof or the District of Columbia, and that is not a Foreign Subsidiary.

"Voting Securities" means, with respect to any Person, Capital Securities of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person.

"wholly owned Subsidiary" means any Subsidiary all of the outstanding Capital Securities of which (other than any director's qualifying shares or investments by foreign nationals mandated by applicable laws) is owned directly or indirectly by the Borrower.

"Working Capital" means (without duplication), at any date of determination, the difference of (a) consolidated current assets of the Parent and its Subsidiaries on such date in the nature of ordinary course trade accounts receivable, inventory and similar current assets, less (b) consolidated current liabilities of the Parent and its Subsidiaries on such date in the nature of ordinary course trade accounts payable and similar current liabilities, but excluding, without limitation, the current portion of Total Debt to the extent included in the computation of current liabilities.

SECTION 1.2   Use of Defined Terms.  Unless otherwise defined or the context otherwise requires, terms for which meanings are provided in this Agreement shall have such meanings when used in each other Loan Document and the Disclosure Schedule.

SECTION 1.3   Cross-References.  Unless otherwise specified, references in a Loan Document to any Article or Section are references to such Article or Section of such Loan Document, and references in any Article, Section or definition to any clause are references to such clause of such Article, Section or definition.

SECTION 1.4   Accounting and Financial Determinations.

(a)  Unless otherwise specified, all accounting terms used in each Loan Document shall be interpreted, and all accounting determinations and computations thereunder (including under Section 7.2.4 and the definitions used in such calculations) shall be made, in accordance with those generally accepted accounting principles in effect in the United States ("GAAP").  Unless otherwise expressly provided, all financial covenants and defined financial terms shall be computed on a consolidated basis for the Parent and its Subsidiaries (and, to the extent applicable and unless otherwise specified, any predecessor company), in each case without duplication.

(b)  As of any date of determination, for purposes of determining EBITDA or the Interest Coverage Ratio or Total Leverage Ratio (and any financial calculations required to be made or included within such calculations or ratios, or required for purposes of preparing any Compliance Certificate to be delivered pursuant to the definition of "Permitted Acquisition"), the calculation of such ratios and other financial calculations shall include or exclude, as the case may be, the effect of any assets or businesses that have been acquired pursuant to any Permitted Acquisition or Disposed of by the Borrower or any of its Subsidiaries pursuant to the terms hereof (including through mergers or consolidations), as of such date of determination, as determined by the Borrower on a pro forma basis in accordance with GAAP, which determination may include one-time adjustments or reductions in costs, if any, directly attributable to any

26

such permitted Disposition or Permitted Acquisition, as the case may be, in each case (i) calculated in accordance with Regulation S-X of the Securities Act of 1933, as amended from time to time, and any successor statute, for the period of four Fiscal Quarters ended on or immediately prior to the date of determination of any such ratios or other financial calculations (and giving effect to any reasonable cost-savings or adjustments prepared in good faith by the Borrower relating to synergies resulting from any Permitted Acquisition) and (ii) giving effect to any such Permitted Acquisition or permitted Disposition as if it had occurred on the first day of such period of four Fiscal Quarters.

ARTICLE II
LOANS, CLOSING RATE AND NOTES

SECTION 2.1   Loans.  Each of the parties hereto acknowledges and agrees that on the Closing Date (which shall be a Business Day), the Exchange of Loans shall occur, pursuant to which each Lender will be deemed to have made Loans to the Borrower under this Agreement (relative to such Lender, its "Loans"), with the principal amount of each Loan as of the Closing Date being the amount, and in the Lender's Percentage, in each case set forth opposite the name of such Lender on Schedule II hereto.  Each of the Lenders on the Closing Date, by operation of the Plan and the Confirmation Order, shall be deemed to have agreed to, and shall be bound by, the terms and conditions hereof, without any further action or consent on the part of such Lender. No amounts paid or prepaid with respect to the Loans may be reborrowed.

SECTION 2.2   Closing Rate.  On the Closing Date, all of the Loans shall be LIBO Rate Loans with an Interest Period of one month.

SECTION 2.3   Continuation and Conversion Elections.  By delivering a Continuation/Conversion Notice to the Administrative Agent on or before 1:00 p.m., New York time, on a Business Day, the Borrower may from time to time irrevocably elect, on not less than one Business Day's notice in the case of Base Rate Loans, or three Business Days' notice in the case of LIBO Rate Loans, and in either case not more than five Business Days' notice, that all, or any portion in an aggregate minimum amount of $1,000,000 and an integral multiple of $250,000 be, in the case of Base Rate Loans, converted into LIBO Rate Loans, or in the case of LIBO Rate Loans, converted into Base Rate Loans or continued as LIBO Rate Loans (in the absence of delivery of a Continuation/Conversion Notice with respect to any LIBO Rate Loan at least three Business Days (but not more than five Business Days) before the last day of the then current Interest Period with respect thereto, such LIBO Rate Loan shall, on such last day, automatically convert to a Base Rate Loan); provided that, (i) each such conversion or continuation shall be pro rated among the applicable outstanding Loans of all Lenders that have made such Loans, and (ii) no portion of the outstanding principal amount of any Loans may be continued as, or be converted into, LIBO Rate Loans when any Default has occurred and is continuing.  Each such irrevocable request may be made by telephone confirmed promptly by facsimile to the Administrative Agent of the applicable Continuation/Conversion Notice.  The conversion of a Base Rate Loan into a LIBO Rate Loan or a LIBO Rate Loan into a Base Rate Loan shall not effect a novation of the Loan so converted.

SECTION 2.4   Funding.  Each Lender may, if it so elects, fulfill its obligation to continue or convert LIBO Rate Loans hereunder by causing one of its foreign branches or

27

Affiliates (or an international banking facility created by such Lender) to make or maintain such LIBO Rate Loan; provided that, such LIBO Rate Loan shall nonetheless be deemed to have been made and to be held by such Lender, and the obligation of the Borrower to repay such LIBO Rate Loan shall nevertheless be to such Lender for the account of such foreign branch, Affiliate or international banking facility.  In addition, the Borrower hereby consents and agrees that, for purposes of any determination to be made for purposes of Sections 4.1, 4.2, 4.3 or 4.4, it shall be conclusively assumed that each Lender elected to fund all LIBO Rate Loans by purchasing Dollar deposits in its LIBOR Office's interbank Eurodollar market.

SECTION 2.5    Register; Notes.  The Register shall be maintained on the following terms:

(a)  The Borrower hereby designates the Administrative Agent to serve as the Borrower's agent, solely for the purpose of this clause, to maintain a register (the "Register") on which the Administrative Agent will record the Loans held by each Lender (and SPC), each repayment in respect of the principal amount of the Loans, and each assignment or transfer of an interest in any Loan made pursuant to Section 10.11, annexed to which the Administrative Agent shall retain a copy of each Lender Assignment Agreement delivered to the Administrative Agent pursuant to Section 10.11.  Failure to make any recordation, or any error in such recordation, shall not affect any Obligor's Obligations.  The entries in the Register shall be conclusive and binding in the absence of manifest error, and the Borrower, the Administrative Agent, and the Lenders (including any SPC) shall treat each Person in whose name a Loan is registered as the owner thereof for the purposes of all Loan Documents, notwithstanding notice or any provision herein to the contrary.  Any assignment or transfer of the Loans made pursuant hereto shall be registered in the Register only upon delivery to the Administrative Agent of a Lender Assignment Agreement that has been executed by the requisite parties pursuant to Section 10.11.  No assignment or transfer of a Lender's (or SPC's) Loans shall be effective unless such assignment or transfer shall have been recorded in the Register by the Administrative Agent as provided in this Section.

(b)  Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to each Lender a Note evidencing the Loans held by, and payable to the order of, such Lender in a maximum principal amount equal to such Lender's Percentage of the Loan.  The Borrower hereby irrevocably authorizes each Lender to make (or cause to be made) appropriate notations on the grid attached to such Lender's Note (or on any continuation of such grid), which notations, if made, shall evidence, inter alia, the date of, the outstanding principal amount of, and the interest rate and Interest Period applicable to the Loans evidenced thereby.  Such notations shall, to the extent not inconsistent with notations made by the Administrative Agent in the Register, be conclusive and binding on each Obligor absent manifest error; provided that, the failure of any Lender to make any such notations shall not limit or otherwise affect any Obligations of any Obligor.

## ARTICLE III
## REPAYMENTS, PREPAYMENTS, INTEREST AND FEES

SECTION 3.1    Repayments and Prepayments; Application.  The Borrower agrees that the Loans shall be repaid and prepaid pursuant to the following terms.

SECTION 3.1.1  Repayments and Prepayments.  The Borrower shall repay in full the unpaid principal amount of each Loan on the Stated Maturity Date.  Prior thereto, payments and prepayments of the Loans shall or may be made as set forth below.

(a)  From time to time on any Business Day, the Borrower may make a voluntary prepayment, in whole or in part, of the outstanding principal amount of any Loans; provided that, (i) any such prepayment of the Loans shall be applied to the remaining amortization payments for the Loans in such amounts as the Borrower shall determine (but in all events on a pro rata basis among all Lenders holding such Loans); (ii) all such voluntary prepayments shall require, in the case of Base Rate Loans at least the same Business Day's prior notice (such notice to be delivered before noon New York time on such day), and in the case of LIBO Rate Loans at least three Business Days' prior notice (such notice to be delivered before noon New York time on such day), and in either case not more than five Business Days' prior irrevocable notice to the Administrative Agent (which notice may be telephonic so long as such notice is confirmed in writing within 24 hours thereafter and such notice to be delivered before noon New York time on such day); and (iii) all such voluntary partial prepayments shall be, in the case of LIBO Rate Loans, in an aggregate minimum amount of $500,000 and an integral multiple of $500,000 and, in the case of Base Rate Loans, in an aggregate minimum amount of $500,000 and an integral multiple of $100,000.  Each notice of prepayment sent pursuant to this clause shall specify the prepayment date, the principal amount of each Loan (or portion thereof) to be prepaid and the scheduled installment or installments of principal to which such prepayment is to be applied.  Each such notice shall be irrevocable and shall commit the Borrower to prepay such Loan (or portion thereof) by the amount stated therein on the date stated therein; provided that a notice of prepayment may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.  All prepayments under this clause shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

(b)  On the Stated Maturity Date and on each Quarterly Payment Date occurring during any period set forth below, the Borrower shall make a scheduled repayment of the aggregate outstanding principal amount, if any, of all Loans in an amount equal to the amount set forth below opposite the Stated Maturity Date or such Quarterly Payment Date, as applicable, and the Lenders agree that any reduction in the amount of any required amortization payments set forth in this clause, or any extension of any of the dates for payment set forth in this clause, shall in each case require the consent of all Lenders.

| Payment Date | Amount of Required Principal Repayment |
| --- | --- |
| Each Quarterly Payment Date commencing on June 30, 2011 through December 31, 2011 | $1,000,000 |
| Each Quarterly Payment Date commencing on | $2,000,000 |

29

March 31, 2012 through [●],
201[4]

The Stated Maturity Date          The then outstanding
                                   amount of Loans

(c)  The Borrower shall (subject to the next proviso), within five (5) Business Days of receipt of any Net Casualty Proceeds or any Net Disposition Proceeds by the Borrower or any of its Subsidiaries, deliver to the Administrative Agent a calculation of the amount of such proceeds, and, to the extent the aggregate amount of such proceeds received by the Borrower and its Subsidiaries exceeds $1,000,000 for any single transaction or a series of related transactions, the Borrower shall make a mandatory prepayment of the Loans in an amount equal to 100% of such Net Casualty Proceeds or Net Disposition Proceeds, as applicable; provided that upon written notice by the Borrower to the Administrative Agent not more than five (5) Business Days following receipt of any Net Casualty Proceeds or Net Disposition Proceeds, as applicable (so long as no Default has occurred and is continuing), such proceeds may be retained by the Borrower and its Subsidiaries (and may be excluded from the prepayment requirements of this clause) if (i) the Borrower informs the Administrative Agent in such notice of its good faith intention to apply (or cause one or more of the Subsidiary Guarantors to apply) such Net Casualty Proceeds or Net Disposition Proceeds, as applicable, to the acquisition of other assets or properties in the U.S. consistent with the businesses permitted to be conducted pursuant to Section 7.2.1 (including by way of merger or Investment), and (ii) within 365 days following the receipt of such Net Casualty Proceeds or such Net Disposition Proceeds, as applicable, such proceeds are applied or committed to such acquisition.  The amount of such Net Casualty Proceeds or such Net Disposition Proceeds, as applicable, unused or uncommitted after such 365 day period (subject to the extension set forth above) shall be applied to prepay the Loans as set forth in Section 3.1.2.

(d)  Within 120 days after the close of each Fiscal Year (beginning with the close of the 2011 Fiscal Year) the Borrower shall make a mandatory prepayment of the Loans in an amount equal to (i) 50% of Excess Cash Flow (if any) for such Fiscal Year, minus (ii) the aggregate amount of all optional prepayments of the Loans (without duplication) made since the beginning of such Fiscal Year through the date on which the prepayment of the Loans pursuant to this clause (d) is made (including any call premiums paid in cash upon repayment of such Indebtedness).

(e)  The Borrower shall, within five (5) Business Days of receipt of any Net Debt Proceeds, by the Borrower or any of its Subsidiaries, make a mandatory prepayment of the Loans in an amount equal to 100% of the aggregate Net Debt Proceeds.

(f)  Immediately upon any acceleration of the Stated Maturity Date of any Loans pursuant to Section 8.2 or Section 8.3, the Borrower shall repay all the Loans, unless, pursuant to Section 8.3, only a portion of all the Loans is so accelerated (in which case the portion so accelerated shall be so repaid).

30

Each prepayment of any Loans made pursuant to this Section shall be without premium or penalty, except as may be required by Section 4.4.

SECTION 3.1.2    Application.  Amounts prepaid pursuant to Section 3.1.1 shall be applied as set forth in this Section.

(a)  Subject to clause (b), each prepayment or repayment of the principal of the Loans shall be applied, to the extent of such prepayment or repayment, first, to the principal amount thereof being maintained as Base Rate Loans, and second, subject to the terms of Section 4.4, to the principal amount thereof being maintained as LIBO Rate Loans, in each case in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to Section 4.4.

(b) Each prepayment of the Loans made pursuant to clause (a) of Section 3.1.1 shall be applied to the remaining scheduled amortization payments as directed by the Borrower.  Each prepayment of the Loans made pursuant to clauses (c), (d) and (e) of Section 3.1.1 shall be applied pro rata to the remaining scheduled Loan amortization payments.  Once all Loans have been repaid in full, proceeds of mandatory prepayments will be applied to repay outstanding Second Lien Loans until repaid in full (as set forth in the Second Lien Credit Agreement).  Amounts in excess thereof shall be retained by the Borrower.

SECTION 3.2    Interest Provisions.  Interest on the outstanding principal amount of the Loans shall accrue and be payable in accordance with the terms set forth below.

SECTION 3.2.1    Rates.  Subject to Section 2.3, pursuant to an appropriately delivered Continuation/Conversion Notice, the Borrower may elect that the Loans accrue interest at a rate per annum:

(a)  on that portion maintained from time to time as a Base Rate Loan, equal to the sum of the Alternate Base Rate, from time to time in effect plus the Applicable Margin; and

(b)  on that portion maintained as a LIBO Rate Loan, during each Interest Period applicable thereto, equal to the sum of the LIBO Rate (Reserve Adjusted) for such Interest Period plus the Applicable Margin.

All LIBO Rate Loans shall bear interest from and including the first day of the applicable Interest Period to (but not including) the last day of such Interest Period at the interest rate determined as applicable to such LIBO Rate Loan.

SECTION 3.2.2    Post-Default Rates.  After the date any Event of Default has occurred and for so long as such Event of Default is continuing, the Borrower shall pay, but only to the extent permitted by law, interest (after as well as before judgment) on all outstanding Obligations at a rate per annum equal to (a) in the case of principal on any Loan, subject to applicable law, the rate of interest that otherwise would be applicable to such Loan plus 2% per annum; and (b) in the case of overdue interest, fees, and other monetary Obligations, the Base

31

Rate from time to time in effect, plus the Applicable Margin for Loans accruing interest at the Base Rate, plus a margin of 2% per annum.

SECTION 3.2.3   Payment Dates.  Interest accrued on each Loan shall be payable, without duplication:

(a)  on the Stated Maturity Date therefor;

(b)  except as set forth in clause (c) below, on the date of any payment or prepayment, in whole or in part, of principal outstanding on such Loan on the principal amount so paid or prepaid;

(c)  with respect to Base Rate Loans, on each Quarterly Payment Date occurring after the Effective Date;

(d)  with respect to LIBO Rate Loans, on the last day of each applicable Interest Period (and, if such Interest Period shall exceed three months, on the date occurring on each three-month interval occurring after the first day of such Interest Period);

(e)  with respect to any Base Rate Loans converted into LIBO Rate Loans on a day when interest would not otherwise have been payable pursuant to clause (c), on the date of such conversion; and

(f)  on that portion of any Loans the Stated Maturity Date of which is accelerated pursuant to Section 8.2 or Section 8.3, immediately upon such acceleration.

Interest accrued on Loans or other monetary Obligations after the date such amount is due and payable (whether on the Stated Maturity Date, upon acceleration or otherwise) shall be payable upon demand.

SECTION 3.3  Fees.  The Borrower agrees to pay the fees set forth below.  All such fees shall be non-refundable.

SECTION 3.3.1   Administrative Agent's Fee.  The Borrower agrees to pay to the Administrative Agent, for its own account, the fees and expenses (including documented, reasonable attorney's fees and expenses) in the amounts and on the dates set forth in the Fee Letter.

## ARTICLE IV
## CERTAIN LIBO RATE AND OTHER PROVISIONS

SECTION 4.1   LIBO Rate Lending Unlawful.  If any Lender shall determine (which determination shall, upon notice thereof to the Borrower and the Administrative Agent, be conclusive and binding on the Borrower) that the introduction of or any change in or in the interpretation of any law makes it unlawful, or any Governmental Authority asserts that it is unlawful, for such Lender to make or continue any Loan as, or to convert any Loan into, a LIBO Rate Loan, the obligations of such Lender to make, continue or convert any such LIBO Rate Loan shall, upon such determination, forthwith be suspended until such Lender shall notify the

Administrative Agent that the circumstances causing such suspension no longer exist, and all outstanding LIBO Rate Loans payable to such Lender shall automatically convert into Base Rate Loans at the end of the then current Interest Periods with respect thereto or sooner, if required by such law or assertion.

SECTION 4.2   Deposits Unavailable.  If the Administrative Agent shall have determined that (a) Dollar deposits in the relevant amount and for the relevant Interest Period are not available to it in its relevant market; or (b) by reason of circumstances affecting its relevant market, adequate means do not exist for ascertaining the interest rate applicable hereunder to LIBO Rate Loans; then, upon notice from the Administrative Agent to the Borrower and the Lenders, the obligations of all Lenders under Section 2.3 and Section 2.4 to make or continue any Loans as, or to convert any Loans into, LIBO Rate Loans shall forthwith be suspended until the Administrative Agent shall notify the Borrower and the Lenders that the circumstances causing such suspension no longer exist.

SECTION 4.3   Increased LIBO Rate Loan Costs, etc.  The Borrower agrees to reimburse each Secured Party for any increase in the cost to such Secured Party of, or any reduction in the amount of any sum receivable by such Secured Party in respect of, such Secured Party's Loans hereunder (including the making, continuing or maintaining (or of its obligation to make or continue) any Loans as, or of converting (or of its obligation to convert) any Loans into, LIBO Rate Loans) that arise in connection with any change in, or the introduction, adoption, effectiveness, interpretation, reinterpretation or phase in after the Closing Date of, any law or regulation, directive, guideline, decision or request (whether or not having the force of law) of any Governmental Authority, except for such changes with respect to increased capital costs and Taxes (which are governed by Sections 4.5 and 4.6), respectively.  Each affected Secured Party shall promptly notify the Administrative Agent and the Borrower in writing of the occurrence of any such event, stating the reasons therefor and the additional amount required fully to compensate such Secured Party for such increased cost or reduced amount.  Such additional amounts shall be payable by the Borrower directly to such Secured Party within five days of its receipt of such notice, and such notice shall, in the absence of manifest error, be conclusive and binding on the Borrower.

SECTION 4.4   Funding Losses.  In the event any Lender shall incur any loss or expense (including any loss or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to make or continue any portion of the principal amount of any Loan as, or to convert any portion of the principal amount of any Loan into, a LIBO Rate Loan) as a result of

(a)  any conversion or repayment or prepayment of the principal amount of any LIBO Rate Loan on a date other than the scheduled last day of the Interest Period applicable thereto, whether pursuant to Article III or otherwise;

(b)  any Loans not being continued as, or converted into, LIBO Rate Loans in accordance with the Continuation/Conversion Notice therefor; or

(c) any LIBO Rate Loans not being prepaid in accordance with any notice delivered pursuant to <u>clause (a)</u> of <u>Section 3.1.1</u> (as a result of a revocation of such notice or as a result of such payment not being made);

but in each case other than due to such Lender's failure to fulfill its obligations hereunder then, upon the written notice of such Lender to the Borrower, the Borrower shall, within ten days of its receipt thereof, pay directly to such Lender such amount as will (in the reasonable determination of such Lender) reimburse such Lender for such loss or expense.  Such written notice shall, in the absence of manifest error, be conclusive and binding on the Borrower.

SECTION 4.5   <u>Increased Capital Costs</u>.  If any change in, or the introduction, adoption, effectiveness, interpretation, reinterpretation or phase in of, any law or regulation, directive, guideline, decision or request (whether or not having the force of law) of any Governmental Authority affects or would affect the amount of capital required or expected to be maintained by any Secured Party or any Person controlling such Secured Party, and such Secured Party determines (in good faith but in its sole and absolute discretion) that the rate of return on its or such controlling Person's capital as a consequence of the Loans held by such Secured Party is reduced to a level below that which such Secured Party or such controlling Person could have achieved but for the occurrence of any such circumstance, then upon notice from time to time by such Secured Party to the Borrower, the Borrower shall within five days following receipt of such notice pay directly to such Secured Party additional amounts sufficient to compensate such Secured Party or such controlling Person for such reduction in rate of return.  A statement of such Secured Party as to any such additional amount or amounts shall, in the absence of manifest error, be conclusive and binding on the Borrower.  In determining such amount, such Secured Party may use any method of averaging and attribution that it (in its sole and absolute discretion) shall deem applicable.

SECTION 4.6   <u>Taxes</u>.  The Borrower covenants and agrees as follows with respect to Taxes.

(a)  Any and all payments by the Borrower and each other Obligor under each Loan Document shall be made without setoff, counterclaim or other defense, and free and clear of, and without deduction or withholding for or on account of, any Taxes except to the extent that deduction or withholding of such Taxes is required by applicable law.  In the event that any such Taxes are required by applicable law to be deducted or withheld from any payment required to be made to or on behalf of any Secured Party under any Loan Document, then:

(i)   subject to <u>clause (f)</u>, if such Taxes are Non-Excluded Taxes or Other Taxes, the Borrower and each Obligor shall increase the amount of such payment so that each Secured Party receives an amount equal to the amount it would have received had no such deduction or withholding been made; and

(ii)   the Borrower or the Administrative Agent (as applicable) shall withhold the full amount of such Taxes from such payment (as increased pursuant to <u>clause (a)(i)</u>) and shall pay such amount to the Governmental Authority imposing such Taxes in accordance with applicable law.

34

(b)  In addition, the Borrower shall pay all Other Taxes imposed to the relevant Governmental Authority imposing such Other Taxes in accordance with applicable law.

(c)  The Borrower shall furnish to the Administrative Agent, within 45 days of any such payment being due under applicable law, an official receipt (or a certified copy thereof) or other proof of payment satisfactory to the Administrative Agent, acting reasonably, evidencing the payment of such Taxes or Other Taxes.  The Administrative Agent shall make copies thereof available to any Lender upon request therefor.

(d)  Subject to clause (f), the Borrower shall indemnify each Secured Party for any Non-Excluded Taxes and Other Taxes (including Non-Excluded Taxes and Other Taxes imposed or asserted on, or attributable to, amounts payable under this Section 4.6) paid by such Secured Party, whether or not such Non-Excluded Taxes or Other Taxes were correctly or legally asserted by the relevant Governmental Authority, provided that no Secured Party shall be entitled to receive any payment under this clause (d), unless such Secured Party or the Administrative Agent provides a written request for such payment to the Borrower within six months of the due date for the payment of the Non-Excluded Taxes or Other Taxes for which indemnification is sought.  With respect to the indemnification provided in the immediately preceding sentence, such indemnification shall be made within 30 days after the date such Secured Party makes written demand therefor.

(e)  Each Lender making Loans to the Borrower, on or prior to the date on which such Lender becomes a Lender hereunder (and from time to time thereafter upon the request of the Borrower or the Administrative Agent, but only for so long as such Lender is legally entitled to do so), shall deliver to the Borrower and the Administrative Agent either (i) two duly completed copies of either (x) Internal Revenue Service Form W-8BEN or W-8IMY claiming eligibility of a Non-U.S. Lender for benefits of an income tax treaty to which the United States is a party or (y) Internal Revenue Service Form W-8ECI, or in either case an applicable successor form; (ii) in the case of a Non-U.S. Lender that is not legally entitled to deliver either form listed in clause (e)(i), (x) a certificate to the effect that such Non-U.S. Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a controlled foreign corporation receiving interest from a related person within the meaning of Section 881(c)(3)(C) of the Code (referred to as an "Exemption Certificate") and (y) two duly completed copies of Internal Revenue Service Form W-8BEN or W-8IMY or applicable successor form, or (iii) in the case of a Lender that is not a Non-U.S. Lender, two duly completed copies of Internal Revenue Service form W-9 or applicable successor form, and  (iv) in the case of any Lender, such documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will permit payments by the Borrower and each other Obligor under any Loan Document to be made without withholding or at a reduced rate of withholding, or as is reasonably requested by the Borrower or the Administrative Agent to comply with FATCA.  The Administrative Agent shall deliver to the Borrower such IRS forms as are required to ensure that payments made to the Administrative Agent are not subject to withholding, but only for so long as the Administrative Agent is legally entitled to do so.  Each Lender agrees to promptly notify the Borrower and the Administrative Agent in writing of any change in circumstances which would modify or render invalid any claimed exemption or reduction.  In addition, each Lender shall timely deliver to the Borrower and the Administrative Agent two further copies of such

Form W-8BEN, W-8IMY, W-8ECI or W-9 or successor forms on or before the date that any previously executed form expires or becomes obsolete, or after the occurrence of any event requiring a change in the most recent form delivered by such Person to the Borrower.

(f)  The Borrower shall not be obligated to pay any additional amounts to any Secured Party pursuant to clause (a)(i), or to indemnify any Secured Party pursuant to clause (d), in respect of United States federal withholding taxes to the extent imposed as a result of (i) the failure, inability or ineligibility of such Secured Party to deliver to the Borrower the form or forms and/or an Exemption Certificate, as applicable to such Secured Party, pursuant to clause (e), (ii) such form or forms and/or Exemption Certificate not establishing a complete exemption from U.S. federal withholding tax or the information or certifications made therein by the Secured Party being untrue or inaccurate on the date delivered in any material respect, or (iii) the Secured Party designating a successor lending office at which it maintains its Loans which has the effect of causing such Secured Party to become obligated for tax payments in excess of those in effect immediately prior to such designation; provided that, the Borrower shall be obligated to pay additional amounts to any such Secured Party pursuant to clause (a)(i), and to indemnify any such Secured Party pursuant to clause (d), in respect of United States federal withholding taxes if (i) any such failure to deliver a form or forms or an Exemption Certificate or the failure of such form or forms or Exemption Certificate to establish a complete exemption from U.S. federal withholding tax resulted from a change in any applicable statute, treaty, regulation or other applicable law or any official interpretation of any of the foregoing occurring after the Closing Date (or in the case of an Assignee Lender, after the date of the assignment, except to the extent that the applicable assigning lender was entitled to receive additional amounts with respect to such payment), which change rendered such Secured Party no longer legally entitled to deliver such form or forms or Exemption Certificate or otherwise ineligible for a complete exemption from U.S. federal withholding tax, (ii) the redesignation of the Secured Party's lending office was made at the request of the Borrower or (iii) the obligation to pay any additional amounts to any such Secured Party pursuant to clause (a)(i) or to indemnify any such Secured Party pursuant to clause (d) is with respect to an Assignee Lender that becomes an Assignee Lender as a result of an assignment made at the request of the Borrower.

(g)  In the event that any Lender or the Administrative Agent determines in its sole discretion that it has received a refund or a credit in respect of Taxes or Other Taxes as to which it has been paid additional amounts by the Borrower pursuant to clause (a) or indemnified by the Borrower pursuant to clause (d) and such Lender or the Administrative Agent, as applicable, determines in its good faith judgment that such refund is attributable to such additional amounts or indemnification, then such Lender or Administrative Agent shall promptly notify the Administrative Agent and the Borrower, shall use reasonable efforts to apply for such refund or credit and shall within 30 Business Days of receipt of such refund or application of such credit remit to the Borrower an amount as such Lender or Administrative Agent reasonably determines to be the proportion of the refunded or credited amount as will leave it, after such remittance, in no better or worse position than it would have been if the Taxes or Other Taxes had not been imposed and the corresponding additional amounts or indemnification payment not been made. Neither the Lenders nor the Administrative Agent shall be obligated to disclose information regarding its tax affairs or computations to the Borrower in connection with this clause (g) or any other provision of this Section that such Lender or the Administrative Agent reasonably deems confidential.

Notwithstanding anything to the contrary herein, Section 4.6 shall not apply to any Rate Protection Agreements.

SECTION 4.7    Payments, Computations; Proceeds of Collateral, etc.  (a)  Unless otherwise expressly provided in a Loan Document, all payments by the Borrower pursuant to each Loan Document shall be made by the Borrower to the Administrative Agent for the pro rata account of the Secured Parties entitled to receive such payment.  All payments shall be made without setoff, deduction or counterclaim not later than 11:00 a.m. New York time on the date due in same day or immediately available funds to such account as the Administrative Agent shall specify from time to time by notice to the Borrower.  Funds received after that time shall be deemed to have been received by the Administrative Agent on the next succeeding Business Day.  The Administrative Agent shall promptly remit in same day funds to each Secured Party its share, if any, of such payments received by the Administrative Agent for the account of such Secured Party.  All interest (including interest on LIBO Rate Loans) and fees shall be computed on the basis of the actual number of days (including the first day but excluding the last day) occurring during the period for which such interest or fee is payable over a year comprised of 360 days (or, in the case of interest on a Base Rate Loan (calculated at other than the Federal Funds Rate), 365 days or, if appropriate, 366 days).  Payments due on other than a Business Day shall (except as otherwise required by clause (b) of the proviso in the definition of "Interest Period") be made on the next succeeding Business Day and such extension of time shall be included in computing interest and fees in connection with that payment.

(b)  After the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and upon written direction from the Required Lenders, shall, apply all amounts received under the Loan Documents (including from the proceeds of collateral securing the Obligations) or under applicable law shall be applied upon receipt to the Obligations as follows: (i) first, to the payment of all Obligations in respect of fees, expense reimbursements, indemnities and other amounts owing to the Administrative Agent, in its capacity as the Administrative Agent (including the fees and expenses of counsel to the Administrative Agent), (ii) second, after payment in full in cash of the amounts specified in clause (b)(i), to the ratable payment of all interest (including interest accruing (or which would accrue) after the commencement of a proceeding in bankruptcy, insolvency or similar law, whether or not permitted as a claim under such law) and fees owing under the Loan Documents, and all costs and expenses owing to the Secured Parties pursuant to the terms of the Loan Documents, until paid in full in cash, (iii) third, after payment in full in cash of the amounts specified in clauses (b)(i) and (b)(ii), to the ratable payment of the principal amount of the Loans then outstanding and the net credit exposure owing to Secured Parties under Rate Protection Agreements, if any, (iv) fourth, after payment in full in cash of the amounts specified in clauses (b)(i) through (b)(iii), to the ratable payment of all other Obligations owing to the Secured Parties, and (v) fifth, after payment in full in cash of the amounts specified in clauses (b)(i) through (b)(iv), and following the Termination Date, to each applicable Obligor or any other Person lawfully entitled to receive such surplus.  For purposes of clause (b)(iii), the "net credit exposure" at any time of any Secured Party with respect to a Rate Protection Agreement to which such Secured Party is a party shall be determined by such Secured Party (and such Secured Party shall notify the Administrative Agent in writing) at such time in accordance with the customary methods of calculating net credit exposure under similar arrangements by the counterparty to such arrangements, taking into account potential interest rate (or, if applicable,

currency) movements and the respective termination provisions and notional principal amount and term of such Rate Protection Agreement.

SECTION 4.8   <u>Sharing of Payments</u>.  If any Secured Party shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or otherwise) on account of any Loan (other than pursuant to the terms of <u>Sections 4.3</u>, <u>4.4</u>, <u>4.5</u> or <u>4.6</u>) in excess of its pro rata share of payments obtained by all Secured Parties, such Secured Party shall purchase for cash at face value from the other Secured Parties such participations in Loans held by them as shall be necessary to cause such purchasing Secured Party to share the excess payment or other recovery ratably (to the extent such other Secured Parties were entitled to receive a portion of such payment or recovery) with each of them; <u>provided</u> that, if all or any portion of the excess payment or other recovery is thereafter recovered from such purchasing Secured Party, the purchase shall be rescinded and each Secured Party which has sold a participation to the purchasing Secured Party shall repay to the purchasing Secured Party the purchase price to the ratable extent of such recovery together with an amount equal to such selling Secured Party's ratable share (according to the proportion of (a) the amount of such selling Secured Party's required repayment to the purchasing Secured Party to (b) total amount so recovered from the purchasing Secured Party) of any interest or other amount paid or payable by the purchasing Secured Party in respect of the total amount so recovered.  The Borrower agrees that any Secured Party purchasing a participation from another Secured Party pursuant to this Section may, to the fullest extent permitted by law, exercise all its rights of payment (including pursuant to <u>Section 4.9</u>) with respect to such participation as fully as if such Secured Party were the direct creditor of the Borrower in the amount of such participation.  If under any applicable bankruptcy, insolvency or other similar law any Secured Party receives a secured claim in lieu of a setoff to which this Section applies, such Secured Party shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Secured Parties entitled under this Section to share in the benefits of any recovery on such secured claim.

SECTION 4.9   <u>Setoff</u>.  Each Secured Party shall, upon the occurrence and during the continuance of any Event of Default described in <u>clauses (b)</u> through <u>(d)</u> of <u>Section 8.1.7</u> or, with the consent of the Required Lenders, upon the occurrence and during the continuance of any other Event of Default, have the right to appropriate and apply to the payment of the Obligations owing to it (whether or not then due), and (as security for such Obligations) the Borrower hereby grants to each Secured Party a continuing security interest in, any and all balances, credits, deposits, accounts or moneys of the Borrower then or thereafter maintained with such Secured Party; <u>provided</u> that, any such appropriation and application shall be subject to the provisions of <u>Section 4.8</u>.  Each Secured Party agrees promptly to notify the Borrower and the Administrative Agent in writing after any such appropriation and application made by such Secured Party; <u>provided</u> that, the failure to give such notice shall not affect the validity of such setoff and application.  The rights of each Secured Party under this Section are in addition to other rights and remedies (including other rights of setoff under applicable law or otherwise) which such Secured Party may have.

SECTION 4.10   <u>Replacement of Lenders</u>.  If any Lender (an "<u>Affected Lender</u>") (a) fails to consent to an election, consent, amendment, waiver or other modification to this Agreement or other Loan Document that requires the consent of a greater percentage of the Lenders than the Required Lenders and such election, consent, amendment, waiver or other

38

modification is otherwise consented to by the Required Lenders or (b) makes a demand upon the Borrower for (or if the Borrower is otherwise required to pay) amounts pursuant to <u>Section 4.3</u>, <u>4.5</u> or <u>4.6</u> (and the payment of such amounts is, and is likely to continue to be, materially more onerous in the reasonable judgment of the Borrower than with respect to the other Lenders) or gives notice pursuant to <u>Section 4.1</u> requiring a conversion of such Affected Lender's LIBO Rate Loans to Base Rate Loans or suspending such Lender's obligation to hold Loans as, or to convert Loans into, LIBO Rate Loans, the Borrower may, within 30 days of receipt by the Borrower of such demand or notice, as the case may be, give notice (a "<u>Replacement Notice</u>") in writing to the Administrative Agent and such Affected Lender of its intention to cause such Affected Lender to sell all or any portion of its Loans and/or Notes to an Eligible Assignee (a "<u>Replacement Lender</u>") designated in such Replacement Notice; <u>provided</u>, <u>however</u>, that no Replacement Notice may be given by the Borrower if (i) such replacement conflicts with any applicable law or regulation, (ii) any Event of Default shall have occurred and be continuing at the time of such replacement or (iii) prior to any such replacement, such Lender shall have taken any necessary action under <u>Section 4.5</u> or <u>4.6</u> (if applicable) which shall have eliminated the continued need for payment of amounts owing pursuant to <u>Section 4.5</u> or <u>4.6</u>.  Within 30 days of its receipt of such Replacement Notice, the Affected Lender shall, subject to the payment of any amounts due pursuant to <u>Section 4.4</u>, assign, in accordance with <u>Section 10.11</u>, the portion of its Loans, Notes (if any), and other rights and obligations under this Agreement and all other Loan Documents designated in the replacement notice to such Replacement Lender; <u>provided</u>, <u>however</u>, that (i) such assignment shall be without recourse, representation or warranty and shall be on terms and conditions reasonably satisfactory to such Affected Lender and such Replacement Lender, (ii) the purchase price paid by such Replacement Lender shall be in the amount of such Affected Lender's Loans designated in the Replacement Notice, together with all accrued and unpaid interest and fees in respect thereof, plus all other amounts (including the amounts demanded and unreimbursed under <u>Sections 4.3</u>, <u>4.5</u> and <u>4.6</u>) and including any call premiums, owing to such Affected Lender hereunder and (iii) the Borrower shall pay to the Affected Lender and the Administrative Agent all reasonable out-of-pocket expenses incurred by the Affected Lender and the Administrative Agent in connection with such assignment and assumption (including the processing fees described in <u>Section 10.11</u>).  Upon the effective date of an assignment described above, the Replacement Lender shall become a "Lender" for all purposes under the Loan Documents.  Each assignment pursuant to this <u>Section 4.10</u> shall be effective upon the satisfaction of the conditions specified in this <u>Section 4.10</u> without further action on the part of the applicable Affected Lender.

SECTION 4.11   <u>Change in Lending Office</u>.  If any Lender makes a demand upon the Borrower for (or if the Borrower is otherwise required to pay) amounts pursuant to <u>Section 4.3</u>, <u>4.5</u> or <u>4.6</u>, or gives notice pursuant to <u>Section 4.1</u> requiring a conversion of such Lender's LIBO Rate Loans to Base Rate Loans or suspending such Lender's obligation to hold Loans as, or to convert Loans into, LIBO Rate Loans, then such Lender shall use reasonable efforts to designate a different lending office with respect to its rights and obligations hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment (a) would eliminate the need for such notice or reduce amounts payable or to be withheld in the future, as applicable; and (b) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be materially disadvantageous to such Lender.  The affected Lender shall pay all

reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

ARTICLE V
CONDITIONS TO EXCHANGE OF LOANS

The obligations of the Lenders pursuant to the Exchange of Loans shall be subject to the prior or concurrent satisfaction (or waiver in accordance with Section 10.1; provided that the conditions in Sections 5.2 and 5.3 may not be waived) of each of the conditions precedent set forth in this Article.

SECTION 5.1   Resolutions, etc.  The Administrative Agent shall have received from each Obligor, as applicable, (i) a copy of a good standing certificate, dated a date reasonably close to the Closing Date, for each such Person and (ii) a certificate, dated as of the Closing Date, duly executed and delivered by such Person's Secretary or Assistant Secretary, managing member or general partner, as applicable, as to

(a)  resolutions of each such Person's Board of Directors (or other managing body, in the case of other than a corporation) then in full force and effect authorizing, to the extent relevant, all aspects of the Transactions applicable to such Person and the execution, delivery and performance of each Loan Document to be executed by such Person and the transactions contemplated hereby and thereby;

(b)  the incumbency and signatures of those of its officers, managing member or general partner, as applicable, authorized to act with respect to each Loan Document to be executed by such Person; and

(c)  the full force and validity of each Organic Document of such Person and copies thereof;

upon which certificates each Secured Party may conclusively rely until it shall have received a further certificate of the Secretary, Assistant Secretary, managing member or general partner, as applicable, of any such Person canceling or amending the prior certificate of such Person.

SECTION 5.2   Entry of Confirmation Order and Consummation of Transactions.  The Administrative Agent shall have received a certificate of an Authorized Officer of the Borrower to the effect that:

(a)   No amendment or other modification of or to the Plan shall be filed or proposed since the date the Confirmation Order was originally entered which contains modifications materially adverse to the Administrative Agent.

(b)   The Bankruptcy Court shall have entered the Confirmation Order.

(c)   Concurrently with the closing of the credit facility provided hereby, the Plan (including the transfer of substantially all assets of the Bankruptcy Debtors pursuant to the Asset Purchase Agreement) shall have been substantially consummated (as defined

in Section 1101 of the Bankruptcy Code) in accordance in all material respects with the terms of the Plan and the Confirmation Order.

SECTION 5.3   Delivery of Notes.  The Administrative Agent shall have received, for the account of each Lender that has requested a Note, such Lender's Note(s) duly executed and delivered by an Authorized Officer of the Borrower.

SECTION 5.4   Guarantees.  The Administrative Agent shall have received each Guaranty, dated as of the Closing Date, duly executed and delivered by an Authorized Officer of the Parent and each U.S. Subsidiary, as applicable.

SECTION 5.5   Security Agreements.  The Administrative Agent shall have received executed counterparts of the Security Agreement, each dated as of the Closing Date, duly executed and delivered by the Parent, the Borrower and each U.S. Subsidiary (if any), together with:

(a)  certificates (in the case of Capital Securities that are securities (as defined in the UCC)) evidencing all of the issued and outstanding capital Securities owned by each Obligor in its U.S. Subsidiaries and 65% (or, if less, such lesser amount owned by such Obligor) of the issued and outstanding Voting Securities of each Foreign Subsidiary (together with all the issued and outstanding non-voting Capital Securities of such Foreign Subsidiary) directly owned by each Obligor, which certificates in each case shall be accompanied by undated instruments of transfer duly executed in blank, or, if any Capital Securities (in the case of Capital Securities that are uncertificated securities (as defined in the UCC)), confirmation and evidence satisfactory to the Administrative Agent that the security interest therein has been transferred to and perfected by the Administrative Agent for the benefit of the Secured Parties in accordance with Articles 8 and 9 of the UCC and all laws otherwise applicable to the perfection of the pledge of such Capital Securities;

(b)  Filing Statements suitable in form for naming the Parent, the Borrower and each Subsidiary Guarantor as a debtor and the Administrative Agent as the secured party, or other similar instruments or documents to be filed under the UCC of all jurisdictions as may be necessary or as the Required Lenders may require to perfect the security interests of the Administrative Agent pursuant to such Security Agreement;

(c)  UCC Form UCC-3 termination statements, if any, necessary to release all Liens and other rights of any Person (i)  in any collateral described in any Security Agreement previously granted by any Person, and (ii) securing any of the Indebtedness identified in Item 5.5(c) of the Disclosure Schedule, together with such other UCC Form UCC-3 termination statements as the Required Lenders may reasonably request from such Obligors; and

(d)  certified copies of UCC Requests for Information or Copies (Form UCC-11), or a similar search report certified by a party acceptable to the Required Lenders, dated a date reasonably near to the Closing Date, listing all effective financing statements which name any Obligor (under its present name and any previous names) as the debtor,

41

together with copies of such financing statements (none of which shall, except with respect to Liens permitted by Section 7.2.3.), evidence a Lien on any collateral described in any Loan Document).

SECTION 5.6   Intellectual Property Security Agreements.  The Administrative Agent shall have received a Patent Security Agreement, a Copyright Security Agreement and a Trademark Security Agreement, as applicable, each dated as of the Closing Date, duly executed and delivered by each Obligor that, pursuant to a Security Agreement, is required to provide such intellectual property security agreements to the Administrative Agent.

SECTION 5.7   Filing Agent, etc.  All Uniform Commercial Code financing statements or other similar financing statements and Uniform Commercial Code (Form UCC-3) termination statements required pursuant to the Loan Documents (collectively, the "Filing Statements"), shall have been delivered to CT Corporation System or another similar filing service company acceptable to the Required Lenders (the "Filing Agent").  The Filing Agent shall have acknowledged in a writing satisfactory to the Required Lenders (i) the Filing Agent's receipt of all Filing Statements, (ii) that the Filing Statements have either been submitted for filing in the appropriate filing offices or will be submitted for filing in the appropriate offices within ten days following the Closing Date and (iii) that the Filing Agent will notify the Administrative Agent and its counsel of the results of such submissions within 30 days following the Closing Date.

SECTION 5.8   Intercreditor Agreement.  The Administrative Agent shall have received the Intercreditor Agreement, dated as of the Closing Date, duly executed and delivered by the Administrative Agent, the administrative agent under the Second Lien Credit Agreement and the Borrower.

SECTION 5.9   Patriot Act Disclosures.  The Administrative Agent and each Lender shall have received all Patriot Act Disclosures requested by them prior to execution of this Agreement.

SECTION 5.10   Compliance with Warranties, No Default, etc.  The Administrative Agent shall have received a certificate of an Authorized Officer of the Borrower to the effect that, both before and after giving effect to the Exchange of Loans:

(a)  the representations and warranties set forth in each Loan Document shall, in each case, be true and correct in all material respects with the same effect as if then made (unless stated to relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date); and

(b)  no Default shall have then occurred and be continuing.

ARTICLE VI
REPRESENTATIONS AND WARRANTIES

In order to induce the Secured Parties to enter into this Agreement the Borrower represents and warrants to each Secured Party on the Closing Date as set forth in this Article.

SECTION 6.1   <u>Organization, etc</u>.  Each Obligor is validly organized and existing and in good standing under the laws of the state or jurisdiction of its incorporation or organization, is duly qualified to do business and is in good standing as a foreign entity in each jurisdiction where the nature of its business requires such qualification, except for such jurisdictions where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect, and has full power and authority and holds all requisite governmental licenses, permits and other approvals to enter into and perform its Obligations under each Loan Document to which it is a party, to own and hold under lease its property and to conduct its business substantially as currently conducted by it, except for those licenses, permits or other approvals, the absence of which could not reasonably be expected to have a Material Adverse Effect.

SECTION 6.2   <u>Due Authorization, Non-Contravention, Defaults etc</u>.  The execution, delivery and performance by each Obligor of each Loan Document executed or to be executed by it, each Obligor's participation in the consummation of all aspects of the Transactions, and the execution, delivery and performance by the Borrower or (if applicable) any Obligor of the agreements executed and delivered by it in connection with the Transactions are in each case within such Person's powers, have been duly authorized by all necessary action, and do not

(a)  contravene any (i) Obligor's Organic Documents, (ii) court decree or order binding on or affecting any Obligor or (iii) law or governmental regulation binding on or affecting any Obligor; or

(b)  result in (i) or require the creation or imposition of, any Lien on any Obligor's properties (except as permitted by this Agreement),(ii) a default under any material contractual restriction binding on or affecting any Obligor or (iii) any noncompliance, suspension, impairment, forfeiture or nonrenewal of any material license, permit or other governmental approval.

No Obligor is in default under any agreement, instrument or undertaking to which it is a party or by which it or any of its property is bound which could reasonably be expected to have a Material Adverse Effect.  No Obligor is a party to any agreement or instrument or subject to any other obligation or any charter or corporate restriction or any provision of any applicable law, rule or regulation which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

SECTION 6.3   <u>Government Approval, Regulation, etc</u>.  No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or other Person (other than those that have been, or on the Effective Date will be, duly obtained or made and which are, or on the Effective Date will be, in full force and effect) is required for the consummation of the Transactions or the due execution, delivery or performance by any Obligor of any Loan Document to which it is a party, or for the due execution, delivery and/or performance of Transaction Documents, in each case by the parties thereto or the consummation of the Transactions, other than pursuant to the Plan.  Neither the Borrower nor any of its Subsidiaries is an "investment company" within the meaning of the Investment Company Act of 1940, as amended, or a "holding company", or a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company", within the meaning of the Public Utility Holding Company Act of 1935, as amended.

43

SECTION 6.4   <u>Validity, etc</u>.  Each Loan Document and each Transaction Document to which any Obligor is a party constitutes the legal, valid and binding obligations of such Obligor, enforceable against such Obligor in accordance with their respective terms (except, in any case, as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally and by principles of equity).

SECTION 6.5   <u>Financial Information</u>.  All balance sheets, all statements of income and of cash flow and all other financial information of each of the Borrower and its Subsidiaries furnished pursuant to <u>Section 7.1.1</u> have been and will for periods following the Effective Date be prepared in accordance with GAAP, and do or will present fairly the consolidated financial condition of the Persons covered thereby as at the dates thereof and the results of their operations for the periods then ended.

SECTION 6.6   <u>Litigation, Labor Controversies, etc</u>.  There is no pending or, to the actual knowledge of the Borrower or any of its Subsidiaries, threatened litigation, action, proceeding, investigation or labor controversy

(a)  other than the Bankruptcy Cases and the related proceedings under Chapter 11 of the Bankruptcy Code;

(b)  except as disclosed in <u>Item 6.6</u> of the Disclosure Schedule, affecting the Borrower, any of its Subsidiaries or any other Obligor, or any of their respective properties, businesses, assets or revenues, which could reasonably be expected to have a Material Adverse Effect; or

(c)  which purports to affect the legality, validity or enforceability of any Loan Document, the Transaction Documents or the Transactions.

SECTION 6.7   <u>Subsidiaries</u>.  The Borrower has no Subsidiaries, except those Subsidiaries which are identified in <u>Item 6.7</u> of the Disclosure Schedule, or which are permitted to have been organized or acquired in accordance with <u>Sections 7.2.5</u> or <u>7.2.9</u>.

SECTION 6.8   <u>Ownership of Properties</u>.  The Borrower and each of its Subsidiaries owns (i) in the case of owned real property, good and marketable fee title to, and (ii) in the case of owned personal property, good and valid title to, or, in the case of leased real or personal property, valid and enforceable leasehold interests (as the case may be) in, all of its material properties and assets, tangible and intangible, of any nature whatsoever, free and clear in each case of all Liens or claims, except for Liens permitted pursuant to <u>Section 7.2.3</u> and all matters reflected in the title insurance policies delivered pursuant to <u>clause (b)</u> of <u>Section 7.1.11</u>.

SECTION 6.9   <u>Taxes</u>.  The Borrower and each of its Subsidiaries has filed all tax returns and reports required by law to have been filed by it and has paid all Taxes thereby shown to be due and owing, (except any such Taxes which are being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books) and has paid all Taxes shown to be due on any assessment received to the extent that such Taxes have become due and payable, except where the failure to file any such returns or reports or to pay any such Taxes would not give rise to a Material Adverse Effect.

SECTION 6.10  Employee Benefit Plans

(a)      Except as could not reasonably be expected to have a Material Adverse Effect: (i) the Borrower and each member of its Controlled Group is in compliance with all applicable provisions of ERISA, the Code and the regulations and published interpretations thereunder with respect to all Employee Benefit Plans except for any required amendments for which the remedial amendment period as defined in Section 401(b) of the Code has not yet expired; (ii) each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code has been determined by the Internal Revenue Service to be so qualified, and each trust related to such plan has been determined to be exempt under Section 501(a) of the Code except for such plans that have not yet received determination letters but for which the remedial amendment period for submitting a determination letter has not yet expired; and (iii) there are no pending or, to the actual knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority.

(b)      Neither the Borrower nor any member of its Controlled Group sponsors or contributes to any Pension Plan, nor do any of them have any liability, contingent or otherwise, with respect to any Pension Plan (for the avoidance of doubt, other than payments pursuant to the PBGC Settlement).

(c)      Neither the Borrower nor any member of its Controlled Group sponsors, maintains, contributes to or has any liability, contingent or otherwise, with respect to any plan, fund or other similar program, arrangement or agreement established or maintained outside of the United States primarily for the benefit of employees of the Borrower or any such Controlled Group member residing outside the United States (for the avoidance of doubt, other than payments pursuant to the PBGC Settlement).

SECTION 6.11  Environmental Warranties.  Except as set forth in Item 6.11 of the Disclosure Schedule and except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)  all facilities and property owned, operated or leased by the Borrower or any of its Subsidiaries are owned, operated or leased by the Borrower and its Subsidiaries in material compliance with all Environmental Laws and have been for the past three years;

(b)  there are no pending or, to the Borrower's actual knowledge, threatened (i) written claims, complaints, notices or governmental requests for information received by the Borrower or any of its Subsidiaries with respect to any alleged material violation of any Environmental Law, or (ii) written complaints, notices or inquiries to the Borrower or any of its Subsidiaries regarding material potential liability of the Borrower or any of its Subsidiaries under any Environmental Law;

(c)  there have been no Releases of Hazardous Materials at, on or under any property now or previously owned, operated, or leased by the Borrower or any of its Subsidiaries that to the Borrower's actual knowledge, would require investigation or remediation under any applicable Environmental Law;

(d)  the Borrower and its Subsidiaries have been issued and are in material compliance with all permits, certificates, approvals, licenses, registrations and other authorizations required under any applicable Environmental Law;

(e)  to the actual knowledge of the Borrower, no property currently or previously owned, operated or leased by the Borrower or any of its Subsidiaries is listed, or proposed for listing on the National Priorities List pursuant to CERCLA, on the CERCLIS or on any similar foreign, federal, state or provincial list of sites requiring investigation or clean-up under Environmental Laws; and

(f)  there is no friable asbestos present at any property now owned or leased by the Borrower or any of its Subsidiaries that requires abatement or removal under any applicable Environmental Law.

SECTION 6.12   Regulations U and X.  No Obligor is engaged in the business of extending credit for the purpose of buying or carrying margin stock, and no proceeds of any Loans will be used to purchase or carry margin stock or otherwise for a purpose which violates, or would be inconsistent with, F.R.S. Board Regulation U or Regulation X.  Terms for which meanings are provided in F.R.S. Board Regulation U or Regulation X or any regulations substituted therefor, as from time to time in effect, are used in this Section with such meanings.

SECTION 6.13   Labor Matters.  Except as set forth on Item 6.13 of the Disclosure Schedule, as of the date hereof no Obligor is subject to any labor or collective bargaining agreement.  Except as set forth on Item 6.13 of the Disclosure Schedule, there are no existing or threatened strikes, lockouts or other labor disputes involving any Obligor that singly or in the aggregate could reasonably be expected to have a Material Adverse Effect.  Hours worked by and payments made to employees of each Obligor are not in violation of the Fair Labor Standards Act or any other applicable law, rule or regulation dealing with such matters where such violation could reasonably be expected to have a Material Adverse Effect.

SECTION 6.14   Compliance with Laws.  Each Obligor is in compliance in all material respects with the requirements of all applicable laws and all orders, writs, injunctions and decrees applicable to it or to its properties (except for Environmental Laws which are the subject of Section 6.11), except in such instances in which the failure to comply therewith, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

SECTION 6.15   Deposit Account and Cash Management Accounts.  Set forth on Item 6.15(a) of the Disclosure Schedule is a complete and accurate list of all Deposit Accounts of the Borrower and each Subsidiary and set forth on Item 6.15(b) of the Disclosure Schedule is a complete and accurate list of all Securities Accounts (as defined in the UCC) of the Borrower and each Subsidiary, if any as updated in accordance with Section 7.1.8.

SECTION 6.16   Insurance.  The Borrower and each of its Subsidiaries keeps its property adequately insured and maintains (a) insurance to such extent and against such risks, including fire, as is customary with companies of similar size and in the same or similar businesses, (b) workmen's compensation insurance in the amount required by applicable law, (c) public liability

insurance, which shall include product liability insurance, in the amount customary with companies of similar size and in the same or similar business against claims for personal injury or death on properties owned, occupied or controlled by it, and (d) such other insurance as may be required by law.

SECTION 6.17   Material Contracts.  Except as could not be reasonably expected to result in a Material Adverse Effect, each of the Borrower's and its Subsidiaries' material contracts (a) are in full force and effect and are binding upon and enforceable against each Obligor that is a party thereto and, to the best actual knowledge of the Borrower and its Subsidiaries, all other parties thereto in accordance with its terms, and (b) is not in default due to the action of such Obligor.

ARTICLE VII
COVENANTS

SECTION 7.1   Affirmative Covenants.  The Borrower agrees with each Lender and the Administrative Agent that on or after the Closing Date until the Termination Date has occurred, the Borrower will, and will cause its Subsidiaries to, perform or cause to be performed the obligations set forth below.

SECTION 7.1.1   Financial Information, Reports, Notices, etc.  The Borrower will furnish the Administrative Agent, who will distribute to each Lender, copies of the following financial statements, reports, notices and information:

(a)  as soon as available and in any event within 45 days after the end of each of the first three Fiscal Quarters of each Fiscal Year (commencing with the second Fiscal Quarter of the 2011 Fiscal Year), an unaudited consolidated balance sheet of the Parent and its Subsidiaries as of the end of such Fiscal Quarter and consolidated statements of income and cash flow of the Parent and its Subsidiaries for such Fiscal Quarter and for the period commencing at the end of the previous Fiscal Year and ending with the end of such Fiscal Quarter, and including (in each case, except in the case of the second Fiscal Quarter of the 2011 Fiscal Year), in comparative form the figures for the corresponding Fiscal Quarter in, and year to date portion of, the immediately preceding Fiscal Year, in each case, certified as complete and correct by the chief financial or accounting officer of the Borrower (subject to normal year-end audit adjustments);

(b)  as soon as available and in any event within 120 days after the end of each Fiscal Year (commencing with the 2011 Fiscal Year), a copy of the consolidated balance sheet of the Parent and its Subsidiaries, and the related consolidated statements of income and cash flow of the Parent and its Subsidiaries for such Fiscal Year, setting forth in comparative form the figures for the immediately preceding Fiscal Year, audited by independent public accountants; provided that for the 2011 Fiscal Year, such consolidated balance sheet and related consolidated statements of income and cash flow shall cover the period commencing on a date selected by the Borrower in its reasonable discretion (which date is to be no later than the Closing Date) and terminating on December 31, 2011 and shall not need to include comparative statements;

47

(c)  concurrently with the delivery of the financial information pursuant to clauses (a) and (b), a Compliance Certificate, executed by the chief financial or accounting officer of the Borrower, (i) showing compliance with the financial covenants set forth in Section 7.2.4 and stating that no Default has occurred and is continuing (or, if a Default has occurred, specifying the details of such Default and the action that the Borrower or an Obligor has taken or proposes to take with respect thereto), (ii) stating that no Subsidiary has been formed or acquired since the delivery of the last Compliance Certificate (or, if a Subsidiary has been formed or acquired since the delivery of the last Compliance Certificate, a statement that such Subsidiary has complied with Section 7.1.7) and (iii) in the case of a Compliance Certificate delivered concurrently with the financial information pursuant to clause (b), a calculation of Excess Cash Flow;

(d)  as soon as practicable and in any event within 45 days after the commencement of each Fiscal Year beginning with the 2012 Fiscal Year, a business plan and financial projections for the Borrower and its Subsidiaries (on a consolidated basis) for such Fiscal Year (including an operating budget and cash flow budget) for the Borrower and its Subsidiaries (on a consolidated basis) accompanied by a certificate of an Authorized Officer of the Borrower to the effect that (a) such projections were prepared by the Borrower in good faith, (b) the Borrower has a reasonable basis for the assumptions contained in such projections and (c) such projections have been prepared in accordance with such assumptions;

(e)  as soon as possible and in any event within 5 days after any executive officer of the Borrower or any other Obligor obtains actual knowledge of the occurrence of an Event of Default, a statement of an Authorized Officer of the Borrower setting forth details of such Event of Default and the action which the Borrower or such Obligor has taken and proposes to take with respect thereto;

(f)  as soon as possible and in any event within 5 days after any executive officer of the Borrower or any other Obligor obtains actual knowledge of (i) the occurrence of any material adverse development with respect to any litigation, action, proceeding or labor controversy described in Item 6.6 of the Disclosure Schedule or (ii) the commencement of any litigation, action, proceeding or labor controversy of the type and materiality described in Section 6.6, notice thereof and, to the extent the Administrative Agent reasonably requests, copies of all documentation relating thereto;

(g)  promptly after the sending or filing thereof, copies of all reports, notices, prospectuses and registration statements which any Obligor files with the SEC, or any national securities exchange;

(h)  promptly following the mailing or receipt of any material notice or report delivered under the terms of the Second Lien Credit Agreement, copies of such notice or report;

(i)  promptly (i) if any executive officer of the Borrower obtains actual knowledge that the Borrower or any Person which owns, directly or indirectly, any Capital Securities of the Borrower, or any other holder at any time of any direct or indirect equitable, legal

or beneficial interest therein is the subject of any of the Terrorism Laws, the Borrower will notify the Administrative Agent in writing and (ii) upon the request of any Lender, the Borrower will provide any information such Lender believes is reasonably necessary to be delivered to comply with the Patriot Act;

(j)  such other financial and other information as the Lenders holding at least 10.0% of the aggregate amount of outstanding Loans may from time to time reasonably request through the Administrative Agent (including information and reports in such detail as such Lenders may reasonably request with respect to the terms of and information provided pursuant to the Compliance Certificate); and

(k) promptly upon receipt thereof, copies of all "management letters" submitted to the Borrower or any other Obligor by the independent public accountants referred to in clause (b) in connection with each audit made by such accountants.

SECTION 7.1.2   Maintenance of Existence; Compliance with Contracts, Laws, etc.  The Borrower will, and will cause each of its Subsidiaries to, preserve and maintain its and their respective legal existence (except as otherwise permitted by Section 7.2.10) and comply in all material respects with all applicable material laws, rules, regulations and orders, including the payment (before the same become delinquent), of all Taxes, imposed upon the Borrower or its Subsidiaries or upon their property except to the extent being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP have been set aside on the books of the Borrower or its Subsidiaries, as applicable.

SECTION 7.1.3   Maintenance of Properties.  The Borrower will, and will cause each of its Subsidiaries to, maintain, preserve, protect and keep its and their respective properties in good repair, working order and condition (ordinary wear and tear excepted), and make necessary material repairs, renewals and replacements so that the business carried on by the Borrower and its Subsidiaries may be properly conducted at all times, unless the Borrower or such Subsidiary determines in good faith that the continued maintenance of such property is no longer economically desirable, necessary or useful to the business of the Borrower or any of its Subsidiaries or the Disposition of such property is otherwise permitted by Sections 7.2.9 or 7.2.10.

SECTION 7.1.4   Insurance.  The Borrower will, and will cause each of its Subsidiaries to maintain:

(a)  insurance on its property with financially sound and reputable insurance companies against loss and damage in at least the amounts (and with only those deductibles) customarily maintained, and against such risks as are typically insured against in the same general area, by Persons of comparable size engaged in the same or similar business as the Borrower and its Subsidiaries; and

(b)  all worker's compensation, employer's liability insurance or similar insurance as may be required under the material laws of any state or jurisdiction in which it may be engaged in business.

49

Without limiting the foregoing, all insurance policies required pursuant to this Section shall (i) name the Administrative Agent on behalf of the Secured Parties as mortgagee or loss payee (in the case of property insurance) or additional insured (in the case of liability insurance), as applicable, and provide that no cancellation of the policies will be made without thirty days' prior written notice to the Administrative Agent and (ii) be in addition to any requirements to maintain specific types of insurance contained in the other Loan Documents.

SECTION 7.1.5   Books and Records.  The Borrower will, and will cause each of its Subsidiaries to, keep books and records in accordance with GAAP which accurately reflect all of its business affairs and transactions and permit each Secured Party or any of their respective representatives, at reasonable times and intervals upon reasonable notice to the Borrower, to visit each Obligor's offices, to discuss such Obligor's financial matters with its officers and employees and to examine (and photocopy extracts from) any of its books and records.

SECTION 7.1.6   Environmental Law Covenant.  The Borrower will, and will cause each of its Subsidiaries to,

(a)  use and operate all of its and their facilities and properties in compliance with all Environmental Laws, maintain all necessary permits, approvals, certificates, licenses and other authorizations required under applicable Environmental Laws in effect and remain in material compliance therewith, and handle all Hazardous Materials in material compliance with all applicable Environmental Laws, in each case, except for such non-compliance or failure to maintain that would not reasonably be expected to result in a Material Adverse Effect; and

(b)  reasonably promptly notify the Administrative Agent in writing and provide copies upon receipt of all written claims, complaints, notices or inquiries relating to the condition of its owned, operated and leased facilities and properties in respect of, or as to compliance with, Environmental Laws that would reasonably be expected to result in a Material Adverse Effect, and shall promptly resolve any non-compliance with Environmental Laws and keep its owned property free of any Lien imposed by any Environmental Law, except for such Lien that is being contested in good faith and by proper proceedings and for which appropriate reserves consistent with same are being maintained.

SECTION 7.1.7   Future Guarantors, Security, etc.  The Borrower will, and will cause each of its U.S. Subsidiaries to, execute any documents, Filing Statements, agreements and instruments, and take all further action (including filing Mortgages) that may be required under applicable law, or that the Administrative Agent (acting at the written direction of the Required Lenders) may reasonably request, in order to effectuate the transactions contemplated by the Loan Documents and in order to grant, preserve, protect and perfect the validity and first priority (subject to Liens permitted by Section 7.2.3) of the Liens created or intended to be created by the Loan Documents.  The Borrower will cause any subsequently acquired or organized U.S. Subsidiary to execute, within 10 Business Days of its acquisition or organization, a supplement to the Subsidiary Guaranty (in the form of Annex I thereto) and each other applicable Loan Document in favor of the Secured Parties.  In addition, from time to time, the Borrower will, at its cost and expense, promptly secure the Obligations by pledging or creating, or causing to be

pledged or created, perfected Liens with respect to such of its assets and properties as the Required Lenders shall designate, it being agreed that it is the intent of the parties that the Obligations shall be secured by, among other things, substantially all the assets of the Borrower and its U.S. Subsidiaries (including real and personal property acquired subsequent to the Effective Date (but in the case of real property acquired after the Closing Date, the Borrower will only be required to perfect Liens on such real property to the extent the fair market value of such property exceeds $1,000,000)); provided that, neither the Borrower nor its U.S. Subsidiaries shall be required to pledge more than 65% of the Voting Securities of any Foreign Subsidiary unless such pledge would not result in an adverse tax consequence to the Borrower and its Subsidiaries or to their equity holders on a flow through basis.  The Borrower shall deliver or cause to be delivered to the Administrative Agent all customary instruments and documents (including legal opinions, title insurance policies and lien searches) to evidence compliance with this Section. The Borrower and its Subsidiaries will use commercially reasonable efforts to get a landlord waiver in form and substance reasonably satisfactory to the Required Lenders for all real property leased by any Obligor after the Effective Date which relates to a location in which there is, or is reasonably expected to be, collateral with a book value of $5,000,000 or more.  The Borrower agrees that it will not, nor will it permit any of its Subsidiaries to, store collateral with a book value of more than $5,000,000 in any location at which it has not obtained a landlord waiver for more than 60 days.

SECTION 7.1.8   Cash Management.  The Borrower will, and will cause each Subsidiary Guarantor to: (i) ensure that such Person's Account Debtors forward payment of all amounts owed by them to such Person to one of the Deposit Accounts of such Person set forth on Item 6.15(a) of the Disclosure Schedule, and (ii) deposit, or cause to be deposited, promptly, and in any event no later than the fourth Business Day after the date of receipt thereof, all of such Person's Collections in one of the Deposit Accounts of such Person set forth on Item 6.15(a) of the Disclosure Schedule.  Prior to or as soon as practicable following the Closing Date, the Borrower will use commercially reasonable efforts to deliver to the Administrative Agent fully executed Control Agreements with respect to each Deposit Account and Securities Account of the Borrower set forth on Item 6.15(a) and Item 6.15(b) of the Disclosure Schedule.  At all times after the delivery of such Control Agreements, the Borrower will use commercially reasonable efforts to ensure, prior to any termination or expiration of the Control Agreement relating to the Deposit Accounts initially set forth on Item 6.15(a) of the Disclosure Schedule, that such Deposit Accounts are replaced with Deposit Accounts subject to a Control Agreement.  The Borrower may amend Item 6.15(a) and Item 6.15(b) of the Disclosure Schedule to add or replace one or more of the Deposit Accounts; provided, however, that (i) the prospective depository institution at which such Deposit Account will be held shall be reasonably satisfactory to the Required Lenders and (ii) in the event such Deposit Account will replace or be in addition to a Deposit Account set forth on Item 6.15(a) of the Disclosure Schedule hereto, prior to the time of the opening of such Deposit Account, the Borrower and such prospective depository institution shall use commercially reasonable efforts to have executed and delivered to the Administrative Agent, and the Administrative Agent shall have executed, a Control Agreement in respect of such Deposit Account.

SECTION 7.1.9   Maintenance of Corporate Separateness.  The Borrower will, and will cause each of its Subsidiaries to, satisfy customary corporate formalities, including the holding of regular board of directors' and shareholders' meetings and the maintenance of

corporate offices and records and take all actions reasonably necessary to maintain their corporate separateness.

SECTION 7.1.10   Landlord's Agreements and Bailee Letters.  Prior to or as soon as practicable following the Closing Date, the Borrower will use commercially reasonable efforts to deliver to the Administrative Agent a landlord's agreement or bailee letter with respect to each location set forth on Item 7.1.10 to the Disclosure Schedule.

SECTION 7.1.11   Mortgages and Insurance.  Within 30 days following the Closing Date, the Borrower will deliver to the Administrative Agent counterparts of each Mortgage, duly executed and delivered by the applicable Obligor, together with:

(a)  evidence of the completion (or satisfactory arrangements for the completion) of all recordings and filings of each Mortgage as may be necessary or desirable to create a valid, perfected first priority Lien against the properties purported to be covered thereby;

(b)  mortgagee's title insurance policies in favor of the Administrative Agent for the benefit of the Secured Parties in amounts and in form and substance as shall be customary for similar properties, with respect to the real and, if any, other property purported to be covered by each Mortgage, insuring that title to such property is marketable and that the interests created by each Mortgage constitute valid first Liens thereon free and clear of all defects and encumbrances (other than the subordinated lien in favor of the Second Lien Lenders pursuant to the Second Lien Loan Documents and the Intercreditor Agreement);

(c)  opinions addressed to the Administrative Agent and all Lenders from local real estate counsel to the Obligors in all jurisdictions where the Borrower maintains material real estate, as determined in the Borrower's reasonable discretion; and

(d)  a certificate of an Authorized Officer of the Borrower certifying as to compliance with Section 7.1.4.

SECTION 7.2   Negative Covenants.  The Borrower covenants and agrees with each Lender and the Administrative Agent that on or after the Closing Date until the Termination Date has occurred, the Borrower will, and will cause its Subsidiaries to, perform or cause to be performed the obligations set forth below.

SECTION 7.2.1   Business Activities.  The Borrower will not, and will not permit any of its Subsidiaries to engage in any business activity except those business activities engaged in or contemplated on the date of this Agreement and activities reasonably incidental thereto or reasonable extensions thereof.

SECTION 7.2.2   Indebtedness.  The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Indebtedness, except:

(a)  Indebtedness in respect of the Obligations;

52

(b)  Indebtedness existing as of the Effective Date which is identified in Item 7.2.2(b) of the Disclosure Schedule, and refinancing of such Indebtedness in a principal amount not in excess of that which is outstanding on the Effective Date (as such amount has been reduced following the Effective Date) plus all costs, fees and expenses related to such refinancing;

(c)  unsecured Indebtedness (i) incurred in the ordinary course of business of the Borrower and its Subsidiaries (including open accounts extended by suppliers on normal trade terms in connection with purchases of goods and services (including insurance premium payables in the ordinary course), which are not overdue for a period of more than 90 days or, if overdue for more than 90 days, as to which a dispute exists and adequate reserves in conformity with GAAP have been established on the books of the Borrower or such Subsidiary) and (ii) in respect of performance, surety or appeal bonds provided in the ordinary course of business, but excluding (in each case), Indebtedness incurred through the borrowing of money or Contingent Liabilities in respect thereof;

(d)  Indebtedness (i) in respect of industrial revenue bonds or other similar governmental or municipal bonds, (ii) evidencing the deferred purchase price of newly acquired property or incurred to finance the acquisition of equipment of the Borrower and its Subsidiaries (pursuant to purchase money mortgages or otherwise, whether owed to the seller or a third party) used in the ordinary course of business of the Borrower and its Subsidiaries (provided that, such Indebtedness is incurred within 60 days of the acquisition of such property) and (iii) in respect of Capitalized Lease Liabilities; provided that, the aggregate amount of all Indebtedness outstanding pursuant to this clause shall not at any time exceed $10,000,000;

(e)  Indebtedness of any Subsidiary owing to the Borrower or any other Subsidiary; provided that, the aggregate amount of all such Indebtedness incurred by a Subsidiary that is not a Subsidiary Guarantor, when aggregated with the amount of all Investments made by the Borrower and the Subsidiary Guarantors in Subsidiaries which are not Subsidiary Guarantors pursuant to clause (e)(i) of Section 7.2.5, shall not exceed $5,000,000 at any time;

(f)  Second Lien Loans incurred pursuant to the terms of the Second Lien Loan Documents (for the avoidance of doubt, including PIK interest paid pursuant thereto) and Contingent Liabilities of the Subsidiary Guarantors in respect of the Second Lien Loans; and, the refinancing of all such Indebtedness so long as (i) such refinancing is permitted by the Intercreditor Agreement and (ii) the administrative agent for such replacement Second Lien Credit Agreement executes and delivers the Intercreditor Agreement;

(g)  Indebtedness incurred by the Borrower and its Subsidiaries arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, or from guaranties or letters of credit, surety bonds or performance bonds securing the performance of the Borrower or any such Subsidiary pursuant to such agreements, in connection with Permitted Acquisitions or permitted Dispositions of any business, assets or Subsidiary of the Borrower or any of its Subsidiaries;

(h)  the Borrower and its Subsidiaries may become and remain liable with respect to deferred purchase price obligations (including obligations in respect of Earnout Payments) incurred as part of the consideration paid or payable in respect of Permitted Acquisitions; provided that with respect to all Permitted Acquisitions, the aggregate principal amount of all such deferred purchase price obligations shall not exceed $10,000,000 in the aggregate over the term of this Agreement;

(i)  Indebtedness of a Person existing at the time such Person became a Subsidiary of the Borrower, but only if such Indebtedness was not created or incurred in contemplation of such Person becoming a Subsidiary and the aggregate outstanding amount of all Indebtedness existing pursuant to this clause does not exceed $10,000,000 at any time;

(j)  Indebtedness incurred by the Borrower or any of its Subsidiaries which may be deemed to exist pursuant to any performance guaranties, performance, surety, statutory, appeal or similar obligations incurred in the ordinary course of business;

(k)  Indebtedness incurred by the Borrower or any of its Subsidiaries in respect of customary netting services, overdraft protections and similar liabilities incurred in the ordinary course in connection with customary Deposit Accounts maintained by the Borrower and its Subsidiaries as part of its ordinary course cash management program;

(l)  Indebtedness with respect to Purchase Card Agreements in an aggregate amount not to exceed $2,000,000 outstanding at any one time;

(m)  other unsecured Indebtedness of the Borrower and its Subsidiaries (other than Indebtedness of Foreign Subsidiaries owing to the Borrower or Guarantors) in an aggregate amount at any time outstanding not to exceed $10,000,000;

(n)  Indebtedness to one or more issuers of letters of credit with respect to cash collateralized letters of credit in a principal or face amount not to exceed $10,000,000 in the aggregate; and

(o)  Indebtedness consisting of obligations to PBGC pursuant to the PBGC Settlement.

SECTION 7.2.3    Liens.  The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Lien upon any of its property (including Capital Securities of any Person), revenues or assets, whether now owned or hereafter acquired, except:

(a)  Liens securing payment of the Obligations;

(b)  Liens existing as of the Effective Date and disclosed in Item 7.2.3(b) of the Disclosure Schedule securing Indebtedness described in clause (b) of Section 7.2.2, and refinancings of such Indebtedness; provided that, no such Lien shall encumber any additional property and the amount of Indebtedness secured by such Lien is not increased from that existing on the Effective Date (as such Indebtedness may have been

permanently reduced subsequent to the Effective Date) plus all costs, fees and expenses related to such Liens;

(c)  Liens securing Indebtedness of the type permitted under clause (d) of Section 7.2.2; provided that, with respect to Indebtedness permitted by clause (d)(ii) of Section 7.2.2, (i) such Lien is granted within 60 days after such Indebtedness is incurred, (ii) the Indebtedness secured thereby does not exceed 80% of the lesser of the cost or the fair market value of the applicable property, improvements or equipment at the time of such acquisition (or construction) and (iii) such Lien secures only the assets that are the subject of the Indebtedness referred to in such clause;

(d)  Liens securing Indebtedness permitted by clause (i) of Section 7.2.2; provided that, such Liens existed prior to such Person becoming a Subsidiary, were not created in anticipation thereof and attach only to assets of such Person;

(e)  Liens in favor of carriers, warehousemen, mechanics, materialmen and landlords granted in the ordinary course of business for amounts not overdue or being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books;

(f)  Liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance or other forms of governmental insurance or benefits, or to secure performance of tenders, statutory obligations, bids, leases or other similar obligations (other than for borrowed money) entered into in the ordinary course of business or to secure obligations on surety and appeal bonds or performance bonds;

(g)  judgment Liens in existence for less than 60 days after the entry thereof or with respect to which execution has been stayed or the payment of which is covered in full (subject to a customary deductible) by insurance maintained with responsible insurance companies and which do not otherwise result in an Event of Default under Section 8.1.5;

(h)  easements, rights-of-way, zoning restrictions, minor defects or irregularities in title and other similar encumbrances not interfering in any material respect with the value or use of the property to which such Lien is attached;

(i)  Liens for Taxes not at the time delinquent or thereafter payable without penalty or being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books;

(j)  Liens securing Indebtedness permitted under clause (f) of Section 7.2.2 and subordinated to the Liens securing the Obligations pursuant to the Intercreditor Agreement;

(k)  Liens solely on any earnest money deposit made by the Borrower or any of its Subsidiaries in connection with any lease, letter of intent, purchase agreement or lease permitted hereunder entered into the ordinary course of business;

(l)  purported Liens evidenced by filing of precautionary UCC financing statements relating solely to operating leases for personal property entered into in the ordinary course of business;

(m)  Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of custom duties in connection with the importation of goods;

(n)  any zoning or similar law or right reserved or vested in any governmental office or agency to control or regulate the use of, or any reservation in the grant from the crown in respect of, any real property;

(o)  licenses of patents, trademarks and other intellectual property rights granted by the Borrower or any of its Subsidiaries in the ordinary course of business and not interfering in any respect with the ordinary conduct of such Borrower or such Subsidiary;

(p)  Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a creditor depository institution;

(q)  any interest or title of a lessor, licensor or sublessor under any lease or license entered into the ordinary course of its business and covering only the assets so leased or licensed granted in the ordinary course of business;

(r)  Liens on inventory that is in the possession of a third party in the ordinary course of business;

(s)  Liens on any leased real property granted by landlords under such leases;

(t)  Liens on any leased real property granted to landlords under any leases; and

(u) Liens on cash held by one or more issuers of letters of credit in an amount not to exceed $10,500,000 in the aggregate securing Indebtedness permitted by clause (n) of Section 7.2.2.

SECTION 7.2.4   Financial Condition and Operations.  The Borrower will not permit any of the events set forth below in clauses (a) and (b) to occur:

(a)  The Borrower will not permit the Total Leverage Ratio as of the last day of any period set forth below to be greater than:

| Fiscal Quarter Ending | Total Leverage Ratio |
| --- | --- |
| September 30, 2011 | 7.60:1.00 |
| December 31, 2011 | 7.35:1.00 |
| March 31, 2012 | 7.15:1.00 |
| June 30, 2012 | 7.00:1.00 |

56

| September 30, 2012 | 6.80:1.00 |
| December 31, 2012 | 6.60:1.00 |
| March 31, 2013 | 6.50:1.00 |
| June 30, 2013 | 6.40:1.00 |
| September 30, 2013 | 6.40:1.00 |
| December 31, 2013 | 6.40:1.00 |
| March 31, 2014 | 6.30:1.00 |
| June 30, 2014 | 6.10:1.00 |
| September 30, 2014 | 6.00:1.00 |
| December 31, 2014 | 6.00:1.00 |
| [March 31, 2015] | 6.00:1.00 |

(b)  The Borrower will not permit the Interest Coverage Ratio as of the last day of any period set forth below to be less than:

| Fiscal Quarter Ending | Interest Coverage Ratio |
|---|---|
| September 30, 2011 | 1.80:1.00 |
| December 31, 2011 | 1.80:1.00 |
| March 31, 2012 | 1.80:1.00 |
| June 30, 2012 | 2.00:1.00 |
| September 30, 2012 | 2.00:1.00 |
| December 31, 2012 | 2.00:1.00 |
| March 31, 2013 | 2.00:1.00 |
| June 30, 2013 | 2.00:1.00 |
| September 30, 2013 | 2.00:1.00 |
| December 31, 2013 | 2.00:1.00 |
| March 31, 2014 | 2.00:1.00 |
| June 30, 2014 | 2.00:1.00 |
| September 30, 2014 | 2.00:1.00 |
| December 31, 2014 | 2.00:1.00 |
| [March 31, 2015] | 2.00:1.00 |

SECTION 7.2.5    <u>Investments</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, purchase, make, incur, assume or permit to exist any Investment in any other Person, except:

(a)  Investments existing on the Effective Date and identified in <u>Item 7.2.5(a)</u> of the Disclosure Schedule;

(b)  Cash Equivalent Investments;

(c)  Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(d)  Investments consisting of any deferred portion of the sales price received by the Borrower or any Subsidiary in connection with any Disposition permitted under <u>Section 7.2.10</u>;

(e)  Investments by way of contributions to capital or purchases of Capital Securities (i) by the Borrower in any Subsidiaries or by any Subsidiary in other Subsidiaries; <u>provided</u> that, the aggregate amount of intercompany loans made pursuant to <u>clause (e)</u> of <u>Section 7.2.2</u> and Investments under this clause made by the Borrower and Subsidiary Guarantors in Subsidiaries that are not Subsidiary Guarantors shall not exceed the amount set forth in <u>clause (e)</u> of <u>Section 7.2.2</u> at any time, or the Borrower or (ii) by any Subsidiary in the Borrower;

(f)  Investments constituting (i) accounts receivable arising, (ii) trade debt granted, or (iii) deposits made in connection with the purchase price of goods or services, in each case in the ordinary course of business;

(g)  Investments by way of the acquisition of Capital Securities constituting Permitted Acquisitions permitted under <u>clause (d)</u> of <u>Section 7.2.9</u>; <u>provided</u>, that such Investments shall result in the acquisition of a wholly owned U.S. Subsidiary;

(h)  intercompany loans, advances or guaranties among the Borrower and its Subsidiaries, all to the extent permitted by <u>clause (e)</u> of <u>Section 7.2.2</u> and <u>clause (e)</u> of this <u>Section 7.2.5</u>;

(i)  Capital Expenditures to the extent permitted by <u>Section 7.2.7</u>;

(j)  loans to officers, directors and employees of the Borrower and its Subsidiaries to be used to purchase Capital Securities of the Parent and/or to acquire options on, or purchase upon exercise of such options, Capital Securities of the Parent; <u>provided</u>, that, in each case, the proceeds of such loans are reinvested in the Borrower and do not exceed $5,000,000;

(k)  Investments in Persons (other than Obligors or any Person owning, controlling or managing, directly or indirectly an Obligor) that are not Subsidiaries in an aggregate amount not to exceed $2,000,000 at any time outstanding;

(l)  without duplication, Contingent Liabilities to the extent permitted by Section 7.2.2;

(m)  good faith deposits made in connection with prospective Permitted Acquisitions to the extent permitted by Section 7.2.9;

(n)  bank deposits established and maintained in the ordinary course of business and consistent with past practice;

(o)  customary deposits made in connection with operating leases;

(p)  Investments in the form of deposits, prepayments and other credits to suppliers in the ordinary course of business;

(q)  Investments in the form of Capital Securities received from or on behalf of any Person as a part of the consideration paid or payable in respect of any Disposition made by the Borrower or any of its Subsidiaries; provided that, the fair market value of all such Capital Securities held by the Borrower and its Subsidiaries (as determined as of the time such securities are received) shall not exceed in the aggregate the greater of (i) $5,000,000 and (ii) 25% of the aggregate proceeds received by the Borrower from such Disposition; provided, further, that, "fair market value" for any such Capital Securities shall be (x) if prices for such securities are quoted on a national public exchange or equivalent, the quoted price for such securities on such exchange as of the close of business on the Business Day immediately preceding the day of receipt of such securities, and (y) if prices for such securities are not quoted on a national public exchange or equivalent, the value of such securities as determined by the board of directors (or equivalent) of the Borrower in the exercise of its good faith judgment at the time of receipt of such securities; and

(r)  other Investments in an amount not to exceed $10,000,000 at any time over the term of this Agreement irrespective of any gains received, accrued or recognized on such Investments;

provided that any Investment which when made complies with the requirements of the definition of the term "Cash Equivalent Investment" may continue to be held notwithstanding that such Investment if made thereafter would not comply with such requirements; and no Investment otherwise permitted by clauses (g), (j) or (m) shall be permitted to be made if any Default has occurred and is continuing or would result therefrom.

SECTION 7.2.6   Restricted Payments, etc.  The Borrower will not, and will not permit any of its Subsidiaries to, declare or make a Restricted Payment, or make any deposit for any Restricted Payment, except:

(a)  Restricted Payments made by Subsidiaries to the Borrower or wholly owned Subsidiaries;

(b)  so long as no Default has occurred and is continuing, or shall be caused thereby, Restricted Payments made by the Borrower or its Subsidiaries:

(i)  to make payments pursuant to the Management Agreements and the LLC Agreement as in effect from time to time;

(ii)  in an aggregate amount not to exceed $2,500,000 in any Fiscal Year (A) to the extent necessary to make repurchases of Capital Securities (and options or warrants to purchase such Capital Securities) of the Parent from employees (1) upon termination (including by reason of death, disability or retirement) of such employees or (2) pursuant to a contractual obligation of the Parent and (B) to the Parent to the extent necessary to permit the Parent or any parent company thereof to pay reasonable accounting, legal, insurance, SEC related, and similar fees, expenses and costs, and expenses and indemnity payments to directors; and

(iii)  to the Parent to permit the Parent to make tax distributions to its members in accordance with (and in the amounts permitted by) the LLC Agreement; provided, that, with respect to any taxable year, the amount distributed to members of the Parent pursuant to this clause shall not exceed the product of the amount of taxable income of the Borrower allocable to such members and the Hypothetical Tax Rate and, provided, further, that the Borrower shall be permitted to make periodic tax distributions to permit payments of estimated taxes by members of the Parent based on reasonable estimates of the taxable income of the Borrower allocable to the members of the Parent and the Hypothetical Tax Rate.

SECTION 7.2.7   Capital Expenditures.  Subject (in the case of Capitalized Lease Liabilities) to clause (e) of Section 7.2.2, the Borrower will not, and will not permit any of its Subsidiaries to, make or commit to make Capital Expenditures in any period set forth below which aggregate in excess of the amount set forth below opposite such period:

| Period | Maximum Capital Expenditure Amount |
|---|---|
| Each period of twelve consecutive months ending on the last day of each Fiscal Quarter starting with the Fiscal Quarter ending on September 30, 2011 | $20,000,000 |

SECTION 7.2.8  Issuance of Capital Securities.  The Borrower will not, and will not permit any of its Subsidiaries to, issue any Capital Securities (whether for value or otherwise) to any Person other than (in the case of Subsidiaries), to the Borrower or another wholly owned Subsidiary (unless such Capital Securities are not mandatorily redeemable at any time prior to one year and one day after the Stated Maturity Date for the Loans).

SECTION 7.2.9  <u>Consolidation, Merger; Permitted Acquisitions, etc.</u>  The Borrower will not, and will not permit any of its Subsidiaries to, liquidate or dissolve, consolidate with, or merge or amalgamate into or with, any other Person, or purchase or otherwise acquire all or substantially all of the assets of any Person (or any division thereof), except:

(a)  any Subsidiary may liquidate or dissolve voluntarily into, and may merge or amalgamate with and into, the Borrower or any other Subsidiary; (<u>provided</u> that, in any merger involving the Borrower, the Borrower is the surviving Person and a Subsidiary Guarantor may only merge with and into another Subsidiary Guarantor);

(b)  the assets or Capital Securities of any Subsidiary may be purchased or otherwise acquired by the Borrower or any other Subsidiary (<u>provided</u> that, the assets or Capital Securities of any Subsidiary Guarantor may only be purchased or otherwise acquired by the Borrower or another Subsidiary Guarantor); <u>provided</u>, <u>further</u>, that in no event shall any Subsidiary consolidate with or merge with and into any other Subsidiary unless after giving effect thereto, the Administrative Agent shall have a perfected pledge of, and security interest in and to, at least the same percentage of the issued and outstanding interests of Capital Securities (on a fully diluted basis) and other assets of the surviving Person as the Administrative Agent had immediately prior to such merger or consolidation;

(c)  Investments made in accordance with <u>Section 7.2.5</u>;

(d)  the Borrower or any of its Subsidiaries may purchase all or substantially all of the assets of any Person (or any division thereof), or acquire such Person by merger or otherwise, in each case, if:

(i)  no Default has occurred and is continuing or would occur after giving effect thereto;

(ii)  such purchase or acquisition constitutes a Permitted Acquisition;

(iii)  the amount (which shall include all obligations in respect of Earnout Payments and other deferred purchase price arrangements) paid or payable in connection with all other transactions permitted under this <u>clause (d)</u> (together with all previous Permitted Acquisitions) does not exceed $20,000,000 in any Fiscal Year and $50,000,000 over the term of this Agreement;

(e)  any Subsidiary may convert into a limited liability company following at least sixty (60) days' advance written notice to the Administrative Agent.

SECTION 7.2.10   <u>Permitted Dispositions</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, Dispose of any of the Borrower's or such Subsidiaries' assets (including accounts receivable and Capital Securities of Subsidiaries) to any Person in one transaction or series of transactions unless such Disposition is:

(a)  inventory or obsolete, damaged, worn out or surplus property, or the discounted sale of defaulted or delinquent trade receivables written off and reserved;

(b)  permitted by Sections 7.2.9 and 7.2.14;

(c)  (i) the cross-licensing or non-exclusive licensing of intellectual property, in the ordinary course of business and (ii) the contemporaneous exchange, in the ordinary course of business, of property for property of a substantially like kind and use (other than as set forth in clause (i)), to the extent that the property received in such exchange is of a value substantially equivalent to the value of the property exchanged;

(d)  Investments made in accordance with Section 7.2.5 and Restricted Payments made in accordance with Section 7.2.6;

(e)  the leasing or sub-leasing of property that would not materially interfere with the required use of such property by the Borrower or any of its Subsidiaries; and

(f)  other Dispositions so long as: (i) such Disposition is for fair market value and the consideration received consists of no less than 75% in cash, (ii) the Net Disposition Proceeds received from such Disposition, together with the Net Disposition Proceeds of all other assets Disposed of pursuant to this clause since the Closing Date, does not exceed (individually or in the aggregate) $25,000,000 over the term of this Agreement (inclusive of the fair market value of any Capital Securities of the type described in clause (q) of Section 7.2.5), (iii) the Net Disposition Proceeds from such Disposition are applied pursuant to Sections 3.1.1 and 3.1.2, and (iv) no Default has occurred and is continuing; and

(g)  set forth on Item 7.2.10(g) of the Disclosure Schedule.

SECTION 7.2.11   Modification of Certain Agreements.  The Borrower will not, and will not permit any of its Subsidiaries to, consent to any amendment, supplement, waiver or other modification of, or enter into any forbearance from exercising any rights with respect to the terms or provisions contained in:

(a)  the Asset Purchase Agreement, the Plan and the Management Agreements to the extent such action is materially adverse to the Lenders (it being agreed that annual scheduled management fees payable under the Management Agreements shall be subject to a cap of $1,250,000 in the aggregate);

(b)  the Organic Documents of the Borrower or any of its Subsidiaries, if the result would have a material adverse effect on the rights or remedies of any Secured Party; and

(c)  any of the Second Lien Loan Documents, other than any amendment, supplement, waiver or modification to the extent permitted by the Intercreditor Agreement.

SECTION 7.2.12   <u>Transactions with Affiliates</u>.  The Borrower will not, and will not permit any of its Subsidiaries, to enter into or cause or permit to exist any arrangement, transaction or contract (including for the purchase, lease or exchange of property or the rendering of services) with any of its other Affiliates, unless such arrangement, transaction or contract is on fair and reasonable terms no less favorable to the Borrower or such Subsidiary than it could obtain in an arm's-length transaction with a Person that is not an Affiliate other than:

(a)  transactions among the Obligors otherwise permitted hereunder;

(b)  reasonable fees and compensation (including equity-based compensation and employee benefits) paid to, and indemnity provided for the benefit of, officers, directors, board members, employees or consultants of the Parent or any Subsidiary as determined in good faith by the Parent's board of directors;

(c)  the payment of Restricted Payments as provided under <u>Section 7.2.6</u>;

(d)  transactions that were or are consummated in accordance with the Plan or the Asset Purchase Agreement, in each case, as in effect on the Effective Date;

(e)  Indebtedness represented by this Agreement and the Second Lien Credit Agreement, the Intercreditor Agreement, and any amendments, restatements or modifications thereof and the transactions pursuant thereto that are permitted hereby and by the Intercreditor Agreement; and

(f)  transactions pursuant to the Management Agreements and the LLC Agreement.

SECTION 7.2.13   <u>Restrictive Agreements, etc.</u>  The Borrower will not, and will not permit any of its Subsidiaries to, enter into any agreement prohibiting:

(a)  the creation or assumption of any Lien upon its properties, revenues or assets, whether now owned or hereafter acquired;

(b)  the ability of any Obligor to amend or otherwise modify any Loan Document; or

(c)  the ability of any Subsidiary to make any payments, directly or indirectly, to the Borrower, including by way of dividends, advances, repayments of loans, reimbursements of management and other intercompany charges, expenses and accruals or other returns on investments.

The foregoing prohibitions shall not apply to restrictions contained (i) in any Loan Document, (ii) in the case of <u>clause (a)</u>, any agreement governing any Indebtedness permitted by <u>clause (d)</u> of <u>Section 7.2.2</u> as to the assets financed with the proceeds of such Indebtedness, (iii) in the case of <u>clause (a)</u>, covenants in documents creating Liens permitted by <u>Section 7.2.3</u> prohibiting further Liens on the properties encumbered thereby; (iv) in the case of <u>clauses (a)</u> and <u>b</u>), in the Second Lien Loan Documents; or (v) any prohibition or limitation that (a) exists pursuant to applicable law, (b) consists of customary restrictions and conditions contained in any agreement

relating to the sale of any property permitted under Section 7.2.10 pending the consummation of such sale, (c) consists of customary restrictions and conditions contained in any lease or restricts subletting or assignment of any lease governing a leasehold interest of an Obligor, (d) exists in any agreement or other instrument of a person acquired in an Investment permitted hereunder in existence at the time of such Investment (but not created in connection therewith or in contemplation thereof), which prohibition or limitation is not applicable to any person, or the properties or assets of any person, other than the person, or the property or assets of the person so acquired or (e) is imposed by any amendments or refinancings that are otherwise permitted by the Loan Documents of the contracts, instruments or obligations referred to in clause (iv) or (v)(d); provided that such amendments and refinancings are no more materially restrictive with respect to such prohibitions and limitations than those prior to such amendment or refinancing.

SECTION 7.2.14   Sale and Leaseback.  The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly enter into any agreement or arrangement providing for the sale or transfer by it of any property (now owned or hereafter acquired) to a Person and the subsequent lease or rental of such property or other similar property from such Person except the sale-leasebacks entered into in connection with the Livermore Property, the Goshen Property and the Emigsville Property.

SECTION 7.2.15   Pension Plans.  The Borrower will not, and will not permit any of its Subsidiaries to sponsor or contribute to any Pension Plan, or have any liability, contingent or otherwise, with respect to any Pension Plan (for the avoidance of doubt, other than the PBGC Settlement).

SECTION 7.2.16   No Payment or Prepayment of Certain Indebtedness.  The Borrower will not, and will not permit any of its Subsidiaries to:

(a)  make any payment or prepayment of principal of, or premium or interest on any Second Lien Loan, other than: (A) interest required to be paid pursuant to (1) the Second Lien Credit Agreement and (2) the documents governing any refinancing of the Second Lien Loans that is permitted by the Intercreditor Agreement (including, with respect to clauses (1) and (2), any interest capitalized or paid in kind), to the extent such cash payment is not prohibited by the Intercreditor Agreement (or, in the case of a permitted refinancing, any intercreditor agreement related to such refinancing or required to be entered into in connection therewith) or (B) with respect to principal, (1) on the Stated Maturity Date (as defined in the Second Lien Credit Agreement), (2) following the repayment in full of the Loans, with excess proceeds of mandatory prepayments or (3) upon any refinancing of the Second Lien Loans permitted by the Intercreditor Agreement;

(b)  redeem, retire, purchase, defease or otherwise acquire any Second Lien Loan (except as set forth in clause (a)); or

(c)  make any deposit (including the payment of amounts into a sinking fund or other similar fund) for any of the foregoing purposes other than, in the case of the Second Lien Loans, in connection with a refinancing of the Second Lien Loans to the extent permitted by the Intercreditor Agreement.

ARTICLE VIII
EVENTS OF DEFAULT

SECTION 8.1    Listing of Events of Default.  Each of the following events or occurrences described in this Article shall constitute an "Event of Default".

SECTION 8.1.1    Non-Payment of Obligations.  The Borrower shall default in the payment or prepayment when due of:

(a)  any principal of any Loan and such default shall continue unremedied for a period of two Business Days after such amount was due; or

(b)  any interest or fee described in Article III or any other monetary Obligation, and such default shall continue unremedied for a period of five Business Days after such amount was due.

SECTION 8.1.2    Non-Performance of Certain Covenants and Obligations.  The Borrower shall default in the due performance or observance of any of its obligations under Section 7.1.1, Section 7.1.2 or Section 7.2.

SECTION 8.1.3    Non-Performance of Other Covenants and Obligations.  Any Obligor shall default in the due performance and observance of any other agreement contained in any Loan Document executed by it, and such default shall continue unremedied for a period of 60 days after the earlier of (a) the date of the Borrower's actual knowledge of such default or (b) notice thereof given to the Borrower by the Administrative Agent or any Lender.

SECTION 8.1.4    Default on Other Indebtedness.  A default shall occur in the payment of any amount when due (subject to any applicable grace period), whether by acceleration or otherwise, of any principal or stated amount of, or interest or fees on, any Indebtedness (other than Indebtedness described in Section 8.1.1) of the Borrower or any of its Subsidiaries or any other Obligor having a principal or stated amount, individually or in the aggregate, in excess of $10,000,000, or a default shall occur in the performance or observance of any obligation or condition with respect to such Indebtedness if the effect of such default is to accelerate the maturity of any such Indebtedness or such default shall continue unremedied for any applicable period of time sufficient to permit the holder or holders of such Indebtedness, or any trustee or agent for such holders, to cause or declare such Indebtedness to become due and payable or to require such Indebtedness to be prepaid, redeemed, purchased or defeased, or require an offer to purchase or defease such Indebtedness to be made, prior to its expressed maturity.

SECTION 8.1.5    Judgments.  Any judgment or order for the payment of money individually or in the aggregate in excess of $10,000,000 (exclusive of any amounts fully covered by insurance (less any applicable deductible) and as to which the insurer has not denied or objected to its responsibility to cover such judgment or order) shall be rendered against the Borrower or any of its Subsidiaries or any other Obligor and such judgment shall not have been vacated or discharged or stayed or bonded pending appeal within 60 days after the entry thereof or enforcement proceedings shall have been commenced by any creditor upon such judgment or order.

SECTION 8.1.6   <u>Change in Control</u>.  Any Change in Control shall occur.

SECTION 8.1.7   <u>Bankruptcy, Insolvency, etc.</u>  The Borrower, any of its Subsidiaries or any other Obligor shall:

(a)  generally fail to pay, or admit in writing its inability or general unwillingness to pay, debts as they become due;

(b)  apply for, consent to, or acquiesce in the appointment of a trustee, receiver, sequestrator or other custodian for any substantial part of the property of any thereof, or make a general assignment for the benefit of creditors;

(c)  in the absence of such application, consent or acquiescence in or permit or suffer to exist the appointment of a trustee, receiver, receiver manager, sequestrator or other custodian for a substantial part of the property of any thereof, and such trustee, receiver, receiver manager, sequestrator or other custodian shall not be discharged within 90 days; <u>provided</u> that, the Borrower, each Subsidiary and each other Obligor hereby expressly authorizes each Secured Party to appear in any court conducting any relevant proceeding during such 90-day period to preserve, protect and defend their rights under the Loan Documents;

(d)  permit or suffer to exist the commencement of any bankruptcy, reorganization, debt arrangement or other case or proceeding under any bankruptcy or insolvency law or any dissolution, winding up or liquidation proceeding, in respect thereof, and, if any such case or proceeding is not commenced by the Borrower, any Subsidiary or any Obligor, such case or proceeding shall be consented to or acquiesced in by the Borrower, such Subsidiary or such Obligor, as the case may be, or shall result in the entry of an order for relief or shall remain for 90 days undismissed; <u>provided</u> that, the Borrower, each Subsidiary and each Obligor hereby expressly authorizes each Secured Party to appear in any court conducting any such case or proceeding during such 90-day period to preserve, protect and defend their rights under the Loan Documents; or

(e)  take any action authorizing, or in furtherance of, any of the foregoing.

SECTION 8.1.8   <u>Impairment of Security, etc.</u>  Any Loan Document shall (except in accordance with its terms), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of any Obligor party thereto; any Lien shall (except in accordance with the terms of any Loan Document), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of any Obligor subject thereto in respect of any material portion of the Collateral (as defined in the Security Agreement); any Obligor or any other party shall contest in any manner such effectiveness, validity, binding nature or enforceability; or, except as permitted under any Loan Document, any Lien securing any Obligation shall, in whole or in part, cease to be a perfected first priority Lien with respect to any material portion of the Collateral.

SECTION 8.2   <u>Action if Bankruptcy</u>.  If any Event of Default described in <u>clauses (a)</u> through <u>(d)</u> of <u>Section 8.1.7</u> with respect to the Borrower shall occur, the outstanding principal

amount of all outstanding Loans and all other Obligations shall automatically be and become immediately due and payable, without notice or demand to any Person.

SECTION 8.3   <u>Action if Other Event of Default</u>.  If any Event of Default (other than any Event of Default described in <u>clauses (a)</u> through <u>(d)</u> of <u>Section 8.1.7</u> with respect to the Borrower) shall occur for any reason, whether voluntary or involuntary, and be continuing, the Administrative Agent, upon the written direction of the Required Lenders, shall by notice to the Borrower declare all or any portion of the outstanding principal amount of the Loans and other Obligations to be due and payable, whereupon the full unpaid amount of such Loans and other Obligations which shall be so declared due and payable shall be and become immediately due and payable, without further notice, demand or presentment.

ARTICLE IX
THE ADMINISTRATIVE AGENT

SECTION 9.1   <u>Actions</u>.

(a)  Each Lender hereby appoints The Bank of New York Mellon as its Administrative Agent under and for purposes of each Loan Document.  Each Lender authorizes the Administrative Agent to act on behalf of such Lender under each Loan Document and to appoint other agents or sub-agents to assist in its actions under the Loan Documents and the Administrative Agent shall not be liable for the acts and omissions of such agents as long as they are appointed with due care and without gross negligence or willful misconduct.  Each Lender further authorizes the Administrative Agent, in the absence of other written instructions from the Required Lenders received from time to time by the Administrative Agent (with respect to which the Administrative Agent agrees that it will comply, subject to the terms and conditions of <u>Article IX</u>), to exercise such powers hereunder and thereunder as are delegated to or required of the Administrative Agent by the terms hereof and thereof, together with such powers as may be incidental thereto (including the release of Liens on assets Disposed of in accordance with the terms of the Loan Documents).

(b)  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise in writing as directed by the Required Lenders in accordance with the terms of this Agreement (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 10.1</u>).  Each Lender hereby indemnifies (which indemnity shall be payable within thirty (30) days of demand therefor, to the extent not reimbursed by the Borrower or any other Obligor, and without limiting the Borrower's and Obligors' obligations under this Agreement and which indemnity shall survive any termination of this Agreement) the Administrative Agent and its officers, directors, employees and agents, <u>pro rata</u> according to the proportionate amount of Loans held by

such Lender, from and against any and all liabilities, obligations, losses, damages, claims, penalties, judgments, costs, disbursements or expenses of any kind or nature whatsoever which may at any time be imposed on, incurred by, or asserted against, the Administrative Agent in any way relating to or arising out of any Loan Document or any action taken or omitted to be taken by the Administrative Agent under the Loan Documents, (including reasonable attorneys' fees and expenses), and as to which the Administrative Agent, is not reimbursed by the Borrower; provided that, no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, claims, costs or expenses which are determined by a court of competent jurisdiction in a final proceeding to have resulted from the Administrative Agent's gross negligence or willful misconduct.  By executing a Lender Assignment Agreement, each future Lender (acting for itself and on behalf of each Affiliate thereof which becomes a Secured Party from time to time) shall be deemed to ratify the power of attorney granted to the Administrative Agent hereunder.

SECTION 9.2   Exculpation.  Neither the Administrative Agent nor any of its directors, officers, employees or agents shall be liable to any Secured Party for any action taken or omitted to be taken by it under any Loan Document, or in connection therewith, except for its own willful misconduct or gross negligence, nor responsible for any recitals or warranties herein or therein, nor for the effectiveness, enforceability, validity or due execution of any Loan Document, nor for the creation, perfection or priority of any Liens purported to be created by any of the Loan Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any collateral security, nor to make any inquiry respecting the performance by any Obligor of its Obligations.  Any such inquiry which may be made by the Administrative Agent shall not obligate it to make any further inquiry or to take any action.  The Administrative Agent shall be entitled to rely upon advice of counsel concerning legal matters and upon any notice, consent, certificate, statement or writing which the Administrative Agent believes to be genuine and to have been presented by a proper Person.

To the fullest extent permitted by applicable law, no Obligor or Lender shall assert, and each Obligor and Lender hereby waives, any claim against the Administrative Agent, its sub-agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated herby or thereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.

No provision of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby or the transactions contemplated hereby or thereby, shall require the Administrative Agent to: (i) expend or risk its own funds or provide indemnities in the performance of any of its duties hereunder or the exercise of any of its rights or power or (ii) otherwise incur any financial liability in the performance of its duties or the exercise of any of its rights or powers unless it is indemnified to its satisfaction and the Administrative Agent shall have no liability to any person for any loss occasioned by any delay in taking or failure to take any action while it is awaiting an indemnity satisfactory to it.

The Administrative Agent shall not be responsible for (i) perfecting, maintaining, monitoring, preserving or protecting the security interest or lien granted under this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, (ii) the filing, re-filing, recording, re-recording or continuing or any document, financing statement, mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at any time or times or (iii) providing, maintaining, monitoring or preserving insurance on or the payment of taxes with respect to any of the Collateral. The actions described in items (i) through (iii) shall be the sole responsibility of the Obligors.

The Administrative Agent shall not be required to qualify in any jurisdiction in which it is not presently qualified to perform its obligations as Administrative Agent.

The Administrative Agent has accepted and is bound by the Loan Documents executed by the Administrative Agent as of the date of this Agreement and, as directed in writing by the Required Lenders, the Administrative Agent shall execute additional Loan Documents delivered to it after the date of this Agreement; *provided, however*, that such additional Loan Documents do not adversely affect the rights, privileges, benefits and immunities of the Administrative Agent. The Administrative Agent will not otherwise be bound by, or be held obligated by, the provisions of any credit agreement, indenture or other agreement governing the Obligations (other than this Agreement and the other Loan Documents to which the Administrative Agent is a party).

No written direction given to the Administrative Agent by the Required Lenders or the Borrower that in the sole reasonable judgment of the Administrative Agent imposes, purports to impose or might reasonably be expected to impose upon the Administrative Agent any obligation or liability not set forth in or arising under this Agreement and the other Loan Documents will be binding upon the Administrative Agent unless the Administrative Agent elects, at its sole option, to accept such direction.

The Administrative Agent shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or the other Loan Documents arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; business interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; acts of civil or military authority and governmental action.

The Administrative Agent shall not be under any obligation to exercise any of its rights or powers vested in it by this Agreement or the other Loan Documents, at the request, order or direction of the Required Lenders unless the same is given pursuant to the express provisions of this Agreement or the other Loan Documents and the Required Lenders shall have offered to the Administrative Agent security or indemnity reasonably satisfactory to the Administrative Agent against the costs, expenses and liabilities (including, without limitation, attorneys' fees and expenses) which might be incurred therein or thereby.

Beyond the exercise of reasonable care in the custody of the Collateral in its possession, the Administrative Agent will have no duty as to any Collateral in its possession or control or in the

possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto. The Administrative Agent will be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property, and the Administrative Agent will not be liable or responsible for any loss or diminution in the value of any of the Collateral by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Administrative Agent in good faith without gross negligence or willful misconduct.

The Administrative Agent will not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of the Administrative Agent, as determined by a court of competent jurisdiction in a final, nonappealable order, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of any grantor to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Administrative Agent hereby disclaims any representation or warranty to the present and future Secured Parties concerning the perfection of the Liens granted hereunder or in the value of any of the Collateral.

In the event that the Administrative Agent is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any fiduciary or trust obligation for the benefit of another, which in the Administrative Agent's sole reasonable discretion may cause the Administrative Agent to be considered an "owner or operator" under any environmental laws or otherwise cause the Administrative Agent to incur, or be exposed to, any environmental liability or any liability under any other federal, state or local law, the Administrative Agent reserves the right, instead of taking such action, either to resign as Administrative Agent or to arrange for the transfer of the title or control of the asset to a court appointed receiver. The Administrative Agent will not be liable to any person for any environmental liability or any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of the Administrative Agent's actions and conduct as authorized, empowered and directed hereunder or relating to any kind of discharge or release or threatened discharge or release of any hazardous materials into the environment.

SECTION 9.3   Successor. The Administrative Agent may resign as such at any time upon at least 30 days' prior notice to the Borrower and all Lenders.  The Administrative Agent may be removed at any time upon the affirmative vote of the Required Lenders.  If the Administrative Agent at any time shall resign or be removed, the Required Lenders may appoint another Lender as a successor Administrative Agent which shall thereupon become the Administrative Agent hereunder.  In the case of the Administrative Agent's resignation, if no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the retiring Administrative Agent's giving notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a

successor as provided for above.  Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent and the payment of the reasonable fees and expenses (including attorney's fees and expenses) of the resigning or removed Administrative Agent), such successor Administrative Agent shall be entitled to receive from the retiring or removed Administrative Agent such documents of transfer and assignment as such successor Administrative Agent may reasonably request, and shall thereupon succeed to and become vested with all rights, powers, privileges and duties of the retiring or removed Administrative Agent.  The retiring or removed Administrative Agent shall cooperate in all respects with the transition of the Administrative Agent role to the successor Administrative Agent and shall, following such transition, be discharged from its duties and obligations under the Loan Documents.  After any retiring or removed Administrative Agent's resignation or removal, as applicable, hereunder as the Administrative Agent, the provisions of this Article shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under the Loan Documents, and Section 9.1, Section 10.3 and Section 10.4 shall continue to inure to its benefit.

SECTION 9.4    Loans by the Administrative Agent.  The Administrative Agent shall have the same rights and powers with respect to (x) the Loans held by it or any of its Affiliates, and (y) the Notes held by it or any of its Affiliates as any other Lender and may exercise the same as if it were not the Administrative Agent.  The Administrative Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of business with the Borrower or any Subsidiary or Affiliate of the Borrower as if the Administrative Agent were not the Administrative Agent hereunder.

SECTION 9.5    Credit Decisions.  Each Lender acknowledges that it has, independently of the Administrative Agent and each other Lender, and based on such Lender's review of the financial information of the Borrower, the Loan Documents (the terms and provisions of which being satisfactory to such Lender) and such other documents, information and investigations as such Lender has deemed appropriate, made its own credit decision to extend the Loans.  Each Lender also acknowledges that it will, independently of the Administrative Agent and each other Lender, and based on such other documents, information and investigations as it shall deem appropriate at any time, continue to make its own credit decisions as to exercising or not exercising from time to time any rights and privileges available to it under the Loan Documents.

SECTION 9.6    Copies, etc.  The Administrative Agent shall give prompt notice to each Lender of each notice or request required or permitted to be given to the Administrative Agent by the Borrower pursuant to the terms of the Loan Documents (unless concurrently delivered to the Lenders by the Borrower).  The Administrative Agent will distribute to each Lender each document or instrument received (other than notices delivered pursuant to Articles II and III) for its account and copies of all other communications received by the Administrative Agent from the Borrower for distribution to the Lenders by the Administrative Agent in accordance with the terms of the Loan Documents.

SECTION 9.7    Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely upon any certification, notice or other communication (including any thereof by telephone, telecopy, telegram or cable) believed by it to be genuine and correct and to have been signed or sent by or on behalf of the proper Person, and upon advice and statements of legal

counsel, independent accountants and other experts selected by the Administrative Agent.  As to any matters not expressly provided for by the Loan Documents, the Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, thereunder in accordance with instructions given by the Required Lenders or all of the Lenders as is required in such circumstance, and such instructions of such Lenders and any action taken or failure to act pursuant thereto shall be binding on all Secured Parties.  For purposes of applying amounts in accordance with this Agreement, the Administrative Agent shall be entitled to rely upon any Secured Party that has entered into a Rate Protection Agreement with any Obligor for a determination (which such Secured Party agrees to provide or cause to be provided upon request of the Administrative Agent) of the outstanding Obligations owed to such Secured Party under any Rate Protection Agreement.  Unless it has actual knowledge evidenced by way of written notice from any such Secured Party and the Borrower to the contrary, the Administrative Agent, in acting in such capacity under the Loan Documents, shall be entitled to assume that no Rate Protection Agreements or Obligations in respect thereof are in existence or outstanding between any Secured Party and any Obligor.

SECTION 9.8   Defaults.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of a Default unless the Administrative Agent has received a written notice from a Lender or the Borrower specifying such Default and stating that such notice is a "Notice of Default".  In the event that the Administrative Agent receives such a notice of the occurrence of a Default, the Administrative Agent shall give prompt notice thereof to the Lenders.  The Administrative Agent shall (subject to the provisions of this Article IX and Section 10.1) take such action and exercise such remedies with respect to such Default as shall be directed by the Required Lenders pursuant to any of the Loan Documents; provided that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action (including, without limitation, credit bidding the Loans of all Lenders hereunder), or refrain from taking such action, with respect to such Default as it shall deem advisable in the best interest of the Secured Parties except to the extent that this Agreement expressly requires that such action be taken, or not be taken, only with the consent or upon the authorization of the Required Lenders or all Lenders.

SECTION 9.9   Posting of Approved Electronic Communications.

(a)  The Borrower hereby agrees, unless directed otherwise by the Administrative Agent or unless the electronic mail address referred to below has not been provided by the Administrative Agent to the Borrower, that it will, or will cause its Subsidiaries to, provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents or to the Lenders under Section 7.1.1, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to a Continuation/Conversion Notice, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default under this Agreement or any other Loan Document or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement (all such non-excluded communications being referred to herein collectively as "Communications"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Administrative Agent to an electronic mail address as directed by the Administrative

Agent.  In addition, the Borrower agrees, and agrees to cause its Subsidiaries, to continue to provide the Communications to the Administrative Agent or the Lenders, as the case may be, in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.

(b)  The Borrower further agrees that the Administrative Agent may make the Communications available to the Lenders by posting the Communications on Intralinks or a substantially similar electronic transmission system (the "Platform").

(c)  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".  THE INDEMNIFIED PARTIES DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE INDEMNIFIED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE INDEMNIFIED PARTIES HAVE ANY LIABILITY TO ANY OBLIGOR, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY OBLIGOR'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY INDEMNIFIED PARTY IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH INDEMNIFIED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)  The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents.  Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.

(e)  Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

SECTION 9.10   Proofs of Claim.  The Lenders and the Borrower hereby agree that after the occurrence of an Event of Default pursuant to Section 8.1.7, in case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment,

composition or other judicial proceeding relative to any of the Obligors, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall have made any demand on any of the Obligors) shall be entitled and empowered, by intervention in such proceeding or otherwise:

      (a)  to file and prove a claim for the whole amount of principal and interest owing and unpaid in respect of the Loans and any other Obligations (excluding Obligations arising under any Rate Protection Agreement) that are owing and unpaid and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Lenders, the Administrative Agent and other agents appointed by the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Administrative Agent and such other agents and their agents and counsel and all other amounts due Lenders, Administrative Agent and such other agents hereunder) allowed in such judicial proceeding; and

      (b)  to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel, and any other amounts due Administrative Agent and other agents hereunder.  Nothing herein contained shall be deemed to authorize Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lenders or to authorize Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.  Further, nothing contained in this Section shall affect or preclude the ability of any Lender to (i) file and prove such a claim in the event that the Administrative Agent has not acted within ten days prior to any applicable bar date and (ii) require an amendment of the proof of claim to accurately reflect such Lender's outstanding Obligations.

ARTICLE X
MISCELLANEOUS PROVISIONS

      SECTION 10.1   <u>Waivers, Amendments, etc</u>.  The provisions of each Loan Document (other than a Fee Letter, which shall be modified only in accordance with its terms) may from time to time be amended, modified or waived, if such amendment, modification or waiver is in writing and consented to by the Borrower and the Required Lenders; <u>provided</u>, that no such amendment, modification or waiver shall:

      (a)  modify <u>clause (b)</u> of <u>Section 4.7</u>, <u>Section 4.8</u> (as it relates to sharing of payments) or this Section, in each case, without the consent of all Lenders;

(b)  increase the aggregate amount of any Loans held by a Lender or extend the final Stated Maturity Date for any Lender's Loan, in each case without the consent of such Lender (it being agreed, however, that any vote to rescind any acceleration made pursuant to Section 8.2 and Section 8.3 of amounts owing with respect to the Loans and other Obligations shall only require the vote of the Required Lenders);

(c)  reduce (by way of forgiveness), the principal amount of or reduce the rate of interest on any Lender's Loan, reduce any fees described in Article III payable to any Lender or extend the date on which interest or fees are payable in respect of such Lender's Loans, in each case without the consent of such Lender (provided that, the vote of Required Lenders shall be sufficient to waive the payment, or reduce the increased portion, of interest accruing under Section 3.2.2);

(d)  make any change to the definition of "Required Lenders" or modify any requirement hereunder that any particular action be taken by all Lenders without the consent of all Lenders;

(e)  except with the consent of the Lenders holding more than 90% of the aggregate amount of outstanding Loans, release (i) either Borrower from its Obligations under the Loan Documents or any Guarantor from its obligations under a Guaranty or (ii) all or substantially all of the collateral under the Loan Documents;

(f)  affect adversely the interests, rights or obligations of the Administrative Agent (in its capacity as the Administrative Agent) unless consented to by the Administrative Agent; or

(g)  except with the consent of the Special Required Lenders, take any of the following actions: (i) contractually subordinate any of the Liens granted to the Administrative Agent to the Liens securing the Obligations under, and as defined in, the Second Lien Loan Documents, (ii) increase the cap on annual scheduled management fees referred to in Section 7.2.11(a), (iii) amend the last sentence of Section 5.3(a) of, or clause (b)(2) of the definition of Refinancing in, the Intercreditor Agreement, or (iv) enter into any forbearance agreement during the continuance of an event of default under Section 8.1.1 which is not conditioned, during the continuance of such forbearance, upon the Borrower not making (A) any payment in cash of interest or principal on the Second Lien Obligations and (B) any Restricted Payment otherwise permitted under Section 7.2.6(b)(ii).

No failure or delay on the part of any Secured Party in exercising any power or right under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right. No notice to or demand on any Obligor in any case shall entitle it to any notice or demand in similar or other circumstances. No waiver or approval by any Secured Party under any Loan Document shall, except as may be otherwise stated in such waiver or approval, be applicable to subsequent transactions. No waiver or approval hereunder shall require any similar or dissimilar waiver or approval thereafter to be granted hereunder.

SECTION 10.2    Notices; Time.  All notices and other communications provided under each Loan Document shall be in writing or by facsimile and addressed, delivered or transmitted, if to the Borrower, the Administrative Agent or a Lender, to the applicable Person at its address or facsimile number set forth on Schedule II hereto or set forth in the Lender Assignment Agreement, or at such other address or facsimile number as may be designated by such party in a notice to the other parties.  Any notice, if mailed and properly addressed with postage prepaid or if properly addressed and sent by pre-paid courier service, shall be deemed given when received; any notice, if transmitted by facsimile, shall be deemed given when the confirmation of transmission thereof is received by the transmitter.  The parties hereto agree that delivery of an executed counterpart of a signature page to this Agreement and each other Loan Document by facsimile (or electronic transmission) shall be effective as delivery of an original executed counterpart of this Agreement or such other Loan Document.  Unless otherwise indicated, all references to the time of a day in a Loan Document shall refer to New York time.

SECTION 10.3    Payment of Costs and Expenses.  Whether or not the transactions contemplated hereby shall be consummated, the Borrower agrees to pay promptly, and in any event within thirty (30) days after written demand therefor, (a) all the actual and reasonable costs and expenses of preparation of this Agreement and the other Loan Documents and any consents, amendments, waivers or other modifications thereto; (b) all the costs of furnishing all opinions by counsel for the Borrower and the other Obligors; (c) the reasonable fees, expenses and disbursements of counsel to the Administrative Agent in connection with the negotiation, preparation, execution and administration of this Agreement and the other Loan Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters in connection therewith; (d) all the actual costs and expenses of creating and perfecting Liens in favor of the Administrative Agent, for the benefit of the Lenders pursuant hereto, including filing and recording fees, search fees, title insurance premiums and fees, expenses and disbursements of counsel to the Administrative Agent and of counsel providing any opinions that the Administrative Agent or Required Lenders may request in respect of the Collateral or the Liens created pursuant to the Loan Documents; (e) all the actual reasonable costs and fees, expenses and disbursements of any auditors, accountants, consultants or appraisers whether internal or external; (f) all the actual reasonable costs and expenses (including the fees, expenses and disbursements of counsel and of any appraisers, consultants, advisors and agents employed or retained by the Administrative Agent and its counsel) in connection with the custody or preservation of any of the Collateral; (g) all other actual reasonable costs and expenses incurred by the Administrative Agent in connection with the negotiation, preparation and execution of this Agreement and the Loan Documents and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby; and (h) after the occurrence of a Default or an Event of Default, all reasonable costs and expenses, including reasonable attorneys' fees and expenses and costs of settlement, incurred by the Administrative Agent and the Required Lenders in enforcing any Obligations of or in collecting any payments due from any Obligor hereunder or under the other Loan Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of any Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work out" or pursuant to any insolvency or bankruptcy cases or proceedings.

SECTION 10.4   Indemnification.  In consideration of the execution and delivery of this Agreement by each Secured Party, the Borrower hereby indemnifies, exonerates and holds each Secured Party and each of their respective affiliates and their and their affiliates' officers, directors, employees, advisors and agents (collectively, the "Indemnified Parties") free and harmless from and against any and all losses, claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, judgments, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (collectively, the "Indemnified Liabilities") as a result of, or arising out of, or relating to:

(a)  the execution and delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the Transactions contemplated hereby or thereby or the monitoring of Borrower's and the other Obligors' compliance with the terms of the Loan Documents;

(b)  any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Party is a party thereto), or any act, omission, event, or circumstance in any manner related thereto;

(c)  any investigation, litigation or proceeding related to any acquisition or proposed acquisition by any Obligor or any Subsidiary thereof of all or any portion of the Capital Securities or assets of any Person, whether or not an Indemnified Party is party thereto;

(d)  (i) the Release from any real property owned or operated by any Obligor or any Subsidiary thereof of any Hazardous Material (including any losses, liabilities, damages, injuries, costs, expenses or claims asserted or arising under any Environmental Law), or (ii) each Lender's Environmental Liability (the indemnification herein shall survive repayment of the Obligations and any transfer of the property of any Obligor or its Subsidiaries by foreclosure or by a deed in lieu of foreclosure for any Lender's Environmental Liability); in each case of clauses (i) and (ii), other than any Release or Lender's Environmental Liability first caused and first created after the Administrative Agent completes the sale and the transfer of the respective real property pursuant to a foreclosure or deed in lieu of foreclosure;

provided that the Borrower shall not be required to indemnify any Indemnified Party to the extent the applicable Indemnified Liability arises by reason of such Indemnified Party's gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction.  If and to the extent that the foregoing undertaking may be unenforceable for any reason, each Obligor agrees to make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law.  To the extent permitted by applicable law, the Borrower and each other Obligor shall not assert, and hereby waive, any claim against any Indemnified Party, on any theory of liability, for special, indirect,

consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, any Loan or the use of the proceeds thereof.

SECTION 10.5    Survival.  The obligations of the Borrower under Sections 4.3, 4.4, 4.5, 4.6, 10.3 and 10.4, and the obligations of the Lenders under Section 9.1, shall in each case survive any assignment from one Lender to another (in the case of Sections 10.3 and 10.4), the occurrence of the Termination Date and the resignation or removal of the Administrative Agent. The representations and warranties made by each Obligor in each Loan Document shall survive the execution and delivery of such Loan Document.

SECTION 10.6    Severability.  Any provision of any Loan Document which is prohibited or unenforceable in any jurisdiction shall, as to such provision and such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of such Loan Document or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 10.7    Headings.  The various headings of each Loan Document are inserted for convenience only and shall not affect the meaning or interpretation of such Loan Document or any provisions thereof.

SECTION 10.8    Execution in Counterparts, Effectiveness, etc.  This Agreement may be executed by the parties hereto in several counterparts, each of which shall be an original (whether such counterpart is originally executed or an electronic copy of an original and each party hereto expressly waives its rights to receive originally executed documents other than with respect to any documents for which originals are required for any filing or perfection) and all of which shall constitute together but one and the same agreement.  This Agreement shall become effective when counterparts hereof executed on behalf of the Borrower shall have been received by the Administrative Agent.

SECTION 10.9    Governing Law; Entire Agreement.  EACH LOAN DOCUMENT WILL EACH BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING FOR SUCH PURPOSE SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).  The Loan Documents constitute the entire understanding among the parties hereto with respect to the subject matter thereof and supersede any prior agreements, written or oral, with respect thereto.

SECTION 10.10    Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns; provided that, the Borrower may not assign or transfer its rights or obligations hereunder without the consent of all Lenders.

SECTION 10.11    Sale and Transfer of Loans; Participations in Loans; Notes.  Each Lender may assign, or sell participations in, its Loans to one or more other Persons in accordance with the terms set forth below.

(a)  Any Lender may, with the consent of the Borrower (such consent (x) not to be unreasonably withheld or delayed and (y) to be required only to the extent no default under Sections 8.1.1 or 8.1.7 has occurred and is continuing), assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Loans at the time owing to it); provided that:

(i)   the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Lender Assignment Agreement with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000, unless (A) the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); (B) such assignment is an assignment of the entire remaining amount of the assigning Lender's Loans at the time owing to it, (C) such assignment is an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender or (D) such assignment is to one or more Eligible Assignees managed by an Affiliate of such Eligible Assignee(s) and the aggregate amount of such assignments is not less than $1,000,000;

(ii)   each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans assigned; and

(iii)   the parties to each assignment shall (A) electronically execute and deliver to the Administrative Agent a Lender Assignment Agreement via an electronic settlement system acceptable to the Administrative Agent or (B) with the consent of the Administrative Agent, manually execute and deliver to the Administrative Agent a Lender Assignment Agreement, together with, in either case, a processing and recordation fee of $1,000 (which fee may be waived or reduced in the sole discretion of the Administrative Agent) and if the Eligible Assignee is not a Lender, administrative details information with respect to such Eligible Assignee and applicable tax forms.

(b)  Subject to acceptance and recording thereof by the Administrative Agent pursuant to clause (c), from and after the effective date specified in each Lender Assignment Agreement, (i) the Eligible Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Lender Assignment Agreement, have the rights and obligations of a Lender under this Agreement, and (ii) the assigning Lender thereunder shall, to the extent of the interest assigned by such Lender Assignment Agreement, subject to Section 10.5, be released from its obligations under this Agreement (and, in the case of a Lender Assignment Agreement covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto, but shall continue to be entitled to the benefits of any provisions of this Agreement which by their terms survive the termination of this Agreement).  If the consent of the Borrower to an assignment or to an Eligible Assignee is required hereunder (including a consent to an assignment which does not meet the minimum assignment thresholds specified in this Section), the Borrower shall be deemed to have given its consent ten days after the date notice thereof has been delivered by the assigning Lender (through the Administrative Agent or ClearPar, LLC) unless such consent is expressly refused by the Borrower prior to such tenth day.

(c)  The Administrative Agent shall record each assignment made in accordance with this Section in the Register pursuant to <u>clause (a)</u> of <u>Section 2.5</u> and at the request of the Borrower give the Borrower notice of such assignments.  The Register shall be available for inspection by the Borrower and any Lender (in respect of its own position only), at any reasonable time and from time to time upon reasonable prior notice.

(d)  Any Lender may, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to one or more banks or other entities other than an Ineligible Assignee (a "<u>Participant</u>") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Loans owing to it); <u>provided</u> that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; <u>provided</u> that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver with respect to any of the items set forth in <u>clauses (a)</u> through <u>(e)</u> of <u>Section 10.1</u>, in each case except as otherwise specifically provided in a Loan Document.  Subject to <u>clause (e)</u>, the Borrower agrees that each Participant shall be entitled to the benefits of <u>Sections 4.3</u>, <u>4.4</u>, <u>4.5</u>, <u>4.6</u>, <u>7.1.1</u>, <u>10.3</u> and <u>10.4</u> to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to <u>clause (b)</u>.  To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 4.9</u> as though it were a Lender, provided such Participant agrees to be subject to <u>Sections 4.8</u> and <u>4.10</u> as though it were a Lender.  Each Lender shall, as agent of the Borrower solely for the purpose of this Section, record in book entries maintained by such Lender the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the obligations under this Agreement (the "<u>Participant Register</u>").  The entries in the Participant Register shall be conclusive and binding absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  If requested by the Administrative Agent or the Borrowers, such Lender shall make the Participant Register available to the Administrative Agent or to the Borrower upon either (i) the exercise by a Participant of remedies hereunder or (ii) a request for the Participant Register by the IRS.

(e)  A Participant shall not be entitled to receive any greater payment under <u>Sections 4.3</u>, <u>4.4</u>, <u>4.5</u>, <u>4.6</u>, <u>10.3</u> and <u>10.4</u>, as of the time of the sale of such participation, than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  A Participant shall not be entitled to the benefits of <u>Section 4.6</u> unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with the requirements set forth in <u>Section 4.6</u> as though it were a Lender that acquired its interest by assignment.  In addition, if at the time of the sale of such participation, any greater Taxes subject to payment under <u>Section 4.6</u> would apply to the Participant than applied to the applicable Lender, then such Participant shall not be entitled to

any payment under Section 4.6 with respect to the portion of such Taxes as exceeds the Taxes applicable to the Lender at the time of the sale of the participation unless the Participant's request for the Borrower's prior written consent for the Participation described in the first sentence of this clause states that such greater Taxes would be applicable to such Participant, it being understood that the Participant shall be entitled to additional payments under Section 4.6 to the extent such Lender selling the participation would be entitled to any payment resulting from a change in law occurring after the time the participation was sold.

(f)   Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)   Notwithstanding anything to the contrary contained herein, any Lender ("Granting Lender") may grant to a special purpose funding vehicle (a "SPC"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; provided that (x) nothing herein shall constitute a commitment by any SPC to make any Loans and (y) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof.  In addition, notwithstanding anything to the contrary contained in this clause, any SPC may (i) with notice to, but without the prior written consent of, the Borrower or the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower) providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC.  This Section may not be amended without the written consent of the SPC.  The Borrower acknowledges and agrees, subject to the next sentence, that, to the fullest extent permitted under applicable law, each SPC, for purposes of Sections 4.3, 4.4, 4.5, 4.6, 4.8, 4.9, 10.3 and 10.4, shall be considered a Lender (provided, in the case of Section 4.6, that the SPC complies with the requirements of such Section as if it were a Lender that acquired its interest by assignment).  The Borrower shall not be required to pay any amount under Sections 4.3, 4.4, 4.5, 4.6, 10.3 and 10.4 that is greater than the amount which it would have been required to pay had no grant been made by a Granting Lender to a SPC.

SECTION 10.12   <u>Other Transactions</u>.  Nothing contained herein shall preclude the Administrative Agent or any other Lender from engaging in any transaction, in addition to those contemplated by the Loan Documents, with the Borrower or any of its Affiliates in which the Borrower or such Affiliate is not restricted hereby from engaging with any other Person.

SECTION 10.13   <u>Forum Selection and Consent to Jurisdiction</u>.  ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, ANY LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE ADMINISTRATIVE AGENT, THE LENDERS OR THE BORROWER IN CONNECTION HEREWITH OR THEREWITH MAY BE BROUGHT AND MAINTAINED IN THE COURTS OF THE STATE OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK; <u>PROVIDED</u> THAT, ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT THE ADMINISTRATIVE AGENT'S OPTION (ACTING AT THE WRITTEN DIRECTION OF THE REQUIRED LENDERS), IN THE COURTS OF ANY JURISDICTION WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.  THE BORROWER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF NEW YORK AT THE ADDRESS FOR NOTICES SPECIFIED IN <u>SECTION 10.2</u>.  THE BORROWER HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  TO THE EXTENT THAT THE BORROWER HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, THE BORROWER HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS.

SECTION 10.14   <u>Waiver of Jury Trial</u>.  THE ADMINISTRATIVE AGENT, EACH LENDER AND THE BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, EACH LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE ADMINISTRATIVE AGENT, SUCH LENDER OR THE BORROWER IN CONNECTION THEREWITH.  THE BORROWER ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION (AND EACH OTHER PROVISION OF EACH OTHER LOAN DOCUMENT TO WHICH IT IS A PARTY) AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE

ADMINISTRATIVE AGENT AND EACH LENDER ENTERING INTO THE LOAN
DOCUMENTS.

SECTION 10.15   Confidentiality.

(a)  Subject to the provisions of clause (b) of this Section, each Lender agrees that it will
follow its customary procedures in an effort not to disclose without the prior consent of the
Borrower (other than to its employees, auditors, advisors or counsel or to another Lender if the
Lender or such Lender's holding or parent company in its sole discretion determines that any
such party should have access to such information, provided such Persons shall be subject to the
provisions of this Section to the same extent as such Lender) any information which is now or in
the future furnished pursuant to this Agreement or any other Loan Document, provided that any
Lender may disclose any such information (i) as has become generally available to the public
other than by virtue of a breach of this clause by the respective Lender or any other Person to
whom such Lender has provided such information as permitted by this Section, (ii) as may be
required or appropriate in any report, statement or testimony submitted to any municipal, state,
provincial or Federal regulatory body having or claiming to have jurisdiction over such Lender
or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar
organizations (whether in the United States or elsewhere) or their successors, (iii) as may be
required or appropriate in respect to any summons or subpoena or in connection with any
litigation, (iv) in order to comply with any law, order, regulation or ruling applicable to such
Lender, (v) to the Administrative Agent, (vi) to any pledgee referred to in clause (f) of
Section 10.11 or any prospective or actual transferee or participant in connection with any
contemplated transfer or participation of any of the Notes or Loans or any interest therein by
such Lender, provided that such prospective transferee agrees to be bound by the confidentiality
provisions contained in this Section, (vii) to any direct or indirect contractual counterparty in
swap agreements or such contractual counterparty's professional advisor (so long as such
contractual counterparty or professional advisor to such contractual counterparty agrees to be
bound by the provisions of this Section) and (viii) to the National Association of Insurance
Commissioners or any similar organization or any nationally recognized rating agency that
requires access to information about a Lender's investment portfolio in connection with ratings
issued with respect to such Lender.

(b)  The Borrower hereby acknowledges and agrees that each Lender may share with any
of its Affiliates, and such Affiliates may share with such Lender, any information related to the
Borrower or any of its Subsidiaries, provided such Persons shall be subject to the provisions of
this Section to the same extent as such Lender.

Notwithstanding the foregoing paragraphs of this Section, any party to this Agreement
(and each Affiliate, director, officer, employee, agent or representative of the foregoing or such
Affiliate) may disclose to any and all persons, without limitation of any kind, the tax treatment
and tax structure of the Transactions contemplated herein and all materials of any kind (including
opinions or other tax analyses) that are provided to such party relating to such tax treatment or
tax structure.  The foregoing language is not intended to waive any confidentiality obligations
otherwise applicable under this Agreement except with respect to the information and materials
specifically referenced in the preceding sentence.  This authorization does not extend to
disclosure of any other information, including (a) the identity of participants or potential

participants in the transactions contemplated herein, (b) the existence or status of any negotiations, or (c) any financial, business, legal or personal information of or regarding a party or its affiliates, or of or regarding any participants or potential participants in the transactions contemplated herein (or any of their respective affiliates), in each case to the extent such other information is not related to the tax treatment or tax structure of the transactions contemplated herein.

SECTION 10.16   Counsel Representation.  THE BORROWER ACKNOWLEDGES AND AGREES THAT IT HAS BEEN REPRESENTED BY COMPETENT COUNSEL IN THE NEGOTIATION OF THIS AGREEMENT, AND THAT ANY RULE OR CONSTRUCTION OF LAW ENABLING THE BORROWER TO ASSERT THAT ANY AMBIGUITIES OR INCONSISTENCIES IN THE DRAFTING OR PREPARATION OF THE TERMS OF THIS AGREEMENT SHOULD DIMINISH ANY RIGHTS OR REMEDIES OF THE ADMINISTRATIVE AGENT OR THE OTHER SECURED PARTIES ARE HEREBY WAIVED BY THE BORROWER.

SECTION 10.17   Patriot Act.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Patriot Act.

SECTION 10.18   Authorization of Administrative Agent.  Each Lender agrees that any action taken by the Administrative Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by the Administrative Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

WORKFLOWONE LLC

By: _____
      Name:
      Title:

THE BANK OF NEW YORK MELLON,
as the Administrative Agent


By:_____
    Name:
    Title:

SCHEDULE I

DISCLOSURE SCHEDULE TO CREDIT AGREEMENT

ITEM 5.5(c)  Indebtedness with respect to which UCC-3 termination statements will be filed.

ITEM 6.6.  Litigation.

ITEM 6.7.  Existing Subsidiaries.

ITEM 6.11.  Environmental Matters.

ITEM 6.13.  Labor Matters.

ITEM 6.15(a)  Deposit Accounts of Borrower and each Subsidiary.

ITEM 6.15(b)  Securities Accounts of Borrower and each Subsidiary.

ITEM 7.1.10.  Landlord's Agreements and Bailee Letters.

ITEM 7.2.2(b)  Indebtedness Existing as of the Effective Date.

| CREDITOR | OUTSTANDING PRINCIPAL AMOUNT |
|---|---|
| | |

ITEM 7.2.3(b)  Ongoing Liens.

ITEM 7.2.5(a)  Ongoing Investments.

SCHEDULE II

PERCENTAGES;
LIBOR OFFICE;
DOMESTIC OFFICE

WorkflowOne LLC
[220 East Monument Avenue
Dayton, Ohio 45402
Attention: Chief Financial Officer
Telephone: (___) ___-____
Facsimile: (___) ___-____
E-mail: pbogutsky@workflowmanagement.com]

| NAME AND NOTICE ADDRESS OF LENDER | LIBO OFFICE | DOMESTIC OFFICE | LOAN PERCENTAGE |
|---|---|---|---|
| [To come from CS] | | | |

SCHEDULE III
SPECIFIED EBITDA

| For the Period | $ |
|---|---|
| July 1, 2010 – September 30, 2010 | $12,272,000 |
| October 1, 2010 – December 31, 2010 | $11,466,000 |
| January 1, 2011 – Effective Date | $7,638,000[2] |

---

[2] Calculated assuming Effective Date of February 28, 2011.

**<u>Blackline To February 14, 2011 Version</u>**

**FF DRAFT 2/~~11~~17/11**

FIRST LIEN CREDIT AGREEMENT,

dated as of [●], 2011,

among

WORKFLOWONE LLC,

as the Borrower,

VARIOUS FINANCIAL INSTITUTIONS AND OTHER PERSONS FROM TIME TO TIME
PARTIES HERETO,

as the Lenders,

and

THE BANK OF NEW YORK MELLON,
as the Administrative Agent.

7956804

**TABLE OF CONTENTS**

Page

ARTICLE I  DEFINITIONS AND ACCOUNTING TERMS ..................................................2

    SECTION 1.1  Defined Terms............................................................................. 2

    SECTION 1.2  Use of Defined Terms ............................................................... 26

    SECTION 1.3  Cross-References ....................................................................... 26

    SECTION 1.4  Accounting and Financial Determinations................................. 26

ARTICLE II  LOANS, CLOSING RATE AND NOTES ....................................................27

    SECTION 2.1  Loans ........................................................................................ 27

    SECTION 2.2  Closing Rate ............................................................................. 27

    SECTION 2.3  Continuation and Conversion Elections..................................... 27

    SECTION 2.4  Funding ..................................................................................... 27

    SECTION 2.5  Register; Notes.......................................................................... 28

ARTICLE III  REPAYMENTS, PREPAYMENTS, INTEREST AND FEES ............................28

    SECTION 3.1  Repayments and Prepayments; Application ............................... 28

        SECTION 3.1.1  Repayments and Prepayments ............................... ~~28~~29

        SECTION 3.1.2  Application ............................................................ ~~30~~31

    SECTION 3.2  Interest Provisions .................................................................... 31

        SECTION 3.2.1  Rates ....................................................................... 31

        SECTION 3.2.2  Post-Default Rates................................................... 31

        SECTION 3.2.3  Payment Dates........................................................ ~~31~~32

    SECTION 3.3  Fees .......................................................................................... 32

        SECTION 3.3.1  Administrative Agent's Fee ..................................... 32

ARTICLE IV  CERTAIN LIBO RATE AND OTHER PROVISIONS....................................32

    SECTION 4.1  LIBO Rate Lending Unlawful.................................................... 32

    SECTION 4.2  Deposits Unavailable ............................................................. ~~32~~33

    SECTION 4.3  Increased LIBO Rate Loan Costs, etc ........................................ 33

    SECTION 4.4  Funding Losses ......................................................................... 33

    SECTION 4.5  Increased Capital Costs ............................................................ 34

    SECTION 4.6  Taxes ........................................................................................ 34

    SECTION 4.7  Payments, Computations; Proceeds of Collateral, etc ............... ~~36~~37

    SECTION 4.8  Sharing of Payments ............................................................... ~~37~~38

    SECTION 4.9  Setoff ........................................................................................ 38

**TABLE OF CONTENTS**

(continued)

Page

SECTION 4.10  Replacement of Lenders ................................................................ 38

SECTION 4.11  Change in Lending Office ............................................................. 39

ARTICLE V  CONDITIONS TO EXCHANGE OF LOANS ............................................. 3940

SECTION 5.1  Resolutions, etc ............................................................................. 40

SECTION 5.2  Entry of Confirmation Order and Consummation of Transactions ......... 40

SECTION 5.3  Delivery of Notes ......................................................................... 4041

SECTION 5.4  Guarantees ................................................................................... 41

SECTION 5.5  Security Agreements ..................................................................... 41

SECTION 5.6  Intellectual Property Security Agreements ..................................... 4142

SECTION 5.7  Filing Agent, etc ........................................................................... 42

SECTION 5.8  Intercreditor Agreement ............................................................... 42

SECTION 5.9  Patriot Act Disclosures ................................................................. 42

SECTION 5.10  Compliance with Warranties, No Default, etc ............................... 42

ARTICLE VI  REPRESENTATIONS AND WARRANTIES ............................................. 42

SECTION 6.1  Organization, etc .......................................................................... 4243

SECTION 6.2  Due Authorization, Non-Contravention, Defaults etc. ....................... 43

SECTION 6.3  Government Approval, Regulation, etc ........................................... 43

SECTION 6.4  Validity, etc .................................................................................. 4344

SECTION 6.5  Financial Information ..................................................................... 44

SECTION 6.6  Litigation, Labor Controversies, etc .............................................. 44

SECTION 6.7  Subsidiaries ................................................................................. 44

SECTION 6.8  Ownership of Properties ............................................................... 44

SECTION 6.9  Taxes .......................................................................................... 44

SECTION 6.10  Employee Benefit Plans .............................................................. 4445

SECTION 6.11  Environmental Warranties ........................................................... 45

SECTION 6.12  Regulations U and X ................................................................... 46

SECTION 6.13  Labor Matters ............................................................................. 46

SECTION 6.14  Compliance with Laws ................................................................ 46

SECTION 6.15  Deposit Account and Cash Management Accounts ......................... 46

SECTION 6.16  Insurance ................................................................................... 46

SECTION 6.17  Material Contracts ....................................................................... 47

17437108

**TABLE OF CONTENTS**

(continued)

Page

ARTICLE VII  COVENANTS ............................................................................47

    SECTION 7.1  Affirmative Covenants ........................................................ 47

        SECTION 7.1.1  Financial Information, Reports, Notices, etc. ......................... 47

        SECTION 7.1.2  Maintenance of Existence; Compliance with Contracts, Laws, etc ......................................................................................... 49

        SECTION 7.1.3  Maintenance of Properties ........................................... 49

        SECTION 7.1.4  Insurance .................................................................... 49

        SECTION 7.1.5  Books and Records........................................................ 4950

        SECTION 7.1.6  Environmental Law Covenant .................................... 50

        SECTION 7.1.7  Future Guarantors, Security, etc ................................. 50

        SECTION 7.1.8  Cash Management ....................................................... 51

        SECTION 7.1.9  Maintenance of Corporate Separateness ................... 51

        SECTION 7.1.10  Landlord's Agreements and Bailee Letters...................... 5152

        SECTION 7.1.11  Mortgages and Insurance ........................................ 52

    SECTION 7.2  Negative Covenants ............................................................ 52

        SECTION 7.2.1  Business Activities ..................................................... 52

        SECTION 7.2.2  Indebtedness............................................................... 52

        SECTION 7.2.3  Liens........................................................................... 54

        SECTION 7.2.4  Financial Condition and Operations ......................... 56

        SECTION 7.2.5  Investments ................................................................ 5758

        SECTION 7.2.6  Restricted Payments, etc ........................................... 59

        SECTION 7.2.7  Capital Expenditures ................................................. 60

        SECTION 7.2.8  Issuance of Capital Securities ................................... 60

        SECTION 7.2.9  Consolidation, Merger; Permitted Acquisitions, etc 60........... 61

        SECTION 7.2.10  Permitted Dispositions ............................................ 61

        SECTION 7.2.11  Modification of Certain Agreements ....................... 62

        SECTION 7.2.12  Transactions with Affiliates .................................... 6263

        SECTION 7.2.13  Restrictive Agreements, etc .................................... 63

        SECTION 7.2.14  Sale and Leaseback ................................................. 64

        SECTION 7.2.15  Pension Plans ........................................................... 64

        SECTION 7.2.16  No Payment or Prepayment of Certain Indebtedness ............ 64

TABLE OF CONTENTS

(continued)

Page

ARTICLE VIII  EVENTS OF DEFAULT ...................................................................... 6465

SECTION 8.1  Listing of Events of Default ................................................. 6465

SECTION 8.1.1  Non-Payment of Obligations ............................................. 6465

SECTION 8.1.2  Non-Performance of Certain Covenants and Obligations ........ 65

SECTION 8.1.3  Non-Performance of Other Covenants and Obligations .......... 65

SECTION 8.1.4  Default on Other Indebtedness .......................................... 65

SECTION 8.1.5  Judgments .................................................................... 65

SECTION 8.1.6  Change in Control ........................................................... 6566

SECTION 8.1.7  Bankruptcy, Insolvency, etc ............................................. 6566

SECTION 8.1.8  Impairment of Security, etc .............................................. 66

SECTION 8.2  Action if Bankruptcy ......................................................... 66

SECTION 8.3  Action if Other Event of Default .......................................... 6667

ARTICLE IX  THE ADMINISTRATIVE AGENT ...................................................... 67

SECTION 9.1  Actions. ......................................................................... 67

SECTION 9.2  Exculpation .................................................................... 68

SECTION 9.3  Successor ....................................................................... 70

SECTION 9.4  Loans by the Administrative Agent ...................................... 71

SECTION 9.5  Credit Decisions .............................................................. 71

SECTION 9.6  Copies, etc ..................................................................... 71

SECTION 9.7  Reliance by Administrative Agent ........................................ 71

SECTION 9.8  Defaults ......................................................................... 72

SECTION 9.9  Posting of Approved Electronic Communications ..................... 72

SECTION 9.10  Proofs of Claim .............................................................. 73

ARTICLE X  MISCELLANEOUS PROVISIONS ...................................................... 74

SECTION 10.1  Waivers, Amendments, etc ............................................... 74

SECTION 10.2  Notices; Time ................................................................ 75

SECTION 10.3  Payment of Costs and Expenses ........................................ 76

SECTION 10.4  Indemnification .............................................................. 76

SECTION 10.5  Survival ........................................................................ 7778

SECTION 10.6  Severability ................................................................... 7778

SECTION 10.7  Headings ...................................................................... 78

17437108

**TABLE OF CONTENTS**

(continued)

Page

SECTION 10.8  Execution in Counterparts, Effectiveness, etc ..................................... 78

SECTION 10.9  Governing Law; Entire Agreement ........................................................ 78

SECTION 10.10  Successors and Assigns ...................................................................... 78

SECTION 10.11  Sale and Transfer of Loans; Participations in Loans; Notes .............. 78

SECTION 10.12  Other Transactions ............................................................................. 81

SECTION 10.13  Forum Selection and Consent to Jurisdiction ................................ 8182

SECTION 10.14  Waiver of Jury Trial ........................................................................... 82

SECTION 10.15  Confidentiality. ................................................................................... 82

SECTION 10.16  Counsel Representation........................................................................ 8384

SECTION 10.17  Patriot Act ........................................................................................... 84

SECTION 10.18  Authorization of Administrative Agent ............................................. 84

17437108

Case 10-74617-SCS    Doc 811    Filed 02/17/11    Entered 02/17/11 20:55:03    Desc Main
Document    Page 108 of 453

| SCHEDULE I | - | Disclosure Schedule |
| SCHEDULE II | - | Percentages and Amounts; LIBOR Office; Domestic Office |
| SCHEDULE III | - | Specified EBITDA |
| | | |
| EXHIBIT A | - | Form of Note |
| EXHIBIT B | - | Form of Continuation/Conversion Notice |
| EXHIBIT C | - | Form of Lender Assignment Agreement |
| EXHIBIT D | - | Form of Compliance Certificate |
| EXHIBIT E-1 | - | Form of Parent Guaranty |
| EXHIBIT E-2 | - | Form of Subsidiary Guaranty |
| EXHIBIT F | - | Form of Pledge and Security Agreement |
| EXHIBIT G | - | Form of Intercreditor Agreement |
| EXHIBIT H | - | Form of Mortgage |

vi

FIRST LIEN CREDIT AGREEMENT

THIS FIRST LIEN CREDIT AGREEMENT, dated as of [●], 2011, is among WORKFLOWONE LLC, a Delaware limited liability company (the "Borrower"), the various financial institutions and other Persons from time to time parties hereto (the "Lenders") and THE BANK OF NEW YORK MELLON as the administrative agent (in such capacity, the "Administrative Agent"), for the Lenders.

W I T N E S S E T H:

WHEREAS, on September 29, 2010, WF Capital Holdings, Inc. and its subsidiaries (collectively, "Bankruptcy Debtors") filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§101-1532, as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia, Norfolk Division (the "Bankruptcy Court"), jointly administered as In re Workflow Management, Inc., et al., Chapter 11 Case No. 10-74617 (SCS) and continued in the possession of their property and in the management of their businesses pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code (the "Bankruptcy Cases");

WHEREAS, on January 21, 2011, the Bankruptcy Debtors filed with the Bankruptcy Court a Third Amended Joint Chapter 11 Plan of Workflow Management, Inc. and its Affiliated Debtors (the "Plan") and a disclosure statement;

WHEREAS, the Plan contemplates, among other things: (i) the transfer of substantially all assets of the Bankruptcy Debtors to Workflow Holdings LLC, a Delaware limited liability company (the "Parent"), or to another entity or entities designated by Parent, pursuant to the Asset Purchase and Sale Agreement, dated as of January 21, 2011, by and among the Bankruptcy Debtors as Sellers and Parent as Buyer, as amended, supplemented, amended and restated or otherwise modified from time to time prior to the Effective Date and, as permitted hereunder, thereafter (the "Asset Purchase Agreement"); (ii) the cancellation of all Indebtedness outstanding under the First Lien Credit Agreement (as defined in the Plan, and referred to herein as the "Pre-Petition First Lien Credit Agreement") in exchange for the issuance of Loans hereunder; and (iii) the cancellation of all Indebtedness outstanding under the Second Lien Credit Agreement (as defined in the Plan, and referred to herein as the "Pre-Petition Second Lien Credit Agreement") in exchange for the issuance of (x) the Second Lien Loans under the Second Lien Credit Agreement and (y) the Newco Preferred Units (as defined in the Plan);

WHEREAS, Parent owns all of the Capital Securities of Borrower and has designated[1] Borrower to purchase substantially all of the assets of the Bankruptcy Debtors pursuant to the Asset Purchase Agreement;

WHEREAS, on [●], 2011, the Bankruptcy Court entered the order confirming the Plan (the "Confirmation Order") pursuant to which, among other things, the Bankruptcy Court approved the transactions contemplated by the Plan;

---

[1] To be designated in bill of sale or by resolution.

WHEREAS, on the date hereof (the "Effective Date"), concurrently with the effectiveness of this Agreement, the Plan shall become effective in accordance with its terms;

WHEREAS, in connection with the transactions contemplated by the Plan and by operation of the Confirmation Order, on the Effective Date, each lender under the Pre-Petition First Lien Credit Agreement shall receive (via an exchange) its Pro Rata Share (as defined in the Plan) of the Loans (the "Exchange of Loans") and shall become a Lender hereunder, subject to all of the rights and obligations of a Lender hereunder without any further action on the part of such Lender; and

WHEREAS, the Parent and each Subsidiary of the Borrower, which is or hereafter becomes a party hereto as a Guarantor, is or will be affiliated, is or will be engaged in interrelated businesses, and is or will derive substantial direct and indirect benefit from extensions of credit to the Borrower.

NOW, THEREFORE, the parties hereto agree as follows.

ARTICLE I
DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.1   Defined Terms.  The following terms (whether or not underscored) when used in this Agreement, including its preamble and recitals, shall, except where the context otherwise requires, have the following meanings (such meanings to be equally applicable to the singular and plural forms thereof):

"Account Debtor" means any Person who is or who may become obligated under, with respect to, or on account of, an account, chattel paper, or a general intangible or intangible, as applicable, in each case, as such term is defined under the UCC.

"Administrative Agent" is defined in the preamble and includes each other Person appointed as the successor Administrative Agent pursuant to Section 9.3.

"Affected Lender" is defined in Section 4.10.

"Affiliate" of any Person means any other Person which, directly or indirectly, controls, is controlled by or is under common control with such Person.  "Control" of a Person means the power, directly or indirectly,

(a)  to vote 10% or more of the Capital Securities (on a fully diluted basis) of such Person having ordinary voting power for the election of directors, managing members or general partners (as applicable); or

(b)  to direct or cause the direction of the management and policies of such Person (whether by contract or otherwise).

"Agreement" means, on any date, this First Lien Credit Agreement as originally in effect on the Effective Date and as thereafter from time to time amended, supplemented, amended and restated or otherwise modified from time to time and in effect on such date.

2

"Alternate Base Rate" means, on any date and with respect to all Base Rate Loans, a fluctuating rate of interest per annum (rounded upward, if necessary, to the next highest 1/16 of 1%) equal to the higher of

 (a)  the Base Rate in effect on such day; and

 (b)  the Federal Funds Rate in effect on such day plus ½ of 1%.

Changes in the rate of interest on that portion of any Loans maintained as Base Rate Loans will take effect simultaneously with each change in the Alternate Base Rate.

"Applicable Margin" means, with respect to (1) all Loans maintained as LIBO Rate Loans, 7.00%, and (2) all Loans maintained as Base Rate Loans, 6.00%.

"Approved Fund" means any Person (other than a natural Person) that (a) is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business, and (b) is administered or managed by a Lender, an Affiliate of a Lender or a Person or an Affiliate of a Person that administers or manages a Lender.

"Assignee Lender" means each future Lender which signs a Lender Assignment Agreement pursuant to Section 10.11.

"Asset Purchase Agreement" is defined in the third recital.

"Authorized Officer" means, relative to any Obligor, those of its officers, general partners or managing members (as applicable) whose signatures and incumbency shall have been certified to the Administrative Agent pursuant to Section 5.1(b).

"Bankruptcy Cases" is defined in the first recital.

"Bankruptcy Code" is defined in the first recital.

"Bankruptcy Court" is defined in the first recital.

"Bankruptcy Debtors" is defined in the first recital.

"Base Rate" means, at any time, an annual rate equal to the greater of (a) 4.00% and (b) the rate of interest then most recently established by the Administrative Agent in New York as its base rate for Dollars loaned in the United States.  The Base Rate is not necessarily intended to be the lowest rate of interest determined by the Administrative Agent in connection with extensions of credit.

"Base Rate Loan" means a Loan bearing interest at a fluctuating rate determined by reference to the Alternate Base Rate.

"Borrower" is defined in the preamble.

"Business Day" means (a) any day which is neither a Saturday nor Sunday nor a legal holiday on which banks are authorized or required to be closed in New York, New York and (b) relative to the making, continuing, prepaying or repaying of any LIBO Rate Loans, any day which is a Business Day described in clause (a) above, and which is also a day on which dealings in Dollars are carried on in the London interbank Eurodollar market.

"Capital Expenditures" means, for any period, (a) the aggregate amount of all expenditures of the Borrower and its Subsidiaries for fixed or capital assets made during such period which, in accordance with GAAP, would have been (or in accordance with GAAP, should be) classified as capital expenditures, including the capitalized portion of any Capitalized Lease Liabilities (determined in accordance with GAAP) incurred by the Borrower and its Subsidiaries during such period, less (b) the aggregate amount of expenditures to replace capital assets with Net Disposition Proceeds or Net Casualty Proceeds pursuant to clause (c) of Section 3.1.1; provided, however that Capital Expenditures shall not include expenditures made in connection with the replacement, substitution or restoration of assets to the extent financed with awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced.

"Capital Securities" means, with respect to any Person, all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of such Person's capital (including all capital stock, partnership, membership or other equity interests in such Person), whether now outstanding or issued after the Effective Date and whether or not certificated.

"Capitalized Lease Liabilities" means, with respect to any Person, all monetary obligations of such Person and its Subsidiaries under any leasing or similar arrangement which have been (or, in accordance with GAAP, should be) classified as capitalized leases, and for purposes of each Loan Document the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP, and the stated maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a premium or a penalty.

"Cash Equivalent Investment" means, at any time:

(a)  any direct obligation of (or unconditionally guaranteed by) the United States or a State thereof (or any agency or political subdivision thereof, to the extent such obligations are supported by the full faith and credit of the United States or a State thereof) maturing not more than one year after such time;

(b)  commercial paper maturing not more than 270 days from the date of issue, which is issued by a corporation (other than an Affiliate of any Obligor) organized under the laws of any State of the United States or of the District of Columbia, and rated A-1 or higher by S&P or P-1 or higher by Moody's;

(c)  any certificate of deposit, time deposit or bankers acceptance, maturing not more than one year after its date of issuance, which is issued by any bank organized under the laws of the United States (or any State thereof), and which has (x) a credit

rating of A2 or higher from Moody's or A or higher from S&P and (y) a combined capital and surplus greater than $500,000,000;

(d) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of <u>clauses (a)</u> through <u>c</u>) of this definition;

(e)  money market funds that (i) purport to comply generally with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by S&P or Aaa by Moody's or carrying an equivalent rating by a national recognized rating agency, and (iii) have portfolio assets of at least $5,000,000,000; or

(f)  any repurchase agreement having a term of 30 days or less entered into with any Lender or any commercial banking institution satisfying the criteria set forth in <u>clause (c)</u> which

(i)  is secured by a fully perfected security interest in any obligation of the type described in <u>clause (a)</u>, and

(ii)  has a market value at the time such repurchase agreement is entered into of not less than 100% of the repurchase obligation of such commercial banking institution thereunder.

"<u>Casualty Event</u>" means the damage, destruction or condemnation, as the case may be, of property of any Person or any of its Subsidiaries.

"<u>CERCLA</u>" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"<u>CERCLIS</u>" means the Comprehensive Environmental Response, Compensation and Liability Information System database.

"<u>Change in Control</u>" means:

(a)  the failure of Parent at any time to directly own beneficially and of record on a fully diluted basis 100% of the outstanding Capital Securities of the Borrower, such Capital Securities to be held free and clear of all Liens (other than Liens granted under a Loan Document or a Second Lien Loan Document); or

(b)  an event by which any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act) other than the Permitted Holders is or becomes the beneficial owner of Capital Securities of the Parent representing more than 50% of the economic power of the total outstanding Capital Securities of the Parent.

"<u>Closing Date</u>" means the Effective Date.

"<u>Code</u>" means the Internal Revenue Code of 1986, and the regulations thereunder, in each case as amended, reformed or otherwise modified from time to time.

"Collections" means all cash, checks, notes, instruments and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds and tax refunds) of the Borrower and its Subsidiaries.

"Communications" is defined in clause (a) of Section 9.9.

"Compliance Certificate" means a certificate duly completed and executed by an Authorized Officer of the Borrower, substantially in the form of Exhibit D hereto, together with such changes thereto as the Administrative Agent may (acting at the written request of the Required Lenders) from time to time request for the purpose of monitoring the Borrower's compliance with the financial covenants contained herein.

"Confirmation Order" is defined in the fifth recital.

"Contingent Liability" means any agreement, undertaking or arrangement by which any Person guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or otherwise to invest in, a debtor, or otherwise to assure a creditor against loss) the Indebtedness (or, solely for purposes of the definition of Investment, other obligations) of any other Person (other than by endorsements of instruments in the course of collection), or guarantees the payment of dividends or other distributions upon the Capital Securities of any other Person.  The amount of any Person's obligation under any Contingent Liability shall (subject to any limitation set forth therein) be deemed to be the outstanding principal amount of the debt, obligation or other liability guaranteed thereby.

"Continuation/Conversion Notice" means a notice of continuation or conversion and certificate duly executed by an Authorized Officer of the Borrower, substantially in the form of Exhibit B hereto.

"Control Agreement" means an agreement in form and substance reasonably satisfactory to the Administrative Agent which provides for the Administrative Agent to have "control" (as defined in Section 8-106 of the UCC, as such term relates to investment property (other than certificated securities or commodity contracts), or as used in Section 9-106 of the UCC, as such term relates to commodity contracts, or as used in Section 9-104(a) of the UCC, as such term relates to deposit accounts).

"Controlled Group" means all members of a controlled group of corporations and all members of a controlled group of trades or businesses (whether or not incorporated) under common control which, together with the Borrower, are treated as a single employer under Section 414(b) or 414(c) of the Code or Section 4001 of ERISA.

"Copyright Security Agreement" means any Copyright Security Agreement executed and delivered by any Obligor in substantially the form of Exhibit C to the Security Agreement, as amended, supplemented, amended and restated or otherwise modified from time to time.

"Debt Issuance" means the issuance of any Indebtedness within the meaning of clauses (a) and (c) of the definition thereof by the Borrower or any of its Subsidiaries.

6

"Default" means any Event of Default or any condition, occurrence or event which, after notice or lapse of time or both, would constitute an Event of Default.

"Deposit Account" means a "deposit account" as that term is defined in Section 9-102(a) of the UCC.

"Disclosure Schedule" means the Disclosure Schedule attached hereto as Schedule I, as it may be amended, supplemented, amended and restated or otherwise modified from time to time by the Borrower with the written consent of the Required Lenders.

"Disposition" (or similar words such as "Dispose") means any sale, transfer, lease, sale-leaseback, contribution or other conveyance (including by way of merger) of, or the granting of options, warrants or other rights to, any of the Borrower's or its Subsidiaries' assets (including accounts receivable and Capital Securities of Subsidiaries) to any other Person (other than to another Obligor) in a single transaction or series of transactions.

"Dollar" and the sign "$" mean lawful money of the United States.

"Domestic Office" means the office of a Lender designated as its "Domestic Office" on Schedule II hereto or in a Lender Assignment Agreement, or such other office within the United States as may be designated from time to time by written notice from such Lender to the Administrative Agent and the Borrower.

"Earnout Payment" means in connection with any Permitted Acquisition, any portion of the purchase price for such acquisition which is (a) deferred to a date after the closing date therefor and (b) is contingent upon the performance of the business being acquired pursuant to such Permitted Acquisition.

"EBITDA" means, for any applicable period, Net Income for such period, plus, to the extent deducted in determining Net Income for such period, the sum, without duplication, of:

    (a) income and state franchise Tax expense;

    (b) interest expense, together with (i) amortization or write-off of debt discount and debt issuance costs and commissions, discounts and other fees and charges associated with Indebtedness (including administrative fees and charges with respect to the Obligations and the Second Lien Loans), and (ii) prepayment penalties, make-whole payments or call premiums payable on prepayment of Indebtedness;

    (c) depreciation and amortization expense;

    (d) any (i) extraordinary expenses or losses (including whether or not otherwise includable in the Parent's statement of Net Income for such period) or (ii) losses on sales or write-offs of assets outside of the ordinary course of business);

7

(e) any unusual non-cash or other non-cash charges, expenses or losses, including any inventory revaluations resulting from the Transactions and any non-cash write-offs required to be made under FASB ASC Topic 350, and any non-cash charges, fees, payments, expenses or losses accrued in connection with the consummation of the Plan (including all fresh start accounting adjustments), in each case incurred during such period;

(f) (x) restructuring and integration costs of the Borrower and its Subsidiaries, including but not limited to severance costs, plant moving costs, central sourcing costs, lease termination costs, and professional advisory fees incurred in connection with the adoption and execution of restructuring integration initiatives and the restructuring and refinancing of the Borrower's debt incurred during such period, and (y) any non-recurring expenses or losses consisting of (a) losses from extinguishment of debt, casualty (including fire, earthquake, hurricane, terrorism or other force majeure events), condemnation and expropriation and (b) other non-recurring losses which are set forth as such in the income statement of the Parent; provided that such costs, expenses or losses referred to in this clause (f) shall only be included to the extent in the aggregate they are equal to or less than $~~20,000,000~~15,000,000 for any four-quarter period;

(g) transaction fees and expenses related to the Transactions paid by any Obligor;

(h) all fees and expenses (including management fees) accrued, or permitted hereunder to be paid and actually paid by any Obligor, for such period pursuant to the LLC Agreement and the Management Agreements, as in effect on the date hereof or as amended, modified or supplemented as permitted hereby;

(i) reasonable transaction fees and expenses incurred by any Obligor in connection with Permitted Acquisitions;

(j) [reserved];

(k) write-offs, reserves or allowances of notes receivable from current and former officers, founders, and direct or indirect shareholders of the Borrower and its Subsidiaries, in a principal amount not to exceed $3,000,000 (plus accrued and unpaid interest) in the aggregate over the term of this Agreement;

(l) costs and expenses of outside professionals engaged by the Borrower and its Subsidiaries at the request of the Lenders or Second Lien Lenders, and outside professionals engaged by the Lenders and Second Lien Lenders at the expense of the Borrower and its Subsidiaries;

(m) expenses related to the issuance of equity-based compensation;

(n) reasonable fees (including reasonable legal fees and other similar advisory and consulting fees, administrative fees and working fees), charges, payments and

expenses accrued or paid by any Obligor in connection with the consummation of the Plan;

(o) reasonable fees paid to the Administrative Agent pursuant to the Fee Letter; and

(p) any letter of credit fees, to the extent paid by any Obligor in cash;

minus, to the extent included in Net Income for such period, the sum, without duplication, of:

(i)  interest income (except to the extent deducted in determining interest expense);

(ii)  any extraordinary or non-recurring income or gains (including whether or not otherwise includable in the Parent's statement of Net Income for such period, gains on the sales of assets outside the ordinary course of business); and

(iii)  any unusual non-cash or other non-cash income;

provided that, for purposes of Section 7.2.4, and notwithstanding any provision of Section 1.4(b) to the contrary, calculations of EBITDA for any period shall be adjusted to exclude items otherwise properly included to the extent such items relate to assets Disposed in such period, on a *pro forma* basis as if such asset was Disposed on the first day of such period; and

provided further that, notwithstanding the foregoing provisions of this definition of EBITDA, (i) the quarterly EBITDA of the Borrower and its Subsidiaries for each Fiscal Quarter ending on September 30, 2010 and December 31, 2010 and (ii) the EBITDA of the Borrower and its Subsidiaries for the period commencing on January 1, 2011 until the Closing Date, and with respect to clauses (i) and (ii), together with all itemized additions and deductions thereto, shall be as set forth in Schedule III hereto.

"Effective Date" is defined in the sixth recital.

"Eligible Assignee" means any Person (other than an Ineligible Assignee).

"Emigsville Property" means the real property owned by the Borrower, located in York County, Pennsylvania and commonly known as 325 Busser Road, Emigsville, Pennsylvania.

"Employee Benefit Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA that is maintained for employees of the Borrower or any member of the Borrower's Controlled Group.

"Environmental Laws" means all applicable foreign, federal, state, provincial or local statutes, laws, ordinances, codes, rules and regulations (including consent decrees and administrative orders) relating to public health and safety and protection of the environment.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto of similar import, together with the regulations thereunder, in each case as in effect from time to time.  References to sections of ERISA also refer to any successor sections thereto.

"Event of Default" is defined in Section 8.1.

"Excess Cash Flow" means, for any Fiscal Year, the result of the following calculation:

(a)  EBITDA for such period;

plus

(b)  the absolute value of any net decrease in Working Capital for such period;

less

(c)  the sum (without duplication) for such period of the following:

(i)  the aggregate amount of (A) all regularly scheduled or mandatorily repayable principal payments of Indebtedness (including the Loans) made during such Fiscal Year, (B) all optional prepayments of Indebtedness permitted hereby (other than the Loans) during such Fiscal Year (including any call premiums paid in cash upon repayment of such Indebtedness) and (C) the portion of any regularly scheduled payments with respect to Capital Lease Liabilities allocable to principal;

(ii)  cash payments made with respect to Capital Expenditures (to the extent permitted hereunder and not funded with debt or equity issuances);

(iii)  all federal, state, local and foreign income, franchise or other similar taxes to the extent paid by the Parent and its Subsidiaries in cash (including any future payments of past-priority taxes assumed from the Bankruptcy Debtors for any past, present or current periods) and, to the extent not duplicative thereof, Restricted Payments made for the purposes described in clause (b)(iii) of Section 7.2.6;

(iv)  interest expense to the extent paid in cash during such Fiscal Year;

(v)  to the extent actually paid in cash during such Fiscal Year, Earnout Payments (to the extent not funded with debt or equity issuances);

(vi)  the absolute value of any net increase in Working Capital for such period;

(vii)  cash payments to the extent (A) actually paid in cash during such period and (B) added back to EBITDA for such period under clauses (d), (f), (g), (h), (i), (l), (n), (o) and (p) of the definition of EBITDA; and

10

(viii)  cash payments made with respect to Permitted Acquisitions and Investments permitted under Section 7.2.5 (except to the extent funded with debt or equity issuances); and

(ix) cash payments made pursuant to the Transactions.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Exchange of Loans" is defined in the seventh recital.

"Exemption Certificate" is defined in clause (e) of Section 4.6.

"FATCA" means Sections 1471 through 1474 of the Code.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal for each day during such period to

(a)  the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published for such day (or, if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York; or

(b)  if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"Fee Letter" means the confidential letter, dated February 2, 2011, between the Administrative Agent and the Borrower.

"Filing Agent" is defined in Section 5.7.

"Filing Statements" is defined in Section 5.7.

"Fiscal Quarter" means a quarter ending on the last day of March, June, September or December.

"Fiscal Year" means any period of twelve consecutive calendar months ending on December 31; references to a Fiscal Year with a number corresponding to any calendar year (e.g., the "2011 Fiscal Year") refer to the Fiscal Year ending on December 31 of such calendar year.

"Foreign Pledge Agreement" means any supplemental pledge agreement governed by the laws of a jurisdiction other than the United States or a State thereof executed and delivered by the Borrower or any of its Subsidiaries pursuant to the terms of this Agreement, in form and substance reasonably satisfactory to the Administrative Agent, as may be necessary or desirable under the laws of organization or incorporation of a Subsidiary to further protect or perfect the Lien on and security interest in any Collateral (as defined in the Security Agreement).

"Foreign Subsidiary" means any Subsidiary that is not incorporated or organized under the laws of the United States, a state thereof or the District of Columbia and any Subsidiary of such a Foreign Subsidiary.

"F.R.S. Board" means the Board of Governors of the Federal Reserve System or any successor thereto.

"GAAP" is defined in Section 1.4.

"Goshen Property" means the real property owned by the Borrower, located in Elkhart County, Indiana and commonly known as 1302 Eisenhower Drive North, Goshen, Indiana.

"Governmental Authority" means the government of the United States, any other nation, or any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other Person exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Granting Lender" is defined in clause (g) of Section 10.11.

"Guarantor" means, collectively, the Parent, each Subsidiary Guarantor and each other Person party to a Guaranty.

"Guaranty" means, as applicable, the Parent Guaranty, any Subsidiary Guaranty and any other document delivered by a U.S. Subsidiary of the Borrower whereby such U.S. Subsidiary becomes liable for the Obligations.

"Hazardous Material" means

   (a)  any "hazardous substance", as defined by CERCLA;

   (b)  any "hazardous waste", as defined by the RCRA; or

   (c)  any pollutant or contaminant or hazardous, dangerous or toxic chemical, material or substance (including any petroleum product) within the meaning of any other applicable Environmental Law relating to or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material, all as amended.

"Hedging Obligations" means, with respect to any Person, all liabilities of such Person under currency exchange agreements, interest rate swap agreements, interest rate cap agreements and interest rate collar agreements, and all other agreements or arrangements designed to protect such Person against fluctuations in interest rates or currency exchange rates.

"herein", "hereof", "hereto", "hereunder" and similar terms contained in any Loan Document refer to such Loan Document as a whole and not to any particular Section, paragraph or provision of such Loan Document.

12

"Hypothetical Tax Rate" means, for any taxable year, the greater of the highest marginal rate of combined federal, state and local income tax (including any Medicare contribution taxes imposed on net investment income) payable by (i) an individual resident in New York City and (ii) a corporation resident in New York City whose sole assets are the membership interests of the Parent that are held by such corporation, in each case taking into account the particular character of the income involved (e.g., capital gain or ordinary income) and taking into account the deductibility of state and local income taxes in computing federal income tax liability.

"including" and "include" means including without limiting the generality of any description preceding such term, and, for purposes of each Loan Document, the parties hereto agree that the rule of ejusdem generis shall not be applicable to limit a general statement, which is followed by or referable to an enumeration of specific matters, to matters similar to the matters specifically mentioned.

"Indebtedness" of any Person means:

(a)  all obligations of such Person for borrowed money or advances and all obligations of such Person evidenced by bonds, debentures, notes or similar instruments or upon which interest payments are customarily made;

(b)  all obligations, contingent or otherwise, relative to the face amount of all letters of credit, whether or not drawn, banker's acceptances, performance, surety or appeal bonds (or similar obligations) issued for the account of such Person;

(c)  all Capitalized Lease Liabilities of such Person;

(d)  all reimbursement, payment or other obligations or liabilities of such Person created or arising under any conditional sale or title retention agreement with respect to property used or acquired by such Person;

(e)  for purposes of Section 8.1.4 only, all other items which, in accordance with GAAP, would be included as liabilities on the balance sheet of such Person as of the date at which Indebtedness is to be determined;

(f)  net Hedging Obligations of such Person;

(g)  whether or not so included as liabilities in accordance with GAAP, all obligations of such Person to pay the deferred purchase price of property or services (including all reimbursement, payment or other obligations or liabilities of such Person created or arising under any conditional sale or title retention agreement with respect to property used or acquired by such Person) (excluding trade accounts payable in the ordinary course of business and not outstanding for more than 120 days after such payable was due unless, if such payable is outstanding more than 120 days after such payable was due, they are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted) of the date of purchase of such goods and services (including all reimbursement, payment or other obligations or liabilities of such Person created or arising under any conditional sale or title retention agreement with respect to property used or acquired by such Person), and indebtedness secured by (or for

which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien on property owned or being acquired by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

      (h)  obligations arising under Synthetic Leases;

      (i)  all Contingent Liabilities of such Person; and

      (j)  all obligations referred to in clauses (a) through (i) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person.

The Indebtedness of any Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such Person, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Liabilities" is defined in Section 10.4.

"Indemnified Parties" is defined in Section 10.4.

"Ineligible Assignee" means a natural Person, the Parent, any Subsidiary of Parent and Perseus.

"Intercreditor Agreement" means the Intercreditor Agreement, dated the date hereof and substantially in the form of Exhibit G hereto, executed and delivered by the Administrative Agent, the administrative agent under the Second Lien Credit Agreement and the Obligors pursuant to the terms of this Agreement, as amended, supplemented, amended and restated, replaced or otherwise modified from time to time.

"Interest Coverage Ratio" means, as of the last day of any Fiscal Quarter, the ratio computed for the period consisting of such Fiscal Quarter and each of the three immediately preceding Fiscal Quarters of:

      (a)  EBITDA (for all such Fiscal Quarters)

      to

      (b)  the sum (for all such Fiscal Quarters) of Interest Expense;

provided that for purposes of calculating the Interest Coverage Ratio for each of the following Fiscal Quarters of the 2011 Fiscal Year, Interest Expense shall be calculated as follows: (i) with respect to the third Fiscal Quarter of such Fiscal Year, the amount of Interest Expense for such Fiscal Quarter and the immediately preceding Fiscal Quarter multiplied by two; and (ii) with respect to the fourth Fiscal Quarter of such Fiscal Year, the amount of Interest

Expense for such Fiscal Quarter and the two immediately preceding Fiscal Quarters multiplied by one and one-third.

"Interest Expense" means, for any applicable period, (a) the aggregate cash interest expense of the Parent and its Subsidiaries for such applicable period, including the portion of any payments made in respect of Capitalized Lease Liabilities allocable to interest expense but excluding (to the extent otherwise included in the definition of Interest Expense) (i) amortization of deferred financing costs, (ii) make-whole payments or call premiums paid or payable in cash upon repayment of Indebtedness and (iii) any interest capitalized or paid in kind; less (b) the aggregate interest income received by Parent and its Subsidiaries for such applicable period.

"Interest Period" means, relative to any LIBO Rate Loan, the period beginning on (and including) the date on which such LIBO Rate Loan is made or continued as, or converted into, a LIBO Rate Loan pursuant to Sections 2.2 or 2.3 and shall end on (but exclude) the day which numerically corresponds to such date one, two, three or six months thereafter (or, if such month has no numerically corresponding day, on the last Business Day of such month), in either case as the Borrower may select in its relevant notice pursuant to Sections 2.2 or 2.3; provided, that,

(a)  the Borrower shall not be permitted to select Interest Periods to be in effect at any one time which have expiration dates occurring on more than ten different dates;

(b)  if such Interest Period would otherwise end on a day which is not a Business Day, such Interest Period shall end on the next following Business Day (unless such next following Business Day is the first Business Day of a calendar month, in which case such Interest Period shall end on the Business Day next preceding such numerically corresponding day); and

(c)  no Interest Period for any Loan may end later than the Stated Maturity Date for such Loan.

"Investment" means, relative to any Person,

(a)  any loan, advance or extension of credit made by such Person to any other Person, including the purchase by such Person of any bonds, notes, debentures or other debt securities of any other Person;

(b)  Contingent Liabilities in favor of any other Person; and

(c)  any Capital Securities held by such Person in any other Person.

The amount of any Investment shall be the original principal or capital amount thereof less all returns of principal or capital thereon and shall, if made by the transfer or exchange of property other than cash, be deemed to have been made in an original principal or capital amount equal to the fair market value of such property at the time of such Investment.

"Lender Assignment Agreement" means an assignment agreement substantially in the form of Exhibit C hereto.

"Lenders" is defined in the preamble.

"Lender's Environmental Liability" means any and all losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, costs, judgments, suits, proceedings, damages, (including consequential damages), disbursements or expenses of any kind or nature whatsoever (including reasonable attorneys' fees and expenses at trial and appellate levels and experts' fees and disbursements and expenses incurred in investigating, defending against or prosecuting any litigation, claim or proceeding) which may at any time be imposed upon, incurred by or asserted or awarded against the Administrative Agent or any Lender or any of such Person's Affiliates, shareholders, directors, officers, employees, and agents in connection with or arising from:

> (a)  any Hazardous Material on, in, under or migrating from all or any portion of any property of the Borrower or any of its Subsidiaries or the groundwater thereunder to the extent caused by Releases from the Borrower's or any of its Subsidiaries' or any of their respective predecessors' properties;

> (b)  any misrepresentation, inaccuracy or breach of any warranty, contained or referred to in Section 6.11;

> (c)  any violation or claim of violation by the Borrower or any of its Subsidiaries of any Environmental Laws; or

> (d)  the imposition of any Lien for damages caused by, or the recovery of any costs with respect to, the cleanup, Release of Hazardous Material by the Borrower or any of its Subsidiaries, or in connection with any property owned by the Borrower or any of its Subsidiaries.

"LIBO Rate" means, relative to any Interest Period for LIBO Rate Loans, an annual rate equal to the greater of (i) 3.00% and (ii) the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the beginning of the relevant Interest Period by reference to the British Bankers' Association Interest Settlement Rates for deposits in Dollars (as set forth by the Bloomberg Information Service or any successor thereto or any other service selected by the Administrative Agent which has been nominated by the British Bankers' Association as an authorized information vendor for the purpose of displaying such rates) for a period equal to such Interest Period; provided that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this clause (ii), the interest rate determined in accordance with this clause (ii) shall be the interest rate per annum determined by the Administrative Agent to be the average of the rates per annum at which deposits in Dollars are offered for such relevant Interest Period to major banks in the London interbank market in London, England by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the beginning of such Interest Period.

"LIBO Rate Loan" means a Loan bearing interest, at all times during an Interest Period applicable to such Loan, at a rate of interest determined by reference to the LIBO Rate (Reserve Adjusted).

"LIBO Rate (Reserve Adjusted)" means, relative to any Loan to be made, continued or maintained as, or converted into, a LIBO Rate Loan for any Interest Period, a rate per annum determined pursuant to the following formula:

$$\text{LIBO Rate (Reserve Adjusted)} = \frac{\text{LIBO Rate}}{1.00 - \text{LIBOR Reserve Percentage}}$$

The LIBO Rate (Reserve Adjusted) for any Interest Period for LIBO Rate Loans will be determined by the Administrative Agent on the basis of the LIBOR Reserve Percentage in effect two Business Days before the first day of such Interest Period.

"LIBOR Office" means the office of a Lender designated as its "LIBOR Office" on Schedule II hereto or in a Lender Assignment Agreement, or such other office designated from time to time by written notice from such Lender to the Borrower and the Administrative Agent, whether or not outside the United States, which shall be making or maintaining the LIBO Rate Loans of such Lender.

"LIBOR Reserve Percentage" means, relative to any Interest Period for LIBO Rate Loans, the reserve percentage (expressed as a decimal) equal to the maximum aggregate reserve requirements (including all basic, emergency, supplemental, marginal and other reserves and taking into account any transitional adjustments or other scheduled changes in reserve requirements) specified under regulations issued from time to time by the F.R.S. Board and then applicable to assets or liabilities consisting of or including "Eurocurrency Liabilities", as currently defined in Regulation D of the F.R.S. Board, having a term approximately equal or comparable to such Interest Period.

"Lien" means any security interest, mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), charge against or security interest in property, or other priority or preferential arrangement of any kind or nature whatsoever, including any conditional sale or title retention arrangement, any Capitalized Lease Liability and any assignment, deposit arrangement or financing lease intended as security.

"Livermore Property" means the real property owned by the Borrower, located in Alameda County, California and commonly known as 5775 Brisa Street, Livermore, California.

"LLC Agreement" means the Amended and Restated Limited Liability Company Agreement, dated [●], 2011, among the Parent and the other parties thereto, as amended, supplemented, amended and restated or otherwise modified from time to time.

"Loan Documents" means, collectively, this Agreement, the Notes, any Rate Protection Agreement, the Fee Letter, each agreement pursuant to which the Administrative Agent is granted a Lien to secure all or any part of the Obligations, each Guaranty, the Intercreditor Agreement and each other agreement, certificate, document or instrument delivered in connection with any Loan Document, whether or not specifically mentioned herein or therein.

"Loans" is defined in Section 2.1.

"<u>Management Agreements</u>" means the Management Agreements, dated as of the Effective Date, among Silver Point Capital, L.P. and Perseus and the Borrower, as amended, supplemented, amended and restated or otherwise modified from time to time as permitted hereunder.

"<u>Material Adverse Effect</u>" means a material adverse effect on (a) the business, condition (financial or otherwise), operations, performance or properties of the Parent and its Subsidiaries taken as a whole, (b) the rights and remedies of any Secured Party under any Loan Document, (c) the ability of any Obligor to perform its Obligations under any Loan Document, (d) the legality, validity or enforceability of this Agreement or any other Loan Document or (e) the validity, perfection or priority of Liens with respect to any material portion of the collateral in favor of the Administrative Agent for the benefit of the Secured Parties (other than any material adverse effect that has occurred as a result of the Bankruptcy Cases and related proceedings).

"<u>Moody's</u>" means Moody's Investors Service, Inc.

"<u>Mortgage</u>" means each mortgage, deed of hypothec, debenture, pledge, deed of trust or agreement executed and delivered by any Obligor in favor of the Administrative Agent for the benefit of the Secured Parties pursuant to the requirements of this Agreement substantially in the form set forth in <u>Exhibit H</u> hereto (with such changes as are reasonably satisfactory to the Administrative Agent), under which a Lien is granted on the real property and fixtures described therein, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"<u>Net Casualty Proceeds</u>" means, with respect to any Casualty Event, the amount of any insurance proceeds or condemnation awards received by the Parent, the Borrower or any of its Subsidiaries in connection with such Casualty Event (net of all reasonable and customary collection expenses thereof), but excluding any proceeds or awards required to be paid to a creditor (other than the Lenders) which holds a first priority Lien permitted pursuant to this Agreement on the property which is the subject of such Casualty Event <u>minus</u> the sum of (i) all taxes actually paid or estimated by the Borrower to be payable in cash within the 12 months following the date of such Casualty Event and (ii) to the extent not excluded above, payments made by the Borrower or its Subsidiaries to retire Indebtedness (other than the Loans) where payment of such Indebtedness is required in connection with such Casualty Event; <u>provided</u> that, if the amount of any estimated taxes pursuant to <u>clause (i)</u> exceeds the amount of taxes actually required to be paid in cash in respect of such Casualty Event, the aggregate amount of such excess shall constitute Net Casualty Proceeds.

"<u>Net Debt Proceeds</u>" means the cash proceeds received by the Borrower or its Subsidiaries from any Debt Issuance by the Borrower or any Subsidiary not otherwise permitted pursuant to the terms of <u>Section 7.2.2</u> (net of underwriting discounts and commissions and other reasonable fees, expenses and costs associated therewith including, without limitation, those of attorneys, accountants and other professionals).

"<u>Net Disposition Proceeds</u>" means the gross cash proceeds received by the Borrower or its Subsidiaries from any Disposition other than those pursuant to clauses <u>(a)</u>, <u>(b)</u> (but not to the extent <u>clause (b)</u> references <u>Section 7.2.14</u><u>(a)</u>), <u>(c)</u>, <u>(d)</u> and <u>(e)</u> of <u>Section 7.2.10</u> and any cash

18

payment received in respect of promissory notes or other non-cash consideration delivered to the Borrower or its Subsidiaries in respect thereof, minus the sum of (i) all reasonable and customary legal, investment banking, brokerage, accounting and other similar professional fees and expenses incurred in connection with such Disposition, (ii) all taxes actually paid or estimated by the Borrower to be payable in cash within the 12 months following the date of such Disposition, and (iii) payments made by the Borrower or its Subsidiaries to retire Indebtedness (other than the Loans) secured by a Lien permitted pursuant to Section 7.2.3 (and such Lien is senior to the Liens created under the Loan Documents) where payment of such Indebtedness is required in connection with such Disposition; provided that, if the amount of any estimated taxes pursuant to clause (ii) exceeds the amount of taxes actually required to be paid in cash in respect of such Disposition, the aggregate amount of such excess shall constitute Net Disposition Proceeds.

"Net Income" means, for any period, the aggregate of all amounts which would be included as net income (or loss) on the consolidated financial statements of the Parent and its Subsidiaries for such period.

"Non-Excluded Taxes" means any Taxes imposed, deducted or withheld with respect to any Secured Party on payments under this Agreement or any Loan Document other than (i) net income and franchise Taxes imposed by any Governmental Authority under the laws of which such Secured Party is organized or in which it maintains its principal office or its applicable lending office, (ii) any U.S. federal withholding tax imposed under FATCA, (iii) Taxes imposed as a result of a present or former connection between such Secured Party and the jurisdiction imposing such Taxes, but excluding any such connection arising from such Secured Party's exercise of its rights or performance of its obligations pursuant to or in respect of this Agreement or any Loan Document, (iv) any branch profits tax imposed by the United States or any comparable tax imposed by any foreign jurisdiction and (v) any Other Taxes.

"Non-U.S. Lender" means any Lender that is not a "United States person", as defined under Section 7701(a)(30) of the Code.

"Note" means a promissory note of the Borrower payable to any Lender, in the form of Exhibit A hereto (as such promissory note may be amended, endorsed or otherwise modified from time to time), evidencing the aggregate Indebtedness of the Borrower to such Lender resulting from outstanding Loans, and also means all other promissory notes accepted from time to time in substitution therefor or renewal thereof.

"Obligations" means all obligations (monetary or otherwise, whether absolute or contingent, matured or unmatured) of the Borrower and each other Obligor to the Secured Parties arising under or in connection with a Loan Document, including, but not limited to, the principal of and premium, if any, and interest (including interest accruing (or which would have accrued) during the pendency of any proceeding of the type described in Section 8.1.7, whether or not allowed in such proceeding) on the Loans as well as all Fees and expenses (including attorneys' fees and expenses) and indemnity payable to the Secured Parties hereunder.

"Obligor" means, as the context may require, the Borrower and each other Person (other than a Secured Party) obligated under any Loan Document.

"<u>Organic Document</u>" means, relative to any Obligor, as applicable, its certificate or articles of incorporation, articles and memorandum of association, by-laws, certificate of partnership, partnership agreement, certificate of formation, limited liability agreement, operating agreement and all shareholder agreements, voting trusts and similar arrangements applicable to any of such Obligor's Capital Securities.

"<u>Other Taxes</u>" means any and all present or future stamp, documentary or similar Taxes, or any other excise or property Taxes or similar levies that arise on account of any payment made or required to be made under any Loan Document or from the execution, delivery, registration, recording or enforcement of, or otherwise with respect to, any Loan Document, but excluding, for the avoidance of doubt, any Taxes arising in connection with any transfer, assignment or participation of any rights or obligations under this Agreement, or any change in lending office by any Lender, except if such transfer, assignment, participation or change in lending office is done at the request of Borrower.

"<u>Parent</u>" is defined in the <u>third recital</u>.

"<u>Parent Guaranty</u>" means the guaranty, dated as of the date hereof, executed and delivered by an Authorized Officer of the Parent pursuant to the terms of this Agreement, substantially in the form of <u>Exhibit E-1</u> hereto, as amended, supplemented, amended and restated or otherwise modified from time to time.

"<u>Participant</u>" is defined in <u>clause (d)</u> of <u>Section 10.11</u>.

"<u>Patent Security Agreement</u>" means any Patent Security Agreement executed and delivered by any Obligor in substantially the form of Exhibit A to the Security Agreement, as amended, supplemented, amended and restated or otherwise modified.

"<u>Patriot Act</u>" means the USA PATRIOT ACT (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as amended and supplemented from time to time.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation and any Person succeeding to any or all of its functions under ERISA.

"<u>PBGC Settlement</u>" means the settlement agreement, if any, with PBGC.

"<u>Pension Plan</u>" means a "pension plan", as such term is defined in Section 3(2) of ERISA, which is subject to Title IV of ERISA, and to which the Borrower or any corporation, trade or business that is, along with the Borrower, a member of a Controlled Group, may have liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

"<u>Percentage</u>" means, relative to any Lender, the percentage set forth opposite its name on <u>Schedule II</u> hereto or set forth in a Lender Assignment Agreement, as such percentage may be adjusted from time to time (x) in accordance with <u>Section 4.8</u> or (y) pursuant to Lender Assignment Agreements executed by such Lender and its Assignee Lender and delivered pursuant to <u>Section 10.11</u>.

"Permitted Acquisition" means an acquisition (whether pursuant to an acquisition of Capital Securities, assets or otherwise) by the Borrower or any Subsidiary from any Person in which the following conditions are satisfied:

(a)  the Borrower shall have submitted to the Administrative Agent at least 15 20 days prior to the consummation of such acquisition, a business description of the business or assets being acquired, the financial statements of the business or assets being acquired and a summary of the terms of the acquisition, all in reasonable detail;

(b)  the assets, Capital Securities or business being acquired, will be located, incorporated and/or doing business in the United States;

(c)  Borrower shall have delivered a certificate certifying that before and after giving effect to such acquisition, the representations and warranties set forth in each Loan Document shall, in each case, be true and correct in all material respects with the same effect as if then made (unless stated to relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date) and no Default has occurred and is continuing; and

(d)  the Borrower shall have delivered to the Administrative Agent a Compliance Certificate for the period of four full Fiscal Quarters immediately preceding such acquisition (prepared in good faith and in a manner and using such methodology which is consistent with the most recent financial statements delivered pursuant to Section 7.1.1) giving pro forma effect to the consummation of such acquisition as if such Permitted Acquisition had occurred on the first day of the period of four Fiscal Quarters ending on the last day of the most recently ended Fiscal Quarter ending at least 45 days prior to the date of such Permitted Acquisition.

"Permitted Holders" means (i) Perseus, (ii) any Person that holds the Capital Securities of the Parent as of the Closing Date and (iii) the respective affiliates of the Persons referred to in the foregoing clauses (i) and (ii).

"Perseus" means Perseus, L.L.C. and its Affiliates.

"Person" means any natural person, corporation, limited liability company, partnership, joint venture, association, trust or unincorporated organization, Governmental Authority or any other legal entity, whether acting in an individual, fiduciary or other capacity.

"Plan" is defined in the second recital.

"Platform" is defined in clause (b) of Section 9.9.

"Purchase Card Agreements" means any arrangement by any Obligor to provide company-paid credit cards to employees that permit such employees to make purchases on behalf of such Obligor of supplies or services used in the ordinary course of business by such Obligor, including in respect of ordinary course, business related travel and entertainment expenses.

21

"Quarterly Payment Date" means the last Business Day of March, June, September and December.

"Rate Protection Agreement" means, collectively, any interest rate swap, cap, collar or similar agreement entered into by the Borrower or any of its Subsidiaries under which the counterparty of such agreement is (or at the time such agreement was entered into, was) a Lender or an Affiliate of a Lender.

"RCRA" means the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., as amended.

"Register" is defined in clause (a) of Section 2.5.

"Release" means a "release", as such term is defined in CERCLA or any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material in the indoor or outdoor environment, including the movement of Hazardous Material through or in the air, soil, surface water, ground water or property.

"Replacement Lender" is defined in Section 4.10.

"Replacement Notice" is defined in Section 4.10.

"Required Lenders" means, at any time, Lenders holding more than 50% of the aggregate principal amount of the then outstanding Loans.

"Restricted Payment" means (i) the declaration or payment of any dividend (other than dividends payable solely in Capital Securities (that are not mandatorily redeemable prior to one year and one day after the Stated Maturity Date) of the Borrower or any Subsidiary) on, or the making of any payment or distribution on account of, or setting apart assets for a sinking or other analogous fund for the purchase, redemption, defeasance, retirement or other acquisition of, any class of Capital Securities of the Borrower or any Subsidiary or any warrants, options or other right or obligation to purchase or acquire any such Capital Securities, whether now or hereafter outstanding, or (ii) the making of any other distribution in respect of such Capital Securities, in each case either directly or indirectly, whether in cash, property or obligations of the Borrower or any Subsidiary or otherwise.

"S&P" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc.

"SEC" means the Securities and Exchange Commission.

"Second Lien Credit Agreement" means the Second Lien Credit Agreement, dated as of the date hereof, among the Borrower, the various financial institutions and other Persons from time to time party thereto as lenders, Silver Point, as the administrative agent and the other Persons party thereto as agents, as amended, supplemented, amended and restated, refinanced or otherwise modified from time to time in accordance with Section 7.2.11.

"Second Lien Lender" means each "Lender" as defined in the Second Lien Credit Agreement (or such corresponding term in the event the Second Lien Credit Agreement is refinanced in accordance with the terms hereof).

"Second Lien Loan Documents" means the "Loan Documents" as defined in the Second Lien Credit Agreement (or such corresponding term in the event the Second Lien Credit Agreement is refinanced in accordance with the terms hereof).

"Second Lien Loans" means the "Loans" as defined in the Second Lien Credit Agreement (or such corresponding term in the event the Second Lien Credit Agreement is refinanced in accordance with the terms hereof).

"Secured Parties" means, collectively, the Lenders, the Administrative Agent, each counterparty to a Rate Protection Agreement that is (or at the time such Rate Protection Agreement was entered into, was) a Lender or an Affiliate thereof and (in each case) each of their respective successors, transferees and assigns.

"Security Agreement" means the Pledge and Security Agreement executed and delivered by an Authorized Officer of the Parent and its Subsidiaries, substantially in the form of Exhibit F hereto, together with any supplemental Foreign Pledge Agreement delivered pursuant to the terms of this Agreement, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"Silver Point" means Silver Point Finance LLC.

"SPC" is defined in clause (g) of Section 10.11.

"Special Required Lenders" means, at any time, Lenders holding more than 50% of the aggregate principal amount of then outstanding Loans, which includes at least one Lender that is not managed or controlled by, and is not an Affiliate of, Silver Point Capital, L.P. and which holds more than 3% of the aggregate principal amount of then outstanding Loans.

"Stated Maturity Date" means [●], 2015.

"Subsidiary" means, with respect to any Person, any other Person of which more than 50% of the outstanding Voting Securities of such other Person (irrespective of whether at the time Capital Securities of any other class or classes of such other Person shall or might have voting power upon the occurrence of any contingency) is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more other Subsidiaries of such Person, or by one or more other Subsidiaries of such Person.  Unless the context otherwise specifically requires, the term "Subsidiary" shall be a reference to a Subsidiary of the Borrower.

"Subsidiary Guarantor" means each U.S. Subsidiary of the Borrower that has executed and delivered to the Administrative Agent the Subsidiary Guaranty (including by means of a delivery of a supplement thereto).

"Subsidiary Guaranty" means the subsidiary guaranty executed and delivered by an Authorized Officer of each U.S. Subsidiary pursuant to the terms of this Agreement,

substantially in the form of <u>Exhibit E-2</u> hereto, as amended, supplemented, amended and restated or otherwise modified from time to time.

"<u>Synthetic Lease</u>" means, as applied to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is not a capital lease in accordance with GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for federal income tax purposes, other than any such lease under which that Person is the lessor.

"<u>Taxes</u>" means all taxes, duties, levies, imposts, charges, assessments, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, and all interest, penalties or similar liabilities with respect thereto.

"<u>Termination Date</u>" means the date on which all Obligations have been paid in full in cash.

"<u>Terrorism Laws</u>" means any of the following (a) Executive Order 13224 issued by the President of the United States, (b) the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations), (c) the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations), (d) the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations), (e) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of  2001 (as it may be subsequently codified), (f) all other present and future legal requirements of any Governmental Authority addressing, relating to, or attempting to eliminate, terrorist acts and acts of war and (g) any regulations promulgated pursuant thereto or pursuant to any legal requirements of any Governmental Authority governing terrorist acts or acts of war.

"<u>Total Debt</u>" means, on any date of determination, the outstanding principal amount of all Indebtedness of the Parent and its Subsidiaries of the type referred to in <u>clause (a)</u> (which, in the case of the Loans, shall be deemed to equal the aggregate outstanding principal amount of the Loans outstanding on the last day of the Fiscal Quarter ending on or immediately preceding the date of determination), <u>clause (c)</u> and <u>clause (g)</u>, in each case of the definition of "Indebtedness" (exclusive of (x) intercompany Indebtedness between the Parent and its Subsidiaries and (y) any Preferred Units (as defined in the LLC Agreement)) and any Contingent Liability in respect of any of the foregoing.

"<u>Total Leverage Ratio</u>" means, as of the last day of any Fiscal Quarter, the ratio of

(a)  Total Debt outstanding on the last day of such Fiscal Quarter,

<u>to</u>

(b)  EBITDA computed for the period consisting of such Fiscal Quarter and each of the three immediately preceding Fiscal Quarters.

"Trademark Security Agreement" means any Trademark Security Agreement executed and delivered by any Obligor substantially in the form of Exhibit B to the Security Agreement, as amended, supplemented, amended and restated or otherwise modified from time to time.

"Transactions" means, collectively, (a) the consummation of the Plan and the other transactions contemplated by the Plan to be consummated on the Closing Date (including, without limitation, transactions contemplated by the Asset Purchase Agreement), (b) the entering into by the Obligors of the Loan Documents and the Second Lien Loan Documents to which they are intended to be a party, and the Exchange of Loans on the Closing Date, (c) the issuance of the Class A Common Units, Class B Common Units and the Preferred Units (each as defined in, and pursuant to, the LLC Agreement), (d) the satisfaction of all Indebtedness required to be paid pursuant to the Plan, (e) the payment of the fees and expenses incurred in connection with the consummation of the foregoing that are required to be paid on the Closing Date and (f) any payments made pursuant to the PBGC Settlement.

"Transaction Documents" means, collectively, the Loan Documents, Second Lien Loan Documents, the Plan, the Asset Purchase Agreement, the LLC Agreement, the Management Agreements, and each other document delivered in connection therewith, whether or not specifically mentioned herein or therein, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"type" means, relative to any Loan, the portion thereof, if any, being maintained as a Base Rate Loan or a LIBO Rate Loan.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that, if, with respect to any Filing Statement or by reason of any provisions of law, the perfection or the effect of perfection or non-perfection of the security interests granted to the Administrative Agent pursuant to the applicable Loan Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, then "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of each Loan Document and any Filing Statement relating to such perfection or effect of perfection or non-perfection.

"United States" or "U.S." means the United States of America, its fifty states and the District of Columbia.

"Unrestricted" means, when referring to cash and Cash Equivalent Investments of the Borrower and its Subsidiaries, that such cash and Cash Equivalent Investments (i) do not appear (and are not required to appear) as "restricted" on a balance sheet of the Borrower and its Subsidiaries (unless the restrictions causing such appearance or required appearance are solely pursuant to the Loan Documents); (ii) are not subject to any Lien of any Person other than Liens permitted under clauses (a), (e), (g), (i), (j), (m), and (p) of Section 7.2.3; and (iii) are otherwise generally available for use by the Borrower and its Subsidiaries.

"U.S. Subsidiary" means any Subsidiary that is incorporated or organized under the laws of the United States, a state thereof or the District of Columbia, and that is not a Foreign Subsidiary.

"Voting Securities" means, with respect to any Person, Capital Securities of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person.

"wholly owned Subsidiary" means any Subsidiary all of the outstanding Capital Securities of which (other than any director's qualifying shares or investments by foreign nationals mandated by applicable laws) is owned directly or indirectly by the Borrower.

"Working Capital" means (without duplication), at any date of determination, the difference of (a) consolidated current assets of the Parent and its Subsidiaries on such date in the nature of ordinary course trade accounts receivable, inventory and similar current assets, less (b) consolidated current liabilities of the Parent and its Subsidiaries on such date in the nature of ordinary course trade accounts payable and similar current liabilities, but excluding, without limitation, the current portion of Total Debt to the extent included in the computation of current liabilities.

SECTION 1.2    Use of Defined Terms.  Unless otherwise defined or the context otherwise requires, terms for which meanings are provided in this Agreement shall have such meanings when used in each other Loan Document and the Disclosure Schedule.

SECTION 1.3    Cross-References.  Unless otherwise specified, references in a Loan Document to any Article or Section are references to such Article or Section of such Loan Document, and references in any Article, Section or definition to any clause are references to such clause of such Article, Section or definition.

SECTION 1.4    Accounting and Financial Determinations.

(a)  Unless otherwise specified, all accounting terms used in each Loan Document shall be interpreted, and all accounting determinations and computations thereunder (including under Section 7.2.4 and the definitions used in such calculations) shall be made, in accordance with those generally accepted accounting principles in effect in the United States ("GAAP").  Unless otherwise expressly provided, all financial covenants and defined financial terms shall be computed on a consolidated basis for the Parent and its Subsidiaries (and, to the extent applicable and unless otherwise specified, any predecessor company), in each case without duplication.

(b)  As of any date of determination, for purposes of determining EBITDA or the Interest Coverage Ratio or Total Leverage Ratio (and any financial calculations required to be made or included within such calculations or ratios, or required for purposes of preparing any Compliance Certificate to be delivered pursuant to the definition of "Permitted Acquisition"), the calculation of such ratios and other financial calculations shall include or exclude, as the case may be, the effect of any assets or businesses that have been acquired pursuant to any Permitted Acquisition or Disposed of by the Borrower or any of its Subsidiaries pursuant to the terms hereof (including through mergers or consolidations), as of such date of determination, as determined by the Borrower on a pro forma basis in accordance with GAAP, which determination may include one-time adjustments or reductions in costs, if any, directly attributable to any

such permitted Disposition or Permitted Acquisition, as the case may be, in each case (i) calculated in accordance with Regulation S-X of the Securities Act of 1933, as amended from time to time, and any successor statute, for the period of four Fiscal Quarters ended on or immediately prior to the date of determination of any such ratios or other financial calculations (and giving effect to any reasonable cost-savings or adjustments prepared in good faith by the Borrower relating to synergies resulting from any Permitted Acquisition) and (ii) giving effect to any such Permitted Acquisition or permitted Disposition as if it had occurred on the first day of such period of four Fiscal Quarters.

## ARTICLE II
## LOANS, CLOSING RATE AND NOTES

SECTION 2.1    Loans.  Each of the parties hereto acknowledges and agrees that on the Closing Date (which shall be a Business Day), the Exchange of Loans shall occur, pursuant to which each Lender will be deemed to have made Loans to the Borrower under this Agreement (relative to such Lender, its "Loans"), with the principal amount of each Loan as of the Closing Date being the amount, and in the Lender's Percentage, in each case set forth opposite the name of such Lender on Schedule II hereto.  Each of the Lenders on the Closing Date, by operation of the Plan and the Confirmation Order, shall be deemed to have agreed to, and shall be bound by, the terms and conditions hereof, without any further action or consent on the part of such Lender.  No amounts paid or prepaid with respect to the Loans may be reborrowed.

SECTION 2.2    Closing Rate.  On the Closing Date, all of the Loans shall be LIBO Rate Loans with an Interest Period of one month.

SECTION 2.3    Continuation and Conversion Elections.  By delivering a Continuation/Conversion Notice to the Administrative Agent on or before 1:00 p.m., New York time, on a Business Day, the Borrower may from time to time irrevocably elect, on not less than one Business Day's notice in the case of Base Rate Loans, or three Business Days' notice in the case of LIBO Rate Loans, and in either case not more than five Business Days' notice, that all, or any portion in an aggregate minimum amount of $1,000,000 and an integral multiple of $250,000 be, in the case of Base Rate Loans, converted into LIBO Rate Loans, or in the case of LIBO Rate Loans, converted into Base Rate Loans or continued as LIBO Rate Loans (in the absence of delivery of a Continuation/Conversion Notice with respect to any LIBO Rate Loan at least three Business Days (but not more than five Business Days) before the last day of the then current Interest Period with respect thereto, such LIBO Rate Loan shall, on such last day, automatically convert to a Base Rate Loan); provided that, (i) each such conversion or continuation shall be pro rated among the applicable outstanding Loans of all Lenders that have made such Loans, and (ii) no portion of the outstanding principal amount of any Loans may be continued as, or be converted into, LIBO Rate Loans when any Default has occurred and is continuing.  Each such irrevocable request may be made by telephone confirmed promptly by facsimile to the Administrative Agent of the applicable Continuation/Conversion Notice.  The conversion of a Base Rate Loan into a LIBO Rate Loan or a LIBO Rate Loan into a Base Rate Loan shall not effect a novation of the Loan so converted.

SECTION 2.4    Funding.  Each Lender may, if it so elects, fulfill its obligation to continue or convert LIBO Rate Loans hereunder by causing one of its foreign branches or

Affiliates (or an international banking facility created by such Lender) to make or maintain such LIBO Rate Loan; provided that, such LIBO Rate Loan shall nonetheless be deemed to have been made and to be held by such Lender, and the obligation of the Borrower to repay such LIBO Rate Loan shall nevertheless be to such Lender for the account of such foreign branch, Affiliate or international banking facility.  In addition, the Borrower hereby consents and agrees that, for purposes of any determination to be made for purposes of Sections 4.1, 4.2, 4.3 or 4.4, it shall be conclusively assumed that each Lender elected to fund all LIBO Rate Loans by purchasing Dollar deposits in its LIBOR Office's interbank Eurodollar market.

SECTION 2.5    Register; Notes.  The Register shall be maintained on the following terms:

(a)  The Borrower hereby designates the Administrative Agent to serve as the Borrower's agent, solely for the purpose of this clause, to maintain a register (the "Register") on which the Administrative Agent will record the Loans held by each Lender (and SPC), each repayment in respect of the principal amount of the Loans, and each assignment or transfer of an interest in any Loan made pursuant to Section 10.11, annexed to which the Administrative Agent shall retain a copy of each Lender Assignment Agreement delivered to the Administrative Agent pursuant to Section 10.11.  Failure to make any recordation, or any error in such recordation, shall not affect the amount of any Obligor's Obligations.  The entries in the Register shall be conclusive and binding in the absence of manifest error, and the Borrower, the Administrative Agent, and the Lenders (including any SPC) shall treat each Person in whose name a Loan is registered as the owner thereof for the purposes of all Loan Documents, notwithstanding notice or any provision herein to the contrary.  Any assignment or transfer of the Loans made pursuant hereto shall be registered in the Register only upon delivery to the Administrative Agent of a Lender Assignment Agreement that has been executed by the requisite parties pursuant to Section 10.11.  No assignment or transfer of a Lender's (or SPC's) Loans shall be effective unless such assignment or transfer shall have been recorded in the Register by the Administrative Agent as provided in this Section.

(b)  The Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to each Lender a Note evidencing the Loans held by, and payable to the order of, such Lender in a maximum principal amount equal to such Lender's Percentage of the Loan.  The Borrower hereby irrevocably authorizes each Lender to make (or cause to be made) appropriate notations on the grid attached to such Lender's Note (or on any continuation of such grid), which notations, if made, shall evidence, inter alia, the date of, the outstanding principal amount of, and the interest rate and Interest Period applicable to the Loans evidenced thereby.  Such notations shall, to the extent not inconsistent with notations made by the Administrative Agent in the Register, be conclusive and binding on each Obligor absent manifest error; provided that, the failure of any Lender to make any such notations shall not limit or otherwise affect any Obligations of any Obligor.

ARTICLE III
REPAYMENTS, PREPAYMENTS, INTEREST AND FEES

SECTION 3.1    Repayments and Prepayments; Application.  The Borrower agrees that the Loans shall be repaid and prepaid pursuant to the following terms.

28

SECTION 3.1.1   <u>Repayments and Prepayments</u>.  The Borrower shall repay in full the unpaid principal amount of each Loan on the Stated Maturity Date.  Prior thereto, payments and prepayments of the Loans shall or may be made as set forth below.

(a)  From time to time on any Business Day, the Borrower may make a voluntary prepayment, in whole or in part, of the outstanding principal amount of any Loans; <u>provided</u> that, (i) any such prepayment of the Loans shall be applied to the remaining amortization payments for the Loans in such amounts as the Borrower shall determine (but in all events on a pro rata basis among all Lenders holding such Loans); (ii) all such voluntary prepayments shall require, in the case of Base Rate Loans at least the same Business Day's prior notice (such notice to be delivered before noon New York time on such day), and in the case of LIBO Rate Loans at least three Business Days' prior notice (such notice to be delivered before noon New York time on such day), and in either case not more than five Business Days' prior irrevocable notice to the Administrative Agent (which notice may be telephonic so long as such notice is confirmed in writing within 24 hours thereafter and such notice to be delivered before noon New York time on such day); and (iii) all such voluntary partial prepayments shall be, in the case of LIBO Rate Loans, in an aggregate minimum amount of $500,000 and an integral multiple of $500,000 and, in the case of Base Rate Loans, in an aggregate minimum amount of $500,000 and an integral multiple of $100,000.  Each notice of prepayment sent pursuant to this clause shall specify the prepayment date, the principal amount of each Loan (or portion thereof) to be prepaid and the scheduled installment or installments of principal to which such prepayment is to be applied.  Each such notice shall be irrevocable and shall commit the Borrower to prepay such Loan (or portion thereof) by the amount stated therein on the date stated therein; <u>provided</u> that a notice of prepayment may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.  All prepayments under this clause shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment.

(b)  On the Stated Maturity Date and on each Quarterly Payment Date occurring during any period set forth below, the Borrower shall make a scheduled repayment of the aggregate outstanding principal amount, if any, of all Loans in an amount equal to the amount set forth below opposite the Stated Maturity Date or such Quarterly Payment Date, as applicable, and the Lenders agree that any reduction in the amount of any required amortization payments set forth in this clause, or any extension of any of the dates for payment set forth in this clause, shall in each case require the consent of all Lenders.

| Payment Date | Amount of Required Principal Repayment |
|---|---|
| Each Quarterly Payment Date commencing on June 30, 2011 through December 31, 2011 | $1,000,000 |
| Each Quarterly Payment Date commencing on | $2,000,000 |

March 31, 2012 through [●],
201[4]

The Stated Maturity Date       The then outstanding
amount of Loans

(c)  The Borrower shall (subject to the next proviso), within five (5) Business Days of receipt of any Net Casualty Proceeds or any Net Disposition Proceeds by the Borrower or any of its Subsidiaries, deliver to the Administrative Agent a calculation of the amount of such proceeds, and, to the extent the aggregate amount of such proceeds received by the Borrower and its Subsidiaries exceeds $1,000,000 for any single transaction or a series of related transactions, the Borrower shall make a mandatory prepayment of the Loans in an amount equal to 100% of such Net Casualty Proceeds or Net Disposition Proceeds, as applicable; provided that upon written notice by the Borrower to the Administrative Agent not more than five (5) Business Days following receipt of any Net Casualty Proceeds or Net Disposition Proceeds, as applicable (so long as no Default has occurred and is continuing), such proceeds may be retained by the Borrower and its Subsidiaries (and may be excluded from the prepayment requirements of this clause) if (i) the Borrower informs the Administrative Agent in such notice of its good faith intention to apply (or cause one or more of the Subsidiary Guarantors to apply) such Net Casualty Proceeds or Net Disposition Proceeds, as applicable, to the acquisition of other assets or properties in the U.S. consistent with the businesses permitted to be conducted pursuant to Section 7.2.1 (including by way of merger or Investment), and (ii) within 365 days following the receipt of such Net Casualty Proceeds or such Net Disposition Proceeds, as applicable, such proceeds are applied or committed to such acquisition.  The amount of such Net Casualty Proceeds or such Net Disposition Proceeds, as applicable, unused or uncommitted after such 365 day period (subject to the extension set forth above) shall be applied to prepay the Loans as set forth in Section 3.1.2.

(d)  Within 120 days after the close of each Fiscal Year (beginning with the close of the 2011 Fiscal Year) the Borrower shall make a mandatory prepayment of the Loans in an amount equal to (i) 50% of Excess Cash Flow (if any) for such Fiscal Year, minus (ii) the aggregate amount of all optional prepayments of the Loans (without duplication) made since the beginning of such Fiscal Year through the date on which the prepayment of the Loans pursuant to this clause (d) is made (including any call premiums paid in cash upon repayment of such Indebtedness).

(e)  The Borrower shall, within five (5) Business Days of receipt of any Net Debt Proceeds, by the Borrower or any of its Subsidiaries, make a mandatory prepayment of the Loans in an amount equal to 100% of the aggregate Net Debt Proceeds.

(f)  Immediately upon any acceleration of the Stated Maturity Date of any Loans pursuant to Section 8.2 or Section 8.3, the Borrower shall repay all the Loans, unless, pursuant to Section 8.3, only a portion of all the Loans is so accelerated (in which case the portion so accelerated shall be so repaid).

Each prepayment of any Loans made pursuant to this Section shall be without premium or penalty, except as may be required by Section 4.4.

SECTION 3.1.2   Application.  Amounts prepaid pursuant to Section 3.1.1 shall be applied as set forth in this Section.

(a)  Subject to clause (b), each prepayment or repayment of the principal of the Loans shall be applied, to the extent of such prepayment or repayment, first, to the principal amount thereof being maintained as Base Rate Loans, and second, subject to the terms of Section 4.4, to the principal amount thereof being maintained as LIBO Rate Loans, in each case in a manner that minimizes the amount of any payments required to be made by the Borrower pursuant to Section 4.4.

(b) Each prepayment of the Loans made pursuant to clause (a) of Section 3.1.1 shall be applied to the remaining scheduled amortization payments as directed by the Borrower.  Each prepayment of the Loans made pursuant to clauses (c), (d) and (e) of Section 3.1.1 shall be applied ~~to the next four scheduled amortization payments on the Loans, with any excess applied~~ pro rata to the remaining scheduled Loan amortization payments.  Once all Loans have been repaid in full, proceeds of mandatory prepayments will be applied to repay outstanding Second Lien Loans until repaid in full (as set forth in the Second Lien Credit Agreement).  Amounts in excess thereof shall be retained by the Borrower.

SECTION 3.2   Interest Provisions.  Interest on the outstanding principal amount of the Loans shall accrue and be payable in accordance with the terms set forth below.

SECTION 3.2.1   Rates.  Subject to Section 2.3, pursuant to an appropriately delivered Continuation/Conversion Notice, the Borrower may elect that the Loans accrue interest at a rate per annum:

(a)  on that portion maintained from time to time as a Base Rate Loan, equal to the sum of the Alternate Base Rate, from time to time in effect plus the Applicable Margin; and

(b)  on that portion maintained as a LIBO Rate Loan, during each Interest Period applicable thereto, equal to the sum of the LIBO Rate (Reserve Adjusted) for such Interest Period plus the Applicable Margin.

All LIBO Rate Loans shall bear interest from and including the first day of the applicable Interest Period to (but not including) the last day of such Interest Period at the interest rate determined as applicable to such LIBO Rate Loan.

SECTION 3.2.2   Post-Default Rates.  After the date any Event of Default has occurred and for so long as such Event of Default is continuing, the Borrower shall pay, but only to the extent permitted by law, interest (after as well as before judgment) on all outstanding Obligations at a rate per annum equal to (a) in the case of principal on any Loan, subject to applicable law, the rate of interest that otherwise would be applicable to such Loan plus 2% per annum; and (b) in the case of overdue interest, fees, and other monetary Obligations, the Base

31

Rate from time to time in effect, plus the Applicable Margin for Loans accruing interest at the Base Rate, plus a margin of 2% per annum.

SECTION 3.2.3   Payment Dates.  Interest accrued on each Loan shall be payable, without duplication:

(a)  on the Stated Maturity Date therefor;

(b)  except as set forth in clause (c) below, on the date of any payment or prepayment, in whole or in part, of principal outstanding on such Loan on the principal amount so paid or prepaid;

(c)  with respect to Base Rate Loans, on each Quarterly Payment Date occurring after the Effective Date;

(d)  with respect to LIBO Rate Loans, on the last day of each applicable Interest Period (and, if such Interest Period shall exceed three months, on the date occurring on each three-month interval occurring after the first day of such Interest Period);

(e)  with respect to any Base Rate Loans converted into LIBO Rate Loans on a day when interest would not otherwise have been payable pursuant to clause (c), on the date of such conversion; and

(f)  on that portion of any Loans the Stated Maturity Date of which is accelerated pursuant to Section 8.2 or Section 8.3, immediately upon such acceleration.

Interest accrued on Loans or other monetary Obligations after the date such amount is due and payable (whether on the Stated Maturity Date, upon acceleration or otherwise) shall be payable upon demand.

SECTION 3.3   Fees.  The Borrower agrees to pay the fees set forth below.  All such fees shall be non-refundable.

SECTION 3.3.1   Administrative Agent's Fee.  The Borrower agrees to pay to the Administrative Agent, for its own account, the fees and expenses (including documented, reasonable attorney's fees and expenses) in the amounts and on the dates set forth in the Fee Letter.

## ARTICLE IV
## CERTAIN LIBO RATE AND OTHER PROVISIONS

SECTION 4.1   LIBO Rate Lending Unlawful.  If any Lender shall determine (which determination shall, upon notice thereof to the Borrower and the Administrative Agent, be conclusive and binding on the Borrower) that the introduction of or any change in or in the interpretation of any law makes it unlawful, or any Governmental Authority asserts that it is unlawful, for such Lender to make or continue any Loan as, or to convert any Loan into, a LIBO Rate Loan, the obligations of such Lender to make, continue or convert any such LIBO Rate Loan shall, upon such determination, forthwith be suspended until such Lender shall notify the

Administrative Agent that the circumstances causing such suspension no longer exist, and all outstanding LIBO Rate Loans payable to such Lender shall automatically convert into Base Rate Loans at the end of the then current Interest Periods with respect thereto or sooner, if required by such law or assertion.

SECTION 4.2    Deposits Unavailable.  If the Administrative Agent shall have determined that (a) Dollar deposits in the relevant amount and for the relevant Interest Period are not available to it in its relevant market; or (b) by reason of circumstances affecting it's its relevant market, adequate means do not exist for ascertaining the interest rate applicable hereunder to LIBO Rate Loans; then, upon notice from the Administrative Agent to the Borrower and the Lenders, the obligations of all Lenders under Section 2.3 and Section 2.4 to make or continue any Loans as, or to convert any Loans into, LIBO Rate Loans shall forthwith be suspended until the Administrative Agent shall notify the Borrower and the Lenders that the circumstances causing such suspension no longer exist.

SECTION 4.3    Increased LIBO Rate Loan Costs, etc.  The Borrower agrees to reimburse each Secured Party for any increase in the cost to such Secured Party of, or any reduction in the amount of any sum receivable by such Secured Party in respect of, such Secured Party's Loans hereunder (including the making, continuing or maintaining (or of its obligation to make or continue) any Loans as, or of converting (or of its obligation to convert) any Loans into, LIBO Rate Loans) that arise in connection with any change in, or the introduction, adoption, effectiveness, interpretation, reinterpretation or phase in after the Closing Date of, any law or regulation, directive, guideline, decision or request (whether or not having the force of law) of any Governmental Authority, except for such changes with respect to increased capital costs and Taxes (which are governed by Sections 4.5 and 4.6), respectively.  Each affected Secured Party shall promptly notify the Administrative Agent and the Borrower in writing of the occurrence of any such event, stating the reasons therefor and the additional amount required fully to compensate such Secured Party for such increased cost or reduced amount.  Such additional amounts shall be payable by the Borrower directly to such Secured Party within five days of its receipt of such notice, and such notice shall, in the absence of manifest error, be conclusive and binding on the Borrower.

SECTION 4.4    Funding Losses.  In the event any Lender shall incur any loss or expense (including any loss or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to make or continue any portion of the principal amount of any Loan as, or to convert any portion of the principal amount of any Loan into, a LIBO Rate Loan) as a result of

(a)  any conversion or repayment or prepayment of the principal amount of any LIBO Rate Loan on a date other than the scheduled last day of the Interest Period applicable thereto, whether pursuant to Article III or otherwise;

(b)  any Loans not being continued as, or converted into, LIBO Rate Loans in accordance with the Continuation/Conversion Notice therefor; or

33

(c)  any LIBO Rate Loans not being prepaid in accordance with any notice delivered pursuant to clause (a) of Section 3.1.1 (as a result of a revocation of such notice or as a result of such payment not being made);

but in each case other than due to such Lender's failure to fulfill its obligations hereunder then, upon the written notice of such Lender to the Borrower, the Borrower shall, within ten days of its receipt thereof, pay directly to such Lender such amount as will (in the reasonable determination of such Lender) reimburse such Lender for such loss or expense.  Such written notice shall, in the absence of manifest error, be conclusive and binding on the Borrower.

SECTION 4.5    Increased Capital Costs.  If any change in, or the introduction, adoption, effectiveness, interpretation, reinterpretation or phase in of, any law or regulation, directive, guideline, decision or request (whether or not having the force of law) of any Governmental Authority affects or would affect the amount of capital required or expected to be maintained by any Secured Party or any Person controlling such Secured Party, and such Secured Party determines (in good faith but in its sole and absolute discretion) that the rate of return on its or such controlling Person's capital as a consequence of the Loans held by such Secured Party is reduced to a level below that which such Secured Party or such controlling Person could have achieved but for the occurrence of any such circumstance, then upon notice from time to time by such Secured Party to the Borrower, the Borrower shall within five days following receipt of such notice pay directly to such Secured Party additional amounts sufficient to compensate such Secured Party or such controlling Person for such reduction in rate of return.  A statement of such Secured Party as to any such additional amount or amounts shall, in the absence of manifest error, be conclusive and binding on the Borrower.  In determining such amount, such Secured Party may use any method of averaging and attribution that it (in its sole and absolute discretion) shall deem applicable.

SECTION 4.6    Taxes.  The Borrower covenants and agrees as follows with respect to Taxes.

(a)  Any and all payments by the Borrower and each other Obligor under each Loan Document shall be made without setoff, counterclaim or other defense, and free and clear of, and without deduction or withholding for or on account of, any Taxes except to the extent that deduction or withholding of such Taxes is required by applicable law.  In the event that any such Taxes are required by applicable law to be deducted or withheld from any payment required to be made to or on behalf of any Secured Party under any Loan Document, then:

(i)  subject to clause (f), if such Taxes are Non-Excluded Taxes or Other Taxes, the Borrower and each Obligor shall increase the amount of such payment so that each Secured Party receives an amount equal to the amount it would have received had no such deduction or withholding been made; and

(ii)  the Borrower or the Administrative Agent (as applicable) shall withhold the full amount of such Taxes from such payment (as increased pursuant to clause (a)(i)) and shall pay such amount to the Governmental Authority imposing such Taxes in accordance with applicable law.

(b)  In addition, the Borrower shall pay all Other Taxes imposed to the relevant Governmental Authority imposing such Other Taxes in accordance with applicable law.

(c)  The Borrower shall furnish to the Administrative Agent, within 45 days of any such payment being due under applicable law, an official receipt (or a certified copy thereof) or other proof of payment satisfactory to the Administrative Agent, acting reasonably, evidencing the payment of such Taxes or Other Taxes.  The Administrative Agent shall make copies thereof available to any Lender upon request therefor.

(d)  Subject to clause (f), the Borrower shall indemnify each Secured Party for any Non-Excluded Taxes and Other Taxes (including Non-Excluded Taxes and Other Taxes imposed or asserted on, or attributable to, amounts payable under this Section 4.6) paid by such Secured Party, whether or not such Non-Excluded Taxes or Other Taxes were correctly or legally asserted by the relevant Governmental Authority, provided that no Secured Party shall be entitled to receive any payment under this clause (d), unless such Secured Party or the Administrative Agent provides a written request for such payment to the Borrower within six months of the due date for the payment of the Non-Excluded Taxes or Other Taxes for which indemnification is sought.  With respect to the indemnification provided in the immediately preceding sentence, such indemnification shall be made within 30 days after the date such Secured Party makes written demand therefor.

(e)  Each Lender making Loans to the Borrower, on or prior to the date on which such Lender becomes a Lender hereunder (and from time to time thereafter upon the request of the Borrower or the Administrative Agent, but only for so long as such Lender is legally entitled to do so), shall deliver to the Borrower and the Administrative Agent either (i) two duly completed copies of either (x) Internal Revenue Service Form W-8BEN or W-8IMY claiming eligibility of a Non-U.S. Lender for benefits of an income tax treaty to which the United States is a party or (y) Internal Revenue Service Form W-8ECI, or in either case an applicable successor form; (ii) in the case of a Non-U.S. Lender that is not legally entitled to deliver either form listed in clause (e)(i), (x) a certificate to the effect that such Non-U.S. Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a controlled foreign corporation receiving interest from a related person within the meaning of Section 881(c)(3)(C) of the Code (referred to as an "Exemption Certificate") and (y) two duly completed copies of Internal Revenue Service Form W-8BEN or W-8IMY or applicable successor form, or (iii) in the case of a Lender that is not a Non-U.S. Lender, two duly completed copies of Internal Revenue Service form W-9 or applicable successor form, and  (iv) in the case of any Lender, such documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will permit payments by the Borrower and each other Obligor under any Loan Document to be made without withholding or at a reduced rate of withholding, or as is reasonably requested by the Borrower or the Administrative Agent to comply with FATCA.  The Administrative Agent shall deliver to the Borrower such IRS forms as are required to ensure that payments made to the Administrative Agent are not subject to withholding, but only for so long as the Administrative Agent is legally entitled to do so.  Each Lender agrees to promptly notify the Borrower and the Administrative Agent in writing of any change in circumstances which would modify or render invalid any claimed exemption or reduction.  In addition, each Lender shall timely deliver to the Borrower and the Administrative Agent two further copies of such

35

Form W-8BEN, W-8IMY, W-8ECI or W-9 or successor forms on or before the date that any previously executed form expires or becomes obsolete, or after the occurrence of any event requiring a change in the most recent form delivered by such Person to the Borrower.

(f)  The Borrower shall not be obligated to pay any additional amounts to any Secured Party pursuant to clause (a)(i), or to indemnify any Secured Party pursuant to clause (d), in respect of United States federal withholding taxes to the extent imposed as a result of (i) the failure, inability or ineligibility of such Secured Party to deliver to the Borrower the form or forms and/or an Exemption Certificate, as applicable to such Secured Party, pursuant to clause (e), (ii) such form or forms and/or Exemption Certificate not establishing a complete exemption from U.S. federal withholding tax or the information or certifications made therein by the Secured Party being untrue or inaccurate on the date delivered in any material respect, or (iii) the Secured Party designating a successor lending office at which it maintains its Loans which has the effect of causing such Secured Party to become obligated for tax payments in excess of those in effect immediately prior to such designation; provided that, the Borrower shall be obligated to pay additional amounts to any such Secured Party pursuant to clause (a)(i), and to indemnify any such Secured Party pursuant to clause (d), in respect of United States federal withholding taxes if (i) any such failure to deliver a form or forms or an Exemption Certificate or the failure of such form or forms or Exemption Certificate to establish a complete exemption from U.S. federal withholding tax resulted from a change in any applicable statute, treaty, regulation or other applicable law or any official interpretation of any of the foregoing occurring after the Closing Date (or in the case of an Assignee Lender, after the date of the assignment, except to the extent that the applicable assigning lender was entitled to receive additional amounts with respect to such payment), which change rendered such Secured Party no longer legally entitled to deliver such form or forms or Exemption Certificate or otherwise ineligible for a complete exemption from U.S. federal withholding tax, (ii) the redesignation of the Secured Party's lending office was made at the request of the Borrower or (iii) the obligation to pay any additional amounts to any such Secured Party pursuant to clause (a)(i) or to indemnify any such Secured Party pursuant to clause (d) is with respect to an Assignee Lender that becomes an Assignee Lender as a result of an assignment made at the request of the Borrower.

(g)  In the event that any Lender or the Administrative Agent determines in its sole discretion that it has received a refund or a credit in respect of Taxes or Other Taxes as to which it has been paid additional amounts by the Borrower pursuant to clause (a) or indemnified by the Borrower pursuant to clause (d) and such Lender or the Administrative Agent, as applicable, determines in its good faith judgment that such refund is attributable to such additional amounts or indemnification, then such Lender or Administrative Agent shall promptly notify the Administrative Agent and the Borrower, shall use reasonable efforts to apply for such refund or credit and shall within 30 Business Days of receipt of such refund or application of such credit remit to the Borrower an amount as such Lender or Administrative Agent reasonably determines to be the proportion of the refunded or credited amount as will leave it, after such remittance, in no better or worse position than it would have been if the Taxes or Other Taxes had not been imposed and the corresponding additional amounts or indemnification payment not been made. Neither the Lenders nor the Administrative Agent shall be obligated to disclose information regarding its tax affairs or computations to the Borrower in connection with this clause (g) or any other provision of this Section that such Lender or the Administrative Agent reasonably deems confidential.

36

Notwithstanding anything to the contrary herein, Section 4.6 shall not apply to any Rate Protection Agreements.

SECTION 4.7    Payments, Computations; Proceeds of Collateral, etc.  (a)  Unless otherwise expressly provided in a Loan Document, all payments by the Borrower pursuant to each Loan Document shall be made by the Borrower to the Administrative Agent for the pro rata account of the Secured Parties entitled to receive such payment.  All payments shall be made without setoff, deduction or counterclaim not later than 11:00 a.m. New York time on the date due in same day or immediately available funds to such account as the Administrative Agent shall specify from time to time by notice to the Borrower.  Funds received after that time shall be deemed to have been received by the Administrative Agent on the next succeeding Business Day.  The Administrative Agent shall promptly remit in same day funds to each Secured Party its share, if any, of such payments received by the Administrative Agent for the account of such Secured Party.  All interest (including interest on LIBO Rate Loans) and fees shall be computed on the basis of the actual number of days (including the first day but excluding the last day) occurring during the period for which such interest or fee is payable over a year comprised of 360 days (or, in the case of interest on a Base Rate Loan (calculated at other than the Federal Funds Rate), 365 days or, if appropriate, 366 days).  Payments due on other than a Business Day shall (except as otherwise required by clause (b) of the proviso in the definition of "Interest Period") be made on the next succeeding Business Day and such extension of time shall be included in computing interest and fees in connection with that payment.

(b)  After the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and upon written direction from the Required Lenders, shall, apply all amounts received under the Loan Documents (including from the proceeds of collateral securing the Obligations) or under applicable law shall be applied upon receipt to the Obligations as follows: (i) first, to the payment of all Obligations in respect of fees, expense reimbursements, indemnities and other amounts owing to the Administrative Agent, in its capacity as the Administrative Agent (including the fees and expenses of counsel to the Administrative Agent), (ii) second, after payment in full in cash of the amounts specified in clause (b)(i), to the ratable payment of all interest (including interest accruing (or which would accrue) after the commencement of a proceeding in bankruptcy, insolvency or similar law, whether or not permitted as a claim under such law) and fees owing under the Loan Documents, and all costs and expenses owing to the Secured Parties pursuant to the terms of the Loan Documents, until paid in full in cash, (iii) third, after payment in full in cash of the amounts specified in clauses (b)(i) and (b)(ii), to the ratable payment of the principal amount of the Loans then outstanding and the net credit exposure owing to Secured Parties under Rate Protection Agreements, if any, (iv) fourth, after payment in full in cash of the amounts specified in clauses (b)(i) through (b)(iii), to the ratable payment of all other Obligations owing to the Secured Parties, and (v) fifth, after payment in full in cash of the amounts specified in clauses (b)(i) through (b)(iv), and following the Termination Date, to each applicable Obligor or any other Person lawfully entitled to receive such surplus.  For purposes of clause (b)(iii), the "net credit exposure" at any time of any Secured Party with respect to a Rate Protection Agreement to which such Secured Party is a party shall be determined by such Secured Party (and such Secured Party shall notify the Administrative Agent in writing) at such time in accordance with the customary methods of calculating net credit exposure under similar arrangements by the counterparty to such arrangements, taking into account potential interest rate (or, if applicable, currency) movements

and the respective termination provisions and notional principal amount and term of such Rate Protection Agreement.

SECTION 4.8   <u>Sharing of Payments</u>.  If any Secured Party shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or otherwise) on account of any Loan (other than pursuant to the terms of <u>Sections 4.3</u>, <u>4.4</u>, <u>4.5</u> or <u>4.6</u>) in excess of its pro rata share of payments obtained by all Secured Parties, such Secured Party shall purchase for cash at face value from the other Secured Parties such participations in Loans held by them as shall be necessary to cause such purchasing Secured Party to share the excess payment or other recovery ratably (to the extent such other Secured Parties were entitled to receive a portion of such payment or recovery) with each of them; <u>provided</u> that, if all or any portion of the excess payment or other recovery is thereafter recovered from such purchasing Secured Party, the purchase shall be rescinded and each Secured Party which has sold a participation to the purchasing Secured Party shall repay to the purchasing Secured Party the purchase price to the ratable extent of such recovery together with an amount equal to such selling Secured Party's ratable share (according to the proportion of (a) the amount of such selling Secured Party's required repayment to the purchasing Secured Party to (b) total amount so recovered from the purchasing Secured Party) of any interest or other amount paid or payable by the purchasing Secured Party in respect of the total amount so recovered.  The Borrower agrees that any Secured Party purchasing a participation from another Secured Party pursuant to this Section may, to the fullest extent permitted by law, exercise all its rights of payment (including pursuant to <u>Section 4.9</u>) with respect to such participation as fully as if such Secured Party were the direct creditor of the Borrower in the amount of such participation.  If under any applicable bankruptcy, insolvency or other similar law any Secured Party receives a secured claim in lieu of a setoff to which this Section applies, such Secured Party shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Secured Parties entitled under this Section to share in the benefits of any recovery on such secured claim.

SECTION 4.9   <u>Setoff</u>.  Each Secured Party shall, upon the occurrence and during the continuance of any Event of Default described in <u>clauses (b)</u> through <u>(d)</u> of <u>Section 8.1.7</u> or, with the consent of the Required Lenders, upon the occurrence and during the continuance of any other Event of Default, have the right to appropriate and apply to the payment of the Obligations owing to it (whether or not then due), and (as security for such Obligations) the Borrower hereby grants to each Secured Party a continuing security interest in, any and all balances, credits, deposits, accounts or moneys of the Borrower then or thereafter maintained with such Secured Party; <u>provided</u> that, any such appropriation and application shall be subject to the provisions of <u>Section 4.8</u>.  Each Secured Party agrees promptly to notify the Borrower and the Administrative Agent in writing after any such appropriation and application made by such Secured Party; <u>provided</u> that, the failure to give such notice shall not affect the validity of such setoff and application.  The rights of each Secured Party under this Section are in addition to other rights and remedies (including other rights of setoff under applicable law or otherwise) which such Secured Party may have.

SECTION 4.10   <u>Replacement of Lenders</u>.  If any Lender (an "<u>Affected Lender</u>") (a) fails to consent to an election, consent, amendment, waiver or other modification to this Agreement or other Loan Document that requires the consent of a greater percentage of the Lenders than the Required Lenders and such election, consent, amendment, waiver or other

modification is otherwise consented to by the Required Lenders or (b) makes a demand upon the Borrower for (or if the Borrower is otherwise required to pay) amounts pursuant to <u>Section 4.3</u>, <u>4.5</u> or <u>4.6</u> (and the payment of such amounts is, and is likely to continue to be, materially more onerous in the reasonable judgment of the Borrower than with respect to the other Lenders) or gives notice pursuant to <u>Section 4.1</u> requiring a conversion of such Affected Lender's LIBO Rate Loans to Base Rate Loans or suspending such Lender's obligation to hold Loans as, or to convert Loans into, LIBO Rate Loans, the Borrower may, within 30 days of receipt by the Borrower of such demand or notice, as the case may be, give notice (a "<u>Replacement Notice</u>") in writing to the Administrative Agent and such Affected Lender of its intention to cause such Affected Lender to sell all or any portion of its Loans and/or Notes to an Eligible Assignee (a "<u>Replacement Lender</u>") designated in such Replacement Notice; <u>provided</u>, <u>however</u>, that no Replacement Notice may be given by the Borrower if (i) such replacement conflicts with any applicable law or regulation, (ii) any Event of Default shall have occurred and be continuing at the time of such replacement or (iii) prior to any such replacement, such Lender shall have taken any necessary action under <u>Section 4.5</u> or <u>4.6</u> (if applicable) which shall have eliminated the continued need for payment of amounts owing pursuant to <u>Section 4.5</u> or <u>4.6</u>.  Within 30 days of its receipt of such Replacement Notice, the Affected Lender shall, subject to the payment of any amounts due pursuant to <u>Section 4.4</u>, assign, in accordance with <u>Section 10.11</u>, the portion of its Loans, Notes (if any), and other rights and obligations under this Agreement and all other Loan Documents designated in the replacement notice to such Replacement Lender; <u>provided</u>, <u>however</u>, that (i) such assignment shall be without recourse, representation or warranty and shall be on terms and conditions reasonably satisfactory to such Affected Lender and such Replacement Lender, (ii) the purchase price paid by such Replacement Lender shall be in the amount of such Affected Lender's Loans designated in the Replacement Notice, together with all accrued and unpaid interest and fees in respect thereof, plus all other amounts (including the amounts demanded and unreimbursed under <u>Sections 4.3</u>, <u>4.5</u> and <u>4.6</u>) and including any call premiums, owing to such Affected Lender hereunder and (iii) the Borrower shall pay to the Affected Lender and the Administrative Agent all reasonable out-of-pocket expenses incurred by the Affected Lender and the Administrative Agent in connection with such assignment and assumption (including the processing fees described in <u>Section 10.11</u>).  Upon the effective date of an assignment described above, the Replacement Lender shall become a "Lender" for all purposes under the Loan Documents.  Each assignment pursuant to this <u>Section 4.10</u> shall be effective upon the satisfaction of the conditions specified in this <u>Section 4.10</u> without further action on the part of the applicable Affected Lender.

SECTION 4.11   <u>Change in Lending Office</u>.  If any Lender makes a demand upon the Borrower for (or if the Borrower is otherwise required to pay) amounts pursuant to <u>Section 4.3</u>, <u>4.5</u> or <u>4.6</u>, or gives notice pursuant to <u>Section 4.1</u> requiring a conversion of such Lender's LIBO Rate Loans to Base Rate Loans or suspending such Lender's obligation to hold Loans as, or to convert Loans into, LIBO Rate Loans, then such Lender shall use reasonable efforts to designate a different lending office with respect to its rights and obligations hereunder or to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment (a) would eliminate the need for such notice or reduce amounts payable or to be withheld in the future, as applicable; and (b) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be materially disadvantageous to such Lender.  The affected Lender shall pay all

reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

## ARTICLE V
## CONDITIONS TO EXCHANGE OF LOANS

The obligations of the Lenders pursuant to the Exchange of Loans shall be subject to the prior or concurrent satisfaction (or waiver in accordance with <u>Section 10.1</u>; <u>provided</u> that the conditions in <u>Sections 5.2</u> and <u>5.3</u> may not be waived) of each of the conditions precedent set forth in this Article.

SECTION 5.1    <u>Resolutions, etc.</u>  The Administrative Agent shall have received from each Obligor, as applicable, (i) a copy of a good standing certificate, dated a date reasonably close to the Closing Date, for each such Person and (ii) a certificate, dated as of the Closing Date, duly executed and delivered by such Person's Secretary or Assistant Secretary, managing member or general partner, as applicable, as to

(a)  resolutions of each such Person's Board of Directors (or other managing body, in the case of other than a corporation) then in full force and effect authorizing, to the extent relevant, all aspects of the Transactions applicable to such Person and the execution, delivery and performance of each Loan Document to be executed by such Person and the transactions contemplated hereby and thereby;

(b)  the incumbency and signatures of those of its officers, managing member or general partner, as applicable, authorized to act with respect to each Loan Document to be executed by such Person; and

(c)  the full force and validity of each Organic Document of such Person and copies thereof;

upon which certificates each Secured Party may conclusively rely until it shall have received a further certificate of the Secretary, Assistant Secretary, managing member or general partner, as applicable, of any such Person canceling or amending the prior certificate of such Person.

SECTION 5.2    <u>Entry of Confirmation Order and Consummation of Transactions</u>.  The Administrative Agent shall have received a certificate of an Authorized Officer of the Borrower to the effect that:

(a)    No amendment or other modification of or to the Plan shall be filed or proposed since the date the Confirmation Order was originally entered which contains modifications materially adverse to the Administrative Agent.

(b)    The Bankruptcy Court shall have entered the Confirmation Order.

(c)    Concurrently with the closing of the credit facility provided hereby, the Plan (including the transfer of substantially all assets of the Bankruptcy Debtors pursuant to the Asset Purchase Agreement) shall have been substantially consummated (as defined

40

in Section 1101 of the Bankruptcy Code) in accordance in all material respects with the terms of the Plan and the Confirmation Order.

SECTION 5.3    Delivery of Notes.  The Administrative Agent shall have received, for the account of each Lender that has requested a Note, such Lender's Note(s) duly executed and delivered by an Authorized Officer of the Borrower.

SECTION 5.4    Guarantees.  The Administrative Agent shall have received each Guaranty, dated as of the Closing Date, duly executed and delivered by an Authorized Officer of the Parent and each U.S. Subsidiary, as applicable.

SECTION 5.5    Security Agreements.  The Administrative Agent shall have received executed counterparts of the Security Agreement, each dated as of the Closing Date, duly executed and delivered by the Parent, the Borrower and each U.S. Subsidiary (if any), together with:

(a)  certificates (in the case of Capital Securities that are securities (as defined in the UCC)) evidencing all of the issued and outstanding capital Securities owned by each Obligor in its U.S. Subsidiaries and 65% (or, if less, such lesser amount owned by such Obligor) of the issued and outstanding Voting Securities of each Foreign Subsidiary (together with all the issued and outstanding non-voting Capital Securities of such Foreign Subsidiary) directly owned by each Obligor, which certificates in each case shall be accompanied by undated instruments of transfer duly executed in blank, or, if any Capital Securities (in the case of Capital Securities that are uncertificated securities (as defined in the UCC)), confirmation and evidence satisfactory to the Administrative Agent that the security interest therein has been transferred to and perfected by the Administrative Agent for the benefit of the Secured Parties in accordance with Articles 8 and 9 of the UCC and all laws otherwise applicable to the perfection of the pledge of such Capital Securities;

(b)  Filing Statements suitable in form for naming the Parent, the Borrower and each Subsidiary Guarantor as a debtor and the Administrative Agent as the secured party, or other similar instruments or documents to be filed under the UCC of all jurisdictions as may be necessary or as the Required Lenders may require to perfect the security interests of the Administrative Agent pursuant to such Security Agreement;

(c)  UCC Form UCC-3 termination statements, if any, necessary to release all Liens and other rights of any Person (i)  in any collateral described in any Security Agreement previously granted by any Person, and (ii) securing any of the Indebtedness identified in Item 5.5(c) of the Disclosure Schedule, together with such other UCC Form UCC-3 termination statements as the Required Lenders may reasonably request from such Obligors; and

(d)  certified copies of UCC Requests for Information or Copies (Form UCC-11), or a similar search report certified by a party acceptable to the Required Lenders, dated a date reasonably near to the Closing Date, listing all effective financing statements which name any Obligor (under its present name and any previous names) as the debtor,

41

together with copies of such financing statements (none of which shall, except with respect to Liens permitted by Section 7.2.3.), evidence a Lien on any collateral described in any Loan Document).

SECTION 5.6   Intellectual Property Security Agreements.  The Administrative Agent shall have received a Patent Security Agreement, a Copyright Security Agreement and a Trademark Security Agreement, as applicable, each dated as of the Closing Date, duly executed and delivered by each Obligor that, pursuant to a Security Agreement, is required to provide such intellectual property security agreements to the Administrative Agent.

SECTION 5.7   Filing Agent, etc.  All Uniform Commercial Code financing statements or other similar financing statements and Uniform Commercial Code (Form UCC-3) termination statements required pursuant to the Loan Documents (collectively, the "Filing Statements"), shall have been delivered to CT Corporation System or another similar filing service company acceptable to the Required Lenders (the "Filing Agent").  The Filing Agent shall have acknowledged in a writing satisfactory to the Required Lenders (i) the Filing Agent's receipt of all Filing Statements, (ii) that the Filing Statements have either been submitted for filing in the appropriate filing offices or will be submitted for filing in the appropriate offices within ten days following the Closing Date and (iii) that the Filing Agent will notify the Administrative Agent and its counsel of the results of such submissions within 30 days following the Closing Date.

SECTION 5.8   Intercreditor Agreement.  The Administrative Agent shall have received the Intercreditor Agreement, dated as of the Closing Date, duly executed and delivered by the Administrative Agent, the administrative agent under the Second Lien Credit Agreement and the Borrower.

SECTION 5.9   Patriot Act Disclosures.  The Administrative Agent and each Lender shall have received all Patriot Act Disclosures requested by them prior to execution of this Agreement.

SECTION 5.10   Compliance with Warranties, No Default, etc.  The Administrative Agent shall have received a certificate of an Authorized Officer of the Borrower to the effect that, both before and after giving effect to the Exchange of Loans:

(a)  the representations and warranties set forth in each Loan Document shall, in each case, be true and correct in all material respects with the same effect as if then made (unless stated to relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date); and

(b)  no Default shall have then occurred and be continuing.

ARTICLE VI
REPRESENTATIONS AND WARRANTIES

In order to induce the Secured Parties to enter into this Agreement the Borrower represents and warrants to each Secured Party on the Closing Date as set forth in this Article.

SECTION 6.1   <u>Organization, etc</u>.  Each Obligor is validly organized and existing and in good standing under the laws of the state or jurisdiction of its incorporation or organization, is duly qualified to do business and is in good standing as a foreign entity in each jurisdiction where the nature of its business requires such qualification, except for such jurisdictions where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect, and has full power and authority and holds all requisite governmental licenses, permits and other approvals to enter into and perform its Obligations under each Loan Document to which it is a party, to own and hold under lease its property and to conduct its business substantially as currently conducted by it, except for those licenses, permits or other approvals, the absence of which could not reasonably be expected to have a Material Adverse Effect.

SECTION 6.2   <u>Due Authorization, Non-Contravention, Defaults etc</u>.  The execution, delivery and performance by each Obligor of each Loan Document executed or to be executed by it, each Obligor's participation in the consummation of all aspects of the Transactions, and the execution, delivery and performance by the Borrower or (if applicable) any Obligor of the agreements executed and delivered by it in connection with the Transactions are in each case within such Person's powers, have been duly authorized by all necessary action, and do not

(a)  contravene any (i) Obligor's Organic Documents, (ii) court decree or order binding on or affecting any Obligor or (iii) law or governmental regulation binding on or affecting any Obligor; or

(b)  result in (i) or require the creation or imposition of, any Lien on any Obligor's properties (except as permitted by this Agreement),(ii) a default under any material contractual restriction binding on or affecting any Obligor or (iii) any noncompliance, suspension, impairment, forfeiture or nonrenewal of any material license, permit or other governmental approval.

No Obligor is in default under any agreement, instrument or undertaking to which it is a party or by which it or any of its property is bound which could reasonably be expected to have a Material Adverse Effect.  No Obligor is a party to any agreement or instrument or subject to any other obligation or any charter or corporate restriction or any provision of any applicable law, rule or regulation which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

SECTION 6.3   <u>Government Approval, Regulation, etc</u>.  No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or other Person (other than those that have been, or on the Effective Date will be, duly obtained or made and which are, or on the Effective Date will be, in full force and effect) is required for the consummation of the Transactions or the due execution, delivery or performance by any Obligor of any Loan Document to which it is a party, or for the due execution, delivery and/or performance of Transaction Documents, in each case by the parties thereto or the consummation of the Transactions, other than pursuant to the Plan.  Neither the Borrower nor any of its Subsidiaries is an "investment company" within the meaning of the Investment Company Act of 1940, as amended, or a "holding company", or a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company", within the meaning of the Public Utility Holding Company Act of 1935, as amended.

SECTION 6.4    Validity, etc.  Each Loan Document and each Transaction Document to which any Obligor is a party constitutes the legal, valid and binding obligations of such Obligor, enforceable against such Obligor in accordance with their respective terms (except, in any case, as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally and by principles of equity).

SECTION 6.5    Financial Information.  All balance sheets, all statements of income and of cash flow and all other financial information of each of the Borrower and its Subsidiaries furnished pursuant to Section 7.1.1 have been and will for periods following the Effective Date be prepared in accordance with GAAP, and do or will present fairly the consolidated financial condition of the Persons covered thereby as at the dates thereof and the results of their operations for the periods then ended.

SECTION 6.6    Litigation, Labor Controversies, etc.  There is no pending or, to the actual knowledge of the Borrower or any of its Subsidiaries, threatened litigation, action, proceeding, investigation or labor controversy

(a)  other than the Bankruptcy Cases and the related proceedings under Chapter 11 of the Bankruptcy Code;

(b)  except as disclosed in Item 6.6 of the Disclosure Schedule, affecting the Borrower, any of its Subsidiaries or any other Obligor, or any of their respective properties, businesses, assets or revenues, which could reasonably be expected to have a Material Adverse Effect; or

(c)  which purports to affect the legality, validity or enforceability of any Loan Document, the Transaction Documents or the Transactions.

SECTION 6.7    Subsidiaries.  The Borrower has no Subsidiaries, except those Subsidiaries which are identified in Item 6.7 of the Disclosure Schedule, or which are permitted to have been organized or acquired in accordance with Sections 7.2.5 or 7.2.9.

SECTION 6.8    Ownership of Properties.  The Borrower and each of its Subsidiaries owns (i) in the case of owned real property, good and marketable fee title to, and (ii) in the case of owned personal property, good and valid title to, or, in the case of leased real or personal property, valid and enforceable leasehold interests (as the case may be) in, all of its material properties and assets, tangible and intangible, of any nature whatsoever, free and clear in each case of all Liens or claims, except for Liens permitted pursuant to Section 7.2.3 and all matters reflected in the title insurance policies delivered pursuant to clause (b) of Section 7.1.11.

SECTION 6.9    Taxes.  The Borrower and each of its Subsidiaries has filed all tax returns and reports required by law to have been filed by it and has paid all Taxes thereby shown to be due and owing, (except any such Taxes which are being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books) and has paid all Taxes shown to be due on any assessment received to the extent that such Taxes have become due and payable, except where the failure to file any such returns or reports or to pay any such Taxes would not give rise to a Material Adverse Effect.

44

SECTION 6.10  Employee Benefit Plans

(a)     Except as could not reasonably be expected to have a Material Adverse Effect: (i) the Borrower and each member of its Controlled Group is in compliance with all applicable provisions of ERISA, the Code and the regulations and published interpretations thereunder with respect to all Employee Benefit Plans except for any required amendments for which the remedial amendment period as defined in Section 401(b) of the Code has not yet expired; (ii) each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code has been determined by the Internal Revenue Service to be so qualified, and each trust related to such plan has been determined to be exempt under Section 501(a) of the Code except for such plans that have not yet received determination letters but for which the remedial amendment period for submitting a determination letter has not yet expired; and (iii) there are no pending or, to the actual knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority.

(b)     Neither the Borrower nor any member of its Controlled Group sponsors or contributes to any Pension Plan, nor do any of them have any liability, contingent or otherwise, with respect to any Pension Plan (for the avoidance of doubt, other than payments pursuant to the PBGC Settlement).

(c)     Neither the Borrower nor any member of its Controlled Group sponsors, maintains, contributes to or has any liability, contingent or otherwise, with respect to any plan, fund or other similar program, arrangement or agreement established or maintained outside of the United States primarily for the benefit of employees of the Borrower or any such Controlled Group member residing outside the United States (for the avoidance of doubt, other than payments pursuant to the PBGC Settlement).

SECTION 6.11  Environmental Warranties.  Except as set forth in Item 6.11 of the Disclosure Schedule and except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)  all facilities and property owned, operated or leased by the Borrower or any of its Subsidiaries are owned, operated or leased by the Borrower and its Subsidiaries in material compliance with all Environmental Laws and have been for the past three years;

(b)  there are no pending or, to the Borrower's actual knowledge, threatened (i) written claims, complaints, notices or governmental requests for information received by the Borrower or any of its Subsidiaries with respect to any alleged material violation of any Environmental Law, or (ii) written complaints, notices or inquiries to the Borrower or any of its Subsidiaries regarding material potential liability of the Borrower or any of its Subsidiaries under any Environmental Law;

(c)  there have been no Releases of Hazardous Materials at, on or under any property now or previously owned, operated, or leased by the Borrower or any of its Subsidiaries that to the Borrower's actual knowledge, would require investigation or remediation under any applicable Environmental Law;

(d) the Borrower and its Subsidiaries have been issued and are in material compliance with all permits, certificates, approvals, licenses, registrations and other authorizations required under any applicable Environmental Law;

(e) to the actual knowledge of the Borrower, no property currently or previously owned, operated or leased by the Borrower or any of its Subsidiaries is listed, or proposed for listing on the National Priorities List pursuant to CERCLA, on the CERCLIS or on any similar foreign, federal, state or provincial list of sites requiring investigation or clean-up under Environmental Laws; and

(f) there is no friable asbestos present at any property now owned or leased by the Borrower or any of its Subsidiaries that requires abatement or removal under any applicable Environmental Law.

SECTION 6.12   Regulations U and X.  No Obligor is engaged in the business of extending credit for the purpose of buying or carrying margin stock, and no proceeds of any Loans will be used to purchase or carry margin stock or otherwise for a purpose which violates, or would be inconsistent with, F.R.S. Board Regulation U or Regulation X.  Terms for which meanings are provided in F.R.S. Board Regulation U or Regulation X or any regulations substituted therefor, as from time to time in effect, are used in this Section with such meanings.

SECTION 6.13   Labor Matters.  Except as set forth on Item 6.13 of the Disclosure Schedule, as of the date hereof no Obligor is subject to any labor or collective bargaining agreement.  Except as set forth on Item 6.13 of the Disclosure Schedule, there are no existing or threatened strikes, lockouts or other labor disputes involving any Obligor that singly or in the aggregate could reasonably be expected to have a Material Adverse Effect.  Hours worked by and payments made to employees of each Obligor are not in violation of the Fair Labor Standards Act or any other applicable law, rule or regulation dealing with such matters where such violation could reasonably be expected to have a Material Adverse Effect.

SECTION 6.14   Compliance with Laws.  Each Obligor is in compliance in all material respects with the requirements of all applicable laws and all orders, writs, injunctions and decrees applicable to it or to its properties (except for Environmental Laws which are the subject of Section 6.11), except in such instances in which the failure to comply therewith, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

SECTION 6.15   Deposit Account and Cash Management Accounts.  Set forth on Item 6.15(a) of the Disclosure Schedule is a complete and accurate list of all Deposit Accounts of the Borrower and each Subsidiary and set forth on Item 6.15(b) of the Disclosure Schedule is a complete and accurate list of all Securities Accounts (as defined in the UCC) of the Borrower and each Subsidiary, if any as updated in accordance with Section 7.1.8.

SECTION 6.16   Insurance.  The Borrower and each of its Subsidiaries keeps its property adequately insured and maintains (a) insurance to such extent and against such risks, including fire, as is customary with companies of similar size and in the same or similar businesses, (b) workmen's compensation insurance in the amount required by applicable law, (c) public liability

46

insurance, which shall include product liability insurance, in the amount customary with companies of similar size and in the same or similar business against claims for personal injury or death on properties owned, occupied or controlled by it, and (d) such other insurance as may be required by law.

SECTION 6.17  Material Contracts.  Except as could not be reasonably expected to result in a Material Adverse Effect, each of the Borrower's and its Subsidiaries' material contracts (a) are in full force and effect and are binding upon and enforceable against each Obligor that is a party thereto and, to the best actual knowledge of the Borrower and its Subsidiaries, all other parties thereto in accordance with its terms, and (b) is not in default due to the action of such Obligor.

ARTICLE VII
COVENANTS

SECTION 7.1  Affirmative Covenants.  The Borrower agrees with each Lender and the Administrative Agent that on or after the Closing Date until the Termination Date has occurred, the Borrower will, and will cause its Subsidiaries to, perform or cause to be performed the obligations set forth below.

SECTION 7.1.1  Financial Information, Reports, Notices, etc.  The Borrower will furnish the Administrative Agent, who will distribute to each Lender, copies of the following financial statements, reports, notices and information:

(a)  as soon as available and in any event within 45 days after the end of each of the first three Fiscal Quarters of each Fiscal Year (commencing with the second Fiscal Quarter of the 2011 Fiscal Year), an unaudited consolidated balance sheet of the Parent and its Subsidiaries as of the end of such Fiscal Quarter and consolidated statements of income and cash flow of the Parent and its Subsidiaries for such Fiscal Quarter and for the period commencing at the end of the previous Fiscal Year and ending with the end of such Fiscal Quarter, and including (in each case, except in the case of the second Fiscal Quarter of the 2011 Fiscal Year), in comparative form the figures for the corresponding Fiscal Quarter in, and year to date portion of, the immediately preceding Fiscal Year, in each case, certified as complete and correct by the chief financial or accounting officer of the Borrower (subject to normal year-end audit adjustments);

(b)  as soon as available and in any event within 120 days after the end of each Fiscal Year (commencing with the 2011 Fiscal Year), a copy of the consolidated balance sheet of the Parent and its Subsidiaries, and the related consolidated statements of income and cash flow of the Parent and its Subsidiaries for such Fiscal Year, setting forth in comparative form the figures for the immediately preceding Fiscal Year, audited by independent public accountants; provided that for the 2011 Fiscal Year, such consolidated balance sheet and related consolidated statements of income and cash flow shall cover the period commencing on a date selected by the Borrower in its reasonable discretion (which date is to be no later than the Closing Date) and terminating on December 31, 2011 and shall not need to include comparative statements;

(c)  concurrently with the delivery of the financial information pursuant to <u>clauses (a)</u> and <u>(b)</u>, a Compliance Certificate, executed by the chief financial or accounting officer of the Borrower, (i) showing compliance with the financial covenants set forth in <u>Section 7.2.4</u> and stating that no Default has occurred and is continuing (or, if a Default has occurred, specifying the details of such Default and the action that the Borrower or an Obligor has taken or proposes to take with respect thereto), (ii) stating that no Subsidiary has been formed or acquired since the delivery of the last Compliance Certificate (or, if a Subsidiary has been formed or acquired since the delivery of the last Compliance Certificate, a statement that such Subsidiary has complied with <u>Section 7.1.7</u>) and (iii) in the case of a Compliance Certificate delivered concurrently with the financial information pursuant to <u>clause (b)</u>, a calculation of Excess Cash Flow;

(d)  as soon as practicable and in any event within 45 days after the commencement of each Fiscal Year beginning with the 2012 Fiscal Year, a business plan and financial projections for the Borrower and its Subsidiaries (on a consolidated basis) for such Fiscal Year (including an operating budget and cash flow budget) for the Borrower and its Subsidiaries (on a consolidated basis) accompanied by a certificate of an Authorized Officer of the Borrower to the effect that (a) such projections were prepared by the Borrower in good faith, (b) the Borrower has a reasonable basis for the assumptions contained in such projections and (c) such projections have been prepared in accordance with such assumptions;

(e)  as soon as possible and in any event within ~~10~~5 days after any executive officer of the Borrower or any other Obligor obtains actual knowledge of the occurrence of an Event of Default, a statement of an Authorized Officer of the Borrower setting forth details of such Event of Default and the action which the Borrower or such Obligor has taken and proposes to take with respect thereto;

(f)  as soon as possible and in any event within ~~10~~5 days after any executive officer of the Borrower or any other Obligor obtains actual knowledge of (i) the occurrence of any material adverse development with respect to any litigation, action, proceeding or labor controversy described in <u>Item 6.6</u> of the Disclosure Schedule or (ii) the commencement of any litigation, action, proceeding or labor controversy of the type and materiality described in <u>Section 6.6</u>, notice thereof and, to the extent the Administrative Agent reasonably requests, copies of all documentation relating thereto;

(g)  promptly after the sending or filing thereof, copies of all reports, notices, prospectuses and registration statements which any Obligor files with the SEC, or any national securities exchange;

(h)  promptly following the mailing or receipt of any material notice or report delivered under the terms of the Second Lien Credit Agreement, copies of such notice or report;

(i)  promptly (i) if any executive officer of the Borrower obtains actual knowledge that the Borrower or any Person which owns, directly or indirectly, any Capital Securities of the Borrower, or any other holder at any time of any direct or indirect equitable, legal

or beneficial interest therein is the subject of any of the Terrorism Laws, the Borrower will notify the Administrative Agent in writing and (ii) upon the request of any Lender, the Borrower will provide any information such Lender believes is reasonably necessary to be delivered to comply with the Patriot Act; ~~and~~

(j)  such other financial and other information as the Lenders holding at least 10.0% of the aggregate amount of outstanding Loans may from time to time reasonably request through the Administrative Agent (including information and reports in such detail as such Lenders may reasonably request with respect to the terms of and information provided pursuant to the Compliance Certificate); and

(k) promptly upon receipt thereof, copies of all "management letters" submitted to the Borrower or any other Obligor by the independent public accountants referred to in clause (b) in connection with each audit made by such accountants.

SECTION 7.1.2    Maintenance of Existence; Compliance with Contracts, Laws, etc.  The Borrower will, and will cause each of its Subsidiaries to, preserve and maintain its and their respective legal existence (except as otherwise permitted by Section 7.2.10) and comply in all material respects with all applicable material laws, rules, regulations and orders, including the payment (before the same become delinquent), of all Taxes, imposed upon the Borrower or its Subsidiaries or upon their property except to the extent being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP have been set aside on the books of the Borrower or its Subsidiaries, as applicable.

SECTION 7.1.3    Maintenance of Properties.  The Borrower will, and will cause each of its Subsidiaries to, maintain, preserve, protect and keep its and their respective properties in good repair, working order and condition (ordinary wear and tear excepted), and make necessary material repairs, renewals and replacements so that the business carried on by the Borrower and its Subsidiaries may be properly conducted at all times, unless the Borrower or such Subsidiary determines in good faith that the continued maintenance of such property is no longer economically desirable, necessary or useful to the business of the Borrower or any of its Subsidiaries or the Disposition of such property is otherwise permitted by Sections 7.2.9 or 7.2.10.

SECTION 7.1.4    Insurance.  The Borrower will, and will cause each of its Subsidiaries to maintain:

(a)  insurance on its property with financially sound and reputable insurance companies against loss and damage in at least the amounts (and with only those deductibles) customarily maintained, and against such risks as are typically insured against in the same general area, by Persons of comparable size engaged in the same or similar business as the Borrower and its Subsidiaries; and

(b)  all worker's compensation, employer's liability insurance or similar insurance as may be required under the material laws of any state or jurisdiction in which it may be engaged in business.

Without limiting the foregoing, all insurance policies required pursuant to this Section shall (i) name the Administrative Agent on behalf of the Secured Parties as mortgagee or loss payee (in the case of property insurance) or additional insured (in the case of liability insurance), as applicable, and provide that no cancellation of the policies will be made without thirty days' prior written notice to the Administrative Agent and (ii) be in addition to any requirements to maintain specific types of insurance contained in the other Loan Documents.

SECTION 7.1.5    Books and Records.  The Borrower will, and will cause each of its Subsidiaries to, keep books and records in accordance with GAAP which accurately reflect all of its business affairs and transactions and permit each Secured Party or any of their respective representatives, at reasonable times and intervals upon reasonable notice to the Borrower, to visit each Obligor's offices, to discuss such Obligor's financial matters with its officers and employees and to examine (and photocopy extracts from) any of its books and records.

SECTION 7.1.6    Environmental Law Covenant.  The Borrower will, and will cause each of its Subsidiaries to,

(a)  use and operate all of its and their facilities and properties in compliance with all Environmental Laws, maintain all necessary permits, approvals, certificates, licenses and other authorizations required under applicable Environmental Laws in effect and remain in material compliance therewith, and handle all Hazardous Materials in material compliance with all applicable Environmental Laws, in each case, except for such non-compliance or failure to maintain that would not reasonably be expected to result in a Material Adverse Effect; and

(b)  reasonably promptly notify the Administrative Agent in writing and provide copies upon receipt of all written claims, complaints, notices or inquiries relating to the condition of its owned, operated and leased facilities and properties in respect of, or as to compliance with, Environmental Laws that would reasonably be expected to result in a Material Adverse Effect, and shall promptly resolve any non-compliance with Environmental Laws and keep its owned property free of any Lien imposed by any Environmental Law, except for such Lien that is being contested in good faith and by proper proceedings and for which appropriate reserves consistent with same are being maintained.

SECTION 7.1.7    Future Guarantors, Security, etc.  The Borrower will, and will cause each of its U.S. Subsidiaries to, execute any documents, Filing Statements, agreements and instruments, and take all further action (including filing Mortgages) that may be required under applicable law, or that the Administrative Agent (acting at the written direction of the Required Lenders) may reasonably request, in order to effectuate the transactions contemplated by the Loan Documents and in order to grant, preserve, protect and perfect the validity and first priority (subject to Liens permitted by Section 7.2.3) of the Liens created or intended to be created by the Loan Documents.  The Borrower will cause any subsequently acquired or organized U.S. Subsidiary to execute, within 10 Business Days of its acquisition or organization, a supplement to the Subsidiary Guaranty (in the form of Annex I thereto) and each other applicable Loan Document in favor of the Secured Parties.  In addition, from time to time, the Borrower will, at its cost and expense, promptly secure the Obligations by pledging or creating, or causing to be

pledged or created, perfected Liens with respect to such of its assets and properties as the Required Lenders shall designate, it being agreed that it is the intent of the parties that the Obligations shall be secured by, among other things, substantially all the assets of the Borrower and its U.S. Subsidiaries (including real and personal property acquired subsequent to the Effective Date (but in the case of real property acquired after the Closing Date, the Borrower will only be required to perfect Liens on such real property to the extent the fair market value of such property exceeds $1,000,000)); provided that, neither the Borrower nor its U.S. Subsidiaries shall be required to pledge more than 65% of the Voting Securities of any Foreign Subsidiary unless such pledge would not result in an adverse tax consequence to the Borrower and its Subsidiaries or to their equity holders on a flow through basis.  The Borrower shall deliver or cause to be delivered to the Administrative Agent all customary instruments and documents (including legal opinions, title insurance policies and lien searches) to evidence compliance with this Section.  The Borrower and its Subsidiaries will use commercially reasonable efforts to get a landlord waiver in form and substance reasonably satisfactory to the Required Lenders for all real property leased by any Obligor after the Effective Date which relates to a location in which there is, or is reasonably expected to be, collateral with a book value of $5,000,000 or more.  The Borrower agrees that it will not, nor will it permit any of its Subsidiaries to, store collateral with a book value of more than $5,000,000 in any location at which it has not obtained a landlord waiver for more than 60 days.

SECTION 7.1.8   Cash Management.  The Borrower will, and will cause each Subsidiary Guarantor to: (i) ensure that such Person's Account Debtors forward payment of all amounts owed by them to such Person to one of the Deposit Accounts of such Person set forth on Item 6.15(a) of the Disclosure Schedule, and (ii) deposit, or cause to be deposited, promptly, and in any event no later than the fifourth Business Day after the date of receipt thereof, all of such Person's Collections in one of the Deposit Accounts of such Person set forth on Item 6.15(a) of the Disclosure Schedule.  Prior to or as soon as practicable following the Closing Date, the Borrower will use commercially reasonable efforts to deliver to the Administrative Agent fully executed Control Agreements with respect to each Deposit Account and Securities Account of the Borrower set forth on Item 6.15(a) and Item 6.15(b) of the Disclosure Schedule.  At all times after the delivery of such Control Agreements, the Borrower will use commercially reasonable efforts to ensure, prior to any termination or expiration of the Control Agreement relating to the Deposit Accounts initially set forth on Item 6.15(a) of the Disclosure Schedule, that such Deposit Accounts are replaced with Deposit Accounts subject to a Control Agreement.  The Borrower may amend Item 6.15(a) and Item 6.15(b) of the Disclosure Schedule to add or replace one or more of the Deposit Accounts; provided, however, that (i) the prospective depository institution at which such Deposit Account will be held shall be reasonably satisfactory to the Required Lenders and (ii) in the event such Deposit Account will replace or be in addition to a Deposit Account set forth on Item 6.15(a) of the Disclosure Schedule hereto, prior to the time of the opening of such Deposit Account, the Borrower and such prospective depository institution shall use commercially reasonable efforts to have executed and delivered to the Administrative Agent, and the Administrative Agent shall have executed, a Control Agreement in respect of such Deposit Account.

SECTION 7.1.9   Maintenance of Corporate Separateness.  The Borrower will, and will cause each of its Subsidiaries to, satisfy customary corporate formalities, including the holding of regular board of directors' and shareholders' meetings and the maintenance of

corporate offices and records and take all actions reasonably necessary to maintain their corporate separateness.

SECTION 7.1.10    Landlord's Agreements and Bailee Letters.  Prior to or as soon as practicable following the Closing Date, the Borrower will use commercially reasonable efforts to deliver to the Administrative Agent a landlord's agreement or bailee letter with respect to each location set forth on Item 7.1.10 to the Disclosure Schedule.

SECTION 7.1.11    Mortgages. ~~Prior to or as soon as practicable~~ and Insurance.  Within 30 days following the Closing Date, the Borrower will deliver to the Administrative Agent counterparts of each Mortgage, duly executed and delivered by the applicable Obligor, together with:

(a)  evidence of the completion (or satisfactory arrangements for the completion) of all recordings and filings of each Mortgage as may be necessary or desirable to create a valid, perfected first priority Lien against the properties purported to be covered thereby;

(b)  mortgagee's title insurance policies in favor of the Administrative Agent for the benefit of the Secured Parties in amounts and in form and substance as shall be customary for similar properties, with respect to the real and, if any, other property purported to be covered by each Mortgage, insuring that title to such property is marketable and that the interests created by each Mortgage constitute valid first Liens thereon free and clear of all defects and encumbrances (other than the subordinated lien in favor of the Second Lien Lenders pursuant to the Second Lien Loan Documents and the Intercreditor Agreement); ~~and~~

(c)  opinions addressed to the Administrative Agent and all Lenders from local real estate counsel to the Obligors in all jurisdictions where the Borrower maintains material real estate, as determined in the Borrower's reasonable discretion~~.~~; and

(d)  a certificate of an Authorized Officer of the Borrower certifying as to compliance with Section 7.1.4.

SECTION 7.2    Negative Covenants.  The Borrower covenants and agrees with each Lender and the Administrative Agent that on or after the Closing Date until the Termination Date has occurred, the Borrower will, and will cause its Subsidiaries to, perform or cause to be performed the obligations set forth below.

SECTION 7.2.1    Business Activities.  The Borrower will not, and will not permit any of its Subsidiaries to engage in any business activity except those business activities engaged in or contemplated on the date of this Agreement and activities reasonably incidental thereto or reasonable extensions thereof.

SECTION 7.2.2    Indebtedness.  The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Indebtedness, except:

(a)  Indebtedness in respect of the Obligations;

(b)  Indebtedness existing as of the Effective Date which is identified in Item 7.2.2(b) of the Disclosure Schedule, and refinancing of such Indebtedness in a principal amount not in excess of that which is outstanding on the Effective Date (as such amount has been reduced following the Effective Date) plus all costs, fees and expenses related to such refinancing;

(c)  unsecured Indebtedness (i) incurred in the ordinary course of business of the Borrower and its Subsidiaries (including open accounts extended by suppliers on normal trade terms in connection with purchases of goods and services (including insurance premium payables in the ordinary course), which are not overdue for a period of more than 90 days or, if overdue more than 90 days, as to which a dispute exists and adequate reserves in conformity with GAAP have been established on the books of the Borrower or such Subsidiary) and (ii) in respect of performance, surety or appeal bonds provided in the ordinary course of business, but excluding (in each case), Indebtedness incurred through the borrowing of money or Contingent Liabilities in respect thereof;

(d)  Indebtedness (i) in respect of industrial revenue bonds or other similar governmental or municipal bonds, (ii) evidencing the deferred purchase price of newly acquired property or incurred to finance the acquisition of equipment of the Borrower and its Subsidiaries (pursuant to purchase money mortgages or otherwise, whether owed to the seller or a third party) used in the ordinary course of business of the Borrower and its Subsidiaries (provided that, such Indebtedness is incurred within 60 days of the acquisition of such property) and (iii) in respect of Capitalized Lease Liabilities; provided that, the aggregate amount of all Indebtedness outstanding pursuant to this clause shall not at any time exceed $10,000,000;

(e)  Indebtedness of any Subsidiary owing to the Borrower or any other Subsidiary; provided that, the aggregate amount of all such Indebtedness incurred by a Subsidiary that is not a Subsidiary Guarantor, when aggregated with the amount of all Investments made by the Borrower and the Subsidiary Guarantors in Subsidiaries which are not Subsidiary Guarantors pursuant to clause (e)(i) of Section 7.2.5, shall not exceed $5,000,000 at any time;

(f)  Second Lien Loans incurred pursuant to the terms of the Second Lien Loan Documents (for the avoidance of doubt, including PIK interest paid pursuant thereto), and Contingent Liabilities of the Subsidiary Guarantors in respect of the Second Lien Loans; and, the refinancing of all such Indebtedness so long as (i) such refinancing is permitted by the Intercreditor Agreement and (ii) the administrative agent for such replacement Second Lien Credit Agreement executes and delivers the Intercreditor Agreement;

(g)  Indebtedness incurred by the Borrower and its Subsidiaries arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, or from guaranties or letters of credit, surety bonds or performance bonds securing the performance of the Borrower or any such Subsidiary pursuant to such agreements, in connection with Permitted Acquisitions or permitted Dispositions of any business, assets or Subsidiary of the Borrower or any of its Subsidiaries;

(h)  the Borrower and its Subsidiaries may become and remain liable with respect to deferred purchase price obligations (including obligations in respect of Earnout Payments) incurred as part of the consideration paid or payable in respect of Permitted Acquisitions; provided that with respect to all Permitted Acquisitions, the aggregate principal amount of all such deferred purchase price obligations shall not exceed $10,000,000 in the aggregate over the term of this Agreement;

(i)  Indebtedness of a Person existing at the time such Person became a Subsidiary of the Borrower, but only if such Indebtedness was not created or incurred in contemplation of such Person becoming a Subsidiary and the aggregate outstanding amount of all Indebtedness existing pursuant to this clause does not exceed $10,000,000 at any time;

(j)  Indebtedness incurred by the Borrower or any of its Subsidiaries which may be deemed to exist pursuant to any performance guaranties, performance, surety, statutory, appeal or similar obligations incurred in the ordinary course of business;

(k)  Indebtedness incurred by the Borrower or any of its Subsidiaries in respect of customary netting services, overdraft protections and similar liabilities incurred in the ordinary course in connection with customary Deposit Accounts maintained by the Borrower and its Subsidiaries as part of its ordinary course cash management program;

(l)  Indebtedness with respect to Purchase Card Agreements in an aggregate amount not to exceed $2,000,000 outstanding at any one time;

(m)  other unsecured Indebtedness of the Borrower and its Subsidiaries (other than Indebtedness of Foreign Subsidiaries owing to the Borrower or Guarantors) in an aggregate amount at any time outstanding not to exceed $10,000,000;

(n)  Indebtedness to one or more issuers of letters of credit with respect to cash collateralized letters of credit in a principal or face amount not to exceed $10,000,000 in the aggregate; and

(o)  Indebtedness consisting of obligations to PBGC pursuant to the PBGC Settlement.

SECTION 7.2.3    Liens.  The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Lien upon any of its property (including Capital Securities of any Person), revenues or assets, whether now owned or hereafter acquired, except:

(a)  Liens securing payment of the Obligations;

(b)  Liens existing as of the Effective Date and disclosed in Item 7.2.3(b) of the Disclosure Schedule securing Indebtedness described in clause (b) of Section 7.2.2, and refinancings of such Indebtedness; provided that, no such Lien shall encumber any additional property and the amount of Indebtedness secured by such Lien is not increased from that existing on the Effective Date (as such Indebtedness may have been

permanently reduced subsequent to the Effective Date) plus all costs, fees and expenses related to such Liens;

(c)  Liens securing Indebtedness of the type permitted under clause (d) of Section 7.2.2; provided that, with respect to Indebtedness permitted by clause (d)(ii) of Section 7.2.2, (i) such Lien is granted within 60 days after such Indebtedness is incurred, (ii) the Indebtedness secured thereby does not exceed 80% of the lesser of the cost or the fair market value of the applicable property, improvements or equipment at the time of such acquisition (or construction) and (iii) such Lien secures only the assets that are the subject of the Indebtedness referred to in such clause;

(d)  Liens securing Indebtedness permitted by clause (i) of Section 7.2.2; provided that, such Liens existed prior to such Person becoming a Subsidiary, were not created in anticipation thereof and attach only to assets of such Person;

(e)  Liens in favor of carriers, warehousemen, mechanics, materialmen and landlords granted in the ordinary course of business for amounts not overdue or being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books;

(f)  Liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance or other forms of governmental insurance or benefits, or to secure performance of tenders, statutory obligations, bids, leases or other similar obligations (other than for borrowed money) entered into in the ordinary course of business or to secure obligations on surety and appeal bonds or performance bonds;

(g)  judgment Liens in existence for less than 60 days after the entry thereof or with respect to which execution has been stayed or the payment of which is covered in full (subject to a customary deductible) by insurance maintained with responsible insurance companies and which do not otherwise result in an Event of Default under Section 8.1.5;

(h)  easements, rights-of-way, zoning restrictions, minor defects or irregularities in title and other similar encumbrances not interfering in any material respect with the value or use of the property to which such Lien is attached;

(i)  Liens for Taxes not at the time delinquent or thereafter payable without penalty or being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books;

(j)  Liens securing Indebtedness permitted under clause (f) of Section 7.2.2 and subordinated to the Liens securing the Obligations pursuant to the Intercreditor Agreement;

(k)  Liens solely on any earnest money deposit made by the Borrower or any of its Subsidiaries in connection with any lease, letter of intent, purchase agreement or lease permitted hereunder entered into the ordinary course of business;

(l)  purported Liens evidenced by filing of precautionary UCC financing statements relating solely to operating leases for personal property entered into in the ordinary course of business;

(m)  Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of custom duties in connection with the importation of goods;

(n)  any zoning or similar law or right reserved or vested in any governmental office or agency to control or regulate the use of, or any reservation in the grant from the crown in respect of, any real property;

(o)  licenses of patents, trademarks and other intellectual property rights granted by the Borrower or any of its Subsidiaries in the ordinary course of business and not interfering in any respect with the ordinary conduct of such Borrower or such Subsidiary;

(p)  Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a creditor depository institution;

(q)  any interest or title of a lessor, licensor or sublessor under any lease or license entered into the ordinary course of its business and covering only the assets so leased or licensed granted in the ordinary course of business;

(r)  Liens on inventory that is in the possession of a third party in the ordinary course of business;

(s)  Liens on any leased real property granted by landlords under such leases;

(t)  Liens on any leased real property granted to landlords under any leases; and

(u) Liens on cash held by one or more issuers of letters of credit in an amount not to exceed $10,500,000 in the aggregate securing Indebtedness permitted by clause (n) of Section 7.2.2.

SECTION 7.2.4   Financial Condition and Operations.  The Borrower will not permit any of the events set forth below in clauses (a) and (b) to occur:

(a)  The Borrower will not permit the Total Leverage Ratio as of the last day of any period set forth below to be greater than:

| Fiscal Quarter Ending | Total Leverage Ratio |
|---|---|
| September 30, 2011 | ~~8.00~~7.60:1.00 |
| December 31, 2011 | ~~7.75~~7.35:1.00 |
| March 31, 2012 | ~~7.75~~7.15:1.00 |
| June 30, 2012 | ~~7.50~~7.00:1.00 |

| | |
|---|---|
| September 30, 2012 | ~~7.25~~6.80:1.00 |
| December 31, 2012 | ~~7.00~~6.60:1.00 |
| March 31, 2013 | ~~7.00~~6.50:1.00 |
| June 30, 2013 | ~~6.75~~6.40:1.00 |
| September 30, 2013 | ~~6.75~~6.40:1.00 |
| December 31, 2013 | ~~6.75~~6.40:1.00 |
| March 31, 2014 | ~~6.75~~6.30:1.00 |
| June 30, 2014 | ~~6.50~~6.10:1.00 |
| September 30, 2014 | ~~6.50~~6.00:1.00 |
| December 31, 2014 | ~~6.50~~6.00:1.00 |
| [March 31, 2015] | ~~6.25~~6.00:1.00 |

(b)  The Borrower will not permit the Interest Coverage Ratio as of the last day of any period set forth below to be less than:

| Fiscal Quarter Ending | Interest Coverage Ratio |
|---|---|
| September 30, 2011 | ~~1.75~~1.80:1.00 |
| December 31, 2011 | ~~1.75~~1.80:1.00 |
| March 31, 2012 | ~~1.75~~1.80:1.00 |
| June 30, 2012 | ~~1.75~~2.00:1.00 |
| September 30, 2012 | ~~1.75~~2.00:1.00 |
| December 31, 2012 | 2.00:1.00 |
| March 31, 2013 | 2.00:1.00 |
| June 30, 2013 | 2.00:1.00 |
| September 30, 2013 | 2.00:1.00 |
| December 31, 2013 | 2.00:1.00 |
| March 31, 2014 | 2.00:1.00 |
| June 30, 2014 | 2.00:1.00 |
| September 30, 2014 | 2.00:1.00 |
| December 31, 2014 | 2.00:1.00 |
| [March 31, 2015] | 2.00:1.00 |

SECTION 7.2.5   <u>Investments</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, purchase, make, incur, assume or permit to exist any Investment in any other Person, except:

(a)  Investments existing on the Effective Date and identified in <u>Item 7.2.5(a)</u> of the Disclosure Schedule;

(b)  Cash Equivalent Investments;

(c)  Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(d)  Investments consisting of any deferred portion of the sales price received by the Borrower or any Subsidiary in connection with any Disposition permitted under <u>Section 7.2.10</u>;

(e)  Investments by way of contributions to capital or purchases of Capital Securities (i) by the Borrower in any Subsidiaries or by any Subsidiary in other Subsidiaries; <u>provided</u> that, the aggregate amount of intercompany loans made pursuant to <u>clause (e)</u> of <u>Section 7.2.2</u> and Investments under this clause made by the Borrower and Subsidiary Guarantors in Subsidiaries that are not Subsidiary Guarantors shall not exceed the amount set forth in <u>clause (e)</u> of <u>Section 7.2.2</u> at any time, or the Borrower or (ii) by any Subsidiary in the Borrower;

(f)  Investments constituting (i) accounts receivable arising, (ii) trade debt granted, or (iii) deposits made in connection with the purchase price of goods or services, in each case in the ordinary course of business;

(g)  Investments by way of the acquisition of Capital Securities constituting Permitted Acquisitions permitted under <u>clause (d)</u> of <u>Section 7.2.9</u>; <u>provided</u>, that such Investments shall result in the acquisition of a wholly owned U.S. Subsidiary;

(h)  intercompany loans, advances or guaranties among the Borrower and its Subsidiaries, all to the extent permitted by <u>clause (e)</u> of <u>Section 7.2.2</u> and <u>clause (e)</u> of this <u>Section 7.2.5</u>;

(i)  Capital Expenditures to the extent permitted by <u>Section 7.2.7</u>;

(j)  loans to officers, directors and employees of the Borrower and its Subsidiaries to be used to purchase Capital Securities of the Parent and/or to acquire options on, or purchase upon exercise of such options, Capital Securities of the Parent; <u>provided</u>, that, in each case, the proceeds of such loans are reinvested in the Borrower and do not exceed $5,000,000;

(k)  Investments in Persons (other than Obligors or any Person owning, controlling or managing, directly or indirectly an Obligor) that are not Subsidiaries in an aggregate amount not to exceed $2,000,000 at any time outstanding;

(l)  without duplication, Contingent Liabilities to the extent permitted by Section 7.2.2;

(m)  good faith deposits made in connection with prospective Permitted Acquisitions to the extent permitted by Section 7.2.9;

(n)  bank deposits established and maintained in the ordinary course of business and consistent with past practice;

(o)  customary deposits made in connection with operating leases;

(p)  Investments in the form of deposits, prepayments and other credits to suppliers in the ordinary course of business;

(q)  Investments in the form of Capital Securities received from or on behalf of any Person as a part of the consideration paid or payable in respect of any Disposition made by the Borrower or any of its Subsidiaries; provided that, the fair market value of all such Capital Securities held by the Borrower and its Subsidiaries (as determined as of the time such securities are received) shall not exceed in the aggregate the greater of (i) $5,000,000 and (ii) 25% of the aggregate proceeds received by the Borrower from such Disposition; provided, further, that, "fair market value" for any such Capital Securities shall be (x) if prices for such securities are quoted on a national public exchange or equivalent, the quoted price for such securities on such exchange as of the close of business on the Business Day immediately preceding the day of receipt of such securities, and (y) if prices for such securities are not quoted on a national public exchange or equivalent, the value of such securities as determined by the board of directors (or equivalent) of the Borrower in the exercise of its good faith judgment at the time of receipt of such securities; and

(r)  other Investments in an amount not to exceed $10,000,000 at any time over the term of this Agreement irrespective of any gains received, accrued or recognized on such Investments;

provided that any Investment which when made complies with the requirements of the definition of the term "Cash Equivalent Investment" may continue to be held notwithstanding that such Investment if made thereafter would not comply with such requirements; and no Investment otherwise permitted by clauses (g), (j), or (m) shall be permitted to be made if any Default has occurred and is continuing or would result therefrom.

SECTION 7.2.6    Restricted Payments, etc.  The Borrower will not, and will not permit any of its Subsidiaries to, declare or make a Restricted Payment, or make any deposit for any Restricted Payment, except:

(a)  Restricted Payments made by Subsidiaries to the Borrower or wholly owned Subsidiaries;

(b)  so long as no Default has occurred and is continuing, or shall be caused thereby, Restricted Payments made by the Borrower or its Subsidiaries:

(i)  to make payments pursuant to the Management Agreements and the LLC Agreement as in effect from time to time;

(ii)  in an aggregate amount not to exceed $2,500,000 in any Fiscal Year (A) to the extent necessary to make repurchases of Capital Securities (and options or warrants to purchase such Capital Securities) of the Parent from employees (1) upon termination (including by reason of death, disability or retirement) of such employees or (2) pursuant to a contractual obligation of the Parent and (B) to the Parent to the extent necessary to permit the Parent or any parent company thereof to pay reasonable accounting, legal, insurance, SEC related, and similar fees, expenses and costs, and expenses and indemnity payments to directors; and

(iii)  to the Parent to permit the Parent to make tax distributions to its members in accordance with (and in the amounts permitted by) the LLC Agreement; provided, that, with respect to any taxable year, the amount distributed to members of the Parent pursuant to this clause shall not exceed the product of the amount of taxable income of the Borrower allocable to such members and the Hypothetical Tax Rate and, provided, further, that the Borrower shall be permitted to make periodic tax distributions to permit payments of estimated taxes by members of the Parent based on reasonable estimates of the taxable income of the Borrower allocable to the members of the Parent and the Hypothetical Tax Rate.

SECTION 7.2.7   Capital Expenditures.  Subject (in the case of Capitalized Lease Liabilities) to clause (e) of Section 7.2.2, the Borrower will not, and will not permit any of its Subsidiaries to, make or commit to make Capital Expenditures in any period set forth below which aggregate in excess of the amount set forth below opposite such period:

| Period | Maximum Capital Expenditure Amount |
|---|---|
| Each period of twelve consecutive months ending on the last day of each Fiscal Quarter starting with the Fiscal Quarter ending on September 30, 2011 | $20,000,000 |

SECTION 7.2.8  Issuance of Capital Securities.  The Borrower will not, and will not permit any of its Subsidiaries to, issue any Capital Securities (whether for value or otherwise) to any Person other than (in the case of Subsidiaries), to the Borrower or another wholly owned Subsidiary (unless such Capital Securities are not mandatorily redeemable at any time prior to one year and one day after the Stated Maturity Date for the Loans).

SECTION 7.2.9  <u>Consolidation, Merger; Permitted Acquisitions, etc.</u>  The Borrower will not, and will not permit any of its Subsidiaries to, liquidate or dissolve, consolidate with, or merge or amalgamate into or with, any other Person, or purchase or otherwise acquire all or substantially all of the assets of any Person (or any division thereof), except:

(a)  any Subsidiary may liquidate or dissolve voluntarily into, and may merge or amalgamate with and into, the Borrower or any other Subsidiary; (<u>provided</u> that, in any merger involving the Borrower, the Borrower is the surviving Person and a Subsidiary Guarantor may only merge with and into another Subsidiary Guarantor);

(b)  the assets or Capital Securities of any Subsidiary may be purchased or otherwise acquired by the Borrower or any other Subsidiary (<u>provided</u> that, the assets or Capital Securities of any Subsidiary Guarantor may only be purchased or otherwise acquired by the Borrower or another Subsidiary Guarantor); <u>provided</u>, <u>further</u>, that in no event shall any Subsidiary consolidate with or merge with and into any other Subsidiary unless after giving effect thereto, the Administrative Agent shall have a perfected pledge of, and security interest in and to, at least the same percentage of the issued and outstanding interests of Capital Securities (on a fully diluted basis) and other assets of the surviving Person as the Administrative Agent had immediately prior to such merger or consolidation;

(c)  Investments made in accordance with <u>Section 7.2.5</u>;

(d)  the Borrower or any of its Subsidiaries may purchase all or substantially all of the assets of any Person (or any division thereof), or acquire such Person by merger or otherwise, in each case, if:

(i)  no Default has occurred and is continuing or would occur after giving effect thereto;

(ii)  such purchase or acquisition constitutes a Permitted Acquisition;

(iii)  the amount (which shall include all obligations in respect of Earnout Payments and other deferred purchase price arrangements) paid or payable in connection with all other transactions permitted under this <u>clause (d)</u> (together with all previous Permitted Acquisitions) does not exceed $20,000,000 in any Fiscal Year and $50,000,000 over the term of this Agreement;

(e)  any Subsidiary may convert into a limited liability company following at least sixty (60) days' advance written notice to the Administrative Agent.

SECTION 7.2.10   <u>Permitted Dispositions</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, Dispose of any of the Borrower's or such Subsidiaries' assets (including accounts receivable and Capital Securities of Subsidiaries) to any Person in one transaction or series of transactions unless such Disposition is:

(a)  inventory or obsolete, damaged, worn out or surplus property, or the discounted sale of defaulted or delinquent trade receivables written off and reserved;

(b)  permitted by Sections 7.2.9 and 7.2.14;

(c)  (i) the cross-licensing or non-exclusive licensing of intellectual property, in the ordinary course of business and (ii) the contemporaneous exchange, in the ordinary course of business, of property for property of a substantially like kind and use (other than as set forth in clause (i)), to the extent that the property received in such exchange is of a value substantially equivalent to the value of the property exchanged;

(d)  Investments made in accordance with Section 7.2.5 and Restricted Payments made in accordance with Section 7.2.6;

(e)  the leasing or sub-leasing of property that would not materially interfere with the required use of such property by the Borrower or any of its Subsidiaries; and

(f)  other Dispositions so long as: (i) such Disposition is for fair market value and the consideration received consists of no less than 75% in cash, (ii) the Net Disposition Proceeds received from such Disposition, together with the Net Disposition Proceeds of all other assets Disposed of pursuant to this clause since the Closing Date, does not exceed (individually or in the aggregate) $25,000,000 over the term of this Agreement (inclusive of the fair market value of any Capital Securities of the type described in clause (q) of Section 7.2.5), (iii) the Net Disposition Proceeds from such Disposition are applied pursuant to Sections 3.1.1 and 3.1.2, and (iv) no Default has occurred and is continuing; and

(g)  set forth on Item 7.2.10(g) of the Disclosure Schedule.

SECTION 7.2.11   Modification of Certain Agreements.  The Borrower will not, and will not permit any of its Subsidiaries to, consent to any amendment, supplement, waiver or other modification of, or enter into any forbearance from exercising any rights with respect to the terms or provisions contained in:

(a)  the Asset Purchase Agreement, the Plan and the Management Agreements to the extent such action is materially adverse to the Lenders (it being agreed that annual scheduled management fees payable under the Management Agreements shall be subject to a cap of $1,250,000 in the aggregate ~~unless otherwise agreed by the Required Lenders~~));

(b)  the Organic Documents of the Borrower or any of its Subsidiaries, if the result would have a material adverse effect on the rights or remedies of any Secured Party; and

(c)  any of the Second Lien Loan Documents, other than any amendment, supplement, waiver or modification to the extent permitted by the Intercreditor Agreement.

SECTION 7.2.12   <u>Transactions with Affiliates</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, enter into or cause or permit to exist any arrangement, transaction or contract (including for the purchase, lease or exchange of property or the rendering of services) with any of its other Affiliates, unless such arrangement, transaction or contract is on fair and reasonable terms no less favorable to the Borrower or such Subsidiary than it could obtain in an arm's-length transaction with a Person that is not an Affiliate other than:

(a)  transactions among the Obligors otherwise permitted hereunder;

(b)  reasonable fees and compensation (including equity-based compensation and employee benefits) paid to, and indemnity provided for the benefit of, officers, directors, board members, employees or consultants of the Parent or any Subsidiary as determined in good faith by the Parent's board of directors;

(c)  the payment of Restricted Payments as provided under <u>Section 7.2.6</u>;

(d)  transactions that were or are consummated in accordance with the Plan or the Asset Purchase Agreement, in each case, as in effect on the Effective Date;

(e)  Indebtedness represented by this Agreement and the Second Lien Credit Agreement, the Intercreditor Agreement, and any amendments, restatements or modifications thereof and the transactions pursuant thereto that are permitted hereby and by the Intercreditor Agreement; and

(f)  transactions pursuant to the Management Agreements and the LLC Agreement.

SECTION 7.2.13   <u>Restrictive Agreements, etc.</u>  The Borrower will not, and will not permit any of its Subsidiaries to, enter into any agreement prohibiting:

(a)  the creation or assumption of any Lien upon its properties, revenues or assets, whether now owned or hereafter acquired;

(b)  the ability of any Obligor to amend or otherwise modify any Loan Document; or

(c)  the ability of any Subsidiary to make any payments, directly or indirectly, to the Borrower, including by way of dividends, advances, repayments of loans, reimbursements of management and other intercompany charges, expenses and accruals or other returns on investments.

The foregoing prohibitions shall not apply to restrictions contained (i) in any Loan Document, (ii) in the case of <u>clause (a)</u>, any agreement governing any Indebtedness permitted by <u>clause (d)</u> of <u>Section 7.2.2</u> as to the assets financed with the proceeds of such Indebtedness, (iii) in the case of <u>clause (a)</u>, covenants in documents creating Liens permitted by <u>Section 7.2.3</u> prohibiting further Liens on the properties encumbered thereby; (iv) in the case of <u>clauses (a)</u> and <u>b</u>), in the Second Lien Loan Documents; or (v) any prohibition or limitation that (a) exists pursuant to applicable law, (b) consists of customary restrictions and conditions contained in any agreement

relating to the sale of any property permitted under Section 7.2.10 pending the consummation of such sale, (c) consists of customary restrictions and conditions contained in any lease or restricts subletting or assignment of any lease governing a leasehold interest of an Obligor, (d) exists in any agreement or other instrument of a person acquired in an Investment permitted hereunder in existence at the time of such Investment (but not created in connection therewith or in contemplation thereof), which prohibition or limitation is not applicable to any person, or the properties or assets of any person, other than the person, or the property or assets of the person so acquired or (e) is imposed by any amendments or refinancings that are otherwise permitted by the Loan Documents of the contracts, instruments or obligations referred to in clause (iv) or (v)(d); provided that such amendments and refinancings are no more materially restrictive with respect to such prohibitions and limitations than those prior to such amendment or refinancing.

SECTION 7.2.14    Sale and Leaseback.  The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly enter into any agreement or arrangement providing for the sale or transfer by it of any property (now owned or hereafter acquired) to a Person and the subsequent lease or rental of such property or other similar property from such Person except the sale-leasebacks entered into in connection with the Livermore Property, the Goshen Property and the Emigsville Property.

SECTION 7.2.15    Pension Plans.  The Borrower will not, and will not permit any of its Subsidiaries to sponsor or contribute to any Pension Plan, or have any liability, contingent or otherwise, with respect to any Pension Plan (for the avoidance of doubt, other than the PBGC Settlement).

SECTION 7.2.16    No Payment or Prepayment of Certain Indebtedness.  The Borrower will not, and will not permit any of its Subsidiaries to:

(a)  make any payment or prepayment of principal of, or premium or interest on any Second Lien Loan, other than: (A) interest required to be paid pursuant to (1) the Second Lien Credit Agreement and (2) the documents governing any refinancing of the Second Lien Loans that is permitted by the Intercreditor Agreement (including, with respect to clauses (1) and (2), any interest capitalized or paid in kind), to the extent such cash payment is not prohibited by the Intercreditor Agreement (or, in the case of a permitted refinancing, any intercreditor agreement related to such refinancing or required to be entered into in connection therewith) or (B) with respect to principal, (1) on the Stated Maturity Date (as defined in the Second Lien Credit Agreement), (2) following the repayment in full of the Loans, with excess proceeds of mandatory prepayments or (3) upon any refinancing of the Second Lien Loans permitted by the Intercreditor Agreement;

(b)  redeem, retire, purchase, defease or otherwise acquire any Second Lien Loan (except as set forth in clause (a)); or

(c)  make any deposit (including the payment of amounts into a sinking fund or other similar fund) for any of the foregoing purposes other than, in the case of the Second Lien Loans, in connection with a refinancing of the Second Lien Loans to the extent permitted by the Intercreditor Agreement.

ARTICLE VIII
EVENTS OF DEFAULT

SECTION 8.1    Listing of Events of Default.  Each of the following events or occurrences described in this Article shall constitute an "Event of Default".

SECTION 8.1.1    Non-Payment of Obligations.  The Borrower shall default in the payment or prepayment when due of:

(a)  any principal of any Loan and such default shall continue unremedied for a period of two Business Days after such amount was due; or

(b)  any interest or fee described in Article III or any other monetary Obligation, and such default shall continue unremedied for a period of five Business Days after such amount was due.

SECTION 8.1.2    Non-Performance of Certain Covenants and Obligations.  The Borrower shall default in the due performance or observance of any of its obligations under Section 7.1.1, Section 7.1.2 or Section 7.2.

SECTION 8.1.3    Non-Performance of Other Covenants and Obligations.  Any Obligor shall default in the due performance and observance of any other agreement contained in any Loan Document executed by it, and such default shall continue unremedied for a period of 60 days after the earlier of (a) the date of the Borrower's actual knowledge of such default or (b) notice thereof given to the Borrower by the Administrative Agent or any Lender.

SECTION 8.1.4    Default on Other Indebtedness.  A default shall occur in the payment of any amount when due (subject to any applicable grace period), whether by acceleration or otherwise, of any principal or stated amount of, or interest or fees on, any Indebtedness (other than Indebtedness described in Section 8.1.1) of the Borrower or any of its Subsidiaries or any other Obligor having a principal or stated amount, individually or in the aggregate, in excess of $10,000,000, or a default shall occur in the performance or observance of any obligation or condition with respect to such Indebtedness if the effect of such default is to accelerate the maturity of any such Indebtedness or such default shall continue unremedied for any applicable period of time sufficient to permit the holder or holders of such Indebtedness, or any trustee or agent for such holders, to cause or declare such Indebtedness to become due and payable or to require such Indebtedness to be prepaid, redeemed, purchased or defeased, or require an offer to purchase or defease such Indebtedness to be made, prior to its expressed maturity.

SECTION 8.1.5    Judgments.  Any judgment or order for the payment of money individually or in the aggregate in excess of $10,000,000 (exclusive of any amounts fully covered by insurance (less any applicable deductible) and as to which the insurer has not denied or objected to its responsibility to cover such judgment or order) shall be rendered against the Borrower or any of its Subsidiaries or any other Obligor and such judgment shall not have been vacated or discharged or stayed or bonded pending appeal within 60 days after the entry thereof or enforcement proceedings shall have been commenced by any creditor upon such judgment or order.

SECTION 8.1.6   <u>Change in Control</u>.  Any Change in Control shall occur.

SECTION 8.1.7   <u>Bankruptcy, Insolvency, etc.</u>  The Borrower, any of its Subsidiaries or any other Obligor shall:

(a)  generally fail to pay, or admit in writing its inability or general unwillingness to pay, debts as they become due;

(b)  apply for, consent to, or acquiesce in the appointment of a trustee, receiver, sequestrator or other custodian for any substantial part of the property of any thereof, or make a general assignment for the benefit of creditors;

(c)  in the absence of such application, consent or acquiescence in or permit or suffer to exist the appointment of a trustee, receiver, receiver manager, sequestrator or other custodian for a substantial part of the property of any thereof, and such trustee, receiver, receiver manager, sequestrator or other custodian shall not be discharged within 90 days; <u>provided</u> that, the Borrower, each Subsidiary and each other Obligor hereby expressly authorizes each Secured Party to appear in any court conducting any relevant proceeding during such 90-day period to preserve, protect and defend their rights under the Loan Documents;

(d)  permit or suffer to exist the commencement of any bankruptcy, reorganization, debt arrangement or other case or proceeding under any bankruptcy or insolvency law or any dissolution, winding up or liquidation proceeding, in respect thereof, and, if any such case or proceeding is not commenced by the Borrower, any Subsidiary or any Obligor, such case or proceeding shall be consented to or acquiesced in by the Borrower, such Subsidiary or such Obligor, as the case may be, or shall result in the entry of an order for relief or shall remain for 90 days undismissed; <u>provided</u> that, the Borrower, each Subsidiary and each Obligor hereby expressly authorizes each Secured Party to appear in any court conducting any such case or proceeding during such 90-day period to preserve, protect and defend their rights under the Loan Documents; or

(e)  take any action authorizing, or in furtherance of, any of the foregoing.

SECTION 8.1.8   <u>Impairment of Security, etc.</u>  Any Loan Document shall (except in accordance with its terms), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of any Obligor party thereto; any Lien shall (except in accordance with the terms of any Loan Document), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of any Obligor subject thereto in respect of any material portion of the Collateral (as defined in the Security Agreement); any Obligor or any other party shall contest in any manner such effectiveness, validity, binding nature or enforceability; or, except as permitted under any Loan Document, any Lien securing any Obligation shall, in whole or in part, cease to be a perfected first priority Lien with respect to any material portion of the Collateral.

SECTION 8.2   <u>Action if Bankruptcy</u>.  If any Event of Default described in <u>clauses (a)</u> through <u>(d)</u> of <u>Section 8.1.7</u> with respect to the Borrower shall occur, the outstanding principal

amount of all outstanding Loans and all other Obligations shall automatically be and become immediately due and payable, without notice or demand to any Person.

SECTION 8.3    Action if Other Event of Default.  If any Event of Default (other than any Event of Default described in clauses (a) through (d) of Section 8.1.7 with respect to the Borrower) shall occur for any reason, whether voluntary or involuntary, and be continuing, the Administrative Agent, upon the written direction of the Required Lenders, shall by notice to the Borrower declare all or any portion of the outstanding principal amount of the Loans and other Obligations to be due and payable, whereupon the full unpaid amount of such Loans and other Obligations which shall be so declared due and payable shall be and become immediately due and payable, without further notice, demand or presentment.

ARTICLE IX
THE ADMINISTRATIVE AGENT

SECTION 9.1    Actions.

(a)  Each Lender hereby appoints The Bank of New York Mellon as its Administrative Agent under and for purposes of each Loan Document.  Each Lender authorizes the Administrative Agent to act on behalf of such Lender under each Loan Document and to appoint other agents or sub-agents to assist in its actions under the Loan Documents and the Administrative Agent shall not be liable for the acts and omissions of such agents as long as they are appointed with due care and without gross negligence or willful misconduct.  Each Lender further authorizes the Administrative Agent, in the absence of other written instructions from the Required Lenders received from time to time by the Administrative Agent (with respect to which the Administrative Agent agrees that it will comply, subject to the terms and conditions of Article IX), to exercise such powers hereunder and thereunder as are delegated to or required of the Administrative Agent by the terms hereof and thereof, together with such powers as may be incidental thereto (including the release of Liens on assets Disposed of in accordance with the terms of the Loan Documents).

(b)  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise in writing as directed by the Required Lenders in accordance with the terms of this Agreement (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.1).  Each Lender hereby indemnifies (which indemnity shall be payable within thirty (30) days of demand therefor, to the extent not reimbursed by the Borrower or any other Obligor, and without limiting the Borrower's and Obligors' obligations under this Agreement and which indemnity shall survive any termination of this Agreement) the Administrative Agent and its officers, directors, employees and agents, pro rata according to the proportionate amount of Loans held by

such Lender, from and against any and all liabilities, obligations, losses, damages, claims, penalties, judgments, costs, disbursements or expenses of any kind or nature whatsoever which may at any time be imposed on, incurred by, or asserted against, the Administrative Agent in any way relating to or arising out of any Loan Document or any action taken or omitted to be taken by the Administrative Agent under the Loan Documents, (including reasonable attorneys' fees and expenses), and as to which the Administrative Agent, is not reimbursed by the Borrower; provided that, no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, claims, costs or expenses which are determined by a court of competent jurisdiction in a final proceeding to have resulted from the Administrative Agent's gross negligence or willful misconduct.  By executing a Lender Assignment Agreement, each future Lender (acting for itself and on behalf of each Affiliate thereof which becomes a Secured Party from time to time) shall be deemed to ratify the power of attorney granted to the Administrative Agent hereunder.

SECTION 9.2   Exculpation.  Neither the Administrative Agent nor any of its directors, officers, employees or agents shall be liable to any Secured Party for any action taken or omitted to be taken by it under any Loan Document, or in connection therewith, except for its own willful misconduct or gross negligence, nor responsible for any recitals or warranties herein or therein, nor for the effectiveness, enforceability, validity or due execution of any Loan Document, nor for the creation, perfection or priority of any Liens purported to be created by any of the Loan Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any collateral security, nor to make any inquiry respecting the performance by any Obligor of its Obligations.  Any such inquiry which may be made by the Administrative Agent shall not obligate it to make any further inquiry or to take any action.  The Administrative Agent shall be entitled to rely upon advice of counsel concerning legal matters and upon any notice, consent, certificate, statement or writing which the Administrative Agent believes to be genuine and to have been presented by a proper Person.

To the fullest extent permitted by applicable law, no Obligor or Lender shall assert, and each Obligor and Lender hereby waives, any claim against the Administrative Agent, its sub-agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated herby or thereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.

No provision of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby or the transactions contemplated hereby or thereby, shall require the Administrative Agent to: (i) expend or risk its own funds or provide indemnities in the performance of any of its duties hereunder or the exercise of any of its rights or power or (ii) otherwise incur any financial liability in the performance of its duties or the exercise of any of its rights or powers unless it is indemnified to its satisfaction and the Administrative Agent shall have no liability to any person for any loss occasioned by any delay in taking or failure to take any action while it is awaiting an indemnity satisfactory to it.

The Administrative Agent shall not be responsible for (i) perfecting, maintaining, monitoring, preserving or protecting the security interest or lien granted under this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, (ii) the filing, re-filing, recording, re-recording or continuing or any document, financing statement, mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at any time or times or (iii) providing, maintaining, monitoring or preserving insurance on or the payment of taxes with respect to any of the Collateral. The actions described in items (i) through (iii) shall be the sole responsibility of the Obligors.

The Administrative Agent shall not be required to qualify in any jurisdiction in which it is not presently qualified to perform its obligations as Administrative Agent.

The Administrative Agent has accepted and is bound by the Loan Documents executed by the Administrative Agent as of the date of this Agreement and, as directed in writing by the Required Lenders, the Administrative Agent shall execute additional Loan Documents delivered to it after the date of this Agreement; *provided, however*, that such additional Loan Documents do not adversely affect the rights, privileges, benefits and immunities of the Administrative Agent. The Administrative Agent will not otherwise be bound by, or be held obligated by, the provisions of any credit agreement, indenture or other agreement governing the Obligations (other than this Agreement and the other Loan Documents to which the Administrative Agent is a party).

No written direction given to the Administrative Agent by the Required Lenders or the Borrower that in the sole reasonable judgment of the Administrative Agent imposes, purports to impose or might reasonably be expected to impose upon the Administrative Agent any obligation or liability not set forth in or arising under this Agreement and the other Loan Documents will be binding upon the Administrative Agent unless the Administrative Agent elects, at its sole option, to accept such direction.

The Administrative Agent shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or the other Loan Documents arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; business interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; acts of civil or military authority and governmental action.

The Administrative Agent shall not be under any obligation to exercise any of its rights or powers vested in it by this Agreement or the other Loan Documents, at the request, order or direction of the Required Lenders unless the same is given pursuant to the express provisions of this Agreement or the other Loan Documents and the Required Lenders shall have offered to the Administrative Agent security or indemnity reasonably satisfactory to the Administrative Agent against the costs, expenses and liabilities (including, without limitation, attorneys' fees and expenses) which might be incurred therein or thereby.

Beyond the exercise of reasonable care in the custody of the Collateral in its possession, the Administrative Agent will have no duty as to any Collateral in its possession or control or in the

possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto. The Administrative Agent will be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property, and the Administrative Agent will not be liable or responsible for any loss or diminution in the value of any of the Collateral by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Administrative Agent in good faith without gross negligence or willful misconduct.

The Administrative Agent will not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of the Administrative Agent, as determined by a court of competent jurisdiction in a final, nonappealable order, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of any grantor to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Administrative Agent hereby disclaims any representation or warranty to the present and future Secured Parties concerning the perfection of the Liens granted hereunder or in the value of any of the Collateral.

In the event that the Administrative Agent is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any fiduciary or trust obligation for the benefit of another, which in the Administrative Agent's sole reasonable discretion may cause the Administrative Agent to be considered an "owner or operator" under any environmental laws or otherwise cause the Administrative Agent to incur, or be exposed to, any environmental liability or any liability under any other federal, state or local law, the Administrative Agent reserves the right, instead of taking such action, either to resign as Administrative Agent or to arrange for the transfer of the title or control of the asset to a court appointed receiver. The Administrative Agent will not be liable to any person for any environmental liability or any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of the Administrative Agent's actions and conduct as authorized, empowered and directed hereunder or relating to any kind of discharge or release or threatened discharge or release of any hazardous materials into the environment.

SECTION 9.3   Successor.  The Administrative Agent may resign as such at any time upon at least 30 days' prior notice to the Borrower and all Lenders.  The Administrative Agent may be removed at any time upon the affirmative vote of the Required Lenders.  If the Administrative Agent at any time shall resign or be removed, the Required Lenders may appoint another Lender as a successor Administrative Agent which shall thereupon become the Administrative Agent hereunder.  In the case of the Administrative Agent's resignation, if no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the retiring Administrative Agent's giving notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a

successor as provided for above.  Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent and the payment of the reasonable fees and expenses (including attorney's fees and expenses) of the resigning or removed Administrative Agent), such successor Administrative Agent shall be entitled to receive from the retiring or removed Administrative Agent such documents of transfer and assignment as such successor Administrative Agent may reasonably request, and shall thereupon succeed to and become vested with all rights, powers, privileges and duties of the retiring or removed Administrative Agent.  The retiring or removed Administrative Agent shall cooperate in all respects with the transition of the Administrative Agent role to the successor Administrative Agent and shall, following such transition, be discharged from its duties and obligations under the Loan Documents.  After any retiring or removed Administrative Agent's resignation or removal, as applicable, hereunder as the Administrative Agent, the provisions of this Article shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under the Loan Documents, and Section 9.1, Section 10.3 and Section 10.4 shall continue to inure to its benefit.

SECTION 9.4    Loans by the Administrative Agent.  The Administrative Agent shall have the same rights and powers with respect to (x) the Loans held by it or any of its Affiliates, and (y) the Notes held by it or any of its Affiliates as any other Lender and may exercise the same as if it were not the Administrative Agent.  The Administrative Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of business with the Borrower or any Subsidiary or Affiliate of the Borrower as if the Administrative Agent were not the Administrative Agent hereunder.

SECTION 9.5    Credit Decisions.  Each Lender acknowledges that it has, independently of the Administrative Agent and each other Lender, and based on such Lender's review of the financial information of the Borrower, the Loan Documents (the terms and provisions of which being satisfactory to such Lender) and such other documents, information and investigations as such Lender has deemed appropriate, made its own credit decision to extend the Loans.  Each Lender also acknowledges that it will, independently of the Administrative Agent and each other Lender, and based on such other documents, information and investigations as it shall deem appropriate at any time, continue to make its own credit decisions as to exercising or not exercising from time to time any rights and privileges available to it under the Loan Documents.

SECTION 9.6    Copies, etc.  The Administrative Agent shall give prompt notice to each Lender of each notice or request required or permitted to be given to the Administrative Agent by the Borrower pursuant to the terms of the Loan Documents (unless concurrently delivered to the Lenders by the Borrower).  The Administrative Agent will distribute to each Lender each document or instrument received (other than notices delivered pursuant to Articles II and III) for its account and copies of all other communications received by the Administrative Agent from the Borrower for distribution to the Lenders by the Administrative Agent in accordance with the terms of the Loan Documents.

SECTION 9.7    Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely upon any certification, notice or other communication (including any thereof by telephone, telecopy, telegram or cable) believed by it to be genuine and correct and to have been signed or sent by or on behalf of the proper Person, and upon advice and statements of legal

counsel, independent accountants and other experts selected by the Administrative Agent.  As to any matters not expressly provided for by the Loan Documents, the Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, thereunder in accordance with instructions given by the Required Lenders or all of the Lenders as is required in such circumstance, and such instructions of such Lenders and any action taken or failure to act pursuant thereto shall be binding on all Secured Parties.  For purposes of applying amounts in accordance with this Agreement, the Administrative Agent shall be entitled to rely upon any Secured Party that has entered into a Rate Protection Agreement with any Obligor for a determination (which such Secured Party agrees to provide or cause to be provided upon request of the Administrative Agent) of the outstanding Obligations owed to such Secured Party under any Rate Protection Agreement.  Unless it has actual knowledge evidenced by way of written notice from any such Secured Party and the Borrower to the contrary, the Administrative Agent, in acting in such capacity under the Loan Documents, shall be entitled to assume that no Rate Protection Agreements or Obligations in respect thereof are in existence or outstanding between any Secured Party and any Obligor.

SECTION 9.8    Defaults.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of a Default unless the Administrative Agent has received a written notice from a Lender or the Borrower specifying such Default and stating that such notice is a "Notice of Default".  In the event that the Administrative Agent receives such a notice of the occurrence of a Default, the Administrative Agent shall give prompt notice thereof to the Lenders.  The Administrative Agent shall (subject to the provisions of this Article IX and Section 10.1) take such action and exercise such remedies with respect to such Default as shall be directed by the Required Lenders pursuant to any of the Loan Documents; provided that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action (including, without limitation, credit bidding the Loans of all Lenders hereunder), or refrain from taking such action, with respect to such Default as it shall deem advisable in the best interest of the Secured Parties except to the extent that this Agreement expressly requires that such action be taken, or not be taken, only with the consent or upon the authorization of the Required Lenders or all Lenders.

SECTION 9.9    Posting of Approved Electronic Communications.

(a)  The Borrower hereby agrees, unless directed otherwise by the Administrative Agent or unless the electronic mail address referred to below has not been provided by the Administrative Agent to the Borrower, that it will, or will cause its Subsidiaries to, provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents or to the Lenders under Section 7.1.1, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to a Continuation/Conversion Notice, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default under this Agreement or any other Loan Document or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement (all such non-excluded communications being referred to herein collectively as "Communications"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Administrative Agent to an electronic mail address as directed by the Administrative

Agent.  In addition, the Borrower agrees, and agrees to cause its Subsidiaries, to continue to provide the Communications to the Administrative Agent or the Lenders, as the case may be, in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.

(b)  The Borrower further agrees that the Administrative Agent may make the Communications available to the Lenders by posting the Communications on Intralinks or a substantially similar electronic transmission system (the "Platform").

(c)  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".  THE INDEMNIFIED PARTIES DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE INDEMNIFIED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE INDEMNIFIED PARTIES HAVE ANY LIABILITY TO ANY OBLIGOR, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY OBLIGOR'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY INDEMNIFIED PARTY IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH INDEMNIFIED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)  The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents.  Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.

(e)  Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

SECTION 9.10   Proofs of Claim.  The Lenders and the Borrower hereby agree that after the occurrence of an Event of Default pursuant to Section 8.1.7, in case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment,

composition or other judicial proceeding relative to any of the Obligors, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall have made any demand on any of the Obligors) shall be entitled and empowered, by intervention in such proceeding or otherwise:

   (a)  to file and prove a claim for the whole amount of principal and interest owing and unpaid in respect of the Loans and any other Obligations (excluding Obligations arising under any Rate Protection Agreement) that are owing and unpaid and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Lenders, the Administrative Agent and other agents appointed by the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Administrative Agent and such other agents and their agents and counsel and all other amounts due Lenders, Administrative Agent and such other agents hereunder) allowed in such judicial proceeding; and

   (b)  to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel, and any other amounts due Administrative Agent and other agents hereunder.  Nothing herein contained shall be deemed to authorize Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lenders or to authorize Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.  Further, nothing contained in this Section shall affect or preclude the ability of any Lender to (i) file and prove such a claim in the event that the Administrative Agent has not acted within ten days prior to any applicable bar date and (ii) require an amendment of the proof of claim to accurately reflect such Lender's outstanding Obligations.

ARTICLE X<br>MISCELLANEOUS PROVISIONS

   SECTION 10.1 <u>Waivers, Amendments, etc</u>.  The provisions of each Loan Document (other than a Fee Letter, which shall be modified only in accordance with its terms) may from time to time be amended, modified or waived, if such amendment, modification or waiver is in writing and consented to by the Borrower and the Required Lenders; <u>provided</u>, that no such amendment, modification or waiver shall:

   (a)  modify <u>clause (b)</u> of <u>Section 4.7</u>, <u>Section 4.8</u> (as it relates to sharing of payments) or this Section, in each case, without the consent of all Lenders;

(b)  increase the aggregate amount of any Loans held by a Lender or extend the final Stated Maturity Date for any Lender's Loan, in each case without the consent of such Lender (it being agreed, however, that any vote to rescind any acceleration made pursuant to Section 8.2 and Section 8.3 of amounts owing with respect to the Loans and other Obligations shall only require the vote of the Required Lenders);

(c)  reduce (by way of forgiveness), the principal amount of or reduce the rate of interest on any Lender's Loan, reduce any fees described in Article III payable to any Lender or extend the date on which interest or fees are payable in respect of such Lender's Loans, in each case without the consent of such Lender (provided that, the vote of Required Lenders shall be sufficient to waive the payment, or reduce the increased portion, of interest accruing under Section 3.2.2);

(d)  make any change to the definition of "Required Lenders" or modify any requirement hereunder that any particular action be taken by all Lenders without the consent of all Lenders;

(e)  except with the consent of the Lenders holding more than 90% of the aggregate amount of outstanding Loans, release (i) either Borrower from its Obligations under the Loan Documents or any Guarantor from its obligations under a Guaranty or (ii) all or substantially all of the collateral under the Loan Documents; ~~or~~

(f)  affect adversely the interests, rights or obligations of the Administrative Agent (in its capacity as the Administrative Agent) unless consented to by the Administrative Agent; or

(g)  except with the consent of the Special Required Lenders, take any of the following actions: (i) contractually subordinate any of the Liens granted to the Administrative Agent to the Liens securing the Obligations under, and as defined in, the Second Lien Loan Documents, (ii) increase the cap on annual scheduled management fees referred to in Section 7.2.11(a), (iii) amend the last sentence of Section 5.3(a) of, or clause (b)(2) of the definition of Refinancing in, the Intercreditor Agreement, or (iv) enter into any forbearance agreement during the continuance of an event of default under Section 8.1.1 which is not conditioned, during the continuance of such forbearance, upon the Borrower not making (A) any payment in cash of interest or principal on the Second Lien Obligations and (B) any Restricted Payment otherwise permitted under Section 7.2.6(b)(ii).

No failure or delay on the part of any Secured Party in exercising any power or right under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right.  No notice to or demand on any Obligor in any case shall entitle it to any notice or demand in similar or other circumstances.  No waiver or approval by any Secured Party under any Loan Document shall, except as may be otherwise stated in such waiver or approval, be applicable to subsequent transactions.  No waiver or approval hereunder shall require any similar or dissimilar waiver or approval thereafter to be granted hereunder.

SECTION 10.2   Notices; Time.  All notices and other communications provided under each Loan Document shall be in writing or by facsimile and addressed, delivered or transmitted, if to the Borrower, the Administrative Agent or a Lender, to the applicable Person at its address or facsimile number set forth on Schedule II hereto or set forth in the Lender Assignment Agreement, or at such other address or facsimile number as may be designated by such party in a notice to the other parties.  Any notice, if mailed and properly addressed with postage prepaid or if properly addressed and sent by pre-paid courier service, shall be deemed given when received; any notice, if transmitted by facsimile, shall be deemed given when the confirmation of transmission thereof is received by the transmitter.  The parties hereto agree that delivery of an executed counterpart of a signature page to this Agreement and each other Loan Document by facsimile (or electronic transmission) shall be effective as delivery of an original executed counterpart of this Agreement or such other Loan Document.  Unless otherwise indicated, all references to the time of a day in a Loan Document shall refer to New York time.

SECTION 10.3   Payment of Costs and Expenses.  Whether or not the transactions contemplated hereby shall be consummated, the Borrower agrees to pay promptly, and in any event within thirty (30) days after written demand therefor, (a) all the actual and reasonable costs and expenses of preparation of this Agreement and the other Loan Documents and any consents, amendments, waivers or other modifications thereto; (b) all the costs of furnishing all opinions by counsel for the Borrower and the other Obligors; (c) the reasonable fees, expenses and disbursements of counsel to the Administrative Agent in connection with the negotiation, preparation, execution and administration of this Agreement and the other Loan Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters in connection therewith; (d) all the actual costs and expenses of creating and perfecting Liens in favor of the Administrative Agent, for the benefit of the Lenders pursuant hereto, including filing and recording fees, search fees, title insurance premiums and fees, expenses and disbursements of counsel to the Administrative Agent and of counsel providing any opinions that the Administrative Agent or Required Lenders may request in respect of the Collateral or the Liens created pursuant to the Loan Documents; (e) all the actual reasonable costs and fees, expenses and disbursements of any auditors, accountants, consultants or appraisers whether internal or external; (f) all the actual reasonable costs and expenses (including the fees, expenses and disbursements of counsel and of any appraisers, consultants, advisors and agents employed or retained by the Administrative Agent and its counsel) in connection with the custody or preservation of any of the Collateral; (g) all other actual reasonable costs and expenses incurred by the Administrative Agent in connection with the negotiation, preparation and execution of this Agreement and the Loan Documents and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby; and (h) after the occurrence of a Default or an Event of Default, all reasonable costs and expenses, including reasonable attorneys' fees and expenses and costs of settlement, incurred by the Administrative Agent and the Required Lenders in enforcing any Obligations of or in collecting any payments due from any Obligor hereunder or under the other Loan Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of any Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work out" or pursuant to any insolvency or bankruptcy cases or proceedings.

76

SECTION 10.4   Indemnification.  In consideration of the execution and delivery of this Agreement by each Secured Party, the Borrower hereby indemnifies, exonerates and holds each Secured Party and each of their respective affiliates and their and their affiliates' officers, directors, employees, advisors and agents (collectively, the "Indemnified Parties") free and harmless from and against any and all losses, claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, judgments, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (collectively, the "Indemnified Liabilities") as a result of, or arising out of, or relating to:

(a)  the execution and delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the Transactions contemplated hereby or thereby or the monitoring of Borrower's and the other Obligors' compliance with the terms of the Loan Documents;

(b)  any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Party is a party thereto), or any act, omission, event, or circumstance in any manner related thereto;

(c)  any investigation, litigation or proceeding related to any acquisition or proposed acquisition by any Obligor or any Subsidiary thereof of all or any portion of the Capital Securities or assets of any Person, whether or not an Indemnified Party is party thereto;

(d)  (i) the Release from any real property owned or operated by any Obligor or any Subsidiary thereof of any Hazardous Material (including any losses, liabilities, damages, injuries, costs, expenses or claims asserted or arising under any Environmental Law), or (ii) each Lender's Environmental Liability (the indemnification herein shall survive repayment of the Obligations and any transfer of the property of any Obligor or its Subsidiaries by foreclosure or by a deed in lieu of foreclosure for any Lender's Environmental Liability); in each case of clauses (i) and (ii), other than any Release or Lender's Environmental Liability first caused and first created after the Administrative Agent completes the sale and the transfer of the respective real property pursuant to a foreclosure or deed in lieu of foreclosure;

provided that the Borrower shall not be required to indemnify any Indemnified Party to the extent the applicable Indemnified Liability arises by reason of such Indemnified Party's gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction.  If and to the extent that the foregoing undertaking may be unenforceable for any reason, each Obligor agrees to make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law.  To the extent permitted by applicable law, the Borrower and each other Obligor shall not assert, and hereby waive, any claim against any Indemnified Party, on any theory of liability, for special, indirect,

consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, any Loan or the use of the proceeds thereof.

SECTION 10.5    Survival.  The obligations of the Borrower under Sections 4.3, 4.4, 4.5, 4.6, 10.3 and 10.4, and the obligations of the Lenders under Section 9.1, shall in each case survive any assignment from one Lender to another (in the case of Sections 10.3 and 10.4), the occurrence of the Termination Date and the resignation or removal of the Administrative Agent. The representations and warranties made by each Obligor in each Loan Document shall survive the execution and delivery of such Loan Document.

SECTION 10.6    Severability.  Any provision of any Loan Document which is prohibited or unenforceable in any jurisdiction shall, as to such provision and such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of such Loan Document or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 10.7    Headings.  The various headings of each Loan Document are inserted for convenience only and shall not affect the meaning or interpretation of such Loan Document or any provisions thereof.

SECTION 10.8    Execution in Counterparts, Effectiveness, etc.  This Agreement may be executed by the parties hereto in several counterparts, each of which shall be an original (whether such counterpart is originally executed or an electronic copy of an original and each party hereto expressly waives its rights to receive originally executed documents other than with respect to any documents for which originals are required for any filing or perfection) and all of which shall constitute together but one and the same agreement.  This Agreement shall become effective when counterparts hereof executed on behalf of the Borrower shall have been received by the Administrative Agent.

SECTION 10.9    Governing Law; Entire Agreement.  EACH LOAN DOCUMENT WILL EACH BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING FOR SUCH PURPOSE SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).  The Loan Documents constitute the entire understanding among the parties hereto with respect to the subject matter thereof and supersede any prior agreements, written or oral, with respect thereto.

SECTION 10.10    Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns; provided that, the Borrower may not assign or transfer its rights or obligations hereunder without the consent of all Lenders.

SECTION 10.11    Sale and Transfer of Loans; Participations in Loans; Notes.  Each Lender may assign, or sell participations in, its Loans to one or more other Persons in accordance with the terms set forth below.

(a)  Any Lender may, with the consent of the Borrower (such consent (x) not to be unreasonably withheld or delayed and (y) to be required only to the extent no default under Sections 8.1.1 or 8.1.7 has occurred and is continuing), assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Loans at the time owing to it); provided that:

(i)   the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Lender Assignment Agreement with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000, unless (A) the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); (B) such assignment is an assignment of the entire remaining amount of the assigning Lender's Loans at the time owing to it, (C) such assignment is an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender or (D) such assignment is to one or more Eligible Assignees managed by an Affiliate of such Eligible Assignee(s) and the aggregate amount of such assignments is not less than $1,000,000;

(ii)   each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans assigned; and

(iii)   the parties to each assignment shall (A) electronically execute and deliver to the Administrative Agent a Lender Assignment Agreement via an electronic settlement system acceptable to the Administrative Agent or (B) with the consent of the Administrative Agent, manually execute and deliver to the Administrative Agent a Lender Assignment Agreement, together with, in either case, a processing and recordation fee of $1,000 (which fee may be waived or reduced in the sole discretion of the Administrative Agent) and if the Eligible Assignee is not a Lender, administrative details information with respect to such Eligible Assignee and applicable tax forms.

(b)  Subject to acceptance and recording thereof by the Administrative Agent pursuant to clause (c), from and after the effective date specified in each Lender Assignment Agreement, (i) the Eligible Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Lender Assignment Agreement, have the rights and obligations of a Lender under this Agreement, and (ii) the assigning Lender thereunder shall, to the extent of the interest assigned by such Lender Assignment Agreement, subject to Section 10.5, be released from its obligations under this Agreement (and, in the case of a Lender Assignment Agreement covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto, but shall continue to be entitled to the benefits of any provisions of this Agreement which by their terms survive the termination of this Agreement).  If the consent of the Borrower to an assignment or to an Eligible Assignee is required hereunder (including a consent to an assignment which does not meet the minimum assignment thresholds specified in this Section), the Borrower shall be deemed to have given its consent ten days after the date notice thereof has been delivered by the assigning Lender (through the Administrative Agent or ClearPar, LLC) unless such consent is expressly refused by the Borrower prior to such tenth day.

(c)  The Administrative Agent shall record each assignment made in accordance with this Section in the Register pursuant to clause (a) of Section 2.5 and at the request of the Borrower give the Borrower notice of such assignments.  The Register shall be available for inspection by the Borrower and any Lender (in respect of its own position only), at any reasonable time and from time to time upon reasonable prior notice.

(d)  Any Lender may, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to one or more banks or other entities other than an Ineligible Assignee (a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver with respect to any of the items set forth in clauses (a) through (e) of Section 10.1, in each case except as otherwise specifically provided in a Loan Document.  Subject to clause (e), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 4.3, 4.4, 4.5, 4.6, 7.1.1, 10.3 and 10.4 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to clause (b).  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 4.9 as though it were a Lender, provided such Participant agrees to be subject to Sections 4.8 and 4.10 as though it were a Lender.  Each Lender shall, as agent of the Borrower solely for the purpose of this Section, record in book entries maintained by such Lender the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the obligations under this Agreement (the "Participant Register").  The entries in the Participant Register shall be conclusive and binding absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  If requested by the Administrative Agent or the Borrowers, such Lender shall make the Participant Register available to the Administrative Agent or to the Borrower upon either (i) the exercise by a Participant of remedies hereunder or (ii) a request for the Participant Register by the IRS.

(e)  A Participant shall not be entitled to receive any greater payment under Sections 4.3, 4.4, 4.5, 4.6, 10.3 and 10.4, as of the time of the sale of such participation, than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  A Participant shall not be entitled to the benefits of Section 4.6 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with the requirements set forth in Section 4.6 as though it were a Lender that acquired its interest by assignment.  In addition, if at the time of the sale of such participation, any greater Taxes subject to payment under Section 4.6 would apply to the Participant than applied to the applicable Lender, then such Participant shall not be entitled to any payment under Section 4.6 with respect to the portion of such Taxes as exceeds the Taxes

80

applicable to the Lender at the time of the sale of the participation unless the Participant's request for the Borrower's prior written consent for the Participation described in the first sentence of this clause states that such greater Taxes would be applicable to such Participant, it being understood that the Participant shall be entitled to additional payments under <u>Section 4.6</u> to the extent such Lender selling the participation would be entitled to any payment resulting from a change in law occurring after the time the participation was sold.

(f)  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; <u>provided</u> that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)  Notwithstanding anything to the contrary contained herein, any Lender ("<u>Granting Lender</u>") may grant to a special purpose funding vehicle (a "<u>SPC</u>"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; <u>provided</u> that (x) nothing herein shall constitute a commitment by any SPC to make any Loans and (y) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof.  In addition, notwithstanding anything to the contrary contained in this clause, any SPC may (i) with notice to, but without the prior written consent of, the Borrower or the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower) providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC.  This Section may not be amended without the written consent of the SPC.  The Borrower acknowledges and agrees, subject to the next sentence, that, to the fullest extent permitted under applicable law, each SPC, for purposes of <u>Sections 4.3</u>, <u>4.4</u>, <u>4.5</u>, <u>4.6</u>, <u>4.8</u>, <u>4.9</u>, <u>10.3</u> and <u>10.4</u>, shall be considered a Lender (<u>provided</u>, in the case of <u>Section 4.6</u>, that the SPC complies with the requirements of such Section as if it were a Lender that acquired its interest by assignment).  The Borrower shall not be required to pay any amount under <u>Sections 4.3</u>, <u>4.4</u>, <u>4.5</u>, <u>4.6</u>, <u>10.3</u> and <u>10.4</u> that is greater than the amount which it would have been required to pay had no grant been made by a Granting Lender to a SPC.

SECTION 10.12   <u>Other Transactions</u>.  Nothing contained herein shall preclude the Administrative Agent or any other Lender from engaging in any transaction, in addition to those

contemplated by the Loan Documents, with the Borrower or any of its Affiliates in which the Borrower or such Affiliate is not restricted hereby from engaging with any other Person.

SECTION 10.13   Forum Selection and Consent to Jurisdiction.  ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, ANY LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE ADMINISTRATIVE AGENT, THE LENDERS OR THE BORROWER IN CONNECTION HEREWITH OR THEREWITH MAY BE BROUGHT AND MAINTAINED IN THE COURTS OF THE STATE OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK; PROVIDED THAT, ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT THE ADMINISTRATIVE AGENT'S OPTION (ACTING AT THE WRITTEN DIRECTION OF THE REQUIRED LENDERS), IN THE COURTS OF ANY JURISDICTION WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND.  THE BORROWER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF NEW YORK AT THE ADDRESS FOR NOTICES SPECIFIED IN SECTION 10.2.  THE BORROWER HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  TO THE EXTENT THAT THE BORROWER HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, THE BORROWER HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS.

SECTION 10.14   Waiver of Jury Trial.  THE ADMINISTRATIVE AGENT, EACH LENDER AND THE BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, EACH LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE ADMINISTRATIVE AGENT, SUCH LENDER OR THE BORROWER IN CONNECTION THEREWITH.  THE BORROWER ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION (AND EACH OTHER PROVISION OF EACH OTHER LOAN DOCUMENT TO WHICH IT IS A PARTY) AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE ADMINISTRATIVE AGENT AND EACH LENDER ENTERING INTO THE LOAN DOCUMENTS.

SECTION 10.15   Confidentiality.

(a)  Subject to the provisions of clause (b) of this Section, each Lender agrees that it will follow its customary procedures in an effort not to disclose without the prior consent of the Borrower (other than to its employees, auditors, advisors or counsel or to another Lender if the Lender or such Lender's holding or parent company in its sole discretion determines that any such party should have access to such information, provided such Persons shall be subject to the provisions of this Section to the same extent as such Lender) any information which is now or in the future furnished pursuant to this Agreement or any other Loan Document, provided that any Lender may disclose any such information (i) as has become generally available to the public other than by virtue of a breach of this clause by the respective Lender or any other Person to whom such Lender has provided such information as permitted by this Section, (ii) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state, provincial or Federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors, (iii) as may be required or appropriate in respect to any summons or subpoena or in connection with any litigation, (iv) in order to comply with any law, order, regulation or ruling applicable to such Lender, (v) to the Administrative Agent, (vi) to any pledgee referred to in clause (f) of Section 10.11 or any prospective or actual transferee or participant in connection with any contemplated transfer or participation of any of the Notes or Loans or any interest therein by such Lender, provided that such prospective transferee agrees to be bound by the confidentiality provisions contained in this Section, (vii) to any direct or indirect contractual counterparty in swap agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor to such contractual counterparty agrees to be bound by the provisions of this Section) and (viii) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender.

(b)  The Borrower hereby acknowledges and agrees that each Lender may share with any of its Affiliates, and such Affiliates may share with such Lender, any information related to the Borrower or any of its Subsidiaries, provided such Persons shall be subject to the provisions of this Section to the same extent as such Lender.

Notwithstanding the foregoing paragraphs of this Section, any party to this Agreement (and each Affiliate, director, officer, employee, agent or representative of the foregoing or such Affiliate) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Transactions contemplated herein and all materials of any kind (including opinions or other tax analyses) that are provided to such party relating to such tax treatment or tax structure.  The foregoing language is not intended to waive any confidentiality obligations otherwise applicable under this Agreement except with respect to the information and materials specifically referenced in the preceding sentence.  This authorization does not extend to disclosure of any other information, including (a) the identity of participants or potential participants in the transactions contemplated herein, (b) the existence or status of any negotiations, or (c) any financial, business, legal or personal information of or regarding a party or its affiliates, or of or regarding any participants or potential participants in the transactions

contemplated herein (or any of their respective affiliates), in each case to the extent such other information is not related to the tax treatment or tax structure of the transactions contemplated herein.

SECTION 10.16    Counsel Representation.  THE BORROWER ACKNOWLEDGES AND AGREES THAT IT HAS BEEN REPRESENTED BY COMPETENT COUNSEL IN THE NEGOTIATION OF THIS AGREEMENT, AND THAT ANY RULE OR CONSTRUCTION OF LAW ENABLING THE BORROWER TO ASSERT THAT ANY AMBIGUITIES OR INCONSISTENCIES IN THE DRAFTING OR PREPARATION OF THE TERMS OF THIS AGREEMENT SHOULD DIMINISH ANY RIGHTS OR REMEDIES OF THE ADMINISTRATIVE AGENT OR THE OTHER SECURED PARTIES ARE HEREBY WAIVED BY THE BORROWER.

SECTION 10.17    Patriot Act.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Patriot Act.

SECTION 10.18    Authorization of Administrative Agent.  Each Lender agrees that any action taken by the Administrative Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by the Administrative Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

WORKFLOWONE LLC

By: _____
     Name:
     Title:

THE BANK OF NEW YORK MELLON,
as the Administrative Agent


By:_____
    Name:
    Title:

SCHEDULE I

## DISCLOSURE SCHEDULE TO CREDIT AGREEMENT

ITEM 5.5(c)  Indebtedness with respect to which UCC-3 termination statements will be filed.

ITEM 6.6.  Litigation.

ITEM 6.7.  Existing Subsidiaries.

ITEM 6.11.  Environmental Matters.

ITEM 6.13.  Labor Matters.

ITEM 6.15(a)  Deposit Accounts of Borrower and each Subsidiary.

ITEM 6.15(b)  Securities Accounts of Borrower and each Subsidiary.

ITEM 7.1.10.  Landlord's Agreements and Bailee Letters.

ITEM 7.2.2(b)  Indebtedness Existing as of the Effective Date.

| CREDITOR | OUTSTANDING PRINCIPAL AMOUNT |
| --- | --- |
| | |

ITEM 7.2.3(b)  Ongoing Liens.

ITEM 7.2.5(a)  Ongoing Investments.

SCHEDULE II

PERCENTAGES;
LIBOR OFFICE;
DOMESTIC OFFICE

WorkflowOne LLC
[220 East Monument Avenue
Dayton, Ohio 45402
Attention: Chief Financial Officer
Telephone: (___) ___-____
Facsimile: (___) ___-____
E-mail: pbogutsky@workflowmanagement.com]

| NAME AND NOTICE ADDRESS OF LENDER | LIBO OFFICE | DOMESTIC OFFICE | LOAN PERCENTAGE |
|---|---|---|---|
| [To come from CS] | | | |

SCHEDULE III
SPECIFIED EBITDA

| For the Period | $ |
| --- | --- |
| July 1, 2010 – September 30, 2010 | $12,272,000 |
| October 1, 2010 – December 31, 2010 | $11,466,000 |
| January 1, 2011 – Effective Date | $7,638,000[2] |

---

[2] Calculated assuming Effective Date of February 28, 2011.

**Exhibit G**
(Amended Newco First Lien Form Notes with Blackline)

EXHIBIT A

FORM OF NOTE

$_____                                                                                          [●], 2011


FOR VALUE RECEIVED, WORKFLOWONE LLC, a Delaware limited liability company (the "Borrower"), promises to pay [Name of Lender] (the "Lender") on the Stated Maturity Date the principal sum of [_____] ($[_____]) or, if less, the aggregate unpaid principal amount of all Loans set forth in the Register (and any continuation thereof) made by the Lender pursuant to that certain First Lien Credit Agreement, dated as of [●], 2011 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "First Lien Credit Agreement"), among the Borrower, the various financial institutions and other Persons from time to time parties thereto as lenders and The Bank of New York Mellon, as Administrative Agent.  Terms used in this Note, unless otherwise defined herein, have the meanings provided in the First Lien Credit Agreement.

The Borrower also promises to pay interest on the unpaid principal amount hereof from time to time outstanding from the date hereof until maturity (whether by acceleration or otherwise) and, after maturity, until paid, at the rates per annum and on the dates specified in the First Lien Credit Agreement.

Payments of both principal and interest are to be made in U.S. Dollars in same day or immediately available funds to the account designated by the Lender pursuant to the First Lien Credit Agreement.

This Note is one of the (i) Newco First Lien Notes referred to in the Plan, and evidences the payment obligations of Purchaser (as defined in the Plan) under the First Lien Credit Agreement, (ii) Newco First Lien Loan Notes referred to in the Asset Purchase Agreement, and evidences the payment obligations of Buyer (as defined in the Asset Purchase Agreement) under the First Lien Credit Agreement and (iii) Notes referred to in, and evidences Indebtedness incurred under, the First Lien Credit Agreement, to which reference is made for a description of the security for this Note and for a statement of the terms and conditions on which the Borrower is permitted and required to make prepayments and repayments, in whole or in part, of principal of the Indebtedness evidenced by this Note and on which such Indebtedness may be declared to be immediately due and payable.

All parties hereto, whether as makers, endorsers, or otherwise, severally waive presentment for payment, demand, protest and notice of dishonor.


A-1

THIS TERM NOTE HAS BEEN DELIVERED IN NEW YORK, NEW YORK AND SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING FOR SUCH PURPOSE SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).

WORKFLOWONE LLC

By: _____

     Name:

     Title:

LOANS AND PRINCIPAL PAYMENTS

| Date | Amount of Loan Made | Amount of Principal Repaid | Unpaid Principal Balance | Total | Notation Made By |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

**<u>Blackline To February 14, 2011 Version</u>**

EXHIBIT A

FORM OF NOTE

$_____                                                                    [●], 2011


        FOR VALUE RECEIVED, WORKFLOWONE LLC, a Delaware limited liability company (the "Borrower"), promises to pay ~~to the order of~~ [Name of Lender] (the "Lender") on the Stated Maturity Date the principal sum of [_____] ($[_____]) or, if less, the aggregate unpaid principal amount of all Loans set forth in the Register (and any continuation thereof) made by the Lender pursuant to that certain First Lien Credit Agreement, dated as of [●], 2011 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "First Lien Credit Agreement"), among the Borrower, the various financial institutions and other Persons from time to time parties thereto as lenders and The Bank of New York Mellon, as Administrative Agent.  Terms used in this Note, unless otherwise defined herein, have the meanings provided in the First Lien Credit Agreement.

        The Borrower also promises to pay interest on the unpaid principal amount hereof from time to time outstanding from the date hereof until maturity (whether by acceleration or otherwise) and, after maturity, until paid, at the rates per annum and on the dates specified in the First Lien Credit Agreement.

        Payments of both principal and interest are to be made in U.S. Dollars in same day or immediately available funds to the account designated by the Lender pursuant to the First Lien Credit Agreement.

        This Note is one of the (i) Newco First Lien Notes referred to in the Plan, and evidences the payment obligations of Purchaser (as defined in the Plan) under the First Lien Credit Agreement, (ii) Newco First Lien Loan Notes referred to in the Asset Purchase Agreement, and evidences the payment obligations of Buyer (as defined in the Asset Purchase Agreement) under the First Lien Credit Agreement and (iii) Notes referred to in, and evidences Indebtedness incurred under, the First Lien Credit Agreement, to which reference is made for a description of the security for this Note and for a statement of the terms and conditions on which the Borrower is permitted and required to make prepayments and repayments, in whole or in part, of principal of the Indebtedness evidenced by this Note and on which such Indebtedness may be declared to be immediately due and payable.

        All parties hereto, whether as makers, endorsers, or otherwise, severally waive presentment for payment, demand, protest and notice of dishonor.

7979933

THIS TERM NOTE HAS BEEN DELIVERED IN NEW YORK, NEW YORK AND SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING FOR SUCH PURPOSE SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).

WORKFLOWONE LLC


By: _____
    Name:
    Title:

LOANS AND PRINCIPAL PAYMENTS

| Date | Amount of Loan Made | Amount of Principal Repaid | Unpaid Principal Balance | Total | Notation Made By |
|------|--------------------|-----------------------------|--------------------------|-------|------------------|
|      |                    |                             |                          |       |                  |
|      |                    |                             |                          |       |                  |
|      |                    |                             |                          |       |                  |
|      |                    |                             |                          |       |                  |
|      |                    |                             |                          |       |                  |
|      |                    |                             |                          |       |                  |
|      |                    |                             |                          |       |                  |
|      |                    |                             |                          |       |                  |
|      |                    |                             |                          |       |                  |
|      |                    |                             |                          |       |                  |

**<u>Exhibit H</u>**
(Amended Newco Second Lien Credit Agreement with Blackline)

**FF DRAFT 2/17/11**

SECOND LIEN CREDIT AGREEMENT

dated as of [●], 2011,

among

WORKFLOWONE LLC,

as the Borrower,

VARIOUS FINANCIAL INSTITUTIONS AND OTHER PERSONS FROM TIME TO TIME
PARTIES HERETO,

as the Lenders,

and

SILVER POINT FINANCE, LLC,
as the Administrative Agent.

# TABLE OF CONTENTS

**Page**

ARTICLE I        DEFINITIONS AND ACCOUNTING TERMS .......................................... 8

    Section 1.1        Defined Terms ....................................................... 8

    Section 1.2        Use of Defined Terms .......................................... 32

    Section 1.3        Cross-References ................................................. 32

    Section 1.4        Accounting and Financial Determinations ........................ 33

ARTICLE II        LOANS, CLOSING RATE AND NOTES .................................... 33

    Section 2.1        Loans ............................................................... 33

    Section 2.2        Term A-Prime Loans. .......................................... 33

        SECTION 2.2.1 Requests for Term A-Prime Loans Commitments.................... 34

        SECTION 2.2.2 Ranking and Other Provisions. ................................... 34

        SECTION 2.2.3 Term A-Prime Amendment. ..................................... 34

        SECTION 2.2.4 Effective Date and Allocations. ................................ 34

        SECTION 2.2.5 Conditions to Effectiveness to Increase. ................... 35

        SECTION 2.2.6 Effect of Term A-Prime Amendment. ..................... 35

    Section 2.3        Register; Notes ................................................... 35

ARTICLE III        REPAYMENTS, PREPAYMENTS, INTEREST AND FEES ..................... 36

    Section 3.1        Repayments and Prepayments; Application ..................... 36

        SECTION 3.1.1 Repayments and Prepayments. ............................... 36

    Section 3.2        Interest Provisions .............................................. 38

        SECTION 3.2.1 Rates. ..................................................... 38

        SECTION 3.2.2 Post-Default Rates ......................................... 39

        SECTION 3.2.3 Payment Dates ............................................. 39

    Section 3.3        Administrative Agent's Fee ................................... 39

ARTICLE IV        CERTAIN LENDER PROVISIONS ....................................... 40

    Section 4.1        Increased Capital Costs ........................................ 40

    Section 4.2        Taxes .............................................................. 40

    Section 4.3        Payments; Proceeds. ........................................... 43

# TABLE OF CONTENTS
(continued)

**Page**

SECTION 4.3.1 Payments and Computations. .................................................. 43

SECTION 4.3.2 Proceeds of Collateral and Order of Payments upon Event of Default. ...................................................................................... 43

Section 4.4      Sharing of Payments ................................................. 44

Section 4.5      Setoff .................................................................... 44

Section 4.6      Replacement of Lenders ......................................... 45

ARTICLE V      CONDITIONS TO EXCHANGE OF LOANS ............ 46

Section 5.1      Resolutions, etc ...................................................... 46

Section 5.2      Entry of Confirmation Order and Consummation of Transactions .......................................................... 46

Section 5.3      Delivery of Notes ................................................... 47

Section 5.4      Guarantees. ............................................................ 47

Section 5.5      Security Agreements ............................................... 47

Section 5.6      Intellectual Property Security Agreements ............ 47

Section 5.7      Filing Agent, etc .................................................... 48

Section 5.8      Intercreditor Agreement ......................................... 48

Section 5.9      Patriot Act Disclosures .......................................... 48

Section 5.10      Compliance with Warranties, No Default, etc ....... 48

ARTICLE VI      REPRESENTATIONS AND WARRANTIES ............ 48

Section 6.1      Organization, etc .................................................... 48

Section 6.2      Due Authorization, Non-Contravention, Defaults etc ....... 49

Section 6.3      Government Approval, Regulation, etc .................. 49

Section 6.4      Validity, etc ............................................................ 49

Section 6.5      Financial Information.............................................. 50

Section 6.6      Litigation, Labor Controversies, etc ..................... 50

Section 6.7      Subsidiaries ............................................................ 50

Section 6.8      Ownership of Properties ......................................... 50

Section 6.9      Taxes ...................................................................... 50

Section 6.10      Employee Benefit Plans.......................................... 50

-ii-

## TABLE OF CONTENTS
(continued)

**Page**

Section 6.11        Environmental Warranties ................................................................ 51

Section 6.12        Regulations U and X ..................................................................... 52

Section 6.13        Labor Matters ................................................................................ 52

Section 6.14        Compliance with Laws ................................................................. 52

Section 6.15        Deposit Account and Cash Management Accounts ...................... 52

Section 6.16        Insurance ....................................................................................... 52

Section 6.17        Material Contracts ........................................................................ 53

ARTICLE VII        COVENANTS ........................................................................... 53

Section 7.1        Affirmative Covenants .................................................................. 53

SECTION 7.1.1 Financial Information, Reports, Notices, etc. ........................ 53

SECTION 7.1.2 Maintenance of Existence; Compliance with Contracts,
Laws, etc. ................................................................................... 55

SECTION 7.1.3 Maintenance of Properties. ...................................................... 55

SECTION 7.1.4 Insurance. ................................................................................. 55

SECTION 7.1.5 Books and Records. .................................................................. 55

SECTION 7.1.6 Environmental Law Covenant. ................................................ 56

SECTION 7.1.7 Future Guarantors, Security, etc. ............................................ 56

SECTION 7.1.8 Cash Management. ................................................................... 57

SECTION 7.1.9 Maintenance of Corporate Separateness. ................................ 57

SECTION 7.1.10 Landlord's Agreements and Bailee Letters............................ 57

SECTION 7.1.11 Mortgages and Insurance. ...................................................... 58

Section 7.2        Negative Covenants ...................................................................... 58

SECTION 7.2.1 Business Activities. .................................................................. 58

SECTION 7.2.2 Indebtedness. ............................................................................ 58

SECTION 7.2.3 Liens. ........................................................................................ 60

SECTION 7.2.4 Financial Condition and Operations. ...................................... 62

SECTION 7.2.5 Investments. .............................................................................. 63

SECTION 7.2.6 Restricted Payments, etc. ........................................................ 65

SECTION 7.2.7 Capital Expenditures. ............................................................... 66

SECTION 7.2.8 Issuance of Capital Securities. ................................................ 66

# TABLE OF CONTENTS
(continued)

SECTION 7.2.9 Consolidation, Merger; Permitted Acquisitions, etc. ................ 66

SECTION 7.2.10 Permitted Dispositions. .......................................................... 67

SECTION 7.2.11 Modification of Certain Agreements. ...................................... 68

SECTION 7.2.12 Transactions with Affiliates. .................................................. 68

SECTION 7.2.13 Restrictive Agreements, etc. ................................................... 69

SECTION 7.2.14 Sale and Leaseback. ................................................................ 69

SECTION 7.2.15 Pension Plans. ........................................................................ 69

ARTICLE VIII     EVENTS OF DEFAULT ....................................................... 70

Section 8.1        Listing of Events of Default ................................................. 70

SECTION 8.1.1 Non-Payment of Obligations. .................................................. 70

SECTION 8.1.2 Non-Performance of Certain Covenants and Obligations ......... 70

SECTION 8.1.3 Non-Performance of Other Covenants and Obligations. .......... 70

SECTION 8.1.4 Default on Other Indebtedness ................................................. 70

SECTION 8.1.5 Judgments ................................................................................ 70

SECTION 8.1.6 Change in Control. ................................................................... 71

SECTION 8.1.7 Bankruptcy, Insolvency, etc. .................................................... 71

SECTION 8.1.8 Impairment of Security, etc. ..................................................... 71

Section 8.2        Action if Bankruptcy ............................................................ 71

Section 8.3        Action if Other Event of Default .......................................... 72

ARTICLE IX      THE ADMINISTRATIVE AGENT ....................................... 72

Section 9.1        Actions. ................................................................................. 72

Section 9.2        Exculpation ........................................................................... 73

Section 9.3        Successor ............................................................................... 75

Section 9.4        Loans by Silver Point ........................................................... 76

Section 9.5        Credit Decisions .................................................................... 76

Section 9.6        Copies, etc ............................................................................ 76

Section 9.7        Reliance by Administrative Agent ......................................... 76

Section 9.8        Defaults ................................................................................. 77

Section 9.9        Posting of Approved Electronic Communications. ............... 77

# TABLE OF CONTENTS
### (continued)

**Page**

Section 9.10      Proofs of Claim ..................................................................... 78

ARTICLE X      MISCELLANEOUS PROVISIONS ......................................... 79

Section 10.1      Waivers, Amendments, etc ................................................ 79

Section 10.2      Notices; Time ...................................................................... 80

Section 10.3      Payment of Costs and Expenses ..................................... 80

Section 10.4      Indemnification .................................................................. 81

Section 10.5      Survival ................................................................................ 82

Section 10.6      Severability ......................................................................... 82

Section 10.7      Headings .............................................................................. 82

Section 10.8      Execution in Counterparts, Effectiveness, etc ............... 82

Section 10.9      Governing Law; Entire Agreement ................................... 82

Section 10.10     Successors and Assigns ..................................................... 83

Section 10.11     Sale and Transfer of Loans; Participations in Loans; Notes ............. 83

Section 10.12     Other Transactions ............................................................ 86

Section 10.13     Forum Selection and Consent to Jurisdiction .................. 86

Section 10.14     Waiver of Jury Trial .......................................................... 87

Section 10.15     Confidentiality. .................................................................. 87

Section 10.16     Counsel Representation ..................................................... 88

Section 10.17     Patriot Act ........................................................................... 88

Section 10.18     Authorization of Administrative Agent ........................... 88

SCHEDULE I        -     Disclosure Schedule
SCHEDULE II       -     Percentages and Amounts
SCHEDULE III      -     Specified EBITDA


EXHIBIT A-1       -     Form of Term A-Prime Note
EXHIBIT A-2       -     Form of Term A Note
EXHIBIT A-3       -     Form of Term B Note
EXHIBIT B         -     [Reserved]
EXHIBIT C         -     Form of Lender Assignment Agreement
EXHIBIT D         -     Form of Compliance Certificate
EXHIBIT E-1       -     Form of Parent Guaranty
EXHIBIT E-2       -     Form of Subsidiary Guaranty
EXHIBIT F         -     Form of Pledge and Security Agreement
EXHIBIT G         -     Form of Intercreditor Agreement
EXHIBIT H         -     Form of Mortgage

SECOND LIEN CREDIT AGREEMENT

THIS SECOND LIEN CREDIT AGREEMENT, dated as of [●], 2011, is among
WORKFLOWONE LLC, a Delaware limited liability company (the "Borrower"), the various
financial institutions and other Persons from time to time parties hereto (the "Lenders") and
SILVER POINT FINANCE, LLC ("Silver Point"), as the administrative agent (in such capacity,
the "Administrative Agent"), for the Lenders.

W I T N E S S E T H:

WHEREAS, on September 29, 2010, WF Capital Holdings, Inc. and its subsidiaries
(collectively, "Bankruptcy Debtors") filed voluntary petitions for reorganization under Chapter
11 of the United States Bankruptcy Code (11 U.S.C. §§101-1532, as amended, the "Bankruptcy
Code") in the United States Bankruptcy Court for the Eastern District of Virginia, Norfolk
Division (the "Bankruptcy Court"), jointly administered as In re Workflow Management, Inc., et
al., Chapter 11 Case No. 10-74617 (SCS) and continued in the possession of their property and
in the management of their businesses pursuant to Sections 1107(a) and 1108 of the Bankruptcy
Code (the "Bankruptcy Cases");

WHEREAS, on January 21, 2011, the Bankruptcy Debtors filed with the Bankruptcy
Court a Third Amended Joint Chapter 11 Plan of Workflow Management, Inc. and its Affiliated
Debtors (the "Plan") and a disclosure statement;

WHEREAS, the Plan contemplates, among other things: (i) the transfer of substantially
all assets of the Bankruptcy Debtors to Workflow Holdings LLC, a Delaware limited liability
company (the "Parent"), or to another entity or entities designated by Parent, pursuant to the
Asset Purchase and Sale Agreement, dated as of January 21, 2011, by and among the Bankruptcy
Debtors as Sellers and Parent as Buyer, as amended, supplemented, amended and restated or
otherwise modified from time to time prior to the Effective Date and, as permitted hereunder,
thereafter (the "Asset Purchase Agreement"); (ii) the cancellation of all Indebtedness outstanding
under the First Lien Credit Agreement (as defined in the Plan, and referred to herein as the "Pre-
Petition First Lien Credit Agreement") in exchange for the issuance of First Lien Loans under
the First Lien Credit Agreement; and (iii) the cancellation of all Indebtedness outstanding under
the Second Lien Credit Agreement (as defined in the Plan, and referred to herein as the "Pre-
Petition Second Lien Credit Agreement") in exchange for the issuance of (x) the Term A Loans
and Term B Loans hereunder and (y) the Newco Preferred Units (as defined in the Plan);

WHEREAS, Parent owns all of the Capital Securities of Borrower and has designated[1]
Borrower to purchase substantially all of the assets of the Bankruptcy Debtors pursuant to the
Asset Purchase Agreement;

WHEREAS, on [●], 2011, the Bankruptcy Court entered the order confirming the Plan
(the "Confirmation Order") pursuant to which, among other things, the Bankruptcy Court
approved the transactions contemplated by the Plan;

---

[1] To be designated in bill of sale or by resolution.

WHEREAS, on the date hereof (the "Effective Date"), concurrently with the effectiveness of this Agreement, the Plan shall become effective in accordance with its terms;

WHEREAS, in connection with the transactions contemplated by the Plan and by operation of the Confirmation Order, on the Effective Date, each lender under the Pre-Petition Second Lien Credit Agreement shall receive (via an exchange) its Pro Rata Share (as defined in the Plan) of (x) the Newco Preferred Units (as defined in the Plan) and (y) the Term A Loans and Term B Loans (the "Exchange of Loans") and shall become a Lender hereunder, subject to all of the rights and obligations of a Lender hereunder without any further action on the part of such Lender; and

WHEREAS, the Parent and each Subsidiary of the Borrower, which is or hereafter becomes a party hereto as a Guarantor, is or will be affiliated, is or will be engaged in interrelated businesses, and is or will derive substantial direct and indirect benefit from extensions of credit to the Borrower.

NOW, THEREFORE, the parties hereto agree as follows.

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.1 Defined Terms.  The following terms (whether or not underscored) when used in this Agreement, including its preamble and recitals, shall, except where the context otherwise requires, have the following meanings (such meanings to be equally applicable to the singular and plural forms thereof):

"Account Debtor" means any Person who is or who may become obligated under, with respect to, or on account of, an account, chattel paper, or a general intangible or intangible, as applicable, in each case, as such term is defined under the UCC.

"Additional Cash Interest Conditions" means, with respect to any Interest Payment Date occurring on or after May 15, 2012, both (a) as of the Business Day immediately preceding such Interest Payment Date, without giving pro forma effect to any payment of interest to be made in cash on such Interest Payment Date, the Adjusted Cash Balance shall be greater than or equal to $25,000,000; and (b) after giving pro forma effect to the payment of interest in cash on the Loans required to be made on such Interest Payment Date pursuant to Section 3.2.1 (but before giving effect to any interest required to be paid pursuant to clause (y)(ii)(B) of Section 3.2.1(b)), the Fixed Charge Coverage Ratio with respect to such Interest Payment Date shall be greater than 2.00 to 1.00.

"Adjusted Cash Balance" means, as of any date, the sum of cash and Cash Equivalent Investments of the Borrower and its Subsidiaries on such date, plus 100% of the amount of all repayments of principal of the First Lien Loans made through such date pursuant to Sections 3.1.1(a) and 3.1.1(d) of the First Lien Credit Agreement.

"Administrative Agent" is defined in the preamble and includes each other Person appointed as the successor Administrative Agent pursuant to Section 9.3.

"<u>Affected Lender</u>" is defined in <u>Section 4.10</u>.

"<u>Affiliate</u>" of any Person means any other Person which, directly or indirectly, controls, is controlled by or is under common control with such Person.  "Control" of a Person means the power, directly or indirectly,

(a)     to vote 10% or more of the Capital Securities (on a fully diluted basis) of such Person having ordinary voting power for the election of directors, managing members or general partners (as applicable); or

(b)     to direct or cause the direction of the management and policies of such Person (whether by contract or otherwise).

"<u>Agreement</u>" means, on any date, this Credit Agreement as originally in effect on the Effective Date and as thereafter from time to time amended, supplemented, amended and restated or otherwise modified from time to time and in effect on such date.

"<u>Approved Fund</u>" means any Person (other than a natural Person) that (a) is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business, and (b) is administered or managed by a Lender, an Affiliate of a Lender or a Person or an Affiliate of a Person that administers or manages a Lender.

"<u>Assignee Lender</u>" means each future Lender which signs a Lender Assignment Agreement pursuant to <u>Section 10.11</u>.

"<u>Asset Purchase Agreement</u>" is defined in the <u>third recital</u>.

"<u>Authorized Officer</u>" means, relative to any Obligor, those of its officers, general partners or managing members (as applicable) whose signatures and incumbency shall have been certified to the Administrative Agent pursuant to <u>Section 5.1(b)</u>.

"<u>Bankruptcy Cases</u>" is defined in the <u>first recital</u>.

"<u>Bankruptcy Code</u>" is defined in the <u>first recital</u>.

"<u>Bankruptcy Court</u>" is defined in the <u>first recital</u>.

"<u>Bankruptcy Debtors</u>" is defined in the <u>first recital</u>.

"<u>Base Margin</u>" means 11.0%.

"<u>Borrower</u>" is defined in the <u>preamble</u>.

"<u>Business Day</u>" means any day which is neither a Saturday nor Sunday nor a legal holiday on which banks are authorized or required to be closed in New York, New York.

"<u>Capital Expenditures</u>" means, for any period, (a) the aggregate amount of all expenditures of the Borrower and its Subsidiaries for fixed or capital assets made during such

9

period which, in accordance with GAAP, would have been (or in accordance with GAAP, should be) classified as capital expenditures, including the capitalized portion of any Capitalized Lease Liabilities (determined in accordance with GAAP) incurred by the Borrower and its Subsidiaries during such period, less (b) the aggregate amount of expenditures to replace capital assets with Net Disposition Proceeds or Net Casualty Proceeds pursuant to clause (c) of Section 3.1.1; provided, however that Capital Expenditures shall not include expenditures made in connection with the replacement, substitution or restoration of assets to the extent financed with awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced.

"Capital Securities" means, with respect to any Person, all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of such Person's capital (including all capital stock, partnership, membership or other equity interests in such Person), whether now outstanding or issued after the Effective Date and whether or not certificated.

"Capitalized Lease Liabilities" means, with respect to any Person, all monetary obligations of such Person and its Subsidiaries under any leasing or similar arrangement which have been (or, in accordance with GAAP, should be) classified as capitalized leases, and for purposes of each Loan Document the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP, and the stated maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a premium or a penalty.

"Cash Equivalent Investment" means, at any time:

(a)  any direct obligation of (or unconditionally guaranteed by) the United States or a State thereof (or any agency or political subdivision thereof, to the extent such obligations are supported by the full faith and credit of the United States or a State thereof) maturing not more than one year after such time;

(b)  commercial paper maturing not more than 270 days from the date of issue, which is issued by a corporation (other than an Affiliate of any Obligor) organized under the laws of any State of the United States or of the District of Columbia, and rated A-1 or higher by S&P or P-1 or higher by Moody's;

(c)  any certificate of deposit, time deposit or bankers acceptance, maturing not more than one year after its date of issuance, which is issued by any bank organized under the laws of the United States (or any State thereof), and which has (x) a credit rating of A2 or higher from Moody's or A or higher from S&P and (y) a combined capital and surplus greater than $500,000,000;

(d)  shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (c) of this definition;

(e)  money market funds that (i) purport to comply generally with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by S&P or Aaa by Moody's or carrying an equivalent rating by a national recognized rating agency, and (iii) have portfolio assets of at least $5,000,000,000; or

(f)      any repurchase agreement having a term of 30 days or less entered into with any Lender or any commercial banking institution satisfying the criteria set forth in <u>clause (c)</u> which

(i)      is secured by a fully perfected security interest in any obligation of the type described in <u>clause (a)</u>, and

(ii)      has a market value at the time such repurchase agreement is entered into of not less than 100% of the repurchase obligation of such commercial banking institution thereunder.

"<u>Cash Interest Conditions</u>" means, with respect to any Interest Payment Date, both (a) as of the Business Day immediately preceding such Interest Payment Date, and after giving pro forma effect to any payment of interest to be made in cash on such Interest Payment Date, cash and Cash Equivalent Investments of the Borrower and its Subsidiaries shall be greater than or equal to $12,500,000; and (b) for the four-quarter period ended as of the most recent fiscal quarter of the Borrower ended prior to such Interest Payment Date, EBITDA shall be greater than or equal to $37,500,000.

"<u>Casualty Event</u>" means the damage, destruction or condemnation, as the case may be, of property of any Person or any of its Subsidiaries.

"<u>CERCLA</u>" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"<u>CERCLIS</u>" means the Comprehensive Environmental Response, Compensation and Liability Information System database.

"<u>Change in Control</u>" means:

(a)  the failure of Parent at any time to directly own beneficially and of record on a fully diluted basis 100% of the outstanding Capital Securities of the Borrower, such Capital Securities to be held free and clear of all Liens (other than Liens granted under a Loan Document or a Second Lien Loan Document); or

(b)  an event by which any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act) other than the Permitted Holders is or becomes the beneficial owner of Capital Securities of the Parent representing more than 50% of the economic power of the total outstanding Capital Securities of the Parent.

"<u>Closing Date</u>" means the Effective Date.

"<u>Code</u>" means the Internal Revenue Code of 1986, and the regulations thereunder, in each case as amended, reformed or otherwise modified from time to time.

"<u>Collections</u>" means all cash, checks, notes, instruments and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds and tax refunds) of the Borrower and its Subsidiaries.

"Communications" is defined in clause (a) of Section 9.9.

"Compliance Certificate" means a certificate duly completed and executed by an Authorized Officer of the Borrower, substantially in the form of Exhibit D hereto, together with such changes thereto as the Administrative Agent may from time to time request for the purpose of monitoring the Borrower's compliance with the financial covenants contained herein.

"Confirmation Order" is defined in the fifth recital.

"Contingent Liability" means any agreement, undertaking or arrangement by which any Person guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or otherwise to invest in, a debtor, or otherwise to assure a creditor against loss) the Indebtedness (or, solely for purposes of the definition of Investment, other obligations) of any other Person (other than by endorsements of instruments in the course of collection), or guarantees the payment of dividends or other distributions upon the Capital Securities of any other Person.  The amount of any Person's obligation under any Contingent Liability shall (subject to any limitation set forth therein) be deemed to be the outstanding principal amount of the debt, obligation or other liability guaranteed thereby.

"Continuation/Conversion Notice" means a notice of continuation or conversion and certificate duly executed by an Authorized Officer of the Borrower, substantially in the form of Exhibit B hereto.

"Control Agreement" means an agreement in form and substance reasonably satisfactory to the Administrative Agent which provides for the Administrative Agent to have "control" (as defined in Section 8-106 of the UCC, as such term relates to investment property (other than certificated securities or commodity contracts), or as used in Section 9-106 of the UCC, as such term relates to commodity contracts, or as used in Section 9-104(a) of the UCC, as such term relates to deposit accounts).

"Controlled Group" means all members of a controlled group of corporations and all members of a controlled group of trades or businesses (whether or not incorporated) under common control which, together with the Borrower, are treated as a single employer under Section 414(b) or 414(c) of the Code or Section 4001 of ERISA.

"Controlling Class" means, at any time that any Term A-Prime Loans are outstanding, Lenders holding more than 50% of the outstanding principal amount of the Term A-Prime Loans.

"Copyright Security Agreement" means any Copyright Security Agreement executed and delivered by any Obligor in substantially the form of Exhibit C to the Security Agreement, as amended, supplemented, amended and restated or otherwise modified from time to time.

"Debt Issuance' means the issuance of any Indebtedness within the meaning of clauses (a) and (c) of the definition thereof by the Borrower or any of its Subsidiaries.

"Default" means any Event of Default or any condition, occurrence or event which, after notice or lapse of time or both, would constitute an Event of Default.

"Deposit Account" means a "deposit account" as that term is defined in Section 9-102(a) of the UCC.

"Disclosure Schedule" means the Disclosure Schedule attached hereto as Schedule I, as it may be amended, supplemented, amended and restated or otherwise modified from time to time by the Borrower with the written consent of the Administrative Agent.

"Disposition" (or similar words such as "Dispose") means any sale, transfer, lease, sale-leaseback, contribution or other conveyance (including by way of merger) of, or the granting of options, warrants or other rights to, any of the Borrower's or its Subsidiaries' assets (including accounts receivable and Capital Securities of Subsidiaries) to any other Person (other than to another Obligor) in a single transaction or series of transactions.

"Dollar" and the sign "$" mean lawful money of the United States.

"Earnout Payment" means in connection with any Permitted Acquisition, any portion of the purchase price for such acquisition which is (a) deferred to a date after the closing date therefor and (b) is contingent upon the performance of the business being acquired pursuant to such Permitted Acquisition.

"EBITDA" means, for any applicable period, Net Income for such period, plus, to the extent deducted in determining Net Income for such period, the sum, without duplication, of:

(a)  income and state franchise Tax expense;

(b)  interest expense, together with (i) amortization or write-off of debt discount and debt issuance costs and commissions, discounts and other fees and charges associated with Indebtedness (including administrative fees and charges with respect to the Obligations and the First Lien Loans), and (ii) prepayment penalties, make-whole payments or call premiums payable on prepayment of Indebtedness;

(c)  depreciation and amortization expense;

(d)  any (i) extraordinary expenses or losses (including whether or not otherwise includable in the Parent's statement of Net Income for such period) or (ii) losses on sales or write-offs of assets outside of the ordinary course of business);

(e)  any unusual non-cash or other non-cash charges, expenses or losses, including any inventory revaluations resulting from the Transactions and any non-cash write-offs required to be made under FASB ASC Topic 350, and any non-cash charges, fees, payments, expenses or losses accrued in connection with the consummation of the Plan (including all fresh start accounting adjustments), in each case incurred during such period;

13

(f)  (x) restructuring and integration costs of the Borrower and its Subsidiaries, including but not limited to severance costs, plant moving costs, central sourcing costs, lease termination costs, and professional advisory fees incurred in connection with the adoption and execution of restructuring integration initiatives and the restructuring and refinancing of the Borrower's debt incurred during such period, and (y) any non-recurring expenses or losses consisting of (a) losses from extinguishment of debt, casualty (including fire, earthquake, hurricane, terrorism or other force majeure events), condemnation and expropriation and (b) other non-recurring losses which are set forth as such in the income statement of the Parent; provided that such costs, expenses or losses referred to in this clause (f) shall only be included to the extent in the aggregate they are equal to or less than $15,000,000 for any four quarter period;

(g)  transaction fees and expenses related to the Transactions paid by any Obligor;

(h)  all fees and expenses (including management fees) accrued, or permitted hereunder to be paid and actually paid by any Obligor, for such period pursuant to the LLC Agreement and the Management Agreements, as in effect on the date hereof or as amended, modified or supplemented as permitted hereby;

(i)  reasonable transaction fees and expenses incurred by any Obligor in connection with Permitted Acquisitions;

(j)  [reserved];

(k)  write-offs, reserves or allowances of notes receivable from current and former officers, founders, and direct or indirect shareholders of the Borrower and its Subsidiaries, in a principal amount not to exceed $3,000,000 (plus accrued and unpaid interest) in the aggregate over the term of this Agreement;

(l)  costs and expenses of outside professionals engaged by the Borrower and its Subsidiaries at the request of the Lenders or First Lien Lenders, and outside professionals engaged by the Lenders and First Lien Lenders at the expense of the Borrower and its Subsidiaries;

(m) expenses related to the issuance of equity-based compensation;

(n)  reasonable fees (including reasonable legal fees and other similar advisory and consulting fees, administrative fees and working fees), charges, payments and expenses accrued or paid by any Obligor in connection with the consummation of the Plan;

(o)  reasonable fees paid to the Administrative Agent pursuant to the Fee Letter; and

(q)  any letter of credit fees, to the extent paid by any Obligor in cash;

14

<u>minus</u>, to the extent included in Net Income for such period, the sum, without duplication, of:

(i)  interest income (except to the extent deducted in determining interest expense);

(ii)  any extraordinary or non-recurring income or gains (including whether or not otherwise includable in the Parent's statement of Net Income for such period, gains on the sales of assets outside the ordinary course of business); and

(iii)  any unusual non-cash or other non-cash income;

<u>provided</u> that, for purposes of <u>Section 7.2.4</u>, and notwithstanding any provision of <u>Section 1.4(b)</u> to the contrary, calculations of EBITDA for any period shall be adjusted to exclude items otherwise properly included to the extent such items relate to assets Disposed in such period, on a *pro forma* basis as if such asset was Disposed on the first day of such period; and

<u>provided</u> further that, notwithstanding the foregoing provisions of this definition of EBITDA, (i) the quarterly EBITDA of the Borrower and its Subsidiaries for each Fiscal Quarter ending on September 30, 2010 and December 31, 2010 and (ii) the EBITDA of the Borrower and its Subsidiaries for the period commencing on January 1, 2011 until the Closing Date, and with respect to clauses (i) and (ii), together with all itemized additions and deductions thereto, shall be as set forth in <u>Schedule III</u> hereto.

"<u>Effective Date</u>" is defined in the <u>sixth recital</u>.

"<u>Eligible Assignee</u>" means any Person (other than an Ineligible Assignee).

"<u>Emigsville Property</u>" means the real property owned by the Borrower, located in York County, Pennsylvania and commonly known as 325 Busser Road, Emigsville, Pennsylvania.

"<u>Employee Benefit Plan</u>" means any employee benefit plan within the meaning of Section 3(3) of ERISA that is maintained for employees of the Borrower or any member of the Borrower's Controlled Group.

"<u>Environmental Laws</u>" means all applicable foreign, federal, state, provincial or local statutes, laws, ordinances, codes, rules and regulations (including consent decrees and administrative orders) relating to public health and safety and protection of the environment.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto of similar import, together with the regulations thereunder, in each case as in effect from time to time.  References to sections of ERISA also refer to any successor sections thereto.

"<u>Event of Default</u>" is defined in <u>Section 8.1</u>.

"<u>Excess Cash Factor</u>" means, with respect to any Interest Payment Date, the fraction that (x) the rate at which the Loans bear interest payable in cash for such Interest Payment Date

15

pursuant to clause (y)(ii)(B) of Section 3.2.1(b), bears to (y) 6% per annum (which proportion shall be zero in the event that no cash interest is payable on such Interest Payment Date pursuant to such clause (y)(ii)(B)).

"Excess Cash Flow" means, for any Fiscal Year, the result of the following calculation:

(a)  EBITDA for such period;

plus

(b)  the absolute value of any net decrease in Working Capital for such period;

less

(c)  the sum (without duplication) for such period of the following:

(i)  the aggregate amount of (A) all regularly scheduled or mandatorily repayable principal payments of Indebtedness (including the Loans) made during such Fiscal Year, (B) all optional prepayments of Indebtedness permitted hereby (other than the Loans) during such Fiscal Year (including any call premiums paid in cash upon repayment of such Indebtedness) and (C) the portion of any regularly scheduled payments with respect to Capital Lease Liabilities allocable to principal;

(ii)  cash payments made with respect to Capital Expenditures (to the extent permitted hereunder and not funded with debt or equity issuances);

(iii)  all federal, state, local and foreign income, franchise or other similar taxes to the extent paid by the Parent and its Subsidiaries in cash (including any future payments of past-priority taxes assumed from the Bankruptcy Debtors for any past, present or current periods) and, to the extent not duplicative thereof, Restricted Payments made for the purposes described in clause (b)(iii) of Section 7.2.6;

(iv)  interest expense to the extent paid in cash during such Fiscal Year;

(v)  to the extent actually paid in cash during such Fiscal Year, Earnout Payments (to the extent not funded with debt or equity issuances);

(vi)  the absolute value of any net increase in Working Capital for such period;

(vii)  cash payments to the extent (A) actually paid in cash during such period and (B) added back to EBITDA for such period under clauses (d), (f), (g), (h), (i), (l), (n), (o) and (p) of the definition of EBITDA; and

(ix)  cash payments made with respect to Permitted Acquisitions and Investments permitted under Section 7.2.5 (except to the extent funded with debt or equity issuances); and

(x)  cash payments made pursuant to the Transactions.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Exchange of Loans" is defined in the seventh recital.

"Exemption Certificate" is defined in clause (e) of Section 4.6.

"FATCA" means Sections 1471 through 1474 of the Code.

"Fee Letter" means the confidential letter, dated the date hereof, between the Administrative Agent and the Borrower.

"Filing Agent" is defined in Section 5.7.

"Filing Statements" is defined in Section 5.7.

"First Lien Administrative Agent" means the "Administrative Agent" as defined in the First Lien Credit Agreement (or such corresponding term in the event the First Lien Credit Agreement is refinanced in accordance with the terms hereof).

"First Lien Credit Agreement" means the First Lien Credit Agreement, dated as of the date hereof, among the Borrower, the various financial institutions and other Persons from time to time party thereto as lenders, The Bank of New York Mellon, as the administrative agent and the other Persons party thereto as agents, as amended, supplemented, amended and restated, refinanced or otherwise modified from time to time.

"First Lien Lender" means the "Lenders" as defined in the First Lien Credit Agreement (or such corresponding term in the event the First Lien Credit Agreement is refinanced in accordance with the terms hereof).

"First Lien Loan Documents" means the "Loan Documents" as defined in the First Lien Credit Agreement (or such corresponding term in the event the First Lien Credit Agreement is refinanced in accordance with the terms hereof).

"First Lien Loans" means the "Loans" as defined in the First Lien Credit Agreement (or such corresponding term in the event the First Lien Credit Agreement is refinanced in accordance with the terms hereof).

"First Lien Obligations" means all Obligations as that term is defined in the First Lien Credit Agreement as in effect on the date hereof or as modified as permitted thereby.

17

"First Lien Termination Date" means the "Termination Date" as defined in the First Lien Credit Agreement (or such corresponding term in the event the First Lien Credit Agreement is refinanced in accordance with the terms hereof).

"Fiscal Quarter" means a quarter ending on the last day of March, June, September or December.

"Fiscal Year" means any period of twelve consecutive calendar months ending on December 31; references to a Fiscal Year with a number corresponding to any calendar year (e.g., the "2011 Fiscal Year") refer to the Fiscal Year ending on December 31 of such calendar year.

"Fixed Charge Coverage Ratio" means, as of any Interest Payment Date, the ratio of (a) EBITDA for the four quarter period ended as of the most recent fiscal quarter ended immediately prior to such Interest Payment Date to (b) the Fixed Charges for such four quarter period (as determined in accordance with the definition thereof).

"Fixed Charges" means, for any four quarter period with respect to the Borrower and its Subsidiaries on a consolidated basis for which the Fixed Charge Coverage Ratio is being determined, the sum of (a) cash Interest Expense of the Borrower and its Subsidiaries on a consolidated basis for such period, and (b) all scheduled amortization payments of principal of Indebtedness made by the Borrower and its Subsidiaries during such period, provided, however, that for purposes of determining the amount of Interest Expense required to be paid in cash on the Loans for such period in connection with the determination of the Fixed Charge Coverage Ratio, the amount of such cash Interest Expense used for purposes of clause (a) of this definition shall be the sum of (i) interest on the Loans required to be paid in cash on the Interest Payment Date immediately following the end of such period shall be treated as if such cash interest payments were made on the last day of such four quarter period, plus (ii) Interest Expense paid in cash on the Loans on the three preceding Interest Payment Dates.

"Foreign Pledge Agreement" means any supplemental pledge agreement governed by the laws of a jurisdiction other than the United States or a State thereof executed and delivered by the Borrower or any of its Subsidiaries pursuant to the terms of this Agreement, in form and substance reasonably satisfactory to the Administrative Agent, as may be necessary or desirable under the laws of organization or incorporation of a Subsidiary to further protect or perfect the Lien on and security interest in any Collateral (as defined in the Security Agreement).

"Foreign Subsidiary" means any Subsidiary that is not incorporated or organized under the laws of the United States, a state thereof or the District of Columbia and any Subsidiary of such a Foreign Subsidiary.

"F.R.S. Board" means the Board of Governors of the Federal Reserve System or any successor thereto.

"GAAP" is defined in Section 1.4.

"Goshen Property" means the real property owned by the Borrower, located in Elkhart County, Indiana and commonly known as 1302 Eisenhower Drive North, Goshen, Indiana.

18

"Governmental Authority" means the government of the United States, any other nation, or any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other Person exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Granting Lender" is defined in clause (g) of Section 10.11.

"Guarantor" means, collectively, the Parent, each Subsidiary Guarantor and each other Person party to a Guaranty.

"Guaranty" means, as applicable, the Parent Guaranty, any Subsidiary Guaranty and any other document delivered by a U.S. Subsidiary of the Borrower whereby such U.S. Subsidiary becomes liable for the Obligations.

"Hazardous Material" means

    (a)    any "hazardous substance", as defined by CERCLA;

    (b)    any "hazardous waste", as defined by the RCRA; or

    (c)    any pollutant or contaminant or hazardous, dangerous or toxic chemical, material or substance (including any petroleum product) within the meaning of any other applicable Environmental Law relating to or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material, all as amended.

"Hedging Obligations" means, with respect to any Person, all liabilities of such Person under currency exchange agreements, interest rate swap agreements, interest rate cap agreements and interest rate collar agreements, and all other agreements or arrangements designed to protect such Person against fluctuations in interest rates or currency exchange rates.

"herein", "hereof", "hereto", "hereunder" and similar terms contained in any Loan Document refer to such Loan Document as a whole and not to any particular Section, paragraph or provision of such Loan Document.

"Hypothetical Tax Rate" means, for any taxable year, the greater of the highest marginal rate of combined federal, state and local income tax (including any Medicare contribution taxes imposed on net investment income) payable by (i) an individual resident in New York City and (ii) a corporation resident in New York City whose sole assets are the membership interests of the Parent that are held by such corporation, in each case taking into account the particular character of the income involved (e.g., capital gain or ordinary income) and taking into account the deductibility of state and local income taxes in computing federal income tax liability.

"including" and "include" means including without limiting the generality of any description preceding such term, and, for purposes of each Loan Document, the parties hereto agree that the rule of ejusdem generis shall not be applicable to limit a general statement, which

19

is followed by or referable to an enumeration of specific matters, to matters similar to the matters specifically mentioned.

"<u>Indebtedness</u>" of any Person means:

(a)      all obligations of such Person for borrowed money or advances and all obligations of such Person evidenced by bonds, debentures, notes or similar instruments or upon which interest payments are customarily made;

(b)      all obligations, contingent or otherwise, relative to the face amount of all letters of credit, whether or not drawn, banker's acceptances, performance, surety or appeal bonds (or similar obligations) issued for the account of such Person;

(c)      all Capitalized Lease Liabilities of such Person;

(d)      all reimbursement, payment or other obligations or liabilities of such Person created or arising under any conditional sale or title retention agreement with respect to property used or acquired by such Person;

(e)      for purposes of <u>Section 8.1.4</u> only, all other items which, in accordance with GAAP, would be included as liabilities on the balance sheet of such Person as of the date at which Indebtedness is to be determined;

(f)      net Hedging Obligations of such Person;

(g)      whether or not so included as liabilities in accordance with GAAP, all obligations of such Person to pay the deferred purchase price of property or services (including all reimbursement, payment or other obligations or liabilities of such Person created or arising under any conditional sale or title retention agreement with respect to property used or acquired by such Person) (excluding trade accounts payable in the ordinary course of business and not outstanding for more than 120 days after such payable was due unless, if such payable is outstanding more than 120 days after such payable was due, they are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted) of the date of purchase of such goods and services (including all reimbursement, payment or other obligations or liabilities of such Person created or arising under any conditional sale or title retention agreement with respect to property used or acquired by such Person), and indebtedness secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien on property owned or being acquired by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(h)      obligations arising under Synthetic Leases;

(i)      all Contingent Liabilities of such Person; and

(j)      all obligations referred to in clauses (a) through (i) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person.

The Indebtedness of any Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such Person, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Liabilities" is defined in Section 10.4.

"Indemnified Parties" is defined in Section 10.4.

"Ineligible Assignee" means a natural Person, the Parent, any Subsidiary of Parent and Perseus.

"Intercreditor Agreement" means the Intercreditor Agreement, dated the date hereof, and substantially in the form of Exhibit G hereto, executed and delivered by the Administrative Agent, the administrative agent under the First Lien Credit Agreement and the Obligors pursuant to the terms of this Agreement, as amended, supplemented, amended and restated, replaced or otherwise modified from time to time.

"Interest Coverage Ratio" means, as of the last day of any Fiscal Quarter, the ratio computed for the period consisting of such Fiscal Quarter and each of the three immediately preceding Fiscal Quarters of:

(a) EBITDA (for all such Fiscal Quarters)

to

(b) the sum (for all such Fiscal Quarters) of Interest Expense;

provided that, for purposes of calculating the Interest Coverage Ratio for each of the following Fiscal Quarters of the 2011 Fiscal Year, Interest Expense shall be calculated as follows: (i) with respect to the third Fiscal Quarter of such Fiscal Year, the amount of Interest Expense for such Fiscal Quarter and the immediately preceding Fiscal Quarter multiplied by two; and (ii) with respect to the fourth Fiscal Quarter of such Fiscal Year, the amount of Interest Expense for such Fiscal Quarter and the two immediately preceding Fiscal Quarters multiplied by one and one-third.

"Interest Expense" means, for any applicable period, (a) the aggregate cash interest expense of the Parent and its Subsidiaries for such applicable period, including the portion of any payments made in respect of Capitalized Lease Liabilities allocable to interest expense but excluding (to the extent otherwise included in the definition of Interest Expense) (i) amortization of deferred financing costs, (ii) make-whole payments or call premiums paid or payable in cash

upon repayment of Indebtedness and (iii) any interest capitalized or paid in kind; <u>less</u> (b) the aggregate interest income received by Parent and its Subsidiaries for such applicable period.

"<u>Interest Payment Date</u>" means each February 15, May 15, August 15 and November 15 in each year, commencing on May 15, 2011 and continuing until, and including, the Stated Maturity Date.

"<u>Investment</u>" means, relative to any Person,

      (a)      any loan, advance or extension of credit made by such Person to any other Person, including the purchase by such Person of any bonds, notes, debentures or other debt securities of any other Person;

      (b)      Contingent Liabilities in favor of any other Person; and

      (c)      any Capital Securities held by such Person in any other Person.

The amount of any Investment shall be the original principal or capital amount thereof less all returns of principal or capital thereon and shall, if made by the transfer or exchange of property other than cash, be deemed to have been made in an original principal or capital amount equal to the fair market value of such property at the time of such Investment.

"<u>Lender Assignment Agreement</u>" means an assignment agreement substantially in the form of <u>Exhibit C</u> hereto.

"<u>Lenders</u>" is defined in the <u>preamble</u>.

"<u>Lender's Environmental Liability</u>" means any and all losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, costs, judgments, suits, proceedings, damages, (including consequential damages), disbursements or expenses of any kind or nature whatsoever (including reasonable attorneys' fees and expenses at trial and appellate levels and experts' fees and disbursements and expenses incurred in investigating, defending against or prosecuting any litigation, claim or proceeding) which may at any time be imposed upon, incurred by or asserted or awarded against the Administrative Agent or any Lender or any of such Person's Affiliates, shareholders, directors, officers, employees, and agents in connection with or arising from:

      (a)  any Hazardous Material on, in, under or migrating from all or any portion of any property of the Borrower or any of its Subsidiaries or the groundwater thereunder to the extent caused by Releases from the Borrower's or any of its Subsidiaries' or any of their respective predecessors' properties;

      (b)  any misrepresentation, inaccuracy or breach of any warranty, contained or referred to in <u>Section 6.11</u>;

      (c)  any violation or claim of violation by the Borrower or any of its Subsidiaries of any Environmental Laws; or

(d)  the imposition of any Lien for damages caused by, or the recovery of any costs with respect to, the cleanup, Release of Hazardous Material by the Borrower or any of its Subsidiaries, or in connection with any property owned by the Borrower or any of its Subsidiaries.

"LIBO Rate" means, with respect to each period (each an "Interest Period") commencing on the day immediately following an Interest Payment Date (or the Effective Date in the case of the first such period) and ending on the next succeeding Interest Payment Date, a rate per annum equal to the greater of (i) 3.00% and (ii) the rate published at approximately 11:00 a.m. (London time) on the first Business Day of any Interest Period by the British Bankers' Association for deposits in Dollars for three months (as set forth by the Bloomberg Information Service or any successor thereto or any other service selected by the Administrative Agent which has been nominated by the British Bankers' Association as an authorized information vendor for the purpose of displaying such rates).

"Lien" means any security interest, mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), charge against or security interest in property, or other priority or preferential arrangement of any kind or nature whatsoever, including any conditional sale or title retention arrangement, any Capitalized Lease Liability and any assignment, deposit arrangement or financing lease intended as security.

"Livermore Property" means the real property owned by the Borrower, located in Alameda County, California and commonly known as 5775 Brisa Street, Livermore, California.

"LLC Agreement" means the Amended and Restated Limited Liability Company Agreement, dated [●], 2011, among the Parent and the other parties thereto, as amended, supplemented, amended and restated or otherwise modified from time to time.

"Loan" means, as the context may require, a Term A-Prime Loan, Term A Loan or Term B Loan; "Loans" means the Term A-Prime Loans, Term A Loans and Term B Loans, collectively.

"Loan Documents" means, collectively, this Agreement, the Notes, the Fee Letter, each agreement pursuant to which the Administrative Agent is granted a Lien to secure all or any part of the Obligations, each Guaranty, the Intercreditor Agreement and each other agreement, certificate, document or instrument delivered in connection with any Loan Document, whether or not specifically mentioned herein or therein.

"Make-Whole Premium" means, with respect to any Loan on any date of prepayment, the present value of (a) all required remaining interest payments (excluding accrued and unpaid interest on the amount prepaid on the date of such prepayment) due on such Loan from the date of prepayment through and including the second anniversary of the Effective Date plus (b) 7.5% of the aggregate principal amount of the Loans that would be outstanding on such second anniversary, in each case discounted from the second anniversary of the Effective Date to the date of prepayment using a discount rate equal to the Treasury Rate plus 50 basis points (it being agreed, for purposes hereof, that (a) the LIBO Rate applicable to all required remaining interest payments on such Loan shall be deemed to be equal to the LIBO Rate in effect on the date of

23

such prepayment), (b) the remaining interest payments shall be calculated on the assumption that the Cash Interest Conditions are satisfied and the Additional Cash Interest Conditions are not satisfied on all remaining Interest Payment Dates, and (c) all interest capitalized on the Loans on such remaining Interest Payments shall be due and payable as a single payment on such second anniversary); provided, however, that if a sale of all or substantially all assets or Capital Securities of the Borrower occurs to a Person who is not an Affiliate of the Borrower without the consent of Perseus, on or before the second anniversary of the Effective Date, then the Make-Whole Premium shall not exceed 10% of the then outstanding aggregate principal amount of the Loans.

"Management Agreements" means the Management Agreements, dated as of the Effective Date, among Silver Point Capital, L.P. and Perseus and the Borrower, as amended, supplemented, amended and restated or otherwise modified from time to time as permitted hereunder.

"Material Adverse Effect" means a material adverse effect on (a) the business, condition (financial or otherwise), operations, performance or properties of the Parent and its Subsidiaries taken as a whole, (b) the rights and remedies of any Secured Party under any Loan Document, (c) the ability of any Obligor to perform its Obligations under any Loan Document, (d) the legality, validity or enforceability of this Agreement or any other Loan Document or (e) the validity, perfection or priority of Liens with respect to any material portion of the collateral in favor of the Administrative Agent for the benefit of the Secured Parties (other than any material adverse effect that has occurred as a result of the Bankruptcy Cases and related proceedings).

"Moody's" means Moody's Investors Service, Inc.

"Mortgage" means each mortgage, deed of hypothec, debenture, pledge, deed of trust or agreement executed and delivered by any Obligor in favor of the Administrative Agent for the benefit of the Secured Parties pursuant to the requirements of this Agreement substantially in the form set forth in Exhibit H hereto (with such changes as are reasonably satisfactory to the Administrative Agent) under which a Lien is granted on the real property and fixtures described therein, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"Net Casualty Proceeds" means, with respect to any Casualty Event, the amount of any insurance proceeds or condemnation awards received by the Parent, the Borrower or any of its Subsidiaries in connection with such Casualty Event (net of all reasonable and customary collection expenses thereof), but excluding any proceeds or awards required to be paid to a creditor (other than the Lenders) which holds a first priority Lien permitted pursuant to this Agreement on the property which is the subject of such Casualty Event minus the sum of (i) all taxes actually paid or estimated by the Borrower to be payable in cash within the 12 months following the date of such Casualty Event and (ii) to the extent not excluded above, payments made by the Borrower or its Subsidiaries to retire Indebtedness (other than the Loans) where payment of such Indebtedness is required in connection with such Casualty Event; provided that, if the amount of any estimated taxes pursuant to clause (i) exceeds the amount of taxes actually required to be paid in cash in respect of such Casualty Event, the aggregate amount of such excess shall constitute Net Casualty Proceeds.

"Net Debt Proceeds" means the cash proceeds received by the Borrower or its Subsidiaries from any Debt Issuance by the Borrower or any Subsidiary not otherwise permitted pursuant to the terms of Section 7.2.2 (net of underwriting discounts and commissions and other reasonable fees, expenses and costs associated therewith including, without limitation, those of attorneys, accountants and other professionals).

"Net Disposition Proceeds" means the gross cash proceeds received by the Borrower or its Subsidiaries from any Disposition other than those pursuant to clauses (a), (b) (but not to the extent clause (b) references Section 7.2.14), (c), (d) and (e) of Section 7.2.10 and any cash payment received in respect of promissory notes or other non-cash consideration delivered to the Borrower or its Subsidiaries in respect thereof, minus the sum of (i) all reasonable and customary legal, investment banking, brokerage, accounting and other similar professional fees and expenses incurred in connection with such Disposition, (ii) all taxes actually paid or estimated by the Borrower to be payable in cash within the 12 months following the date of such Disposition, and (iii) payments made by the Borrower or its Subsidiaries to retire Indebtedness (other than the Loans) secured by a Lien permitted pursuant to Section 7.2.3 (and such Lien is senior to the Liens created under the Loan Documents) where payment of such Indebtedness is required in connection with such Disposition; provided that, if the amount of any estimated taxes pursuant to clause (ii) exceeds the amount of taxes actually required to be paid in cash in respect of such Disposition, the aggregate amount of such excess shall constitute Net Disposition Proceeds.

"Net Income" means, for any period, the aggregate of all amounts which would be included as net income (or loss) on the consolidated financial statements of the Parent and its Subsidiaries for such period.

"Non-Excluded Taxes" means any Taxes imposed, deducted or withheld with respect to any Secured Party on payments under this Agreement or any Loan Document other than (i) net income and franchise Taxes imposed by any Governmental Authority under the laws of which such Secured Party is organized or in which it maintains its principal office or its applicable lending office, (ii) any U.S. federal withholding tax imposed under FATCA, (iii) Taxes imposed as a result of a present or former connection between such Secured Party and the jurisdiction imposing such Taxes, but excluding any such connection arising from such Secured Party's exercise of its rights or performance of its obligations pursuant to or in respect of this Agreement or any Loan Document, (iv) any branch profits tax imposed by the United States or any comparable tax imposed by any foreign jurisdiction and (v) any Other Taxes.

"Non-U.S. Lender" means any Lender that is not a "United States person", as defined under Section 7701(a)(30) of the Code.

"Note" means, as the context may require, a Term A-Prime Note, Term A Note or Term B Note; "Notes" means the Term A-Prime Notes, Term A Notes and Term B Notes collectively.

"Obligations" means all obligations (monetary or otherwise, whether absolute or contingent, matured or unmatured) of the Borrower and each other Obligor to the Secured Parties arising under or in connection with a Loan Document, including, but not limited to, the principal of and premium, if any, and interest (including interest accruing (or which would have accrued) during the pendency of any proceeding of the type described in Section 8.1.7, whether or not

allowed in such proceeding) on the Loans as well as all Fees and expenses (including attorneys' fees and expenses) and indemnity payable to the Secured Parties hereunder.

"<u>Obligor</u>" means, as the context may require, the Borrower and each other Person (other than a Secured Party) obligated under any Loan Document.

"<u>Organic Document</u>" means, relative to any Obligor, as applicable, its certificate or articles of incorporation, articles and memorandum of association, by-laws, certificate of partnership, partnership agreement, certificate of formation, limited liability agreement, operating agreement and all shareholder agreements, voting trusts and similar arrangements applicable to any of such Obligor's Capital Securities.

"<u>Other Taxes</u>" means any and all present or future stamp, documentary or similar Taxes, or any other excise or property Taxes or similar levies that arise on account of any payment made or required to be made under any Loan Document or from the execution, delivery, registration, recording or enforcement of, or otherwise with respect to, any Loan Document, but excluding, for the avoidance of doubt, any Taxes arising in connection with any transfer, assignment or participation of any rights or obligations under this Agreement, or any change in lending office by any Lender, except if such transfer, assignment, participation or change in lending office is done at the request of Borrower.

"<u>Parent</u>" is defined in the <u>third recital</u>.

"<u>Parent Guaranty</u>" means the guaranty, dated as of the date hereof, executed and delivered by an Authorized Officer of the Parent pursuant to the terms of this Agreement, substantially in the form of <u>Exhibit E-1</u> hereto, as amended, supplemented, amended and restated or otherwise modified from time to time.

"<u>Participant</u>" is defined in <u>clause (d)</u> of <u>Section 10.11</u>.

"<u>Patent Security Agreement</u>" means any Patent Security Agreement executed and delivered by any Obligor in substantially the form of Exhibit A to the Security Agreement, as amended, supplemented, amended and restated or otherwise modified.

"<u>Patriot Act</u>" means the USA PATRIOT ACT (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as amended and supplemented from time to time.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation and any Person succeeding to any or all of its functions under ERISA.

"<u>PBGC Settlement</u>" means the settlement agreement, if any, with PBGC.

"<u>Pension Plan</u>" means a "pension plan", as such term is defined in Section 3(2) of ERISA, which is subject to Title IV of ERISA, and to which the Borrower or any corporation, trade or business that is, along with the Borrower, a member of a Controlled Group, may have liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

26

"Percentage" means, relative to any Lender, the percentage set forth opposite its name on Schedule II hereto or set forth in a Lender Assignment Agreement, as such percentage may be adjusted from time to time (x) in accordance with Section 4.8 or (y) pursuant to Lender Assignment Agreements executed by such Lender and its Assignee Lender and delivered pursuant to Section 10.11.

"Permitted Acquisition" means an acquisition (whether pursuant to an acquisition of Capital Securities, assets or otherwise) by the Borrower or any Subsidiary from any Person in which the following conditions are satisfied:

(a)  the Borrower shall have submitted to the Administrative Agent at least 20 days prior to the consummation of such acquisition, a business description of the business or assets being acquired, the financial statements of the business or assets being acquired and a summary of the terms of the acquisition, all in reasonable detail;

(b)  the assets, Capital Securities or business being acquired, will be located, incorporated and/or doing business in the United States;

(c)  Borrower shall have delivered a certificate certifying that before and after giving effect to such acquisition, the representations and warranties set forth in each Loan Document shall, in each case, be true and correct in all material respects with the same effect as if then made (unless stated to relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date) and no Default has occurred and is continuing; and

(d)  the Borrower shall have delivered to the Administrative Agent a Compliance Certificate for the period of four full Fiscal Quarters immediately preceding such acquisition (prepared in good faith and in a manner and using such methodology which is consistent with the most recent financial statements delivered pursuant to Section 7.1.1) giving pro forma effect to the consummation of such acquisition as if such Permitted Acquisition had occurred on the first day of the period of four Fiscal Quarters ending on the last day of the most recently ended Fiscal Quarter ending at least 45 days prior to the date of such Permitted Acquisition.

"Permitted Holders" means (i) Perseus, (ii) any Person that holds the Capital Securities of the Parent as of the Closing Date and (iii) the respective affiliates of the Persons referred to in the foregoing clauses (i) and (ii).

"Perseus" means Perseus, L.L.C. and its Affiliates.

"Person" means any natural person, corporation, limited liability company, partnership, joint venture, association, trust or unincorporated organization, Governmental Authority or any other legal entity, whether acting in an individual, fiduciary or other capacity.

"Plan" is defined in the second recital.

"Platform" is defined in clause (b) of Section 9.9.

27

"Purchase Card Agreements" means any arrangement by any Obligor to provide company-paid credit cards to employees that permit such employees to make purchases on behalf of such Obligor of supplies or services used in the ordinary course of business by such Obligor, including in respect of ordinary course, business related travel and entertainment expenses.

"Quarterly Payment Date" means the last Business Day of March, June, September and December.

"RCRA" means the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., as amended.

"Register" is defined in clause (a) of Section 2.3.

"Release" means a "release", as such term is defined in CERCLA or any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material in the indoor or outdoor environment, including the movement of Hazardous Material through or in the air, soil, surface water, ground water or property.

"Replacement Lender" is defined in Section 4.10.

"Replacement Notice" is defined in Section 4.10.

"Required Lenders" means, at any time, Lenders holding more than 50% of the aggregate principal amount of the then outstanding Loans.

"Restricted Payment" means (i) the declaration or payment of any dividend (other than dividends payable solely in Capital Securities (that are not mandatorily redeemable prior to one year and one day after the Stated Maturity Date) of the Borrower or any Subsidiary) on, or the making of any payment or distribution on account of, or setting apart assets for a sinking or other analogous fund for the purchase, redemption, defeasance, retirement or other acquisition of, any class of Capital Securities of the Borrower or any Subsidiary or any warrants, options or other right or obligation to purchase or acquire any such Capital Securities, whether now or hereafter outstanding, or (ii) the making of any other distribution in respect of such Capital Securities, in each case either directly or indirectly, whether in cash, property or obligations of the Borrower or any Subsidiary or otherwise.

"S&P" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc.

"SEC" means the Securities and Exchange Commission.

"Secured Parties" means, collectively, the Lenders, the Administrative Agent and (in each case) each of their respective successors, transferees and assigns.

"Security Agreement" means the Pledge and Security Agreement executed and delivered by an Authorized Officer of the Parent and its Subsidiaries, substantially in the form of Exhibit F

28

hereto, together with any supplemental Foreign Pledge Agreement delivered pursuant to the terms of this Agreement, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"Silver Point" is defined in the preamble.

"SPC" is defined in clause (g) of Section 10.11.

"Stated Maturity Date" means [●], 2015[2].

"Subsidiary" means, with respect to any Person, any other Person of which more than 50% of the outstanding Voting Securities of such other Person (irrespective of whether at the time Capital Securities of any other class or classes of such other Person shall or might have voting power upon the occurrence of any contingency) is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more other Subsidiaries of such Person, or by one or more other Subsidiaries of such Person.  Unless the context otherwise specifically requires, the term "Subsidiary" shall be a reference to a Subsidiary of the Borrower.

"Subsidiary Guarantor" means each U.S. Subsidiary of the Borrower that has executed and delivered to the Administrative Agent the Subsidiary Guaranty (including by means of a delivery of a supplement thereto).

"Subsidiary Guaranty" means the subsidiary guaranty, executed and delivered by an Authorized Officer of each U.S. Subsidiary pursuant to the terms of this Agreement, substantially in the form of Exhibit E-2 hereto, as amended, supplemented, amended and restated or otherwise modified from time to time.

"Supplemental Margin" means (x) on any Interest Payment Date occurring on or prior to May 15, 2012, 2.0% and (y) thereafter, 2.0% times the result of 1 minus the Excess Cash Factor.

"Synthetic Lease" means, as applied to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is not a capital lease in accordance with GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for federal income tax purposes, other than any such lease under which that Person is the lessor.

"Taxes" means all taxes, duties, levies, imposts, charges, assessments, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, and all interest, penalties or similar liabilities with respect thereto.

"Term A Lender" means any Lender that holds Term A Loans.

"Term A Loan" means the Loans held by a Term A Lender in an amount equal to the Percentage set forth opposite its name on Schedule II hereto or set forth in a Lender Assignment Agreement.

---

[2]        Insert date that is 4 ½ year anniversary of the Closing Date.

"Term A Note" means a promissory note of the Borrower payable to any Term A Lender, in the form of Exhibit A-2 hereto (as such promissory note may be amended, endorsed or otherwise modified from time to time), evidencing the aggregate Indebtedness of the Borrower to such Term A Lender resulting from outstanding Loans, and also means all other promissory notes accepted from time to time in substitution therefor or renewal thereof.

"Term A-Prime Amendment" is defined in Section 2.2.3.

"Term A-Prime Closing Date" is defined in Section 2.2.5.

"Term A-Prime Effective Date" is defined in Section 2.2.4.

"Term A-Prime Lender" means any Lender that holds Term A-Prime Loans.

"Term A-Prime Loan" means the Loans made to the Borrower by any Lender pursuant to Section 2.2.

"Term A-Prime Note" means a promissory note of the Borrower payable to any Term A-Prime Lender, in the form of Exhibit A-1 hereto (as such promissory note may be amended, endorsed or otherwise modified from time to time), evidencing the aggregate Indebtedness of the Borrower to such Term A-Prime Lender resulting from outstanding Loans, and also means all other promissory notes accepted from time to time in substitution therefor or renewal thereof.

"Term B Lender" means any Lender that holds Term B Loans.

"Term B Loan" means the Loans held by a Term B Lender in an amount equal to the Percentage set forth opposite its name on Schedule II hereto or set forth in a Lender Assignment Agreement.

"Term B Note" means a promissory note of the Borrower payable to any Term B Lender, in the form of Exhibit A-3 hereto (as such promissory note may be amended, endorsed or otherwise modified from time to time), evidencing the aggregate Indebtedness of the Borrower to such Term B Lender resulting from outstanding Loans, and also means all other promissory notes accepted from time to time in substitution therefor or renewal thereof.

"Termination Date" means the date on which all Obligations have been paid in full in cash.

"Terrorism Laws"  means any of the following (a) Executive Order 13224 issued by the President of the United States, (b) the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations), (c) the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations), (d) the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations), (e) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of  2001 (as it may be subsequently codified), (f) all other present and future legal requirements of any Governmental Authority addressing, relating to, or attempting to eliminate, terrorist acts and acts of war and (g) any

regulations promulgated pursuant thereto or pursuant to any legal requirements of any Governmental Authority governing terrorist acts or acts of war.

"Total Debt" means, on any date of determination, the outstanding principal amount of all Indebtedness of the Parent and its Subsidiaries of the type referred to in clause (a) (which, in the case of the Loans, shall be deemed to equal the aggregate outstanding principal amount of the Loans outstanding on the last day of the Fiscal Quarter ending on or immediately preceding the date of determination), clause (c) and clause (g), in each case of the definition of "Indebtedness" (exclusive of (x) intercompany Indebtedness between the Parent and its Subsidiaries and (y) any Preferred Units (as defined in the LLC Agreement)) and any Contingent Liability in respect of any of the foregoing.

"Total Leverage Ratio" means, as of the last day of any Fiscal Quarter, the ratio of

(a)     Total Debt outstanding on the last day of such Fiscal Quarter

to

(b)     EBITDA computed for the period consisting of such Fiscal Quarter and each of the three immediately preceding Fiscal Quarters.

"Trademark Security Agreement" means any Trademark Security Agreement executed and delivered by any Obligor substantially in the form of Exhibit B to the Security Agreement, as amended, supplemented, amended and restated or otherwise modified from time to time.

"Transactions" means, collectively, (a) the consummation of the Plan and the other transactions contemplated by the Plan to be consummated on the Closing Date (including, without limitation, transactions contemplated by the Asset Purchase Agreement), (b) the entering into by the Obligors of the Loan Documents and the First Lien Loan Documents to which they are intended to be a party, and the Exchange of Loans on the Closing Date, (c) the issuance of the Class A Common Units, Class B Common Units and the Preferred Units (each as defined in, and pursuant to, the LLC Agreement), (d) the satisfaction of all Indebtedness required to be paid pursuant to the Plan, (e) the payment of the fees and expenses incurred in connection with the consummation of the foregoing that are required to be paid on the Closing Date and (f) any payments made pursuant to the PBGC Settlement.

"Transaction Documents" means, collectively, the Loan Documents, the First Lien Loan Documents, the Plan, the Asset Purchase Agreement, the LLC Agreement, the Management Agreements and each other document delivered in connection therewith, whether or not specifically mentioned herein or therein, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"Treasury Rate" means, at any date, the yield to maturity as of such date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to such date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from such date to the date which is the second anniversary of the Closing Date.

31

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided that, if, with respect to any Filing Statement or by reason of any provisions of law, the perfection or the effect of perfection or non-perfection of the security interests granted to the Administrative Agent pursuant to the applicable Loan Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, then "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of each Loan Document and any Filing Statement relating to such perfection or effect of perfection or non-perfection.

"United States" or "U.S." means the United States of America, its fifty states and the District of Columbia.

"Unrestricted" means, when referring to cash and Cash Equivalent Investments of the Borrower and its Subsidiaries, that such cash and Cash Equivalent Investments (i) do not appear (and are not required to appear) as "restricted" on a balance sheet of the Borrower and its Subsidiaries (unless the restrictions causing such appearance or required appearance are solely pursuant to the Loan Documents); (ii) are not subject to any Lien of any Person other than Liens permitted under clauses (a), (e), (g), (i), (j), (m), and (p) of Section 7.2.3; and (iii) are otherwise generally available for use by the Borrower and its Subsidiaries.

"U.S. Subsidiary" means any Subsidiary that is incorporated or organized under the laws of the United States, a state thereof or the District of Columbia, and that is not a Foreign Subsidiary.

"Voting Securities" means, with respect to any Person, Capital Securities of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person.

"wholly owned Subsidiary" means any Subsidiary all of the outstanding Capital Securities of which (other than any director's qualifying shares or investments by foreign nationals mandated by applicable laws) is owned directly or indirectly by the Borrower.

"Working Capital" means (without duplication), at any date of determination, the difference of (a) consolidated current assets of the Parent and its Subsidiaries on such date in the nature of ordinary course trade accounts receivable, inventory and similar current assets, less (b) consolidated current liabilities of the Parent and its Subsidiaries on such date in the nature of ordinary course trade accounts payable and similar current liabilities, but excluding, without limitation, the current portion of Total Debt to the extent included in the computation of current liabilities.

SECTION 1.2 Use of Defined Terms.  Unless otherwise defined or the context otherwise requires, terms for which meanings are provided in this Agreement shall have such meanings when used in each other Loan Document and the Disclosure Schedule.

SECTION 1.3 Cross-References.  Unless otherwise specified, references in a Loan Document to any Article or Section are references to such Article or Section of such Loan Document, and references in any Article, Section or definition to any clause are references to such clause of such Article, Section or definition.

SECTION 1.4 <u>Accounting and Financial Determinations</u>.

(a)     Unless otherwise specified, all accounting terms used in each Loan Document shall be interpreted, and all accounting determinations and computations thereunder (including under <u>Section 7.2.4</u> and the definitions used in such calculations) shall be made, in accordance with those generally accepted accounting principles in effect in the United States ("<u>GAAP</u>").  Unless otherwise expressly provided, all financial covenants and defined financial terms shall be computed on a consolidated basis for the Parent and its Subsidiaries (and, to the extent applicable and unless otherwise specified, any predecessor company), in each case without duplication.

(b)     As of any date of determination, for purposes of determining EBITDA or the Interest Coverage Ratio or Total Leverage Ratio (and any financial calculations required to be made or included within such calculations or ratios, or required for purposes of preparing any Compliance Certificate to be delivered pursuant to the definition of "Permitted Acquisition"), the calculation of such ratios and other financial calculations shall include or exclude, as the case may be, the effect of any assets or businesses that have been acquired pursuant to any Permitted Acquisition or Disposed of by the Borrower or any of its Subsidiaries pursuant to the terms hereof (including through mergers or consolidations), as of such date of determination, as determined by the Borrower on a <u>pro forma</u> basis in accordance with GAAP, which determination may include one-time adjustments or reductions in costs, if any, directly attributable to any such permitted Disposition or Permitted Acquisition, as the case may be, in each case (i) calculated in accordance with Regulation S-X of the Securities Act of 1933, as amended from time to time, and any successor statute, for the period of four Fiscal Quarters ended on or immediately prior to the date of determination of any such ratios or other financial calculations (and giving effect to any reasonable cost-savings or adjustments prepared in good faith by the Borrower relating to synergies resulting from any Permitted Acquisition) and (ii) giving effect to any such Permitted Acquisition or permitted Disposition as if it had occurred on the first day of such period of four Fiscal Quarters.

## ARTICLE II
## LOANS, CLOSING RATE AND NOTES

SECTION 2.1 <u>Loans</u>.  Each of the parties hereto acknowledges and agrees that on the Closing Date (which shall be a Business Day), the Exchange of Loans shall occur, pursuant to which each Term A Lender and Term B Lender will be deemed to have made Term A Loans and Term B Loans to the Borrower under this Agreement (the Loans referred to in this <u>Section 2.1</u> relative to each such Lender, its "<u>Loans</u>"), with the principal amount of each Loan as of the Closing Date being the amount, and in the Lender's Percentage, in each case set forth opposite the name of such Lender on <u>Schedule II</u> hereto.  Each of the Lenders on the Closing Date, by operation of the Plan and the Confirmation Order, shall be deemed to have agreed to, and shall be bound by, the terms and conditions hereof, without any further action or consent on the part of such Lender.  No amounts paid or prepaid with respect to the Loans may be reborrowed.

SECTION 2.2 <u>Term A-Prime Loans</u>.

SECTION 2.2.1  <u>Requests for Term A-Prime Loans Commitments</u>.  Upon notice to the Administrative Agent (whereupon the Administrative Agent shall promptly deliver a copy of such notice to each of the Lenders), at any time from time to time after the Closing Date, the Borrower may request commitments for Term A-Prime Loans in an aggregate amount to be determined from one or more Term A-Prime Lenders (which may include any existing Lender) willing to provide such commitments for Term A-Prime Loans in their own discretion.  Such notice shall set forth (i) the amount of the Term A-Prime Loans being requested and (ii) the date on which commitments for such Term A-Prime Loans are requested to become effective.  At the time of the sending of such notice, the Borrower shall specify the time period within which each Lender is requested to respond (which shall in no event be less than ten Business Days from the date of delivery of such notice to the Lenders).  No Lender shall be obligated to provide any Term A-Prime Loans unless it so agrees.  Each Lender shall notify the Administrative Agent within such time period whether or not it agrees to provide any Term A-Prime Loans and, if so, whether by an amount equal to, greater than, or less than its Percentage of such requested increase (which shall be calculated on the basis of the pro rata amount of the Loans held by each Lender).  Any Lender not responding within such time period shall be deemed to have declined to provide any Term A-Prime Loans.  The Administrative Agent shall notify the Borrower of the Lenders' responses to each request made hereunder.  If, within ten Business Days after providing the notice pursuant to this <u>Section 2.2.1</u>, the existing Lenders do not provide sufficient commitments to achieve the full amount of a requested increase, the Borrower may invite additional Eligible Assignees to become Term A-Prime Lenders pursuant to an accession agreement in form and substance reasonably satisfactory to the Administrative Agent.

SECTION 2.2.2  <u>Ranking and Other Provisions</u>.  The Term A-Prime Loans:

(a)     shall have a maturity date and conversion features, be subject to such amortization and bear interest at such rate or rates, which may be payable in cash or through capitalization of interest, and be subject to such call protection or premiums upon payment thereof, in each case, as shall be agreed between the Borrower and the Persons providing the Term A-Prime Loans; and

(b)     shall otherwise, except as otherwise provided herein, have the same terms as the other Loans hereunder.

SECTION 2.2.3  <u>Term A-Prime Amendment</u>.  Commitments in respect of Term A-Prime Loans shall become commitments under this Agreement pursuant to an amendment (the "<u>Term A-Prime Amendment</u>") to this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower, the Term A-Prime Lenders and the Administrative Agent.  The Term A-Prime Amendment may, without the consent of any other Lenders, effect such amendments to any Loan Documents as may be necessary or appropriate, in the opinion of the Administrative Agent, to effect the provisions of this <u>Section 2.2</u>.

SECTION 2.2.4  <u>Effective Date and Allocations</u>.  If any Term A-Prime Loans are added in accordance with this <u>Section 2.2</u>, the Administrative Agent and the Borrower shall determine the effective date (the "<u>Term A-Prime Effective Date</u>") and the final allocation of such addition.  The Administrative Agent shall promptly notify the Borrower and the Lenders of the final allocation of such addition and the Term A-Prime Effective Date.

34

SECTION 2.2.5  Conditions to Effectiveness to Increase.  The effectiveness of the Term A-Prime Amendment shall, unless otherwise agreed to by the Administrative Agent, be subject to the satisfaction on the date thereof (the "Term A-Prime Closing Date") of each of the following conditions:

(a)      the Administrative Agent shall have received on or prior to the Term A-Prime Effective Date each of the following, with each dated the Term A-Prime Effective Date unless otherwise indicated or agreed to by the Administrative Agent and each in form and substance reasonably satisfactory to the Administrative Agent and the Borrower:  (i) the applicable Term A-Prime Amendment and (ii) certified copies of resolutions of the managing body of the Parent, the Borrower and its Subsidiaries approving the execution, delivery and performance of the Term A-Prime Amendment;

(b)      (i) the conditions precedent set forth in Article V shall have been satisfied both before and after giving effect to such Term A-Prime Amendment and the Term A-Prime Loans provided thereby and (ii) such Term A-Prime Loans shall be made on the terms and conditions provided for above; and

(c)      there shall have been paid to the Administrative Agent, for the account of the Administrative Agent and the Lenders (including any Person becoming a Lender as part of such Term A-Prime Amendment on the related Term A-Prime Effective Date), as applicable, all fees and expenses (including reasonable out-of-pocket fees, charges and disbursements of counsel) that are due and payable on or before the Term A-Prime Effective Date.

SECTION 2.2.6  Effect of Term A-Prime Amendment.  On the Term A-Prime Effective Date, each Lender or Eligible Assignee which is providing Term A-Prime Loans shall become a "Lender" for all purposes of this Agreement and the other Loan Documents.

SECTION 2.3 Register; Notes.  The Register shall be maintained on the following terms.

(a)      The Borrower hereby designates the Administrative Agent to serve as the Borrower's agent, solely for the purpose of this clause, to maintain a register (the "Register") on which the Administrative Agent will record the Term A-Prime Loans (if any), the Term A Loans and the Term B Loans held by each Lender (and SPC), the capitalization of interest accruing to each Lender (and SPC) in respect of such Lender's (and SPC's) Term A-Prime Loans (if any), Term A Loans and Term B Loans, each repayment in respect of the principal amount of any Loans, and each assignment or transfer of an interest in any Loan made pursuant to Section 10.11, annexed to which the Administrative Agent shall retain a copy of each Lender Assignment Agreement delivered to the Administrative Agent pursuant to Section 10.11.  Failure to make any recordation, or any error in such recordation, shall not affect any Obligor's Obligations.  The entries in the Register shall be conclusive and binding in the absence of manifest error, and the Borrower, the Administrative Agent, and the Lenders (including any SPC) shall treat each Person in whose name a Loan is registered as the owner thereof for the purposes of all Loan Documents, notwithstanding notice or any provision herein to the contrary.  Any assignment or transfer of the Loans made pursuant hereto shall be registered in the Register only upon delivery to the Administrative Agent of a Lender Assignment Agreement that has been executed by the requisite parties pursuant to Section 10.11.  No assignment or transfer of a

Lender's (or SPC's) Loans shall be effective unless such assignment or transfer shall have been recorded in the Register by the Administrative Agent as provided in this Section.

(b)      Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to each Lender a Note evidencing each of the Term A-Prime (if any), Term A, and Terms B Loans held by, and payable to the order of, such Lender in a maximum principal amount equal to the amount of such Term A-Prime (if any), Term A, and Terms B Loans when made.  The Borrower hereby irrevocably authorizes each Lender to make (or cause to be made) appropriate notations on the grid attached to such Lender's Note (or on any continuation of such grid), which notations, if made, shall evidence, inter alia, the date of, the outstanding principal amount of, and the interest rate applicable to the Loans evidenced thereby.  Such notations shall, to the extent not inconsistent with notations made by the Administrative Agent in the Register, be conclusive and binding on each Obligor absent manifest error; provided that, the failure of any Lender to make any such notations shall not limit or otherwise affect any Obligations of any Obligor.

ARTICLE III
REPAYMENTS, PREPAYMENTS, INTEREST AND FEES

SECTION 3.1 Repayments and Prepayments; Application.  The Borrower agrees that the Loans shall be repaid and prepaid pursuant to the following terms.

SECTION 3.1.1 Repayments and Prepayments.  The Borrower shall repay in full the unpaid principal amount of each Loan on the Stated Maturity Date.  Prior thereto, payments and prepayments of the Loans shall or may be made as set forth below.

(a)      From time to time on any Business Day occurring after the First Lien Termination Date, the Borrower may make a voluntary prepayment, in whole or in part, of the outstanding principal amount of any Loans; provided that,

(i)      all such voluntary prepayments shall require at least the same Business Day's prior notice (such notice to be delivered before noon on such day), and not more than five Business Days' prior irrevocable notice to the Administrative Agent (which notice may be telephonic so long as such notice is confirmed in writing within 24 hours thereafter and such notice to be delivered before noon New York time on such day).  Each notice of prepayment sent pursuant to this clause shall specify the prepayment date, the principal amount of each Loan (or portion thereof) to be prepaid and the scheduled installment or installments of principal to which such prepayment is to be applied.  Each such notice shall be irrevocable and shall commit the Borrower to prepay such Loan (or portion thereof) by the amount stated therein on the date stated therein; provided that a notice of prepayment may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied;

(ii)      all such voluntary partial prepayments shall be in an aggregate minimum amount of $500,000 and an integral multiple of $100,000;

(iii)    no prepayments of the Term A Loans or the Term B Loans shall be made at any time any Term A-Prime Loans shall be outstanding, and no prepayments of the Term B Loans shall be made at any time any Term A Loans shall be outstanding;

(iv)    all prepayments of Term A Loans and Term B Loans under this clause (a) shall be accompanied by (a) all accrued and unpaid interest on the principal amount of the Loans to be prepaid to but excluding the date of payment, plus (b) the payment of a prepayment premium equal to, (i) in the case of any prepayment made prior to the second anniversary of the Closing Date, the Make-Whole Premium, (ii) in the case of any prepayment made on or after the second anniversary of the Closing Date but prior to the third anniversary of the Closing Date, a premium equal to 7.50% of the principal amount of the Loans being prepaid, and (iii) in the case of any prepayment made on or after the third anniversary of the Closing Date but prior to the fourth anniversary of the Closing Date, a premium equal to 3.75% of the principal amount of the Loans being prepaid.

(b)    On the Stated Maturity Date, the Borrower shall repay the outstanding principal amount of all Loans.

(c)    To the extent permitted by the First Lien Credit Agreement and after the First Lien Termination Date, the Borrower shall (subject to the next proviso), within five (5) Business Days of receipt of any Net Casualty Proceeds or any Net Disposition Proceeds by the Borrower or any of its Subsidiaries, deliver to the Administrative Agent a calculation of the amount of such proceeds, and, to the extent the aggregate amount of such proceeds received by the Borrower and its Subsidiaries exceeds $1,000,000 for any single transaction or a series of related transactions, the Borrower shall make a mandatory prepayment of the Loans in an amount equal to 100% of such Net Casualty Proceeds or Net Disposition Proceeds, as applicable; provided that upon written notice by the Borrower to the Administrative Agent not more than five (5) Business Days following receipt of any Net Casualty Proceeds or Net Disposition Proceeds, as applicable (so long as no Default has occurred and is continuing), such proceeds may be retained by the Borrower and its Subsidiaries (and may be excluded from the prepayment requirements of this clause) if (i) the Borrower informs the Administrative Agent in such notice of its good faith intention to apply (or cause one or more of the Subsidiary Guarantors to apply) such Net Casualty Proceeds or Net Disposition Proceeds, as applicable, to the acquisition of other assets or properties in the U.S. consistent with the businesses permitted to be conducted pursuant to Section 7.2.1 (including by way of merger or Investment), and (ii) within 365 days following the receipt of such Net Casualty Proceeds or such Net Disposition Proceeds, as applicable, such proceeds are applied or committed to such acquisition.  The amount of such Net Casualty Proceeds or such Net Disposition Proceeds, as applicable, unused or uncommitted after such 365 day period (subject to the extension set forth above) shall be applied to prepay the Loans as set forth in Section 3.1.2.

(d)    To the extent permitted by the First Lien Credit Agreement and after the First Lien Termination Date, within 120 days after the close of each Fiscal Year (beginning with the close of the 2011 Fiscal Year) the Borrower shall make a mandatory prepayment of the Loans in an amount equal to (i) 50% of Excess Cash Flow (if any) for such Fiscal Year, minus (ii) the aggregate amount of all optional prepayments of the Loans (without duplication) made

since the beginning of such Fiscal Year through the date on which the prepayment of the Loans pursuant to this clause (d) is made (including any call premiums paid in cash upon repayment of such Indebtedness).

(e)     To the extent permitted by the First Lien Credit Agreement and after the First Lien Termination Date, the Borrower shall, within five (5) Business Days of receipt of any Net Debt Proceeds, by the Borrower or any of its Subsidiaries, make a mandatory prepayment of the Loans in an amount equal to 100% of the aggregate Net Debt Proceeds.

(f)     Immediately upon any acceleration of the Stated Maturity Date of any Loans pursuant to <u>Section 8.2</u> or <u>Section 8.3</u>, the Borrower shall repay all the Loans, unless, pursuant to <u>Section 8.3</u>, only a portion of all the Loans is so accelerated (in which case the portion so accelerated shall be so repaid).

(g)     Each prepayment made pursuant to <u>clauses (c), (d)</u> and <u>(e)</u> of this <u>Section 3.1.1</u> shall be applied <u>first</u>, to the outstanding principal amount of the Term A-Prime Loans (if any), and <u>second</u>, to the extent the amount of such prepayment exceeds the outstanding principal amount of the Term A-Prime Loans, or to the extent no Term A-Prime Loans are outstanding, to the ratable principal amount of the Term A Loans, and <u>third</u>, to the extent the amount of such prepayment exceeds the outstanding principal amount of the Term A Loans, to the Term B Loans then outstanding.

Except as set forth in <u>clause (a)</u> above, each prepayment of any Loans made pursuant to this Section shall be without premium or penalty, except as may be required by <u>Section 4.4</u>.

SECTION 3.2 <u>Interest Provisions</u>.  Interest on the outstanding principal amount of the Loans shall accrue and be payable in accordance with the terms set forth below.

SECTION 3.2.1 <u>Rates</u>.  (a)  The Term A Loans and Term B Loans shall accrue interest on the principal amount thereof outstanding from time to time at a rate per annum equal to the sum of (i) the LIBO Rate from time to time in effect, <u>plus</u> (ii) 1.0%, <u>plus</u> (iii) the Base Margin, <u>plus</u> (iv) the Supplemental Margin, if any.  The portion of the interest accrued on the Loans attributable to clauses (i), (ii) and (iv) of the preceding sentence shall be paid on each Interest Payment Date by capitalizing such interest on such Loans and adding it to the then outstanding principal amount of the Loans.

(b)     The portion of the interest attributable to the Base Margin shall be paid on each Interest Payment Date by capitalizing such interest on such Loans and adding it to the then outstanding principal amount of the Loans; <u>provided</u> that:

(x)     with respect to any Interest Payment Date occurring prior to May 15, 2012 on which the Cash Interest Conditions are satisfied, interest due on such Interest Payment Date that accrued at the rate of 5.0% per annum shall be payable in cash and the remainder shall be capitalized and added to the then outstanding principal amount of the Loans, and

(y)     (i) with respect to any Interest Payment Date occurring on or after May 15, 2012 on which the Cash Interest Conditions are satisfied but the Additional Cash

Interest Conditions are not satisfied, interest due on such Interest Payment Date that accrued at the rate of 5.0% per annum shall be payable in cash and the remainder shall be capitalized and added to the then outstanding principal amount of the Loans, and (ii) with respect to any Interest Payment Date occurring on or after May 15, 2012 on which both the Cash Interest Conditions and the Additional Cash Interest Conditions are satisfied, (A) interest due on such Interest Payment Date that accrued at the rate of 5.0% per annum shall be payable in cash, plus (B) up to the amount of additional interest due on such Interest Payment Date that accrued at the rate of 6.0% per annum shall be payable in cash; provided that, with respect to this clause (B), if the condition specified in clause (a) of the definition of Additional Cash Interest Conditions is satisfied but the Fixed Charge Coverage Ratio (which shall include for this purpose, any interest payable under this clause (B), after giving pro forma effect to the payment of interest in cash on such Interest Payment Date would be less than 2.00 to 1.00, the portion of interest payable in cash on such Interest Payment Date shall be limited to the amount that would not cause the Fixed Charge Coverage Ratio with respect to such Interest Payment Date to be less than 2.00 to 1.00, and the remainder shall be capitalized and added to the then outstanding principal amount of the Loans.

SECTION 3.2.2  Post-Default Rates.  After the date any Event of Default has occurred and for so long as such Event of Default is continuing, the Borrower shall pay, but only to the extent permitted by law, interest (after as well as before judgment) on all outstanding Obligations at a rate per annum equal to (a) in the case of principal on any Loan, subject to applicable law, the rate of interest that otherwise would be applicable to such Loan plus 2% per annum; and (b) in the case of overdue interest, fees, and other monetary Obligations, the LIBO Rate from time to time in effect, plus 14% per annum, plus a margin of 2% per annum.

SECTION 3.2.3  Payment Dates.  Interest accrued on each Loan shall be payable or capitalized in accordance with Sections 3.2.1 and 3.2.2, without duplication:

(a)  on the Stated Maturity Date;

(b)  except as set forth in clause (c) below, on the date of any payment or prepayment, in whole or in part, of principal outstanding on such Loan on the principal amount so paid or prepaid;

(c)  on each Interest Payment Date occurring after the Effective Date; and

(d)  on that portion of any Loans the Stated Maturity Date of which is accelerated pursuant to Section 8.2 or Section 8.3, immediately upon such acceleration.

Interest accrued on Loans or other monetary Obligations after the date such amount is due and payable (whether on the Stated Maturity Date, upon acceleration or otherwise) shall be payable upon demand.

SECTION 3.3  Administrative Agent's Fee.  The Borrower agrees to pay to the Administrative Agent, for its own account, the fees and expenses (including documented, reasonable attorney's fees and expenses) in the amounts and on the dates set forth in the Fee Letter.

## ARTICLE IV
## CERTAIN LENDER PROVISIONS

SECTION 4.1 <u>Increased Capital Costs</u>.  If any change in, or the introduction, adoption, effectiveness, interpretation, reinterpretation or phase in of, any law or regulation, directive, guideline, decision or request (whether or not having the force of law) of any Governmental Authority affects or would affect the amount of capital required or expected to be maintained by any Secured Party or any Person controlling such Secured Party, and such Secured Party determines (in good faith but in its sole and absolute discretion) that the rate of return on its or such controlling Person's capital as a consequence of the Loans held by such Secured Party is reduced to a level below that which such Secured Party or such controlling Person could have achieved but for the occurrence of any such circumstance, then upon notice from time to time by such Secured Party to the Borrower, the Borrower shall within five days following receipt of such notice pay directly to such Secured Party additional amounts sufficient to compensate such Secured Party or such controlling Person for such reduction in rate of return.  A statement of such Secured Party as to any such additional amount or amounts shall, in the absence of manifest error, be conclusive and binding on the Borrower.  In determining such amount, such Secured Party may use any method of averaging and attribution that it (in its sole and absolute discretion) shall deem applicable.

SECTION 4.2 <u>Taxes</u>.  The Borrower covenants and agrees as follows with respect to Taxes.

(a)    Any and all payments by the Borrower and each other Obligor under each Loan Document shall be made without setoff, counterclaim or other defense, and free and clear of, and without deduction or withholding for or on account of, any Taxes except to the extent that deduction or withholding of such Taxes is required by applicable law.  In the event that any such Taxes are required by applicable law to be deducted or withheld from any payment required to be made to or on behalf of any Secured Party under any Loan Document, then:

(i)    subject to <u>clause (f)</u>, if such Taxes are Non-Excluded Taxes or Other Taxes, the Borrower and each Obligor shall increase the amount of such payment so that each Secured Party receives an amount equal to the amount it would have received had no such deduction or withholding been made; and

(ii)    the Borrower or the Administrative Agent (as applicable) shall withhold the full amount of such Taxes from such payment (as increased pursuant to <u>clause (a)(i)</u>) and shall pay such amount to the Governmental Authority imposing such Taxes in accordance with applicable law.

(b)    In addition, the Borrower shall pay all Other Taxes imposed to the relevant Governmental Authority imposing such Other Taxes in accordance with applicable law.

(c)    The Borrower shall furnish to the Administrative Agent, within 45 days of any such payment being due under applicable law, an official receipt (or a certified copy thereof) or other proof of payment satisfactory to the Administrative Agent, acting reasonably,

evidencing the payment of such Taxes or Other Taxes.  The Administrative Agent shall make copies thereof available to any Lender upon request therefor.

(d)     Subject to clause (f), the Borrower shall indemnify each Secured Party for any Non-Excluded Taxes and Other Taxes (including Non-Excluded Taxes and Other Taxes imposed or asserted on, or attributable to, amounts payable under this Section 4.6) paid by such Secured Party, whether or not such Non-Excluded Taxes or Other Taxes were correctly or legally asserted by the relevant Governmental Authority, provided that no Secured Party shall be entitled to receive any payment under this clause (d), unless such Secured Party or the Administrative Agent provides a written request for such payment to the Borrower within six months of the due date for the payment of the Non-Excluded Taxes or Other Taxes for which indemnification is sought.  With respect to the indemnification provided in the immediately preceding sentence, such indemnification shall be made within 30 days after the date such Secured Party makes written demand therefor.

(e)     Each Term A-Prime Lender and each Term A Lender making Loans to the Borrower, on or prior to the date on which such Lender becomes a Lender hereunder or under the Term A-Prime Amendment, as applicable (and from time to time thereafter upon the request of the Borrower or the Administrative Agent, but only for so long as such Lender is legally entitled to do so), shall deliver to the Borrower and the Administrative Agent either (i) two duly completed copies of either (x) Internal Revenue Service Form W-8BEN or W-8IMY claiming eligibility of a Non-U.S. Lender for benefits of an income tax treaty to which the United States is a party or (y) Internal Revenue Service Form W-8ECI, or in either case an applicable successor form; (ii) in the case of a Non-U.S. Lender that is not legally entitled to deliver either form listed in clause (e)(i), (x) a certificate to the effect that such Non-U.S. Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a controlled foreign corporation receiving interest from a related person within the meaning of Section 881(c)(3)(C) of the Code (referred to as an "Exemption Certificate") and (y) two duly completed copies of Internal Revenue Service Form W-8BEN or W-8IMY or applicable successor form, or (iii) in the case of a Lender that is not a Non-U.S. Lender, two duly completed copies of Internal Revenue Service form W-9 or applicable successor form, and  (iv) in the case of any Lender, such documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will permit payments by the Borrower and each other Obligor under any Loan Document to be made without withholding or at a reduced rate of withholding, or as is reasonably requested by the Borrower or the Administrative Agent to comply with FATCA. Each Term B Lender shall provide two duly completed copies of Internal Revenue Service form W-9 or applicable successor form, such documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will permit payments by the Borrower and each other Obligor under any Loan Document to be made without withholding or at a reduced rate of withholding, or as is reasonably requested by the Borrower or the Administrative Agent to comply with FATCA.  The Administrative Agent shall deliver to the Borrower such IRS forms as are required to ensure that payments made to the Administrative Agent are not subject to withholding, but only for so long as the Administrative Agent is legally entitled to do so.  Each Lender agrees to promptly notify the Borrower and the Administrative Agent in writing of any change in circumstances which would modify or render invalid any claimed exemption or reduction.  In addition, each Lender shall timely deliver to the Borrower

41

and the Administrative Agent two further copies of such Form W-8BEN, W-8IMY, W-8ECI or W-9 or successor forms on or before the date that any previously executed form expires or becomes obsolete, or after the occurrence of any event requiring a change in the most recent form delivered by such Person to the Borrower.

(f)     The Borrower shall not be obligated to pay any additional amounts to any Secured Party pursuant to clause (a)(i), or to indemnify any Secured Party pursuant to clause (d), in respect of United States federal withholding taxes to the extent imposed as a result of (i) the failure, inability or ineligibility of such Secured Party to deliver to the Borrower the form or forms and/or an Exemption Certificate, as applicable to such Secured Party, pursuant to clause (e), (ii) such form or forms and/or Exemption Certificate not establishing a complete exemption from U.S. federal withholding tax or the information or certifications made therein by the Secured Party being untrue or inaccurate on the date delivered in any material respect, or (iii) the Secured Party designating a successor lending office at which it maintains its Loans which has the effect of causing such Secured Party to become obligated for tax payments in excess of those in effect immediately prior to such designation; provided that, the Borrower shall be obligated to pay additional amounts to any such Secured Party pursuant to clause (a)(i), and to indemnify any such Secured Party pursuant to clause (d), in respect of United States federal withholding taxes if (i) any such failure to deliver a form or forms or an Exemption Certificate or the failure of such form or forms or Exemption Certificate to establish a complete exemption from U.S. federal withholding tax resulted from a change in any applicable statute, treaty, regulation or other applicable law or any official interpretation of any of the foregoing occurring after the Closing Date (or in the case of an Assignee Lender, after the date of the assignment, except to the extent that the applicable assigning lender was entitled to receive additional amounts with respect to such payment), which change rendered such Secured Party no longer legally entitled to deliver such form or forms or Exemption Certificate or otherwise ineligible for a complete exemption from U.S. federal withholding tax, (ii) the redesignation of the Secured Party's lending office was made at the request of the Borrower or (iii) the obligation to pay any additional amounts to any such Secured Party pursuant to clause (a)(i) or to indemnify any such Secured Party pursuant to clause (d) is with respect to an Assignee Lender that becomes an Assignee Lender as a result of an assignment made at the request of the Borrower.

(g)     In the event that any Lender or the Administrative Agent determines in its sole discretion that it has received a refund or a credit in respect of Taxes or Other Taxes as to which it has been paid additional amounts by the Borrower pursuant to clause (a) or indemnified by the Borrower pursuant to clause (d) and such Lender or the Administrative Agent, as applicable, determines in its good faith judgment that such refund is attributable to such additional amounts or indemnification, then such Lender or Administrative Agent shall promptly notify the Administrative Agent and the Borrower, shall use reasonable efforts to apply for such refund or credit and shall within 30 Business Days of receipt of such refund or application of such credit remit to the Borrower an amount as such Lender or Administrative Agent reasonably determines to be the proportion of the refunded or credited amount as will leave it, after such remittance, in no better or worse position than it would have been if the Taxes or Other Taxes had not been imposed and the corresponding additional amounts or indemnification payment not been made.  Neither the Lenders nor the Administrative Agent shall be obligated to disclose information regarding its tax affairs or computations to the Borrower in connection with this

clause (g) or any other provision of this Section that such Lender or the Administrative Agent reasonably deems confidential.

SECTION 4.3 <u>Payments; Proceeds.Payments and Computations</u>.  Unless otherwise expressly provided in a Loan Document, all payments by the Borrower pursuant to each Loan Document shall be made by the Borrower to the Administrative Agent for the <u>pro rata</u> account of the Secured Parties entitled to receive such payment.  All payments shall be made without setoff, deduction or counterclaim not later than 11:00 a.m. New York time on the date due in same day or immediately available funds to such account as the Administrative Agent shall specify from time to time by notice to the Borrower.  Funds received after that time shall be deemed to have been received by the Administrative Agent on the next succeeding Business Day.  The Administrative Agent shall promptly remit in same day funds to each Secured Party its share, if any, of such payments received by the Administrative Agent for the account of such Secured Party.  All interest and fees shall be computed on the basis of the actual number of days (including the first day but excluding the last day) occurring during the period for which such interest or fee is payable over a year comprised of 360 days.  Payments due on other than a Business Day shall be made on the next succeeding Business Day and such extension of time shall be included in computing interest and fees in connection with that payment.

SECTION 4.3.2 <u>Proceeds of Collateral and Order of Payments upon Event of Default</u>. After the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and upon direction from the Required Lenders, shall, apply all amounts received under the Loan Documents (including from the proceeds of collateral securing the Obligations) or under applicable law; <u>provided</u> that (a) before the First Lien Termination Date, notwithstanding any direction from the Required Lenders, the Administrative Agent shall apply all such proceeds as required by the Intercreditor Agreement, and (b) after the First Lien Termination Date, such proceeds shall be applied upon receipt to the Obligations as follows: (i) <u>first</u>, to the payment of all Obligations in respect of fees, expense reimbursements, indemnities and other amounts owing to the Administrative Agent, in its capacity as the Administrative Agent (including the fees and expenses of counsel to the Administrative Agent), (ii) <u>second</u>, after payment in full in cash of the amounts specified in <u>clause (b)(i)</u>, to the ratable payment of all interest (including interest accruing (or which would accrue) after the commencement of a proceeding in bankruptcy, insolvency or similar law, whether or not permitted as a claim under such law) and fees owing to the Term A-Prime Lenders under the Loan Documents, and all costs and expenses owing to the Term A-Prime Lenders pursuant to the terms of the Loan Documents, until paid in full in cash, (iii) <u>third</u>, after payment in full in cash of the amounts specified in <u>clauses (i)</u> and <u>(ii)</u>, to the ratable payment of the principal amount of the Term A-Prime Loans then outstanding (if any), (iv) <u>fourth</u>, after payment in full in cash of the amounts specified in <u>clauses (i)</u> through <u>(iii)</u>, to the ratable payment of all interest (including interest accruing (or which would accrue) after the commencement of a proceeding in bankruptcy, insolvency or similar law, whether or not permitted as a claim under such law) and fees owing to the Term A Lenders under the Loan Documents, and all costs and expenses owing to the Term A Lenders pursuant to the terms of the Loan Documents, until paid in full in cash, (v) <u>fifth</u>, after payment in full in cash of the amounts specified in <u>clauses (i)</u> through <u>(iv)</u>, to the ratable payment of the principal amount of the Term A Loans then outstanding, (vi) <u>sixth</u>, after payment in full in cash of the amounts specified in <u>clauses (i)</u> through <u>(v)</u>, to the ratable payment of all interest (including interest accruing (or which would accrue) after the commencement of a proceeding in

bankruptcy, insolvency or similar law, whether or not permitted as a claim under such law) and fees owing to the Term B Lenders under the Loan Documents, and all costs and expenses owing to the Term B Lenders pursuant to the terms of the Loan Documents, until paid in full in cash, (vii) seventh, after payment in full in cash of the amounts specified in clauses (i) through (vi), to the ratable payment of the principal amount of the Term B Loans then outstanding, (viii) eighth, after payment in full in cash of the amounts specified in clauses (i) through (vii), to the ratable payment of all other Obligations owing to the Secured Parties with respect to the Term A-Prime Loans, (ix) ninth, after payment in full in cash of the amounts specified in clauses (i) through (viii), to the ratable payment of all other Obligations owing to the Secured Parties with respect to the Term A Loans, (x) tenth, after payment in full in cash of the amounts specified in clauses (i) through (ix), to the ratable payment of all other Obligations owing to the Secured Parties with respect to the Term B Loans, and (xi) eleventh, after payment in full in cash of the amounts specified in clauses (i) through (x), and following the Termination Date, to each applicable Obligor or any other Person lawfully entitled to receive such surplus.

SECTION 4.4  Sharing of Payments.  If any Secured Party shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or otherwise) on account of any Loan (other than pursuant to the terms of Sections 4.3, 4.4, 4.5 or 4.6) in excess of its pro rata share of payments obtained by all Secured Parties of the same class, such Secured Party shall purchase for cash at face value from the other Secured Parties of such class such participations in Loans held by them as shall be necessary to cause such purchasing Secured Party to share the excess payment or other recovery ratably (to the extent such other Secured Parties were entitled to receive a portion of such payment or recovery) with each of them; provided that, if all or any portion of the excess payment or other recovery is thereafter recovered from such purchasing Secured Party, the purchase shall be rescinded and each Secured Party which has sold a participation to the purchasing Secured Party shall repay to the purchasing Secured Party the purchase price to the ratable extent of such recovery together with an amount equal to such selling Secured Party's ratable share (according to the proportion of (a) the amount of such selling Secured Party's required repayment to the purchasing Secured Party to (b) total amount so recovered from the purchasing Secured Party) of any interest or other amount paid or payable by the purchasing Secured Party in respect of the total amount so recovered.  The Borrower agrees that any Secured Party purchasing a participation from another Secured Party pursuant to this Section may, to the fullest extent permitted by law, exercise all its rights of payment (including pursuant to Section 4.9) with respect to such participation as fully as if such Secured Party were the direct creditor of the Borrower in the amount of such participation.  If under any applicable bankruptcy, insolvency or other similar law any Secured Party receives a secured claim in lieu of a setoff to which this Section applies, such Secured Party shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Secured Parties entitled under this Section to share in the benefits of any recovery on such secured claim.

SECTION 4.5  Setoff.  Each Secured Party shall, upon the occurrence and during the continuance of any Event of Default described in clauses (b) through (d) of Section 8.1.7 or, with the consent of the Required Lenders, upon the occurrence and during the continuance of any other Event of Default, have the right to appropriate and apply to the payment of the Obligations owing to it (whether or not then due), and (as security for such Obligations) the Borrower hereby grants to each Secured Party a continuing security interest in, any and all balances, credits,

deposits, accounts or moneys of the Borrower then or thereafter maintained with such Secured Party; provided that, any such appropriation and application shall be subject to the provisions of Section 4.8. Each Secured Party agrees promptly to notify the Borrower and the Administrative Agent in writing after any such appropriation and application made by such Secured Party; provided that, the failure to give such notice shall not affect the validity of such setoff and application. The rights of each Secured Party under this Section are in addition to other rights and remedies (including other rights of setoff under applicable law or otherwise) which such Secured Party may have.

SECTION 4.6 Replacement of Lenders. If any Lender (an "Affected Lender") (a) fails to consent to an election, consent, amendment, waiver or other modification to this Agreement or other Loan Document that requires the consent of a greater percentage of the Lenders than the Required Lenders and such election, consent, amendment, waiver or other modification is otherwise consented to by the Required Lenders or (b) makes a demand upon the Borrower for (or if the Borrower is otherwise required to pay) amounts pursuant to Section 4.3, 4.5 or 4.6 (and the payment of such amounts is, and is likely to continue to be, materially more onerous in the reasonable judgment of the Borrower than with respect to the other Lender), the Borrower or the Administrative Agent may, within 30 days of receipt by the Borrower of such demand or notice, as the case may be, give notice (a "Replacement Notice") in writing to the Administrative Agent and such Affected Lender of its intention to cause such Affected Lender to sell all or any portion of its Loans and/or Notes to an Eligible Assignee (a "Replacement Lender") designated in such Replacement Notice; provided, however, that no Replacement Notice may be given by the Borrower if (i) such replacement conflicts with any applicable law or regulation, (ii) any Event of Default shall have occurred and be continuing at the time of such replacement or (iii) prior to any such replacement, such Lender shall have taken any necessary action under Section 4.5 or 4.6 (if applicable) which shall have eliminated the continued need for payment of amounts owing pursuant to Section 4.5 or 4.6. If the Administrative Agent shall, in the exercise of its reasonable discretion and within 30 days of its receipt of such Replacement Notice, notify the Borrower and such Affected Lender in writing that the Replacement Lender is satisfactory to the Administrative Agent (such consent not being required where the Replacement Lender is already a Lender or an Affiliate of a Lender), then such Affected Lender shall, subject to the payment of any amounts due pursuant to Section 4.4, assign, in accordance with Section 10.11, the portion of its Loans, Notes (if any), and other rights and obligations under this Agreement and all other Loan Documents designated in the replacement notice to such Replacement Lender; provided, however, that (i) such assignment shall be without recourse, representation or warranty and shall be on terms and conditions reasonably satisfactory to such Affected Lender and such Replacement Lender, (ii) the purchase price paid by such Replacement Lender shall be in the amount of such Affected Lender's Loans designated in the Replacement Notice, together with all accrued and unpaid interest and fees in respect thereof, plus all other amounts (including the amounts demanded and unreimbursed under Sections 4.3, 4.5 and 4.6) and including any call premiums owing to such Affected Lender hereunder and (iii) the Borrower shall pay to the Affected Lender and the Administrative Agent all reasonable out-of-pocket expenses incurred by the Affected Lender and the Administrative Agent in connection with such assignment and assumption (including the processing fees described in Section 10.11). Upon the effective date of an assignment described above, the Replacement Lender shall become a "Lender" for all purposes under the Loan Documents. Each assignment pursuant to this Section 4.10 shall be

effective upon the satisfaction of the conditions specified in this Section 4.10 without further action on the part of the applicable Affected Lender.

ARTICLE V
CONDITIONS TO EXCHANGE OF LOANS

The obligations of the Lenders pursuant to the Exchange of Loans shall be subject to the prior or concurrent satisfaction (or waiver in accordance with Section 10.1; provided that the conditions in Sections 5.2 and 5.3 may not be waived) of each of the conditions precedent set forth in this Article.

SECTION 5.1 Resolutions, etc.  The Administrative Agent shall have received from each Obligor, as applicable, (i) a copy of a good standing certificate, dated a date reasonably close to the Closing Date, for each such Person and (ii) a certificate, dated as of the Closing Date, duly executed and delivered by such Person's Secretary or Assistant Secretary, managing member or general partner, as applicable, as to

(a)     resolutions of each such Person's Board of Directors (or other managing body, in the case of other than a corporation) then in full force and effect authorizing, to the extent relevant, all aspects of the Transactions applicable to such Person and the execution, delivery and performance of each Loan Document to be executed by such Person and the transactions contemplated hereby and thereby;

(b)     the incumbency and signatures of those of its officers, managing member or general partner, as applicable, authorized to act with respect to each Loan Document to be executed by such Person; and

(c)     the full force and validity of each Organic Document of such Person and copies thereof;

upon which certificates each Secured Party may conclusively rely until it shall have received a further certificate of the Secretary, Assistant Secretary, managing member or general partner, as applicable, of any such Person canceling or amending the prior certificate of such Person.

SECTION 5.2 Entry of Confirmation Order and Consummation of Transactions.  The Administrative Agent shall have received evidence that:

(a)     No amendment or other modification of or to the Plan shall be filed or proposed since the date the Confirmation Order was originally entered which contains modifications materially adverse to the Administrative Agent.

(b)     The Bankruptcy Court shall have entered the Confirmation Order.

(c)     Concurrently with the closing of the credit facility provided hereby, the Plan (including the transfer of substantially all assets of the Bankruptcy Debtors pursuant to the Asset Purchase Agreement) shall have been substantially consummated (as defined in Section 1101 of the Bankruptcy Code) in accordance in all material respects with the terms of the Plan and the Confirmation Order.

46

SECTION 5.3 <u>Delivery of Notes</u>.  The Administrative Agent shall have received, for the account of each Lender that has requested a Note, such Lender's Note(s) duly executed and delivered by an Authorized Officer of the Borrower.

SECTION 5.4 <u>Guarantees</u>.  The Administrative Agent shall have received each Guaranty, dated as of the Closing Date, duly executed and delivered by an Authorized Officer of the Parent and each U.S. Subsidiary, as applicable.

SECTION 5.5 <u>Security Agreements</u>.  The Administrative Agent (or in the case of <u>clause (a)(x)</u>, the First Lien Administrative Agent) shall have received executed counterparts of the Security Agreement, each dated as of the Closing Date, duly executed and delivered by the Parent, the Borrower and each U.S. Subsidiary (if any), together with:

(a)     (x) certificates (in the case of Capital Securities that are securities (as defined in the UCC)) evidencing all of the issued and outstanding capital Securities owned by each Obligor in its U.S. Subsidiaries and 65% (or, if less, such lesser amount owned by such Obligor) of the issued and outstanding Voting Securities of each Foreign Subsidiary (together with all the issued and outstanding non-voting Capital Securities of such Foreign Subsidiary) directly owned by each Obligor, which certificates in each case shall be accompanied by undated instruments of transfer duly executed in blank, or, if any Capital Securities (in the case of Capital Securities that are uncertificated securities (as defined in the UCC)), and (y) confirmation and evidence satisfactory to the Administrative Agent that the security interest therein has been transferred to and perfected by the First Lien Administrative Agent for the benefit of the Secured Parties in accordance with Articles 8 and 9 of the UCC and all laws otherwise applicable to the perfection of the pledge of such Capital Securities;

(b)     Filing Statements suitable in form for naming the Parent, the Borrower and each Subsidiary Guarantor as a debtor and the Administrative Agent as the secured party, or other similar instruments or documents to be filed under the UCC of all jurisdictions as may be necessary or, in the opinion of the Administrative Agent, desirable to perfect the security interests of the Administrative Agent pursuant to such Security Agreement;

(c)     UCC Form UCC-3 termination statements, if any, necessary to release all Liens and other rights of any Person (i)  in any collateral described in any Security Agreement previously granted by any Person, and (ii) securing any of the Indebtedness identified in <u>Item 5.5(c)</u> of the Disclosure Schedule, together with such other UCC Form UCC-3 termination statements as the Administrative Agent may reasonably request from such Obligors; and

(d)     certified copies of UCC Requests for Information or Copies (Form UCC-11), or a similar search report certified by a party acceptable to the Administrative Agent, dated a date reasonably near to the Closing Date, listing all effective financing statements which name any Obligor (under its present name and any previous names) as the debtor, together with copies of such financing statements (none of which shall, except with respect to Liens permitted by <u>Section 7.2.3</u>), evidence a Lien on any collateral described in any Loan Document).

SECTION 5.6 <u>Intellectual Property Security Agreements</u>.  The Administrative Agent shall have received a Patent Security Agreement, a Copyright Security Agreement and a

Trademark Security Agreement, as applicable, each dated as of the Closing Date, duly executed and delivered by each Obligor that, pursuant to a Security Agreement, is required to provide such intellectual property security agreements to the Administrative Agent.

SECTION 5.7 <u>Filing Agent, etc.</u>  All Uniform Commercial Code financing statements or other similar financing statements and Uniform Commercial Code (Form UCC-3) termination statements required pursuant to the Loan Documents (collectively, the "<u>Filing Statements</u>"), shall have been delivered to CT Corporation System or another similar filing service company acceptable to the Administrative Agent (the "<u>Filing Agent</u>").  The Filing Agent shall have acknowledged in a writing satisfactory to the Administrative Agent and its counsel (i) the Filing Agent's receipt of all Filing Statements, (ii) that the Filing Statements have either been submitted for filing in the appropriate filing offices or will be submitted for filing in the appropriate offices within ten days following the Closing Date and (iii) that the Filing Agent will notify the Administrative Agent and its counsel of the results of such submissions within 30 days following the Closing Date.

SECTION 5.8 <u>Intercreditor Agreement</u>.  The Administrative Agent shall have received the Intercreditor Agreement, dated as of the Closing Date, duly executed and delivered by the Administrative Agent, the administrative agent under the First Lien Credit Agreement and the Borrower.

SECTION 5.9 <u>Patriot Act Disclosures</u>.  The Administrative Agent and each Lender shall have received all Patriot Act Disclosures requested by them prior to execution of this Agreement.

SECTION 5.10      <u>Compliance with Warranties, No Default, etc.</u>  Both before and after giving effect to the Exchange of Loans the following statements shall be true and correct:

(a)      the representations and warranties set forth in each Loan Document shall, in each case, be true and correct in all material respects with the same effect as if then made (unless stated to relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date); and

(b)      no Default shall have then occurred and be continuing.

ARTICLE VI
REPRESENTATIONS AND WARRANTIES

In order to induce the Secured Parties to enter into this Agreement the Borrower represents and warrants to each Secured Party on the Closing Date as set forth in this Article.

SECTION 6.1 <u>Organization, etc</u>.  Each Obligor is validly organized and existing and in good standing under the laws of the state or jurisdiction of its incorporation or organization, is duly qualified to do business and is in good standing as a foreign entity in each jurisdiction where the nature of its business requires such qualification, except for such jurisdictions where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect, and has full power and authority and holds all requisite governmental licenses, permits and other approvals to enter into and perform its Obligations under each Loan Document to which it is a party, to own and hold under lease its property and to conduct its business substantially as

48

currently conducted by it, except for those licenses, permits or other approvals, the absence of which could not reasonably be expected to have a Material Adverse Effect.

SECTION 6.2 <u>Due Authorization, Non-Contravention, Defaults etc</u>.  The execution, delivery and performance by each Obligor of each Loan Document executed or to be executed by it, each Obligor's participation in the consummation of all aspects of the Transactions, and the execution, delivery and performance by the Borrower or (if applicable) any Obligor of the agreements executed and delivered by it in connection with the Transactions are in each case within such Person's powers, have been duly authorized by all necessary action, and do not

(a)    contravene any (i) Obligor's Organic Documents, (ii) court decree or order binding on or affecting any Obligor or (iii) law or governmental regulation binding on or affecting any Obligor; or

(b)    result in (i) or require the creation or imposition of, any Lien on any Obligor's properties (except as permitted by this Agreement), (ii) a default under any material contractual restriction binding on or affecting any Obligor or (iii) any noncompliance, suspension, impairment, forfeiture or nonrenewal of any material license, permit or other governmental approval.

No Obligor is in default under any agreement, instrument or undertaking to which it is a party or by which it or any of its property is bound which could reasonably be expected to have a Material Adverse Effect.  No Obligor is a party to any agreement or instrument or subject to any other obligation or any charter or corporate restriction or any provision of any applicable law, rule or regulation which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

SECTION 6.3 <u>Government Approval, Regulation, etc</u>.  No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or other Person (other than those that have been, or on the Effective Date will be, duly obtained or made and which are, or on the Effective Date will be, in full force and effect) is required for the consummation of the Transactions or the due execution, delivery or performance by any Obligor of any Loan Document to which it is a party, or for the due execution, delivery and/or performance of Transaction Documents, in each case by the parties thereto or the consummation of the Transactions, other than pursuant to the Plan.  Neither the Borrower nor any of its Subsidiaries is an "investment company" within the meaning of the Investment Company Act of 1940, as amended, or a "holding company", or a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company", within the meaning of the Public Utility Holding Company Act of 1935, as amended.

SECTION 6.4 <u>Validity, etc</u>.  Each Loan Document and each Transaction Document to which any Obligor is a party constitutes the legal, valid and binding obligations of such Obligor, enforceable against such Obligor in accordance with their respective terms (except, in any case, as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally and by principles of equity).

SECTION 6.5 <u>Financial Information</u>.  All balance sheets, all statements of income and of cash flow and all other financial information of each of the Borrower and its Subsidiaries furnished pursuant to <u>Section 7.1.1</u> have been and will for periods following the Effective Date be prepared in accordance with GAAP, and do or will present fairly the consolidated financial condition of the Persons covered thereby as at the dates thereof and the results of their operations for the periods then ended.

SECTION 6.6 <u>Litigation, Labor Controversies, etc</u>.  There is no pending or, to the actual knowledge of the Borrower or any of its Subsidiaries, threatened litigation, action, proceeding, investigation or labor controversy

(a)     other than the Bankruptcy Cases and the related proceedings under Chapter 11 of the Bankruptcy Code;

(b)     except as disclosed in <u>Item 6.6</u> of the Disclosure Schedule, affecting the Borrower, any of its Subsidiaries or any other Obligor, or any of their respective properties, businesses, assets or revenues, which could reasonably be expected to have a Material Adverse Effect; or

(c)     which purports to affect the legality, validity or enforceability of any Loan Document, the Transaction Documents or the Transactions.

SECTION 6.7 <u>Subsidiaries</u>.  The Borrower has no Subsidiaries, except those Subsidiaries which are identified in <u>Item 6.7</u> of the Disclosure Schedule, or which are permitted to have been organized or acquired in accordance with <u>Sections 7.2.5</u> or <u>7.2.9</u>.

SECTION 6.8 <u>Ownership of Properties</u>.  The Borrower and each of its Subsidiaries owns (i) in the case of owned real property, good and marketable fee title to, and (ii) in the case of owned personal property, good and valid title to, or, in the case of leased real or personal property, valid and enforceable leasehold interests (as the case may be) in, all of its material properties and assets, tangible and intangible, of any nature whatsoever, free and clear in each case of all Liens or claims, except for Liens permitted pursuant to <u>Section 7.2.3</u> and all matters reflected in the title insurance policies delivered pursuant to <u>clause (b)</u> of <u>Section 7.1.11</u>.

SECTION 6.9 <u>Taxes</u>.  The Borrower and each of its Subsidiaries has filed all tax returns and reports required by law to have been filed by it and has paid all Taxes thereby shown to be due and owing, (except any such Taxes which are being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books) and has paid all Taxes shown to be due on any assessment received to the extent that such Taxes have become due and payable, except where the failure to file any such returns or reports or to pay any such Taxes would not give rise to a Material Adverse Effect.

SECTION 6.10     <u>Employee Benefit Plans</u>.

(a)     Except as could not reasonably be expected to have a Material Adverse Effect: (i) the Borrower and each member of its Controlled Group is in compliance with all applicable provisions of ERISA, the Code and the regulations and published interpretations

thereunder with respect to all Employee Benefit Plans except for any required amendments for which the remedial amendment period as defined in Section 401(b) of the Code has not yet expired; (ii) each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code has been determined by the Internal Revenue Service to be so qualified, and each trust related to such plan has been determined to be exempt under Section 501(a) of the Code except for such plans that have not yet received determination letters but for which the remedial amendment period for submitting a determination letter has not yet expired; and (iii) there are no pending or, to the actual knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority.

(b)      Neither the Borrower nor any member of its Controlled Group sponsors or contributes to any Pension Plan, nor do any of them have any liability, contingent or otherwise, with respect to any Pension Plan (for the avoidance of doubt, other than payments pursuant to the PBGC Settlement).

(c)      Neither the Borrower nor any member of its Controlled Group sponsors, maintains, contributes to or has any liability, contingent or otherwise, with respect to any plan, fund or other similar program, arrangement or agreement established or maintained outside of the United States primarily for the benefit of employees of the Borrower or any such Controlled Group member residing outside the United States (for the avoidance of doubt, other than payments pursuant to the PBGC Settlement).

SECTION 6.11      Environmental Warranties.  Except as set forth in Item 6.11 of the Disclosure Schedule and except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)      all facilities and property owned, operated or leased by the Borrower or any of its Subsidiaries are owned, operated or leased by the Borrower and its Subsidiaries in material compliance with all Environmental Laws and have been for the past three years;

(b)      there are no pending or, to the Borrower's actual knowledge, threatened (i) written claims, complaints, notices or governmental requests for information received by the Borrower or any of its Subsidiaries with respect to any alleged material violation of any Environmental Law, or (ii) written complaints, notices or inquiries to the Borrower or any of its Subsidiaries regarding material potential liability of the Borrower or any of its Subsidiaries under any Environmental Law;

(c)      there have been no Releases of Hazardous Materials at, on or under any property now or previously owned, operated, or leased by the Borrower or any of its Subsidiaries that to the Borrower's actual knowledge, would require investigation or remediation under any applicable Environmental Law;

(d)      the Borrower and its Subsidiaries have been issued and are in material compliance with all permits, certificates, approvals, licenses, registrations and other authorizations required under any applicable Environmental Law;

(e)      to the actual knowledge of the Borrower, no property currently or previously owned, operated or leased by the Borrower or any of its Subsidiaries is listed, or

proposed for listing on the National Priorities List pursuant to CERCLA, on the CERCLIS or on any similar foreign, federal, state or provincial list of sites requiring investigation or clean-up under Environmental Laws; and

       (f)     there is no friable asbestos present at any property now owned or leased by the Borrower or any of its Subsidiaries that requires abatement or removal under any applicable Environmental Law.

SECTION 6.12      Regulations U and X. No Obligor is engaged in the business of extending credit for the purpose of buying or carrying margin stock, and no proceeds of any Loans will be used to purchase or carry margin stock or otherwise for a purpose which violates, or would be inconsistent with, F.R.S. Board Regulation U or Regulation X. Terms for which meanings are provided in F.R.S. Board Regulation U or Regulation X or any regulations substituted therefor, as from time to time in effect, are used in this Section with such meanings.

SECTION 6.13      Labor Matters. Except as set forth on Item 6.13 of the Disclosure Schedule, as of the date hereof no Obligor is subject to any labor or collective bargaining agreement. Except as set forth on Item 6.13 of the Disclosure Schedule, there are no existing or threatened strikes, lockouts or other labor disputes involving any Obligor that singly or in the aggregate could reasonably be expected to have a Material Adverse Effect. Hours worked by and payments made to employees of each Obligor are not in violation of the Fair Labor Standards Act or any other applicable law, rule or regulation dealing with such matters where such violation could reasonably be expected to have a Material Adverse Effect.

SECTION 6.14      Compliance with Laws. Each Obligor is in compliance in all material respects with the requirements of all applicable laws and all orders, writs, injunctions and decrees applicable to it or to its properties (except for Environmental Laws which are the subject of Section 6.11), except in such instances in which the failure to comply therewith, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

SECTION 6.15      Deposit Account and Cash Management Accounts. Set forth on Item 6.15(a) of the Disclosure Schedule is a complete and accurate list of all Deposit Accounts of the Borrower and each Subsidiary and set forth on Item 6.15(b) of the Disclosure Schedule is a complete and accurate list of all Securities Accounts (as defined in the UCC) of the Borrower and each Subsidiary, if any as updated in accordance with Section 7.1.8.

SECTION 6.16      Insurance. The Borrower and each of its Subsidiaries keeps its property adequately insured and maintains (i) insurance to such extent and against such risks, including fire, as is customary with companies of similar size and in the same or similar businesses, (ii) workmen's compensation insurance in the amount required by applicable law, (iii) public liability insurance, which shall include product liability insurance, in the amount customary with companies of similar size and in the same or similar business against claims for personal injury or death on properties owned, occupied or controlled by it, and (iv) such other insurance as may be required by law.

SECTION 6.17        Material Contracts.  Except as could not be reasonably expected  to result in a Material Adverse Effect, each of the Borrower's and its Subsidiaries' material contracts (i) are in full force and effect and are binding upon and enforceable against each Obligor that is a party thereto and, to the best actual knowledge of the Borrower and its Subsidiaries, all other parties thereto in accordance with its terms, and (ii) is not in default due to the action of such Obligor.

ARTICLE VII
COVENANTS

SECTION 7.1 Affirmative Covenants.  The Borrower agrees with each Lender and the Administrative Agent that on or after the Closing Date until the Termination Date has occurred, the Borrower will, and will cause its Subsidiaries to, perform or cause to be performed the obligations set forth below.

SECTION 7.1.1 Financial Information, Reports, Notices, etc.  The Borrower will furnish the Administrative Agent, who will distribute to each Lender, copies of the following financial statements, reports, notices and information:

(a)        as soon as available and in any event within 45 days after the end of each of the first three Fiscal Quarters of each Fiscal Year (commencing with the second Fiscal Quarter of the 2011 Fiscal Year), an unaudited consolidated balance sheet of the Parent and its Subsidiaries as of the end of such Fiscal Quarter and consolidated statements of income and cash flow of the Parent and its Subsidiaries for such Fiscal Quarter and for the period commencing at the end of the previous Fiscal Year and ending with the end of such Fiscal Quarter, and including (in each case, except in the case of the second Fiscal Quarter of the 2011 Fiscal Year), in comparative form the figures for the corresponding Fiscal Quarter in, and year to date portion of, the immediately preceding Fiscal Year, in each case, certified as complete and correct by the chief financial or accounting officer of the Borrower (subject to normal year-end audit adjustments);

(b)        as soon as available and in any event within 120 days after the end of each Fiscal Year (commencing with the 2011 Fiscal Year), a copy of the consolidated balance sheet of the Parent and its Subsidiaries, and the related consolidated statements of income and cash flow of the Parent and its Subsidiaries for such Fiscal Year, setting forth in comparative form the figures for the immediately preceding Fiscal Year, audited by independent public accountants; provided that for the 2011 Fiscal Year, such consolidated balance sheet and related consolidated statements of income and cash flow shall cover the period commencing on a date selected by the Borrower in its reasonable discretion (which date is to be no later than the Closing Date) and terminating on December 31, 2011 and shall not need to include comparative statements;

(c)        concurrently with the delivery of the financial information pursuant to clauses (a) and (b), a Compliance Certificate, executed by the chief financial or accounting officer of the Borrower, (i) showing compliance with the financial covenants set forth in Section 7.2.4 and stating that no Default has occurred and is continuing (or, if a Default has occurred, specifying the details of such Default and the action that the Borrower or an Obligor has taken or proposes to take with respect thereto), (ii) stating that no Subsidiary has been formed or acquired

since the delivery of the last Compliance Certificate (or, if a Subsidiary has been formed or acquired since the delivery of the last Compliance Certificate, a statement that such Subsidiary has complied with <u>Section 7.1.7</u>) and (iii) in the case of a Compliance Certificate delivered concurrently with the financial information pursuant to <u>clause (b)</u>, a calculation of Excess Cash Flow;

(d)      as soon as practicable and in any event within 45 days after the commencement of each Fiscal Year beginning with the 2012 Fiscal Year, a business plan and financial projections for the Borrower and its Subsidiaries (on a consolidated basis) for such Fiscal Year (including an operating budget and cash flow budget) for the Borrower and its Subsidiaries (on a consolidated basis) accompanied by a certificate of an Authorized Officer of the Borrower to the effect that (a) such projections were prepared by the Borrower in good faith, (b) the Borrower has a reasonable basis for the assumptions contained in such projections and (c) such projections have been prepared in accordance with such assumptions;

(e)      as soon as possible and in any event within 5 days after any executive officer of the Borrower or any other Obligor obtains actual knowledge of the occurrence of an Event of Default, a statement of an Authorized Officer of the Borrower setting forth details of such Event of Default and the action which the Borrower or such Obligor has taken and proposes to take with respect thereto;

(f)      as soon as possible and in any event within 5 days after any executive officer of the Borrower or any other Obligor obtains actual knowledge of (i) the occurrence of any material adverse development with respect to any litigation, action, proceeding or labor controversy described in <u>Item 6.6</u> of the Disclosure Schedule or (ii) the commencement of any litigation, action, proceeding or labor controversy of the type and materiality described in <u>Section 6.6</u>, notice thereof and, to the extent the Administrative Agent reasonably requests, copies of all documentation relating thereto;

(g)      promptly after the sending or filing thereof, copies of all reports, notices, prospectuses and registration statements which any Obligor files with the SEC, or any national securities exchange;

(h)      promptly following the mailing or receipt of any material notice or report delivered under the terms of the First Lien Credit Agreement, copies of such notice or report;

(i)      promptly (i) if any executive officer of the Borrower obtains actual knowledge that the Borrower or any Person which owns, directly or indirectly, any Capital Securities of the Borrower, or any other holder at any time of any direct or indirect equitable, legal or beneficial interest therein is the subject of any of the Terrorism Laws, the Borrower will notify the Administrative Agent in writing and (ii) upon the request of any Lender, the Borrower will provide any information such Lender believes is reasonably necessary to be delivered to comply with the Patriot Act;

(j)      such other financial and other information as the Lenders holding at least 10.0% of the aggregate amount of outstanding Loans may from time to time reasonably request through the Administrative Agent (including information and reports in such detail as such

Lenders may reasonably request with respect to the terms of and information provided pursuant to the Compliance Certificate); and

(k)     promptly upon receipt thereof, copies of all "management letters" submitted to the Borrower or any other Obligor by the independent public accountants referred to in clause (b) in connection with each audit made by such accountants.

SECTION 7.1.2  Maintenance of Existence; Compliance with Contracts, Laws, etc.  The Borrower will, and will cause each of its Subsidiaries to, preserve and maintain its and their respective legal existence (except as otherwise permitted by Section 7.2.10) and comply in all material respects with all applicable material laws, rules, regulations and orders, including the payment (before the same become delinquent), of all Taxes, imposed upon the Borrower or its Subsidiaries or upon their property except to the extent being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP have been set aside on the books of the Borrower or its Subsidiaries, as applicable.

SECTION 7.1.3  Maintenance of Properties.  The Borrower will, and will cause each of its Subsidiaries to, maintain, preserve, protect and keep its and their respective properties in good repair, working order and condition (ordinary wear and tear excepted), and make necessary material repairs, renewals and replacements so that the business carried on by the Borrower and its Subsidiaries may be properly conducted at all times, unless the Borrower or such Subsidiary determines in good faith that the continued maintenance of such property is no longer economically desirable, necessary or useful to the business of the Borrower or any of its Subsidiaries or the Disposition of such property is otherwise permitted by Sections 7.2.9 or 7.2.10.

SECTION 7.1.4  Insurance.  The Borrower will, and will cause each of its Subsidiaries to maintain:

(a)     insurance on its property with financially sound and reputable insurance companies against loss and damage in at least the amounts (and with only those deductibles) customarily maintained, and against such risks as are typically insured against in the same general area, by Persons of comparable size engaged in the same or similar business as the Borrower and its Subsidiaries; and

(b)     all worker's compensation, employer's liability insurance or similar insurance as may be required under the material laws of any state or jurisdiction in which it may be engaged in business.

Without limiting the foregoing, all insurance policies required pursuant to this Section shall (i) name the Administrative Agent on behalf of the Secured Parties as mortgagee or loss payee (in the case of property insurance) or additional insured (in the case of liability insurance), as applicable, and provide that no cancellation of the policies will be made without thirty days' prior written notice to the Administrative Agent and (ii) be in addition to any requirements to maintain specific types of insurance contained in the other Loan Documents.

SECTION 7.1.5  Books and Records.  The Borrower will, and will cause each of its Subsidiaries to, keep books and records in accordance with GAAP which accurately reflect all of

its business affairs and transactions and permit each Secured Party or any of their respective representatives, at reasonable times and intervals upon reasonable notice to the Borrower, to visit each Obligor's offices, to discuss such Obligor's financial matters with its officers and employees and to examine (and photocopy extracts from) any of its books and records.

SECTION 7.1.6 <u>Environmental Law Covenant</u>.  The Borrower will, and will cause each of its Subsidiaries to,

(a)     use and operate all of its and their facilities and properties in compliance with all Environmental Laws, maintain all necessary permits, approvals, certificates, licenses and other authorizations required under applicable Environmental Laws in effect and remain in material compliance therewith, and handle all Hazardous Materials in material compliance with all applicable Environmental Laws, in each case, except for such non-compliance or failure to maintain that would not reasonably be expected to result in a Material Adverse Effect; and

(b)     reasonably promptly notify the Administrative Agent in writing and provide copies upon receipt of all written claims, complaints, notices or inquiries relating to the condition of its owned, operated and leased facilities and properties in respect of, or as to compliance with, Environmental Laws that would reasonably be expected to result in a Material Adverse Effect, and shall promptly resolve any non-compliance with Environmental Laws and keep its owned property free of any Lien imposed by any Environmental Law, except for such Lien that is being contested in good faith and by proper proceedings and for which appropriate reserves consistent with same are being maintained.

SECTION 7.1.7 <u>Future Guarantors, Security, etc.</u>  The Borrower will, and will cause each of its U.S. Subsidiaries to, execute any documents, Filing Statements, agreements and instruments, and take all further action (including filing Mortgages) that may be required under applicable law, or that the Administrative Agent may reasonably request, in order to effectuate the transactions contemplated by the Loan Documents and in order to grant, preserve, protect and perfect the validity (subject to Liens permitted by <u>Section 7.2.3</u>) of the Liens created or intended to be created by the Loan Documents.  The Borrower will cause any subsequently acquired or organized U.S. Subsidiary to execute, within 10 Business Days of its acquisition or organization, a supplement to the Subsidiary Guaranty (in the form of Annex I thereto) and each other applicable Loan Document in favor of the Secured Parties.  In addition, from time to time, the Borrower will, at its cost and expense, promptly secure the Obligations by pledging or creating, or causing to be pledged or created, perfected Liens with respect to such of its assets and properties as the Administrative Agent or the Required Lenders shall designate, it being agreed that it is the intent of the parties that the Obligations shall be secured by, among other things, substantially all the assets of the Borrower and its U.S. Subsidiaries (including real and personal property acquired subsequent to the Effective Date (but in the case of real property acquired after the Closing Date, the Borrower will only be required to perfect Liens on such real property to the extent the fair market value of such property exceeds $1,000,000)); <u>provided</u> that, neither the Borrower nor its U.S. Subsidiaries shall be required to pledge more than 65% of the Voting Securities of any Foreign Subsidiary unless such pledge would not result in an adverse tax consequence to the Borrower and its Subsidiaries or to their equity holders on a flow through basis.  The Borrower shall deliver or cause to be delivered to the Administrative Agent all customary instruments and documents (including legal opinions, title insurance policies and lien

56

searches) to evidence compliance with this Section. The Borrower and its Subsidiaries will use commercially reasonable efforts to get a landlord waiver in form and substance reasonably satisfactory to the Administrative Agent for all real property leased by any Obligor after the Effective Date which relates to a location in which there is, or is reasonably expected to be, collateral with a book value of $5,000,000 or more. The Borrower agrees that it will not, nor will it permit any of its Subsidiaries to, store collateral with a book value of more than $5,000,000 in any location at which it has not obtained a landlord waiver for more than 60 days.

SECTION 7.1.8  <u>Cash Management</u>. The Borrower will, and will cause each Subsidiary Guarantor to: (i) ensure that such Person's Account Debtors forward payment of all amounts owed by them to such Person to one of the Deposit Accounts of such Person set forth on <u>Item 6.15(a)</u> of the Disclosure Schedule, and (ii) deposit, or cause to be deposited, promptly, and in any event no later than the fifth Business Day after the date of receipt thereof, all of such Person's Collections in one of the Deposit Accounts of such Person set forth on <u>Item 6.15(a)</u> of the Disclosure Schedule. Prior to or as soon as practicable following the Closing Date, the Borrower will use commercially reasonable efforts to deliver to the Administrative Agent fully executed Control Agreements with respect to each Deposit Account and Securities Account of the Borrower set forth on <u>Item 6.15(a)</u> and <u>Item 6.15(b)</u> of the Disclosure Schedule. At all times after the delivery of such Control Agreements, the Borrower will use commercially reasonable efforts to ensure, prior to any termination or expiration of the Control Agreement relating to the Deposit Accounts initially set forth on <u>Item 6.15(a)</u> of the Disclosure Schedule, that such Deposit Accounts are replaced with Deposit Accounts subject to a Control Agreement. So long as no Default has occurred and is continuing (except with respect to the Deposit Accounts initially set forth in <u>Item 6.15(a)</u> of the Disclosure Schedule, which Deposit Accounts may be replaced at any time, subject to the proviso to this sentence), the Borrower may amend <u>Item 6.15(a)</u> and <u>Item 6.15(b)</u> of the Disclosure Schedule to add or replace one or more of the Deposit Accounts; <u>provided</u>, <u>however</u>, that (i) the prospective depository institution at which such Deposit Account will be held shall be reasonably satisfactory to the Administrative Agent and (ii) in the event such Deposit Account will replace or be in addition to a Deposit Account set forth on <u>Item 6.15(a)</u> of the Disclosure Schedule hereto, prior to the time of the opening of such Deposit Account, the Borrower and such prospective depository institution shall use commercially reasonable efforts to have executed and delivered to the Administrative Agent a Control Agreement in respect of such Deposit Account.

SECTION 7.1.9  <u>Maintenance of Corporate Separateness</u>. The Borrower will, and will cause each of its Subsidiaries to, satisfy customary corporate formalities, including the holding of regular board of directors' and shareholders' meetings and the maintenance of corporate offices and records and take all actions reasonably necessary to maintain their corporate separateness.

SECTION 7.1.10  <u>Landlord's Agreements and Bailee Letters</u>. Prior to or as soon as practicable following the Closing Date, the Borrower will use commercially reasonable efforts to deliver to the Administrative Agent a landlord's agreement or bailee letter with respect to each location set forth on <u>Item 7.1.10</u> to the Disclosure Schedule.

SECTION 7.1.11  <u>Mortgages and Insurance</u>.  Within 30 days following the Closing Date, the Borrower will deliver to the Administrative Agent counterparts of each Mortgage, duly executed and delivered by the applicable Obligor, together with:

(a)     evidence of the completion (or satisfactory arrangements for the completion) of all recordings and filings of each Mortgage as may be necessary or, in the reasonable opinion of the Administrative Agent, desirable to create a valid, perfected Lien against the properties purported to be covered thereby;

(b)     mortgagee's title insurance policies in favor of the Administrative Agent for the benefit of the Secured Parties in amounts and in form and substance as shall be customary for similar properties, with respect to the real and, if any, other property purported to be covered by each Mortgage, insuring that title to such property is marketable and that the interests created by each Mortgage constitute valid first Liens thereon free and clear of all defects and encumbrances (other than in favor of the First Lien Lenders pursuant to the First Lien Loan Documents and the Intercreditor Agreement);

(c)     opinions addressed to the Administrative Agent and all Lenders from local real estate counsel to the Obligors in all jurisdictions where the Borrower maintains material real estate, as determined in the Borrower's reasonable discretion; and

(d)     a certificate of an Authorized Officer of the Borrower certifying as to compliance with <u>Section 7.1.4</u>.

SECTION 7.2  <u>Negative Covenants</u>.  The Borrower covenants and agrees with each Lender and the Administrative Agent that on or after the Closing Date until the Termination Date has occurred, the Borrower will, and will cause its Subsidiaries to, perform or cause to be performed the obligations set forth below.

SECTION 7.2.1  <u>Business Activities</u>.  The Borrower will not, and will not permit any of its Subsidiaries to engage in any business activity except those business activities engaged in or contemplated on the date of this Agreement and activities reasonably incidental thereto or reasonable extensions thereof.

SECTION 7.2.2  <u>Indebtedness</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Indebtedness, except:

(a)     Indebtedness in respect of the Obligations;

(b)     Indebtedness existing as of the Effective Date which is identified in <u>Item 7.2.2(b)</u> of the Disclosure Schedule, and refinancing of such Indebtedness in a principal amount not in excess of that which is outstanding on the Effective Date (as such amount has been reduced following the Effective Date) plus all costs, fees and expenses related to such refinancing;

(c)     unsecured Indebtedness (i) incurred in the ordinary course of business of the Borrower and its Subsidiaries (including open accounts extended by suppliers on normal trade terms in connection with purchases of goods and services (including insurance premium

payables in the ordinary course) which are not overdue for a period of more than 90 days or, if overdue for more than 90 days, as to which a dispute exists and adequate reserves in conformity with GAAP have been established on the books of the Borrower or such Subsidiary) and (ii) in respect of performance, surety or appeal bonds provided in the ordinary course of business, but excluding (in each case), Indebtedness incurred through the borrowing of money or Contingent Liabilities in respect thereof;

(d)        Indebtedness (i) in respect of industrial revenue bonds or other similar governmental or municipal bonds, (ii) evidencing the deferred purchase price of newly acquired property or incurred to finance the acquisition of equipment of the Borrower and its Subsidiaries (pursuant to purchase money mortgages or otherwise, whether owed to the seller or a third party) used in the ordinary course of business of the Borrower and its Subsidiaries (provided that, such Indebtedness is incurred within 60 days of the acquisition of such property) and (iii) in respect of Capitalized Lease Liabilities; provided that, the aggregate amount of all Indebtedness outstanding pursuant to this clause shall not at any time exceed $10,000,000;

(e)        Indebtedness of any Subsidiary owing to the Borrower or any other Subsidiary; provided that, the aggregate amount of all such Indebtedness incurred by a Subsidiary that is not a Subsidiary Guarantor, when aggregated with the amount of all Investments made by the Borrower and the Subsidiary Guarantors in Subsidiaries which are not Subsidiary Guarantors pursuant to clause (e)(i) of Section 7.2.5, shall not exceed $5,000,000 at any time;

(f)        First Lien Loans incurred pursuant to the terms of the First Lien Loan Documents in a principal amount not to exceed the Maximum First Lien Principal Amount (as defined in the Intercreditor Agreement), and Contingent Liabilities of the Subsidiary Guarantors in respect of the First Lien Loans; and, the refinancing of all such Indebtedness not in excess of the Maximum First Lien Principal Amount so long as (i) such refinancing is permitted by the Intercreditor Agreement and (ii) the administrative agent for such replacement First Lien Credit Agreement executes and delivers the Intercreditor Agreement;

(g)        Indebtedness incurred by the Borrower and its Subsidiaries arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, or from guaranties or letters of credit, surety bonds or performance bonds securing the performance of the Borrower or any such Subsidiary pursuant to such agreements, in connection with Permitted Acquisitions or permitted Dispositions of any business, assets or Subsidiary of the Borrower or any of its Subsidiaries;

(h)        the Borrower and its Subsidiaries may become and remain liable with respect to deferred purchase price obligations (including obligations in respect of Earnout Payments) incurred as part of the consideration paid or payable in respect of Permitted Acquisitions; provided that with respect to all Permitted Acquisitions, the aggregate principal amount of all such deferred purchase price obligations shall not exceed $10,000,000 in the aggregate over the term of this Agreement;

(i)        Indebtedness of a Person existing at the time such Person became a Subsidiary of the Borrower, but only if such Indebtedness was not created or incurred in

contemplation of such Person becoming a Subsidiary and the aggregate outstanding amount of all Indebtedness existing pursuant to this clause does not exceed $10,000,000 at any time;

(j)      Indebtedness incurred by the Borrower or any of its Subsidiaries which may be deemed to exist pursuant to any performance guaranties, performance, surety, statutory, appeal or similar obligations incurred in the ordinary course of business;

(k)      Indebtedness incurred by the Borrower or any of its Subsidiaries in respect of customary netting services, overdraft protections and similar liabilities incurred in the ordinary course in connection with customary Deposit Accounts maintained by the Borrower and its Subsidiaries as part of its ordinary course cash management program;

(l)      Indebtedness with respect to Purchase Card Agreements in an aggregate amount not to exceed $2,000,000 outstanding at any one time;

(m)      other unsecured Indebtedness of the Borrower and its Subsidiaries (other than Indebtedness of Foreign Subsidiaries owing to the Borrower or Guarantors) in an aggregate amount at any time outstanding not to exceed $10,000,000;

(n)      Indebtedness to one or more issuers of letters of credit with respect to cash collateralized letters of credit in a principal or face amount not to exceed $10,000,000 in the aggregate; and

(o)      Indebtedness consisting of obligations to PBGC pursuant to the PBGC Settlement.

SECTION 7.2.3  Liens.  The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Lien upon any of its property (including Capital Securities of any Person), revenues or assets, whether now owned or hereafter acquired, except:

(a)      Liens securing payment of the Obligations;

(b)      Liens existing as of the Effective Date and disclosed in Item 7.2.3(b) of the Disclosure Schedule securing Indebtedness described in clause (b) of Section 7.2.2, and refinancings of such Indebtedness; provided that, no such Lien shall encumber any additional property and the amount of Indebtedness secured by such Lien is not increased from that existing on the Effective Date (as such Indebtedness may have been permanently reduced subsequent to the Effective Date) plus all costs, fees and expenses related to such Liens;

(c)      Liens securing Indebtedness of the type permitted under clause (d) of Section 7.2.2; provided that, with respect to Indebtedness permitted by clause (d)(ii) of Section 7.2.2, (i) such Lien is granted within 60 days after such Indebtedness is incurred, (ii) the Indebtedness secured thereby does not exceed 80% of the lesser of the cost or the fair market value of the applicable property, improvements or equipment at the time of such acquisition (or construction) and (iii) such Lien secures only the assets that are the subject of the Indebtedness referred to in such clause;

(d)     Liens securing Indebtedness permitted by clause (i) of Section 7.2.2; provided that, such Liens existed prior to such Person becoming a Subsidiary, were not created in anticipation thereof and attach only to assets of such Person;

(e)     Liens in favor of carriers, warehousemen, mechanics, materialmen and landlords granted in the ordinary course of business for amounts not overdue or being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books;

(f)     Liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance or other forms of governmental insurance or benefits, or to secure performance of tenders, statutory obligations, bids, leases or other similar obligations (other than for borrowed money) entered into in the ordinary course of business or to secure obligations on surety and appeal bonds or performance bonds;

(g)     judgment Liens in existence for less than 60 days after the entry thereof or with respect to which execution has been stayed or the payment of which is covered in full (subject to a customary deductible) by insurance maintained with responsible insurance companies and which do not otherwise result in an Event of Default under Section 8.1.5;

(h)     easements, rights-of-way, zoning restrictions, minor defects or irregularities in title and other similar encumbrances not interfering in any material respect with the value or use of the property to which such Lien is attached;

(i)     Liens for Taxes not at the time delinquent or thereafter payable without penalty or being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books;

(j)     Liens securing Indebtedness permitted under clause (f) of Section 7.2.2 and senior to the Liens securing the Obligations pursuant to the Intercreditor Agreement;

(k)     Liens solely on any earnest money deposit made by the Borrower or any of its Subsidiaries in connection with any lease, letter of intent, purchase agreement or lease permitted hereunder entered into the ordinary course of business;

(l)     purported Liens evidenced by filing of precautionary UCC financing statements relating solely to operating leases for personal property entered into in the ordinary course of business;

(m)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of custom duties in connection with the importation of goods;

(n)     any zoning or similar law or right reserved or vested in any governmental office or agency to control or regulate the use of, or any reservation in the grant from the crown in respect of, any real property;

(o)      licenses of patents, trademarks and other intellectual property rights granted by the Borrower or any of its Subsidiaries in the ordinary course of business and not interfering in any respect with the ordinary conduct of such Borrower or such Subsidiary;

(p)      Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a creditor depository institution;

(q)      any interest or title of a lessor, licensor or sublessor under any lease or license entered into the ordinary course of its business and covering only the assets so leased or licensed granted in the ordinary course of business;

(r)      Liens on inventory that is in the possession of a third party in the ordinary course of business;

(s)      Liens on any leased real property granted by landlords under such leases;

(t)      Liens on any leased real property granted to landlords under any leases; and

(u)      Liens on cash held by one or more issuers of letters of credit in an amount not to exceed $10,500,000 in the aggregate securing Indebtedness permitted by clause (n) of Section 7.2.2.

SECTION 7.2.4  Financial Condition and Operations.  The Borrower will not permit any of the events set forth below in clauses (a) and (b) to occur:

(a)      The Borrower will not permit the Total Leverage Ratio as of the last day of any period set forth below to be greater than:

| Fiscal Quarter Ending | Total Leverage Ratio |
| --- | --- |
| September 30, 2011 | 7.60:1.00 |
| December 31, 2011 | 7.35:1.00 |
| March 31, 2012 | 7.15:1.00 |
| June 30, 2012 | 7.00:1.00 |
| September 30, 2012 | 6.80:1.00 |
| December 31, 2012 | 6.60:1.00 |
| March 31, 2013 | 6.50:1.00 |
| June 30, 2013 | 6.40:1.00 |
| September 30, 2013 | 6.40:1.00 |
| December 31, 2013 | 6.40:1.00 |
| March 31, 2014 | 6.30:1.00 |

| | |
|---|---|
| June 30, 2014 | 6.10:1.00 |
| September 30, 2014 | 6.00:1.00 |
| December 31, 2014 | 6.00:1.00 |
| March 31, 2015 and thereafter | 6.00:1.00 |

(b)     The Borrower will not permit the Interest Coverage Ratio as of the last day of any period set forth below to be less than:

| Fiscal Quarter Ending | Interest Coverage Ratio |
|---|---|
| September 30, 2011 | 1.80:1.00 |
| December 31, 2011 | 1.80:1.00 |
| March 31, 2012 | 1.80:1.00 |
| June 30, 2012 | 2.00:1.00 |
| September 30, 2012 | 2.00:1.00 |
| December 31, 2012 | 2.00:1.00 |
| March 31, 2013 | 2.00:1.00 |
| June 30, 2013 | 2.00:1.00 |
| September 30, 2013 | 2.00:1.00 |
| December 31, 2013 | 2.00:1.00 |
| March 31, 2014 | 2.00:1.00 |
| June 30, 2014 | 2.00:1.00 |
| September 30, 2014 | 2.00:1.00 |
| December 31, 2014 | 2.00:1.00 |
| March 31, 2015 and thereafter | 2.00:1.00 |

SECTION 7.2.5  Investments.  The Borrower will not, and will not permit any of its Subsidiaries to, purchase, make, incur, assume or permit to exist any Investment in any other Person, except:

(a)     Investments existing on the Effective Date and identified in Item 7.2.5(a) of the Disclosure Schedule;

(b)     Cash Equivalent Investments;

(c)     Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(d)    Investments consisting of any deferred portion of the sales price received by the Borrower or any Subsidiary in connection with any Disposition permitted under Section 7.2.10;

(e)    Investments by way of contributions to capital or purchases of Capital Securities (i) by the Borrower in any Subsidiaries or by any Subsidiary in other Subsidiaries; provided that, the aggregate amount of intercompany loans made pursuant to clause (e) of Section 7.2.2 and Investments under this clause made by the Borrower and Subsidiary Guarantors in Subsidiaries that are not Subsidiary Guarantors shall not exceed the amount set forth in clause (e) of Section 7.2.2 at any time, or the Borrower or (ii) by any Subsidiary in the Borrower;

(f)    Investments constituting (i) accounts receivable arising, (ii) trade debt granted, or (iii) deposits made in connection with the purchase price of goods or services, in each case in the ordinary course of business;

(g)    Investments by way of the acquisition of Capital Securities constituting Permitted Acquisitions permitted under clause (d) of Section 7.2.9, provided that such Investments shall result in the acquisition of a wholly owned U.S. Subsidiary;

(h)    intercompany loans, advances or guaranties among the Borrower and its Subsidiaries, all to the extent permitted by clause (e) of Section 7.2.2 and clause (e) of this Section 7.2.5;

(i)    Capital Expenditures to the extent permitted by Section 7.2.7;

(j)    loans to officers, directors and employees of the Borrower and its Subsidiaries to be used to purchase Capital Securities of the Parent and/or to acquire options on, or purchase upon exercise of such options, Capital Securities of the Parent; provided, that, in each case, the proceeds of such loans are reinvested in the Borrower and do not exceed $5,000,000;

(k)    Investments in Persons (other than Obligors or any Person owning, controlling or managing, directly or indirectly an Obligor) that are not Subsidiaries in an aggregate amount not to exceed $2,000,000 at any time outstanding;

(l)    without duplication, Contingent Liabilities to the extent permitted by Section 7.2.2;

(m)    good faith deposits made in connection with prospective Permitted Acquisitions to the extent permitted by Section 7.2.9;

(n)    bank deposits established and maintained in the ordinary course of business and consistent with past practice;

(o)    customary deposits made in connection with operating leases;

64

(p)      Investments in the form of deposits, prepayments and other credits to suppliers in the ordinary course of business;

(q)      Investments in the form of Capital Securities received from or on behalf of any Person as a part of the consideration paid or payable in respect of any Disposition made by the Borrower or any of its Subsidiaries; provided that, the fair market value of all such Capital Securities held by the Borrower and its Subsidiaries (as determined as of the time such securities are received) shall not exceed in the aggregate the greater of (i) $5,000,000 and (ii) 25% of the aggregate proceeds received by the Borrower from such Disposition; provided, further, that, "fair market value" for any such Capital Securities shall be (x) if prices for such securities are quoted on a national public exchange or equivalent, the quoted price for such securities on such exchange as of the close of business on the Business Day immediately preceding the day of receipt of such securities, and (y) if prices for such securities are not quoted on a national public exchange or equivalent, the value of such securities as determined by the board of directors (or equivalent) of the Borrower in the exercise of its good faith judgment at the time of receipt of such securities; and

(r)      other Investments in an amount not to exceed $10,000,000 at any time over the term of this Agreement irrespective of any gains received, accrued or recognized on such Investments;

provided that any Investment which when made complies with the requirements of the definition of the term "Cash Equivalent Investment" may continue to be held notwithstanding that such Investment if made thereafter would not comply with such requirements; and no Investment otherwise permitted by clauses (g), (j) or (m) shall be permitted to be made if any Default has occurred and is continuing or would result therefrom.

SECTION 7.2.6  Restricted Payments, etc.  The Borrower will not, and will not permit any of its Subsidiaries to, declare or make a Restricted Payment, or make any deposit for any Restricted Payment, except:

(a)      Restricted Payments made by Subsidiaries to the Borrower or wholly owned Subsidiaries;

(b)      so long as no Default has occurred and is continuing, or shall be caused thereby, Restricted Payments made by the Borrower or its Subsidiaries:

(i)      to make payments pursuant to the Management Agreements and the LLC Agreement as in effect from time to time;

(ii)      in an aggregate amount not to exceed $2,500,000 in any Fiscal Year (A) to the extent necessary to make repurchases of Capital Securities (and options or warrants to purchase such Capital Securities) of the Parent from employees (1) upon termination (including by reason of death, disability or retirement) of such employees or (2) pursuant to a contractual obligation of the Parent and (B) to the Parent to the extent necessary to permit the Parent or any parent company thereof to pay reasonable accounting, legal, insurance, SEC related, and similar fees, expenses and costs, and expenses and indemnity payments to directors; and

(iii)     to the Parent to permit the Parent to make tax distributions to its members in accordance with (and in the amounts permitted by) the LLC Agreement; provided, that, with respect to any taxable year, the amount distributed to members of the Parent pursuant to this clause shall not exceed the product of the amount of taxable income of the Borrower allocable to such members and the Hypothetical Tax Rate and, provided, further, that the Borrower shall be permitted to make periodic tax distributions to permit payments of estimated taxes by members of the Parent based on reasonable estimates of the taxable income of the Borrower allocable to the members of the Parent and the Hypothetical Tax Rate.

SECTION 7.2.7  Capital Expenditures.  Subject (in the case of Capitalized Lease Liabilities) to clause (e) of Section 7.2.2, the Borrower will not, and will not permit any of its Subsidiaries to, make or commit to make Capital Expenditures in any period set forth below which aggregate in excess of the amount set forth below opposite such period:

| Period | Maximum Capital Expenditure Amount |
|---|---|
| Each period of twelve consecutive months ending on the last day of each Fiscal Quarter starting with the Fiscal Quarter ending on September 30, 2011 | $20,000,000 |

SECTION 7.2.8  Issuance of Capital Securities.  The Borrower will not, and will not permit any of its Subsidiaries to, issue any Capital Securities (whether for value or otherwise) to any Person other than (in the case of Subsidiaries), to the Borrower or another wholly owned Subsidiary (unless such Capital Securities are not mandatorily redeemable at any time prior to one year and one day after the Stated Maturity Date for the Loans).

SECTION 7.2.9  Consolidation, Merger; Permitted Acquisitions, etc.  The Borrower will not, and will not permit any of its Subsidiaries to, liquidate or dissolve, consolidate with, or merge or amalgamate into or with, any other Person, or purchase or otherwise acquire all or substantially all of the assets of any Person (or any division thereof), except:

(a)     any Subsidiary may liquidate or dissolve voluntarily into, and may merge or amalgamate with and into, the Borrower or any other Subsidiary; (provided that, in any merger involving the Borrower, the Borrower is the surviving Person and a Subsidiary Guarantor may only merge with and into another Subsidiary Guarantor);

(b)     the assets or Capital Securities of any Subsidiary may be purchased or otherwise acquired by the Borrower or any other Subsidiary (provided that, the assets or Capital Securities of any Subsidiary Guarantor may only be purchased or otherwise acquired by the Borrower or another Subsidiary Guarantor); provided, further, that in no event shall any Subsidiary consolidate with or merge with and into any other Subsidiary unless after giving effect thereto, the Administrative Agent shall have a perfected pledge of, and security interest in and to, at least the same percentage of the issued and outstanding interests of Capital Securities

(on a fully diluted basis) and other assets of the surviving Person as the Administrative Agent had immediately prior to such merger or consolidation in form and substance reasonably satisfactory to the Administrative Agent and its counsel, pursuant to such documentation as shall be necessary in the reasonable opinion of the Administrative Agent to create, perfect or maintain the collateral position of the Secured Parties therein;

(c)      Investments made in accordance with Section 7.2.5;

(d)      the Borrower or any of its Subsidiaries may purchase all or substantially all of the assets of any Person (or any division thereof), or acquire such Person by merger or otherwise, in each case, if:

(i)      no Default has occurred and is continuing or would occur after giving effect thereto;

(ii)      such purchase or acquisition constitutes a Permitted Acquisition;

(iii)      the amount (which shall include all obligations in respect of Earnout Payments and other deferred purchase price arrangements) paid or payable in connection with all other transactions permitted under this clause (d) (together with all previous Permitted Acquisitions) does not exceed $20,000,000 in any Fiscal Year and $50,000,000 over the term of this Agreement;

(e)      any Subsidiary may convert into a limited liability company following at least sixty (60) days' advance written notice to the Administrative Agent.

SECTION 7.2.10   Permitted Dispositions.  The Borrower will not, and will not permit any of its Subsidiaries to, Dispose of any of the Borrower's or such Subsidiaries' assets (including accounts receivable and Capital Securities of Subsidiaries) to any Person in one transaction or series of transactions unless such Disposition is:

(a)      inventory or obsolete, damaged, worn out or surplus property, or the discounted sale of defaulted or delinquent trade receivables written off and reserved;

(b)      permitted by Sections 7.2.9 and 7.2.14;

(c)      (i) the cross-licensing or non-exclusive licensing of intellectual property, in the ordinary course of business and (ii) the contemporaneous exchange, in the ordinary course of business, of property for property of a substantially like kind and use (other than as set forth in clause (i)), to the extent that the property received in such exchange is of a value substantially equivalent to the value of the property exchanged;

(d)      Investments made in accordance with Section 7.2.5 and Restricted Payments made in accordance with Section 7.2.6;

(e)      the leasing or sub-leasing of property that would not materially interfere with the required use of such property by the Borrower or any of its Subsidiaries;

(f)     other Dispositions so long as: (i) such Disposition is for fair market value and the consideration received consists of no less than 75% in cash, (ii) the Net Disposition Proceeds received from such Disposition, together with the Net Disposition Proceeds of all other assets Disposed of pursuant to this clause since the Closing Date, does not exceed (individually or in the aggregate) $25,000,000 over the term of this Agreement (inclusive of the fair market value of any Capital Securities of the type described in clause (q) of Section 7.2.5), (iii) the Net Disposition Proceeds from such Disposition are applied pursuant to Sections 3.1.1 and 3.1.2, and (iv) no Default has occurred and is continuing; and

(g)     set forth on Item 7.2.10(g) of the Disclosure Schedule.

SECTION 7.2.11   Modification of Certain Agreements.   The Borrower will not, and will not permit any of its Subsidiaries to, consent to any amendment, supplement, waiver or other modification of, or enter into any forbearance from exercising any rights with respect to the terms or provisions contained in:

(a)     the Asset Purchase Agreement, the Plan, and (to the extent such action is materially adverse to the Lenders) the Management Agreements;

(b)     the Organic Documents of the Borrower or any of its Subsidiaries, if the result would have a material adverse effect on the rights or remedies of any Secured Party; and

(c)     any of the First Lien Loan Documents, other than any amendment, supplement, waiver or modification to the extent permitted by the Intercreditor Agreement.

SECTION 7.2.12   Transactions with Affiliates.   The Borrower will not, and will not permit any of its Subsidiaries to, enter into or cause or permit to exist any arrangement, transaction or contract (including for the purchase, lease or exchange of property or the rendering of services) with any of its other Affiliates, unless such arrangement, transaction or contract is on fair and reasonable terms no less favorable to the Borrower or such Subsidiary than it could obtain in an arm's-length transaction with a Person that is not an Affiliate other than:

(a)     transactions among the Obligors otherwise permitted hereunder;

(b)     reasonable fees and compensation (including equity-based compensation and employee benefits) paid to, and indemnity provided for the benefit of, officers, directors, board members, employees or consultants of the Parent or any Subsidiary as determined in good faith by the Parent's board of directors;

(c)     the payment of Restricted Payments as provided under Section 7.2.6;

(d)     transactions that were or are consummated in accordance with the Plan or the Asset Purchase Agreement, in each case, as in effect on the Effective Date;

(e)     Indebtedness represented by this Agreement and the First Lien Credit Agreement, the Intercreditor Agreement, and any amendments, restatements or modifications thereof and the transactions pursuant thereto that are permitted hereby and by the Intercreditor Agreement; and

68

(f)       transactions pursuant to the Management Agreements and the LLC Agreement.

SECTION 7.2.13  Restrictive Agreements, etc.  The Borrower will not, and will not permit any of its Subsidiaries to, enter into any agreement prohibiting

(a)       the creation or assumption of any Lien upon its properties, revenues or assets, whether now owned or hereafter acquired;

(b)       the ability of any Obligor to amend or otherwise modify any Loan Document; or

(c)       the ability of any Subsidiary to make any payments, directly or indirectly, to the Borrower, including by way of dividends, advances, repayments of loans, reimbursements of management and other intercompany charges, expenses and accruals or other returns on investments.

The foregoing prohibitions shall not apply to restrictions contained (i) in any Loan Document, (ii) in the case of clause (a), any agreement governing any Indebtedness permitted by clause (d) of Section 7.2.2 as to the assets financed with the proceeds of such Indebtedness, (iii) in the case of clause (a), covenants in documents creating Liens permitted by Section 7.2.3 prohibiting further Liens on the properties encumbered thereby; (iv) in the case of clauses (a) and (b), in the First Lien Loan Documents; or (v) any prohibition or limitation that (a) exists pursuant to applicable law, (b) consists of customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under Section 7.2.10 pending the consummation of such sale, (c) consists of customary restrictions and conditions contained in any lease or restricts subletting or assignment of any lease governing a leasehold interest of an Obligor, (d) exists in any agreement or other instrument of a person acquired in an Investment permitted hereunder in existence at the time of such Investment (but not created in connection therewith or in contemplation thereof), which prohibition or limitation is not applicable to any person, or the properties or assets of any person, other than the person, or the property or assets of the person so acquired or (e) is imposed by any amendments or refinancings that are otherwise permitted by the Loan Documents of the contracts, instruments or obligations referred to in clause (iv) or (v)(d); provided that such amendments and refinancings are no more materially restrictive with respect to such prohibitions and limitations than those prior to such amendment or refinancing.

SECTION 7.2.14  Sale and Leaseback.  The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly enter into any agreement or arrangement providing for the sale or transfer by it of any property (now owned or hereafter acquired) to a Person and the subsequent lease or rental of such property or other similar property from such Person except the sale-leasebacks entered into in connection with the Livermore Property, the Goshen Property and the Emigsville Property.

SECTION 7.2.15  Pension Plans.  The Borrower will not, and will not permit any of its Subsidiaries to sponsor or contribute to any Pension Plan, or have any liability, contingent or otherwise, with respect to any Pension Plan (for the avoidance of doubt, other than the PBGC Settlement).

# ARTICLE VIII
## EVENTS OF DEFAULT

SECTION 8.1 <u>Listing of Events of Default</u>. Each of the following events or occurrences described in this Article shall constitute an "<u>Event of Default</u>".

SECTION 8.1.1 <u>Non-Payment of Obligations</u>. The Borrower shall default in the payment or prepayment when due of

(a)     any principal of any Loan and such default shall continue unremedied for a period of two Business Days after such amount was due; or

(b)     any interest or fee described in <u>Article III</u> or any other monetary Obligation, and such default shall continue unremedied for a period of five Business Days after such amount was due.

SECTION 8.1.2 <u>Non-Performance of Certain Covenants and Obligations</u>. The Borrower shall default in the due performance or observance of any of its obligations under <u>Section 7.1.1</u>, <u>Section 7.1.2</u> or <u>Section 7.2</u>.

SECTION 8.1.3 <u>Non-Performance of Other Covenants and Obligations</u>. Any Obligor shall default in the due performance and observance of any other agreement contained in any Loan Document executed by it, and such default shall continue unremedied for a period of 60 days after the earlier of (a) the date of the Borrower's actual knowledge of such default or (b) notice thereof given to the Borrower by the Administrative Agent or any Lender.

SECTION 8.1.4 <u>Default on Other Indebtedness</u>. A default shall occur in the payment of any amount when due (subject to any applicable grace period), whether by acceleration or otherwise, of any principal or stated amount of, or interest or fees on, any Indebtedness (other than Indebtedness described in <u>Section 8.1.1</u>) of the Borrower or any of its Subsidiaries or any other Obligor having a principal or stated amount, individually or in the aggregate, in excess of $10,000,000, or a default shall occur in the performance or observance of any obligation or condition with respect to such Indebtedness if the effect of such default is to accelerate the maturity of any such Indebtedness or such default shall continue unremedied for any applicable period of time sufficient to permit the holder or holders of such Indebtedness, or any trustee or agent for such holders, to cause or declare such Indebtedness to become due and payable or to require such Indebtedness to be prepaid, redeemed, purchased or defeased, or require an offer to purchase or defease such Indebtedness to be made, prior to its expressed maturity**.**

SECTION 8.1.5 <u>Judgments</u>. Any judgment or order for the payment of money individually or in the aggregate in excess of $10,000,000 (exclusive of any amounts fully covered by insurance (less any applicable deductible) and as to which the insurer has not denied or objected to its responsibility to cover such judgment or order) shall be rendered against the Borrower or any of its Subsidiaries or any other Obligor and such judgment shall not have been vacated or discharged or stayed or bonded pending appeal within 60 days after the entry thereof or enforcement proceedings shall have been commenced by any creditor upon such judgment or order.

70

SECTION 8.1.6  <u>Change in Control</u>.  Any Change in Control shall occur.

SECTION 8.1.7  <u>Bankruptcy, Insolvency, etc.</u>  The Borrower, any of its Subsidiaries or any other Obligor shall

(a)     generally fail to pay, or admit in writing its inability or general unwillingness to pay, debts as they become due;

(b)     apply for, consent to, or acquiesce in the appointment of a trustee, receiver, sequestrator or other custodian for any substantial part of the property of any thereof, or make a general assignment for the benefit of creditors;

(c)     in the absence of such application, consent or acquiescence in or permit or suffer to exist the appointment of a trustee, receiver, receiver manager, sequestrator or other custodian for a substantial part of the property of any thereof, and such trustee, receiver, receiver manager, sequestrator or other custodian shall not be discharged within 90 days; <u>provided</u> that, the Borrower, each Subsidiary and each other Obligor hereby expressly authorizes each Secured Party to appear in any court conducting any relevant proceeding during such 90-day period to preserve, protect and defend their rights under the Loan Documents;

(d)     permit or suffer to exist the commencement of any bankruptcy, reorganization, debt arrangement or other case or proceeding under any bankruptcy or insolvency law or any dissolution, winding up or liquidation proceeding, in respect thereof, and, if any such case or proceeding is not commenced by the Borrower, any Subsidiary or any Obligor, such case or proceeding shall be consented to or acquiesced in by the Borrower, such Subsidiary or such Obligor, as the case may be, or shall result in the entry of an order for relief or shall remain for 90 days undismissed; <u>provided</u> that, the Borrower, each Subsidiary and each Obligor hereby expressly authorizes each Secured Party to appear in any court conducting any such case or proceeding during such 90-day period to preserve, protect and defend their rights under the Loan Documents; or

(e)     take any action authorizing, or in furtherance of, any of the foregoing.

SECTION 8.1.8  <u>Impairment of Security, etc.</u>  Any Loan Document shall (except in accordance with its terms), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of any Obligor party thereto; any Lien shall (except in accordance with the terms of any Loan Document), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of any Obligor subject thereto in respect of any material portion of the Collateral (as defined in the Security Agreement); any Obligor or any other party shall contest in any manner such effectiveness, validity, binding nature or enforceability; or, except as permitted under any Loan Document, any Lien securing any Obligation shall, in whole or in part, cease to be a perfected Lien with respect to any material portion of the Collateral.

SECTION 8.2  <u>Action if Bankruptcy</u>.  If any Event of Default described in <u>clauses (a)</u> through <u>(d)</u> of <u>Section 8.1.7</u> with respect to the Borrower shall occur, the outstanding principal amount of all outstanding Loans and all other Obligations shall automatically be and become immediately due and payable, without notice or demand to any Person.

SECTION 8.3 <u>Action if Other Event of Default</u>.  If any Event of Default (other than any Event of Default described in <u>clauses (a)</u> through <u>(d)</u> of <u>Section 8.1.7</u> with respect to the Borrower) shall occur for any reason, whether voluntary or involuntary, and be continuing, the Administrative Agent, upon the written direction of the Required Lenders, shall by notice to the Borrower declare all or any portion of the outstanding principal amount of the Loans and other Obligations to be due and payable, whereupon the full unpaid amount of such Loans and other Obligations which shall be so declared due and payable shall be and become immediately due and payable, without further notice, demand or presentment.

ARTICLE IX
THE ADMINISTRATIVE AGENT

SECTION 9.1 <u>Actions</u>.

(a)      Each Lender hereby appoints Silver Point as its Administrative Agent under and for purposes of each Loan Document.  Each Lender authorizes the Administrative Agent to act on behalf of such Lender under each Loan Document and to appoint other agents or sub-agents to assist in its actions under the Loan Documents and the Administrative Agent shall not be liable for the acts or omissions of such agents as long as they are appointed with due care and without gross negligence or willful misconduct.  Each Lender further authorizes the Administrative Agent, in the absence of other written instructions from the Required Lenders received from time to time by the Administrative Agent (with respect to which the Administrative Agent agrees that it will comply, subject to the terms and conditions of <u>Article IX</u>), to exercise such powers hereunder and thereunder as are delegated to or required of the Administrative Agent by the terms hereof and thereof, together with such powers as may be incidental thereto (including the release of Liens on assets Disposed of in accordance with the terms of the Loan Documents).

(b)      The Administrative Agent shall not have any duties or obligations except those expressly set forth herein. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise in writing as directed by the Required Lenders in accordance with the terms of this Agreement (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in <u>Section 10.1</u>).  Each Lender hereby indemnifies (which indemnity shall be payable within thirty (30) days of demand therefor, to the extent not reimbursed by the Borrower or any other Obligor, and without limiting the Borrower's and Obligors' obligations under this Agreement and which indemnity shall survive any termination of this Agreement) the Administrative Agent and its officers, directors, employees and agents, <u>pro</u> <u>rata</u> according to the proportionate amount of Loans held by such Lender, from and against any and all liabilities, obligations, losses, damages, claims, penalties, judgments, costs, disbursements or expenses of any kind or nature whatsoever which may at any time be imposed on, incurred by, or asserted against, the Administrative Agent in any way relating to or arising out of any Loan Document or any action taken or omitted to be taken by the Administrative Agent under the Loan Documents, (including reasonable attorneys' fees and

expenses), and as to which the Administrative Agent, is not reimbursed by the Borrower; provided that, no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, claims, costs or expenses which are determined by a court of competent jurisdiction in a final proceeding to have resulted from the Administrative Agent's gross negligence or willful misconduct.  By executing a Lender Assignment Agreement, each future Lender (acting for itself and on behalf of each Affiliate thereof which becomes a Secured Party from time to time) shall be deemed to ratify the power of attorney granted to the Administrative Agent hereunder.

SECTION 9.2 Exculpation.  Neither the Administrative Agent nor any of its directors, officers, employees or agents shall be liable to any Secured Party for any action taken or omitted to be taken by it under any Loan Document, or in connection therewith, except for its own willful misconduct or gross negligence, nor responsible for any recitals or warranties herein or therein, nor for the effectiveness, enforceability, validity or due execution of any Loan Document, nor for the creation, perfection or priority of any Liens purported to be created by any of the Loan Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any collateral security, nor to make any inquiry respecting the performance by any Obligor of its Obligations.  Any such inquiry which may be made by the Administrative Agent shall not obligate it to make any further inquiry or to take any action.  The Administrative Agent shall be entitled to rely upon advice of counsel concerning legal matters and upon any notice, consent, certificate, statement or writing which the Administrative Agent believes to be genuine and to have been presented by a proper Person.

To the fullest extent permitted by applicable law, no Obligor or Lender shall assert, and each Obligor and Lender hereby waives, any claim against the Administrative Agent, its sub-agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated herby or thereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.

No provision of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby or the transactions contemplated hereby or thereby, shall require the Administrative Agent to: (i) expend or risk its own funds or provide indemnities in the performance of any of its duties hereunder or the exercise of any of its rights or power or (ii) otherwise incur any financial liability in the performance of its duties or the exercise of any of its rights or powers unless it is indemnified to its satisfaction and the Administrative Agent shall have no liability to any person for any loss occasioned by any delay in taking or failure to take any action while it is awaiting an indemnity satisfactory to it.

Except as expressly set forth herein or in any other Loan Document, the Administrative Agent shall not be responsible for (i) perfecting, maintaining, monitoring, preserving or protecting the security interest or lien granted under this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, (ii) the filing, re-filing, recording, re-recording or continuing or any document, financing statement, mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at

any time or times or (iii) providing, maintaining, monitoring or preserving insurance on or the payment of taxes with respect to any of the Collateral. The actions described in items (i) through (iii) shall be the sole responsibility of the Obligors.

The Administrative Agent shall not be required to qualify in any jurisdiction in which it is not presently qualified to perform its obligations as Administrative Agent.

The Administrative Agent has accepted and is bound by the Loan Documents executed by the Administrative Agent as of the date of this Agreement and, as directed in writing by the Required Lenders, the Administrative Agent shall execute additional Loan Documents delivered to it after the date of this Agreement; provided, however, that such additional Loan Documents do not adversely affect the rights, privileges, benefits and immunities of the Administrative Agent. The Administrative Agent will not otherwise be bound by, or be held obligated by, the provisions of any credit agreement, indenture or other agreement governing the Obligations (other than this Agreement and the other Loan Documents to which the Administrative Agent is a party).

No written direction given to the Administrative Agent by the Required Lenders or the Borrower that in the sole reasonable judgment of the Administrative Agent imposes, purports to impose or might reasonably be expected to impose upon the Administrative Agent any obligation or liability not set forth in or arising under this Agreement and the other Loan Documents will be binding upon the Administrative Agent unless the Administrative Agent elects, at its sole option, to accept such direction.

Except as expressly set forth herein or in any other Loan Document, the Administrative Agent shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or the other Loan Documents arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; business interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; acts of civil or military authority and governmental action.

The Administrative Agent shall not be under any obligation to exercise any of its rights or powers vested in it by this Agreement or the other Loan Documents, at the request, order or direction of the Required Lenders given unless the same is given pursuant to the express provisions of this Agreement or the other Loan Documents or unless the Required Lenders shall have offered to the Administrative Agent security or indemnity reasonably satisfactory to the Administrative Agent against the costs, expenses and liabilities (including, without limitation, attorneys' fees and expenses) which might be incurred therein or thereby.

Beyond the exercise of reasonable care in the custody of the Collateral in its possession, the Administrative Agent will have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto. The Administrative Agent will be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property,

and the Administrative Agent will not be liable or responsible for any loss or diminution in the value of any of the Collateral by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Administrative Agent in good faith without gross negligence or willful misconduct.

The Administrative Agent will not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of the Administrative Agent, as determined by a court of competent jurisdiction in a final, nonappealable order, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of any grantor to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Administrative Agent hereby disclaims any representation or warranty to the present and future Secured Parties concerning the perfection of the Liens granted hereunder or in the value of any of the Collateral.

In the event that the Administrative Agent is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any fiduciary or trust obligation for the benefit of another, which in the Administrative Agent's sole reasonable discretion may cause the Administrative Agent to be considered an "owner or operator" under any environmental laws or otherwise cause the Administrative Agent to incur, or be exposed to, any environmental liability or any liability under any other federal, state or local law, the Administrative Agent reserves the right, instead of taking such action, either to resign as Administrative Agent or to arrange for the transfer of the title or control of the asset to a court appointed receiver. The Administrative Agent will not be liable to any person for any environmental liability or any environmental claims or contribution actions under any federal, state or local law, rule or regulation by reason of the Administrative Agent's actions and conduct as authorized, empowered and directed hereunder or relating to any kind of discharge or release or threatened discharge or release of any hazardous materials into the environment.

SECTION 9.3 Successor. The Administrative Agent may resign as such at any time upon at least 30 days' prior notice to the Borrower and all Lenders. If the Administrative Agent at any time shall resign, the Required Lenders may appoint another Lender as a successor Administrative Agent which shall thereupon become the Administrative Agent hereunder. If no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the retiring Administrative Agent's giving notice of resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which shall be one of the Lenders or a commercial banking institution organized under the laws of the United States (or any State thereof) or a United States branch or agency of a commercial banking institution, and having a combined capital and surplus of at least $250,000,000; provided that, if, such retiring Administrative Agent is unable to find a commercial banking institution which is willing to accept such appointment and which meets the qualifications set forth in above, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the

Required Lenders appoint a successor as provided for above.  Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent and the payment of reasonable fees and expenses (including attorneys' fees and expenses) of the resigning Administrative Agent), such successor Administrative Agent shall be entitled to receive from the retiring Administrative Agent such documents of transfer and assignment as such successor Administrative Agent may reasonably request, and shall thereupon succeed to and become vested with all rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents.  After any retiring Administrative Agent's resignation hereunder as the Administrative Agent, the provisions of this Article shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under the Loan Documents, and Section 10.3 and Section 10.4 shall continue to inure to its benefit.

SECTION 9.4  Loans by Silver Point.  Silver Point shall have the same rights and powers with respect to (x) the Loans held by it or any of its Affiliates, and (y) the Notes held by it or any of its Affiliates as any other Lender and may exercise the same as if it were not the Administrative Agent.  Silver Point and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of business with the Borrower or any Subsidiary or Affiliate of the Borrower as if Silver Point were not the Administrative Agent hereunder.

SECTION 9.5  Credit Decisions.  Each Lender acknowledges that it has, independently of the Administrative Agent and each other Lender, and based on such Lender's review of the financial information of the Borrower, the Loan Documents (the terms and provisions of which being satisfactory to such Lender) and such other documents, information and investigations as such Lender has deemed appropriate, made its own credit decision to extend the Loans.  Each Lender also acknowledges that it will, independently of the Administrative Agent and each other Lender, and based on such other documents, information and investigations as it shall deem appropriate at any time, continue to make its own credit decisions as to exercising or not exercising from time to time any rights and privileges available to it under the Loan Documents.

SECTION 9.6  Copies, etc.  The Administrative Agent shall give prompt notice to each Lender of each notice or request required or permitted to be given to the Administrative Agent by the Borrower pursuant to the terms of the Loan Documents (unless concurrently delivered to the Lenders by the Borrower).  The Administrative Agent will distribute to each Lender each document or instrument received (other than notices delivered pursuant to Articles II and III) for its account and copies of all other communications received by the Administrative Agent from the Borrower for distribution to the Lenders by the Administrative Agent in accordance with the terms of the Loan Documents.

SECTION 9.7  Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely upon any certification, notice or other communication (including any thereof by telephone, telecopy, telegram or cable) believed by it to be genuine and correct and to have been signed or sent by or on behalf of the proper Person, and upon advice and statements of legal counsel, independent accountants and other experts selected by the Administrative Agent.  As to any matters not expressly provided for by the Loan Documents, the Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, thereunder in accordance with instructions given by the Required Lenders  or such other of the Lenders as is required

hereunder in such circumstance, and such instructions of such Lenders and any action taken or failure to act pursuant thereto shall be binding on all Secured Parties.

SECTION 9.8 <u>Defaults</u>.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of a Default unless the Administrative Agent has received a written notice from a Lender or the Borrower specifying such Default and stating that such notice is a "Notice of Default".  In the event that the Administrative Agent receives such a notice of the occurrence of a Default, the Administrative Agent shall give prompt notice thereof to the Lenders.  The Administrative Agent shall (subject to the provisions of this <u>Article IX</u> and <u>Section 10.1</u>) take such action and exercise such remedies with respect to such Default as shall be directed by the Controlling Class, or after the Obligations under the Term A-Prime Loans have been paid in full, the Required Lenders, pursuant to any of the Loan Documents; <u>provided</u> that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action (including, without limitation, credit bidding the Loans of all Lenders hereunder), or refrain from taking such action, with respect to such Default as it shall deem advisable in the best interest of the Secured Parties except to the extent that this Agreement expressly requires that such action be taken, or not be taken, only with the consent or upon the authorization of the Required Lenders or all Lenders.

SECTION 9.9 <u>Posting of Approved Electronic Communications</u>.  The Borrower hereby agrees, unless directed otherwise by the Administrative Agent or unless the electronic mail address referred to below has not been provided by the Administrative Agent to the Borrower, that it will, or will cause its Subsidiaries to, provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents or to the Lenders under <u>Section 7.1.1</u>, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to a Continuation/Conversion Notice, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default under this Agreement or any other Loan Document or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement (all such non-excluded communications being referred to herein collectively as "<u>Communications</u>"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Administrative Agent to an electronic mail address as directed by the Administrative Agent.  In addition, the Borrower agrees, and agrees to cause its Subsidiaries, to continue to provide the Communications to the Administrative Agent or the Lenders, as the case may be, in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.

(b)      The Borrower further agrees that the Administrative Agent may make the Communications available to the Lenders by posting the Communications on Intralinks or a substantially similar electronic transmission system (the "<u>Platform</u>").

(c)      THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".  THE INDEMNIFIED PARTIES DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR

STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE INDEMNIFIED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE INDEMNIFIED PARTIES HAVE ANY LIABILITY TO ANY OBLIGOR, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY OBLIGOR'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY INDEMNIFIED PARTY IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH INDEMNIFIED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)      The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents.  Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.

(e)      Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

SECTION 9.10      Proofs of Claim.  The Lenders and the Borrower hereby agree that after the occurrence of an Event of Default pursuant to Section 8.1.7, in case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any of the Obligors, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall have made any demand on any of the Obligors) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)      to file and prove a claim for the whole amount of principal and interest owing and unpaid in respect of the Loans and any other Obligations that are owing and unpaid and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Lenders, the Administrative Agent and other agents appointed by the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Administrative Agent and such other agents and

their agents and counsel and all other amounts due Lenders, Administrative Agent and such other agents hereunder) allowed in such judicial proceeding; and

(b)  to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel, and any other amounts due Administrative Agent and other agents hereunder.  Nothing herein contained shall be deemed to authorize Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lenders or to authorize Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.  Further, nothing contained in this Section shall affect or preclude the ability of any Lender to (i) file and prove such a claim in the event that the Administrative Agent has not acted within ten days prior to any applicable bar date and (ii) require an amendment of the proof of claim to accurately reflect such Lender's outstanding Obligations.

ARTICLE X
MISCELLANEOUS PROVISIONS

SECTION 10.1       Waivers, Amendments, etc.  The provisions of each Loan Document (other than a Fee Letter, which shall be modified only in accordance with its terms) may from time to time be amended, modified or waived, if such amendment, modification or waiver is in writing and consented to by the Borrower and the Required Lenders; provided, that no such amendment, modification or waiver shall:

(a)  modify clause (b) of Section 4.7, Section 4.8 (as it relates to sharing of payments) or this Section, in each case, without the consent of all Lenders;

(b)  increase the aggregate amount of any Loans held by a Lender or extend the final Stated Maturity Date for any Lender's Loan, in each case without the consent of such Lender (it being agreed, however, that any vote to rescind any acceleration made pursuant to Section 8.2 and Section 8.3 of amounts owing with respect to the Loans and other Obligations shall only require the vote of the Required Lenders);

(c)  reduce (by way of forgiveness), the principal amount of or reduce the rate of interest on any Lender's Loan, reduce any fees described in Article III payable to any Lender, in each case without the consent of such Lender (provided that, the vote of Required Lenders shall be sufficient to (i) waive the payment, or reduce the increased portion, of interest accruing under Section 3.2.2 or (ii) on any Interest Payment Date, consent to the capitalization of interest otherwise due in cash);

(d)      make any change to the definition of "Required Lenders" or modify any requirement hereunder that any particular action be taken by all Lenders without the consent of all Lenders; or

(e)      affect adversely the interests, rights or obligations of the Administrative Agent (in its capacity as the Administrative Agent) unless consented to by the Administrative Agent.

No failure or delay on the part of any Secured Party in exercising any power or right under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right.  No notice to or demand on any Obligor in any case shall entitle it to any notice or demand in similar or other circumstances.  No waiver or approval by any Secured Party under any Loan Document shall, except as may be otherwise stated in such waiver or approval, be applicable to subsequent transactions.  No waiver or approval hereunder shall require any similar or dissimilar waiver or approval thereafter to be granted hereunder.

SECTION 10.2      Notices; Time.  All notices and other communications provided under each Loan Document shall be in writing or by facsimile and addressed, delivered or transmitted, if to the Borrower, the Administrative Agent or a Lender, to the applicable Person at its address or facsimile number set forth on Schedule II hereto or set forth in the Lender Assignment Agreement, or at such other address or facsimile number as may be designated by such party in a notice to the other parties.  Any notice, if mailed and properly addressed with postage prepaid or if properly addressed and sent by pre-paid courier service, shall be deemed given when received; any notice, if transmitted by facsimile, shall be deemed given when the confirmation of transmission thereof is received by the transmitter.  The parties hereto agree that delivery of an executed counterpart of a signature page to this Agreement and each other Loan Document by facsimile (or electronic transmission) shall be effective as delivery of an original executed counterpart of this Agreement or such other Loan Document.  Unless otherwise indicated, all references to the time of a day in a Loan Document shall refer to New York time.

SECTION 10.3      Payment of Costs and Expenses.  Whether or not the transactions contemplated hereby shall be consummated, the Borrower agrees to pay promptly, and in any event within thirty (30) days after written demand therefor, (a) all the actual and reasonable costs and expenses of preparation of this Agreement and the other Loan Documents and any consents, amendments, waivers or other modifications thereto; (b) all the costs of furnishing all opinions by counsel for the Borrower and the other Obligors; (c) the reasonable fees, expenses and disbursements of counsel to the Administrative Agent in connection with the negotiation, preparation, execution and administration of this Agreement and the other Loan Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters in connection therewith; (d) all the actual costs and expenses of creating and perfecting Liens in favor of the Administrative Agent, for the benefit of the Lenders pursuant hereto, including filing and recording fees, search fees, title insurance premiums and fees, expenses and disbursements of counsel to the Administrative Agent and of counsel providing any opinions that the Administrative Agent or Required Lenders may request in respect of the Collateral or the Liens created pursuant to the Loan Documents; (e) all the actual reasonable costs and fees, expenses and disbursements of any auditors, accountants, consultants or appraisers whether

internal or external; (f) all the actual reasonable costs and expenses (including the fees, expenses and disbursements of counsel and of any appraisers, consultants, advisors and agents employed or retained by the Administrative Agent and its counsel in connection with the custody or preservation of any of the Collateral; (g) all other actual reasonable costs and expenses incurred by the Administrative Agent in connection with the negotiation, preparation and execution of this Agreement and the Loan Documents and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby; and (h) after the occurrence of a Default or an Event of Default, all reasonable costs and expenses, including reasonable attorneys' fees and expenses and costs of settlement, incurred by the Administrative Agent and the Required Lenders in enforcing any Obligations or in collecting any payments due from any Obligor hereunder or under the other Loan Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of any Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work out" or pursuant to any insolvency or bankruptcy cases or proceedings.

SECTION 10.4      Indemnification.  In consideration of the execution and delivery of this Agreement by each Secured Party, the Borrower hereby indemnifies, exonerates and holds each Secured Party and each of their respective affiliates and their and their affiliates' officers, directors, employees, advisors and agents (collectively, the "Indemnified Parties") free and harmless from and against any and all losses, claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, judgments, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (collectively, the "Indemnified Liabilities") as a result of, or arising out of, or relating to:

(a)      the execution and delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the Transactions contemplated hereby or thereby or the monitoring of Borrower's and the other Obligors' compliance with the terms of the Loan Documents;

(b)      any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Party is a party thereto), or any act, omission, event, or circumstance in any manner related thereto;

(c)      any investigation, litigation or proceeding related to any acquisition or proposed acquisition by any Obligor or any Subsidiary thereof of all or any portion of the Capital Securities or assets of any Person, whether or not an Indemnified Party is party thereto;

(d)      (i) the Release from any real property owned or operated by any Obligor or any Subsidiary thereof of any Hazardous Material (including any losses, liabilities, damages, injuries, costs, expenses or claims asserted or arising under any Environmental Law), or (ii) each Lender's Environmental Liability (the indemnification herein shall survive repayment of the Obligations and any transfer of the property of any Obligor or its Subsidiaries by foreclosure or

81

by a deed in lieu of foreclosure for any Lender's Environmental Liability); in each case of clauses (i) and (ii), other than any Release or Lender's Environmental Liability first caused and first created after the Administrative Agent completes the sale and the transfer of the respective real property pursuant to a foreclosure or deed in lieu of foreclosure;

provided that the Borrower shall not be required to indemnify any Indemnified Party to the extent the applicable Indemnified Liability arises by reason of such Indemnified Party's gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction.  If and to the extent that the foregoing undertaking may be unenforceable for any reason, each Obligor agrees to make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law.  To the extent permitted by applicable law, the Borrower and each other Obligor shall not assert, and hereby waive, any claim against any Indemnified Party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, any Loan or the use of the proceeds thereof.

SECTION 10.5        Survival.  The obligations of the Borrower under Sections 4.3, 4.4, 4.5, 4.6, 10.3 and 10.4, and the obligations of the Lenders under Section 9.1, shall in each case survive any assignment from one Lender to another (in the case of Sections 10.3 and 10.4), the occurrence of the Termination Date and the resignation or removal of the Administrative Agent. The representations and warranties made by each Obligor in each Loan Document shall survive the execution and delivery of such Loan Document.

SECTION 10.6        Severability.  Any provision of any Loan Document which is prohibited or unenforceable in any jurisdiction shall, as to such provision and such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of such Loan Document or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 10.7        Headings.  The various headings of each Loan Document are inserted for convenience only and shall not affect the meaning or interpretation of such Loan Document or any provisions thereof.

SECTION 10.8        Execution in Counterparts, Effectiveness, etc.  This Agreement may be executed by the parties hereto in several counterparts, each of which shall be an original (whether such counterpart is originally executed or an electronic copy of an original and each party hereto expressly waives its rights to receive originally executed documents other than with respect to any documents for which originals are required for any filing or perfection) and all of which shall constitute together but one and the same agreement.  This Agreement shall become effective when counterparts hereof executed on behalf of the Borrower shall have been received by the Administrative Agent.

SECTION 10.9        Governing Law; Entire Agreement.  EACH LOAN DOCUMENT WILL EACH BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING FOR SUCH PURPOSE SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF

THE STATE OF NEW YORK).  The Loan Documents constitute the entire understanding among the parties hereto with respect to the subject matter thereof and supersede any prior agreements, written or oral, with respect thereto.

SECTION 10.10    <u>Successors and Assigns</u>.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns; <u>provided</u> that, the Borrower may not assign or transfer its rights or obligations hereunder without the consent of all Lenders.

SECTION 10.11    <u>Sale and Transfer of Loans; Participations in Loans; Notes</u>.  Each Lender may assign, or sell participations in, its Loans to one or more other Persons in accordance with the terms set forth below.

(a)    Any Lender may, with the consent of the Borrower (such consent (x) not to be unreasonably withheld or delayed and (y) to be required only to the extent no default under <u>Sections 8.1.1</u> or <u>8.1.7</u> has occurred and is continuing), assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Loans at the time owing to it); <u>provided</u> that:

(i)    the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Lender Assignment Agreement with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000, unless (A) the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); (B) such assignment is an assignment of the entire remaining amount of the assigning Lender's Loans at the time owing to it, (C) such assignment is an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender or (D) such assignment is to one or more Eligible Assignees managed by an Affiliate of such Eligible Assignee(s) and the aggregate amount of such assignments is not less than $1,000,000;

(ii)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans assigned;

(iii)    the parties to each assignment shall (A) electronically execute and deliver to the Administrative Agent a Lender Assignment Agreement via an electronic settlement system acceptable to the Administrative Agent or (B) with the consent of the Administrative Agent, manually execute and deliver to the Administrative Agent a Lender Assignment Agreement, together with, in either case, a processing and recordation fee of $1,000 (which fee may be waived or reduced in the sole discretion of the Administrative Agent) and if the Eligible Assignee is not a Lender, administrative details information with respect to such Eligible Assignee and applicable tax forms; and

(iv)    in the case of any assignment of Term B Loans, the assignee is a "United States person", as defined under Section 7701(a)(30) of the Code.

(b)      Subject to acceptance and recording thereof by the Administrative Agent pursuant to clause (c), from and after the effective date specified in each Lender Assignment Agreement, (i) the Eligible Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Lender Assignment Agreement, have the rights and obligations of a Lender under this Agreement, and (ii) the assigning Lender thereunder shall, to the extent of the interest assigned by such Lender Assignment Agreement, subject to Section 10.5, be released from its obligations under this Agreement (and, in the case of a Lender Assignment Agreement covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto, but shall continue to be entitled to the benefits of any provisions of this Agreement which by their terms survive the termination of this Agreement). If the consent of the Borrower to an assignment or to an Eligible Assignee is required hereunder (including a consent to an assignment which does not meet the minimum assignment thresholds specified in this Section), the Borrower shall be deemed to have given its consent ten days after the date notice thereof has been delivered by the assigning Lender (through the Administrative Agent or ClearPar, LLC) unless such consent is expressly refused by the Borrower prior to such tenth day.

(c)      The Administrative Agent shall record each assignment made in accordance with this Section in the Register pursuant to clause (a) of Section 2.5 and periodically give the Borrower notice of such assignments. The Register shall be available for inspection by the Borrower and any Lender (in respect of its own position only), at any reasonable time and from time to time upon reasonable prior notice.

(d)      Any Lender may, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to one or more banks or other entities other than an Ineligible Assignee (a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (iv) in the case of any sale of a participation of any Term B Loans, the Participant is a "United States person", as defined under Section 7701(a)(30) of the Code. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver with respect to any of the items set forth in clauses (a) through (d) of Section 10.1, in each case except as otherwise specifically provided in a Loan Document. Subject to clause (e), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 4.3, 4.4, 4.5, 4.6, 7.1.1, 10.3 and 10.4 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to clause (b). To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 4.9 as though it were a Lender, provided such Participant agrees to be subject to Sections 4.8 and 4.10 as though it were a Lender. Each Lender shall, as agent of the Borrower solely for the purpose of this Section, record in book entries maintained by such Lender the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the

obligations under this Agreement (the "Participant Register").  The entries in the Participant Register shall be conclusive and binding absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  If requested by the Administrative Agent or the Borrowers, such Lender shall make the Participant Register available to the Administrative Agent or to the Borrower upon either (i) the exercise by a Participant of remedies hereunder or (ii) a request for the Participant Register by the IRS.

     (e)    A Participant shall not be entitled to receive any greater payment under Sections 4.3, 4.4, 4.5, 4.6, 10.3 and 10.4, as of the time of such participation, than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  A Participant shall not be entitled to the benefits of Section 4.6 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with the requirements set forth in Section 4.6 as though it were a Lender that acquired its interest by assignment.  In addition, if at the time of the sale of such participation, any greater Taxes subject to payment under Section 4.6 would apply to the Participant than applied to the applicable Lender, then such Participant shall not be entitled to any payment under Section 4.6 with respect to the portion of such Taxes as exceeds the Taxes applicable to the Lender at the time of the sale of the participation unless the Participant's request for the Borrower's prior written consent for the Participation described in the first sentence of this clause states that such greater Taxes would be applicable to such Participant, it being understood that the Participant shall be entitled to additional payments under Section 4.6 to the extent such Lender selling the participation would be entitled to any payment resulting from a change in law occurring after the time the participation was sold.

     (f)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

     (g)    Notwithstanding anything to the contrary contained herein, any Lender ("Granting Lender") may grant to a special purpose funding vehicle (a "SPC"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; provided that (x) nothing herein shall constitute a commitment by any SPC to make any Loans and (y) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws

85

of the United States or any State thereof.  In addition, notwithstanding anything to the contrary contained in this clause, any SPC may (i) with notice to, but without the prior written consent of, the Borrower or the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower, and the Administrative Agent) providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC.  This Section may not be amended without the written consent of the SPC.  The Borrower acknowledges and agrees, subject to the next sentence, that, to the fullest extent permitted under applicable law, each SPC, for purposes of <u>Sections 4.3</u>, <u>4.4</u>, <u>4.5</u>, <u>4.6</u>, <u>4.8</u>, <u>4.9</u>, <u>10.3</u> and <u>10.4</u>, shall be considered a Lender (<u>provided</u>, that in the case of <u>Section 4.6</u>, that the SPC complies with the requirements of such Section as if it were a Lender that acquired its interest by assignment).  The Borrower shall not be required to pay any amount under <u>Sections 4.3</u>, <u>4.4</u>, <u>4.5</u>, <u>4.6</u>, <u>10.3</u> and <u>10.4</u> that is greater than the amount which it would have been required to pay had no grant been made by a Granting Lender to a SPC.

SECTION 10.12      <u>Other Transactions</u>.  Nothing contained herein shall preclude the Administrative Agent or any other Lender from engaging in any transaction, in addition to those contemplated by the Loan Documents, with the Borrower or any of its Affiliates in which the Borrower or such Affiliate is not restricted hereby from engaging with any other Person.

SECTION 10.13      <u>Forum Selection and Consent to Jurisdiction</u>.  ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, ANY LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE ADMINISTRATIVE AGENT, THE LENDERS OR THE BORROWER IN CONNECTION HEREWITH OR THEREWITH MAY BE BROUGHT AND MAINTAINED IN THE COURTS OF THE STATE OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK; <u>PROVIDED</u> THAT, ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT THE ADMINISTRATIVE AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. THE BORROWER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF NEW YORK AT THE ADDRESS FOR NOTICES SPECIFIED IN <u>SECTION 10.2</u>.  THE BORROWER HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  TO THE EXTENT THAT THE BORROWER HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, THE BORROWER HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW

SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THE LOAN
DOCUMENTS.

SECTION 10.14    Waiver of Jury Trial.  THE ADMINISTRATIVE AGENT, EACH
LENDER AND THE BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND
INTENTIONALLY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY
RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION
BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, EACH
LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING,
STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE
ADMINISTRATIVE AGENT, SUCH LENDER OR THE BORROWER IN CONNECTION
THEREWITH.  THE BORROWER ACKNOWLEDGES AND AGREES THAT IT HAS
RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION (AND
EACH OTHER PROVISION OF EACH OTHER LOAN DOCUMENT TO WHICH IT IS A
PARTY) AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE
ADMINISTRATIVE AGENT AND EACH LENDER ENTERING INTO THE LOAN
DOCUMENTS.

SECTION 10.15    Confidentiality. (a)  Subject to the provisions of clause (b) of this
Section, each Lender agrees that it will follow its customary procedures in an effort not to
disclose without the prior consent of the Borrower (other than to its employees, auditors,
advisors or counsel or to another Lender if the Lender or such Lender's holding or parent
company in its sole discretion determines that any such party should have access to such
information, provided such Persons shall be subject to the provisions of this Section to the same
extent as such Lender) any information which is now or in the future furnished pursuant to this
Agreement or any other Loan Document, provided that any Lender may disclose any such
information (i) as has become generally available to the public other than by virtue of a breach of
this clause by the respective Lender or any other Person to whom such Lender has provided such
information as permitted by this Section, (ii) as may be required or appropriate in any report,
statement or testimony submitted to any municipal, state, provincial or Federal regulatory body
having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the
Federal Deposit Insurance Corporation or similar organizations (whether in the United States or
elsewhere) or their successors, (iii) as may be required or appropriate in respect to any summons
or subpoena or in connection with any litigation, (iv) in order to comply with any law, order,
regulation or ruling applicable to such Lender, (v) to the Administrative Agent, (vi) to any
pledgee referred to in clause (f) of Section 10.11 or any prospective or actual transferee or
participant in connection with any contemplated transfer or participation of any of the Notes or
Loans or any interest therein by such Lender, provided that such prospective transferee agrees to
be bound by the confidentiality provisions contained in this Section, (vii) to any direct or indirect
contractual counterparty in swap agreements or such contractual counterparty's professional
advisor (so long as such contractual counterparty or professional advisor to such contractual
counterparty agrees to be bound by the provisions of this Section) and (viii) to the National
Association of Insurance Commissioners or any similar organization or any nationally
recognized rating agency that requires access to information about a Lender's investment
portfolio in connection with ratings issued with respect to such Lender.

(b)     The Borrower hereby acknowledges and agrees that each Lender may share with any of its Affiliates, and such Affiliates may share with such Lender, any information related to the Borrower or any of its Subsidiaries, provided such Persons shall be subject to the provisions of this Section to the same extent as such Lender.

Notwithstanding the foregoing paragraphs of this Section, any party to this Agreement (and each Affiliate, director, officer, employee, agent or representative of the foregoing or such Affiliate) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Transactions contemplated herein and all materials of any kind (including opinions or other tax analyses) that are provided to such party relating to such tax treatment or tax structure.  The foregoing language is not intended to waive any confidentiality obligations otherwise applicable under this Agreement except with respect to the information and materials specifically referenced in the preceding sentence.  This authorization does not extend to disclosure of any other information, including (a) the identity of participants or potential participants in the transactions contemplated herein, (b) the existence or status of any negotiations, or (c) any financial, business, legal or personal information of or regarding a party or its affiliates, or of or regarding any participants or potential participants in the transactions contemplated herein (or any of their respective affiliates), in each case to the extent such other information is not related to the tax treatment or tax structure of the transactions contemplated herein.

SECTION 10.16     Counsel Representation.  THE BORROWER ACKNOWLEDGES AND AGREES THAT IT HAS BEEN REPRESENTED BY COMPETENT COUNSEL IN THE NEGOTIATION OF THIS AGREEMENT, AND THAT ANY RULE OR CONSTRUCTION OF LAW ENABLING THE BORROWER TO ASSERT THAT ANY AMBIGUITIES OR INCONSISTENCIES IN THE DRAFTING OR PREPARATION OF THE TERMS OF THIS AGREEMENT SHOULD DIMINISH ANY RIGHTS OR REMEDIES OF THE ADMINISTRATIVE AGENT OR THE OTHER SECURED PARTIES ARE HEREBY WAIVED BY THE BORROWER.

SECTION 10.17     Patriot Act.  Each Lender hereby notifies the Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Patriot Act.

SECTION 10.18     Authorization of Administrative Agent.  Each Lender agrees that any action taken by the Administrative Agent in accordance with the terms of this Agreement or the other Loan Documents relating to the Collateral and the exercise by the Administrative Agent of its powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

WORKFLOWONE LLC


By: _____
    Name:
    Title:

SILVER POINT FINANCE, LLC,
as the Administrative Agent


By:_____
    Name:
    Title:

DISCLOSURE SCHEDULE TO CREDIT AGREEMENT

[See Attached]

SCHEDULE II

PERCENTAGES
AND AMOUNTS

WorkflowOne LLC
[220 East Monument Avenue
Dayton, Ohio 45402
Attention: Chief Financial Officer
Telephone: (___) ___-____
Facsimile: (___) ___-____
E-mail: pbogutsky@workflowmanagement.com]

| NAME AND NOTICE ADDRESS OF LENDER | LOAN PERCENTAGE | LOAN AMOUNT |
|---|---|---|
| **TERM A-PRIME LOANS** | | |
| **TERM A LOANS** | | |
| [Silver Point] | | |
| [Dune Capital Holdings, Inc.] | | |
| [DLJ Investment Partners] | | |
| [GSO Capital] | | |
| **TERM B LOANS** | | |

SCHEDULE III

SPECIFIED EBITDA

| For the Period | $ |
|---|---|
| July 1, 2010 – September 30, 2010 | 12,272,000 |
| October 1, 2010 – December 31, 2010 | 11,466,000 |
| January 1, 2011 – Effective Date | 7,638,000[3] |

---

[3] Calculated assuming Effective Date of February 28, 2011.

**Blackline To February 14, 2011 Version**

**FF DRAFT 2/~~11~~17/11**

SECOND LIEN CREDIT AGREEMENT

dated as of [●], 2011,

among

WORKFLOWONE LLC,

as the Borrower,

VARIOUS FINANCIAL INSTITUTIONS AND OTHER PERSONS FROM TIME TO TIME
PARTIES HERETO,

as the Lenders,

and

SILVER POINT FINANCE, LLC,
as the Administrative Agent.

# TABLE OF CONTENTS

**Page**

ARTICLE I          DEFINITIONS AND ACCOUNTING TERMS ..................................... ~~41~~40

    Section 1.1          Defined Terms ........................................................ ~~41~~40

    Section 1.2          Use of Defined Terms ........................................... ~~65~~64

    Section 1.3          Cross-References ................................................... ~~65~~64

    Section 1.4          Accounting and Financial Determinations........................................ 65

ARTICLE II          LOANS, CLOSING RATE AND NOTES .............................................. ~~66~~65

    Section 2.1          Loans.................................................................... ~~66~~65

    Section 2.2          Term A-Prime Loans. ........................................... ~~66~~65

        SECTION 2.2.1 Requests for Term A-Prime Loans Commitments.................... 66

        SECTION 2.2.2 Ranking and Other Provisions. ............................................ ~~67~~66

        SECTION 2.2.3 Term A-Prime Amendment. ............................................... ~~67~~66

        SECTION 2.2.4 Effective Date and Allocations. ........................................... ~~67~~66

        SECTION 2.2.5 Conditions to Effectiveness to Increase. .................................. 67

        SECTION 2.2.6 Effect of Term A-Prime Amendment. ................................ ~~68~~67

    Section 2.3          Register; Notes ..................................................... ~~68~~67

ARTICLE III          REPAYMENTS, PREPAYMENTS, INTEREST AND FEES ................ ~~69~~68

    Section 3.1          Repayments and Prepayments; Application .............................. ~~69~~68

        SECTION 3.1.1 Repayments and Prepayments. ........................................... ~~69~~68

    Section 3.2          Interest Provisions ............................................... ~~71~~70

        SECTION 3.2.1 Rates. ............................................................... ~~71~~70

        SECTION 3.2.2 Post-Default Rates.......................................... ~~72~~71

        SECTION 3.2.3 Payment Dates.............................................. ~~72~~71

    Section 3.3          Administrative Agent's Fee ....................................... ~~72~~71

ARTICLE IV          CERTAIN LENDER PROVISIONS ..................................................... 72

    Section 4.1          Increased Capital Costs........................................... 72

    Section 4.2          Taxes .................................................................. ~~73~~72

    Section 4.3          Payments; Proceeds. ............................................ 75

# TABLE OF CONTENTS
(continued)

**Page**

SECTION 4.3.1 Payments and Computations. .................................................... 75

SECTION 4.3.2 Proceeds of Collateral and Order of Payments upon Event
of Default. .................................................................................. ~~76~~75

Section 4.4    Sharing of Payments ....................................................... 76

Section 4.5    Setoff ............................................................................. ~~77~~76

Section 4.6    Replacement of Lenders ................................................ 77

ARTICLE V    CONDITIONS TO EXCHANGE OF LOANS ...................... 78

Section 5.1    Resolutions, etc .............................................................. 78

Section 5.2    Entry of Confirmation Order and Consummation of
Transactions ................................................................... ~~79~~78

Section 5.3    Delivery of Notes ........................................................... 79

Section 5.4    Guarantees ...................................................................... 79

Section 5.5    Security Agreements ....................................................... 79

Section 5.6    Intellectual Property Security Agreements ..................... 80

Section 5.7    Filing Agent, etc ............................................................ 80

Section 5.8    Intercreditor Agreement ................................................. 80

Section 5.9    Patriot Act Disclosures .................................................. ~~81~~80

Section 5.10   Compliance with Warranties, No Default, etc .............. ~~81~~80

ARTICLE VI    REPRESENTATIONS AND WARRANTIES ..................... ~~81~~80

Section 6.1    Organization, etc ........................................................... ~~81~~80

Section 6.2    Due Authorization, Non-Contravention, Defaults etc ...... 81

Section 6.3    Government Approval, Regulation, etc ......................... ~~82~~81

Section 6.4    Validity, etc .................................................................... ~~82~~81

Section 6.5    Financial Information ..................................................... 82

Section 6.6    Litigation, Labor Controversies, etc .............................. 82

Section 6.7    Subsidiaries .................................................................... ~~83~~82

Section 6.8    Ownership of Properties ................................................ ~~83~~82

Section 6.9    Taxes ............................................................................... ~~83~~82

Section 6.10   Employee Benefit Plans. ............................................... ~~83~~82

-ii-

## TABLE OF CONTENTS
(continued)

**Page**

Section 6.11        Environmental Warranties ............................................................ ~~84~~83

Section 6.12        Regulations U and X ................................................................ 84

Section 6.13        Labor Matters ..................................................................... 84

Section 6.14        Compliance with Laws ............................................................ ~~85~~84

Section 6.15        Deposit Account and Cash Management Accounts ..................... ~~85~~84

Section 6.16        Insurance ........................................................................ ~~85~~84

Section 6.17        Material Contracts ................................................................ 85

ARTICLE VII       COVENANTS ...................................................................... 85

Section 7.1         Affirmative Covenants .......................................................... 85

SECTION 7.1.1 Financial Information, Reports, Notices, etc. ......................... 85

SECTION 7.1.2 Maintenance of Existence; Compliance with Contracts,
Laws, etc. ......................................................................... 87

SECTION 7.1.3 Maintenance of Properties. ................................................. 87

SECTION 7.1.4 Insurance. ...................................................................... ~~88~~87

SECTION 7.1.5 Books and Records ............................................................ ~~88~~87

SECTION 7.1.6 Environmental Law Covenant. ............................................ 88

SECTION 7.1.7 Future Guarantors, Security, etc. ........................................ 88

SECTION 7.1.8 Cash Management. ........................................................... 89

SECTION 7.1.9 Maintenance of Corporate Separateness. ............................. ~~90~~89

SECTION 7.1.10 Landlord's Agreements and Bailee Letters. ......................... ~~90~~89

SECTION 7.1.11 Mortgages and Insurance. ................................................ 90

Section 7.2         Negative Covenants ............................................................ 90

SECTION 7.2.1 Business Activities. ......................................................... 90

SECTION 7.2.2 Indebtedness. ................................................................. ~~91~~90

SECTION 7.2.3 Liens. ........................................................................... 92

SECTION 7.2.4 Financial Condition and Operations. ................................... 94

SECTION 7.2.5 Investments. .................................................................. ~~96~~95

SECTION 7.2.6 Restricted Payments, etc. ................................................. 97

SECTION 7.2.7 Capital Expenditures. ..................................................... 98

SECTION 7.2.8 Issuance of Capital Securities. .......................................... 98

# TABLE OF CONTENTS
(continued)

**Page**

SECTION 7.2.9 Consolidation, Merger; Permitted Acquisitions, etc. ........... ~~99~~98

SECTION 7.2.10 Permitted Dispositions. ........................................ 99

SECTION 7.2.11 Modification of Certain Agreements. ................................ 100

SECTION 7.2.12 Transactions with Affiliates. ................................. 100

SECTION 7.2.13 Restrictive Agreements, etc. ................................. 101

SECTION 7.2.14 Sale and Leaseback. ....................................... ~~102~~101

SECTION 7.2.15 Pension Plans. .......................................... ~~102~~101

ARTICLE VIII    EVENTS OF DEFAULT ..................................... 102

Section 8.1        Listing of Events of Default .............................. 102

SECTION 8.1.1 Non-Payment of Obligations. ................................. 102

SECTION 8.1.2 Non-Performance of Certain Covenants and Obligations. ...... 102

SECTION 8.1.3 Non-Performance of Other Covenants and Obligations. ........ 102

SECTION 8.1.4 Default on Other Indebtedness. ................................ 102

SECTION 8.1.5 Judgments. ............................................... ~~103~~102

SECTION 8.1.6 Change in Control. ......................................... 103

SECTION 8.1.7 Bankruptcy, Insolvency, etc. ................................. 103

SECTION 8.1.8 Impairment of Security, etc. .................................. ~~104~~103

Section 8.2        Action if Bankruptcy ................................... ~~104~~103

Section 8.3        Action if Other Event of Default ......................... 104

ARTICLE IX      THE ADMINISTRATIVE AGENT ............................. 104

Section 9.1        Actions. ............................................. 104

Section 9.2        Exculpation .......................................... 105

Section 9.3        Successor ............................................ ~~108~~107

Section 9.4        Loans by Silver Point .................................. 108

Section 9.5        Credit Decisions ...................................... 108

Section 9.6        Copies, etc. .......................................... ~~109~~108

Section 9.7        Reliance by Administrative Agent ....................... ~~109~~108

Section 9.8        Defaults ............................................. 109

Section 9.9        Posting of Approved Electronic Communications. ......... 109

# TABLE OF CONTENTS
(continued)

**Page**

Section 9.10        Proofs of Claim ................................................................ ~~111~~110

ARTICLE X        MISCELLANEOUS PROVISIONS ................................................ ~~112~~111

Section 10.1        Waivers, Amendments, etc ...................................... ~~112~~111

Section 10.2        Notices; Time ......................................................... 112

Section 10.3        Payment of Costs and Expenses .............................. ~~113~~112

Section 10.4        Indemnification ..................................................... 113

Section 10.5        Survival ................................................................. 114

Section 10.6        Severability .......................................................... ~~115~~114

Section 10.7        Headings .............................................................. ~~115~~114

Section 10.8        Execution in Counterparts, Effectiveness, etc ......... ~~115~~114

Section 10.9        Governing Law; Entire Agreement ........................... ~~115~~114

Section 10.10        Successors and Assigns ....................................... 115

Section 10.11        Sale and Transfer of Loans; Participations in Loans; Notes ........... 115

Section 10.12        Other Transactions ............................................. 118

Section 10.13        Forum Selection and Consent to Jurisdiction ........... ~~119~~118

Section 10.14        Waiver of Jury Trial ............................................ 119

Section 10.15        Confidentiality. ................................................... 119

Section 10.16        Counsel Representation ........................................ ~~121~~120

Section 10.17        Patriot Act ......................................................... ~~121~~120

Section 10.18        Authorization of Administrative Agent ................... ~~121~~120

SCHEDULE I      -   Disclosure Schedule
SCHEDULE II     -   Percentages and Amounts
SCHEDULE III    -   Specified EBITDA


EXHIBIT A-1     -   Form of Term A-Prime Note
EXHIBIT A-2     -   Form of Term A Note
EXHIBIT A-3     -   Form of Term B Note
EXHIBIT B       -   [Reserved]
EXHIBIT C       -   Form of Lender Assignment Agreement
EXHIBIT D       -   Form of Compliance Certificate
EXHIBIT E-1     -   Form of Parent Guaranty
EXHIBIT E-2     -   Form of Subsidiary Guaranty
EXHIBIT F       -   Form of Pledge and Security Agreement
EXHIBIT G       -   Form of Intercreditor Agreement
EXHIBIT H       -   Form of Mortgage

SECOND LIEN CREDIT AGREEMENT

THIS SECOND LIEN CREDIT AGREEMENT, dated as of [●], 2011, is among
WORKFLOWONE LLC, a Delaware limited liability company (the "Borrower"), the various
financial institutions and other Persons from time to time parties hereto (the "Lenders") and
SILVER POINT FINANCE, LLC ("Silver Point"), as the administrative agent (in such capacity,
the "Administrative Agent"), for the Lenders.

W I T N E S S E T H:

WHEREAS, on September 29, 2010, WF Capital Holdings, Inc. and its subsidiaries
(collectively, "Bankruptcy Debtors") filed voluntary petitions for reorganization under Chapter
11 of the United States Bankruptcy Code (11 U.S.C. §§101-1532, as amended, the "Bankruptcy
Code") in the United States Bankruptcy Court for the Eastern District of Virginia, Norfolk
Division (the "Bankruptcy Court"), jointly administered as In re Workflow Management, Inc., et
al., Chapter 11 Case No. 10-74617 (SCS) and continued in the possession of their property and
in the management of their businesses pursuant to Sections 1107(a) and 1108 of the Bankruptcy
Code (the "Bankruptcy Cases");

WHEREAS, on January 21, 2011, the Bankruptcy Debtors filed with the Bankruptcy
Court a Third Amended Joint Chapter 11 Plan of Workflow Management, Inc. and its Affiliated
Debtors (the "Plan") and a disclosure statement;

WHEREAS, the Plan contemplates, among other things: (i) the transfer of substantially
all assets of the Bankruptcy Debtors to Workflow Holdings LLC, a Delaware limited liability
company (the "Parent"), or to another entity or entities designated by Parent, pursuant to the
Asset Purchase and Sale Agreement, dated as of January 21, 2011, by and among the Bankruptcy
Debtors as Sellers and Parent as Buyer, as amended, supplemented, amended and restated or
otherwise modified from time to time prior to the Effective Date and, as permitted hereunder,
thereafter (the "Asset Purchase Agreement"); (ii) the cancellation of all Indebtedness outstanding
under the First Lien Credit Agreement (as defined in the Plan, and referred to herein as the "Pre-
Petition First Lien Credit Agreement") in exchange for the issuance of First Lien Loans under
the First Lien Credit Agreement; and (iii) the cancellation of all Indebtedness outstanding under
the Second Lien Credit Agreement (as defined in the Plan, and referred to herein as the "Pre-
Petition Second Lien Credit Agreement") in exchange for the issuance of (x) the Term A Loans
and Term B Loans hereunder and (y) the Newco Preferred Units (as defined in the Plan);

WHEREAS, Parent owns all of the Capital Securities of Borrower and has designated[1]
Borrower to purchase substantially all of the assets of the Bankruptcy Debtors pursuant to the
Asset Purchase Agreement;

WHEREAS, on [●], 2011, the Bankruptcy Court entered the order confirming the Plan
(the "Confirmation Order") pursuant to which, among other things, the Bankruptcy Court
approved the transactions contemplated by the Plan;

---

[1] To be designated in bill of sale or by resolution.

WHEREAS, on the date hereof (the "Effective Date"), concurrently with the effectiveness of this Agreement, the Plan shall become effective in accordance with its terms;

WHEREAS, in connection with the transactions contemplated by the Plan and by operation of the Confirmation Order, on the Effective Date, each lender under the Pre-Petition Second Lien Credit Agreement shall receive (via an exchange) its Pro Rata Share (as defined in the Plan) of (x) the Newco Preferred Units (as defined in the Plan) and (y) the Term A Loans and Term B Loans (the "Exchange of Loans") and shall become a Lender hereunder, subject to all of the rights and obligations of a Lender hereunder without any further action on the part of such Lender; and

WHEREAS, the Parent and each Subsidiary of the Borrower, which is or hereafter becomes a party hereto as a Guarantor, is or will be affiliated, is or will be engaged in interrelated businesses, and is or will derive substantial direct and indirect benefit from extensions of credit to the Borrower.

NOW, THEREFORE, the parties hereto agree as follows.

ARTICLE I
DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.1 Defined Terms.  The following terms (whether or not underscored) when used in this Agreement, including its preamble and recitals, shall, except where the context otherwise requires, have the following meanings (such meanings to be equally applicable to the singular and plural forms thereof):

"Account Debtor" means any Person who is or who may become obligated under, with respect to, or on account of, an account, chattel paper, or a general intangible or intangible, as applicable, in each case, as such term is defined under the UCC.

"Additional Cash Interest Conditions" means, with respect to any Interest Payment Date occurring on or after May 15, 2012, both (a) as of the Business Day immediately prior to preceding such Interest Payment Date, without giving pro forma effect to the interest any payment of interest to be made in cash on such Interest Payment Date, as of the Business Day immediately preceding such Interest Payment Date, the Adjusted Cash Balance shall be greater than or equal to $25,000,000; and (b) after giving pro forma effect to the payment of interest in cash on the Loans required to be made on such Interest Payment Date pursuant to Section 3.2.1 (but before giving effect to any interest required to be paid pursuant to clause (y)(ii)(B) of Section 3.2.1(b)), the Fixed Charge Coverage Ratio with respect to such Interest Payment Date shall be greater than 2.00 to 1.00.

"Adjusted Cash Balance" means, as of any date, the sum of cash and Cash Equivalent Investments of the Borrower and its Subsidiaries on such date, plus 100% of the amount of all repayments of principal of the First Lien Loans made through such date pursuant to Sections 3.1.1(a) and 3.1.1(d) of the First Lien Credit Agreement.

"Administrative Agent" is defined in the preamble and includes each other Person appointed as the successor Administrative Agent pursuant to Section 9.3.

"<u>Affected Lender</u>" is defined in <u>Section 4.10</u>.

"<u>Affiliate</u>" of any Person means any other Person which, directly or indirectly, controls, is controlled by or is under common control with such Person.  "Control" of a Person means the power, directly or indirectly,

      (a)      to vote 10% or more of the Capital Securities (on a fully diluted basis) of such Person having ordinary voting power for the election of directors, managing members or general partners (as applicable); or

      (b)      to direct or cause the direction of the management and policies of such Person (whether by contract or otherwise).

"<u>Agreement</u>" means, on any date, this Credit Agreement as originally in effect on the Effective Date and as thereafter from time to time amended, supplemented, amended and restated or otherwise modified from time to time and in effect on such date.

"<u>Approved Fund</u>" means any Person (other than a natural Person) that (a) is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business, and (b) is administered or managed by a Lender, an Affiliate of a Lender or a Person or an Affiliate of a Person that administers or manages a Lender.

"<u>Assignee Lender</u>" means each future Lender which signs a Lender Assignment Agreement pursuant to <u>Section 10.11</u>.

"<u>Asset Purchase Agreement</u>" is defined in the <u>third recital</u>.

"<u>Authorized Officer</u>" means, relative to any Obligor, those of its officers, general partners or managing members (as applicable) whose signatures and incumbency shall have been certified to the Administrative Agent pursuant to <u>Section 5.1(b)</u>.

"<u>Bankruptcy Cases</u>" is defined in the <u>first recital</u>.

"<u>Bankruptcy Code</u>" is defined in the <u>first recital</u>.

"<u>Bankruptcy Court</u>" is defined in the <u>first recital</u>.

"<u>Bankruptcy Debtors</u>" is defined in the <u>first recital</u>.

"<u>Base Margin</u>" means 11.0%.

"<u>Borrower</u>" is defined in the <u>preamble</u>.

"<u>Business Day</u>" means any day which is neither a Saturday nor Sunday nor a legal holiday on which banks are authorized or required to be closed in New York, New York.

"<u>Capital Expenditures</u>" means, for any period, (a) the aggregate amount of all expenditures of the Borrower and its Subsidiaries for fixed or capital assets made during such

period which, in accordance with GAAP, would have been (or in accordance with GAAP, should be) classified as capital expenditures, including the capitalized portion of any Capitalized Lease Liabilities (determined in accordance with GAAP) incurred by the Borrower and its Subsidiaries during such period, less (b) the aggregate amount of expenditures to replace capital assets with Net Disposition Proceeds or Net Casualty Proceeds pursuant to clause (c) of Section 3.1.1; provided, however that Capital Expenditures shall not include expenditures made in connection with the replacement, substitution or restoration of assets to the extent financed with awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced.

"Capital Securities" means, with respect to any Person, all shares, interests, participations or other equivalents (however designated, whether voting or non-voting) of such Person's capital (including all capital stock, partnership, membership or other equity interests in such Person), whether now outstanding or issued after the Effective Date and whether or not certificated.

"Capitalized Lease Liabilities" means, with respect to any Person, all monetary obligations of such Person and its Subsidiaries under any leasing or similar arrangement which have been (or, in accordance with GAAP, should be) classified as capitalized leases, and for purposes of each Loan Document the amount of such obligations shall be the capitalized amount thereof, determined in accordance with GAAP, and the stated maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a premium or a penalty.

"Cash Equivalent Investment" means, at any time:

(a)     any direct obligation of (or unconditionally guaranteed by) the United States or a State thereof (or any agency or political subdivision thereof, to the extent such obligations are supported by the full faith and credit of the United States or a State thereof) maturing not more than one year after such time;

(b)     commercial paper maturing not more than 270 days from the date of issue, which is issued by a corporation (other than an Affiliate of any Obligor) organized under the laws of any State of the United States or of the District of Columbia, and rated A-1 or higher by S&P or P-1 or higher by Moody's;

(c)     any certificate of deposit, time deposit or bankers acceptance, maturing not more than one year after its date of issuance, which is issued by any bank organized under the laws of the United States (or any State thereof), and which has (x) a credit rating of A2 or higher from Moody's or A or higher from S&P and (y) a combined capital and surplus greater than $500,000,000;

(d)     shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (c) of this definition;

(e)     money market funds that (i) purport to comply generally with the criteria set forth in SEC Rule 2a-7 under the Investment Company Act of 1940, as amended, (ii) are rated AAA by S&P or Aaa by Moody's or carrying an equivalent rating by a national recognized rating agency, and (iii) have portfolio assets of at least $5,000,000,000; or

(f)    any repurchase agreement having a term of 30 days or less entered into with any Lender or any commercial banking institution satisfying the criteria set forth in clause (c) which

(i)    is secured by a fully perfected security interest in any obligation of the type described in clause (a), and

(ii)    has a market value at the time such repurchase agreement is entered into of not less than 100% of the repurchase obligation of such commercial banking institution thereunder.

"Cash Interest Conditions" means, with respect to ~~the Business Day immediately preceding~~ any Interest Payment Date, ~~that (a)~~both (a) as of the Business Day immediately preceding such Interest Payment Date, and after giving pro forma effect to ~~the~~any payment of interest to be made in cash on such Interest Payment Date ~~pursuant to Section 3.2.1.~~, cash and Cash Equivalent Investments of the Borrower and its Subsidiaries shall be ~~equal to or~~ greater than ~~$12,500,000,~~or equal to $12,500,000; and (b) ~~EBITDA~~ for the four-quarter period ended as of the most recent fiscal quarter of the Borrower ended prior to such Interest Payment Date, EBITDA shall be ~~equal to or~~ greater than or equal to $37,500,000.

"Casualty Event" means the damage, destruction or condemnation, as the case may be, of property of any Person or any of its Subsidiaries.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"CERCLIS" means the Comprehensive Environmental Response, Compensation and Liability Information System database.

"Change in Control" means:

(a)  the failure of Parent at any time to directly own beneficially and of record on a fully diluted basis 100% of the outstanding Capital Securities of the Borrower, such Capital Securities to be held free and clear of all Liens (other than Liens granted under a Loan Document or a Second Lien Loan Document); or

(b)  an event by which any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act) other than the Permitted Holders is or becomes the beneficial owner of Capital Securities of the Parent representing more than 50% of the economic power of the total outstanding Capital Securities of the Parent.

"Closing Date" means the Effective Date.

"Code" means the Internal Revenue Code of 1986, and the regulations thereunder, in each case as amended, reformed or otherwise modified from time to time.

"Collections" means all cash, checks, notes, instruments and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds and tax refunds) of the Borrower and its Subsidiaries.

"Communications" is defined in clause (a) of Section 9.9.

"Compliance Certificate" means a certificate duly completed and executed by an Authorized Officer of the Borrower, substantially in the form of Exhibit D hereto, together with such changes thereto as the Administrative Agent may from time to time request for the purpose of monitoring the Borrower's compliance with the financial covenants contained herein.

"Confirmation Order" is defined in the fifth recital.

"Contingent Liability" means any agreement, undertaking or arrangement by which any Person guarantees, endorses or otherwise becomes or is contingently liable upon (by direct or indirect agreement, contingent or otherwise, to provide funds for payment, to supply funds to, or otherwise to invest in, a debtor, or otherwise to assure a creditor against loss) the Indebtedness (or, solely for purposes of the definition of Investment, other obligations) of any other Person (other than by endorsements of instruments in the course of collection), or guarantees the payment of dividends or other distributions upon the Capital Securities of any other Person.  The amount of any Person's obligation under any Contingent Liability shall (subject to any limitation set forth therein) be deemed to be the outstanding principal amount of the debt, obligation or other liability guaranteed thereby.

"Continuation/Conversion Notice" means a notice of continuation or conversion and certificate duly executed by an Authorized Officer of the Borrower, substantially in the form of Exhibit B hereto.

"Control Agreement" means an agreement in form and substance reasonably satisfactory to the Administrative Agent which provides for the Administrative Agent to have "control" (as defined in Section 8-106 of the UCC, as such term relates to investment property (other than certificated securities or commodity contracts), or as used in Section 9-106 of the UCC, as such term relates to commodity contracts, or as used in Section 9-104(a) of the UCC, as such term relates to deposit accounts).

"Controlled Group" means all members of a controlled group of corporations and all members of a controlled group of trades or businesses (whether or not incorporated) under common control which, together with the Borrower, are treated as a single employer under Section 414(b) or 414(c) of the Code or Section 4001 of ERISA.

"Controlling Class" means, at any time that any Term A-Prime Loans are outstanding, Lenders holding more than 50% of the outstanding principal amount of the Term A-Prime Loans.

"Copyright Security Agreement" means any Copyright Security Agreement executed and delivered by any Obligor in substantially the form of Exhibit C to the Security Agreement, as amended, supplemented, amended and restated or otherwise modified from time to time.

"<u>Debt Issuance</u>' means the issuance of any Indebtedness within the meaning of clauses (a) and (c) of the definition thereof by the Borrower or any of its Subsidiaries.

"<u>Default</u>" means any Event of Default or any condition, occurrence or event which, after notice or lapse of time or both, would constitute an Event of Default.

"<u>Deposit Account</u>" means a "deposit account" as that term is defined in Section 9-102(a) of the UCC.

"<u>Disclosure Schedule</u>" means the Disclosure Schedule attached hereto as <u>Schedule I</u>, as it may be amended, supplemented, amended and restated or otherwise modified from time to time by the Borrower with the written consent of the Administrative Agent.

"<u>Disposition</u>" (or similar words such as "<u>Dispose</u>") means any sale, transfer, lease, sale-leaseback, contribution or other conveyance (including by way of merger) of, or the granting of options, warrants or other rights to, any of the Borrower's or its Subsidiaries' assets (including accounts receivable and Capital Securities of Subsidiaries) to any other Person (other than to another Obligor) in a single transaction or series of transactions.

"<u>Dollar</u>" and the sign "<u>$</u>" mean lawful money of the United States.

"<u>Earnout Payment</u>" means in connection with any Permitted Acquisition, any portion of the purchase price for such acquisition which is (a) deferred to a date after the closing date therefor and (b) is contingent upon the performance of the business being acquired pursuant to such Permitted Acquisition.

"<u>EBITDA</u>" means, for any applicable period, Net Income for such period, <u>plus</u>, to the extent deducted in determining Net Income for such period, the sum, without duplication, of:

      (a)  income and state franchise Tax expense;

      (b)  interest expense, together with (i) amortization or write-off of debt discount and debt issuance costs and commissions, discounts and other fees and charges associated with Indebtedness (including administrative fees and charges with respect to the Obligations and the First Lien Loans), and (ii) prepayment penalties, make-whole payments or call premiums payable on prepayment of Indebtedness;

      (c)  depreciation and amortization expense;

      (d)  any (i) extraordinary expenses or losses (including whether or not otherwise includable in the Parent's statement of Net Income for such period) or (ii) losses on sales or write-offs of assets outside of the ordinary course of business);

      (e)  any unusual non-cash or other non-cash charges, expenses or losses, including any inventory revaluations resulting from the Transactions and any non-cash write-offs required to be made under FASB ASC Topic 350, and any non-cash

charges, fees, payments, expenses or losses accrued in connection with the consummation of the Plan (including all fresh start accounting adjustments), in each case incurred during such period;

(f)   (x) restructuring and integration costs of the Borrower and its Subsidiaries, including but not limited to severance costs, plant moving costs, central sourcing costs, lease termination costs, and professional advisory fees incurred in connection with the adoption and execution of restructuring integration initiatives and the restructuring and refinancing of the Borrower's debt incurred during such period, and (y) any non-recurring expenses or losses consisting of (a) losses from extinguishment of debt, casualty (including fire, earthquake, hurricane, terrorism or other force majeure events), condemnation and expropriation and (b) other non-recurring losses which are set forth as such in the income statement of the Parent; provided that such costs, expenses or losses referred to in this clause (f) shall only be included to the extent in the aggregate they are equal to or less than $~~20,000,000~~15,000,000 for any four quarter period;

(g)   transaction fees and expenses related to the Transactions paid by any Obligor;

(h)   all fees and expenses (including management fees) accrued, or permitted hereunder to be paid and actually paid by any Obligor, for such period pursuant to the LLC Agreement and the Management Agreements, as in effect on the date hereof or as amended, modified or supplemented as permitted hereby;

(i)   reasonable transaction fees and expenses incurred by any Obligor in connection with Permitted Acquisitions;

(j)   [reserved];

(k)   write-offs, reserves or allowances of notes receivable from current and former officers, founders, and direct or indirect shareholders of the Borrower and its Subsidiaries, in a principal amount not to exceed $3,000,000 (plus accrued and unpaid interest) in the aggregate over the term of this Agreement;

(l)   costs and expenses of outside professionals engaged by the Borrower and its Subsidiaries at the request of the Lenders or First Lien Lenders, and outside professionals engaged by the Lenders and First Lien Lenders at the expense of the Borrower and its Subsidiaries;

(m) expenses related to the issuance of equity-based compensation;

(n)   reasonable fees (including reasonable legal fees and other similar advisory and consulting fees, administrative fees and working fees), charges, payments and expenses accrued or paid by any Obligor in connection with the consummation of the Plan;

(o) reasonable fees paid to the Administrative Agent pursuant to the Fee Letter; and

(q) any letter of credit fees, to the extent paid by any Obligor in cash;

minus, to the extent included in Net Income for such period, the sum, without duplication, of:

(i) interest income (except to the extent deducted in determining interest expense);

(ii) any extraordinary or non-recurring income or gains (including whether or not otherwise includable in the Parent's statement of Net Income for such period, gains on the sales of assets outside the ordinary course of business); and

(iii) any unusual non-cash or other non-cash income;

provided that, for purposes of Section 7.2.4, and notwithstanding any provision of Section 1.4(b) to the contrary, calculations of EBITDA for any period shall be adjusted to exclude items otherwise properly included to the extent such items relate to assets Disposed in such period, on a *pro forma* basis as if such asset was Disposed on the first day of such period; and

provided further that, notwithstanding the foregoing provisions of this definition of EBITDA, (i) the quarterly EBITDA of the Borrower and its Subsidiaries for each Fiscal Quarter ending on September 30, 2010 and December 31, 2010 and (ii) the EBITDA of the Borrower and its Subsidiaries for the period commencing on January 1, 2011 until the Closing Date, and with respect to clauses (i) and (ii), together with all itemized additions and deductions thereto, shall be as set forth in Schedule III hereto.

"Effective Date" is defined in the sixth recital.

"Eligible Assignee" means any Person (other than an Ineligible Assignee).

"Emigsville Property" means the real property owned by the Borrower, located in York County, Pennsylvania and commonly known as 325 Busser Road, Emigsville, Pennsylvania.

"Employee Benefit Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA that is maintained for employees of the Borrower or any member of the Borrower's Controlled Group.

"Environmental Laws" means all applicable foreign, federal, state, provincial or local statutes, laws, ordinances, codes, rules and regulations (including consent decrees and administrative orders) relating to public health and safety and protection of the environment.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto of similar import, together with the regulations thereunder, in each case as in effect from time to time.  References to sections of ERISA also refer to any successor sections thereto.

"Event of Default" is defined in Section 8.1.

"Excess Cash Factor" means, with respect to any Interest Payment Date, the ~~proportion~~fraction that (~~a~~x) the rate at which the Loans bear interest payable in cash for such Interest Payment Date pursuant to clause (y)(ii) ~~of the third sentence~~(B) of Section ~~3.2.1,~~3.2.1(b), bears to (~~b~~y) 6% per annum (which proportion shall be zero in the event that no cash interest is payable on such Interest Payment Date pursuant to such clause (y)(ii)(B)).

"Excess Cash Flow" means, for any Fiscal Year, the result of the following calculation:

(a)  EBITDA for such period;

plus

(b)  the absolute value of any net decrease in Working Capital for such period;

less

(c)  the sum (without duplication) for such period of the following:

(i)  the aggregate amount of (A) all regularly scheduled or mandatorily repayable principal payments of Indebtedness (including the Loans) made during such Fiscal Year, (B) all optional prepayments of Indebtedness permitted hereby (other than the Loans) during such Fiscal Year (including any call premiums paid in cash upon repayment of such Indebtedness) and (C) the portion of any regularly scheduled payments with respect to Capital Lease Liabilities allocable to principal;

(ii)  cash payments made with respect to Capital Expenditures (to the extent permitted hereunder and not funded with debt or equity issuances);

(iii)  all federal, state, local and foreign income, franchise or other similar taxes to the extent paid by the Parent and its Subsidiaries in cash (including any future payments of past-priority taxes assumed from the Bankruptcy Debtors for any past, present or current periods) and, to the extent not duplicative thereof, Restricted Payments made for the purposes described in clause (b)(iii) of Section 7.2.6;

(iv)  interest expense to the extent paid in cash during such Fiscal Year;

(v)  to the extent actually paid in cash during such Fiscal Year, Earnout Payments (to the extent not funded with debt or equity issuances);

(vi)  the absolute value of any net increase in Working Capital for such period;

(vii)  cash payments to the extent (A) actually paid in cash during such period and (B) added back to EBITDA for such period under clauses (d), (f), (g), (h), (i), (l), (n), (o) and (p) of the definition of EBITDA; and

(ix)  cash payments made with respect to Permitted Acquisitions and Investments permitted under Section 7.2.5 (except to the extent funded with debt or equity issuances); and

(x)  cash payments made pursuant to the Transactions.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Exchange of Loans" is defined in the seventh recital.

"Exemption Certificate" is defined in clause (e) of Section 4.6.

"FATCA" means Sections 1471 through 1474 of the Code.

"Fee Letter" means the confidential letter, dated the date hereof, between the Administrative Agent and the Borrower.

"Filing Agent" is defined in Section 5.7.

"Filing Statements" is defined in Section 5.7.

"First Lien Administrative Agent" means the "Administrative Agent" as defined in the First Lien Credit Agreement (or such corresponding term in the event the First Lien Credit Agreement is refinanced in accordance with the terms hereof).

"First Lien Credit Agreement" means the First Lien Credit Agreement, dated as of the date hereof, among the Borrower, the various financial institutions and other Persons from time to time party thereto as lenders, The Bank of New York Mellon, as the administrative agent and the other Persons party thereto as agents, as amended, supplemented, amended and restated, refinanced or otherwise modified from time to time.

"First Lien Debt" means, on any date of determination, the aggregate outstanding principal amount of all Indebtedness of the Parent and its Subsidiaries secured by a Lien (other than the Loans and Indebtedness of the types set forth in clauses (b) and (f) of the definition of Indebtedness and any Contingent Liability in respect of the foregoing) outstanding on the last day of the Fiscal Quarter ending on or immediately preceding the date of determination.

"First Lien Lender" means the "Lenders" as defined in the First Lien Credit Agreement (or such corresponding term in the event the First Lien Credit Agreement is refinanced in accordance with the terms hereof).

"First Lien Loan Documents" means the "Loan Documents" as defined in the First Lien Credit Agreement (or such corresponding term in the event the First Lien Credit Agreement is refinanced in accordance with the terms hereof).

"First Lien Loans" means the "Loans" as defined in the First Lien Credit Agreement (or such corresponding term in the event the First Lien Credit Agreement is refinanced in accordance with the terms hereof).

"First Lien Obligations" means all Obligations as that term is defined in the First Lien Credit Agreement as in effect on the date hereof or as modified as permitted thereby.

"First Lien Termination Date" means the "Termination Date" as defined in the First Lien Credit Agreement (or such corresponding term in the event the First Lien Credit Agreement is refinanced in accordance with the terms hereof).

"Fiscal Quarter" means a quarter ending on the last day of March, June, September or December.

"Fiscal Year" means any period of twelve consecutive calendar months ending on December 31; references to a Fiscal Year with a number corresponding to any calendar year (e.g., the "2011 Fiscal Year") refer to the Fiscal Year ending on December 31 of such calendar year.

"Fixed Charge Coverage Ratio" means, as of any Interest Payment Date, the ratio of (a) EBITDA for the four quarter period ended as of the most recent fiscal quarter ended immediately prior to such Interest Payment Date to (b) the Fixed Charges for such four quarter period (as determined in accordance with the definition thereof).

"Fixed Charges" means, for any four quarter period with respect to the Borrower and its Subsidiaries on a consolidated basis for which the Fixed Charge Coverage Ratio is being determined, the sum of (a) cash Interest Expense of the Borrower and its Subsidiaries on a consolidated basis for such period, and (b) all scheduled amortization payments of principal of Indebtedness made by the Borrower and its Subsidiaries during such period, provided, however, that for purposes of determining the amount of Interest Expense required to be paid in cash on the Loans for such period, such amount in connection with the determination of the Fixed Charge Coverage Ratio, the amount of such cash Interest Expense used for purposes of clause (a) of this definition shall be the sum of (i) interest on the Loans required to be paid in cash on the Interest Payment Date immediately following the end of such period which shall be treated as if such cash interest payments were made on the last day of such four quarter period, plus (ii) Interest Expense paid in cash on the Loans on the three preceding Interest Payment Dates.

"Foreign Pledge Agreement" means any supplemental pledge agreement governed by the laws of a jurisdiction other than the United States or a State thereof executed and delivered by the Borrower or any of its Subsidiaries pursuant to the terms of this Agreement, in form and substance reasonably satisfactory to the Administrative Agent, as may be necessary or desirable under the laws of organization or incorporation of a Subsidiary to further protect or perfect the Lien on and security interest in any Collateral (as defined in the Security Agreement).

"Foreign Subsidiary" means any Subsidiary that is not incorporated or organized under the laws of the United States, a state thereof or the District of Columbia and any Subsidiary of such a Foreign Subsidiary.

"F.R.S. Board" means the Board of Governors of the Federal Reserve System or any successor thereto.

"GAAP" is defined in Section 1.4.

"Goshen Property" means the real property owned by the Borrower, located in Elkhart County, Indiana and commonly known as 1302 Eisenhower Drive North, Goshen, Indiana.

"Governmental Authority" means the government of the United States, any other nation, or any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other Person exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Granting Lender" is defined in clause (g) of Section 10.11.

"Guarantor" means, collectively, the Parent, each Subsidiary Guarantor and each other Person party to a Guaranty.

"Guaranty" means, as applicable, the Parent Guaranty, any Subsidiary Guaranty and any other document delivered by a U.S. Subsidiary of the Borrower whereby such U.S. Subsidiary becomes liable for the Obligations.

"Hazardous Material" means

      (a)     any "hazardous substance", as defined by CERCLA;

      (b)     any "hazardous waste", as defined by the RCRA; or

      (c)     any pollutant or contaminant or hazardous, dangerous or toxic chemical, material or substance (including any petroleum product) within the meaning of any other applicable Environmental Law relating to or imposing liability or standards of conduct concerning any hazardous, toxic or dangerous waste, substance or material, all as amended.

"Hedging Obligations" means, with respect to any Person, all liabilities of such Person under currency exchange agreements, interest rate swap agreements, interest rate cap agreements and interest rate collar agreements, and all other agreements or arrangements designed to protect such Person against fluctuations in interest rates or currency exchange rates.

"herein", "hereof", "hereto", "hereunder" and similar terms contained in any Loan Document refer to such Loan Document as a whole and not to any particular Section, paragraph or provision of such Loan Document.

"Hypothetical Tax Rate" means, for any taxable year, the greater of the highest marginal rate of combined federal, state and local income tax (including any Medicare contribution taxes imposed on net investment income) payable by (i) an individual resident in New York City and (ii) a corporation resident in New York City whose sole assets are the membership interests of

the Parent that are held by such corporation, in each case taking into account the particular character of the income involved (e.g., capital gain or ordinary income) and taking into account the deductibility of state and local income taxes in computing federal income tax liability.

"including" and "include" means including without limiting the generality of any description preceding such term, and, for purposes of each Loan Document, the parties hereto agree that the rule of ejusdem generis shall not be applicable to limit a general statement, which is followed by or referable to an enumeration of specific matters, to matters similar to the matters specifically mentioned.

"Indebtedness" of any Person means:

(a)     all obligations of such Person for borrowed money or advances and all obligations of such Person evidenced by bonds, debentures, notes or similar instruments or upon which interest payments are customarily made;

(b)     all obligations, contingent or otherwise, relative to the face amount of all letters of credit, whether or not drawn, banker's acceptances, performance, surety or appeal bonds (or similar obligations) issued for the account of such Person;

(c)     all Capitalized Lease Liabilities of such Person;

(d)     all reimbursement, payment or other obligations or liabilities of such Person created or arising under any conditional sale or title retention agreement with respect to property used or acquired by such Person;

(e)     for purposes of Section 8.1.4 only, all other items which, in accordance with GAAP, would be included as liabilities on the balance sheet of such Person as of the date at which Indebtedness is to be determined;

(f)     net Hedging Obligations of such Person;

(g)     whether or not so included as liabilities in accordance with GAAP, all obligations of such Person to pay the deferred purchase price of property or services (including all reimbursement, payment or other obligations or liabilities of such Person created or arising under any conditional sale or title retention agreement with respect to property used or acquired by such Person) (excluding trade accounts payable in the ordinary course of business and not outstanding for more than 120 days after such payable was due unless, if such payable is outstanding more than 120 days after such payable was due, they are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted) of the date of purchase of such goods and services (including all reimbursement, payment or other obligations or liabilities of such Person created or arising under any conditional sale or title retention agreement with respect to property used or acquired by such Person), and indebtedness secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien on property owned or being acquired by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether

or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(h) obligations arising under Synthetic Leases;

(i) all Contingent Liabilities of such Person; and

(j) all obligations referred to in clauses (a) through (i) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person.

The Indebtedness of any Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such Person, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Liabilities" is defined in Section 10.4.

"Indemnified Parties" is defined in Section 10.4.

"Ineligible Assignee" means a natural Person, the Parent, any Subsidiary of Parent and Perseus.

"Intercreditor Agreement" means the Intercreditor Agreement, dated the date hereof, and substantially in the form of Exhibit G hereto, executed and delivered by the Administrative Agent, the administrative agent under the First Lien Credit Agreement and the Obligors pursuant to the terms of this Agreement, as amended, supplemented, amended and restated, replaced or otherwise modified from time to time.

"Interest Coverage Ratio" means, as of the last day of any Fiscal Quarter, the ratio computed for the period consisting of such Fiscal Quarter and each of the three immediately preceding Fiscal Quarters of:

(a) EBITDA (for all such Fiscal Quarters)

to

(b) the sum (for all such Fiscal Quarters) of Interest Expense;

provided that, for purposes of calculating the Interest Coverage Ratio for each of the following Fiscal Quarters of the 2011 Fiscal Year, Interest Expense shall be calculated as follows: (i) with respect to the third Fiscal Quarter of such Fiscal Year, the amount of Interest Expense for such Fiscal Quarter and the immediately preceding Fiscal Quarter multiplied by two; and (ii) with respect to the fourth Fiscal Quarter of such Fiscal Year, the amount of Interest Expense for such Fiscal Quarter and the two immediately preceding Fiscal Quarters multiplied by one and one-third.

"Interest Expense" means, for any applicable period, (a) the aggregate cash interest expense of the Parent and its Subsidiaries for such applicable period, including the portion of any payments made in respect of Capitalized Lease Liabilities allocable to interest expense but excluding (to the extent otherwise included in the definition of Interest Expense) (i) amortization of deferred financing costs, (ii) make-whole payments or call premiums paid or payable in cash upon repayment of Indebtedness and (iii) any interest capitalized or paid in kind; less (b) the aggregate interest income received by Parent and its Subsidiaries for such applicable period.

"Interest Payment Date" means each February 15, May 15, August 15 and November 15 in each year, commencing on May 15, 2011 and continuing until, and including, the Stated Maturity Date.

"Investment" means, relative to any Person,

(a)     any loan, advance or extension of credit made by such Person to any other Person, including the purchase by such Person of any bonds, notes, debentures or other debt securities of any other Person;

(b)     Contingent Liabilities in favor of any other Person; and

(c)     any Capital Securities held by such Person in any other Person.

The amount of any Investment shall be the original principal or capital amount thereof less all returns of principal or capital thereon and shall, if made by the transfer or exchange of property other than cash, be deemed to have been made in an original principal or capital amount equal to the fair market value of such property at the time of such Investment.

"Lender Assignment Agreement" means an assignment agreement substantially in the form of Exhibit C hereto.

"Lenders" is defined in the preamble.

"Lender's Environmental Liability" means any and all losses, liabilities, obligations, penalties, claims, litigation, demands, defenses, costs, judgments, suits, proceedings, damages, (including consequential damages), disbursements or expenses of any kind or nature whatsoever (including reasonable attorneys' fees and expenses at trial and appellate levels and experts' fees and disbursements and expenses incurred in investigating, defending against or prosecuting any litigation, claim or proceeding) which may at any time be imposed upon, incurred by or asserted or awarded against the Administrative Agent or any Lender or any of such Person's Affiliates, shareholders, directors, officers, employees, and agents in connection with or arising from:

(a)  any Hazardous Material on, in, under or migrating from all or any portion of any property of the Borrower or any of its Subsidiaries or the groundwater thereunder to the extent caused by Releases from the Borrower's or any of its Subsidiaries' or any of their respective predecessors' properties;

(b)  any misrepresentation, inaccuracy or breach of any warranty, contained or referred to in Section 6.11;

(c)  any violation or claim of violation by the Borrower or any of its Subsidiaries of any Environmental Laws; or

(d)  the imposition of any Lien for damages caused by, or the recovery of any costs with respect to, the cleanup, Release of Hazardous Material by the Borrower or any of its Subsidiaries, or in connection with any property owned by the Borrower or any of its Subsidiaries.

"LIBO Rate" means, with respect to each period (each an "Interest Period") commencing on the day immediately following an Interest Payment Date (or the Effective Date in the case of the first such period) and ending on the next succeeding Interest Payment Date, a rate per annum equal to the greater of (i) 3.00% and (ii) the rate published at approximately 11:00 a.m. (London time) on the first Business Day of any Interest Period by the British Bankers' Association for deposits in Dollars for three months (as set forth by the Bloomberg Information Service or any successor thereto or any other service selected by the Administrative Agent which has been nominated by the British Bankers' Association as an authorized information vendor for the purpose of displaying such rates).

"Lien" means any security interest, mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), charge against or security interest in property, or other priority or preferential arrangement of any kind or nature whatsoever, including any conditional sale or title retention arrangement, any Capitalized Lease Liability and any assignment, deposit arrangement or financing lease intended as security.

"Livermore Property" means the real property owned by the Borrower, located in Alameda County, California and commonly known as 5775 Brisa Street, Livermore, California.

"LLC Agreement" means the Amended and Restated Limited Liability Company Agreement, dated [●], 2011, among the Parent and the other parties thereto, as amended, supplemented, amended and restated or otherwise modified from time to time.

"Loan" means, as the context may require, a Term A-Prime Loan, Term A Loan or Term B Loan; "Loans" means the Term A-Prime Loans, Term A Loans and Term B Loans, collectively.

"Loan Documents" means, collectively, this Agreement, the Notes, the Fee Letter, each agreement pursuant to which the Administrative Agent is granted a Lien to secure all or any part of the Obligations, each Guaranty, the Intercreditor Agreement and each other agreement, certificate, document or instrument delivered in connection with any Loan Document, whether or not specifically mentioned herein or therein.

"Make-Whole Premium" means, with respect to any Loan on any date of prepayment, the present value of (a) all required remaining interest payments (excluding accrued and unpaid interest on the amount prepaid on the date of such prepayment) due on such Loan from the date of prepayment through and including the second anniversary of the Effective Date plus (b) 7.5% of the aggregate principal amount of the Loans that would be outstanding on such second anniversary, in each case discounted from the second anniversary of the Effective Date to the

date of prepayment using a discount rate equal to the Treasury Rate plus 50 basis points (it being agreed, for purposes hereof, that (a) the LIBO Rate applicable to all required remaining interest payments on such Loan shall be deemed to be equal to the LIBO Rate in effect on the date of such prepayment), (b) the remaining interest payments shall be calculated on the assumption that the Cash Interest Conditions are satisfied and the Additional Cash Interest Conditions are not satisfied on all remaining Interest Payment Dates, and (c) all interest capitalized on the Loans on such remaining Interest Payments shall be due and payable as a single payment on such second anniversary); provided, however, that if a sale of all or substantially all assets or Capital Securities of the Borrower occurs to a Person who is not an Affiliate of the Borrower without the consent of Perseus, on or before the second anniversary of the Effective Date, then the Make-Whole Premium shall not exceed 10% of the then outstanding aggregate principal amount of the Loans.

"Management Agreements" means the Management Agreements, dated as of the Effective Date, among Silver Point Capital, L.P. and Perseus and the Borrower, as amended, supplemented, amended and restated or otherwise modified from time to time as permitted hereunder.

"Material Adverse Effect" means a material adverse effect on (a) the business, condition (financial or otherwise), operations, performance or properties of the Parent and its Subsidiaries taken as a whole, (b) the rights and remedies of any Secured Party under any Loan Document, (c) the ability of any Obligor to perform its Obligations under any Loan Document, (d) the legality, validity or enforceability of this Agreement or any other Loan Document or (e) the validity, perfection or priority of Liens with respect to any material portion of the collateral in favor of the Administrative Agent for the benefit of the Secured Parties (other than any material adverse effect that has occurred as a result of the Bankruptcy Cases and related proceedings).

"Moody's" means Moody's Investors Service, Inc.

"Mortgage" means each mortgage, deed of hypothec, debenture, pledge, deed of trust or agreement executed and delivered by any Obligor in favor of the Administrative Agent for the benefit of the Secured Parties pursuant to the requirements of this Agreement substantially in the form set forth in Exhibit H hereto (with such changes as are reasonably satisfactory to the Administrative Agent) under which a Lien is granted on the real property and fixtures described therein, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"Net Casualty Proceeds" means, with respect to any Casualty Event, the amount of any insurance proceeds or condemnation awards received by the Parent, the Borrower or any of its Subsidiaries in connection with such Casualty Event (net of all reasonable and customary collection expenses thereof), but excluding any proceeds or awards required to be paid to a creditor (other than the Lenders) which holds a first priority Lien permitted pursuant to this Agreement on the property which is the subject of such Casualty Event minus the sum of (i) all taxes actually paid or estimated by the Borrower to be payable in cash within the 12 months following the date of such Casualty Event and (ii) to the extent not excluded above, payments made by the Borrower or its Subsidiaries to retire Indebtedness (other than the Loans) where payment of such Indebtedness is required in connection with such Casualty Event; provided that,

if the amount of any estimated taxes pursuant to clause (i) exceeds the amount of taxes actually required to be paid in cash in respect of such Casualty Event, the aggregate amount of such excess shall constitute Net Casualty Proceeds.

"Net Debt Proceeds" means the cash proceeds received by the Borrower or its Subsidiaries from any Debt Issuance by the Borrower or any Subsidiary not otherwise permitted pursuant to the terms of Section 7.2.2 (net of underwriting discounts and commissions and other reasonable fees, expenses and costs associated therewith including, without limitation, those of attorneys, accountants and other professionals).

"Net Disposition Proceeds" means the gross cash proceeds received by the Borrower or its Subsidiaries from any Disposition other than those pursuant to clauses (a), (b) (but not to the extent clause (b) references Section 7.2.14(a)), (c), (d) and (e) of Section 7.2.10 and any cash payment received in respect of promissory notes or other non-cash consideration delivered to the Borrower or its Subsidiaries in respect thereof, minus the sum of (i) all reasonable and customary legal, investment banking, brokerage, accounting and other similar professional fees and expenses incurred in connection with such Disposition, (ii) all taxes actually paid or estimated by the Borrower to be payable in cash within the 12 months following the date of such Disposition, and (iii) payments made by the Borrower or its Subsidiaries to retire Indebtedness (other than the Loans) secured by a Lien permitted pursuant to Section 7.2.3 (and such Lien is senior to the Liens created under the Loan Documents) where payment of such Indebtedness is required in connection with such Disposition; provided that, if the amount of any estimated taxes pursuant to clause (ii) exceeds the amount of taxes actually required to be paid in cash in respect of such Disposition, the aggregate amount of such excess shall constitute Net Disposition Proceeds.

"Net Income" means, for any period, the aggregate of all amounts which would be included as net income (or loss) on the consolidated financial statements of the Parent and its Subsidiaries for such period.

"Non-Excluded Taxes" means any Taxes imposed, deducted or withheld with respect to any Secured Party on payments under this Agreement or any Loan Document other than (i) net income and franchise Taxes imposed by any Governmental Authority under the laws of which such Secured Party is organized or in which it maintains its principal office or its applicable lending office, (ii) any U.S. federal withholding tax imposed under FATCA, (iii) Taxes imposed as a result of a present or former connection between such Secured Party and the jurisdiction imposing such Taxes, but excluding any such connection arising from such Secured Party's exercise of its rights or performance of its obligations pursuant to or in respect of this Agreement or any Loan Document, (iv) any branch profits tax imposed by the United States or any comparable tax imposed by any foreign jurisdiction and (v) any Other Taxes.

"Non-U.S. Lender" means any Lender that is not a "United States person", as defined under Section 7701(a)(30) of the Code.

"Note" means, as the context may require, a Term A-Prime Note, Term A Note or Term B Note; "Notes" means the Term A-Prime Notes, Term A Notes and Term B Notes collectively.

"Obligations" means all obligations (monetary or otherwise, whether absolute or contingent, matured or unmatured) of the Borrower and each other Obligor to the Secured Parties arising under or in connection with a Loan Document, including, but not limited to, the principal of and premium, if any, and interest (including interest accruing (or which would have accrued) during the pendency of any proceeding of the type described in Section 8.1.7, whether or not allowed in such proceeding) on the Loans as well as all Fees and expenses (including attorneys' fees and expenses) and indemnity payable to the Secured Parties hereunder.

"Obligor" means, as the context may require, the Borrower and each other Person (other than a Secured Party) obligated under any Loan Document.

"Organic Document" means, relative to any Obligor, as applicable, its certificate or articles of incorporation, articles and memorandum of association, by-laws, certificate of partnership, partnership agreement, certificate of formation, limited liability agreement, operating agreement and all shareholder agreements, voting trusts and similar arrangements applicable to any of such Obligor's Capital Securities.

"Other Taxes" means any and all present or future stamp, documentary or similar Taxes, or any other excise or property Taxes or similar levies that arise on account of any payment made or required to be made under any Loan Document or from the execution, delivery, registration, recording or enforcement of, or otherwise with respect to, any Loan Document, but excluding, for the avoidance of doubt, any Taxes arising in connection with any transfer, assignment or participation of any rights or obligations under this Agreement, or any change in lending office by any Lender, except if such transfer, assignment, participation or change in lending office is done at the request of Borrower.

"Parent" is defined in the third recital.

"Parent Guaranty" means the guaranty, dated as of the date hereof, executed and delivered by an Authorized Officer of the Parent pursuant to the terms of this Agreement, substantially in the form of Exhibit E-1 hereto, as amended, supplemented, amended and restated or otherwise modified from time to time.

"Participant" is defined in clause (d) of Section 10.11.

"Patent Security Agreement" means any Patent Security Agreement executed and delivered by any Obligor in substantially the form of Exhibit A to the Security Agreement, as amended, supplemented, amended and restated or otherwise modified.

"Patriot Act" means the USA PATRIOT ACT (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), as amended and supplemented from time to time.

"PBGC" means the Pension Benefit Guaranty Corporation and any Person succeeding to any or all of its functions under ERISA.

"PBGC Settlement" means the settlement agreement, if any, with PBGC.

"Pension Plan" means a "pension plan", as such term is defined in Section 3(2) of ERISA, which is subject to Title IV of ERISA, and to which the Borrower or any corporation, trade or business that is, along with the Borrower, a member of a Controlled Group, may have liability, including any liability by reason of having been a substantial employer within the meaning of Section 4063 of ERISA at any time during the preceding five years, or by reason of being deemed to be a contributing sponsor under Section 4069 of ERISA.

"Percentage" means, relative to any Lender, the percentage set forth opposite its name on Schedule II hereto or set forth in a Lender Assignment Agreement, as such percentage may be adjusted from time to time (x) in accordance with Section 4.8 or (y) pursuant to Lender Assignment Agreements executed by such Lender and its Assignee Lender and delivered pursuant to Section 10.11.

"Permitted Acquisition" means an acquisition (whether pursuant to an acquisition of Capital Securities, assets or otherwise) by the Borrower or any Subsidiary from any Person in which the following conditions are satisfied:

(a)  the Borrower shall have submitted to the Administrative Agent at least ~~15~~20 days prior to the consummation of such acquisition, a business description of the business or assets being acquired, the financial statements of the business or assets being acquired and a summary of the terms of the acquisition, all in reasonable detail;

(b)  the assets, Capital Securities or business being acquired, will be located, incorporated and/or doing business in the United States;

(c)  Borrower shall have delivered a certificate certifying that before and after giving effect to such acquisition, the representations and warranties set forth in each Loan Document shall, in each case, be true and correct in all material respects with the same effect as if then made (unless stated to relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date) and no Default has occurred and is continuing; and

(d)  the Borrower shall have delivered to the Administrative Agent a Compliance Certificate for the period of four full Fiscal Quarters immediately preceding such acquisition (prepared in good faith and in a manner and using such methodology which is consistent with the most recent financial statements delivered pursuant to Section 7.1.1) giving pro forma effect to the consummation of such acquisition as if such Permitted Acquisition had occurred on the first day of the period of four Fiscal Quarters ending on the last day of the most recently ended Fiscal Quarter ending at least 45 days prior to the date of such Permitted Acquisition.

"Permitted Holders" means (i) Perseus, (ii) any Person that holds the Capital Securities of the Parent as of the Closing Date and (iii) the respective affiliates of the Persons referred to in the foregoing clauses (i) and (ii).

"Perseus" means Perseus, L.L.C. and its Affiliates.

"Person" means any natural person, corporation, limited liability company, partnership, joint venture, association, trust or unincorporated organization, Governmental Authority or any other legal entity, whether acting in an individual, fiduciary or other capacity.

"Plan" is defined in the second recital.

"Platform" is defined in clause (b) of Section 9.9.

"Purchase Card Agreements" means any arrangement by any Obligor to provide company-paid credit cards to employees that permit such employees to make purchases on behalf of such Obligor of supplies or services used in the ordinary course of business by such Obligor, including in respect of ordinary course, business related travel and entertainment expenses.

"Quarterly Payment Date" means the last Business Day of March, June, September and December.

"RCRA" means the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., as amended.

"Register" is defined in clause (a) of Section 2.3.

"Release" means a "release", as such term is defined in CERCLA or any release, threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material in the indoor or outdoor environment, including the movement of Hazardous Material through or in the air, soil, surface water, ground water or property.

"Replacement Lender" is defined in Section 4.10.

"Replacement Notice" is defined in Section 4.10.

"Required Lenders" means, at any time, Lenders holding more than 50% of the aggregate principal amount of the then outstanding Loans.

"Restricted Payment" means (i) the declaration or payment of any dividend (other than dividends payable solely in Capital Securities (that are not mandatorily redeemable prior to one year and one day after the Stated Maturity Date) of the Borrower or any Subsidiary) on, or the making of any payment or distribution on account of, or setting apart assets for a sinking or other analogous fund for the purchase, redemption, defeasance, retirement or other acquisition of, any class of Capital Securities of the Borrower or any Subsidiary or any warrants, options or other right or obligation to purchase or acquire any such Capital Securities, whether now or hereafter outstanding, or (ii) the making of any other distribution in respect of such Capital Securities, in each case either directly or indirectly, whether in cash, property or obligations of the Borrower or any Subsidiary or otherwise.

"S&P" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc.

"SEC" means the Securities and Exchange Commission.

"Secured Parties" means, collectively, the Lenders, the Administrative Agent and (in each case) each of their respective successors, transferees and assigns.

"Security Agreement" means the Pledge and Security Agreement executed and delivered by an Authorized Officer of the Parent and its Subsidiaries, substantially in the form of Exhibit F hereto, together with any supplemental Foreign Pledge Agreement delivered pursuant to the terms of this Agreement, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"Silver Point" is defined in the preamble.

"SPC" is defined in clause (g) of Section 10.11.

"Stated Maturity Date" means [●], 2015[2].

"Subsidiary" means, with respect to any Person, any other Person of which more than 50% of the outstanding Voting Securities of such other Person (irrespective of whether at the time Capital Securities of any other class or classes of such other Person shall or might have voting power upon the occurrence of any contingency) is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more other Subsidiaries of such Person, or by one or more other Subsidiaries of such Person.  Unless the context otherwise specifically requires, the term "Subsidiary" shall be a reference to a Subsidiary of the Borrower.

"Subsidiary Guarantor" means each U.S. Subsidiary of the Borrower that has executed and delivered to the Administrative Agent the Subsidiary Guaranty (including by means of a delivery of a supplement thereto).

"Subsidiary Guaranty" means the subsidiary guaranty, executed and delivered by an Authorized Officer of each U.S. Subsidiary pursuant to the terms of this Agreement, substantially in the form of Exhibit E-2 hereto, as amended, supplemented, amended and restated or otherwise modified from time to time.

"Supplemental Margin" means (x) on any Interest Payment Date occurring on or prior to May 15, 2012, 2.0% and (y) thereafter, 2.0% times the result of 1 minus the Excess Cash Factor.

"Synthetic Lease" means, as applied to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is not a capital lease in accordance with GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for federal income tax purposes, other than any such lease under which that Person is the lessor.

"Taxes" means all taxes, duties, levies, imposts, charges, assessments, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, and all interest, penalties or similar liabilities with respect thereto.

---

[2]    Insert date that is 4 ½ year anniversary of the Closing Date.

"Term A Lender" means any Lender that holds Term A Loans.

"Term A Loan" means the Loans held by a Term A Lender in an amount equal to the Percentage set forth opposite its name on Schedule II hereto or set forth in a Lender Assignment Agreement.

"Term A Note" means a promissory note of the Borrower payable to any Term A Lender, in the form of Exhibit A-2 hereto (as such promissory note may be amended, endorsed or otherwise modified from time to time), evidencing the aggregate Indebtedness of the Borrower to such Term A Lender resulting from outstanding Loans, and also means all other promissory notes accepted from time to time in substitution therefor or renewal thereof.

"Term A-Prime Amendment" is defined in Section 2.2.3.

"Term A-Prime Closing Date" is defined in Section 2.2.5.

"Term A-Prime Effective Date" is defined in Section 2.2.4.

"Term A-Prime Lender" means any Lender that holds Term A-Prime Loans.

"Term A-Prime Loan" means the Loans made to the Borrower by any Lender pursuant to Section 2.2.

"Term A-Prime Note" means a promissory note of the Borrower payable to any Term A-Prime Lender, in the form of Exhibit A-1 hereto (as such promissory note may be amended, endorsed or otherwise modified from time to time), evidencing the aggregate Indebtedness of the Borrower to such Term A-Prime Lender resulting from outstanding Loans, and also means all other promissory notes accepted from time to time in substitution therefor or renewal thereof.

"Term B Lender" means any Lender that holds Term B Loans.

"Term B Loan" means the Loans held by a Term B Lender in an amount equal to the Percentage set forth opposite its name on Schedule II hereto or set forth in a Lender Assignment Agreement.

"Term B Note" means a promissory note of the Borrower payable to any Term B Lender, in the form of Exhibit A-3 hereto (as such promissory note may be amended, endorsed or otherwise modified from time to time), evidencing the aggregate Indebtedness of the Borrower to such Term B Lender resulting from outstanding Loans, and also means all other promissory notes accepted from time to time in substitution therefor or renewal thereof.

"Termination Date" means the date on which all Obligations have been paid in full in cash.

"Terrorism Laws"  means any of the following (a) Executive Order 13224 issued by the President of the United States, (b) the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations), (c) the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations), (d) the Foreign Terrorist

Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations), (e) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001 (as it may be subsequently codified), (f) all other present and future legal requirements of any Governmental Authority addressing, relating to, or attempting to eliminate, terrorist acts and acts of war and (g) any regulations promulgated pursuant thereto or pursuant to any legal requirements of any Governmental Authority governing terrorist acts or acts of war.

"Total Debt" means, on any date of determination, the outstanding principal amount of all Indebtedness of the Parent and its Subsidiaries of the type referred to in clause (a) (which, in the case of the Loans, shall be deemed to equal the aggregate outstanding principal amount of the Loans outstanding on the last day of the Fiscal Quarter ending on or immediately preceding the date of determination), clause (c) and clause (g), in each case of the definition of "Indebtedness" (exclusive of (x) intercompany Indebtedness between the Parent and its Subsidiaries and (y) any Preferred Units (as defined in the LLC Agreement)) and any Contingent Liability in respect of any of the foregoing.

"Total Leverage Ratio" means, as of the last day of any Fiscal Quarter, the ratio of

(a)     Total Debt outstanding on the last day of such Fiscal Quarter

to

(b)     EBITDA computed for the period consisting of such Fiscal Quarter and each of the three immediately preceding Fiscal Quarters.

"Trademark Security Agreement" means any Trademark Security Agreement executed and delivered by any Obligor substantially in the form of Exhibit B to the Security Agreement, as amended, supplemented, amended and restated or otherwise modified from time to time.

"Transactions" means, collectively, (a) the consummation of the Plan and the other transactions contemplated by the Plan to be consummated on the Closing Date (including, without limitation, transactions contemplated by the Asset Purchase Agreement), (b) the entering into by the Obligors of the Loan Documents and the First Lien Loan Documents to which they are intended to be a party, and the Exchange of Loans on the Closing Date, (c) the issuance of the Class A Common Units, Class B Common Units and the Preferred Units (each as defined in, and pursuant to, the LLC Agreement), (d) the satisfaction of all Indebtedness required to be paid pursuant to the Plan, (e) the payment of the fees and expenses incurred in connection with the consummation of the foregoing that are required to be paid on the Closing Date and (f) any payments made pursuant to the PBGC Settlement.

"Transaction Documents" means, collectively, the Loan Documents, the First Lien Loan Documents, the Plan, the Asset Purchase Agreement, the LLC Agreement, the Management Agreements and each other document delivered in connection therewith, whether or not specifically mentioned herein or therein, in each case as amended, supplemented, amended and restated or otherwise modified from time to time.

"<u>Treasury Rate</u>" means, at any date, the yield to maturity as of such date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to such date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from such date to the date which is the second anniversary of the Closing Date.

"<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in the State of New York; <u>provided</u> that, if, with respect to any Filing Statement or by reason of any provisions of law, the perfection or the effect of perfection or non-perfection of the security interests granted to the Administrative Agent pursuant to the applicable Loan Document is governed by the Uniform Commercial Code as in effect in a jurisdiction of the United States other than New York, then "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions of each Loan Document and any Filing Statement relating to such perfection or effect of perfection or non-perfection.

"<u>United States</u>" or "<u>U.S.</u>" means the United States of America, its fifty states and the District of Columbia.

"<u>Unrestricted</u>" means, when referring to cash and Cash Equivalent Investments of the Borrower and its Subsidiaries, that such cash and Cash Equivalent Investments (i) do not appear (and are not required to appear) as "restricted" on a balance sheet of the Borrower and its Subsidiaries (unless the restrictions causing such appearance or required appearance are solely pursuant to the Loan Documents); (ii) are not subject to any Lien of any Person other than Liens permitted under <u>clauses (a)</u>, <u>(e)</u>, <u>(g)</u>, <u>(i)</u>, <u>(j)</u>, <u>(m)</u>, and <u>(p)</u> of <u>Section 7.2.3</u>; and (iii) are otherwise generally available for use by the Borrower and its Subsidiaries.

"<u>U.S. Subsidiary</u>" means any Subsidiary that is incorporated or organized under the laws of the United States, a state thereof or the District of Columbia, and that is not a Foreign Subsidiary.

"<u>Voting Securities</u>" means, with respect to any Person, Capital Securities of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person.

"<u>wholly owned Subsidiary</u>" means any Subsidiary all of the outstanding Capital Securities of which (other than any director's qualifying shares or investments by foreign nationals mandated by applicable laws) is owned directly or indirectly by the Borrower.

"<u>Working Capital</u>" means (without duplication), at any date of determination, the difference of (a) consolidated current assets of the Parent and its Subsidiaries on such date in the nature of ordinary course trade accounts receivable, inventory and similar current assets, <u>less</u> (b) consolidated current liabilities of the Parent and its Subsidiaries on such date in the nature of ordinary course trade accounts payable and similar current liabilities, but excluding, without limitation, the current portion of Total Debt to the extent included in the computation of current liabilities.

SECTION 1.2 <u>Use of Defined Terms</u>.  Unless otherwise defined or the context otherwise requires, terms for which meanings are provided in this Agreement shall have such meanings when used in each other Loan Document and the Disclosure Schedule.

SECTION 1.3 <u>Cross-References</u>.  Unless otherwise specified, references in a Loan Document to any Article or Section are references to such Article or Section of such Loan Document, and references in any Article, Section or definition to any clause are references to such clause of such Article, Section or definition.

SECTION 1.4 <u>Accounting and Financial Determinations</u>.

(a)    Unless otherwise specified, all accounting terms used in each Loan Document shall be interpreted, and all accounting determinations and computations thereunder (including under <u>Section 7.2.4</u> and the definitions used in such calculations) shall be made, in accordance with those generally accepted accounting principles in effect in the United States ("<u>GAAP</u>").  Unless otherwise expressly provided, all financial covenants and defined financial terms shall be computed on a consolidated basis for the Parent and its Subsidiaries (and, to the extent applicable and unless otherwise specified, any predecessor company), in each case without duplication.

(b)    As of any date of determination, for purposes of determining EBITDA or the Interest Coverage Ratio or Total Leverage Ratio (and any financial calculations required to be made or included within such calculations or ratios, or required for purposes of preparing any Compliance Certificate to be delivered pursuant to the definition of "Permitted Acquisition"), the calculation of such ratios and other financial calculations shall include or exclude, as the case may be, the effect of any assets or businesses that have been acquired pursuant to any Permitted Acquisition or Disposed of by the Borrower or any of its Subsidiaries pursuant to the terms hereof (including through mergers or consolidations), as of such date of determination, as determined by the Borrower on a <u>pro forma</u> basis in accordance with GAAP, which determination may include one-time adjustments or reductions in costs, if any, directly attributable to any such permitted Disposition or Permitted Acquisition, as the case may be, in each case (i) calculated in accordance with Regulation S-X of the Securities Act of 1933, as amended from time to time, and any successor statute, for the period of four Fiscal Quarters ended on or immediately prior to the date of determination of any such ratios or other financial calculations (and giving effect to any <u>reasonable</u> cost-savings or adjustments <u>prepared in good faith by the Borrower</u> relating to synergies resulting from any Permitted Acquisition) and (ii) giving effect to any such Permitted Acquisition or permitted Disposition as if it had occurred on the first day of such period of four Fiscal Quarters.

ARTICLE II
LOANS, CLOSING RATE AND NOTES

SECTION 2.1 <u>Loans</u>.  Each of the parties hereto acknowledges and agrees that on the Closing Date (which shall be a Business Day), the Exchange of Loans shall occur, pursuant to which each Term A Lender and Term B Lender will be deemed to have made Term A Loans and Term B Loans to the Borrower under this Agreement (the Loans referred to in this <u>Section 2.1</u> relative to each such Lender, its "<u>Loans</u>"), with the principal amount of each Loan as of the

Closing Date being the amount, and in the Lender's Percentage, in each case set forth opposite the name of such Lender on <u>Schedule II</u> hereto.  Each of the Lenders on the Closing Date, by operation of the Plan and the Confirmation Order, shall be deemed to have agreed to, and shall be bound by, the terms and conditions hereof, without any further action or consent on the part of such Lender.  No amounts paid or prepaid with respect to the Loans may be reborrowed.

SECTION 2.2 <u>Term A-Prime Loans</u>.

SECTION 2.2.1  <u>Requests for Term A-Prime Loans Commitments</u>.  Upon notice to the Administrative Agent (whereupon the Administrative Agent shall promptly deliver a copy of such notice to each of the Lenders), at any time from time to time after the Closing Date, the Borrower may request commitments for Term A-Prime Loans in an aggregate amount to be determined from one or more Term A-Prime Lenders (which may include any existing Lender) willing to provide such commitments for Term A-Prime Loans in their own discretion.  Such notice shall set forth (i) the amount of the Term A-Prime Loans being requested and (ii) the date on which commitments for such Term A-Prime Loans are requested to become effective.  At the time of the sending of such notice, the Borrower shall specify the time period within which each Lender is requested to respond (which shall in no event be less than ten Business Days from the date of delivery of such notice to the Lenders).  No Lender shall be obligated to provide any Term A-Prime Loans unless it so agrees.  Each Lender shall notify the Administrative Agent within such time period whether or not it agrees to provide any Term A-Prime Loans and, if so, whether by an amount equal to, greater than, or less than its Percentage of such requested increase (which shall be calculated on the basis of the pro rata amount of the Loans held by each Lender).  Any Lender not responding within such time period shall be deemed to have declined to provide any Term A-Prime Loans.  The Administrative Agent shall notify the Borrower of the Lenders' responses to each request made hereunder.  If, within ten Business Days after providing the notice pursuant to this <u>Section 2.2.1</u>, the existing Lenders do not provide sufficient commitments to achieve the full amount of a requested increase, the Borrower may invite additional Eligible Assignees to become Term A-Prime Lenders pursuant to an accession agreement in form and substance reasonably satisfactory to the Administrative Agent.

SECTION 2.2.2  <u>Ranking and Other Provisions</u>.  The Term A-Prime Loans:

(a)      shall have a maturity date and conversion features, be subject to such amortization and bear interest at such rate or rates, which may be payable in cash or through capitalization of interest, and be subject to such call protection or premiums upon payment thereof, in each case, as shall be agreed between the Borrower and the Persons providing the Term A-Prime Loans; and

(b)      shall otherwise, except as otherwise provided herein, have the same terms as the other Loans hereunder.

SECTION 2.2.3  <u>Term A-Prime Amendment</u>.  Commitments in respect of Term A-Prime Loans shall become commitments under this Agreement pursuant to an amendment (the "<u>Term A-Prime Amendment</u>") to this Agreement and, as appropriate, the other Loan Documents, executed by the Borrower, the Term A-Prime Lenders and the Administrative Agent.  The Term A-Prime Amendment may, without the consent of any other Lenders, effect such amendments to

any Loan Documents as may be necessary or appropriate, in the opinion of the Administrative Agent, to effect the provisions of this Section 2.2.

SECTION 2.2.4  Effective Date and Allocations.  If any Term A-Prime Loans are added in accordance with this Section 2.2, the Administrative Agent and the Borrower shall determine the effective date (the "Term A-Prime Effective Date") and the final allocation of such addition. The Administrative Agent shall promptly notify the Borrower and the Lenders of the final allocation of such addition and the Term A-Prime Effective Date.

SECTION 2.2.5  Conditions to Effectiveness to Increase.  The effectiveness of the Term A-Prime Amendment shall, unless otherwise agreed to by the Administrative Agent, be subject to the satisfaction on the date thereof (the "Term A-Prime Closing Date") of each of the following conditions:

(a)  the Administrative Agent shall have received on or prior to the Term A-Prime Effective Date each of the following, with each dated the Term A-Prime Effective Date unless otherwise indicated or agreed to by the Administrative Agent and each in form and substance reasonably satisfactory to the Administrative Agent and the Borrower:  (i) the applicable Term A-Prime Amendment and (ii) certified copies of resolutions of the managing body of the Parent, the Borrower and its Subsidiaries approving the execution, delivery and performance of the Term A-Prime Amendment;

(b)  (i) the conditions precedent set forth in Article V shall have been satisfied both before and after giving effect to such Term A-Prime Amendment and the Term A-Prime Loans provided thereby and (ii) such Term A-Prime Loans shall be made on the terms and conditions provided for above; and

(c)  there shall have been paid to the Administrative Agent, for the account of the Administrative Agent and the Lenders (including any Person becoming a Lender as part of such Term A-Prime Amendment on the related Term A-Prime Effective Date), as applicable, all fees and expenses (including reasonable out-of-pocket fees, charges and disbursements of counsel) that are due and payable on or before the Term A-Prime Effective Date.

SECTION 2.2.6  Effect of Term A-Prime Amendment.  On the Term A-Prime Effective Date, each Lender or Eligible Assignee which is providing Term A-Prime Loans shall become a "Lender" for all purposes of this Agreement and the other Loan Documents.

SECTION 2.3 Register; Notes.  The Register shall be maintained on the following terms.

(a)  The Borrower hereby designates the Administrative Agent to serve as the Borrower's agent, solely for the purpose of this clause, to maintain a register (the "Register") on which the Administrative Agent will record the Term A-Prime Loans (if any), the Term A Loans and the Term B Loans held by each Lender (and SPC), the capitalization of interest accruing to each Lender (and SPC) in respect of such Lender's (and SPC's) Term A-Prime Loans (if any), Term A Loans and Term B Loans, each repayment in respect of the principal amount of any Loans, and each assignment or transfer of an interest in any Loan made pursuant to Section 10.11, annexed to which the Administrative Agent shall retain a copy of each Lender Assignment Agreement delivered to the Administrative Agent pursuant to Section 10.11.  Failure

to make any recordation, or any error in such recordation, shall not affect the amount of any Obligor's Obligations.  The entries in the Register shall be conclusive and binding in the absence of manifest error, and the Borrower, the Administrative Agent, and the Lenders (including any SPC) shall treat each Person in whose name a Loan is registered as the owner thereof for the purposes of all Loan Documents, notwithstanding notice or any provision herein to the contrary.  Any assignment or transfer of the Loans made pursuant hereto shall be registered in the Register only upon delivery to the Administrative Agent of a Lender Assignment Agreement that has been executed by the requisite parties pursuant to <u>Section 10.11</u>.  No assignment or transfer of a Lender's (or SPC's) Loans shall be effective unless such assignment or transfer shall have been recorded in the Register by the Administrative Agent as provided in this Section.

(b)    The<u>Upon the request of any Lender made through the Administrative Agent, the</u> Borrower shall execute and deliver to each Lender a Note evidencing each of the Term A-Prime (if any), Term A, and Terms B Loans held by, and payable to the order of, such Lender in a maximum principal amount equal to the amount of such Term A-Prime (if any), Term A, and Terms B Loans when made.  The Borrower hereby irrevocably authorizes each Lender to make (or cause to be made) appropriate notations on the grid attached to such Lender's Note (or on any continuation of such grid), which notations, if made, shall evidence, <u>inter alia</u>, the date of, the outstanding principal amount of, and the interest rate applicable to the Loans evidenced thereby.  Such notations shall, to the extent not inconsistent with notations made by the Administrative Agent in the Register, be conclusive and binding on each Obligor absent manifest error; <u>provided</u> that, the failure of any Lender to make any such notations shall not limit or otherwise affect any Obligations of any Obligor.

## ARTICLE III
## REPAYMENTS, PREPAYMENTS, INTEREST AND FEES

SECTION 3.1 <u>Repayments and Prepayments; Application</u>.  The Borrower agrees that the Loans shall be repaid and prepaid pursuant to the following terms.

SECTION 3.1.1  <u>Repayments and Prepayments</u>.  The Borrower shall repay in full the unpaid principal amount of each Loan on the Stated Maturity Date.  Prior thereto, payments and prepayments of the Loans shall or may be made as set forth below.

(a)    From time to time on any Business Day occurring after the First Lien Termination Date, the Borrower may make a voluntary prepayment, in whole or in part, of the outstanding principal amount of any Loans; <u>provided</u> that,

(i)    all such voluntary prepayments shall require at least the same Business Day's prior notice (such notice to be delivered before noon on such day), and not more than five Business Days' prior irrevocable notice to the Administrative Agent (which notice may be telephonic so long as such notice is confirmed in writing within 24 hours thereafter and such notice to be delivered before noon New York time on such day).  Each notice of prepayment sent pursuant to this clause shall specify the prepayment date, the principal amount of each Loan (or portion thereof) to be prepaid and the scheduled installment or installments of principal to which such prepayment is to be applied.  Each such notice shall be irrevocable and shall commit the Borrower to

prepay such Loan (or portion thereof) by the amount stated therein on the date stated therein; provided that a notice of prepayment may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied;

(ii)     all such voluntary partial prepayments shall be in an aggregate minimum amount of $500,000 and an integral multiple of $100,000;

(iii)     no prepayments of the Term A Loans or the Term B Loans shall be made at any time any Term A-Prime Loans shall be outstanding, and no prepayments of the Term B Loans shall be made at any time any Term A Loans shall be outstanding;

(iv)     all prepayments of Term A Loans and Term B Loans under this clause (a) shall be accompanied by (a) all accrued and unpaid interest on the principal amount of the Loans to be prepaid to but excluding the date of payment, plus (b) the payment of a prepayment premium equal to, (i) in the case of any prepayment made prior to the second anniversary of the Closing Date, the Make-Whole Premium, (ii) in the case of any prepayment made on or after the second anniversary of the Closing Date but prior to the third anniversary of the Closing Date, a premium equal to 7.50% of the principal amount of the Loans being prepaid, and (iii) in the case of any prepayment made on or after the third anniversary of the Closing Date but prior to the fourth anniversary of the Closing Date, a premium equal to 3.75% of the principal amount of the Loans being prepaid.

(b)     On the Stated Maturity Date, the Borrower shall repay the outstanding principal amount of all Loans.

(c)     To the extent permitted by the First Lien Credit Agreement and after repayment in full of allthe First Lien LoansTermination Date, the Borrower shall (subject to the next proviso), within five (5) Business Days of receipt of any Net Casualty Proceeds or any Net Disposition Proceeds by the Borrower or any of its Subsidiaries, deliver to the Administrative Agent a calculation of the amount of such proceeds, and, to the extent the aggregate amount of such proceeds received by the Borrower and its Subsidiaries exceeds $1,000,000 for any single transaction or a series of related transactions, the Borrower shall make a mandatory prepayment of the Loans in an amount equal to 100% of such Net Casualty Proceeds or Net Disposition Proceeds, as applicable; provided that upon written notice by the Borrower to the Administrative Agent not more than five (5) Business Days following receipt of any Net Casualty Proceeds or Net Disposition Proceeds, as applicable (so long as no Default has occurred and is continuing), such proceeds may be retained by the Borrower and its Subsidiaries (and may be excluded from the prepayment requirements of this clause) if (i) the Borrower informs the Administrative Agent in such notice of its good faith intention to apply (or cause one or more of the Subsidiary Guarantors to apply) such Net Casualty Proceeds or Net Disposition Proceeds, as applicable, to the acquisition of other assets or properties in the U.S. consistent with the businesses permitted to be conducted pursuant to Section 7.2.1 (including by way of merger or Investment), and (ii) within 365 days following the receipt of such Net Casualty Proceeds or such Net Disposition Proceeds, as applicable, such proceeds are applied or committed to such acquisition.  The

amount of such Net Casualty Proceeds or such Net Disposition Proceeds, as applicable, unused or uncommitted after such 365 day period (subject to the extension set forth above) shall be applied to prepay the Loans as set forth in <u>Section 3.1.2</u>.

(d)     To the extent permitted by the First Lien Credit Agreement and after ~~repayment in full of all~~<u>the</u> First Lien ~~Loans~~<u>Termination Date</u>, within 120 days after the close of each Fiscal Year (beginning with the close of the 2011 Fiscal Year) the Borrower shall make a mandatory prepayment of the Loans in an amount equal to (i) 50% of Excess Cash Flow (if any) for such Fiscal Year, <u>minus</u> (ii) the aggregate amount of all optional prepayments of the Loans (without duplication) made since the beginning of such Fiscal Year through the date on which the prepayment of the Loans pursuant to this clause (d) is made (including any call premiums paid in cash upon repayment of such Indebtedness).

(e)     To the extent permitted by the First Lien Credit Agreement and after ~~repayment in full of all~~<u>the</u> First Lien ~~Loans~~<u>Termination Date</u>, the Borrower shall, within five (5) Business Days of receipt of any Net Debt Proceeds, by the Borrower or any of its Subsidiaries, make a mandatory prepayment of the Loans in an amount equal to 100% of the aggregate Net Debt Proceeds.

(f)     Immediately upon any acceleration of the Stated Maturity Date of any Loans pursuant to <u>Section 8.2</u> or <u>Section 8.3</u>, the Borrower shall repay all the Loans, unless, pursuant to <u>Section 8.3</u>, only a portion of all the Loans is so accelerated (in which case the portion so accelerated shall be so repaid).

(g)     Each prepayment made pursuant to <u>clauses (c), (d)</u> and <u>(e)</u> of this <u>Section 3.1.1</u> shall be applied <u>first</u>, to the outstanding principal amount of the Term A-Prime Loans (if any), and <u>second</u>, to the extent the amount of such prepayment exceeds the outstanding principal amount of the Term A-Prime Loans, or to the extent no Term A-Prime Loans are outstanding, to the ratable principal amount of the Term A Loans, and <u>third</u>, to the extent the amount of such prepayment exceeds the outstanding principal amount of the Term A Loans, to the Term B Loans then outstanding.

Except as set forth in <u>clause (a)</u> above, each prepayment of any Loans made pursuant to this Section shall be without premium or penalty, except as may be required by <u>Section 4.4</u>.

SECTION 3.2  <u>Interest Provisions</u>.  Interest on the outstanding principal amount of the Loans shall accrue and be payable in accordance with the terms set forth below.

SECTION 3.2.1  <u>Rates</u>.  <u>(a)</u>  The Term A Loans and Term B Loans shall accrue interest on the principal amount thereof outstanding from time to time at a rate per annum equal to the sum of (i) the LIBO Rate from time to time in effect, <u>plus</u> (ii) 1.0%, <u>plus</u> (iii) the Base Margin, <u>plus</u> (iv) the Supplemental Margin, if any.  The portion of the interest accrued on the Loans attributable to clauses (i), (ii) and (iv) of the preceding sentence shall be paid on each Interest Payment Date by capitalizing such interest on such Loans and adding it to the then outstanding principal amount of the Loans.

(b)      The portion of the interest attributable to the Base Margin shall be paid on each Interest Payment Date by capitalizing such interest on such Loans and adding it to the then outstanding principal amount of the Loans; provided that :

(x)      with respect to any Interest Payment Date occurring prior to May 15, 2012 on which the Cash Interest Conditions are satisfied, interest due on such Interest Payment Date that accrued at the rate of 5.0% per annum shall be payable in cash and the remainder shall be capitalized and added to the then outstanding principal amount of the Loans, and

(y)      (i) with respect to any Interest Payment Date occurring on or after May 15, 2012 on which the Cash Interest Conditions are satisfied but (for any Interest Payment date occurring on or after May 15, 2012) the Additional Cash Interest Conditions are not satisfied, interest due on such Interest Payment Date that accrued at the rate of 5.0% per annum shall be payable in cash and the remainder shall be capitalized and added to the then outstanding principal amount of the Loans, plus in addition to clause (i),and (ii) with respect to any Interest Payment Date occurring on or after May 15, 2012 on which both the Cash Interest Conditions and the Additional Cash Interest Conditions are satisfied, (A) interest due on such Interest Payment Date that accrued at the rate of 5.0% per annum shall be payable in cash, plus (B) up to the amount of additional interest due on such Interest Payment Date that accrued at the rate of 6.0% per annum shall be payable in cash; provided that, with respect to this clause (iiB), if the condition specified in clause (a) of the definition of Additional Cash Interest Conditions is satisfied but the Fixed Charge Coverage Ratio (which shall include for this purpose, any interest payable under this clause (ii)B), after giving pro forma effect to the payment of interest in cash on such Interest Payment Date would be less than 2.00 to 1.00, the portion of interest payable in cash on such Interest Payment Date shall be limited to the amount that would not cause the Fixed Charge Coverage Ratio with respect to such Interest Payment Date to be less than 2.00 to 1.00, and the remainder shall be capitalized and added to the then outstanding principal amount of the Loans.

SECTION 3.2.2  Post-Default Rates.  After the date any Event of Default has occurred and for so long as such Event of Default is continuing, the Borrower shall pay, but only to the extent permitted by law, interest (after as well as before judgment) on all outstanding Obligations at a rate per annum equal to (a) in the case of principal on any Loan, subject to applicable law, the rate of interest that otherwise would be applicable to such Loan plus 2% per annum; and (b) in the case of overdue interest, fees, and other monetary Obligations, the LIBO Rate from time to time in effect, plus 14% per annum, plus a margin of 2% per annum.

SECTION 3.2.3  Payment Dates.  Interest accrued on each Loan shall be payable or capitalized in accordance with Sections 3.2.1 and 3.2.2, without duplication:

(a)      on the Stated Maturity Date;

(b)      except as set forth in clause (c) below, on the date of any payment or prepayment, in whole or in part, of principal outstanding on such Loan on the principal amount so paid or prepaid;

(c)      on each Interest Payment Date occurring after the Effective Date; and

(d)      on that portion of any Loans the Stated Maturity Date of which is accelerated pursuant to <u>Section 8.2</u> or <u>Section 8.3</u>, immediately upon such acceleration.

Interest accrued on Loans or other monetary Obligations after the date such amount is due and payable (whether on the Stated Maturity Date, upon acceleration or otherwise) shall be payable upon demand.

SECTION 3.3 <u>Administrative Agent's Fee</u>.  The Borrower agrees to pay to the Administrative Agent, for its own account, the fees and expenses (including documented, reasonable attorney's fees and expenses) in the amounts and on the dates set forth in the Fee Letter.

ARTICLE IV
CERTAIN LENDER PROVISIONS

SECTION 4.1 <u>Increased Capital Costs</u>.  If any change in, or the introduction, adoption, effectiveness, interpretation, reinterpretation or phase in of, any law or regulation, directive, guideline, decision or request (whether or not having the force of law) of any Governmental Authority affects or would affect the amount of capital required or expected to be maintained by any Secured Party or any Person controlling such Secured Party, and such Secured Party determines (in good faith but in its sole and absolute discretion) that the rate of return on its or such controlling Person's capital as a consequence of the Loans held by such Secured Party is reduced to a level below that which such Secured Party or such controlling Person could have achieved but for the occurrence of any such circumstance, then upon notice from time to time by such Secured Party to the Borrower, the Borrower shall within five days following receipt of such notice pay directly to such Secured Party additional amounts sufficient to compensate such Secured Party or such controlling Person for such reduction in rate of return.  A statement of such Secured Party as to any such additional amount or amounts shall, in the absence of manifest error, be conclusive and binding on the Borrower.  In determining such amount, such Secured Party may use any method of averaging and attribution that it (in its sole and absolute discretion) shall deem applicable.

SECTION 4.2 <u>Taxes</u>.  The Borrower covenants and agrees as follows with respect to Taxes.

(a)      Any and all payments by the Borrower and each other Obligor under each Loan Document shall be made without setoff, counterclaim or other defense, and free and clear of, and without deduction or withholding for or on account of, any Taxes except to the extent that deduction or withholding of such Taxes is required by applicable law.  In the event that any such Taxes are required by applicable law to be deducted or withheld from any payment required to be made to or on behalf of any Secured Party under any Loan Document, then:

(i)      subject to <u>clause (f)</u>, if such Taxes are Non-Excluded Taxes or Other Taxes, the Borrower and each Obligor shall increase the amount of such payment so that each Secured Party receives an amount equal to the amount it would have received had no such deduction or withholding been made; and

(ii)    the Borrower or the Administrative Agent (as applicable) shall withhold the full amount of such Taxes from such payment (as increased pursuant to clause (a)(i)) and shall pay such amount to the Governmental Authority imposing such Taxes in accordance with applicable law.

(b)    In addition, the Borrower shall pay all Other Taxes imposed to the relevant Governmental Authority imposing such Other Taxes in accordance with applicable law.

(c)    The Borrower shall furnish to the Administrative Agent, within 45 days of any such payment being due under applicable law, an official receipt (or a certified copy thereof) or other proof of payment satisfactory to the Administrative Agent, acting reasonably, evidencing the payment of such Taxes or Other Taxes.  The Administrative Agent shall make copies thereof available to any Lender upon request therefor.

(d)    Subject to clause (f), the Borrower shall indemnify each Secured Party for any Non-Excluded Taxes and Other Taxes (including Non-Excluded Taxes and Other Taxes imposed or asserted on, or attributable to, amounts payable under this Section 4.6) paid by such Secured Party, whether or not such Non-Excluded Taxes or Other Taxes were correctly or legally asserted by the relevant Governmental Authority, provided that no Secured Party shall be entitled to receive any payment under this clause (d), unless such Secured Party or the Administrative Agent provides a written request for such payment to the Borrower within six months of the due date for the payment of the Non-Excluded Taxes or Other Taxes for which indemnification is sought.  With respect to the indemnification provided in the immediately preceding sentence, such indemnification shall be made within 30 days after the date such Secured Party makes written demand therefor.

(e)    Each Term A-Prime Lender and each Term A Lender making Loans to the Borrower, on or prior to the date on which such Lender becomes a Lender hereunder or under the Term A-Prime Amendment, as applicable (and from time to time thereafter upon the request of the Borrower or the Administrative Agent, but only for so long as such Lender is legally entitled to do so), shall deliver to the Borrower and the Administrative Agent either (i) two duly completed copies of either (x) Internal Revenue Service Form W-8BEN or W-8IMY claiming eligibility of a Non-U.S. Lender for benefits of an income tax treaty to which the United States is a party or (y) Internal Revenue Service Form W-8ECI, or in either case an applicable successor form; (ii) in the case of a Non-U.S. Lender that is not legally entitled to deliver either form listed in clause (e)(i), (x) a certificate to the effect that such Non-U.S. Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a controlled foreign corporation receiving interest from a related person within the meaning of Section 881(c)(3)(C) of the Code (referred to as an "Exemption Certificate") and (y) two duly completed copies of Internal Revenue Service Form W-8BEN or W-8IMY or applicable successor form, or (iii) in the case of a Lender that is not a Non-U.S. Lender, two duly completed copies of Internal Revenue Service form W-9 or applicable successor form, and  (iv) in the case of any Lender, such documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will permit payments by the Borrower and each other Obligor under any Loan Document to be made without withholding or at a reduced rate of withholding, or as is reasonably requested by the Borrower or the Administrative Agent to comply with FATCA.

Each Term B Lender shall provide two duly completed copies of Internal Revenue Service form W-9 or applicable successor form, such documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will permit payments by the Borrower and each other Obligor under any Loan Document to be made without withholding or at a reduced rate of withholding, or as is reasonably requested by the Borrower or the Administrative Agent shall to comply with FATCA.  The Administrative Agent shall deliver to the Borrower such IRS forms as are required to ensure that payments made to the Administrative Agent are not subject to withholding, but only for so long as the Administrative Agent is legally entitled to do so.  Each Lender agrees to promptly notify the Borrower and the Administrative Agent in writing of any change in circumstances which would modify or render invalid any claimed exemption or reduction.  In addition, each Lender shall timely deliver to the Borrower and the Administrative Agent two further copies of such Form W-8BEN, W-8IMY, W-8ECI or W-9 or successor forms on or before the date that any previously executed form expires or becomes obsolete, or after the occurrence of any event requiring a change in the most recent form delivered by such Person to the Borrower.

(f)     The Borrower shall not be obligated to pay any additional amounts to any Secured Party pursuant to clause (a)(i), or to indemnify any Secured Party pursuant to clause (d), in respect of United States federal withholding taxes to the extent imposed as a result of (i) the failure, inability or ineligibility of such Secured Party to deliver to the Borrower the form or forms and/or an Exemption Certificate, as applicable to such Secured Party, pursuant to clause (e), (ii) such form or forms and/or Exemption Certificate not establishing a complete exemption from U.S. federal withholding tax or the information or certifications made therein by the Secured Party being untrue or inaccurate on the date delivered in any material respect, or (iii) the Secured Party designating a successor lending office at which it maintains its Loans which has the effect of causing such Secured Party to become obligated for tax payments in excess of those in effect immediately prior to such designation; provided that, the Borrower shall be obligated to pay additional amounts to any such Secured Party pursuant to clause (a)(i), and to indemnify any such Secured Party pursuant to clause (d), in respect of United States federal withholding taxes if (i) any such failure to deliver a form or forms or an Exemption Certificate or the failure of such form or forms or Exemption Certificate to establish a complete exemption from U.S. federal withholding tax resulted from a change in any applicable statute, treaty, regulation or other applicable law or any official interpretation of any of the foregoing occurring after the Closing Date (or in the case of an Assignee Lender, after the date of the assignment, except to the extent that the applicable assigning lender was entitled to receive additional amounts with respect to such payment), which change rendered such Secured Party no longer legally entitled to deliver such form or forms or Exemption Certificate or otherwise ineligible for a complete exemption from U.S. federal withholding tax, (ii) the redesignation of the Secured Party's lending office was made at the request of the Borrower or (iii) the obligation to pay any additional amounts to any such Secured Party pursuant to clause (a)(i) or to indemnify any such Secured Party pursuant to clause (d) is with respect to an Assignee Lender that becomes an Assignee Lender as a result of an assignment made at the request of the Borrower.

(g)     In the event that any Lender or the Administrative Agent determines in its sole discretion that it has received a refund or a credit in respect of Taxes or Other Taxes as to which it has been paid additional amounts by the Borrower pursuant to clause (a) or indemnified by the Borrower pursuant to clause (d) and such Lender or the Administrative Agent, as

applicable, determines in its good faith judgment that such refund is attributable to such additional amounts or indemnification, then such Lender or Administrative Agent shall promptly notify the Administrative Agent and the Borrower, shall use reasonable efforts to apply for such refund or credit and shall within 30 Business Days of receipt of such refund or application of such credit remit to the Borrower an amount as such Lender or Administrative Agent reasonably determines to be the proportion of the refunded or credited amount as will leave it, after such remittance, in no better or worse position than it would have been if the Taxes or Other Taxes had not been imposed and the corresponding additional amounts or indemnification payment not been made.  Neither the Lenders nor the Administrative Agent shall be obligated to disclose information regarding its tax affairs or computations to the Borrower in connection with this clause (g) or any other provision of this Section that such Lender or the Administrative Agent reasonably deems confidential.

SECTION 4.3 Payments; Proceeds.Payments and Computations.  Unless otherwise expressly provided in a Loan Document, all payments by the Borrower pursuant to each Loan Document shall be made by the Borrower to the Administrative Agent for the pro rata account of the Secured Parties entitled to receive such payment.  All payments shall be made without setoff, deduction or counterclaim not later than 11:00 a.m. New York time on the date due in same day or immediately available funds to such account as the Administrative Agent shall specify from time to time by notice to the Borrower.  Funds received after that time shall be deemed to have been received by the Administrative Agent on the next succeeding Business Day.  The Administrative Agent shall promptly remit in same day funds to each Secured Party its share, if any, of such payments received by the Administrative Agent for the account of such Secured Party.  All interest and fees shall be computed on the basis of the actual number of days (including the first day but excluding the last day) occurring during the period for which such interest or fee is payable over a year comprised of 360 days.  Payments due on other than a Business Day shall be made on the next succeeding Business Day and such extension of time shall be included in computing interest and fees in connection with that payment.

SECTION 4.3.2  Proceeds of Collateral and Order of Payments upon Event of Default. After the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and upon direction from the Required Lenders, shall, apply all amounts received under the Loan Documents (including from the proceeds of collateral securing the Obligations) or under applicable law; provided that (a) before the First Lien Termination Date, notwithstanding any direction from the Required Lenders, the Administrative Agent shall apply all such proceeds as required by the Intercreditor Agreement, and (b) after the First Lien Termination Date, theysuch proceeds shall be applied upon receipt to the Obligations as follows: (i) first, to the payment of all Obligations in respect of fees, expense reimbursements, indemnities and other amounts owing to the Administrative Agent, in its capacity as the Administrative Agent (including the fees and expenses of counsel to the Administrative Agent), (ii) second, after payment in full in cash of the amounts specified in clause (b)(i), to the ratable payment of all interest (including interest accruing (or which would accrue) after the commencement of a proceeding in bankruptcy, insolvency or similar law, whether or not permitted as a claim under such law) and fees owing to the Term A-Prime Lenders under the Loan Documents, and all costs and expenses owing to the Term A-Prime Lenders pursuant to the terms of the Loan Documents, until paid in full in cash, (iii) third, after payment in full in cash of the amounts specified in clauses (i) and (ii), to the ratable payment of the principal amount of the

Term A-Prime Loans then outstanding (if any), (iv) <u>fourth</u>, after payment in full in cash of the amounts specified in <u>clauses (i)</u> through <u>(iii)</u>, to the ratable payment of all interest (including interest accruing (or which would accrue) after the commencement of a proceeding in bankruptcy, insolvency or similar law, whether or not permitted as a claim under such law) and fees owing to the Term A Lenders under the Loan Documents, and all costs and expenses owing to the Term A Lenders pursuant to the terms of the Loan Documents, until paid in full in cash, (v) <u>fifth</u>, after payment in full in cash of the amounts specified in <u>clauses (i)</u> through <u>(iv)</u>, to the ratable payment of the principal amount of the Term A Loans then outstanding, (vi) <u>sixth</u>, after payment in full in cash of the amounts specified in <u>clauses (i)</u> through <u>(v)</u>, to the ratable payment of all interest (including interest accruing (or which would accrue) after the commencement of a proceeding in bankruptcy, insolvency or similar law, whether or not permitted as a claim under such law) and fees owing to the Term B Lenders under the Loan Documents, and all costs and expenses owing to the Term B Lenders pursuant to the terms of the Loan Documents, until paid in full in cash, (vii) <u>seventh</u>, after payment in full in cash of the amounts specified in <u>clauses (i)</u> through <u>(vi)</u>, to the ratable payment of the principal amount of the Term B Loans then outstanding, (viii) <u>eighth</u>, after payment in full in cash of the amounts specified in <u>clauses (i)</u> through <u>(vii)</u>, to the ratable payment of all other Obligations owing to the Secured Parties with respect to the Term A-Prime Loans, (ix) <u>ninth</u>, after payment in full in cash of the amounts specified in <u>clauses (i)</u> through <u>(viii)</u>, to the ratable payment of all other Obligations owing to the Secured Parties with respect to the Term A Loans, (x) <u>tenth</u>, after payment in full in cash of the amounts specified in <u>clauses (i)</u> through <u>(ix)</u>, to the ratable payment of all other Obligations owing to the Secured Parties with respect to the Term B Loans, and (xi) <u>eleventh</u>, after payment in full in cash of the amounts specified in <u>clauses (i)</u> through <u>(x)</u>, and following the Termination Date, to each applicable Obligor or any other Person lawfully entitled to receive such surplus.

SECTION 4.4 <u>Sharing of Payments</u>. If any Secured Party shall obtain any payment or other recovery (whether voluntary, involuntary, by application of setoff or otherwise) on account of any Loan (other than pursuant to the terms of <u>Sections 4.3</u>, <u>4.4</u>, <u>4.5</u> or <u>4.6</u>) in excess of its pro rata share of payments obtained by all Secured Parties of the same class, such Secured Party shall purchase for cash at face value from the other Secured Parties of such class such participations in Loans held by them as shall be necessary to cause such purchasing Secured Party to share the excess payment or other recovery ratably (to the extent such other Secured Parties were entitled to receive a portion of such payment or recovery) with each of them; <u>provided</u> that, if all or any portion of the excess payment or other recovery is thereafter recovered from such purchasing Secured Party, the purchase shall be rescinded and each Secured Party which has sold a participation to the purchasing Secured Party shall repay to the purchasing Secured Party the purchase price to the ratable extent of such recovery together with an amount equal to such selling Secured Party's ratable share (according to the proportion of (a) the amount of such selling Secured Party's required repayment to the purchasing Secured Party to (b) total amount so recovered from the purchasing Secured Party) of any interest or other amount paid or payable by the purchasing Secured Party in respect of the total amount so recovered. The Borrower agrees that any Secured Party purchasing a participation from another Secured Party pursuant to this Section may, to the fullest extent permitted by law, exercise all its rights of payment (including pursuant to <u>Section 4.9</u>) with respect to such participation as fully as if such Secured Party were the direct creditor of the Borrower in the amount of such participation. If under any applicable bankruptcy, insolvency or other similar law any Secured Party receives a secured claim in lieu of a setoff to which this Section applies, such Secured

Party shall, to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights of the Secured Parties entitled under this Section to share in the benefits of any recovery on such secured claim.

SECTION 4.5 Setoff. Each Secured Party shall, upon the occurrence and during the continuance of any Event of Default described in clauses (b) through (d) of Section 8.1.7 or, with the consent of the Required Lenders, upon the occurrence and during the continuance of any other Event of Default, have the right to appropriate and apply to the payment of the Obligations owing to it (whether or not then due), and (as security for such Obligations) the Borrower hereby grants to each Secured Party a continuing security interest in, any and all balances, credits, deposits, accounts or moneys of the Borrower then or thereafter maintained with such Secured Party; provided that, any such appropriation and application shall be subject to the provisions of Section 4.8. Each Secured Party agrees promptly to notify the Borrower and the Administrative Agent in writing after any such appropriation and application made by such Secured Party; provided that, the failure to give such notice shall not affect the validity of such setoff and application. The rights of each Secured Party under this Section are in addition to other rights and remedies (including other rights of setoff under applicable law or otherwise) which such Secured Party may have.

SECTION 4.6 Replacement of Lenders. If any Lender (an "Affected Lender") (a) fails to consent to an election, consent, amendment, waiver or other modification to this Agreement or other Loan Document that requires the consent of a greater percentage of the Lenders than the Required Lenders and such election, consent, amendment, waiver or other modification is otherwise consented to by the Required Lenders or (b) makes a demand upon the Borrower for (or if the Borrower is otherwise required to pay) amounts pursuant to Section 4.3, 4.5 or 4.6 (and the payment of such amounts is, and is likely to continue to be, materially more onerous in the reasonable judgment of the Borrower than with respect to the other Lender), the Borrower or the Administrative Agent may, within 30 days of receipt by the Borrower of such demand or notice, as the case may be, give notice (a "Replacement Notice") in writing to the Administrative Agent and such Affected Lender of its intention to cause such Affected Lender to sell all or any portion of its Loans and/or Notes to an Eligible Assignee (a "Replacement Lender") designated in such Replacement Notice; provided, however, that no Replacement Notice may be given by the Borrower if (i) such replacement conflicts with any applicable law or regulation, (ii) any Event of Default shall have occurred and be continuing at the time of such replacement or (iii) prior to any such replacement, such Lender shall have taken any necessary action under Section 4.5 or 4.6 (if applicable) which shall have eliminated the continued need for payment of amounts owing pursuant to Section 4.5 or 4.6. If the Administrative Agent shall, in the exercise of its reasonable discretion and within 30 days of its receipt of such Replacement Notice, notify the Borrower and such Affected Lender in writing that the Replacement Lender is satisfactory to the Administrative Agent (such consent not being required where the Replacement Lender is already a Lender or an Affiliate of a Lender), then such Affected Lender shall, subject to the payment of any amounts due pursuant to Section 4.4, assign, in accordance with Section 10.11, the portion of its Loans, Notes (if any), and other rights and obligations under this Agreement and all other Loan Documents designated in the replacement notice to such Replacement Lender; provided, however, that (i) such assignment shall be without recourse, representation or warranty and shall be on terms and conditions reasonably satisfactory to such Affected Lender and such Replacement Lender, (ii) the purchase price paid by such Replacement Lender shall be in the

amount of such Affected Lender's Loans designated in the Replacement Notice, together with all accrued and unpaid interest and fees in respect thereof, plus all other amounts (including the amounts demanded and unreimbursed under Sections 4.3, 4.5 and 4.6) and including any call premiums owing to such Affected Lender hereunder and (iii) the Borrower shall pay to the Affected Lender and the Administrative Agent all reasonable out-of-pocket expenses incurred by the Affected Lender and the Administrative Agent in connection with such assignment and assumption (including the processing fees described in Section 10.11).  Upon the effective date of an assignment described above, the Replacement Lender shall become a "Lender" for all purposes under the Loan Documents.  Each assignment pursuant to this Section 4.10 shall be effective upon the satisfaction of the conditions specified in this Section 4.10 without further action on the part of the applicable Affected Lender.

ARTICLE V
CONDITIONS TO EXCHANGE OF LOANS

The obligations of the Lenders pursuant to the Exchange of Loans shall be subject to the prior or concurrent satisfaction (or waiver in accordance with Section 10.1; provided that the conditions in Sections 5.2 and 5.3 may not be waived) of each of the conditions precedent set forth in this Article.

SECTION 5.1 Resolutions, etc.  The Administrative Agent shall have received from each Obligor, as applicable, (i) a copy of a good standing certificate, dated a date reasonably close to the Closing Date, for each such Person and (ii) a certificate, dated as of the Closing Date, duly executed and delivered by such Person's Secretary or Assistant Secretary, managing member or general partner, as applicable, as to

(a)     resolutions of each such Person's Board of Directors (or other managing body, in the case of other than a corporation) then in full force and effect authorizing, to the extent relevant, all aspects of the Transactions applicable to such Person and the execution, delivery and performance of each Loan Document to be executed by such Person and the transactions contemplated hereby and thereby;

(b)     the incumbency and signatures of those of its officers, managing member or general partner, as applicable, authorized to act with respect to each Loan Document to be executed by such Person; and

(c)     the full force and validity of each Organic Document of such Person and copies thereof;

upon which certificates each Secured Party may conclusively rely until it shall have received a further certificate of the Secretary, Assistant Secretary, managing member or general partner, as applicable, of any such Person canceling or amending the prior certificate of such Person.

SECTION 5.2 Entry of Confirmation Order and Consummation of Transactions.  The Administrative Agent shall have received evidence that:

(a)     No amendment or other modification of or to the Plan shall be filed or proposed since the date the Confirmation Order was originally entered which contains modifications materially adverse to the Administrative Agent.

(b)     The Bankruptcy Court shall have entered the Confirmation Order.

(c)     Concurrently with the closing of the credit facility provided hereby, the Plan (including the transfer of substantially all assets of the Bankruptcy Debtors pursuant to the Asset Purchase Agreement) shall have been substantially consummated (as defined in Section 1101 of the Bankruptcy Code) in accordance in all material respects with the terms of the Plan and the Confirmation Order.

SECTION 5.3 Delivery of Notes.  The Administrative Agent shall have received, for the account of each Lender that has requested a Note, such Lender's Note(s) duly executed and delivered by an Authorized Officer of the Borrower.

SECTION 5.4 Guarantees.  The Administrative Agent shall have received each Guaranty, dated as of the Closing Date, duly executed and delivered by an Authorized Officer of the Parent and each U.S. Subsidiary, as applicable.

SECTION 5.5 Security Agreements.  The Administrative Agent (or in the case of clause (a)(x), the First Lien Administrative Agent) shall have received executed counterparts of the Security Agreement, each dated as of the Closing Date, duly executed and delivered by the Parent, the Borrower and each U.S. Subsidiary (if any), together with:

(a)     (x) certificates (in the case of Capital Securities that are securities (as defined in the UCC)) evidencing all of the issued and outstanding capital Securities owned by each Obligor in its U.S. Subsidiaries and 65% (or, if less, such lesser amount owned by such Obligor) of the issued and outstanding Voting Securities of each Foreign Subsidiary (together with all the issued and outstanding non-voting Capital Securities of such Foreign Subsidiary) directly owned by each Obligor, which certificates in each case shall be accompanied by undated instruments of transfer duly executed in blank, or, if any Capital Securities (in the case of Capital Securities that are uncertificated securities (as defined in the UCC)), and (y) confirmation and evidence satisfactory to the Administrative Agent that the security interest therein has been transferred to and perfected by the First Lien Administrative Agent for the benefit of the Secured Parties in accordance with Articles 8 and 9 of the UCC and all laws otherwise applicable to the perfection of the pledge of such Capital Securities;

(b)     Filing Statements suitable in form for naming the Parent, the Borrower and each Subsidiary Guarantor as a debtor and the Administrative Agent as the secured party, or other similar instruments or documents to be filed under the UCC of all jurisdictions as may be necessary or, in the opinion of the Administrative Agent, desirable to perfect the security interests of the Administrative Agent pursuant to such Security Agreement;

(c)     UCC Form UCC-3 termination statements, if any, necessary to release all Liens and other rights of any Person (i) in any collateral described in any Security Agreement previously granted by any Person, and (ii) securing any of the Indebtedness identified in Item

5.5(c) of the Disclosure Schedule, together with such other UCC Form UCC-3 termination statements as the Administrative Agent may reasonably request from such Obligors; and

(d)     certified copies of UCC Requests for Information or Copies (Form UCC-11), or a similar search report certified by a party acceptable to the Administrative Agent, dated a date reasonably near the Closing Date, listing all effective financing statements which name any Obligor (under its present name and any previous names) as the debtor, together with copies of such financing statements (none of which shall, except with respect to Liens permitted by Section ~~7.2.3.~~7.2.3), evidence a Lien on any collateral described in any Loan Document).

SECTION 5.6   Intellectual Property Security Agreements.  The Administrative Agent shall have received a Patent Security Agreement, a Copyright Security Agreement and a Trademark Security Agreement, as applicable, each dated as of the Closing Date, duly executed and delivered by each Obligor that, pursuant to a Security Agreement, is required to provide such intellectual property security agreements to the Administrative Agent.

SECTION 5.7 Filing Agent, etc.  All Uniform Commercial Code financing statements or other similar financing statements and Uniform Commercial Code (Form UCC-3) termination statements required pursuant to the Loan Documents (collectively, the "Filing Statements"), shall have been delivered to CT Corporation System or another similar filing service company acceptable to the Administrative Agent (the "Filing Agent").  The Filing Agent shall have acknowledged in a writing satisfactory to the Administrative Agent and its counsel (i) the Filing Agent's receipt of all Filing Statements, (ii) that the Filing Statements have either been submitted for filing in the appropriate filing offices or will be submitted for filing in the appropriate offices within ten days following the Closing Date and (iii) that the Filing Agent will notify the Administrative Agent and its counsel of the results of such submissions within 30 days following the Closing Date.

SECTION 5.8 Intercreditor Agreement.  The Administrative Agent shall have received the Intercreditor Agreement, dated as of the Closing Date, duly executed and delivered by the Administrative Agent, the administrative agent under the First Lien Credit Agreement and the Borrower.

SECTION 5.9 Patriot Act Disclosures.  The Administrative Agent and each Lender shall have received all Patriot Act Disclosures requested by them prior to execution of this Agreement.

SECTION 5.10     Compliance with Warranties, No Default, etc.  Both before and after giving effect to the Exchange of Loans the following statements shall be true and correct:

(a)     the representations and warranties set forth in each Loan Document shall, in each case, be true and correct in all material respects with the same effect as if then made (unless stated to relate solely to an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date); and

(b)     no Default shall have then occurred and be continuing.

ARTICLE VI
REPRESENTATIONS AND WARRANTIES

In order to induce the Secured Parties to enter into this Agreement the Borrower represents and warrants to each Secured Party on the Closing Date as set forth in this Article.

SECTION 6.1 Organization, etc.  Each Obligor is validly organized and existing and in good standing under the laws of the state or jurisdiction of its incorporation or organization, is duly qualified to do business and is in good standing as a foreign entity in each jurisdiction where the nature of its business requires such qualification, except for such jurisdictions where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect, and has full power and authority and holds all requisite governmental licenses, permits and other approvals to enter into and perform its Obligations under each Loan Document to which it is a party, to own and hold under lease its property and to conduct its business substantially as currently conducted by it, except for those licenses, permits or other approvals, the absence of which could not reasonably be expected to have a Material Adverse Effect.

SECTION 6.2 Due Authorization, Non-Contravention, Defaults etc.  The execution, delivery and performance by each Obligor of each Loan Document executed or to be executed by it, each Obligor's participation in the consummation of all aspects of the Transactions, and the execution, delivery and performance by the Borrower or (if applicable) any Obligor of the agreements executed and delivered by it in connection with the Transactions are in each case within such Person's powers, have been duly authorized by all necessary action, and do not

(a)    contravene any (i) Obligor's Organic Documents, (ii) court decree or order binding on or affecting any Obligor or (iii) law or governmental regulation binding on or affecting any Obligor; or

(b)    result in (i) or require the creation or imposition of, any Lien on any Obligor's properties (except as permitted by this Agreement), (ii) a default under any material contractual restriction binding on or affecting any Obligor or (iii) any noncompliance, suspension, impairment, forfeiture or nonrenewal of any material license, permit or other governmental approval.

No Obligor is in default under any agreement, instrument or undertaking to which it is a party or by which it or any of its property is bound which could reasonably be expected to have a Material Adverse Effect.  No Obligor is a party to any agreement or instrument or subject to any other obligation or any charter or corporate restriction or any provision of any applicable law, rule or regulation which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

SECTION 6.3 Government Approval, Regulation, etc.  No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or other Person (other than those that have been, or on the Effective Date will be, duly obtained or made and which are, or on the Effective Date will be, in full force and effect) is required for the consummation of the Transactions or the due execution, delivery or performance by any Obligor of any Loan Document to which it is a party, or for the due execution, delivery and/or

performance of Transaction Documents, in each case by the parties thereto or the consummation of the Transactions, other than pursuant to the Plan.  Neither the Borrower nor any of its Subsidiaries is an "investment company" within the meaning of the Investment Company Act of 1940, as amended, or a "holding company", or a "subsidiary company" of a "holding company", or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company", within the meaning of the Public Utility Holding Company Act of 1935, as amended.

SECTION 6.4 <u>Validity, etc</u>.  Each Loan Document and each Transaction Document to which any Obligor is a party constitutes the legal, valid and binding obligations of such Obligor, enforceable against such Obligor in accordance with their respective terms (except, in any case, as such enforceability may be limited by applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally and by principles of equity).

SECTION 6.5 <u>Financial Information</u>.  All balance sheets, all statements of income and of cash flow and all other financial information of each of the Borrower and its Subsidiaries furnished pursuant to <u>Section 7.1.1</u> have been and will for periods following the Effective Date be prepared in accordance with GAAP, and do or will present fairly the consolidated financial condition of the Persons covered thereby as at the dates thereof and the results of their operations for the periods then ended.

SECTION 6.6 <u>Litigation, Labor Controversies, etc</u>.  There is no pending or, to the actual knowledge of the Borrower or any of its Subsidiaries, threatened litigation, action, proceeding, investigation or labor controversy

(a)     other than the Bankruptcy Cases and the related proceedings under Chapter 11 of the Bankruptcy Code;

(b)     except as disclosed in <u>Item 6.6</u> of the Disclosure Schedule, affecting the Borrower, any of its Subsidiaries or any other Obligor, or any of their respective properties, businesses, assets or revenues, which could reasonably be expected to have a Material Adverse Effect; or

(c)     which purports to affect the legality, validity or enforceability of any Loan Document, the Transaction Documents or the Transactions.

SECTION 6.7 <u>Subsidiaries</u>.  The Borrower has no Subsidiaries, except those Subsidiaries which are identified in <u>Item 6.7</u> of the Disclosure Schedule, or which are permitted to have been organized or acquired in accordance with <u>Sections 7.2.5</u> or <u>7.2.9</u>.

SECTION 6.8 <u>Ownership of Properties</u>.  The Borrower and each of its Subsidiaries owns (i) in the case of owned real property, good and marketable fee title to, and (ii) in the case of owned personal property, good and valid title to, or, in the case of leased real or personal property, valid and enforceable leasehold interests (as the case may be) in, all of its material properties and assets, tangible and intangible, of any nature whatsoever, free and clear in each case of all Liens or claims, except for Liens permitted pursuant to <u>Section 7.2.3</u> and all matters reflected in the title insurance policies delivered pursuant to <u>clause (b)</u> of <u>Section 7.1.11</u>.

SECTION 6.9 <u>Taxes</u>.  The Borrower and each of its Subsidiaries has filed all tax returns and reports required by law to have been filed by it and has paid all Taxes thereby shown to be due and owing, (except any such Taxes which are being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books) and has paid all Taxes shown to be due on any assessment received to the extent that such Taxes have become due and payable, except where the failure to file any such returns or reports or to pay any such Taxes would not give rise to a Material Adverse Effect.

SECTION 6.10      <u>Employee Benefit Plans</u>.

(a)      Except as could not reasonably be expected to have a Material Adverse Effect: (i) the Borrower and each member of its Controlled Group is in compliance with all applicable provisions of ERISA, the Code and the regulations and published interpretations thereunder with respect to all Employee Benefit Plans except for any required amendments for which the remedial amendment period as defined in Section 401(b) of the Code has not yet expired; (ii) each Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code has been determined by the Internal Revenue Service to be so qualified, and each trust related to such plan has been determined to be exempt under Section 501(a) of the Code except for such plans that have not yet received determination letters but for which the remedial amendment period for submitting a determination letter has not yet expired; and (iii) there are no pending or, to the actual knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority.

(b)      Neither the Borrower nor any member of its Controlled Group sponsors or contributes to any Pension Plan, nor do any of them have any liability, contingent or otherwise, with respect to any Pension Plan (for the avoidance of doubt, other than payments pursuant to the PBGC Settlement).

(c)      Neither the Borrower nor any member of its Controlled Group sponsors, maintains, contributes to or has any liability, contingent or otherwise, with respect to any plan, fund or other similar program, arrangement or agreement established or maintained outside of the United States primarily for the benefit of employees of the Borrower or any such Controlled Group member residing outside the United States (for the avoidance of doubt, other than payments pursuant to the PBGC Settlement).

SECTION 6.11      <u>Environmental Warranties</u>.  Except as set forth in <u>Item 6.11</u> of the Disclosure Schedule and except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect:

(a)      all facilities and property owned, operated or leased by the Borrower or any of its Subsidiaries are owned, operated or leased by the Borrower and its Subsidiaries in material compliance with all Environmental Laws and have been for the past three years;

(b)      there are no pending or, to the Borrower's actual knowledge, threatened (i) written claims, complaints, notices or governmental requests for information received by the Borrower or any of its Subsidiaries with respect to any alleged material violation of any

Environmental Law, or (ii) written complaints, notices or inquiries to the Borrower or any of its Subsidiaries regarding material potential liability of the Borrower or any of its Subsidiaries under any Environmental Law;

(c)      there have been no Releases of Hazardous Materials at, on or under any property now or previously owned, operated, or leased by the Borrower or any of its Subsidiaries that to the Borrower's actual knowledge, would require investigation or remediation under any applicable Environmental Law;

(d)      the Borrower and its Subsidiaries have been issued and are in material compliance with all permits, certificates, approvals, licenses, registrations and other authorizations required under any applicable Environmental Law;

(e)      to the actual knowledge of the Borrower, no property currently or previously owned, operated or leased by the Borrower or any of its Subsidiaries is listed, or proposed for listing on the National Priorities List pursuant to CERCLA, on the CERCLIS or on any similar foreign, federal, state or provincial list of sites requiring investigation or clean-up under Environmental Laws; and

(f)      there is no friable asbestos present at any property now owned or leased by the Borrower or any of its Subsidiaries that requires abatement or removal under any applicable Environmental Law.

SECTION 6.12      Regulations U and X.  No Obligor is engaged in the business of extending credit for the purpose of buying or carrying margin stock, and no proceeds of any Loans will be used to purchase or carry margin stock or otherwise for a purpose which violates, or would be inconsistent with, F.R.S. Board Regulation U or Regulation X.  Terms for which meanings are provided in F.R.S. Board Regulation U or Regulation X or any regulations substituted therefor, as from time to time in effect, are used in this Section with such meanings.

SECTION 6.13      Labor Matters.  Except as set forth on Item 6.13 of the Disclosure Schedule, as of the date hereof no Obligor is subject to any labor or collective bargaining agreement.  Except as set forth on Item 6.13 of the Disclosure Schedule, there are no existing or threatened strikes, lockouts or other labor disputes involving any Obligor that singly or in the aggregate could reasonably be expected to have a Material Adverse Effect.  Hours worked by and payments made to employees of each Obligor are not in violation of the Fair Labor Standards Act or any other applicable law, rule or regulation dealing with such matters where such violation could reasonably be expected to have a Material Adverse Effect.

SECTION 6.14      Compliance with Laws.  Each Obligor is in compliance in all material respects with the requirements of all applicable laws and all orders, writs, injunctions and decrees applicable to it or to its properties (except for Environmental Laws which are the subject of Section 6.11), except in such instances in which the failure to comply therewith, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

SECTION 6.15      Deposit Account and Cash Management Accounts.  Set forth on Item 6.15(a) of the Disclosure Schedule is a complete and accurate list of all Deposit Accounts

of the Borrower and each Subsidiary and set forth on <u>Item 6.15(b)</u> of the Disclosure Schedule is a complete and accurate list of all Securities Accounts (as defined in the UCC) of the Borrower and each Subsidiary, if any as updated in accordance with <u>Section 7.1.8</u>.

SECTION 6.16    <u>Insurance</u>.  The Borrower and each of its Subsidiaries keeps its property adequately insured and maintains (i) insurance to such extent and against such risks, including fire, as is customary with companies of similar size and in the same or similar businesses, (ii) workmen's compensation insurance in the amount required by applicable law, (iii) public liability insurance, which shall include product liability insurance, in the amount customary with companies of similar size and in the same or similar business against claims for personal injury or death on properties owned, occupied or controlled by it, and (iv) such other insurance as may be required by law.

SECTION 6.17    <u>Material Contracts</u>.  Except as could not be reasonably expected  to result in a Material Adverse Effect, each of the Borrower's and its Subsidiaries' material contracts (i) are in full force and effect and are binding upon and enforceable against each Obligor that is a party thereto and, to the best actual knowledge of the Borrower and its Subsidiaries, all other parties thereto in accordance with its terms, and (ii) is not in default due to the action of such Obligor.

ARTICLE VII
COVENANTS

SECTION 7.1 <u>Affirmative Covenants</u>.  The Borrower agrees with each Lender and the Administrative Agent that on or after the Closing Date until the Termination Date has occurred, the Borrower will, and will cause its Subsidiaries to, perform or cause to be performed the obligations set forth below.

SECTION 7.1.1 <u>Financial Information, Reports, Notices, etc.</u>  The Borrower will furnish the Administrative Agent, who will distribute to each Lender, copies of the following financial statements, reports, notices and information:

(a)    as soon as available and in any event within 45 days after the end of each of the first three Fiscal Quarters of each Fiscal Year (commencing with the second Fiscal Quarter of the 2011 Fiscal Year), an unaudited consolidated balance sheet of the Parent and its Subsidiaries as of the end of such Fiscal Quarter and consolidated statements of income and cash flow of the Parent and its Subsidiaries for such Fiscal Quarter and for the period commencing at the end of the previous Fiscal Year and ending with the end of such Fiscal Quarter, and including (in each case, except in the case of the second Fiscal Quarter of the 2011 Fiscal Year), in comparative form the figures for the corresponding Fiscal Quarter in, and year to date portion of, the immediately preceding Fiscal Year, in each case, certified as complete and correct by the chief financial or accounting officer of the Borrower (subject to normal year-end audit adjustments);

(b)    as soon as available and in any event within 120 days after the end of each Fiscal Year (commencing with the 2011 Fiscal Year), a copy of the consolidated balance sheet of the Parent and its Subsidiaries, and the related consolidated statements of income and cash flow

of the Parent and its Subsidiaries for such Fiscal Year, setting forth in comparative form the figures for the immediately preceding Fiscal Year, audited by independent public accountants; provided that for the 2011 Fiscal Year, such consolidated balance sheet and related consolidated statements of income and cash flow shall cover the period commencing on a date selected by the Borrower in its reasonable discretion (which date is to be no later than the Closing Date) and terminating on December 31, 2011 and shall not need to include comparative statements;

(c)      concurrently with the delivery of the financial information pursuant to clauses (a) and (b), a Compliance Certificate, executed by the chief financial or accounting officer of the Borrower, (i) showing compliance with the financial covenants set forth in Section 7.2.4 and stating that no Default has occurred and is continuing (or, if a Default has occurred, specifying the details of such Default and the action that the Borrower or an Obligor has taken or proposes to take with respect thereto), (ii) stating that no Subsidiary has been formed or acquired since the delivery of the last Compliance Certificate (or, if a Subsidiary has been formed or acquired since the delivery of the last Compliance Certificate, a statement that such Subsidiary has complied with Section 7.1.7) and (iii) in the case of a Compliance Certificate delivered concurrently with the financial information pursuant to clause (b), a calculation of Excess Cash Flow;

(d)      as soon as practicable and in any event within 45 days after the commencement of each Fiscal Year beginning with the 2012 Fiscal Year, a business plan and financial projections for the Borrower and its Subsidiaries (on a consolidated basis) for such Fiscal Year (including an operating budget and cash flow budget) for the Borrower and its Subsidiaries (on a consolidated basis) accompanied by a certificate of an Authorized Officer of the Borrower to the effect that (a) such projections were prepared by the Borrower in good faith, (b) the Borrower has a reasonable basis for the assumptions contained in such projections and (c) such projections have been prepared in accordance with such assumptions;

(e)      as soon as possible and in any event within 105 days after any executive officer of the Borrower or any other Obligor obtains actual knowledge of the occurrence of an Event of Default, a statement of an Authorized Officer of the Borrower setting forth details of such Event of Default and the action which the Borrower or such Obligor has taken and proposes to take with respect thereto;

(f)      as soon as possible and in any event within 105 days after any executive officer of the Borrower or any other Obligor obtains actual knowledge of (i) the occurrence of any material adverse development with respect to any litigation, action, proceeding or labor controversy described in Item 6.6 of the Disclosure Schedule or (ii) the commencement of any litigation, action, proceeding or labor controversy of the type and materiality described in Section 6.6, notice thereof and, to the extent the Administrative Agent reasonably requests, copies of all documentation relating thereto;

(g)      promptly after the sending or filing thereof, copies of all reports, notices, prospectuses and registration statements which any Obligor files with the SEC, or any national securities exchange;

(h)       promptly following the mailing or receipt of any material notice or report delivered under the terms of the First Lien Credit Agreement, copies of such notice or report;

(i)       promptly (i) if any executive officer of the Borrower obtains actual knowledge that the Borrower or any Person which owns, directly or indirectly, any Capital Securities of the Borrower, or any other holder at any time of any direct or indirect equitable, legal or beneficial interest therein is the subject of any of the Terrorism Laws, the Borrower will notify the Administrative Agent in writing and (ii) upon the request of any Lender, the Borrower will provide any information such Lender believes is reasonably necessary to be delivered to comply with the Patriot Act; and

(j)       such other financial and other information as the Lenders holding at least 10.0% of the aggregate amount of outstanding Loans may from time to time reasonably request through the Administrative Agent (including information and reports in such detail as such Lenders may reasonably request with respect to the terms of and information provided pursuant to the Compliance Certificate); and

(k)       promptly upon receipt thereof, copies of all "management letters" submitted to the Borrower or any other Obligor by the independent public accountants referred to in clause (b) in connection with each audit made by such accountants.

SECTION 7.1.2  Maintenance of Existence; Compliance with Contracts, Laws, etc.  The Borrower will, and will cause each of its Subsidiaries to, preserve and maintain its and their respective legal existence (except as otherwise permitted by Section 7.2.10) and comply in all material respects with all applicable material laws, rules, regulations and orders, including the payment (before the same become delinquent) of, all Taxes, imposed upon the Borrower or its Subsidiaries or upon their property except to the extent being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP have been set aside on the books of the Borrower or its Subsidiaries, as applicable.

SECTION 7.1.3  Maintenance of Properties.  The Borrower will, and will cause each of its Subsidiaries to, maintain, preserve, protect and keep its and their respective properties in good repair, working order and condition (ordinary wear and tear excepted), and make necessary material repairs, renewals and replacements so that the business carried on by the Borrower and its Subsidiaries may be properly conducted at all times, unless the Borrower or such Subsidiary determines in good faith that the continued maintenance of such property is no longer economically desirable, necessary or useful to the business of the Borrower or any of its Subsidiaries or the Disposition of such property is otherwise permitted by Sections 7.2.9 or 7.2.10.

SECTION 7.1.4  Insurance.  The Borrower will, and will cause each of its Subsidiaries to maintain:

(a)       insurance on its property with financially sound and reputable insurance companies against loss and damage in at least the amounts (and with only those deductibles) customarily maintained, and against such risks as are typically insured against in the same

general area, by Persons of comparable size engaged in the same or similar business as the Borrower and its Subsidiaries; and

(b)     all worker's compensation, employer's liability insurance or similar insurance as may be required under the material laws of any state or jurisdiction in which it may be engaged in business.

Without limiting the foregoing, all insurance policies required pursuant to this Section shall (i) name the Administrative Agent on behalf of the Secured Parties as mortgagee or loss payee (in the case of property insurance) or additional insured (in the case of liability insurance), as applicable, and provide that no cancellation of the policies will be made without thirty days' prior written notice to the Administrative Agent and (ii) be in addition to any requirements to maintain specific types of insurance contained in the other Loan Documents.

SECTION 7.1.5  Books and Records.  The Borrower will, and will cause each of its Subsidiaries to, keep books and records in accordance with GAAP which accurately reflect all of its business affairs and transactions and permit each Secured Party or any of their respective representatives, at reasonable times and intervals upon reasonable notice to the Borrower, to visit each Obligor's offices, to discuss such Obligor's financial matters with its officers and employees and to examine (and photocopy extracts from) any of its books and records.

SECTION 7.1.6  Environmental Law Covenant.  The Borrower will, and will cause each of its Subsidiaries to,

(a)     use and operate all of its and their facilities and properties in compliance with all Environmental Laws, maintain all necessary permits, approvals, certificates, licenses and other authorizations required under applicable Environmental Laws in effect and remain in material compliance therewith, and handle all Hazardous Materials in material compliance with all applicable Environmental Laws, in each case, except for such non-compliance or failure to maintain that would not reasonably be expected to result in a Material Adverse Effect; and

(b)     reasonably promptly notify the Administrative Agent in writing and provide copies upon receipt of all written claims, complaints, notices or inquiries relating to the condition of its owned, operated and leased facilities and properties in respect of, or as to compliance with, Environmental Laws that would reasonably be expected to result in a Material Adverse Effect, and shall promptly resolve any non-compliance with Environmental Laws and keep its owned property free of any Lien imposed by any Environmental Law, except for such Lien that is being contested in good faith and by proper proceedings and for which appropriate reserves consistent with same are being maintained.

SECTION 7.1.7  Future Guarantors, Security, etc.  The Borrower will, and will cause each of its U.S. Subsidiaries to, execute any documents, Filing Statements, agreements and instruments, and take all further action (including filing Mortgages) that may be required under applicable law, or that the Administrative Agent may reasonably request, in order to effectuate the transactions contemplated by the Loan Documents and in order to grant, preserve, protect and perfect the validity (subject to Liens permitted by Section 7.2.3) of the Liens created or intended to be created by the Loan Documents.  The Borrower will cause any subsequently acquired or

organized U.S. Subsidiary to execute, within 10 Business Days of its acquisition or organization, a supplement to the Subsidiary Guaranty (in the form of Annex I thereto) and each other applicable Loan Document in favor of the Secured Parties.  In addition, from time to time, the Borrower will, at its cost and expense, promptly secure the Obligations by pledging or creating, or causing to be pledged or created, perfected Liens with respect to such of its assets and properties as the Administrative Agent or the Required Lenders shall designate, it being agreed that it is the intent of the parties that the Obligations shall be secured by, among other things, substantially all the assets of the Borrower and its U.S. Subsidiaries (including real and personal property acquired subsequent to the Effective Date (but in the case of real property acquired after the Closing Date, the Borrower will only be required to perfect Liens on such real property to the extent the fair market value of such property exceeds $1,000,000)); provided that, neither the Borrower nor its U.S. Subsidiaries shall be required to pledge more than 65% of the Voting Securities of any Foreign Subsidiary unless such pledge would not result in an adverse tax consequence to the Borrower and its Subsidiaries or to their equity holders on a flow through basis.  The Borrower shall deliver or cause to be delivered to the Administrative Agent all customary instruments and documents (including legal opinions, title insurance policies and lien searches) to evidence compliance with this Section.  The Borrower and its Subsidiaries will use commercially reasonable efforts to get a landlord waiver in form and substance reasonably satisfactory to the Administrative Agent for all real property leased by any Obligor after the Effective Date which relates to a location in which there is, or is reasonably expected to be, collateral with a book value of $5,000,000 or more.  The Borrower agrees that it will not, nor will it permit any of its Subsidiaries to, store collateral with a book value of more than $5,000,000 in any location at which it has not obtained a landlord waiver for more than 60 days.

SECTION 7.1.8  Cash Management.  The Borrower will, and will cause each Subsidiary Guarantor to: (i) ensure that such Person's Account Debtors forward payment of all amounts owed by them to such Person to one of the Deposit Accounts of such Person set forth on Item 6.15(a) of the Disclosure Schedule, and (ii) deposit, or cause to be deposited, promptly, and in any event no later than the fifth Business Day after the date of receipt thereof, all of such Person's Collections in one of the Deposit Accounts of such Person set forth on Item 6.15(a) of the Disclosure Schedule.  Prior to or as soon as practicable following the Closing Date, the Borrower will use commercially reasonable efforts to deliver to the Administrative Agent fully executed Control Agreements with respect to each Deposit Account and Securities Account of the Borrower set forth on Item 6.15(a) and Item 6.15(b) of the Disclosure Schedule.  At all times after the delivery of such Control Agreements, the Borrower will use commercially reasonable efforts to ensure, prior to any termination or expiration of the Control Agreement relating to the Deposit Accounts initially set forth on Item 6.15(a) of the Disclosure Schedule, that such Deposit Accounts are replaced with Deposit Accounts subject to a Control Agreement.  So long as no Default has occurred and is continuing (except with respect to the Deposit Accounts initially set forth in Item 6.15(a) of the Disclosure Schedule, which Deposit Accounts may be replaced at any time, subject to the proviso to this sentence), the Borrower may amend Item 6.15(a) and Item 6.15(b) of the Disclosure Schedule to add or replace one or more of the Deposit Accounts; provided, however, that (i) the prospective depository institution at which such Deposit Account will be held shall be reasonably satisfactory to the Administrative Agent and (ii) in the event such Deposit Account will replace or be in addition to a Deposit Account set forth on Item 6.15(a) of the Disclosure Schedule hereto, prior to the time of the opening of such Deposit Account, the Borrower and such prospective depository institution shall use commercially

reasonable efforts to have executed and delivered to the Administrative Agent a Control Agreement in respect of such Deposit Account.

SECTION 7.1.9  Maintenance of Corporate Separateness.  The Borrower will, and will cause each of its Subsidiaries to, satisfy customary corporate formalities, including the holding of regular board of directors' and shareholders' meetings and the maintenance of corporate offices and records and take all actions reasonably necessary to maintain their corporate separateness.

SECTION 7.1.10  Landlord's Agreements and Bailee Letters.  Prior to or as soon as practicable following the Closing Date, the Borrower will use commercially reasonable efforts to deliver to the Administrative Agent a landlord's agreement or bailee letter with respect to each location set forth on Item 7.1.10 to the Disclosure Schedule.

SECTION 7.1.11  Mortgages.  Prior to or as soon as practicable and Insurance.  Within 30 days following the Closing Date, the Borrower will deliver to the Administrative Agent counterparts of each Mortgage, duly executed and delivered by the applicable Obligor, together with:

(a)  evidence of the completion (or satisfactory arrangements for the completion) of all recordings and filings of each Mortgage as may be necessary or, in the reasonable opinion of the Administrative Agent, desirable to create a valid, perfected Lien against the properties purported to be covered thereby;

(b)  mortgagee's title insurance policies in favor of the Administrative Agent for the benefit of the Secured Parties in amounts and in form and substance as shall be customary for similar properties, with respect to the real and, if any, other property purported to be covered by each Mortgage, insuring that title to such property is marketable and that the interests created by each Mortgage constitute valid first Liens thereon free and clear of all defects and encumbrances (other than in favor of the First Lien Lenders pursuant to the First Lien Loan Documents and the Intercreditor Agreement); and

(c)  opinions addressed to the Administrative Agent and all Lenders from local real estate counsel to the Obligors in all jurisdictions where the Borrower maintains material real estate, as determined in the Borrower's reasonable discretion.; and

(d)  a certificate of an Authorized Officer of the Borrower certifying as to compliance with Section 7.1.4.

SECTION 7.2  Negative Covenants.  The Borrower covenants and agrees with each Lender and the Administrative Agent that on or after the Closing Date until the Termination Date has occurred, the Borrower will, and will cause its Subsidiaries to, perform or cause to be performed the obligations set forth below.

SECTION 7.2.1  Business Activities.  The Borrower will not, and will not permit any of its Subsidiaries to engage in any business activity except those business activities engaged in or contemplated on the date of this Agreement and activities reasonably incidental thereto or reasonable extensions thereof.

SECTION 7.2.2 Indebtedness.  The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Indebtedness, except:

(a)        Indebtedness in respect of the Obligations;

(b)        Indebtedness existing as of the Effective Date which is identified in Item 7.2.2(b) of the Disclosure Schedule, and refinancing of such Indebtedness in a principal amount not in excess of that which is outstanding on the Effective Date (as such amount has been reduced following the Effective Date) plus all costs, fees and expenses related to such refinancing;

(c)        unsecured Indebtedness (i) incurred in the ordinary course of business of the Borrower and its Subsidiaries (including open accounts extended by suppliers on normal trade terms in connection with purchases of goods and services (including insurance premium payables in the ordinary course) which are not overdue for a period of more than 90 days or, if overdue for more than 90 days, as to which a dispute exists and adequate reserves in conformity with GAAP have been established on the books of the Borrower or such Subsidiary) and (ii) in respect of performance, surety or appeal bonds provided in the ordinary course of business, but excluding (in each case), Indebtedness incurred through the borrowing of money or Contingent Liabilities in respect thereof;

(d)        Indebtedness (i) in respect of industrial revenue bonds or other similar governmental or municipal bonds, (ii) evidencing the deferred purchase price of newly acquired property or incurred to finance the acquisition of equipment of the Borrower and its Subsidiaries (pursuant to purchase money mortgages or otherwise, whether owed to the seller or a third party) used in the ordinary course of business of the Borrower and its Subsidiaries (provided that, such Indebtedness is incurred within 60 days of the acquisition of such property) and (iii) in respect of Capitalized Lease Liabilities; provided that, the aggregate amount of all Indebtedness outstanding pursuant to this clause shall not at any time exceed $10,000,000;

(e)        Indebtedness of any Subsidiary owing to the Borrower or any other Subsidiary; provided that, the aggregate amount of all such Indebtedness incurred by a Subsidiary that is not a Subsidiary Guarantor, when aggregated with the amount of all Investments made by the Borrower and the Subsidiary Guarantors in Subsidiaries which are not Subsidiary Guarantors pursuant to clause (e)(i) of Section 7.2.5, shall not exceed $5,000,000 at any time;

(f)        First Lien Loans incurred pursuant to the terms of the First Lien Loan Documents in a principal amount not to exceed the Maximum First Lien Principal Amount (as defined in the Intercreditor Agreement), and Contingent Liabilities of the Subsidiary Guarantors in respect of the First Lien Loans; and, the refinancing of all such Indebtedness not in excess of the Maximum First Lien Principal Amount so long as (i) such refinancing is permitted by the Intercreditor Agreement and (ii) the administrative agent for such replacement First Lien Credit Agreement executes and delivers the Intercreditor Agreement;

(g)        Indebtedness incurred by the Borrower and its Subsidiaries arising from agreements providing for indemnification, adjustment of purchase price or similar obligations, or

from guaranties or letters of credit, surety bonds or performance bonds securing the performance of the Borrower or any such Subsidiary pursuant to such agreements, in connection with Permitted Acquisitions or permitted Dispositions of any business, assets or Subsidiary of the Borrower or any of its Subsidiaries;

(h)     the Borrower and its Subsidiaries may become and remain liable with respect to deferred purchase price obligations (including obligations in respect of Earnout Payments) incurred as part of the consideration paid or payable in respect of Permitted Acquisitions; provided that with respect to all Permitted Acquisitions, the aggregate principal amount of all such deferred purchase price obligations shall not exceed $10,000,000 in the aggregate over the term of this Agreement;

(i)     Indebtedness of a Person existing at the time such Person became a Subsidiary of the Borrower, but only if such Indebtedness was not created or incurred in contemplation of such Person becoming a Subsidiary and the aggregate outstanding amount of all Indebtedness existing pursuant to this clause does not exceed $10,000,000 at any time;

(j)     Indebtedness incurred by the Borrower or any of its Subsidiaries which may be deemed to exist pursuant to any performance guaranties, performance, surety, statutory, appeal or similar obligations incurred in the ordinary course of business;

(k)     Indebtedness incurred by the Borrower or any of its Subsidiaries in respect of customary netting services, overdraft protections and similar liabilities incurred in the ordinary course in connection with customary Deposit Accounts maintained by the Borrower and its Subsidiaries as part of its ordinary course cash management program;

(l)     Indebtedness with respect to Purchase Card Agreements in an aggregate amount not to exceed $2,000,000 outstanding at any one time;

(m)     other unsecured Indebtedness of the Borrower and its Subsidiaries (other than Indebtedness of Foreign Subsidiaries owing to the Borrower or Guarantors) in an aggregate amount at any time outstanding not to exceed $10,000,000;

(n)     Indebtedness to one or more issuers of letters of credit with respect to cash collateralized letters of credit in a principal or face amount not to exceed $10,000,000 in the aggregate; and

(o)     Indebtedness consisting of obligations to PBGC pursuant to the PBGC Settlement.

SECTION 7.2.3  Liens.  The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Lien upon any of its property (including Capital Securities of any Person), revenues or assets, whether now owned or hereafter acquired, except:

(a)     Liens securing payment of the Obligations;

(b)     Liens existing as of the Effective Date and disclosed in Item 7.2.3(b) of the Disclosure Schedule securing Indebtedness described in clause (b) of Section 7.2.2, and refinancings of such Indebtedness; provided that, no such Lien shall encumber any additional property and the amount of Indebtedness secured by such Lien is not increased from that existing on the Effective Date (as such Indebtedness may have been permanently reduced subsequent to the Effective Date) plus all costs, fees and expenses related to such Liens;

(c)     Liens securing Indebtedness of the type permitted under clause (d) of Section 7.2.2; provided that, with respect to Indebtedness permitted by clause (d)(ii) of Section 7.2.2, (i) such Lien is granted within 60 days after such Indebtedness is incurred, (ii) the Indebtedness secured thereby does not exceed 80% of the lesser of the cost or the fair market value of the applicable property, improvements or equipment at the time of such acquisition (or construction) and (iii) such Lien secures only the assets that are the subject of the Indebtedness referred to in such clause;

(d)     Liens securing Indebtedness permitted by clause (i) of Section 7.2.2; provided that, such Liens existed prior to such Person becoming a Subsidiary, were not created in anticipation thereof and attach only to assets of such Person;

(e)     Liens in favor of carriers, warehousemen, mechanics, materialmen and landlords granted in the ordinary course of business for amounts not overdue or being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books;

(f)     Liens incurred or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance or other forms of governmental insurance or benefits, or to secure performance of tenders, statutory obligations, bids, leases or other similar obligations (other than for borrowed money) entered into in the ordinary course of business or to secure obligations on surety and appeal bonds or performance bonds;

(g)     judgment Liens in existence for less than 60 days after the entry thereof or with respect to which execution has been stayed or the payment of which is covered in full (subject to a customary deductible) by insurance maintained with responsible insurance companies and which do not otherwise result in an Event of Default under Section 8.1.5;

(h)     easements, rights-of-way, zoning restrictions, minor defects or irregularities in title and other similar encumbrances not interfering in any material respect with the value or use of the property to which such Lien is attached;

(i)     Liens for Taxes not at the time delinquent or thereafter payable without penalty or being diligently contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP shall have been set aside on its books;

(j)     Liens securing Indebtedness permitted under clause (f) of Section 7.2.2 and senior to the Liens securing the Obligations pursuant to the Intercreditor Agreement;

(k)     Liens solely on any earnest money deposit made by the Borrower or any of its Subsidiaries in connection with any lease, letter of intent, purchase agreement or lease permitted hereunder entered into the ordinary course of business;

(l)     purported Liens evidenced by filing of precautionary UCC financing statements relating solely to operating leases for personal property entered into in the ordinary course of business;

(m)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of custom duties in connection with the importation of goods;

(n)     any zoning or similar law or right reserved or vested in any governmental office or agency to control or regulate the use of, or any reservation in the grant from the crown in respect of, any real property;

(o)     licenses of patents, trademarks and other intellectual property rights granted by the Borrower or any of its Subsidiaries in the ordinary course of business and not interfering in any respect with the ordinary conduct of such Borrower or such Subsidiary;

(p)     Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a creditor depository institution;

(q)     any interest or title of a lessor, licensor or sublessor under any lease or license entered into the ordinary course of its business and covering only the assets so leased or licensed granted in the ordinary course of business;

(r)     Liens on inventory that is in the possession of a third party in the ordinary course of business;

(s)     Liens on any leased real property granted by landlords under such leases;

(t)     Liens on any leased real property granted to landlords under any leases; and

(u)     Liens on cash held by one or more issuers of letters of credit in an amount not to exceed $10,500,000 in the aggregate securing Indebtedness permitted by clause (n) of Section 7.2.2.

SECTION 7.2.4   Financial Condition and Operations.  The Borrower will not permit any of the events set forth below in clauses (a) and (b) to occur:

(a)     The Borrower will not permit the Total Leverage Ratio as of the last day of any period set forth below to be greater than:

| Fiscal Quarter Ending | Total Leverage Ratio |
|---|---|
| September 30, 2011 | 8.007.60:1.00 |

| December 31, 2011 | ~~7.75~~7.35:1.00 |
| March 31, 2012 | ~~7.75~~7.15:1.00 |
| June 30, 2012 | ~~7.50~~7.00:1.00 |
| September 30, 2012 | ~~7.25~~6.80:1.00 |
| December 31, 2012 | ~~7.00~~6.60:1.00 |
| March 31, 2013 | ~~7.00~~6.50:1.00 |
| June 30, 2013 | ~~6.75~~6.40:1.00 |
| September 30, 2013 | ~~6.75~~6.40:1.00 |
| December 31, 2013 | ~~6.75~~6.40:1.00 |
| March 31, 2014 | ~~6.75~~6.30:1.00 |
| June 30, 2014 | ~~6.50~~6.10:1.00 |
| September 30, 2014 | ~~6.50~~6.00:1.00 |
| December 31, 2014 | ~~6.50~~6.00:1.00 |
| March 31, 2015 and thereafter | ~~6.25~~6.00:1.00 |

(b)     The Borrower will not permit the Interest Coverage Ratio as of the last day of any period set forth below to be less than:

| Fiscal Quarter Ending | Interest Coverage Ratio |
|---|---|
| September 30, 2011 | ~~1.75~~1.80:1.00 |
| December 31, 2011 | ~~1.75~~1.80:1.00 |
| March 31, 2012 | ~~1.75~~1.80:1.00 |
| June 30, 2012 | ~~1.75~~2.00:1.00 |
| September 30, 2012 | ~~1.75~~2.00:1.00 |
| December 31, 2012 | 2.00:1.00 |
| March 31, 2013 | 2.00:1.00 |
| June 30, 2013 | 2.00:1.00 |
| September 30, 2013 | 2.00:1.00 |
| December 31, 2013 | 2.00:1.00 |
| March 31, 2014 | 2.00:1.00 |
| June 30, 2014 | 2.00:1.00 |
| September 30, 2014 | 2.00:1.00 |
| December 31, 2014 | 2.00:1.00 |
| March 31, 2015 and thereafter | 2.00:1.00 |

SECTION 7.2.5  Investments.  The Borrower will not, and will not permit any of its Subsidiaries to, purchase, make, incur, assume or permit to exist any Investment in any other Person, except:

(a)     Investments existing on the Effective Date and identified in Item 7.2.5(a) of the Disclosure Schedule;

(b)     Cash Equivalent Investments;

(c)     Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(d)     Investments consisting of any deferred portion of the sales price received by the Borrower or any Subsidiary in connection with any Disposition permitted under Section 7.2.10;

(e)     Investments by way of contributions to capital or purchases of Capital Securities (i) by the Borrower in any Subsidiaries or by any Subsidiary in other Subsidiaries; provided that, the aggregate amount of intercompany loans made pursuant to clause (e) of Section 7.2.2 and Investments under this clause made by the Borrower and Subsidiary Guarantors in Subsidiaries that are not Subsidiary Guarantors shall not exceed the amount set forth in clause (e) of Section 7.2.2 at any time, or the Borrower or (ii) by any Subsidiary in the Borrower;

(f)     Investments constituting (i) accounts receivable arising, (ii) trade debt granted, or (iii) deposits made in connection with the purchase price of goods or services, in each case in the ordinary course of business;

(g)     Investments by way of the acquisition of Capital Securities constituting Permitted Acquisitions permitted under clause (d) of Section 7.2.9, provided that such Investments shall result in the acquisition of a wholly owned U.S. Subsidiary;

(h)     intercompany loans, advances or guaranties among the Borrower and its Subsidiaries, all to the extent permitted by clause (e) of Section 7.2.2 and clause (e) of this Section 7.2.5;

(i)     Capital Expenditures to the extent permitted by Section 7.2.7;

(j)     loans to officers, directors and employees of the Borrower and its Subsidiaries to be used to purchase Capital Securities of the Parent and/or to acquire options on, or purchase upon exercise of such options, Capital Securities of the Parent; provided, that, in each case, the proceeds of such loans are reinvested in the Borrower and do not exceed $5,000,000;

(k)      Investments in Persons (other than Obligors or any Person owning, controlling or managing, directly or indirectly an Obligor) that are not Subsidiaries in an aggregate amount not to exceed $2,000,000 at any time outstanding;

(l)      without duplication, Contingent Liabilities to the extent permitted by Section 7.2.2;

(m)      good faith deposits made in connection with prospective Permitted Acquisitions to the extent permitted by Section 7.2.9;

(n)      bank deposits established and maintained in the ordinary course of business and consistent with past practice;

(o)      customary deposits made in connection with operating leases;

(p)      Investments in the form of deposits, prepayments and other credits to suppliers in the ordinary course of business;

(q)      Investments in the form of Capital Securities received from or on behalf of any Person as a part of the consideration paid or payable in respect of any Disposition made by the Borrower or any of its Subsidiaries; provided that, the fair market value of all such Capital Securities held by the Borrower and its Subsidiaries (as determined as of the time such securities are received) shall not exceed in the aggregate the greater of (i) $5,000,000 and (ii) 25% of the aggregate proceeds received by the Borrower from such Disposition; provided, further, that, "fair market value" for any such Capital Securities shall be (x) if prices for such securities are quoted on a national public exchange or equivalent, the quoted price for such securities on such exchange as of the close of business on the Business Day immediately preceding the day of receipt of such securities, and (y) if prices for such securities are not quoted on a national public exchange or equivalent, the value of such securities as determined by the board of directors (or equivalent) of the Borrower in the exercise of its good faith judgment at the time of receipt of such securities; and

(r)      other Investments in an amount not to exceed $10,000,000 at any time over the term of this Agreement irrespective of any gains received, accrued or recognized on such Investments;

provided that any Investment which when made complies with the requirements of the definition of the term "Cash Equivalent Investment" may continue to be held notwithstanding that such Investment if made thereafter would not comply with such requirements; and no Investment otherwise permitted by clauses (g), (j) or (m) shall be permitted to be made if any Default has occurred and is continuing or would result therefrom.

(s)      no Investment otherwise permitted by clauses (g), (j), or (m) shall be permitted to be made if any Default has occurred and is continuing or would result therefrom.

SECTION 7.2.6  Restricted Payments, etc.  The Borrower will not, and will not permit any of its Subsidiaries to, declare or make a Restricted Payment, or make any deposit for any Restricted Payment, except:

(a)     Restricted Payments made by Subsidiaries to the Borrower or wholly owned Subsidiaries;

(b)     so long as no Default has occurred and is continuing, or shall be caused thereby, Restricted Payments made by the Borrower or its Subsidiaries:

(i)     to make payments pursuant to the Management Agreements and the LLC Agreement as in effect from time to time;

(ii)     in an aggregate amount not to exceed $2,500,000 in any Fiscal Year (A) to the extent necessary to make repurchases of Capital Securities (and options or warrants to purchase such Capital Securities) of the Parent from employees (1) upon termination (including by reason of death, disability or retirement) of such employees or (2) pursuant to a contractual obligation of the Parent and (B) to the Parent to the extent necessary to permit the Parent or any parent company thereof to pay reasonable accounting, legal, insurance, SEC related, and similar fees, expenses and costs, and expenses and indemnity payments to directors; and

(iii)     to the Parent to permit the Parent to make tax distributions to its members in accordance with (and in the amounts permitted by) the LLC Agreement; provided, that, with respect to any taxable year, the amount distributed to members of the Parent pursuant to this clause shall not exceed the product of the amount of taxable income of the Borrower allocable to such members and the Hypothetical Tax Rate and, provided, further, that the Borrower shall be permitted to make periodic tax distributions to permit payments of estimated taxes by members of the Parent based on reasonable estimates of the taxable income of the Borrower allocable to the members of the Parent and the Hypothetical Tax Rate.

SECTION 7.2.7  Capital Expenditures.  Subject (in the case of Capitalized Lease Liabilities) to clause (e) of Section 7.2.2, the Borrower will not, and will not permit any of its Subsidiaries to, make or commit to make Capital Expenditures in any period set forth below which aggregate in excess of the amount set forth below opposite such period:

| Period | Maximum Capital Expenditure Amount |
|---|---|
| Each period of twelve consecutive months ending on the last day of each Fiscal Quarter starting with the Fiscal Quarter ending on September 30, 2011 | $20,000,000 |

SECTION 7.2.8  Issuance of Capital Securities.  The Borrower will not, and will not permit any of its Subsidiaries to, issue any Capital Securities (whether for value or otherwise) to any Person other than (in the case of Subsidiaries), to the Borrower or another wholly owned Subsidiary (unless such Capital Securities are not mandatorily redeemable at any time prior to one year and one day after the Stated Maturity Date for the Loans).

SECTION 7.2.9  <u>Consolidation, Merger; Permitted Acquisitions, etc.</u>  The Borrower will not, and will not permit any of its Subsidiaries to, liquidate or dissolve, consolidate with, or merge or amalgamate into or with, any other Person, or purchase or otherwise acquire all or substantially all of the assets of any Person (or any division thereof), except:

(a)  any Subsidiary may liquidate or dissolve voluntarily into, and may merge or amalgamate with and into, the Borrower or any other Subsidiary; (<u>provided</u> that, in any merger involving the Borrower, the Borrower is the surviving Person and a Subsidiary Guarantor may only merge with and into another Subsidiary Guarantor);

(b)  the assets or Capital Securities of any Subsidiary may be purchased or otherwise acquired by the Borrower or any other Subsidiary (<u>provided</u> that, the assets or Capital Securities of any Subsidiary Guarantor may only be purchased or otherwise acquired by the Borrower or another Subsidiary Guarantor); <u>provided</u>, <u>further</u>, that in no event shall any Subsidiary consolidate with or merge with and into any other Subsidiary unless after giving effect thereto, the Administrative Agent shall have a perfected pledge of, and security interest in and to, at least the same percentage of the issued and outstanding interests of Capital Securities (on a fully diluted basis) and other assets of the surviving Person as the Administrative Agent had immediately prior to such merger or consolidation in form and substance reasonably satisfactory to the Administrative Agent and its counsel, pursuant to such documentation as shall be necessary in the reasonable opinion of the Administrative Agent to create, perfect or maintain the collateral position of the Secured Parties therein;

(c)  Investments made in accordance with <u>Section 7.2.5</u>;

(d)  the Borrower or any of its Subsidiaries may purchase all or substantially all of the assets of any Person (or any division thereof), or acquire such Person by merger or otherwise, in each case, if:

(i)  no Default has occurred and is continuing or would occur after giving effect thereto;

(ii)  such purchase or acquisition constitutes a Permitted Acquisition;

(iii)  the amount (which shall include all obligations in respect of Earnout Payments and other deferred purchase price arrangements) paid or payable in connection with all other transactions permitted under this <u>clause (d)</u> (together with all previous Permitted Acquisitions) does not exceed $20,000,000 in any Fiscal Year and $50,000,000 over the term of this Agreement;

(e)  any Subsidiary may convert into a limited liability company following at least sixty (60) days' advance written notice to the Administrative Agent.

SECTION 7.2.10  <u>Permitted Dispositions</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, Dispose of any of the Borrower's or such Subsidiaries' assets (including accounts receivable and Capital Securities of Subsidiaries) to any Person in one transaction or series of transactions unless such Disposition is:

(a)      inventory or obsolete, damaged, worn out or surplus property, or the discounted sale of defaulted or delinquent trade receivables written off and reserved;

(b)      permitted by Sections 7.2.9 and 7.2.14;

(c)      (i) the cross-licensing or non-exclusive licensing of intellectual property, in the ordinary course of business and (ii) the contemporaneous exchange, in the ordinary course of business, of property for property of a substantially like kind and use (other than as set forth in clause (i)), to the extent that the property received in such exchange is of a value substantially equivalent to the value of the property exchanged;

(d)      Investments made in accordance with Section 7.2.5 and Restricted Payments made in accordance with Section 7.2.6;

(e)      the leasing or sub-leasing of property that would not materially interfere with the required use of such property by the Borrower or any of its Subsidiaries;

(f)      other Dispositions so long as: (i) such Disposition is for fair market value and the consideration received consists of no less than 75% in cash, (ii) the Net Disposition Proceeds received from such Disposition, together with the Net Disposition Proceeds of all other assets Disposed of pursuant to this clause since the Closing Date, does not exceed (individually or in the aggregate) $25,000,000 over the term of this Agreement (inclusive of the fair market value of any Capital Securities of the type described in clause (q) of Section 7.2.5), (iii) the Net Disposition Proceeds from such Disposition are applied pursuant to Sections 3.1.1 and 3.1.2, and (iv) no Default has occurred and is continuing; and

(g)      set forth on Item 7.2.10(g) of the Disclosure Schedule.

SECTION 7.2.11  Modification of Certain Agreements.  The Borrower will not, and will not permit any of its Subsidiaries to, consent to any amendment, supplement, waiver or other modification of, or enter into any forbearance from exercising any rights with respect to the terms or provisions contained in:

(a)      the Asset Purchase Agreement, the Plan, and (to the extent such action is materially adverse to the Lenders) the Management Agreements;

(b)      the Organic Documents of the Borrower or any of its Subsidiaries, if the result would have a material adverse effect on the rights or remedies of any Secured Party; and

(c)      any of the First Lien Loan Documents, other than any amendment, supplement, waiver or modification to the extent permitted by the Intercreditor Agreement.

SECTION 7.2.12  Transactions with Affiliates.  The Borrower will not, and will not permit any of its Subsidiaries to, enter into or cause or permit to exist any arrangement, transaction or contract (including for the purchase, lease or exchange of property or the rendering of services) with any of its other Affiliates, unless such arrangement, transaction or contract is on fair and reasonable terms no less favorable to the Borrower or such Subsidiary than it could obtain in an arm's-length transaction with a Person that is not an Affiliate other than:

(a)       transactions among the Obligors otherwise permitted hereunder;

(b)       reasonable fees and compensation (including equity-based compensation and employee benefits) paid to, and indemnity provided for the benefit of, officers, directors, board members, employees or consultants of the Parent or any Subsidiary as determined in good faith by the Parent's board of directors;

(c)       the payment of Restricted Payments as provided under Section 7.2.6;

(d)       transactions that were or are consummated in accordance with the Plan or the Asset Purchase Agreement, in each case, as in effect on the Effective Date;

(e)       Indebtedness represented by this Agreement and the First Lien Credit Agreement, the Intercreditor Agreement, and any amendments, restatements or modifications thereof and the transactions pursuant thereto that are permitted hereby and by the Intercreditor Agreement; and

(f)       transactions pursuant to the Management Agreements and the LLC Agreement.

SECTION 7.2.13  Restrictive Agreements, etc.  The Borrower will not, and will not permit any of its Subsidiaries to, enter into any agreement prohibiting

(a)       the creation or assumption of any Lien upon its properties, revenues or assets, whether now owned or hereafter acquired;

(b)       the ability of any Obligor to amend or otherwise modify any Loan Document; or

(c)       the ability of any Subsidiary to make any payments, directly or indirectly, to the Borrower, including by way of dividends, advances, repayments of loans, reimbursements of management and other intercompany charges, expenses and accruals or other returns on investments.

The foregoing prohibitions shall not apply to restrictions contained (i) in any Loan Document, (ii) in the case of clause (a), any agreement governing any Indebtedness permitted by clause (d) of Section 7.2.2 as to the assets financed with the proceeds of such Indebtedness, (iii) in the case of clause (a), covenants in documents creating Liens permitted by Section 7.2.3 prohibiting further Liens on the properties encumbered thereby; (iv) in the case of clauses (a) and (b), in the First Lien Loan Documents; or (v) any prohibition or limitation that (a) exists pursuant to applicable law, (b) consists of customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under Section 7.2.10 pending the consummation of such sale, (c) consists of customary restrictions and conditions contained in any lease or restricts subletting or assignment of any lease governing a leasehold interest of an Obligor, (d) exists in any agreement or other instrument of a person acquired in an Investment permitted hereunder in existence at the time of such Investment (but not created in connection therewith or in contemplation thereof), which prohibition or limitation is not applicable to any person, or the properties or assets of any person, other than the person, or the property or assets of the person so

acquired or (e) is imposed by any amendments or refinancings that are otherwise permitted by the Loan Documents of the contracts, instruments or obligations referred to in clause (iv) or (v)(d); provided that such amendments and refinancings are no more materially restrictive with respect to such prohibitions and limitations than those prior to such amendment or refinancing.

SECTION 7.2.14  Sale and Leaseback.  The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly enter into any agreement or arrangement providing for the sale or transfer by it of any property (now owned or hereafter acquired) to a Person and the subsequent lease or rental of such property or other similar property from such Person except the sale-leasebacks entered into in connection with the Livermore Property, the Goshen Property and the Emigsville Property.

SECTION 7.2.15  Pension Plans.  The Borrower will not, and will not permit any of its Subsidiaries to sponsor or contribute to any Pension Plan, or have any liability, contingent or otherwise, with respect to any Pension Plan (for the avoidance of doubt, other than the PBGC Settlement).

ARTICLE VIII
EVENTS OF DEFAULT

SECTION 8.1 Listing of Events of Default.  Each of the following events or occurrences described in this Article shall constitute an "Event of Default".

SECTION 8.1.1  Non-Payment of Obligations.  The Borrower shall default in the payment or prepayment when due of

(a)      any principal of any Loan and such default shall continue unremedied for a period of two Business Days after such amount was due; or

(b)      any interest or fee described in Article III or any other monetary Obligation, and such default shall continue unremedied for a period of five Business Days after such amount was due.

SECTION 8.1.2  Non-Performance of Certain Covenants and Obligations.  The Borrower shall default in the due performance or observance of any of its obligations under Section 7.1.1, Section 7.1.2 or Section 7.2.

SECTION 8.1.3  Non-Performance of Other Covenants and Obligations.  Any Obligor shall default in the due performance and observance of any other agreement contained in any Loan Document executed by it, and such default shall continue unremedied for a period of 60 days after the earlier of (a) the date of the Borrower's actual knowledge of such default or (b) notice thereof given to the Borrower by the Administrative Agent or any Lender.

SECTION 8.1.4  Default on Other Indebtedness.  A default shall occur in the payment of any amount when due (subject to any applicable grace period), whether by acceleration or otherwise, of any principal or stated amount of, or interest or fees on, any Indebtedness (other than Indebtedness described in Section 8.1.1) of the Borrower or any of its Subsidiaries or any other Obligor having a principal or stated amount, individually or in the aggregate, in excess of

$10,000,000, or a default shall occur in the performance or observance of any obligation or condition with respect to such Indebtedness if the effect of such default is to accelerate the maturity of any such Indebtedness or such default shall continue unremedied for any applicable period of time sufficient to permit the holder or holders of such Indebtedness, or any trustee or agent for such holders, to cause or declare such Indebtedness to become due and payable or to require such Indebtedness to be prepaid, redeemed, purchased or defeased, or require an offer to purchase or defease such Indebtedness to be made, prior to its expressed maturity**.**

SECTION 8.1.5  <u>Judgments</u>.  Any judgment or order for the payment of money individually or in the aggregate in excess of $10,000,000 (exclusive of any amounts fully covered by insurance (less any applicable deductible) and as to which the insurer has not denied or objected to its responsibility to cover such judgment or order) shall be rendered against the Borrower or any of its Subsidiaries or any other Obligor and such judgment shall not have been vacated or discharged or stayed or bonded pending appeal within 60 days after the entry thereof or enforcement proceedings shall have been commenced by any creditor upon such judgment or order.

SECTION 8.1.6  <u>Change in Control</u>.  Any Change in Control shall occur.

SECTION 8.1.7  <u>Bankruptcy, Insolvency, etc.</u>  The Borrower, any of its Subsidiaries or any other Obligor shall

(a)      generally fail to pay, or admit in writing its inability or general unwillingness to pay, debts as they become due;

(b)      apply for, consent to, or acquiesce in the appointment of a trustee, receiver, sequestrator or other custodian for any substantial part of the property of any thereof, or make a general assignment for the benefit of creditors;

(c)      in the absence of such application, consent or acquiescence in or permit or suffer to exist the appointment of a trustee, receiver, receiver manager, sequestrator or other custodian for a substantial part of the property of any thereof, and such trustee, receiver, receiver manager, sequestrator or other custodian shall not be discharged within 90 days; <u>provided</u> that, the Borrower, each Subsidiary and each other Obligor hereby expressly authorizes each Secured Party to appear in any court conducting any relevant proceeding during such 90-day period to preserve, protect and defend their rights under the Loan Documents;

(d)      permit or suffer to exist the commencement of any bankruptcy, reorganization, debt arrangement or other case or proceeding under any bankruptcy or insolvency law or any dissolution, winding up or liquidation proceeding, in respect thereof, and, if any such case or proceeding is not commenced by the Borrower, any Subsidiary or any Obligor, such case or proceeding shall be consented to or acquiesced in by the Borrower, such Subsidiary or such Obligor, as the case may be, or shall result in the entry of an order for relief or shall remain for 90 days undismissed; <u>provided</u> that, the Borrower, each Subsidiary and each Obligor hereby expressly authorizes each Secured Party to appear in any court conducting any such case or proceeding during such 90-day period to preserve, protect and defend their rights under the Loan Documents; or

(e)      take any action authorizing, or in furtherance of, any of the foregoing.

SECTION 8.1.8  <u>Impairment of Security, etc.</u>  Any Loan Document shall (except in accordance with its terms), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of any Obligor party thereto; any Lien shall (except in accordance with the terms of any Loan Document), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of any Obligor subject thereto in respect of any material portion of the Collateral (as defined in the Security Agreement); any Obligor or any other party shall contest in any manner such effectiveness, validity, binding nature or enforceability; or, except as permitted under any Loan Document, any Lien securing any Obligation shall, in whole or in part, cease to be a perfected Lien with respect to any material portion of the Collateral.

SECTION 8.2  <u>Action if Bankruptcy.</u>  If any Event of Default described in <u>clauses (a)</u> through <u>(d)</u> of <u>Section 8.1.7</u> with respect to the Borrower shall occur, the outstanding principal amount of all outstanding Loans and all other Obligations shall automatically be and become immediately due and payable, without notice or demand to any Person.

SECTION 8.3  <u>Action if Other Event of Default</u>.  If any Event of Default (other than any Event of Default described in <u>clauses (a)</u> through <u>(d)</u> of <u>Section 8.1.7</u> with respect to the Borrower) shall occur for any reason, whether voluntary or involuntary, and be continuing, the Administrative Agent, upon the written direction of the Required Lenders, shall by notice to the Borrower declare all or any portion of the outstanding principal amount of the Loans and other Obligations to be due and payable, whereupon the full unpaid amount of such Loans and other Obligations which shall be so declared due and payable shall be and become immediately due and payable, without further notice, demand or presentment.

ARTICLE IX
THE ADMINISTRATIVE AGENT

SECTION 9.1  <u>Actions</u>.

(a)      Each Lender hereby appoints Silver Point as its Administrative Agent under and for purposes of each Loan Document.  Each Lender authorizes the Administrative Agent to act on behalf of such Lender under each Loan Document and to appoint other agents or sub-agents to assist in its actions under the Loan Documents and the Administrative Agent shall not be liable for the acts or omissions of such agents as long as they are appointed with due care and without gross negligence or willful misconduct.  Each Lender further authorizes the Administrative Agent, in the absence of other written instructions from the Required Lenders received from time to time by the Administrative Agent (with respect to which the Administrative Agent agrees that it will comply, subject to the terms and conditions of <u>Article IX</u>), to exercise such powers hereunder and thereunder as are delegated to or required of the Administrative Agent by the terms hereof and thereof, together with such powers as may be incidental thereto (including the release of Liens on assets Disposed of in accordance with the terms of the Loan Documents).

(b)      The Administrative Agent shall not have any duties or obligations except those expressly set forth herein. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise in writing as directed by the Required Lenders in accordance with the terms of this Agreement (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 10.1).  Each Lender hereby indemnifies (which indemnity shall be payable within thirty (30) days of demand therefor, to the extent not reimbursed by the Borrower or any other Obligor, and without limiting the Borrower's and Obligors' obligations under this Agreement and which indemnity shall survive any termination of this Agreement) the Administrative Agent and its officers, directors, employees and agents, pro rata according to the proportionate amount of Loans held by such Lender, from and against any and all liabilities, obligations, losses, damages, claims, penalties, judgments, costs, disbursements or expenses of any kind or nature whatsoever which may at any time be imposed on, incurred by, or asserted against, the Administrative Agent in any way relating to or arising out of any Loan Document or any action taken or omitted to be taken by the Administrative Agent under the Loan Documents, (including reasonable attorneys' fees and expenses), and as to which the Administrative Agent, is not reimbursed by the Borrower; provided that, no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, claims, costs or expenses which are determined by a court of competent jurisdiction in a final proceeding to have resulted from the Administrative Agent's gross negligence or willful misconduct.  By executing a Lender Assignment Agreement, each future Lender (acting for itself and on behalf of each Affiliate thereof which becomes a Secured Party from time to time) shall be deemed to ratify the power of attorney granted to the Administrative Agent hereunder.

SECTION 9.2 Exculpation.  Neither the Administrative Agent nor any of its directors, officers, employees or agents shall be liable to any Secured Party for any action taken or omitted to be taken by it under any Loan Document, or in connection therewith, except for its own willful misconduct or gross negligence, nor responsible for any recitals or warranties herein or therein, nor for the effectiveness, enforceability, validity or due execution of any Loan Document, nor for the creation, perfection or priority of any Liens purported to be created by any of the Loan Documents, or the validity, genuineness, enforceability, existence, value or sufficiency of any collateral security, nor to make any inquiry respecting the performance by any Obligor of its Obligations.  Any such inquiry which may be made by the Administrative Agent shall not obligate it to make any further inquiry or to take any action.  The Administrative Agent shall be entitled to rely upon advice of counsel concerning legal matters and upon any notice, consent, certificate, statement or writing which the Administrative Agent believes to be genuine and to have been presented by a proper Person.

To the fullest extent permitted by applicable law, no Obligor or Lender shall assert, and each Obligor and Lender hereby waives, any claim against the Administrative Agent, its sub-agents and their respective Affiliates in respect of any actions taken or omitted to be taken by any of them, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this

Agreement, any other Loan Document or any agreement or instrument contemplated herby or thereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.

No provision of this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby or the transactions contemplated hereby or thereby, shall require the Administrative Agent to: (i) expend or risk its own funds or provide indemnities in the performance of any of its duties hereunder or the exercise of any of its rights or power or (ii) otherwise incur any financial liability in the performance of its duties or the exercise of any of its rights or powers unless it is indemnified to its satisfaction and the Administrative Agent shall have no liability to any person for any loss occasioned by any delay in taking or failure to take any action while it is awaiting an indemnity satisfactory to it.

Except as expressly set forth herein or in any other Loan Document, the Administrative Agent shall not be responsible for (i) perfecting, maintaining, monitoring, preserving or protecting the security interest or lien granted under this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, (ii) the filing, re-filing, recording, re-recording or continuing or any document, financing statement, mortgage, assignment, notice, instrument of further assurance or other instrument in any public office at any time or times or (iii) providing, maintaining, monitoring or preserving insurance on or the payment of taxes with respect to any of the Collateral. The actions described in items (i) through (iii) shall be the sole responsibility of the Obligors.

The Administrative Agent shall not be required to qualify in any jurisdiction in which it is not presently qualified to perform its obligations as Administrative Agent.

The Administrative Agent has accepted and is bound by the Loan Documents executed by the Administrative Agent as of the date of this Agreement and, as directed in writing by the Required Lenders, the Administrative Agent shall execute additional Loan Documents delivered to it after the date of this Agreement; provided, however, that such additional Loan Documents do not adversely affect the rights, privileges, benefits and immunities of the Administrative Agent. The Administrative Agent will not otherwise be bound by, or be held obligated by, the provisions of any credit agreement, indenture or other agreement governing the Obligations (other than this Agreement and the other Loan Documents to which the Administrative Agent is a party).

No written direction given to the Administrative Agent by the Required Lenders or the Borrower that in the sole reasonable judgment of the Administrative Agent imposes, purports to impose or might reasonably be expected to impose upon the Administrative Agent any obligation or liability not set forth in or arising under this Agreement and the other Loan Documents will be binding upon the Administrative Agent unless the Administrative Agent elects, at its sole option, to accept such direction.

Except as expressly set forth herein or in any other Loan Document, the Administrative Agent shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement or the other Loan Documents arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including, without limitation, acts

of God; earthquakes; fire; flood; terrorism; wars and other military disturbances; sabotage; epidemics; riots; business interruptions; loss or malfunctions of utilities, computer (hardware or software) or communication services; accidents; labor disputes; acts of civil or military authority and governmental action.

The Administrative Agent shall not be under any obligation to exercise any of its rights or powers vested in it by this Agreement or the other Loan Documents, at the request, order or direction of the Required Lenders given unless the same is given pursuant to the express provisions of this Agreement or the other Loan Documents or unless the Required Lenders shall have offered to the Administrative Agent security or indemnity reasonably satisfactory to the Administrative Agent against the costs, expenses and liabilities (including, without limitation, attorneys' fees and expenses) which might be incurred therein or thereby.

Beyond the exercise of reasonable care in the custody of the Collateral in its possession, the Administrative Agent will have no duty as to any Collateral in its possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto. The Administrative Agent will be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property, and the Administrative Agent will not be liable or responsible for any loss or diminution in the value of any of the Collateral by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Administrative Agent in good faith without gross negligence or willful misconduct.

The Administrative Agent will not be responsible for the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder, except to the extent such action or omission constitutes gross negligence or willful misconduct on the part of the Administrative Agent, as determined by a court of competent jurisdiction in a final, nonappealable order, for the validity or sufficiency of the Collateral or any agreement or assignment contained therein, for the validity of the title of any grantor to the Collateral, for insuring the Collateral or for the payment of taxes, charges, assessments or Liens upon the Collateral or otherwise as to the maintenance of the Collateral. The Administrative Agent hereby disclaims any representation or warranty to the present and future Secured Parties concerning the perfection of the Liens granted hereunder or in the value of any of the Collateral.

In the event that the Administrative Agent is required to acquire title to an asset for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any fiduciary or trust obligation for the benefit of another, which in the Administrative Agent's sole reasonable discretion may cause the Administrative Agent to be considered an "owner or operator" under any environmental laws or otherwise cause the Administrative Agent to incur, or be exposed to, any environmental liability or any liability under any other federal, state or local law, the Administrative Agent reserves the right, instead of taking such action, either to resign as Administrative Agent or to arrange for the transfer of the title or control of the asset to a court appointed receiver. The Administrative Agent will not be liable to any person for any environmental liability or any environmental claims or contribution actions under any federal,

state or local law, rule or regulation by reason of the Administrative Agent's actions and conduct as authorized, empowered and directed hereunder or relating to any kind of discharge or release or threatened discharge or release of any hazardous materials into the environment.

SECTION 9.3 <u>Successor</u>.  The Administrative Agent may resign as such at any time upon at least 30 days' prior notice to the Borrower and all Lenders.  If the Administrative Agent at any time shall resign, the Required Lenders may appoint another Lender as a successor Administrative Agent which shall thereupon become the Administrative Agent hereunder.  If no successor Administrative Agent shall have been so appointed by the Required Lenders, and shall have accepted such appointment, within 30 days after the retiring Administrative Agent's giving notice of resignation, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which shall be one of the Lenders or a commercial banking institution organized under the laws of the United States (or any State thereof) or a United States branch or agency of a commercial banking institution, and having a combined capital and surplus of at least $250,000,000; <u>provided</u> that, if, such retiring Administrative Agent is unable to find a commercial banking institution which is willing to accept such appointment and which meets the qualifications set forth in above, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor as provided for above.  Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent and the payment of reasonable fees and expenses (including attorneys' fees and expenses) of the resigning Administrative Agent), such successor Administrative Agent shall be entitled to receive from the retiring Administrative Agent such documents of transfer and assignment as such successor Administrative Agent may reasonably request, and shall thereupon succeed to and become vested with all rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations under the Loan Documents.  After any retiring Administrative Agent's resignation hereunder as the Administrative Agent, the provisions of this Article shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent under the Loan Documents, and <u>Section 10.3</u> and <u>Section 10.4</u> shall continue to inure to its benefit.

SECTION 9.4 <u>Loans by Silver Point</u>.  Silver Point shall have the same rights and powers with respect to (x) the Loans held by it or any of its Affiliates, and (y) the Notes held by it or any of its Affiliates as any other Lender and may exercise the same as if it were not the Administrative Agent.  Silver Point and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of business with the Borrower or any Subsidiary or Affiliate of the Borrower as if Silver Point were not the Administrative Agent hereunder.

SECTION 9.5 <u>Credit Decisions</u>.  Each Lender acknowledges that it has, independently of the Administrative Agent and each other Lender, and based on such Lender's review of the financial information of the Borrower, the Loan Documents (the terms and provisions of which being satisfactory to such Lender) and such other documents, information and investigations as such Lender has deemed appropriate, made its own credit decision to extend the Loans.  Each Lender also acknowledges that it will, independently of the Administrative Agent and each other Lender, and based on such other documents, information and investigations as it shall deem

appropriate at any time, continue to make its own credit decisions as to exercising or not exercising from time to time any rights and privileges available to it under the Loan Documents.

SECTION 9.6 <u>Copies, etc</u>.  The Administrative Agent shall give prompt notice to each Lender of each notice or request required or permitted to be given to the Administrative Agent by the Borrower pursuant to the terms of the Loan Documents (unless concurrently delivered to the Lenders by the Borrower).  The Administrative Agent will distribute to each Lender each document or instrument received (other than notices delivered pursuant to <u>Articles II</u> and <u>III</u>) for its account and copies of all other communications received by the Administrative Agent from the Borrower for distribution to the Lenders by the Administrative Agent in accordance with the terms of the Loan Documents.

SECTION 9.7 <u>Reliance by Administrative Agent</u>.  The Administrative Agent shall be entitled to rely upon any certification, notice or other communication (including any thereof by telephone, telecopy, telegram or cable) believed by it to be genuine and correct and to have been signed or sent by or on behalf of the proper Person, and upon advice and statements of legal counsel, independent accountants and other experts selected by the Administrative Agent.  As to any matters not expressly provided for by the Loan Documents, the Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, thereunder in accordance with instructions given by the Required Lenders  or such other of the Lenders as is required hereunder in such circumstance, and such instructions of such Lenders and any action taken or failure to act pursuant thereto shall be binding on all Secured Parties.

SECTION 9.8 <u>Defaults</u>.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of a Default unless the Administrative Agent has received a written notice from a Lender or the Borrower specifying such Default and stating that such notice is a "Notice of Default".  In the event that the Administrative Agent receives such a notice of the occurrence of a Default, the Administrative Agent shall give prompt notice thereof to the Lenders.  The Administrative Agent shall (subject to the provisions of this <u>Article IX</u> and <u>Section 10.1</u>) take such action and exercise such remedies with respect to such Default as shall be directed by the Controlling Class, or after the Obligations under the Term A-Prime Loans have been paid in full, the Required Lenders, pursuant to any of the Loan Documents; <u>provided</u> that, unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action (including, without limitation, credit bidding the Loans of all Lenders hereunder), or refrain from taking such action, with respect to such Default as it shall deem advisable in the best interest of the Secured Parties except to the extent that this Agreement expressly requires that such action be taken, or not be taken, only with the consent or upon the authorization of the Required Lenders or all Lenders.

SECTION 9.9 <u>Posting of Approved Electronic Communications</u>.  The Borrower hereby agrees, unless directed otherwise by the Administrative Agent or unless the electronic mail address referred to below has not been provided by the Administrative Agent to the Borrower, that it will, or will cause its Subsidiaries to, provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents or to the Lenders under <u>Section 7.1.1</u>, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to a Continuation/Conversion Notice, (ii)

relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default under this Agreement or any other Loan Document or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement (all such non-excluded communications being referred to herein collectively as "Communications"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Administrative Agent to an electronic mail address as directed by the Administrative Agent.  In addition, the Borrower agrees, and agrees to cause its Subsidiaries, to continue to provide the Communications to the Administrative Agent or the Lenders, as the case may be, in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.

(b)     The Borrower further agrees that the Administrative Agent may make the Communications available to the Lenders by posting the Communications on Intralinks or a substantially similar electronic transmission system (the "Platform").

(c)     THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE". THE INDEMNIFIED PARTIES DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE INDEMNIFIED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE INDEMNIFIED PARTIES HAVE ANY LIABILITY TO ANY OBLIGOR, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY OBLIGOR'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY INDEMNIFIED PARTY IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH INDEMNIFIED PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)     The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its e-mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents.  Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.

(e)      Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

SECTION 9.10      Proofs of Claim.  The Lenders and the Borrower hereby agree that after the occurrence of an Event of Default pursuant to Section 8.1.7, in case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any of the Obligors, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Administrative Agent shall have made any demand on any of the Obligors) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)      to file and prove a claim for the whole amount of principal and interest owing and unpaid in respect of the Loans and any other Obligations that are owing and unpaid and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Lenders, the Administrative Agent and other agents appointed by the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Administrative Agent and such other agents and their agents and counsel and all other amounts due Lenders, Administrative Agent and such other agents hereunder) allowed in such judicial proceeding; and

(b)      to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of Administrative Agent and its agents and counsel, and any other amounts due Administrative Agent and other agents hereunder.  Nothing herein contained shall be deemed to authorize Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lenders or to authorize Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.  Further, nothing contained in this Section shall affect or preclude the ability of any Lender to (i) file and prove such a claim in the event that the Administrative Agent has not acted within ten days prior to any applicable bar date and (ii) require an amendment of the proof of claim to accurately reflect such Lender's outstanding Obligations.

ARTICLE X
MISCELLANEOUS PROVISIONS

SECTION 10.1      Waivers, Amendments, etc.  The provisions of each Loan Document (other than a Fee Letter, which shall be modified only in accordance with its terms) may from time to time be amended, modified or waived, if such amendment, modification or

waiver is in writing and consented to by the Borrower and the Required Lenders; <u>provided</u>, that no such amendment, modification or waiver shall:

        (a)      modify <u>clause (b)</u> of <u>Section 4.7</u>, <u>Section 4.8</u> (as it relates to sharing of payments) or this Section, in each case, without the consent of all Lenders;

        (b)      increase the aggregate amount of any Loans held by a Lender or extend the final Stated Maturity Date for any Lender's Loan, in each case without the consent of such Lender (it being agreed, however, that any vote to rescind any acceleration made pursuant to <u>Section 8.2</u> and <u>Section 8.3</u> of amounts owing with respect to the Loans and other Obligations shall only require the vote of the Required Lenders);

        (c)      reduce (by way of forgiveness), the principal amount of or reduce the rate of interest on any Lender's Loan, reduce any fees described in <u>Article III</u> payable to any Lender, in each case without the consent of such Lender (<u>provided</u> that, the vote of Required Lenders shall be sufficient to (i) waive the payment, or reduce the increased portion, of interest accruing under <u>Section 3.2.2</u> or (ii) on any Interest Payment Date, consent to the capitalization of interest otherwise due in cash);

        (d)      make any change to the definition of "Required Lenders" or modify any requirement hereunder that any particular action be taken by all Lenders without the consent of all Lenders; ~~and~~or

        (e)      affect adversely the interests, rights or obligations of the Administrative Agent (in its capacity as the Administrative Agent) unless consented to by the Administrative Agent.

No failure or delay on the part of any Secured Party in exercising any power or right under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right.  No notice to or demand on any Obligor in any case shall entitle it to any notice or demand in similar or other circumstances.  No waiver or approval by any Secured Party under any Loan Document shall, except as may be otherwise stated in such waiver or approval, be applicable to subsequent transactions.  No waiver or approval hereunder shall require any similar or dissimilar waiver or approval thereafter to be granted hereunder.

       SECTION 10.2     <u>Notices; Time</u>.  All notices and other communications provided under each Loan Document shall be in writing or by facsimile and addressed, delivered or transmitted, if to the Borrower, the Administrative Agent or a Lender, to the applicable Person at its address or facsimile number set forth on <u>Schedule II</u> hereto or set forth in the Lender Assignment Agreement, or at such other address or facsimile number as may be designated by such party in a notice to the other parties.  Any notice, if mailed and properly addressed with postage prepaid or if properly addressed and sent by pre-paid courier service, shall be deemed given when received; any notice, if transmitted by facsimile, shall be deemed given when the confirmation of transmission thereof is received by the transmitter.  The parties hereto agree that delivery of an executed counterpart of a signature page to this Agreement and each other Loan Document by facsimile (or electronic transmission) shall be effective as delivery of an original

executed counterpart of this Agreement or such other Loan Document.  Unless otherwise indicated, all references to the time of a day in a Loan Document shall refer to New York time.

SECTION 10.3          Payment of Costs and Expenses.  Whether or not the transactions contemplated hereby shall be consummated, the Borrower agrees to pay promptly, and in any event within thirty (30) days after written demand therefor, (a) all the actual and reasonable costs and expenses of preparation of this Agreement and the other Loan Documents and any consents, amendments, waivers or other modifications thereto; (b) all the costs of furnishing all opinions by counsel for the Borrower and the other Obligors; (c) the reasonable fees, expenses and disbursements of counsel to the Administrative Agent in connection with the negotiation, preparation, execution and administration of this Agreement and the other Loan Documents and any consents, amendments, waivers or other modifications thereto and any other documents or matters in connection therewith; (d) all the actual costs and expenses of creating and perfecting Liens in favor of the Administrative Agent, for the benefit of the Lenders pursuant hereto, including filing and recording fees, search fees, title insurance premiums and fees, expenses and disbursements of counsel to the Administrative Agent and of counsel providing any opinions that the Administrative Agent or Required Lenders may request in respect of the Collateral or the Liens created pursuant to the Loan Documents; (e) all the actual reasonable costs and fees, expenses and disbursements of any auditors, accountants, consultants or appraisers whether internal or external; (f) all the actual reasonable costs and expenses (including the fees, expenses and disbursements of counsel and of any appraisers, consultants, advisors and agents employed or retained by the Administrative Agent and its counsel in connection with the custody or preservation of any of the Collateral; (g) all other actual reasonable costs and expenses incurred by the Administrative Agent in connection with the negotiation, preparation and execution of this Agreement and the Loan Documents and any consents, amendments, waivers or other modifications thereto and the transactions contemplated thereby; and (h) after the occurrence of a Default or an Event of Default, all reasonable costs and expenses, including reasonable attorneys' fees and expenses and costs of settlement, incurred by the Administrative Agent and the Required Lenders in enforcing any Obligations of or in collecting any payments due from any Obligor hereunder or under the other Loan Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of any Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work out" or pursuant to any insolvency or bankruptcy cases or proceedings.

SECTION 10.4          Indemnification.  In consideration of the execution and delivery of this Agreement by each Secured Party, the Borrower hereby indemnifies, exonerates and holds each Secured Party and each of their respective affiliates and their and their affiliates' officers, directors, employees, advisors and agents (collectively, the "Indemnified Parties") free and harmless from and against any and all losses, claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, judgments, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (collectively, the "Indemnified Liabilities") as a result of, or arising out of, or relating to:

(a)      the execution and delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the Transactions contemplated hereby or thereby or the monitoring of Borrower's and the other Obligors' compliance with the terms of the Loan Documents;

(b)      any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Party is a party thereto), or any act, omission, event, or circumstance in any manner related thereto;

(c)      any investigation, litigation or proceeding related to any acquisition or proposed acquisition by any Obligor or any Subsidiary thereof of all or any portion of the Capital Securities or assets of any Person, whether or not an Indemnified Party is party thereto;

(d)      (i) the Release from any real property owned or operated by any Obligor or any Subsidiary thereof of any Hazardous Material (including any losses, liabilities, damages, injuries, costs, expenses or claims asserted or arising under any Environmental Law), or (ii) each Lender's Environmental Liability (the indemnification herein shall survive repayment of the Obligations and any transfer of the property of any Obligor or its Subsidiaries by foreclosure or by a deed in lieu of foreclosure for any Lender's Environmental Liability); in each case of clauses (i) and (ii), other than any Release or Lender's Environmental Liability first caused and first created after the Administrative Agent completes the sale and the transfer of the respective real property pursuant to a foreclosure or deed in lieu of foreclosure;

provided that the Borrower shall not be required to indemnify any Indemnified Party to the extent the applicable Indemnified Liability arises by reason of such Indemnified Party's gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction.  If and to the extent that the foregoing undertaking may be unenforceable for any reason, each Obligor agrees to make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities which is permissible under applicable law.  To the extent permitted by applicable law, the Borrower and each other Obligor shall not assert, and hereby waive, any claim against any Indemnified Party, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, any Loan or the use of the proceeds thereof.

SECTION 10.5      Survival.  The obligations of the Borrower under Sections 4.3, 4.4, 4.5, 4.6, 10.3 and 10.4, and the obligations of the Lenders under Section 9.1, shall in each case survive any assignment from one Lender to another (in the case of Sections 10.3 and 10.4), the occurrence of the Termination Date and the resignation or removal of the Administrative Agent. The representations and warranties made by each Obligor in each Loan Document shall survive the execution and delivery of such Loan Document.

SECTION 10.6      Severability.  Any provision of any Loan Document which is prohibited or unenforceable in any jurisdiction shall, as to such provision and such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the

remaining provisions of such Loan Document or affecting the validity or enforceability of such provision in any other jurisdiction.

SECTION 10.7     Headings.  The various headings of each Loan Document are inserted for convenience only and shall not affect the meaning or interpretation of such Loan Document or any provisions thereof.

SECTION 10.8     Execution in Counterparts, Effectiveness, etc.  This Agreement may be executed by the parties hereto in several counterparts, each of which shall be an original (whether such counterpart is originally executed or an electronic copy of an original and each party hereto expressly waives its rights to receive originally executed documents other than with respect to any documents for which originals are required for any filing or perfection) and all of which shall constitute together but one and the same agreement.  This Agreement shall become effective when counterparts hereof executed on behalf of the Borrower shall have been received by the Administrative Agent.

SECTION 10.9     Governing Law; Entire Agreement.  EACH LOAN DOCUMENT WILL EACH BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING FOR SUCH PURPOSE SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).  The Loan Documents constitute the entire understanding among the parties hereto with respect to the subject matter thereof and supersede any prior agreements, written or oral, with respect thereto.

SECTION 10.10     Successors and Assigns.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns; provided that, the Borrower may not assign or transfer its rights or obligations hereunder without the consent of all Lenders.

SECTION 10.11     Sale and Transfer of Loans; Participations in Loans; Notes.  Each Lender may assign, or sell participations in, its Loans to one or more other Persons in accordance with the terms set forth below.

(a)     Any Lender may, with the consent of the Borrower (such consent (x) not to be unreasonably withheld or delayed and (y) to be required only to the extent no default under Sections 8.1.1 or 8.1.7 has occurred and is continuing), assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Loans at the time owing to it); provided that:

(i)     the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Lender Assignment Agreement with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000, unless (A) the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); (B) such assignment is an assignment of the entire remaining amount of the assigning Lender's Loans at the time owing to it, (C) such assignment is an assignment to a Lender

or an Affiliate of a Lender or an Approved Fund with respect to a Lender or (D) such assignment is to one or more Eligible Assignees managed by an Affiliate of such Eligible Assignee(s) and the aggregate amount of such assignments is not less than $1,000,000;

(ii)      each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans assigned;

(iii)      the parties to each assignment shall (A) electronically execute and deliver to the Administrative Agent a Lender Assignment Agreement via an electronic settlement system acceptable to the Administrative Agent or (B) with the consent of the Administrative Agent, manually execute and deliver to the Administrative Agent a Lender Assignment Agreement, together with, in either case, a processing and recordation fee of $1,000 (which fee may be waived or reduced in the sole discretion of the Administrative Agent) and if the Eligible Assignee is not a Lender, administrative details information with respect to such Eligible Assignee and applicable tax forms; and

(iv)      in the case of any assignment of Term B Loans, the assignee is a "United States person", as defined under Section 7701(a)(30) of the Code.

(b)      Subject to acceptance and recording thereof by the Administrative Agent pursuant to clause (c), from and after the effective date specified in each Lender Assignment Agreement, (i) the Eligible Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Lender Assignment Agreement, have the rights and obligations of a Lender under this Agreement, and (ii) the assigning Lender thereunder shall, to the extent of the interest assigned by such Lender Assignment Agreement, subject to Section 10.5, be released from its obligations under this Agreement (and, in the case of a Lender Assignment Agreement covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto, but shall continue to be entitled to the benefits of any provisions of this Agreement which by their terms survive the termination of this Agreement).  If the consent of the Borrower to an assignment or to an Eligible Assignee is required hereunder (including a consent to an assignment which does not meet the minimum assignment thresholds specified in this Section), the Borrower shall be deemed to have given its consent ten days after the date notice thereof has been delivered by the assigning Lender (through the Administrative Agent or ClearPar, LLC) unless such consent is expressly refused by the Borrower prior to such tenth day.

(c)      The Administrative Agent shall record each assignment made in accordance with this Section in the Register pursuant to clause (a) of Section 2.5 and periodically give the Borrower notice of such assignments.  The Register shall be available for inspection by the Borrower and any Lender (in respect of its own position only), at any reasonable time and from time to time upon reasonable prior notice.

(d)      Any Lender may, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to one or more banks or other entities other than an Ineligible Assignee (a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Loans owing to it); provided that (i) such

Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (iv) in the case of any sale of a participation of any Term B Loans, the Participant is a "United States person", as defined under Section 7701(a)(30) of the Code.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver with respect to any of the items set forth in clauses (a) through (d) of Section 10.1, in each case except as otherwise specifically provided in a Loan Document.  Subject to clause (e), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 4.3, 4.4, 4.5, 4.6, 7.1.1, 10.3 and 10.4 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to clause (b).  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 4.9 as though it were a Lender, provided such Participant agrees to be subject to Sections 4.8 and 4.10 as though it were a Lender.  Each Lender shall, as agent of the Borrower solely for the purpose of this Section, record in book entries maintained by such Lender the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the obligations under this Agreement (the "Participant Register").  The entries in the Participant Register shall be conclusive and binding absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  If requested by the Administrative Agent or the Borrowers, such Lender shall make the Participant Register available to the Administrative Agent or to the Borrower upon either (i) the exercise by a Participant of remedies hereunder or (ii) a request for the Participant Register by the IRS.

            (e)      A Participant shall not be entitled to receive any greater payment under Sections 4.3, 4.4, 4.5, 4.6, 10.3 and 10.4, as of the time of the sale of such participation, than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  A Participant shall not be entitled to the benefits of Section 4.6 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with the requirements set forth in Section 4.6 as though it were a Lender that acquired its interest by assignment.  In addition, if at the time of the sale of such participation, any greater Taxes subject to payment under Section 4.6 would apply to the Participant than applied to the applicable Lender, then such Participant shall not be entitled to any payment under Section 4.6 with respect to the portion of such Taxes as exceeds the Taxes applicable to the Lender at the time of the sale of the participation unless the Participant's request for the Borrower's prior written consent for the Participation described in the first sentence of this clause states that such greater Taxes would be applicable to such Participant, it being understood that the Participant shall be entitled to additional payments under Section 4.6 to the extent such Lender selling the participation would be entitled to any payment resulting from a change in law occurring after the time the participation was sold.

(f)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     Notwithstanding anything to the contrary contained herein, any Lender ("Granting Lender") may grant to a special purpose funding vehicle (a "SPC"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement; provided that (x) nothing herein shall constitute a commitment by any SPC to make any Loans and (y) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof.  In addition, notwithstanding anything to the contrary contained in this clause, any SPC may (i) with notice to, but without the prior written consent of, the Borrower or the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower, and the Administrative Agent) providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC.  This Section may not be amended without the written consent of the SPC.  The Borrower acknowledges and agrees, subject to the next sentence, that, to the fullest extent permitted under applicable law, each SPC, for purposes of Sections 4.3, 4.4, 4.5, 4.6, 4.8, 4.9, 10.3 and 10.4, shall be considered a Lender (provided, that in the case of Section 4.6, that the SPC complies with the requirements of such Section as if it were a Lender that acquired its interest by assignment).  The Borrower shall not be required to pay any amount under Sections 4.3, 4.4, 4.5, 4.6, 10.3 and 10.4 that is greater than the amount which it would have been required to pay had no grant been made by a Granting Lender to a SPC.

SECTION 10.12      Other Transactions.  Nothing contained herein shall preclude the Administrative Agent or any other Lender from engaging in any transaction, in addition to those contemplated by the Loan Documents, with the Borrower or any of its Affiliates in which the Borrower or such Affiliate is not restricted hereby from engaging with any other Person.

SECTION 10.13      Forum Selection and Consent to Jurisdiction.  ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, ANY LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE

ADMINISTRATIVE AGENT, THE LENDERS OR THE BORROWER IN CONNECTION HEREWITH OR THEREWITH MAY BE BROUGHT AND MAINTAINED IN THE COURTS OF THE STATE OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK; <u>PROVIDED</u> THAT, ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT THE ADMINISTRATIVE AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. THE BORROWER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF NEW YORK AT THE ADDRESS FOR NOTICES SPECIFIED IN <u>SECTION 10.2</u>. THE BORROWER HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT THE BORROWER HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, THE BORROWER HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THE LOAN DOCUMENTS.

SECTION 10.14    <u>Waiver of Jury Trial</u>. THE ADMINISTRATIVE AGENT, EACH LENDER AND THE BORROWER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHTS THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, EACH LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF THE ADMINISTRATIVE AGENT, SUCH LENDER OR THE BORROWER IN CONNECTION THEREWITH. THE BORROWER ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION (AND EACH OTHER PROVISION OF EACH OTHER LOAN DOCUMENT TO WHICH IT IS A PARTY) AND THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE ADMINISTRATIVE AGENT AND EACH LENDER ENTERING INTO THE LOAN DOCUMENTS.

SECTION 10.15    <u>Confidentiality</u>. (a)  Subject to the provisions of <u>clause (b)</u> of this Section, each Lender agrees that it will follow its customary procedures in an effort not to disclose without the prior consent of the Borrower (other than to its employees, auditors, advisors or counsel or to another Lender if the Lender or such Lender's holding or parent company in its sole discretion determines that any such party should have access to such information, provided such Persons shall be subject to the provisions of this Section to the same extent as such Lender) any information which is now or in the future furnished pursuant to this Agreement or any other Loan Document, <u>provided</u> that any Lender may disclose any such

information (i) as has become generally available to the public other than by virtue of a breach of this clause by the respective Lender or any other Person to whom such Lender has provided such information as permitted by this Section, (ii) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state, provincial or Federal regulatory body having or claiming to have jurisdiction over such Lender or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors, (iii) as may be required or appropriate in respect to any summons or subpoena or in connection with any litigation, (iv) in order to comply with any law, order, regulation or ruling applicable to such Lender, (v) to the Administrative Agent, (vi) to any pledgee referred to in clause (f) of Section 10.11 or any prospective or actual transferee or participant in connection with any contemplated transfer or participation of any of the Notes or Loans or any interest therein by such Lender, provided that such prospective transferee agrees to be bound by the confidentiality provisions contained in this Section, (vii) to any direct or indirect contractual counterparty in swap agreements or such contractual counterparty's professional advisor (so long as such contractual counterparty or professional advisor so such contractual counterparty agrees to be bound by the provisions of this Section) and (viii) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender.

(b)     The Borrower hereby acknowledges and agrees that each Lender may share with any of its Affiliates, and such Affiliates may share with such Lender, any information related to the Borrower or any of its Subsidiaries, provided such Persons shall be subject to the provisions of this Section to the same extent as such Lender.

Notwithstanding the foregoing paragraphs of this Section, any party to this Agreement (and each Affiliate, director, officer, employee, agent or representative of the foregoing or such Affiliate) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Transactions contemplated herein and all materials of any kind (including opinions or other tax analyses) that are provided to such party relating to such tax treatment or tax structure. The foregoing language is not intended to waive any confidentiality obligations otherwise applicable under this Agreement except with respect to the information and materials specifically referenced in the preceding sentence. This authorization does not extend to disclosure of any other information, including (a) the identity of participants or potential participants in the transactions contemplated herein, (b) the existence or status of any negotiations, or (c) any financial, business, legal or personal information of or regarding a party or its affiliates, or of or regarding any participants or potential participants in the transactions contemplated herein (or any of their respective affiliates), in each case to the extent such other information is not related to the tax treatment or tax structure of the transactions contemplated herein.

SECTION 10.16     Counsel Representation. THE BORROWER ACKNOWLEDGES AND AGREES THAT IT HAS BEEN REPRESENTED BY COMPETENT COUNSEL IN THE NEGOTIATION OF THIS AGREEMENT, AND THAT ANY RULE OR CONSTRUCTION OF LAW ENABLING THE BORROWER TO ASSERT THAT ANY AMBIGUITIES OR INCONSISTENCIES IN THE DRAFTING OR PREPARATION OF THE TERMS OF THIS AGREEMENT SHOULD DIMINISH ANY RIGHTS OR REMEDIES OF THE

ADMINISTRATIVE AGENT OR THE OTHER SECURED PARTIES ARE HEREBY
WAIVED BY THE BORROWER.

   SECTION 10.17  Patriot Act.  Each Lender hereby notifies the Borrower that
pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record
information that identifies the Borrower, which information includes the name and address of the
Borrower and other information that will allow such Lender to identify the Borrower in
accordance with the Patriot Act.

   SECTION 10.18  Authorization of Administrative Agent.  Each Lender agrees that
any action taken by the Administrative Agent in accordance with the terms of this Agreement or
the other Loan Documents relating to the Collateral and the exercise by the Administrative Agent
of its powers set forth therein or herein, together with such other powers that are reasonably
incidental thereto, shall be binding upon all of the Lenders.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the day and year first above written.

WORKFLOWONE LLC


By: _____
    Name:
    Title:

SILVER POINT FINANCE, LLC,
as the Administrative Agent


By:_____
   Name:
   Title:

DISCLOSURE SCHEDULE TO CREDIT AGREEMENT

[See Attached]

SCHEDULE II

PERCENTAGES
AND AMOUNTS

WorkflowOne LLC
[220 East Monument Avenue
Dayton, Ohio 45402
Attention: Chief Financial Officer
Telephone: (___) ___-____
Facsimile: (___) ___-____
E-mail: pbogutsky@workflowmanagement.com]

| NAME AND NOTICE ADDRESS OF LENDER | LOAN PERCENTAGE | LOAN AMOUNT |
|---|---|---|
| **TERM A-PRIME LOANS** | | |
| **TERM A LOANS** | | |
| [Silver Point] | | |
| [Dune Capital Holdings, Inc.] | | |
| [DLJ Investment Partners] | | |
| [GSO Capital] | | |
| **TERM B LOANS** | | |

SCHEDULE III

## SPECIFIED EBITDA

| For the Period | $ |
|---|---|
| July 1, 2010 – September 30, 2010 | 12,272,000 |
| October 1, 2010 – December 31, 2010 | 11,466,000 |
| January 1, 2011 – Effective Date | 7,638,000[3] |

---

[3] Calculated assuming Effective Date of February 28, 2011.

**<u>Exhibit I</u>**
(Amended Newco Second Lien Form Notes with Blackline)

EXHIBIT A-1

FORM OF TERM A-PRIME NOTE

$_____                                                          [●], 2011

FOR VALUE RECEIVED, WORKFLOWONE LLC, a Delaware limited liability company (the "Borrower"), promises to pay [Name of Lender] (the "Lender") on the Stated Maturity Date the principal sum of [_____] ($[_____]) or, if less, the aggregate unpaid principal amount of all Loans set forth in the Register (and any continuation thereof) made by the Lender pursuant to that certain Second Lien Credit Agreement, dated as of [●], 2011 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Second Lien Credit Agreement"), among the Borrower, the various financial institutions and other Persons from time to time parties thereto as lenders and [●], as Administrative Agent. Terms used in this Term A-Prime Note, unless otherwise defined herein, have the meanings provided in the Second Lien Credit Agreement.

The Borrower also promises to pay interest on the unpaid principal amount hereof from time to time outstanding from the date hereof until maturity (whether by acceleration or otherwise) and, after maturity, until paid, at the rates per annum and on the dates specified in the Second Lien Credit Agreement.

Payments of both principal and interest are to be made in U.S. Dollars in same day or immediately available funds to the account designated by the Lender pursuant to the Second Lien Credit Agreement.

This Term A-Prime Note is one of the (i) Newco Second Lien Loan Notes referred to in the Plan, and evidences the payment obligations of Purchaser (as defined in the Plan) under the Second Lien Credit Agreement, (ii) Newco Second Lien Loan Notes referred to in the Asset Purchase Agreement, and evidences the payment obligations of Buyer (as defined in the Asset Purchase Agreement) under the Second Lien Credit Agreement and (iii) Term A-Prime Notes referred to in, and evidences Indebtedness incurred under, the Second Lien Credit Agreement, to which reference is made for a description of the security for this Term A-Prime Note and for a statement of the terms and conditions on which the Borrower is permitted and required to make prepayments and repayments, in whole or in part, of principal of the Indebtedness evidenced by this Term A-Prime Note and on which such Indebtedness may be declared to be immediately due and payable.

All parties hereto, whether as makers, endorsers, or otherwise, severally waive presentment for payment, demand, protest and notice of dishonor.

A-1

7979933

THIS TERM A-PRIME NOTE HAS BEEN DELIVERED IN NEW YORK, NEW YORK AND SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING FOR SUCH PURPOSE SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).

WORKFLOWONE LLC

By: _____
    Name:
    Title:

A-2

LOANS AND PRINCIPAL PAYMENTS

| Date | Amount of Loan Made | Amount of Principal Repaid | Unpaid Principal Balance | Total | Notation Made By |
|------|---------------------|----------------------------|--------------------------|-------|------------------|
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |

EXHIBIT A-2

FORM OF TERM A NOTE

$_____                                                                    [●], 2011

FOR VALUE RECEIVED, WORKFLOWONE LLC, a Delaware limited liability company (the "Borrower"), promises to pay [Name of Lender] (the "Lender") on the Stated Maturity Date the principal sum of [_____] ($[_____]) or, if less, the aggregate unpaid principal amount of all Loans set forth in the Register (and any continuation thereof) made by the Lender pursuant to that certain Second Lien Credit Agreement, dated as of [●], 2011 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Second Lien Credit Agreement"), among the Borrower, the various financial institutions and other Persons from time to time parties thereto as lenders and [●], as Administrative Agent. Terms used in this Term A Note, unless otherwise defined herein, have the meanings provided in the Second Lien Credit Agreement.

The Borrower also promises to pay interest on the unpaid principal amount hereof from time to time outstanding from the date hereof until maturity (whether by acceleration or otherwise) and, after maturity, until paid, at the rates per annum and on the dates specified in the Second Lien Credit Agreement.

Payments of both principal and interest are to be made in U.S. Dollars in same day or immediately available funds to the account designated by the Lender pursuant to the Second Lien Credit Agreement.

This Term A Note is one of the (i) Newco Second Lien Loan Notes referred to in the Plan, and evidences the payment obligations of Purchaser (as defined in the Plan) under the Second Lien Credit Agreement, (ii) Newco Second Lien Loan Notes referred to in the Asset Purchase Agreement, and evidences the payment obligations of Buyer (as defined in the Asset Purchase Agreement) under the Second Lien Credit Agreement and (iii) Term A Notes referred to in, and evidences Indebtedness incurred under, the Second Lien Credit Agreement, to which reference is made for a description of the security for this Term A Note and for a statement of the terms and conditions on which the Borrower is permitted and required to make prepayments and repayments, in whole or in part, of principal of the Indebtedness evidenced by this Term A Note and on which such Indebtedness may be declared to be immediately due and payable.

All parties hereto, whether as makers, endorsers, or otherwise, severally waive presentment for payment, demand, protest and notice of dishonor.

A-1

THIS TERM A NOTE HAS BEEN DELIVERED IN NEW YORK, NEW YORK AND SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING FOR SUCH PURPOSE SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).

WORKFLOWONE LLC


By: _____
    Name:
    Title:

A-2

## LOANS AND PRINCIPAL PAYMENTS

| Date | Amount of Loan Made | Amount of Principal Repaid | Unpaid Principal Balance | Total | Notation Made By |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

8000834

FORM OF TERM B NOTE

$_____                                                                    [●], 2011


FOR VALUE RECEIVED, WORKFLOWONE LLC, a Delaware limited liability company (the "<u>Borrower</u>"), promises to pay [Name of Lender] (the "<u>Lender</u>") on the Stated Maturity Date the principal sum of [_____] ($[_____]) or, if less, the aggregate unpaid principal amount of all Loans set forth in the Register (and any continuation thereof) made by the Lender pursuant to that certain Second Lien Credit Agreement, dated as of [●], 2011 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "<u>Second Lien Credit Agreement</u>"), among the Borrower, the various financial institutions and other Persons from time to time parties thereto as lenders and [●], as Administrative Agent. Terms used in this Term B Note, unless otherwise defined herein, have the meanings provided in the Second Lien Credit Agreement.

The Borrower also promises to pay interest on the unpaid principal amount hereof from time to time outstanding from the date hereof until maturity (whether by acceleration or otherwise) and, after maturity, until paid, at the rates per annum and on the dates specified in the Second Lien Credit Agreement.

Payments of both principal and interest are to be made in U.S. Dollars in same day or immediately available funds to the account designated by the Lender pursuant to the Second Lien Credit Agreement.

This Term B Note is one of the (i) Newco Second Lien Loan Notes referred to in the Plan, and evidences the payment obligations of Purchaser (as defined in the Plan) under the Second Lien Credit Agreement, (ii) Newco Second Lien Loan Notes referred to in the Asset Purchase Agreement, and evidences the payment obligations of Buyer (as defined in the Asset Purchase Agreement) under the Second Lien Credit Agreement and (iii) Term B Notes referred to in, and evidences Indebtedness incurred under, the Second Lien Credit Agreement, to which reference is made for a description of the security for this Term B Note and for a statement of the terms and conditions on which the Borrower is permitted and required to make prepayments and repayments, in whole or in part, of principal of the Indebtedness evidenced by this Term B Note and on which such Indebtedness may be declared to be immediately due and payable.

All parties hereto, whether as makers, endorsers, or otherwise, severally waive presentment for payment, demand, protest and notice of dishonor.

THIS TERM B NOTE HAS BEEN DELIVERED IN NEW YORK, NEW YORK AND SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING FOR SUCH PURPOSE SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).

WORKFLOWONE LLC

By: _____

    Name:

    Title:

A-2

## LOANS AND PRINCIPAL PAYMENTS

| Date | Amount of Loan Made | Amount of Principal Repaid | Unpaid Principal Balance | Total | Notation Made By |
|------|------|------|------|------|------|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

8000838

**<u>Blackline To February 14, 2011 Version</u>**

EXHIBIT A-1

FORM OF TERM A-PRIME NOTE

$_____                                                                                    [●], 2011

FOR VALUE RECEIVED, WORKFLOWONE LLC, a Delaware limited liability company (the "Borrower"), promises to pay to the order of [Name of Lender] (the "Lender") on the Stated Maturity Date the principal sum of [_____] ($[_____]) or, if less, the aggregate unpaid principal amount of all Loans set forth in the Register (and any continuation thereof) made by the Lender pursuant to that certain Second Lien Credit Agreement, dated as of [●], 2011 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Second Lien Credit Agreement"), among the Borrower, the various financial institutions and other Persons from time to time parties thereto as lenders and [●], as Administrative Agent.  Terms used in this Term A-Prime Note, unless otherwise defined herein, have the meanings provided in the Second Lien Credit Agreement.

The Borrower also promises to pay interest on the unpaid principal amount hereof from time to time outstanding from the date hereof until maturity (whether by acceleration or otherwise) and, after maturity, until paid, at the rates per annum and on the dates specified in the Second Lien Credit Agreement.

Payments of both principal and interest are to be made in U.S. Dollars in same day or immediately available funds to the account designated by the Lender pursuant to the Second Lien Credit Agreement.

This Term A-Prime Note is one of the (i) Newco Second Lien Loan Notes referred to in the Plan, and evidences the payment obligations of Purchaser (as defined in the Plan) under the Second Lien Credit Agreement, (ii) Newco Second Lien Loan Notes referred to in the Asset Purchase Agreement, and evidences the payment obligations of Buyer (as defined in the Asset Purchase Agreement) under the Second Lien Credit Agreement and (iii) Term A-Prime Notes referred to in, and evidences Indebtedness incurred under, the Second Lien Credit Agreement, to which reference is made for a description of the security for this Term A-Prime Note and for a statement of the terms and conditions on which the Borrower is permitted and required to make prepayments and repayments, in whole or in part, of principal of the Indebtedness evidenced by this Term A-Prime Note and on which such Indebtedness may be declared to be immediately due and payable.

All parties hereto, whether as makers, endorsers, or otherwise, severally waive presentment for payment, demand, protest and notice of dishonor.

A-1

**Error! Unknown document property name.**

7979933

THIS TERM A-PRIME NOTE HAS BEEN DELIVERED IN NEW YORK, NEW YORK AND SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING FOR SUCH PURPOSE SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).

WORKFLOWONE LLC

By: _____
    Name:
    Title:

A-2

## LOANS AND PRINCIPAL PAYMENTS

| Date | Amount of Loan Made | Amount of Principal Repaid | Unpaid Principal Balance | Total | Notation Made By |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

**Error! Unknown document property name.**

EXHIBIT A-2

FORM OF TERM A NOTE

$_____                                                                [●], 2011

FOR VALUE RECEIVED, WORKFLOWONE LLC, a Delaware limited liability company (the "Borrower"), promises to pay ~~to the order of~~ [Name of Lender] (the "Lender") on the Stated Maturity Date the principal sum of [_____] ($[_____]) or, if less, the aggregate unpaid principal amount of all Loans set forth in the Register (and any continuation thereof) made by the Lender pursuant to that certain Second Lien Credit Agreement, dated as of [●], 2011 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Second Lien Credit Agreement"), among the Borrower, the various financial institutions and other Persons from time to time parties thereto as lenders and [●], as Administrative Agent.  Terms used in this Term A Note, unless otherwise defined herein, have the meanings provided in the Second Lien Credit Agreement.

The Borrower also promises to pay interest on the unpaid principal amount hereof from time to time outstanding from the date hereof until maturity (whether by acceleration or otherwise) and, after maturity, until paid, at the rates per annum and on the dates specified in the Second Lien Credit Agreement.

Payments of both principal and interest are to be made in U.S. Dollars in same day or immediately available funds to the account designated by the Lender pursuant to the Second Lien Credit Agreement.

This Term A Note is one of the (i) Newco Second Lien Loan Notes referred to in the Plan, and evidences the payment obligations of Purchaser (as defined in the Plan) under the Second Lien Credit Agreement, (ii) Newco Second Lien Loan Notes referred to in the Asset Purchase Agreement, and evidences the payment obligations of Buyer (as defined in the Asset Purchase Agreement) under the Second Lien Credit Agreement and (iii) Term A Notes referred to in, and evidences Indebtedness incurred under, the Second Lien Credit Agreement, to which reference is made for a description of the security for this Term A Note and for a statement of the terms and conditions on which the Borrower is permitted and required to make prepayments and repayments, in whole or in part, of principal of the Indebtedness evidenced by this Term A Note and on which such Indebtedness may be declared to be immediately due and payable.

All parties hereto, whether as makers, endorsers, or otherwise, severally waive presentment for payment, demand, protest and notice of dishonor.

Error! Unknown document property name.

THIS TERM A NOTE HAS BEEN DELIVERED IN NEW YORK, NEW YORK AND SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING FOR SUCH PURPOSE SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).

WORKFLOWONE LLC

By: _____
    Name:
    Title:

A-2

LOANS AND PRINCIPAL PAYMENTS

| Date | Amount of Loan Made | Amount of Principal Repaid | Unpaid Principal Balance | Total | Notation Made By |
|------|---------------------|----------------------------|--------------------------|-------|------------------|
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |

**Error! Unknown document property name.**
8000834

EXHIBIT A-3

## FORM OF TERM B NOTE

$_____                                                              [●], 2011

FOR VALUE RECEIVED, WORKFLOWONE LLC, a Delaware limited liability company (the "Borrower"), promises to pay ~~to the order of~~ [Name of Lender] (the "Lender") on the Stated Maturity Date the principal sum of [_____] ($[_____]) or, if less, the aggregate unpaid principal amount of all Loans set forth in the Register (and any continuation thereof) made by the Lender pursuant to that certain Second Lien Credit Agreement, dated as of [●], 2011 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Second Lien Credit Agreement"), among the Borrower, the various financial institutions and other Persons from time to time parties thereto as lenders and [●], as Administrative Agent.  Terms used in this Term B Note, unless otherwise defined herein, have the meanings provided in the Second Lien Credit Agreement.

The Borrower also promises to pay interest on the unpaid principal amount hereof from time to time outstanding from the date hereof until maturity (whether by acceleration or otherwise) and, after maturity, until paid, at the rates per annum and on the dates specified in the Second Lien Credit Agreement.

Payments of both principal and interest are to be made in U.S. Dollars in same day or immediately available funds to the account designated by the Lender pursuant to the Second Lien Credit Agreement.

This Term B Note is one of the (i) Newco Second Lien Loan Notes referred to in the Plan, and evidences the payment obligations of Purchaser (as defined in the Plan) under the Second Lien Credit Agreement, (ii) Newco Second Lien Loan Notes referred to in the Asset Purchase Agreement, and evidences the payment obligations of Buyer (as defined in the Asset Purchase Agreement) under the Second Lien Credit Agreement and (iii) Term B Notes referred to in, and evidences Indebtedness incurred under, the Second Lien Credit Agreement, to which reference is made for a description of the security for this Term B Note and for a statement of the terms and conditions on which the Borrower is permitted and required to make prepayments and repayments, in whole or in part, of principal of the Indebtedness evidenced by this Term B Note and on which such Indebtedness may be declared to be immediately due and payable.

All parties hereto, whether as makers, endorsers, or otherwise, severally waive presentment for payment, demand, protest and notice of dishonor.

A-1

**Error! Unknown document property name.**

THIS TERM B NOTE HAS BEEN DELIVERED IN NEW YORK, NEW YORK AND SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING FOR SUCH PURPOSE SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).

WORKFLOWONE LLC

By: _____

    Name:

    Title:

**Error! Unknown document property name.**

LOANS AND PRINCIPAL PAYMENTS

| Date | Amount of Loan Made | Amount of Principal Repaid | Unpaid Principal Balance | Total | Notation Made By |
|------|---------------------|----------------------------|--------------------------|-------|------------------|
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |
|      |                     |                            |                          |       |                  |

**Error! Unknown document property name.**
8000838

**Exhibit L**
(Intercreditor Agreement)

**FF DRAFT 2/17/11**

## INTERCREDITOR AGREEMENT

This INTERCREDITOR AGREEMENT (as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with Section 8.3 hereof, this "Agreement"), is entered into as of [●], 2011, among WORKFLOWONE LLC, a Delaware limited liability company (the "Borrower"), THE BANK OF NEW YORK MELLON, in its capacity as administrative agent (together with its successors and assigns from time to time, the "First Lien Agent") for the First Lien Claimholders (capitalized terms used herein have the meanings set forth in or incorporated by reference in Article I), and SILVER POINT FINANCE, LLC, in its capacity as administrative agent (together with its successors and assigns from time to time, the "Second Lien Agent") for the Second Lien Claimholders.

W I T N E S S E T H :

WHEREAS, on September 29, 2010, WF Capital Holdings, Inc. and its subsidiaries (collectively, "Bankruptcy Debtors") filed voluntary petitions for reorganization under Chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§101-1532, as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia, Norfolk Division (the "Bankruptcy Court"), jointly administered as In re Workflow Management, Inc., et al., Chapter 11 Case No. 10-74617 (SCS) and continued in the possession of their property and in the management of their businesses pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, on January 21, 2011, the Bankruptcy Debtors filed with the Bankruptcy Court a Third Amended Joint Chapter 11 Plan of Workflow Management, Inc. and its Affiliated Debtors (the "Plan") and a disclosure statement;

WHEREAS, the Plan contemplates, among other things: (i) the transfer of substantially all assets of the Bankruptcy Debtors to Workflow Holdings LLC, a Delaware limited liability company (the "Parent"), or to another entity or entities designated by Parent, pursuant to the Asset Purchase and Sale Agreement, dated as of January 21, 2011, by and among the Bankruptcy Debtors as Sellers and Parent as Buyer, as amended, supplemented, amended and restated or otherwise modified from time to time (the "Asset Purchase Agreement"); (ii) the cancellation of all Indebtedness outstanding under the First Lien Credit Agreement (as defined in the Plan, and referred to herein as the "Pre-Petition First Lien Credit Agreement") in exchange for the issuance of Loans under the First Lien Credit Agreement (as defined below); and (iii) the cancellation of all Indebtedness outstanding under the Second Lien Credit Agreement (as defined in the Plan, and referred to herein as the "Pre-Petition Second Lien Credit Agreement") in exchange for the issuance of (x) the Second Lien Loans under the Second Lien Credit Agreement (as defined below) and (y) the Newco Preferred Units (as defined in the Plan);

WHEREAS, the Parent owns all of the Capital Securities of the Borrower and has designated Borrower to purchase substantially all of the assets of the Bankruptcy Debtors pursuant to the Asset Purchase Agreement;

7970675

WHEREAS, on [●], 2011, the Bankruptcy Court entered the order confirming the Plan (the "Confirmation Order") pursuant to which, among other things, the Bankruptcy Court approved the transactions contemplated by the Plan;

WHEREAS, on the date hereof, concurrently with the effectiveness of this Agreement, the Plan shall become effective in accordance with its terms;

WHEREAS, in connection with the transactions contemplated by the Plan and by operation of the Confirmation Order, on the date hereof, each lender under the Pre-Petition First Lien Credit Agreement shall have received (via an exchange) its Pro Rata Share (as defined in the Plan) of the Loans and shall have become a Lender under the First Lien Credit Agreement, dated as of the date hereof (as amended, restated, supplemented, modified or Refinanced from time to time, the "First Lien Credit Agreement") among the Borrower, the Lenders thereunder and the First Lien Administrative Agent, subject to all of the rights and obligations of a Lender thereunder without any further action on the part of such Lender;

WHEREAS, in connection with the transactions contemplated by the Plan and by operation of the Confirmation Order, on the date hereof, each lender under the Pre-Petition Second Lien Credit Agreement shall have received (via an exchange) its Pro Rata Share (as defined in the Plan) of the Loans and shall have become a Lender under the Second Lien Credit Agreement, dated as of the date hereof (as amended, restated, supplemented, modified or Refinanced from time to time, the "Second Lien Credit Agreement") among the Borrower, the Lenders thereunder and the Second Lien Administrative Agent, subject to all of the rights and obligations of a Lender thereunder without any further action on the part of such Lender;

WHEREAS, the obligations of the Parent, the Borrower and the Subsidiary Guarantors under the First Lien Credit Agreement and the other First Lien Credit Documents (including Hedging Obligations under any Rate Protection Agreement (as defined in the First Lien Credit Agreement)) will be secured by substantially all the assets of the Parent, the Borrower and the Subsidiary Guarantors pursuant to the terms of the First Lien Collateral Documents;

WHEREAS, the obligations of the Borrower under the Second Lien Credit Agreement and the other Second Lien Credit Documents will be secured by substantially all the assets of the Parent, the Borrower and the Subsidiary Guarantors pursuant to the terms of the Second Lien Collateral Documents;

WHEREAS, the First Lien Credit Documents and the Second Lien Credit Documents provide, among other things, that the parties thereto shall set forth in this Agreement their respective rights and remedies with respect to the Collateral; and

WHEREAS, in connection with the transactions contemplated by the Plan and by operation of the Confirmation Order, this Agreement shall govern the relative priorities and rights between the Second Lien Claimholders and the First Lien Claimholders and the Second Lien Agent on behalf of the Second Lien Claimholders, and the First Lien Agent on behalf of the First Lien Claimholders will be bound by the subordination, intercreditor and other provisions set forth herein.

2

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I

DEFINITIONS

**SECTION 1.1**   Defined Terms.  As used in the Agreement, the following terms shall have the following meanings:

"363 Sale" has the meaning set forth in Section 6.1.

"Affiliate" of any Person means any other Person which, directly or indirectly, controls, is controlled by or is under common control with such Person.  "Control" of a Person means the power, directly or indirectly, (a) to vote 10% or more of the Capital Securities (on a fully diluted basis) of such Person having ordinary voting power for the election of directors, managing members or general partners (as applicable) or (b) to direct or cause the direction of the management and policies of such Person (whether by contract or otherwise).

"Agreement" means this Agreement, as amended, renewed, extended, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Debtors" has the meaning set forth in the recitals.

"Bankruptcy Law" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

"Borrower" has the meaning set forth in the preamble.

"Business Day" means any day which is neither a Saturday nor Sunday nor a legal holiday on which banks are authorized or required to be closed in New York, New York.

"Capital Securities" means, with respect to any Person, all shares, interests, participations or other equivalents (however designated, whether voting or non-voting and whether certificated or uncertificated) of such Person's capital, whether now outstanding or issued after the date hereof, including common shares, preferred shares, membership interests in a limited liability company, limited or general partnership interests in a partnership or any other equivalent of such ownership interest.

"Collateral" means all of the assets and property of any Obligor, whether real, personal or mixed, constituting both First Lien Collateral and Second Lien Collateral.

3

"Comparable Second Lien Collateral Document" means, in relation to any Collateral subject to any Lien created under any First Lien Collateral Document, that Second Lien Credit Document which creates a Lien on the same Collateral, granted by the same Obligor.

"DIP Financing" has the meaning set forth in Section 6.1.

"Discharge of First Lien Obligations" means (a) payment in full in cash of the principal of and interest (including interest accruing on or after the commencement of any Insolvency or Liquidation Proceeding, whether or not such interest would be allowed in such Insolvency or Liquidation Proceeding) and premium, if any, on all Indebtedness outstanding under the First Lien Credit Documents and (b) payment in full in cash of all other First Lien Obligations (other than contingent indemnification, gross-up, and other obligations as to which no claim has been asserted) that are due and payable or otherwise accrued and owing at or prior to the time such principal, interest and premium, if any, are paid; provided that with respect to the principal amount of First Lien Obligations, "Discharge of First Lien Obligations" means payment in full in cash of the principal amount thereof only up to the Maximum First Lien Principal Amount.

"First Lien Agent" has the meaning set forth in the preamble.

"First Lien Claimholders" means, at any relevant time, the holders of First Lien Obligations at such time, including the First Lien Lenders, the agents under the First Lien Credit Agreement and the counterparties of the Borrower or any of its Subsidiaries under the First Lien Hedging Agreements, if any.

"First Lien Collateral" means all of the assets and property of any Obligor, whether real, personal or mixed, with respect to which a Lien is granted by such Obligor as security for any First Lien Obligations.

"First Lien Collateral Documents" means, collectively, the Security Agreement and the Mortgages (as each such term is defined in the First Lien Credit Agreement) and any other agreement, document or instrument pursuant to which a Lien is granted securing any First Lien Obligations or under which rights or remedies with respect to such Liens are governed.

"First Lien Credit Agreement" has the meaning set forth in the recitals.

"First Lien Credit Documents" means the First Lien Credit Agreement and the Loan Documents (as defined in the First Lien Credit Agreement, including any First Lien Hedging Agreement) and each of the other agreements, documents and instruments delivered at any time in connection with the foregoing, as each may be amended, restated or modified from time to time, including any documents or instruments executed or delivered in connection with a Refinancing.

"First Lien Hedging Agreement" means any Hedging Agreement entered into by the Borrower or any Subsidiary of the Borrower designed to protect the Borrower or any Subsidiary Guarantor from fluctuations in interest rates or currency exchange rates with a counterparty that is (or, at the time such agreement was entered into, was) a First Lien Lender or the First Lien Agent or an Affiliate of a First Lien Lender or the First Lien Agent.

"First Lien Lenders" means the "Lenders" under and as defined in the First Lien Credit Agreement.

"First Lien Mortgages" means a collective reference to, if any, each mortgage, deed of trust and any other document or instrument under which any Lien on real property owned by any Obligor is granted to secure any First Lien Obligations or under which rights or remedies with respect to any such Liens are governed (including each Mortgage as defined in the First Lien Credit Agreement).

"First Lien Obligations" means all Obligations outstanding under the First Lien Credit Agreement and the other First Lien Credit Documents (including any Hedging Obligation owing under the First Lien Hedging Agreements).  To the extent any payment with respect to the First Lien Obligations (whether by or on behalf of any Obligor, as proceeds of security, enforcement of any right of set-off or otherwise) is declared to be fraudulent or preferential in any respect, set aside or required to be paid or turned over to a debtor in possession, trustee, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall be deemed to be reinstated and outstanding as if such payment had not occurred.  "First Lien Obligations" shall include all interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant First Lien Credit Document whether or not the claim for such interest is allowed as a claim in such Insolvency or Liquidation Proceeding.

"Governmental Authority" means the government of the United States, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, tribunal, grand jury, arbitrator, central bank, bureau, department, commission or other Person exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantors" means the Parent and the Subsidiary Guarantors and each of their and the Borrower's future U.S. Subsidiaries that may from time to time hereafter execute and deliver a First Lien Collateral Document or a Second Lien Collateral Document.

"Hedging Agreements" means currency exchange agreements, interest rate swap agreements, interest rate cap agreements, interest rate collar agreements, and all other agreements or arrangements designed to protect a Person against fluctuations in interest rates or, currency exchange rates.

"Hedging Obligation" of the Borrower or any of its Subsidiaries means any obligation of any such Person pursuant to any Hedging Agreement.

"Indebtedness" means and includes all Obligations that constitute "Indebtedness" within the meaning of the First Lien Credit Agreement or the Second Lien Credit Agreement.

"Insolvency or Liquidation Proceeding" means (a) any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to any Obligor, (b) any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Obligor or

5

with respect to a material portion of their respective assets, (c) any liquidation, dissolution, reorganization or winding up of any Obligor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy or (d) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Obligor.

"Lien" means any security interest, mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or otherwise), charge against or interest in property, or other priority or preferential arrangement of any kind or nature whatsoever, including any conditional sale or title retention arrangement, any capitalized lease and any assignment, deposit arrangement or financing lease intended as, or having the effect of, security.

"Maximum First Lien Principal Amount" means, at any time,

(i)     $141,528,677;

less

(ii)     the aggregate principal amount of repayments or prepayments of Indebtedness under the First Lien Credit Agreement;

plus

(iii)     $10,000,000;

plus

(iv)     any accrued and unpaid interest, fees or other amounts that have been capitalized or otherwise added to principal in accordance with the First Lien Credit Documents (as in effect on the date hereof or as modified in accordance herewith or therewith).

"Obligations" means any and all obligations with respect to the payment of (a) any principal of or interest or premium on any indebtedness, including any other liability, including interest accruing after the filing of a petition initiating any proceeding under the Bankruptcy Code, (b) any fees, indemnification obligations, expense reimbursement obligations or other liabilities payable under the documentation governing any indebtedness (including any such liabilities arising or accruing after the filing of a petition commencing any case under the Bankruptcy Code) and (c) any Hedging Obligations.

"Obligor" means the Parent, the Borrower and/or any Subsidiary Guarantor.

"Parent" has the meaning set forth in the recitals.

"Person" means any natural person, corporation, limited liability company, partnership, joint venture, association, trust or unincorporated organization, Governmental Authority or any other legal entity, whether acting in an individual, fiduciary or other capacity.

"Pledged Collateral" means, as the context may require, (a) any Collateral in the possession or control of the First Lien Agent (or its agents), to the extent that possession or

6

control thereof is taken to perfect a Lien thereon under the Uniform Commercial Code, including any deposit account or securities account (as such terms are defined in the UCC) and/or (b) any rights to receive payments under any insurance policy that constitute Collateral and with respect to which the First Lien Agent (or any of its agents) is named as an additional insured or a loss payee.

"Recovery" has the meaning set forth in Section 6.5.

"Refinancing" means,

(a)     in respect of any Indebtedness under the First Lien Credit Agreement, any refinancing, extension, renewal, defeasance, restructuring, replacement or refunding of loans, to the extent (i) the aggregate principal amount of loans and commitments made in connection with such refinancing, extension, renewal, defeasance, restructuring, replacement or refunding does not exceed the Maximum First Lien Principal Amount as of the date of such Refinancing and (ii) the Second Lien Agent has been provided written notice by the Borrower that the Obligations arising from such refinancing, extension, renewal, defeasance, restructuring, replacement or refunding are intended to constitute First Lien Obligations hereunder; and

(b)     in respect of any Indebtedness under the Second Lien Credit Agreement, any refinancing, extension, renewal, defeasance, restructuring, replacement or refunding of loans under the Second Lien Credit Agreement, to the extent the First Lien Agent has been provided written notice thereof that the Obligations arising therefrom are intended to constitute Second Lien Obligations hereunder; provided that any such refinancing, extension, renewal, defeasance, restructuring, replacement or refunding (and the Indebtedness resulting therefrom) does not (1) contravene the provisions of this Agreement (and the holder of such refinancing Indebtedness, or an agent on their behalf, have agreed to be bound by the terms hereof), (2) result in an increase in the "Applicable Margin" or similar component of the interest yield of the loans of such refinancing Indebtedness which is more than 2.00 % per annum above the "Applicable Margin" or similar component under the Second Lien Credit Agreement as of the date hereof (exclusive, for the avoidance of doubt, of any imposition of up to 2.00% of "default" interest); provided that this clause shall not apply to any interest that is not paid in cash, (3) provide for dates for payment of principal, interest, premium (if any) or fees which are earlier than such dates under the Second Lien Credit Agreement, or (4) provide for collateral securing such refinancing Indebtedness which is more extensive than the collateral provided with respect to the First Lien Credit Agreement unless comparable senior Liens are granted to the First Lien Agent for the benefit of the First Lien Claimholders.

"Refinanced" and "Refinance" shall have correlative meanings.

"Second Lien Agent" has the meaning set forth in the preamble.

"Second Lien Claimholders" means, at any relevant time, the holders of Second Lien Obligations at such time, including the Second Lien Lenders and the agents under the Second Lien Credit Agreement.

"Second Lien Collateral" means all of the assets of any Obligor, whether real, personal or mixed, with respect to which a Lien is granted by such Obligor as security for any Second Lien Obligations.

"Second Lien Collateral Documents" means, collectively, the Security Agreement and the Mortgages (as each such term is defined in the Second Lien Credit Agreement) and any other agreement, document or instrument pursuant to which a Lien is granted securing any Second Lien Obligations or under which rights or remedies with respect to such Liens are governed.

"Second Lien Credit Agreement" has the meaning set forth in the recitals.

"Second Lien Credit Documents" means the Second Lien Credit Agreement and the Loan Documents (as defined in the Second Lien Credit Agreement) and each of the other agreements, documents and instruments delivered at any time in connection with the foregoing, as the same may be amended, restated or modified from time to time (including any documents or instruments executed or delivered in connection with any Refinancing).

"Second Lien Lenders" means the "Lenders" under and as defined in the Second Lien Credit Agreement.

"Second Lien Mortgages" means a collective reference to, if any, each mortgage, deed of trust and any other document or instrument under which any Lien on real property owned by any Obligor is granted to secure any Second Lien Obligations or under which rights or remedies with respect to any such Liens are governed (including each Mortgage as defined in the Second Lien Credit Agreement).

"Second Lien Obligations" means all Obligations outstanding under the Second Lien Credit Agreement and the other Second Lien Credit Documents.  To the extent any payment with respect to the Second Lien Obligations (whether by or on behalf of any Obligor, as proceeds of security, enforcement of any right of set-off or otherwise) is declared to be fraudulent or preferential in any respect, set aside or required to be paid or turned over to a debtor in possession, trustee, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied shall be deemed to be reinstated and outstanding as if such payment had not occurred.  "Second Lien Obligations" shall include all interest accrued or accruing (or which would, absent commencement of an Insolvency or Liquidation Proceeding, accrue) after commencement of an Insolvency or Liquidation Proceeding in accordance with the rate specified in the relevant Second Lien Credit Document whether or not the claim for such interest is allowed as a claim in such Insolvency or Liquidation Proceeding.

"Subsidiary" means, with respect to any Person, any other Person of which more than 50% of the outstanding Voting Securities of such other Person (irrespective of whether at the time Capital Securities of any other class or classes of such other Person shall or might have voting power upon the occurrence of any contingency) is at the time directly or indirectly owned or controlled by such Person, by such Person and one or more other Subsidiaries of such Person, or by one or more other Subsidiaries of such Person.  Unless the context otherwise specifically requires, the term "Subsidiary" shall be a reference to a Subsidiary of the Borrower.

"Subsidiary Guarantor" means any U.S. Subsidiary that executes a "Subsidiary Guaranty" pursuant to the First Lien Credit Agreement and the Second Lien Credit Agreement.

"U.S. Subsidiary" means each Subsidiary of the Borrower organized in the United States.

"Uniform Commercial Code" or "UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"Voting Securities" means, with respect to any Person, Capital Securities of any class or kind ordinarily having the power to vote for the election of directors, managers or other voting members of the governing body of such Person.

**SECTION 1.2**   Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified, (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Sections shall be construed to refer to Sections of this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

**ARTICLE II**

LIEN PRIORITIES

**SECTION 2.1**   Subordination.  Notwithstanding the date, manner or order of grant, attachment or perfection of any Liens securing the Second Lien Obligations granted on the Collateral or of any Liens securing the First Lien Obligations granted on the Collateral and notwithstanding any provision of the UCC or any applicable law or the Second Lien Credit Documents or any other circumstance whatsoever, the Second Lien Agent, on behalf of itself and the Second Lien Claimholders, hereby agrees that, subject to Section 6.6 hereof: (a) any Lien on the Collateral securing any First Lien Obligations now or hereafter held by or on behalf of any First Lien Claimholder, the First Lien Agent or any other agent or trustee therefor, regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be senior in all respects and prior to any Lien on the Collateral securing any of the Second Lien Obligations; and (b) any Lien on the Collateral now or hereafter held by or on behalf of any Second Lien Claimholder, the Second Lien Agent or any other agent or trustee therefor regardless of how acquired, whether by grant, possession, statute, operation of law, subrogation or otherwise, shall be junior and subordinate in all respects to all Liens on the Collateral securing

9

any First Lien Obligations.  All Liens on the Collateral securing any First Lien Obligations shall be and remain senior in all respects and prior to all Liens on the Collateral securing any Second Lien Obligations for all purposes, whether or not such Liens securing any First Lien Obligations are subordinated to any Lien securing any other obligation of the Borrower, the Parent, any other Guarantor or any other Person.

      **SECTION 2.2**   Prohibition on Contesting Claims and Liens.  Each of the Second Lien Agent, for itself and on behalf of each Second Lien Claimholder, and the First Lien Agent, for itself and on behalf of each First Lien Claimholder, agrees that it shall not (and hereby waives any right to) contest or support any other Person in contesting, in any proceeding (including any Insolvency or Liquidation Proceeding), the validity, perfection or enforceability of any First Lien Obligation or any Second Lien Obligation, respectively, or the priority, validity or enforceability of a Lien held by or on behalf of any of the First Lien Claimholders in the First Lien Collateral or by or on behalf of any of the Second Lien Claimholders in the Second Lien Collateral, respectively; provided that nothing in this Agreement shall be construed to prevent or impair the rights of the First Lien Agent or any First Lien Claimholder to enforce this Agreement, including the priority of the Liens securing the First Lien Obligations as provided in Section 2.1.

      **SECTION 2.3**   No New Liens.  So long as the Discharge of First Lien Obligations has not occurred, the parties hereto agree that no Obligor shall grant or permit any additional Liens on any asset of such Obligor to secure (a) any Second Lien Obligation unless it has also granted a senior Lien on such asset to secure the First Lien Obligations or (b) any First Lien Obligation unless immediately after giving effect to such grant or concurrently therewith, it will grant a Lien on such asset to secure the Second Lien Obligations.  To the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the First Lien Agent and/or the First Lien Claimholders, the Second Lien Agent, on behalf of itself and the Second Lien Claimholders, agrees that any amounts received by or distributed to it or any Second Lien Claimholder pursuant to or as a result of Liens granted in contravention of this Section 2.3 shall be subject to Section 4.2.

      **SECTION 2.4**   Similar Liens and Agreements.  The parties hereto agree that it is their intention that the First Lien Collateral and the Second Lien Collateral be substantially identical.  In furtherance of the foregoing and of Section 8.9, the parties hereto agree, subject to the other provisions of this Agreement that the Second Lien Collateral Documents, the Parent Guaranty and the Subsidiary Guaranty (as defined in the Second Lien Credit Agreement) shall be substantially in the same forms (except for differences relating to the subordination of the Liens securing the Second Lien Obligations to the Liens securing the First Lien Obligations) as the First Lien Collateral Documents, the Parent Guaranty and the Subsidiary Guaranty (as defined in the First Lien Credit Agreement), respectively.

## ARTICLE III

ENFORCEMENT

      **SECTION 3.1**   Exercise of Remedies.  (a) So long as the Discharge of First Lien Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been

10

commenced by or against the Borrower or any Obligor:

(i)        the Second Lien Agent and the Second Lien Claimholders will not exercise or seek to exercise any rights or remedies (including setoff and the right to credit bid their debt) with respect to any Collateral (including the exercise of any right under any lockbox agreement, control account agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the Second Lien Agent or any Second Lien Claimholder is a party) or institute any action or proceeding with respect to such rights or remedies (including any action of foreclosure), and will not contest, protest or object to any foreclosure proceeding or action brought by the First Lien Agent or any First Lien Claimholder or any other exercise by the First Lien Agent or any First Lien Claimholder, of any rights and remedies relating to the First Lien Collateral or otherwise, or object to the forbearance by the First Lien Agent or the First Lien Claimholders from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the First Lien Collateral; provided, however, that if an Event of Default (as defined in the Second Lien Credit Agreement (as in effect on the date hereof or as modified as permitted hereby)) has occurred and for so long as such Event of Default is continuing, subject at all times to the provisions of Sections 2.1 and Article IV, commencing 90 days after the receipt by the First Lien Agent of the written declaration of the Second Lien Agent of such Event of Default, the Second Lien Agent may take action to enforce its Liens on the Second Lien Collateral upon five (5) days' prior written notice to the First Lien Agent (which notice may be given prior to the completion of such 90 day period), but only so long as the First Lien Agent is not diligently pursuing in good faith the exercise of its enforcement rights or remedies against, or diligently attempting to vacate any stay or enforcement of its Liens on, a material portion of the Collateral (including, without limitation, commencement of any reasonable action to foreclose its Liens on a material portion of the Collateral, any reasonable action to take possession of a material portion of the Collateral or commencement of any reasonable legal proceedings or actions against or with respect to a material portion of the Collateral); and

(ii)        the First Lien Agent and the First Lien Claimholders shall, except as otherwise expressly provided herein (including in the proviso to paragraph (i) above, Subsections 3.1(d) and (e), and Article VI), have the exclusive right to enforce rights, exercise remedies (including set off and the right to credit bid their debt) and make determinations regarding the release, disposition, or restrictions with respect to the First Lien Collateral without any consultation with or the consent of the Second Lien Agent or any Second Lien Claimholder; provided that the First Lien Agent will prior to foreclosing upon all or a material portion of the Collateral, provide the Second Lien Agent with at least thirty (30) days' notice of its intent to commence such foreclosure and the First Lien Agent will not take any such action to the extent prohibited by Section 5.6; provided further that in any Insolvency or Liquidation Proceeding commenced by or against the Parent, the Borrower or any Subsidiary Guarantor, the Second Lien Agent may file a claim or statement of interest with respect to the Second Lien Obligations and the Second Lien Agent may take any action (not adverse to the prior Liens on the First Lien Collateral or the rights of the First Lien Agent or the First Lien Claimholders to exercise remedies in respect thereof) in order to preserve or protect (but not, except as otherwise permitted hereby, enforce) its Lien on the Collateral and to preserve its rights to share in the proceeds of the Collateral in accordance with the terms of this Agreement.

(b)     The Second Lien Agent, on behalf of itself and the Second Lien Claimholders, agrees that it will not take or receive any Collateral or any proceeds of Collateral in connection with the exercise of any right or remedy (including setoff) with respect to any Collateral, unless and until the Discharge of First Lien Obligations has occurred, except to preserve its rights to share in the proceeds of the Collateral in accordance with the terms of this Agreement to the extent expressly provided in clauses (i) and (ii) of Section 3.1(a) of this Agreement (it being understood and agreed for the avoidance of doubt that this sentence shall not be construed to prevent any mandatory prepayment of the Second Lien Obligations under and in accordance with the terms of Section 3.1.1(c), (d), (e) or (f) of the Second Lien Credit Agreement (as in effect on the date hereof or as modified in accordance herewith) or any payment of interest, fees or other amounts owing under the Second Lien Credit Agreement).

(c)     Except as expressly provided in Subsections 3.1(a), (d) and (e), and Article VI of this Agreement, (i) the Second Lien Agent, for itself and on behalf of the Second Lien Claimholders, agrees that the Second Lien Agent and the Second Lien Claimholders will not take any action that would hinder any exercise of remedies under the First Lien Credit Documents, including any sale, lease, exchange, transfer or other disposition of the Collateral, whether by foreclosure or otherwise, and (ii) the Second Lien Agent, for itself and on behalf of the Second Lien Claimholders, hereby waives any and all rights it or the Second Lien Claimholders may have as a junior lien creditor or otherwise to object to the manner in which the First Lien Agent or the First Lien Claimholders seek to enforce or collect the First Lien Obligations or the Liens granted in any of the First Lien Collateral, regardless of whether any action or failure to act by or on behalf of the First Lien Agent or First Lien Claimholders is adverse to the interest of the Second Lien Claimholders; provided that such enforcement and collection is in accordance with the UCC and applicable law.

(d)     Notwithstanding anything to the contrary herein, the Second Lien Agent and each Second Lien Claimholder shall be entitled to:

(i)     file a claim or statement of interest with respect to the Second Lien Obligations; provided that an Insolvency or Liquidation Proceeding has been commenced by or against the Borrower or any other Obligor;

(ii)     take any action (not adverse to the priority status of the Liens on the First Lien Collateral securing the First Lien Obligations (giving effect to this Agreement) or the rights of any of the First Lien Agent or any of the other First Lien Claimholders to exercise rights or remedies in respect thereof) in order to create, perfect, preserve or protect (but not, except as otherwise permitted hereby, enforce) its Lien on any of the Collateral;

(iii)     file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any Person objecting to or otherwise seeking the disallowance of the claims of the Second Lien Claimholders, including any claims secured by the First Lien Collateral, if any, in each case in accordance with the terms of this Agreement;

(iv)     file any pleadings, objections, motions or agreements which assert rights or interests available to unsecured creditors of the Obligors arising under any Second Lien

12

Loan Document, Insolvency or Liquidation Proceeding or applicable non-bankruptcy law, in each case not inconsistent with the terms of this Agreement;

(v)     negotiate, develop or vote on any plan of reorganization, file any proof of claim, make other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the Second Lien Obligations;

(vi)     exercise any of its rights or remedies with respect to any of the First Lien Collateral after the termination of the period specified in Section 3.1(a)(i) to the extent permitted by and subject to the terms of Section 3.1(a)(i);

(vii)     bid for or purchase Collateral for cash at any private or judicial foreclosure sale (provided that if any such private sale is conducted by the Second Lien Agent pursuant to Section 3.1 (a)(i), at least five (5) days' prior written notice thereof shall have been given to the First Lien Agent); and

(viii)     in any sale pursuant to Section 363 of the Bankruptcy Code, credit bid any Obligor's debt (provided that such bid provides for either: (x) payment in full in cash at closing of the First Lien Obligations or (y) reinstatement or assumption of the First Lien Obligations in accordance with law, so long as the transaction does not provide for the repayment in cash of the Second Lien Obligations).

(e)     Notwithstanding the foregoing, this Section 3.1 shall not be construed to limit or impair in any way the right of (i) any Second Lien Claimholder to join (but not control) any foreclosure or other judicial lien enforcement proceeding with respect to the Collateral initiated by a First Lien Claimholder for the purpose of protecting such Second Lien Claimholder's Lien on the Collateral, so long as it does not delay or interfere with the exercise by such First Lien Claimholder of its rights under this Agreement, the First Lien Credit Documents and under applicable law and (ii) the Second Lien Claimholders to receive any remaining proceeds of Collateral after the Discharge of the First Lien Obligations.

**SECTION 3.2**   Cooperation.  Subject to Section 3.1, the Second Lien Agent, on behalf of itself and the Second Lien Claimholders, agrees that, unless and until the Discharge of First Lien Obligations has occurred, it will not commence any enforcement, collection, execution, levy or foreclosure action or proceeding (including pursuant to any Insolvency or Liquidation Proceeding) with respect to any Lien held by it under the Second Lien Collateral Documents or any other Second Lien Credit Document or otherwise.

**ARTICLE IV**

PAYMENTS

**SECTION 4.1**   Application of Proceeds.  So long as the Discharge of First Lien Obligations has not occurred, Collateral and any proceeds of Collateral received in connection with the sale or other disposition of, or collection on, such Collateral upon the exercise of remedies (whether prior to or during the pendency of any Insolvency or Liquidation Proceeding), shall be applied by the First Lien Agent to the First Lien Obligations in such order as specified in

13

the relevant First Lien Credit Documents.  Upon the Discharge of the First Lien Obligations, the First Lien Agent shall deliver to the Second Lien Agent any proceeds of Collateral held by it in the same form as received, without recourse, representation or warranty (other than a representation of the First Lien Agent that it has not otherwise sold, assigned, transferred or pledged any right, title or interest in and to such proceeds) but with any necessary endorsements or as a court of competent jurisdiction may otherwise direct to be applied by the Second Lien Agent to the Second Lien Obligations in such order as specified in the Second Lien Credit Documents.

SECTION 4.2   <u>Payments Over</u>.  Any Collateral or proceeds thereof (together with assets or proceeds subject to Liens referred to in the final sentence of <u>Section 2.3</u>) received by the Second Lien Agent or any Second Lien Claimholders prior to the Discharge of the First Lien Obligations in connection with the exercise of any right or remedy (including set-off) relating to the Collateral in contravention of this Agreement shall be segregated and held in trust and forthwith paid over to be applied to the First Lien Obligations without recourse, representation or warranty (other than a representation of the Second Lien Agent that it has not otherwise sold, assigned, transferred or pledged any right, title or interest in and to such Collateral, assets or proceeds) to the First Lien Agent for the benefit of the First Lien Claimholders in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct until such time as the Discharge of First Lien Obligations has occurred.  The First Lien Agent is hereby authorized to make any such endorsements as agent for the Second Lien Agent or any such Second Lien Claimholders.  This authorization is coupled with an interest and is irrevocable.

SECTION 4.3   <u>Certain Agreements with respect to Unenforceable Collateral</u>.  In addition to the rights and obligations of the First Lien Agent, the Second Lien Agent, the First Lien Claimholders and Second Lien Claimholders set forth herein, in the event that in any Insolvency or Liquidation Proceeding a determination is made that Liens encumbering any Collateral is not enforceable for any reason, then the Second Lien Agent and the Second Lien Claimholders agree that, any distribution or recovery they may receive with respect to, or allocable to, the value of such Collateral or any proceeds thereof shall (for so long as the Discharge of the First Lien Obligations has not occurred) be segregated and held in trust and forthwith paid over to the First Lien Agent for the benefit of the First Lien Claimholders in the same form as received without recourse, representation or warranty (other than a representation of the Second Lien Agent that it has not otherwise sold, assigned, transferred or pledged any right, title or interest in and to such distribution or recovery) but with any necessary endorsements or as a court of competent jurisdiction may otherwise direct until such time as the Discharge of First Lien Obligations has occurred.  The First Lien Agent is hereby authorized to make any such endorsements as agent for the Second Lien Agent or any such Second Lien Claimholders.  This authorization is coupled with an interest and is irrevocable.

## ARTICLE V

## OTHER AGREEMENTS

SECTION 5.1   <u>Releases</u>.  (a) If an Event of Default (under and as defined in the First

Lien Credit Agreement) occurs and the First Lien Agent exercises remedies in respect of any of the Collateral provided for in <u>Section 3.1</u>, including any sale, lease, exchange, transfer or other disposition (whether effected by the First Lien Agent, the Borrower or any Guarantor, a "<u>Disposition</u>") of any such Collateral and in connection therewith the First Lien Agent, for itself or on behalf of any of the First Lien Claimholders, releases any of its Liens on any part of the Collateral, then the Liens, if any, of the Second Lien Agent, for itself or for the benefit of the Second Lien Claimholders, on such Collateral shall be automatically, unconditionally and simultaneously released and the Second Lien Agent, for itself or on behalf of any such Second Lien Claimholders, shall promptly execute and deliver to the First Lien Agent or such Obligor at the sole cost and expense of such Obligor such termination statements, releases and other documents as the First Lien Agent (acting at the written direction of the Required Lenders (as defined in the First Lien Credit Agreement)) or such Obligor may reasonably request to effectively confirm such release; <u>provided</u> that, if, after giving effect to any such exercise of remedies or Disposition, the Discharge of First Lien Obligations shall have occurred, the Second Lien Agent and the Second Lien Claimholders shall receive (or shall be entitled to receive) any residual cash or cash equivalents remaining that they would have been entitled to receive but for the provisions of this <u>Section 5.1</u>.

(b)     Until the Discharge of First Lien Obligations occurs, the Second Lien Agent, for itself and on behalf of the Second Lien Claimholders, hereby irrevocably constitutes and appoints the First Lien Agent and any officer or agent of the First Lien Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Second Lien Agent or such holder or in the First Lien Agent's own name, for the purpose of carrying out the terms of this <u>Section 5.1</u>, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the purposes of this <u>Section 5.1</u>, including any endorsements or other instruments of transfer or release.  Such appointment is coupled with an interest and irrevocable.

**SECTION 5.2**   <u>Insurance</u>.  Unless and until the Discharge of First Lien Obligations has occurred, the First Lien Agent and the First Lien Claimholders shall have the sole and exclusive right, subject to the rights of the Obligor under the First Lien Credit Documents, to adjust settlement for any insurance policy covering the Collateral in the event of any loss thereunder and to approve any award granted in any condemnation or similar proceeding (or any deed in lieu of condemnation) affecting the Collateral.  Unless and until the Discharge of First Lien Obligations has occurred, and subject to the rights of the Obligor under the First Lien Collateral Documents, all proceeds of any such policy and any such award (or any payments with respect to a deed in lieu of condemnation) if in respect to the Collateral shall be paid to the First Lien Agent for the benefit of the First Lien Claimholders pursuant to the terms of the First Lien Credit Documents (including First Lien Hedging Agreements) and thereafter, to the Second Lien Agent for the benefit of the Second Lien Claimholders to the extent required under the Second Lien Collateral Documents and then to the holder of such policy, such other Person as may be entitled thereto or as a court of competent jurisdiction may otherwise direct.  If the Second Lien Agent or any Second Lien Claimholders shall, at any time, receive any proceeds of any such insurance policy or any such award or payment in contravention of this Agreement, it shall pay such proceeds over to the First Lien Agent in accordance with the terms of <u>Section 4.2</u> of this Agreement.

**SECTION 5.3**   <u>Amendments to First Lien Credit Documents, Second Lien Credit</u>

<u>Documents, First Lien Collateral Documents and Second Lien Collateral Documents</u>.  (a) Without the prior written consent of the First Lien Agent (such consent to be given or withheld at the written direction of the Required Lenders (as defined in the First Lien Credit Agreement)), no Second Lien Credit Document may be amended, supplemented or otherwise modified to the extent such amendment, supplement or modification would: (i) contravene the provisions of this Agreement, (ii) result in an increase in the "Applicable Margin" or similar component of the interest or the yield on the loans thereunder by more than 2.00 % per annum (exclusive, for the avoidance of doubt, of any imposition of up to 2.00% of "default" interest); <u>provided</u> that this clause shall not apply to any interest that is not paid in cash, (iii) provide for dates for payment of principal, interest, premium (if any) or fees which are earlier than such dates under the Second Lien Credit Agreement, or (iv) provide for collateral securing Indebtedness thereunder which is more extensive than the collateral provided with respect to the First Lien Credit Agreement unless comparable senior liens are granted to the First Lien Agent for the benefit of the First Lien Claimholders.  For the avoidance of doubt, neither the Second Lien Agent nor any Second Lien Lender shall receive or accept any payment of interest in cash on any Second Lien Loans <u>unless</u>, and only to the extent, such cash payment is (i) required by the Second Lien Credit Agreement (as in effect on the date hereof or as modified in accordance herewith), and (ii) not prohibited by this Agreement.  Any payments received or accepted in contravention of the immediately preceding sentence shall be treated as proceeds of Collateral in connection with the exercise of rights and remedies relating to Collateral for purposes of <u>Section 4.2</u> hereof and, accordingly, shall be held in trust for and paid over to the First Lien Agent for application to the First Lien Obligations.  Notwithstanding the foregoing provisions of this <u>Section 5.3(a)</u>, no Second Lien Credit Document may be amended, supplemented or otherwise modified to the extent such amendment, supplement or modification would increase the amount of, accelerate the schedule or timing of, or affect the conditions required for, payments of cash interest required to be paid pursuant to Sections 3.2.1(a) and (b) of the Second Lien Credit Agreement.

      (b)    Each of the Second Lien Agent, the Parent, the Borrower and the Subsidiary Guarantors agrees that each Second Lien Mortgage shall include the following language:

> "Notwithstanding anything herein to the contrary, the lien and security interest granted to The Bank of New York Mellon ("<u>BNYM</u>"), as administrative agent, pursuant to this Agreement and the exercise of any right or remedy by BNYM in its capacity as administrative agent hereunder are subject to the provisions of the Intercreditor Agreement, dated as of [●], 2011 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>Intercreditor Agreement</u>"), among WorkflowOne LLC, a Delaware limited liability company, guarantors party thereto, and BNYM, as First Lien Agent, and Silver Point Finance, LLC, as Second Lien Agent.  In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control."

      (c)    Without the prior written consent of the Second Lien Agent (and any required consent of the Second Lien Lenders), no First Lien Credit Document may be amended,

supplemented or otherwise modified to the extent such amendment, supplement or modification would (i) contravene the provisions of this Agreement, or (ii) increase the then outstanding aggregate principal amount of the loans under the First Lien Credit Agreement.

(d)      In the event that the First Lien Agent enters into (or otherwise agrees or consents to) any modification in respect of any of the First Lien Collateral Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any First Lien Collateral Document or changing in any manner the rights of any parties thereunder, in each case solely with respect to any First Lien Collateral, then such modification shall apply automatically to any comparable provision of the Comparable Second Lien Collateral Document without the consent of or action by the Second Lien Agent or any Second Lien Claimholder, as the case may be (with all such modifications subject to the terms hereof); provided that, (A) no such modification shall have the effect of removing assets subject to the Lien of any Second Lien Collateral Document, except to the extent that a release of such Lien is permitted, required or effected by Section 5.1, (B) any such modification that materially and adversely affects the rights of any of the Second Lien Claimholders and does not affect the First Lien Claimholders in a like or similar manner shall not, to the extent of the dissimilarity, apply to the Second Lien Documents, as the case may be, without the consent of the Second Lien Agent, (C) no such modification with respect to any provision applicable to the Second Lien Agent under any Second Lien Collateral Documents shall be made without the prior written consent of the Second Lien Agent and (D) notice of such modification shall be given to the Second Lien Agent by the Borrower no later than 30 days after its effectiveness (provided that the failure to give such notice shall not affect the effectiveness and validity thereof).

**SECTION 5.4**   Rights As Unsecured Creditors.  Notwithstanding any other provision set forth in this Agreement, the Second Lien Agent and the Second Lien Claimholders may exercise any rights and remedies as unsecured creditors against the Parent, the Borrower, or any Subsidiary Guarantor that has guaranteed the Second Lien Obligations in accordance with the terms of the Second Lien Credit Documents as in effect on the date hereof or as modified in a manner permitted hereunder and under the First Lien Credit Documents and applicable law, including declaring the Second Lien Obligations to be due and payable prior to their stated maturity upon the occurrence of an Event of Default under and as defined in the Second Lien Loan Documents.  Except as otherwise set forth in this Agreement or the First Lien Credit Agreement (as in effect on the date hereof), nothing in this Agreement shall prohibit the receipt by the Second Lien Agent or any Second Lien Claimholders of the required payments of interest and principal so long as such receipt is not the direct or indirect result of the exercise by the Second Lien Agent or any Second Lien Claimholder of rights or remedies as a secured creditor (including setoff and the right to credit bid their debt) or enforcement in contravention of this Agreement of any Lien held by any of them.  In the event the Second Lien Agent or any Second Lien Claimholder becomes a judgment lien creditor in respect of Collateral as a result of its enforcement of its rights as an unsecured creditor, such judgment lien shall be subordinated to the Liens securing First Lien Obligations on the same basis as the other Liens securing the Second Lien Obligations are so subordinated to such First Lien Obligations under this Agreement. Nothing in this Agreement impairs or otherwise adversely affects any rights or remedies the First Lien Agent or the First Lien Claimholders may have with respect to the First Lien Collateral.

**SECTION 5.5**   Agent for Perfection.  (a) The First Lien Agent agrees to hold, maintain

17

control of or be listed as a secured party on any certificate of title or as an additional insured or a loss payee with respect to the Pledged Collateral that is part of the Collateral in its possession, control or with respect to which it is listed as a secured party or an additional insured or a loss payee (or in the possession or control of an agent of the First Lien Agent or with respect to which an agent of the First Lien Agent is listed as a secured party or an additional insured or loss payee), including control of any deposit account or securities account (as such terms are defined in the UCC) pursuant to an agreement to which the First Lien Agent is a party, as agent for the First Lien Claimholders and the Second Lien Agent and any assignee solely for the purpose of perfecting the security interest granted under the First Lien Credit Documents and the Second Lien Credit Documents, subject to the terms and conditions of this Section 5.5.

(b)     Except to the extent otherwise provided in Section 5.1 and until the Discharge of First Lien Obligations has occurred, the First Lien Agent shall be entitled to deal with the Pledged Collateral in accordance with the terms of the First Lien Credit Documents as if the Liens of the Second Lien Agent under the Second Lien Collateral Documents did not exist; provided that, with respect to its actions pursuant to this Section 5.5(b), the First Lien Agent will act in a commercially reasonable manner.  The rights of the Second Lien Agent with respect to the Pledged Collateral shall at all times be subject to the terms of this Agreement and to the First Lien Agent's rights under the First Lien Credit Documents.

(c)     The First Lien Agent shall have no obligation whatsoever to the First Lien Claimholders, the Second Lien Agent or any Second Lien Claimholder to assure that the Pledged Collateral is genuine or owned by any Obligor or to preserve rights or benefits of any Person except as expressly set forth in this Section 5.5.  The duties or responsibilities of the First Lien Agent under this Section 5.5 shall be limited solely to holding the Pledged Collateral as agent in accordance with this Section 5.5.

(d)     The First Lien Agent shall not have by reason of the First Lien Collateral Documents, the Second Lien Collateral Documents, this Agreement or any other document a fiduciary relationship in respect of the First Lien Claimholders, the Second Lien Agent or any Second Lien Claimholder.

(e)     Upon the Discharge of the First Lien Obligations, the First Lien Agent shall deliver, relinquish control of, authorize its removal as secured party from any certificates of title with respect to the remaining Pledged Collateral (if any) without recourse, representation or warranty (other than a representation of the First Lien Agent that it has not otherwise sold, assigned, transferred or pledged any right, title or interest in and to such Pledged Collateral), together with any necessary endorsements, first, to the Second Lien Agent to the extent Second Lien Obligations remain outstanding, and second, to the applicable Obligor to the extent no First Lien Obligations or Second Lien Obligations remain outstanding (in each case, so as to allow such Person to obtain possession or control of, be listed as a secured party (or, in the case of an Obligor, the sole owner) on such certificate of title with respect to, or, if applicable, be listed as an additional insured or a loss payee with respect to, such Pledged Collateral).

**SECTION 5.6**   Second Lien Claimholders Purchase Option.  (a) If (i) a default or an Event of Default has occurred under the First Lien Credit Agreement, (ii) all of the First Lien Obligations have been accelerated, (iii) the First Lien Agent delivers a notice of its intent to sell

or otherwise dispose of all or a material portion of the Collateral or (iv) an Insolvency or Liquidation Proceeding occurs with respect to the Borrower or any Guarantor, the Second Lien Claimholders or their designee(s) shall have the option at any time upon at least five (5) Business Days' prior written notice by the Second Lien Agent to the First Lien Agent (with copies to the Parent and the Borrower) to purchase all, and not less than all, of the First Lien Obligations from the First Lien Claimholders.  Such notice from the Second Lien Agent to the First Lien Agent shall be irrevocable.

(b)     On the date specified by the Second Lien Agent in such notice (which shall not be less than three (3) Business Days, nor more than thirty (30) Business Days, after the receipt by the First Lien Agent of the notice from the Second Lien Agent of the election by the Second Lien Claimholders to exercise such option), the First Lien Claimholders shall sell to the Second Lien Claimholders or their designee(s) exercising such option, and such Second Lien Claimholders or their designee(s) shall purchase from the First Lien Claimholders, the First Lien Obligations without the prior written consent of the Parent or the Borrower and, during such period, the First Lien Agent shall not take any enforcement action without the consent of the Second Lien Agent.

(c)     Upon the date of such purchase and sale, the Second Lien Claimholders or their designee(s) that have exercised such option shall purchase the First Lien Obligations pursuant to the Lender Assignment Agreement in the form attached to the First Lien Credit Agreement and (i) pay to the First Lien Agent and the First Lien Claimholders as the purchase price therefor, in cash, the full amount of all the First Lien Obligations then outstanding and unpaid (including principal, the credit exposure of the First Lien Claimholders under all First Lien Hedging Agreements, interest, fees and expenses, including reasonable and documented attorneys' fees and legal expenses and any prepayment fee or other similar fee then due and owing pursuant to the First Lien Credit Agreement) at par, and (ii) agree to reimburse the First Lien Agent and the First Lien Claimholders for any loss, cost, damage or expense (including reasonable attorneys' fees and legal expenses) in connection with any checks or other payments provisionally credited to the First Lien Obligations, and/or as to which the First Lien Agent or any First Lien Claimholder has not yet received final payment.  Such purchase price and cash collateral shall be remitted by wire transfer in federal funds to such bank account of the First Lien Agent for the ratable account of the First Lien Agent and the First Lien Claimholders, as the First Lien Agent may designate in writing to the Second Lien Agent for such purpose.  Interest shall be calculated to but excluding the Business Day on which such purchase and sale shall occur if the amounts so paid by the Second Lien Claimholders that have exercised such option to the bank account designated by the First Lien Agent are received in such bank account prior to 1:00 p.m., New York City time and interest shall be calculated to and including such Business Day if the amounts so paid by such Second Lien Claimholders to the bank account designated by the First Lien Agent are received in such bank account later than 1:00 p.m., New York City time on such Business Day.

(d)     Such purchase shall be expressly made without recourse, representation or warranty of any kind by the First Lien Agent or any First Lien Claimholder as to the First Lien Obligations owed to such Person or otherwise, except that each such Person shall represent and warrant: (i) the amount of the First Lien Obligations being sold by it, (ii) that such Person has not created any Lien on any First Lien Obligation being sold by it that would remain after such sale

19

and (iii) that such Person has the right to assign First Lien Obligations being assigned by it and its assignment is duly authorized.

(e)    The First Lien Agent agrees that prior to selling, transferring or otherwise disposing of (or causing or consenting to the sale, transfer or other disposition of) all or a material portion of the Collateral (pursuant to a foreclosure action or otherwise), it will provide the Second Lien Agent with at least thirty (30) days' written notice of its intent to commence such foreclosure. If the Second Lien Agent shall give the First Lien Agent written notice of any Second Lien Claimholder's or designee(s)' intention to exercise the purchase option provided under this Section 5.6 prior to such sale, transfer or other disposition by the First Lien Agent on any Collateral, the First Lien Agent shall not continue such action or initiate any other action to sell or otherwise realize upon any of the Collateral so long as the purchase and sale with respect to the First Lien Obligations provided for herein shall have closed within thirty (30) Business Days thereafter and the First Lien Agent and the First Lien Claimholders shall have received payment in full of the First Lien Obligations as provided for herein within such thirty (30) Business Day period.

## ARTICLE VI

### INSOLVENCY OR LIQUIDATION PROCEEDINGS

**SECTION 6.1    Finance Issues; Section 363.** (a) If the Parent, the Borrower or any Subsidiary Guarantor shall be subject to any Insolvency or Liquidation Proceeding and the First Lien Agent (acting at the written direction of the Required Lenders (as defined in the First Lien Credit Agreement)) shall desire to permit the use of cash collateral on which the First Lien Agent or any other creditor has a Lien or to permit the Parent, the Borrower or any Subsidiary Guarantor to obtain financing, whether from the First Lien Claimholders or any other entity under Section 363 or Section 364 of the Bankruptcy Code or any similar Bankruptcy Law (each, a "DIP Financing"), then, as long as (i) the Second Lien Claimholders retain a Lien on the Collateral (including proceeds thereof arising after the commencement of such proceeding) with the same priority as existed prior to the commencement of the case under the Bankruptcy Code (subject to the Liens securing such financing as described below and any adequate protection granted to the First Lien Claimholders and the First Lien Agent), (ii) the Second Lien Claimholders receive a replacement Lien on all post-petition assets upon which the First Lien Claimholders are granted a senior replacement Lien, with the same priority as existed prior to the commencement of the case under the Bankruptcy Code, subject only to Liens securing the DIP Financing and any Liens or adequate protection securing, or granted to, the First Lien Claimholders and First Lien Agent (provided that the inability of the Second Lien Lenders to receive a Lien on actions under Chapter 5 of the Bankruptcy Code or proceeds thereof shall not affect the agreement and waivers set forth in this clause (a) but the First Lien Claimholders shall not oppose their attempt to do so), (iii) the aggregate principal amount of loans and letter of credit accommodations outstanding under such post-petition financing, together with the principal amount of pre-petition First Lien Loan Obligations, shall not exceed the Maximum First Lien Principal Amount, and (iv) such financing or use of cash collateral is subject to the terms of this Agreement, the Second Lien Agent, on behalf of itself and the Second Lien Claimholders, agrees that it will raise no objection to such use of cash collateral or to any Liens securing a DIP Financing and, to the extent the Liens

securing the First Lien Obligations are subordinated or <u>pari passu</u> with such DIP Financing, will subordinate its Liens in the Collateral to the Liens securing such DIP Financing (and all Obligations relating thereto); <u>provided</u> that the foregoing shall not prevent the Second Lien Claimholders from (i) objecting to any DIP Financing that (A) does not satisfy the requirements of <u>clauses (i)-(iv)</u> above, (B) permits the First Lien Claimholders (or any subset thereof) to be granted adequate protection in the form of additional collateral without the Second Lien Agent, on behalf of itself or any of the Second Lien Claimholders, being granted adequate protection in the form of a Lien on such additional collateral that is subordinated to the Liens securing the First Lien Obligations and such DIP Financing (and all Obligations relating thereto) on the same basis as the other Liens securing the Second Lien Obligations are so subordinated to the First Lien Obligations under this Agreement (including by giving effect to any carve-out or similar exception applicable to Liens securing First Lien Obligations) or (C) purports to govern or control the provisions, content or timing of a plan of reorganization (other than providing for satisfaction in full in cash of the DIP Financing on or prior to the effective date of such plan of reorganization), (ii) proposing, supporting or providing any other DIP Financing to the Borrower or the bankruptcy court or (iii) taking any actions permitted under <u>Section 3.1(d)</u>.

(b)    If the Parent, the Borrower or any Subsidiary Guarantor shall be subject to any Insolvency or Liquidation Proceeding and the First Lien Agent (acting at the written direction of the Required Lenders (as defined in the First Lien Credit Agreement)) shall desire to permit the Parent, the Borrower or any Subsidiary Guarantor to sell, lease or otherwise dispose of Collateral free and clear of the Liens securing the First Lien Obligations or other claims under Section 363 of the Bankruptcy Code (a "<u>363 Sale</u>"), then the Second Lien Agent, on behalf of itself and the Second Lien Claimholders, agrees that it will raise no objection to such 363 Sale other than any objection that could be asserted by an unsecured creditor; <u>provided</u> that the Second Lien Agent and the Second Lien Claimholders are provided with an opportunity to cause and/or coordinate with any Obligor to select a, or be the, stalking horse bidder in any such 363 Sale, and/or to credit bid their debt in any such 363 Sale (<u>provided</u> that such bid provides for either: (x) payment in full in cash at closing of the First Lien Obligations or (y) reinstatement or assumption of the First Lien Obligations in accordance with law, so long as the transaction does not provide for the repayment in cash of the Second Lien Obligations).

(c)    The First Lien Agent, on behalf of itself and the First Lien Claimholders, consents to, and agrees it will not contest (or support any other person contesting), any DIP Financing so long as any Lien granted in connection with such DIP Financing, if any, is subordinate to the First Lien Claimholders; <u>provided</u> that the First Lien Agent, on behalf of itself and the First Lien Claimholders, may contest the interest rate provisions and other terms of such DIP Financing (except the terms of any such Lien).

**SECTION 6.2**    <u>Relief from the Automatic Stay</u>.  Until the Discharge of First Lien Obligations has occurred, the Second Lien Agent, on behalf of itself and the Second Lien Claimholders, agrees that neither it nor any Second Lien Claimholder shall seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Collateral (except, if the First Lien Agent, on behalf of itself and the First Lien Claimholders, seeks relief from the automatic stay to exercise its rights against the Collateral under and in accordance with this Agreement, then the Second Lien Agent, on behalf of itself and the Second Lien Claimholders, may seek limited relief from the automatic stay to preserve its right, subject to

21

<u>Section 4</u>, to receive proceeds of Collateral payable to it and the Second Lien Claimholders under and in accordance with this Agreement) without the prior written consent of the First Lien Agent (such consent to be given or withheld at the written direction of the Required Lenders (as defined in the First Lien Credit Agreement)).

**SECTION 6.3**   <u>Adequate Protection</u>.  The Second Lien Agent, on behalf of itself and the Second Lien Claimholders, agrees that neither it nor any Second Lien Claimholder shall contest (or support any other person contesting) (a) any request by the First Lien Agent or the First Lien Claimholders for adequate protection or (b) any objection by the First Lien Agent or the First Lien Claimholders to any motion, relief, action or proceeding based on the First Lien Agent or the First Lien Claimholders claiming a lack of adequate protection; <u>provided</u> that the foregoing shall not prevent the Second Lien Claimholders from objecting to any DIP Financing to the extent permitted by <u>Section 6.1</u>.  In the event the Second Lien Agent, on behalf of itself and the Second Lien Claimholders, seeks or requests adequate protection in respect of Second Lien Obligations, then the Second Lien Agent, on behalf of itself or any of the Second Lien Claimholders, agrees that the First Lien Agent shall also be granted a senior Lien on such additional collateral as security for the First Lien Obligations and for any such DIP Financing provided by the First Lien Claimholders and that any Lien on such additional collateral securing the Second Lien Obligations shall be subordinated to the Liens on such collateral securing the First Lien Obligations and any such DIP Financing provided by the First Lien Claimholders (and all Obligations relating thereto) and to any other Liens granted to the First Lien Claimholders as adequate protection on the same basis as the other Liens securing the Second Lien Obligations are so subordinated to such First Lien Obligations under this Agreement.  Except as set forth in this <u>Article VI</u>, the Second Lien Agent shall not be limited from seeking adequate protection with respect to its rights in the Collateral in an Insolvency or Liquidation Proceeding (including adequate protection in the form of cash payments of interest or otherwise).

**SECTION 6.4**   [Reserved].

**SECTION 6.5**   <u>Recovery Issues</u>.  If the First Lien Agent or any First Lien Claimholder is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of the Parent, the Borrower or any Subsidiary Guarantor any amount (a "<u>Recovery</u>"), then the First Lien Obligations shall be reinstated to the extent of such Recovery and the First Lien Agent and/or such First Lien Claimholder shall be entitled to a reinstatement of First Lien Obligations with respect to all such recovered amounts.  If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement.

**SECTION 6.6**   <u>Reorganization Securities</u>.  If, in any Insolvency or Liquidation Proceeding, debt instruments or securities of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed, pursuant to a court-authorized plan of reorganization or similar court-authorized dispositive restructuring plan, both on account of First Lien Obligations and on account of Second Lien Obligations, then, to the extent the debt instruments or securities distributed on account of the First Lien Obligations and on account of the Second Lien Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt instruments or securities pursuant to such

22

plan and will apply with like effect to the Liens securing such debt instruments or securities.

**SECTION 6.7**    Post-Petition Interest.  (a) Neither the Second Lien Agent nor any Second Lien Claimholder shall oppose or seek to challenge any claim by the First Lien Agent or any First Lien Claimholder for allowance in any Insolvency or Liquidation Proceeding of First Lien Obligations consisting of post-petition interest, fees or expenses, without regard to the existence of the Lien of the Second Lien Agent on behalf of the Second Lien Claimholders on the Collateral.

(b)    Neither the First Lien Agent nor any other First Lien Claimholder shall oppose or seek to challenge any claim by the Second Lien Agent or any Second Lien Claimholder for allowance in any Insolvency or Liquidation Proceeding of Second Lien Obligations consisting of post-petition interest, fees or expenses to the extent of the value of the Lien of the Second Lien Agent on behalf of the Second Lien Claimholders on the Collateral (after taking into account the First Lien Collateral).

**SECTION 6.8**    Voting for Plan of Reorganization.  The First Lien Claimholders, on the one hand, and the Second Lien Claimholders, on the other hand, shall be entitled to vote as separate classes with respect to any plan of reorganization in connection with any Insolvency or Liquidation Proceeding.

**SECTION 6.9**    Effectiveness in Insolvency or Liquidation Proceedings.  This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of the Bankruptcy Code, shall, for the avoidance of any doubt, be effective before, during and after the commencement of an Insolvency or Liquidation Proceeding.  All references in this Agreement to any Obligor or any of its subsidiaries shall include such Obligor or such subsidiary, as applicable, as a debtor-in-possession and any receiver or trustee for such Obligor or such subsidiary, as applicable, in any Insolvency or Liquidation Proceeding.

**SECTION 6.10**    Rights as Unsecured Creditors.  Notwithstanding anything to the contrary herein, in any Insolvency or Liquidation Proceeding, the Second Lien Claimholders may exercise rights and remedies as unsecured creditors against the Borrower and other Obligors in accordance with the Second Lien Loan Documents (as in effect on the date hereof or as modified in accordance herewith), this Agreement and applicable law.

## ARTICLE VII

### RELIANCE; WAIVERS; ETC.

**SECTION 7.1**    Reliance.  Other than any reliance on the terms of this Agreement, the First Lien Agent, on behalf of itself and the First Lien Claimholders, acknowledges that it and such First Lien Claimholders have, independently and without reliance on the Second Lien Agent or any Second Lien Claimholders, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to be bound by such First Lien Credit Documents and by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the First Lien Credit Documents or this

Agreement.  The Second Lien Agent, on behalf of itself and the Second Lien Claimholders, acknowledges that it and the Second Lien Claimholders have, independently and without reliance on the First Lien Agent or any First Lien Claimholder, and based on documents and information deemed by them appropriate, made their own credit analysis and decision to be bound by each of the Second Lien Credit Documents and by the terms of this Agreement and they will continue to make their own credit decision in taking or not taking any action under the Second Lien Credit Documents or this Agreement.

      **SECTION 7.2**    No Warranties or Liability.  The First Lien Agent, on behalf of itself and the First Lien Claimholders, acknowledges and agrees that neither the Second Lien Agent nor the Second Lien Claimholders have made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the Second Lien Credit Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon.  The Second Lien Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under the Second Lien Credit Documents in accordance with applicable law and as they may otherwise, in their sole discretion, deem appropriate.  The Second Lien Agent, on behalf of itself and the Second Lien Claimholders, acknowledges and agrees that neither the First Lien Agent nor the First Lien Claimholders have made any express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the First Lien Credit Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon.  The First Lien Claimholders will be entitled to manage and supervise their respective loans and extensions of credit under their respective First Lien Documents in accordance with applicable law and as they may otherwise, in their sole discretion, deem appropriate.  Neither the Second Lien Agent nor the Second Lien Claimholders shall have any duty to the First Lien Agent or any of the First Lien Claimholders, and neither the First Lien Agent nor the First Lien Claimholders shall have any duty to the Second Lien Agent or any of the Second Lien Claimholders, to act or refrain from acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreements with the Parent, the Borrower, or any Subsidiary Guarantor (including the First Lien Credit Documents and the Second Lien Credit Documents), regardless of any knowledge thereof which they may have or be charged with.

      **SECTION 7.3**    No Waiver of Lien Priorities.  (a) No right of the First Lien Claimholders, the First Lien Agent or any of them to enforce any provision of this Agreement or any First Lien Credit Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Parent, the Borrower, or any Subsidiary Guarantor or by any act or failure to act by any First Lien Claimholder or the First Lien Agent, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the First Lien Credit Documents or any of the Second Lien Credit Documents, regardless of any knowledge thereof which the First Lien Agent or the First Lien Claimholders, or any of them, may have or be otherwise charged with.

      (b)    Without in any way limiting the generality of the foregoing paragraph (but subject to the rights of the Parent, the Borrower and the Subsidiary Guarantors under the First Lien Credit Documents), the First Lien Claimholders, the First Lien Agent and any of them may, at any time and from time to time in accordance with the First Lien Credit Documents and/or

applicable law, without the consent of, or notice to, the Second Lien Agent or any Second Lien Claimholders, without incurring any liabilities to the Second Lien Agent or any Second Lien Claimholders and without impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of the Second Lien Agent or any Second Lien Claimholders is affected, impaired or extinguished thereby) do any one or more of the following (in each case to the extent not otherwise prohibited by this Agreement):

(i)        change the manner, place or terms of payment or change or extend the time of payment of, or amend, renew, exchange, increase or alter, the terms of any of the First Lien Obligations or any Lien on any First Lien Collateral or guaranty thereof or any liability of the Parent, the Borrower or any Subsidiary Guarantor, or any liability incurred directly or indirectly in respect thereof (including any increase in or extension of the First Lien Obligations, without any restriction as to the amount, tenor or terms of any such increase or extension), or otherwise amend, renew, exchange, extend, modify or supplement in any manner any Liens held by the First Lien Agent or any of the First Lien Claimholders, the First Lien Obligations or any of the First Lien Credit Documents, except to the extent that any such change, amendment, renewal, exchange, increase, alteration, extension, modification or supplement contravenes the provisions of this Agreement;

(ii)        sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the First Lien Collateral or any liability of the Parent, the Borrower or any Subsidiary Guarantor to the First Lien Claimholders or the First Lien Agent, or any liability incurred directly or indirectly in respect thereof;

(iii)        settle or compromise any First Lien Obligation or any other liability of the Parent, the Borrower or any Subsidiary Guarantor or any security therefor or any liability incurred directly or indirectly in respect thereof and apply any sums by whomsoever paid and however realized to any liability (including the First Lien Obligations) in any manner or order; and

(iv)        exercise or delay in or refrain from exercising any right or remedy against the Parent, the Borrower, or any security or any Guarantor or any other Person, elect any remedy and otherwise deal freely with the Parent, the Borrower, any Guarantor or any First Lien Collateral and any security and any guarantor or any liability of the Parent, the Borrower or any Subsidiary Guarantor to the First Lien Claimholders or any liability incurred directly or indirectly in respect thereof, and, not in limitation but in furtherance thereof, neither the First Lien Agent nor any First Lien Claimholder shall be required to proceed against the Parent, the Borrower, or any surety or guarantor (including any Guarantor) or against any First Lien Collateral prior to or as a condition of exercising or enforcing its rights or remedies.

(c)        The Second Lien Agent, on behalf of itself and the Second Lien Claimholders, also agrees that the First Lien Claimholders and the First Lien Agent shall have no liability to the Second Lien Agent or any Second Lien Claimholders, and the Second Lien Agent, on behalf of itself and the Second Lien Claimholders, hereby waives any claim against any First Lien Claimholder or the First Lien Agent, arising out of any and all actions which the First Lien Claimholders or the First Lien Agent may take or permit or omit to take (so long as such actions taken, permitted to be taken or not taken are in compliance with the terms of this Agreement, as

25

applicable) with respect to: (i) the First Lien Credit Documents, (ii) the collection of the First Lien Obligations or (iii) the foreclosure upon, or sale, liquidation or other disposition of, any First Lien Collateral.  The Second Lien Agent, on behalf of itself and the Second Lien Claimholders, agrees that the First Lien Claimholders and the First Lien Agent have no duty to itself or any Second Lien Claimholder in respect of the maintenance or preservation of the First Lien Collateral, the First Lien Obligations or otherwise, except to the extent expressly provided in Section 5.5.

(d)     The Second Lien Agent, on behalf of itself and the Second Lien Claimholders, agrees not to assert and hereby waives, to the fullest extent permitted by law, any right to demand, request, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal, valuation or other similar right that may otherwise be available under applicable law with respect to the Collateral or any other similar rights a junior secured creditor may have under applicable law.

(e)     The Second Lien Agent and the Second Lien Claimholders waive any claim or defense which any or all of them may now or hereafter have against the First Lien Agent or the First Lien Claimholders arising out of any and all actions which the First Lien Agent or the First Lien Claimholders take or omit to take (including actions with respect to the creation, perfection or continuation of liens or security interests in any First Lien Collateral, actions with respect to the occurrence of any default or event of default, actions with respect to the foreclosure upon, sale, release of, depreciation of or failure to realize upon, any First Lien Collateral and actions with respect to the collection of any claim for all or any part of the First Lien Obligations from the Parent, the Borrower, any account debtor, guarantor (including any Subsidiary Guarantor) or any other party) with respect to the First Lien Credit Documents but in any event not in contravention of this Agreement.

(f)     In the event that all or any part of the First Lien Obligations at any time is secured by any deeds of trust or mortgages or other instruments creating or granting liens on any interest in real property, including the First Lien Mortgages, the Second Lien Agent and the Second Lien Claimholders authorize the First Lien Agent (acting at the written direction of the Required Lenders (as defined in the First Lien Credit Agreement)) and the First Lien Claimholders, upon the occurrence of and during the continuance of any Event of Default (as defined in the First Lien Credit Agreement), at its or their sole option, without notice or demand (except as contemplated by the last sentence of this clause (f)) and without affecting any obligations of the Second Lien Agent and the Second Lien Claimholders hereunder, the enforceability of this Agreement, or the validity or enforceability of any liens of First Lien Claimholders on any First Lien Collateral, to foreclose any and all of such deeds of trust or mortgages or other instruments by judicial or nonjudicial sale.  The Second Lien Agent and the Second Lien Claimholders expressly waive any defenses to the enforcement of this Agreement or any liens created or granted by any First Lien Collateral Document or to the recovery by the First Lien Agent or the First Lien Claimholders against the Borrower or any guarantor (including any Guarantor) or any other Person liable therefor of any deficiency after a judicial or nonjudicial foreclosure or sale, even though such a foreclosure or sale may impair the subrogation rights of the Second Lien Agent and the Second Lien Claimholders and may preclude the Second Lien Agent and the Second Lien Claimholders from obtaining reimbursement or contribution from any guarantor (including other Guarantor) or any other Person.  The First Lien Agent agrees to give thirty (30) days' prior notice to the Second Lien Agent of any judicial or nonjudicial foreclosure

or sale of all or any material portion of the Collateral (including any material portion of the Collateral consisting of real property or any interest therein).

**SECTION 7.4**   Obligations Unconditional.  All rights, interests, agreements and obligations of the First Lien Agent and the First Lien Claimholders and the Second Lien Agent and the Second Lien Claimholders, respectively, hereunder shall remain in full force and effect irrespective of:

(a)   any lack of validity or enforceability of any First Lien Credit Documents or any Second Lien Credit Documents;

(b)   any change in the time, manner or place of payment of, or in any other terms of, all or any of the First Lien Obligations or Second Lien Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any First Lien Credit Document or any Second Lien Credit Document (except to the extent otherwise prohibited by this Agreement);

(c)   any exchange of any security interest in any Collateral or any other collateral, or any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the First Lien Obligations or Second Lien Obligations or any guarantee thereof;

(d)   the commencement of any Insolvency or Liquidation Proceeding in respect of the Parent, the Borrower or any Subsidiary Guarantor; or

(e)   any other circumstances which otherwise might constitute a defense available to, or a discharge of, the Parent, the Borrower or any Subsidiary Guarantor in respect of the First Lien Obligations, or of the Second Lien Agent or any Second Lien Claimholder in respect of this Agreement.

**ARTICLE VIII**

MISCELLANEOUS

**SECTION 8.1**   Conflicts.  In the event of any conflict between the provisions of this Agreement and the provisions of the First Lien Credit Documents or the Second Lien Credit Documents, the provisions of this Agreement shall govern and control.

**SECTION 8.2**   Effectiveness; Continuing Nature of this Agreement; Severability.  This Agreement shall become effective when executed and delivered by the parties hereto.  This is a continuing agreement of lien subordination and the First Lien Claimholders may continue, at any time and without notice to the Second Lien Agent or any Second Lien Claimholder, to extend credit and other financial accommodations and lend monies to or for the benefit of the Parent, the Borrower or any Subsidiary Guarantor constituting First Lien Obligations in reliance hereof.  Each of the Second Lien Agent, on behalf of itself and the Second Lien Claimholders, and the First Lien Agent, on behalf of itself and the First Lien Claimholders, hereby waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this

27

Agreement.  The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  All references to the Parent, the Borrower or any Subsidiary Guarantor shall include the Parent, the Borrower or such Guarantor as debtor and debtor-in-possession and any receiver or trustee for the Parent, the Borrower or any Subsidiary Guarantor (as the case may be) in any Insolvency or Liquidation Proceeding.  Subject to Section 6.5, this Agreement shall terminate and be of no further force and effect, (i) with respect to the Second Lien Agent, the Second Lien Claimholders and the Second Lien Obligations, upon (1) the Discharge of the First Lien Obligations and (2) payment in full of all outstanding Second Lien Obligations and (ii) with respect to the First Lien Agent, the First Lien Claimholders and the First Lien Obligations, the date of Discharge of all First Lien Obligations.

**SECTION 8.3**   Amendments; Waivers.  No amendment, modification or waiver of any of the provisions of this Agreement by the Second Lien Agent or the First Lien Agent shall be deemed to be effective unless the same shall be effected in compliance with the terms of Section 10.1 of the First Lien Credit Agreement and Section 10.1 of the Second Lien Credit Agreement and shall be in writing signed on behalf of each party hereto or its authorized agent and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  Notwithstanding the foregoing, no Obligor shall have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement.

**SECTION 8.4**   Information Concerning Financial Condition of the Parent, the Borrower and Their Respective Subsidiaries.  (a) The First Lien Claimholders (but not the First Lien Agent), on the one hand, and the Second Lien Claimholders (but not the Second Lien Agent), on the other hand, shall each be responsible for keeping themselves informed of (i) the financial condition of the Parent, the Borrower, the Subsidiary Guarantors and their respective Subsidiaries and all endorsers and/or guarantors of the First Lien Obligations or the Second Lien Obligations and (ii) all other circumstances bearing upon the risk of nonpayment of the First Lien Obligations or the Second Lien Obligations.

(b)       Neither the First Lien Agent nor the First Lien Claimholders shall have any duty to advise the Second Lien Agent or any Second Lien Claimholder of information known to it or them regarding such condition or any such circumstances or otherwise.  In the event the First Lien Agent or any of the First Lien Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to the Second Lien Agent or any Second Lien Claimholder, it or they shall be under no obligation (w) to make, and the First Lien Agent and the First Lien Claimholders shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any, such information so provided, (x) to provide any additional information or to provide any such information on any subsequent occasion, (y) to undertake any investigation or (z) to disclose any information which, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential.

28

(c)    Neither the Second Lien Agent nor the Second Lien Claimholders shall have any duty to advise the First Lien Agent or any First Lien Claimholder of information known to it or them regarding such condition or any such circumstances or otherwise.  In the event the Second Lien Agent or any of the Second Lien Claimholders, in its or their sole discretion, undertakes at any time or from time to time to provide any such information to the First Lien Agent or any First Lien Claimholder, it or they shall be under no obligation (w) to make, and the Second Lien Agent and the Second Lien Claimholders shall not make, any express or implied representation or warranty, including with respect to the accuracy, completeness, truthfulness or validity of any, such information so provided, (x) to provide any additional information or to provide any such information on any subsequent occasion, (y) to undertake any investigation or (z) to disclose any information which, pursuant to accepted or reasonable commercial finance practices, such party wishes to maintain confidential or is otherwise required to maintain confidential

**SECTION 8.5**    Subrogation.  Subject to the Discharge of First Lien Obligations, with respect to the value of any payments or distributions in cash, property or other assets that the Second Lien Claimholders or Second Lien Agent pay over to the First Lien Agent or First Lien Claimholders under the terms of this Agreement, the Second Lien Claimholders and the Second Lien Agent shall be subrogated to the rights of the First Lien Agent and First Lien Claimholders; provided that, the Second Lien Agent, on behalf of itself and the Second Lien Claimholders, hereby agrees not to assert or enforce any and all such rights of subrogation it may acquire as a result of any payment or distribution hereunder until the Discharge of First Lien Obligations has occurred.  Each Obligor acknowledges and agrees that, with respect to the value of any payments or distributions in cash, property or other assets received by the Second Lien Agent or the Second Lien Claimholders and paid over to the First Lien Agent or the First Lien Claimholders pursuant to, and applied in accordance with this Agreement, shall not relieve or reduce any of the obligations owed by such Obligor under the Second Lien Credit Documents.

**SECTION 8.6**    Application of Payments.  Any payments received by the First Lien Agent or the First Lien Claimholders may be applied, reversed and reapplied, in whole or in part, in accordance with the terms of the First Lien Credit Documents.  The Second Lien Agent, on behalf of itself and the Second Lien Claimholders, assents to any extension or postponement of the time of payment of the First Lien Obligations or any part thereof and to any other indulgence with respect thereto, to any substitution, exchange or release of any security which may at any time secure any part of the First Lien Obligations and to the addition or release of any other Person primarily or secondarily liable therefor, in each case to the extent not prohibited hereunder.

**SECTION 8.7    SUBMISSION TO JURISDICTION; WAIVERS.  (a) ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR ACTIONS OF ANY PARTY HERETO IN CONNECTION HEREWITH MAY BE BROUGHT AND MAINTAINED IN THE COURTS OF THE COUNTY OF NEW YORK IN THE STATE OF NEW YORK OR IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE NON-EXCLUSIVE**

29

JURISDICTION OF EACH SUCH COURT; PROVIDED THAT ANY SUIT SEEKING
ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE
BROUGHT, AT THE FIRST LIEN AGENT'S OPTION (ACTING AT THE WRITTEN
DIRECTION OF THE REQUIRED LENDERS (AS DEFINED IN THE FIRST LIEN
CREDIT AGREEMENT)), IN THE COURTS OF ANY JURISDICTION WHERE SUCH
COLLATERAL OR OTHER PROPERTY MAY BE FOUND.  EACH PARTY HERETO
HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT
PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER
MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT
IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH
LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.  TO THE
EXTENT THAT ANY SUCH PARTY HAS OR HEREAFTER MAY ACQUIRE ANY
IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL
PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR
TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH
RESPECT TO ITSELF OR ITS PROPERTY, SUCH PARTY HEREBY IRREVOCABLY
WAIVES TO THE FULLEST EXTENT PERMITTED BY LAW SUCH IMMUNITY IN
RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT.

(b)     EACH PARTY HERETO HEREBY KNOWINGLY,
VOLUNTARILY AND INTENTIONALLY WAIVES TO THE FULLEST EXTENT
PERMITTED BY LAW ANY RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN
RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER,
OR IN CONNECTION WITH THIS AGREEMENT, OR ANY COURSE OF CONDUCT,
COURSE OF DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN) OR
ACTIONS OF ANY OTHER PARTY HERETO IN CONNECTION THEREWITH.
EACH PARTY HERETO ACKNOWLEDGES AND AGREES THAT IT HAS RECEIVED
FULL AND SUFFICIENT CONSIDERATION FOR THIS PROVISION AND THAT THIS
PROVISION IS A MATERIAL INDUCEMENT FOR THE OTHER PARTIES HERETO
IN ENTERING INTO THIS AGREEMENT.

**SECTION 8.8**   Notices.  All notices to the Second Lien Claimholders and the First Lien
Claimholders permitted or required under this Agreement may be sent to the Second Lien Agent
and the First Lien Agent, respectively.  Unless otherwise specifically provided herein, any notice
or other communication herein required or permitted to be given shall be in writing and may be
personally served, electronically mailed or sent by courier service or U.S. mail and shall be
deemed to have been given when delivered in person or by courier service, upon receipt of
electronic mail or four Business Days after deposit in the U.S. mail (certified, return receipt
requested, with postage prepaid and properly addressed); provided that service of process must be
by personal service or by certified mail, return receipt requested.  For the purposes hereof, the
addresses of the parties hereto shall be as set forth below each party's name on the signature
pages hereto, or, as to each party, at such other address as may be designated by such party in a
written notice to all of the other parties.

**SECTION 8.9**   Further Assurances.  Each of the First Lien Agent, on behalf of itself
and the First Lien Claimholders, and the Second Lien Agent, on behalf of itself and the Second
Lien Claimholders at the sole cost and expense of the Borrower, and each Obligor, agrees that

each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the First Lien Agent or the Second Lien Agent may reasonably request to effectuate the terms of and the lien priorities contemplated by this Agreement:

**SECTION 8.10   APPLICABLE LAW.  THIS AGREEMENT WILL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK (INCLUDING FOR SUCH PURPOSE SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK). THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO ORAL AGREEMENTS BETWEEN THE PARTIES.**

**SECTION 8.11**   Binding on Successors and Assigns; Joinder.  (a) This Agreement shall be binding upon and inure to the benefit of the First Lien Agent, the First Lien Claimholders, the Second Lien Agent, the Second Lien Claimholders and their respective successors and assigns.

(b)   Each of the Parent, the Borrower and the Subsidiary Guarantors agrees that it shall ensure that each of its U.S. Subsidiaries that is or is to become a party to any First Lien Collateral Document or any Second Lien Collateral Document shall either be a Subsidiary Guarantor hereunder or shall confirm that it is a Subsidiary Guarantor hereunder pursuant to a supplement (in the form of Annex I to the Subsidiary Guaranty) to this Agreement that is executed and delivered by such Subsidiary prior to or concurrent with its execution and delivery of such First Lien Collateral Document or such Second Lien Collateral Document.

**SECTION 8.12**   Specific Performance.  Each of the First Lien Agent and the Second Lien Agent may demand specific performance of this Agreement without the necessity of proving the inadequacy of money damages as a remedy and without regards to anything to the contrary contained in applicable law.  The First Lien Agent, on behalf of itself and the First Lien Claimholders, and the Second Lien Agent, on behalf of itself and the Second Lien Claimholders, hereby irrevocably waives any defense based on the adequacy of a remedy at law and any other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by the First Lien Agent or the Second Lien Agent, as the case may be.

**SECTION 8.13**   Headings.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

**SECTION 8.14**   Counterparts.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  Delivery of an executed counterpart of a signature page of this Agreement or any document or instrument delivered in connection herewith by telecopy or electronic submission shall be effective as delivery of a manually executed counterpart of this Agreement or such other document or instrument, as applicable.

**SECTION 8.15**   <u>Authorization</u>.  By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

**SECTION 8.16**   <u>No Third Party Beneficiaries; Effect of Agreement</u>.  This Agreement and the rights and benefits hereof shall inure to the benefit of each of the parties hereto and its respective successors and assigns and shall inure to the benefit of each of the First Lien Claimholders and the Second Lien Claimholders.  No other Person shall have or be entitled to assert rights or benefits hereunder.  Nothing in this Agreement shall impair, as between each Obligor and the First Lien Agent and the First Lien Claimholders, on the one hand, and such Obligor and the Second Lien Agent and the Second Lien Claimholders, on the other hand, the obligations of such Obligor to pay principal, interest, fees and other amounts as provided in the First Lien Credit Documents and the Second Lien Credit Documents, respectively.

**SECTION 8.17**   <u>Liability of the Agents</u>.  The parties hereto agree that the First Lien Agent and the Second Lien Agent shall be afforded all of the rights, privileges, protections, indemnities and immunities afforded to such Agent under the First Lien Credit Agreement or Second Lien Credit Agreement, as applicable, in connection with its execution of this Agreement and the performance of its respective duties hereunder.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

      IN WITNESS WHEREOF, the parties hereto have executed this Intercreditor Agreement as of the date first written above.

WORKFLOWONE LLC,
as Borrower

By: _____
      Name:
      Title:

Address:  276 Park Avenue
         New York, NY 10010
         Attention: Chief Financial Officer
         Telephone: (212) 777-1715
         Facsimile: (212) 533-4405

THE BANK OF NEW YORK MELLON,
as First Lien Administrative Agent

By: _____
      Name:
      Title:

Address:  600 East Las Colinas Blvd., Suite 1300
         Irving, Texas 75039
         Attention: Melinda Valentine
         Telephone: (972) 401-8520
         Facsimile: (972) 401-8555

SILVER POINT FINANCE, LLC,
as Second Lien Administrative Agent

By: _____
      Name:
      Title:

Address: _____

33

34

**<u>Exhibit M</u>**
(Designation of Plan Administrator)

Pursuant to section 9.2 of the Plan, the Committee has designated JLL Consultants, Inc., to be appointed as the Plan Administrator.