Ross C. Reeves (VSB No. 13628)
Stephanie N. Gilbert (VSB No. 77140)
WILLCOX & SAVAGE, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, Virginia 23510
(757) 628-5500

Kenneth N. Klee (admitted *pro hac vice*)
Lee R. Bogdanoff (admitted *pro hac vice*)
Whitman L. Holt (admitted *pro hac vice*)
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067

*Attorneys for Perseus*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| WORKFLOW MANAGEMENT, INC., | ) | |
| et al., | ) | Case No. 10-74617 (SCS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**PERSEUS' RESPONSE TO THE CONFIRMATION OBJECTIONS FILED BY
RELIZON HOLDINGS, LLC AND MOHAMED YACOUB**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...............................................................................................1

ARGUMENT .........................................................................................................................4

   A.   The Plan Does Not Violate The "Absolute Priority Rule." ...............................4

      1.   Perseus' Participation In The Purchaser Is Not Provided "On Account Of" Perseus' Claims Or Equity Interests. .........................................................................5

      2.   Perseus Is Not Receiving Any Property "Under The Plan," And Perseus Further Is Not Receiving Any Value Otherwise Payable To The Objectors. ........................7

      3.   Perseus Does Not Have The "Exclusive" Right To Participate In The Purchaser. .......12

      4.   To The Extent That A "Market Test" Is Required, The Market Has Spoken Loudly, Clearly, And Repeatedly. ..............................................................................13

      5.   Carlyle Has Never Sought The Termination Of Exclusivity, Which Could Theoretically Test Whether There Is Any Alternative To The Plan, Because Even It Realizes That Doing So Would Be Futile. ..................................................17

      6.   Summary. ...................................................................................................18

   B.   The Classification And Treatment Of Carlyle's Claim Against WF Holdings Under Class 5B Are Not Improper. ...................................................................................19

      1.   The Classification Of Carlyle's Claim In Class 5B Does Not Violate Bankruptcy Code Section 1122. ......................................................................................19

      2.   The Treatment Of Carlyle's Claim In Class 5B Does Not Violate Bankruptcy Code Section 1123(a)(4). ...................................................................................21

   C.   The Plan Does Not Effect A Substantive Consolidation Or Prevent Carlyle From Realizing Any Value To Which It Otherwise Might Be Entitled As A Creditor Of WF Holdings. .................................................................................................21

      1.   The Former Shareholder Notes Are Fully Encumbered In Favor Of The Second Lien Lenders. ...................................................................................................21

      2.   There Is Nothing Improper About The Purchaser's Decision To Compromise The Amount Of The Former Shareholder Notes Following Its Acquisition Of Those Notes From WF Holdings. ....................................................................................25

   D.   Perseus Is Not Receiving Any Inappropriate Release Under The Plan. ...........................27

CONCLUSION ...................................................................................................................29

**CASES**

*Ad Hoc Adelphia Trade Claims Comm. v. Adelphia Commc'ns Corp.*,
    337 B.R. 475 (S.D.N.Y. 2006) .................................................................................11

*Ala. Dep't of Envtl. Conservation v. E.P.A.*,
    540 U.S. 461 (2004) ..................................................................................................9

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
    526 U.S. 434 (1999) ...........................................................................................*passim*

*Chariot Plastics, Inc. v. United States*,
    28 F. Supp. 2d 874 (S.D.N.Y. 1998) .....................................................................28

*Dish Network Corp. v. DBSD N. Am., Inc. (In re DBSD N. Am.)*,
    No. 10-1175, 2010 U.S. App. LEXIS 27007 (2d Cir. Feb. 7, 2011) ...................7, 9

*Fairchild Dornier GMBH v Official Comm. of Unsecured Creditors (In re Dornier
    Aviation (N. Am.), Inc.)*,
    453 F.3d 225 (4th Cir. 2006) .................................................................................11

*Grp. of Institutional Investors v. Chicago, M., S. P. & P. R. Co.*,
    318 U.S. 523 (1943) ................................................................................................10

*Hobson v. Travelstead (In re Travelstead)*,
    227 B.R. 638 (D. Md. 1998) ...................................................................................20

*In re Alta+Cast, LLC*,
    No. 02-12982 (MFW), 2004 Bankr. LEXIS 222 (Bankr. D. Del. Mar. 2, 2004) ...................13

*In re Coventry Commons Assocs.*,
    149 B.R. 109 (Bankr. E.D. Mich. 1992) ................................................................20

*In re Cypresswood Land Partners, I*,
    409 B.R. 396 (Bankr. S.D. Tex. 2009) ...................................................................14

*In re Davis*,
    262 B.R. 791 (Bankr. D. Ariz. 2001) .....................................................................17

*In re Deep River Warehouse, Inc.*,
    2005 Bankr. LEXIS 1090 (Bankr. M.D.N.C. 2005) ..............................................10

*In re Global Crossing Ltd.*,
    295 B.R. 726 (Bankr. S.D.N.Y. 2003) ...................................................................18

*In re Global Ocean Carriers, Ltd.*,
    251 B.R. 31 (Bankr. D. Del. 2000) ...................................................................10, 17

*In re Naron & Wagner, Chartered*,
  88 B.R. 85 (Bankr. D. Md. 1988) ........................................................................13

*In re PWS Holding Corp.*,
  228 F.3d 224 (3d Cir. 2000) ...........................................................................5, 12

*In re Sacred Heart Hosp.*,
  182 B.R. 413 (Bankr. E.D. Pa. 1995) ................................................................20

*In re Shady Grove Tech. Ct. Assocs. Ltd. P'ship*,
  216 B.R. 386 (Bankr. D. Md. 1998) ...................................................................12

*In re Situation Mgmt.*,
  252 B.R. 859 (Bankr. D. Mass. 2000) ................................................................17

*In re Woodscape Ltd. P'ship*,
  134 B.R. 165 (Bankr. D. Md. 1991) ...................................................................13

*In re Young Broad. Inc.*,
  430 B.R. 99 (Bankr. S.D.N.Y. 2010) .................................................................10

*In re Zenith Elecs. Corp.*,
  241 B.R. 92 (Bankr. D. Del. 1999)................................................................13, 14

*J&S Carburetor Co. v. Comm'r*,
  93 T.C. 166 (1989) ............................................................................................28

*JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns )*,
  419 B.R. 221 (Bankr. S.D.N.Y. 2009) ...............................................................6, 7

*Kansas City Terminal Ry. v. Cen. Union Trust Co.*,
  271 U.S. 445 (1926) ..........................................................................................10

*Norwest Bank Worthington v. Ahlers*,
  485 U.S. 197 (1988) ..........................................................................................15

*Official Comm. of Unsecured Creditors v. Perseus Partners VII, L.P.*
  *(In re Distributed Energy Sys. Corp.)*,
  No. 08-51120, 2009 Bankr. LEXIS 1284 (Bankr. D. Del. May 18, 2009) ............11

*Travelers Ins. Co. v Bryson Props., XVIII (In re Bryson Props., XVIII)*,
  961 F.2d 496 (4th Cir. 1992) ........................................................................10, 11

*Troy Sav. Bank v. Travelers Motor Inn, Inc.*,
  215 B.R. 485 (N.D.N.Y. 1997)...........................................................................13

### S<small>TATUTES</small>

11 U.S.C. § 502(a) ................................................................................................. 26

11 U.S.C. § 506(a) ................................................................................................. 26

11 U.S.C. § 507(b) ................................................................................................. 18

11 U.S.C. § 1111(b)(2) .......................................................................................... 18

11 U.S.C. § 1122 ............................................................................................. 19, 20

11 U.S.C. § 1123(a)(4) .......................................................................................... 21

11 U.S.C. § 1123(a)(5)(D) ................................................................................. 8, 14

11 U.S.C. § 1126(g) .............................................................................................. 20

11 U.S.C. § 1129(a)(8) .......................................................................................... 20

11 U.S.C. § 1129(b) ................................................................................ 2, 4, 11, 20

11 U.S.C. § 1129(b)(2)(B)(ii) ..................................................................... 4, 5, 7, 9

11 U.S.C. § 1141(d)(3) ............................................................................................ 8


### F<small>EDERAL</small> R<small>EGULATIONS</small>

26 C.F.R. § 1.1502-6(a) ........................................................................................ 28

26 C.F.R. § 1.1502-78(b)(2) .................................................................................. 28


### U<small>NIFORM</small> C<small>OMMERCIAL</small> C<small>ODE</small>

U.C.C. § 9-102(a)(47) ........................................................................................... 22

U.C.C. § 9-102(a)(61) ........................................................................................... 22

U.C.C. § 9-102(a)(65) ........................................................................................... 22

U.C.C. § 9-312(a) ................................................................................................. 22

U.C.C. § 9-313 cmt. 2 ........................................................................................... 23

Perseus[1] respectfully submits this response to the following objections to confirmation of the Plan[2]: (1) the *Objection of Relizon Holdings, LLC to Confirmation of the Debtors' Third Amended Joint Chapter 11 Plan* (the "Carlyle Objection" [ECF No. 804]) filed by Relizon Holdings, LLC, a shell company owned by The Carlyle Group ("Carlyle"); and (2) the *Objection to Confirmation of Third Amended Plan and Memorandum in Support* (the "Yacoub Objection" [ECF No. 806]) filed by Mohamed Yacoub ("Yacoub").[3]

## PRELIMINARY STATEMENT

Perseus is among the parties most adversely affected by the Plan. Under the Plan, Perseus will see over $80 million of indebtedness Perseus holds against certain of the Holdco Debtors eliminated without any distribution whatsoever. Perseus also will see the Plan wipe out forever Perseus' significant equity investment in the Debtors. These harsh economic consequences are a dramatic shift from the first chapter 11 plan proposed in this case, which would have reinstated Perseus' claims and left Perseus with full ownership of the Debtors.

The Plan's treatment of all stakeholders represents part of a settlement reached with the Debtors' largest creditor, Silver Point. This good faith, arms' length resolution was reached due

---

[1] "Perseus" means Perseus, L.L.C. together with each of Perseus Acquisition/Recapitalization Fund, L.L.C., Perseus Market Opportunity Fund, L.P., Perseus 2000 Expansion, L.L.C., WF Holdings Co-Investment, L.P., and Perseus Partners VII, L.P. (collectively, the "Perseus Funds").

[2] The "Plan" means the *Third Amended Joint Chapter 11 Plan of Workflow Management, Inc. and Its Affiliated Debtors* dated January 21, 2011, as it may be amended at or prior to the confirmation hearing. All capitalized terms used but not otherwise defined in this response have the meaning given to such terms by the Plan. Perseus understands that the Debtors will separately be responding to confirmation objections filed by the various parties. Perseus generally agrees with and adopts the Debtors' responses, but has filed this separate response to address certain aspects of the two objections specifically attacking Perseus.

[3] Carlyle and Yacoub are both members of the Official Committee of Unsecured Creditors (the "Committee") appointed in these cases. As the Court is aware, the Committee and its counsel, in the exercise of their respective fiduciary duties to all the Debtors' unsecured creditors, have agreed to support confirmation of the Plan as part of a multi-party compromise. The reasons why the Committee decided to overrule these two dissenting members should be clear after a review of this response.

1

to economic realities and exigencies of which the Court is well aware. The resulting Plan is now supported by all the largest creditor constituencies, including the Debtors, the First Lien Lenders, the Second Lien Lenders, the Committee, and Perseus. The Plan fully complies with all provisions of Bankruptcy Code section 1129, offers a prompt and viable path for the conclusion of the Debtors' cases, and will enable the preservation of both a valuable going concern and the employment opportunities it provides. Simply put, the Plan achieves exactly what chapter 11 is designed to do.

As the Court and many key parties already have recognized, a cornerstone of the Plan's feasibility is Perseus' decision to invest $12.5 million into the business pursuant to Perseus' agreement to participate in the Purchaser (the Purchaser was formed and funded outside of the Plan, but will acquire the Debtors' assets under the Plan). This investment – the only new funds that any party is providing or has even offered to provide in respect of the Debtors' business – will be used to fund the Purchaser's obligations under the Plan, including the Administrative Expense Claim Reserve and the Unsecured Claim Fund. Proving the adage that no good deed goes unpunished, Perseus' choice to contribute these substantial and critical funds to the Purchaser in connection with a resolution of these cases is the principal target of the objections.

Unhappy with the treatment of their unsecured claims under the Plan, both Carlyle and Yacoub contend, among other things, that the Plan cannot be confirmed because Perseus' investment in the Purchaser violates their rights under the absolute priority rule embodied in Bankruptcy Code section 1129(b). The absolute priority rule, however, is neither implicated nor violated because, among other things: (i) Perseus' participation in the Purchaser is not being provided "on account of" the claims or equity interests of Perseus; (ii) Perseus is not receiving or retaining property "under the Plan," and is not receiving any value otherwise payable to the

objecting parties; (iii) Perseus did not enjoy an "exclusive" right to participate in the Purchaser; (iv) to the extent a "market test" is required, the market has spoken clearly in favor of the sale contemplated by the Plan; and (v) neither Carlyle nor Yacoub has sought to terminate exclusivity and pursue an alternative plan.

Ironically, as loud as Carlyle and Yacoub trumpet the absolute priority rule as a basis to deny confirmation of the Plan, they ignore the fact that the treatment of their claims (with which they are dissatisfied) has been *compelled* by the application of that rule to the economic realities of this case. The Second Lien Lender Claims, which are senior in each instance to the unsecured claims of Carlyle and Yacoub, are substantially undersecured and are not being paid in full. Under these circumstances, the absolute priority rule dictates that neither Carlyle nor Yacoub is legally entitled to *any* distribution under the Plan on account of its claims, except to the extent that the Second Lien Lenders have consented.[4] This is an unfortunate circumstance for Carlyle and Yacoub, but it is not a circumstance created by the Plan or by Perseus. It is economic reality. The Plan itself addresses this reality in accordance with applicable bankruptcy law and should be confirmed. Without the Plan, the Debtors' operations likely will not survive, and *all* stakeholders will receive materially lower recoveries than the Plan provides.

The objections raise a handful of ancillary issues in addition to their ineffective resort to the absolute priority rule, but those arguments also suffer from serious legal flaws or are premised on a similarly faulty understanding of the facts. As a result, they are not convincing.

For the reasons set forth below, the Court should overrule the objections and confirm the Plan.

---

[4] The class in which Yacoub's claim is classified, Class 5A, is indeed receiving *some* consideration under the Plan, with the consent of the Second Lien Lenders. The class in which Carlyle's claim is classified, Class 5B, is not receiving or retaining any property under the Plan.

**ARGUMENT**

The Carlyle Objection and Yacoub Objection assert four arguments against confirmation of the Plan: (a) that the Plan violates the absolute priority rule under Bankruptcy Code section 1129(b); (b) that the Plan improperly classifies and treats Carlyle's claim in Class 5B under the Plan, in violation of Bankruptcy Code sections 1122 and 1123(a)(4); (c) that the Plan improperly effectuates a substantive consolidation of the Debtors and deprives Carlyle of value to which it is uniquely entitled; and (d) that the Plan improperly confers a release upon Perseus in connection with the proposed asset sale. The infirmity of each argument is addressed in turn.

**A.     The Plan Does Not Violate The "Absolute Priority Rule."**

Carlyle and Yacoub contend that the Plan cannot be confirmed because it violates their rights as unsecured creditors under the absolute priority rule, as embodied in Bankruptcy Code section 1129(b) and interpreted in *Bank of America National Trust & Savings Ass'n v. 203 North LaSalle Street Partnership*, 526 U.S. 434 (1999) ("*LaSalle*"). *See* Carlyle Obj. at 3-7; Yacoub Obj. at 25-26. This argument fails for a multitude of reasons.

As always, the analysis must start with the statutory text. The relevant provision here is section 1129(b)(2)(B)(ii), which requires that when a class of unsecured claims has rejected the Plan, "the holder of any claim or interest that is junior to the claims of such class will not receive or retain *under the plan* [and] *on account of* such junior claim or interest any property." 11 U.S.C. § 1129(b)(2)(B)(ii) (emphasis added). That is exactly what the Plan provides.

The Yacoub unsecured claim, which is asserted against The Relizon Company, is classified in Class 5A of the Plan. That class comprises most unsecured claims asserted against Debtors *other than* the "Holdco Debtors," i.e., Workflow Holdings Corporation, WF Holdings, Inc. ("WF Holdings"), and WF Capital Holdings, Inc. The Carlyle unsecured claim is classified – along with nearly $80 million of Perseus' unsecured claims – in Class 5B of the Plan, which

4

comprises all unsecured claims against the Holdco Debtors. The WF Equity Interests held by Perseus are classified in Class 7.

Section 5.6 of the Plan makes clear that Perseus and all other holders of Class 5B claims "shall not receive or retain any property under the Plan." Similarly, Section 5.9 of the Plan makes clear that Perseus and any other holder of WF Equity Interests classified in Class 7 "shall not receive or retain any property under the Plan." That section puts a fine point on the matter, providing expressly that "all WF Equity Interests shall be deemed cancelled." Thus, the Plan plainly provides that Perseus will not receive under the Plan any distribution on account of its significant claims or its equity interests, in strict accordance with section 1129(b)(2)(B)(ii).

Unable to dispute this, Carlyle instead argues that the Plan runs afoul of the Supreme Court's holding in *LaSalle* that a "new value" plan "providing junior interest holders with exclusive opportunities free from competition and without benefit of market valuation fall[s] within the prohibition of § 1129(b)(2)(B)(ii)." 526 U.S. at 458; Carlyle Obj. at 4-5, 7-10. But the contention is wrong on multiple levels, any one of which is independently sufficient to defeat the argument.

### 1. Perseus' Participation In The Purchaser Is Not Provided "On Account Of" Perseus' Claims Or Equity Interests.

Critical to the Supreme Court's holding in *LaSalle* was its finding that the old equity holders' rights to contribute new value were provided "on account of" those equity interests, i.e., that there was "a causal relationship between holding the prior claim or interest and receiving or retaining property." 526 U.S. at 450-51. The need for this causal link exists because the absolute priority rule does *not* prohibit parties who hold equity from receiving property for reasons other than their interests in the debtor. *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d 224, 238 (3d Cir. 2000) (explaining how a portion of *LaSalle* "confirms that there are some cases

in which property can transfer to junior interests not 'on account of' those interests but for other reasons"); *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns )*, 419 B.R. 221, 269 (Bankr. S.D.N.Y. 2009) (concluding that plan was structured so old equity holder received value "on account of his cooperation" under and pursuant to the plan, rather than "on account of" equity interests). Here, as in *Charter*, the necessary link is missing.

The architecture of the relevant transactions demonstrates that Perseus' old equity interests, as well as its millions of dollars in claims against the Holdco Debtors, are irrelevant to its new investment. Rather, the fresh money that is being made available by Perseus through the Purchaser is needed to make the Plan work. This need is why the Asset Purchase Agreement (the "APA") makes it a closing condition that Perseus fund the cash required to meet the Purchaser's cash obligations, and that such funds be delivered to the Debtors, unless waived by the Purchaser. *See* APA §§ 6.2(b), 6.3(d), 8.4. This need is why the Plan conditions releases on actual funding of the contribution to the Purchaser. *See* Plan § 13.1. This need is why counsel for the First Lien Lenders explained to the Court how "some first lien lenders feel very strongly" that Perseus' contribution *must* be part of the transactions associated with the Plan's sale to the Purchaser. *See* Jan. 13, 2011 Hr'g Tr. [ECF No. 736] at 18:15 – 19:3. And this need is why the Court noted on the record that the equity contribution from Perseus is critical to the feasibility and confirmability of the Plan. *See id.* at 33:15-20. The stark economic reality of this case is that the Debtors' enterprise value does not exceed the First and Second Lien Lenders' debt, all of the property of the relevant estates is encumbered in favor of those creditors, and the Debtors' business is in immediate need of additional capital. Perseus has made a financial commitment to pay cash to receive an interest in the Purchaser, and it is that commitment, not Perseus' claims against or interests in the Debtors, that enabled Perseus to acquire a minority interest in the

Purchaser.  It is inconceivable that Silver Point and the other Second Lien Lenders controlling the Purchaser would have permitted Perseus to participate in the Purchaser on any basis other than arms' length, on account of Perseus' commitment of cash.  Under these circumstances, it is simply inaccurate to suggest that Perseus is getting anything "on account of" its unsecured claims against the Holdco Debtors or its deeply underwater equity interests.

These circumstances distinguish this case from the "gifting" case Carlyle cites, *Dish Network Corp. v. DBSD North America, Inc. (In re DBSD North America)*, No. 10-1175, 2010 U.S. App. LEXIS 27007 (2d Cir. Feb. 7, 2011).  *See* Carlyle Obj. at 11-12.  In that case a junior stakeholder truly received a "gift" – something for nothing – from a senior stakeholder.  *See, e.g.*, 2010 U.S. App. LEXIS 27007, at *36 (noting how "[t]he existing shareholder did not contribute additional capital to the reorganized entity").  That case has no application here, where Perseus is not receiving anything for free, but rather is paying a substantial amount of cash – $12.5 million – for a minority interest in the Purchaser of the Debtors' assets.  The notion that Silver Point and the other Second Lien Lenders participating in the Purchaser would make a "gift" to Perseus defies common sense and is belied by the facts:  Perseus is putting in money to participate in the Purchaser.  If Perseus fails to meet its funding commitment, it receives *nothing*.

At bottom, as in *Charter*, Carlyle's objection based upon the absolute priority rule grossly mischaracterizes the Plan and ignores that Perseus is not receiving anything "on account of" its equity interests in or claims against the Holdco Debtors.  *See* 419 B.R. at 269.

> **2.    Perseus Is Not Receiving Any Property "Under The Plan," And Perseus Further Is Not Receiving Any Value Otherwise Payable To The Objectors.**

The objections further fail because any right Perseus has to participate in the Purchaser is not one provided "under the plan."  11 U.S.C. § 1129(b)(2)(B)(ii).  Instead, the *Purchaser* is

acquiring all of the Debtors' assets under the Plan, and the Purchaser is independently being

capitalized by the Second Lien Lenders and Perseus, pursuant to an agreement between Perseus

and Silver Point under which the Purchaser was formed and funded, to acquire the Debtors'

assets. The Debtors' counsel previously explained this feature of the transactions at the

disclosure statement hearing: "The common equity of Newco, which is the purchaser under the

plan, was arrived at pursuant to an agreement between Perseus and Silver Point. We're not

distributing the common equity of Newco, the purchaser, under the plan." Jan. 13, 2011 Hr'g Tr.

at 44:25 – 45:3. This structure, which the Court provisionally approved after the disclosure

statement hearing (notably, without any comment whatsoever from Carlyle),[5] further undermines

any absolute priority attack on the Plan.

This is not a matter of "form over substance." *See* Carlyle Obj. at 10-11. The Plan

proposes to sell the Debtors' assets pursuant to the APA to the Purchaser, which is controlled by

those Second Lien Lenders participating in the Purchaser. A sale of substantially all of the

Debtors' assets under a plan is specifically authorized by Bankruptcy Code section

1123(a)(5)(D). Unlike a new value plan premised upon an internal reorganization, the Debtors

are selling substantially all of their assets, and will not be receiving a discharge. *See* 11 U.S.C.

§ 1141(d)(3). As in the case of a sale outside a plan, the APA contains all of the terms of a

typical asset sale transaction – including a description of the assets being sold free and clear of

liens, a description of assets that are excluded from the transaction, the purchase consideration to

be paid to the estates, representations and warranties by the parties, conditions to closing and

---

[5]  *See* Jan. 21, 2011 *Order (A) Approving Disclosure Statement . . . and (F) Granting the Debtors Authority to Enter into Asset Purchase Agreement and Pay Certain Fees and Expenses in Connection Therewith* [ECF No. 719] at p. 7 (authorizing and directing the Debtors to enter into and consummate the APA, subject to further order of the Court regarding closing of the Sale Transaction, and granting the Purchaser all rights and remedies provided under the APA).

required deliveries, and an allocations of assets and liabilities (including prorations) as between the Debtors' estates and the Purchaser. After the closing of this transaction, as in the case of any other sale, any value that the Purchaser realizes from its operation of the purchased assets will belong exclusively to the Purchaser. It is *not* value that would have been available to creditors.

Carlyle and Yacoub are objecting to the Second Lien Lenders' business decision to allow Perseus to participate in the Purchaser, *but there is no provision of the Plan calling for such treatment that could be altered in response to the objections*. The simple fact of the matter is that the Purchaser is not being formed and funded under the Plan. The Purchaser is being formed and funded to acquire the Debtors' assets pursuant to an external agreement negotiated at arms' length between Silver Point and Perseus. Perseus' participation in the Purchaser therefore is not value being received "under the Plan." This is yet another reason why section 1129(b)(2)(B)(ii) is inapplicable here by its own terms.[6]

The objectors' contentions to the contrary should be rejected as rendering the phrase "under the plan" superfluous. *See, e.g.*, *Ala. Dep't of Envtl. Conservation v. E.P.A.*, 540 U.S. 461, 489 n.13 (2004) ("It is . . . a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (quotation marks and citations omitted)). None of the case authorities Carlyle cites in support of this argument involved the kind of facts and circumstances

---

[6] This aspect of the transactions provides a further reason for distinguishing the recent *DBSD* opinion. There, it was quite clear that "the existing shareholder receives [the subject] property 'under the plan.'" *See* 2010 U.S. App. LEXIS 27007, at *33 (describing the plan treatment provided to "Class 9 –Existing Stockholder Interests" by the Plan, which included stock and warrants). In fact, the Second Circuit Court of Appeals expressly declined to address "whether the Code would allow the existing shareholder and Senior Noteholders to agree to transfer shares outside of the plan," and offered no reason to believe such a structure would be improper. *See id.* Here, Sections 5.6 and 5.9 of the Plan could not be more clear: Perseus will receive nothing under the Plan.

presented here – where the plan provides for an asset sale, and the purchaser has entered into a

separate agreement permitting a former equity holder to acquire a minority participation.[7]

More fundamentally, the purpose of the absolute priority rule is to ensure that value is not

inappropriately diverted from non-consenting creditor classes to equity holders.[8] Here, the value

of the estates runs out before the Second Lien Lenders' claims are satisfied. The objectors make

no effort to dispute that all property transferred to the Purchaser under this sale transaction is

subject to the valid liens of the First Lien Lenders and the Second Lien Lenders, let alone to

show that the Second Lien Lenders are not undersecured. As a result, there are no assets

available to create any value for the Holdco Debtors, which is why Section 5.6 of the Plan

provides no distribution to unsecured creditors of those entities, including Perseus. The

distribution Yacoub will receive is being made available by the Purchaser, but only as a result of

the Second Lien Lenders' consent. The necessary implication of these facts is that the objectors

have no cognizable interest in the property being transferred to the Purchaser, regardless of who

---

[7] *See LaSalle*, 526 U.S. at 437-41 (plan conferring ownership of reorganized debtor exclusively upon existing equity holders that made a new value contribution); *Travelers Ins. Co. v Bryson Props., XVIII (In re Bryson Props., XVIII)*, 961 F.2d 496, 504-05 (4th Cir. 1992) (plan conferring ownership of reorganized debtor exclusively upon existing equity holders making new value contribution, and providing that upon sale, lender's unsecured deficiency claim would be repaid under plan only after new equity contribution was repaid); *In re Young Broad. Inc.*, 430 B.R. 99, 140-41 (Bankr. S.D.N.Y. 2010) (contribution by plan sponsor was nebulous and intangible, rather than actual cash paid to an outside purchaser); *In re Global Ocean Carriers, Ltd.*, 251 B.R. 31, 48-52 (Bankr. D. Del. 2000) (plan conferring ownership of reorganized debtor on daughter of debtor's controlling shareholder). *See also In re Deep River Warehouse, Inc.*, 2005 Bankr. LEXIS 1090, at *37-38 & n.11 (Bankr. M.D.N.C. 2005) (denying relief from stay motion without describing plan in detail, noting new value issues raised by debtor's plan under *LaSalle*, but also concluding that confirmation of the plan or an amended version was not impossible or unlikely).

[8] *See, e.g.*, *Grp. of Institutional Investors v. Chicago, M., S. P. & P. R. Co.*, 318 U.S. 523, 565 (1943) (holding that the absolute priority rule is satisfied when "each security holder in the order of his priority receives from *that which is available for the satisfaction of his claim* the equitable equivalent of the rights surrendered" (emphasis added)); *Kansas City Terminal Ry. v. Cen. Union Trust Co.*, 271 U.S. 445, 455 (1926) ("Unsecured creditors of insolvent corporations are entitled to the benefit of *the values which remain after lienholders are satisfied*, whether this is present or prospective, for dividends or only for purposes of control." (emphasis added)).

may be the Purchaser's owners. As in the *Adelphia* case, a party whose "interests in the assets would have been superior to those of the creditors in any case" is agreeing to transfer an indirect ownership interest in those assets to a party who happens to be a former owner of the Debtors, but this is "not [done] via a distribution of assets of the debtors' estates as part of a plan of reorganization," thereby rendering the absolute priority rule inapplicable. *See Ad Hoc Adelphia Trade Claims Comm. v. Adelphia Commc'ns Corp.*, 337 B.R. 475, 478 (S.D.N.Y. 2006).

Thus, *a fortiori*, there cannot be any breach of the absolute priority rule because Perseus will never receive value that would otherwise flow to the objectors. *See, e.g.*, *Official Comm. of Unsecured Creditors v. Perseus Partners VII, L.P. (In re Distributed Energy Sys. Corp.)*, No. 08-51120, 2009 Bankr. LEXIS 1284, at *11-13 (Bankr. D. Del. May 18, 2009) (finding that settlement whereby some proceeds of sale of secured creditor's collateral would be allocated to junior creditors did not violate absolute priority rule because "the funds at issue would otherwise not have been available to the debtors' estate").

The same is true of any value that Perseus may realize as a minority participant in the Purchaser. Any such value will not be coming from creditors, but from the post-sale operation of the acquired assets, and the Purchaser's independently-negotiated agreement to share a minority portion of that value with Perseus in exchange for Perseus' substantial cash contribution. This is a *substantively* different series of transactions than the new value plans at issue in the cases cited by Carlyle, such as *LaSalle* and *In re Bryson Properties*, in which controlling equity single-handedly proposed plans that conferred themselves all equity in a reorganized debtor.[9]

---

[9] In support of its "form over substance" argument, Carlyle cites case authorities articulating the basic equitable principle that a court should not exalt form over substance. *Id.* However, none of these cases address this principle in the context construing and applying Bankruptcy Code section 1129(b) or *LaSalle*. *See Fairchild Dornier GMBH v Official Comm. of Unsecured Creditors. (In re Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225, 233 (4th Cir.

Footnote continued on next page

Stated succinctly, the Purchaser is acquiring the Debtors' assets pursuant to a sale transaction in which all of the consideration flowing from the Purchaser is being allocated consistent with the requirements of the absolute priority rule.

### 3. Perseus Does Not Have The "Exclusive" Right To Participate In The Purchaser.

Another critical facet of the *LaSalle* opinion is the Court's focus on the *exclusive* nature of the opportunity offered to old equity under that plan. *See, e.g.*, 526 U.S. at 455 ("At the moment of the plan's approval the Debtor's partners necessarily enjoyed an exclusive opportunity that was in no economic sense distinguishable from the advantage of the exclusively entitled offeror or option holder."); *id.* at 456 ("Hence it is that the exclusiveness of the opportunity . . . renders the partners' right a property interest extended 'on account of' the old equity position and therefore subject to an unpaid senior creditor class's objection."). *See also In re PWS Holding*, 228 F.3d at 238-39 (noting that "[w]hat doomed the plan in 203 North LaSalle was not that old equity received property under the plan, but the 'exclusivity' that old equity enjoyed"). This key element is lacking here.

Tellingly, the Carlyle Objection fails to allege that Carlyle sought to participate in the Purchaser, let alone that it was denied the opportunity to participate. In fact, Carlyle repeatedly has been provided such opportunity and has advised Perseus that it has no interest in participating in the Purchaser.

This is significant for at least two reasons. First, unlike in *LaSalle*, it demonstrates that there is no "exclusive" opportunity for Perseus. Second, it reveals that Carlyle's objection is not

---

Footnote continued from previous page

2006) (recharacterization of debt as equity); *In re Shady Grove Tech. Ct. Assocs. Ltd. P'ship*, 216 B.R. 386, 391 (Bankr. D. Md. 1998) ("manufacture" of claims on the eve of bankruptcy to create the appearance that the case is something other than a "two-party" dispute). In any case, the transactions here *do* differ substantively from an internal reorganization.

a plea for "fair and equitable" treatment in the form of shares issued to it, but rather is a beggar thy neighbor attempt to extract money on the eve of confirmation. If the opportunity to obtain minority interests in the Purchaser were as valuable as Carlyle's pleading intimates, then it would be economically irrational for Carlyle not to seek out that opportunity. Yet that is exactly where things stand. Even if Carlyle's own actions (and its failure to act) did not seriously undermine its position, the position itself is meritless because the circumstances presented lack the exclusiveness that was a lynchpin of the Court's holding in *LaSalle*.

4. **To The Extent That A "Market Test" Is Required, The Market Has Spoken Loudly, Clearly, And Repeatedly.**

Even if *LaSalle* were germane (which it is not), Carlyle's attempts to broaden that opinion to require, in every single case, a comprehensive and formal auction of the Debtors is simply wrong. This notion has been broadly rejected in the case law; numerous courts have held that a private sale under a plan is permitted by the Bankruptcy Code.[10] In fact, *LaSalle* itself is focused not on the *process* but on the *result*; the Court was clear that "[a] truly full value

---

[10] *See, e.g.*, *Troy Sav. Bank v. Travelers Motor Inn, Inc.*, 215 B.R. 485, 495 (N.D.N.Y. 1997) (rejecting argument that section 363 protections should apply in context of a private sale under a plan, and commenting that a party's higher offer for the same asset "is irrelevant in that the [transaction] was a proposed part of the Debtors' reorganization plan, not a court monitored auction"); *In re Alta+Cast, LLC*, No. 02-12982 (MFW), 2004 Bankr. LEXIS 222, at *12 (Bankr. D. Del. Mar. 2, 2004) ("To the extent that Hays is asserting that *LaSalle* requires all chapter 11 debtors be sold, we disagree. The Supreme Court objected to the *LaSalle* plan's grant to shareholders of an exclusive right to invest in the debtor, but it did not require that the debtor be liquidated."); *In re Zenith Elecs. Corp.*, 241 B.R. 92, 106 (Bankr. D. Del. 1999) (disposing of suggestion that it is required "in all cases that a debtor be placed 'on the market' for sale to the highest bidder"); *In re Woodscape Ltd. P'ship*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) ("As property of the estate, the right to future participation in a debtor's enterprise may be sold. It may be sold pursuant to a plan of reorganization. *There is no prohibition against a private sale or against a sale to insiders; and there is no requirement that the sale be by public auction.*" (citations omitted; emphasis added)). *See also, e.g.*, *In re Naron & Wagner, Chartered*, 88 B.R. 85 (Bankr. D. Md. 1988) (permitting a private sale of substantially all of the debtor's assets to a purchaser in which the debtor's insiders were involved where adequate notice of the sale had been provided to the debtor's creditors, and a "failure to close the sale quickly will likely result in a halt of [the debtor's] continuous operations").

transaction, on the other hand, would pose no threat to the bankruptcy estate not posed by any reorganization, provided of course that the contribution be in cash or be realizable money's worth." 526 U.S. at 453-54. Thus, it is not surprising that courts have cautioned against "extend[ing] the ruling of the *203 North LaSalle* case beyond the facts of that case," because doing so would improperly impinge on a debtor's ability to take advantage of "the broad powers of the debtor to propose a plan in whatever format it desires," specifically including the ability to propose asset sales under section 1123(a)(5)(D). *See, e.g.*, *In re Zenith Elecs.*, 241 B.R. at 106. Rather, the critical teaching of *LaSalle* is that, to the extent the new value principle is implicated, there must be *some* check on the values provided and received by former shareholders. While this check is not necessary here for the reasons explained above, the facts nevertheless confirm that Perseus' participation in the Purchaser is appropriately priced.

First, the APA contains a clear "fiduciary out" for the Debtors that permits the Debtors to abandon the Plan and the transaction with the Purchaser if a better offer comes along. *See* APA § 9.1(e). Perseus understands that the Debtors have received no offers, or even any indications of interest, despite the broad notice and availability of the Plan. This lack of interest supports the conclusion that there is no higher price to be gained by a formalized marketing process. It also demonstrates the baseless nature of Carlyle's objection insofar as Carlyle has had every opportunity to propose a better transaction if it really believed the value provided by the Purchaser to the Debtors, or by Perseus to the Purchaser, is too low. *See, e.g.*, *In re Cypresswood Land Partners, I*, 409 B.R. 396, 439-40 (Bankr. S.D. Tex. 2009) (concluding "that this case presents an appropriate factual basis for application of the new value exception" where the objecting parties "knowingly chose to sit on their hands and remain inactive despite having ample notice and opportunity to act").

Second, as noted above, Carlyle has never sought to participate in the Purchaser on the terms to which Perseus has agreed (or otherwise). Carlyle's lack of interest in doing so speaks volumes. Carlyle is nothing if not a sophisticated market participant. Indeed, Carlyle's own website notes how:

- "The Carlyle Group is a global alternative asset manager with more than $97.7 billion under management." This massive sum is invested via "76 funds across four investment disciplines" by "a top-flight team of 400+ investment professionals operating out of offices in 19 countries" who are always looking "to uncover superior opportunities." This "team of investment professionals includes 166 M.B.A.s, 28 J.D.s and 6 Ph.D./M.D.s from many of the world's most prestigious universities."

- Carlyle is "open to opportunities wherever they can be found" and possesses the insight that "is often in short supply" among other investors, thereby providing "a broader view of potential investment opportunities and deeper level of expertise" in value creation.

*See* The Carlyle Group: Firm Profile, *available on-line at* http://www.carlyle.com/Company/item1676.html (last accessed February 21, 2011). The fact that Carlyle – with full knowledge of the Debtors, their assets, and their operations – did not seek to participate in the Purchaser on the same terms as Perseus (or under any terms for that matter), despite having several months to consider whether it should do so, provides exactly the sort of value check *LaSalle* contemplates.

Third, unlike *LaSalle*, the transactions at issue here will not result in Perseus having 100% of the equity in the post-confirmation owner of the Debtors' assets. *Cf.* 526 U.S. at 440 (describing the plan where the debtors' former partners "would contribute $6.125 million in new capital . . . in exchange for the Partnership's entire ownership of the reorganized debtor"). In fact, Perseus' investment is not even one made "only for purposes of control," *see Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 208 (1988), given that the Second Lien Lenders will own 58.5% of the Purchaser. The controlling participation by Silver Point provides an effective

check on any theoretical possibility that Perseus will extract value via the Purchaser that is greater than the value of its contribution.

Also unlike *LaSalle*, the Second Lien Lenders, particularly Silver Point, are sophisticated, arms' length counterparties who had every incentive to ensure that Perseus is providing a "truly full value transaction." After all, if Perseus were underpaying for its 41.5% stake in the Purchaser, then any associated difference in value would be coming from *the Second Lien Lenders' pockets* (notably, *not* from Carlyle's pockets). This dynamic eliminates the ability of Perseus to use a "new value" contribution in the abusive fashion condemned in *LaSalle*.

In summary, although the Debtors have not been subject to a formal "marketing" process (which would be both time consuming and expensive), there is no requirement under *LaSalle* or otherwise for the Court to require this wasteful and likely futile gesture. The lesson of *LaSalle* is that there must be some reasonable external crosscheck on whether an equity holder's contribution of "new value" is a "truly full value transaction." Thus, even if LaSalle were applicable here, which it is not, its objective has been accomplished. Any number of sophisticated parties, including both Silver Point and Carlyle, could have attempted to better Perseus' contribution – or at least matched it. No one has stepped up. Likewise, Silver Point has not attempted to reduce Perseus' stake in the Purchaser, even though it would have every incentive to do so if it believed that Perseus is getting too rich a deal. Thus, although the *LaSalle* test is inapplicable here for the reasons discussed above, the Supreme Court's objective of preventing a former equity holder from unfairly taking advantage of creditors has been achieved.

5. **Carlyle Has Never Sought The Termination Of Exclusivity, Which Could Theoretically Test Whether There Is Any Alternative To The Plan, Because Even It Realizes That Doing So Would Be Futile.**

Throughout all its attacks on the Plan, Carlyle never suggests a productive alternative. Some courts have suggested that a "market test" under *LaSalle* can be accomplished by terminating the Debtors' plan exclusivity.[11] Here, as the Court will likely recall, Silver Point moved to terminate the Debtors' exclusivity periods prior to the parties' compromise. *See Motion of Silver Point Finance, LLC, as Administrative Agent Under the Second Lien Credit Agreement, Pursuant to Section 1121(d) of the Bankruptcy Code to (I) Terminate the Debtors' Exclusive Periods to File a Plan of Reorganization and Solicit Acceptances Thereto or, in the Alternative, (II) Authorize and Direct a Sale of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code* [ECF No. 284].

The Committee, of which Carlyle is a member, opposed this motion. *See Opposition of the Official Committee of Unsecured Creditors [etc.]* [ECF No. 368]. Neither the Committee nor Carlyle has ever sought to reconsider this decision or otherwise move to terminate the Debtors' exclusivity periods. Importantly, the general structure of the Plan, including Perseus' investment in the Purchaser, has been known to all parties in interest since late December 2010. As such, there has been ample time for any party who believes the Plan to be unduly generous to Perseus (or the Purchaser) to attempt to terminate exclusivity. No such attempts have been made.

The reason why no party, including Carlyle, has moved to terminate exclusivity is because doing so would be futile. The economics of this case would make it very difficult for Carlyle or any other party to propose and confirm a plan that is not supported by the Second Lien

---

[11] *See, e.g.*, *In re Davis*, 262 B.R. 791, 799 (Bankr. D. Ariz. 2001); *In re Global Ocean Carriers Ltd.*, 251 B.R. at 49; *In re Situation Mgmt.*, 252 B.R. 859, 865 (Bankr. D. Mass. 2000). *See also LaSalle*, 526 U.S. at 458 (suggesting this possibility).

Lenders.  Among other things, that plan would need to provide appropriate "cram down" treatment for both parts of the Second Lien Lenders' bifurcated claims (assuming the class including their secured claims failed to make a Bankruptcy Code section 1111(b)(2) election).  In addition, that plan would need to find a solution to (1) the likely inability of the Debtors to utilize cash collateral while an alternative plan was being pursued and (2) the ever-increasing size of the Second Lien Lenders' superiority priority claims under Bankruptcy Code section 507(b).  Achieving all this without having the Debtors' business die in the process would be extremely difficult, if not impossible.

At day's end, incurring the costs associated with a formal auction or competing plan process would be wasteful.  As such, it was a completely reasonable exercise of the Debtors' business judgment not to engage in steps that likely would destroy value, and it is not surprising that no other interested party, including Carlyle, has meaningfully pursued or even suggested an alternative path.  *See, e.g.*, *In re Global Crossing Ltd.*, 295 B.R. 726, 746 (Bankr. S.D.N.Y. 2003) ("The Board could indeed reasonably regard keeping the [current proposed] deal as keeping the 'bird in the hand;' abandoning [that] deal could indeed reasonably be viewed, as the Creditors' Committee counsel argued, as 'letting the bird in hand go and going out and looking for a bush with some birds in it.'  Declining to take the associated risks of that was well within the bounds of reasonable business judgment." (footnote omitted)).  Yet again, there is ample reason for the Court to overrule this objection to the Plan.

### 6. Summary.

As shown above, the absolute priority rule simply does not apply because Perseus is not receiving any property "on account of" its extinguished claims or equity interests, nor is Perseus' participation in the Purchaser occurring "under the plan."  Even if the Court disagrees, however,

any legal requirements associated with a contribution of "new value" have been satisfied since Perseus' contribution to the Purchaser is (1) in the form of substantial new money, (2) necessary for the feasibility of the Plan and the reorganization proposed thereunder, and (3) reasonably equivalent in value to the minority interests Perseus will hold in the Purchaser. *See LaSalle*, 526 U.S. at 442. *LaSalle* itself does not require anything further since Perseus has never enjoyed an "exclusive" opportunity to participate in the Purchaser. Assuming *arguendo* that some "marketing" requirement does apply, that requirement has been met as a result of the valuation crosscheck provided by all parties in interest – particularly by Silver Point and Carlyle itself. Imposition of any further requirements would almost certainly be futile and destructive to the Debtors and all stakeholders. Nothing in the Bankruptcy Code or case law requires such a regrettable step. The Court can and should overrule any confirmation objections premised on the absolute priority rule or the *LaSalle* decision.

> **B.** **The Classification And Treatment Of Carlyle's Claim Against WF Holdings Under Class 5B Are Not Improper.**

Carlyle advances a series of technical – but ultimately inconsequential – arguments regarding the classification and treatment of its unsecured claim against WF Holdings in Class 5B under the Plan. *See* Carlyle Obj. at 12-14. These provide no reason to deny confirmation.

> **1.** **The Classification Of Carlyle's Claim In Class 5B Does Not Violate Bankruptcy Code Section 1122.**

First, Carlyle argues that the Plan cannot be confirmed because Class 5B combines unsecured claims asserted against each of the Holdco Debtors in a single class. Because each of these Debtors has separate balance sheets and separate assets, Carlyle contends, the claims combined in Class 5B are not substantially similar and may not be classified together in the same class under Bankruptcy Code section 1122(a). Carlyle Obj. at 12-13. As a technical matter, the argument is misinformed. Section 7.4 of the Plan plainly contemplates that each class in the Plan

is to be deemed its own class against each applicable Debtor.  *See* Plan § 7.4 ("The Plan

constitutes a joint chapter 11 plan of reorganization proposed with respect to each Debtor and,

accordingly, the classifications set forth in Classes 1 through 7 shall be deemed to apply to each

of the Debtors separately, as applicable.").

As a practical matter, this alleged "defect" is inconsequential.  A technical violation of

the requirement under section 1122(a) that only substantially similar claims be classified together

does not preclude confirmation when, as a practical matter, there is no prejudice resulting from

the alleged error.  *See In re Sacred Heart Hosp.*, 182 B.R. 413, 424-25 (Bankr. E.D. Pa. 1995)

(classification of secured and unsecured claims subject to a compromise under the plan in a

single class did not have "practical repercussions" and therefore would not preclude

confirmation); *In re Coventry Commons Assocs.*, 149 B.R. 109, 113 n.3 (Bankr. E.D. Mich.

1992) (concluding that classification of creditor's secured and unsecured claims in the same class

in "technical violation" of Bankruptcy Code section 1122 "creates no actual prejudice" where

plan provided that both claims would be paid in full).

This is just such a case.  Even if the classification of Carlyle's claim were technically

incorrect (which it is not), the lack of prejudice is manifest here.  As noted above, all of the

claims classified in Class 5B (including those of Perseus) are neither receiving nor retaining

property under the Plan.  As such, Class 5B is deemed to reject, in each applicable Debtor's case.

11 U.S.C. § 1126(g).  This would be true regardless of whether Carlyle's claim is in Class 5B or

in a separately labeled class.  In either case, the class containing Carlyle's claim will be deemed

to reject the Plan and the Debtors will be required to demonstrate that the cramdown

requirements of Bankruptcy Code section 1129(b) have been met.  *See* 11 U.S.C. § 1129(a)(8),

(b).  *Cf. Hobson v. Travelstead (In re Travelstead)*, 227 B.R. 638, 652-53 (D. Md. 1998)

(declining on appeal to address appellant's classification argument because any error was harmless; even if appellant's claim had been classified in a separate class by itself, appellant would have voted to reject the plan, requiring the debtor to demonstrate that the cram down requirements had been satisfied, which the debtor had done).

## 2. The Treatment Of Carlyle's Claim In Class 5B Does Not Violate Bankruptcy Code Section 1123(a)(4).

Second, Carlyle argues that the treatment of its claim together with the claims of Perseus in Class 5B violates the requirement under Bankruptcy Code section 1123(a)(4) that all claims within a class receive the same treatment. Carlyle Obj. at 14. This contention is incorrect. As discussed above, none of the holders of claims in Class 5B will receive or retain *any* property on account thereof under the Plan. Thus, the claims of both Carlyle and Perseus are receiving identical treatment in accordance with section 1123(a)(4).

Carlyle's argument to the contrary is premised on the specious assumption that the Plan is providing Perseus with equity in the Purchaser on account of Perseus' prepetition claims. This repackaging of Carlyle's absolute priority argument is no more persuasive here than it is in the first instance. As discussed extensively above, Perseus is not receiving *anything* under the Plan on account of its prepetition claims against – or its prepetition interests in – the Holdco Debtors. Accordingly, there is no section 1123(a)(4) problem here.

## C. The Plan Does Not Effect A Substantive Consolidation Or Prevent Carlyle From Realizing Any Value To Which It Otherwise Might Be Entitled As A Creditor Of WF Holdings.

### 1. The Former Shareholder Notes Are Fully Encumbered In Favor Of The Second Lien Lenders.

Carlyle argues that the Plan cannot be confirmed because it effectuates a "de facto partial substantive consolidation" of the Debtors that is prejudicial to the interests of Carlyle. Carlyle Obj. at 14-18. As noted, Carlyle asserts an unsecured claim against WF Holdings. Carlyle's

complaint is that the principal asset of WF Holdings, certain "Former Shareholder Notes" with an outstanding balance of approximately $3.2 million, are being sold under the APA, but Carlyle is not receiving any of the proceeds from the sale of those assets. *Id.* This is true, but not because of any legal or de facto consolidation of the estates. The simple reason that Carlyle is not receiving any value on account of the Former Shareholder Notes is that those notes are fully encumbered by the liens of the Second Lien Lenders.[12]

WF Holdings is a guarantor of the debt under the Second Lien Loan Facility. As of the Petition Date, the amount of that debt was approximately $196.5 million. Pursuant to that certain pledge and security agreement dated November 30, 2005 (the "2L Pledge Agreement"), a copy of which is attached hereto as **Exhibit 1**, WF Holdings and other Debtors granted the Second Lien Administrative Agent a security interest to secure their obligations via liens on, *inter alia*, the following property held by each of them: (1) "General Intangibles," (2) "Instruments," (3) "all Proceeds of the foregoing," and (4) "all other property and rights of every kind."

The Former Shareholder Notes likely constitute "promissory notes" under U.C.C. § 9-102(a)(65), which is a subset of "instruments" under U.C.C. § 9-102(a)(47). Rights in such property may be perfected via the filing of a UCC-1 financing statement, *see* U.C.C. § 9-312(a), which Perseus understands was timely done. Alternatively, to the extent the Former Shareholder Notes constitute a "payment intangible" under U.C.C. § 9-102(a)(61), they would be within the

---

[12] Carlyle suggests that there is some sinister effort to hide the treatment of the Former Shareholder Notes. *See* Carlyle Obj. ¶¶ 11-12. This is incorrect; the Plan and the APA clearly specify the treatment of this property. *See* Plan §§ 1.68 & 13.2 (defining the "Former Shareholder Notes" and excluding them from any release under the Plan); APA §§ 1.1 & 2.2(r) (specifying the Former Shareholder Notes as "Purchased Assets" to be transferred to the Purchaser and subsequent partial release granted by the Purchaser – which is discussed in the following section). Understanding what Carlyle calls the "subtleties of the effect that the treatment of the Former Shareholder Notes" does not require any more of "a very close read of the Plan" than many other, completely permissible aspects of the Plan or of bankruptcy plans in similar sized cases. Perseus is dubious that Carlyle's highly qualified lawyers were unable to quickly review and understand the plain language of the documents.

Second Lien Administrative Agent's security interest on "General Intangibles," which also is perfected by filing. *See* U.C.C. § 9-313 cmt. 2. In either case, the 2L Pledge Agreement and the filed financing statement created a perfected security interest in the Former Shareholder Notes that secures WF Holdings' nearly $200 million guarantee obligation to the Second Lien Lenders.

On the asset side of the ledger, WF Holdings has little to offer. According to its Schedules, WF Holdings has no valuable property with which to satisfy this debt other than the Former Shareholder Notes themselves. *See* Schedules of Assets A & B [Case No. 10-74620, ECF No. 8]. Moreover, as discussed above, the First Lien Lender Claims and the Second Lien Lender Claims substantially exceed the value of *all* of the Debtors' assets. Thus, contrary to Carlyle's protestations, the transfer of the Former Shareholder Notes to the Purchaser is *not* a loss to Carlyle, because neither Carlyle nor WF Holdings has an economic interest in them to begin with. The Former Shareholder Notes effectively belong to the Second Lien Lenders, and are appropriately included in the assets being sold to the Purchaser, with the consent of the First Lien Lenders and Second Lien Lenders.[13]

Carlyle would prefer to ignore this $200 million lien,[14] but it cannot do so. The Carlyle Objection takes a stunning and illogical trip through the looking glass, suggesting that because the treatment provided by the Plan will be deemed to fully satisfy the Second Lien Lenders, Carlyle will retain the "remaining claims to the assets of WF Holdings (including the Former

---

[13] Carlyle also is wrong when it states that Former Shareholder Notes will "be used to pay the liabilities of other Debtor entities" and hence "not flow back to WF Holdings – and therefore Carlyle – but instead to the creditors of other Debtors." Carlyle Obj. at 14. Carlyle's argument ignores the fact that the Second Lien Lenders are secured creditors of WF Holdings, with a nearly $200 million dollar claim that is senior to Carlyle's unsecured claim.

[14] Carlyle failed to disclose or address the existence of this lien in its objection, even though counsel for Perseus had provided counsel for Carlyle with a copy of the documentation weeks before, and specifically explained how the security interest held by the Second Lien Lenders eliminates any economic interest Carlyle might have held in respect of the notes.

Shareholder Notes)." *See* Carlyle Obj. ¶ 7; *see also id.* ¶ 11 (asserting what might happen "[i]f the Former Shareholder Notes were to remain the property of WF Holdings"). This makes no sense. The Second Lien Lenders will deemed to be "fully satisfied" only upon the occurrence of the Effective Date of the Plan, because at that time the Purchaser will acquire substantially all assets on which the Second Lien Lenders have enforceable liens, *including the Former Shareholder Notes*. A plan in which the Former Shareholder Notes somehow "remain the property of WF Holdings" would not be confirmable over the objection of the Second Lien Lenders. The Second Lien Lenders undoubtedly would take the position that such a plan permits junior stakeholders to receive or retain property while they are not being paid in full. Carlyle's vision of a world in which the Former Shareholder Notes somehow drop out of the Second Lien Lenders' collateral package is nonsensical fantasy. The undisputable existence of undersecured liens on the Former Shareholder Notes is dispositive of this objection.

Furthermore, even if Carlyle were to articulate a defect in the security interest that fully encumbers the Former Shareholder Notes – which it has not done – Carlyle would be barred from seeking relief in respect of that defect. Pursuant to the final cash collateral order entered in this case (the "Final Cash Collateral Order"), the only party in interest with rights to contest the validity and enforceability of the Second Lien Lenders' liens and security interests was the Committee, and the deadline for it to take any legal action with respect to those liens and security interests has passed.[15] Much as it would prefer otherwise, Carlyle cannot change the facts that render worthless any economic interest it conceivably might have held in WF Holdings' interests in the Former Shareholder Notes.

---

[15] *See Final Order (I) Authorizing Debtors to Use Cash Collateral, (II) Authorizing Debtors to Provide Adequate Protection in Form of Replacement Liens, Administrative Expense Claims, and Accrual or Payment of Interest, and (III) Granting Certain Related Relief* [ECF No. 526] at Recitals E & G, and Decretal Paragraph 18.

2.	**There Is Nothing Improper About The Purchaser's Decision To Compromise The Amount Of The Former Shareholder Notes Following Its Acquisition Of Those Notes From WF Holdings.**

Pursuant to section 2.2(r) of the APA, upon the acquisition of Former Shareholder Notes by the Purchaser, and upon the funding by Perseus of $12.5 million in cash, the Purchaser "shall irrevocably release and waive 50% of the outstanding principal amount of each of the Former Shareholder Notes and all interest thereon as of the Closing." Carlyle intimates that this provision improperly confers value on Perseus to which it is not entitled, and does so to the detriment of Carlyle. Carlyle Obj. at 5-7. Neither of these propositions is accurate.

First, *nothing* that happens to the Former Shareholder Notes prejudices the rights of Carlyle. As demonstrated in the foregoing section, Carlyle has no economic interest in those notes because they are fully encumbered. Second, there is nothing improper about the Purchaser (controlled by Silver Point) determining to compromise the outstanding amount of those notes based upon the offsets asserted by Perseus against that indebtedness. That compromise, which is reflected in the APA, is the result of arms' length negotiations between Silver Point and Perseus.

Furthermore, even if Carlyle had a cognizable interest in the matter, Silver Point's decision to compromise the amount of the debt is reasonable and appropriate. The offsets asserted by Perseus flow from a certain Management Agreement between WF Holdings and Perseus. As Carlyle notes, Perseus timely "filed a proof of claim alleging rights of setoff against the Former Shareholder Notes" due to Perseus' claims under the Management Agreement. *See* Carlyle Obj. ¶ 13.[16] These claims result from a long period of accrued and unpaid obligations, in some cases extending back to early 2008. While Carlyle vaguely suggests that it believes that Perseus' claim under the Management Agreement may be invalid, Carlyle (1) offers no

---

[16]	A copy of the underlying proof of claim filed by Perseus – Proof of Claim No. 1157 (filed December 7, 2010) – is attached hereto as **Exhibit 2**.

substantive analysis whatsoever to support this speculation; and (2) ignores the fact that neither Carlyle nor any other party has objected to Perseus' claim, which is currently deemed allowed under Bankruptcy Code section 502(a).

Carlyle's attempt to shift the burden on the eve of confirmation is untoward; if Carlyle wanted to pursue an objection to Perseus' claim, it had ample time and opportunity to do so. As of today, however, Perseus holds an allowed claim. Moreover, Perseus' right of setoff creates another security interest against the Former Shareholder Notes that is senior to any interest of Carlyle. *See* 11 U.S.C. § 506(a) (providing that allowed claims accompanied by a right of setoff are secured to the extent of the setoff).

Carlyle again takes an illogical trip through the looking glass when it suggests Perseus' setoff right is invalid because that right is not preserved by the Plan and/or because the transfer to the Purchaser destroys mutuality. *See* Carlyle Obj. ¶ 13. What the state of affairs may be *after* the transactions occur has no bearing on what Perseus' rights are *today*. Carlyle cannot assume that the Plan is consummated and then backdate the effects of the Plan and the APA in an effort to undermine the basis for proceeding with the Plan; the argument is an utter *non sequitur*.

Ultimately, the Court need not evaluate the merits of Perseus' claims under the Management Agreement or whether Perseus has a right of setoff. Silver Point concluded that Perseus had plausible arguments on both fronts, which is why it agreed that the Purchaser would release 50% of the Former Shareholder Notes as a settlement of these issues. Whether this was an overly generous concession by Silver Point has no effect on Carlyle since the Former Shareholder Notes are not assets upon which Carlyle could ever realize. This fact alone should dispose of Carlyle's argument that the Plan or the APA somehow treat it unfairly.

**D.      Perseus Is Not Receiving Any Inappropriate Release Under The Plan.**

Finally, Carlyle contends that the Plan improperly confers a release upon Perseus, to the detriment of WF Holdings.  Carlyle Obj. at 19-20.[17]  Specifically, Carlyle contends that the release being granted by WF Holdings under Section 13.2 of the Plan (i) deprives the stakeholders of that estate potential avoidance actions against Perseus in connection with management fees accrued by Perseus over the last few years, and (ii) relinquishes valuable rights in exchange for no consideration to the WF Holdings estate.  These arguments do not withstand scrutiny.  As an initial matter, the contention that there may be avoidance actions based upon "payments" described in Perseus' proof of claim makes no sense, as the proof of claim describes management fees that have been accrued and *not* paid over the course of many years.[18]  *See* **Exhibit 2**.  Nor, as noted, has any objection been presented to Perseus' asserted rights of offset.

As for the consideration being conferred by Perseus on WF Holdings, Perseus is making available to the Purchaser $12.5 million, which will be used by the Purchaser to make the entire Plan feasible, including the funding of the administrative expenses of the Debtors' estates, and satisfaction of priority tax claims – both of which directly benefit the estate of WF Holdings. That estate shares administrative liability with the other Debtors' estates for the substantial

---

[17]   Although Carlyle refers in passing to releases conferred by third parties under Section 13.3 of the Plan, *see* Carlyle Obj. at 19, that provision is not applicable to Carlyle because it has not voted to accept the Plan.  *See* Plan at §§ 1.140 (definition of "Releasing Parties"), 13.3 (third party releases are only made by "Releasing Parties").

[18]   Carlyle suggests at paragraph 15 of the Carlyle Objection that $500,000 of the accrued prepetition management fees owing to Perseus will be paid to Perseus.  This is incorrect. Perseus is informed and believes that the Debtors are in the process of correcting "Exhibit D" to the Disclosure Statement, which is referenced by Carlyle.  The Plan does not now, nor did it ever, provide for the payment of Perseus' management fees.  Upon closing, however, the Purchaser has agreed to reimburse Perseus $500,000 for its costs and expenses in connection with the APA and the transactions contemplated thereby, but no management fees (prepetition or otherwise) will ever be paid to Perseus.

administrative expenses incurred in this case.  Further, as a member of a consolidated tax filing group, WF Holdings shares liability for priority taxes.[19]

Moreover, as Perseus anticipates the evidence will show at the confirmation hearing, the Second Lien Lenders hold a massive, multi-million dollar adequate protection claim for the diminution of the estates' cash and other value over the course of this case.  Pursuant to the Final Cash Collateral Order, the Second Lien Lenders were granted a superpriority administrative expense claim against all of the Debtors' estates, and a lien on all of the Debtors' assets (including proceeds of avoidance actions), all to protect against diminution in the Second Lien Lenders' collateral.  *See* Final Cash Collateral Order ¶ 6.  Thus, Carlyle has no economic interest in any potential avoidance action released by WF Holdings against Perseus – and effectively no standing to complain about it.

The Plan resolves these liabilities of WF Holdings.  Although *Carlyle* may not benefit, that is because all of the claims for which WF Holdings is jointly or severally liable are senior to Carlyle's unsecured claim.  There is no question that WF Holdings benefits by not having administrative or priority claim overhang against it post-confirmation. Perseus is making a tangible and substantial contribution WF Holdings' estate and the estates of all other Debtors. Under these circumstances, the release to be granted Perseus is reasonable and appropriate.

---

[19]  *See* 26 C.F.R. § 1.1502-6(a) (providing that "the common parent corporation and each subsidiary which was a member of the group during any part of the consolidated return year shall be severally liable for the tax for such year"); *id.* § 1.1502-78(b)(2) (stating that where a consolidated return is filed by a group and a subsequent deficiency is assessed against the group, "each member of such group shall be severally liable for such deficiency including any interest or penalty assessed in connection with such deficiency").  Courts have consistently applied these regulations to result in co-liability for a parent and its subsidiaries with respect to amounts due to the IRS under a consolidated return. *See, e.g., J&S Carburetor Co. v. Comm'r*, 93 T.C. 166, 168-69 (1989) (noting that subsidiaries of bankrupt parent would be co-liable for any amounts due the IRS for consolidated returns filed by the parent); *Chariot Plastics, Inc. v. United States*, 28 F. Supp. 2d 874, 882-83 (S.D.N.Y. 1998) (concluding that subsidiaries were co-liable for deficiencies and penalties that were assessed against, and later settled by, the parent on account of consolidated returns).

**CONCLUSION**

WHEREFORE, Perseus respectfully urges the Court to overrule all confirmation objections, including those addressed above, and enter an order confirming the Plan.

Dated: Norfolk, Virginia
February 22, 2011

/s/ *Ross C. Reeves*
Ross C. Reeves (VSB No. 13628)
Stephanie N. Gilbert (VSB No. 77140)
WILLCOX & SAVAGE, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, Virginia 23510
(757) 628-5500

Kenneth N. Klee (admitted *pro hac vice*)
Lee R. Bogdanoff (admitted *pro hac vice*)
Whitman L. Holt (admitted *pro hac vice*)
KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, 39th Floor
Los Angeles, California 90067

*Attorneys for Perseus*

# CERTIFICATE OF SERVICE

I certify that the foregoing *Perseus' Response to the Confirmation Objections Filed by Relizon Holdings, LLC and Mohamed Yacoub* was posted on the electronic docket maintained for this chapter 11 case on this 22nd day of February, 2011 for purposes of service to all persons designated to receive electronic service.

In addition, copies of the foregoing *Perseus' Response to the Confirmation Objections Filed by Relizon Holdings, LLC and Mohamed Yacoub* were sent via U.S. mail to the following parties on this 22nd day of February, 2011:

Counsel for the Debtors and Debtors in Possession
McGuireWoods LLP
Attn: Douglas M. Foley
9000 World Trade Center
101 West Main Street
Norfolk, VA 23510

Counsel for the First Lien Administrative Agent
Wilmer Cutler Pickering Hale & Dorr LLP
Attn: Philip D. Anker
399 Park Avenue
New York, NY 10022

-and-

Peter Zemanian
233 East City Hall Avenue, Suite 201
Norfolk, VA 23510

Counsel for the Second Lien Administrative Agent
Fried, Frank, Harris, Shriver & Jacobson LLP
Attn: Gary L. Kaplan, Peter B. Siroka
One New York Plaza
New York, NY 10004

-and-

Hunton & Williams LLP
Attn: Benjamin C. Ackerly
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074

Counsel for the Committee
Venable LLP
Attn: Richard L. Wasserman
750 E. Pratt Street, Suite 900
Baltimore, MD 21202

-and-

Venable LLP
Attn: Lawrence A. Katz
8010 Towers Crescent Drive, Suite 300
Vienna, VA 22182

UST
Office of the United States Trustee
200 Granby Street, Room 625
Norfolk, VA 23510

Counsel for Relizon Holdings, LLC
Latham & Watkins LLP
Attn: Douglas Bacon & Alice Decker Burke
233 S. Wacker Drive
Chicago, IL 60606

-and-

Wolcott River Gates
Attn: Richard E. Biemiller
301 Bendix Road, Suite 500
Virginia Beach, VA 23452

Counsel for Mohamed Yacoub
Crowley, Liberatore & Ryan, P.C.
Attn: Ann B. Brogan
1435 Crossways Blvd., Suite 300
Chesapeake, VA 23320

/s/ *Ross C. Reeves*
Ross C. Reeves (VSB No. 13628)
Stephanie N. Gilbert (VSB No. 77140)
WILLCOX & SAVAGE, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, Virginia 23510
(757) 628-5500

*Attorneys for Perseus*